1  William A. Kershaw (SBN 057486)
   Stuart C. Talley (SBN 180374)
2  Ian J. Barlow (SBN 262213)
   **KERSHAW, COOK & TALLEY PC**
3  401 Watt Avenue
   Sacramento, California 95864
4  Telephone: (916) 779-7000
   Facsimile: (916) 721-2501
5  bill@kctlegal.com
   stuart@kctlegal.com
6  ian@kctlegal.com

7  *Attorneys for Plaintiff and the Proposed Class*

8

9

10

11

12

13

14

   UNITED STATES DISTRICT COURT
   EASTERN DISTRICT OF CALIFORNIA

15 | VANESSA MILLER, *as an individual and* | Case No. _____
16 | *on behalf of all others similarly situated,* |
   |                                         | **CLASS ACTION COMPLAINT FOR**
17 | Plaintiff,                              | **DAMAGES**
18 | v.                                      |
19 | FORD MOTOR COMPANY,                     | **JURY TRIAL DEMANDED**
20 | Defendant.                              |

21

22

23

24

25

26

27

28

CLASS ACTION COMPLAINT FOR DAMAGES
CASE NO. _____

## NATURE OF THE CASE

1.      Plaintiff Vanessa Miller brings this action individually and on behalf of all persons who purchased or leased in California certain Ford vehicles equipped uniformly defective engines that were designed, manufactured, distributed, and sold/leased by Ford Motor Company and/or its related subsidiaries or affiliates ("Ford"), as further described below ("Class Members").

2.      The vehicles at issue in this action include certain Ford vehicles equipped with 1.5L, 1.6L, or 2.0L Ecoboost engines(the "Ecoboost engines"). These vehicles are 2013-2019 Ford Escapes, 2013-2019 Ford Fusions, 2015-2018 Ford Edges, 2017-2019 Lincoln MKC's, and 2017-2019 Lincoln MKZ's (the "Class Vehicles").

3.      The Ecoboost engines in each of the Class Vehicles are substantially the same, from an engineering standpoint, notwithstanding their varying sizes. The Ecoboost engines in the Class Vehicles contain the same relevant components, made of the same materials.

4.      The Ecoboost engines in the Class Vehicles have a critical defect that causes engine coolant—which is vital to the safety and functionality of the engine—to leak into the engine's cylinders (the "Engine Defect").  The lack of coolant created by the leaks causes overheating, and can, even at low mileages, result in the cylinder head cracking and, in some instances, can cause total engine failures and engine fires. Presence of coolant within the cylinders of the engine, alone, can also cause corrosion, oil dilution and contamination, and engine failure.

5.      Ford has failed to provide an effective solution to consumers who purchased or leased Class Vehicles. Further, Ford has not satisfactorily or effectively addressed the source of the defect for those consumers, including for those whose vehicles remain in warranty. Instead of replacing the engine block, Ford merely applies superficial stop-gap, "Band-Aid," remedies such as installing coolant level sensors. This sensor alerts consumers when their coolant has been depleted, so that they can replenish it. It does not, however, prevent further future coolant depletion, or do anything to prevent the coolant from seeping into the engine cylinders. In some instances, Ford just replaced certain parts other than the defective engine block, thereby failing to address the root cause of the Engine Defect.

6.      These half measures force consumers to repeatedly return for service and to continue driving a vehicle at risk of future damage to the engine and components, engine failure, and/or engine fires.

7.      Those consumers whose Ecoboost engines overheat or fail when the vehicle is out of warranty must pay out-of-pocket for the necessary repairs and, again, may have to return for repeated service if Ford does not, at the outset, replace the defective engine with a non-defective engine block. These repairs, including a full engine replacement, can reach total costs of thousands of dollars.

8.      The Engine Defect interferes with Plaintiff's and Class Members' safe, comfortable, and expected use of their Class Vehicles. It exposes them to severe risk created by engine failures and engine fires, and requires them to pay for repairs and/or engine replacement.

9.      On information and belief, prior to the sale or lease of the Subject Vehicles, Ford knew about the Engine defect through sources such as pre-release evaluation and testing; repair data; replacement part sales data; early consumer complaints made directly to Ford and/or posted on public online vehicle owner forums; testing done in response to those complaints; aggregate data from Ford dealers; and other internal sources.

10.      Yet despite its knowledge, Ford failed to disclose and actively concealed the Engine Defect from Class Members and the public, and has continued to market and advertise the Class Vehicles as safe, comfortable, and of high quality.

11.      As a result of Ford's alleged misconduct, Plaintiff and Class Members were harmed and suffered actual damages, including that the Class Vehicles contain the Engine Defect, have manifested, and continue to manifest, the Engine Defect, and that Ford has not provided a permanent, no-cost remedy for this Defect within a reasonable amount of time. Furthermore, Plaintiff and Class Members have incurred, and will continue to incur, out-of-pocket, unreimbursed costs and expenses relating to the Engine Defect.

**PARTIES**

12.      Plaintiff Vanessa Miller resides in Sacramento, California.

13.      Ms. Miller owns a 2017 Ford Edge, VIN 2FMPK4K96HBB28812, which contains a 2.0L Ecoboost engine. Ms. Miller purchased her vehicle from Enterprise Car Sales in Sacramento, California for personal, family, and household use. At the time of her purchase, the vehicle had 20,699 miles on it. The vehicle now has approximately 85,000 miles on it.

14.      As detailed below, as a result of the Engine Defect, Ms. Miller's 2017 Ford Edge has experienced two engine failures. The first occurred in June 2018 at approximately 36,853 miles. At that time, the vehicle was under warranty and Ford agreed to replace the defective engine. The replacement engine was similarly defective. The second instance of engine failure occurred a little over one year later, in November 2019, at about 85,000 miles. The car was no longer in warranty and Ms. Miller had to pay out of pocket more than $6,000.

15.      At the time she purchased her vehicle, Ms. Miller did not know, and had no reason to know or expect, that it contained the Engine Defect and that her Ecoboost engine would leak coolant, overheat, fail, and even potentially result in an engine fire. She was not aware of, and did not have any reason to anticipate, the costly repairs that would be required for the vehicle as a result of the Engine Defect. If she had known these facts, she would not have bought her vehicle or would have paid less for it.

16.      Defendant Ford Motor Company ("Ford") is a Delaware corporation, which has its principal place of business in the State of Michigan, and is a citizen of the States of Delaware and Michigan.

17.      At all times relevant herein, Defendant Ford engaged in the business of selling, designing, manufacturing, marketing, warranting, distributing, selling, and leasing automobiles, including the Class Vehicles, in California and throughout the United States.

## JURISDICTION AND VENUE

18.      The Court has diversity jurisdiction over this action under 28 U.S.C. § 1332(d) and the Class Action Fairness Act ("CAFA"). Plaintiff and other Class Members are residents and citizens of states different from the home states of the Defendant, and the amount in controversy in this action for the Class exceeds $5,000,000.00.

19.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because Plaintiff resides in this District, purchased her vehicle in this District and a substantial portion of the events or omissions giving rise to this Action occurred in this District. Furthermore, Defendant conducts substantial business in, and has gained substantial benefit from doing business in, this District.

20.     Defendant markets, sells, and leases vehicles to consumers throughout this District, a significant number of Defendant's customers are residents of this District, and the wrongful acts and omissions alleged herein have affected consumers in this District. Defendant is therefore subject to personal jurisdiction in this District.

21.     Plaintiff's venue declaration pursuant to Cal. Civ. Code § 1780(d) is attached hereto as Exhibit A.

## **FACTUAL ALLEGATIONS**

22.     In 2009, Ford began producing the Ecoboost engine, which are gasoline-fueled, turbocharged, direct-injection (also called "GTDI") engines. Ecoboost engines are marketed as providing a low-emissions, fuel-efficient alternative to hybrid or electric vehicles.

23.     Because of the Engine Defect, the Ecoboost engines in Class Vehicles are predisposed to leak coolant, allowing coolant to seep into the engine cylinder, causing the engines in the Class Vehicles to overheat and ultimately causing engine fires and/or total engine failure, thereby compromising the comfort, safety, and enjoyment of Plaintiff and Class Members, and requiring them to pay out-of-pocket to temporarily ameliorate the problem and/or replace the defective Ecoboost engine with an equally defective engine, leaving the Class Vehicle susceptible to repeated failures like those experienced by Plaintiff.

## I.     **The Engine Defect**

24.     On information and belief, and subject to additional information learned after obtaining discovery from Defendant and third parties, the Engine Defect is the result of the design of the engine block and cylinder head, including an inadequate seal on the cylinder head. This design includes grooves at the point where the engine's cylinder head attaches to the engine block, as seen here:



25.     In a non-defective engine, liquid coolant is used to ensure that the engine does not overheat. The coolant circulates through a set path within the engine block and cylinder head, cooling the engine. The liquid gathers heat due to contact with the engine and then flows through a hose and into the radiator to cool back down. Once its temperature has lowered, the coolant returns to the engine, and continues to circulate.

26.     In the Class Vehicles, however, as the coolant circulates through the engine, it seeps through the grooves present on the cylinder head, and pools there. The coolant pooling contributes to the seal degrading, eventually allowing the coolant to leak into the engine's cylinders. The degraded seals can be seen below:



27.     The coolant leak causes two related problems. First, the leak causes there to be insufficient coolant to properly lower the engine's temperature, which results in the engine overheating. Engine overheating can cause catastrophic damage to an engine. For example, overheating can cause the cylinder head to crack.  Engine overheating can also warp other internal components, such as pistons. Additionally, when an engine overheats to a certain degree, it causes a loss of oil viscosity which can lead the engine to completely seize.  In some instances, engine overheating can result in engine fire.

28.     Second, the coolant leakage *into* the cylinders causes the engine to misfire. Coolant present in the cylinders is burned through the combustion chamber and exits through the vehicle's exhaust, sometimes resulting in smoke emitting from the vehicles' exhaust. In addition, coolant that enters the cylinders will mix with the oil on the cylinder walls, causing oil dilution and/or contamination that result in the corrosion and excessive wear on bearings and other internal engine surfaces.  .

