1   William A. Kershaw (SBN 057486)
    Stuart C. Talley (SBN 180374)
2   Ian J. Barlow (SBN 262213)
    **KERSHAW, COOK & TALLEY PC**
3   401 Watt Avenue
    Sacramento, California 95864
4   Telephone: (916) 779-7000
    Facsimile: (916) 721-2501
5   bill@kctlegal.com
    stuart@kctlegal.com
6   ian@kctlegal.com

7   *Attorneys for Plaintiffs and the Proposed Class*

8

9

10

11

12

13

14

                    UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF CALIFORNIA

15  VANESSA MILLER, AMBER WEST,        Case No.  2:20-cv-01796-TLN-CKD
    and EVAN WEST, *as individuals and on*
16  *behalf of all others similarly situated*,   **FIRST AMENDED CLASS ACTION**
                                       **COMPLAINT FOR DAMAGES**
17              Plaintiffs,

18  v.

19  FORD MOTOR COMPANY,                **JURY TRIAL DEMANDED**

20              Defendant.

21

22

23

24

25

26

27

28

## NATURE OF THE CASE

1.      Plaintiffs Vanessa Miller, Amber West, and Evan West bring this action individually and on behalf of all persons who purchased or leased in California certain Ford vehicles equipped uniformly defective engines that were designed, manufactured, distributed, and sold/leased by Ford Motor Company and/or its related subsidiaries or affiliates ("Ford"), as further described below ("Class Members").

2.      The vehicles at issue in this action include certain Ford vehicles equipped with 1.5L, 1.6L, or 2.0L Ecoboost engines (the "Ecoboost engines"). These vehicles are 2013-2019 Ford Escapes, 2013-2019 Ford Fusions, 2015-2018 Ford Edges, 2017-2019 Lincoln MKC's, and 2017-2019 Lincoln MKZ's (the "Class Vehicles").

3.      The Ecoboost engines in each of the Class Vehicles are substantially the same, from an engineering standpoint, notwithstanding their varying sizes. The Ecoboost engines in the Class Vehicles contain the same relevant components, made of the same materials.

4.      The Ecoboost engines in the Class Vehicles have a critical defect that causes engine coolant—which is vital to the safety and functionality of the engine—to leak into the engine's cylinders (the "Engine Defect").  The lack of coolant created by the leaks causes overheating, and can, even at low mileages, result in the cylinder head cracking and, in some instances, can cause total engine failures and engine fires. Presence of coolant within the cylinders of the engine, alone, can also cause corrosion, oil dilution and contamination, and engine failure.

5.      Ford has failed to provide an effective solution to consumers who purchased or leased Class Vehicles. Further, Ford has not satisfactorily or effectively addressed the source of the defect for those consumers, including for those whose vehicles remain in warranty. Instead of replacing the engine block, Ford merely applies superficial stop-gap, "Band-Aid," remedies such as installing coolant level sensors. This sensor alerts consumers when their coolant has been depleted, so that they can replenish it. It does not, however, prevent further future coolant depletion, or do anything to prevent the coolant from seeping into the engine cylinders. In some

instances, Ford just replaced certain parts other than the defective engine block, thereby failing to address the root cause of the Engine Defect.

6.      These half measures force consumers to repeatedly return for service and to continue driving a vehicle at risk of future damage to the engine and components, engine failure, and/or engine fires.

7.      Those consumers whose Ecoboost engines overheat or fail when the vehicle is out of warranty must pay out-of-pocket for the necessary repairs and, again, may have to return for repeated service if Ford does not, at the outset, replace the defective engine with a non-defective engine block. These repairs, including a full engine replacement, can reach total costs of thousands of dollars.

8.      The Engine Defect interferes with Plaintiffs' and Class Members' safe, comfortable, and expected use of their Class Vehicles. It exposes them to severe risk created by engine failures and engine fires, and it requires them to pay for repairs and/or engine replacement.

9.      On information and belief, prior to the sale or lease of the Subject Vehicles, Ford knew about the Engine defect through sources such as pre-release evaluation and testing; repair data; replacement part sales data; early consumer complaints made directly to Ford and/or posted on public online vehicle owner forums; testing done in response to those complaints; aggregate data from Ford dealers; and other internal sources.

10.     Yet despite its knowledge, Ford failed to disclose and actively concealed the Engine Defect from Class Members and the public, and Ford has continued to market and advertise the Class Vehicles as safe, comfortable, and of high quality.

11.     As a result of Ford's alleged misconduct, Plaintiffs and Class Members were harmed and suffered actual damages, including that the Class Vehicles contain the Engine Defect, have manifested, and continue to manifest, the Engine Defect, and that Ford has not provided a permanent, no-cost remedy for this Defect within a reasonable amount of time. Furthermore, Plaintiffs and Class Members have incurred, and will continue to incur, out-of-pocket, unreimbursed costs and expenses relating to the Engine Defect.

**PARTIES**

12.     Plaintiff Vanessa Miller resides in Sacramento, California.

13.     Ms. Miller owns a 2017 Ford Edge, VIN 2FMPK4K96HBB28812, which contains a 2.0L Ecoboost engine.  Ms. Miller purchased her vehicle from Enterprise Car Sales in Sacramento, California for personal, family, and household use. At the time of her purchase, the vehicle had 20,699 miles on it. The vehicle now has approximately 85,000 miles on it.

14.     As detailed below, as a result of the Engine Defect, Ms. Miller's 2017 Ford Edge has experienced two engine failures. The first occurred in June 2018 at approximately 36,853 miles. At that time, the vehicle was under warranty and Ford agreed to replace the defective engine. The replacement engine was similarly defective. The second instance of engine failure occurred a little over one year later, in November 2019, at about 85,000 miles. Rather than replace the defective engine at no cost, Ford told Ms. Miller that her car was no longer in warranty and that she had to pay thousands of dollars out of pocket to replace the engine.

15.     Plaintiffs Amber and Evan West (the "Wests") reside in Palmdale, California.

16.     The Wests own a 2013 Ford Fusion, 3FA6P0HR2DR345079, which contains a 1.6L Ecoboost engine. The Wests purchased their vehicle new from Antelope Valley Ford in Palmdale, California for personal, family, and household use.

17.     As detailed below, as a result of the Engine Defect, the Wests' 2013 Ford Fusion experienced numerous issues beginning in September 2016, including that the engine would overheat and shut down while the vehicle was being driven. The Wests sought to have the problem diagnosed while the vehicle was under warranty but Ford only replaced the coolant sensor and told the Wests to add more coolant to the engine. After the warranty period on their 2013 Ford Fusion expired, the vehicle continued to experience the same issues. Antelope Valley Ford finally diagnosed their vehicle as suffering from the engine defect and told the Wests they had to pay $6,800 out of pocket to replace the engine.

18.     At no time prior to their purchase of the subject vehicles did Ford disclose to consumers including Ms. Miller and the Wests, and they did not know, and had no reason to know or expect, that their vehicles contained the Engine Defect and that the Ecoboost engine

would leak coolant, overheat, fail, and even potentially result in an engine fire. Ford failed to disclose to consumers including Ms. Miller and the Wests, and Ms. Miller and the Wests were not aware of, and did not have any reason to anticipate, the costly repairs that would be required for the vehicle as a result of the Engine Defect. If Ford had adequately disclosed these facts, Ms. Miller and the Wests would not have bought their vehicles or would have paid less for it.

19.     Defendant Ford Motor Company ("Ford") is a Delaware corporation, which has its principal place of business in the State of Michigan and is a citizen of the States of Delaware and Michigan.

20.     At all times relevant herein, Defendant Ford engaged in the business of selling, designing, manufacturing, marketing, warranting, distributing, selling, and leasing automobiles, including the Class Vehicles, in California and throughout the United States.

## JURISDICTION AND VENUE

21.     The Court has diversity jurisdiction over this action under 28 U.S.C. § 1332(d) and the Class Action Fairness Act ("CAFA"). Plaintiffs and other Class Members are residents and citizens of states different from the home states of the Defendant, and the amount in controversy in this action for the Class exceeds $5,000,000.00.

22.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because Plaintiff Miller resides in this District, purchased her vehicle in this District and a substantial portion of the events or omissions giving rise to this Action occurred in this District. Furthermore, Defendant conducts substantial business in, and has gained substantial benefit from doing business in, this District.

23.     Defendant markets, sells, and leases vehicles to consumers throughout this District, a significant number of Defendant's customers are residents of this District, and the wrongful acts and omissions alleged herein have affected consumers in this District. Defendant is therefore subject to personal jurisdiction in this District.

24.     Plaintiff Miller's venue declaration pursuant to Cal. Civ. Code § 1780(d) is attached hereto as Exhibit A.

**FACTUAL ALLEGATIONS**

25.     In 2009, Ford began producing the Ecoboost engine, which are gasoline-fueled, turbocharged, direct-injection (also called "GTDI") engines. Ecoboost engines are marketed as providing low-emissions, fuel-efficient alternative to hybrid or electric vehicles.

26.     Because of the Engine Defect, the Ecoboost engines in Class Vehicles are predisposed to leak coolant, allowing coolant to seep into the engine cylinder, causing the engines in the Class Vehicles to overheat and ultimately causing engine fires and/or total engine failure, thereby compromising the comfort, safety, and enjoyment of Plaintiffs and Class Members, and requiring them to pay out-of-pocket to temporarily ameliorate the problem and/or replace the defective Ecoboost engine with an equally defective engine, leaving the Class Vehicle susceptible to repeated failures like those experienced by Plaintiffs.

## I.     **The Engine Defect**

27.     On information and belief, and subject to additional information learned after obtaining discovery from Defendant and third parties, the Engine Defect is the result of the design of the engine block and cylinder head, including an inadequate seal on the cylinder head. This design includes grooves at the point where the engine's cylinder head attaches to the engine block, as seen here:



28.     In a non-defective engine, liquid coolant is used to ensure that the engine does not overheat. The coolant circulates through a set path within the engine block and cylinder head, cooling the engine. The liquid gathers heat due to contact with the engine and then flows through a hose and into the radiator to cool back down. Once its temperature has lowered, the coolant returns to the engine, and continues to circulate.

29.     In the Class Vehicles, however, as the coolant circulates through the engine, it seeps through the grooves present on the cylinder head, and pools there. The coolant pooling contributes to the seal degrading, eventually allowing the coolant to leak into the engine's cylinders. The degraded seals can be seen below:



30.     The coolant leak causes two related problems. First, the leak causes there to be insufficient coolant to properly lower the engine's temperature, which results in the engine overheating. Engine overheating can cause catastrophic damage to an engine. For example, overheating can cause the cylinder head to crack.  Engine overheating can also warp other internal components, such as pistons. Additionally, when an engine overheats to a certain degree, it causes a loss of oil viscosity which can lead the engine to completely seize.  In some instances, engine overheating can result in engine fire.

31.     Second, the coolant leakage *into* the cylinders causes the engine to misfire. Coolant present in the cylinders is burned through the combustion chamber and exits through the vehicle's exhaust, sometimes resulting in smoke emitting from the vehicles' exhaust. In addition, coolant that enters the cylinders will mix with the oil on the cylinder walls, causing oil dilution

and/or contamination that result in the corrosion and excessive wear on bearings and other internal engine surfaces.

