1  William A. Kershaw (S.B. #057486)
   Stuart C. Talley (S.B. #180374)
2  Ian J. Barlow (S.B. #262213)
   **KERSHAW, COOK & TALLEY PC**
3  401 Watt Avenue
   Sacramento, California 95864
4  Telephone: (916) 779-7000
   Facsimile: (916) 721-2501
5  stuart@kctlegal.com

6  Tarek H. Zohdy (SBN 247775)
   Cody R. Padgett (SBN 275553)
7  **CAPSTONE LAW APC**
   1875 Century Park East, Suite 1000
8  Los Angeles, California 90067
   Telephone:    (310) 556-4811
9  Facsimile:    (310) 943-0396
   Tarek.Zohdy@capstonelawyers.com
10 Cody.Padgett@capstonelawyers.com

11 [Additional Counsel on Signature Pages]

12 *Attorneys for Plaintiffs and the*
   *Proposed Classes and Subclasses*

13

14                    UNITED STATES DISTRICT COURT

15                    EASTERN DISTRICT OF CALIFORNIA

16 VANESSA MILLER, PATSY              Case No. 2:20-cv-01796-TLN-CKD
   LUND,AMBER WEST, EVAN WEST,       (Consolidated with Nos. 2:21-cv-00417-TLN-
17 DARRICK CHRISTODARO, AMY          CKD, 2:21-cv-00468-TLN-CKD)
   HOFFER, JAMES PADGETT, JILLIAN
18 CONSTABLE, MONTERIO BUTCHER,      **CONSOLIDATED CLASS ACTION**
   HARLAMPI BOZHINOV, MARY           **COMPLAINT FOR DAMAGES**
19 GLADE, TERESA BALSZEK, CRAIG
   MORFORD, KELLI MORFORD,
20 AARON MANFRA, VICTORIA
   MANFRA, STACEY COPPOCK,
21 RACHEL GOODRICH, BRIAN
   SIMONDS, DAVID SCHIAVI, ROBYN     **JURY TRIAL DEMANDED**
22 PIROG, ZACHARY SCOTT DAMM
   AMANDA GATES , AND SHARI
23 TECHLIN, as individuals and on behalf of
   all others similarly situated,
24
                   Plaintiffs,
25
   v.
26
   FORD MOTOR COMPANY,
27
                   Defendant.
28

## NATURE OF THE CASE

1.      Plaintiffs Vanessa Miller, Patsy Lund, Amber West, Evan West, Darrick Christodaro, Amy Hoffer, James Padgett, Jillian Constable, Monterio Butcher, Harlampi Bozhinov, Mary Glade, Teresa Balaszek, Craig Morford, Kelli Morford, Aaron Manfra, Victoria Manfra, Stacey Coppock, Rachel Goodrich, Brian Simonds, David Schiavi, Robyn Pirog, Benito Almanza, Tammy Almanza, Zachary Scott Damm, Amanda Gates, and Shari Techlin bring this action individually and on behalf of all persons who purchased or leased in Arkansas, California, Colorado, Florida, Georgia, Illinois, Indiana, Kansas, Maryland, Michigan, Minnesota, Missouri, New Jersey, North Carolina, Washington, and Wisconsin, certain Ford vehicles equipped uniformly with defective engines that were designed, manufactured, distributed, and sold/leased by Ford Motor Company and/or its related subsidiaries or affiliates ("Ford"), as further described below ("Class Members").

2.      The vehicles at issue in this action include certain Ford vehicles equipped with 1.5L, 1.6L, or 2.0L Ecoboost engines (the "Ecoboost engines"). These vehicles are 2013-2019 Ford Escapes, 2013-2019 Ford Fusions, 2015-2018 Ford Edges, 2017-2019 Lincoln MKCs, and 2017-2019 Lincoln MKZs (the "Class Vehicles").

3.      The Ecoboost engines in each of the Class Vehicles are substantially the same, from an engineering standpoint, notwithstanding their varying sizes. The Ecoboost engines in the Class Vehicles contain the same relevant components, made of the same materials.

4.      The Ecoboost engines in the Class Vehicles have a critical defect that causes engine coolant—which is vital to the safety and functionality of the engine—to leak into the engine's cylinders (the "Engine Defect"). The lack of coolant created by the leaks causes overheating, and can, even at low mileages, result in the cylinder head cracking and, in some instances, can cause total engine failures and engine fires. Presence of coolant within the cylinders of the engine, alone, can also cause corrosion, oil dilution and contamination, and engine failure.

5.      Ford has failed to provide an effective solution to consumers who purchased or leased Class Vehicles. Further, Ford has not satisfactorily or effectively addressed the source of the defect for those consumers, including for those whose vehicles remain in warranty. Instead of replacing the engine block, Ford merely applies superficial stop-gap, "Band-Aid" remedies such as installing coolant level sensors. This sensor alerts consumers when their coolant has been depleted, so that they can replenish it. It does not, however, prevent further future coolant depletion, or do anything

1

to prevent the coolant from seeping into the engine cylinders. In some instances, Ford just replaces certain parts other than the defective engine block, thereby failing to address the root cause of the Engine Defect.

6.      These half measures force consumers to return repeatedly for service and to continue driving a vehicle at risk of future damage to the engine and components, engine failure, and engine fires.

7.      Consumers whose Ecoboost engines overheat or fail when the vehicle is out of warranty must pay out-of-pocket for the necessary repairs and, again, may have to return for repeated service if Ford does not replace the defective engine with a non-defective engine block. These repairs, including a full engine replacement, can cost thousands of dollars.

8.      The Engine Defect interferes with Plaintiffs' and Class Members' safe, comfortable, and expected use of their Class Vehicles. It exposes them to severe risk created by engine failures and engine fires, and it requires them to pay for repairs and/or engine replacement.

9.      Discovery will show that before selling or leasing the Class Vehicles, Ford knew about the Engine defect through sources including pre-production testing, pre-production design failure mode analysis, pre-release evaluation and testing; repair and warranty data; replacement part sales data; high failure rates and analysis in response; early consumer complaints made directly to Ford and/or posted on public online vehicle owner forums; consumer complaints made to Ford's authorized dealerships, who are Ford's agents for vehicle sales, leases, servicing, and repairs, testing done in response to those complaints; aggregate data from Ford dealers; and other internal sources.

10.     Yet despite its knowledge, Ford failed to disclose and actively concealed the Engine Defect from Class Members and the public, and Ford has continued to market and advertise the Class Vehicles as safe, comfortable, and of high quality.

11.     As a result of Ford's alleged misconduct, Plaintiffs and Class Members were harmed and suffered actual damages, including that the Class Vehicles contain the Engine Defect, have manifested, and continue to manifest, the Engine Defect, and that Ford has not provided a permanent, no-cost remedy for this Defect within a reasonable amount of time. Furthermore, Plaintiffs and Class Members have incurred, and will continue to incur, out-of-pocket, unreimbursed

costs and expenses relating to the Engine Defect.

**PARTIES**

**Plaintiff Vanessa Miller**

12.     Plaintiff Vanessa Miller resides in Sacramento, California.

13.     Ms. Miller owns a 2017 Ford Edge, VIN 2FMPK4K96HBB28812, which contains a 2.0L Ecoboost engine. Ms. Miller purchased her vehicle from Enterprise Car Sales in Sacramento, California for personal, family, and household use. At the time of her purchase, the vehicle had 20,699 miles on it. The vehicle now has approximately 85,000 miles on it.

14.     As detailed below, as a result of the Engine Defect, Ms. Miller's 2017 Ford Edge has experienced two engine failures. The first occurred in June 2018 at approximately 36,853 miles. At that time, the vehicle was under warranty and Ford agreed to replace the defective engine. The replacement engine was similarly defective. The second instance of engine failure occurred a little over one year later, in November 2019, at about 85,000 miles. Rather than replace the defective engine at no cost, Ford told Ms. Miller that her car was no longer in warranty and that she had to pay thousands of dollars out of pocket to replace the engine.

15.     Prior to purchasing her vehicle, Ms. Miller researched the quality, reliability and safety of a variety of different vehicles. Based on her research and review of information regarding Ford, she believed Ford vehicles were of high quality, safe and reliable.

16.     Based on her belief, Plaintiff Vanessa Miller purchased her 2017 Ford Edge equipped with a 2.0L Ecoboost engine from Enterprise Car Sales in Sacramento, California in November 2017. At the time of purchase, the vehicle had 20,699 miles on it. Ms. Miller's decision to purchase the vehicle was also influenced by the fact that Ford's warranty still applied to the vehicle.

17.     Shortly after her purchase, in June 2018, the "check engine" alert light came on and the engine began to shake violently while the vehicle was in use. At that time, the vehicle had approximately 36,853 miles on it and it was under warranty. When Ms. Miller took the vehicle to a Ford dealership for repairs, the service center employee informed her that coolant was leaking into the engine system, and that the long block needed to be replaced. The engine block was replaced with an engine that apparently contained the same Engine Defect. The initial repair took

3

approximately three weeks, during which Ms. Miller was not able to enjoy the use of her vehicle.

18.     Less than two years later, in November 2019, due to the Engine Defect, Ms. Miller's 2017 Ford Edge began manifesting the same problems in the replacement engine as the vehicle's original engine had displayed in 2018, including total engine failure. Ford contended that the car was no longer in warranty and Ms. Miller had to pay out of pocket more than $6,000.

19.     On December 9, 2019, Ms. Miller's husband contacted Ford directly and spoke with a customer service representative. He alerted the representative that Ms. Miller had experienced yet another engine failure in her 2017 Ford Edge and was told that there were "no coverages for the engine" in her vehicle.

20.     Ford eventually agreed to pay a small portion—$1,500—of the repair costs, which totaled $7,579.19. This left Ms. Miller still forced to spend $6,079.19 out of pocket. Furthermore, this amount does not include the costs Ms. Miller had to bear related to being without the use of her vehicle for the time required to conduct the repairs.

21.     At no time prior to her purchase of the subject vehicle did Ford disclose to consumers including Ms. Miller, and she did not know, and had no reason to know or expect, that it contained the Engine Defect and that her Ecoboost engine would leak coolant, overheat, fail, and even potentially result in an engine fire. Ford failed to disclose to consumers including Ms. Miller, and Ms. Miller was not aware of, and did not have any reason to anticipate, the costly repairs that would be required for the vehicle as a result of the Engine Defect. If Ford had adequately disclosed these facts, Ms. Miller would not have bought her vehicle or would have paid less for it.

**Plaintiff Patsy Lund**

22.     Plaintiff Patsy Lund is a citizen of the State of Arkansas. Plaintiff resides in Fort Smith, Arkansas. Plaintiff owned a used 2016 Ford Escape with a 2.0L EcoBoost Engine, VIN 1FMCU9G95GUB74249.

23.     Before purchasing her vehicle, Ms. Lund conducted research online on the safety of and reliability of the vehicle. Ms. Lund had also seen television advertisements for the Ford Escape. Ms. Lund relied on these representations when she purchased the vehicle.

24.     On October 21, 2016, Ms. Lund purchased her vehicle from Fort City Motors in Fort Smith, Arkansas. The vehicle had approximately 14,532 miles on the odometer.

25.     Safety and reliability were important to Ms. Lund when she purchased the vehicle.

26.     Ms. Lund purchased her vehicle primarily for personal, family or household use.

27.     Ms. Lund took her vehicle in for service at a Ford Dealership to diagnose a check engine light. The Ford Dealership told Ms. Lund her vehicle was low on engine coolant. The Ford Dealership provided Ms. Lund with a loaner vehicle and two weeks later advised her that the vehicle's engine would need to be replaced. The Ford Dealership told Ms. Lund the engine in those vehicles was obsolete and that her vehicle would need another engine that would not be available until summer of 2021. The Dealership said that Ms. Lund couldn't continue a loaner vehicle for that long and the best they could do was offer a trade in because her vehicle could not be repaired.

28.     If Ford disclosed its knowledge of the Engine Defect to Ms. Lund, she would not have purchased the Vehicle or paid less for her Vehicle.

29.     Ms. Lund has attempted to drive her Vehicle in a manner that was both foreseeable and in which it was intended to be used.

30.     Ms. Lund provided pre-suit notice to Ford.

31.     At all times, Ms. Lund, like other class members, has attempted to drive her vehicle in a manner that was both foreseeable and in which it was intended to be used.

**Plaintiffs Amber and Evan West**

32.     Plaintiffs Amber and Evan West (the "Wests") reside in Palmdale, California.

33.     The Wests own a 2013 Ford Fusion, 3FA6P0HR2DR345079, which contains a 1.6L Ecoboost engine. The Wests purchased their vehicle new from Antelope Valley Ford in Palmdale, California for personal, family, and household use.

34.     As detailed below, as a result of the Engine Defect, the Wests' 2013 Ford Fusion experienced numerous issues beginning in September 2016, including that the engine would overheat and shut down while the vehicle was being driven. The Wests sought to have the problem diagnosed while the vehicle was under warranty but Ford only replaced the coolant sensor and told

the Wests to add more coolant to the engine. After the warranty period on their 2013 Ford Fusion expired, the vehicle continued to experience the same issues. Antelope Valley Ford finally diagnosed their vehicle as suffering from the engine defect and told the Wests they had to pay $6,800 out of pocket to replace the engine.

35. At no time prior to their purchase of the subject vehicles did Ford disclose to consumers including the Wests, and they did not know, and had no reason to know or expect, that their vehicles contained the Engine Defect and that the Ecoboost engine would leak coolant, overheat, fail, and even potentially result in an engine fire. Ford failed to disclose to consumers including the Wests, and the Wests were not aware of, and did not have any reason to anticipate, the costly repairs that would be required for the vehicle as a result of the Engine Defect. If Ford had adequately disclosed these facts, Ms. Miller and the Wests would not have bought their vehicles or would have paid less for it. Prior to purchasing their vehicle, the Wests did significant research on the internet with respect to the various vehicles that were within their price range. Because the Wests planned on using the vehicle to transport their young children, one of the most important considerations in their purchasing decision was that the vehicle be reliable and safe. Based on the representations made on Ford's website, the Wests believed that Ford vehicles were safe, reliable, and utilized state-of-the-art safety technology.

36. After conducting preliminary research, the Wests decided to visit an authorized Ford dealership, Antelope Valley Ford, to obtain more information about the Ford Fusion. Specifically, on or about May 27, 2013 the Wests met with a Ford salesman at Antelope Valley Ford. This individual, whose name is currently unknown to Plaintiffs, told the Wests that Ford's Ecoboost engine that came standard with the Ford Fusion was state of the art. He also stressed that vehicle was one of the safest on the highway with a five-star safety rating from the National Highway Traffic Safety Administration (NHTSA). This five-star NHTSA rating was also prominently displayed on a sticker in the vehicle's window. These representations concerning the quality of the Ecoboost engine and the safety of this vehicle were consistent with Ford's marketing of its vehicles, were important to the Wests' purchasing decision, and were substantial factors that caused them to purchase the subject Ford Fusion.

37.     At no time prior to their purchase of the subject vehicle did Ford disclose to consumers including the Wests, and they did not know, and had no reason to know or expect, that it contained the Engine Defect and that their Ecoboost engine would leak coolant, overheat, fail, and even potentially result in an engine fire. Ford failed to disclose to consumers including the Wests, and the Wests were not aware of, and did not have any reason to anticipate, the costly repairs that would be required for the vehicle as a result of the Engine Defect. If Ford had adequately disclosed these facts, the Wests would not have bought her vehicle or would have paid less for it.

38.     Despite Ford's representations concerning the reliability and safety of the Ford Fusion, the Wests' experience with their vehicle has demonstrated the opposite. The first incident with the vehicle occurred in September 2016 at approximately 47,812 miles, during the vehicle's express warranty period, when the vehicle suddenly lost all power when being driven by Mr. West on the highway. After approximately 10 minutes, the engine started and Mr. West was able to return the vehicle to his home. Thereafter it was towed to Antelope Valley Ford to be repaired. Ford told Mr. West that there was a problem with the coolant sensor. Although Ford knew the engine in the Wests' 2013 Ford Fusion was leaking coolant, the dealership only replaced the sensor and told the Wests to add more coolant to the engine. Ford did not tell the Wests that their vehicle was suffering from the Engine Defect.

39.     Installing the new sensor and adding more coolant failed to fix the Engine Defect. The Wests continued to experience problems with their car: the car would overheat and stop working shortly after starting up, and the "check engine" alert light was frequently illuminated. The Wests brought their 2013 Ford Fusion to the dealership three more times—on June 5, 2017, November 22, 2017, and May 9, 2018, during the vehicle's express warranty period—for repairs related to the loss of coolant from the vehicle's engine. Rather than actually repair the vehicle, on each occasion the dealership merely told the Wests to add more coolant to the engine. The Wests' problems with their vehicle continued after its express warranty expired. On February 5, 2020, March 10, 2020, July 18, 2020, September 22, 2020, and October 7, 2020 they brought the vehicle to Palmdale Firestone, a third party repair facility. Firestone diagnosed the vehicle as having problems with its fuel injectors and replaced the injectors. However, the problems continued. Eventually, the facility determined

7

that it was unable to the root cause of the numerous failures and directed the Wests to a Ford dealership for further evaluation. Antelope Valley Ford finally told the Wests that their vehicle—which was by this point out of warranty—was suffering from a coolant leak. Ford advised the Wests that their vehicle, which had only been driven 86,950 miles, needed a new engine. The cost of the new engine is $6,800. Faced with no other choice, the Wests paid the $6,800 to repair their engine. In addition, they have spent approximately $1,500 on motor oil, coolant, and sparkplugs trying to fix the Engine Defect since they first brought their vehicle in for repairs in 2016.

40.     At the time the Wests purchased their vehicle, they did not know, and had no reason to know or expect, that it contained the Engine Defect and that their Ecoboost engine would leak coolant, overheat, fail, and even potentially result in an engine fire. They were not aware of, and did not have any reason to anticipate, the costly repairs that would be required for the vehicle as a result of the Engine Defect. If they had known these facts, they would not have bought the vehicle or would have paid less for it.

**Plaintiff Darrick Christodaro**

41.     In February 2017, Plaintiff Darrick Christodaro needed a new car. Before making the purchase, Mr. Christodaro researched the quality, reliability, and safety of a variety of different vehicles. Based on his research and review of information regarding Ford, he believed Ford's representations that its vehicles were of high quality, safe, and reliable. He also knew Ford vehicles came with a 3-year/36,000-mile bumper-to-bumper warranty and a 5-year/60,000-mile powertrain warranty.

42.     Based on this research and knowledge, Mr. Christodaro purchased a new 2017 Ford Escape, VIN 1FMCU9GD5HUD28657, equipped with a 1.5L Ecoboost engine. Mr. Christodaroo bought the car at Western Slope Auto, an authorized Ford dealership in Grand Junction, Colorado, near where he lived at the time.

43.     In June 2017, Mr. Christodaro moved from Grand Junction to Fredonia, New York.

44.     On December 12, 2019, Ford issued Customer Satisfaction Program ("CSP") #19B37. This CSP informed Ford dealers that 2017-2019 Ford Escape and Fusion "may exhibit coolant

intrusion into the cylinder bores" and symptoms include "coolant loss, excessive tailpipe smoke, or illuminated malfunction indicator lights (MIL) due to engine misfire. Over time, this condition may damage the engine, requiring replacement of the engine short block." The CSP instructed the dealers "to reprogram the Powertrain Control Module (PCM)" in order to "improve cooling and reduce the potential for coolant intrusion into the cylinders." The CSP said this service "must be performed on all affected vehicles at no charge to the vehicle owner" and that dealers "should repair any affected vehicles that arrive at their dealerships, whether or not the customer has received a letter" informing them of the defect. The CSP was in effect through June 30, 2021.

45.     In January 2020, Mr. Christodaro received a letter from Ford with information about CSP #19B37.

46.     On February 14, 2020, Mr. Christodaro brought his vehicle in for a service appointment at Shults Ford-Lincoln, an authorized Ford dealership in Jamestown, New York. At this time, the vehicle had only 59,918 miles on it. As such, the vehicle was still covered by Ford's powertrain warranty. Specifically mentioning CSP #19B37, Mr. Christodaro asked Shults Ford-Lincoln to check his car for signs of the issues described in the CSP notice. Shults Ford-Lincoln reprogrammed Mr. Christodaro's vehicle's PCM. Nevertheless, the dealership told Mr. Christodaro that no coolant leakage was detected so no further repair was made.

47.     Less than a month later, Mr. Christodaro attempted to turn his vehicle on. The vehicle, which had been working normally, was suddenly without power. When Mr. Christodaro finally got the vehicle to start, it started shaking violently and shut down again. The "check engine" alert light then illuminated.

48.     Mr. Christodaro brought his vehicle back to Shults Ford-Lincoln on March 10, 2020. By this point, Mr. Christodaro's vehicle had 61,272 miles on it and it was therefore barely out of warranty. Shults Ford-Lincoln told Mr. Christodaro they would have to perform a pressure check on his vehicle. Although the mechanic at Shults Ford-Lincoln observed coolant on the vehicle's spark plug, the dealership declined to make any repairs beyond replacing one of the vehicle's spark plugs. As it was, Mr. Christodaro had to pay $176 out of pocket for the pressure check.

49.     Throughout that spring, Mr. Christodaro continued to experience the same problem

9

with his vehicle: the car would regularly refuse to start or misfire. On June 11, 2020, he brought the vehicle back to Shults Ford-Lincoln. The dealership's mechanic observed that one of the engine's spark plugs was seized in the head. The mechanic suspected coolant intrusion into the engine's cylinder. Nevertheless, the dealership once again said Mr. Christodaro would have to pay out of pocket for any repairs related to the engine issue.

50.     It was clear to Mr. Christodaro that his vehicle was suffering from the engine issue described in CSP #19B37. Because Ford was clear in the CSP that service "must be performed on all affected vehicles at no charge to the vehicle owner" and that dealers "should repair any affected vehicles that arrive at their dealerships," he pressed the dealership to make good on that promise. Shults Ford-Lincoln sent a fax to Ford corporate headquarters asking for permission to perform the repair. Ford refused to allow the dealership to repair Mr. Christodaro's engine.

51.     On June 17, 2020, Mr. Christodaro called Ford. He spoke with a customer assistant associate named Makiah Powell, who told him Ford would not authorize the repair because his vehicle was out of warranty. Over the next few weeks, Mr. Christodaro called Ford repeatedly to attempt to get Ford to cover the necessary repairs-to no avail. His complaints, which received Case No. CAS-26839481-Z9T3H5, were not successful.

52.     On June 29, 2020, Shults Ford-Lincoln quoted Mr. Christodaro $6,072.89 to replace his vehicle's engine. Mr. Christodaro is a social worker and his wife is a teacher-they could not afford to pay for the engine repair, a repair that he expected would be covered by his vehicle's warranty and/or CSP #19B37.

53.     In mid-July 2020, Mr. Christodaro's vehicle again failed to start, this time for good. Numerous attempts to start it were unsuccessful. Each time, it would either not start or start and shutter for a minute and then shut down. Mr. Christodaro called Gowanda Ford-an authorized Ford dealership in Gowanda, New York-to arrange to have his car towed (at his own expense).

54.     Gowanda Ford quoted Mr. Christodaro $5098.37 to replace his vehicle's engine plus the cost of towing his vehicle. Left without any alternative, Mr. Christodaro had to pay out of pocket for the repairs.

55.     At no time prior to his purchase of his vehicle did Ford disclose to consumers

including Mr. Christodaro, and he did not know, and had no reason to know or expect, that it contained the Engine Defect and that his Ecoboost engine would leak coolant, overheat, fail, and even potentially result in an engine fire. Ford failed to disclose to consumers including Mr. Christodaro, and Mr. Christodaro was not aware of, and did not have any reason to anticipate, the costly repairs that would be required for the vehicle as a result of the Engine Defect. If Ford had adequately disclosed these facts, Mr. Christodaro would not have bought his vehicle or would have paid less for it.

**Plaintiff Amy Hoffer**

56.     Plaintiff Amy Hoffer is a Florida citizen and resident.

57.     In or about May 2018, Plaintiff Hoffer purchased, with her husband Kevin Hoffer, a used 2017 Ford Edge, with approximately 34,000 miles on the odometer, from Arlington Toyota in Jacksonville, Florida.

58.     Plaintiff Hoffer purchased her 2017 Ford Edge primarily for personal, family, or household use.

59.     Passenger safety and reliability were important factors in Plaintiff Hoffer's decision to purchase her vehicle. Before making her purchase, Plaintiff Hoffer researched her vehicle. Plaintiff Hoffer's husband, Kevin Hoffer, did a general online search for information on the vehicle, visited the manufacturer's website, reviewed the window sticker and documents provided at the dealership, and went on a test drive. Plaintiff Hoffer believed that the 2017 Ford Edge would be a safe and reliable vehicle.

60.     Ford's omissions were material to Plaintiff Hoffer. Had Ford disclosed its knowledge of the Engine Defect before she purchased her 2017 Ford Edge, Plaintiff Hoffer would have seen and been aware of the disclosures. Furthermore, had she known of the Engine Defect, Plaintiff Hoffer would not have purchased her vehicle or would have paid less for her vehicle.

61.     On or around February 15, 2021, when the vehicle had approximately 67,000 miles on the odometer, the check engine light illuminated while driving. Plaintiff Hoffer brought her vehicle to Ford Duval, an authorized Ford dealership in Jacksonville, Florida. The dealership stated that the engine block was cracked, causing coolant to leak on the pistons and the only solution was

11

installing a new engine. The dealership further stated that a used engine was not an option because it would also fail and recommended a new, redesigned engine. Plaintiff Hoffer brought her vehicle to an independent mechanic who installed the redesigned engine. To date, Plaintiff Hoffer has paid over $5,800 for repairs.

62.     At all times, Plaintiff Hoffer, like other class members, has attempted to drive her vehicle in a manner that was both foreseeable and in which it was intended to be used.

**Plaintiff James Padgett**

63.     Plaintiff James Padgett is a Florida citizen and resident.

64.     On or around June 28, 2018, Mr. Padgett purchased a certified pre-owned 2017 Ford Edge with approximately 38,000 miles on the odometer from Auto Nation Ford, an authorized Ford dealership, in Jacksonville, Florida.

65.     Plaintiff Padgett purchased his 2017 Ford Edge primarily for personal, family, or household use.

66.     Passenger safety and reliability were important factors in Plaintiff Padgett's decision to purchase his vehicle. Before making his purchase, Plaintiff Padgett researched his vehicle. Plaintiff Padgett did a general online search for information on the vehicle, visited the dealership website and the manufacturer's website, reviewed the window sticker and documents provided at the dealership, and went on a test drive. Plaintiff Padgett believed that the 2017 Ford Edge would be a safe and reliable vehicle.

67.     Ford's omissions were material to Plaintiff Padgett. Had Ford disclosed its knowledge of the Engine Defect before he purchased his 2017 Ford Edge, Plaintiff Padgett would have seen and been aware of the disclosures. Furthermore, had he known of the Engine Defect, Plaintiff Padgett would not have purchased his vehicle or would have paid less for his vehicle.

68.     In or around September 2018, when the vehicle had approximately 46,000 miles on the odometer, Plaintiff Padgett began experiencing issues with his vehicle, including the engine running rough and leaking from the exhaust pipe. Plaintiff Padgett complained to the dealership several times, starting in September 2018, when he was told there was nothing wrong with the vehicle. On or about December 3, 2018, Plaintiff Padgett brought his vehicle to the dealership again

12

complaining about his engine and a possible coolant leak. The dealership confirmed that coolant was leaking into a cylinder due to a crack in the short block. The dealership replaced the short block and told Plaintiff Padgett that engine replacement was not a recommended repair for this issue. Despite this repair, Plaintiff Padgett continued to experience issues with his vehicle. On or around November 9, 2020, Plaintiff Padgett brought his vehicle to the dealership because the check engine light illuminated. The dealership confirmed diagnostic codes P0302 and P0316 and found coolant leaking into a cylinder. The dealership replaced the long block and the engine, informing Plaintiff Padgett that this was now the recommended repair for these issues. Plaintiff Padgett spent approximately $4,700 on repairs in an attempt to fix the issue.

69.     At all times, Plaintiff Padgett, like other class members, has attempted to drive his vehicle in a manner that was both foreseeable and in which it was intended to be used.

**Plaintiff Jillian Constable**

70.     Plaintiff Jillian Constable is a Florida citizen and resident.

71.     On or around August 25, 2017, Plaintiff Constable purchased a used 2016 Ford Edge Titanium from Chestatee Ford, a Ford authorized dealership located in Dahlonega, Georgia.

72.     Plaintiff Constable purchased her 2016 Ford Edge primarily for personal, family, or household use.

73.     Passenger safety and reliability were important factors in Plaintiff Constable's decision to purchase her vehicle. Before making her purchase, Plaintiff Constable researched her vehicle. Plaintiff Constable did a general online search for information on the vehicle, visited the dealership's website and the manufacturer's website, reviewed the window sticker and documents provided at the dealership. She also spoke with a salesperson at the dealership regarding the 2016 Ford Edge, who stated it was a good family car, and went on a test drive with the dealership salesperson. Plaintiff Constable believed that the 2016 Ford Edge would be a safe and reliable vehicle.

74.     Ford's omissions were material to Plaintiff Constable. Had Ford disclosed its knowledge of the Engine Defect before she purchased her 2016 Ford Edge, Plaintiff Constable would have seen and been aware of the disclosures. Furthermore, had she known of the Engine

13

Defect, Plaintiff Constable would not have purchased her vehicle or would have paid less for her vehicle.

75.     On or around December 25, 2020, Ms. Constable first started experiencing problems with the engine in her vehicle, including the vehicle idling when driving. On or around December 29, 2020, the car engine light illuminated, and Ms. Constable brought her vehicle to an independent mechanic who found that the diagnostic trouble codes indicated a cylinder misfire. The independent mechanic advised that this was common issue and scheduled a repair for the next week.  On or around January 2, 2021, after the car engine light illuminated a second time and before the scheduled the repair, Ms. Constable brought her vehicle to Auto Nation Ford Dealership. The dealership said the engine failed due to overheating and an internal leak resulting in no coolant in the vehicle and coolant found in the oil and replaced the engine. Ms. Constable spent approximately $5,800 on repairs, including replacing the engine, in an attempt to fix the issue.

76.     At all times, Plaintiff Constable, like other class members, has attempted to drive his vehicle in a manner that was both foreseeable and in which it was intended to be used.

**Plaintiff Monterio Butcher**

77.     Plaintiff Monterio Butcher is a citizen of Georgia.

78.     On or around November 30, 2020, Mr. Butcher purchased a used 2013 Ford Escape with a 2.0L engine at Autodeals in Jonesboro, Georgia, for personal, family, or household use.

79.     Mr. Butcher's purchase was based in part on the advertised safety, reliability, and quality of the vehicle and its components. But for these representations, Mr. Butcher would not have purchased his vehicle or would not have purchased his vehicle for the price he did. Indeed, at this time, Mr. Butcher's daughter was two years old and his girlfriend was pregnant. Hence, safety and reliability were Mr. Butcher's prime concerns when making this purchase.

80.     On January 1, 2021, just a month after purchasing his vehicle, Mr. Butcher was driving in the vehicle with his girlfriend and daughter. The check engine light came on and white smoke was exiting the engine. Mr. Butcher realized the vehicle was overheating so he pulled into a parking lot. He opened the hood of the car and, shortly thereafter, the engine caught fire causing a total loss of the car. Prior to this incident, Mr. Butcher had experienced coolant leaking from his

14

vehicle on numerous occasions. Mr. Butcher had to replace the coolant three times in one month because so much had leaked from the engine.

81.    Mr. Butcher complained about the engine fire to an authorized Ford dealership. Although the car was a total loss, the dealership refused to cover the cost of replacement because the vehicle was no longer in warranty.

82.    Mr. Butcher has lost the use of his vehicle and incurred costs related to the loss of use of his vehicle.

83.    Mr. Butcher provided Ford with notice of the defect through written correspondence dated May 21, 2021, and delivered to Ford via certified mail. Ford has not responded to Mr. Butcher's demand that Ford correct or repair the Engine Defect and compensate Mr. Butcher and all others who were similarly harmed by the Defect.

84.    At all times, Mr. Butcher, like other class members, has attempted to drive his vehicle in a manner that was both foreseeable and in which it was intended to be used.

**Plaintiff Harlampi Bozhinov**

85.    Plaintiff Harlampi Bozhinov is an Illinois citizen and resident.

86.    On or around August 1, 2018, Plaintiff Bozhinov purchased a new 2018 Ford Fusion from Willowbrook Ford, an authorized Ford dealership in Willowbrook, Illinois.

87.    Passenger safety and reliability were important factors in Plaintiff Bozhinov's decision to purchase his vehicle. Before making his purchase, Plaintiff Bozhinov researched his vehicle. Plaintiff Bozhinov did a general online search for information on the vehicle, visited the dealership website and the manufacturer's website, reviewed the window sticker and documents provided at the dealership. He also viewed several commercials about the Ford Fusion, including commercials stating it was the "car of the year." He also spoke with a salesperson at the dealership regarding the 2018 Ford Fusion, who recommended the vehicle, and went on a test drive. Plaintiff Bozhinov believed that the 2018 Ford Fusion would be a safe and reliable vehicle.

88.    Ford's omissions were material to Plaintiff Bozhinov. Had Ford disclosed its knowledge of the Engine Defect before he purchased his 2018 Ford Fusion, Plaintiff Bozhinov would have seen and been aware of the disclosures. Furthermore, had he known of the Engine

15

Defect, Plaintiff Bozhinov would not have purchased his vehicle or would have paid less for his vehicle.

89.     On or around May 10, 2019, Plaintiff Bozhinov was driving on a highway at a speed of approximately 75 miles per hour when the engine block cracked. He brought his vehicle to the dealership who found that coolant in the third cylinder caused the engine block to crack. The dealership replaced the entire system, keeping his car for two months.

90.     At all times, Plaintiff Bozhinov, like other class members, has attempted to drive his vehicle in a manner that was both foreseeable and in which it was intended to be used.

**Plaintiff Mary Glade**

91.     Plaintiff Mary Glade is an Illinois citizen and resident.

92.     In or about October 2019, Plaintiff Glade purchased a used 2017 Ford Escape, with approximately 52,000 miles on the odometer, from Sherman Dodge in Skokie, Illinois.

93.     Plaintiff Glade purchased her 2017 Ford Escape primarily for personal, family, or household use.

94.     Passenger safety and reliability were important factors in Plaintiff Glade's decision to purchase her vehicle. Before making her purchase, Plaintiff Glade researched her vehicle. Plaintiff Glade did a general online search for information on the vehicle, visited the dealership's website, reviewed the window sticker and documents provided at the dealership, and went on a test drive. Plaintiff Glade believed that the 2017 Ford Escape would be a safe and reliable vehicle.

95.     Ford's omissions were material to Plaintiff Glade. Had Ford disclosed its knowledge of the Engine Defect before she purchased her 2017 Ford Escape, Plaintiff Glade would have seen and been aware of the disclosures. Furthermore, had she known of the Engine Defect, Plaintiff Glade would not have purchased her vehicle or would have paid less for her vehicle.

96.     On or about September 29, 2020, Plaintiff Glade was driving her vehicle when the engine light illuminated. She immediately pulled to the side of the road and called a tow truck to take her vehicle to an independent mechanic. The mechanic initially diagnosed the issue as a misfire in the cylinder, but upon further investigation, the mechanic found a Ford technical service bulletin ("TSB") stating there was an issue with coolant leaking into the engine block and confirmed that

16

was the issue with Plaintiff Glade's vehicle. Ford informed the mechanic that the engine would need a rebuild and sold the mechanic an updated version of the engine to be installed in Plaintiff Glade's vehicle. To date, Plaintiff Glade has paid over $4,800 for repairs.

97.    At all times, Plaintiff Glade, like other class members, has attempted to drive her vehicle in a manner that was both foreseeable and in which it was intended to be used.

**Plaintiff Theresa Balaszek**

98.    Plaintiff Teresa Balaszek is an Indiana citizen and resident.

99.    On or around November 23, 2016, Plaintiff Balaszek purchased a new 2017 Ford Escape from Web Ford, Inc., an authorized Ford dealership in Highland, Indiana.

100.    Plaintiff Balaszek purchased her 2017 Ford Escape primarily for personal, family, or household use.

101.    Passenger safety and reliability were important factors in Plaintiff Balaszek's decision to purchase her vehicle. Before making her purchase, Plaintiff Balaszek researched her vehicle. Plaintiff Balaszek did a general online search for information on the vehicle, visited the dealership's website and the manufacturer's website, reviewed documents provided at the dealership, and went on a test drive. Plaintiff Balaszek believed that the 2017 Ford Escape would be a safe and reliable vehicle.

102.    Ford's omissions were material to Plaintiff Balaszek. Had Ford disclosed its knowledge of the Engine Defect before she purchased her 2017 Ford Escape, Plaintiff Balaszek would have seen and been aware of the disclosures. Furthermore, had she known of the Engine Defect, Plaintiff Balaszek would not have purchased her vehicle or would have paid less for her vehicle.

103.    In or around September 2020, when she started the vehicle, Plaintiff Balaszek noticed a substantial amount of white smoke emerging from the tailpipe of her vehicle. She called Web Ford, Inc. and spoke with the salesperson who sold her the vehicle. She was informed that to even look over the vehicle, she would have to pay $100 diagnostic fee, and that they would not waive this fee even after she asked specifically.  Shortly thereafter, Plaintiff Balaszek brought her vehicle to an independent mechanic for an oil change and asked about the smoke. She was informed that

1   the issue causing the smoke was not worth fixing and she was advised to trade in her vehicle. On or

2   around September 22, 2020, Plaintiff Balaszek took her vehicle to Dean's Auto Repair, an

3   independent mechanic, who found coolant had leaked into the engine cylinders and that the engine

4   would have to be rebuilt. To date, she has paid over $600 for repairs. In addition, Plaintiff Balaszek

5   lost use of her vehicle for approximately a month while it was being repair and incurred out-of-

6   pocket expenses in connection with using rental vehicles.

7       104.   At all times, Plaintiff Balaszek, like other class members, has attempted to drive her

8   vehicle in a manner that was both foreseeable and in which it was intended to be used.

9   **Plaintiffs Craig and Kelly Morford**

10      105.   Plaintiffs Craig and Kelly Morford are Missouri citizens and residents.

11      106.   On or around April 18, 2017, the Morfords purchased a new 2017 Ford Escape from

12   Shawnee Mission Ford, a Ford authorized dealership located in Shawnee, Kansas.

13      107.   The Morfords purchased their 2017 Ford Escape primarily for personal, family, or

14   household use.

15      108.   Passenger safety and reliability were important factors in the Morfords' decision to

16   purchase their vehicle. Before making their purchase, the Morfords spent four months researching

17   the 2017 Ford Escape and comparing it to other vehicles including visiting Ford's website. They

18   viewed commercials and advertisements, reviewed brochures and the window sticker, spoke with a

19   salesperson at the dealership regarding the 2017 Ford Escape, and went on a test drive with the

20   dealership salesperson. The Morfords believed that the 2017 Ford Escape would be a safe and

21   reliable vehicle.

22      109.   Ford's omissions were material to the Morfords. Had Ford disclosed its knowledge of

23   the Engine Defect before they purchased their 2017 Ford Escape, the Morfords would have seen

24   and been aware of the disclosures. Furthermore, had they known of the Engine Defect, the Morfords

25   would not have purchased their vehicle or would have paid less for their vehicle.

26      110.   In or around October of 2020, with approximately 66,331 miles on the odometer, the

27   Morfords began to experience the Engine Defect. The car would idle rough and seem to misfire

28   while driving. Plaintiff Craig Morford delivered their vehicle to Bob Sight Auto Group, an

authorized Ford repair facility. He complained that his vehicle's check engine light was illuminated and that the vehicle seemed to shake at idle. The technician "RAN ON IDS. P0302, P0316 IN SYSTEM, COOLANT LEVEL LOW, PRESSURE TEST SYSTEM. REMOVE SPARK PLUG AND INSPECT CYLINDERS FOR COOLANT. FOUND COOLANT LEAKING INTO CYLINDER."

111.   Plaintiff Craig Morford was informed that he would have to pay $5,950.00 to "REPLACE LONG BLOCK DUE TO COOLANT INRUSTION INTO CYLINDER #2." He was charged $100.00 for the diagnosis. The Morfords' vehicle has never been repaired or replaced, and it continues to be defective.

112.   At all times, the Morfords, like other class members, have attempted to drive their vehicle in a manner that was both foreseeable and in which it was intended to be used.

**Plaintiffs Aaron and Victoria Manfra**

113.   Plaintiffs Aaron and Victoria Manfra are Maryland citizens and residents.

114.   On or about February 18, 2017, the Manfra Plaintiffs purchased a new 2017 Ford Fusion from Len Stoler Ford, an authorized Ford dealership in Owings Mills, Maryland.

115.   The Manfra Plaintiffs purchased their 2017 Ford Fusion primarily for personal, family, or household use.

116.   Passenger safety and reliability were important factors in the Manfra Plaintiffs' decision to purchase their vehicle. Before making their purchase, the Manfra Plaintiffs researched their vehicle. Aaron Manfra did a general online search for information on the vehicle, viewed YouTube videos about the vehicle, reviewed the window sticker and documents provided at the dealership, and went on a test drive. They also spoke with a salesperson at the dealership regarding the 2017 Ford Fusion who stated that it had a 5-star crash rating. The Manfra Plaintiffs believed that the 2017 Ford Fusion would be a safe and reliable vehicle.

117.   Ford's omissions were material to the Manfra Plaintiffs. Had Ford disclosed its knowledge of the Engine Defect before they purchased their 2017 Ford Fusion, the Manfra Plaintiffs would have seen and been aware of the disclosures. Furthermore, had they known of the Engine Defect, the Manfra Plaintiffs would not have purchased their vehicle or would have paid less for

19

their vehicle.

118.   In or around early October 2020, Plaintiffs were driving their vehicle on the highway when the engine light came on and the engine lost about 50% of its power. The vehicle also began to ride rough. They had it towed to a local, independent mechanic who found that there had been a misfire in cylinder 2. After pulling the spark plug, the mechanic observed coolant in the cylinder and then advised Plaintiffs to take the vehicle to an authorized Ford dealership. On or about October 6, 2020, Plaintiffs had the vehicle towed to Crouse Ford, an authorized Ford dealership in Taneytown, Maryland. Plaintiffs were then informed that the EcoBoost engine in their vehicle has a defect in the short block, which over time caused coolant to leak into the cylinder. Plaintiffs were also told that the dealership had seen five or six other vehicles come in with the same problem. Plaintiffs asked if the repair would be done under warranty, because Ford had known of the Defect, but Ford declined to provide the repair free of cost because Plaintiffs' vehicle had 64,500 miles on the odometer. As a result, Plaintiffs were forced to pay nearly $4,000 to have the short block replaced and their engine clean and rebuilt.

119.   At all times, the Manfra Plaintiffs, like other class members, have attempted to drive their vehicle in a manner that was both foreseeable and in which it was intended to be used.

**Plaintiff Stacey Coppock**

120.   Plaintiff Stacey Coppock is a Michigan citizen and resident.

121.   On or around September 6, 2017, Plaintiff Coppock purchased a new 2017 Ford Edge from Brighton Ford, a Ford authorized dealership located in Brighton, Michigan.

122.   Plaintiff Coppock purchased her 2017 Ford Edge primarily for personal, family, or household use.

123.   Passenger safety and reliability were important factors in Plaintiff Coppock's decision to purchase her vehicle. Before making her purchase, Plaintiff Coppock spent approximately two weeks researching and comparing the 2017 Ford Edge and visiting dealer websites. Plaintiff Coppock reviewed the window sticker, vehicle information sheet and vehicle information brochure, and spoke with a salesperson at the dealership regarding the 2017 Ford Edge and went on a test drive of the vehicle. Plaintiff Coppock believed that the 2017 Ford Edge would be a safe and reliable

vehicle.

124.   Ford's omissions were material to Plaintiff Coppock. Had Ford disclosed its knowledge of the Engine Defect before she purchased her 2017 Ford Edge, Plaintiff Coppock would have seen and been aware of the disclosures. Furthermore, had she known of the Engine Defect, Plaintiff Coppock would not have purchased her vehicle or would have paid less for her vehicle.

125.   On or around October 8, 2019, with approximately 64,041 miles on the odometer, Plaintiff Coppock began to experience the Engine Defect. On that date, Plaintiff Coppock delivered her vehicle to Brighton Ford complaining that her engine light was illuminated, and that the vehicle had a coolant smell. The technician found that diagnostic trouble codes P0301, P0012, and P0217, confirmed that the D8 Block was cracked in cylinder number 1, and low coolant levels. The technician "VERIFIED CHECK ENGINE LIGHT IS ON DTC P0012, P0217, P0301 AND LOW COOLANT ADD AND PRESSURE TESTED COOLING SYSTEM LOOSING (sp) 4PSI AFTER 5HRS REMOVED SPARK PLUG FOUND COOLANT NO1 CYLINDER WITH BORE SCOPE. FOUND TSB 19-2346. REMOVED ENGINE AND REPLACED LONG BLOCK ENGINE AND ALL GASKET FITTING LINES BOLTES PER TSB AND WORSHOP MANUAL, RE-ASSEMBLED INSTALLED AND CLAR DTC RESET MISFIRE PROFILE AND ROAD TESTED AND RETESTED PASSED." Plaintiff Coppock was forced to pay $3,314.00 for the repair.

126.   At all times, Plaintiff Coppock, like other class members, has attempted to drive her vehicle in a manner that was both foreseeable and in which it was intended to be used.

**Plaintiff Rachel Goodrich**

127.   Plaintiff Rachel Goodrich is a Michigan citizen and resident.

128.   On or about August 29, 2018, Plaintiff purchased a used 2017 Ford Fusion with approximately 33,000 miles on the odometer from Preferred Chrysler in Muskegon, Michigan. Preferred Chrysler is a companion dealership to Preferred Ford in Grand Haven, Michigan, an authorized Ford dealer.

129.   Plaintiff Goodrich purchased her 2017 Ford Fusion primarily for personal, family, or household use.

130.   Passenger safety and reliability were important factors in Plaintiff Goodrich's decision to purchase her vehicle. Before making her purchase, Plaintiff Goodrich researched her vehicle. Plaintiff Goodrich reviewed the window sticker and her husband went on a test drive. She also spoke to a salesperson at the dealership regrading her vehicle who told her that there was nothing wrong with the vehicle and that it had never been in an accident. Plaintiff Goodrich Believed that the 2017 Ford Fusion would be a safe and reliable vehicle.

131.   Ford's omissions were material to Plaintiff Goodrich. Had Ford disclosed its knowledge of the Engine Defect before she purchased her 2017 Ford Fusion, Plaintiff Goodrich would have seen and been aware of the disclosures. Furthermore, had she known of the Engine Defect, Plaintiff Goodrich would not have purchased her vehicle or would have paid less for her vehicle.

132.   On or about September 5, 2018, just days after purchasing her vehicle, Plaintiff Goodrich was driving her vehicle when the check engine light illuminated, and the engine overheated, resulting in the vehicle stalling. She took her vehicle to Preferred Ford, where a technician found engine codes P1299 and P1285, as well as no coolant in the engine. He reset the codes, and filled the engine with coolant. Since that time, Plaintiff has repeatedly taken her vehicle to Preferred Ford when the vehicle has overheated, and she has spent about $1,000 on repairs such as new spark plugs and coils in an attempt to fix the issue.

133.   On or about October 29, 2020, the check engine light illuminated in Plaintiff Goodrich's vehicle once again while it was being driven and the vehicle began overheating. The vehicle stalled and white smoke came from the dash. Plaintiff took her vehicle to Preferred Ford, where a technician found low coolant and the codes P0300 and P0316. The vehicle also failed the pressure test. The dealership advised Plaintiff the vehicle needs a new engine and quoted a cost of approximately $8,700. Because she could not afford such a costly repair, the vehicle was inoperable for several months. On or about January 5, 2021, Plaintiff Goodrich took her vehicle to Great Lakes Ford of Muskegon, who confirmed that she needed a new engine due to an internal coolant leak. Plaintiff Goodrich was forced to pay approximately $6,700 for the repair.

134.   At all times, Plaintiff Goodrich, like other class members, has attempted to drive her

vehicle in a manner that was both foreseeable and in which it was intended to be used.

**Plaintiff Brian Simonds**

135.   Plaintiff Brian Simonds is a Minnesota citizen and resident.

136.   On or around December 7, 2015, Mr. Simonds purchased a new 2015 Ford Fusion with approximately 18 miles on the odometer from Superior Ford, an authorized Ford dealership, in Plymouth, Minnesota.

137.   Plaintiff Simonds purchased his 2015 Ford Fusion primarily for personal, family, or household use.

138.   Passenger safety and reliability were important factors in Plaintiff Simonds's decision to purchase his vehicle. Before making his purchase, Plaintiff Simonds researched his vehicle. Plaintiff Simonds reviewed the window sticker and documents provided at the dealership. He also spoke with a salesperson at the dealership regarding the 2015 Ford Fusion, and went on a test drive. Plaintiff Simonds believed that the 2015 Ford Fusion would be a safe and reliable vehicle.

139.   Ford's omissions were material to Plaintiff Simonds. Had Ford disclosed its knowledge of the Engine Defect before he purchased his 2018 Ford Fusion, Plaintiff Simonds would have seen and been aware of the disclosures. Furthermore, had he known of the Engine Defect, Plaintiff Simonds would not have purchased his vehicle or would have paid less for his vehicle.

140.   On or around December 7, 2020, when there were approximately 64,000 miles on the odometer, Mr. Simonds started to drive his vehicle when the vehicle started shaking badly and emitting a burning smell. Later that day, the check engine light illuminated and Mr. Simonds brought his vehicle to the dealership. The dealership informed Mr. Simonds that his vehicle needed the engine replaced because there was a coolant leak into the cylinders resulting in engine failure and quoted a cost of approximately $7,200 to replace the long block. Ford has refused to cover the cost of the repair. Plaintiff Simonds was forced to pay approximately $7,200 for the repair.

141.   At all times, Plaintiff Simonds, like other class members, has attempted to drive his vehicle in a manner that was both foreseeable and in which it was intended to be used.

**Plaintiff David Schiavi**

142.   Plaintiff David Schiavi is a New Jersey citizen and resident.

143.   On or around July 29, 2015, Plaintiff Schiavi purchased a new 2015 Ford Escape from Fullerton Ford, a Ford authorized dealership located in Somerville, NJ.

144.   Plaintiff Schiavi purchased his 2015 Ford Escape primarily for personal, family, or household use.

145.   Passenger safety and reliability were important factors in Plaintiff Schiavi's decision to purchase his vehicle. Before making his purchase, Plaintiff Schiavi researched his vehicle. Plaintiff Schiavi did a general online search for information on the vehicle, watched television advertisements for the vehicle, and reviewed the window sticker and documents provided at the dealership. He also spoke with a salesperson at the dealership regarding the 2015 Ford Escape, who informed him that the Ecoboost was just as powerful and reliable as the six-cylinder engine in his prior Ford Escape, and went on a test drive with the dealership salesperson. Plaintiff Schiavi believed that the 2015 Ford Escape would be a safe and reliable vehicle.

146.   Ford's omissions were material to Plaintiff Schiavi. Had Ford disclosed its knowledge of the Engine Defect before he purchased his 2015 Ford Escape, Plaintiff Schiavi would have seen and been aware of the disclosures. Furthermore, had he known of the Engine Defect, Plaintiff Schiavi would not have purchased his vehicle or would have paid less for his vehicle.

147.   On or around October 28, 2020, with approximately 55,265 miles on the odometer, Plaintiff Schiavi began to experience the Engine Defect. He delivered his vehicle to Fullerton Ford complaining that the engine light was illuminated and that "ROUGH IDLE ADNLOSS OF HEAT ALL STARTED AT THE SAME TIME." The technician "Verified customer concern. Tch scanned vehicle for codes found P0303, P0316, and overtemp codes for cylinder head and coolant temp sensor. Tech found the degas bottle had little to no coolant present in the bottle. Tech toppf (sic) off the coolant, pressure tested the system but found no leaks. Tech then removed the spark plug on cylinder 3 and removed the spark plugs on the 2 adjacent cylinders. Tech pressure tested the cooling system over night to see if coolant was present in the cylinders. Tech came back the next day, used a bore scope on all 3 cylinders and found the pressure dropped from 25 psi to 20 psi and then cylinders had coolant present. Tech recommended a new engine along with all the hardware and gaskets recommend to be replaced when replacing the engine as per Ford. Customer declined work

24

at this time." The dealership informed Plaintiff Schiavi he would need to pay to replace his engine and charged him $169.00 for diagnosing the vehicle. Plaintiff Schiavi's vehicle has never been repaired and continues to be defective.

148.   At all times, Plaintiff Schiavi, like other class members, has attempted to drive his vehicle in a manner that was both foreseeable and in which it was intended to be used.

**Plaintiff Robyn Pirog**

149.   Plaintiff Robyn Pirog is a South Carolina citizen and resident.

150.   On or about July 18, 2016, Plaintiff Pirog purchased a new 2016 Ford Edge from Crossroads Ford, an authorized Ford dealership in Wake Forest, North Carolina.

151.   Plaintiff Pirog purchased her 2016 Ford Edge primarily for personal, family, or household use.

152.   Passenger safety and reliability were important factors in Plaintiff Pirog's decision to purchase her vehicle. Before making her purchase, Plaintiff Pirog researched her vehicle. Plaintiff Pirog did a general online search for information on the vehicle, visited the dealership website and the manufacturer's website, reviewed the window sticker and documents provided at the dealership, and went on a test drive with an employee of the authorized Ford dealership. Plaintiff Pirog believed that the 2016 Ford Edge would be a safe and reliable vehicle.

153.   Ford's omissions were material to Plaintiff Pirog. Had Ford disclosed its knowledge of the Engine Defect before she purchased her 2016 Ford Edge, Plaintiff Pirog would have seen and been aware of the disclosures. Furthermore, had she known of the Engine Defect, Plaintiff Pirog would not have purchased her vehicle or would have paid less for her vehicle.

154.   On or about December 30, 2020, the check engine light illuminated in Plaintiff Pirog's vehicle while she was driving. She called her local authorized Ford dealership, Jones Ford, in Shallotte, North Carolina, and was told to bring in her vehicle for an oil change the next day. Plaintiff Pirog dropped off her vehicle to Jones Ford on December 31, 2020. When she called later in the day to pay for the oil change, she was told she needed a new engine in her vehicle and the cost would be thousands of dollars, despite the fact that she had properly maintained her vehicle. The technician at Jones Ford found that coolant had intruded into the engine at cylinder #3, causing engine failure.

25

Jones Ford replaced the long block of the engine and installed a completely new engine, for a cost of over $5,000.

155.   At all times, Plaintiff Pirog, like other class members, has attempted to drive her vehicle in a manner that was both foreseeable and in which it was intended to be used.

156.

**Plaintiff Zachary Scott Damm**

157.   Plaintiff Zachary Scott Damm and Amanda Gates are a Washington citizens and residents.

158.   On or around December 7, 2016, Plaintiffs Damm and Gates purchased a used 2016 Ford Fusion with approximately 32,000 miles on the odometer from an independent retailer, Enterprise Case Sales, in Shoreline, Washington.

159.   Plaintiffs Damm and Gates purchased their 2016 Ford Fusion primarily for personal, family, or household use.

160.   Passenger safety and reliability were important factors in Plaintiffs Damm's and Gates' decision to purchase their vehicle. Before making their purchase, Plaintiffs Damm and Gates researched their vehicle. Plaintiff Damm visited the dealership's website, reviewed the window sticker and documents provided at the dealership, and went on a test drive with a dealership employee. Plaintiffs Damm and Gates believed that the 2016 Ford Fusion would be a safe and reliable vehicle.

161.   Ford's omissions were material to Plaintiffs Damm and Gates. Had Ford disclosed its knowledge of the Engine Defect before they purchased their 2016 Ford Fusion, Plaintiffs Damm and Gates would have seen and been aware of the disclosures. Furthermore, had they known of the Engine Defect, Plaintiffs Damm and Gates would not have purchased their vehicle or would have paid less for their vehicle.

162.   On or about May 17, 2021, Plaintiff Damm brought his vehicle to Harris Ford Lincoln because the check engine light illuminated. The dealership found diagnosis code P0302 and discovered coolant leaking into the cylinders. The dealership advised Plaintiff Damm that the vehicle needs a new engine and quoted a cost of approximately $9,000. Because he cannot afford

26

such a costly repair, Plaintiff Damm continues to use his vehicle on an infrequent basis for relatively short distances, despite the risk of catastrophic engine failure.

163.   At all times, Plaintiffs Damm and Gates, like other class members, has attempted to drive his vehicle in a manner that was both foreseeable and in which it was intended to be used.

**Plaintiff Shari Techlin**

164.   Plaintiff Shari Techlin is a citizen of the State of Wisconsin. Ms. Techlin resides in Neenah, Wisconsin. Ms. Techlin purchased a used 2017 Ford Escape with a 2.0L EcoBoost Engine on April 24, 2020, with VIN 1FMCU9G92HUB27116, from Carvana, LLC. The vehicle had approximately 29,828 miles on the odometer.

165.   Before she purchased the vehicle, Ms. Techlin researched the safety and reliability of the vehicle online. Ms. Techlin also looked at the warranty on the vehicle online.

166.   Safety and reliability were important to Ms. Techlin when she purchased the Vehicle.

167.   Ms. Techlin purchased her Vehicle primarily for personal, family or household use.

168.   After purchasing her vehicle, the engine chugged and misfired. The vehicle's check engine light illuminated, and Ms. Techlin smelled antifreeze.

169.   On April 22, 2021, Ms. Techlin took her vehicle to Bergstrom Ford-Lincoln of the Fox Valley. The Ford Dealership told Ms. Techline she needed a new engine at a cost of $5,970.18.. Her vehicle had 69,150 miles at the time.

170.   The Ford Dealership noted that the vehicle was "throwing p0303 and random other codes." The Ford Dealership noted there was an "occasional strong whiff of coolant at startup." The Ford Dealership inspected the Vehicle and found no coolant in the bottle and "P0303 stored in the PCM." The Ford Dealership found "TSB 19-2346 applies . . . proceeded with replacing long block and all corresponding compendents."

171.   At all times, Plaintiff Techlin, like other class members, has attempted to drive her vehicle in a manner that was both foreseeable and in which it was intended to be used.

**Defendant Ford Motor Company**

172.   Defendant Ford Motor Company is a Delaware limited liability company with its Corporate Headquarters located at 1 American Road, Dearborn, Michigan 48126. Ford Motor

27

Company is registered to do business in the State of Delaware. Ford Motor Company designs and manufactures motor vehicles, parts, and other products for sale in the United States and throughout the world. Ford Motor Company is the warrantor and distributor of the Class Vehicles in California and throughout the United States.

173.   At all relevant times, Defendant was and is engaged in the business of designing, manufacturing, constructing, assembling, marketing, distributing, and selling automobiles and motor vehicle components in Delaware and throughout the United States of America.

174.   In order to sell vehicles to the general public, Defendant enters into agreements with dealerships who are then authorized to sell its branded vehicles such as Fords and Lincolns to consumers such as Plaintiffs. In return for the exclusive right to sell new Ford and/or Lincoln vehicles in a geographic area, authorized dealerships are also permitted to service and repair these vehicles under the warranties Defendant provides directly to consumers. These contracts give Defendant a significant amount of control over the actions of the dealerships, including sale and marketing of vehicles and parts for those vehicles. All service and repair at an authorized dealership are also completed according to Defendant's explicit instructions, issued through service manuals, technical service bulletins, and other documents. Per the agreements between Defendant and the authorized dealers, consumers such as Plaintiffs can receive services under Defendant's issued warranties at dealer locations that are convenient to them.

175.   Defendant also develops and disseminates the owners' manual, warranty booklets, maintenance schedules, advertisements, and other promotional materials relating to the Class Vehicles. Defendant is also responsible for the production and content of the information on the Moroney Stickers.

176.   Defendant is the drafter of the warranties it provides to consumers nationwide, the terms of which unreasonably favor Defendant. Consumers are not given a meaningful choice in the terms of the warranties provided by Defendant, and those warranties are offered on a "take it or leave it" basis.

## JURISDICTION AND VENUE

177.   The Court has diversity jurisdiction over this action under 28 U.S.C. § 1332(d) and

the Class Action Fairness Act ("CAFA"). Plaintiffs and other Class Members are residents and citizens of states different from the home states of the Defendant, and the amount in controversy in this action for the Class exceeds $5,000,000.00.

178.   Venue is proper in this District pursuant to 28 U.S.C. § 1391 because Plaintiff Miller resides in this District, purchased her vehicle in this District and a substantial portion of the events or omissions giving rise to this Action occurred in this District. Furthermore, Defendant conducts substantial business in, and has gained substantial benefit from doing business in, this District.

179.   Defendant markets, sells, and leases vehicles to consumers throughout this District, a significant number of Defendant's customers are residents of this District, and the wrongful acts and omissions alleged herein have affected consumers in this District. Defendant is therefore subject to personal jurisdiction in this District.

180.   Plaintiff Miller's venue declaration pursuant to Cal. Civ. Code § 1780(d) is attached hereto as Exhibit A.

## FACTUAL ALLEGATIONS

181.   In 2009, Ford began producing the Ecoboost engine, which are gasoline-fueled, turbocharged, direct-injection (also called "GTDI") engines. Ecoboost engines are marketed as providing low-emissions, fuel-efficient alternative to hybrid or electric vehicles.

182.   Because of the Engine Defect, the Ecoboost engines in Class Vehicles are predisposed to leak coolant, allowing coolant to seep into the engine cylinder, causing the engines in the Class Vehicles to overheat and ultimately causing engine fires and/or total engine failure, thereby compromising the comfort, safety, and enjoyment of Plaintiffs and Class Members, and requiring them to pay out-of-pocket to temporarily ameliorate the problem and/or replace the defective Ecoboost engine with an equally defective engine, leaving the Class Vehicle susceptible to repeated failures like those experienced by Plaintiffs.

## I.   The Engine Defect

183.   Discovery will show that the Engine Defect is the result of the design of the engine block and cylinder head, including an inadequate seal on the cylinder head. This design includes

grooves at the point where the engine's cylinder head attaches to the engine block, as seen here:



184.   In a non-defective engine, liquid coolant is used to ensure that the engine does not overheat. The coolant circulates through a set path within the engine block and cylinder head, cooling the engine. The liquid gathers heat due to contact with the engine and then flows through a hose and into the radiator to cool back down. Once its temperature has lowered, the coolant returns to the engine, and continues to circulate.

185.   In the Class Vehicles, however, as the coolant circulates through the engine, it seeps through the grooves present on the cylinder head, and pools there. The coolant pooling contributes to the seal degrading, eventually allowing the coolant to leak into the engine's cylinders. The degraded seals can be seen below:



CONSOLIDATED CLASS ACTION COMPLAINT FOR DAMAGES       CASE NO. 2:20-cv-01796-TLN-CKD

186.   The coolant leak causes two related problems. First, the leak results in insufficient coolant levels and, consequently, engine overheating. Engine overheating is well known to cause catastrophic damage to an engine. For example, overheating can cause the cylinder head to crack. Engine overheating can also warp other internal components, such as pistons. Additionally, when an engine overheats sufficiently, it causes a loss of oil viscosity, which can lead the engine to completely seize. In some instances, engine overheating can result in engine fire.

187.   The second related problem caused by the coolant leak occurs as a result of the coolant leaking *into* the cylinders. Coolant should not enter the cylinders, and when it does, it causes the engine to misfire. Coolant in the cylinders is burned through the combustion chamber and exits through the vehicle's exhaust, sometimes resulting in smoke emitting from the vehicles' exhaust. In addition, coolant that enters the cylinders mixes with the oil on the cylinder walls, causing oil dilution and contamination, which in turn cause corrosion and excessive wear on bearings and other internal engine surfaces.

188.   The Engine Defect can occur at low mileage, often while the vehicle remains within the warranty period.

189.   Ford's insufficient Band-Aid repair measures, such as installing a low coolant sensor, and/or the replacement of faulty Ecoboost engines in Class Vehicles with equally defective replacement engines leave Class Vehicles susceptible to repeated failure.

190.   Because of the Engine Defect, consumers are forced to pay thousands of dollars out of pocket, despite the fact that the repair does not remedy the Engine Defect and leaves consumers still subject to future risk of failure.

191.   Ford has apparently developed a feasible alternative design for an Ecoboost engine that does not contain the defect Class Vehicles suffer from, but has not used these newly-developed non-defective engines to replace failed Ecoboost engines installed in Class Vehicles, leaving Class Members to face the specter of repeated engine failure and engine fires.

**II.**   **The Engine Defect Poses a Safety Risk to Vehicle Drivers, Passengers, and the Public.**

192.   The Engine Defect poses a safety hazard to drivers, passengers, and the public because an engine with insufficient coolant and/or coolant in its cylinders can misfire, suddenly fail, catch

31

on fire while the vehicle is otherwise in normal operation. Sudden engine failures and engine fires create serious risks of injury or death to those inside the vehicle and to others nearby.

193. For instance, one complaint filed with NHTSA detailed a consumer's experience while driving a 2017 Ford Edge with their family in the car. The driver pulled over to the side of the road and saw smoke coming out of the car. Within minutes after the family evacuated the vehicle, "the entire car was engulfed in flames."[1]

194. Another 2017 Ford Edge owner described experiencing complete engine failure while on the highway: "Suddenly the car basically went dead while in motion going 75 miles per hour. I had to steer it off the highway and turn it off, leaving us stranded on the side of the highway for 4 hours." This event occurred after the driver had received a check engine alert, and had the engine's head gasket replaced due to coolant in the cylinder. Following the total engine failure, it was determined that coolant had leaked into the cylinder, causing misfiring and engine failure, for the second time in less than 12 months. The complaint stated that the author was forced to pay $7,000.00 for a full engine replacement.[2]

195. As these instances demonstrate, engine failures put the vehicle occupants and others on the road in extreme risk of accidents, and engine fires pose a potentially lethal hazard.

196. As further detailed below, the NHTSA website is replete with similar complaints of smoking vehicles, engine failures while the car is in operation on the road, and fires. Additionally, these complaints highlight that the Engine Defect often requires repeated repairs, each of which can cost consumers thousands of dollars.

### III. **Ford Knew or Should Have Known the Ecoboost Engines in the Subject Vehicles Were Defective Before Selling or Leasing the Class Vehicles to Plaintiffs and the Class Members.**

197. Discovery will show that Ford became aware of the Engine Defect at least as early as 2010—well before Plaintiffs and Class Members purchased their Class Vehicles. Ford learned of the defect through sources such as pre-production testing, pre-production design failure mode analysis, pre-release evaluation and testing; repair and warranty data; replacement part sales data;

---

[1] NHTSA ID Number: 11020178, Incident Date August 18, 2017.
[2] NHTSA ID Number: 11338725, Incident Date June 24, 2020.

high failure rates and analysis in response; early consumer complaints made to Ford, NHTSA, and posted on public online vehicle owner forums; testing done in response to those complaints; consumer complaints made to Ford's authorized dealerships, which are Ford's agents for vehicle sales, leases, servicing, and repairs; testing and analysis done in response to those complaints; aggregate data from Ford dealers; as well as through other internal sources unavailable to Plaintiffs prior to discovery.

### A.   Ford's Knowledge of the Engine Defect Gained from Pre-Release Design, Manufacture, Engineering, and Testing Data.

198.   While designing, manufacturing, engineering, and testing Class Vehicles in advance of the vehicles' release, Ford would have gained comprehensive and exclusive knowledge about the Ecoboost engines installed in those Vehicles. In particular, Ford would have an understanding of the functionality of standard engine systems, such as coolant flow, and the compatibility of the engine materials with necessary chemicals, such as coolant and antifreeze.

199.   Adequate pre-release analysis of the design, engineering, and manufacture of the Ecoboost engines in the Class Vehicles would have revealed to Ford that the design of the engine was defective and susceptible to leaking coolant into the cylinders.

### B.   Ford Had Knowledge of the Engine Based on Warranty Repair Data.

200.   In order to guarantee the quality of its products, Ford implements a highly integrated system known as "Six Sigma." According to Ford's former Chief Engineer, Art Hyde, this quality operating system is "crucial for identifying and correcting problems within the manufacturing facilities. The Six Sigma and Quality Operating System implemented in each plant includes cross-functional groups of engineers, plant management, and production specialists – all skilled problem solvers who've been trained through Six Sigma."[3] In fact, Ford employs more than 67,000 Six Sigma engineers to deal with quality assurance issues that arise with its products.[4]

---

[3] Jean Scheid, *Ford Motor Company and a Total Quality Management Example (TQM)*, BRIGHT HUB PM (May 26, 2010), https://www.brighthubpm.com/methods-strategies/72279-tqm-and-ford-motor-company/.
[4] Andrea Gabor, *Management: Ford Embraces Six Sigma*, N.Y. TIMES (June 13, 2001), https://www.nytimes.com/2001/06/13/business/management-ford-embraces-six-sigma.html.

201. In order to quickly identify quality issues in real time, Ford utilizes business process management software known as "One Warranty Solution" that allows it to obtain and analyze warranty data from Ford Dealerships in real time. As noted by Curt Yun, Ford's director of global warranty analysis: "Our plants receive and analyze warranty claims from dealerships every day . . . . That's one of the processes now built into the fabric of our business. We're producing fewer defects, and if (problems come up), we find them and contain them and resolve them more quickly than we ever have."[5]

202. According to Mike Roberts, Ford's Global Warranty Strategy Manager, the One Warranty Solution software is critical to alerting Ford to quality problems in the field and immediately taking steps to prevent those problems from occurring in the future: "Every day that you know about something sooner, you can save one day's worth of bad production. Every day has a huge cost saving associated with it." He also noted that Ford's integrated system allows Ford to be "able to connect [an] engineer to dealership, to a technician, to a vehicle that had that exact concern, the minute it was written up on the service drive. [The Ford engineer] could intercept the repair process and talk to the technician." The system also allows the technician in the field to provide highly detailed information about repairs that can be shared with Ford Engineers. In fact, the software allows technicians to attach pictures of the repair along with copies of bills and invoices.[6]

203. Consumers complain that the Engine Defect often causes the engine to overheat, misfire, emit smoke, fail, and spontaneously ignite at low mileages, when vehicles remain within the warranty period. Through Ford's integrated software system and its team of dedicated quality assurance engineers, such issues were undoubtedly brought to Ford's attention.

---

[5] Byron Pope, *Ford's Warranty Costs Dropping as Quality Improves*, WARDSAUTO (Mar. 19, 2008), https://www.wardsauto.com/news-analysis/ford-s-warranty-costs-dropping-quality-improves.

[6] Bill Goodwin, *Software Project Will Save Ford Tens of Millions a Year in Car Repair Bills*, COMPUTERWEEKLY.COM (July 23, 2015), https://www.computerweekly.com/news/4500250364/Software-project-will-save-Ford-tens-of-millions-a-year-in-car-repair-bills.

**C.** **Ford Had Knowledge of the Engine Defect Because of the Large Number of Replacement Engines Ordered from Ford.**

204. Discovery will show that Ford also knew or should have known about the Engine Defect because of the higher than expected number of replacement engines ordered from Ford—even at low mileage—which should have alerted Ford of the presence of a defect impacting a wide range of its Vehicles.

205. Discovery will show that Ford service centers use Ford replacement parts that they order directly from Ford. Independent repair shops and consumers doing repairs themselves also purchase replacement parts directly from Ford. Therefore, Ford would have detailed and accurate data regarding the number and frequency of replacement part orders. The ongoing high sales of replacement Ecoboost engines was certainly known to Ford, and should have alerted Ford that its engines were suffering from a defect, causing coolant loss, overheating, engine failure, and engine fires.

**D.** **Ford's Knowledge of the Engine Defect Is Apparent From Its Issuance of Technical Service Bulletins**

206. Ford has issued multiple TSBs to address the Engine Defect.

a. 3/30/2018 SSM 47204 - Some *2015-2018 Fusion/MKZ/MKC/Escape/ Edge* vehicles equipped with a 2.0L EcoBoost engine may exhibit a runs rough condition with DTCs P0300, P0301, P0302, P0303, P0304 and/or P0316. **This may be due to coolant intrusion due to corrosion on the engine** block**.** To diagnose this concern, with the engine at normal operating temperature, pressurize the cooling system to 138 kPa (20 psi) and hold for 5 hours. If the coolant pressure drops 27.57 kPa (4psi), remove the spark plugs and inspect for coolant in the cylinders. **If coolant is found in any of the cylinders, replace the engine long block assembly**. Follow normal prior approval process for your Dealership. However, follow the diagnostic repair procedure in this article to determine correct repair. For claiming, use causal part 6006 and applicable labor operations in Section 6 of the SLTS Manual.

b. 8/13/2018 SSM 47462 - 2015-2018 Edge, Fusion, Focus, MKZ, MKC, Escape vehicles equipped with a 2.0L EcoBoost engine may exhibit coolant consumption, white smoke and/or a runs rough condition. Refer to the extended coolant pressure test and checking for

combustion gases in Workshop Manual (WSM), Section 303-03A. If internal coolant loss is confirmed, further investigation of the head gasket interface is required. Carefully inspect the cylinder block and head for erosion, pitting, and flatness defects, primarily between the cylinder to cylinder bore bridges. If defects to the aluminum surface on the cylinder block and/or cylinder head are found, follow the cost cap tool for component replacement. Follow WSM, Section 303-01A for the repair procedures

     c.    10/30/2018 SSM 47625 - Some 2014-2019 Fusion and 2017-2019 Escape vehicles equipped with a 1.5L Ecoboost engine may exhibit coolant consumption and white smoke concern. Follow the Cooling System Pressure Test procedure in Workshop Manual (WSM), Section 303-03, pressurize the cooling system to 138 kPa (20 psi) and hold for 5 hours. If cooling system pressure drops 27.57kPa(4psi) after 5 hours and internal engine coolant loss is confirmed, further investigation of the head gasket interface is required. Carefully inspect cylinder block for erosion, pitting, and flatness. Defects will be between the engine block cylinders and cylinder bore bridges. If defects with the surface of the cylinder block and/or cylinder head are identified, follow WSM, Section 303-01A procedures for repairs. Complete cost cap as needed to determine the most cost-effective repair.

     d.    3/7/2019 SSM 47849 - Some 2014-2019 Fusion and 2017-2019 Escape equipped with 1.5L Ecoboost engine may exhibit coolant consumption and white smoke concern. Follow the Cooling System Pressure Test procedure in WSM, Section 303-03, pressurize the cooling system to 138kPa(20 psi0 and hold for 5 hours. If cooling system pressure drops 27.57kPa(4psi) after 5 hours and internal engine coolant loss is confirmed, further investigation of the engine block surface to head gasket interface is required. Carefully inspect engine block cylinders and cylinder bore bridges for erosion, pitting, and flatness. If defects with the cylinder block surface are identified, follow WSM, Section 303-01A procedures for repairs. Complete cost cap as needed to determine the most cost-effective repair. Ford has found that all returned cylinder heads pass inspection and may have been reused.

     e.    12/11/2019 TSB 19-2375 - 2017-2019 Ford Escape; 2014-2019 Ford Fusion. This article supersedes TSB 19-2139 to update the production fix date. Some 2014-2019

Fusion vehicles built on or before 10-Jun-2019 and 2017-2019 Escape vehicles built on or before 08-Apr-2019 equipped with a 1.5L EcoBoost engine may exhibit low coolant level, white exhaust smoke and/or runs rough condition with or without an illuminated malfunction indicator light (MIL) with only diagnostic trouble codes (DTCs) P0300, P0301-P0304, P0316, P0217, P1285 and/or P1299 stored in powertrain control module (PCM). This may be due to coolant intrusion into the cylinder. To resolve the condition, replace the short block and head gasket.

f.      12/20/2019 TSB 19-2346 - 2015-2018 Ford Edge; 2017-2019 Ford Escape, Fusion; 2017-2019 Lincoln MKC, MKZ. Some 2015-2018 Edge and 2017-2019 Fusion/MKZ/Escape/MKC vehicles equipped with a 2.0L EcoBoost engine may exhibit a low coolant level, white exhaust smoke and/or a runs rough condition with or without an illuminated malfunction indicator lamp (MIL). Diagnostic trouble codes (DTCs) may include P0300, P0301-P0304, P0316, P0217, P1285 and/or P1299 stored in powertrain control module (PCM). This may be due to coolant intrusion into the cylinder. To correct the condition, follow the Service Procedure steps to replace the long block engine assembly.

g.      4/2/2020 TSB 20-2100 - Some 2014-2019 Fusion vehicles built on or before 10-Jun-2019 and 2017-2019 Escape vehicles built on or before 08-Apr-2019 equipped with a 1.5L EcoBoost engine may exhibit low coolant level, white exhaust smoke and/or runs rough condition with or without an illuminated malfunction indicator light (MIL) with only diagnostic trouble codes (DTCs) P0300, P0301-P0304, P0316, P0217, P1285 and/or P1299 stored in powertrain control module (PCM). This may be due to coolant intrusion into the cylinder. To resolve the condition, follow the Service Procedure to replace the short block and head gasket.

h.      7/10/2020 SSM 48991 – Some 2015-2020 F150/Edge/Fusion, 2016-2018 MKX, 2019-2020 Nautilus, and 2017-2020 Continental vehicles equipped with 2.7L EcoBoost engines may exhibit an illuminated malfunction indicator lamp (MIL) and/or Engine Coolant Over Temperature warning with diagnostic trouble codes (DTCs) P0116, P0117, P0118, P0119, P0128, P0217, P0330, P1026, P1299, and/or P130D. This may be due to the engine coolant temperature (ECT) sensor or knock sensor wiring harness. To correct the condition, replace the 12A648 ECT sensor and 12A699 knock sensor. Do not disconnect the ECT sensor from the knock sensor harness

37

in case parts are called back for analysis. For claiming, use causal part 12A699 and applicable labor operations in Section 10 of the Service Labor Time Standards (SLTS) Manual.

### 2.   Ford's Customer Service Program

207.   On December 21, 2019, Ford rolled out a Customer Service Program (CSP 19B37) for 2017-2019 Fusion and Escape vehicles equipped with a 1.5L GTDI engine. The program notice stated, "Some of the affected vehicles may exhibit coolant intrusion into the cylinder bores. Customer symptoms include coolant loss, excessive tailpipe smoke, or illuminated malfunction indicator lights (MIL) due to engine misfire. Over time, this condition my damage the engine, requiring replacement of the engine short block." Ford directed dealers to reprogram the Powertrain Control Module. This service program is in effect through June 30, 2021 and is offered to vehicle owners, free of charge, with no mileage limitation. The program bulletin was updated on January 21, February 27, and May 6, 2020 to include additional repair instructions and expand the types of related services Ford would reimburse dealers for performing.

208.   The Customer Service Program, including the supplements, is insufficient to address the underlying Engine defect and does not come close to adequately and wholly compensating Plaintiffs and Class Members for the injuries caused by the Engine Defect and Ford's related acts and omissions.

### 3.   Ford Issued A Recall

209.   On March 27, 2017, Ford issued a Recall – NHTSA Campaign Number 17V209000 – 2013-2015 Transit Connect vehicles equipped with 1.6L GTDI engines." The recall notice stated that, because of an insufficient coolant level, the "engine cylinder head may overheat, crack, and leak oil."

210.   The Recall, which was set to begin on January 5, 2018, provided for the installation of a coolant level sensor, free of charge. The sensor was intended to alert drivers, and vehicle owners/leasers when the coolant in the engine needs to be refilled.

211.   The Recall did not disclose the risk of engine fires or total engine failure, and it did nothing to prevent the continued coolant leaks, and therefore did not repair the Engine Defect.

212.   The Recall was inadequate because the Recall did not address the true source of the

problem and did nothing to repair the Engine Defect. Secondly, it did not include the full range of Vehicles affected by the defect.

213.   The Recall applied only to 1.6L Ecoboost engines, though1.5L and 2.0L Ecoboost engines are designed with the same engine block design, are made from the same materials, and suffer from the same Engine Defect.

214.   Despite the numerous customer complaints reported to Ford and NHTSA, as detailed above, Ford has never expanded the Recall to all vehicle models and model years that suffer from the Engine Defect.

215.   In 2018, Ford supplemented the Recall. This supplement acknowledged the risk of engine fires, but again did not include 1.5L or 2.0L engines, did not apply to the full class of vehicles equipped with defective Ecoboost engines, and did not address the underlying defect. Rather, it identified the problem as "localized overheating of engine cylinders."

216.   Indeed, the supplement simply provided "enhancements to the engine cooling and control systems" and repairs to damage caused by cracked cylinder heads resulting from overheating. But, the supplement did not provide for replacement engines.

217.   Additionally, although the Recall provides that the coolant sensor installation and the specific repairs and "enhancements" will be completed at no cost, it does not call for reimbursement of any payments by consumer for having the Vehicles' coolant refilled, to replace failed engines, vehicles lost to engine fires, and it does not compensate consumers for the costs and expenses associated with the time during which they are unable to use their vehicle as a result of the recurrent Engine Defect.

218.   The Recall, including the supplement, is insufficient to address the underlying Engine defect and does not come close to adequately and wholly compensating Plaintiffs and Class Members for the injuries caused by the Engine Defect and Ford's related acts and omissions.

**E.**     **Ford Knew About the Engine Defect Because of Class Member Complaints Collected by NHTSA.**

219.   Many Class Vehicle owners and lessees lodged complaints about the Engine Defect with NHTSA's Office of Defect Investigations ("ODI").

39

220.   Federal law requires automakers like Ford to be in close contact with NHTSA regarding potential auto defects, including imposing a legal requirement, backed by criminal penalties for violation, of confidential disclosure of defects by automakers to NHTSA, including field reports, customer complaints, and warranty data. *See* TREAD Act, Pub. L. No. 106-414, 114 Stat. 1800 (2000).

221.   Thus, automakers monitor NHTSA databases for consumer complaints regarding their automobiles as part of the automakers' ongoing obligation to identify potential defects in their vehicles, such as spontaneous engine fires.

222.   From its monitoring of the NHTSA databases, Ford knew or should have known of the many complaints about Engine Defect logged by NHTSA ODI, and the content, consistency, and large number of those complaints alerted, or should have alerted, Ford that the Engine Defect is widespread, and a safety hazard.

223.   A sampling of the publicly available complaints lodged with NHTSA ODI includes the following:[7]

   a.    NHTSA ID Number: 10480692, Incident Date October 21, 2011:

> MY 2013 FORD ESCAPE, 1.6 LITER ENGINE, HAD 3 RECALLS, (TWO WERE ENGINE FIRE RELATED). ALL 3 RECALL REPAIRS WERE DONE BY THE LOCAL FORD DEALER, SALEM, VA. WE PICKED VEHICLE UP AFTER THIRD RECALL WORK HAD BEEN DONE ON 9/17/12. WE ASSUMED THE RECALL WORK WAS DONE CORRECTLY, AND THAT FORD'S "FIX" WORKED CORRECTLY. ON 9/21/12 WE WERE TRAVELING EAST AT 65 MPH IN THE RIGHT LANE ON I-64 NEAR CHARLOTTESVILLE, VA. IT WAS ABOUT 1 PM IN THE AFTERNOON. THERE WAS A "POP" SOUND IN THE ENGINE AREA. INSTANTLY, THE ACCELERATOR HAD NO RESPONSE, THE HIGH ENGINE TEMPERATURE WARNING LIGHT CAME ON, AND THEN ALL WARNING LIGHTS, GAUGES, & TACHOMETER ALL WENT DEAD. LUCKILY, WE WERE ADJACENT TO AN EXIT RAMP, AND WE COASTED TO A STOP ON RTE 20/53. IMMEDIATELY, WHITE STEAM CAME OUT OF THE ENGINE COMPARTMENT. KNOWING THE THIRD RECALL DEALT WITH THE "RISK OF ENGINE FIRES", WE GOT OUT, AND MOVED WELL AWAY FROM THE VEHICLE. WITHIN MINUTES, BROWN, OILY

---

[7] This collection of complaints have been taken verbatim from NHTSA's website and have not been edited for grammar or spelling.

SMOKE CAME OUT FROM UNDER THE HOOD. THEN FLAMES CAME OUT FROM UNDER THE HOOD, AT THE WINDSHIELD AND OUT THE SIDES OF THE ENGINE COMPARTMENT. THEN THE CAR BURST INTO FLAMES AND WAS DESTROYED. PICTURES WERE TAKEN OF THE VEHICLE ON FIRE, AND AFTER IT WAS OUT, WITH A CELL PHONE. AFTER THE FIRE WAS OUT, THE VEHICLE WAS TAKEN TO THE FORD DEALER IN                    CHARLOTTESVILLE,                    VA..

WE WERE TOLD THE INSURANCE COMPANY HAD RETAINED A FIRE INSPECTOR TO LOOK AT THE CAR, AND ASK ME QUESTIONS, WHICH HE DID. LATER THE INSPECTOR SAID THE INSURANCE COMPANY DID NOT REQUIRE A REPORT.

b.    NHTSA ID Number: 10513837, Incident Date May 22, 2013:

WAS DRIVING DOING 40MPH WHEN OUT OF NO WHERE I RECEIVED A MESSAGE INSTRUCTING ME TO IMMEDIATELY PULL VEHICLE OVER AND SHUT DOWN DUE TO ENGINE OVERHEATING.

NEVER RECEIVED A "LOW COOLANT" LIGHT, JUST A SUDDEN WARNING TO PULL OVER. HAD TO BE TOWED FROM THE INCIDENT. LUCKILY NO ONE WAS INJURED AND THERE WERE NO ACCIDENTS AS IT WAS A TWO LANE, ONE WAY, STREET WITH NO SHOULDERS. OPENED THE HOOD AND I HAD ABSOLUTELY NO ENGINE COOLANT. ALSO NOTICED THAT THE ENGINE WAS IN FACT VERY HOT. I AM CONCERNED THAT THIS HAS CAUSED ENGINE DAMAGE ON MY BRAND NEW VEHICLE.

c.    NHTSA ID Number: 10521995, Incident Date June 22, 2013:

MY CAR HAS OVERHEATED TWICE AFTER THE RECALL FIX. MY COOLANT WAS VIOLENTLY BOILING OVER. MY TRANSMISSION IS ALSO GROSSLY SHIFTING INCORRECTLY. I ALMOST GOT HIT BY ANOTHER CAR WHEN I WAS TRYING TO MERGE ONTO THE FREEWAY SINCE IT WASN'T GOING TO THE NEXT GEAR. THE TRANSMISSION REDLINED AND THEN SHIFTED. I CHECKED MY OBT AND I'M NOT GETTING ANY CODES             FOR             THESE             PROBLEMS.

I'M NOT SURE WHAT TO DO ANYMORE SINCE ANYTIME I'VE BROUGHT MY CAR IN THEY HAVEN'T FOUND ANY ISSUES. I'VE BROUGHT MY CAR IN SEVERAL TIMES ABOUT THE ENGINE AND TRANSMISSION AND NO ISSUES HAVE BEEN FOUND. I DRIVE THROUGH THE SANTA CRUZ MOUNTAINS EVERY WEEK AND I'M AFRAID ONE DAY MY ENGINE WILL CATCH ON FIRE (HILLY ROADS AND LOW SPEEDS CAUSE

THE ENGINE TO RUN HOT). IT WOULD BE DISASTROUS FOR THE STATE OF CALIFORNIA IF A WILDFIRE WAS STARTED DUE TO THIS CAR.

   d.      NHTSA ID Number: 10549427, Incident Date October 23, 2013:

I WAS DRIVING MY 2013 1.6 LITER FORD FUSION ON 10/23/2013 AND THE ENGINE OVERHEATED. MY VEHICLE HAD TO BE TOWED TO THE DEALERSHIP. I LOOKED UP MY VIN NUMBER ON FORD BECAUSE AFTER THIS ALL HAPPENED I HEARD ABOUT FUSIONS BEING RECALLED FOR THIS SAME PROBLEM. ACCORDING TO FORD MY VIN NUMBER MY WAS NOT UNDER THE RECALLED FORD FUSIONS THAT HAD THE OVERHEATING PROBLEM. THE DEALERSHIP SAID THAT THE COOLANT HAD LEAKED INTO THE ENGINE AND HAD CAUSED IT TO OVERHEAT. THIS SOUNDS EXACTLY LIKE THE RECALL TO ME. I HAD NO IDEA ABOUT THE RECALL UNTIL AFTER THIS HAPPEN TO ME SO I DIDN'T GET OUT OF MY CAR. MY CAR COULD OF HAD AN ENGINE FIRE LIKE SOME OF THE RECALLED ONES HAVE HAD. I AM VERY UPSET WITH FORD. I BELIEVE THAT THEY STILL HAVE A PROBLEM AND MORE FUSIONS NEED TO BE RECALLED. IT IS SAD THAT FORD IS SELLING THESE CARS TO PEOPLE AND THEY COULD STILL BE UNSAFE.

   e.      NHTSA ID Number: 10552925, Incident Date November 18, 2013:

MY CAR IS STILL OVERHEATING AFTER BRINGING IT INTO THE DEALER 6 TIMES. THEY HAVE DONE THE RECALL FIX TWICE NOW. THERE APPEARS TO BE SMOKE COMING OUT OF MY HOOD NOW WITH A BURNT SMELL. THE BURNING AND COOLANT SMELL IS TRIGGERING MY ASTHMA WHILE DRIVING.

   f.      NHTSA ID Number: 10639009, Incident Date September 22, 2014:

TL* THE CONTACT OWNS A 2013 FORD FUSION. THE CONTACT STATED THAT WHILE DRIVING AT AN UNKNOWN SPEED, THE VEHICLE DECELERATED AND THE TEMPERATURE WARNING LIGHT ILLUMINATED. THE CONTACT MENTIONED THAT THE TEMPERATURE GAUGE WAS AT THE MAXIMUM HIGH. THE CONTACT WAS NOT INCLUDED IN RECALL NHTSA CAMPAIGN NUMBER: 12V551000 (ENGINE AND ENGINE COOLING). THE VEHICLE WAS TOWED TO A DEALER. THE TECHNICIAN DIAGNOSED THAT THE ENGINE NEEDED TO BE REPLACED. THE MANUFACTURER WAS NOT MADE AWARE OF THE FAILURE. THE FAILURE MILEAGE WAS 7,755

g.    NHTSA ID Number: 10959479, Incident Date January 1, 2017:

ON MANY DIFFERENT TIMES MY CAR OVER HEATS. I IMMEDIATELY HAVE TO PARK N WAIT A WHILE FOR IT TO COOL DOWN.

h.    NHTSA ID Number: 10993089, Incident Date March 20, 2017:

IT KEEPS SHOWING THAT THE SUV IS OVERHEATING WITH A WARNING. IT WILL PASS AFTER A FEW MINUTES. IT HAS HAPPENED AT LEAST 6 TIMES. WR HAVE LESS THEN 35,000 MILES ON THE CAR

i.    NHTSA ID Number: 10979800, Incident Date March 26, 2017:

VEHICLE BEGAN TO OVERHEAT WHILE DRIVING ON INTERSTATE... WARNING LIGHT WOULD BLINK AND CAR WOULD        GET        EXTREMELY        HOT...

COOLANT WAS LEAKING INTO THE ENGINE, INTERNAL LEAK, SO WARNING LIGHT WOULD APPEAR ABOUT EVERY 3                                DAYS

VEHICLE HAS BEEN PROPERLY MAINTENANCE AND NOTHING DONE BY OWNER TO CAUSE ENGINE FAILURE

j.    NHTSA ID Number: 10984996, Incident Date May 8, 2017:

RECEIVED RECALL 17S09 ONE WEEK STATING LOSS OF COOLANT COULD CAUSE CYLINDER HEAD TO CRACK AND OIL TO LEAK OUT ONTO EXHAUST MANIFOLD AND CATCH FIRE. THE VERY NEXT WEEK WHILE DRIVING ON A COUNTRY ROAD MY ESCAPE CAUGHT FIRE WHILE DRIVING. I WAS LUCKY TO HAVE DRINKS IN THE CAR TO BE ABLE TO GET THE FIRE OUT BEFORE THE FIRE DEPARTMENT GOT THERE. TOWED VEHICLE TO FORD SHOP AND CONTACTED FORD CUSTOMER CARE KNOWING THAT THEY ARE AWARE OF THIS PROBLEM AND THEY WILL NOT ASSIST ME IN REPAIRING VEHICLE. THE RECALL BASICALLY ONLY STATES ADDING A LOW COOLANT SENSOR WHICH IN REALLY WILL NOT HELP BECAUSE IF IT BECOMES LOW ON COOLANT THE HEAD IS ALREADY CRACKED AND DAMAGE IS ALREADY DONE. FURTHER MORE FORD KNOWING THEY HAVE THIS PROBLEM DOESN'T EVEN HAVE PARTS AVAILABLE UNTIL AT THE EARLIEST FALL OF 2017 SO MORE PEOPLE WILL BE HAVING CAR FIRES AND MAY NOT BE AS LUCKY AS I WAS TO WRITE THIS REPORT.

k.      NHTSA ID Number: 11002119, Incident Date June 28, 2017:

TL* THE CONTACT OWNED A 2014 FORD ESCAPE. WHILE
DRIVING APPROXIMATELY 55 MPH, FLAMES ERUPTED
UNDERNEATH THE VEHICLE AND UNDER THE HOOD. THE
VEHICLE WAS COASTED TO THE SIDE OF THE ROAD. THE
DRIVER NOTICED FLAMES COMING FROM UNDER THE
HOOD AND FROM THE ENGINE COMPARTMENT. THE FRONT
OF THE VEHICLE BURST INTO FLAMES. THE FIRE
DEPARTMENT EXTINGUISHED THE FIRE. A POLICE REPORT
WAS FILED. THE VEHICLE WAS DESTROYED AND TOWED TO
WATERFORD TOWING LOT. THE VIN WAS INCLUDED IN
NHTSA CAMPAIGN NUMBER: 17V209000 (ENGINE AND
ENGINE COOLING). THE MANUFACTURER AND THE DEALER
WERE NOT MADE AWARE OF THE FAILURE. THE
APPROXIMATE FAILURE MILEAGE WAS 65,000. THE VIN WAS
NOT AVAILABLE. *LN *TR

l.      NHTSA ID Number: 11032145, Incident Date September 29, 2017:

WE WERE TRAVELING IN THE CAR AT APPROXIMATELY 80
MPH. THE CAR ENGINE BEGAN TO RACE STRONGLY
WITHOUT A CORRESPONDING INCREASE IN SPEED. THIS
HAPPENED TWICE AND THEN A RED OIL INDICATOR LIGHT
CAME ON. IT SOUNDED ALSO LIKE A HEAD GASKET BLEW
ON THE 1.6 LITER ECO-BOOST ENGINE AS THERE WAS A
RATTLING NOISE LIKE TUMBLING PEBBLES IN A CAN OR
DRUM. WE LOST POWER. BLUE SMOKE STREAMED OUT THE
TAIL PIPE OF THE CAR. WE COASTED OVER TO THE
SHOULDER OF THE HIGHWAY AND CAME TO A STOP. BY THE
TIME THE CAR CAME TO A STOP SMOKE WAS COMING FROM
UNDER THE HOOD OF THE CAR. I GOT OUT OF THE CAR AND
LOOKED TOWARD THE ENGINE COMPARTMENT FROM THE
PASSENGER SIDE. FLAMES WERE COMING FROM BELOW
THE CAR JUST INSIDE THE FRONT PASSENGER SIDE TIRE. WE
QUICKLY GOT EVERYONE AND EVERYTHING OUT OF THE
CAR. THE FLAMES SPREAD VERY QUICKLY. THE FRONT
HALF OF THE CAR WAS ENGULFED IN FLAMES IN
APPROXIMATELY 4 MINUTES AND THE WHOLE CAR WAS
CONSUMED IN ABOUT 8 OR 9 MINUTES.

m.      NHTSA ID Number: 11051098, Incident Date November 28, 2017:

CAR SAYS IT'S IVERHEATING AND IT WAS STATIONARY FOR
HOURS BEFORE.

n.      NHTSA ID Number: 11101736, Incident Date December 5, 2017:

L* THE CONTACT OWNS A 2013 FORD FUSION. THE CONTACT STATED THAT THERE WAS A COOLANT LEAK AND THE ENGINE KEPT OVERHEATING. THE DEALER (FRED BEANS FORD OF NEWTOWN, 10 N SYCAMORE ST, NEWTOWN, PA 18940, (215) 968-3806) INSTALLED A SENSOR AND REPLACED THE COOLANT RESERVOIR TANK; HOWEVER, THE REMEDY FAILED TO PROVIDE A PERMANENT SOLUTION. THE CONTACT STATED THAT THE VEHICLE STALLED AND THE COOLANT WARNING INDICATOR WAS STILL FLASHING. SEVERAL INDEPENDENT MECHANICS DIAGNOSED THE VEHICLE, BUT WAS UNABLE TO PROVIDE A SPECIFIC DIAGNOSIS. THE MANUFACTURER INDICATED THAT THERE WAS NO RECALL FOR THE VEHICLE AND ADVISED THE CONTACT TO TAKE THE VEHICLE BACK TO THE DEALER FOR SERVICING. THE FAILURE MILEAGE WAS NOT AVAILABLE.

o.   MY CAR STOPPED WHILE DRIVING ON A SIDE STREET. AUTONATION FORD CLAIMED THERE WAS A MALFUNCTION WHICH LED TO THE TRANSMISSION FAILURE. THEY WANTED $7K TO REPAIR. I TOOK IT ELSEWHERE FOR REPAIR AND WITHIN 1 WEEK AFTER REPAIR THE CAR ENGINE CAUGHT ON FIRE WHILE DRIVING. I HAD BEEN ON THE INTERSTATE BUT HAD JUST EXITED TO A NEARBY RESIDENTIAL AREA. THE ENTIRE FRONT OF THE CAR WAS MELTED. THE CAR IS TOTALED AND HAS BEEN TURNED OVER TO MY INSURANCE COMPANY, ALLSTATE.

p.   NHTSA ID Number: 11111995, Incident Date July 15, 2018:

VEHICLE IS EXPERIENCING SIMILAR PROBLEMS WITH PREVIOUSLY RECALLED FORD ESCAPES FROM 2015. CHECK ENGINE LIGHT HAS GONE ON WITH THE CODE TO "REPLACE COOLANT BYPASS VALVE"

q.   NHTSA ID Number: 11205720, Incident Date May 5, 2019:

TL* THE CONTACT OWNS A 2015 FORD ESCAPE. WHILE DRIVING 45 MPH, THE VEHICLE BEGAN TO OVERHEAT AS THE IDLE AND COOLER TEMP WARNING INDICATORS ILLUMINATED. THE VEHICLE WAS TAKEN TO TOM WOOD FORD (LOCATED AT 3130 E 96TH ST, INDIANAPOLIS, IN 4624, (317) 846-4241) WHERE IT WAS DIAGNOSED THAT COOLANT FUEL NEEDED TO BE ADDED. THE MANUFACTURER WAS

NOTIFIED AND PROVIDED CASE NUMBER: CAS-21644009. THE FAILURE MILEAGE WAS 78,000

    r.    NHTSA ID Number: 11194806, Incident Date April 4, 2019:

MY CAR HAD A PROBLEM IDLING LAST WEEK. GOT IT TO THE MECHANIC. MECHANIC TRIED TO CHANGE THE SPARK PLUG DUE TO A PROBLEM IN THE CYLINDER BUT SPARK PLUG WAS FROZEN. FOUND COOLANT UNDERNEATH. MECHANIC HAD WORKED AS A MECHANIC AT A FORD DEALERSHIP, SAID THIS PROBLEM WAS PREVALENT WITH FORDS. I CONTACTED FORD. THE FORD REPRESENTATIVE SAID I HAD NO EXTENDED WARRANTY AND THAT THERE WAS NO RECALL ON THE PRODUCT SO THERE WAS NOTHING THEY COULD DO. THE ONLY LONG-TERM FIX IS AN ENTIRELY NEW ENGINE BECAUSE COOLANT IS LEAKING FROM THE ENGINE. THE CAR IS ONLY THREE YEARS OLD.

    s.    NHTSA ID Number: 11205720, Incident Date May 5, 2019:

THE CONTACT OWNS A 2015 FORD ESCAPE. WHILE DRIVING 45 MPH, THE VEHICLE BEGAN TO OVERHEAT AS THE IDLE AND COOLER TEMP WARNING INDICATORS ILLUMINATED. THE VEHICLE WAS TAKEN TO TOM WOOD FORD (LOCATED AT 3130 E 96TH ST, INDIANAPOLIS, IN 4624, (317) 846-4241) WHERE IT WAS DIAGNOSED THAT COOLANT FUEL NEEDED TO BE ADDED. THE MANUFACTURER WAS NOTIFIED AND PROVIDED CASE NUMBER: CAS-21644009. THE FAILURE MILEAGE WAS 78,000.

    t.    NHTSA ID Number: 11320502, Incident Date December 2, 2019:

I BOUGHT THE CAR NEW. SEVERAL MONTH'S AGO I HEARD WATER SLOSHING CHECK ENGINE LIGHT CAME ON, OVERHEATING LIGHT ALONG WITH MANY OTHERS. THE CAR SHUT OFF ON A VERY BUSY HIGHWAY ALMOST CAUSED ME TO GET FROM BEHIND. THE CAR WAS NOT OVERHEATING. REPLACED WATER PUMP, COIL PACK, PLUGS, SEVERAL SENSORS. DDREOVER AGAIN VEH SHUT OFF SAMETHING. TOOK TO SHOP #1 FOUND COOLANT IN THE ENGINE CRACK BLOCK. NOW ITS AT FORD DEALERSHIP DIAGNOSED SAMEE AS SHOP #1. CALLED FORD THEY STATED NOTHING THEY WILL DO. FORRDD EXPERT SAID SEVERAL HAS BEEN REPORTED BUT NO RECALL YET.

    u.    NHTSA ID Number: 11339218, Incident Date July 8, 2020:

MY 2017 FORD EDGE 2.0L ECOBOOST, CHECK ENGINE LIGHT CAME ON WITH CODE OF P0302, AFTER CHANGING THE SPARK PLUGS AND COIL PACKS, FINALLY TOOK IT TO OUR

LOCAL DEALERSHIP, BANNER FORD IN MANDEVILLE, LA AND AFTER A DIAGNOSTIC WAS FOUND TO HAVE "COOLANT INTRUSION ON CYLINDER #2, AND WAS TOLD THAT FORD WOULD NOT SELL THE PARTS TO REPAIR THE ENGINE, BUT THAT THE ENTIRE ENGINE HAD TO BE REPLACED BECAUSE FORD HAD CHANGED THE DESIGN ON THE ENGINE AND GASKETS. THIS SHOULD BE A RECALL, NOT A TSB, AS I HAVE FOUND MULTIPLE COMPLAINTS AND THEY ALL HAVE CONTACTED FORD WITH THE SAME RESULTS, SO FORD IS WELL AWARE OF THIS ISSUE, COMPLAINTS GO BACK AS FAR AS 2015 AND ALL ARE AROUND THE 65K TO 70K MILE MARK. FORD KNOWS ABOUT THIS BY REDESIGNING THE ENGINES AND THE GASKETS. I AM LOOKING AT AN $8500 ENGINE REPLACEMENT BILL BECAUSE I AM OUT-OF-WARRANTY.

v.    NHTSA ID Number: 11339266, Incident Date July 10, 2020:

TL* THE CONTACT OWNS A 2016 FORD FUSION. THE CONTACT STATED THAT AFTER STARTING THE VEHICLE, THE VEHICLE DROVE VERY ROUGH PRIOR TO THE CHECK ENGINE WARNING LIGHT BECAME ILLUMINATED. THE VEHICLE WAS TAKEN TO BILL ESTES FORD LOCATED AT 450 EAST NORTH FIELD DR, BROWNSBURG, IN 46112, TO BE DIAGNOSED. THE CONTACT WAS INFORMED THAT COOLANT LEAKED INTO CYLINDER #1 AND THE ENGINE NEEDED TO BE REPLACED. THE VEHICLE WAS NOT REPAIRED. THE MANUFACTURER WAS NOTIFIED OF THE FAILURE BUT NO ASSISTANCE WAS OFFERED. THE FAILURE MILEAGE WAS 85,000.

w.    NHTSA ID Number: 11338041, Incident Date June 30, 2020:

AT 55K MILES THE CHECK ENGINE LIGHT APPEARED. WE IMMEDIATELY TOOK THE CAR TO THE DEALER. WE ARE TOLD THAT THERE IS A COOLANT INTRUSION IN A CYLINDER AND THAT THE ENTIRE ENGINE WILL NEED TO BE REPLACED. THE VEHICLE WARRANTY STARTED JUNE 26, 2015. THE VEHICLE WAS CHECKED INTO THE DEALER 6/30/2020, 4 DAYS AFTER THE 5 YEAR/60 MILE WARRANTY EXPIRED. DAYS EXPIRED, NOT MILAGE. WE ARE BEING TOLD BY THE DEALER AND FORD CUSTOMER SERVICE THAT NOTHING WILL BE DONE TO FIX THE CAR EVEN THOUGH THE ISSUE IS A KNOWN PROBLEM AND THE REPLACEMENT ENGINE THAT WOULD BE INSTALLED IS COMPLETELY REDESIGNED DUE TO THE KNOWN DEFECT.

224.    As is made apparent by the above examples and those discussed earlier in this Complaint, consumers have repeatedly and clearly alerted NHTSA ODI about the Engine Defect

47

and Ford was, or should have been, aware of and monitoring those complaints. Thus, Ford should have known about the defect plaguing Ecoboost engines in the Class Vehicles.

225.   In sum, as early as 2010, and certainly well before Plaintiffs and Class Members purchased or leased their Class Vehicles, Ford was aware of the Engine Defect, should have been aware of the Engine Defect through the exercise of reasonable care, and/or was negligent in failing to be aware of the Engine Defect, based on, among others, the following sources:

a.   Data gathered during pre-release design, manufacturing, engineering, and testing;

b.   Data gathered by Ford regarding an abnormally large number of requested repairs dealing with leaking coolant and/or engine failures in Ecoboost engines, including the need for full engine replacements at low vehicle mileage;

c.   Data about the large number of replacement engines for Class Vehicles ordered from Ford;

d.   The multitude of consumer complaints regularly lodged with NHTSA and Ford regarding the Ecoboost engines overheating, misfiring, failing, and / or catching on fire;

e.   Ford service center employees' familiarity with the Engine defect.

226.   Moreover, the large number and consistency of Class Member complaints describing the propensity of Ecoboost engines in Class Vehicles to leak coolant, expel white smoke, shut down while in use, and spontaneously catch fire demonstrate that Class Members consider the Engine Defect to be a material safety issue to the reasonable consumer.

**IV.   <u>Applicable Warranties</u>**

227.   Ford sold and leased the Ford-branded Class Vehicles with a written express warranty covering the Vehicles for three years or 36,000 miles, whichever comes first (the "Ford Warranty"). Ford sold and leased the Lincoln-branded Class Vehicles with a written express warranty covering the Vehicles for four years or 50,000 miles, whichever comes first (the "Lincoln Warranty").

228.   Ford's New Vehicle Limited Warranty expressly states that Ford will "without charge, repair, replace, or adjust all parts on your vehicle that malfunction or fail during normal use during the applicable coverage period due to a manufacturing defect in factory-supplied materials or factory

1   workmanship" so long the Vehicle is properly operated and maintained and taken to a Ford

2   dealership for repair within the warranty period.

3       229.   Ford further provides powertrain warranty coverage, which is applicable to "the

4   Engine: all internal lubricated parts, cylinder block, cylinder heads, electrical fuel pump, powertrain

5   control module, engine mounts, flywheel, injection pump, manifold (exhaust and intake), manifold

6   bolts, oil pan, oil pump, seals and gaskets, engine thermostat, engine, thermostat housing, timing

7   chain cover, timing chain (gears or belt), turbocharger/supercharger unit, valve covers, water pump"

8   as well as the components in the transmission, front-wheel drive, rear-wheel drive, and four-

9   wheel/all-wheel drive. This coverage applies for 5 years or up to 60,000 miles, whichever comes

10  first, under the Ford Warranty, and 6 years or 70,000 miles, whichever comes first, under the Lincoln

11  Warranty.

12      230.   For certified pre-owned ("CPO") Vehicles, Ford offers a limited warranty covering

13  CPO Vehicles for 12 months or 12,000 miles, whichever comes first.

14      231.   Ford's CPO Vehicle warranty states that a dealer will replace "all covered

15  components . . . that are found to be defective in factory-supplied materials or workmanship during

16  the applicable warranty periods." The engine and its components—including the cylinder block and

17  cylinder heads—are included in Ford's list of "covered components."

18      232.   Ford provides these warranties to buyers and lessees after the purchase/lease of the

19  Class Vehicle is completed; buyers and lessees have no pre-sale/pre-lease knowledge or ability to

20  bargain as to the terms of the warranties.

21      233.   Finally, Ford sells replacement parts, including engines and engine components,

22  through its Motorcraft parts brand, and provides an express written warranty with all new Ford and

23  Motorcraft replacement parts. That warranty provides that for parts sold on or after October 1, 2013,

24  parts found to be defective in factory-supplied material or workmanship will be repaired, replaced,

25  or exchanged within 24 months of part purchase, regardless of the number of miles driven.

26  **V.   <u>Ford's Prior Safety Recall</u>**

27      234.   On March 27, 2017, Ford issued a Recall—NHTSA Campaign Number

28  17V209000—applicable to "certain 2014 Escape, 2014-2015 Fiesta ST, 2013-2014 Fusion and

49

2013-2015 Transit Connect vehicles equipped with 1.6L GTDI engines." The recall notice stated that, because of an insufficient coolant level, the "engine cylinder head may overheat, crack, and leak oil."

235.  The Recall, which was set to begin on January 5, 2018, provided for the installation of a coolant level sensor, free of charge. The sensor would alert drivers and vehicle owners/leasers when the coolant in the engine required replenishment.

236.  The Recall did not mention the risk of engine fires or total engine failure, and it did nothing to prevent the continued coolant leakage.

237.  The Recall was inadequate for several reasons. First, as already noted, the Recall did not address the true source of the problem and did nothing to ameliorate the issue. Second, it did not encompass the full range of Vehicles affected by the defect.

238.  The Recall applied only to 1.6L Ecoboost engines, although 1.5L and 2.0L Ecoboost engines have the same engine block design, are made from the same materials, and likewise suffer from the Engine Defect.

239.  Additionally, the Recall did not apply to all of the vehicle models and model years outfitted with the defective Ecoboost engines. Despite the numerous customer complaints reported to Ford and NHTSA, as detailed above, Ford has never expanded the applicability of the Recall to other vehicle models and model years.

240.  In 2018, Ford supplemented its initial Recall. This supplement acknowledged the possibility of engine fires, but still did not include 1.5L or 2.0L engines, did not apply to the full class of vehicles equipped with defective Ecoboost engines, and did not address the underlying defect. Rather, it identified the problem as "localized overheating of engine cylinders."

241.  Instead, the supplement called for "enhancements to the engine cooling and control systems" and repairs to damage caused by cracked cylinder heads resulting from overheating. The supplement did not provide for replacement engines.

242.  Furthermore, although the Recall provides that the coolant sensor installation and the specific repairs and "enhancements" will be completed free of cost, it does not call for reimbursement of consumers' repeated costs to have the Vehicles' coolant replenished, to replace

totally failed engines, to reimburse consumers for vehicles lost to engine fires, and it does not compensate consumers for the costs and expenses associated with the time during which they are unable to use their vehicle as a result of the recurrent Engine Defect.

243. The Recall, including the supplement, is insufficient to address the underlying Engine defect, and does not come close to adequately and wholly compensating Plaintiffs and Class Members for the injuries caused by the Engine Defect and Ford's related acts and omissions.

## VI.  Ford's Marketing and Concealment

244. Discovery will show that Ford knowingly marketed, advertised, and sold / leased the Class Vehicles with the Engine Defect while willfully concealing the true—defective—quality and safety risks of the Ecoboost engines installed in these Vehicles.

245. Ford markets the Class Vehicles directly to consumers through nationwide multimedia advertising campaigns on television, the Internet, billboards, print publications, mailings, and through other mass media. Ford touts the safety and quality of Class Vehicles, despite its knowledge that the Vehicles are equipped with an Engine Defect that poses severe risks to drivers, passengers, and the public.

246. For instance, in a brochure marketing the 2018 Fusion, Ford describes itself as "steadfast about safety," and specifically identifies the Fusion as "proof of [the company's] commitment to safety." In brochures advertising the 2013 Ford Fusion and 2014 Ford Escape, Ford markets the vehicle as "Quality, Green, Safe, Smart." The 2014 Escape, according to Ford, "proves you can get style, function, and fun in one well-priced package." And the Ecoboost engine, according to Ford, "offer[s] a no-compromise combination of power and efficiency."

247. But in actuality, the Class Vehicles fall far short of these promises. Ford failed to inform consumers of the Engine Defect, which causes coolant to leak into the cylinders, leads to smoke emitting from the exhaust, requires repeated and frequent coolant replacement, and results in cracked cylinder heads, engine overheating, total engine failure—at times while the car is moving at high speeds—and spontaneous engine fires.

248. These hazards do not live up to Ford's assurances of its "commitment to safety" and the "confidence" that Ford promoted to its customers. Ford concealed from consumers the Engine

Defect and its outcomes, and misled the public about the actual quality of the Class Vehicles.

249.   Plaintiffs and Class Members were exposed to Ford's long-term, national, multimedia marketing campaign touting the supposed quality, safety, and comfort of the Class Vehicles, and Class Members, including Plaintiffs, justifiably made their decisions to purchase or lease their Class Vehicles based on Ford's misleading marketing that concealed the true, defective nature of the Class Vehicles.

250.   As detailed above, Discovery will show that Ford has been aware of the Engine Defect since at least 2010, and certainly well before Plaintiffs and Class Members purchased or leased their Class Vehicles, through pre-release evaluation and testing; the high number of repairs and replacement part sales related to the Engine Defect; and the numerous and consistent complaints about the Engine Defect collected by NHTSA.

251.   Through its acts and omissions, Ford has actively concealed the existence and natures of the Engine Defect from Class Members, including Plaintiffs, since at least 2010. Specifically, Ford:

a.   Failed to disclose, and actively concealed, before, at the time of, and after the purchase, lease, and / or service of the Vehicles, any and all known material defects of the Class Vehicles, including the Engine Defect;

b.   Failed to disclose, at the time of and after the purchase, lease, and or service, that the Ecoboost engines installed in Class Vehicles were defective and not fit for their intended purpose;

c.   Failed to disclose, and actively concealed, the existence and pervasiveness of the Engine Defect even when Class Members directly inquired about potential defects affecting their Ecoboost engines during communications with Ford, Ford dealerships, and Ford service centers;

d.   Actively concealed the Engine Defect by forcing Class Members to bear the cost of stop-gap "solutions" that only temporarily alleviated the symptoms of the defect without permanently and effectively curing the defect;

e.   Actively concealed the Engine Defect by failing to issue a comprehensive and

effective Recall providing for the replacement of the defective Ecoboost engines with non-defective engine blocks, and instead, only when the Vehicles remained under warranty, providing for the replacement of one defective, failed engine block with yet another similarly and equally defective engine block.

252.   By engaging in the conduct described above, Ford has concealed, and continues to conceal, the Engine Defect from Class Members. If Class Members had had knowledge of the information Ford concealed, they would not have purchased or leased the Class Vehicles or would have paid less to do so.

**FRAUDULENT CONCEALMENT ALLEGATIONS**

253.   Plaintiffs' claims arise out of Ford's fraudulent concealment of the Engine Defect, and its representations about the quality, safety, and comfort of the Class Vehicles. To the extent that Plaintiffs' claims arise from Ford's fraudulent concealment, there is no one document or communication, and no one interaction, upon which Plaintiffs base their claims. Absent discovery, Plaintiffs are unaware of and unable through reasonable investigation to obtain the true names and identities of those individuals at Ford responsible for disseminating false and misleading marketing materials regarding the Class Vehicles. Ford necessarily is in possession of all of this relevant information.

254.   Plaintiffs allege that at all relevant times, including specifically at the time he and other Class Members purchased or leased their Class Vehicles, Ford knew or should have known of the Engine Defect; Ford was under a duty to disclose the Defect based upon its exclusive knowledge of it, and its concealment of it; and Ford never disclosed the Defect to Plaintiffs, Class Members, or the public at any time or place or in any manner other than an inadequate and ineffective recall of a small subset of the Class Vehicles.

255.   Plaintiffs make the following specific fraud allegations with as much specificity as possible absent access to the information necessarily available only to Ford:

a.     ***Who***: Ford actively concealed the Engine Defect from Plaintiffs and Class Members while simultaneously touting the safety, comfort, and quality of the Class Vehicles, including as alleged in paragraphs 90-98, above. Plaintiffs are unaware of, and therefore unable to

1    identify, the true names and identities of those specific individuals at Ford responsible for such

2    decisions.

3        b.    **What**: Ford knew, or was reckless or negligent in not knowing, that the Class

4    Vehicles contain the Engine Defect, including as alleged above in paragraphs 55-71. Ford concealed

5    the Defect and made representations about the safety, comfort, quality, and other attributes of the

6    Class Vehicles, including as alleged above in paragraphs 90-98.

7        c.    **When**: Ford concealed material information regarding the Defect at all times

8    and made representations about the quality, safety, and comfort of the Class Vehicles, starting no

9    later than 2010, or at the subsequent introduction of certain models of Class Vehicles to the market,

10   continuing through the time of sale/lease, and on an ongoing basis, and continuing to this day,

11   including as alleged above in paragraphs 90-98. Ford still has not disclosed the truth about the full

12   scope of the Defect in the Class Vehicles to anyone outside of Ford. Ford has never taken any action

13   to inform consumers about the true nature of the Defect in Class Vehicles. And when consumers

14   brought their Vehicles to Ford complaining of the problems with their Ecoboost engines, including

15   recurrent coolant leakage, smoking, failures, and fires, Ford denied any knowledge of or

16   responsibility for the Engine Defect.

17       d.    **Where**: Ford concealed material information regarding the true nature of the

18   Defect in every communication it had with Plaintiffs and Class Members and made representations

19   about the quality, safety, and comfort of the Class Vehicles. Plaintiffs are aware of no document,

20   communication, or other place or thing, in which Ford disclosed the truth about the full scope of the

21   Defect in the Class Vehicles to anyone outside of Ford. Such information is not adequately disclosed

22   in any sales documents, displays, advertisements, warranties, owner's manuals, or on Ford's

23   website.

24       e.    **How**: Ford concealed the Engine Defect from Plaintiffs and Class Members

25   and made representations about the quality, safety, and comfort of the Class Vehicles. Ford actively

26   concealed the truth about the existence, scope, and nature of the Defect from Plaintiffs and Class

27   Members at all times, even though it knew about the Defect and knew that information about the

28   Defect would be material to a reasonable consumer, and Ford promised in its marketing materials

1   that Class Vehicles have qualities that they do not have.

2          f.     *Why*: Ford actively concealed material information about the Engine Defect

3   in the Class Vehicles for the purpose of inducing Plaintiffs and Class Members to purchase and/or

4   lease Class Vehicles, rather than purchasing or leasing competitors' vehicles and made

5   representations about the quality, safety, and comfort of the Class Vehicles. Had Ford disclosed the

6   truth—for example, in its advertisements or other materials or communications—Plaintiffs and

7   Class Members (all reasonable consumers) would have been aware of it, and would not have bought

8   or leased the Class Vehicles or would have paid less for them.

9                    **TOLLING AND THE STATUTE OF LIMITATIONS**

10  **VII.   Fraudulent Concealment and Equitable Tolling**

11          256.   Discovery will show that Ford has known of the Engine Defect in the Class Vehicles

12  since at least 2010, and certainly well before Plaintiffs and Class Members purchased or leased their

13  Class Vehicles, and yet has concealed from or failed to notify Plaintiffs, Class Members, and the

14  public of the full and complete nature of the Engine Defect. Ford continues to conceal the scope and

15  extent of the Defect to this day, as detailed above.

16          257.   Moreover, Ford's attempts to conceal the defect also include conducting insufficient

17  "Band Aid" repairs during the warranty period, including replacing only certain components, adding

18  a low coolant sensor, and otherwise failing to replace the defective parts with non-defective parts.

19          258.   Any applicable statute of limitations has been tolled by Ford's knowledge, active

20  concealment, and denial of the facts alleged herein, which behavior is ongoing.

21  **VIII.  Estoppel**

22          259.   Ford was and is under a continuous duty to disclose to Plaintiffs and Class Members

23  the true character, quality, and nature of the Class Vehicles. Ford actively concealed – and continues

24  to conceal – the true character, quality, and nature of the Class Vehicles and, despite its awareness

25  of the Engine Defect, knowingly made representations about the quality, sophistication, state-of-

26  the-art safety, and comfort of the Class Vehicles. Plaintiffs and Class Members reasonably relied

27  upon Ford's knowing representations and active concealment of these facts. Based on the foregoing,

28  Ford is estopped from relying on any statutes of limitations in defense of this action.

IX.     **Discovery Rule**

260.   The causes of action alleged herein did not accrue until Plaintiffs and Class Members discovered that their Class Vehicles contained the Engine Defect.

261.   Plaintiffs and Class Members had no realistic ability to discern that the Class Vehicles were defective until—at the earliest—after the Engine Defect caused their Ecoboost engines to leak coolant, overheat (leading to, among other things, the cylinder heading cracking), misfire, totally fail, and / or ignite. Even then, Plaintiffs and Class Members had no reason to know the Ecoboost engine failures were caused by a defect in the Class Vehicles because of Ford's active concealment of the Engine Defect.

262.   Plaintiffs and Class Members were not reasonably able to discover the Engine Defect until after they had purchased or leased their Class Vehicles, despite their exercise of due diligence, and their causes of action did not accrue until they discovered that the Engine Defect caused their Vehicles' Ecoboost engines to leak coolant fluid, misfire, overheat, catch on fire, and totally fail.

## CLASS ACTION ALLEGATIONS

263.   Plaintiffs bring this lawsuit as a class action on behalf of themselves and all other Class Members similarly situated pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3), (b)(2), and/or (c)(4). This Action satisfies the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements of those provisions.

264.   Plaintiffs bring this class action, including all causes of action stated below, on behalf of themselves and all other similarly situated members of the proposed Class (referred to herein as "Class Members") defined as follows:

Class:

> All persons nationwide who purchased or leased a 2013-2019 Ford Escape, 2013-2019 Ford Fusion, 2015-2018 Ford Edge, 2017-2019 Lincoln MKC, and 2017-2019 Lincoln MKZ (the "Class Vehicles") equipped with a 1.5L, 1.6L, or 2.0L Ecoboost engine.

Arkansas Sub-Class:

> All members of the Class who purchased or leased their vehicles in the State of Arkansas.

California Sub-Class:

> All members of the Class who purchased or leased their vehicles in the State of California.

Colorado Sub-Class:

> All members of the Class who purchased or leased their vehicles in the State of Colorado.

Florida Sub-Class:

> All members of the Class who purchased or leased their vehicles in the State of Florida.

Georgia Sub-Class:

> All members of the Class who purchased or leased their vehicles in the State of Georgia.

Illinois Sub-Class:

> All members of the Class who purchased or leased their vehicles in the State of Illinois.

Indiana Sub-Class:

> All members of the Class who purchased or leased their vehicles in the State of Indiana.

Kansas Sub-Class:

> All members of the Class who purchased or leased their vehicles in the State of Kansas.

Maryland Sub-Class:

> All members of the Class who purchased or leased their vehicles in the State of Maryland.

Michigan Sub-Class:

> All members of the Class who purchased or leased their vehicles in the State of Michigan.

Minnesota Sub-Class:

> All members of the Class who purchased or leased their vehicles in the State of Minnesota.

New Jersey Sub-Class:

> All members of the Class who purchased or leased their vehicles in the State of New Jersey.

North Carolina Sub-Class:

> All members of the Class who purchased or leased their vehicles in the State of North Carolina.

Washington Sub-Class:

> All members of the Class who purchased or leased their vehicles in the State of Washington.

Wisconsin Sub-Class:

> All members of the Class who purchased or leased their vehicles in the State of Wisconsin.

265. Plaintiffs intend to seek certification of a "Damages Subclass" under 23(b)(3) for all Class Members who have experienced Engine Defects and an "Owner Subclass" under Rule 23(b)(2) for purposes of declaratory relief as to future Engine Defects, as well as certification of other subclasses and particular issues under Rule 23(c)(4), as warranted.

266. Excluded from the proposed Class are:  (1) Ford, any entity or division in which Ford has a controlling interest, and its legal representatives, officers, directors, assigns, and successors; (2) the judicial officer(s) to whom this case is assigned, and the judicial officer(s) staff; (3) government entities; and (4) those persons who have suffered personal injuries as a result of the facts alleged herein. Plaintiffs reserve the right to amend the Class definition if discovery and further investigation reveal that the Class should be expanded, otherwise divided into subclasses, or modified in any other way.

**I.    Numerosity**

267. Although the exact number of Class Members is uncertain and can only be ascertained through appropriate discovery, the number is great enough such that joinder is impracticable. The disposition of the claims of these Class Members in a single action will provide substantial benefits to all parties and to the Court. Class Members are readily identifiable from information and records in Ford's possession, custody, and/or control, as well as from records kept by the Department of Motor Vehicles.

**II.    Typicality**

268. The claims of Plaintiffs are typical of the claims of Class Members in that Plaintiffs, like all Class Members, purchased or leased a Class Vehicle designed, manufactured, marketed,

distributed, warranted, sold/leased, and serviced by Ford. Plaintiffs, like all Class Members, have been damaged by Ford's misconduct in that she purchased/leased a Vehicle she would not have purchased/leased, or would not have purchased/leased at the price she paid, or incurred or will incur the cost of repairs relating to and caused by the Engine Defect. Furthermore, the factual bases of Ford's misconduct are common to all Class Members and represent a common thread of misconduct resulting in injury to all Class Members.

**III.    Adequate Representation**

269.   Plaintiffs will fairly and adequately represent and protect the interests of the Class Members. Plaintiffs have retained counsel with substantial experience in prosecuting consumer class actions, including actions involving defective vehicles.

270.   Plaintiffs and their counsel are committed to vigorously prosecuting this action on behalf of Class Members and have the financial resources to do so. Neither Plaintiffs nor their counsel have interests adverse to those of Class Members.

**IV.    Predominance of Common Issues**

271.   There are numerous questions of law and fact common to Plaintiffs and Class Members that predominate over any question affecting only individual Class Members, the answers to which will advance resolution of the litigation as to all Class Members. These common legal and factual issues include:

a.    whether the subject engines in the Class Vehicles are defective;

b.    whether Ford knew or should have known about the Engine Defect, and, if so, how long Ford has known of the defect;

c.    whether the defective nature of the Class Vehicles constitutes a material fact reasonable consumers would have considered in deciding whether to purchase or lease a Class Vehicle;

d.    whether Ford had a duty to disclose the defective nature of the Class Vehicles to Plaintiffs and Class Members;

e.    whether Ford omitted and failed to disclose material facts about the Class Vehicles;

f.      whether Ford's concealment of the true defective nature of the Class Vehicles induced Plaintiffs and Class Members to act to their detriment by purchasing or leasing Class Vehicles;

g.      whether Ford's representations and omissions about the true defective nature of the Class Vehicles were likely to mislead or deceive, and therefore fraudulent, within the meaning of California's Unfair Competition Law ("UCL");

h.      whether Ford's representations and omissions about the true defective nature of the Class Vehicles were and are unfair within the meaning of the UCL;

i.      whether Ford represented, through its words and conduct, that the Class Vehicles had characteristics, uses, or benefits that they did not actually have;

j.      whether Ford represented, through its words and conduct, that the Class Vehicles were of a particular standard, quality, or grade when they were of another;

k.      whether Ford advertised the Class Vehicles with the intent not to sell/lease them as advertised;

l.      whether Ford's representations and omissions about the true defective nature of the Class Vehicles were likely to create confusion or misunderstanding;

m.      whether Ford's representations and omissions about the true defective nature of the Class Vehicles were and are deceptive;

n.      whether the Class Vehicles were unfit for the ordinary purposes for which they were used, in violation of the implied warranty of merchantability;

o.      whether Plaintiffs and the other Class Members are entitled to a declaratory judgment stating that the Ecoboost engines in Class Vehicles are defective and/or not merchantable;

p.      whether Plaintiffs and the other Class Members are entitled to equitable relief, including, but not limited to, a preliminary and/or permanent injunction;

q.      whether Ford should be declared financially responsible for notifying all Class Members of the problems with the Class Vehicles and for the costs and expenses of permanently remedying the Engine Defect in the Class Vehicles;

r.      whether Ford is obligated to inform Class Members of their right to seek

reimbursement for having paid to diagnose, repair, or replace the defective Ecoboost engines.

**V.    Superiority**

272.   Plaintiffs and Class Members have all suffered and will continue to suffer harm and damages as a result of Ford's unlawful and wrongful conduct. A class action is superior to other available methods for fair and efficient adjudication of this controversy.

273.   Absent a class action, most Class Members would likely find the cost of litigating their claims prohibitively high and would therefore have no effective remedy at law. Because of the relatively small size of the individual Class Members' claims (compared to the cost of litigation), it is likely that only a few Class Members could afford to seek legal redress for Ford's misconduct. Absent a class action, Class Members will continue to incur damages, and Ford's misconduct will continue without remedy.

274.   Class treatment of common questions of law and fact would also be a superior method to multiple individual actions or piecemeal litigation in that class treatment will conserve the resources of the courts and the litigants, and will promote consistency and efficiency of adjudication.

**FIRST CAUSE OF ACTION**
**(Violation of California's Consumer Legal Remedies Act ("CLRA"),**
**Cal Civ. Code § 1750, et seq.)**

275.   Plaintiffs incorporate by reference each allegation set forth in paragraphs 1-274, above.

276.   Plaintiffs Vanessa Miller, Amber West, and Evan West ("California Plaintiffs") bring this cause of action on behalf of themselves and on behalf of the Class Members.

277.   Ford is a "person" as defined by the CLRA. Cal. Civ. Code § 1761(c).

278.   Plaintiffs and Class Members are "consumers" within the meaning of the CLRA. Cal. Civ. Code § 1761(d).

279.   The purchase and leases of Class Vehicles by Plaintiffs and the Class Members constitute "transactions" as defined by the CLRA. Cal. Civ. Code § 1761(e)

280.   The Class Vehicles constitute "goods" or "services" as defined by the CLRA. Cal. Civ. Code § 1761(a) and (b).

281.   Plaintiffs and Class Members purchased or leased the Class Vehicles primarily for

61

personal, family, and household purposes as meant by the CLRA. Cal. Civ. Code § 1761(d).

282.  Ford's representations, active concealments, omissions, and failures to disclose regarding the Class Vehicles violated the CLRA in the following ways:

a.      Ford misrepresented the Class Vehicles had characteristics, uses, or benefits Class Vehicles did not in fact have (Cal. Civ. Code § 1770(a)(5));

b.      Ford misrepresented that the Class Vehicles were of a particular standard, quality, or grade when they were of another (Cal. Civ. Code § 1770(a)(7));

c.      Ford advertised the Class Vehicles with the intent not to sell/lease them as advertised (Cal. Civ. Code § 1770(a)(9));

d.      Ford misrepresented that the Class Vehicles and the warranties conferred or involved rights, remedies, or obligations that they did not (Cal. Civ. Code§ 1770(a)(14)); and

e.      Ford misrepresented that the Class Vehicles were supplied in accordance with previous representations when they were not (Cal. Civ. Code § 1770(a)(16)).

283.  Ford repeatedly engaged in these unfair and deceptive acts or practices in the course of its trade or business. These acts or practices were material, capable of deceiving a substantial portion of the purchasing public, and caused economic harm to purchasers and lessees of the Class Vehicles, including the Plaintiffs.

284.  By 2010, and well before the sale or lease of Class Vehicles, Ford knew or should have known about the Engine Defect affecting the Class Vehicles. Ford further knew or should have known that the Class vehicles were defectively designed or manufactured, that, as a result of this defect, the Ecoboost engines would repeatedly fail, and that they were not suitable for their intended use.

285.  Ford had exclusive knowledge of material facts concerning the existence of the Engine Defect in the Class Vehicles, and actively concealed that defect from consumers. It did so by denying the existence of a defect to consumers—such as Plaintiffs—who contacted Ford about the failures of their Ecoboost engines. Ford also concealed the Engine Defect by failing to provide an effective and permanent remedy to all of the Class Vehicles and by replacing failed engines with equally defective engines, bound to suffer from the same failures.

286.   Ford was under a duty to Plaintiffs and Class Members to disclose the defective nature of the Ecoboost engines, as well as the associated costs that would have to be repeatedly expended in order to temporarily address the failures caused by the Engine Defect, because:

    a.   Ford was in a superior position to know the true state of facts about the Engine Defect in the Class Vehicles;

    b.   Plaintiffs and Class Members could not reasonably have been expected to learn or discover that the Class Vehicles suffered from the Engine Defect until, at the earliest, the manifestation of the Defect; and

    c.   Ford knew that Plaintiffs and Class Members could not reasonably have been expected to learn or discover the Engine Defect prior to its manifestation.

287.   In failing to disclose the defective nature of the Class Vehicles, Ford knowingly and intentionally concealed material facts and breached its duty not to do so.

288.   The facts concealed or not disclosed by Ford to Plaintiffs and Class Members are material in that a reasonable consumer would have considered them to be important in deciding whether or not to purchase or lease a Class Vehicle. Moreover, a reasonable consumer would consider the Engine Defect to be an undesirable quality, as Plaintiffs and Class Members did. Had Plaintiffs and other Class Members known that the Class Vehicles had the Engine Defect, they would not have purchased or leased a Class Vehicle, or would have paid less for it.

289.   Plaintiffs and Class Members are reasonable consumers who did not expect their Class Vehicles to contain a defective Ecoboost engine. It is a reasonable and objective consumer expectation for consumers to expect that the engine will not suffer from repeated and continual coolant leakage into the cylinders, causing overheating and leading the cylinder head to crack and misfire, the vehicle to emit white smoke, and the engine to fail or spontaneously catch fire.

290.   As a result of Ford's misconduct, Plaintiffs and Class Members have been harmed in that the Class Vehicles contain defective Ecoboost engines and suffer from repeated and continual coolant leakage into the cylinders, causing overheating and leading the cylinder head to crack, causing misfires, the vehicle to emit white smoke, and the engine to fail or spontaneously catch fire—all of which create a grave risk of serious injury to person and property and cause Class

Members to spend money to attempt to remedy the Defect.

291.   As a direct and proximate result of Ford's unfair or deceptive acts or practices, Plaintiffs and Class Members have suffered and will continue to suffer harm in that they have a Vehicle with a defective Ecoboost engine and they have experienced and may continue to experience their Class Vehicles' engines leaking coolant into the cylinders, causing overheating and leading the cylinder head to crack, misfire, the vehicle to emit white smoke, and the engine to fail or spontaneously catch fire, for which Ford has refused to provide and effective and permanent fix.

292.   Plaintiffs and the Class seek to recover actual damages, an order enjoining Ford's unfair or deceptive acts or practices and equitable relief under Cal. Civ. Code § 1780(e), and any other just and proper relief available under the CLRA.

293.   In accordance with section 1782(a) of the CLRA, Plaintiffs' counsel has served Ford with notice of its alleged violations of Cal. Civ. Code § 1770(a) relating to the Class Vehicles purchased by Plaintiffs and Class Members, and demanded that Ford, within thirty (30) days of such notice, correct or agree to correct the actions described therein and agree to reimburse associated out-of-pocket costs. Ford responded to that letter on August 7, 2020 and did not agree to correct the actions described therein, to reimburse associated out-of-pocket costs, or otherwise to remedy the harm alleged.

## SECOND CAUSE OF ACTION
### (Violation of California's Unfair Competition Law, Cal. Bus. & Prof. Code § 17200, et seq.)

294.   Plaintiffs incorporate by reference each allegation set forth in paragraphs 1-274, above.

295.   Plaintiffs bring this cause of action for themselves and on behalf of Class Members.

296.   California Business & Professions Code § 17200 prohibits "unfair competition" including any "unlawful, unfair, or fraudulent business practice" and "unfair, deceptive, untrue or misleading advertising." Ford engaged in conduct that violated each of this statute's three prongs.

297.   Ford committed an unlawful business act or practice in violation of Cal. Bus. & Prof. Code § 17200, *et seq.*, by systematically breaching its warranty obligations and by violating the CLRA and the Song-Beverly Consumer Warranty Act as alleged above and below.

64

298.   Ford committed unfair business acts and practices in violation of Cal. Bus. & Prof. Code § 17200, *et seq.*, because the acts and practices described herein, including but not limited to Ford's failure to provide a permanent remedy to fix the Engine Defect, where immoral, unethical, oppressive, unscrupulous, unconscionable, and/or substantially injurious to Plaintiffs and Class Members. Ford's acts and practices were additionally unfair because the harm to Plaintiffs and Class Members is substantial and is not outweighed by any countervailing benefits to consumers or competition. Further, Ford's acts and practices were unfair in that they were contrary to legislatively declared or public policy.

299.   Ford committed fraudulent business acts and practices in violation of Cal. Bus. & Prof. Code § 17200, *et seq.*, when it concealed the existence and nature of the Engine Defect, while representing in its marketing, advertising, and other broadly disseminated representations that the Class Vehicles were, for example, high quality, functional, and "proof of [Ford's] commitment to safety," and that Ford itself is "steadfast about safety," when, in fact, the Engine Defect creates a significant and material safety hazard and inhibits the quality and functionality of the Class Vehicles. Ford's representations, omissions, and active concealments about the Engine Defect are likely to mislead the public with regard to the true defective nature of Class Vehicles.

300.   Ford's unfair or deceptive acts or practices occurred repeatedly in the course of Ford's trade or business, and were likely to mislead a substantial portion of the purchasing public.

301.   Plaintiffs relied on Ford's material representations and nondisclosures and would not have purchased/leased, or would have paid less for, the Class Vehicles had he known the truth.

302.   As a direct and proximate result of Ford's unfair, unlawful, and deceptive practices, Plaintiffs have lost money.

303.   Plaintiffs would consider purchasing or leasing similar Ford vehicles in the future if Plaintiffs could rely on Ford's representations regarding the vehicles.

304.   Plaintiffs and Class Members seek an order enjoining Ford from committing such unlawful, unfair, and fraudulent business practices, and seek restitution pursuant to Cal. Bus. & Prof. Code § 17203.

**THIRD CAUSE OF ACTION**

**(Breach of Implied Warranty Under the Song-Beverly Consumer Warranty Act)**

305.   Plaintiffs incorporate by reference each allegation set forth in paragraphs 1-274, above.

306.   Plaintiffs bring this cause of action for themselves and on behalf of Class Members.

307.   Ford's Class Vehicles are "consumer goods" within the meaning of Cal. Civ. Code § 1791(a).

308.   Ford is a manufacturer within the meaning of Cal. Civ. Code § 1791(j).

309.   Plaintiffs and Class Members who purchased or leased their Class Vehicles within the State of California are "buyers" and "lessees" within the meaning of Cal. Civ. Code §§ 1791(b) and (h).

310.   Ford impliedly warranted to Plaintiffs and Class Members that its Vehicles were "merchantable" within the meaning of Cal. Civ. Code §§ 1791(a) and 1792.

311.   Ford impliedly warranted to Plaintiffs and Class Members that it would repair or replace any defective products, including the Ecoboost engine.

312.   The propensity of the Engine Defect to cause coolant to leak, seep into the cylinders, cause the cylinder head to crack, cause misfiring, cause white smoke to emit from the vehicle, cause the engine to fail and/or ignite renders the Class Vehicles to not be of the quality that a buyer or lessee would reasonably expect, and therefore not merchantable.

313.   The Engine Defect is latent and was present at the time of the sale/lease of Class Vehicles, and therefore the Vehicles were not merchantable at the time of sale/lease.

314.   The Class Vehicles do not conform to the promises and affirmations of fact made by Ford in its promotional materials and vehicle owner manuals in that the Engine Defect creates a safety hazard contrary to Ford's assurances that, among other things, it is "steadfast about safety" and that the Vehicles are "quality, comfortable, and "proof of [Ford's] commitment to safety."

315.   In violation of Cal. Civ. Code § 1791(a), Ford breached its implied warranty by selling/leasing defective Class Vehicles and refusing to permanently replace and/or repair the defective Ecoboost engines.

316. The Engine Defect has deprived Plaintiffs and Class Members of the benefit of their bargain, and has caused the Class Vehicles to depreciate in value.

317. Any attempt by Ford to limit or disclaim the implied warranties in a manner that would exclude coverage of the Engine Defect is unenforceable and void pursuant to Cal. Civ. Code §§ 1790.1, 1792.3, and 1793.

318. As a result of Ford's breach of its implied warranties, Plaintiffs and Class Members have been damaged in an amount to be proven at trial and are entitled to incidental, consequential, and other damages and other legal and equitable relief, as well as costs and attorneys' fees, pursuant to Cal. Civ. Code §§ 1794 and 1795.4.

## FOURTH CAUSE OF ACTION
### (California Breach of Implied Warranty)

319. Plaintiffs incorporate by reference each allegation set forth in paragraphs 1-274, above.

320. Plaintiffs bring this cause of action for themselves and on behalf of Class Members.

321. The Class Vehicles are and were at all relevant times "goods" within the meaning of, *inter alia*, Cal. Com. Code §§ 2105(1) and 10103(a)(8).

322. Ford is and was at all relevant times a "merchant" with respect to the Class Vehicles, under, *inter alia*, Cal. Com. Code §§ 2104(1) and 10103(c), and a "seller" of the Class Vehicles, under § 2103(1)(d); and, with respect to leases, is and was at all relevant time a "lessor" of the Class Vehicles, under, *inter alia*, Cal. Com. Code § 10103(a)(16).

323. Plaintiffs and Class Members are "buyers" or "lessees" within the meaning of, *inter alia*, Cal. Com. Code §§ 2103(a) and 10103(a)(14).

324. When it sold or leased its Class Vehicles, Ford extended an implied warranty to Class Members that the Class Vehicles were merchantable and fit for the ordinary purpose for which they were sold or leased, pursuant to Cal. Com. Code §§ 2314, 10212, and 10214.

325. Plaintiffs and other Class Members who purchased or leased a Class Vehicle directly from Ford are entitled to the benefit of their bargain: a Vehicle with a nondefective Ecoboost engine that does not leak coolant and cause coolant to seep into the cylinders, resulting in the engine

overheating, the cylinder head cracking, the engine misfiring, the engine totally failing, and/or the engine igniting.

326.  Plaintiffs and the Class Members who purchased or leased Certified Pre-Owned Class Vehicles are likewise entitled to the benefit of their bargains:  a Vehicle with a nondefective Ecoboost engine that does not leak coolant and cause coolant to seep into the cylinders, resulting in the engine overheating, the cylinder head cracking, the engine misfiring, the engine totally failing, and/or the engine igniting.

327.  Class Members who purchased Certified Pre-Owned Class Vehicles are the intended ultimate consumers of the Class Vehicles, and therefore are third-party beneficiaries for the purposes of implied warranty claims.

328.  Ford breached this implied warranty in that its Class Vehicles are (1) not fit for ordinary use, and (2) not of a merchantable quality.

329.  The Engine Defect is latent and was present at the time of the sale/lease, and therefore the Vehicles were not merchantable at the time of the sale/lease.

330.  Had the Engine Defect that existed at the time of sale/lease been known, the Class Vehicles would not have been sold or leased, or would not have been sold or leased at the same price for which Class Members paid.

331.  As a direct and proximate result of Ford's breach of the implied warranty of merchantability, Plaintiffs and Class Members have been damaged in an amount to be proven at trial.

**FIFTH CAUSE OF ACTION**
**Violation of the Arkansas Deceptive Trade Practices Act**
**(ARK. CODE ANN. §§ 4-88-101, *et seq*.)**
**(On behalf of the Arkansas Sub-Class)**

332.  Plaintiffs incorporate by reference each allegation set forth in paragraphs 1-274, above.

333.  Plaintiff Patricia Lund ("Arkansas Plaintiff") brings this cause of action individually and on behalf of the members of the Arkansas Sub-Class.

334.  Ford is a "person" within the meaning of the Arkansas Deceptive Trade Practices Act

("Arkansas DTPA"), Ark. Code Ann. § 4-88-102(5).

335. The Arkansas DTPA prohibits a person from engaging in a "deceptive trade practice," including, *inter alia*, "knowingly making a false representation as to the characteristics, ingredients, uses, benefits, alterations, source, sponsorship, approval, or certification of goods or services or as to whether goods are original or new or of a particular standard, quality, grade, style, or model;" and "advertising the goods or services with the intent not to sell them as advertised." Ark. Code Ann. § 4-88-102(a)(1) and (a)(3). Ford engaged in unfair and deceptive practices that violated the Arkansas DTPA as described above.

336. Ford participated in and engaged in deceptive business or trade practices prohibited by the Arkansas DTPA by failing to disclose and actively concealing that the Class Vehicles contained the Engine Defect, by marketing their Class Vehicles as safe and of high quality, and by presenting themselves as a reputable manufacturer that valued safety and stood behind its vehicles after they were sold.

337. By failing to disclose the Engine Defect; by concealing the Engine Defect; by promoting and selling or leasing Class Vehicles it knew were defective, including by marketing its vehicles as safe, reliable, easily operable, efficient, and of high quality; by presenting itself as a reputable manufacturer that valued safety, reliability, performance and efficiency, and stood behind its vehicles after they were sold; by failing to make repairs or making repairs and providing replacements that caused Arkansas Plaintiff and the Arkansas Sub-Class Members to experience repeated instances of failure, rendering the New Vehicle Limited Warranty useless; and by minimized the scope and severity of the problems with the Class Vehicles, refusing to acknowledge that they are defective, and failing to provide adequate relief to consumers, Ford knowingly and intentionally misrepresented and omitted material facts in connection with the sale or lease of the Class Vehicles.

338. Ford systematically misrepresented, concealed, suppressed, or omitted material facts relating to the Class Vehicles and Engine Defect in the course of its business.

339. Ford also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact

1  with intent that others rely upon such concealment, suppression or omission, in connection with the

2  sale of the Class Vehicles.

3     340.   Ford's unfair and deceptive acts or practices occurred repeatedly in Ford's trade or

4  business, were capable of deceiving a substantial portion of the purchasing public, and imposed a

5  serious safety risk on the public.

6     341.   Ford knew that the Class Vehicles and their engines suffered from an inherent defect,

7  were defectively designed or manufactured, and were not suitable for their intended use.

8     342.   Ford knew or should have known that its conduct violated the Arkansas DTPA.

9     343.   Arkansas Plaintiff and the Arkansas Sub-Class Members reasonably relied on Ford's

10  misrepresentations and omissions of material facts in its advertisements of the Class Vehicles and

11  in the purchase of the Class Vehicles.

12     344.   Had Arkansas Plaintiff and the Arkansas Sub-Class Members known that the Class

13  Vehicles would exhibit the Engine Defect, they would not have purchased or leased the Class

14  Vehicles or would have paid less for them. Plaintiff did not receive the benefit of their bargain as a

15  result of Ford's misconduct.

16     345.   Ford owed Arkansas Plaintiff and the Arkansas Sub-Class Members a duty to disclose

17  the truth about the Engine Defect because Ford:

18        a.     possessed exclusive and superior knowledge of the design of the Class

19  Vehicles and the Engine Defect;

20        b.     intentionally concealed the foregoing from Arkansas Plaintiff and the

21  Arkansas Sub-Class Members; and/or

22        c.     made incomplete representations regarding the quality and durability of the

23  Class Vehicles, while purposefully withholding material facts from Arkansas Plaintiff and the

24  Arkansas Sub-Class Members that contradicted these representations.

25     346.   Due to Ford's specific and superior knowledge that the Engines in the Class Vehicles

26  will fail due to the Engine Defect, its false representations regarding the increased durability of the

27  Class Vehicles, and reliance by Arkansas Plaintiff and the Arkansas Sub-Class Members on these

28  material representations, Ford had a duty to disclose to Class members that the Engine Defect will

cause engine failure in Class Vehicles, that Class Vehicles do not have the expected durability, reliability, and/or safety over other vehicles or of their predecessor engines, that failure of the Engines will cause damage to Class Vehicle, and that Class members would be required to bear the cost of the damage to their vehicles. Having volunteered to provide information to Arkansas Plaintiff and the Arkansas Sub-Class Members, Ford had the duty to disclose not just the partial truth, but the entire truth. These omitted and concealed facts were material because they directly impact the value of the Class Vehicles purchased or leased by Arkansas Plaintiff and the Arkansas Sub-Class Members. Longevity, durability, performance, and safety are material concerns to Ford consumers. Ford represented to Arkansas Plaintiff and the Arkansas Sub-Class Members that they were purchasing or leasing vehicles that were durable, reliable, safe, efficient, of high quality, and containing engines of advanced and superior characteristics and technology as alleged throughout this Complaint, when in fact it is only a matter of time before the engines fail due to the Engine Defect.

347.   Arkansas Plaintiff and the Arkansas Sub-Class Members suffered injury in fact to a legally protected interest. As a result of Ford's conduct, Arkansas Plaintiff and the Arkansas Sub-Class Members were harmed and suffered actual damages in the form of the costs of diagnosis and repair of their vehicles, and the diminished value of their vehicles.

348.   As a direct and proximate result of Ford's unfair or deceptive acts or practices, Arkansas Plaintiff and the Arkansas Sub-Class Members suffered and will continue to suffer injury in fact and/or actual damages.

349.   Defendant's violations present a continuing risk to Arkansas Plaintiff and the Arkansas Sub-Class Members as well as to the general public. Defendant's unlawful acts and practices complained of herein affect the public interest.

350.   As a proximate and direct result of Ford's unfair and deceptive trade practices, Arkansas Plaintiff and members of the Arkansas Sub-Class purchased or leased Class Vehicles and suffered an ascertainable loss and financial harm. This included ascertainable losses in the form of actual damages in the amount of the cost to attempt to repair the Engine Defect, replaced the damaged related system components, diminution of Class Vehicle resale value, increased repair and

maintenance costs, and other substantial monetary damages and inconvenience.

351.   As a direct and proximate result of Ford's unfair or deceptive acts or practices alleged herein, Arkansas Plaintiff and other members of the Arkansas Sub-Class suffered and will continue to suffer actual damages and are entitled to recover actual damages to the extent permitted by law, including class action rules, in an amount to be proven at trial. In addition, Arkansas Plaintiff and the putative Class seek equitable and injunctive relief against Ford on terms that the Court considers reasonable, and reasonable attorneys' fees.

**SIXTH CAUSE OF ACTION**
**Breach of Express Warranty**
**(Ark. Code Ann. §§ 4-2-313 and 4-2A-210)**
**(On behalf of the Arkansas Sub-Class)**

352.   Plaintiffs incorporate by reference each allegation set forth in paragraphs 1-274, above.

353.   Arkansas Plaintiff brings this cause of action individually and on behalf of the members of the Arkansas Sub-Class.

354.   Ford is and was at all relevant times a "merchant" with respect to motor vehicles Ark. Code Ann. §§ 4-2-104(1) and 4-2A-103(3), and a "seller" of motor vehicles under § 4-2-103(1)(d).

355.   With respect to leases, Ford is and was at all relevant times a "lessor" of motor vehicles under Ark. Code Ann. § 4-2A-103(1)(p).

356.   The Class Vehicles are and were at all relevant times "goods" within the meaning of Ark. Code Ann. §§ 4-2-105(1) and 4-2A-103(1)(h).

357.   Ford provided all purchasers and lessees of the Class Vehicles with the express warranty described herein, which became a material part of the bargain.

358.   Ford provided all purchasers and lessees of Lincoln-branded Class Vehicles with the Lincoln Warranty and all purchasers and lessees of Ford or Ford-branded Class Vehicles with the Ford/Ford Warranty.

359.   Ford sold and leased the Class Vehicles with a written express warranty covering the Vehicles for three years or 36,000 miles, whichever comes first.

360.   Ford's New Vehicle Limited Warranty expressly states that Ford will "without charge,

repair, replace, or adjust all parts on your vehicle that malfunction or fail during normal use during the applicable coverage period due to a manufacturing defect in factory-supplied materials or factory workmanship" so long the Vehicle is properly operated and maintained and taken to a Ford dealership for repair within the warranty period.

361.   Ford further provides powertrain warranty coverage, which is applicable to "the Engine: all internal lubricated parts, cylinder block, cylinder heads, electrical fuel pump, powertrain control module, engine mounts, flywheel, injection pump, manifold (exhaust and intake), manifold bolts, oil pan, oil pump, seals and gaskets, engine thermostat, engine, thermostat housing, timing chain cover, timing chain (gears or belt), turbocharger/supercharger unit, valve covers, water pump" as well as the components in the transmission, front-wheel drive, rear-wheel drive, and four-wheel/all-wheel drive. This coverage applies for 5-years or up to 60,000 miles, whichever comes first.

362.   For certified pre-owned ("CPO") Vehicles, Ford offers a limited warranty covering CPO Vehicles for 12 months or 12,000 miles, whichever comes first.

363.   Ford's CPO Vehicle warranty states that a dealer will replace "all covered components . . . that are found to be defective in factory-supplied materials or workmanship during the applicable warranty periods." The engine and its components—including the cylinder block and cylinder heads—are included in Ford's list of "covered components."

364.   Ford manufactured and/or installed the engines and the engines' component parts in the Class Vehicles, and the engines and their component parts are covered by the express Warranties.

365.   The Engine Defect at issue in this litigation was present at the time the Class Vehicles were sold or leased to Arkansas Plaintiff and the Arkansas Sub-Class Members.

366.   Plaintiff relied on Ford's express warranties, which were a material part of the bargain, when purchasing or leasing their Class Vehicles.

367.   Under the express Warranties, Ford was obligated to correct the Engine Defect in the vehicles owned or leased by Arkansas Plaintiff and the Arkansas Sub-Class Members.

368.   Although Ford was obligated to correct the Engine Defect, none of the attempted fixes

to the engines are adequate under the terms of the Warranties, as they did not cure the defect.

369.   Ford breached the express Warranties by performing illusory repairs. Rather than repairing the vehicles pursuant to the express Warranties, Ford falsely informed Arkansas Sub-Class Members that there was no problem with their Class Vehicles, performed ineffective procedures including software updates, and/or replaced defective components in the  engines with equally defective components, without actually repairing the Class Vehicles.

370.   Ford and its agent dealers have failed and refused to conform the engines to the express Warranties. Ford's conduct, as discussed throughout this Complaint, has voided any attempt on its part to disclaim liability for its actions.

371.   Moreover, Ford's attempt to disclaim or limit these express Warranties vis-à-vis consumers is unconscionable and unenforceable under the circumstances here. Specifically, Ford's warranty limitation is unenforceable because it knowingly sold a defective product without informing consumers about the defect.

372.   The time limits contained in Ford's warranty period were also unconscionable and inadequate to protect Arkansas Plaintiff and the Arkansas Sub-Class Members. Among other things, Arkansas Plaintiff and the Arkansas Sub-Class Members had no meaningful choice in determining these time limitations, the terms of which unreasonably favored Ford. A gross disparity in bargaining power existed between Ford and the Class members, and Ford knew or should have known that the Class Vehicles were defective at the time of sale.

373.   Arkansas Plaintiff and the Arkansas Sub-Class Members have complied with all obligations under the Warranties, or otherwise have been excused from performance of said obligations as a result of Ford's conduct described herein.

374.   Arkansas Plaintiff and the Arkansas Sub-Class Members were not required to notify Ford of the breach because affording Ford a reasonable opportunity to cure its breach of written warranty would have been futile. Ford was also on notice of the Engine Defect from the complaints and service requests it received from Plaintiff and the Class Members, from repairs and/or replacements of the engines or components thereof, and through other internal and external sources.

375.   Because Ford, through its conduct and exemplified by its own service bulletins, has

covered repairs of the Engine Defect if Ford determines the repairs are appropriately covered under the Warranties, Ford cannot now deny that the Warranties cover the Engine Defect.

376.   Because Ford has not been able remedy the Engine Defect, any limitation on remedies included in the Warranties causes the Warranties to fail their essential purposes, rendering them null and void.

377.   As a direct and proximate cause of Ford's breach, Arkansas Plaintiff and the Arkansas Sub-Class Members suffered damages and continue to suffer damages, including economic damages at the point of sale or lease and diminution of value of their Class Vehicles. Additionally, Arkansas Plaintiff and the Arkansas Sub-Class Members have incurred or will incur economic damages at the point of repair in the form of the cost of repair.

378.   As a direct and proximate result of Ford's breach of express warranties, Arkansas Plaintiff and the Arkansas Sub-Class Members have been damaged in an amount to be determined at trial.

**SEVENTH CAUSE OF ACTION**
**Breach of the Implied Warranty of Merchantability**
**(Ark. Code Ann. §§ 4-2-313 and 4-2A-212)**
**(On behalf of the Arkansas Sub-Class)**

379.   Plaintiffs incorporate by reference each allegation set forth in paragraphs 1-274, above.

380.   Arkansas Plaintiff brings this cause of action individually and on behalf of the members of the Arkansas Sub-Class.

381.   Ford is and was at all relevant times a "merchant" with respect to motor vehicles under Ark. Code Ann. §§ 4-2-104(1) and 4-2A-103(3), and a "seller" of motor vehicles under § 4-2-103(1)(d).

382.   With respect to leases, Ford is and was at all relevant times a "lessor" of motor vehicles under Ark. Code Ann. § 4-2A-103(1)(p).

383.   The Class Vehicles are and were at all relevant times "goods" within the meaning of Ark. Code Ann. §§ 4-2-105(1) and 4-2A-103(1)(h).

384.   A warranty that the Class Vehicles were in merchantable condition and fit for the

ordinary purpose for which vehicles are used is implied by law under Ark. Code Ann. §§ 4-2-313 and 4-2A-212.

385.   Ford knew or had reason to know of the specific use for which the Class Vehicles were purchased or leased. Ford directly sold and marketed vehicles equipped with the engines to customers through authorized dealers, like those from whom Arkansas Plaintiff and the Arkansas Sub-Class Members bought or leased their vehicles, for the intended purpose of consumers purchasing the vehicles. Ford knew that the Class Vehicles would and did pass unchanged from the authorized dealers to Arkansas Plaintiff and the Arkansas Sub-Class Members, with no modification to the defective engines.

386.   Ford provided Plaintiff and Class Members with an implied warranty that the Class Vehicles and their components and parts are merchantable and fit for the ordinary purposes for which they were sold.

387.   This implied warranty included, among other things: (i) a warranty that the Class Vehicles and their engines that were manufactured, supplied, distributed, and/or sold by Ford were safe and reliable for providing transportation; and (ii) a warranty that the Class Vehicles and their engines would be fit for their intended use while the Class Vehicles were being operated.

388.   Contrary to the applicable implied warranties, the Class Vehicles and their engines at the time of sale and thereafter were not fit for their ordinary and intended purpose of providing Plaintiff and Class Members with reliable, durable, and safe transportation. Instead, the Class Vehicles are defective, including, but not limited to, the defective design and manufacture of their engines and the existence of the Engine Defect at the time of sale or lease and thereafter. Ford knew of this defect at the time these sale or lease transactions occurred.

389.   As a result of Ford's breach of the applicable implied warranties, Arkansas Plaintiff and the Arkansas Sub-Class Members of the Class Vehicles suffered an ascertainable loss of money, property, and/or value of their Class Vehicles. Additionally, as a result of the Engine Defect, Arkansas Plaintiff and the Arkansas Sub-Class Members were harmed and suffered actual damages in that the Class Vehicles' engine components are substantially certain to fail before their expected useful life has run.

390.   Ford's actions, as complained of herein, breached the implied warranty that the Class Vehicles were of merchantable quality and fit for such use in violation of Ark. Code Ann. §§ 4-2-313 and 4-2A-212.

391.   Arkansas Plaintiff and the Arkansas Sub-Class Members have complied with all obligations under the warranty, or otherwise have been excused from performance of said obligations as a result of Ford's conduct described herein.

392.   Arkansas Plaintiff and the Arkansas Sub-Class Members were not required to notify Ford of the breach because affording Ford a reasonable opportunity to cure its breach of written warranty would have been futile. Ford was also on notice of the Engine Defect from the complaints and service requests it received from Plaintiff and the Class Members, from repairs and/or replacements of the engines or components thereof, and through other internal sources.

393.   As a direct and proximate cause of Ford's breach, Arkansas Plaintiff and the Arkansas Sub-Class Members suffered damages and continue to suffer damages, including economic damages at the point of sale or lease and diminution of value of their Class Vehicles. Additionally, Arkansas Plaintiff and the Arkansas Sub-Class Members have incurred or will incur economic damages at the point of repair in the form of the cost of repair.

394.   As a direct and proximate result of Ford's breach of the implied warranty of merchantability, Arkansas Plaintiff and the Arkansas Sub-Class Members have been damaged in an amount to be proven at trial.

**EIGHTH CAUSE OF ACTION**
**Violation of the Colorado Consumer Protection Act**
**(COLO. REV. STAT. §§ 6-1-101, *et seq*.)**
**(On behalf of the Colorado Sub-Class)**

395.   Plaintiffs incorporate by reference the allegations set forth in paragraphs 1-274, above.

396.   Plaintiff Darrick Christodaro ("Colorado Plaintiff") brings this cause of action on his own behalf and on behalf of the members of the Colorado Sub-Class.

397.   Colorado Plaintiff and the Colorado Sub-Class Members are "consumer[s]" under the Colorado Consumer Protection Act ("Colorado CPA"), Colo. Rev. Stat. § 6-1-101 *et seq.*

398.   Ford is a "person" within the meaning of the Colorado CPA. *See* Colo. Rev. Stat. § 6-1-102(6).

399.   The Colorado CPA prohibits a person from engaging in a "deceptive trade practice," including (1) knowingly "mak[ing] a false representation as to the source, sponsorship, approval, or certification of goods, services, or property," (2) representing "that goods, food, services, or property are of a particular standard, quality, or grade . . . if he knows or should know that they are of another," (3) advertising "goods, services, or property with intent not to sell them as advertised," and (4) failing "failure "to disclose material information concerning goods, services, or property which information was known at the time of an advertisement or sale if such failure to disclose such information was intended to induce the consumer to enter into a transaction." Colo. Rev. Stat. § 6-1-105(1)(e), (g), (*i*), (u). The Colorado CPA also provides that no person may "[e]ither knowingly or recklessly engage[] in any unfair, unconscionable, deceptive, deliberately misleading, false, or fraudulent act or practice." Colo. Rev. Stat. § 6-1-105(kkk).

400.   Ford participated in and engaged in deceptive business or trade practices prohibited by the Colorado CPA by failing to disclose and actively concealing that the Class Vehicles contained the Engine Defect, by marketing their Class Vehicles as safe and of high quality, and by presenting themselves as a reputable manufacturer that valued safety and stood behind its vehicles after they were sold.

401.   By failing to disclose the Engine Defect; by concealing the Engine Defect; by promoting and selling or leasing Class Vehicles it knew were defective, including by marketing its vehicles as safe, reliable, easily operable, efficient, and of high quality; by presenting itself as a reputable manufacturer that valued safety, reliability, performance and efficiency, and stood behind its vehicles after they were sold; by failing to make repairs or making repairs and providing replacements that caused Colorado Plaintiffs and the Colorado Sub-Class Members to experience repeated instances of failure, rendering the New Vehicle Limited Warranty useless; and by minimized the scope and severity of the problems with the Class Vehicles, refusing to acknowledge that they are defective, and failing to provide adequate relief to consumers, Ford knowingly and intentionally misrepresented and omitted material facts in connection with the sale or lease of the

1    Class Vehicles.

2        402.   Ford systematically misrepresented, concealed, suppressed, or omitted material facts

3    relating to the Class Vehicles and Engine Defect in the course of its business.

4        403.   Ford also engaged in unlawful trade practices by employing deception, deceptive acts

5    or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact

6    with intent that others rely upon such concealment, suppression or omission, in connection with the

7    sale of the Class Vehicles.

8        404.   Ford's unfair and deceptive acts or practices occurred repeatedly in Ford's trade or

9    business, were capable of deceiving a substantial portion of the purchasing public, and imposed a

10   serious safety risk on the public.

11       405.   Ford knew that the Class Vehicles and their engines suffered from an inherent defect,

12   were defectively designed or manufactured, and were not suitable for their intended use.

13       406.   Ford knew or should have known that its conduct violated the Colorado CPA.

14       407.   Colorado Plaintiff and the Colorado Sub-Class Members reasonably relied on Ford's

15   misrepresentations and omissions of material facts in its advertisements of the Class Vehicles and

16   in the purchase of the Class Vehicles.

17       408.   Had Colorado Plaintiff and the Colorado Sub-Class Members known that the Class

18   Vehicles would exhibit the Engine Defect, they would not have purchased or leased the Class

19   Vehicles or would have paid less for them. Colorado Plaintiff and the Colorado Sub-Class Members

20   did not receive the benefit of their bargain as a result of Ford's misconduct.

21       409.   Ford owed Colorado Plaintiff and the Colorado Sub-Class Members a duty to disclose

22   the truth about the Engine Defect because Ford:

23           a.    possessed exclusive and superior knowledge of the design of the Class

24   Vehicles and the Engine Defect;

25           b.    intentionally concealed the foregoing from Colorado Plaintiff and the

26   Colorado Sub-Class Members; and/or

27           c.    made incomplete representations regarding the quality and durability of the

28   Class Vehicles, while purposefully withholding material facts from Colorado Plaintiff and the

79

Colorado Sub-Class Members that contradicted these representations.

410.   Due to Ford's specific and superior knowledge that the Engines in the Class Vehicles will fail due to the Engine Defect, its false representations regarding the increased durability of the Class Vehicles, and reliance by Colorado Plaintiff and the Colorado Sub-Class Members on these material representations, Ford had a duty to disclose to Class members that the Engine Defect will cause engine failure in Class Vehicles, that Class Vehicles do not have the expected durability, reliability, and/or safety over other vehicles or of their predecessor engines, that failure of the Engines will cause damage to Class Vehicle, and that Class members would be required to bear the cost of the damage to their vehicles. Having volunteered to provide information to Colorado Plaintiff and the Colorado Sub-Class Members, Ford had the duty to disclose not just the partial truth, but the entire truth. These omitted and concealed facts were material because they directly impact the value of the Class Vehicles purchased or leased by Colorado Plaintiff and the Colorado Sub-Class Members. Longevity, durability, performance, and safety are material concerns to Ford consumers. Ford represented to Colorado Plaintiff and the Colorado Sub-Class Members that they were purchasing or leasing vehicles that were durable, reliable, safe, efficient, of high quality, and containing engines of advanced and superior characteristics and technology as alleged throughout this Complaint, when in fact it is only a matter of time before the engines fail due to the Engine Defect.

411.   As a direct and proximate result of Ford's unfair or deceptive acts or practices, Colorado Plaintiff and the Colorado Sub-Class Members suffered and will continue to suffer injury in fact and/or actual damages.

412.   Defendant's violations present a continuing risk to Colorado Plaintiff and the Colorado Sub-Class Members as well as to the general public. Defendant's unlawful acts and practices complained of herein affect the public interest.

413.   As a proximate and direct result of Ford's unfair and deceptive trade practices, Colorado Plaintiff and members of the Colorado Sub-Class purchased or leased Class Vehicles and suffered an ascertainable loss and financial harm. This included ascertainable losses in the form of actual damages in the amount of the cost to attempt to repair the Engine Defect, replaced the

damaged related system components, diminution of Class Vehicle resale value, increased repair and maintenance costs, and other substantial monetary damages and inconvenience.

414.   Colorado Plaintiff and the Colorado Sub-Class Members seek an order enjoining Ford's unfair, unlawful, and/or deceptive practices, declaratory relief, attorneys' fees, and any other just and proper relief available under the Colorado CPA.

**NINTH CAUSE OF ACTION**
**Breach of Express Warranty**
**(COLO. REV. STAT. §§ 4-2-313 AND 4-2.5-210)**
**(On behalf of the Colorado Sub-Class)**

415.   Plaintiffs incorporate by reference the allegations set forth in paragraphs 1-274, above.

416.   Colorado Plaintiff brings this cause of action on his own behalf and on behalf of the members of the Colorado Sub-Class.

417.   Ford is and was at all relevant times a "merchant" with respect to motor vehicles Colo. Rev. Stat. §§ 4-2-104(1) and 4-2.5-103(3), and a "seller" of motor vehicles under § 4-2-103(1)(d).

418.   With respect to leases, Ford is and was at all relevant times a "lessor" of motor vehicles under Colo. Rev. Stat. § 4-2.5-103(1)(p).

419.   The Class Vehicles are and were at all relevant times "goods" within the meaning of Colo. Rev. Stat. §§ 4-2-105(1) and 4-2.5-103(1)(h).

420.   Ford provided all purchasers and lessees of the Class Vehicles with the express warranty described herein, which became a material part of the bargain.

421.   Ford provided all purchasers and lessees of Lincoln-branded Class Vehicles with the Lincoln Warranty and all purchasers and lessees of Ford or Ford-branded Class Vehicles with the Ford/Ford Warranty.

422.   Ford sold and leased the Class Vehicles with a written express warranty covering the Vehicles for three years or 36,000 miles, whichever comes first.

423.   Ford's New Vehicle Limited Warranty expressly states that Ford will "without charge, repair, replace, or adjust all parts on your vehicle that malfunction or fail during normal use during the applicable coverage period due to a manufacturing defect in factory-supplied materials or factory

81

workmanship" so long the Vehicle is properly operated and maintained and taken to a Ford dealership for repair within the warranty period.

424.   Ford further provides powertrain warranty coverage, which is applicable to "the Engine: all internal lubricated parts, cylinder block, cylinder heads, electrical fuel pump, powertrain control module, engine mounts, flywheel, injection pump, manifold (exhaust and intake), manifold bolts, oil pan, oil pump, seals and gaskets, engine thermostat, engine, thermostat housing, timing chain cover, timing chain (gears or belt), turbocharger/supercharger unit, valve covers, water pump" as well as the components in the transmission, front-wheel drive, rear-wheel drive, and four-wheel/all-wheel drive. This coverage applies for 5-years or up to 60,000 miles, whichever comes first.

425.   For certified pre-owned ("CPO") Vehicles, Ford offers a limited warranty covering CPO Vehicles for 12 months or 12,000 miles, whichever comes first.

426.   Ford's CPO Vehicle warranty states that a dealer will replace "all covered components . . . that are found to be defective in factory-supplied materials or workmanship during the applicable warranty periods." The engine and its components—including the cylinder block and cylinder heads—are included in Ford's list of "covered components."

427.   Ford manufactured and/or installed the engines and the engines' component parts in the Class Vehicles, and the engines and their component parts are covered by the express Warranties.

428.   The Engine Defect at issue in this litigation was present at the time the Class Vehicles were sold or leased to Colorado Plaintiff and the Colorado Sub-Class Members.

429.   Colorado Plaintiff relied on Ford's express warranties, which were a material part of the bargain, when purchasing or leasing their Class Vehicles.

430.   Colorado Plaintiff and the Colorado Sub-Class Members are the intended ultimate consumers of the Class Vehicles and therefore have standing to sue Ford for breach of its express warranty. Colo. Rev. Stat. §§ 4-2-318, 4-2.5-216.

431.   Under the express Warranties, Ford was obligated to correct the Engine Defect in the vehicles owned or leased by Colorado Plaintiff and the Colorado Sub-Class Members.

432. Although Ford was obligated to correct the Engine Defect, none of the attempted fixes to the engines are adequate under the terms of the Warranties, as they did not cure the defect.

433. Ford breached the express Warranties by performing illusory repairs. Rather than repairing the vehicles pursuant to the express Warranties, Ford falsely informed Colorado Sub-Class Members that there was no problem with their Class Vehicles, performed ineffective procedures including software updates, and/or replaced defective components in the  engines with equally defective components, without actually repairing the Class Vehicles.

434. Ford and its agent dealers have failed and refused to conform the engines to the express Warranties. Ford's conduct, as discussed throughout this Complaint, has voided any attempt on its part to disclaim liability for its actions.

435. Moreover, Ford's attempt to disclaim or limit these express Warranties vis-à-vis consumers is unconscionable and unenforceable under the circumstances here. Specifically, Ford's warranty limitation is unenforceable because it knowingly sold a defective product without informing consumers about the defect.

436. The time limits contained in Ford's warranty period were also unconscionable and inadequate to protect Colorado Plaintiff and the Colorado Sub-Class Members. Among other things, Colorado Plaintiff and the Colorado Sub-Class Members had no meaningful choice in determining these time limitations, the terms of which unreasonably favored Ford. A gross disparity in bargaining power existed between Ford and the Class members, and Ford knew or should have known that the Class Vehicles were defective at the time of sale.

437. Colorado Plaintiff and the Colorado Sub-Class Members have complied with all obligations under the Warranties, or otherwise have been excused from performance of said obligations as a result of Ford's conduct described herein.

438. Colorado Plaintiff and the Colorado Sub-Class Members were not required to notify Ford of the breach because affording Ford a reasonable opportunity to cure its breach of written warranty would have been futile. Ford was also on notice of the Engine Defect from the complaints and service requests it received from Plaintiff and the Class Members, from repairs and/or replacements of the engines or components thereof, and through other internal and external sources.

83

439.   Because Ford, through its conduct and exemplified by its own service bulletins, has covered repairs of the Engine Defect if Ford determines the repairs are appropriately covered under the Warranties, Ford cannot now deny that the Warranties cover the Engine Defect.

440.   Because Ford has not been able remedy the Engine Defect, any limitation on remedies included in the Warranties causes the Warranties to fail their essential purposes, rendering them null and void.

441.   As a direct and proximate cause of Ford's breach, Colorado Plaintiff and the Colorado Sub-Class Members suffered damages and continue to suffer damages, including economic damages at the point of sale or lease and diminution of value of their Class Vehicles. Additionally, Colorado Plaintiff and the Colorado Sub-Class Members have incurred or will incur economic damages at the point of repair in the form of the cost of repair.

442.   As a direct and proximate result of Ford's breach of express warranties, Colorado Plaintiff and the Colorado Sub-Class Members have been damaged in an amount to be determined at trial.

**TENTH CAUSE OF ACTION**
**Breach of the Implied Warranty of Merchantability**
**(COLO. REV. STAT. §§ 4-2-313 AND 4-2.5-212)**
**(On behalf of the Colorado Sub-Class)**

443.   Plaintiffs incorporate by reference the allegations set forth in paragraphs 1-274, above.

444.   Colorado Plaintiff brings this cause of action on his own behalf and on behalf of the members of the Colorado Sub-Class.

445.   Ford is and was at all relevant times a "merchant" with respect to motor vehicles under Colo. Rev. Stat. §§ 4-2-104(1) and 4-2.5-103(3), and a "seller" of motor vehicles under § 4-2-103(1)(d).

446.   With respect to leases, Ford is and was at all relevant times a "lessor" of motor vehicles under Colo. Rev. Stat. § 4-2.5-103(1)(p).

447.   The Class Vehicles are and were at all relevant times "goods" within the meaning of Colo. Rev. Stat. §§ 4-2-105(1) and 4-2.5-103(1)(h).

448.   A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law under Colo. Rev. Stat. §§ 4-2-314 and 4-2.5-212.

449.   Ford knew or had reason to know of the specific use for which the Class Vehicles were purchased or leased. Ford directly sold and marketed vehicles equipped with the engines to customers through authorized dealers, like those from whom Colorado Plaintiff and the Colorado Sub-Class Members bought or leased their vehicles, for the intended purpose of consumers purchasing the vehicles. Ford knew that the Class Vehicles would and did pass unchanged from the authorized dealers to Colorado Plaintiff and the Colorado Sub-Class Members, with no modification to the defective engines.

450.   Ford provided Plaintiff and Class Members with an implied warranty that the Class Vehicles and their components and parts are merchantable and fit for the ordinary purposes for which they were sold.

451.   This implied warranty included, among other things: (i) a warranty that the Class Vehicles and their engines that were manufactured, supplied, distributed, and/or sold by Ford were safe and reliable for providing transportation; and (ii) a warranty that the Class Vehicles and their engines would be fit for their intended use while the Class Vehicles were being operated.

452.   Contrary to the applicable implied warranties, the Class Vehicles and their engines at the time of sale and thereafter were not fit for their ordinary and intended purpose of providing Plaintiff and Class Members with reliable, durable, and safe transportation. Instead, the Class Vehicles are defective, including, but not limited to, the defective design and manufacture of their engines and the existence of the Engine Defect at the time of sale or lease and thereafter. Ford knew of this defect at the time these sale or lease transactions occurred.

453.   As a result of Ford's breach of the applicable implied warranties, Colorado Plaintiff and the Colorado Sub-Class Members of the Class Vehicles suffered an ascertainable loss of money, property, and/or value of their Class Vehicles. Additionally, as a result of the Engine Defect, Colorado Plaintiff and the Colorado Sub-Class Members were harmed and suffered actual damages in that the Class Vehicles' engine components are substantially certain to fail before their expected

85

useful life has run.

454.   Ford's actions, as complained of herein, breached the implied warranty that the Class Vehicles were of merchantable quality and fit for such use in violation of Colo. Rev. Stat. §§ 4-2-314 and 4-2.5-212.

455.   Colorado Plaintiff and the Colorado Sub-Class Members have complied with all obligations under the warranty, or otherwise have been excused from performance of said obligations as a result of Ford's conduct described herein.

456.   Colorado Plaintiff and the Colorado Sub-Class Members were not required to notify Ford of the breach because affording Ford a reasonable opportunity to cure its breach of written warranty would have been futile. Ford was also on notice of the Engine Defect from the complaints and service requests it received from Plaintiff and the Class Members, from repairs and/or replacements of the engines or components thereof, and through other internal sources.

457.   As a direct and proximate cause of Ford's breach, Colorado Plaintiff and the Colorado Sub-Class Members suffered damages and continue to suffer damages, including economic damages at the point of sale or lease and diminution of value of their Class Vehicles. Additionally, Colorado Plaintiff and the Colorado Sub-Class Members have incurred or will incur economic damages at the point of repair in the form of the cost of repair.

458.   Plaintiff and Class Members are the intended ultimate consumers of the Class Vehicles and therefore have standing to sue Ford for breach of its implied warranty. Colo. Rev. Stat. §§ 4-2-318, 4-2.5-216.

459.   As a direct and proximate result of Ford's breach of the implied warranty of merchantability, Colorado Plaintiff and the Colorado Sub-Class Members have been damaged in an amount to be proven at trial.

### **ELEVENTH CAUSE OF ACTION**
**(Violations of the Florida Deceptive and Unfair Trade Practices Act,
Fla. Stat. § 501.201, *et seq.*)**
**(On Behalf of the Florida Sub-Class)**

460.   Plaintiffs incorporate by reference each allegation set forth in paragraphs 1-274, above.

461.   Plaintiffs Amy Hoffer and James Padgett ("Florida Plaintiffs") bring this cause of action individually and on behalf of the Florida Sub-Class.

462.   Florida Plaintiffs and the Florida Sub-Class Members are "consumers[s]" under the Florida Deceptive and Unfair Trade Practices Act ("FDUPTA"), Fla. Stat. § 501.203(7).

463.   Ford engaged in "trade or commerce" in Florida within the meaning of the FDUPTA. *See* Fla. Stat. § 501.203(8).

464.   The FDUPTA prohibits "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce." Fla. Stat. § 501.204(1). Ford engaged in unfair and deceptive practices that violated the FDUPTA as described above.

465.   Ford participated in and engaged in deceptive business or trade practices prohibited by the FDUPTA by failing to disclose and actively concealing that the Class Vehicles contained the Engine Defect, by marketing their Class Vehicles as safe and of high quality, and by presenting themselves as a reputable manufacturer that valued safety and stood behind its vehicles after they were sold.

466.   By failing to disclose the Engine Defect; by concealing the Engine Defect; by promoting and selling or leasing Class Vehicles it knew were defective, including by marketing its vehicles as safe, reliable, easily operable, efficient, and of high quality; by presenting itself as a reputable manufacturer that valued safety, reliability, performance and efficiency, and stood behind its vehicles after they were sold; by failing to make repairs or making repairs and providing replacements that caused Florida Plaintiffs and the Florida Sub-Class Members to experience repeated instances of failure, rendering the New Vehicle Limited Warranty useless; and by minimized the scope and severity of the problems with the Class Vehicles, refusing to acknowledge that they are defective, and failing to provide adequate relief to consumers, Ford knowingly and intentionally misrepresented and omitted material facts in connection with the sale or lease of the Class Vehicles.

467.   Ford systematically misrepresented, concealed, suppressed, or omitted material facts relating to the Class Vehicles and Engine Defect in the course of its business.

468.   Ford also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Class Vehicles.

469.   Ford's unfair and deceptive acts or practices occurred repeatedly in Ford's trade or business, were capable of deceiving a substantial portion of the purchasing public, and imposed a serious safety risk on the public.

470.   Ford knew that the Class Vehicles and their engines suffered from an inherent defect, were defectively designed or manufactured, and were not suitable for their intended use.

471.   Ford knew or should have known that its conduct violated the FDUPTA.

472.   Florida Plaintiffs and the Florida Sub-Class Members reasonably relied on Ford's misrepresentations and omissions of material facts in its advertisements of the Class Vehicles and in the purchase of the Class Vehicles.

473.   Had Florida Plaintiffs and the Florida Sub-Class Members known that the Class Vehicles would exhibit the Engine Defect, they would not have purchased or leased the Class Vehicles or would have paid less for them. Plaintiffs did not receive the benefit of their bargain as a result of Ford's misconduct.

474.   Ford owed Florida Plaintiffs and the Florida Sub-Class Members a duty to disclose the truth about the Engine Defect because Ford:

a.   possessed exclusive and superior knowledge of the design of the Class Vehicles and the Engine Defect;

b.   intentionally concealed the foregoing from Florida Plaintiffs and the Florida Sub-Class Members; and/or

c.   made incomplete representations regarding the quality and durability of the Class Vehicles, while purposefully withholding material facts from Florida Plaintiffs and the Florida Sub-Class Members that contradicted these representations.

475.   Due to Ford's specific and superior knowledge that the Engines in the Class Vehicles will fail due to the Engine Defect, its false representations regarding the increased durability of the

Class Vehicles, and reliance by Florida Plaintiffs and the Florida Sub-Class Members on these material representations, Ford had a duty to disclose to Class members that the Engine Defect will cause engine failure in Class Vehicles, that Class Vehicles do not have the expected durability, reliability, and/or safety over other vehicles or of their predecessor engines, that failure of the Engines will cause damage to Class Vehicle, and that Class members would be required to bear the cost of the damage to their vehicles. Having volunteered to provide information to Florida Plaintiffs and the Florida Sub-Class Members, Ford had the duty to disclose not just the partial truth, but the entire truth. These omitted and concealed facts were material because they directly impact the value of the Class Vehicles purchased or leased by Florida Plaintiffs and the Florida Sub-Class Members. Longevity, durability, performance, and safety are material concerns to Ford consumers. Ford represented to Florida Plaintiffs and the Florida Sub-Class Members that they were purchasing or leasing vehicles that were durable, reliable, safe, efficient, of high quality, and containing engines of advanced and superior characteristics and technology as alleged throughout this Complaint, when in fact it is only a matter of time before the engines fail due to the Engine Defect.

476.   Florida Plaintiffs and the Florida Sub-Class Members suffered injury in fact to a legally protected interest. As a result of Ford's conduct, Florida Plaintiffs and the Florida Sub-Class Members were harmed and suffered actual damages in the form of the costs of diagnosis and repair of their vehicles, and the diminished value of their vehicles.

477.   As a direct and proximate result of Ford's unfair or deceptive acts or practices, Florida Plaintiffs and the Florida Sub-Class Members suffered and will continue to suffer injury in fact and/or actual damages.

478.   Defendant's violations present a continuing risk to Florida Plaintiffs and the Florida Sub-Class Members as well as to the general public. Defendant's unlawful acts and practices complained of herein affect the public interest.

479.   As a proximate and direct result of Ford's unfair and deceptive trade practices, Florida Plaintiffs and members of the Florida Sub-Class purchased or leased Class Vehicles and suffered an ascertainable loss and financial harm. This included ascertainable losses in the form of actual damages in the amount of the cost to attempt to repair the Engine Defect, replaced the damaged

related system components, diminution of Class Vehicle resale value, increased repair and maintenance costs, and other substantial monetary damages and inconvenience.

480.   Florida Plaintiffs and the Florida Sub-Class Members seek, *inter alia*, actual damages in an amount to be determined at trial, reasonable attorneys' fees; and any other just and proper relief available under the FDUPTA. Because Ford acted with willful and conscious disregard of the rights and safety of others, Ford's conduct constitutes malice, oppression, and fraud warranting punitive damages.

**TWELFTH CAUSE OF ACTION**
**Breach of Express Warranty**
**(FLA. STAT.§§ 672.313 and 680.21)**
**(On behalf of the Florida Sub-Class)**

481.   Plaintiffs incorporate by reference each allegation set forth in paragraphs 1-274, above.

482.   Florida Plaintiffs bring this cause of action on their own behalf and on behalf of the members of the Florida Sub-Class.

483.   Ford is and was at all relevant times a "merchant" with respect to motor vehicles under Fla. Stat. §§ 672.104(1) and 680.1031(3)(k), and a "seller" of motor vehicles under § 672.103(1)(d ).

484.   With respect to leases, Ford is and was at all relevant times a "lessor" of motor vehicles under Fla. Stat. § 680.1031(1)(p).

485.   The Class Vehicles are and were at all relevant times "goods" within the meaning of Fla. Stat. §§ 672.105(1) and 680.1031(1)(h).

486.   Ford provided all purchasers and lessees of the Class Vehicles with the express warranty described herein, which became a material part of the bargain.

487.   Ford provided all purchasers and lessees of Lincoln-branded Class Vehicles with the Lincoln Warranty and all purchasers and lessees of Ford or Ford-branded Class Vehicles with the Ford/Ford Warranty.

488.   Ford sold and leased the Class Vehicles with a written express warranty covering the Vehicles for three years or 36,000 miles, whichever comes first.

489.   Ford's New Vehicle Limited Warranty expressly states that Ford will "without charge,

90

repair, replace, or adjust all parts on your vehicle that malfunction or fail during normal use during the applicable coverage period due to a manufacturing defect in factory-supplied materials or factory workmanship" so long the Vehicle is properly operated and maintained and taken to a Ford dealership for repair within the warranty period.

490.   Ford further provides powertrain warranty coverage, which is applicable to "the Engine: all internal lubricated parts, cylinder block, cylinder heads, electrical fuel pump, powertrain control module, engine mounts, flywheel, injection pump, manifold (exhaust and intake), manifold bolts, oil pan, oil pump, seals and gaskets, engine thermostat, engine, thermostat housing, timing chain cover, timing chain (gears or belt), turbocharger/supercharger unit, valve covers, water pump" as well as the components in the transmission, front-wheel drive, rear-wheel drive, and four-wheel/all-wheel drive. This coverage applies for 5-years or up to 60,000 miles, whichever comes first.

491.   For certified pre-owned ("CPO") Vehicles, Ford offers a limited warranty covering CPO Vehicles for 12 months or 12,000 miles, whichever comes first.

492.   Ford's CPO Vehicle warranty states that a dealer will replace "all covered components . . . that are found to be defective in factory-supplied materials or workmanship during the applicable warranty periods." The engine and its components—including the cylinder block and cylinder heads—are included in Ford's list of "covered components."

493.   Ford manufactured and/or installed the engines and the engines' component parts in the Class Vehicles, and the engines and their component parts are covered by the express Warranties.

494.   The Engine Defect at issue in this litigation was present at the time the Class Vehicles were sold or leased to Florida Plaintiffs and the Florida Sub-Class Members.

495.   Plaintiffs relied on Ford's express warranties, which were a material part of the bargain, when purchasing or leasing their Class Vehicles.

496.   Under the express Warranties, Ford was obligated to correct the Engine Defect in the vehicles owned or leased by Florida Plaintiffs and the Florida Sub-Class Members.

497.   Although Ford was obligated to correct the Engine Defect, none of the attempted fixes

to the engines are adequate under the terms of the Warranties, as they did not cure the defect.

498.   Ford breached the express Warranties by performing illusory repairs. Rather than repairing the vehicles pursuant to the express Warranties, Ford falsely informed Florida Sub-Class Members that there was no problem with their Class Vehicles, performed ineffective procedures including software updates, and/or replaced defective components in the engines with equally defective components, without actually repairing the Class Vehicles.

499.   Ford and its agent dealers have failed and refused to conform the engines to the express Warranties. Ford's conduct, as discussed throughout this Complaint, has voided any attempt on its part to disclaim liability for its actions.

500.   Moreover, Ford's attempt to disclaim or limit these express Warranties vis-à-vis consumers is unconscionable and unenforceable under the circumstances here. Specifically, Ford's warranty limitation is unenforceable because it knowingly sold a defective product without informing consumers about the defect.

501.   The time limits contained in Ford's warranty period were also unconscionable and inadequate to protect Florida Plaintiffs and the Florida Sub-Class Members. Among other things, Florida Plaintiffs and the Florida Sub-Class Members had no meaningful choice in determining these time limitations, the terms of which unreasonably favored Ford. A gross disparity in bargaining power existed between Ford and the Class members, and Ford knew or should have known that the Class Vehicles were defective at the time of sale.

502.   Florida Plaintiffs and the Florida Sub-Class Members have complied with all obligations under the Warranties, or otherwise have been excused from performance of said obligations as a result of Ford's conduct described herein.

503.   Florida Plaintiffs and the Florida Sub-Class Members were not required to notify Ford of the breach because affording Ford a reasonable opportunity to cure its breach of written warranty would have been futile. Ford was also on notice of the Engine Defect from the complaints and service requests it received from Plaintiffs and the Class Members, from repairs and/or replacements of the engines or components thereof, and through other internal and external sources.

504.   Because Ford, through its conduct and exemplified by its own service bulletins, has

covered repairs of the Engine Defect if Ford determines the repairs are appropriately covered under the Warranties, Ford cannot now deny that the Warranties cover the Engine Defect.

505.   Because Ford has not been able remedy the Engine Defect, any limitation on remedies included in the Warranties causes the Warranties to fail their essential purposes, rendering them null and void.

506.   As a direct and proximate cause of Ford's breach, Florida Plaintiffs and the Florida Sub-Class Members suffered damages and continue to suffer damages, including economic damages at the point of sale or lease and diminution of value of their Class Vehicles. Additionally, Florida Plaintiffs and the Florida Sub-Class Members have incurred or will incur economic damages at the point of repair in the form of the cost of repair.

507.   As a direct and proximate result of Ford's breach of express warranties, Florida Plaintiffs and the Florida Sub-Class Members have been damaged in an amount to be determined at trial.

## THIRTEENTH CAUSE OF ACTION
### Breach of the Implied Warranty of Merchantability
### (Fla. Stat. §§ 672.314 and 680.212)
### (On behalf of the Florida Sub-Class)

508.   Plaintiffs incorporate by reference each allegation set forth in paragraphs 1-274, above.

509.   Florida Plaintiffs bring this cause of action on their own behalf and on behalf of the members of the Florida Sub-Class.

510.   Ford is and was at all relevant times a "merchant" with respect to motor vehicles under Fla. Stat. §§ 672.104(1) and 680.1031(3)(k), and a "seller" of motor vehicles under § 672.103(1)(d ).

511.   With respect to leases, Ford is and was at all relevant times a "lessor" of motor vehicles under Fla. Stat. § 680.1031(1)(p).

512.   The Class Vehicles are and were at all relevant times "goods" within the meaning of Fla. Stat. §§ 672.105(1) and 680.1031(1)(h).

513.   A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law under Fla. Stat. §§ 672.314 and

93

680.212.

514.   Ford knew or had reason to know of the specific use for which the Class Vehicles were purchased or leased. Ford directly sold and marketed vehicles equipped with the engines to customers through authorized dealers, like those from whom Florida Plaintiffs and the Florida Sub-Class Members bought or leased their vehicles, for the intended purpose of consumers purchasing the vehicles. Ford knew that the Class Vehicles would and did pass unchanged from the authorized dealers to Florida Plaintiffs and the Florida Sub-Class Members, with no modification to the defective engines.

515.   Ford provided Plaintiffs and Class Members with an implied warranty that the Class Vehicles and their components and parts are merchantable and fit for the ordinary purposes for which they were sold.

516.   This implied warranty included, among other things: (i) a warranty that the Class Vehicles and their engines that were manufactured, supplied, distributed, and/or sold by Ford were safe and reliable for providing transportation; and (ii) a warranty that the Class Vehicles and their engines would be fit for their intended use while the Class Vehicles were being operated.

517.   Contrary to the applicable implied warranties, the Class Vehicles and their engines at the time of sale and thereafter were not fit for their ordinary and intended purpose of providing Plaintiffs and Class Members with reliable, durable, and safe transportation. Instead, the Class Vehicles are defective, including, but not limited to, the defective design and manufacture of their engines and the existence of the Engine Defect at the time of sale or lease and thereafter. Ford knew of this defect at the time these sale or lease transactions occurred.

518.   As a result of Ford's breach of the applicable implied warranties, Florida Plaintiffs and the Florida Sub-Class Members of the Class Vehicles suffered an ascertainable loss of money, property, and/or value of their Class Vehicles. Additionally, as a result of the Engine Defect, Florida Plaintiffs and the Florida Sub-Class Members were harmed and suffered actual damages in that the Class Vehicles' engine components are substantially certain to fail before their expected useful life has run.

519.   Ford's actions, as complained of herein, breached the implied warranty that the Class

94

Vehicles were of merchantable quality and fit for such use in violation of Fla. Stat. §§ 672.314 and 680.212.

520.   Florida Plaintiffs and the Florida Sub-Class Members have complied with all obligations under the warranty, or otherwise have been excused from performance of said obligations as a result of Ford's conduct described herein.

521.   Florida Plaintiffs and the Florida Sub-Class Members were not required to notify Ford of the breach because affording Ford a reasonable opportunity to cure its breach of written warranty would have been futile. Ford was also on notice of the Engine Defect from the complaints and service requests it received from Plaintiffs and the Class Members, from repairs and/or replacements of the engines or components thereof, and through other internal sources.

522.   Because Florida Plaintiffs purchased their vehicles from authorized Ford dealers, they are in privity with Ford since (1) an agency relationship establishes privity for purposes of the breach of implied warranty claims and (2) privity is not required where plaintiffs are intended third-party beneficiaries of a defendant's implied warranties.

523.   As a direct and proximate cause of Ford's breach, Florida Plaintiffs and the Florida Sub-Class Members suffered damages and continue to suffer damages, including economic damages at the point of sale or lease and diminution of value of their Class Vehicles. Additionally, Florida Plaintiffs and the Florida Sub-Class Members have incurred or will incur economic damages at the point of repair in the form of the cost of repair.

524.   As a direct and proximate result of Ford's breach of the implied warranty of merchantability, Florida Plaintiffs and the Florida Sub-Class Members have been damaged in an amount to be proven at trial.

**FOURTEENTH CAUSE OF ACTION**
**(Violations of the Georgia Fair Business Practices Act,**
**Ga. Code Ann. § 10-1-390, *et seq*.)**
**(On Behalf of the Georgia Sub-Class)**

525.   Plaintiffs incorporate by reference each allegation set forth in paragraphs 1-274, above.

526.   Plaintiffs Jillian Constable and Monterio Butcher ("Georgia Plaintiffs") brings this

cause of action individually and on behalf of the Georgia Sub-Class.

527.   Georgia's Fair Business Practices Act ("GFBPA") declares "[u]nfair or deceptive acts or practices in the conduct of consumer transactions and consumer acts or practices in trade or commerce" to be unlawful. Ga. Code Ann. § 10-1-393(a).

528.   Unfair or deceptive acts or practices are defined to include, "representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have," "[r]epresenting that goods or services are of a particular standard, quality, or grade … if they are of another," and [a]dvertising goods or services with intent not to sell them as advertised." Ga. Code Ann. § 10-1-393(b). Ford engaged in unfair and deceptive practices that violated the GFBPA as described above.

529.   Ford participated in and engaged in deceptive business or trade practices prohibited by the GFBPA by failing to disclose and actively concealing that the Class Vehicles contained the Engine Defect, by marketing their Class Vehicles as safe and of high quality, and by presenting themselves as a reputable manufacturer that valued safety and stood behind its vehicles after they were sold.

530.   By failing to disclose the Engine Defect; by concealing the Engine Defect; by promoting and selling or leasing Class Vehicles it knew were defective, including by marketing its vehicles as safe, reliable, easily operable, efficient, and of high quality; by presenting itself as a reputable manufacturer that valued safety, reliability, performance and efficiency, and stood behind its vehicles after they were sold; by failing to make repairs or making repairs and providing replacements that caused Georgia Plaintiffs and the Georgia Sub-Class Members to experience repeated instances of failure, rendering the New Vehicle Limited Warranty useless; and by minimized the scope and severity of the problems with the Class Vehicles, refusing to acknowledge that they are defective, and failing to provide adequate relief to consumers, Ford knowingly and intentionally misrepresented and omitted material facts in connection with the sale or lease of the Class Vehicles.

531.   Ford systematically misrepresented, concealed, suppressed, or omitted material facts relating to the Class Vehicles and Engine Defect in the course of its business.

532.   Ford also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Class Vehicles.

533.   Ford's unfair and deceptive acts or practices occurred repeatedly in Ford's trade or business, were capable of deceiving a substantial portion of the purchasing public, and imposed a serious safety risk on the public.

534.   Ford knew that the Class Vehicles and their engines suffered from an inherent defect, were defectively designed or manufactured, and were not suitable for their intended use.

535.   Ford knew or should have known that its conduct violated the GFBPA.

536.   Georgia Plaintiffs and the Georgia Sub-Class Members reasonably relied on Ford's misrepresentations and omissions of material facts in its advertisements of the Class Vehicles and in the purchase of the Class Vehicles.

537.   Had Georgia Plaintiffs and the Georgia Sub-Class Members known that the Class Vehicles would exhibit the Engine Defect, they would not have purchased or leased the Class Vehicles or would have paid less for them. Plaintiff did not receive the benefit of their bargain as a result of Ford's misconduct.

538.   Ford owed Georgia Plaintiffs and the Georgia Sub-Class Members a duty to disclose the truth about the Engine Defect because Ford:

a.   possessed exclusive and superior knowledge of the design of the Class Vehicles and the Engine Defect;

b.   intentionally concealed the foregoing from Georgia Plaintiffs and the Georgia Sub-Class Members; and/or

c.   made incomplete representations regarding the quality and durability of the Class Vehicles, while purposefully withholding material facts from Georgia Plaintiffs and the Georgia Sub-Class Members that contradicted these representations.

539.   Due to Ford's specific and superior knowledge that the Engines in the Class Vehicles will fail due to the Engine Defect, its false representations regarding the increased durability of the

97

Class Vehicles, and reliance by Georgia Plaintiffs and the Georgia Sub-Class Members on these material representations, Ford had a duty to disclose to Class members that the Engine Defect will cause engine failure in Class Vehicles, that Class Vehicles do not have the expected durability, reliability, and/or safety over other vehicles or of their predecessor engines, that failure of the Engines will cause damage to Class Vehicle, and that Class members would be required to bear the cost of the damage to their vehicles. Having volunteered to provide information to Georgia Plaintiffs and the Georgia Sub-Class Members, Ford had the duty to disclose not just the partial truth, but the entire truth. These omitted and concealed facts were material because they directly impact the value of the Class Vehicles purchased or leased by Georgia Plaintiffs and the Georgia Sub-Class Members. Longevity, durability, performance, and safety are material concerns to Ford consumers. Ford represented to Georgia Plaintiffs and the Georgia Sub-Class Members that they were purchasing or leasing vehicles that were durable, reliable, safe, efficient, of high quality, and containing engines of advanced and superior characteristics and technology as alleged throughout this Complaint, when in fact it is only a matter of time before the engines fail due to the Engine Defect.

540.   Georgia Plaintiffs and the Georgia Sub-Class Members suffered injury in fact to a legally protected interest. As a result of Ford's conduct, Georgia Plaintiffs and the Georgia Sub-Class Members were harmed and suffered actual damages in the form of the costs of diagnosis and repair of their vehicles, and the diminished value of their vehicles.

541.   As a direct and proximate result of Ford's unfair or deceptive acts or practices, Georgia Plaintiffs and the Georgia Sub-Class Members suffered and will continue to suffer injury in fact and/or actual damages.

542.   Defendant's violations present a continuing risk to Georgia Plaintiffs and the Georgia Sub-Class Members as well as to the general public. Defendant's unlawful acts and practices complained of herein affect the public interest.

543.   As a proximate and direct result of Ford's unfair and deceptive trade practices, Georgia Plaintiffs and members of the Georgia Sub-Class purchased or leased Class Vehicles and suffered an ascertainable loss and financial harm. This included ascertainable losses in the form of

1   actual damages in the amount of the cost to attempt to repair the Engine Defect, replaced the

2   damaged related system components, diminution of Class Vehicle resale value, increased repair and

3   maintenance costs, and other substantial monetary damages and inconvenience.

4       544.   Pursuant to statute, Georgia Plaintiffs provided notice of her claim by letter dated May

5   19, 2021. Plaintiff and members of the Georgia Sub-Class seek all damages and relief to which they

6   are entitled to because Ford failed to remedy its unlawful conduct within the requisite time period.

7       545.   Georgia Plaintiffs and members of the Georgia Sub-Class seek monetary relief against

8   Ford in the amount of damages, exemplary damages for intentional violations, injunctive relief,

9   attorneys' fees, and any other just and proper relief available under Ga. Code Ann. § 10-1-399(a).

**FIFTEENTH CAUSE OF ACTION**
**(Violations of the Georgia Uniform Deceptive Trade Practices Act,**
**Ga. Code Ann. § 10-1-370, *et seq*.)**
**(On Behalf of the Georgia Sub-Class)**

13      546.   Plaintiffs incorporate by reference each allegation set forth in paragraphs 1-274,

14  above.

15      547.   Georgia Plaintiffs bring this cause of action individually and on behalf of the Georgia

16  Sub-Class.

17      548.   The Georgia Uniform Deceptive Trade Practices Act ("GUDTPA") prohibits

18  "deceptive trade practices," which include the  "misrepresentation of standard or quality of goods

19  or services," and "engaging in any other conduct which similarly creates a likelihood of confusion

20  or of misunderstanding." Ga. Code Ann. § 10-1-372(a). Ford engaged in unfair and deceptive

21  practices that violated the GUDTPA as described above.

22      549.   Ford, Georgia Plaintiffs and the members of the Georgia Sub-Class are "persons"

23  within the meaning of the GUDTPA, GA. Code Ann. § 10-1-471(5).

24      550.   Ford participated in and engaged in deceptive business or trade practices prohibited

25  by the GUDTPA by failing to disclose and actively concealing that the Class Vehicles contained

26  the Engine Defect, by marketing their Class Vehicles as safe and of high quality, and by presenting

27  themselves as a reputable manufacturer that valued safety and stood behind its vehicles after they

28  were sold.

551.   By failing to disclose the Engine Defect; by concealing the Engine Defect; by promoting and selling or leasing Class Vehicles it knew were defective, including by marketing its vehicles as safe, reliable, easily operable, efficient, and of high quality; by presenting itself as a reputable manufacturer that valued safety, reliability, performance and efficiency, and stood behind its vehicles after they were sold; by failing to make repairs or making repairs and providing replacements that caused Georgia Plaintiffs and the Georgia Sub-Class Members to experience repeated instances of failure, rendering the New Vehicle Limited Warranty useless; and by minimized the scope and severity of the problems with the Class Vehicles, refusing to acknowledge that they are defective, and failing to provide adequate relief to consumers, Ford knowingly and intentionally misrepresented and omitted material facts in connection with the sale or lease of the Class Vehicles.

552.   Ford systematically misrepresented, concealed, suppressed, or omitted material facts relating to the Class Vehicles and Engine Defect in the course of its business.

553.   Ford also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Class Vehicles.

554.   Ford's unfair and deceptive acts or practices occurred repeatedly in Ford's trade or business, were capable of deceiving a substantial portion of the purchasing public, and imposed a serious safety risk on the public.

555.   Ford knew that the Class Vehicles and their engines suffered from an inherent defect, were defectively designed or manufactured, and were not suitable for their intended use.

556.   Ford knew or should have known that its conduct violated the GUDTPA.

557.   Georgia Plaintiffs and the Georgia Sub-Class Members reasonably relied on Ford's misrepresentations and omissions of material facts in its advertisements of the Class Vehicles and in the purchase of the Class Vehicles.

558.   Had Georgia Plaintiffs and the Georgia Sub-Class Members known that the Class Vehicles would exhibit the Engine Defect, they would not have purchased or leased the Class

Vehicles or would have paid less for them. Plaintiff did not receive the benefit of their bargain as a result of Ford's misconduct.

559.   Ford owed Georgia Plaintiffs and the Georgia Sub-Class Members a duty to disclose the truth about the Engine Defect because Ford:

   a.   possessed exclusive and superior knowledge of the design of the Class Vehicles and the Engine Defect;

   b.   intentionally concealed the foregoing from Georgia Plaintiffs and the Georgia Sub-Class Members; and/or

   c.   made incomplete representations regarding the quality and durability of the Class Vehicles, while purposefully withholding material facts from Georgia Plaintiffs and the Georgia Sub-Class Members that contradicted these representations.

560.   Due to Ford's specific and superior knowledge that the Engines in the Class Vehicles will fail due to the Engine Defect, its false representations regarding the increased durability of the Class Vehicles, and reliance by Georgia Plaintiffs and the Georgia Sub-Class Members on these material representations, Ford had a duty to disclose to Class members that the Engine Defect will cause engine failure in Class Vehicles, that Class Vehicles do not have the expected durability, reliability, and/or safety over other vehicles or of their predecessor engines, that failure of the Engines will cause damage to Class Vehicle, and that Class members would be required to bear the cost of the damage to their vehicles. Having volunteered to provide information to Georgia Plaintiffs and the Georgia Sub-Class Members, Ford had the duty to disclose not just the partial truth, but the entire truth. These omitted and concealed facts were material because they directly impact the value of the Class Vehicles purchased or leased by Georgia Plaintiffs and the Georgia Sub-Class Members. Longevity, durability, performance, and safety are material concerns to Ford consumers. Ford represented to Georgia Plaintiffs and the Georgia Sub-Class Members that they were purchasing or leasing vehicles that were durable, reliable, safe, efficient, of high quality, and containing engines of advanced and superior characteristics and technology as alleged throughout this Complaint, when in fact it is only a matter of time before the engines fail due to the Engine Defect.

561.   Georgia Plaintiffs and the Georgia Sub-Class Members suffered injury in fact to a legally protected interest. As a result of Ford's conduct, Georgia Plaintiffs and the Georgia Sub-Class Members were harmed and suffered actual damages in the form of the costs of diagnosis and repair of their vehicles, and the diminished value of their vehicles.

562.   As a direct and proximate result of Ford's unfair or deceptive acts or practices, Georgia Plaintiffs and the Georgia Sub-Class Members suffered and will continue to suffer injury in fact and/or actual damages.

563.   Defendant's violations present a continuing risk to Georgia Plaintiffs and the Georgia Sub-Class Members as well as to the general public. Defendant's unlawful acts and practices complained of herein affect the public interest.

564.   As a proximate and direct result of Ford's unfair and deceptive trade practices, Georgia Plaintiff and members of the Georgia Sub-Class purchased or leased Class Vehicles and suffered an ascertainable loss and financial harm. This included ascertainable losses in the form of actual damages in the amount of the cost to attempt to repair the Engine Defect, replaced the damaged related system components, diminution of Class Vehicle resale value, increased repair and maintenance costs, and other substantial monetary damages and inconvenience.

565.   Georgia Plaintiffs provided notice of their claims by letters dated May 19, 2021 and May 21, 2021.

566.   Georgia Plaintiffs and members of the Georgia Sub-Class seek monetary relief against Ford in the amount of actual damages, injunctive relief, attorneys' fees, and any other just and proper relief available under Ga. Code Ann. § 10-1-373.

**SIXTEENTH CAUSE OF ACTION**
**Breach of Express Warranty**
**(Ga. Code Ann. §§ 11-2-313 and 11-2A-210)**
**(On behalf of the Georgia Sub-Class)**

567.   Plaintiffs incorporate by reference each allegation set forth in paragraphs 1-274, above.

568.   Georgia Plaintiffs bring this cause of action individually and on behalf of the members of the Georgia Sub-Class.

102

569.   Ford is and was at all relevant times a "merchant" with respect to motor vehicles under Ga. Code Ann. §§ 11-2-104(1) and 11-2A-103(3), and a "seller" of motor vehicles under § 11-2-103(1)(d).

570.   With respect to leases, Ford is and was at all relevant times a  "lessor" of motor vehicles under Ga. Code Ann. § 11-2A-103(1)(p).

571.   The Class Vehicles are and were at all relevant times  "goods" within the meaning of Ga. Code Ann. §§ 11-2-105(1) and 11-2A-103(1)(h).

572.   Ford provided all purchasers and lessees of the Class Vehicles with the express warranty described herein, which became a material part of the bargain.

573.   Ford provided all purchasers and lessees of Lincoln-branded Class Vehicles with the Lincoln Warranty and all purchasers and lessees of Ford or Ford-branded Class Vehicles with the Ford/Ford Warranty.

574.   Ford sold and leased the Class Vehicles with a written express warranty covering the Vehicles for three years or 36,000 miles, whichever comes first.

575.   Ford's New Vehicle Limited Warranty expressly states that Ford will "without charge, repair, replace, or adjust all parts on your vehicle that malfunction or fail during normal use during the applicable coverage period due to a manufacturing defect in factory-supplied materials or factory workmanship" so long the Vehicle is properly operated and maintained and taken to a Ford dealership for repair within the warranty period.

576.   Ford further provides powertrain warranty coverage, which is applicable to "the Engine: all internal lubricated parts, cylinder block, cylinder heads, electrical fuel pump, powertrain control module, engine mounts, flywheel, injection pump, manifold (exhaust and intake), manifold bolts, oil pan, oil pump, seals and gaskets, engine thermostat, engine, thermostat housing, timing chain cover, timing chain (gears or belt), turbocharger/supercharger unit, valve covers, water pump" as well as the components in the transmission, front-wheel drive, rear-wheel drive, and four-wheel/all-wheel drive. This coverage applies for 5-years or up to 60,000 miles, whichever comes first.

577.   For certified pre-owned ("CPO") Vehicles, Ford offers a limited warranty covering

103

1    CPO Vehicles for 12 months or 12,000 miles, whichever comes first.

2        578.    Ford's CPO Vehicle warranty states that a dealer will replace "all covered

3    components . . . that are found to be defective in factory-supplied materials or workmanship during

4    the applicable warranty periods." The engine and its components—including the cylinder block and

5    cylinder heads—are included in Ford's list of "covered components."

6        579.    Ford manufactured and/or installed the engines and the engines' component parts in

7    the Class Vehicles, and the engines and their component parts are covered by the express

8    Warranties.

9        580.    The Engine Defect at issue in this litigation was present at the time the Class Vehicles

10    were sold or leased to Georgia Plaintiffs and the Georgia Sub-Class Members.

11        581.    Plaintiff relied on Ford's express warranties, which were a material part of the bargain,

12    when purchasing or leasing their Class Vehicles.

13        582.    Under the express Warranties, Ford was obligated to correct the Engine Defect in the

14    vehicles owned or leased by Georgia Plaintiffs and the Georgia Sub-Class Members.

15        583.    Although Ford was obligated to correct the Engine Defect, none of the attempted fixes

16    to the engines are adequate under the terms of the Warranties, as they did not cure the defect.

17        584.    Ford breached the express Warranties by performing illusory repairs. Rather than

18    repairing the vehicles pursuant to the express Warranties, Ford falsely informed Georgia Sub-Class

19    Members that there was no problem with their Class Vehicles, performed ineffective procedures

20    including software updates, and/or replaced defective components in the engines with equally

21    defective components, without actually repairing the Class Vehicles.

22        585.    Ford and its agent dealers have failed and refused to conform the engines to the

23    express Warranties. Ford's conduct, as discussed throughout this Complaint, has voided any attempt

24    on its part to disclaim liability for its actions.

25        586.    Moreover, Ford's attempt to disclaim or limit these express Warranties vis-à-vis

26    consumers is unconscionable and unenforceable under the circumstances here. Specifically, Ford's

27    warranty limitation is unenforceable because it knowingly sold a defective product without

28    informing consumers about the defect.

587.   The time limits contained in Ford's warranty period were also unconscionable and inadequate to protect Georgia Plaintiffs and the Georgia Sub-Class Members. Among other things, Georgia Plaintiffs and the Georgia Sub-Class Members had no meaningful choice in determining these time limitations, the terms of which unreasonably favored Ford. A gross disparity in bargaining power existed between Ford and the Class members, and Ford knew or should have known that the Class Vehicles were defective at the time of sale.

588.   Georgia Plaintiffs and the Georgia Sub-Class Members have complied with all obligations under the Warranties, or otherwise have been excused from performance of said obligations as a result of Ford's conduct described herein.

589.   Georgia Plaintiffs and the Georgia Sub-Class Members were not required to notify Ford of the breach because affording Ford a reasonable opportunity to cure its breach of written warranty would have been futile. Ford was also on notice of the Engine Defect from the complaints and service requests it received from Plaintiff and the Class Members, from repairs and/or replacements of the engines or components thereof, and through other internal and external sources.

590.   Because Ford, through its conduct and exemplified by its own service bulletins, has covered repairs of the Engine Defect if Ford determines the repairs are appropriately covered under the Warranties, Ford cannot now deny that the Warranties cover the Engine Defect.

591.   Because Ford has not been able remedy the Engine Defect, any limitation on remedies included in the Warranties causes the Warranties to fail their essential purposes, rendering them null and void.

592.   As a direct and proximate cause of Ford's breach, Georgia Plaintiffs and the Georgia Sub-Class Members suffered damages and continue to suffer damages, including economic damages at the point of sale or lease and diminution of value of their Class Vehicles. Additionally, Georgia Plaintiffs and the Georgia Sub-Class Members have incurred or will incur economic damages at the point of repair in the form of the cost of repair.

593.   As a direct and proximate result of Ford's breach of express warranties, Georgia Plaintiffs and the Georgia Sub-Class Members have been damaged in an amount to be determined at trial.

### SEVENTEENTH CAUSE OF ACTION
**Breach of the Implied Warranty of Merchantability**
**(Ga. Code Ann. §§ 11-2-313 and 11-2A-212)**
**(On behalf of the Georgia Sub-Class)**

594. Plaintiffs incorporate by reference each allegation set forth in paragraphs 1-274, above.

595. Georgia Plaintiffs bring this cause of action individually and on behalf of the members of the Georgia Sub-Class.

596. Ford is and was at all relevant times a "merchant" with respect to motor vehicles under Ga. Code Ann. §§ 11-2-104(1) and 11-2A-103(3), and a "seller" of motor vehicles under § 11-2-103(1)(d).

597. With respect to leases, Ford is and was at all relevant times a "lessor" of motor vehicles under Ga. Code Ann. § 11-2A-103(1)(p).

598. The Class Vehicles are and were at all relevant times "goods" within the meaning of Ga. Code Ann. §§ 11-2-105(1) and 11-2A-103(1)(h).

599. A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law under Ga. Code. Ann. §§ 11-2-314 and 11-2A-212.

600. Ford knew or had reason to know of the specific use for which the Class Vehicles were purchased or leased. Ford directly sold and marketed vehicles equipped with the engines to customers through authorized dealers, like those from whom Georgia Plaintiffs and the Georgia Sub-Class Members bought or leased their vehicles, for the intended purpose of consumers purchasing the vehicles. Ford knew that the Class Vehicles would and did pass unchanged from the authorized dealers to Georgia Plaintiffs and the Georgia Sub-Class Members, with no modification to the defective engines.

601. Ford provided Plaintiff and Class Members with an implied warranty that the Class Vehicles and their components and parts are merchantable and fit for the ordinary purposes for which they were sold.

602. This implied warranty included, among other things: (i) a warranty that the Class

106

Vehicles and their engines that were manufactured, supplied, distributed, and/or sold by Ford were safe and reliable for providing transportation; and (ii) a warranty that the Class Vehicles and their engines would be fit for their intended use while the Class Vehicles were being operated.

603.    Contrary to the applicable implied warranties, the Class Vehicles and their engines at the time of sale and thereafter were not fit for their ordinary and intended purpose of providing Plaintiff and Class Members with reliable, durable, and safe transportation. Instead, the Class Vehicles are defective, including, but not limited to, the defective design and manufacture of their engines and the existence of the Engine Defect at the time of sale or lease and thereafter. Ford knew of this defect at the time these sale or lease transactions occurred.

604.    As a result of Ford's breach of the applicable implied warranties, Georgia Plaintiffs and the Georgia Sub-Class Members of the Class Vehicles suffered an ascertainable loss of money, property, and/or value of their Class Vehicles. Additionally, as a result of the Engine Defect, Georgia Plaintiffs and the Georgia Sub-Class Members were harmed and suffered actual damages in that the Class Vehicles' engine components are substantially certain to fail before their expected useful life has run.

605.    Ford's actions, as complained of herein, breached the implied warranty that the Class Vehicles were of merchantable quality and fit for such use in violation of Ga. Code. Ann. §§ 11-2-314 and 11-2A-212.

606.    Georgia Plaintiffs and the Georgia Sub-Class Members have complied with all obligations under the warranty, or otherwise have been excused from performance of said obligations as a result of Ford's conduct described herein.

607.    Georgia Plaintiffs and the Georgia Sub-Class Members were not required to notify Ford of the breach because affording Ford a reasonable opportunity to cure its breach of written warranty would have been futile. Ford was also on notice of the Engine Defect from the complaints and service requests it received from Plaintiff and the Class Members, from repairs and/or replacements of the engines or components thereof, and through other internal sources.

608.    In addition, on or about May 19, 2021 and May 21, 2021 Georgia Plaintiffs gave notice to Defendant that they intended to pursue her warranty claims on behalf of a class of similarly

situated consumers.

609.   Because Plaintiff Jillian Constable purchased her vehicle from an authorized Ford dealer, she is in privity with Ford since (1) an agency relationship establishes privity for purposes of the breach of implied warranty claims and (2) privity is not required where plaintiffs are intended third-party beneficiaries of a defendant's implied warranties.

610.   As a direct and proximate cause of Ford's breach, Georgia Plaintiffs and the Georgia Sub-Class Members suffered damages and continue to suffer damages, including economic damages at the point of sale or lease and diminution of value of their Class Vehicles. Additionally, Georgia Plaintiffs and the Georgia Sub-Class Members have incurred or will incur economic damages at the point of repair in the form of the cost of repair.

611.   As a direct and proximate result of Ford's breach of the implied warranty of merchantability, Georgia Plaintiffs and the Georgia Sub-Class Members have been damaged in an amount to be proven at trial.

## EIGHTEENTH CAUSE OF ACTION
**(Violations of the Illinois Consumer Fraud and Deceptive Business Practices  Act, 815 ILCS 505/1, *et seq.*)**
**(On Behalf of the Illinois Sub-Class)**

612.   Plaintiffs incorporate by reference each allegation set forth in paragraphs 1-274, above.

613.   Plaintiffs Harlampi Bozhinov and Mary Glade ("Illinois Plaintiffs") bring this cause of action individually and on behalf of the Illinois Sub-Class.

614.   Ford is a "person" as that term is defined in 815 ILCS 505/1(c).

615.   The Illinois Plaintiffs and the Illinois Sub-Class members are "consumers" as that term is defined in 815 ILCS 505/1(e).

616.   The purpose of the Illinois Consumer Fraud and Deceptive Business Practices Act ("Illinois CFA") is to enjoin trade practices which confuse or deceive the consumer. The Illinois CFA prohibits  "unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression, or omission of any material fact, with intent that others rely upon the

concealment, suppression, or omission of such material fact … in the conduct of trade or commerce … whether any person has in fact been misled, deceived or damaged thereby." 815 ILCS 505/2. Ford engaged in unfair and deceptive practices that violated the Illinois CFA as described above.

617. Ford participated in and engaged in deceptive business or trade practices prohibited by the Illinois CFA by failing to disclose and actively concealing that the Class Vehicles contained the Engine Defect, by marketing their Class Vehicles as safe and of high quality, and by presenting themselves as a reputable manufacturer that valued safety and stood behind its vehicles after they were sold.

618. By failing to disclose the Engine Defect; by concealing the Engine Defect; by promoting and selling or leasing Class Vehicles it knew were defective, including by marketing its vehicles as safe, reliable, easily operable, efficient, and of high quality; by presenting itself as a reputable manufacturer that valued safety, reliability, performance and efficiency, and stood behind its vehicles after they were sold; by failing to make repairs or making repairs and providing replacements that caused Illinois Plaintiffs and the Illinois Sub-Class Members to experience repeated instances of failure, rendering the New Vehicle Limited Warranty useless; and by minimized the scope and severity of the problems with the Class Vehicles, refusing to acknowledge that they are defective, and failing to provide adequate relief to consumers, Ford knowingly and intentionally misrepresented and omitted material facts in connection with the sale or lease of the Class Vehicles.

619. Ford systematically misrepresented, concealed, suppressed, or omitted material facts relating to the Class Vehicles and Engine Defect in the course of its business.

620. Ford also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Class Vehicles.

621. Ford's unfair and deceptive acts or practices occurred repeatedly in Ford's trade or business, were capable of deceiving a substantial portion of the purchasing public, and imposed a

1    serious safety risk on the public.

2        622.    Ford knew that the Class Vehicles and their engines suffered from an inherent defect,

3    were defectively designed or manufactured, and were not suitable for their intended use.

4        623.    Ford knew or should have known that its conduct violated the Illinois CFA.

5        624.    Illinois Plaintiffs and the Illinois Sub-Class Members reasonably relied on Ford's

6    misrepresentations and omissions of material facts in its advertisements of the Class Vehicles and

7    in the purchase of the Class Vehicles.

8        625.    Had Illinois Plaintiffs and the Illinois Sub-Class Members known that the Class

9    Vehicles would exhibit the Engine Defect, they would not have purchased or leased the Class

10   Vehicles or would have paid less for them. Plaintiffs did not receive the benefit of their bargain as

11   a result of Ford's misconduct.

12       626.    Ford owed Illinois Plaintiffs and the Illinois Sub-Class Members a duty to disclose

13   the truth about the Engine Defect because Ford:

14           a.    possessed exclusive and superior knowledge of the design of the Class

15   Vehicles and the Engine Defect;

16           b.    intentionally concealed the foregoing from Illinois Plaintiffs and the Illinois

17   Sub-Class Members; and/or

18           c.    made incomplete representations regarding the quality and durability of the

19   Class Vehicles, while purposefully withholding material facts from Illinois Plaintiffs and the Illinois

20   Sub-Class Members that contradicted these representations.

21       627.    Due to Ford's specific and superior knowledge that the Engines in the Class Vehicles

22   will fail due to the Engine Defect, its false representations regarding the increased durability of the

23   Class Vehicles, and reliance by Illinois Plaintiffs and the Illinois Sub-Class Members on these

24   material representations, Ford had a duty to disclose to Class members that the Engine Defect will

25   cause engine failure in Class Vehicles, that Class Vehicles do not have the expected durability,

26   reliability, and/or safety over other vehicles or of their predecessor engines, that failure of the

27   Engines will cause damage to Class Vehicle, and that Class members would be required to bear the

28   cost of the damage to their vehicles. Having volunteered to provide information to Illinois Plaintiffs

and the Illinois Sub-Class Members, Ford had the duty to disclose not just the partial truth, but the entire truth. These omitted and concealed facts were material because they directly impact the value of the Class Vehicles purchased or leased by Illinois Plaintiffs and the Illinois Sub-Class Members. Longevity, durability, performance, and safety are material concerns to Ford consumers. Ford represented to Illinois Plaintiffs and the Illinois Sub-Class Members that they were purchasing or leasing vehicles that were durable, reliable, safe, efficient, of high quality, and containing engines of advanced and superior characteristics and technology as alleged throughout this Complaint, when in fact it is only a matter of time before the engines fail due to the Engine Defect.

628.   Illinois Plaintiffs and the Illinois Sub-Class Members suffered injury in fact to a legally protected interest. As a result of Ford's conduct, Illinois Plaintiffs and the Illinois Sub-Class Members were harmed and suffered actual damages in the form of the costs of diagnosis and repair of their vehicles, and the diminished value of their vehicles.

629.   As a direct and proximate result of Ford's unfair or deceptive acts or practices, Illinois Plaintiffs and the Illinois Sub-Class Members suffered and will continue to suffer injury in fact and/or actual damages.

630.   Defendant's violations present a continuing risk to Illinois Plaintiffs and the Illinois Sub-Class Members as well as to the general public. Defendant's unlawful acts and practices complained of herein affect the public interest.

631.   As a proximate and direct result of Ford's unfair and deceptive trade practices, Illinois Plaintiffs and members of the Illinois Sub-Class purchased or leased Class Vehicles and suffered an ascertainable loss and financial harm. This included ascertainable losses in the form of actual damages in the amount of the cost to attempt to repair the Engine Defect, replaced the damaged related system components, diminution of Class Vehicle resale value, increased repair and maintenance costs, and other substantial monetary damages and inconvenience.

632.   The Illinois Plaintiffs provided notice of their claims by letters dated June 14, 2021 and May 21, 2021.

633.   The Illinois Plaintiffs and members of the Illinois Sub-Class seek monetary relief against Ford in the amount of actual damages, as well as punitive damages because Ford act with

1    fraud and/or malice and/or was grossly negligent.

2        634.   The Illinois Plaintiffs and the Illinois Sub-Class Members also seeks attorneys' fees,

3    and any other just and proper relief available under 815 Ill. Comp. Stat. § 505/1, *et seq.*

4                        **NINETEENTH CAUSE OF ACTION**
                          **Breach of Express Warranty**
5              **(Ill. Comp. Stat. .§§ 5/2-313 and 5/2A-210)**
                    **(On behalf of the Illinois Sub-Class)**
6

7        635.   Plaintiffs incorporate by reference each allegation set forth in paragraphs 1-274,

8    above.

9        636.   Illinois Plaintiffs bring this cause of action on their own behalf and on behalf of the

10   members of the Illinois Sub-Class.

11       637.   Ford is and was at all relevant times a "merchant" with respect to motor vehicles under

12   810 Ill. Comp. Stat. §§ 5/2-104(1) and 5/2A-103(3), and a  "seller" of motor vehicles under § 5/2-

13   103(1)(d).

14       638.   With respect to leases, Ford is and was at all relevant times a  "lessor" of motor

15   vehicles under 810 Ill. Comp. Stat. § 5/2A-103(1)(p).

16       639.   The Class Vehicles are and were at all relevant times "goods" within the meaning of

17   810 Ill. Comp. Stat. §§ 5/2-105(1) and 5/2A-103(1)(h).

18       640.   Ford provided all purchasers and lessees of the Class Vehicles with the express

19   warranty described herein, which became a material part of the bargain.

20       641.   Ford provided all purchasers and lessees of Lincoln-branded Class Vehicles with the

21   Lincoln Warranty and all purchasers and lessees of Ford or Ford-branded Class Vehicles with the

22   Ford/Ford Warranty.

23       642.   Ford sold and leased the Class Vehicles with a written express warranty covering the

24   Vehicles for three years or 36,000 miles, whichever comes first.

25       643.   Ford's New Vehicle Limited Warranty expressly states that Ford will "without charge,

26   repair, replace, or adjust all parts on your vehicle that malfunction or fail during normal use during

27   the applicable coverage period due to a manufacturing defect in factory-supplied materials or factory

28   workmanship" so long the Vehicle is properly operated and maintained and taken to a Ford

dealership for repair within the warranty period.

644.   Ford further provides powertrain warranty coverage, which is applicable to "the Engine: all internal lubricated parts, cylinder block, cylinder heads, electrical fuel pump, powertrain control module, engine mounts, flywheel, injection pump, manifold (exhaust and intake), manifold bolts, oil pan, oil pump, seals and gaskets, engine thermostat, engine, thermostat housing, timing chain cover, timing chain (gears or belt), turbocharger/supercharger unit, valve covers, water pump" as well as the components in the transmission, front-wheel drive, rear-wheel drive, and four-wheel/all-wheel drive. This coverage applies for 5-years or up to 60,000 miles, whichever comes first.

645.   For certified pre-owned ("CPO") Vehicles, Ford offers a limited warranty covering CPO Vehicles for 12 months or 12,000 miles, whichever comes first.

646.   Ford's CPO Vehicle warranty states that a dealer will replace "all covered components . . . that are found to be defective in factory-supplied materials or workmanship during the applicable warranty periods." The engine and its components—including the cylinder block and cylinder heads—are included in Ford's list of "covered components."

647.   Ford manufactured and/or installed the engines and the engines' component parts in the Class Vehicles, and the engines and their component parts are covered by the express Warranties.

648.   The Engine Defect at issue in this litigation was present at the time the Class Vehicles were sold or leased to Illinois Plaintiffs and the Illinois Sub-Class Members.

649.   Plaintiffs relied on Ford's express warranties, which were a material part of the bargain, when purchasing or leasing their Class Vehicles.

650.   Under the express Warranties, Ford was obligated to correct the Engine Defect in the vehicles owned or leased by Illinois Plaintiffs and the Illinois Sub-Class Members.

651.   Although Ford was obligated to correct the Engine Defect, none of the attempted fixes to the engines are adequate under the terms of the Warranties, as they did not cure the defect.

652.   Ford breached the express Warranties by performing illusory repairs. Rather than repairing the vehicles pursuant to the express Warranties, Ford falsely informed Illinois Sub-Class

Members that there was no problem with their Class Vehicles, performed ineffective procedures including software updates, and/or replaced defective components in the engines with equally defective components, without actually repairing the Class Vehicles.

653.   Ford and its agent dealers have failed and refused to conform the engines to the express Warranties. Ford's conduct, as discussed throughout this Complaint, has voided any attempt on its part to disclaim liability for its actions.

654.   Moreover, Ford's attempt to disclaim or limit these express Warranties vis-à-vis consumers is unconscionable and unenforceable under the circumstances here. Specifically, Ford's warranty limitation is unenforceable because it knowingly sold a defective product without informing consumers about the defect.

655.   The time limits contained in Ford's warranty period were also unconscionable and inadequate to protect Illinois Plaintiffs and the Illinois Sub-Class Members. Among other things, Illinois Plaintiffs and the Illinois Sub-Class Members had no meaningful choice in determining these time limitations, the terms of which unreasonably favored Ford. A gross disparity in bargaining power existed between Ford and the Class members, and Ford knew or should have known that the Class Vehicles were defective at the time of sale.

656.   Illinois Plaintiffs and the Illinois Sub-Class Members have complied with all obligations under the Warranties, or otherwise have been excused from performance of said obligations as a result of Ford's conduct described herein.

657.   Illinois Plaintiffs and the Illinois Sub-Class Members were not required to notify Ford of the breach because affording Ford a reasonable opportunity to cure its breach of written warranty would have been futile. Ford was also on notice of the Engine Defect from the complaints and service requests it received from Plaintiffs and the Class Members, from repairs and/or replacements of the engines or components thereof, and through other internal and external sources.

658.   Because Ford, through its conduct and exemplified by its own service bulletins, has covered repairs of the Engine Defect if Ford determines the repairs are appropriately covered under the Warranties, Ford cannot now deny that the Warranties cover the Engine Defect.

659.   Because Ford has not been able remedy the Engine Defect, any limitation on remedies

included in the Warranties causes the Warranties to fail their essential purposes, rendering them null and void.

660.   As a direct and proximate cause of Ford's breach, Illinois Plaintiffs and the Illinois Sub-Class Members suffered damages and continue to suffer damages, including economic damages at the point of sale or lease and diminution of value of their Class Vehicles. Additionally, Illinois Plaintiffs and the Illinois Sub-Class Members have incurred or will incur economic damages at the point of repair in the form of the cost of repair.

661.   As a direct and proximate result of Ford's breach of express warranties, Illinois Plaintiffs and the Illinois Sub-Class Members have been damaged in an amount to be determined at trial.

## TWENTIETH CAUSE OF ACTION
### Breach of the Implied Warranty of Merchantability
### (Ill. Comp. Stat. §§ 5/2-314 and 5/2A-212)
### (On behalf of the Illinois Sub-Class)

662.   Plaintiffs incorporate by reference each allegation set forth in paragraphs 1-274, above.

663.   Illinois Plaintiffs bring this cause of action on their own behalf and on behalf of the members of the Illinois Sub-Class.

664.   Ford is and was at all relevant times a "merchant" with respect to motor vehicles under 810 Ill. Comp. Stat. §§ 5/2-104(1) and 5/2A-103(3), and a "seller" of motor vehicles under § 5/2-103(1)(d).

665.   With respect to leases, Ford is and was at all relevant times a "lessor" of motor vehicles under 810 Ill. Comp. Stat. § 5/2A-103(1)(p).

666.   The Class Vehicles are and were at all relevant times "goods" within the meaning of 810 Ill. Comp. Stat. §§ 5/2-105(1) and 5/2A-103(1)(h).

667.   A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law under 810 Ill. Comp. Stat. §§ 5/2-314 and 5/2A-212.

668.   Ford knew or had reason to know of the specific use for which the Class Vehicles

were purchased or leased. Ford directly sold and marketed vehicles equipped with the engines to customers through authorized dealers, like those from whom Illinois Plaintiffs and the Illinois Sub-Class Members bought or leased their vehicles, for the intended purpose of consumers purchasing the vehicles. Ford knew that the Class Vehicles would and did pass unchanged from the authorized dealers to Illinois Plaintiffs and the Illinois Sub-Class Members, with no modification to the defective engines.

669.   Ford provided Plaintiffs and Class Members with an implied warranty that the Class Vehicles and their components and parts are merchantable and fit for the ordinary purposes for which they were sold.

670.   This implied warranty included, among other things: (i) a warranty that the Class Vehicles and their engines that were manufactured, supplied, distributed, and/or sold by Ford were safe and reliable for providing transportation; and (ii) a warranty that the Class Vehicles and their engines would be fit for their intended use while the Class Vehicles were being operated.

671.   Contrary to the applicable implied warranties, the Class Vehicles and their engines at the time of sale and thereafter were not fit for their ordinary and intended purpose of providing Plaintiffs and Class Members with reliable, durable, and safe transportation. Instead, the Class Vehicles are defective, including, but not limited to, the defective design and manufacture of their engines and the existence of the Engine Defect at the time of sale or lease and thereafter. Ford knew of this defect at the time these sale or lease transactions occurred.

672.   As a result of Ford's breach of the applicable implied warranties, Illinois Plaintiffs and the Illinois Sub-Class Members of the Class Vehicles suffered an ascertainable loss of money, property, and/or value of their Class Vehicles. Additionally, as a result of the Engine Defect, Illinois Plaintiffs and the Illinois Sub-Class Members were harmed and suffered actual damages in that the Class Vehicles' engine components are substantially certain to fail before their expected useful life has run.

673.   Ford's actions, as complained of herein, breached the implied warranty that the Class Vehicles were of merchantable quality and fit for such use in violation of 810 Ill. Comp. Stat. §§ 5/2-314 and 5/2A-212.

674.   Illinois Plaintiffs and the Illinois Sub-Class Members have complied with all obligations under the warranty, or otherwise have been excused from performance of said obligations as a result of Ford's conduct described herein.

675.   Illinois Plaintiffs and the Illinois Sub-Class Members were not required to notify Ford of the breach because affording Ford a reasonable opportunity to cure its breach of written warranty would have been futile. Ford was also on notice of the Engine Defect from the complaints and service requests it received from Plaintiffs and the Class Members, from repairs and/or replacements of the engines or components thereof, and through other internal sources.

676.   In addition, on or about June 14, 2021 and May 21, 2021 Illinois Plaintiffs gave notice to Defendant that they intended to pursue her warranty claims on behalf of a class of similarly situated consumers.

677.   Because Illinois Plaintiffs purchased their vehicles from authorized Ford dealers, they are in privity with Ford since (1) an agency relationship establishes privity for purposes of the breach of implied warranty claims and (2) privity is not required where plaintiffs are intended third-party beneficiaries of a defendant's implied warranties.

678.   As a direct and proximate cause of Ford's breach, Illinois Plaintiffs and the Illinois Sub-Class Members suffered damages and continue to suffer damages, including economic damages at the point of sale or lease and diminution of value of their Class Vehicles. Additionally, Illinois Plaintiffs and the Illinois Sub-Class Members have incurred or will incur economic damages at the point of repair in the form of the cost of repair.

679.   As a direct and proximate result of Ford's breach of the implied warranty of merchantability, Illinois Plaintiffs and the Illinois Sub-Class Members have been damaged in an amount to be proven at trial.

**TWENTY-FIRST CAUSE OF ACTION**
**(Violations of the Indiana Consumer Sales Act,**
**Ind. Code § 24-5-0.5-3, *et seq*.)**
**(On Behalf of the Indiana Sub-Class)**

680.   Plaintiffs incorporate by reference each allegation set forth in paragraphs 1-274, above.

681.   Plaintiff Teresa Balaszek ("Indiana Plaintiff") brings this cause of action individually and on behalf of the Indiana Sub-Class.

682.   Ford, Indiana Plaintiff and the Indiana Sub-Class Members are "persons" as that term is defined in Ind. Code Ann. § 24-5-0.5-2.

683.   The Indiana Deceptive Consumer Sales Act, Ind. Code Ann. § 24-5-0.5-3(a) ("Indiana DCSA") prohibits "[u]nfair, abusive, or deceptive act[s], omission[s], or practice[s] by a supplier…before, during, or after the transaction," including if a supplier represents that goods have "performance, characteristics,…uses, or benefits [they do not have]", and that goods are "of a particular standard, quality, grade…if [they are] not." *Id.* at 24-5-0.5-3(a)(1), (2). Ford engaged in unfair and deceptive practices that violated the Indiana DCSA as described above.

684.   Ford participated in and engaged in deceptive business or trade practices prohibited by the Indiana DCSA by failing to disclose and actively concealing that the Class Vehicles contained the Engine Defect, by marketing their Class Vehicles as safe and of high quality, and by presenting themselves as a reputable manufacturer that valued safety and stood behind its vehicles after they were sold.

685.   By failing to disclose the Engine Defect; by concealing the Engine Defect; by promoting and selling or leasing Class Vehicles it knew were defective, including by marketing its vehicles as safe, reliable, easily operable, efficient, and of high quality; by presenting itself as a reputable manufacturer that valued safety, reliability, performance and efficiency, and stood behind its vehicles after they were sold; by failing to make repairs or making repairs and providing replacements that caused Indiana Plaintiff and the Indiana Sub-Class Members to experience repeated instances of failure, rendering the New Vehicle Limited Warranty useless; and by minimized the scope and severity of the problems with the Class Vehicles, refusing to acknowledge that they are defective, and failing to provide adequate relief to consumers, Ford knowingly and intentionally misrepresented and omitted material facts in connection with the sale or lease of the Class Vehicles.

686.   Ford systematically misrepresented, concealed, suppressed, or omitted material facts relating to the Class Vehicles and Engine Defect in the course of its business.

687.   Ford also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Class Vehicles.

688.   Ford's unfair and deceptive acts or practices occurred repeatedly in Ford's trade or business, were capable of deceiving a substantial portion of the purchasing public, and imposed a serious safety risk on the public.

689.   Ford knew that the Class Vehicles and their engines suffered from an inherent defect, were defectively designed or manufactured, and were not suitable for their intended use.

690.   Ford knew or should have known that its conduct violated the Indiana DCSA.

691.   Indiana Plaintiff and the Indiana Sub-Class Members reasonably relied on Ford's misrepresentations and omissions of material facts in its advertisements of the Class Vehicles and in the purchase of the Class Vehicles.

692.   Had Indiana Plaintiff and the Indiana Sub-Class Members known that the Class Vehicles would exhibit the Engine Defect, they would not have purchased or leased the Class Vehicles or would have paid less for them. Plaintiff did not receive the benefit of their bargain as a result of Ford's misconduct.

693.   Ford owed Indiana Plaintiff and the Indiana Sub-Class Members a duty to disclose the truth about the Engine Defect because Ford:

a.   possessed exclusive and superior knowledge of the design of the Class Vehicles and the Engine Defect;

b.   intentionally concealed the foregoing from Indiana Plaintiff and the Indiana Sub-Class Members; and/or

c.   made incomplete representations regarding the quality and durability of the Class Vehicles, while purposefully withholding material facts from Indiana Plaintiff and the Indiana Sub-Class Members that contradicted these representations.

694.   Due to Ford's specific and superior knowledge that the Engines in the Class Vehicles will fail due to the Engine Defect, its false representations regarding the increased durability of the

Class Vehicles, and reliance by Indiana Plaintiff and the Indiana Sub-Class Members on these material representations, Ford had a duty to disclose to Class members that the Engine Defect will cause engine failure in Class Vehicles, that Class Vehicles do not have the expected durability, reliability, and/or safety over other vehicles or of their predecessor engines, that failure of the Engines will cause damage to Class Vehicle, and that Class members would be required to bear the cost of the damage to their vehicles. Having volunteered to provide information to Indiana Plaintiff and the Indiana Sub-Class Members, Ford had the duty to disclose not just the partial truth, but the entire truth. These omitted and concealed facts were material because they directly impact the value of the Class Vehicles purchased or leased by Indiana Plaintiff and the Indiana Sub-Class Members. Longevity, durability, performance, and safety are material concerns to Ford consumers. Ford represented to Indiana Plaintiff and the Indiana Sub-Class Members that they were purchasing or leasing vehicles that were durable, reliable, safe, efficient, of high quality, and containing engines of advanced and superior characteristics and technology as alleged throughout this Complaint, when in fact it is only a matter of time before the engines fail due to the Engine Defect.

695.   Indiana Plaintiff and the Indiana Sub-Class Members suffered injury in fact to a legally protected interest. As a result of Ford's conduct, Indiana Plaintiff and the Indiana Sub-Class Members were harmed and suffered actual damages in the form of the costs of diagnosis and repair of their vehicles, and the diminished value of their vehicles.

696.   As a direct and proximate result of Ford's unfair or deceptive acts or practices, Indiana Plaintiff and the Indiana Sub-Class Members suffered and will continue to suffer injury in fact and/or actual damages.

697.   Defendant's violations present a continuing risk to Indiana Plaintiff and the Indiana Sub-Class Members as well as to the general public. Defendant's unlawful acts and practices complained of herein affect the public interest.

698.   As a proximate and direct result of Ford's unfair and deceptive trade practices, Indiana Plaintiff and members of the Indiana Sub-Class purchased or leased Class Vehicles and suffered an ascertainable loss and financial harm. This included ascertainable losses in the form of actual damages in the amount of the cost to attempt to repair the Engine Defect, replaced the damaged

related system components, diminution of Class Vehicle resale value, increased repair and maintenance costs, and other substantial monetary damages and inconvenience.

699.   As a direct and proximate result of Ford's unfair or deceptive acts or practices alleged herein, Indiana Plaintiff and other members of the Indiana Sub-Class suffered and will continue to suffer actual damages and are entitled to recover actual damages to the extent permitted by law, including class action rules, in an amount to be proven at trial. In addition, Indiana Plaintiff and the putative Class seek equitable and injunctive relief against Ford on terms that the Court considers reasonable, and reasonable attorneys' fees.

**TWENTY-SECOND CAUSE OF ACTION**
**Breach of Express Warranty**
**(Ind. Code §§ 26-1-2-313 and 26-1-2.1-210)**
**(On behalf of the Indiana Sub-Class)**

700.   Plaintiffs incorporate by reference each allegation set forth in paragraphs 1-274, above.

701.   Indiana Plaintiff brings this cause of action individually and on behalf of the members of the Indiana Sub-Class.

702.   Ford is and was at all relevant times a "merchant" with respect to motor vehicles under Ind. Code §§ 26-1-2-104(1) and 26-1-2.1-103(3), and a "seller" of motor vehicles under § 26-1-2-103(1)(d).

703.   With respect to leases, Ford is and was at all relevant times a "lessor" of motor vehicles under Ind. Code § 26-1-2.1-103(1)(p).

704.   The Class Vehicles are and were at all relevant times "goods" within the meaning of Ind. Code §§ 26-1-2-105(1) and 26-1-2.1-103(1)(h).

705.   Ford provided all purchasers and lessees of the Class Vehicles with the express warranty described herein, which became a material part of the bargain.

706.   Ford provided all purchasers and lessees of Lincoln-branded Class Vehicles with the Lincoln Warranty and all purchasers and lessees of Ford or Ford-branded Class Vehicles with the Ford/Ford Warranty.

707.   Ford sold and leased the Class Vehicles with a written express warranty covering the

121

Vehicles for three years or 36,000 miles, whichever comes first.

708.   Ford's New Vehicle Limited Warranty expressly states that Ford will "without charge, repair, replace, or adjust all parts on your vehicle that malfunction or fail during normal use during the applicable coverage period due to a manufacturing defect in factory-supplied materials or factory workmanship" so long the Vehicle is properly operated and maintained and taken to a Ford dealership for repair within the warranty period.

709.   Ford further provides powertrain warranty coverage, which is applicable to "the Engine: all internal lubricated parts, cylinder block, cylinder heads, electrical fuel pump, powertrain control module, engine mounts, flywheel, injection pump, manifold (exhaust and intake), manifold bolts, oil pan, oil pump, seals and gaskets, engine thermostat, engine, thermostat housing, timing chain cover, timing chain (gears or belt), turbocharger/supercharger unit, valve covers, water pump" as well as the components in the transmission, front-wheel drive, rear-wheel drive, and four-wheel/all-wheel drive. This coverage applies for 5-years or up to 60,000 miles, whichever comes first.

710.   For certified pre-owned ("CPO") Vehicles, Ford offers a limited warranty covering CPO Vehicles for 12 months or 12,000 miles, whichever comes first.

711.   Ford's CPO Vehicle warranty states that a dealer will replace "all covered components . . . that are found to be defective in factory-supplied materials or workmanship during the applicable warranty periods." The engine and its components—including the cylinder block and cylinder heads—are included in Ford's list of "covered components."

712.   Ford manufactured and/or installed the engines and the engines' component parts in the Class Vehicles, and the engines and their component parts are covered by the express Warranties.

713.   The Engine Defect at issue in this litigation was present at the time the Class Vehicles were sold or leased to Indiana Plaintiff and the Indiana Sub-Class Members.

714.   Plaintiff relied on Ford's express warranties, which were a material part of the bargain, when purchasing or leasing their Class Vehicles.

715.   Under the express Warranties, Ford was obligated to correct the Engine Defect in the

vehicles owned or leased by Indiana Plaintiff and the Indiana Sub-Class Members.

716.   Although Ford was obligated to correct the Engine Defect, none of the attempted fixes to the engines are adequate under the terms of the Warranties, as they did not cure the defect.

717.   Ford breached the express Warranties by performing illusory repairs. Rather than repairing the vehicles pursuant to the express Warranties, Ford falsely informed Indiana Sub-Class Members that there was no problem with their Class Vehicles, performed ineffective procedures including software updates, and/or replaced defective components in the engines with equally defective components, without actually repairing the Class Vehicles.

718.   Ford and its agent dealers have failed and refused to conform the engines to the express Warranties. Ford's conduct, as discussed throughout this Complaint, has voided any attempt on its part to disclaim liability for its actions.

719.   Moreover, Ford's attempt to disclaim or limit these express Warranties vis-à-vis consumers is unconscionable and unenforceable under the circumstances here. Specifically, Ford's warranty limitation is unenforceable because it knowingly sold a defective product without informing consumers about the defect.

720.   The time limits contained in Ford's warranty period were also unconscionable and inadequate to protect Indiana Plaintiff and the Indiana Sub-Class Members. Among other things, Indiana Plaintiff and the Indiana Sub-Class Members had no meaningful choice in determining these time limitations, the terms of which unreasonably favored Ford. A gross disparity in bargaining power existed between Ford and the Class members, and Ford knew or should have known that the Class Vehicles were defective at the time of sale.

721.   Indiana Plaintiff and the Indiana Sub-Class Members have complied with all obligations under the Warranties, or otherwise have been excused from performance of said obligations as a result of Ford's conduct described herein.

722.   Indiana Plaintiff and the Indiana Sub-Class Members were not required to notify Ford of the breach because affording Ford a reasonable opportunity to cure its breach of written warranty would have been futile. Ford was also on notice of the Engine Defect from the complaints and service requests it received from Plaintiff and the Class Members, from repairs and/or replacements

of the engines or components thereof, and through other internal and external sources.

723.   Because Ford, through its conduct and exemplified by its own service bulletins, has covered repairs of the Engine Defect if Ford determines the repairs are appropriately covered under the Warranties, Ford cannot now deny that the Warranties cover the Engine Defect.

724.   Because Ford has not been able remedy the Engine Defect, any limitation on remedies included in the Warranties causes the Warranties to fail their essential purposes, rendering them null and void.

725.   As a direct and proximate cause of Ford's breach, Indiana Plaintiff and the Indiana Sub-Class Members suffered damages and continue to suffer damages, including economic damages at the point of sale or lease and diminution of value of their Class Vehicles. Additionally, Indiana Plaintiff and the Indiana Sub-Class Members have incurred or will incur economic damages at the point of repair in the form of the cost of repair.

726.   As a direct and proximate result of Ford's breach of express warranties, Indiana Plaintiff and the Indiana Sub-Class Members have been damaged in an amount to be determined at trial.

**TWENTY-THIRD CAUSE OF ACTION**
**Breach of the Implied Warranty of Merchantability**
**(Ind. Code §§ 26-1-2-314 and 26-1-2.1-212)**
**(On behalf of the Indiana Sub-Class)**

727.   Plaintiffs incorporate by reference each allegation set forth in paragraphs 1-274, above.

728.   Indiana Plaintiff brings this cause of action individually and on behalf of the members of the Indiana Sub-Class.

729.   Ford is and was at all relevant times a "merchant" with respect to motor vehicles under Ind. Code §§ 26-1-2-104(1) and 26-1-2.1-103(3), and a "seller" of motor vehicles under § 26-1-2-103(1)(d).

730.   With respect to leases, Ford is and was at all relevant times a "lessor" of motor vehicles under Ind. Code § 26-1-2.1-103(1)(p).

731.   The Class Vehicles are and were at all relevant times "goods" within the meaning of

Ind. Code §§ 26-1-2-105(1) and 26-1-2.1-103(1)(h).

732.   A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law under Ind. Code §§ 26-1-2-314 and 26-1-2.1-212.

733.   Ford knew or had reason to know of the specific use for which the Class Vehicles were purchased or leased. Ford directly sold and marketed vehicles equipped with the engines to customers through authorized dealers, like those from whom Indiana Plaintiff and the Indiana Sub-Class Members bought or leased their vehicles, for the intended purpose of consumers purchasing the vehicles. Ford knew that the Class Vehicles would and did pass unchanged from the authorized dealers to Indiana Plaintiff and the Indiana Sub-Class Members, with no modification to the defective engines.

734.   Ford provided Plaintiff and Class Members with an implied warranty that the Class Vehicles and their components and parts are merchantable and fit for the ordinary purposes for which they were sold.

735.   This implied warranty included, among other things: (i) a warranty that the Class Vehicles and their engines that were manufactured, supplied, distributed, and/or sold by Ford were safe and reliable for providing transportation; and (ii) a warranty that the Class Vehicles and their engines would be fit for their intended use while the Class Vehicles were being operated.

736.   Contrary to the applicable implied warranties, the Class Vehicles and their engines at the time of sale and thereafter were not fit for their ordinary and intended purpose of providing Plaintiff and Class Members with reliable, durable, and safe transportation. Instead, the Class Vehicles are defective, including, but not limited to, the defective design and manufacture of their engines and the existence of the Engine Defect at the time of sale or lease and thereafter. Ford knew of this defect at the time these sale or lease transactions occurred.

737.   As a result of Ford's breach of the applicable implied warranties, Indiana Plaintiff and the Indiana Sub-Class Members of the Class Vehicles suffered an ascertainable loss of money, property, and/or value of their Class Vehicles. Additionally, as a result of the Engine Defect, Indiana Plaintiff and the Indiana Sub-Class Members were harmed and suffered actual damages in that the

Class Vehicles' engine components are substantially certain to fail before their expected useful life has run.

738.   Ford's actions, as complained of herein, breached the implied warranty that the Class Vehicles were of merchantable quality and fit for such use in violation of Ind. Code §§ 26-1-2-314 and 26-1-2.1-212.

739.   Indiana Plaintiff and the Indiana Sub-Class Members have complied with all obligations under the warranty, or otherwise have been excused from performance of said obligations as a result of Ford's conduct described herein.

740.   Indiana Plaintiff and the Indiana Sub-Class Members were not required to notify Ford of the breach because affording Ford a reasonable opportunity to cure its breach of written warranty would have been futile. Ford was also on notice of the Engine Defect from the complaints and service requests it received from Plaintiff and the Class Members, from repairs and/or replacements of the engines or components thereof, and through other internal sources.

741.   In addition, on or about December 8, 2020, Indiana Plaintiff gave notice to Defendant that they intended to pursue her warranty claims on behalf of a class of similarly situated consumers.

742.   Because Indiana Plaintiff purchased her vehicle from an authorized Ford dealer, she is in privity with Ford since (1) an agency relationship establishes privity for purposes of the breach of implied warranty claims and (2) privity is not required where plaintiffs are intended third-party beneficiaries of a defendant's implied warranties.

743.   As a direct and proximate cause of Ford's breach, Indiana Plaintiff and the Indiana Sub-Class Members suffered damages and continue to suffer damages, including economic damages at the point of sale or lease and diminution of value of their Class Vehicles. Additionally, Indiana Plaintiff and the Indiana Sub-Class Members have incurred or will incur economic damages at the point of repair in the form of the cost of repair.

744.   As a direct and proximate result of Ford's breach of the implied warranty of merchantability, Indiana Plaintiff and the Indiana Sub-Class Members have been damaged in an amount to be proven at trial.

1

**TWENTY-FOURTH CAUSE OF ACTION**
**(Violations of the Kansas Consumer Protection Act,**
**Kan. Stat. § 50-623, *et seq*.)**
**(On Behalf of the Kansas Sub-Class)**

2

3

4      745.   Plaintiffs incorporate by reference each allegation set forth in paragraphs 1-274,

5      above.

6      746.   Plaintiffs Craig and Kelli Morford ("Kansas Plaintiffs") bring this cause of action

7      individually and on behalf of the Kansas Sub-Class.

8      747.   Kansas Plaintiffs and the Kansas Sub-Class Members are "consumers[s]" under the

9      Kansas Consumer Protection Act ("Kansas CPA"), Kan. Stat. § 50-624(b).

10     748.   Ford is a "supplier" within the meaning of the Kansas CPA. *See* Kan. Stat. § 50-624(l).

11     749.   The Kansas CPA states that "[n]o supplier shall engage in any deceptive act or

12     practice in connection with a consumer transaction," Kan. Stat. Ann. § 50- 626(a), and that deceptive

13     acts or practices include: (1) knowingly making representations or with reason to know that "(A)

14     Property or services have sponsorship, approval, accessories, characteristics, ingredients, uses,

15     benefits or quantities that they do not have;" and "(D) property or services are of particular standard,

16     quality, grade, style or model, if they are of another which differs materially from the

17     representation;" "(2) the willful use, in any oral or written representation, of exaggeration,

18     falsehood, innuendo or ambiguity as to a material fact;" and "(3) the willful failure to state a material

19     fact, or the willful concealment, suppression, or omission of a material fact." The Kansas CPA also

20     provides that "[n]o supplier shall engage in any unconscionable act or practice in connection with a

21     consumer transaction." Kan. Stat. Ann. § 50-627(a). Ford engaged in unfair and deceptive practices

22     that violated the Kansas CPA as described above.

23     750.   Ford participated in and engaged in deceptive business or trade practices prohibited

24     by the Kansas CPA by failing to disclose and actively concealing that the Class Vehicles contained

25     the Engine Defect, by marketing their Class Vehicles as safe and of high quality, and by presenting

26     themselves as a reputable manufacturer that valued safety and stood behind its vehicles after they

27     were sold.

28     751.   By failing to disclose the Engine Defect; by concealing the Engine Defect; by

127

promoting and selling or leasing Class Vehicles it knew were defective, including by marketing its vehicles as safe, reliable, easily operable, efficient, and of high quality; by presenting itself as a reputable manufacturer that valued safety, reliability, performance and efficiency, and stood behind its vehicles after they were sold; by failing to make repairs or making repairs and providing replacements that caused Kansas Plaintiffs and the Kansas Sub-Class Members to experience repeated instances of failure, rendering the New Vehicle Limited Warranty useless; and by minimized the scope and severity of the problems with the Class Vehicles, refusing to acknowledge that they are defective, and failing to provide adequate relief to consumers, Ford knowingly and intentionally misrepresented and omitted material facts in connection with the sale or lease of the Class Vehicles.

752.   Ford systematically misrepresented, concealed, suppressed, or omitted material facts relating to the Class Vehicles and Engine Defect in the course of its business.

753.   Ford also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Class Vehicles.

754.   Ford's unfair and deceptive acts or practices occurred repeatedly in Ford's trade or business, were capable of deceiving a substantial portion of the purchasing public, and imposed a serious safety risk on the public.

755.   Ford knew that the Class Vehicles and their engines suffered from an inherent defect, were defectively designed or manufactured, and were not suitable for their intended use.

756.   Ford knew or should have known that its conduct violated the Kansas CPA.

757.   Kansas Plaintiffs and the Kansas Sub-Class Members reasonably relied on Ford's misrepresentations and omissions of material facts in its advertisements of the Class Vehicles and in the purchase of the Class Vehicles.

758.   Had Kansas Plaintiffs and the Kansas Sub-Class Members known that the Class Vehicles would exhibit the Engine Defect, they would not have purchased or leased the Class Vehicles or would have paid less for them. Plaintiffs did not receive the benefit of their bargain as

1   a result of Ford's misconduct.

2        759.  Ford owed Kansas Plaintiffs and the Kansas Sub-Class Members a duty to disclose

3   the truth about the Engine Defect because Ford:

4            a.    possessed exclusive and superior knowledge of the design of the Class

5   Vehicles and the Engine Defect;

6            b.    intentionally concealed the foregoing from Kansas Plaintiffs and the Kansas

7   Sub-Class Members; and/or

8            c.    made incomplete representations regarding the quality and durability of the

9   Class Vehicles, while purposefully withholding material facts from Kansas Plaintiffs and the Kansas

10   Sub-Class Members that contradicted these representations.

11        760.  Due to Ford's specific and superior knowledge that the Engines in the Class Vehicles

12   will fail due to the Engine Defect, its false representations regarding the increased durability of the

13   Class Vehicles, and reliance by Kansas Plaintiffs and the Kansas Sub-Class Members on these

14   material representations, Ford had a duty to disclose to Class members that the Engine Defect will

15   cause engine failure in Class Vehicles, that Class Vehicles do not have the expected durability,

16   reliability, and/or safety over other vehicles or of their predecessor engines, that failure of the

17   Engines will cause damage to Class Vehicle, and that Class members would be required to bear the

18   cost of the damage to their vehicles. Having volunteered to provide information to Kansas Plaintiffs

19   and the Kansas Sub-Class Members, Ford had the duty to disclose not just the partial truth, but the

20   entire truth. These omitted and concealed facts were material because they directly impact the value

21   of the Class Vehicles purchased or leased by Kansas Plaintiffs and the Kansas Sub-Class Members.

22   Longevity, durability, performance, and safety are material concerns to Ford consumers. Ford

23   represented to Kansas Plaintiffs and the Kansas Sub-Class Members that they were purchasing or

24   leasing vehicles that were durable, reliable, safe, efficient, of high quality, and containing engines

25   of advanced and superior characteristics and technology as alleged throughout this Complaint, when

26   in fact it is only a matter of time before the engines fail due to the Engine Defect.

27        761.  Kansas Plaintiffs and the Kansas Sub-Class Members suffered injury in fact to a

28   legally protected interest. As a result of Ford's conduct, Kansas Plaintiffs and the Kansas Sub-Class

Members were harmed and suffered actual damages in the form of the costs of diagnosis and repair of their vehicles, and the diminished value of their vehicles.

762.   As a direct and proximate result of Ford's unfair or deceptive acts or practices, Kansas Plaintiffs and the Kansas Sub-Class Members suffered and will continue to suffer injury in fact and/or actual damages.

763.   Defendant's violations present a continuing risk to Kansas Plaintiffs and the Kansas Sub-Class Members as well as to the general public. Defendant's unlawful acts and practices complained of herein affect the public interest.

764.   As a proximate and direct result of Ford's unfair and deceptive trade practices, Kansas Plaintiffs and members of the Kansas Sub-Class purchased or leased Class Vehicles and suffered an ascertainable loss and financial harm. This included ascertainable losses in the form of actual damages in the amount of the cost to attempt to repair the Engine Defect, replaced the damaged related system components, diminution of Class Vehicle resale value, increased repair and maintenance costs, and other substantial monetary damages and inconvenience.

765.   Pursuant to Kan. Stat. Ann. § 50-634, Kansas Plaintiffs and the Kansas Sub-Class Members seek monetary relief against Ford measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $10,000 for Kansas Plaintiffs and each Kansas Sub-Class Member. Ford's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

766.   Kansas Plaintiffs and the Kansas Sub-Class Members also seek an order enjoining Ford's unfair, unlawful, and/or deceptive practices, declaratory relief, attorneys' fees, and any other just and proper relief available under Kan. Stat. Ann. § 50-623 *et seq*.

## TWENTY-FIFTH CAUSE OF ACTION
### Breach of Express Warranty
### (Kan. Stat.§§ 84-2-313 and 84-2A-210)
### (On behalf of the Kansas Sub-Class)

767.   Plaintiffs incorporate by reference each allegation set forth in paragraphs 1-274, above.

768.   Kansas Plaintiffs bring this cause of action on their own behalf and on behalf of the members of the Kansas Sub-Class.

769.   Ford is and was at all relevant times a "merchant" with respect to motor vehicles under Kan. Stat. §§ 84-2-104(1) and 84-2A-103(3), and a "seller" of motor vehicles under § 84-2-103(1)(d).

770.   With respect to leases, Ford is and was at all relevant times a "lessor" of motor vehicles under Kan. Stat. § 84-2A-103(1)(p).

771.   The Class Vehicles are and were at all relevant times "goods" within the meaning of Kan. Stat. § 84-2-105(1) and Kan. Stat. § 84-2A-103(1)(h).

772.   Ford provided all purchasers and lessees of the Class Vehicles with the express warranty described herein, which became a material part of the bargain.

773.   Ford provided all purchasers and lessees of Lincoln-branded Class Vehicles with the Lincoln Warranty and all purchasers and lessees of Ford or Ford-branded Class Vehicles with the Ford/Ford Warranty.

774.   Ford sold and leased the Class Vehicles with a written express warranty covering the Vehicles for three years or 36,000 miles, whichever comes first.

775.   Ford's New Vehicle Limited Warranty expressly states that Ford will "without charge, repair, replace, or adjust all parts on your vehicle that malfunction or fail during normal use during the applicable coverage period due to a manufacturing defect in factory-supplied materials or factory workmanship" so long the Vehicle is properly operated and maintained and taken to a Ford dealership for repair within the warranty period.

776.   Ford further provides powertrain warranty coverage, which is applicable to "the Engine: all internal lubricated parts, cylinder block, cylinder heads, electrical fuel pump, powertrain control module, engine mounts, flywheel, injection pump, manifold (exhaust and intake), manifold bolts, oil pan, oil pump, seals and gaskets, engine thermostat, engine, thermostat housing, timing chain cover, timing chain (gears or belt), turbocharger/supercharger unit, valve covers, water pump" as well as the components in the transmission, front-wheel drive, rear-wheel drive, and four-wheel/all-wheel drive. This coverage applies for 5-years or up to 60,000 miles, whichever comes

first.

777.   For certified pre-owned ("CPO") Vehicles, Ford offers a limited warranty covering CPO Vehicles for 12 months or 12,000 miles, whichever comes first.

778.   Ford's CPO Vehicle warranty states that a dealer will replace "all covered components . . . that are found to be defective in factory-supplied materials or workmanship during the applicable warranty periods." The engine and its components—including the cylinder block and cylinder heads—are included in Ford's list of "covered components."

779.   Ford manufactured and/or installed the engines and the engines' component parts in the Class Vehicles, and the engines and their component parts are covered by the express Warranties.

780.   The Engine Defect at issue in this litigation was present at the time the Class Vehicles were sold or leased to Kansas Plaintiffs and the Kansas Sub-Class Members.

781.   Plaintiffs relied on Ford's express warranties, which were a material part of the bargain, when purchasing or leasing their Class Vehicles.

782.   Under the express Warranties, Ford was obligated to correct the Engine Defect in the vehicles owned or leased by Kansas Plaintiffs and the Kansas Sub-Class Members.

783.   Although Ford was obligated to correct the Engine Defect, none of the attempted fixes to the engines are adequate under the terms of the Warranties, as they did not cure the defect.

784.   Ford breached the express Warranties by performing illusory repairs. Rather than repairing the vehicles pursuant to the express Warranties, Ford falsely informed Kansas Sub-Class Members that there was no problem with their Class Vehicles, performed ineffective procedures including software updates, and/or replaced defective components in the engines with equally defective components, without actually repairing the Class Vehicles.

785.   Ford and its agent dealers have failed and refused to conform the engines to the express Warranties. Ford's conduct, as discussed throughout this Complaint, has voided any attempt on its part to disclaim liability for its actions.

786.   Moreover, Ford's attempt to disclaim or limit these express Warranties vis-à-vis consumers is unconscionable and unenforceable under the circumstances here. Specifically, Ford's

warranty limitation is unenforceable because it knowingly sold a defective product without informing consumers about the defect.

787.   The time limits contained in Ford's warranty period were also unconscionable and inadequate to protect Kansas Plaintiffs and the Kansas Sub-Class Members. Among other things, Kansas Plaintiffs and the Kansas Sub-Class Members had no meaningful choice in determining these time limitations, the terms of which unreasonably favored Ford. A gross disparity in bargaining power existed between Ford and the Class members, and Ford knew or should have known that the Class Vehicles were defective at the time of sale.

788.   Kansas Plaintiffs and the Kansas Sub-Class Members have complied with all obligations under the Warranties, or otherwise have been excused from performance of said obligations as a result of Ford's conduct described herein.

789.   Kansas Plaintiffs and the Kansas Sub-Class Members were not required to notify Ford of the breach because affording Ford a reasonable opportunity to cure its breach of written warranty would have been futile. Ford was also on notice of the Engine Defect from the complaints and service requests it received from Plaintiffs and the Class Members, from repairs and/or replacements of the engines or components thereof, and through other internal and external sources.

790.   Because Ford, through its conduct and exemplified by its own service bulletins, has covered repairs of the Engine Defect if Ford determines the repairs are appropriately covered under the Warranties, Ford cannot now deny that the Warranties cover the Engine Defect.

791.   Because Ford has not been able remedy the Engine Defect, any limitation on remedies included in the Warranties causes the Warranties to fail their essential purposes, rendering them null and void.

792.   As a direct and proximate cause of Ford's breach, Kansas Plaintiffs and the Kansas Sub-Class Members suffered damages and continue to suffer damages, including economic damages at the point of sale or lease and diminution of value of their Class Vehicles. Additionally, Kansas Plaintiffs and the Kansas Sub-Class Members have incurred or will incur economic damages at the point of repair in the form of the cost of repair.

793.   As a direct and proximate result of Ford's breach of express warranties, Kansas

Plaintiffs and the Kansas Sub-Class Members have been damaged in an amount to be determined at trial.

**TWENTY-SIXTH CAUSE OF ACTION**
**Breach of the Implied Warranty of Merchantability**
**(Kan. Stat. §§ 84-2-314 and 84-2A-212)**
**(On behalf of the Kansas Sub-Class)**

794.   Plaintiffs incorporate by reference each allegation set forth in paragraphs 1-274, above.

795.   Kansas Plaintiffs bring this cause of action on their own behalf and on behalf of the members of the Kansas Sub-Class.

796.   Ford is and was at all relevant times a "merchant" with respect to motor vehicles under Kan. Stat. § 84-2-104(1), and a "seller" of motor vehicles under § 84-2-103(1)(d).

797.   With respect to leases, Ford is and was at all relevant times a "lessor" of motor vehicles under Kan. Stat. § 84-2A-103(1)(p).

798.   The Class Vehicles are and were at all relevant times "goods" within the meaning of Kan. Stat. § 84-2-105(1) and Kan. Stat. § 84-2A-103(1)(h).

799.   A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law under Kan. Stat. § 84-2-314 and Kan. Stat. § 84-2A-212.

800.   Ford knew or had reason to know of the specific use for which the Class Vehicles were purchased or leased. Ford directly sold and marketed vehicles equipped with the engines to customers through authorized dealers, like those from whom Kansas Plaintiffs and the Kansas Sub-Class Members bought or leased their vehicles, for the intended purpose of consumers purchasing the vehicles. Ford knew that the Class Vehicles would and did pass unchanged from the authorized dealers to Kansas Plaintiffs and the Kansas Sub-Class Members, with no modification to the defective engines.

801.   Ford provided Plaintiffs and Class Members with an implied warranty that the Class Vehicles and their components and parts are merchantable and fit for the ordinary purposes for which they were sold.

802.    This implied warranty included, among other things: (i) a warranty that the Class Vehicles and their engines that were manufactured, supplied, distributed, and/or sold by Ford were safe and reliable for providing transportation; and (ii) a warranty that the Class Vehicles and their engines would be fit for their intended use while the Class Vehicles were being operated.

803.    Contrary to the applicable implied warranties, the Class Vehicles and their engines at the time of sale and thereafter were not fit for their ordinary and intended purpose of providing Plaintiffs and Class Members with reliable, durable, and safe transportation. Instead, the Class Vehicles are defective, including, but not limited to, the defective design and manufacture of their engines and the existence of the Engine Defect at the time of sale or lease and thereafter. Ford knew of this defect at the time these sale or lease transactions occurred.

804.    As a result of Ford's breach of the applicable implied warranties, Kansas Plaintiffs and the Kansas Sub-Class Members of the Class Vehicles suffered an ascertainable loss of money, property, and/or value of their Class Vehicles. Additionally, as a result of the Engine Defect, Kansas Plaintiffs and the Kansas Sub-Class Members were harmed and suffered actual damages in that the Class Vehicles' engine components are substantially certain to fail before their expected useful life has run.

805.    Ford's actions, as complained of herein, breached the implied warranty that the Class Vehicles were of merchantable quality and fit for such use in violation of Kan. Stat. § 84-2-314 and Kan. Stat. § 84-2A-212.

806.    Kansas Plaintiffs and the Kansas Sub-Class Members have complied with all obligations under the warranty, or otherwise have been excused from performance of said obligations as a result of Ford's conduct described herein.

807.    Kansas Plaintiffs and the Kansas Sub-Class Members were not required to notify Ford of the breach because affording Ford a reasonable opportunity to cure its breach of written warranty would have been futile. Ford was also on notice of the Engine Defect from the complaints and service requests it received from Plaintiffs and the Class Members, from repairs and/or replacements of the engines or components thereof, and through other internal sources.

808.    As a direct and proximate cause of Ford's breach, Kansas Plaintiffs and the Kansas

Sub-Class Members suffered damages and continue to suffer damages, including economic damages at the point of sale or lease and diminution of value of their Class Vehicles. Additionally, Kansas Plaintiffs and the Kansas Sub-Class Members have incurred or will incur economic damages at the point of repair in the form of the cost of repair.

809.   As a direct and proximate result of Ford's breach of the implied warranty of merchantability, Kansas Plaintiffs and the Kansas Sub-Class Members have been damaged in an amount to be proven at trial.

**TWENTY-SEVENTH CAUSE OF ACTION**
**(Violations of the Maryland Consumer Protection Act,**
**Md. Code Ann., Com. Law § 13-101, *et seq.*)**
**(On Behalf of the Maryland Sub-Class)**

810.   Plaintiffs incorporate by reference each allegation set forth in paragraphs 1-274, above.

811.   Plaintiffs Aaron and Victoria Manfra ("Maryland Plaintiffs") bring this cause of action individually and on behalf of the Maryland Sub-Class.

812.   Ford, the Maryland Plaintiffs and the Maryland Sub-Class members are "persons" within the meaning of Md. Code Ann., Com. Law § 13-101(h).

813.   The Maryland Consumer Protection Act ("Maryland CPA") provides that a person may not engage in any unfair and deceptive trade practice in the sale or lease of any consumer good, including representing that goods are of a particular standard, quality, or grade if they are not, advertising goods without intent to sell or lease them as advertised, selling goods knowing that a service, replacement or repair was needed, "failure to state a material fact if the failure deceives or tends to deceive," and "[d]eception, fraud, false pretense, false premise, misrepresentation, or knowing concealment, suppression, or omission of any material fact with the intent that a consumer rely on the same," Md. Code Ann., Com. Law § 13-301, regardless of whether the consumer is actually deceived or damaged, Md. Code Ann., Com. Law § 13-302. Ford engaged in unfair and deceptive practices that violated the Maryland CPA as described above.

814.   Ford participated in and engaged in deceptive business or trade practices prohibited by the Maryland CPA by failing to disclose and actively concealing that the Class Vehicles

136

contained the Engine Defect, by marketing their Class Vehicles as safe and of high quality, and by presenting themselves as a reputable manufacturer that valued safety and stood behind its vehicles after they were sold.

815. By failing to disclose the Engine Defect; by concealing the Engine Defect; by promoting and selling or leasing Class Vehicles it knew were defective, including by marketing its vehicles as safe, reliable, easily operable, efficient, and of high quality; by presenting itself as a reputable manufacturer that valued safety, reliability, performance and efficiency, and stood behind its vehicles after they were sold; by failing to make repairs or making repairs and providing replacements that caused Maryland Plaintiffs and the Maryland Sub-Class Members to experience repeated instances of failure, rendering the New Vehicle Limited Warranty useless; and by minimized the scope and severity of the problems with the Class Vehicles, refusing to acknowledge that they are defective, and failing to provide adequate relief to consumers, Ford knowingly and intentionally misrepresented and omitted material facts in connection with the sale or lease of the Class Vehicles.

816. Ford systematically misrepresented, concealed, suppressed, or omitted material facts relating to the Class Vehicles and Engine Defect in the course of its business.

817. Ford also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Class Vehicles.

818. Ford's unfair and deceptive acts or practices occurred repeatedly in Ford's trade or business, were capable of deceiving a substantial portion of the purchasing public, and imposed a serious safety risk on the public.

819. Ford knew that the Class Vehicles and their engines suffered from an inherent defect, were defectively designed or manufactured, and were not suitable for their intended use.

820. Ford knew or should have known that its conduct violated the Maryland CPA.

821. Maryland Plaintiffs and the Maryland Sub-Class Members reasonably relied on Ford's misrepresentations and omissions of material facts in its advertisements of the Class Vehicles

1   and in the purchase of the Class Vehicles.

2   822.   Had Maryland Plaintiffs and the Maryland Sub-Class Members known that the Class

3   Vehicles would exhibit the Engine Defect, they would not have purchased or leased the Class

4   Vehicles or would have paid less for them. Plaintiffs did not receive the benefit of their bargain as

5   a result of Ford's misconduct.

6   823.   Ford owed Maryland Plaintiffs and the Maryland Sub-Class Members a duty to

7   disclose the truth about the Engine Defect because Ford:

8       a.   possessed exclusive and superior knowledge of the design of the Class

9   Vehicles and the Engine Defect;

10      b.   intentionally concealed the foregoing from Maryland Plaintiffs and the

11  Maryland Sub-Class Members; and/or

12      c.   made incomplete representations regarding the quality and durability of the

13  Class Vehicles, while purposefully withholding material facts from Maryland Plaintiffs and the

14  Maryland Sub-Class Members that contradicted these representations.

15  824.   Due to Ford's specific and superior knowledge that the Engines in the Class Vehicles

16  will fail due to the Engine Defect, its false representations regarding the increased durability of the

17  Class Vehicles, and reliance by Maryland Plaintiffs and the Maryland Sub-Class Members on these

18  material representations, Ford had a duty to disclose to Class members that the Engine Defect will

19  cause engine failure in Class Vehicles, that Class Vehicles do not have the expected durability,

20  reliability, and/or safety over other vehicles or of their predecessor engines, that failure of the

21  Engines will cause damage to Class Vehicle, and that Class members would be required to bear the

22  cost of the damage to their vehicles. Having volunteered to provide information to Maryland

23  Plaintiffs and the Maryland Sub-Class Members, Ford had the duty to disclose not just the partial

24  truth, but the entire truth. These omitted and concealed facts were material because they directly

25  impact the value of the Class Vehicles purchased or leased by Maryland Plaintiffs and the Maryland

26  Sub-Class Members. Longevity, durability, performance, and safety are material concerns to Ford

27  consumers. Ford represented to Maryland Plaintiffs and the Maryland Sub-Class Members that they

28  were purchasing or leasing vehicles that were durable, reliable, safe, efficient, of high quality, and

containing engines of advanced and superior characteristics and technology as alleged throughout this Complaint, when in fact it is only a matter of time before the engines fail due to the Engine Defect.

825.   Maryland Plaintiffs and the Maryland Sub-Class Members suffered injury in fact to a legally protected interest. As a result of Ford's conduct, Maryland Plaintiffs and the Maryland Sub-Class Members were harmed and suffered actual damages in the form of the costs of diagnosis and repair of their vehicles, and the diminished value of their vehicles.

826.   As a direct and proximate result of Ford's unfair or deceptive acts or practices, Maryland Plaintiffs and the Maryland Sub-Class Members suffered and will continue to suffer injury in fact and/or actual damages.

827.   Defendant's violations present a continuing risk to Maryland Plaintiffs and the Maryland Sub-Class Members as well as to the general public. Defendant's unlawful acts and practices complained of herein affect the public interest.

828.   As a proximate and direct result of Ford's unfair and deceptive trade practices, Maryland Plaintiffs and members of the Maryland Sub-Class purchased or leased Class Vehicles and suffered an ascertainable loss and financial harm. This included ascertainable losses in the form of actual damages in the amount of the cost to attempt to repair the Engine Defect, replaced the damaged related system components, diminution of Class Vehicle resale value, increased repair and maintenance costs, and other substantial monetary damages and inconvenience.

829.   The Maryland Plaintiffs provided notice of their claims by letter dated December 18, 2020.

830.   Pursuant to Md. Code Ann., Com. Law § 13-408, the Maryland Plaintiffs and members of the Maryland Sub-Class seek monetary relief against Ford in the amount of actual damages, attorneys' fees, and any other just and proper relief available under the Maryland CPA.

### TWENTY-EIGHTH CAUSE OF ACTION
**Breach of Express Warranty**
**(Md. Com. Law §§ 2-313 and 2A-210)**
**(On behalf of the Maryland Sub-Class)**

831.   Plaintiffs incorporate by reference each allegation set forth in paragraphs 1-274,

139

above.

832.   Maryland Plaintiffs bring this cause of action on their own behalf and on behalf of the members of the Maryland Sub-Class.

833.   Ford is and was at all relevant times a "merchant" with respect to motor vehicles under Md. Com. Law §§ 2-104(1) and 2A-103(3), and a "seller" of motor vehicles under § 2-103(1)(d).

834.   With respect to leases, Ford is and was at all relevant times a "lessor" of motor vehicles under Md. Com. Law § 2A-103(1)(p).

835.   The Class Vehicles are and were at all relevant times "goods" within the meaning of Md. Com. Law §§ 2-105(1) and 2A-103(1)(h).

836.   Ford provided all purchasers and lessees of the Class Vehicles with the express warranty described herein, which became a material part of the bargain.

837.   Ford provided all purchasers and lessees of Lincoln-branded Class Vehicles with the Lincoln Warranty and all purchasers and lessees of Ford or Ford-branded Class Vehicles with the Ford/Ford Warranty.

838.   Ford sold and leased the Class Vehicles with a written express warranty covering the Vehicles for three years or 36,000 miles, whichever comes first.

839.   Ford's New Vehicle Limited Warranty expressly states that Ford will "without charge, repair, replace, or adjust all parts on your vehicle that malfunction or fail during normal use during the applicable coverage period due to a manufacturing defect in factory-supplied materials or factory workmanship" so long the Vehicle is properly operated and maintained and taken to a Ford dealership for repair within the warranty period.

840.   Ford further provides powertrain warranty coverage, which is applicable to "the Engine: all internal lubricated parts, cylinder block, cylinder heads, electrical fuel pump, powertrain control module, engine mounts, flywheel, injection pump, manifold (exhaust and intake), manifold bolts, oil pan, oil pump, seals and gaskets, engine thermostat, engine, thermostat housing, timing chain cover, timing chain (gears or belt), turbocharger/supercharger unit, valve covers, water pump" as well as the components in the transmission, front-wheel drive, rear-wheel drive, and four-wheel/all-wheel drive. This coverage applies for 5-years or up to 60,000 miles, whichever comes

first.

841.   For certified pre-owned ("CPO") Vehicles, Ford offers a limited warranty covering CPO Vehicles for 12 months or 12,000 miles, whichever comes first.

842.   Ford's CPO Vehicle warranty states that a dealer will replace "all covered components . . . that are found to be defective in factory-supplied materials or workmanship during the applicable warranty periods." The engine and its components—including the cylinder block and cylinder heads—are included in Ford's list of "covered components."

843.   Ford manufactured and/or installed the engines and the engines' component parts in the Class Vehicles, and the engines and their component parts are covered by the express Warranties.

844.   The Engine Defect at issue in this litigation was present at the time the Class Vehicles were sold or leased to Maryland Plaintiffs and the Maryland Sub-Class Members.

845.   Plaintiffs relied on Ford's express warranties, which were a material part of the bargain, when purchasing or leasing their Class Vehicles.

846.   Under the express Warranties, Ford was obligated to correct the Engine Defect in the vehicles owned or leased by Maryland Plaintiffs and the Maryland Sub-Class Members.

847.   Although Ford was obligated to correct the Engine Defect, none of the attempted fixes to the engines are adequate under the terms of the Warranties, as they did not cure the defect.

848.   Ford breached the express Warranties by performing illusory repairs. Rather than repairing the vehicles pursuant to the express Warranties, Ford falsely informed Maryland Sub-Class Members that there was no problem with their Class Vehicles, performed ineffective procedures including software updates, and/or replaced defective components in the engines with equally defective components, without actually repairing the Class Vehicles.

849.   Ford and its agent dealers have failed and refused to conform the engines to the express Warranties. Ford's conduct, as discussed throughout this Complaint, has voided any attempt on its part to disclaim liability for its actions.

850.   Moreover, Ford's attempt to disclaim or limit these express Warranties vis-à-vis consumers is unconscionable and unenforceable under the circumstances here. Specifically, Ford's

warranty limitation is unenforceable because it knowingly sold a defective product without informing consumers about the defect.

851.   The time limits contained in Ford's warranty period were also unconscionable and inadequate to protect Maryland Plaintiffs and the Maryland Sub-Class Members. Among other things, Maryland Plaintiffs and the Maryland Sub-Class Members had no meaningful choice in determining these time limitations, the terms of which unreasonably favored Ford. A gross disparity in bargaining power existed between Ford and the Class members, and Ford knew or should have known that the Class Vehicles were defective at the time of sale.

852.   Maryland Plaintiffs and the Maryland Sub-Class Members have complied with all obligations under the Warranties, or otherwise have been excused from performance of said obligations as a result of Ford's conduct described herein.

853.   Maryland Plaintiffs and the Maryland Sub-Class Members were not required to notify Ford of the breach because affording Ford a reasonable opportunity to cure its breach of written warranty would have been futile. Ford was also on notice of the Engine Defect from the complaints and service requests it received from Plaintiffs and the Class Members, from repairs and/or replacements of the engines or components thereof, and through other internal and external sources.

854.   Because Ford, through its conduct and exemplified by its own service bulletins, has covered repairs of the Engine Defect if Ford determines the repairs are appropriately covered under the Warranties, Ford cannot now deny that the Warranties cover the Engine Defect.

855.   Because Ford has not been able remedy the Engine Defect, any limitation on remedies included in the Warranties causes the Warranties to fail their essential purposes, rendering them null and void.

856.   As a direct and proximate cause of Ford's breach, Maryland Plaintiffs and the Maryland Sub-Class Members suffered damages and continue to suffer damages, including economic damages at the point of sale or lease and diminution of value of their Class Vehicles. Additionally, Maryland Plaintiffs and the Maryland Sub-Class Members have incurred or will incur economic damages at the point of repair in the form of the cost of repair.

857.   As a direct and proximate result of Ford's breach of express warranties, Maryland

Plaintiffs and the Maryland Sub-Class Members have been damaged in an amount to be determined at trial.

## TWENTY-NINTH CAUSE OF ACTION
### Breach of the Implied Warranty of Merchantability
### (Md. Com. Law §§ 2-314 and 2A-212)
### (On behalf of the Maryland Sub-Class)

858.   Plaintiffs incorporate by reference each allegation set forth in paragraphs 1-274, above.

859.   Maryland Plaintiffs bring this cause of action on their own behalf and on behalf of the members of the Maryland Sub-Class.

860.   Ford is and was at all relevant times a "merchant" with respect to motor vehicles under Md. Com. Law §§ 2-104(1) and 2A-103(3), and a "seller" of motor vehicles under § 2-103(1)(d).

861.   With respect to leases, Ford is and was at all relevant times a "lessor" of motor vehicles under Md. Com. Law § 2A-103(1)(p).

862.   The Class Vehicles are and were at all relevant times "goods" within the meaning of Md. Com. Law §§ 2-105(1) and 2A-103(1)(h).

863.   A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law under Md. Com. Law §§ 2-314 and 2A-212.

864.   Ford knew or had reason to know of the specific use for which the Class Vehicles were purchased or leased. Ford directly sold and marketed vehicles equipped with the engines to customers through authorized dealers, like those from whom Maryland Plaintiffs and the Maryland Sub-Class Members bought or leased their vehicles, for the intended purpose of consumers purchasing the vehicles. Ford knew that the Class Vehicles would and did pass unchanged from the authorized dealers to Maryland Plaintiffs and the Maryland Sub-Class Members, with no modification to the defective engines.

865.   Ford provided Plaintiffs and Class Members with an implied warranty that the Class Vehicles and their components and parts are merchantable and fit for the ordinary purposes for which they were sold.

866.   This implied warranty included, among other things: (i) a warranty that the Class Vehicles and their engines that were manufactured, supplied, distributed, and/or sold by Ford were safe and reliable for providing transportation; and (ii) a warranty that the Class Vehicles and their engines would be fit for their intended use while the Class Vehicles were being operated.

867.   Contrary to the applicable implied warranties, the Class Vehicles and their engines at the time of sale and thereafter were not fit for their ordinary and intended purpose of providing Plaintiffs and Class Members with reliable, durable, and safe transportation. Instead, the Class Vehicles are defective, including, but not limited to, the defective design and manufacture of their engines and the existence of the Engine Defect at the time of sale or lease and thereafter. Ford knew of this defect at the time these sale or lease transactions occurred.

868.   As a result of Ford's breach of the applicable implied warranties, Maryland Plaintiffs and the Maryland Sub-Class Members of the Class Vehicles suffered an ascertainable loss of money, property, and/or value of their Class Vehicles. Additionally, as a result of the Engine Defect, Maryland Plaintiffs and the Maryland Sub-Class Members were harmed and suffered actual damages in that the Class Vehicles' engine components are substantially certain to fail before their expected useful life has run.

869.   Ford's actions, as complained of herein, breached the implied warranty that the Class Vehicles were of merchantable quality and fit for such use in violation of Md. Com. Law §§ 2-314 and 2A-212.

870.   Maryland Plaintiffs and the Maryland Sub-Class Members have complied with all obligations under the warranty, or otherwise have been excused from performance of said obligations as a result of Ford's conduct described herein.

871.   Maryland Plaintiffs and the Maryland Sub-Class Members were not required to notify Ford of the breach because affording Ford a reasonable opportunity to cure its breach of written warranty would have been futile. Ford was also on notice of the Engine Defect from the complaints and service requests it received from Plaintiffs and the Class Members, from repairs and/or replacements of the engines or components thereof, and through other internal sources.

872.   As a direct and proximate cause of Ford's breach, Maryland Plaintiffs and the

Maryland Sub-Class Members suffered damages and continue to suffer damages, including economic damages at the point of sale or lease and diminution of value of their Class Vehicles. Additionally, Maryland Plaintiffs and the Maryland Sub-Class Members have incurred or will incur economic damages at the point of repair in the form of the cost of repair.

873.   As a direct and proximate result of Ford's breach of the implied warranty of merchantability, Maryland Plaintiffs and the Maryland Sub-Class Members have been damaged in an amount to be proven at trial.

### THIRTIETH CAUSE OF ACTION
**(Violations of the Michigan Consumer Protection Law,**
**Mich. Comp. Laws § 445.903, *et seq*.)**
**(On Behalf of the Michigan Sub-Class)**

874.   Plaintiffs incorporate by reference each allegation set forth in paragraphs 1-274, above.

875.   Plaintiffs Stacey Coppock and Rachel Goodrich ("Michigan Plaintiffs") brings this cause of action individually and on behalf of the Michigan Sub-Class.

876.   Plaintiff Coppock and the Michigan Sub-Class Members are "person[s]" within the meaning of the Mich. Comp. Laws § 445.902(1)(d).

877.    Ford is a "person" engaged in "trade or commerce" within the meaning of the Mich. Comp. Laws § 445.902(1)(d).

878.   The Michigan Consumer Protection Act ("Michigan CPA") prohibits "[u]nfair, unconscionable, or deceptive methods, acts, or practices in the conduct of trade or commerce," including: "(s) Failing to reveal a material fact, the omission of which tends to mislead or deceive the consumer, and which fact could not reasonably be known by the consumer;" and "(cc) Failing to reveal facts that are material to the transaction in light of representations of fact made in a positive manner." Mich. Comp. Laws § 445.903(1). Ford engaged in unfair and deceptive practices that violated the Michigan CPA as described above.

879.   Ford participated in and engaged in deceptive business or trade practices prohibited by the Michigan CPA by failing to disclose and actively concealing that the Class Vehicles contained the Engine Defect, by marketing their Class Vehicles as safe and of high quality, and by

presenting themselves as a reputable manufacturer that valued safety and stood behind its vehicles after they were sold.

880.  By failing to disclose the Engine Defect; by concealing the Engine Defect; by promoting and selling or leasing Class Vehicles it knew were defective, including by marketing its vehicles as safe, reliable, easily operable, efficient, and of high quality; by presenting itself as a reputable manufacturer that valued safety, reliability, performance and efficiency, and stood behind its vehicles after they were sold; by failing to make repairs or making repairs and providing replacements that caused Michigan Plaintiff and the Michigan Sub-Class Members to experience repeated instances of failure, rendering the New Vehicle Limited Warranty useless; and by minimized the scope and severity of the problems with the Class Vehicles, refusing to acknowledge that they are defective, and failing to provide adequate relief to consumers, Ford knowingly and intentionally misrepresented and omitted material facts in connection with the sale or lease of the Class Vehicles.

881.  Ford systematically misrepresented, concealed, suppressed, or omitted material facts relating to the Class Vehicles and Engine Defect in the course of its business.

882.  Ford also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Class Vehicles.

883.  Ford's unfair and deceptive acts or practices occurred repeatedly in Ford's trade or business, were capable of deceiving a substantial portion of the purchasing public, and imposed a serious safety risk on the public.

884.  Ford knew that the Class Vehicles and their engines suffered from an inherent defect, were defectively designed or manufactured, and were not suitable for their intended use.

885.  Ford knew or should have known that its conduct violated the Michigan CPA.

886.  Michigan Plaintiff and the Michigan Sub-Class Members reasonably relied on Ford's misrepresentations and omissions of material facts in its advertisements of the Class Vehicles and in the purchase of the Class Vehicles.

887. Had Michigan Plaintiff and the Michigan Sub-Class Members known that the Class Vehicles would exhibit the Engine Defect, they would not have purchased or leased the Class Vehicles or would have paid less for them. Plaintiff did not receive the benefit of their bargain as a result of Ford's misconduct.

888. Ford owed Michigan Plaintiff and the Michigan Sub-Class Members a duty to disclose the truth about the Engine Defect because Ford:

a. possessed exclusive and superior knowledge of the design of the Class Vehicles and the Engine Defect;

b. intentionally concealed the foregoing from Michigan Plaintiff and the Michigan Sub-Class Members; and/or

c. made incomplete representations regarding the quality and durability of the Class Vehicles, while purposefully withholding material facts from Michigan Plaintiff and the Michigan Sub-Class Members that contradicted these representations.

889. Due to Ford's specific and superior knowledge that the Engines in the Class Vehicles will fail due to the Engine Defect, its false representations regarding the increased durability of the Class Vehicles, and reliance by Michigan Plaintiff and the Michigan Sub-Class Members on these material representations, Ford had a duty to disclose to Class members that the Engine Defect will cause engine failure in Class Vehicles, that Class Vehicles do not have the expected durability, reliability, and/or safety over other vehicles or of their predecessor engines, that failure of the Engines will cause damage to Class Vehicle, and that Class members would be required to bear the cost of the damage to their vehicles. Having volunteered to provide information to Michigan Plaintiff and the Michigan Sub-Class Members, Ford had the duty to disclose not just the partial truth, but the entire truth. These omitted and concealed facts were material because they directly impact the value of the Class Vehicles purchased or leased by Michigan Plaintiff and the Michigan Sub-Class Members. Longevity, durability, performance, and safety are material concerns to Ford consumers. Ford represented to Michigan Plaintiff and the Michigan Sub-Class Members that they were purchasing or leasing vehicles that were durable, reliable, safe, efficient, of high quality, and containing engines of advanced and superior characteristics and technology as alleged throughout

147

this Complaint, when in fact it is only a matter of time before the engines fail due to the Engine Defect.

890.   Michigan Plaintiff and the Michigan Sub-Class Members suffered injury in fact to a legally protected interest. As a result of Ford's conduct, Michigan Plaintiff and the Michigan Sub-Class Members were harmed and suffered actual damages in the form of the costs of diagnosis and repair of their vehicles, and the diminished value of their vehicles.

891.   As a direct and proximate result of Ford's unfair or deceptive acts or practices, Michigan Plaintiff and the Michigan Sub-Class Members suffered and will continue to suffer injury in fact and/or actual damages.

892.   Defendant's violations present a continuing risk to Michigan Plaintiff and the Michigan Sub-Class Members as well as to the general public. Defendant's unlawful acts and practices complained of herein affect the public interest.

893.   As a proximate and direct result of Ford's unfair and deceptive trade practices, Michigan Plaintiff and members of the Michigan Sub-Class purchased or leased Class Vehicles and suffered an ascertainable loss and financial harm. This included ascertainable losses in the form of actual damages in the amount of the cost to attempt to repair the Engine Defect, replaced the damaged related system components, diminution of Class Vehicle resale value, increased repair and maintenance costs, and other substantial monetary damages and inconvenience.

894.   Plaintiff Coppock and the Michigan Sub-Class Members seek monetary relief measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $250 each; and reasonable attorneys' fees; and any other just and proper relief available under Mich. Comp. Laws. Because Ford acted with willful and conscious disregard of the rights and safety of others, Ford's conduct constitutes malice, oppression, and fraud warranting punitive damages.

### THIRTY-FIRST CAUSE OF ACTION
**Breach of Express Warranty**
**(MICH. COMP. LAWS §§ 440.2313 and 440.2860)**
**(On behalf of the Michigan Sub-Class)**

895.   Plaintiffs incorporate by reference each allegation set forth in paragraphs 1-274,

148

above.

896.   Michigan Plaintiffs bring this cause of action on their own behalf and on behalf of the members of the Michigan Sub-Class.

897.   Ford is and was at all relevant times a "merchant" with respect to motor vehicles under Mich. Comp. Laws §§ 440.2104(1) and a "seller" of motor vehicles under § 440.2103(1)(c).

898.   With respect to leases, Ford is and was at all relevant times a "lessor" of motor vehicles under Mich. Comp. Laws § 440.2803(1)(p).

899.   The Class Vehicles are and were at all relevant times "goods" within the meaning of Mich. Comp. Laws §§ 440.2105(1) and 440.2803(1)(h).

900.   Ford provided all purchasers and lessees of the Class Vehicles with the express warranty described herein, which became a material part of the bargain.

901.   Ford provided all purchasers and lessees of Lincoln-branded Class Vehicles with the Lincoln Warranty and all purchasers and lessees of Ford or Ford-branded Class Vehicles with the Ford/Ford Warranty.

902.   Ford sold and leased the Class Vehicles with a written express warranty covering the Vehicles for three years or 36,000 miles, whichever comes first.

903.   Ford's New Vehicle Limited Warranty expressly states that Ford will "without charge, repair, replace, or adjust all parts on your vehicle that malfunction or fail during normal use during the applicable coverage period due to a manufacturing defect in factory-supplied materials or factory workmanship" so long the Vehicle is properly operated and maintained and taken to a Ford dealership for repair within the warranty period.

904.   Ford further provides powertrain warranty coverage, which is applicable to "the Engine: all internal lubricated parts, cylinder block, cylinder heads, electrical fuel pump, powertrain control module, engine mounts, flywheel, injection pump, manifold (exhaust and intake), manifold bolts, oil pan, oil pump, seals and gaskets, engine thermostat, engine, thermostat housing, timing chain cover, timing chain (gears or belt), turbocharger/supercharger unit, valve covers, water pump" as well as the components in the transmission, front-wheel drive, rear-wheel drive, and four-wheel/all-wheel drive. This coverage applies for 5-years or up to 60,000 miles, whichever comes

149

first.

905. For certified pre-owned ("CPO") Vehicles, Ford offers a limited warranty covering CPO Vehicles for 12 months or 12,000 miles, whichever comes first.

906. Ford's CPO Vehicle warranty states that a dealer will replace "all covered components . . . that are found to be defective in factory-supplied materials or workmanship during the applicable warranty periods." The engine and its components—including the cylinder block and cylinder heads—are included in Ford's list of "covered components."

907. Ford manufactured and/or installed the engines and the engines' component parts in the Class Vehicles, and the engines and their component parts are covered by the express Warranties.

908. The Engine Defect at issue in this litigation was present at the time the Class Vehicles were sold or leased to Michigan Plaintiffs and the Michigan Sub-Class Members.

909. Plaintiffs relied on Ford's express warranties, which were a material part of the bargain, when purchasing or leasing their Class Vehicles.

910. Under the express Warranties, Ford was obligated to correct the Engine Defect in the vehicles owned or leased by Michigan Plaintiffs and the Michigan Sub-Class Members.

911. Although Ford was obligated to correct the Engine Defect, none of the attempted fixes to the engines are adequate under the terms of the Warranties, as they did not cure the defect.

912. Ford breached the express Warranties by performing illusory repairs. Rather than repairing the vehicles pursuant to the express Warranties, Ford falsely informed Michigan Sub-Class Members that there was no problem with their Class Vehicles, performed ineffective procedures including software updates, and/or replaced defective components in the engines with equally defective components, without actually repairing the Class Vehicles.

913. Ford and its agent dealers have failed and refused to conform the engines to the express Warranties. Ford's conduct, as discussed throughout this Complaint, has voided any attempt on its part to disclaim liability for its actions.

914. Moreover, Ford's attempt to disclaim or limit these express Warranties vis-à-vis consumers is unconscionable and unenforceable under the circumstances here. Specifically, Ford's

warranty limitation is unenforceable because it knowingly sold a defective product without informing consumers about the defect.

915.   The time limits contained in Ford's warranty period were also unconscionable and inadequate to protect Michigan Plaintiffs and the Michigan Sub-Class Members. Among other things, Michigan Plaintiffs and the Michigan Sub-Class Members had no meaningful choice in determining these time limitations, the terms of which unreasonably favored Ford. A gross disparity in bargaining power existed between Ford and the Class members, and Ford knew or should have known that the Class Vehicles were defective at the time of sale.

916.   Michigan Plaintiffs and the Michigan Sub-Class Members have complied with all obligations under the Warranties, or otherwise have been excused from performance of said obligations as a result of Ford's conduct described herein.

917.   Michigan Plaintiffs and the Michigan Sub-Class Members were not required to notify Ford of the breach because affording Ford a reasonable opportunity to cure its breach of written warranty would have been futile. Ford was also on notice of the Engine Defect from the complaints and service requests it received from Plaintiffs and the Class Members, from repairs and/or replacements of the engines or components thereof, and through other internal and external sources.

918.   Because Ford, through its conduct and exemplified by its own service bulletins, has covered repairs of the Engine Defect if Ford determines the repairs are appropriately covered under the Warranties, Ford cannot now deny that the Warranties cover the Engine Defect.

919.   Because Ford has not been able remedy the Engine Defect, any limitation on remedies included in the Warranties causes the Warranties to fail their essential purposes, rendering them null and void.

920.   As a direct and proximate cause of Ford's breach, Michigan Plaintiffs and the Michigan Sub-Class Members suffered damages and continue to suffer damages, including economic damages at the point of sale or lease and diminution of value of their Class Vehicles. Additionally, Michigan Plaintiffs and the Michigan Sub-Class Members have incurred or will incur economic damages at the point of repair in the form of the cost of repair.

921.   As a direct and proximate result of Ford's breach of express warranties, Michigan

Plaintiffs and the Michigan Sub-Class Members have been damaged in an amount to be determined at trial.

### THIRTY-SECOND CAUSE OF ACTION
**Breach of the Implied Warranty of Merchantability**
**(Mich. Comp. Laws §§ 440.2314 and 440.2860)**
**(On behalf of the Michigan Sub-Class)**

922.   Plaintiffs incorporate by reference each allegation set forth in paragraphs 1-274, above.

923.   Michigan Plaintiffs bring this cause of action on their own behalf and on behalf of the members of the Michigan Sub-Class.

924.   Ford is and was at all relevant times a "merchant" with respect to motor vehicles under Mich. Comp. Laws §§ 440.2104(1) and a "seller" of motor vehicles under § 440.2103(1)(c).

925.   With respect to leases, Ford is and was at all relevant times a "lessor" of motor vehicles under Mich. Comp. Laws § 440.2803(1)(p).

926.   The Class Vehicles are and were at all relevant times "goods" within the meaning of Mich. Comp. Laws §§ 440.2105(1) and 440.2803(1)(h).

927.   A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law under Mich. Comp. Laws §§ 440.2314 and 440.2862.

928.   Ford knew or had reason to know of the specific use for which the Class Vehicles were purchased or leased. Ford directly sold and marketed vehicles equipped with the engines to customers through authorized dealers, like those from whom Michigan Plaintiffs and the Michigan Sub-Class Members bought or leased their vehicles, for the intended purpose of consumers purchasing the vehicles. Ford knew that the Class Vehicles would and did pass unchanged from the authorized dealers to Michigan Plaintiffs and the Michigan Sub-Class Members, with no modification to the defective engines.

929.   Ford provided Plaintiffs and Class Members with an implied warranty that the Class Vehicles and their components and parts are merchantable and fit for the ordinary purposes for which they were sold.

930.   This implied warranty included, among other things: (i) a warranty that the Class Vehicles and their engines that were manufactured, supplied, distributed, and/or sold by Ford were safe and reliable for providing transportation; and (ii) a warranty that the Class Vehicles and their engines would be fit for their intended use while the Class Vehicles were being operated.

931.   Contrary to the applicable implied warranties, the Class Vehicles and their engines at the time of sale and thereafter were not fit for their ordinary and intended purpose of providing Plaintiffs and Class Members with reliable, durable, and safe transportation. Instead, the Class Vehicles are defective, including, but not limited to, the defective design and manufacture of their engines and the existence of the Engine Defect at the time of sale or lease and thereafter. Ford knew of this defect at the time these sale or lease transactions occurred.

932.   As a result of Ford's breach of the applicable implied warranties, Michigan Plaintiffs and the Michigan Sub-Class Members of the Class Vehicles suffered an ascertainable loss of money, property, and/or value of their Class Vehicles. Additionally, as a result of the Engine Defect, Michigan Plaintiffs and the Michigan Sub-Class Members were harmed and suffered actual damages in that the Class Vehicles' engine components are substantially certain to fail before their expected useful life has run.

933.   Ford's actions, as complained of herein, breached the implied warranty that the Class Vehicles were of merchantable quality and fit for such use in violation of under Mich. Comp. Laws §§ 440.2314 and 440.2862.

934.   Michigan Plaintiffs and the Michigan Sub-Class Members have complied with all obligations under the warranty, or otherwise have been excused from performance of said obligations as a result of Ford's conduct described herein.

935.   Michigan Plaintiffs and the Michigan Sub-Class Members were not required to notify Ford of the breach because affording Ford a reasonable opportunity to cure its breach of written warranty would have been futile. Ford was also on notice of the Engine Defect from the complaints and service requests it received from Plaintiffs and the Class Members, from repairs and/or replacements of the engines or components thereof, and through other internal sources.

936.   As a direct and proximate cause of Ford's breach, Michigan Plaintiffs and the

Michigan Sub-Class Members suffered damages and continue to suffer damages, including economic damages at the point of sale or lease and diminution of value of their Class Vehicles. Additionally, Michigan Plaintiffs and the Michigan Sub-Class Members have incurred or will incur economic damages at the point of repair in the form of the cost of repair.

937.  As a direct and proximate result of Ford's breach of the implied warranty of merchantability, Michigan Plaintiffs and the Michigan Sub-Class Members have been damaged in an amount to be proven at trial.

### THIRTY-THIRD CAUSE OF ACTION
**(Violations of the Minnesota Prevention of Consumer Fraud Act,
Minn. Stat.§ 325F.68, *et seq*.)
(On Behalf of the Minnesota Sub-Class)**

938.  Plaintiffs incorporate by reference each allegation set forth in paragraphs 1-274, above.

939.  Plaintiff Brian Simonds ("Minnesota Plaintiff") brings this cause of action individually and on behalf of the Minnesota Sub-Class.

940.  The Class Vehicles constitute "merchandise" within the meaning of Minn. Stat. § 325F.68.

941.  The Minnesota Prevention of Consumer Fraud Act ("Minnesota CFA") prohibits "[t]he act, use, or employment by any person of any fraud, false pretense, false promise, misrepresentation, misleading statement or deceptive practice, with the intent that others rely thereon in connection with the sale of any merchandise, whether or not any person has in fact been misled, deceived, or damaged thereby …." Minn. Stat. § 3 25F.69(1). Ford engaged in unfair and deceptive practices that violated the Minnesota CFA as described above.

942.  Ford participated in and engaged in deceptive business or trade practices prohibited by the Minnesota CFA by failing to disclose and actively concealing that the Class Vehicles contained the Engine Defect, by marketing their Class Vehicles as safe and of high quality, and by presenting themselves as a reputable manufacturer that valued safety and stood behind its vehicles after they were sold.

943.  By failing to disclose the Engine Defect; by concealing the Engine Defect; by

154

promoting and selling or leasing Class Vehicles it knew were defective, including by marketing its vehicles as safe, reliable, easily operable, efficient, and of high quality; by presenting itself as a reputable manufacturer that valued safety, reliability, performance and efficiency, and stood behind its vehicles after they were sold; by failing to make repairs or making repairs and providing replacements that caused Minnesota Plaintiff and the Minnesota Sub-Class Members to experience repeated instances of failure, rendering the New Vehicle Limited Warranty useless; and by minimized the scope and severity of the problems with the Class Vehicles, refusing to acknowledge that they are defective, and failing to provide adequate relief to consumers, Ford knowingly and intentionally misrepresented and omitted material facts in connection with the sale or lease of the Class Vehicles.

944.    Ford systematically misrepresented, concealed, suppressed, or omitted material facts relating to the Class Vehicles and Engine Defect in the course of its business.

945.    Ford also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Class Vehicles.

946.    Ford's unfair and deceptive acts or practices occurred repeatedly in Ford's trade or business, were capable of deceiving a substantial portion of the purchasing public, and imposed a serious safety risk on the public.

947.    Ford knew that the Class Vehicles and their engines suffered from an inherent defect, were defectively designed or manufactured, and were not suitable for their intended use.

948.    Ford knew or should have known that its conduct violated the Minnesota CFA.

949.    Minnesota Plaintiff and the Minnesota Sub-Class Members reasonably relied on Ford's misrepresentations and omissions of material facts in its advertisements of the Class Vehicles and in the purchase of the Class Vehicles.

950.    Had Minnesota Plaintiff and the Minnesota Sub-Class Members known that the Class Vehicles would exhibit the Engine Defect, they would not have purchased or leased the Class Vehicles or would have paid less for them. Plaintiff did not receive the benefit of their bargain as a

result of Ford's misconduct.

951.   Ford owed Minnesota Plaintiff and the Minnesota Sub-Class Members a duty to disclose the truth about the Engine Defect because Ford:

a.     possessed exclusive and superior knowledge of the design of the Class Vehicles and the Engine Defect;

b.     intentionally concealed the foregoing from Minnesota Plaintiff and the Minnesota Sub-Class Members; and/or

c.     made incomplete representations regarding the quality and durability of the Class Vehicles, while purposefully withholding material facts from Minnesota Plaintiff and the Minnesota Sub-Class Members that contradicted these representations.

952.   Due to Ford's specific and superior knowledge that the Engines in the Class Vehicles will fail due to the Engine Defect, its false representations regarding the increased durability of the Class Vehicles, and reliance by Minnesota Plaintiff and the Minnesota Sub-Class Members on these material representations, Ford had a duty to disclose to Class members that the Engine Defect will cause engine failure in Class Vehicles, that Class Vehicles do not have the expected durability, reliability, and/or safety over other vehicles or of their predecessor engines, that failure of the Engines will cause damage to Class Vehicle, and that Class members would be required to bear the cost of the damage to their vehicles. Having volunteered to provide information to Minnesota Plaintiff and the Minnesota Sub-Class Members, Ford had the duty to disclose not just the partial truth, but the entire truth. These omitted and concealed facts were material because they directly impact the value of the Class Vehicles purchased or leased by Minnesota Plaintiff and the Minnesota Sub-Class Members. Longevity, durability, performance, and safety are material concerns to Ford consumers. Ford represented to Minnesota Plaintiff and the Minnesota Sub-Class Members that they were purchasing or leasing vehicles that were durable, reliable, safe, efficient, of high quality, and containing engines of advanced and superior characteristics and technology as alleged throughout this Complaint, when in fact it is only a matter of time before the engines fail due to the Engine Defect.

953.   Minnesota Plaintiff and the Minnesota Sub-Class Members suffered injury in fact to

a legally protected interest. As a result of Ford's conduct, Minnesota Plaintiff and the Minnesota Sub-Class Members were harmed and suffered actual damages in the form of the costs of diagnosis and repair of their vehicles, and the diminished value of their vehicles.

954.   As a direct and proximate result of Ford's unfair or deceptive acts or practices, Minnesota Plaintiff and the Minnesota Sub-Class Members suffered and will continue to suffer injury in fact and/or actual damages.

955.   Defendant's violations present a continuing risk to Minnesota Plaintiff and the Minnesota Sub-Class Members as well as to the general public. Defendant's unlawful acts and practices complained of herein affect the public interest.

956.   As a proximate and direct result of Ford's unfair and deceptive trade practices, Minnesota Plaintiff and members of the Minnesota Sub-Class purchased or leased Class Vehicles and suffered an ascertainable loss and financial harm. This included ascertainable losses in the form of actual damages in the amount of the cost to attempt to repair the Engine Defect, replaced the damaged related system components, diminution of Class Vehicle resale value, increased repair and maintenance costs, and other substantial monetary damages and inconvenience.

957.   As a direct and proximate result of Ford's unfair or deceptive acts or practices alleged herein, Minnesota Plaintiff and other members of the Minnesota Sub-Class suffered and will continue to suffer actual damages and are entitled to recover actual damages to the extent permitted by law, including class action rules, in an amount to be proven at trial. In addition, Minnesota Plaintiff and the putative Class seek equitable and injunctive relief against Ford on terms that the Court considers reasonable, and reasonable attorneys' fees.

958.   Minnesota Plaintiff provided notice of their claims by letter dated May 19, 2021.

959.   Pursuant to Minn. Stat. § 8.31(3a), Minnesota Plaintiff and the Minnesota Sub-Class Members seek damages in an amount to be proven at trial, including but not limited to actual damages and attorneys' fees, under the Minnesota CFA.

960.   Minnesota Plaintiff and the Minnesota Sub-Class Members also seek punitive damages under Minn. Stat. § 549.20(1)(a) given the clear and convincing evidence that GM's acts show deliberate disregard for the rights or safety of others.

### THIRTY-FOURTH CAUSE OF ACTION
**(Violations of the Minnesota Deceptive Trade Practices Act,
Minn. Stat. § 325D.43-48, *et seq.*)
(On Behalf of the Minnesota Sub-Class)**

961. Plaintiffs incorporate by reference each allegation set forth in paragraphs 1-274, above.

962. Minnesota Plaintiff brings this cause of action individually and on behalf of the Minnesota Sub-Class.

963. The Class Vehicles constitute "merchandise" within the meaning of Minn. Stat. § 325F.68.

964. The Minnesota Deceptive Trade Practices Act ("Minnesota DTPA") prohibits deceptive trade practices, which occur when a person "(5) represents that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation, or connection that the person does not have;" "(7) represents that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another;" and "(9) advertises goods or services with intent not to sell them as advertised." Minn. Stat. § 325D.44. Ford engaged in unfair and deceptive practices that violated the Minnesota DTPA as described above.

965. Ford participated in and engaged in deceptive business or trade practices prohibited by the Minnesota DTPA by failing to disclose and actively concealing that the Class Vehicles contained the Engine Defect, by marketing their Class Vehicles as safe and of high quality, and by presenting themselves as a reputable manufacturer that valued safety and stood behind its vehicles after they were sold.

966. By failing to disclose the Engine Defect; by concealing the Engine Defect; by promoting and selling or leasing Class Vehicles it knew were defective, including by marketing its vehicles as safe, reliable, easily operable, efficient, and of high quality; by presenting itself as a reputable manufacturer that valued safety, reliability, performance and efficiency, and stood behind its vehicles after they were sold; by failing to make repairs or making repairs and providing replacements that caused Minnesota Plaintiff and the Minnesota Sub-Class Members to experience

158

repeated instances of failure, rendering the New Vehicle Limited Warranty useless; and by minimized the scope and severity of the problems with the Class Vehicles, refusing to acknowledge that they are defective, and failing to provide adequate relief to consumers, Ford knowingly and intentionally misrepresented and omitted material facts in connection with the sale or lease of the Class Vehicles.

967.   Ford systematically misrepresented, concealed, suppressed, or omitted material facts relating to the Class Vehicles and Engine Defect in the course of its business.

968.   Ford also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Class Vehicles.

969.   Ford's unfair and deceptive acts or practices occurred repeatedly in Ford's trade or business, were capable of deceiving a substantial portion of the purchasing public, and imposed a serious safety risk on the public.

970.   Ford knew that the Class Vehicles and their engines suffered from an inherent defect, were defectively designed or manufactured, and were not suitable for their intended use.

971.   Ford knew or should have known that its conduct violated the Minnesota DTPA.

972.   Minnesota Plaintiff and the Minnesota Sub-Class Members reasonably relied on Ford's misrepresentations and omissions of material facts in its advertisements of the Class Vehicles and in the purchase of the Class Vehicles.

973.   Had Minnesota Plaintiff and the Minnesota Sub-Class Members known that the Class Vehicles would exhibit the Engine Defect, they would not have purchased or leased the Class Vehicles or would have paid less for them. Plaintiff did not receive the benefit of their bargain as a result of Ford's misconduct.

974.   Ford owed Minnesota Plaintiff and the Minnesota Sub-Class Members a duty to disclose the truth about the Engine Defect because Ford:

a.   possessed exclusive and superior knowledge of the design of the Class Vehicles and the Engine Defect;

b.     intentionally concealed the foregoing from Minnesota Plaintiff and the Minnesota Sub-Class Members; and/or

c.     made incomplete representations regarding the quality and durability of the Class Vehicles, while purposefully withholding material facts from Minnesota Plaintiff and the Minnesota Sub-Class Members that contradicted these representations.

975.   Due to Ford's specific and superior knowledge that the Engines in the Class Vehicles will fail due to the Engine Defect, its false representations regarding the increased durability of the Class Vehicles, and reliance by Minnesota Plaintiff and the Minnesota Sub-Class Members on these material representations, Ford had a duty to disclose to Class members that the Engine Defect will cause engine failure in Class Vehicles, that Class Vehicles do not have the expected durability, reliability, and/or safety over other vehicles or of their predecessor engines, that failure of the Engines will cause damage to Class Vehicle, and that Class members would be required to bear the cost of the damage to their vehicles. Having volunteered to provide information to Minnesota Plaintiff and the Minnesota Sub-Class Members, Ford had the duty to disclose not just the partial truth, but the entire truth. These omitted and concealed facts were material because they directly impact the value of the Class Vehicles purchased or leased by Minnesota Plaintiff and the Minnesota Sub-Class Members. Longevity, durability, performance, and safety are material concerns to Ford consumers. Ford represented to Minnesota Plaintiff and the Minnesota Sub-Class Members that they were purchasing or leasing vehicles that were durable, reliable, safe, efficient, of high quality, and containing engines of advanced and superior characteristics and technology as alleged throughout this Complaint, when in fact it is only a matter of time before the engines fail due to the Engine Defect.

976.   Minnesota Plaintiff and the Minnesota Sub-Class Members suffered injury in fact to a legally protected interest. As a result of Ford's conduct, Minnesota Plaintiff and the Minnesota Sub-Class Members were harmed and suffered actual damages in the form of the costs of diagnosis and repair of their vehicles, and the diminished value of their vehicles.

977.   As a direct and proximate result of Ford's unfair or deceptive acts or practices, Minnesota Plaintiff and the Minnesota Sub-Class Members suffered and will continue to suffer

160

injury in fact and/or actual damages.

978.   Defendant's violations present a continuing risk to Minnesota Plaintiff and the Minnesota Sub-Class Members as well as to the general public. Defendant's unlawful acts and practices complained of herein affect the public interest.

979.   As a proximate and direct result of Ford's unfair and deceptive trade practices, Minnesota Plaintiff and members of the Minnesota Sub-Class purchased or leased Class Vehicles and suffered an ascertainable loss and financial harm. This included ascertainable losses in the form of actual damages in the amount of the cost to attempt to repair the Engine Defect, replaced the damaged related system components, diminution of Class Vehicle resale value, increased repair and maintenance costs, and other substantial monetary damages and inconvenience.

980.   Minnesota Plaintiff provided notice of their claims by letter dated May 19, 2021.

981.   Pursuant to Minn. Stat. §§ 8.31(3a) and 325D.45, Minnesota Plaintiff and the Minnesota Sub-Class Members seek damages in an amount to be proven at trial, including but not limited to actual damages and attorneys' fees, under the Minnesota DTPA.

982.   Minnesota Plaintiff and the Minnesota Sub-Class Members also seek punitive damages under Minn. Stat. § 549.20(1)(a) given the clear and convincing evidence that GM's acts show deliberate disregard for the rights or safety of others.

### THIRTY-FIFTH CAUSE OF ACTION
**(Violations of the Minnesota False Statement in Advertising Act,
Minn. Stat. § 325F.67, *et seq*.)
(On Behalf of the Minnesota Sub-Class)**

983.   Plaintiffs incorporate by reference each allegation set forth in paragraphs 1-274, above.

984.   Plaintiff Brian Simonds ("Minnesota Plaintiff") brings this cause of action individually and on behalf of the Minnesota Sub-Class.

985.   The Minnesota False Statement in Advertising Act ("Minnesota FSAA") prohibits "any material assertion, representation, or statement of fact which is untrue, deceptive, or misleading" in connection with the disposition of merchandise or services. Minn. Stat. Ann. § 325F.67. Ford engaged in unfair and deceptive practices that violated the Minnesota FSAA as

161

1   described above.

2   986.   Ford participated in and engaged in deceptive business or trade practices prohibited

3   by the Minnesota FSAA by failing to disclose and actively concealing that the Class Vehicles

4   contained the Engine Defect, by marketing their Class Vehicles as safe and of high quality, and by

5   presenting themselves as a reputable manufacturer that valued safety and stood behind its vehicles

6   after they were sold.

7   987.   By failing to disclose the Engine Defect; by concealing the Engine Defect; by

8   promoting and selling or leasing Class Vehicles it knew were defective, including by marketing its

9   vehicles as safe, reliable, easily operable, efficient, and of high quality; by presenting itself as a

10  reputable manufacturer that valued safety, reliability, performance and efficiency, and stood behind

11  its vehicles after they were sold; by failing to make repairs or making repairs and providing

12  replacements that caused Minnesota Plaintiff and the Minnesota Sub-Class Members to experience

13  repeated instances of failure, rendering the New Vehicle Limited Warranty useless; and by

14  minimized the scope and severity of the problems with the Class Vehicles, refusing to acknowledge

15  that they are defective, and failing to provide adequate relief to consumers, Ford knowingly and

16  intentionally misrepresented and omitted material facts in connection with the sale or lease of the

17  Class Vehicles.

18  988.   Ford systematically misrepresented, concealed, suppressed, or omitted material facts

19  relating to the Class Vehicles and Engine Defect in the course of its business.

20  989.   Ford also engaged in unlawful trade practices by employing deception, deceptive acts

21  or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact

22  with intent that others rely upon such concealment, suppression or omission, in connection with the

23  sale of the Class Vehicles.

24  990.   Ford's unfair and deceptive acts or practices occurred repeatedly in Ford's trade or

25  business, were capable of deceiving a substantial portion of the purchasing public, and imposed a

26  serious safety risk on the public.

27  991.   Ford knew that the Class Vehicles and their engines suffered from an inherent defect,

28  were defectively designed or manufactured, and were not suitable for their intended use.

162

992.   Ford knew or should have known that its conduct violated the Minnesota FSAA.

993.   Minnesota Plaintiff and the Minnesota Sub-Class Members reasonably relied on Ford's misrepresentations and omissions of material facts in its advertisements of the Class Vehicles and in the purchase of the Class Vehicles.

994.   Had Minnesota Plaintiff and the Minnesota Sub-Class Members known that the Class Vehicles would exhibit the Engine Defect, they would not have purchased or leased the Class Vehicles or would have paid less for them. Plaintiff did not receive the benefit of their bargain as a result of Ford's misconduct.

995.   Ford owed Minnesota Plaintiff and the Minnesota Sub-Class Members a duty to disclose the truth about the Engine Defect because Ford:

    a.   possessed exclusive and superior knowledge of the design of the Class Vehicles and the Engine Defect;

    b.   intentionally concealed the foregoing from Minnesota Plaintiff and the Minnesota Sub-Class Members; and/or

    c.   made incomplete representations regarding the quality and durability of the Class Vehicles, while purposefully withholding material facts from Minnesota Plaintiff and the Minnesota Sub-Class Members that contradicted these representations.

996.   Due to Ford's specific and superior knowledge that the Engines in the Class Vehicles will fail due to the Engine Defect, its false representations regarding the increased durability of the Class Vehicles, and reliance by Minnesota Plaintiff and the Minnesota Sub-Class Members on these material representations, Ford had a duty to disclose to Class members that the Engine Defect will cause engine failure in Class Vehicles, that Class Vehicles do not have the expected durability, reliability, and/or safety over other vehicles or of their predecessor engines, that failure of the Engines will cause damage to Class Vehicle, and that Class members would be required to bear the cost of the damage to their vehicles. Having volunteered to provide information to Minnesota Plaintiff and the Minnesota Sub-Class Members, Ford had the duty to disclose not just the partial truth, but the entire truth. These omitted and concealed facts were material because they directly impact the value of the Class Vehicles purchased or leased by Minnesota Plaintiff and the Minnesota

Sub-Class Members. Longevity, durability, performance, and safety are material concerns to Ford consumers. Ford represented to Minnesota Plaintiff and the Minnesota Sub-Class Members that they were purchasing or leasing vehicles that were durable, reliable, safe, efficient, of high quality, and containing engines of advanced and superior characteristics and technology as alleged throughout this Complaint, when in fact it is only a matter of time before the engines fail due to the Engine Defect.

997.   Minnesota Plaintiff and the Minnesota Sub-Class Members suffered injury in fact to a legally protected interest. As a result of Ford's conduct, Minnesota Plaintiff and the Minnesota Sub-Class Members were harmed and suffered actual damages in the form of the costs of diagnosis and repair of their vehicles, and the diminished value of their vehicles.

998.   As a direct and proximate result of Ford's unfair or deceptive acts or practices, Minnesota Plaintiff and the Minnesota Sub-Class Members suffered and will continue to suffer injury in fact and/or actual damages.

999.   Defendant's violations present a continuing risk to Minnesota Plaintiff and the Minnesota Sub-Class Members as well as to the general public. Defendant's unlawful acts and practices complained of herein affect the public interest.

1000. As a proximate and direct result of Ford's unfair and deceptive trade practices, Minnesota Plaintiff and members of the Minnesota Sub-Class purchased or leased Class Vehicles and suffered an ascertainable loss and financial harm. This included ascertainable losses in the form of actual damages in the amount of the cost to attempt to repair the Engine Defect, replaced the damaged related system components, diminution of Class Vehicle resale value, increased repair and maintenance costs, and other substantial monetary damages and inconvenience.

1001. As a direct and proximate result of Ford's unfair or deceptive acts or practices alleged herein, Minnesota Plaintiff and other members of the Minnesota Sub-Class suffered and will continue to suffer actual damages and are entitled to recover actual damages to the extent permitted by law, including class action rules, in an amount to be proven at trial. In addition, Minnesota Plaintiff and the putative Class seek equitable and injunctive relief against Ford on terms that the Court considers reasonable, and reasonable attorneys' fees.

1   1002. Minnesota Plaintiff provided notice of their claims by letter dated May 19, 2021.

2   1003. Pursuant to Minn. Stat. § 8.31(3a), Minnesota Plaintiff and the Minnesota Sub-Class

3   Members seek damages in an amount to be proven at trial, including but not limited to actual

4   damages and attorneys' fees, under the Minnesota CFA.

5   1004. Minnesota Plaintiff and the Minnesota Sub-Class Members also seek punitive

6   damages under Minn. Stat. § 549.20(1)(a) given the clear and convincing evidence that GM's acts

7   show deliberate disregard for the rights or safety of others.

8   **THIRTY-SIXTH CAUSE OF ACTION**
**Breach of Express Warranty**
9   **(Minn. Stat. §§ 336.2-313 and 336.2A-210)**
**(On behalf of the Minnesota Sub-Class)**
10

11   1005. Plaintiffs incorporate by reference each allegation set forth in paragraphs 1-274,

12   above.

13   1006. Minnesota Plaintiff brings this cause of action individually and on behalf of the

14   members of the Minnesota Sub-Class.

15   1007. Ford is and was at all relevant times a "merchant" with respect to motor vehicles under

16   Minn. Stat. §§ 336.2-104(1) and a "seller" of motor vehicles under § 336.2-103(1)(d).

17   1008. With respect to leases, Ford is and was at all relevant times a "lessor" of motor

18   vehicles under Minn. Stat. § 336.2A-103(1)(p).

19   1009. The Class Vehicles are and were at all relevant times "goods" within the meaning of

20   Minn. Stat. §§ 336.2-105(1) and 336.2A-103(1)(h).

21   1010. Ford provided all purchasers and lessees of the Class Vehicles with the express

22   warranty described herein, which became a material part of the bargain.

23   1011. Ford provided all purchasers and lessees of Lincoln-branded Class Vehicles with the

24   Lincoln Warranty and all purchasers and lessees of Ford or Ford-branded Class Vehicles with the

25   Ford/Ford Warranty.

26   1012. Ford sold and leased the Class Vehicles with a written express warranty covering the

27   Vehicles for three years or 36,000 miles, whichever comes first.

28   1013. Ford's New Vehicle Limited Warranty expressly states that Ford will "without charge,

165

repair, replace, or adjust all parts on your vehicle that malfunction or fail during normal use during the applicable coverage period due to a manufacturing defect in factory-supplied materials or factory workmanship" so long the Vehicle is properly operated and maintained and taken to a Ford dealership for repair within the warranty period.

1014. Ford further provides powertrain warranty coverage, which is applicable to "the Engine: all internal lubricated parts, cylinder block, cylinder heads, electrical fuel pump, powertrain control module, engine mounts, flywheel, injection pump, manifold (exhaust and intake), manifold bolts, oil pan, oil pump, seals and gaskets, engine thermostat, engine, thermostat housing, timing chain cover, timing chain (gears or belt), turbocharger/supercharger unit, valve covers, water pump" as well as the components in the transmission, front-wheel drive, rear-wheel drive, and four-wheel/all-wheel drive. This coverage applies for 5-years or up to 60,000 miles, whichever comes first.

1015. For certified pre-owned ("CPO") Vehicles, Ford offers a limited warranty covering CPO Vehicles for 12 months or 12,000 miles, whichever comes first.

1016. Ford's CPO Vehicle warranty states that a dealer will replace "all covered components . . . that are found to be defective in factory-supplied materials or workmanship during the applicable warranty periods." The engine and its components—including the cylinder block and cylinder heads—are included in Ford's list of "covered components."

1017. Ford manufactured and/or installed the engines and the engines' component parts in the Class Vehicles, and the engines and their component parts are covered by the express Warranties.

1018. The Engine Defect at issue in this litigation was present at the time the Class Vehicles were sold or leased to Minnesota Plaintiff and the Minnesota Sub-Class Members.

1019. Plaintiff relied on Ford's express warranties, which were a material part of the bargain, when purchasing or leasing their Class Vehicles.

1020. Under the express Warranties, Ford was obligated to correct the Engine Defect in the vehicles owned or leased by Minnesota Plaintiff and the Minnesota Sub-Class Members.

1021. Although Ford was obligated to correct the Engine Defect, none of the attempted fixes

to the engines are adequate under the terms of the Warranties, as they did not cure the defect.

1022. Ford breached the express Warranties by performing illusory repairs. Rather than repairing the vehicles pursuant to the express Warranties, Ford falsely informed Minnesota Sub-Class Members that there was no problem with their Class Vehicles, performed ineffective procedures including software updates, and/or replaced defective components in the engines with equally defective components, without actually repairing the Class Vehicles.

1023. Ford and its agent dealers have failed and refused to conform the engines to the express Warranties. Ford's conduct, as discussed throughout this Complaint, has voided any attempt on its part to disclaim liability for its actions.

1024. Moreover, Ford's attempt to disclaim or limit these express Warranties vis-à-vis consumers is unconscionable and unenforceable under the circumstances here. Specifically, Ford's warranty limitation is unenforceable because it knowingly sold a defective product without informing consumers about the defect.

1025. The time limits contained in Ford's warranty period were also unconscionable and inadequate to protect Minnesota Plaintiff and the Minnesota Sub-Class Members. Among other things, Minnesota Plaintiff and the Minnesota Sub-Class Members had no meaningful choice in determining these time limitations, the terms of which unreasonably favored Ford. A gross disparity in bargaining power existed between Ford and the Class members, and Ford knew or should have known that the Class Vehicles were defective at the time of sale.

1026. Minnesota Plaintiff and the Minnesota Sub-Class Members have complied with all obligations under the Warranties, or otherwise have been excused from performance of said obligations as a result of Ford's conduct described herein.

1027. Minnesota Plaintiff and the Minnesota Sub-Class Members were not required to notify Ford of the breach because affording Ford a reasonable opportunity to cure its breach of written warranty would have been futile. Ford was also on notice of the Engine Defect from the complaints and service requests it received from Plaintiff and the Class Members, from repairs and/or replacements of the engines or components thereof, and through other internal and external sources.

1028. Because Ford, through its conduct and exemplified by its own service bulletins, has covered repairs of the Engine Defect if Ford determines the repairs are appropriately covered under the Warranties, Ford cannot now deny that the Warranties cover the Engine Defect.

1029. Because Ford has not been able remedy the Engine Defect, any limitation on remedies included in the Warranties causes the Warranties to fail their essential purposes, rendering them null and void.

1030. As a direct and proximate cause of Ford's breach, Minnesota Plaintiff and the Minnesota Sub-Class Members suffered damages and continue to suffer damages, including economic damages at the point of sale or lease and diminution of value of their Class Vehicles. Additionally, Minnesota Plaintiff and the Minnesota Sub-Class Members have incurred or will incur economic damages at the point of repair in the form of the cost of repair.

1031. As a direct and proximate result of Ford's breach of express warranties, Minnesota Plaintiff and the Minnesota Sub-Class Members have been damaged in an amount to be determined at trial.

### THIRTY-SEVENTH CAUSE OF ACTION
**Breach of the Implied Warranty of Merchantability**
**(Minn. Stat. §§ 336.2-314 and 336.2A-212)**
**(On behalf of the Minnesota Sub-Class)**

1032. Plaintiffs incorporate by reference each allegation set forth in paragraphs 1-274, above.

1033. Minnesota Plaintiff brings this cause of action individually and on behalf of the members of the Minnesota Sub-Class.

1034. Ford is and was at all relevant times a "merchant" with respect to motor vehicles under Minn. Stat. §§ 336.2-104(1) and a "seller" of motor vehicles under § 336.2-103(1)(d).

1035. With respect to leases, Ford is and was at all relevant times a "lessor" of motor vehicles under Minn. Stat. § 336.2A-103(1)(p).

1036. The Class Vehicles are and were at all relevant times "goods" within the meaning of Minn. Stat. §§ 336.2-105(1) and 336.2A-103(1)(h).

1037. A warranty that the Class Vehicles were in merchantable condition and fit for the

ordinary purpose for which vehicles are used is implied by law under Minn. Stat. §§ 336.2-314 and 336.2A-212.

1038. Ford knew or had reason to know of the specific use for which the Class Vehicles were purchased or leased. Ford directly sold and marketed vehicles equipped with the engines to customers through authorized dealers, like those from whom Minnesota Plaintiff and the Minnesota Sub-Class Members bought or leased their vehicles, for the intended purpose of consumers purchasing the vehicles. Ford knew that the Class Vehicles would and did pass unchanged from the authorized dealers to Minnesota Plaintiff and the Minnesota Sub-Class Members, with no modification to the defective engines.

1039. Ford provided Plaintiff and Class Members with an implied warranty that the Class Vehicles and their components and parts are merchantable and fit for the ordinary purposes for which they were sold.

1040. This implied warranty included, among other things: (i) a warranty that the Class Vehicles and their engines that were manufactured, supplied, distributed, and/or sold by Ford were safe and reliable for providing transportation; and (ii) a warranty that the Class Vehicles and their engines would be fit for their intended use while the Class Vehicles were being operated.

1041. Contrary to the applicable implied warranties, the Class Vehicles and their engines at the time of sale and thereafter were not fit for their ordinary and intended purpose of providing Plaintiff and Class Members with reliable, durable, and safe transportation. Instead, the Class Vehicles are defective, including, but not limited to, the defective design and manufacture of their engines and the existence of the Engine Defect at the time of sale or lease and thereafter. Ford knew of this defect at the time these sale or lease transactions occurred.

1042. As a result of Ford's breach of the applicable implied warranties, Minnesota Plaintiff and the Minnesota Sub-Class Members of the Class Vehicles suffered an ascertainable loss of money, property, and/or value of their Class Vehicles. Additionally, as a result of the Engine Defect, Minnesota Plaintiff and the Minnesota Sub-Class Members were harmed and suffered actual damages in that the Class Vehicles' engine components are substantially certain to fail before their expected useful life has run.

1043. Ford's actions, as complained of herein, breached the implied warranty that the Class Vehicles were of merchantable quality and fit for such use in violation of Minn. Stat. §§ 336.2-314 and 336.2A-212.

1044. Minnesota Plaintiff and the Minnesota Sub-Class Members have complied with all obligations under the warranty, or otherwise have been excused from performance of said obligations as a result of Ford's conduct described herein.

1045. Minnesota Plaintiff and the Minnesota Sub-Class Members were not required to notify Ford of the breach because affording Ford a reasonable opportunity to cure its breach of written warranty would have been futile. Ford was also on notice of the Engine Defect from the complaints and service requests it received from Plaintiff and the Class Members, from repairs and/or replacements of the engines or components thereof, and through other internal sources.

1046. In addition, on or about May 19, 2021 Minnesota Plaintiff gave notice to Defendant that they intended to pursue her warranty claims on behalf of a class of similarly situated consumers.

1047. Because Minnesota Plaintiff purchased his vehicle from an authorized Ford dealer, she is in privity with Ford since (1) an agency relationship establishes privity for purposes of the breach of implied warranty claims and (2) privity is not required where plaintiffs are intended third-party beneficiaries of a defendant's implied warranties.

1048. As a direct and proximate cause of Ford's breach, Minnesota Plaintiff and the Minnesota Sub-Class Members suffered damages and continue to suffer damages, including economic damages at the point of sale or lease and diminution of value of their Class Vehicles. Additionally, Minnesota Plaintiff and the Minnesota Sub-Class Members have incurred or will incur economic damages at the point of repair in the form of the cost of repair.

1049. As a direct and proximate result of Ford's breach of the implied warranty of merchantability, Minnesota Plaintiff and the Minnesota Sub-Class Members have been damaged in an amount to be proven at trial.

/ / /

/ / /

/ / /

**THIRTY-EIGHTH CAUSE OF ACTION**
**Violation of the New Jersey Consumer Fraud Act**
**(N.J. Stat. Ann. §§ 56:8-1, et seq.)**
**(On behalf of the New Jersey Sub-Class)**

1050. Plaintiffs incorporate by reference each allegation set forth in paragraphs 1-274, above.

1051. Plaintiff David Schiavi ("New Jersey Plaintiff") brings this cause of action on his own behalf and on behalf of the members of the New Jersey Sub-Class.

1052. Ford, New Jersey Plaintiff, and the New Jersey Sub-Class Members "persons" within the meaning of the New Jersey Consumer Fraud Act ("New Jersey CFA"), N.J. Stat. Ann. § 56:8-1(d).

1053. Ford engaged in "sales" of "merchandise" within the meaning of N.J. Stat. Ann. § 56:8-1(c), (d).

1054. The New Jersey CFA makes unlawful "[t]he act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentations, or the knowing concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby…" N.J. Stat. Ann. § 56:8-2. Ford engaged in unfair and deceptive practices that violated the New Jersey CFA as described above.

1055. Ford participated in and engaged in deceptive business or trade practices prohibited by the New Jersey CFA by failing to disclose and actively concealing that the Class Vehicles contained the Engine Defect, by marketing their Class Vehicles as safe and of high quality, and by presenting themselves as a reputable manufacturer that valued safety and stood behind its vehicles after they were sold.

1056. By failing to disclose the Engine Defect; by concealing the Engine Defect; by promoting and selling or leasing Class Vehicles it knew were defective, including by marketing its vehicles as safe, reliable, easily operable, efficient, and of high quality; by presenting itself as a reputable manufacturer that valued safety, reliability, performance and efficiency, and stood behind

171

its vehicles after they were sold; by failing to make repairs or making repairs and providing replacements that caused New Jersey Plaintiff and the New Jersey Sub-Class Members to experience repeated instances of failure, rendering the New Vehicle Limited Warranty useless; and by minimized the scope and severity of the problems with the Class Vehicles, refusing to acknowledge that they are defective, and failing to provide adequate relief to consumers, Ford knowingly and intentionally misrepresented and omitted material facts in connection with the sale or lease of the Class Vehicles.

1057. Ford systematically misrepresented, concealed, suppressed, or omitted material facts relating to the Class Vehicles and Engine Defect in the course of its business.

1058. Ford also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Class Vehicles.

1059. Ford's unfair and deceptive acts or practices occurred repeatedly in Ford's trade or business, were capable of deceiving a substantial portion of the purchasing public, and imposed a serious safety risk on the public.

1060. Ford knew that the Class Vehicles and their engines suffered from an inherent defect, were defectively designed or manufactured, and were not suitable for their intended use.

1061. Ford knew or should have known that its conduct violated the New Jersey CFA.

1062. New Jersey Plaintiff and the New Jersey Sub-Class Members reasonably relied on Ford's misrepresentations and omissions of material facts in its advertisements of the Class Vehicles and in the purchase of the Class Vehicles.

1063. Had New Jersey Plaintiff and the New Jersey Sub-Class Members known that the Class Vehicles would exhibit the Engine Defect, they would not have purchased or leased the Class Vehicles or would have paid less for them. Plaintiff did not receive the benefit of their bargain as a result of Ford's misconduct.

1064. Ford owed New Jersey Plaintiff and the New Jersey Sub-Class Members a duty to disclose the truth about the Engine Defect because Ford:

a.   possessed exclusive and superior knowledge of the design of the Class Vehicles and the Engine Defect;

b.   intentionally concealed the foregoing from New Jersey Plaintiff and the New Jersey Sub-Class Members; and/or

c.   made incomplete representations regarding the quality and durability of the Class Vehicles, while purposefully withholding material facts from New Jersey Plaintiff and the New Jersey Sub-Class Members that contradicted these representations.

1065. Due to Ford's specific and superior knowledge that the Engines in the Class Vehicles will fail due to the Engine Defect, its false representations regarding the increased durability of the Class Vehicles, and reliance by New Jersey Plaintiff and the New Jersey Sub-Class Members on these material representations, Ford had a duty to disclose to Class members that the Engine Defect will cause engine failure in Class Vehicles, that Class Vehicles do not have the expected durability, reliability, and/or safety over other vehicles or of their predecessor engines, that failure of the Engines will cause damage to Class Vehicle, and that Class members would be required to bear the cost of the damage to their vehicles. Having volunteered to provide information to New Jersey Plaintiff and the New Jersey Sub-Class Members, Ford had the duty to disclose not just the partial truth, but the entire truth. These omitted and concealed facts were material because they directly impact the value of the Class Vehicles purchased or leased by New Jersey Plaintiff and the New Jersey Sub-Class Members. Longevity, durability, performance, and safety are material concerns to Ford consumers. Ford represented to New Jersey Plaintiff and the New Jersey Sub-Class Members that they were purchasing or leasing vehicles that were durable, reliable, safe, efficient, of high quality, and containing engines of advanced and superior characteristics and technology as alleged throughout this Complaint, when in fact it is only a matter of time before the engines fail due to the Engine Defect.

1066. New Jersey Plaintiff and the New Jersey Sub-Class Members suffered injury in fact to a legally protected interest. As a result of Ford's conduct, New Jersey Plaintiff and the New Jersey Sub-Class Members were harmed and suffered actual damages in the form of the costs of diagnosis and repair of their vehicles, and the diminished value of their vehicles.

1067. As a direct and proximate result of Ford's unfair or deceptive acts or practices, New Jersey Plaintiff and the New Jersey Sub-Class Members suffered and will continue to suffer injury in fact and/or actual damages.

1068. Defendant's violations present a continuing risk to New Jersey Plaintiff and the New Jersey Sub-Class Members as well as to the general public. Defendant's unlawful acts and practices complained of herein affect the public interest.

1069. As a proximate and direct result of Ford's unfair and deceptive trade practices, New Jersey Plaintiff and members of the New Jersey Sub-Class purchased or leased Class Vehicles and suffered an ascertainable loss and financial harm. This included ascertainable losses in the form of actual damages in the amount of the cost to attempt to repair the Engine Defect, replaced the damaged related system components, diminution of Class Vehicle resale value, increased repair and maintenance costs, and other substantial monetary damages and inconvenience.

1070. Pursuant to N.J. Stat. Ann. § 56:8-19, New Jersey Plaintiff and the New Jersey Sub-Class Members seek an order enjoining Ford's unlawful conduct, actual damages, treble damages, attorneys' fees, costs, and any other just and proper relief available under the New Jersey CFA.

## THIRTY-NINTH CAUSE OF ACTION
### Breach of Express Warranty
### (N.J. Stat. Ann. §§ 12A:2-313 and 2A-210)
### (On behalf of the New Jersey Sub-Class)

1071. Plaintiffs incorporate by reference each allegation set forth in paragraphs 1-274, above.

1072. New Jersey Plaintiff bring this cause of action on his own behalf and on behalf of the members of the New Jersey Sub-Class.

1073. Ford is and was at all relevant times a "merchant" with respect to motor vehicles under N.J. Stat. Ann. § 12A:2-104(1) and a "seller" of motor vehicles under § 2-103(1)(d).

1074. With respect to leases, Ford is and was at all relevant times a "lessor" of motor vehicles under N.J. Stat. Ann.§ 12A:2A-103(1)(p).

1075. The Class Vehicles are and were at all relevant times "goods" within the meaning of N.J. Stat. Ann.§§ 12A:2-105(1) and 2A-103(1)(h).

1076. Ford provided all purchasers and lessees of the Class Vehicles with the express warranty described herein, which became a material part of the bargain.

1077. Ford provided all purchasers and lessees of Lincoln-branded Class Vehicles with the Lincoln Warranty and all purchasers and lessees of Ford or Ford-branded Class Vehicles with the Ford/Ford Warranty.

1078. Ford sold and leased the Class Vehicles with a written express warranty covering the Vehicles for three years or 36,000 miles, whichever comes first.

1079. Ford's New Vehicle Limited Warranty expressly states that Ford will "without charge, repair, replace, or adjust all parts on your vehicle that malfunction or fail during normal use during the applicable coverage period due to a manufacturing defect in factory-supplied materials or factory workmanship" so long the Vehicle is properly operated and maintained and taken to a Ford dealership for repair within the warranty period.

1080. Ford further provides powertrain warranty coverage, which is applicable to "the Engine: all internal lubricated parts, cylinder block, cylinder heads, electrical fuel pump, powertrain control module, engine mounts, flywheel, injection pump, manifold (exhaust and intake), manifold bolts, oil pan, oil pump, seals and gaskets, engine thermostat, engine, thermostat housing, timing chain cover, timing chain (gears or belt), turbocharger/supercharger unit, valve covers, water pump" as well as the components in the transmission, front-wheel drive, rear-wheel drive, and four-wheel/all-wheel drive. This coverage applies for 5-years or up to 60,000 miles, whichever comes first.

1081. For certified pre-owned ("CPO") Vehicles, Ford offers a limited warranty covering CPO Vehicles for 12 months or 12,000 miles, whichever comes first.

1082. Ford's CPO Vehicle warranty states that a dealer will replace "all covered components . . . that are found to be defective in factory-supplied materials or workmanship during the applicable warranty periods." The engine and its components—including the cylinder block and cylinder heads—are included in Ford's list of "covered components."

1083. Ford manufactured and/or installed the engines and the engines' component parts in the Class Vehicles, and the engines and their component parts are covered by the express

Warranties.

1084. The Engine Defect at issue in this litigation was present at the time the Class Vehicles were sold or leased to New Jersey Plaintiff and the New Jersey Sub-Class Members.

1085. Plaintiffs relied on Ford's express warranties, which were a material part of the bargain, when purchasing or leasing their Class Vehicles.

1086. Under the express Warranties, Ford was obligated to correct the Engine Defect in the vehicles owned or leased by New Jersey Plaintiff and the New Jersey Sub-Class Members.

1087. Although Ford was obligated to correct the Engine Defect, none of the attempted fixes to the engines are adequate under the terms of the Warranties, as they did not cure the defect.

1088. Ford breached the express Warranties by performing illusory repairs. Rather than repairing the vehicles pursuant to the express Warranties, Ford falsely informed New Jersey Sub-Class Members that there was no problem with their Class Vehicles, performed ineffective procedures including software updates, and/or replaced defective components in the engines with equally defective components, without actually repairing the Class Vehicles.

1089. Ford and its agent dealers have failed and refused to conform the engines to the express Warranties. Ford's conduct, as discussed throughout this Complaint, has voided any attempt on its part to disclaim liability for its actions.

1090. Moreover, Ford's attempt to disclaim or limit these express Warranties vis-à-vis consumers is unconscionable and unenforceable under the circumstances here. Specifically, Ford's warranty limitation is unenforceable because it knowingly sold a defective product without informing consumers about the defect.

1091. The time limits contained in Ford's warranty period were also unconscionable and inadequate to protect New Jersey Plaintiff and the New Jersey Sub-Class Members. Among other things, New Jersey Plaintiff and the New Jersey Sub-Class Members had no meaningful choice in determining these time limitations, the terms of which unreasonably favored Ford. A gross disparity in bargaining power existed between Ford and the Class members, and Ford knew or should have known that the Class Vehicles were defective at the time of sale.

1092. New Jersey Plaintiff and the New Jersey Sub-Class Members have complied with all

obligations under the Warranties, or otherwise have been excused from performance of said obligations as a result of Ford's conduct described herein.

1093. New Jersey Plaintiff and the New Jersey Sub-Class Members were not required to notify Ford of the breach because affording Ford a reasonable opportunity to cure its breach of written warranty would have been futile. Ford was also on notice of the Engine Defect from the complaints and service requests it received from Plaintiffs and the Class Members, from repairs and/or replacements of the engines or components thereof, and through other internal and external sources.

1094. Because Ford, through its conduct and exemplified by its own service bulletins, has covered repairs of the Engine Defect if Ford determines the repairs are appropriately covered under the Warranties, Ford cannot now deny that the Warranties cover the Engine Defect.

1095. Because Ford has not been able remedy the Engine Defect, any limitation on remedies included in the Warranties causes the Warranties to fail their essential purposes, rendering them null and void.

1096. As a direct and proximate cause of Ford's breach, New Jersey Plaintiff and the New Jersey Sub-Class Members suffered damages and continue to suffer damages, including economic damages at the point of sale or lease and diminution of value of their Class Vehicles. Additionally, New Jersey Plaintiff and the New Jersey Sub-Class Members have incurred or will incur economic damages at the point of repair in the form of the cost of repair.

1097. As a direct and proximate result of Ford's breach of express warranties, New Jersey Plaintiff and the New Jersey Sub-Class Members have been damaged in an amount to be determined at trial.

**FORTIETH CAUSE OF ACTION**
**Breach of the Implied Warranty of Merchantability**
**(N.J. Stat. Ann. §§ 12A:2-314 and 2A-212)**
**(On behalf of the New Jersey Sub-Class)**

1098. Plaintiffs incorporate by reference each allegation set forth in paragraphs 1-274, above.

1099. New Jersey Plaintiff bring this cause of action on his own behalf and on behalf of the

177

members of the New Jersey Sub-Class.

1100. Ford is and was at all relevant times a "merchant" with respect to motor vehicles under N.J. Stat. Ann. § 12A:2-104(1) and a "seller" of motor vehicles under § 2-103(1)(d).

1101. With respect to leases, Ford is and was at all relevant times a "lessor" of motor vehicles under N.J. Stat. Ann.§ 12A:2A-103(1)(p).

1102. The Class Vehicles are and were at all relevant times "goods" within the meaning of N.J. Stat. Ann.§§ 12A:2-105(1) and 2A-103(1)(h).

1103. A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law under N.J. Stat. Ann. §§ 12A:2-314 and 2A-212.

1104. Ford knew or had reason to know of the specific use for which the Class Vehicles were purchased or leased. Ford directly sold and marketed vehicles equipped with the engines to customers through authorized dealers, like those from whom New Jersey Plaintiff and the New Jersey Sub-Class Members bought or leased their vehicles, for the intended purpose of consumers purchasing the vehicles. Ford knew that the Class Vehicles would and did pass unchanged from the authorized dealers to New Jersey Plaintiff and the New Jersey Sub-Class Members, with no modification to the defective engines.

1105. Ford provided Plaintiffs and Class Members with an implied warranty that the Class Vehicles and their components and parts are merchantable and fit for the ordinary purposes for which they were sold.

1106. This implied warranty included, among other things: (i) a warranty that the Class Vehicles and their engines that were manufactured, supplied, distributed, and/or sold by Ford were safe and reliable for providing transportation; and (ii) a warranty that the Class Vehicles and their engines would be fit for their intended use while the Class Vehicles were being operated.

1107. Contrary to the applicable implied warranties, the Class Vehicles and their engines at the time of sale and thereafter were not fit for their ordinary and intended purpose of providing Plaintiffs and Class Members with reliable, durable, and safe transportation. Instead, the Class Vehicles are defective, including, but not limited to, the defective design and manufacture of their

engines and the existence of the Engine Defect at the time of sale or lease and thereafter. Ford knew of this defect at the time these sale or lease transactions occurred.

1108. As a result of Ford's breach of the applicable implied warranties, New Jersey Plaintiff and the New Jersey Sub-Class Members of the Class Vehicles suffered an ascertainable loss of money, property, and/or value of their Class Vehicles. Additionally, as a result of the Engine Defect, New Jersey Plaintiff and the New Jersey Sub-Class Members were harmed and suffered actual damages in that the Class Vehicles' engine components are substantially certain to fail before their expected useful life has run.

1109. Ford's actions, as complained of herein, breached the implied warranty that the Class Vehicles were of merchantable quality and fit for such use in violation of N.J. Stat. Ann. §§ 12A:2-314 and 2A-212.

1110. New Jersey Plaintiff and the New Jersey Sub-Class Members have complied with all obligations under the warranty, or otherwise have been excused from performance of said obligations as a result of Ford's conduct described herein.

1111. New Jersey Plaintiff and the New Jersey Sub-Class Members were not required to notify Ford of the breach because affording Ford a reasonable opportunity to cure its breach of written warranty would have been futile. Ford was also on notice of the Engine Defect from the complaints and service requests it received from Plaintiffs and the Class Members, from repairs and/or replacements of the engines or components thereof, and through other internal sources.

1112. As a direct and proximate cause of Ford's breach, New Jersey Plaintiff and the New Jersey Sub-Class Members suffered damages and continue to suffer damages, including economic damages at the point of sale or lease and diminution of value of their Class Vehicles. Additionally, New Jersey Plaintiff and the New Jersey Sub-Class Members have incurred or will incur economic damages at the point of repair in the form of the cost of repair.

1113. As a direct and proximate result of Ford's breach of the implied warranty of merchantability, New Jersey Plaintiff and the New Jersey Sub-Class Members have been damaged in an amount to be proven at trial.

**FORTY-FIRST CAUSE OF ACTION**
**(Violations of the North Carolina Unfair and Deceptive Acts and Practices Act,**
**N.C. Gen. Stat. § 75-1.1, *et seq.*)**
**(On Behalf of the North Carolina Sub-Class)**

1114. Plaintiffs incorporate by reference each allegation set forth in paragraphs 1-274, above.

1115. Plaintiff Robyn Pirog ("North Carolina Plaintiff") brings this cause of action individually and on behalf of the North Carolina Sub-Class.

1116. Ford engaged in "commerce" within the meaning of the North Carolina Unfair and Deceptive Acts and Practices Act ("North Carolina UDTPA"), N.C. Gen. Stat. § 75-1.1(b).

1117. The North Carolina UDTPA broadly prohibits "unfair or deceptive acts or practices in or affecting commerce." N.C. Gen. Stat. § 75-1.1(a). Ford engaged in unfair and deceptive practices that violated the North Carolina UDTPA as described above.

1118. Ford participated in and engaged in deceptive business or trade practices prohibited by the North Carolina UDTPA by failing to disclose and actively concealing that the Class Vehicles contained the Engine Defect, by marketing their Class Vehicles as safe and of high quality, and by presenting themselves as a reputable manufacturer that valued safety and stood behind its vehicles after they were sold.

1119. By failing to disclose the Engine Defect; by concealing the Engine Defect; by promoting and selling or leasing Class Vehicles it knew were defective, including by marketing its vehicles as safe, reliable, easily operable, efficient, and of high quality; by presenting itself as a reputable manufacturer that valued safety, reliability, performance and efficiency, and stood behind its vehicles after they were sold; by failing to make repairs or making repairs and providing replacements that caused North Carolina Plaintiff and the North Carolina Sub-Class Members to experience repeated instances of failure, rendering the New Vehicle Limited Warranty useless; and by minimized the scope and severity of the problems with the Class Vehicles, refusing to acknowledge that they are defective, and failing to provide adequate relief to consumers, Ford knowingly and intentionally misrepresented and omitted material facts in connection with the sale or lease of the Class Vehicles.

1120. Ford systematically misrepresented, concealed, suppressed, or omitted material facts relating to the Class Vehicles and Engine Defect in the course of its business.

1121. Ford also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Class Vehicles.

1122. Ford's unfair and deceptive acts or practices occurred repeatedly in Ford's trade or business, were capable of deceiving a substantial portion of the purchasing public, and imposed a serious safety risk on the public.

1123. Ford knew that the Class Vehicles and their engines suffered from an inherent defect, were defectively designed or manufactured, and were not suitable for their intended use.

1124. Ford knew or should have known that its conduct violated the North Carolina UDTPA.

1125. North Carolina Plaintiff and the North Carolina Sub-Class Members reasonably relied on Ford's misrepresentations and omissions of material facts in its advertisements of the Class Vehicles and in the purchase of the Class Vehicles.

1126. Had North Carolina Plaintiff and the North Carolina Sub-Class Members known that the Class Vehicles would exhibit the Engine Defect, they would not have purchased or leased the Class Vehicles or would have paid less for them. Plaintiff did not receive the benefit of their bargain as a result of Ford's misconduct.

1127. Ford owed North Carolina Plaintiff and the North Carolina Sub-Class Members a duty to disclose the truth about the Engine Defect because Ford:

    a.    possessed exclusive and superior knowledge of the design of the Class Vehicles and the Engine Defect;

    b.    intentionally concealed the foregoing from North Carolina Plaintiff and the North Carolina Sub-Class Members; and/or

    c.    made incomplete representations regarding the quality and durability of the Class Vehicles, while purposefully withholding material facts from North Carolina Plaintiff and the

North Carolina Sub-Class Members that contradicted these representations.

1128. Due to Ford's specific and superior knowledge that the Engines in the Class Vehicles will fail due to the Engine Defect, its false representations regarding the increased durability of the Class Vehicles, and reliance by North Carolina Plaintiff and the North Carolina Sub-Class Members on these material representations, Ford had a duty to disclose to Class members that the Engine Defect will cause engine failure in Class Vehicles, that Class Vehicles do not have the expected durability, reliability, and/or safety over other vehicles or of their predecessor engines, that failure of the Engines will cause damage to Class Vehicle, and that Class members would be required to bear the cost of the damage to their vehicles. Having volunteered to provide information to North Carolina Plaintiff and the North Carolina Sub-Class Members, Ford had the duty to disclose not just the partial truth, but the entire truth. These omitted and concealed facts were material because they directly impact the value of the Class Vehicles purchased or leased by North Carolina Plaintiff and the North Carolina Sub-Class Members. Longevity, durability, performance, and safety are material concerns to Ford consumers. Ford represented to North Carolina Plaintiff and the North Carolina Sub-Class Members that they were purchasing or leasing vehicles that were durable, reliable, safe, efficient, of high quality, and containing engines of advanced and superior characteristics and technology as alleged throughout this Complaint, when in fact it is only a matter of time before the engines fail due to the Engine Defect.

1129. North Carolina Plaintiff and the North Carolina Sub-Class Members suffered injury in fact to a legally protected interest. As a result of Ford's conduct, North Carolina Plaintiff and the North Carolina Sub-Class Members were harmed and suffered actual damages in the form of the costs of diagnosis and repair of their vehicles, and the diminished value of their vehicles.

1130. As a direct and proximate result of Ford's unfair or deceptive acts or practices, North Carolina Plaintiff and the North Carolina Sub-Class Members suffered and will continue to suffer injury in fact and/or actual damages.

1131. Defendant's violations present a continuing risk to North Carolina Plaintiff and the North Carolina Sub-Class Members as well as to the general public. Defendant's unlawful acts and practices complained of herein affect the public interest.

1132. As a proximate and direct result of Ford's unfair and deceptive trade practices, North Carolina Plaintiff and members of the North Carolina Sub-Class purchased or leased Class Vehicles and suffered an ascertainable loss and financial harm. This included ascertainable losses in the form of actual damages in the amount of the cost to attempt to repair the Engine Defect, replaced the damaged related system components, diminution of Class Vehicle resale value, increased repair and maintenance costs, and other substantial monetary damages and inconvenience.

1133. North Carolina Plaintiff provided notice of her claims by letter dated January 26, 2021.

1134. As a direct and proximate result of Ford's unfair or deceptive acts or practices alleged herein, Plaintiff are entitled to recover actual damages to the extent permitted by law, including class action rules, in an amount to be proven at trial. In addition, Plaintiff and the putative Class seek equitable and injunctive relief against Ford on terms that the Court considers reasonable, and reasonable attorneys' fees.

1135. Because Ford's actions and conduct were willful, Plaintiffs seek an order for treble their actual damages, an order enjoining Ford's unlawful acts, court costs, attorneys' fees, and any other just and proper relief available under the North Carolina Act, N.C. Gen. Stat. § 75-16.

**FORTY-SECOND CAUSE OF ACTION**
**Breach of Express Warranty**
**(N.C. Gen. Stat. §§ 26-1-2-313 and 26-1-2.1-210)**
**(On behalf of the North Carolina Sub-Class)**

1136. Plaintiffs incorporate by reference each allegation set forth in paragraphs 1-274, above.

1137. North Carolina Plaintiff brings this cause of action individually and on behalf of the members of the North Carolina Sub-Class.

1138. Ford is and was at all relevant times a "merchant" with respect to motor vehicles under N.C. Gen. Stat. § 25-2-104(1) and a "seller" of motor vehicles under § 25-2-103(1)(d).

1139. With respect to leases, Ford is and was at all relevant times a "lessor" of motor vehicles under N.C. Gen. Stat. § 25-2A-103(1)(p).

1140. The Class Vehicles are and were at all relevant times "goods" within the meaning of

N.C. Gen. Stat. §§ 25-2-105(1) and 25-2A-103(1)(h).

1141. Ford provided all purchasers and lessees of the Class Vehicles with the express warranty described herein, which became a material part of the bargain.

1142. Ford provided all purchasers and lessees of Lincoln-branded Class Vehicles with the Lincoln Warranty and all purchasers and lessees of Ford or Ford-branded Class Vehicles with the Ford/Ford Warranty.

1143. Ford sold and leased the Class Vehicles with a written express warranty covering the Vehicles for three years or 36,000 miles, whichever comes first.

1144. Ford's New Vehicle Limited Warranty expressly states that Ford will "without charge, repair, replace, or adjust all parts on your vehicle that malfunction or fail during normal use during the applicable coverage period due to a manufacturing defect in factory-supplied materials or factory workmanship" so long the Vehicle is properly operated and maintained and taken to a Ford dealership for repair within the warranty period.

1145. Ford further provides powertrain warranty coverage, which is applicable to "the Engine: all internal lubricated parts, cylinder block, cylinder heads, electrical fuel pump, powertrain control module, engine mounts, flywheel, injection pump, manifold (exhaust and intake), manifold bolts, oil pan, oil pump, seals and gaskets, engine thermostat, engine, thermostat housing, timing chain cover, timing chain (gears or belt), turbocharger/supercharger unit, valve covers, water pump" as well as the components in the transmission, front-wheel drive, rear-wheel drive, and four-wheel/all-wheel drive. This coverage applies for 5-years or up to 60,000 miles, whichever comes first.

1146. For certified pre-owned ("CPO") Vehicles, Ford offers a limited warranty covering CPO Vehicles for 12 months or 12,000 miles, whichever comes first.

1147. Ford's CPO Vehicle warranty states that a dealer will replace "all covered components . . . that are found to be defective in factory-supplied materials or workmanship during the applicable warranty periods." The engine and its components—including the cylinder block and cylinder heads—are included in Ford's list of "covered components."

1148. Ford manufactured and/or installed the engines and the engines' component parts in

the Class Vehicles, and the engines and their component parts are covered by the express Warranties.

1149. The Engine Defect at issue in this litigation was present at the time the Class Vehicles were sold or leased to North Carolina Plaintiff and the North Carolina Sub-Class Members.

1150. Plaintiff relied on Ford's express warranties, which were a material part of the bargain, when purchasing or leasing their Class Vehicles.

1151. Under the express Warranties, Ford was obligated to correct the Engine Defect in the vehicles owned or leased by North Carolina Plaintiff and the North Carolina Sub-Class Members.

1152. Although Ford was obligated to correct the Engine Defect, none of the attempted fixes to the engines are adequate under the terms of the Warranties, as they did not cure the defect.

1153. Ford breached the express Warranties by performing illusory repairs. Rather than repairing the vehicles pursuant to the express Warranties, Ford falsely informed North Carolina Sub-Class Members that there was no problem with their Class Vehicles, performed ineffective procedures including software updates, and/or replaced defective components in the  engines with equally defective components, without actually repairing the Class Vehicles.

1154. Ford and its agent dealers have failed and refused to conform the engines to the express Warranties. Ford's conduct, as discussed throughout this Complaint, has voided any attempt on its part to disclaim liability for its actions.

1155. Moreover, Ford's attempt to disclaim or limit these express Warranties vis-à-vis consumers is unconscionable and unenforceable under the circumstances here. Specifically, Ford's warranty limitation is unenforceable because it knowingly sold a defective product without informing consumers about the defect.

1156. The time limits contained in Ford's warranty period were also unconscionable and inadequate to protect North Carolina Plaintiff and the North Carolina Sub-Class Members. Among other things, North Carolina Plaintiff and the North Carolina Sub-Class Members had no meaningful choice in determining these time limitations, the terms of which unreasonably favored Ford. A gross disparity in bargaining power existed between Ford and the Class members, and Ford knew or should have known that the Class Vehicles were defective at the time of sale.

1157. North Carolina Plaintiff and the North Carolina Sub-Class Members have complied with all obligations under the Warranties, or otherwise have been excused from performance of said obligations as a result of Ford's conduct described herein.

1158. North Carolina Plaintiff and the North Carolina Sub-Class Members were not required to notify Ford of the breach because affording Ford a reasonable opportunity to cure its breach of written warranty would have been futile. Ford was also on notice of the Engine Defect from the complaints and service requests it received from Plaintiff and the Class Members, from repairs and/or replacements of the engines or components thereof, and through other internal and external sources.

1159. Because Ford, through its conduct and exemplified by its own service bulletins, has covered repairs of the Engine Defect if Ford determines the repairs are appropriately covered under the Warranties, Ford cannot now deny that the Warranties cover the Engine Defect.

1160. Because Ford has not been able remedy the Engine Defect, any limitation on remedies included in the Warranties causes the Warranties to fail their essential purposes, rendering them null and void.

1161. As a direct and proximate cause of Ford's breach, North Carolina Plaintiff and the North Carolina Sub-Class Members suffered damages and continue to suffer damages, including economic damages at the point of sale or lease and diminution of value of their Class Vehicles. Additionally, North Carolina Plaintiff and the North Carolina Sub-Class Members have incurred or will incur economic damages at the point of repair in the form of the cost of repair.

1162. As a direct and proximate result of Ford's breach of express warranties, North Carolina Plaintiff and the North Carolina Sub-Class Members have been damaged in an amount to be determined at trial.

### FORTY-THIRD CAUSE OF ACTION
**Breach of the Implied Warranty of Merchantability**
**(N.C. Gen. Stat. §§ 26-1-2-314 and 26-1-2.1-212)**
**(On behalf of the North Carolina Sub-Class)**

1163. Plaintiffs incorporate by reference each allegation set forth in paragraphs 1-274, above.

1164. North Carolina Plaintiff brings this cause of action individually and on behalf of the members of the North Carolina Sub-Class.

1165. Ford is and was at all relevant times a "merchant" with respect to motor vehicles under N.C. Gen. Stat. § 25-2-104(1) and a "seller" of motor vehicles under § 25-2-103(1)(d).

1166. With respect to leases, Ford is and was at all relevant times a "lessor" of motor vehicles under N.C. Gen. Stat. § 25-2A-103(1)(p).

1167. The Class Vehicles are and were at all relevant times "goods" within the meaning of N.C. Gen. Stat. §§ 25-2-105(1) and 25-2A-103(1)(h).

1168. A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law under N.C. Gen. Stat. §§ 25-2-314 and 252A-212.

1169. Ford knew or had reason to know of the specific use for which the Class Vehicles were purchased or leased. Ford directly sold and marketed vehicles equipped with the engines to customers through authorized dealers, like those from whom North Carolina Plaintiff and the North Carolina Sub-Class Members bought or leased their vehicles, for the intended purpose of consumers purchasing the vehicles. Ford knew that the Class Vehicles would and did pass unchanged from the authorized dealers to North Carolina Plaintiff and the North Carolina Sub-Class Members, with no modification to the defective engines.

1170. Ford provided Plaintiff and Class Members with an implied warranty that the Class Vehicles and their components and parts are merchantable and fit for the ordinary purposes for which they were sold.

1171. This implied warranty included, among other things: (i) a warranty that the Class Vehicles and their engines that were manufactured, supplied, distributed, and/or sold by Ford were safe and reliable for providing transportation; and (ii) a warranty that the Class Vehicles and their engines would be fit for their intended use while the Class Vehicles were being operated.

1172. Contrary to the applicable implied warranties, the Class Vehicles and their engines at the time of sale and thereafter were not fit for their ordinary and intended purpose of providing Plaintiff and Class Members with reliable, durable, and safe transportation. Instead, the Class

Vehicles are defective, including, but not limited to, the defective design and manufacture of their engines and the existence of the Engine Defect at the time of sale or lease and thereafter. Ford knew of this defect at the time these sale or lease transactions occurred.

1173. As a result of Ford's breach of the applicable implied warranties, North Carolina Plaintiff and the North Carolina Sub-Class Members of the Class Vehicles suffered an ascertainable loss of money, property, and/or value of their Class Vehicles. Additionally, as a result of the Engine Defect, North Carolina Plaintiff and the North Carolina Sub-Class Members were harmed and suffered actual damages in that the Class Vehicles' engine components are substantially certain to fail before their expected useful life has run.

1174. Ford's actions, as complained of herein, breached the implied warranty that the Class Vehicles were of merchantable quality and fit for such use in violation of N.C. Gen. Stat. §§ 25-2-314 and 252A-212.

1175. North Carolina Plaintiff and the North Carolina Sub-Class Members have complied with all obligations under the warranty, or otherwise have been excused from performance of said obligations as a result of Ford's conduct described herein.

1176. North Carolina Plaintiff and the North Carolina Sub-Class Members were not required to notify Ford of the breach because affording Ford a reasonable opportunity to cure its breach of written warranty would have been futile. Ford was also on notice of the Engine Defect from the complaints and service requests it received from Plaintiff and the Class Members, from repairs and/or replacements of the engines or components thereof, and through other internal sources.

1177. In addition, on or about January 26, 2021, North Carolina Plaintiff gave notice to Defendant that they intended to pursue her warranty claims on behalf of a class of similarly situated consumers.

1178. Because North Carolina Plaintiff purchased her vehicle from an authorized Ford dealer, she is in privity with Ford since (1) an agency relationship establishes privity for purposes of the breach of implied warranty claims and (2) privity is not required where plaintiffs are intended third-party beneficiaries of a defendant's implied warranties.

1179. As a direct and proximate cause of Ford's breach, North Carolina Plaintiff and the

North Carolina Sub-Class Members suffered damages and continue to suffer damages, including economic damages at the point of sale or lease and diminution of value of their Class Vehicles. Additionally, North Carolina Plaintiff and the North Carolina Sub-Class Members have incurred or will incur economic damages at the point of repair in the form of the cost of repair.

1180. As a direct and proximate result of Ford's breach of the implied warranty of merchantability, North Carolina Plaintiff and the North Carolina Sub-Class Members have been damaged in an amount to be proven at trial.

**FORTY-FOURTH CAUSE OF ACTION**
**(Violations of the Washington Consumer Protection Act,**
**WASH REV. CODE § 19.86.010, *et seq*.)**
**(On Behalf of the Washington Sub-Class)**

1181. Plaintiffs incorporate by reference each allegation set forth in paragraphs 1-274, above.

1182. Plaintiffs Zachary Scott Damm and Amanda Gates ("Washington Plaintiffs") bring this cause of action individually and on behalf of the Washington Sub-Class.

1183. Ford, Washington Plaintiffs and Washington Sub-Class Members are "persons" within the meaning of Wash. Rev. Code § 19.86.010(2).

1184. Ford committed the acts complained of herein in the course of "trade" or "commerce" within the meaning of Wash. Rev. Code § 19.96.010.

1185. The Washington Consumer Protection Act ("Washington CPA") broadly prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Wash. Rev. Code § 19.86.020. Ford engaged in unfair and deceptive acts and practices that violated the Washington CPA as described above.

1186. Ford participated in and engaged in deceptive business or trade practices prohibited by the Washington CPA by failing to disclose and actively concealing that the Class Vehicles contained the Engine Defect, by marketing their Class Vehicles as safe and of high quality, and by presenting themselves as a reputable manufacturer that valued safety and stood behind its vehicles after they were sold.

1187. By failing to disclose the Engine Defect; by concealing the Engine Defect; by

promoting and selling or leasing Class Vehicles it knew were defective, including by marketing its vehicles as safe, reliable, easily operable, efficient, and of high quality; by presenting itself as a reputable manufacturer that valued safety, reliability, performance and efficiency, and stood behind its vehicles after they were sold; by failing to make repairs or making repairs and providing replacements that caused Washington Plaintiffs and the Washington Sub-Class Members to experience repeated instances of failure, rendering the New Vehicle Limited Warranty useless; and by minimized the scope and severity of the problems with the Class Vehicles, refusing to acknowledge that they are defective, and failing to provide adequate relief to consumers, Ford knowingly and intentionally misrepresented and omitted material facts in connection with the sale or lease of the Class Vehicles.

1188. Ford systematically misrepresented, concealed, suppressed, or omitted material facts relating to the Class Vehicles and Engine Defect in the course of its business.

1189. Ford also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Class Vehicles.

1190. Ford's unfair and deceptive acts or practices occurred repeatedly in Ford's trade or business, were capable of deceiving a substantial portion of the purchasing public, and imposed a serious safety risk on the public.

1191. Ford knew that the Class Vehicles and their engines suffered from an inherent defect, were defectively designed or manufactured, and were not suitable for their intended use.

1192. Ford knew or should have known that its conduct violated the Washington CPA.

1193. Washington Plaintiffs and the Washington Sub-Class Members reasonably relied on Ford's misrepresentations and omissions of material facts in its advertisements of the Class Vehicles and in the purchase of the Class Vehicles.

1194. Had Washington Plaintiffs and the Washington Sub-Class Members known that the Class Vehicles would exhibit the Engine Defect, they would not have purchased or leased the Class Vehicles or would have paid less for them. Plaintiff did not receive the benefit of their bargain as a

190

result of Ford's misconduct.

1195. Ford owed Washington Plaintiffs and the Washington Sub-Class Members a duty to disclose the truth about the Engine Defect because Ford:

a.    possessed exclusive and superior knowledge of the design of the Class Vehicles and the Engine Defect;

b.    intentionally concealed the foregoing from Washington Plaintiffs and the Washington Sub-Class Members; and/or

c.    made incomplete representations regarding the quality and durability of the Class Vehicles, while purposefully withholding material facts from Washington Plaintiffs and the Washington Sub-Class Members that contradicted these representations.

1196. Due to Ford's specific and superior knowledge that the Engines in the Class Vehicles will fail due to the Engine Defect, its false representations regarding the increased durability of the Class Vehicles, and reliance by Washington Plaintiffs and the Washington Sub-Class Members on these material representations, Ford had a duty to disclose to Class members that the Engine Defect will cause engine failure in Class Vehicles, that Class Vehicles do not have the expected durability, reliability, and/or safety over other vehicles or of their predecessor engines, that failure of the Engines will cause damage to Class Vehicle, and that Class members would be required to bear the cost of the damage to their vehicles. Having volunteered to provide information to Washington Plaintiffs and the Washington Sub-Class Members, Ford had the duty to disclose not just the partial truth, but the entire truth. These omitted and concealed facts were material because they directly impact the value of the Class Vehicles purchased or leased by Washington Plaintiffs and the Washington Sub-Class Members. Longevity, durability, performance, and safety are material concerns to Ford consumers. Ford represented to Washington Plaintiffs and the Washington Sub-Class Members that they were purchasing or leasing vehicles that were durable, reliable, safe, efficient, of high quality, and containing engines of advanced and superior characteristics and technology as alleged throughout this Complaint, when in fact it is only a matter of time before the engines fail due to the Engine Defect.

1197. Washington Plaintiffs and the Washington Sub-Class Members suffered injury in fact

to a legally protected interest. As a result of Ford's conduct, Washington Plaintiffs and the Washington Sub-Class Members were harmed and suffered actual damages in the form of the costs of diagnosis and repair of their vehicles, and the diminished value of their vehicles.

1198. As a direct and proximate result of Ford's unfair or deceptive acts or practices, Washington Plaintiffs and the Washington Sub-Class Members suffered and will continue to suffer injury in fact and/or actual damages.

1199. Defendant's violations present a continuing risk to Washington Plaintiffs and the Washington Sub-Class Members as well as to the general public. Defendant's unlawful acts and practices complained of herein affect the public interest.

1200. As a proximate and direct result of Ford's unfair and deceptive trade practices, Washington Plaintiffs and members of the Washington Sub-Class purchased or leased Class Vehicles and suffered an ascertainable loss and financial harm. This included ascertainable losses in the form of actual damages in the amount of the cost to attempt to repair the Engine Defect, replaced the damaged related system components, diminution of Class Vehicle resale value, increased repair and maintenance costs, and other substantial monetary damages and inconvenience.

1201.  Ford is liable to Washington Plaintiffs and the Washington Sub-Class for damages in amounts to be proven at trial, including punitive damages, attorneys' fees, costs, and any other remedies the Court may deem appropriate under Wash. Rev. Code § 19.86.090. Because Ford's actions were willful and knowing, Plaintiffs' damages should be trebled.

**FORTY-FIFTH CAUSE OF ACTION**
**Breach of Express Warranty**
**(Wash. Rev. Code §§ 62A.2-313 and 62A.2A-210)**
**(On behalf of the Washington Sub-Class)**

1202. Plaintiffs incorporate by reference each allegation set forth in paragraphs 1-274, above.

1203. Washington Plaintiffs bring this cause of action individually and on behalf of the members of the Washington Sub-Class.

1204. Ford is and was at all relevant times a "merchant" with respect to motor vehicles under Wash. Rev. Code §§ 62A.2-104(1) and 62A.2A-103(1)(t), and a "seller" of motor vehicles under §

192

2.103(a)(4).

1205. With respect to leases, Ford is and was at all relevant times a "lessor" of motor vehicles under Wash. Rev. Code § 62A.2A-103(1)(p).

1206. The Class Vehicles are and were at all relevant times "goods" within the meaning of Wash. Rev. Code §§ 62A.2-105(1) and 62A.2A-103(1)(h).

1207. Ford provided all purchasers and lessees of the Class Vehicles with the express warranty described herein, which became a material part of the bargain.

1208. Ford provided all purchasers and lessees of Lincoln-branded Class Vehicles with the Lincoln Warranty and all purchasers and lessees of Ford or Ford-branded Class Vehicles with the Ford/Ford Warranty.

1209. Ford sold and leased the Class Vehicles with a written express warranty covering the Vehicles for three years or 36,000 miles, whichever comes first.

1210. Ford's New Vehicle Limited Warranty expressly states that Ford will "without charge, repair, replace, or adjust all parts on your vehicle that malfunction or fail during normal use during the applicable coverage period due to a manufacturing defect in factory-supplied materials or factory workmanship" so long the Vehicle is properly operated and maintained and taken to a Ford dealership for repair within the warranty period.

1211. Ford further provides powertrain warranty coverage, which is applicable to "the Engine: all internal lubricated parts, cylinder block, cylinder heads, electrical fuel pump, powertrain control module, engine mounts, flywheel, injection pump, manifold (exhaust and intake), manifold bolts, oil pan, oil pump, seals and gaskets, engine thermostat, engine, thermostat housing, timing chain cover, timing chain (gears or belt), turbocharger/supercharger unit, valve covers, water pump" as well as the components in the transmission, front-wheel drive, rear-wheel drive, and four-wheel/all-wheel drive. This coverage applies for 5-years or up to 60,000 miles, whichever comes first.

1212. For certified pre-owned ("CPO") Vehicles, Ford offers a limited warranty covering CPO Vehicles for 12 months or 12,000 miles, whichever comes first.

1213. Ford's CPO Vehicle warranty states that a dealer will replace "all covered

193

components . . . that are found to be defective in factory-supplied materials or workmanship during the applicable warranty periods." The engine and its components—including the cylinder block and cylinder heads—are included in Ford's list of "covered components."

1214. Ford manufactured and/or installed the engines and the engines' component parts in the Class Vehicles, and the engines and their component parts are covered by the express Warranties.

1215. The Engine Defect at issue in this litigation was present at the time the Class Vehicles were sold or leased to Washington Plaintiffs and the Washington Sub-Class Members.

1216. Plaintiff relied on Ford's express warranties, which were a material part of the bargain, when purchasing or leasing their Class Vehicles.

1217. Under the express Warranties, Ford was obligated to correct the Engine Defect in the vehicles owned or leased by Washington Plaintiffs and the Washington Sub-Class Members.

1218. Although Ford was obligated to correct the Engine Defect, none of the attempted fixes to the engines are adequate under the terms of the Warranties, as they did not cure the defect.

1219. Ford breached the express Warranties by performing illusory repairs. Rather than repairing the vehicles pursuant to the express Warranties, Ford falsely informed Washington Sub-Class Members that there was no problem with their Class Vehicles, performed ineffective procedures including software updates, and/or replaced defective components in the engines with equally defective components, without actually repairing the Class Vehicles.

1220. Ford and its agent dealers have failed and refused to conform the engines to the express Warranties. Ford's conduct, as discussed throughout this Complaint, has voided any attempt on its part to disclaim liability for its actions.

1221. Moreover, Ford's attempt to disclaim or limit these express Warranties vis-à-vis consumers is unconscionable and unenforceable under the circumstances here. Specifically, Ford's warranty limitation is unenforceable because it knowingly sold a defective product without informing consumers about the defect.

1222. The time limits contained in Ford's warranty period were also unconscionable and inadequate to protect Washington Plaintiffs and the Washington Sub-Class Members. Among other

194

things, Washington Plaintiffs and the Washington Sub-Class Members had no meaningful choice in determining these time limitations, the terms of which unreasonably favored Ford. A gross disparity in bargaining power existed between Ford and the Class members, and Ford knew or should have known that the Class Vehicles were defective at the time of sale.

1223. Washington Plaintiffs and the Washington Sub-Class Members have complied with all obligations under the Warranties, or otherwise have been excused from performance of said obligations as a result of Ford's conduct described herein.

1224. Washington Plaintiffs and the Washington Sub-Class Members were not required to notify Ford of the breach because affording Ford a reasonable opportunity to cure its breach of written warranty would have been futile. Ford was also on notice of the Engine Defect from the complaints and service requests it received from Plaintiff and the Class Members, from repairs and/or replacements of the engines or components thereof, and through other internal and external sources.

1225. Because Ford, through its conduct and exemplified by its own service bulletins, has covered repairs of the Engine Defect if Ford determines the repairs are appropriately covered under the Warranties, Ford cannot now deny that the Warranties cover the Engine Defect.

1226. Because Ford has not been able remedy the Engine Defect, any limitation on remedies included in the Warranties causes the Warranties to fail their essential purposes, rendering them null and void.

1227. As a direct and proximate cause of Ford's breach, Washington Plaintiffs and the Washington Sub-Class Members suffered damages and continue to suffer damages, including economic damages at the point of sale or lease and diminution of value of their Class Vehicles. Additionally, Washington Plaintiffs and the Washington Sub-Class Members have incurred or will incur economic damages at the point of repair in the form of the cost of repair.

1228. As a direct and proximate result of Ford's breach of express warranties, Washington Plaintiffs and the Washington Sub-Class Members have been damaged in an amount to be determined at trial.

**FORTY-SIXTH CAUSE OF ACTION**
**Breach of the Implied Warranty of Merchantability**
**( Wis. Stat. § 402.314)**
**(On behalf of the Wisconsin Sub-Class)**

1229. Plaintiffs incorporate by reference each allegation set forth in paragraphs 1-274, above.

1230. Plaintiff Shari L. Techlin ("Wisconsin Plaintiff") brings this cause of action individually and on behalf of the members of the Wisconsin Sub-Class.

1231. Ford is and was at all relevant times a "merchant" with respect to motor vehicles under Wis. Stat. § 402.104(3) and a "seller" of motor vehicles under Wis. Stat. § 402.103(d).

1232. With respect to leases, Ford is and was at all relevant times a "lessor" of motor vehicles under Wis. Stat. § 411.103(1)(p).

1233. The Class Vehicles are and were at all relevant times "goods" within the meaning of Wis. Stat. § 411.103(1)(h).

1234. A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law under Wis. Stat. § 402.314 and Wisc. Stat. § 411.212.

1235. Ford knew or had reason to know of the specific use for which the Class Vehicles were purchased or leased. Ford directly sold and marketed vehicles equipped with the engines to customers through authorized dealers, like those from whom Wisconsin Plaintiff and the Wisconsin Sub-Class Members bought or leased their vehicles, for the intended purpose of consumers purchasing the vehicles. Ford knew that the Class Vehicles would and did pass unchanged from the authorized dealers to Wisconsin Plaintiff and the Wisconsin Sub-Class Members, with no modification to the defective engines.

1236. Ford provided Plaintiff and Class Members with an implied warranty that the Class Vehicles and their components and parts are merchantable and fit for the ordinary purposes for which they were sold.

1237. This implied warranty included, among other things: (i) a warranty that the Class Vehicles and their engines that were manufactured, supplied, distributed, and/or sold by Ford were

196

safe and reliable for providing transportation; and (ii) a warranty that the Class Vehicles and their engines would be fit for their intended use while the Class Vehicles were being operated.

1238. Contrary to the applicable implied warranties, the Class Vehicles and their engines at the time of sale and thereafter were not fit for their ordinary and intended purpose of providing Plaintiff and Class Members with reliable, durable, and safe transportation. Instead, the Class Vehicles are defective, including, but not limited to, the defective design and manufacture of their engines and the existence of the Engine Defect at the time of sale or lease and thereafter. Ford knew of this defect at the time these sale or lease transactions occurred.

1239. As a result of Ford's breach of the applicable implied warranties, Wisconsin Plaintiff and the Wisconsin Sub-Class Members of the Class Vehicles suffered an ascertainable loss of money, property, and/or value of their Class Vehicles. Additionally, as a result of the Engine Defect, Wisconsin Plaintiff and the Wisconsin Sub-Class Members were harmed and suffered actual damages in that the Class Vehicles' engine components are substantially certain to fail before their expected useful life has run.

1240. Ford's actions, as complained of herein, breached the implied warranty that the Class Vehicles were of merchantable quality and fit for such use in violation of Wis. Stat. § 402.314 and Wisc. Stat. § 411.212.

1241. Wisconsin Plaintiff and the Wisconsin Sub-Class Members have complied with all obligations under the warranty, or otherwise have been excused from performance of said obligations as a result of Ford's conduct described herein.

1242. Wisconsin Plaintiff and the Wisconsin Sub-Class Members were not required to notify Ford of the breach because affording Ford a reasonable opportunity to cure its breach of written warranty would have been futile. Ford was also on notice of the Engine Defect from the complaints and service requests it received from Plaintiff and the Class Members, from repairs and/or replacements of the engines or components thereof, and through other internal sources.

1243. As a direct and proximate cause of Ford's breach, Wisconsin Plaintiff and the Wisconsin Sub-Class Members suffered damages and continue to suffer damages, including economic damages at the point of sale or lease and diminution of value of their Class Vehicles.

Additionally, Wisconsin Plaintiff and the Wisconsin Sub-Class Members have incurred or will incur economic damages at the point of repair in the form of the cost of repair.

1244. As a direct and proximate result of Ford's breach of the implied warranty of merchantability, Wisconsin Plaintiff and the Wisconsin Sub-Class Members have been damaged in an amount to be proven at trial.

### FORTY-SEVENTH CAUSE OF ACTION
**Breach of Express Warranty**
**(Wis. Stat. 402.313 and 411.210)**
**(On behalf of the Wisconsin Sub-Class)**

1245. Plaintiffs incorporate by reference each allegation set forth in paragraphs 1-274, above.

1246. Wisconsin Plaintiff brings this cause of action individually and on behalf of the members of the Wisconsin Sub-Class.

1247. Ford is and was at all relevant times a "merchant" with respect to motor vehicles under Wis. Stat. § 402.104(3) and a "seller" of motor vehicles under Wis. Stat. § 402.103(d).

1248. With respect to leases, Ford is and was at all relevant times a "lessor" of motor vehicles under Wis. Stat. § 411.103(1)(p).

1249. The Class Vehicles are and were at all relevant times "goods" within the meaning of Wis. Stat. § 411.103(1)(h).

1250. Ford provided all purchasers and lessees of the Class Vehicles with the express warranty described herein, which became a material part of the bargain.

1251. Ford provided all purchasers and lessees of Lincoln-branded Class Vehicles with the Lincoln Warranty and all purchasers and lessees of Ford or Ford-branded Class Vehicles with the Ford/Ford Warranty.

1252. Ford sold and leased the Class Vehicles with a written express warranty covering the Vehicles for three years or 36,000 miles, whichever comes first.

1253. Ford's New Vehicle Limited Warranty expressly states that Ford will "without charge, repair, replace, or adjust all parts on your vehicle that malfunction or fail during normal use during the applicable coverage period due to a manufacturing defect in factory-supplied materials or factory

workmanship" so long the Vehicle is properly operated and maintained and taken to a Ford dealership for repair within the warranty period.

1254. Ford further provides powertrain warranty coverage, which is applicable to "the Engine: all internal lubricated parts, cylinder block, cylinder heads, electrical fuel pump, powertrain control module, engine mounts, flywheel, injection pump, manifold (exhaust and intake), manifold bolts, oil pan, oil pump, seals and gaskets, engine thermostat, engine, thermostat housing, timing chain cover, timing chain (gears or belt), turbocharger/supercharger unit, valve covers, water pump" as well as the components in the transmission, front-wheel drive, rear-wheel drive, and four-wheel/all-wheel drive. This coverage applies for 5-years or up to 60,000 miles, whichever comes first.

1255. For certified pre-owned ("CPO") Vehicles, Ford offers a limited warranty covering CPO Vehicles for 12 months or 12,000 miles, whichever comes first.

1256. Ford's CPO Vehicle warranty states that a dealer will replace "all covered components . . . that are found to be defective in factory-supplied materials or workmanship during the applicable warranty periods." The engine and its components—including the cylinder block and cylinder heads—are included in Ford's list of "covered components."

1257. Ford manufactured and/or installed the engines and the engines' component parts in the Class Vehicles, and the engines and their component parts are covered by the express Warranties.

1258. The Engine Defect at issue in this litigation was present at the time the Class Vehicles were sold or leased to Wisconsin Plaintiff and the Wisconsin Sub-Class Members.

1259. Plaintiff relied on Ford's express warranties, which were a material part of the bargain, when purchasing or leasing their Class Vehicles.

1260. Under the express Warranties, Ford was obligated to correct the Engine Defect in the vehicles owned or leased by Wisconsin Plaintiff and the Wisconsin Sub-Class Members.

1261. Although Ford was obligated to correct the Engine Defect, none of the attempted fixes to the engines are adequate under the terms of the Warranties, as they did not cure the defect.

1262. Ford breached the express Warranties by performing illusory repairs. Rather than

repairing the vehicles pursuant to the express Warranties, Ford falsely informed Washington Sub-Class Members that there was no problem with their Class Vehicles, performed ineffective procedures including software updates, and/or replaced defective components in the engines with equally defective components, without actually repairing the Class Vehicles.

1263. Ford and its agent dealers have failed and refused to conform the engines to the express Warranties. Ford's conduct, as discussed throughout this Complaint, has voided any attempt on its part to disclaim liability for its actions.

1264. Moreover, Ford's attempt to disclaim or limit these express Warranties vis-à-vis consumers is unconscionable and unenforceable under the circumstances here. Specifically, Ford's warranty limitation is unenforceable because it knowingly sold a defective product without informing consumers about the defect.

1265. The time limits contained in Ford's warranty period were also unconscionable and inadequate to protect Wisconsin Plaintiff and the Wisconsin Sub-Class Members. Among other things, Wisconsin Plaintiff and the Wisconsin Sub-Class Members had no meaningful choice in determining these time limitations, the terms of which unreasonably favored Ford. A gross disparity in bargaining power existed between Ford and the Class members, and Ford knew or should have known that the Class Vehicles were defective at the time of sale.

1266. Wisconsin Plaintiff and the Wisconsin Sub-Class Members have complied with all obligations under the Warranties, or otherwise have been excused from performance of said obligations as a result of Ford's conduct described herein.

1267. Wisconsin Plaintiff and the Wisconsin Sub-Class Members were not required to notify Ford of the breach because affording Ford a reasonable opportunity to cure its breach of written warranty would have been futile. Ford was also on notice of the Engine Defect from the complaints and service requests it received from Plaintiff and the Class Members, from repairs and/or replacements of the engines or components thereof, and through other internal and external sources.

1268. Because Ford, through its conduct and exemplified by its own service bulletins, has covered repairs of the Engine Defect if Ford determines the repairs are appropriately covered under

the Warranties, Ford cannot now deny that the Warranties cover the Engine Defect.

1269. Because Ford has not been able remedy the Engine Defect, any limitation on remedies included in the Warranties causes the Warranties to fail their essential purposes, rendering them null and void.

1270. As a direct and proximate cause of Ford's breach, Wisconsin Plaintiff and the Wisconsin Sub-Class Members suffered damages and continue to suffer damages, including economic damages at the point of sale or lease and diminution of value of their Class Vehicles. Additionally, Wisconsin Plaintiff and the Wisconsin Sub-Class Members have incurred or will incur economic damages at the point of repair in the form of the cost of repair.

1271. As a direct and proximate result of Ford's breach of express warranties, Wisconsin Plaintiff and the Wisconsin Sub-Class Members have been damaged in an amount to be determined at trial.

**FORTY-EIGHTH CAUSE OF ACTION**
**(Violations of the Wisconsin Deceptive Trade Practices Act,**
**Wisc. Stat. § 100.18, *et seq*.)**
**(On behalf of the Wisconsin Sub-Class)**

1272. Plaintiffs incorporate by reference each allegation set forth in paragraphs 1-274, above.

1273. Plaintiff Shari Techlin ("Wisconsin Plaintiff") brings this cause of action individually and on behalf of the Wisconsin Sub-Class.

1274. Ford, Wisconsin Plaintiff and Wisconsin Sub-Class Members are "persons" within the meaning of Wis. Stat. § 100.18(1).

1275. Ford committed the acts complained of herein in the course of "trade" or "commerce" within the meaning of Wash. Rev. Code § 19.96.010.

1276. The Wisconsin Deceptive Trade Practices Act ("Wisconsin DTPA") prohibits an "assertion, representation or statement of fact which is untrue, deceptive or misleading." WIS. STAT. § 100.18(1). Ford engaged in unfair and deceptive acts and practices that violated the Wisconsin DTPA as described above.

1277. Ford participated in and engaged in deceptive business or trade practices prohibited

by the Wisconsin DTPA by failing to disclose and actively concealing that the Class Vehicles contained the Engine Defect, by marketing their Class Vehicles as safe and of high quality, and by presenting themselves as a reputable manufacturer that valued safety and stood behind its vehicles after they were sold,.

1278. By failing to disclose the Engine Defect; by concealing the Engine Defect; by promoting and selling or leasing Class Vehicles it knew were defective, including by marketing its vehicles as safe, reliable, easily operable, efficient, and of high quality; by presenting itself as a reputable manufacturer that valued safety, reliability, performance and efficiency, and stood behind its vehicles after they were sold; by failing to make repairs or making repairs and providing replacements that caused Wisconsin Plaintiff and the Wisconsin Sub-Class Members to experience repeated instances of failure, rendering the New Vehicle Limited Warranty useless; and by minimized the scope and severity of the problems with the Class Vehicles, refusing to acknowledge that they are defective, and failing to provide adequate relief to consumers, Ford knowingly and intentionally misrepresented and omitted material facts in connection with the sale or lease of the Class Vehicles.

1279. Ford systematically misrepresented, concealed, suppressed, or omitted material facts relating to the Class Vehicles and Engine Defect in the course of its business.

1280. Ford also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Class Vehicles.

1281. Ford's unfair and deceptive acts or practices occurred repeatedly in Ford's trade or business, were capable of deceiving a substantial portion of the purchasing public, and imposed a serious safety risk on the public.

1282. Ford knew that the Class Vehicles and their engines suffered from an inherent defect, were defectively designed or manufactured, and were not suitable for their intended use.

1283. Ford knew or should have known that its conduct violated the Wisconsin DTPA.

1284. Wisconsin Plaintiff and the Wisconsin Sub-Class Members reasonably relied on

Ford's misrepresentations and omissions of material facts in its advertisements of the Class Vehicles and in the purchase of the Class Vehicles.

1285. Had Wisconsin Plaintiff and the Wisconsin Sub-Class Members known that the Class Vehicles would exhibit the Engine Defect, they would not have purchased or leased the Class Vehicles or would have paid less for them. Plaintiff did not receive the benefit of their bargain as a result of Ford's misconduct.

1286. Ford owed Wisconsin Plaintiff and the Wisconsin Sub-Class Members a duty to disclose the truth about the Engine Defect because Ford:

a.    possessed exclusive and superior knowledge of the design of the Class Vehicles and the Engine Defect;

b.    intentionally concealed the foregoing from Wisconsin Plaintiff and the Wisconsin Sub-Class Members; and/or

c.    made incomplete representations regarding the quality and durability of the Class Vehicles, while purposefully withholding material facts from Wisconsin Plaintiff and the Wisconsin Sub-Class Members that contradicted these representations.

1287. Due to Ford's specific and superior knowledge that the Engines in the Class Vehicles will fail due to the Engine Defect, its false representations regarding the increased durability of the Class Vehicles, and reliance by Wisconsin Plaintiff and the Wisconsin Sub-Class Members on these material representations, Ford had a duty to disclose to Class members that the Engine Defect will cause engine failure in Class Vehicles, that Class Vehicles do not have the expected durability, reliability, and/or safety over other vehicles or of their predecessor engines, that failure of the Engines will cause damage to Class Vehicle, and that Class members would be required to bear the cost of the damage to their vehicles. Having volunteered to provide information to Wisconsin Plaintiff and the Wisconsin Sub-Class Members, Ford had the duty to disclose not just the partial truth, but the entire truth. These omitted and concealed facts were material because they directly impact the value of the Class Vehicles purchased or leased by Wisconsin Plaintiff and the Wisconsin Sub-Class Members. Longevity, durability, performance, and safety are material concerns to Ford consumers. Ford represented to Wisconsin Plaintiff and the Wisconsin Sub-Class Members that

they were purchasing or leasing vehicles that were durable, reliable, safe, efficient, of high quality, and containing engines of advanced and superior characteristics and technology as alleged throughout this Complaint, when in fact it is only a matter of time before the engines fail due to the Engine Defect.

1288. Wisconsin Plaintiff and the Wisconsin Sub-Class Members suffered injury in fact to a legally protected interest. As a result of Ford's conduct, Wisconsin Plaintiff and the Wisconsin Sub-Class Members were harmed and suffered actual damages in the form of the costs of diagnosis and repair of their vehicles, and the diminished value of their vehicles.

1289. As a direct and proximate result of Ford's unfair or deceptive acts or practices, Wisconsin Plaintiff and the Wisconsin Sub-Class Members suffered and will continue to suffer injury in fact and/or actual damages.

1290. Defendant's violations present a continuing risk to Wisconsin Plaintiff and the Wisconsin Sub-Class Members as well as to the general public. Defendant's unlawful acts and practices complained of herein affect the public interest.

1291. As a proximate and direct result of Ford's unfair and deceptive trade practices, Wisconsin Plaintiff and members of the Wisconsin Sub-Class purchased or leased Class Vehicles and suffered an ascertainable loss and financial harm.  This included ascertainable losses in the form of actual damages in the amount of the cost to attempt to repair the Engine Defect, replaced the damaged related system components, diminution of Class Vehicle resale value, increased repair and maintenance costs, and other substantial monetary damages and inconvenience.

1292.  Ford is liable to Wisconsin Plaintiff and the Wisconsin Sub-Class for damages in amounts to be proven at trial, including punitive damages, attorneys' fees, costs, and any other remedies the Court may deem appropriate under Wis. Stat. § 100.18(11)(b)(2). Because Ford's actions were willful and knowing, Plaintiffs' damages should be trebled.

### **FORTY-NINTH CAUSE OF ACTION**
### **(Violation of the Magnuson-Moss Warranty Act, 15 U.S.C. §§ 2301, et seq.)**

1293. Plaintiffs incorporate by reference each allegation set forth in paragraphs 1-274, above.

1294. Plaintiffs bring this cause of action for themselves and on behalf of Class Members.

1295. This Court has jurisdiction to decide claims brought under 15 U.S.C. § 2301 by virtue of 28 U.S.C. §§ 1332(a) and (d).

1296. Plaintiffs are "consumers" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(3).

1297. Ford is a "supplier" and "warrantor" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. 2301(4)-(5).

1298. The Class Vehicles are "consumer products" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(1).

1299. 15 U.S.C. § 2301(d)(1) provides a cause of action for any consumer who is damaged by the failure of a warrantor to comply with a written warranty.

1300. In its Limited Warranty, Ford expressly warranted that it would repair or replace defects in material or workmanship free of charge if those defects became apparent during the warranty period.

1301. Ford's Limited Warranty is a written warranty within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(6). The Class Vehicles' implied warranty of merchantability is covered by 15 U.S.C. 2301(7).

1302. With respect to Class members' purchases or leases of the Class Vehicles, the terms of Ford's written warranty and implied warranty became part of the basis of the bargain between Ford, on the one hand, and Plaintiffs and each of the members of the proposed Class, on the other.

1303. Ford breached the implied warranty of merchantability. Without limitation, the Class Vehicles have engines that leak coolant, overheat, fail, and in some instances catch fire, as described above, and which thus render the Class Vehicles unmerchantable.

1304. Ford breached its express Limited Warranty by refusing to repair the defective engines in the Class Vehicles. Plaintiff Vanessa Miller presented her vehicle for repair after the engine failed for the second time, and instead of providing a non-defective replacement engine, Ford, installed another engine with the same Engine Defect, and Ms. Miller was forced to pay thousands of dollars out-of-pocket.

1305. Plaintiff Miller, individually and on behalf of the members of the proposed Class, notified Ford of the Engine Defect in the Class Vehicles, and its corresponding breach of warranty, through a notice letter delivered by courier on July 10, 2020 to Ford's registered agent in Plymouth, MI. Ford acknowledged receipt through a response letter from its counsel, dated August 7, 2020.

1306. Ford was also provided notice of the defect through thousands of consumer complaints and information about service repairs from its dealerships. Ford has not remedied the breach.

1307. Further, Ford has refused to provide an adequate warranty repair for the Engine Defect, thus rendering the satisfaction of any notice requirement futile. As stated above, customers that have presented their vehicles for warranty repair due to engine overheating, smoke emission, and engine failure have simply been provided either coolant sensors, replacement parts that do nothing to fix the Engine Defect, or replacement defective engines.

1308. At the time of sale or lease of each Class Vehicle, Ford knew, should have known, or was reckless in not knowing of the Class Vehicles' inability to perform as warranted, but nonetheless failed to rectify the situation and/or disclose the Engine Defect. Under the circumstances, the remedies available under any informal settlement procedure would be inadequate, and any requirement that Plaintiffs and the members of the proposed Classes and Subclasses resort to an informal dispute resolution procedure and/or afford Ford a reasonable opportunity to cure its breach of warranties is excused and thus deemed satisfied.

1309. The amount in controversy of Plaintiffs' individual claims meet or exceed the sum of $25. The amount in controversy in this action exceeds the sum of $50,000, exclusive of interest and costs, computed on the basis of all claims to be determined in this lawsuit.

1310. As a direct and proximate result of Ford's breaches of its Limited Warranty and the implied warranty of merchantability, Plaintiffs and the members of the proposed Class have sustained damages in an amount to be determined at trial.

1311. Plaintiffs, individually and on behalf of all members of the proposed Class, seek all damages permitted by law, including the diminution in value of their vehicles, in an amount to be proven at trial.

## FIFTIETH CAUSE OF ACTION
**(Fraud by Concealment)**

1312. Plaintiffs incorporate by reference each allegation set forth in paragraphs 1-274, above.

1313. Plaintiffs bring this cause of action for themselves and on behalf of Class Members.

1314. Ford concealed and suppressed material facts concerning the quality of the Class Vehicles, and the Ecoboost engines Ford installed in Class Vehicles.

1315. Ford concealed and suppressed material facts concerning the serious Defect causing the Ecoboost engines in Class Vehicles to leak coolant, allow the coolant to pool and seep into the cylinders, causing the cylinder head to crack and the engine to misfire, overheat, and totally fail and to catch fire. Discovery will show that the Defect lies in the design of the engine block of the Class Vehicles. Ford knew that Plaintiffs and Class Members would not be able to inspect or otherwise detect the Defect prior to purchasing or leasing the Vehicles. Ford further failed to disclose and/or denied the existence the Defect when Plaintiffs and Class Members complained of the failure of their Ecoboost engines.

1316. Ford did so in order to boost confidence in its vehicles and falsely assure purchasers and lessees of Ford vehicles that the Class Vehicles were world-class, safe, warranted, and reliable vehicles, and concealed the information in order to prevent harm to Ford and its products' reputations in the marketplace and to prevent consumers from learning of the defective nature of the Class Vehicles prior to their purchase or lease.

1317. These false representations and omissions were material to consumers, both because they concerned the quality of the Class Vehicles and because the representations and omissions played a significant role in Plaintiffs' and Class Members' decisions to purchase or lease the Class Vehicles.

1318. Ford had a duty to disclose the Engine Defect in the Class Vehicles because it was known and/or accessible only to Ford; Ford had superior knowledge and access to the facts; and Ford knew the facts were not known to or reasonably discoverable by Plaintiffs and Class Members.

1319. Ford also had a duty to disclose because it made many general affirmative

representations about the quality, warranty, and lack of defects in the Class Vehicles as set forth above, which were misleading, deceptive, and/or incomplete without the disclosure of the additional facts set forth above regarding the actual quality, comfort, and usability of Class Vehicles.

1320. Even when faced with complaints regarding the Defect, Ford misled and concealed the true cause of the symptoms complained of. As a result, Class Members were misled as to the true condition of the Class Vehicles once at the time of purchase or lease and again when the Ecoboost engine failure was complained of to Ford.

1321. The omitted and concealed facts were material because they directly impact the value, appeal, and usability of the Class Vehicles purchased or leased by Plaintiffs and Class Members. Whether a manufacturer's products are as stated by the manufacturer, backed by the manufacturer, and usable for the purpose for which they were purchased/leased, are material concerns to a consumer.

1322. Ford actively concealed and/or suppressed these material facts, in whole or in part, to protect its reputation, sustain its marketing strategy, and avoid recalls that would hurt the brand's image and cost money, and it did so at the expense of the Plaintiffs and Class Members.

1323. Discovery will show that Ford has still not made full and adequate disclosure and continues to defraud Plaintiffs and Class Members and conceal material information regarding defects that exist in Ford vehicles.

1324. Plaintiffs and Class Members were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased or leased their Class Vehicles or would have paid less for them. Plaintiffs' and Class Members' actions were justified. Ford was in exclusive control of the material facts and such facts were not known to the public, Plaintiffs, or Class Members.

1325. Because of the concealment and/or suppression of the facts, Plaintiffs and Class Members sustained damages because they negotiated and paid value for the Class Vehicles not considerate of the Engine Defect that Ford failed to disclose, and they paid for temporary repairs and equally defective replacement parts to attempt to remedy the Defect. Had they been aware of the concealed Defect that existed in the Class Vehicles, Plaintiffs and Class Members would have

1   paid less for their Vehicles or would not have purchased or leased them at all.

2       1326. Accordingly, Ford is liable to Plaintiffs and Class Members for damages in an amount

3   to be proven at trial.

4       1327. Ford's acts were done maliciously, oppressively, deliberately, with intent to defraud,

5   and in reckless disregard of Plaintiffs' and Class Members' rights and well-being to enrich Ford.

6   Ford's conduct warrants an assessment of punitive damages in an amount sufficient to deter such

7   conduct in the future, which amount is to be determined according to proof.

8                           **FIFTY-FIRST CAUSE OF ACTION**
                                **(Unjust Enrichment)**
9

10      1328. Plaintiffs incorporate by reference each allegation set forth in paragraphs 1-274,

11  above.

12      1329. Plaintiffs bring this cause of action for themselves and on behalf of Class Members.

13      1330. Ford has been unjustly enriched by Plaintiffs and Class Members purchasing/leasing

14  Class Vehicles from Ford and purchasing replacement parts and services from Ford that Plaintiffs

15  and Class Members would not have purchased/leased but for Ford's misconduct alleged above with

16  respect to the Engine Defect.

17      1331. Plaintiffs and Class Members unknowingly conferred a benefit on Ford of which Ford

18  had knowledge, since Ford was aware of the defective nature of the Class Vehicles' Ecoboost

19  engines, but failed to disclose this knowledge and misled Plaintiffs and Class Members regarding

20  the nature and quality of the Class Vehicles while profiting from this deception.

21      1332. The circumstances are such that it would be inequitable, unconscionable, and unjust

22  to permit Ford to retain the benefit of profits that it unfairly obtained from Plaintiffs and Class

23  Members. These profits include the premium price Plaintiffs and the Class paid for the Class

24  Vehicles and the cost of the parts and services bought from Ford to temporarily fix the defective

25  engines.

26      1333. Plaintiffs would consider purchasing or leasing similar Ford vehicles in the future if

27  Plaintiffs could rely on Ford's representations regarding the vehicles.

28

1334. Plaintiffs and Class Members, having been damaged by Ford's conduct, are entitled to recover or recoup damages as a result of the unjust enrichment of Ford to their detriment.

## **PRAYER FOR RELIEF**

1335. Plaintiffs on behalf of themselves, and all others similarly situated, request the Court to enter judgment against Ford, as follows:

    a.    an order certifying the proposed Class, any appropriate subclasses, and any appropriate classes with respect to particular issues, designating Plaintiffs as named representatives of the Class, and designating the undersigned as Class Counsel;

    b.    a declaration that the Ecoboost engines in the Class Vehicles are defective;

    c.    a declaration that Ford is financially responsible for notifying all Class Members about the defective nature of the Class Vehicles;

    d.    an order enjoining Ford from further deceptive distribution, sales, and lease practices with respect to the Class Vehicles;

    e.    an order requiring Ford to permanently repair Class Vehicles, within a reasonable time period and at no cost to Class Members, so that they no longer possess the Engine Defect;

    f.    an award to Plaintiffs and Class Members of compensatory, exemplary, and statutory damages, including interest, in an amount to be proven at trial;

    g.    a declaration that Ford must disgorge, for the benefit of Plaintiffs and Class Members, all or part of the ill-gotten profits it received from the sale or lease of the Class Vehicles, or make full restitution to Plaintiffs and Class Members;

    h.    an award of attorneys' fees and costs, under Cal. Code Civ. Proc. § 1021.5, 15 U.S.C. § 2310(d)(1), and as otherwise allowed by law;

    i.    an award of pre-judgment and post-judgment interest, as provided by law;

    j.    such other relief as may be appropriate under the circumstances.

/ / /

/ / /

CONSOLIDATED CLASS ACTION COMPLAINT FOR DAMAGES    CASE NO. 2:20-cv-01796-TLN-CKD

1

## **DEMAND FOR JURY TRIAL**

2         1336. Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury of

3     any and all issues in this action so triable of right.

4     Dated: June 21, 2021.                    Respectfully submitted,

5

6                                              */s/Stuart C. Talley*
                                               William A. Kershaw
7                                              Stuart C. Talley
                                               Ian J. Barlow
8                                              **KERSHAW, COOK & TALLEY PC**
9                                              401 Watt Avenue
                                               Sacramento, California 95864
10                                             Telephone: (916) 779-7000
                                               Facsimile: (916) 244-4829
11                                             bill@kctlegal.com
                                               stuart@kctlegal.com
12                                             ian@kctlegal.com

13                                             Tarek H. Zohdy (SBN 247775)
14                                             Cody R. Padgett (SBN 275553)
                                               **CAPSTONE LAW APC**
15                                             1875 Century Park East, Suite 1000
                                               Los Angeles, California 90067
16                                             Telephone:     (310) 556-4811
17                                             Facsimile:     (310) 943-0396
                                               Tarek.Zohdy@capstonelawyers.com
18                                             Cody.Padgett@capstonelawyers.com

19                                             Mark P. Chalos (*pro hac vice*)
20                                             **LIEFF CABRASER HEIMANN & BERNSTEIN, LLP**
                                               One Nashville Place
21                                             150 Fourth Avenue, Suite 1650
                                               Nashville, TN  37219-2423
22                                             Telephone: (615) 313-9000
                                               mchalos@lchb.com

23

24                                             Annika K. Martin
                                               Gabriel A. Panek  (*pro hac vice*)
25                                             **LIEFF CABRASER HEIMANN & BERNSTEIN, LLP**
                                               250 Hudson Street, 8th Floor
26                                             New York, NY  10013-1413
                                               akmartin@lchb.com
27                                             gpanek@lchb.com

28

CONSOLIDATED CLASS ACTION COMPLAINT FOR DAMAGES          CASE NO. 2:20-cv-01796-TLN-CKD

Russell D. Paul (*pro hac vice*)
Abigail Gertner (*pro hac vice*)
Amey J. Park (*pro hac vice*)
**BERGER MONTAGUE PC**
1818 Market Street, Suite 3600
Philadelphia, PA 19103
Tel.:    (215) 875-3000
Fax:    (215) 875-4604
Email:  rpaul@bm.net
              agertner@bm.net
              apark@bm.net

Patrick Newsom (*pro hac vice*)
**NEWSOM LAW PLC**
40 Music Square East
Nashville, TN 37203
Telephone: 615-251-9500
patrick@newsom.law

Thomas P. Thrash (*pro hac vice*)
Will T. Crowder (*pro hac vice*)
**THRASH LAW FIRM**
1101 Garland Street
Little Rock, AR 72201
501-374-1058
Fax: 501-374-2222
tomthrash@thrashlawfirmpa.com
willcrowder@thrashlawfirmpa.com

Attorneys for Plaintiffs

# EXHIBIT A

I, Vanessa Miller, under penalty of perjury, do hereby state as follows:

1.     I am over the age of eighteen (18), and a Named Plaintiff and proposed Class Representative in the above-entitled action. This Declaration, which is based on my personal knowledge of the facts stated herein, is submitted in support of the Class Action Complaint filed concurrently herewith, pursuant to Cal. Civ. Code § 1780(d).

2.     As Named Plaintiff, I bring this action for money damages, equitable relief, and restitution on behalf of myself and all similarly situated individuals and entities who were harmed by the practices described in the Complaint.

3.     As detailed in the Complaint, I reside in the Eastern District of California, purchased my vehicle in the Eastern District of California, and a substantial portion of the events detailed in the Complaint took place in the Eastern District of California.  Furthermore, Defendant conducts substantial business in, and has gained substantial benefit from doing business in the Eastern District of California.

I declare that the foregoing is true and correct. Executed in Sacramento, California, on September 4, 2020.

_____
VANESSA MILLER