29.     The Engine Defect can occur at low mileage, often while the vehicle remains within the warranty period.

30.     Ford's insufficient Band-Aid repair measures, such as installing a low coolant sensor, and/or the replacement of faulty Ecoboost engines in Class Vehicles with equally defective replacement engines leave Class Vehicles susceptible to repeated failure.

31.     Because of the Engine Defect, consumers are forced to pay thousands of dollars out of pocket, despite the fact that the repair does not remedy the Engine Defect and leaves consumers still subject to future risk of failure.

32.     Ford has apparently developed a feasible alternative design for an Ecoboost engine that does not contain the defect Class Vehicles suffer from, but has not used these newly-developed non-defective engines to replace failed Ecoboost engines installed in Class Vehicles, leaving Class Members to face the specter of repeated engine failure and engine fires.

## II.     <u>Plaintiff Vanessa Miller's Experience</u>

33.     Plaintiff Vanessa Miller purchased her 2017 Ford Edge equipped with a 2.0L Ecoboost engine in November 2017. Shortly thereafter, in June 2018, the "check engine" alert

light came on and the engine began to shake violently while the vehicle was in use. At that time, the vehicle had approximately 36,000 miles on it. When Ms. Miller took the vehicle to a Ford dealership for repairs, the service center employee informed her that coolant was leaking into the engine system, and that the long block needed to be replaced. The engine block was replaced with an engine that apparently contained the same Engine Defect. The initial repair took approximately three weeks, during which Ms. Miller was not able to enjoy the use of her vehicle.

34. Less than two years later, in November 2019, due to the Engine Defect, Ms. Miller's 2017 Ford Edge began manifesting the same problems in the replacement engine as the vehicle's original engine had displayed in 2018, including total engine failure. Ms. Miller's second total engine failure occurred when the vehicle was outside of the warranty period. Ford refused to cover the repair costs.

35. On December 9, 2019, Ms. Miller's husband contacted Ford directly and spoke with a customer service representative. He alerted the representative that Ms. Miller had experienced yet another engine failure in her 2017 Ford Edge and was told that there were "no coverages for the engine" in her vehicle.

36. Ford eventually agreed to pay a small portion—$1,500—of the repair costs, which totaled $7,579.19. This left Ms. Miller still forced to spend $6,079.19 out of pocket. Furthermore, this amount does not include the costs Ms. Miller had to bear related to being without the use of her vehicle for the time required to conduct the repairs.

**III.** **The Engine Defect Poses a Safety Risk to Vehicle Drivers, Passengers, and the Public.**

37. The Engine Defect poses a safety hazard to drivers, passengers, and the public because an engine with insufficient coolant and/or coolant in its cylinders can misfire, suddenly fail, catch on fire while the vehicle is otherwise in normal operation. Sudden engine failures and engine fires create serious risks of injury or death to those inside the vehicle and to others nearby.

38. For instance, one complaint filed with NHTSA detailed a consumer's experience while driving a 2017 Ford Edge with their family in the car. The driver pulled over to the side of

the road and saw smoke coming out of the car. Within minutes after the family evacuated the vehicle, "the entire car was engulfed in flames."[1]

39.     Another 2017 Ford Edge owner described experiencing complete engine failure while on the highway: "Suddenly the car basically went dead while in motion going 75 miles per hour. I had to steer it off the highway and turn it off, leaving us stranded on the side of the highway for 4 hours." This event occurred after the driver had received a check engine alert, and had the engine's head gasket replaced due to coolant in the cylinder. Following the total engine failure, it was determined that coolant had leaked into the cylinder, causing misfiring and engine failure, for the second time in less than 12 months. The complaint stated that the author was forced to pay $7,000.00 for a full engine replacement.[2]

40.     As these instances demonstrate, engine failures put the vehicle occupants and others on the road in extreme risk of accidents, and engine fires pose a potentially lethal hazard.

41.     As further detailed below, the NHTSA website is replete with similar complaints of smoking vehicles, engine failures while the car is in operation on the road, and fires. Additionally, these complaints highlight that the Engine Defect often requires repeated repairs, each of which can cost consumers thousands of dollars.

## IV.     Ford Knew or Should Have Known the Ecoboost Engines in the Subject Vehicles Were Defective Before Selling or Leasing the Class Vehicles to Plaintiff and the Class Members.

42.     On information and belief, Ford became aware of the Engine Defect at least as early as 2010, well before Plaintiff and Class Members purchased their Class Vehicles. Ford learned of the defect through sources such as pre-release evaluation and testing; repair data; replacement part sales data; early consumer complaints made to Ford and/or NHTSA, and/or posted on public online vehicle owner forums; testing done in response to those complaints; aggregate data from Ford dealers; as well as through other internal sources unavailable to Plaintiff prior to discovery.

---

[1] NHTSA ID Number: 11020178, Incident Date August 18, 2017.
[2] NHTSA ID Number: 11338725, Incident Date June 24, 2020.

**A.     Ford's Knowledge of the Engine Defect Gained from Pre-Release Design, Manufacture, Engineering, and Testing Data.**

43.     While designing, manufacturing, engineering, and testing Class Vehicles in advance of the vehicles' release, Ford would have gained comprehensive and exclusive knowledge about the Ecoboost engines installed in those Vehicles. In particular, Ford would have an understanding of the functionality of standard engine systems, such as coolant flow, and the compatibility of the engine materials with necessary chemicals, such as coolant and antifreeze.

44.     Adequate pre-release analysis of the design, engineering, and manufacture of the Ecoboost engines in the Class Vehicles would have revealed to Ford that the design of the engine was defective and susceptible to leaking coolant into the cylinders.

**B.     Ford Had Knowledge of the Engine Based on Warranty Repair Data.**

45.     Ford also knew or should have known about the Engine Defect because of the claims for repairs related to engine overheating and leaking coolant made during the Class Vehicles' warranty periods.

46.     Consumers complain that the Engine Defect often causes the engine to overheat, misfire, emit smoke, fail, and spontaneously ignite at low mileages, when vehicles remain within the warranty period.

47.     Upon information and belief, Ford collects, reviews, and analyzes detailed information about repairs made on vehicles still under warranty at its dealerships and service centers, including the type and frequency of such repairs. Complete data on such repairs is exclusively within Ford's control and unavailable to Plaintiff without discovery.

**C.     Ford Had Knowledge of the Engine Defect Because of the Large Number of Replacement Engines Ordered from Ford.**

48.     Upon information and belief, Ford also knew or should have known about the Engine Defect because of the higher than expected number of replacement engines ordered from Ford—even at low mileage—which should have alerted Ford of the presence of a defect impacting a wide range of its Vehicles.

49.     Upon information and belief, Ford service centers use Ford replacement parts that they order directly from Ford. Independent repair shops and consumers doing repairs themselves also purchase replacement parts directly from Ford. Therefore, Ford would have detailed and accurate data regarding the number and frequency of replacement part orders. The ongoing high sales of replacement Ecoboost engines was certainly known to Ford, and should have alerted Ford that its engines were suffering from a defect, causing coolant loss, overheating, engine failure, and engine fires.

**D.      Ford Knew About the Engine Defect Because of Class Member Complaints Collected by NHTSA.**

50.     Many Class Vehicle owners and lessees lodged complaints about the Engine Defect with NHTSA's Office of Defect Investigations ("ODI").

51.     Federal law requires automakers like Ford to be in close contact with NHTSA regarding potential auto defects, including imposing a legal requirement, backed by criminal penalties for violation, of confidential disclosure of defects by automakers to NHTSA, including field reports, customer complaints, and warranty data. *See* TREAD Act, Pub. L. No. 106-414, 114 Stat. 1800 (2000).

52.     Thus, automakers should (and do) monitor NHTSA databases for consumer complaints regarding their automobiles as part of the automakers' ongoing obligation to identify potential defects in their vehicles, such as spontaneous engine fires.

53.     From its monitoring of the NHTSA databases, Ford knew or should have known of the many complaints about Engine Defect logged by NHTSA ODI, and the content, consistency, and large number of those complaints alerted, or should have alerted, Ford that the Engine Defect is widespread, and a safety hazard.

54.     A sampling of the publicly available complaints lodged with NHTSA ODI includes the following:[3]

a.      MY CAR STOPPED WHILE DRIVING ON A SIDE STREET. AUTONATION FORD CLAIMED THERE WAS A

[3] This collection of complaints have been taken verbatim from NHTSA's website and have not been edited for grammar or spelling.