32.     The Engine Defect can occur at low mileage, often while the vehicle remains within the warranty period.

33.     Ford's insufficient Band-Aid repair measures, such as installing a low coolant sensor, and/or the replacement of faulty Ecoboost engines in Class Vehicles with equally defective replacement engines leave Class Vehicles susceptible to repeated failure.

34.     Because of the Engine Defect, consumers are forced to pay thousands of dollars out of pocket, despite the fact that the repair does not remedy the Engine Defect and leaves consumers still subject to future risk of failure.

35.     Ford has apparently developed a feasible alternative design for an Ecoboost engine that does not contain the defect Class Vehicles suffer from, but has not used these newly-developed non-defective engines to replace failed Ecoboost engines installed in Class Vehicles, leaving Class Members to face the specter of repeated engine failure and engine fires.

## II.     Plaintiff Vanessa Miller's Experience

36.     Prior to purchasing her vehicle, Ms. Miller researched the quality, reliability and safety of a variety of different vehicles.  Based on her research and review of information regarding Ford, she believed Ford vehicles were of high quality, safe and reliable.

37.     Based on her belief, Plaintiff Vanessa Miller purchased her 2017 Ford Edge equipped with a 2.0L Ecoboost engine from Enterprise Car Sales in Sacramento, California in November 2017.   At the time of purchase, the vehicle had 20,699 miles on it. Ms. Miller's decision to purchase the vehicle was also influenced by the fact that Ford's warranty still applied to the vehicle.

38.     Shortly after her purchase, in June 2018, the "check engine" alert light came on and the engine began to shake violently while the vehicle was in use. At that time, the vehicle had approximately 36,853 miles on it and it was under warranty. When Ms. Miller took the vehicle to a Ford dealership for repairs, the service center employee informed her that coolant was leaking into the engine system, and that the long block needed to be replaced. The engine block was

FIRST AMENDED CLASS ACTION
COMPLAINT FOR DAMAGES
CASE NO.  2:20-CV-01796-TLN-CKD

replaced with an engine that apparently contained the same Engine Defect. The initial repair took approximately three weeks, during which Ms. Miller was not able to enjoy the use of her vehicle.

39.     Less than two years later, in November 2019, due to the Engine Defect, Ms. Miller's 2017 Ford Edge began manifesting the same problems in the replacement engine as the vehicle's original engine had displayed in 2018, including total engine failure. Ford contended that the car was no longer in warranty and Ms. Miller had to pay out of pocket more than $6,000.

40.     On December 9, 2019, Ms. Miller's husband contacted Ford directly and spoke with a customer service representative. He alerted the representative that Ms. Miller had experienced yet another engine failure in her 2017 Ford Edge and was told that there were "no coverages for the engine" in her vehicle.

41.     Ford eventually agreed to pay a small portion—$1,500—of the repair costs, which totaled $7,579.19. This left Ms. Miller still forced to spend $6,079.19 out of pocket. Furthermore, this amount does not include the costs Ms. Miller had to bear related to being without the use of her vehicle for the time required to conduct the repairs.

42.     At no time prior to her purchase of the subject vehicle did Ford disclose to consumers including Ms. Miller, and she did not know, and had no reason to know or expect, that it contained the Engine Defect and that her Ecoboost engine would leak coolant, overheat, fail, and even potentially result in an engine fire. Ford failed to disclose to consumers including Ms. Miller, and Ms. Miller was not aware of, and did not have any reason to anticipate, the costly repairs that would be required for the vehicle as a result of the Engine Defect. If Ford had adequately disclosed these facts, Ms. Miller would not have bought her vehicle or would have paid less for it.

### III.     Plaintiffs Amber and Evan Wests' Experience

43.     Prior to purchasing their vehicle, the Wests did significant research on the internet with respect to the various vehicles that were within their price range.  Because the Wests planned on using the vehicle to transport their young children, one of the most important considerations in their purchasing decision was that the vehicle be reliable and safe.  Based on the representations

1    made on Ford's website, the Wests believed that Ford vehicles were safe, reliable, and utilized

2    state-of-the-art safety technology.

3    44.    After conducting preliminary research, the Wests decided to visit an authorized

4    Ford dealership, Antelope Valley Ford, to obtain more information about the Ford Fusion.

5    Specifically, on or about May 27, 2013 the Wests met with a Ford salesman at Antelope Valley

6    Ford.  This individual, whose name is currently unknown to Plaintiffs, told the Wests that Ford's

7    Ecoboost engine that came standard with the Ford Fusion was state of the art.  He also stressed

8    that vehicle was one of the safest on the highway with a five-star safety rating from the National

9    Highway Traffic Safety Administration (NHTSA). This five-star NHTSA rating was also

10   prominently displayed on a sticker in the vehicle's window. These representations concerning the

11   quality of the Ecoboost engine and the safety of this vehicle were consistent with Ford's

12   marketing of its vehicles, were important to the Wests' purchasing decision, and were substantial

13   factors that caused them to purchase the subject Ford Fusion.

14   45.    At no time prior to their purchase of the subject vehicle did Ford disclose to

15   consumers including the Wests, and they did not know, and had no reason to know or expect, that

16   it contained the Engine Defect and that their Ecoboost engine would leak coolant, overheat, fail,

17   and even potentially result in an engine fire. Ford failed to disclose to consumers including the

18   Wests, and the Wests were not aware of, and did not have any reason to anticipate, the costly

19   repairs that would be required for the vehicle as a result of the Engine Defect. If Ford had

20   adequately disclosed these facts, the Wests would not have bought her vehicle or would have paid

21   less for it.

22   46.    Despite Ford's representations concerning the reliability and safety of the Ford

23   Fusion, the Wests' experience with their vehicle has demonstrated the opposite. The first incident

24   with the vehicle occurred in September 2016 at approximately 47,812 miles, during the vehicle's

25   express warranty period, when the vehicle suddenly lost all power when being driven by Mr.

26   West on the highway.  After approximately 10 minutes, the engine started and Mr. West was able

27   to return the vehicle to his home. Thereafter it was towed to Antelope Valley Ford to be repaired.

28   Ford told Mr. West that there was a problem with the coolant sensor. Although Ford knew the

1   engine in the Wests' 2013 Ford Fusion was leaking coolant, the dealership only replaced the

2   sensor and told the Wests to add more coolant to the engine. Ford did not tell the Wests that their

3   vehicle was suffering from the Engine Defect.

4          47.    Installing the new sensor and adding more coolant failed to fix the Engine Defect.

5   The Wests continued to experience problems with their car: the car would overheat and stop

6   working shortly after starting up, and the "check engine" alert light was frequently illuminated.

7   The Wests brought their 2013 Ford Fusion to the dealership three more times—on June 5, 2017,

8   November 22, 2017, and May 9, 2018, during the vehicle's express warranty period—for repairs

9   related to the loss of coolant from the vehicle's engine. Rather than actually repair the vehicle, on

10   each occasion the dealership merely told the Wests to add more coolant to the engine.

11          48.    The Wests' problems with their vehicle continued after its express warranty

12   expired. On February 5, 2020, March 10, 2020, July 18, 2020, September 22, 2020, and October

13   7, 2020 they brought the vehicle to Palmdale Firestone, a third party repair facility. Firestone

14   diagnosed the vehicle as having problems with its fuel injectors and replaced the injectors.

15   However, the problems continued.  Eventually, the facility determined that it was unable to detect

16   the root cause of the numerous failures and directed the Wests to a Ford dealership for further

17   evaluation. Antelope Valley Ford finally told the Wests that their vehicle—which was by this

18   point out of warranty—was suffering from a coolant leak. Ford advised the Wests that their

19   vehicle, which had only been driven 86,950 miles, needed a new engine. The cost of the new

20   engine is $6,800. Faced with no other choice, the Wests paid the $6,800 to repair their engine. In

21   addition, they have spent approximately $1,500 on motor oil, coolant, and sparkplugs trying to fix

22   the Engine Defect since they first brought their vehicle in for repairs in 2016.

23          49.    At the time the Wests purchased their vehicle, they did not know, and had no

24   reason to know or expect, that it contained the Engine Defect and that their Ecoboost engine

25   would leak coolant, overheat, fail, and even potentially result in an engine fire. They were not

26   aware of, and did not have any reason to anticipate, the costly repairs that would be required for

27   the vehicle as a result of the Engine Defect. If they had known these facts, they would not have

28   bought the vehicle or would have paid less for it.

IV.     **The Engine Defect Poses a Safety Risk to Vehicle Drivers, Passengers, and the Public.**

50.     The Engine Defect poses a safety hazard to drivers, passengers, and the public because an engine with insufficient coolant and/or coolant in its cylinders can misfire, suddenly fail, catch on fire while the vehicle is otherwise in normal operation. Sudden engine failures and engine fires create serious risks of injury or death to those inside the vehicle and to others nearby.

51.     For instance, one complaint filed with NHTSA detailed a consumer's experience while driving a 2017 Ford Edge with their family in the car. The driver pulled over to the side of the road and saw smoke coming out of the car. Within minutes after the family evacuated the vehicle, "the entire car was engulfed in flames."[1]

52.     Another 2017 Ford Edge owner described experiencing complete engine failure while on the highway: "Suddenly the car basically went dead while in motion going 75 miles per hour. I had to steer it off the highway and turn it off, leaving us stranded on the side of the highway for 4 hours." This event occurred after the driver had received a check engine alert, and had the engine's head gasket replaced due to coolant in the cylinder. Following the total engine failure, it was determined that coolant had leaked into the cylinder, causing misfiring and engine failure, for the second time in less than 12 months. The complaint stated that the author was forced to pay $7,000.00 for a full engine replacement.[2]

53.     As these instances demonstrate, engine failures put the vehicle occupants and others on the road in extreme risk of accidents, and engine fires pose a potentially lethal hazard.

54.     As further detailed below, the NHTSA website is replete with similar complaints of smoking vehicles, engine failures while the car is in operation on the road, and fires. Additionally, these complaints highlight that the Engine Defect often requires repeated repairs, each of which can cost consumers thousands of dollars.

---

[1] NHTSA ID Number: 11020178, Incident Date August 18, 2017.
[2] NHTSA ID Number: 11338725, Incident Date June 24, 2020.

V.    **Ford Knew or Should Have Known the Ecoboost Engines in the Subject Vehicles Were Defective Before Selling or Leasing the Class Vehicles to Plaintiffs and the Class Members.**

55.    On information and belief, Ford became aware of the Engine Defect at least as early as 2010, well before Plaintiffs and Class Members purchased their Class Vehicles. Ford learned of the defect through sources such as pre-release evaluation and testing; repair data; replacement part sales data; early consumer complaints made to Ford and/or NHTSA, and/or posted on public online vehicle owner forums; testing done in response to those complaints; aggregate data from Ford dealers; as well as through other internal sources unavailable to Plaintiffs prior to discovery.

A.    **Ford's Knowledge of the Engine Defect Gained from Pre-Release Design, Manufacture, Engineering, and Testing Data.**

56.    While designing, manufacturing, engineering, and testing Class Vehicles in advance of the vehicles' release, Ford would have gained comprehensive and exclusive knowledge about the Ecoboost engines installed in those Vehicles. In particular, Ford would have an understanding of the functionality of standard engine systems, such as coolant flow, and the compatibility of the engine materials with necessary chemicals, such as coolant and antifreeze.