MALFUNCTION WHICH LED TO THE TRANSMISSION FAILURE. THEY WANTED $7K TO REPAIR. I TOOK IT ELSEWHERE FOR REPAIR AND WITHIN 1 WEEK AFTER REPAIR THE CAR ENGINE CAUGHT ON FIRE WHILE DRIVING. I HAD BEEN ON THE INTERSTATE BUT HAD JUST EXITED TO A NEARBY RESIDENTIAL AREA. THE ENTIRE FRONT OF THE CAR WAS MELTED. THE CAR IS TOTALED AND HAS BEEN TURNED OVER TO MY INSURANCE COMPANY, ALLSTATE.

b.      MY CAR HAD A PROBLEM IDLING LAST WEEK. GOT IT TO THE MECHANIC. MECHANIC TRIED TO CHANGE THE SPARK PLUG DUE TO A PROBLEM IN THE CYLINDER BUT SPARK PLUG WAS FROZEN. FOUND COOLANT UNDERNEATH. MECHANIC HAD WORKED AS A MECHANIC AT A FORD DEALERSHIP, SAID THIS PROBLEM WAS PREVALENT WITH FORDS. I CONTACTED FORD. THE FORD REPRESENTATIVE SAID I HAD NO EXTENDED WARRANTY AND THAT THERE WAS NO RECALL ON THE PRODUCT SO THERE WAS NOTHING THEY COULD DO. THE ONLY LONG-TERM FIX IS AN ENTIRELY NEW ENGINE BECAUSE COOLANT IS LEAKING FROM THE ENGINE. THE CAR IS ONLY THREE YEARS OLD.[4]

c.      THE CONTACT OWNS A 2015 FORD ESCAPE. WHILE DRIVING 45 MPH, THE VEHICLE BEGAN TO OVERHEAT AS THE IDLE AND COOLER TEMP WARNING INDICATORS ILLUMINATED. THE VEHICLE WAS TAKEN TO TOM WOOD FORD (LOCATED AT 3130 E 96TH ST, INDIANAPOLIS, IN 4624, (317) 846-4241) WHERE IT WAS DIAGNOSED THAT COOLANT FUEL NEEDED TO BE ADDED. THE MANUFACTURER WAS NOTIFIED AND PROVIDED CASE NUMBER: CAS-21644009. THE FAILURE MILEAGE WAS 78,000.[5]

d.      WE WERE TRAVELING IN THE CAR AT APPROXIMATELY 80 MPH. THE CAR ENGINE BEGAN TO RACE STRONGLY WITHOUT A CORRESPONDING INCREASE IN SPEED. THIS HAPPENED TWICE AND THEN A RED OIL INDICATOR LIGHT CAME ON. IT SOUNDED ALSO LIKE A HEAD GASKET BLEW ON THE 1.6 LITER ECO-BOOST ENGINE AS THERE WAS A RATTLING NOISE LIKE TUMBLING PEBBLES IN A CAN OR DRUM. WE LOST POWER. BLUE SMOKE STREAMED OUT THE TAIL PIPE OF THE CAR. WE COASTED OVER TO THE SHOULDER OF THE

---

[4] NHTSA ID Number: 11194806, Incident Date April 4, 2019.
[5] NHTSA ID Number: 11205720, Incident Date May 5, 2019.

HIGHWAY AND CAME TO A STOP. BY THE TIME THE CAR CAME TO A STOP SMOKE WAS COMING FROM UNDER THE HOOD OF THE CAR. I GOT OUT OF THE CAR AND LOOKED TOWARD THE ENGINE COMPARTMENT FROM THE PASSENGER SIDE. FLAMES WERE COMING FROM BELOW THE CAR JUST INSIDE THE FRONT PASSENGER SIDE TIRE. WE QUICKLY GOT EVERYONE AND EVERYTHING OUT OF THE CAR. THE FLAMES SPREAD VERY QUICKLY. THE FRONT HALF OF THE CAR WAS ENGULFED IN FLAMES IN APPROXIMATELY 4 MINUTES AND THE WHOLE CAR WAS CONSUMED IN ABOUT 8 OR 9 MINUTES.[6]

e.    MY 2017 FORD EDGE 2.0L ECOBOOST, CHECK ENGINE LIGHT CAME ON WITH CODE OF P0302, AFTER CHANGING THE SPARK PLUGS AND COIL PACKS, FINALLY TOOK IT TO OUR LOCAL DEALERSHIP, BANNER FORD IN MANDEVILLE, LA AND AFTER A DIAGNOSTIC WAS FOUND TO HAVE "COOLANT INTRUSION ON CYLINDER #2, AND WAS TOLD THAT FORD WOULD NOT SELL THE PARTS TO REPAIR THE ENGINE, BUT THAT THE ENTIRE ENGINE HAD TO BE REPLACED BECAUSE FORD HAD CHANGED THE DESIGN ON THE ENGINE AND GASKETS. THIS SHOULD BE A RECALL, NOT A TSB, AS I HAVE FOUND MULTIPLE COMPLAINTS AND THEY ALL HAVE CONTACTED FORD WITH THE SAME RESULTS, SO FORD IS WELL AWARE OF THIS ISSUE, COMPLAINTS GO BACK AS FAR AS 2015 AND ALL ARE AROUND THE 65K TO 70K MILE MARK. FORD KNOWS ABOUT THIS BY REDESIGNING THE ENGINES AND THE GASKETS. I AM LOOKING AT AN $8500 ENGINE REPLACEMENT BILL BECAUSE I AM OUT-OF-WARRANTY.[7]

f.    TL* THE CONTACT OWNS A 2016 FORD FUSION. THE CONTACT STATED THAT AFTER STARTING THE VEHICLE, THE VEHICLE DROVE VERY ROUGH PRIOR TO THE CHECK ENGINE WARNING LIGHT BECAME ILLUMINATED. THE VEHICLE WAS TAKEN TO BILL ESTES FORD LOCATED AT 450 EAST NORTH FIELD DR, BROWNSBURG, IN 46112, TO BE DIAGNOSED. THE CONTACT WAS INFORMED THAT COOLANT LEAKED INTO CYLINDER #1 AND THE ENGINE NEEDED TO BE REPLACED. THE VEHICLE WAS NOT REPAIRED. THE MANUFACTURER WAS NOTIFIED OF THE FAILURE BUT

---

[6] NHTSA ID Number: 11032145, Incident Date September 29, 2017.
[7] NHTSA ID Number: 11339218, Incident Date July 8, 2020.

NO ASSISTANCE WAS OFFERED. THE FAILURE MILEAGE WAS 85,000.[8]

g.      AT 55K MILES THE CHECK ENGINE LIGHT APPEARED. WE IMMEDIATELY TOOK THE CAR TO THE DEALER. WE ARE TOLD THAT THERE IS A COOLANT INTRUSION IN A CYLINDER AND THAT THE ENTIRE ENGINE WILL NEED TO BE REPLACED. THE VEHICLE WARRANTY STARTED JUNE 26, 2015. THE VEHICLE WAS CHECKED INTO THE DEALER 6/30/2020, 4 DAYS AFTER THE 5 YEAR/60 MILE WARRANTY EXPIRED. DAYS EXPIRED, NOT MILAGE. WE ARE BEING TOLD BY THE DEALER AND FORD CUSTOMER SERVICE THAT NOTHING WILL BE DONE TO FIX THE CAR EVEN THOUGH THE ISSUE IS A KNOWN PROBLEM AND THE REPLACEMENT ENGINE THAT WOULD BE INSTALLED IS COMPLETELY REDESIGNED DUE TO THE KNOWN DEFECT.[9]

h.      I BOUGHT THE CAR NEW. SEVERAL MONTH'S AGO I HEARD WATER SLOSHING CHECK ENGINE LIGHT CAME ON, OVERHEATING LIGHT ALONG WITH MANY OTHERS. THE CAR SHUT OFF ON A VERY BUSY HIGHWAY ALMOST CAUSED ME TO GET FROM BEHIND. THE CAR WAS NOT OVERHEATING. REPLACED WATER PUMP, COIL PACK, PLUGS, SEVERAL SENSORS. DDREOVER AGAIN VEH SHUT OFF SAMETHING. TOOK TO SHOP #1 FOUND COOLANT IN THE ENGINE CRACK BLOCK. NOW ITS AT FORD DEALERSHIP DIAGNOSED SAMEE AS SHOP #1. CALLED FORD THEY STATED NOTHING THEY WILL DO. FORRDD EXPERT SAID SEVERAL HAS BEEN REPORTED BUT NO RECALL YET.[10]

55.      As is made apparent by the above examples and those discussed earlier in this Complaint, consumers have repeatedly and clearly alerted NHTSA ODI about the Engine Defect and Ford was, or should have been, aware of and monitoring those complaints. Thus, Ford should have known about the defect plaguing Ecoboost engines in the Class Vehicles.

56.      In sum, as early as 2010, and certainly well before Plaintiff and Class Members purchased or leased their Class Vehicles, Ford was aware of the Engine Defect, should have been

---

[8] NHTSA ID Number: 11339266, Incident Date July 10, 2020.
[9] NHTSA ID Number: 11338041, Incident Date June 30, 2020.
[10] NHTSA ID Number: 11320502, Incident Date December 2, 2019.

aware of the Engine Defect through the exercise of reasonable care, and/or was negligent in

failing to be aware of the Engine Defect, based on, among others, the following sources:

a.      Data gathered during pre-release design, manufacturing, engineering, and

testing;

b.      Data gathered by Ford regarding an abnormally large number of requested

repairs dealing with leaking coolant and/or engine failures in Ecoboost engines, including the

need for full engine replacements at low vehicle mileage;

c.      Data about the large number of replacement engines for Class Vehicles

ordered from Ford;

d.      The multitude of consumer complaints regularly lodged with NHTSA and

Ford regarding the Ecoboost engines overheating, misfiring, failing, and / or catching on fire;

e.      Ford service center employees' familiarity with the Engine defect.

57.     Moreover, the large number and consistency of Class Member complaints

describing the propensity of Ecoboost engines in Class Vehicles to leak coolant, expel white

smoke, shut down while in use, and spontaneously catch fire demonstrate that Class Members

consider the Engine Defect to be a material safety issue to the reasonable consumer.

**V.      Ford Received Pre-Suit Notice from the Plaintiff.**

58.     In addition to the other forms of notice outlined above, Ford received pre-suit

notice of its violations alleged in this Complaint, and of Ms. Miller's specific claims, via a letter

sent to Ford and its registered service agent on July 10, 2020, on behalf of Ms. Miller and all

others similarly situated. Ford responded to the letter on August 7, 2020. The parties did not

resolve the claims.

**VI.     Applicable Warranties**

59.     Ford sold and leased the Class Vehicles with a written express warranty covering

the Vehicles for three years or 36,000 miles, whichever comes first.

60.     Ford's New Vehicle Limited Warranty expressly states that Ford will "without

charge, repair, replace, or adjust all parts on your vehicle that malfunction or fail during normal

use during the applicable coverage period due to a manufacturing defect in factory-supplied

materials or factory workmanship" so long the Vehicle is properly operated and maintained and taken to a Ford dealership for repair within the warranty period.