57.    Adequate pre-release analysis of the design, engineering, and manufacture of the Ecoboost engines in the Class Vehicles would have revealed to Ford that the design of the engine was defective and susceptible to leaking coolant into the cylinders.

B.    **Ford Had Knowledge of the Engine Based on Warranty Repair Data.**

58.    In order to guarantee the quality of its products, Ford implements a highly integrated system known as "Six Sigma." According to Ford's former Chief Engineer, Art Hyde, this quality operating system is "crucial for identifying and correcting problems within the manufacturing facilities. The Six Sigma and Quality Operating System implemented in each plant includes cross-functional groups of engineers, plant management, and production specialists – all skilled problem solvers who've been trained through Six Sigma."[3] In fact, Ford employs

---

[3] Jean Scheid, *Ford Motor Company and a Total Quality Management Example (TQM)*, BRIGHT HUB PM (May 26, 2010), https://www.brighthubpm.com/methods-strategies/72279-tqm-and-ford-motor-company/.

*Footnote continued on next page*

more than 67,000 Six Sigma engineers to deal with quality assurance issues that arise with its products.[4]

59.     In order to quickly identify quality issues in real time, Ford utilizes business process management software known as "One Warranty Solution" that allows it to obtain and analyze warranty data from Ford Dealerships in real time.  As noted by Curt Yun, Ford's director of global warranty analysis:  "Our plants receive and analyze warranty claims from dealerships every day . . . . That's one of the processes now built into the fabric of our business. We're producing fewer defects, and if (problems come up), we find them and contain them and resolve them more quickly than we ever have."[5]

60.     According to Mike Roberts, Ford's Global Warranty Strategy Manager, the One Warranty Solution software is critical to alerting Ford to quality problems in the field and immediately taking steps to prevent those problems from occurring in the future: "Every day that you know about something sooner, you can save one day's worth of bad production. Every day has a huge cost saving associated with it."  He also noted that Ford's integrated system allows Ford to be "able to connect [an] engineer to dealership, to a technician, to a vehicle that had that exact concern, the minute it was written up on the service drive. [The Ford engineer] could intercept the repair process and talk to the technician."  The system also allows the technician in the field to provide highly detailed information about repairs that can be shared with Ford Engineers.  In fact, the software allows technicians to attach pictures of the repair along with copies of bills and invoices.[6]

---

*Footnote continued from previous page*

[4] Andrea Gabor, *Management: Ford Embraces Six Sigma*, N.Y. TIMES (June 13, 2001), https://www.nytimes.com/2001/06/13/business/management-ford-embraces-six-sigma.html.

[5] Byron Pope, *Ford's Warranty Costs Dropping as Quality Improves*, WARDSAUTO (Mar. 19, 2008), https://www.wardsauto.com/news-analysis/ford-s-warranty-costs-dropping-quality-improves.

[6] Bill Goodwin, *Software Project Will Save Ford Tens of Millions a Year in Car Repair Bills*, COMPUTERWEEKLY.COM (July 23, 2015), https://www.computerweekly.com/news/4500250364/Software-project-will-save-Ford-tens-of-millions-a-year-in-car-repair-bills.

61.     Consumers complain that the Engine Defect often causes the engine to overheat, misfire, emit smoke, fail, and spontaneously ignite at low mileages, when vehicles remain within the warranty period.  Through Ford's integrated software system and its team of dedicated quality assurance engineers, such issues were undoubtedly brought to Ford's attention.

**C.     Ford Had Knowledge of the Engine Defect Because of the Large Number of Replacement Engines Ordered from Ford.**

62.     Upon information and belief, Ford also knew or should have known about the Engine Defect because of the higher than expected number of replacement engines ordered from Ford—even at low mileage—which should have alerted Ford of the presence of a defect impacting a wide range of its Vehicles.

63.     Upon information and belief, Ford service centers use Ford replacement parts that they order directly from Ford. Independent repair shops and consumers doing repairs themselves also purchase replacement parts directly from Ford. Therefore, Ford would have detailed and accurate data regarding the number and frequency of replacement part orders. The ongoing high sales of replacement Ecoboost engines was certainly known to Ford, and should have alerted Ford that its engines were suffering from a defect, causing coolant loss, overheating, engine failure, and engine fires.

**D.     Ford Knew About the Engine Defect Because of Class Member Complaints Collected by NHTSA.**

64.     Many Class Vehicle owners and lessees lodged complaints about the Engine Defect with NHTSA's Office of Defect Investigations ("ODI").

65.     Federal law requires automakers like Ford to be in close contact with NHTSA regarding potential auto defects, including imposing a legal requirement, backed by criminal penalties for violation, of confidential disclosure of defects by automakers to NHTSA, including field reports, customer complaints, and warranty data. *See* TREAD Act, Pub. L. No. 106-414, 114 Stat. 1800 (2000).

66.     Thus, automakers should (and do) monitor NHTSA databases for consumer complaints regarding their automobiles as part of the automakers' ongoing obligation to identify potential defects in their vehicles, such as spontaneous engine fires.

67.     From its monitoring of the NHTSA databases, Ford knew or should have known of the many complaints about Engine Defect logged by NHTSA ODI, and the content, consistency, and large number of those complaints alerted, or should have alerted, Ford that the Engine Defect is widespread, and a safety hazard.

68.     A sampling of the publicly available complaints lodged with NHTSA ODI includes the following:[7]

> a.     MY CAR STOPPED WHILE DRIVING ON A SIDE STREET. AUTONATION FORD CLAIMED THERE WAS A MALFUNCTION WHICH LED TO THE TRANSMISSION FAILURE. THEY WANTED $7K TO REPAIR. I TOOK IT ELSEWHERE FOR REPAIR AND WITHIN 1 WEEK AFTER REPAIR THE CAR ENGINE CAUGHT ON FIRE WHILE DRIVING. I HAD BEEN ON THE INTERSTATE BUT HAD JUST EXITED TO A NEARBY RESIDENTIAL AREA. THE ENTIRE FRONT OF THE CAR WAS MELTED. THE CAR IS TOTALED AND HAS BEEN TURNED OVER TO MY INSURANCE COMPANY, ALLSTATE.
>
> b.     MY CAR HAD A PROBLEM IDLING LAST WEEK. GOT IT TO THE MECHANIC. MECHANIC TRIED TO CHANGE THE SPARK PLUG DUE TO A PROBLEM IN THE CYLINDER BUT SPARK PLUG WAS FROZEN. FOUND COOLANT UNDERNEATH. MECHANIC HAD WORKED AS A MECHANIC AT A FORD DEALERSHIP, SAID THIS PROBLEM WAS PREVALENT WITH FORDS. I CONTACTED FORD. THE FORD REPRESENTATIVE SAID I HAD NO EXTENDED WARRANTY AND THAT THERE WAS NO RECALL ON THE PRODUCT SO THERE WAS NOTHING THEY COULD DO. THE ONLY LONG-TERM FIX IS AN ENTIRELY NEW ENGINE BECAUSE COOLANT IS LEAKING FROM THE ENGINE. THE CAR IS ONLY THREE YEARS OLD.[8]

---

[7] This collection of complaints have been taken verbatim from NHTSA's website and have not been edited for grammar or spelling.

[8] NHTSA ID Number: 11194806, Incident Date April 4, 2019.

c.      THE CONTACT OWNS A 2015 FORD ESCAPE. WHILE DRIVING 45 MPH, THE VEHICLE BEGAN TO OVERHEAT AS THE IDLE AND COOLER TEMP WARNING INDICATORS ILLUMINATED. THE VEHICLE WAS TAKEN TO TOM WOOD FORD (LOCATED AT 3130 E 96TH ST, INDIANAPOLIS, IN 4624, (317) 846-4241) WHERE IT WAS DIAGNOSED THAT COOLANT FUEL NEEDED TO BE ADDED. THE MANUFACTURER WAS NOTIFIED AND PROVIDED CASE NUMBER: CAS-21644009. THE FAILURE MILEAGE WAS 78,000.[9]

d.      WE WERE TRAVELING IN THE CAR AT APPROXIMATELY 80 MPH. THE CAR ENGINE BEGAN TO RACE STRONGLY WITHOUT A CORRESPONDING INCREASE IN SPEED. THIS HAPPENED TWICE AND THEN A RED OIL INDICATOR LIGHT CAME ON. IT SOUNDED ALSO LIKE A HEAD GASKET BLEW ON THE 1.6 LITER ECO-BOOST ENGINE AS THERE WAS A RATTLING NOISE LIKE TUMBLING PEBBLES IN A CAN OR DRUM. WE LOST POWER. BLUE SMOKE STREAMED OUT THE TAIL PIPE OF THE CAR. WE COASTED OVER TO THE SHOULDER OF THE HIGHWAY AND CAME TO A STOP. BY THE TIME THE CAR CAME TO A STOP SMOKE WAS COMING FROM UNDER THE HOOD OF THE CAR. I GOT OUT OF THE CAR AND LOOKED TOWARD THE ENGINE COMPARTMENT FROM THE PASSENGER SIDE. FLAMES WERE COMING FROM BELOW THE CAR JUST INSIDE THE FRONT PASSENGER SIDE TIRE. WE QUICKLY GOT EVERYONE AND EVERYTHING OUT OF THE CAR. THE FLAMES SPREAD VERY QUICKLY. THE FRONT HALF OF THE CAR WAS ENGULFED IN FLAMES IN APPROXIMATELY 4 MINUTES AND THE WHOLE CAR WAS CONSUMED IN ABOUT 8 OR 9 MINUTES.[10]

e.      MY 2017 FORD EDGE 2.0L ECOBOOST, CHECK ENGINE LIGHT CAME ON WITH CODE OF P0302, AFTER CHANGING THE SPARK PLUGS AND COIL PACKS, FINALLY TOOK IT TO OUR LOCAL DEALERSHIP, BANNER FORD IN MANDEVILLE, LA AND AFTER A DIAGNOSTIC WAS FOUND TO HAVE "COOLANT INTRUSION ON CYLINDER #2, AND WAS TOLD THAT FORD WOULD NOT SELL THE PARTS TO REPAIR THE ENGINE, BUT THAT THE ENTIRE ENGINE HAD TO BE REPLACED BECAUSE FORD HAD CHANGED THE DESIGN ON THE ENGINE AND GASKETS. THIS SHOULD BE A RECALL, NOT A TSB, AS I

---

[9] NHTSA ID Number: 11205720, Incident Date May 5, 2019.
[10] NHTSA ID Number: 11032145, Incident Date September 29, 2017.