61.     Ford further provides powertrain warranty coverage, which is applicable to "the Engine: all internal lubricated parts, cylinder block, cylinder heads, electrical fuel pump, powertrain control module, engine mounts, flywheel, injection pump, manifold (exhaust and intake), manifold bolts, oil pan, oil pump, seals and gaskets, engine thermostat, engine, thermostat housing, timing chain cover, timing chain (gears or belt), turbocharger/supercharger unit, valve covers, water pump" as well as the components in the transmission, front-wheel drive, rear-wheel drive, and four-wheel/all-wheel drive.  This coverage applies for 5-years or up to 60,000 miles, whichever comes first.

62.     For certified pre-owned ("CPO") Vehicles, Ford offers a limited warranty covering CPO Vehicles for 12 months or 12,000 miles, whichever comes first.

63.     Ford's CPO Vehicle warranty states that a dealer will replace "all covered components . . . that are found to be defective in factory-supplied materials or workmanship during the applicable warranty periods." The engine and its components—including the cylinder block and cylinder heads—are included in Ford's list of "covered components."

64.     Ford provides these warranties to buyers and lessees after the purchase/lease of the Class Vehicle is completed; buyers and lessees have no pre-sale/pre-lease knowledge or ability to bargain as to the terms of the warranties.

65.     Finally, Ford sells replacement parts, including engines and engine components, through its Motorcraft parts brand, and provides an express written warranty with all new Ford and Motorcraft replacement parts. That warranty provides that for parts sold on or after October 1, 2013, parts found to be defective in factory-supplied material or workmanship will be repaired, replaced, or exchanged within 24 months of part purchase, regardless of the number of miles driven.

**VII.     Ford's Prior Safety Recall**

66.     On March 27, 2017, Ford issued a Recall—NHTSA Campaign Number 17V209000—applicable to "certain 2014 Escape, 2014-2015 Fiesta ST, 2013-2014 Fusion and

2013-2015 Transit Connect vehicles equipped with 1.6L GTDI engines." The recall notice stated that, because of an insufficient coolant level, the "engine cylinder head may overheat, crack, and leak oil."

67.     The Recall, which was set to begin on January 5, 2018, provided for the installation of a coolant level sensor, free of charge. The sensor would alert drivers, and vehicle owners/leasers when the coolant in the engine required replenishment.

68.     The Recall did not mention the risk of engine fires or total engine failure, and it did nothing to prevent the continued coolant leakage.

69.     The Recall was inadequate for several reasons. First, as already noted, the Recall did not address the true source of the problem and did nothing to ameliorate the issue. Second, it did not encompass the full range of Vehicles affected by the defect.

70.     The Recall applied only to 1.6L Ecoboost engines, although 1.5L and 2.0L Ecoboost engines have the same engine block design, are made from the same materials, and likewise suffer from the Engine Defect.

71.     Additionally, the Recall did not apply to all of the vehicle models and model years outfitted with the defective Ecoboost engines. Despite the numerous customer complaints reported to Ford and NHTSA, as detailed above, Ford has never expanded the applicability of the Recall to other vehicle models and model years.

72.     In 2018, Ford supplemented its initial Recall. This supplement acknowledged the possibility of engine fires, but still did not include 1.5L or 2.0L engines, did not apply to the full class of vehicles equipped with defective Ecoboost engines, and did not address the underlying defect. Rather, it identified the problem as "localized overheating of engine cylinders."

73.     Instead, the supplement called for "enhancements to the engine cooling and control systems" and repairs to damage caused by cracked cylinder heads resulting from overheating. The supplement did not provide for replacement engines.

74.     Furthermore, although the Recall provides that the coolant sensor installation and the specific repairs and "enhancements" will be completed free of cost, it does not call for reimbursement of consumers' repeated costs to have the Vehicles' coolant replenished, to replace

1   totally failed engines, to reimburse consumers for vehicles lost to engine fires, and it does not

2   compensate consumers for the costs and expenses associated with the time during which they are

3   unable to use their vehicle as a result of the recurrent Engine Defect.

4        75.    The Recall, including the supplement, is insufficient to address the underlying

5   Engine defect, and does not come close to adequately and wholly compensating Plaintiff and

6   Class Members for the injuries caused by the Engine Defect and Ford's related acts and

7   omissions.

8   **VIII.**   **Ford's Marketing and Concealment**

9        76.    Upon information and belief, Ford knowingly marketed, advertised, and sold /

10   leased the Class Vehicles with the Engine Defect while wilfully concealing the true—defective—

11   quality and safety risks of the Ecoboost engines installed in these Vehicles.

12        77.    Ford markets the Class Vehicles directly to consumers through nationwide

13   multimedia advertising campaigns on television, the Internet, billboards, print publications,

14   mailings, and through other mass media. Ford touts the safety and quality of Class Vehicles,

15   despite its knowledge that the Vehicles are equipped with an Engine Defect that poses severe

16   risks to drivers, passengers, and the public.

17        78.    For instance, in a brochure marketing the 2018 Fusion, Ford describes itself as

18   "steadfast about safety," and specifically identifies the Fusion as "proof of [the company's]

19   commitment to safety." In a brochure advertising the 2014 Ford Escape, Ford markets the vehicle

20   as "Quality, Green, Safe, Smart." The 2014 Escape, according to Ford, "proves you can get style,

21   function, and fun in one well-priced package."

22        79.    But in actuality, the Class Vehicles fall far short of these promises. Ford failed to

23   inform consumers of the Engine Defect, which causes coolant to leak into the pistons, leads to

24   smoke emitting from the exhaust, requires repeated and frequent coolant replacement, and results

25   in cracked cylinder heads, engine overheating, total engine failure—at times while the car is

26   moving at high speeds—and spontaneous engine fires.

27        80.    These hazards do not live up to Ford's assurances of its "commitment to safety"

28   and the "confidence" that Ford promoted to its customers. Ford concealed from consumers the

Engine Defect and its outcomes, and misled the public about the actual quality of the Class Vehicles.

81.     Plaintiff and Class Members were exposed to Ford's long-term, national, multimedia marketing campaign touting the supposed quality, safety, and comfort of the Class Vehicles, and Class Members, including Plaintiff, justifiably made their decisions to purchase or lease their Class Vehicles based on Ford's misleading marketing that concealed the true, defective nature of the Class Vehicles.

82.     As detailed above, upon information and belief, Ford has been aware of the Engine Defect since at least 2010, and certainly well before Plaintiff and Class Members purchased or leased their Class Vehicles, through pre-release evaluation and testing; the high number of repairs and replacement part sales related to the Engine Defect; and the numerous and consistent complaints about the Engine Defect collected by NHTSA.

83.     Through its acts and omissions, Ford has actively concealed the existence and natures of the Engine Defect from Class Members, including Plaintiff, since at least 2010. Specifically, Ford:

a.     Failed to disclose, and actively concealed, before, at the time of, and after the purchase, lease, and / or service of the Vehicles, any and all known material defects of the Class Vehicles, including the Engine Defect;

b.     Failed to disclose, at the time of and after the purchase, lease, and or service, that the Ecoboost engines installed in Class Vehicles were defective and not fit for their intended purpose;

c.     Failed to disclose, and actively concealed, the existence and pervasiveness of the Engine Defect even when Class Members directly inquired about potential defects affecting their Ecoboost engines during communications with Ford, Ford dealerships, and Ford service centers;

d.     Actively concealed the Engine Defect by forcing Class Members to bear the cost of stop-gap "solutions" that only temporarily alleviated the symptoms of the defect without permanently and effectively curing the defect;

e.      Actively concealed the Engine Defect by failing to issue a comprehensive and effective Recall providing for the replacement of the defective Ecoboost engines with non-defective engine blocks, and instead, only when the Vehicles remained under warranty, providing for the replacement of one defective, failed engine block with yet another similarly and equally defective engine block.

84.     By engaging in the conduct described above, Ford has concealed, and continues to conceal, the Engine Defect from Class Members. If Class Members had had knowledge of the information Ford concealed, they would not have purchased or leased the Class Vehicles or would have paid less to do so.

## **FRAUDULENT CONCEALMENT ALLEGATIONS**

85.     Plaintiff's claims arise out of Ford's fraudulent concealment of the Engine Defect, and its representations about the quality, safety, and comfort of the Class Vehicles. To the extent that Plaintiff's claims arise from Ford's fraudulent concealment, there is no one document or communication, and no one interaction, upon which Plaintiff bases her claims. Absent discovery, Plaintiff is unaware of and unable through reasonable investigation to obtain the true names and identities of those individuals at Ford responsible for disseminating false and misleading marketing materials regarding the Class Vehicles. Ford necessarily is in possession of all of this relevant information.

86.     Plaintiff alleges that at all relevant times, including specifically at the time he and other Class Members purchased or leased their Class Vehicles, Ford knew or should have known of the Engine Defect; Ford was under a duty to disclose the Defect based upon its exclusive knowledge of it, and its concealment of it; and Ford never disclosed the Defect to Plaintiff, Class Members, or the public at any time or place or in any manner other than an inadequate and ineffective recall of a small subset of the Class Vehicles.

87.     Plaintiff makes the following specific fraud allegations with as much specificity as possible absent access to the information necessarily available only to Ford:

a.      ***Who***: Ford actively concealed the Engine Defect from Plaintiff and Class Members while simultaneously touting the safety, comfort, and quality of the Class Vehicles,

1    including as alleged in paragraphs 76-84, above. Plaintiff is unaware of, and therefore unable to

2    identify, the true names and identities of those specific individuals at Ford responsible for such

3    decisions.

4              b.      **What**: Ford knew, or was reckless or negligent in not knowing, that the

5    Class Vehicles contain the Engine Defect, including as alleged above in paragraphs 42-57. Ford

6    concealed the Defect and made representations about the safety, comfort, quality, and other

7    attributes of the Class Vehicles, including as alleged above in paragraphs 76-84.