HAVE FOUND MULTIPLE COMPLAINTS AND THEY ALL HAVE CONTACTED FORD WITH THE SAME RESULTS, SO FORD IS WELL AWARE OF THIS ISSUE, COMPLAINTS GO BACK AS FAR AS 2015 AND ALL ARE AROUND THE 65K TO 70K MILE MARK. FORD KNOWS ABOUT THIS BY REDESIGNING THE ENGINES AND THE GASKETS. I AM LOOKING AT AN $8500 ENGINE REPLACEMENT BILL BECAUSE I AM OUT-OF-WARRANTY.[11]

f.      TL* THE CONTACT OWNS A 2016 FORD FUSION. THE CONTACT STATED THAT AFTER STARTING THE VEHICLE, THE VEHICLE DROVE VERY ROUGH PRIOR TO THE CHECK ENGINE WARNING LIGHT BECAME ILLUMINATED. THE VEHICLE WAS TAKEN TO BILL ESTES FORD LOCATED AT 450 EAST NORTH FIELD DR, BROWNSBURG, IN 46112, TO BE DIAGNOSED. THE CONTACT WAS INFORMED THAT COOLANT LEAKED INTO CYLINDER #1 AND THE ENGINE NEEDED TO BE REPLACED. THE VEHICLE WAS NOT REPAIRED. THE MANUFACTURER WAS NOTIFIED OF THE FAILURE BUT NO ASSISTANCE WAS OFFERED. THE FAILURE MILEAGE WAS 85,000.[12]

g.      AT 55K MILES THE CHECK ENGINE LIGHT APPEARED. WE IMMEDIATELY TOOK THE CAR TO THE DEALER. WE ARE TOLD THAT THERE IS A COOLANT INTRUSION IN A CYLINDER AND THAT THE ENTIRE ENGINE WILL NEED TO BE REPLACED. THE VEHICLE WARRANTY STARTED JUNE 26, 2015. THE VEHICLE WAS CHECKED INTO THE DEALER 6/30/2020, 4 DAYS AFTER THE 5 YEAR/60 MILE WARRANTY EXPIRED. DAYS EXPIRED, NOT MILAGE. WE ARE BEING TOLD BY THE DEALER AND FORD CUSTOMER SERVICE THAT NOTHING WILL BE DONE TO FIX THE CAR EVEN THOUGH THE ISSUE IS A KNOWN PROBLEM AND THE REPLACEMENT ENGINE THAT WOULD BE INSTALLED IS COMPLETELY REDESIGNED DUE TO THE KNOWN DEFECT.[13]

h.      I BOUGHT THE CAR NEW. SEVERAL MONTH'S AGO I HEARD WATER SLOSHING CHECK ENGINE LIGHT CAME ON, OVERHEATING LIGHT ALONG WITH MANY OTHERS. THE CAR SHUT OFF ON A VERY BUSY HIGHWAY ALMOST CAUSED ME TO GET FROM BEHIND.

---

[11] NHTSA ID Number: 11339218, Incident Date July 8, 2020.

[12] NHTSA ID Number: 11339266, Incident Date July 10, 2020.

[13] NHTSA ID Number: 11338041, Incident Date June 30, 2020.

FIRST AMENDED CLASS ACTION
COMPLAINT FOR DAMAGES
CASE NO. 2:20-CV-01796-TLN-CKD

THE CAR WAS NOT OVERHEATING. REPLACED WATER PUMP, COIL PACK, PLUGS, SEVERAL SENSORS. DDREOVER AGAIN VEH SHUT OFF SAMETHING. TOOK TO SHOP #1 FOUND COOLANT IN THE ENGINE CRACK BLOCK. NOW ITS AT FORD DEALERSHIP DIAGNOSED SAMEE AS SHOP #1. CALLED FORD THEY STATED NOTHING THEY WILL DO. FORRDD EXPERT SAID SEVERAL HAS BEEN REPORTED BUT NO RECALL YET.[14]

69.     As is made apparent by the above examples and those discussed earlier in this Complaint, consumers have repeatedly and clearly alerted NHTSA ODI about the Engine Defect and Ford was, or should have been, aware of and monitoring those complaints. Thus, Ford should have known about the defect plaguing Ecoboost engines in the Class Vehicles.

70.     In sum, as early as 2010, and certainly well before Plaintiffs and Class Members purchased or leased their Class Vehicles, Ford was aware of the Engine Defect, should have been aware of the Engine Defect through the exercise of reasonable care, and/or was negligent in failing to be aware of the Engine Defect, based on, among others, the following sources:

        a.      Data gathered during pre-release design, manufacturing, engineering, and testing;

        b.      Data gathered by Ford regarding an abnormally large number of requested repairs dealing with leaking coolant and/or engine failures in Ecoboost engines, including the need for full engine replacements at low vehicle mileage;

        c.      Data about the large number of replacement engines for Class Vehicles ordered from Ford;

        d.      The multitude of consumer complaints regularly lodged with NHTSA and Ford regarding the Ecoboost engines overheating, misfiring, failing, and / or catching on fire;

        e.      Ford service center employees' familiarity with the Engine defect.

71.     Moreover, the large number and consistency of Class Member complaints describing the propensity of Ecoboost engines in Class Vehicles to leak coolant, expel white smoke, shut down while in use, and spontaneously catch fire demonstrate that Class Members consider the Engine Defect to be a material safety issue to the reasonable consumer.

---

[14] NHTSA ID Number: 11320502, Incident Date December 2, 2019.

## VI.    Ford Received Pre-Suit Notice.

72.     In addition to the other forms of notice outlined above, Ford received pre-suit notice of its violations alleged in this Complaint via a letter sent to Ford and its registered service agent on July 10, 2020, on behalf of Ms. Miller and all others similarly situated. Ford responded to the letter on August 7, 2020. The parties did not resolve the claims.

## VII.   Applicable Warranties

73.     Ford sold and leased the Class Vehicles with a written express warranty covering the Vehicles for three years or 36,000 miles, whichever comes first.

74.     Ford's New Vehicle Limited Warranty expressly states that Ford will "without charge, repair, replace, or adjust all parts on your vehicle that malfunction or fail during normal use during the applicable coverage period due to a manufacturing defect in factory-supplied materials or factory workmanship" so long the Vehicle is properly operated and maintained and taken to a Ford dealership for repair within the warranty period.

75.     Ford further provides powertrain warranty coverage, which is applicable to "the Engine: all internal lubricated parts, cylinder block, cylinder heads, electrical fuel pump, powertrain control module, engine mounts, flywheel, injection pump, manifold (exhaust and intake), manifold bolts, oil pan, oil pump, seals and gaskets, engine thermostat, engine, thermostat housing, timing chain cover, timing chain (gears or belt), turbocharger/supercharger unit, valve covers, water pump" as well as the components in the transmission, front-wheel drive, rear-wheel drive, and four-wheel/all-wheel drive.  This coverage applies for 5-years or up to 60,000 miles, whichever comes first.

76.     For certified pre-owned ("CPO") Vehicles, Ford offers a limited warranty covering CPO Vehicles for 12 months or 12,000 miles, whichever comes first.

77.     Ford's CPO Vehicle warranty states that a dealer will replace "all covered components . . . that are found to be defective in factory-supplied materials or workmanship during the applicable warranty periods." The engine and its components—including the cylinder block and cylinder heads—are included in Ford's list of "covered components."

78.     Ford provides these warranties to buyers and lessees after the purchase/lease of the Class Vehicle is completed; buyers and lessees have no pre-sale/pre-lease knowledge or ability to bargain as to the terms of the warranties.

79.     Finally, Ford sells replacement parts, including engines and engine components, through its Motorcraft parts brand, and provides an express written warranty with all new Ford and Motorcraft replacement parts. That warranty provides that for parts sold on or after October 1, 2013, parts found to be defective in factory-supplied material or workmanship will be repaired, replaced, or exchanged within 24 months of part purchase, regardless of the number of miles driven.

**VIII.   Ford's Prior Safety Recall**

80.     On March 27, 2017, Ford issued a Recall—NHTSA Campaign Number 17V209000—applicable to "certain 2014 Escape, 2014-2015 Fiesta ST, 2013-2014 Fusion and 2013-2015 Transit Connect vehicles equipped with 1.6L GTDI engines." The recall notice stated that, because of an insufficient coolant level, the "engine cylinder head may overheat, crack, and leak oil."

81.     The Recall, which was set to begin on January 5, 2018, provided for the installation of a coolant level sensor, free of charge. The sensor would alert drivers and vehicle owners/leasers when the coolant in the engine required replenishment.

82.     The Recall did not mention the risk of engine fires or total engine failure, and it did nothing to prevent the continued coolant leakage.

83.     The Recall was inadequate for several reasons. First, as already noted, the Recall did not address the true source of the problem and did nothing to ameliorate the issue. Second, it did not encompass the full range of Vehicles affected by the defect.

84.     The Recall applied only to 1.6L Ecoboost engines, although 1.5L and 2.0L Ecoboost engines have the same engine block design, are made from the same materials, and likewise suffer from the Engine Defect.

85.     Additionally, the Recall did not apply to all of the vehicle models and model years outfitted with the defective Ecoboost engines. Despite the numerous customer complaints

1    reported to Ford and NHTSA, as detailed above, Ford has never expanded the applicability of the

2    Recall to other vehicle models and model years.

3         86.    In 2018, Ford supplemented its initial Recall. This supplement acknowledged the

4    possibility of engine fires, but still did not include 1.5L or 2.0L engines, did not apply to the full

5    class of vehicles equipped with defective Ecoboost engines, and did not address the underlying

6    defect. Rather, it identified the problem as "localized overheating of engine cylinders."

7         87.    Instead, the supplement called for "enhancements to the engine cooling and

8    control systems" and repairs to damage caused by cracked cylinder heads resulting from

9    overheating. The supplement did not provide for replacement engines.

10        88.    Furthermore, although the Recall provides that the coolant sensor installation and

11   the specific repairs and "enhancements" will be completed free of cost, it does not call for

12   reimbursement of consumers' repeated costs to have the Vehicles' coolant replenished, to replace

13   totally failed engines, to reimburse consumers for vehicles lost to engine fires, and it does not

14   compensate consumers for the costs and expenses associated with the time during which they are

15   unable to use their vehicle as a result of the recurrent Engine Defect.

16        89.    The Recall, including the supplement, is insufficient to address the underlying

17   Engine defect, and does not come close to adequately and wholly compensating Plaintiffs and

18   Class Members for the injuries caused by the Engine Defect and Ford's related acts and

19   omissions.

20   **IX.    Ford's Marketing and Concealment**

21        90.    Upon information and belief, Ford knowingly marketed, advertised, and sold /

22   leased the Class Vehicles with the Engine Defect while willfully concealing the true—

23   defective—quality and safety risks of the Ecoboost engines installed in these Vehicles.

24        91.    Ford markets the Class Vehicles directly to consumers through nationwide

25   multimedia advertising campaigns on television, the Internet, billboards, print publications,

26   mailings, and through other mass media. Ford touts the safety and quality of Class Vehicles,

27   despite its knowledge that the Vehicles are equipped with an Engine Defect that poses severe

28   risks to drivers, passengers, and the public.

92.     For instance, in a brochure marketing the 2018 Fusion, Ford describes itself as "steadfast about safety," and specifically identifies the Fusion as "proof of [the company's] commitment to safety." In brochures advertising the 2013 Ford Fusion and 2014 Ford Escape, Ford markets the vehicle as "Quality, Green, Safe, Smart." The 2014 Escape, according to Ford, "proves you can get style, function, and fun in one well-priced package." And the Ecoboost engine, according to Ford, "offer[s] a no-compromise combination of power and efficiency."

93.     But in actuality, the Class Vehicles fall far short of these promises. Ford failed to inform consumers of the Engine Defect, which causes coolant to leak into the cylinders, leads to smoke emitting from the exhaust, requires repeated and frequent coolant replacement, and results in cracked cylinder heads, engine overheating, total engine failure—at times while the car is moving at high speeds—and spontaneous engine fires.