8              c.      **When**: Ford concealed material information regarding the Defect at all

9    times and made representations about the quality, safety, and comfort of the Class Vehicles,

10   starting no later than 2010, or at the subsequent introduction of certain models of Class Vehicles

11   to the market, continuing through the time of sale/lease, and on an ongoing basis, and continuing

12   to this day, including as alleged above in paragraphs 76-84. Ford still has not disclosed the truth

13   about the full scope of the Defect in the Class Vehicles to anyone outside of Ford. Ford has never

14   taken any action to inform consumers about the true nature of the Defect in Class Vehicles. And

15   when consumers brought their Vehicles to Ford complaining of the problems with their Ecoboost

16   engines, including recurrent coolant leakage, smoking, failures, and fires, Ford denied any

17   knowledge of or responsibility for the Engine Defect.

18             d.      **Where**: Ford concealed material information regarding the true nature of

19   the Defect in every communication it had with Plaintiff and Class Members and made

20   representations about the quality, safety, and comfort of the Class Vehicles. Plaintiff is aware of

21   no document, communication, or other place or thing, in which Ford disclosed the truth about the

22   full scope of the Defect in the Class Vehicles to anyone outside of Ford. Such information is not

23   adequately disclosed in any sales documents, displays, advertisements, warranties, owner's

24   manuals, or on Ford's website.

25             e.      **How**: Ford concealed the Engine Defect from Plaintiff and Class Members

26   and made representations about the quality, safety, and comfort of the Class Vehicles. Ford

27   actively concealed the truth about the existence, scope, and nature of the Defect from Plaintiff and

28   Class Members at all times, even though it knew about the Defect and knew that information

about the Defect would be material to a reasonable consumer, and Ford promised in its marketing materials that Class Vehicles have qualities that they do not have.

f.    *Why*: Ford actively concealed material information about the Engine Defect in the Class Vehicles for the purpose of inducing Plaintiff and Class Members to purchase and/or lease Class Vehicles, rather than purchasing or leasing competitors' vehicles and made representations about the quality, safety, and comfort of the Class Vehicles. Had Ford disclosed the truth—for example, in its advertisements or other materials or communications—Plaintiff and Class Members (all reasonable consumers) would have been aware of it, and would not have bought or leased the Class Vehicles or would have paid less for them.

## TOLLING AND THE STATUTE OF LIMITATIONS

### I.    Fraudulent Concealment and Equitable Tolling

88.    Upon information and belief, Ford has known of the Engine Defect in the Class Vehicles since at least 2010, and certainly well before Plaintiff and Class Members purchased or leased their Class Vehicles, and yet has concealed from or failed to notify Plaintiff, Class Members, and the public of the full and complete nature of the Engine Defect. Ford continues to conceal the scope and extent of the Defect to this day, as detailed above.

89.    Moreover, Ford's attempts to conceal the defect also include conducting insufficient "Band Aid" repairs during the warranty period, including replacing only certain components, adding a low coolant sensor, and otherwise failing to replace the defective parts with non-defective parts.

90.    Any applicable statute of limitations has been tolled by Ford's knowledge, active concealment, and denial of the facts alleged herein, which behavior is ongoing.

### II.    Estoppel

91.    Ford was and is under a continuous duty to disclose to Plaintiff and Class Members the true character, quality, and nature of the Class Vehicles. Ford actively concealed – and continues to conceal – the true character, quality, and nature of the Class Vehicles and, despite its awareness of the Engine Defect, knowingly made representations about the quality, sophistication, state-of-the-art safety, and comfort of the Class Vehicles. Plaintiff and Class

Members reasonably relied upon Ford's knowing representations and active concealment of these facts. Based on the foregoing, Ford is estopped from relying on any statutes of limitations in defense of this action.

**III.   Discovery Rule**

92.    The causes of action alleged herein did not accrue until Plaintiff and Class Members discovered that their Class Vehicles contained the Engine Defect.

93.    Plaintiff and Class Members had no realistic ability to discern that the Class Vehicles were defective until—at the earliest—after the Engine Defect caused their Ecoboost engines to leak coolant, overheat (leading to, among other things, the cylinder heading cracking), misfire, totally fail, and / or ignite. Even then, Plaintiff and Class Members had no reason to know the Ecoboost engine failures were caused by a defect in the Class Vehicles because of Ford's active concealment of the Engine Defect.

94.    Plaintiff and Class Members were not reasonably able to discover the Engine Defect until after they had purchased or leased their Class Vehicles, despite their exercise of due diligence, and their causes of action did not accrue until they discovered that the Engine Defect caused their Vehicles' Ecoboost engines to leak coolant fluid, misfire, overheat, catch on fire, and totally fail.

## CLASS ACTION ALLEGATIONS

95.    Plaintiff brings this lawsuit as a class action on behalf of herself and all other Class Members similarly situated pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3), (b)(2), and/or (c)(4). This Action satisfies the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements of those provisions.

96.    Plaintiff brings this class action, including all causes of action stated below, on behalf of himself and all other similarly situated members of the proposed Class (referred to herein as "Class Members") defined as follows:

> All persons who purchased or leased in California a 2013-2019 Ford Escape, 2013-2019 Ford Fusion, 2015-2018 Ford Edge, 2017-2019 Lincoln MKC, and 2017-2019 Lincoln MKZ (the "Class Vehicles") equipped with a 1.5L, 1.6L, or 2.0L Ecoboost engine.

97.     Plaintiffs intend to seek certification of a "Damages Subclass" under 23(b)(3) for all Class Members who have experienced Engine Defects and an "Owner Subclass" under Rule 23(b)(2) for purposes of declaratory relief as to future Engine Defects, as well as certification of other subclasses and particular issues under Rule 23 (c)(4), as warranted.

98.     Excluded from the proposed Class are:  (1) Ford, any entity or division in which Ford has a controlling interest, and its legal representatives, officers, directors, assigns, and successors; (2) the judicial officer(s) to whom this case is assigned, and the judicial officer(s) staff; (3) government entities; and (4) those persons who have suffered personal injuries as a result of the facts alleged herein. Plaintiff reserves the right to amend the Class definition if discovery and further investigation reveal that the Class should be expanded, otherwise divided into subclasses, or modified in any other way.

## I.     **Numerosity**

99.     Although the exact number of Class Members is uncertain and can only be ascertained through appropriate discovery, the number is great enough such that joinder is impracticable. The disposition of the claims of these Class Members in a single action will provide substantial benefits to all parties and to the Court. Class Members are readily identifiable from information and records in Ford's possession, custody, and/or control, as well as from records kept by the Department of Motor Vehicles.

## II.     **Typicality**

100.     The claims of Plaintiff are typical of the claims of Class Members in that Plaintiff, like all Class Members, purchased or leased a Class Vehicle designed, manufactured, marketed, distributed, warranted, sold/leased, and serviced by Ford. Plaintiff, like all Class Members, has been damaged by Ford's misconduct in that she purchased/leased a Vehicle she would not have purchased/leased, or would not have purchased/leased at the price she paid, or incurred or will incur the cost of repairs relating to and caused by the Engine Defect. Furthermore, the factual bases of Ford's misconduct are common to all Class Members and represent a common thread of misconduct resulting in injury to all Class Members.

### III.   Adequate Representation

101.   Plaintiff will fairly and adequately represent and protect the interests of the Class Members. Plaintiff has retained counsel with substantial experience in prosecuting consumer class actions, including actions involving defective vehicles.

102.   Plaintiff and her counsel are committed to vigorously prosecuting this action on behalf of Class Members and have the financial resources to do so. Neither Plaintiff nor her counsel have interests adverse to those of Class Members.

### IV.   Predominance of Common Issues

103.   There are numerous questions of law and fact common to Plaintiff and Class Members that predominate over any question affecting only individual Class Members, the answers to which will advance resolution of the litigation as to all Class Members.  These common legal and factual issues include:

  a. whether the subject engines in the Class Vehicles are defective;

  b. whether Ford knew or should have known about the Engine Defect, and, if so, how long Ford has known of the defect;

  c. whether the defective nature of the Class Vehicles constitutes a material fact reasonable consumers would have considered in deciding whether to purchase or lease a Class Vehicle;

  d. whether Ford had a duty to disclose the defective nature of the Class Vehicles to Plaintiff and Class Members;

  e. whether Ford omitted and failed to disclose material facts about the Class Vehicles;

  f. whether Ford's concealment of the true defective nature of the Class Vehicles induced Plaintiff and Class Members to act to their detriment by purchasing or leasing Class Vehicles;

  g. whether Ford's representations and omissions about the true defective nature of the Class Vehicles were likely to mislead or deceive, and therefore fraudulent, within the meaning of California's Unfair Competition Law ("UCL");

h.      whether Ford's representations and omissions about the true defective nature of the Class Vehicles were and are unfair within the meaning of the UCL;

i.      whether Ford represented, through its words and conduct, that the Class Vehicles had characteristics, uses, or benefits that they did not actually have;

j.      whether Ford represented, through its words and conduct, that the Class Vehicles were of a particular standard, quality, or grade when they were of another;

k.      whether Ford advertised the Class Vehicles with the intent not to sell/lease them as advertised;

l.      whether Ford's representations and omissions about the true defective nature of the Class Vehicles were likely to create confusion or misunderstanding;

m.      whether Ford's representations and omissions about the true defective nature of the Class Vehicles were and are deceptive;

n.      whether the Class Vehicles were unfit for the ordinary purposes for which they were used, in violation of the implied warranty of merchantability;

o.      whether Plaintiff and the other Class Members are entitled to a declaratory judgment stating that the Ecoboost engines in Class Vehicles are defective and/or not merchantable;

p.      whether Plaintiff and the other Class Members are entitled to equitable relief, including, but not limited to, a preliminary and/or permanent injunction;

q.      whether Ford should be declared financially responsible for notifying all Class Members of the problems with the Class Vehicles and for the costs and expenses of permanently remedying the Engine Defect in the Class Vehicles;

r.      whether Ford is obligated to inform Class Members of their right to seek reimbursement for having paid to diagnose, repair, or replace the defective Ecoboost engines.

**V.      Superiority**

104.    Plaintiff and Class Members have all suffered and will continue to suffer harm and damages as a result of Ford's unlawful and wrongful conduct. A class action is superior to other available methods for fair and efficient adjudication of this controversy.