94.     These hazards do not live up to Ford's assurances of its "commitment to safety" and the "confidence" that Ford promoted to its customers. Ford concealed from consumers the Engine Defect and its outcomes, and misled the public about the actual quality of the Class Vehicles.

95.     Plaintiffs and Class Members were exposed to Ford's long-term, national, multimedia marketing campaign touting the supposed quality, safety, and comfort of the Class Vehicles, and Class Members, including Plaintiffs, justifiably made their decisions to purchase or lease their Class Vehicles based on Ford's misleading marketing that concealed the true, defective nature of the Class Vehicles.

96.     As detailed above, upon information and belief, Ford has been aware of the Engine Defect since at least 2010, and certainly well before Plaintiffs and Class Members purchased or leased their Class Vehicles, through pre-release evaluation and testing; the high number of repairs and replacement part sales related to the Engine Defect; and the numerous and consistent complaints about the Engine Defect collected by NHTSA.

97.     Through its acts and omissions, Ford has actively concealed the existence and natures of the Engine Defect from Class Members, including Plaintiffs, since at least 2010. Specifically, Ford:

1          a.     Failed to disclose, and actively concealed, before, at the time of, and after

2    the purchase, lease, and / or service of the Vehicles, any and all known material defects of the

3    Class Vehicles, including the Engine Defect;

4          b.     Failed to disclose, at the time of and after the purchase, lease, and or

5    service, that the Ecoboost engines installed in Class Vehicles were defective and not fit for their

6    intended purpose;

7          c.     Failed to disclose, and actively concealed, the existence and pervasiveness

8    of the Engine Defect even when Class Members directly inquired about potential defects affecting

9    their Ecoboost engines during communications with Ford, Ford dealerships, and Ford service

10   centers;

11         d.     Actively concealed the Engine Defect by forcing Class Members to bear

12   the cost of stop-gap "solutions" that only temporarily alleviated the symptoms of the defect

13   without permanently and effectively curing the defect;

14         e.     Actively concealed the Engine Defect by failing to issue a comprehensive

15   and effective Recall providing for the replacement of the defective Ecoboost engines with non-

16   defective engine blocks, and instead, only when the Vehicles remained under warranty, providing

17   for the replacement of one defective, failed engine block with yet another similarly and equally

18   defective engine block.

19         98.     By engaging in the conduct described above, Ford has concealed, and continues to

20   conceal, the Engine Defect from Class Members. If Class Members had had knowledge of the

21   information Ford concealed, they would not have purchased or leased the Class Vehicles or

22   would have paid less to do so.

23                    **FRAUDULENT CONCEALMENT ALLEGATIONS**

24         99.     Plaintiffs' claims arise out of Ford's fraudulent concealment of the Engine Defect,

25   and its representations about the quality, safety, and comfort of the Class Vehicles. To the extent

26   that Plaintiffs' claims arise from Ford's fraudulent concealment, there is no one document or

27   communication, and no one interaction, upon which Plaintiffs base their claims. Absent

28   discovery, Plaintiffs are unaware of and unable through reasonable investigation to obtain the true

FIRST AMENDED CLASS ACTION
COMPLAINT FOR DAMAGES
CASE No. 2:20-CV-01796-TLN-CKD

1    names and identities of those individuals at Ford responsible for disseminating false and

2    misleading marketing materials regarding the Class Vehicles. Ford necessarily is in possession of

3    all of this relevant information.

4        100.    Plaintiffs allege that at all relevant times, including specifically at the time he and

5    other Class Members purchased or leased their Class Vehicles, Ford knew or should have known

6    of the Engine Defect; Ford was under a duty to disclose the Defect based upon its exclusive

7    knowledge of it, and its concealment of it; and Ford never disclosed the Defect to Plaintiffs, Class

8    Members, or the public at any time or place or in any manner other than an inadequate and

9    ineffective recall of a small subset of the Class Vehicles.

10       101.    Plaintiffs make the following specific fraud allegations with as much specificity as

11   possible absent access to the information necessarily available only to Ford:

12           a.    *Who*: Ford actively concealed the Engine Defect from Plaintiffs and Class

13   Members while simultaneously touting the safety, comfort, and quality of the Class Vehicles,

14   including as alleged in paragraphs 90-98, above. Plaintiffs are unaware of, and therefore unable to

15   identify, the true names and identities of those specific individuals at Ford responsible for such

16   decisions.

17           b.    *What*: Ford knew, or was reckless or negligent in not knowing, that the

18   Class Vehicles contain the Engine Defect, including as alleged above in paragraphs 55-71. Ford

19   concealed the Defect and made representations about the safety, comfort, quality, and other

20   attributes of the Class Vehicles, including as alleged above in paragraphs 90-98.

21           c.    *When*: Ford concealed material information regarding the Defect at all

22   times and made representations about the quality, safety, and comfort of the Class Vehicles,

23   starting no later than 2010, or at the subsequent introduction of certain models of Class Vehicles

24   to the market, continuing through the time of sale/lease, and on an ongoing basis, and continuing

25   to this day, including as alleged above in paragraphs 90-98. Ford still has not disclosed the truth

26   about the full scope of the Defect in the Class Vehicles to anyone outside of Ford. Ford has never

27   taken any action to inform consumers about the true nature of the Defect in Class Vehicles. And

28   when consumers brought their Vehicles to Ford complaining of the problems with their Ecoboost

FIRST AMENDED CLASS ACTION
COMPLAINT FOR DAMAGES
CASE NO. 2:20-CV-01796-TLN-CKD

engines, including recurrent coolant leakage, smoking, failures, and fires, Ford denied any knowledge of or responsibility for the Engine Defect.

d.      *Where*: Ford concealed material information regarding the true nature of the Defect in every communication it had with Plaintiffs and Class Members and made representations about the quality, safety, and comfort of the Class Vehicles. Plaintiffs are aware of no document, communication, or other place or thing, in which Ford disclosed the truth about the full scope of the Defect in the Class Vehicles to anyone outside of Ford. Such information is not adequately disclosed in any sales documents, displays, advertisements, warranties, owner's manuals, or on Ford's website.

e.      *How*: Ford concealed the Engine Defect from Plaintiffs and Class Members and made representations about the quality, safety, and comfort of the Class Vehicles. Ford actively concealed the truth about the existence, scope, and nature of the Defect from Plaintiffs and Class Members at all times, even though it knew about the Defect and knew that information about the Defect would be material to a reasonable consumer, and Ford promised in its marketing materials that Class Vehicles have qualities that they do not have.

f.      *Why*: Ford actively concealed material information about the Engine Defect in the Class Vehicles for the purpose of inducing Plaintiffs and Class Members to purchase and/or lease Class Vehicles, rather than purchasing or leasing competitors' vehicles and made representations about the quality, safety, and comfort of the Class Vehicles. Had Ford disclosed the truth—for example, in its advertisements or other materials or communications— Plaintiffs and Class Members (all reasonable consumers) would have been aware of it, and would not have bought or leased the Class Vehicles or would have paid less for them.

## TOLLING AND THE STATUTE OF LIMITATIONS

### I.      Fraudulent Concealment and Equitable Tolling

102.    Upon information and belief, Ford has known of the Engine Defect in the Class Vehicles since at least 2010, and certainly well before Plaintiffs and Class Members purchased or leased their Class Vehicles, and yet has concealed from or failed to notify Plaintiffs, Class

1    Members, and the public of the full and complete nature of the Engine Defect. Ford continues to

2    conceal the scope and extent of the Defect to this day, as detailed above.

3        103.    Moreover, Ford's attempts to conceal the defect also include conducting

4    insufficient "Band Aid" repairs during the warranty period, including replacing only certain

5    components, adding a low coolant sensor, and otherwise failing to replace the defective parts with

6    non-defective parts.

7        104.    Any applicable statute of limitations has been tolled by Ford's knowledge, active

8    concealment, and denial of the facts alleged herein, which behavior is ongoing.

9    **II.      Estoppel**

10        105.    Ford was and is under a continuous duty to disclose to Plaintiffs and Class

11   Members the true character, quality, and nature of the Class Vehicles. Ford actively concealed –

12   and continues to conceal – the true character, quality, and nature of the Class Vehicles and,

13   despite its awareness of the Engine Defect, knowingly made representations about the quality,

14   sophistication, state-of-the-art safety, and comfort of the Class Vehicles. Plaintiffs and Class

15   Members reasonably relied upon Ford's knowing representations and active concealment of these

16   facts. Based on the foregoing, Ford is estopped from relying on any statutes of limitations in

17   defense of this action.

18   **III.     Discovery Rule**

19        106.    The causes of action alleged herein did not accrue until Plaintiffs and Class

20   Members discovered that their Class Vehicles contained the Engine Defect.

21        107.    Plaintiffs and Class Members had no realistic ability to discern that the Class

22   Vehicles were defective until—at the earliest—after the Engine Defect caused their Ecoboost

23   engines to leak coolant, overheat (leading to, among other things, the cylinder heading cracking),

24   misfire, totally fail, and / or ignite. Even then, Plaintiffs and Class Members had no reason to

25   know the Ecoboost engine failures were caused by a defect in the Class Vehicles because of

26   Ford's active concealment of the Engine Defect.

27        108.    Plaintiffs and Class Members were not reasonably able to discover the Engine

28   Defect until after they had purchased or leased their Class Vehicles, despite their exercise of due

diligence, and their causes of action did not accrue until they discovered that the Engine Defect caused their Vehicles' Ecoboost engines to leak coolant fluid, misfire, overheat, catch on fire, and totally fail.

### CLASS ACTION ALLEGATIONS

109.    Plaintiffs bring this lawsuit as a class action on behalf of themselves and all other Class Members similarly situated pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3), (b)(2), and/or (c)(4). This Action satisfies the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements of those provisions.

110.    Plaintiffs bring this class action, including all causes of action stated below, on behalf of themselves and all other similarly situated members of the proposed Class (referred to herein as "Class Members") defined as follows:

> All persons who purchased or leased in California a 2013-2019 Ford Escape, 2013-2019 Ford Fusion, 2015-2018 Ford Edge, 2017-2019 Lincoln MKC, and 2017-2019 Lincoln MKZ (the "Class Vehicles") equipped with a 1.5L, 1.6L, or 2.0L Ecoboost engine.

111.    Plaintiffs intend to seek certification of a "Damages Subclass" under 23(b)(3) for all Class Members who have experienced Engine Defects and an "Owner Subclass" under Rule 23(b)(2) for purposes of declaratory relief as to future Engine Defects, as well as certification of other subclasses and particular issues under Rule 23 (c)(4), as warranted.

112.    Excluded from the proposed Class are:  (1) Ford, any entity or division in which Ford has a controlling interest, and its legal representatives, officers, directors, assigns, and successors; (2) the judicial officer(s) to whom this case is assigned, and the judicial officer(s) staff; (3) government entities; and (4) those persons who have suffered personal injuries as a result of the facts alleged herein. Plaintiffs reserve the right to amend the Class definition if discovery and further investigation reveal that the Class should be expanded, otherwise divided into subclasses, or modified in any other way.