105.   Absent a class action, most Class Members would likely find the cost of litigating their claims prohibitively high and would therefore have no effective remedy at law. Because of the relatively small size of the individual Class Members' claims (compared to the cost of litigation), it is likely that only a few Class Members could afford to seek legal redress for Ford's misconduct. Absent a class action, Class Members will continue to incur damages, and Ford's misconduct will continue without remedy.

106.   Class treatment of common questions of law and fact would also be a superior method to multiple individual actions or piecemeal litigation in that class treatment will conserve the resources of the courts and the litigants, and will promote consistency and efficiency of adjudication.

### FIRST CAUSE OF ACTION
**(Violation of California's Consumer Legal Remedies Act ("CLRA"),
Cal Civ. Code § 1750, et seq.)**

107.   Plaintiff incorporates by reference each allegation set forth in paragraphs 1-105, above.

108.   Plaintiff brings this cause of action on behalf of herself and on behalf of the Class Members.

109.   Ford is a "person" as defined by the CLRA. Cal. Civ. Code § 1761(c).

110.   Plaintiff and Class Members are "consumers" within the meaning of the CLRA. Cal. Civ. Code § 1761(d).

111.   The purchase and leases of Class Vehicles by Plaintiff and the Class Members constitute "transactions" as defined by the CLRA. Cal. Civ. Code § 1761(e)

112.   The Class Vehicles constitute "goods" or "services" as defined by the CLRA. Cal. Civ. Code § 1761(a) and (b).

113.   Plaintiff and Class Members purchased or leased the Class Vehicles primarily for personal, family, and household purposes as meant by the CLRA. Cal. Civ. Code § 1761(d).

114.   Ford's representations, active concealments, omissions, and failures to disclose regarding the Class Vehicles violated the CLRA in the following ways:

1           a.      Ford misrepresented the Class Vehicles had characteristics, uses, or

2  benefits Class Vehicles did not in fact have (Cal. Civ. Code § 1770(a)(5));

3           b.      Ford misrepresented that the Class Vehicles were of a particular standard,

4  quality, or grade when they were of another (Cal. Civ. Code § 1770(a)(7));

5           c.      Ford advertised the Class Vehicles with the intent not to sell/lease them as

6  advertised (Cal. Civ. Code § 1770(a)(9));

7           d.      Ford misrepresented that the Class Vehicles and the warranties conferred

8  or involved rights, remedies, or obligations that they did not (Cal. Civ. Code§ 1770(a)(14)); and

9           e.      Ford misrepresented that the Class Vehicles were supplied in accordance

10  with previous representations when they were not (Cal. Civ. Code § 1770(a)(16)).

11      115.    Ford repeatedly engaged in these unfair and deceptive acts or practices in the

12  course of its trade or business. These acts or practices were material, capable of deceiving a

13  substantial portion of the purchasing public, and caused economic harm to purchasers and lessees

14  of the Class Vehicles, including the Plaintiff.

15      116.    By 2010, and well before the sale or lease of Class Vehicles, Ford knew or should

16  have known about the Engine Defect affecting the Class Vehicles. Ford further knew or should

17  have known that the Class vehicles were defectively designed or manufactured, that, as a result of

18  this defect, the Ecoboost engines would repeatedly fail, and that they were not suitable for their

19  intended use.

20      117.    Ford had exclusive knowledge of material facts concerning the existence of the

21  Engine Defect in the Class Vehicles, and actively concealed that defect from consumers. It did so

22  by denying the existence of a defect to consumers—such as Plaintiff—who contacted Ford about

23  the failures of their Ecoboost engines. Ford also concealed the Engine Defect by failing to

24  provide an effective and permanent remedy to all of the Class Vehicles and by replacing failed

25  engines with equally defective engines, bound to suffer from the same failures.

26      118.    Ford was under a duty to Plaintiff and Class Members to disclose the defective

27  nature of the Ecoboost engines, as well as the associated costs that would have to be repeatedly

28  expended in order to temporarily address the failures caused by the Engine Defect, because:

1         a.     Ford was in a superior position to know the true state of facts about the

2  Engine Defect in the Class Vehicles;

3         b.     Plaintiff and Class Members could not reasonably have been expected to

4  learn or discover that the Class Vehicles suffered from the Engine Defect until, at the earliest, the

5  manifestation of the Defect; and

6         c.     Ford knew that Plaintiff and Class Members could not reasonably have

7  been expected to learn or discover the Engine Defect prior to its manifestation.

8       119.    In failing to disclose the defective nature of the Class Vehicles, Ford knowingly

9  and intentionally concealed material facts and breached its duty not to do so.

10      120.    The facts concealed or not disclosed by Ford to Plaintiff and Class Members are

11  material in that a reasonable consumer would have considered them to be important in deciding

12  whether or not to purchase or lease a Class Vehicle. Moreover, a reasonable consumer would

13  consider the Engine Defect to be an undesirable quality, as Plaintiff and Class Members did. Had

14  Plaintiff and other Class Members known that the Class Vehicles had the Engine Defect, they

15  would not have purchased or leased a Class Vehicle, or would have paid less for it.

16      121.    Plaintiff and Class Members are reasonable consumers who did not expect their

17  Class Vehicles to contain a defective Ecoboost engine. It is a reasonable and objective consumer

18  expectation for consumers to expect that the engine will not suffer from repeated and continual

19  coolant leakage into the pistons, causing overheating and leading the cylinder head to crack and

20  misfire, the vehicle to emit white smoke, and the engine to fail or spontaneously catch fire.

21      122.    As a result of Ford's misconduct, Plaintiff and Class Members have been harmed

22  in that the Class Vehicles contain defective Ecoboost engines and suffer from repeated and

23  continual coolant leakage into the cylinders, causing overheating and leading the cylinder head to

24  crack, causing misfires, the vehicle to emit white smoke, and the engine to fail or spontaneously

25  catch fire—all of which create a grave risk of serious injury to person and property and cause

26  Class Members to spend money to attempt to remedy the Defect.

27      123.    As a direct and proximate result of Ford's unfair or deceptive acts or practices,

28  Plaintiff and Class Members have suffered and will continue to suffer harm in that they have a

Vehicle with a defective Ecoboost engine and they have experienced and may continue to experience their Class Vehicles' engines leaking coolant into the cylinders, causing overheating and leading the cylinder head to crack, misfire, the vehicle to emit white smoke, and the engine to fail or spontaneously catch fire, for which Ford has refused to provide and effective and permanent fix.

124.    Plaintiff and the Class seek to recover actual damages, an order enjoining Ford's unfair or deceptive acts or practices and equitable relief under Cal. Civ. Code § 1780(e), and any other just and proper relief available under the CLRA.

125.    In accordance with section 1782(a) of the CLRA, Plaintiff's counsel, on behalf of Plaintiff, has served Ford with notice of its alleged violations of Cal. Civ. Code § 1770(a) relating to the Class Vehicles purchased by Plaintiff and Class Members, and demanded that Ford, within thirty (30) days of such notice, correct or agree to correct the actions described therein and agree to reimburse Plaintiff's and Class Members' associated out-of-pocket costs. Ford responded to that letter on August 7, 2020 and did not agree to correct the actions described therein, to reimburse Plaintiff's and Class Members' out-of-pocket costs, or otherwise to remedy the harm alleged.

**SECOND CAUSE OF ACTION**
**(Violation of California's Unfair Competition Law,**
**Cal. Bus. & Prof. Code § 17200, et seq.)**

126.    Plaintiff incorporates by reference each allegation set forth in paragraphs 1-105, above.

127.    Plaintiff brings this cause of action for herself and on behalf of Class Members.

128.    California Business & Professions Code § 17200 prohibits "unfair competition" including any "unlawful, unfair, or fraudulent business practice" and "unfair, deceptive, untrue or misleading advertising." Ford engaged in conduct that violated each of this statute's three prongs.

129.    Ford committed an unlawful business act or practice in violation of Cal. Bus. & Prof. Code § 17200, *et seq.*, by systematically breaching its warranty obligations and by violating the CLRA and the Song-Beverly Consumer Warranty Act as alleged above and below.

130.    Ford committed unfair business acts and practices in violation of Cal. Bus. & Prof. Code § 17200, *et seq.*, because the acts and practices described herein, including but not limited to Ford's failure to provide a permanent remedy to fix the Engine Defect, where immoral, unethical, oppressive, unscrupulous, unconscionable, and/or substantially injurious to Plaintiff and Class Members. Ford's acts and practices were additionally unfair because the harm to Plaintiff and Class Members is substantial and is not outweighed by any countervailing benefits to consumers or competition. Further, Ford's acts and practices were unfair in that they were contrary to legislatively declared or public policy.

131.    Ford committed fraudulent business acts and practices in violation of Cal. Bus. & Prof. Code § 17200, *et seq.*, when it concealed the existence and nature of the Engine Defect, while representing in its marketing, advertising, and other broadly disseminated representations that the Class Vehicles were, for example, high quality, functional, and "proof of [Ford's] commitment to safety," and that Ford itself is "steadfast about safety," when, in fact, the Engine Defect creates a significant and material safety hazard and inhibits the quality and functionality of the Class Vehicles. Ford's representations, omissions, and active concealments about the Engine Defect are likely to mislead the public with regard to the true defective nature of Class Vehicles.

132.    Ford's unfair or deceptive acts or practices occurred repeatedly in the course of Ford's trade or business, and were likely to mislead a substantial portion of the purchasing public.

133.    Plaintiff relied on Ford's material representations and nondisclosures and would not have purchased/leased, or would have paid less for, the Class Vehicles had he known the truth.

134.    As a direct and proximate result of Ford's unfair, unlawful, and deceptive practices, Plaintiff has lost money.

135.    Plaintiff and Class Members seek an order enjoining Ford from committing such unlawful, unfair, and fraudulent business practices, and seek restitution pursuant to Cal. Bus. & Prof. Code § 17203.