### I.    Numerosity

113.    Although the exact number of Class Members is uncertain and can only be ascertained through appropriate discovery, the number is great enough such that joinder is

impracticable. The disposition of the claims of these Class Members in a single action will provide substantial benefits to all parties and to the Court. Class Members are readily identifiable from information and records in Ford's possession, custody, and/or control, as well as from records kept by the Department of Motor Vehicles.

## II.     Typicality

114.    The claims of Plaintiffs are typical of the claims of Class Members in that Plaintiffs, like all Class Members, purchased or leased a Class Vehicle designed, manufactured, marketed, distributed, warranted, sold/leased, and serviced by Ford. Plaintiffs, like all Class Members, have been damaged by Ford's misconduct in that she purchased/leased a Vehicle she would not have purchased/leased, or would not have purchased/leased at the price she paid, or incurred or will incur the cost of repairs relating to and caused by the Engine Defect. Furthermore, the factual bases of Ford's misconduct are common to all Class Members and represent a common thread of misconduct resulting in injury to all Class Members.

## III.     Adequate Representation

115.    Plaintiffs will fairly and adequately represent and protect the interests of the Class Members. Plaintiffs have retained counsel with substantial experience in prosecuting consumer class actions, including actions involving defective vehicles.

116.    Plaintiffs and their counsel are committed to vigorously prosecuting this action on behalf of Class Members and have the financial resources to do so. Neither Plaintiffs nor their counsel have interests adverse to those of Class Members.

## IV.     Predominance of Common Issues

117.    There are numerous questions of law and fact common to Plaintiffs and Class Members that predominate over any question affecting only individual Class Members, the answers to which will advance resolution of the litigation as to all Class Members.  These common legal and factual issues include:

a.    whether the subject engines in the Class Vehicles are defective;

b.    whether Ford knew or should have known about the Engine Defect, and, if so, how long Ford has known of the defect;

1     c. whether the defective nature of the Class Vehicles constitutes a material

2 fact reasonable consumers would have considered in deciding whether to purchase or lease a

3 Class Vehicle;

4     d. whether Ford had a duty to disclose the defective nature of the Class

5 Vehicles to Plaintiffs and Class Members;

6     e. whether Ford omitted and failed to disclose material facts about the Class

7 Vehicles;

8     f. whether Ford's concealment of the true defective nature of the Class

9 Vehicles induced Plaintiffs and Class Members to act to their detriment by purchasing or leasing

10 Class Vehicles;

11     g. whether Ford's representations and omissions about the true defective

12 nature of the Class Vehicles were likely to mislead or deceive, and therefore fraudulent, within

13 the meaning of California's Unfair Competition Law ("UCL");

14     h. whether Ford's representations and omissions about the true defective

15 nature of the Class Vehicles were and are unfair within the meaning of the UCL;

16     i. whether Ford represented, through its words and conduct, that the Class

17 Vehicles had characteristics, uses, or benefits that they did not actually have;

18     j. whether Ford represented, through its words and conduct, that the Class

19 Vehicles were of a particular standard, quality, or grade when they were of another;

20     k. whether Ford advertised the Class Vehicles with the intent not to sell/lease

21 them as advertised;

22     l. whether Ford's representations and omissions about the true defective

23 nature of the Class Vehicles were likely to create confusion or misunderstanding;

24     m. whether Ford's representations and omissions about the true defective

25 nature of the Class Vehicles were and are deceptive;

26     n. whether the Class Vehicles were unfit for the ordinary purposes for which

27 they were used, in violation of the implied warranty of merchantability;

28

o.     whether Plaintiffs and the other Class Members are entitled to a declaratory judgment stating that the Ecoboost engines in Class Vehicles are defective and/or not merchantable;

p.     whether Plaintiffs and the other Class Members are entitled to equitable relief, including, but not limited to, a preliminary and/or permanent injunction;

q.     whether Ford should be declared financially responsible for notifying all Class Members of the problems with the Class Vehicles and for the costs and expenses of permanently remedying the Engine Defect in the Class Vehicles;

r.     whether Ford is obligated to inform Class Members of their right to seek reimbursement for having paid to diagnose, repair, or replace the defective Ecoboost engines.

## V.     **Superiority**

118.     Plaintiffs and Class Members have all suffered and will continue to suffer harm and damages as a result of Ford's unlawful and wrongful conduct. A class action is superior to other available methods for fair and efficient adjudication of this controversy.

119.     Absent a class action, most Class Members would likely find the cost of litigating their claims prohibitively high and would therefore have no effective remedy at law. Because of the relatively small size of the individual Class Members' claims (compared to the cost of litigation), it is likely that only a few Class Members could afford to seek legal redress for Ford's misconduct. Absent a class action, Class Members will continue to incur damages, and Ford's misconduct will continue without remedy.

120.     Class treatment of common questions of law and fact would also be a superior method to multiple individual actions or piecemeal litigation in that class treatment will conserve the resources of the courts and the litigants, and will promote consistency and efficiency of adjudication.

**FIRST CAUSE OF ACTION**
**(Violation of California's Consumer Legal Remedies Act ("CLRA"),**
**Cal Civ. Code § 1750, et seq.)**

121.     Plaintiffs incorporate by reference each allegation set forth in paragraphs 1-120, above.

122.   Plaintiffs bring this cause of action on behalf of themselves and on behalf of the Class Members.

123.   Ford is a "person" as defined by the CLRA. Cal. Civ. Code § 1761(c).

124.   Plaintiffs and Class Members are "consumers" within the meaning of the CLRA. Cal. Civ. Code § 1761(d).

125.   The purchase and leases of Class Vehicles by Plaintiffs and the Class Members constitute "transactions" as defined by the CLRA. Cal. Civ. Code § 1761(e)

126.   The Class Vehicles constitute "goods" or "services" as defined by the CLRA. Cal. Civ. Code § 1761(a) and (b).

127.   Plaintiffs and Class Members purchased or leased the Class Vehicles primarily for personal, family, and household purposes as meant by the CLRA. Cal. Civ. Code § 1761(d).

128.   Ford's representations, active concealments, omissions, and failures to disclose regarding the Class Vehicles violated the CLRA in the following ways:

a.   Ford misrepresented the Class Vehicles had characteristics, uses, or benefits Class Vehicles did not in fact have (Cal. Civ. Code § 1770(a)(5));

b.   Ford misrepresented that the Class Vehicles were of a particular standard, quality, or grade when they were of another (Cal. Civ. Code § 1770(a)(7));

c.   Ford advertised the Class Vehicles with the intent not to sell/lease them as advertised (Cal. Civ. Code § 1770(a)(9));

d.   Ford misrepresented that the Class Vehicles and the warranties conferred or involved rights, remedies, or obligations that they did not (Cal. Civ. Code§ 1770(a)(14)); and

e.   Ford misrepresented that the Class Vehicles were supplied in accordance with previous representations when they were not (Cal. Civ. Code § 1770(a)(16)).

129.   Ford repeatedly engaged in these unfair and deceptive acts or practices in the course of its trade or business. These acts or practices were material, capable of deceiving a substantial portion of the purchasing public, and caused economic harm to purchasers and lessees of the Class Vehicles, including the Plaintiffs.

130.    By 2010, and well before the sale or lease of Class Vehicles, Ford knew or should have known about the Engine Defect affecting the Class Vehicles. Ford further knew or should have known that the Class vehicles were defectively designed or manufactured, that, as a result of this defect, the Ecoboost engines would repeatedly fail, and that they were not suitable for their intended use.

131.    Ford had exclusive knowledge of material facts concerning the existence of the Engine Defect in the Class Vehicles, and actively concealed that defect from consumers. It did so by denying the existence of a defect to consumers—such as Plaintiffs—who contacted Ford about the failures of their Ecoboost engines. Ford also concealed the Engine Defect by failing to provide an effective and permanent remedy to all of the Class Vehicles and by replacing failed engines with equally defective engines, bound to suffer from the same failures.

132.    Ford was under a duty to Plaintiffs and Class Members to disclose the defective nature of the Ecoboost engines, as well as the associated costs that would have to be repeatedly expended in order to temporarily address the failures caused by the Engine Defect, because:

   a.    Ford was in a superior position to know the true state of facts about the Engine Defect in the Class Vehicles;

   b.    Plaintiffs and Class Members could not reasonably have been expected to learn or discover that the Class Vehicles suffered from the Engine Defect until, at the earliest, the manifestation of the Defect; and

   c.    Ford knew that Plaintiffs and Class Members could not reasonably have been expected to learn or discover the Engine Defect prior to its manifestation.

133.    In failing to disclose the defective nature of the Class Vehicles, Ford knowingly and intentionally concealed material facts and breached its duty not to do so.

134.    The facts concealed or not disclosed by Ford to Plaintiffs and Class Members are material in that a reasonable consumer would have considered them to be important in deciding whether or not to purchase or lease a Class Vehicle. Moreover, a reasonable consumer would consider the Engine Defect to be an undesirable quality, as Plaintiffs and Class Members did. Had

1    Plaintiffs and other Class Members known that the Class Vehicles had the Engine Defect, they

2    would not have purchased or leased a Class Vehicle, or would have paid less for it.

3        135.    Plaintiffs and Class Members are reasonable consumers who did not expect their

4    Class Vehicles to contain a defective Ecoboost engine. It is a reasonable and objective consumer

5    expectation for consumers to expect that the engine will not suffer from repeated and continual

6    coolant leakage into the cylinders, causing overheating and leading the cylinder head to crack and

7    misfire, the vehicle to emit white smoke, and the engine to fail or spontaneously catch fire.

8        136.    As a result of Ford's misconduct, Plaintiffs and Class Members have been harmed

9    in that the Class Vehicles contain defective Ecoboost engines and suffer from repeated and

10   continual coolant leakage into the cylinders, causing overheating and leading the cylinder head to

11   crack, causing misfires, the vehicle to emit white smoke, and the engine to fail or spontaneously

12   catch fire—all of which create a grave risk of serious injury to person and property and cause

13   Class Members to spend money to attempt to remedy the Defect.

14       137.    As a direct and proximate result of Ford's unfair or deceptive acts or practices,

15   Plaintiffs and Class Members have suffered and will continue to suffer harm in that they have a

16   Vehicle with a defective Ecoboost engine and they have experienced and may continue to

17   experience their Class Vehicles' engines leaking coolant into the cylinders, causing overheating

18   and leading the cylinder head to crack, misfire, the vehicle to emit white smoke, and the engine to

19   fail or spontaneously catch fire, for which Ford has refused to provide and effective and

20   permanent fix.

21       138.    Plaintiffs and the Class seek to recover actual damages, an order enjoining Ford's

22   unfair or deceptive acts or practices and equitable relief under Cal. Civ. Code § 1780(e), and any

23   other just and proper relief available under the CLRA.

24       139.    In accordance with section 1782(a) of the CLRA, Plaintiffs' counsel has served

25   Ford with notice of its alleged violations of Cal. Civ. Code § 1770(a) relating to the Class

26   Vehicles purchased by Plaintiffs and Class Members, and demanded that Ford, within thirty (30)

27   days of such notice, correct or agree to correct the actions described therein and agree to

28   reimburse associated out-of-pocket costs. Ford responded to that letter on August 7, 2020 and did

1   not agree to correct the actions described therein, to reimburse associated out-of-pocket costs, or

2   otherwise to remedy the harm alleged.