### THIRD CAUSE OF ACTION
**(Breach of Implied Warranty Under the Song-Beverly Consumer Warranty Act)**

136.   Plaintiff incorporates by reference each allegation set forth in paragraphs 1-105, above.

137.   Plaintiff brings this cause of action for herself and on behalf of Class Members.

138.   Ford's Class Vehicles are "consumer goods" within the meaning of Cal. Civ. Code § 1791(a).

139.   Ford is a manufacturer within the meaning of Cal. Civ. Code § 1791(j).

140.   Plaintiff and Class Members who purchased or leased their Class Vehicles within the State of California are "buyers" and "lessees" within the meaning of Cal. Civ. Code §§ 1791(b) and (h).

141.   Ford impliedly warranted to Plaintiff and Class Members that its Vehicles were "merchantable" within the meaning of Cal. Civ. Code §§ 1791(a) and 1792.

142.   Ford impliedly warranted to Plaintiff and Class Members that it would repair or replace any defective products, including the Ecoboost engine.

143.   The propensity of the Engine Defect to cause coolant to leak, seep into the cylinders, cause the cylinder head to crack, cause misfiring, cause white smoke to emit from the vehicle, cause the engine to fail and/or ignite renders the Class Vehicles to not be of the quality that a buyer or lessee would reasonably expect, and therefore not merchantable.

144.   The Engine Defect is latent and was present at the time of the sale/lease of Class Vehicles, and therefore the Vehicles were not merchantable at the time of sale/lease.

145.   The Class Vehicles do not conform to the promises and affirmations of fact made by Ford in its promotional materials and vehicle owner manuals in that the Engine Defect creates a safety hazard contrary to Ford's assurances that, among other things, it is "steadfast about safety" and that the Vehicles are "quality, comfortable, and "proof of [Ford's] commitment to safety."

146.    In violation of Cal. Civ. Code § 1791(a), Ford breached its implied warranty by selling/leasing defective Class Vehicles and refusing to permanently replace and/or repair the defective Ecoboost engines.

147.    The Engine Defect has deprived Plaintiff and Class Members of the benefit of their bargain, and has caused the Class Vehicles to depreciate in value.

148.    Any attempt by Ford to limit or disclaim the implied warranties in a manner that would exclude coverage of the Engine Defect is unenforceable and void pursuant to Cal. Civ. Code §§ 1790.1, 1792.3, and 1793.

149.    As a result of Ford's breach of its implied warranties, Plaintiff and Class Members have been damaged in an amount to be proven at trial and are entitled to incidental, consequential, and other damages and other legal and equitable relief, as well as costs and attorneys' fees, pursuant to Cal. Civ. Code §§ 1794 and 1795.4.

## FOURTH CAUSE OF ACTION
### (Violation of the Magnuson-Moss Warranty Act, 15 U.S.C. §§ 2301, et seq.)

150.    Plaintiff incorporates by reference each allegation set forth in paragraphs 1-105, above.

151.    Plaintiff brings this cause of action for herself and on behalf of Class Members.

152.    This Court has jurisdiction to decide claims brought under 15 U.S.C. § 2301 by virtue of 28 U.S.C. §§ 1332(a) and (d).

153.    Plaintiff is a "consumer" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(3).

154.    Ford is a "supplier" and "warrantor" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. 2301(4)-(5).

155.    The Class Vehicles are "consumer products" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(1).

156.    15 U.S.C. § 2301(d)(1) provides a cause of action for any consumer who is damaged by the failure of a warrantor to comply with a written warranty.

157.    In its Limited Warranty, Ford expressly warranted that it would repair or replace defects in material or workmanship free of charge if those defects became apparent during the warranty period.  Ford provides the following language in its Ford Edge Owner's Manual, which, upon information and belief is substantially identical for all models and model years of the Class Vehicles:

158.    Ford's Limited Warranty is a written warranty within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(6).  The Class Vehicles' implied warranty of merchantability is covered by 15 U.S.C. 2301(7).

159.    With respect to Class members' purchases or leases of the Class Vehicles, the terms of Ford's written warranty and implied warranty became part of the basis of the bargain between Ford, on the one hand, and Plaintiffs and each of the members of the proposed Class, on the other.

160.    Ford breached the implied warranty of merchantability.  Without limitation, the Class Vehicles have engines that leak coolant, overheat, fail, and in some instances catch fire, as described above, and which thus render the Class Vehicles unmerchantable.

161.    Ford breached its express Limited Warranty by refusing to repair the defective engines in the Class Vehicles.  Plaintiff Vanessa Miller presented her vehicle for repair after the engine failed for the second time, and instead of providing a non-defective replacement engine, Ford, installed another engine with the same Engine Defect, and Ms. Miller was forced to pay thousands of dollars out-of-pocket.

162.    Plaintiff Miller, individually and on behalf of the members of the proposed Class, notified Ford of the Engine Defect in the Class Vehicles, and its corresponding breach of warranty, through a notice letter delivered by courier on July 10, 2020 to Ford's registered agent in Plymouth, MI. Ford acknowledged receipt through a response letter from its counsel, dated August 7, 2020.

163.    Ford was also provided notice of the defect through thousands of consumer complaints and information about service repairs from its dealerships.  Ford has not remedied the breach.

164. Further, Ford has refused to provide an adequate warranty repair for the Engine Defect, thus rendering the satisfaction of any notice requirement futile. As stated above, customers that have presented their vehicles for warranty repair due to engine overheating, smoke emission, and engine failure have simply been provided either coolant sensors, replacement parts that do nothing to fix the Engine Defect, or replacement defective engines.

165. At the time of sale or lease of each Class Vehicle, Ford knew, should have known, or was reckless in not knowing of the Class Vehicles' inability to perform as warranted, but nonetheless failed to rectify the situation and/or disclose the Engine Defect. Under the circumstances, the remedies available under any informal settlement procedure would be inadequate, and any requirement that Plaintiffs and the members of the proposed Classes and Subclasses resort to an informal dispute resolution procedure and/or afford Ford a reasonable opportunity to cure its breach of warranties is excused and thus deemed satisfied.

166. The amount in controversy of Plaintiffs' individual claims meet or exceed the sum of $25. The amount in controversy in this action exceeds the sum of $50,000, exclusive of interest and costs, computed on the basis of all claims to be determined in this lawsuit.

167. As a direct and proximate result of Ford's breaches of its Limited Warranty and the implied warranty of merchantability, Plaintiffs and the members of the proposed Class have sustained damages in an amount to be determined at trial.

168. Plaintiff, individually and on behalf of all members of the proposed Class, seeks all damages permitted by law, including the diminution in value of their vehicles, in an amount to be proven at trial.

## FIFTH CAUSE OF ACTION
### (Breach of Implied Warranty)

169. Plaintiff incorporates by reference each allegation set forth in paragraphs 1-105, above.

170. Plaintiff brings this cause of action for herself and on behalf of Class Members.

171. The Class Vehicles are and were at all relevant times "goods" within the meaning of, *inter alia*, Cal. Com. Code §§ 2105(1) and 10103(a)(8).

172.   Ford is and was at all relevant times a "merchant" with respect to the Class Vehicles, under, *inter alia*, Cal. Com. Code §§ 2104(1) and 10103(c), and a "seller" of the Class Vehicles, under § 2103(1)(d); and, with respect to leases, is and was at all relevant time a "lessor" of the Class Vehicles, under, *inter alia*, Cal. Com. Code § 10103(a)(16).

173.   Plaintiff and Class Members are "buyers" or "lessees" within the meaning of, *inter alia*, Cal. Com. Code §§ 2103(a) and 10103(a)(14).

174.   When it sold or leased its Class Vehicles, Ford extended an implied warranty to Class Members that the Class Vehicles were merchantable and fit for the ordinary purpose for which they were sold or leased, pursuant to Cal. Com. Code §§ 2314, 10212, and 10214.

175.   Plaintiff and other Class Members who purchased or leased a Class Vehicle directly from Ford are entitled to the benefit of their bargain:  a Vehicle with a nondefective Ecoboost engine that does not leak coolant and cause coolant to seep into the cylinders, resulting in the engine overheating, the cylinder head cracking, the engine misfiring, the engine totally failing, and/or the engine igniting.

176.   Plaintiff and the Class Members who purchased or leased Certified Pre-Owned Class Vehicles are likewise entitled to the benefit of their bargains:  a Vehicle with a nondefective Ecoboost engine that does not leak coolant and cause coolant to seep into the pistons, resulting in the engine overheating, the cylinder head cracking, the engine misfiring, the engine totally failing, and/or the engine igniting.

177.   Class Members who purchased Certified Pre-Owned Class Vehicles are the intended ultimate consumers of the Class Vehicles, and therefore are third-party beneficiaries for the purposes of implied warranty claims.

178.   Ford breached this implied warranty in that its Class Vehicles are (1) not fit for ordinary use, and (2) not of a merchantable quality.

179.   The Engine Defect is latent and was present at the time of the sale/lease, and therefore the Vehicles were not merchantable at the time of the sale/lease.

180.    Had the Engine Defect that existed at the time of sale/lease been known, the Class Vehicles would not have been sold or leased, or would not have been sold or leased at the same price for which Class Members paid.

181.    As a direct and proximate result of Ford's breach of the implied warranty of merchantability, Plaintiff and Class Members have been damaged in an amount to be proven at trial.

**SIXTH CAUSE OF ACTION**
**(Breach of Express Warranty)**

182.    Plaintiff incorporates by reference each allegation set forth in paragraphs 1-105, above.

183.    As set forth above, the written warranty provided to Plaintiff and the proposed Class specifically and expressly provides that Ford will "without charge, repair, replace, or adjust all parts on your vehicle that malfunction or fail during normal use during the applicable coverage period due to a manufacturing defect in factory-supplied materials or factory workmanship."

184.    As described herein, the Class Vehicles were manufactured with defective material and such defect existed at the time the Vehicles left the manufacturing plant.  Plaintiff and members of the proposed Class submitted their Vehicles for warranty repairs as referenced herein.  Ford failed to comply with the terms of the express written warranty provided to each Class member, by failing and/or refusing to repair the subject materials defect under the Vehicle's warranty as described herein.