3                              **SECOND CAUSE OF ACTION**
    **(Violation of California's Unfair Competition Law,**
4                    **Cal. Bus. & Prof. Code § 17200, et seq.)**

5          140.    Plaintiffs incorporate by reference each allegation set forth in paragraphs 1-120,

6   above.

7          141.    Plaintiffs bring this cause of action for themselves and on behalf of Class

8   Members.

9          142.    California Business & Professions Code § 17200 prohibits "unfair competition"

10  including any "unlawful, unfair, or fraudulent business practice" and "unfair, deceptive, untrue or

11  misleading advertising." Ford engaged in conduct that violated each of this statute's three prongs.

12         143.    Ford committed an unlawful business act or practice in violation of Cal. Bus. &

13  Prof. Code § 17200, *et seq.*, by systematically breaching its warranty obligations and by violating

14  the CLRA and the Song-Beverly Consumer Warranty Act as alleged above and below.

15         144.    Ford committed unfair business acts and practices in violation of Cal. Bus. & Prof.

16  Code § 17200, *et seq.*, because the acts and practices described herein, including but not limited

17  to Ford's failure to provide a permanent remedy to fix the Engine Defect, where immoral,

18  unethical, oppressive, unscrupulous, unconscionable, and/or substantially injurious to Plaintiffs

19  and Class Members. Ford's acts and practices were additionally unfair because the harm to

20  Plaintiffs and Class Members is substantial and is not outweighed by any countervailing benefits

21  to consumers or competition. Further, Ford's acts and practices were unfair in that they were

22  contrary to legislatively declared or public policy.

23         145.    Ford committed fraudulent business acts and practices in violation of Cal. Bus. &

24  Prof. Code § 17200, *et seq.*, when it concealed the existence and nature of the Engine Defect,

25  while representing in its marketing, advertising, and other broadly disseminated representations

26  that the Class Vehicles were, for example, high quality, functional, and "proof of [Ford's]

27  commitment to safety," and that Ford itself is "steadfast about safety," when, in fact, the Engine

28  Defect creates a significant and material safety hazard and inhibits the quality and functionality of

the Class Vehicles. Ford's representations, omissions, and active concealments about the Engine

Defect are likely to mislead the public with regard to the true defective nature of Class Vehicles.

146.    Ford's unfair or deceptive acts or practices occurred repeatedly in the course of

Ford's trade or business, and were likely to mislead a substantial portion of the purchasing public.

147.    Plaintiffs relied on Ford's material representations and nondisclosures and would

not have purchased/leased, or would have paid less for, the Class Vehicles had he known the

truth.

148.    As a direct and proximate result of Ford's unfair, unlawful, and deceptive

practices, Plaintiffs have lost money.

149.    Plaintiffs and Class Members seek an order enjoining Ford from committing such

unlawful, unfair, and fraudulent business practices, and seek restitution pursuant to Cal. Bus. &

Prof. Code § 17203.

### THIRD CAUSE OF ACTION
### (Breach of Implied Warranty Under the Song-Beverly Consumer Warranty Act)

150.    Plaintiffs incorporate by reference each allegation set forth in paragraphs 1-120,

above.

151.    Plaintiffs bring this cause of action for themselves and on behalf of Class

Members.

152.    Ford's Class Vehicles are "consumer goods" within the meaning of Cal. Civ. Code

§ 1791(a).

153.    Ford is a manufacturer within the meaning of Cal. Civ. Code § 1791(j).

154.    Plaintiffs and Class Members who purchased or leased their Class Vehicles within

the State of California are "buyers" and "lessees" within the meaning of Cal. Civ. Code

§§ 1791(b) and (h).

155.    Ford impliedly warranted to Plaintiffs and Class Members that its Vehicles were

"merchantable" within the meaning of Cal. Civ. Code §§ 1791(a) and 1792.

156.    Ford impliedly warranted to Plaintiffs and Class Members that it would repair or

replace any defective products, including the Ecoboost engine.

157.    The propensity of the Engine Defect to cause coolant to leak, seep into the cylinders, cause the cylinder head to crack, cause misfiring, cause white smoke to emit from the vehicle, cause the engine to fail and/or ignite renders the Class Vehicles to not be of the quality that a buyer or lessee would reasonably expect, and therefore not merchantable.

158.    The Engine Defect is latent and was present at the time of the sale/lease of Class Vehicles, and therefore the Vehicles were not merchantable at the time of sale/lease.

159.    The Class Vehicles do not conform to the promises and affirmations of fact made by Ford in its promotional materials and vehicle owner manuals in that the Engine Defect creates a safety hazard contrary to Ford's assurances that, among other things, it is "steadfast about safety" and that the Vehicles are "quality, comfortable, and "proof of [Ford's] commitment to safety."

160.    In violation of Cal. Civ. Code § 1791(a), Ford breached its implied warranty by selling/leasing defective Class Vehicles and refusing to permanently replace and/or repair the defective Ecoboost engines.

161.    The Engine Defect has deprived Plaintiffs and Class Members of the benefit of their bargain, and has caused the Class Vehicles to depreciate in value.

162.    Any attempt by Ford to limit or disclaim the implied warranties in a manner that would exclude coverage of the Engine Defect is unenforceable and void pursuant to Cal. Civ. Code §§ 1790.1, 1792.3, and 1793.

163.    As a result of Ford's breach of its implied warranties, Plaintiffs and Class Members have been damaged in an amount to be proven at trial and are entitled to incidental, consequential, and other damages and other legal and equitable relief, as well as costs and attorneys' fees, pursuant to Cal. Civ. Code §§ 1794 and 1795.4.

**FOURTH CAUSE OF ACTION**
**(Violation of the Magnuson-Moss Warranty Act, 15 U.S.C. §§ 2301, et seq.)**

164.    Plaintiffs incorporate by reference each allegation set forth in paragraphs 1-120, above.

165.    Plaintiffs bring this cause of action for themselves and on behalf of Class Members.

166.    This Court has jurisdiction to decide claims brought under 15 U.S.C. § 2301 by virtue of 28 U.S.C. §§ 1332(a) and (d).

167.    Plaintiffs are "consumers" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(3).

168.    Ford is a "supplier" and "warrantor" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. 2301(4)-(5).

169.    The Class Vehicles are "consumer products" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(1).

170.    15 U.S.C. § 2301(d)(1) provides a cause of action for any consumer who is damaged by the failure of a warrantor to comply with a written warranty.

171.    In its Limited Warranty, Ford expressly warranted that it would repair or replace defects in material or workmanship free of charge if those defects became apparent during the warranty period.

172.    Ford's Limited Warranty is a written warranty within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(6).  The Class Vehicles' implied warranty of merchantability is covered by 15 U.S.C. 2301(7).

173.    With respect to Class members' purchases or leases of the Class Vehicles, the terms of Ford's written warranty and implied warranty became part of the basis of the bargain between Ford, on the one hand, and Plaintiffs and each of the members of the proposed Class, on the other.

174.    Ford breached the implied warranty of merchantability.  Without limitation, the Class Vehicles have engines that leak coolant, overheat, fail, and in some instances catch fire, as described above, and which thus render the Class Vehicles unmerchantable.

175.    Ford breached its express Limited Warranty by refusing to repair the defective engines in the Class Vehicles.  Plaintiff Vanessa Miller presented her vehicle for repair after the engine failed for the second time, and instead of providing a non-defective replacement engine,

1   Ford, installed another engine with the same Engine Defect, and Ms. Miller was forced to pay

2   thousands of dollars out-of-pocket.

3          176.    Plaintiff Miller, individually and on behalf of the members of the proposed Class,

4   notified Ford of the Engine Defect in the Class Vehicles, and its corresponding breach of

5   warranty, through a notice letter delivered by courier on July 10, 2020 to Ford's registered agent

6   in Plymouth, MI. Ford acknowledged receipt through a response letter from its counsel, dated

7   August 7, 2020.

8          177.    Ford was also provided notice of the defect through thousands of consumer

9   complaints and information about service repairs from its dealerships.  Ford has not remedied the

10  breach.

11         178.    Further, Ford has refused to provide an adequate warranty repair for the Engine

12  Defect, thus rendering the satisfaction of any notice requirement futile. As stated above,

13  customers that have presented their vehicles for warranty repair due to engine overheating, smoke

14  emission, and engine failure have simply been provided either coolant sensors, replacement parts

15  that do nothing to fix the Engine Defect, or replacement defective engines.

16         179.    At the time of sale or lease of each Class Vehicle, Ford knew, should have known,

17  or was reckless in not knowing of the Class Vehicles' inability to perform as warranted, but

18  nonetheless failed to rectify the situation and/or disclose the Engine Defect. Under the

19  circumstances, the remedies available under any informal settlement procedure would be

20  inadequate, and any requirement that Plaintiffs and the members of the proposed Classes and

21  Subclasses resort to an informal dispute resolution procedure and/or afford Ford a reasonable

22  opportunity to cure its breach of warranties is excused and thus deemed satisfied.

23         180.    The amount in controversy of Plaintiffs' individual claims meet or exceed the sum

24  of $25. The amount in controversy in this action exceeds the sum of $50,000, exclusive of interest

25  and costs, computed on the basis of all claims to be determined in this lawsuit.

26         181.    As a direct and proximate result of Ford's breaches of its Limited Warranty and

27  the implied warranty of merchantability, Plaintiffs and the members of the proposed Class have

28  sustained damages in an amount to be determined at trial.

182.    Plaintiffs, individually and on behalf of all members of the proposed Class, seek all damages permitted by law, including the diminution in value of their vehicles, in an amount to be proven at trial.

**FIFTH CAUSE OF ACTION**
**(Breach of Implied Warranty)**

183.    Plaintiffs incorporate by reference each allegation set forth in paragraphs 1-120, above.

184.    Plaintiffs bring this cause of action for themselves and on behalf of Class Members.

185.    The Class Vehicles are and were at all relevant times "goods" within the meaning of, *inter alia*, Cal. Com. Code §§ 2105(1) and 10103(a)(8).

186.    Ford is and was at all relevant times a "merchant" with respect to the Class Vehicles, under, *inter alia*, Cal. Com. Code §§ 2104(1) and 10103(c), and a "seller" of the Class Vehicles, under § 2103(1)(d); and, with respect to leases, is and was at all relevant time a "lessor" of the Class Vehicles, under, *inter alia*, Cal. Com. Code § 10103(a)(16).

187.    Plaintiffs and Class Members are "buyers" or "lessees" within the meaning of, *inter alia*, Cal. Com. Code §§ 2103(a) and 10103(a)(14).

188.    When it sold or leased its Class Vehicles, Ford extended an implied warranty to Class Members that the Class Vehicles were merchantable and fit for the ordinary purpose for which they were sold or leased, pursuant to Cal. Com. Code §§ 2314, 10212, and 10214.

189.    Plaintiffs and other Class Members who purchased or leased a Class Vehicle directly from Ford are entitled to the benefit of their bargain:  a Vehicle with a nondefective Ecoboost engine that does not leak coolant and cause coolant to seep into the cylinders, resulting in the engine overheating, the cylinder head cracking, the engine misfiring, the engine totally failing, and/or the engine igniting.