185.    Ford's acts in failing and/or refusing to repair the Engine Defect during the warranty period so as to bring the Vehicles into conformity with the express warranty, deprived Plaintiff and members of the Class of their rights guaranteed to them under the express warranty offered by Ford.

186.    As a direct and proximate result of the willful failure of Ford to comply with its obligations under the express warranty, Plaintiff and members of the proposed Class have suffered actual and consequential damages.  Such damages include, but are not limited to, the cost of repairing the Vehicles, the loss of the use and enjoyment of the subject Vehicle, and a diminution in the value of the Vehicle containing the Engine Defect identified herein.

- 36 -

### SEVENTH CAUSE OF ACTION
#### (Fraud by Concealment)

187.     Plaintiff incorporates by reference each allegation set forth in paragraphs 1-105, above.

188.     Plaintiff brings this cause of action for herself and on behalf of Class Members.

189.     Ford concealed and suppressed material facts concerning the quality of the Class Vehicles, and the Ecoboost engines Ford installed in Class Vehicles.

190.     Ford concealed and suppressed material facts concerning the serious Defect causing the Ecoboost engines in Class Vehicles to leak coolant, allow the coolant to pool and seep into the cylinders, causing the cylinder head to crack and the engine to misfire, overheat, and totally fail and to catch fire. Upon information and belief, the Defect lies in the design of the engine block of the Class Vehicles. Ford knew that Plaintiff and Class Members would not be able to inspect or otherwise detect the Defect prior to purchasing or leasing the Vehicles. Ford further failed to disclose and/or denied the existence the Defect when Plaintiff and Class Members complained of the failure of their Ecoboost engines.

191.     Ford did so in order to boost confidence in its vehicles and falsely assure purchasers and lessees of Ford vehicles that the Class Vehicles were world-class, safe, warranted, and reliable vehicles, and concealed the information in order to prevent harm to Ford and its products' reputations in the marketplace and to prevent consumers from learning of the defective nature of the Class Vehicles prior to their purchase or lease.

192.     These false representations and omissions were material to consumers, both because they concerned the quality of the Class Vehicles and because the representations and omissions played a significant role in Plaintiff's and Class Members' decisions to purchase or lease the Class Vehicles.

193.     Ford had a duty to disclose the Engine Defect in the Class Vehicles because it was known and/or accessible only to Ford; Ford had superior knowledge and access to the facts; and Ford knew the facts were not known to or reasonably discoverable by Plaintiff and Class Members.

- 37 -

194.   Ford also had a duty to disclose because it made many general affirmative representations about the quality, warranty, and lack of defects in the Class Vehicles as set forth above, which were misleading, deceptive, and/or incomplete without the disclosure of the additional facts set forth above regarding the actual quality, comfort, and usability of Class Vehicles.

195.   Even when faced with complaints regarding the Defect, Ford misled and concealed the true cause of the symptoms complained of. As a result, Class Members were misled as to the true condition of the Class Vehicles once at the time of purchase or lease and again when the Ecoboost engine failure was complained of to Ford.

196.   The omitted and concealed facts were material because they directly impact the value, appeal, and usability of the Class Vehicles purchased or leased by Plaintiff and Class Members. Whether a manufacturer's products are as stated by the manufacturer, backed by the manufacturer, and usable for the purpose for which they were purchased/leased, are material concerns to a consumer.

197.   Ford actively concealed and/or suppressed these material facts, in whole or in part, to protect its reputation, sustain its marketing strategy, and avoid recalls that would hurt the brand's image and cost money, and it did so at the expense of the Plaintiff and Class Members.

198.   On information and belief, Ford has still not made full and adequate disclosure and continues to defraud Plaintiff and Class Members and conceal material information regarding defects that exist in Ford vehicles.

199.   Plaintiff and Class Members were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased or leased their Class Vehicles or would have paid less for them. Plaintiff's and Class Members' actions were justified. Ford was in exclusive control of the material facts and such facts were not known to the public, Plaintiff, or Class Members.

200.   Because of the concealment and/or suppression of the facts, Plaintiff and Class Members sustained damages because they negotiated and paid value for the Class Vehicles not considerate of the Engine Defect that Ford failed to disclose, and they paid for temporary repairs

and equally defective replacement parts to attempt to remedy the Defect. Had they been aware of the concealed Defect that existed in the Class Vehicles, Plaintiff and Class Members would have paid less for their Vehicles or would not have purchased or leased them at all.

201.    Accordingly, Ford is liable to Plaintiff and Class Members for damages in an amount to be proven at trial.

202.    Ford's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiff's and Class Members' rights and well-being to enrich Ford. Ford's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## EIGHTH CAUSE OF ACTION
### (Unjust Enrichment)

203.    Plaintiff incorporates by reference each allegation set forth in paragraphs 1-105, above.

204.    Plaintiff brings this cause of action for herself and on behalf of Class Members.

205.    Ford has been unjustly enriched by Plaintiff and Class Members purchasing/leasing Class Vehicles from Ford and purchasing replacement parts and services from Ford that Plaintiff and Class Members would not have purchased/leased but for Ford's misconduct alleged above with respect to the Engine Defect.

206.    Plaintiff and Class Members unknowingly conferred a benefit on Ford of which Ford had knowledge, since Ford was aware of the defective nature of the Class Vehicles' Ecoboost engines, but failed to disclose this knowledge and misled Plaintiff and Class Members regarding the nature and quality of the Class Vehicles while profiting from this deception.

207.    The circumstances are such that it would be inequitable, unconscionable, and unjust to permit Ford to retain the benefit of profits that it unfairly obtained from Plaintiff and Class Members.  These profits include the premium price Plaintiff and the Class paid for the Class Vehicles and the cost of the parts and services bought from Ford to temporarily fix the defective engines.

208.     Plaintiff and Class Members, having been damaged by Ford's conduct, are entitled to recover or recoup damages as a result of the unjust enrichment of Ford to their detriment.

## PRAYER FOR RELIEF

209.     Plaintiff on behalf of herself, and all others similarly situated, request the Court to enter judgment against Ford, as follows:

a.     an order certifying the proposed Class, any appropriate subclasses, and any appropriate classes with respect to particular issues, designating Plaintiff as named representative of the Class, and designating the undersigned as Class Counsel;

b.     a declaration that the Ecoboost engines in the Class Vehicles are defective;

c.     a declaration that Ford is financially responsible for notifying all Class Members about the defective nature of the Class Vehicles;

d.     an order enjoining Ford from further deceptive distribution, sales, and lease practices with respect to the Class Vehicles;

e.     an order requiring Ford to permanently repair Class Vehicles, within a reasonable time period and at no cost to Class Members, so that they no longer possess the Engine Defect;

f.     an award to Plaintiff and Class Members of compensatory, exemplary, and statutory damages, including interest, in an amount to be proven at trial;

g.     a declaration that Ford must disgorge, for the benefit of Plaintiff and Class Members, all or part of the ill-gotten profits it received from the sale or lease of the Class Vehicles, or make full restitution to Plaintiff and Class Members;

h.     an award of attorneys' fees and costs, under Cal. Code Civ. Proc. § 1021.5, 15 U.S.C. § 2310(d)(1), and as otherwise allowed by law;

i.     an award of pre-judgment and post-judgment interest, as provided by law;

j.     such other relief as may be appropriate under the circumstances.

CLASS ACTION COMPLAINT FOR DAMAGES
CASE NO. _____

1

2
## **DEMAND FOR JURY TRIAL**

3
210.     Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury

4
of any and all issues in this action so triable of right.

5

6
Dated: September 4, 2020                     Respectfully submitted,

7

8
/s/ Stuart C. Talley
William A. Kershaw

9
Stuart C. Talley
Ian J. Barlow

10
**KERSHAW, COOK & TALLEY PC**
401 Watt Avenue

11
Sacramento, California 95864
Telephone: (916) 779-7000

12
Facsimile: (916) 721-2501
bill@kctlegal.com

13
stuart@kctlegal.com
ian@kctlegal.com

14
Mark P. Chalos (*pro hac vice* forthcoming)

15
LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
One Nashville Place

16
150 Fourth Avenue, Suite 1650
Nashville, TN  37219-2423

17
Telephone: (615) 313-9000
mchalos@lchb.com

18
Annika K. Martin (*pro hac vice* forthcoming)

19
LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
250 Hudson Street, 8th Floor

20
New York, NY  10013-1413
akmartin@lchb.com

21
Patrick Newsom (*pro hac vice* forthcoming)

22
NEWSOM LAW PLC
40 Music Square East

23
Nashville, TN 37203
Telephone: 615-251-9500

24
patrick@newsom.law

25
*Attorneys for Plaintiff and the Proposed Class*

26

27

28

# EXHIBIT A

I, Vanessa Miller, under penalty of perjury, do hereby state as follows:

1.   I am over the age of eighteen (18), and a Named Plaintiff and proposed Class Representative in the above-entitled action. This Declaration, which is based on my personal knowledge of the facts stated herein, is submitted in support of the Class Action Complaint filed concurrently herewith, pursuant to Cal. Civ. Code § 1780(d).

2.   As Named Plaintiff, I bring this action for money damages, equitable relief, and restitution on behalf of myself and all similarly situated individuals and entities who were harmed by the practices described in the Complaint.

3.   As detailed in the Complaint, I reside in the Eastern District of California, purchased my vehicle in the Eastern District of California, and a substantial portion of the events detailed in the Complaint took place in the Eastern District of California.  Furthermore, Defendant conducts substantial business in, and has gained substantial benefit from doing business in the Eastern District of California.

I declare that the foregoing is true and correct. Executed in Sacramento, California, on September 4, 2020.

_____
VANESSA MILLER

2038163.1                                - 1 -                    VENUE DECLARATION OF VANESSA MILLER
                                                                 CASE NO. _____