190.    Plaintiffs and the Class Members who purchased or leased Certified Pre-Owned Class Vehicles are likewise entitled to the benefit of their bargains:  a Vehicle with a nondefective Ecoboost engine that does not leak coolant and cause coolant to seep into the cylinders, resulting

1     in the engine overheating, the cylinder head cracking, the engine misfiring, the engine totally

2     failing, and/or the engine igniting.

3         191.     Class Members who purchased Certified Pre-Owned Class Vehicles are the

4     intended ultimate consumers of the Class Vehicles, and therefore are third-party beneficiaries for

5     the purposes of implied warranty claims.

6         192.     Ford breached this implied warranty in that its Class Vehicles are (1) not fit for

7     ordinary use, and (2) not of a merchantable quality.

8         193.     The Engine Defect is latent and was present at the time of the sale/lease, and

9     therefore the Vehicles were not merchantable at the time of the sale/lease.

10         194.     Had the Engine Defect that existed at the time of sale/lease been known, the Class

11     Vehicles would not have been sold or leased, or would not have been sold or leased at the same

12     price for which Class Members paid.

13         195.     As a direct and proximate result of Ford's breach of the implied warranty of

14     merchantability, Plaintiffs and Class Members have been damaged in an amount to be proven at

15     trial.

16                     **SIXTH CAUSE OF ACTION**

                        **(Breach of Express Warranty)**

17

18         196.     Plaintiffs incorporate by reference each allegation set forth in paragraphs 1-120,

19     above.

20         197.     As set forth above, the written warranty provided to Plaintiffs and the proposed

21     Class specifically and expressly provides that Ford will "without charge, repair, replace, or adjust

22     all parts on your vehicle that malfunction or fail during normal use during the applicable coverage

23     period due to a manufacturing defect in factory-supplied materials or factory workmanship."

24         198.     As described herein, the Class Vehicles were manufactured with defective material

25     and such defect existed at the time the Vehicles left the manufacturing plant.  Plaintiffs and

26     members of the proposed Class submitted their Vehicles for warranty repairs as referenced

27     herein.  Ford failed to comply with the terms of the express written warranty provided to each

28

1  Class member, by failing and/or refusing to repair the subject materials defect under the Vehicle's

2  warranty as described herein.

3      199.    Ford's acts in failing and/or refusing to repair the Engine Defect during the

4  warranty period so as to bring the Vehicles into conformity with the express warranty, deprived

5  Plaintiffs and members of the proposed Class of their rights guaranteed to them under the express

6  warranty offered by Ford.

7      200.    As a direct and proximate result of the willful failure of Ford to comply with its

8  obligations under the express warranty, Plaintiffs and members of the proposed Class have

9  suffered actual and consequential damages.  Such damages include, but are not limited to, the cost

10  of repairing the Vehicles, the loss of the use and enjoyment of the subject Vehicle, and a

11  diminution in the value of the Vehicle containing the Engine Defect identified herein.

12
## SEVENTH CAUSE OF ACTION
### (Fraud by Concealment)
13

14      201.    Plaintiffs incorporate by reference each allegation set forth in paragraphs 1-120,

15  above.

16      202.    Plaintiffs bring this cause of action for themselves and on behalf of Class

17  Members.

18      203.    Ford concealed and suppressed material facts concerning the quality of the Class

19  Vehicles, and the Ecoboost engines Ford installed in Class Vehicles.

20      204.    Ford concealed and suppressed material facts concerning the serious Defect

21  causing the Ecoboost engines in Class Vehicles to leak coolant, allow the coolant to pool and seep

22  into the cylinders, causing the cylinder head to crack and the engine to misfire, overheat, and

23  totally fail and to catch fire. Upon information and belief, the Defect lies in the design of the

24  engine block of the Class Vehicles. Ford knew that Plaintiffs and Class Members would not be

25  able to inspect or otherwise detect the Defect prior to purchasing or leasing the Vehicles. Ford

26  further failed to disclose and/or denied the existence the Defect when Plaintiffs and Class

27  Members complained of the failure of their Ecoboost engines.

28

205.    Ford did so in order to boost confidence in its vehicles and falsely assure purchasers and lessees of Ford vehicles that the Class Vehicles were world-class, safe, warranted, and reliable vehicles, and concealed the information in order to prevent harm to Ford and its products' reputations in the marketplace and to prevent consumers from learning of the defective nature of the Class Vehicles prior to their purchase or lease.

206.    These false representations and omissions were material to consumers, both because they concerned the quality of the Class Vehicles and because the representations and omissions played a significant role in Plaintiffs' and Class Members' decisions to purchase or lease the Class Vehicles.

207.    Ford had a duty to disclose the Engine Defect in the Class Vehicles because it was known and/or accessible only to Ford; Ford had superior knowledge and access to the facts; and Ford knew the facts were not known to or reasonably discoverable by Plaintiffs and Class Members.

208.    Ford also had a duty to disclose because it made many general affirmative representations about the quality, warranty, and lack of defects in the Class Vehicles as set forth above, which were misleading, deceptive, and/or incomplete without the disclosure of the additional facts set forth above regarding the actual quality, comfort, and usability of Class Vehicles.

209.    Even when faced with complaints regarding the Defect, Ford misled and concealed the true cause of the symptoms complained of. As a result, Class Members were misled as to the true condition of the Class Vehicles once at the time of purchase or lease and again when the Ecoboost engine failure was complained of to Ford.

210.    The omitted and concealed facts were material because they directly impact the value, appeal, and usability of the Class Vehicles purchased or leased by Plaintiffs and Class Members. Whether a manufacturer's products are as stated by the manufacturer, backed by the manufacturer, and usable for the purpose for which they were purchased/leased, are material concerns to a consumer.

211.    Ford actively concealed and/or suppressed these material facts, in whole or in part, to protect its reputation, sustain its marketing strategy, and avoid recalls that would hurt the brand's image and cost money, and it did so at the expense of the Plaintiffs and Class Members.

212.    On information and belief, Ford has still not made full and adequate disclosure and continues to defraud Plaintiffs and Class Members and conceal material information regarding defects that exist in Ford vehicles.

213.    Plaintiffs and Class Members were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased or leased their Class Vehicles or would have paid less for them. Plaintiffs' and Class Members' actions were justified. Ford was in exclusive control of the material facts and such facts were not known to the public, Plaintiffs, or Class Members.

214.    Because of the concealment and/or suppression of the facts, Plaintiffs and Class Members sustained damages because they negotiated and paid value for the Class Vehicles not considerate of the Engine Defect that Ford failed to disclose, and they paid for temporary repairs and equally defective replacement parts to attempt to remedy the Defect. Had they been aware of the concealed Defect that existed in the Class Vehicles, Plaintiffs and Class Members would have paid less for their Vehicles or would not have purchased or leased them at all.

215.    Accordingly, Ford is liable to Plaintiffs and Class Members for damages in an amount to be proven at trial.

216.    Ford's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and Class Members' rights and well-being to enrich Ford. Ford's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

**EIGHTH CAUSE OF ACTION**
**(Unjust Enrichment)**

217.    Plaintiffs incorporate by reference each allegation set forth in paragraphs 1-120, above.

218.   Plaintiffs bring this cause of action for themselves and on behalf of Class Members.

219.   Ford has been unjustly enriched by Plaintiffs and Class Members purchasing/leasing Class Vehicles from Ford and purchasing replacement parts and services from Ford that Plaintiffs and Class Members would not have purchased/leased but for Ford's misconduct alleged above with respect to the Engine Defect.

220.   Plaintiffs and Class Members unknowingly conferred a benefit on Ford of which Ford had knowledge, since Ford was aware of the defective nature of the Class Vehicles' Ecoboost engines, but failed to disclose this knowledge and misled Plaintiffs and Class Members regarding the nature and quality of the Class Vehicles while profiting from this deception.

221.   The circumstances are such that it would be inequitable, unconscionable, and unjust to permit Ford to retain the benefit of profits that it unfairly obtained from Plaintiffs and Class Members.  These profits include the premium price Plaintiffs and the Class paid for the Class Vehicles and the cost of the parts and services bought from Ford to temporarily fix the defective engines.

222.   Plaintiffs and Class Members, having been damaged by Ford's conduct, are entitled to recover or recoup damages as a result of the unjust enrichment of Ford to their detriment.

## **PRAYER FOR RELIEF**

223.   Plaintiffs on behalf of themselves, and all others similarly situated, request the Court to enter judgment against Ford, as follows:

a.   an order certifying the proposed Class, any appropriate subclasses, and any appropriate classes with respect to particular issues, designating Plaintiffs as named representatives of the Class, and designating the undersigned as Class Counsel;

b.   a declaration that the Ecoboost engines in the Class Vehicles are defective;

c.   a declaration that Ford is financially responsible for notifying all Class Members about the defective nature of the Class Vehicles;

1              d.      an order enjoining Ford from further deceptive distribution, sales, and lease

2  practices with respect to the Class Vehicles;

3              e.      an order requiring Ford to permanently repair Class Vehicles, within a

4  reasonable time period and at no cost to Class Members, so that they no longer possess the

5  Engine Defect;

6              f.      an award to Plaintiffs and Class Members of compensatory, exemplary,

7  and statutory damages, including interest, in an amount to be proven at trial;

8              g.      a declaration that Ford must disgorge, for the benefit of Plaintiffs and Class

9  Members, all or part of the ill-gotten profits it received from the sale or lease of the Class

10  Vehicles, or make full restitution to Plaintiffs and Class Members;

11             h.      an award of attorneys' fees and costs, under Cal. Code Civ. Proc. § 1021.5,

12  15 U.S.C. § 2310(d)(1), and as otherwise allowed by law;

13             i.      an award of pre-judgment and post-judgment interest, as provided by law;

14             j.      such other relief as may be appropriate under the circumstances.

15

16                                **DEMAND FOR JURY TRIAL**

17      224.    Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury

18  of any and all issues in this action so triable of right.

19

20

21

22

23

24

25

26

27

28

Dated: November 5, 2020                    Respectfully submitted,

                                           /s/ Stuart C. Talley
                                           William A. Kershaw
                                           Stuart C. Talley
                                           Ian J. Barlow
                                           **KERSHAW, COOK & TALLEY PC**
                                           401 Watt Avenue
                                           Sacramento, California 95864
                                           Telephone: (916) 779-7000
                                           Facsimile: (916) 721-2501
                                           bill@kctlegal.com
                                           stuart@kctlegal.com
                                           ian@kctlegal.com

                                           Mark P. Chalos (*pro hac vice* forthcoming)
                                           LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
                                           One Nashville Place
                                           150 Fourth Avenue, Suite 1650
                                           Nashville, TN  37219-2423
                                           Telephone: (615) 313-9000
                                           mchalos@lchb.com

                                           Annika K. Martin
                                           Gabriel A. Panek  (*pro hac vice* forthcoming)
                                           LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
                                           250 Hudson Street, 8th Floor
                                           New York, NY  10013-1413
                                           akmartin@lchb.com
                                           gpanek@lchb.com

                                           Patrick Newsom (*pro hac vice* forthcoming)
                                           NEWSOM LAW PLC
                                           40 Music Square East
                                           Nashville, TN 37203
                                           Telephone: 615-251-9500
                                           patrick@newsom.law

                                           *Attorneys for Plaintiffs and the Proposed Class*