1   William A. Kershaw (S.B. #057486)
    Stuart C. Talley (S.B. #180374)
2   Ian J. Barlow (S.B. #262213)
    **KERSHAW TALLEY BARLOW PC**
3   401 Watt Avenue
    Sacramento, California 95864
4   Telephone: (916) 779-7000
    Facsimile: (916) 244-4829
5   stuart@ktblegal.com

6   Tarek H. Zohdy (SBN 247775)
    Cody R. Padgett (SBN 275553)
7   Laura E. Goolsby (SBN 321721)
    **CAPSTONE LAW APC**
8   1875 Century Park East, Suite 1000
    Los Angeles, California 90067
9   Telephone: (310) 556-4811
    Facsimile: (310) 943-0396
10  Tarek.Zohdy@capstonelawyers.com
    Cody.Padgett@capstonelawyers.com
11  Laura.Goolsby@capstonelawyers.com

12  [Additional Counsel on Signature Pages]

13  *Attorneys for Plaintiffs and the Proposed Classes and Subclasses*

14              UNITED STATES DISTRICT COURT

15              EASTERN DISTRICT OF CALIFORNIA

16  VANESSA MILLER, PATSY LUND, AMBER        Case No. 2:20-cv-01796-DAD-CKD
    WEST, EVAN WEST, DARRICK                 (Consolidated with Nos. 2:21-cv-00417-
17  CHRISTODARO, AMY HOFFER, JILLIAN         DAD-CKD, 2:21-cv-00468-DAD-CKD)
    CONSTABLE, MONTERIO BUTCHER,
18  HARLAMPI BOZHINOV, MARY GLADE,           **FIRST AMENDED CONSOLIDATED**
    TERESA BALASZEK, CRAIG MORFORD,          **CLASS ACTION COMPLAINT FOR**
19  KELLI MORFORD, AARON MANFRA,             **DAMAGES**
    VICTORIA MANFRA, STACEY COPPOCK,
20  RACHEL GOODRICH, BRIAN SIMONDS,
    DAVID SCHIAVI, ROBYN PIROG, ZACHARY
21  SCOTT DAMM, AMANDA GATES, SHARI
    TECHLIN, TYSON JOHN BATDORF,
22  ANTHONY CICERO, DAVID GONZALEZ,          **JURY TRIAL DEMANDED**
    JEFFERY HODGES, MARK KENNEDY, JOHN
23  KRECEK, TRACEY ANN METRO, SCOTT
    PICKERING, KIMBERLY THOMAS as
24  individuals and on behalf of all others similarly
    situated,
25
                        Plaintiffs,
26
    v.
27
    FORD MOTOR COMPANY,
28
                        Defendant.

# TABLE OF CONTENTS

**PAGE**

I.      INTRODUCTION ........................................................................................ 1

II.     NATURE OF THE ACTION ..................................................................... 1

III.    PARTIES .................................................................................................... 3

     A.      Plaintiff Vanessa Miller ................................................................. 3

     B.      Plaintiff Patsy Lund .......................................................................... 4

     C.      Plaintiffs Amber and Evan West ................................................... 6

     D.      Plaintiff Darrick Christodaro ........................................................ 8

     E.      Plaintiff Amy Hoffer ..................................................................... 10

     F.      Plaintiff Jillian Constable ............................................................ 12

     G.      Plaintiff Monterio Butcher .......................................................... 13

     H.      Plaintiff Harlampi Bozhinov ....................................................... 15

     I.      Plaintiff Mary Glade ..................................................................... 16

     J.      Plaintiff Teresa Balaszek ............................................................. 18

     K.      Plaintiffs Craig and Kelly Morford ............................................. 20

     L.      Plaintiffs Aaron and Victoria Manfra ......................................... 21

     M.      Plaintiff Stacey Coppock .............................................................. 23

     N.      Plaintiff Rachel Goodrich ............................................................ 25

     O.      Plaintiff Brian Simonds ................................................................ 27

     P.      Plaintiff David Schiavi .................................................................. 28

     Q.      Plaintiff Robyn Pirog ..................................................................... 30

     R.      Plaintiff Zachary Scott Damm and Amanda Gates ...................... 32

     S.      Plaintiff Shari Techlin .................................................................. 33

     T.      Plaintiff Tyson John Batdorf ........................................................ 35

     U.      Plaintiff Anthony Cicero ............................................................... 36

     V.      Plaintiff David Gonzalez .............................................................. 39

     W.      Plaintiff Jeffery Hodges ............................................................... 40

     X.      Plaintiff Mark Kennedy ................................................................ 42

     Y.      Plaintiff John Krecek ..................................................................... 43

     Z.      Plaintiff Tracey Ann Metro ........................................................... 45

     AA.    Plaintiff Scott Pickering ............................................................... 47

     BB.    Plaintiff Kimberly Thomas .......................................................... 48

     CC.    Defendant Ford Motor Company ................................................. 50

IV.    JURISDICTION AND VENUE ............................................................... 51

i

## TABLE OF CONTENTS
(continued)

PAGE

V.    FACTUAL ALLEGATIONS ................................................................. 52

    A.    The Engine Defect .................................................................. 52

    B.    The Engine Defect Poses a Safety Risk to Vehicle Drivers, Passengers, and the Public. ........................................................ 54

    C.    Ford Knew That the EcoBoost Engines in the Subject Vehicles Were Defective Since At Least 2012, But It Continued to Sell These Engines Anyway. .................................................................................... 55

        1.    Over the Past Decade, Ford Has Issued Multiple Ineffective Recalls for Issues Relating to Coolant Leaks and Overheating in EcoBoost Engines. ....................................................................... 55

        2.    Ford Knew of the Engine Defect from Its Pre-Release Design, Manufacture, Engineering, and Testing Data. ................................ 59

        3.    Ford Knew About the Engine Defect from Voluminous Internal Data on Repairs and Consumer Complaints. ........................................... 62

        4.    Ford Was Aware of the Engine Defect from Class Member Complaints Collected by NHTSA. ........................................................... 63

        5.    Ford is Well Aware that Its Recalls Have Been Ineffective and It Continues to Issue Technical Service Bulletins Regarding the Engine Defect. ......................................................................... 67

        6.    Ford Created a Customer Service Program for the Defect. ................ 71

    D.    Ford's Marketing and Concealment ........................................... 72

VI.   FRAUDULENT CONCEALMENT ALLEGATIONS ........................... 74

VII.  TOLLING AND THE STATUTE OF LIMITATIONS ......................... 76

    A.    Fraudulent Concealment and Equitable Tolling ........................... 76

    B.    Estoppel ................................................................................. 76

    C.    Discovery Rule ....................................................................... 77

VIII. CLASS ACTION ALLEGATIONS ................................................... 77

    A.    Numerosity ............................................................................. 80

    B.    Typicality ............................................................................... 80

    C.    Adequate Representation .......................................................... 80

    D.    Predominance of Common Issues ............................................. 80

    E.    Superiority ............................................................................. 82

IX.   CAUSES OF ACTION ..................................................................... 83

FIRST CAUSE OF ACTION Violation of California's Consumer Legal Remedies Act ("CLRA"),  Cal Civ. Code § 1750, *et seq.* (On behalf of the California Sub-Class) ........... 83

SECOND CAUSE OF ACTION Violation of California's Unfair Competition Law,  Cal. Bus. & Prof. Code § 17200, *et seq.* (On behalf of the California Sub-Class) ...................... 86

THIRD CAUSE OF ACTION California Breach of Express Warranty (On behalf of the California Sub-Class) ................................................................ 87

ii

1

**TABLE OF CONTENTS**
(continued)

2

**PAGE**

3

FOURTH CAUSE OF ACTION Breach of Implied Warranty  Under the Song-Beverly

4

Consumer Warranty Act Cal. Civ. Code §§ 1790, *et seq.* (On behalf of the California
Sub-Class) ..................................................................................................................... 91

5

FIFTH CAUSE OF ACTION California Breach of Implied Warranty (On behalf of the
California Sub-Class) ...................................................................................................... 92

6

SIXTH CAUSE OF ACTION Violation of the Arkansas Deceptive Trade Practices Act Ark.

7

Code Ann. §§ 4-88-101, *et seq.* (On behalf of the Arkansas Sub-Class) ............................ 95

SEVENTH CAUSE OF ACTION Breach of Express Warranty Ark. Code Ann. §§ 4-2-313

8

and 4-2A-210 (On behalf of the Arkansas Sub-Class) ........................................................ 98

9

EIGHTH CAUSE OF ACTION Breach of the Implied Warranty of Merchantability Ark.
Code Ann. §§ 4-2-313 and 4-2A-212 (On behalf of the Arkansas Sub-Class) .................. 102

10

NINTH CAUSE OF ACTION Violation of the Colorado Consumer Protection Act Colo.
Rev. Stat. §§ 6-1-101, *et seq.* (On behalf of the Colorado Sub-Class) ............................... 104

11

TENTH CAUSE OF ACTION Breach of Express Warranty Colo. Rev. Stat. §§ 4-2-313 and

12

4-2.5-210 (On behalf of the Colorado Sub-Class) ........................................................... 108

13

ELEVENTH CAUSE OF ACTION Breach of the Implied Warranty of Merchantability Colo.
Rev. Stat. §§ 4-2-313 and 4-2.5-212 (On behalf of the Colorado Sub-Class)................... 111

14

TWELFTH CAUSE OF ACTION Violations of the Florida Deceptive and Unfair Trade
Practices Act, Fla. Stat. § 501.201, *et seq.* (On Behalf of the Florida Sub-Class).............. 113

15

THIRTEENTH CAUSE OF ACTION Breach of Express Warranty Fla. Stat. §§ 672.313 and
680.21 (On behalf of the Florida Sub-Class) ................................................................. 117

16

FOURTEENTH CAUSE OF ACTION Breach of the Implied Warranty of Merchantability

17

Fla. Stat. §§ 672.314 and 680.212 (On behalf of the Florida Sub-Class)........................... 120

18

FIFTEENTH CAUSE OF ACTION Violations of the Georgia Fair Business Practices Act,
Ga. Code Ann. § 10-1-390, *et seq.* (On Behalf of the Georgia Sub-Class) ........................ 123

19

SIXTEENTH CAUSE OF ACTION Violations of the Georgia Uniform Deceptive Trade
Practices Act, Ga. Code Ann. § 10-1-370, *et seq.* (On Behalf of the Georgia Sub-
Class)............................................................................................................................ 126

20

SEVENTEENTH CAUSE OF ACTION Violations of the Illinois Consumer Fraud and

21

Deceptive Business Practices Act, 815 ILCS 505/1, *et seq.* (On Behalf of the Illinois
Sub-Class) .................................................................................................................... 130

22

EIGHTEENTH CAUSE OF ACTION Breach of Express Warranty Ill. Comp. Stat. §§ 5/2-

23

313 and 5/2A-210 (On behalf of the Illinois Sub-Class) ..................................................... 134

NINETEENTH CAUSE OF ACTION Breach of the Implied Warranty of Merchantability Ill.

24

Comp. Stat. §§ 5/2-314 and 5/2A-212 (On behalf of the Illinois Sub-Class)..................... 137

25

TWENTIETH CAUSE OF ACTION Violations of the Indiana Consumer Sales Act, Ind.
Code § 24-5-0.5-3, *et seq.* (On Behalf of the Indiana Sub-Class) ..................................... 140

26

TWENTY-FIRST CAUSE OF ACTION Breach of Express Warranty Ind. Code §§ 26-1-2-
313 and 26-1-2.1-210 (On behalf of the Indiana Sub-Class)............................................. 144

27

TWENTY-SECOND CAUSE OF ACTION Breach of the Implied Warranty of

28

Merchantability Ind. Code §§ 26-1-2-314 and 26-1-2.1-212 (On behalf of the Indiana
Sub-Class).................................................................................................................... 147

iii

# TABLE OF CONTENTS

(continued)

TWENTY-THIRD CAUSE OF ACTION Violations of the Kansas Consumer Protection Act, Kan. Stat. § 50-623, *et seq.* (On Behalf of the Kansas Sub-Class).................................... 150

TWENTY-FOURTH CAUSE OF ACTION Breach of the Implied Warranty of Merchantability Kan. Stat. §§ 84-2-314 and 84-2A-212 (On behalf of the Kansas Sub-Class)............................................................................................................ 154

TWENTY-FIFTH CAUSE OF ACTION Violations of the Maryland Consumer Protection Act, Md. Code Ann., Com. Law § 13-101, *et seq.* (On Behalf of the Maryland Sub-Class)........................................................................................................... 156

TWENTY-SIXTH CAUSE OF ACTION Breach of the Implied Warranty of Merchantability Md. Com. Law §§ 2-314 and 2A-212 (On behalf of the Maryland Sub-Class) .................. 160

TWENTY-SEVENTH CAUSE OF ACTION Violations of the Michigan Consumer Protection Law, Mich. Comp. Laws § 445.903, *et seq.* (On Behalf of the Michigan Sub-Class) ........................................................................................................... 162

TWENTY-EIGHTH CAUSE OF ACTION Breach of Express Warranty Mich. Comp. Laws §§ 440.2313 and 440.2860 (On behalf of the Michigan Sub-Class) ................................... 166

TWENTY-NINTH CAUSE OF ACTION Breach of the Implied Warranty of Merchantability Mich. Comp. Laws §§ 440.2314 and 440.2860 (On behalf of the Michigan Sub-Class).... 169

THIRTIETH CAUSE OF ACTION Violations of the Minnesota Prevention of Consumer Fraud Act, Minn. Stat.§ 325F.68, *et seq.* (On Behalf of the Minnesota Sub-Class)............ 171

THIRTY-FIRST CAUSE OF ACTION Violations of the Minnesota Deceptive Trade Practices Act, Minn. Stat. § 325D.43-48, *et seq.* (On Behalf of the Minnesota Sub-Class)........................................................................................................... 175

THIRTY-SECOND CAUSE OF ACTION Violations of the Minnesota False Statement in Advertising Act, Minn. Stat. § 325F.67, *et seq.* (On Behalf of the Minnesota Sub-Class)........................................................................................................... 179

THIRTY-THIRD CAUSE OF ACTION Breach of Express Warranty Minn. Stat. §§ 336.2-313 and 336.2A-210 (On behalf of the Minnesota Sub-Class).......................................... 183

THIRTY-FOURTH CAUSE OF ACTION Breach of the Implied Warranty of Merchantability Minn. Stat. §§ 336.2-314 and 336.2A-212 (On behalf of the Minnesota Sub-Class) .......................................................................................... 186

THIRTY-FIFTH CAUSE OF ACTION Violation of the New Jersey Consumer Fraud Act N.J. Stat. Ann. §§ 56:8-1, *et seq.* (On behalf of the New Jersey Sub-Class)...................... 189

THIRTY-SIXTH CAUSE OF ACTION Violations of the North Carolina Unfair and Deceptive Acts and Practices Act, N.C. Gen. Stat. § 75-1.1, *et seq.* (On Behalf of the North Carolina Sub-Class)................................................................................... 193

THIRTY-SEVENTH CAUSE OF ACTION Breach of Express Warranty N.C. Gen. Stat. §§ 26-1-2-313 and 26-1-2.1-210 (On behalf of the North Carolina Sub-Class)...................... 197

THIRTY-EIGHTH CAUSE OF ACTION Breach of the Implied Warranty of Merchantability N.C. Gen. Stat. §§ 26-1-2-314 and 26-1-2.1-212 (On behalf of the North Carolina Sub-Class).................................................................................... 200

THIRTY-NINTH CAUSE OF ACTION Violations of the Washington Consumer Protection Act, Wash. Rev. Code § 19.86.010, *et seq.* (On Behalf of the Washington Sub-Class)...... 202

iv

1

## TABLE OF CONTENTS
(continued)

2

**PAGE**

3      FORTIETH CAUSE OF ACTION Breach of Express Warranty Wash. Rev. Code §§ 62A.2-
       313 and 62A.2A-210 (On behalf of the Washington Sub-Class) ....................................... 206

4      FORTY-FIRST CAUSE OF ACTION Violations of the Wisconsin Deceptive Trade
5      Practices Act, Wisc. Stat. § 100.18, *et seq.* (On behalf of the Wisconsin Sub-Class)......... 210

6      FORTY-SECOND CAUSE OF ACTION Violation of the Nebraska Consumer Protection
       Act Neb. Rev. Stat. §§ 59-1601, *et seq.* (On behalf of the Nebraska Sub-Class)............... 213

7      FORTY-THIRD CAUSE OF ACTION Breach of Express Warranty, Neb.Rev.St. U.C.C. §§
       2-313 and 2A-210 (On Behalf of the Nebraska Sub-Class) ................................................ 217

8      FORTY-FOURTH CAUSE OF ACTION Breach of the Implied Warranty of
       Merchantability, Neb.Rev.St. U.C.C.§§ 2-314 and 2A-212 (On Behalf of the
9      Nebraska Sub-Class)........................................................................................................... 221

10     FORTY-FIFTH CAUSE OF ACTION Violation of the Tennessee Consumer Protection Act
       Tenn. Code §§ 47-18-101, *et seq.* (On behalf of the Tennessee Sub-Class) ...................... 224

11     FORTY-SIXTH CAUSE OF ACTION Breach of Express Warranty, Tenn. Code §§ 47-2-
       313 and 47-2A-210 (On Behalf of the Tennessee Sub-Class)............................................ 228

12     FORTY-SEVENTH CAUSE OF ACTION Breach of the Implied Warranty of
       Merchantability, Tenn. Code §§ 47-2-314 and 47-2A-212 (On Behalf of the
13     Tennessee Sub-Class) ........................................................................................................ 231

14     FORTY-EIGHTH CAUSE OF ACTION Violation of the Texas Deceptive Trade Practices
       Act Tex. Bus. & Com. Code §§ 17.41, *et seq.* (On behalf of the Texas Sub-Class) .......... 235

15     FORTY-NINTH CAUSE OF ACTION Breach of Express Warranty, Ohio Rev. Code Ann. §
16     1302.26, *et seq.* (On Behalf of the Ohio Sub-Class)............................................................ 239

17     FIFTIETH CAUSE OF ACTION Breach of the Implied Warranty of Merchantability, Ohio
       Rev. Code Ann. §§ 1302.27 and 1310.19 (On Behalf of the Ohio Sub-Class) .................. 242

18     FIFTY-FIRST CAUSE OF ACTION Violation of the Magnuson-Moss Warranty Act, 15
       U.S.C. §§ 2301, *et seq.*...................................................................................................... 245

19     X.      PRAYER FOR RELIEF ........................................................................................ 247

20     XI.     DEMAND FOR JURY TRIAL ........................................................................... 248

21

22

23

24

25

26

27

28

## I.    INTRODUCTION

1.    Plaintiffs Vanessa Miller, Patsy Lund, Amber West, Evan West, Darrick Christodaro, Amy Hoffer, Jillian Constable, Monterio Butcher, Harlampi Bozhinov, Mary Glade, Theresa Balaszek, Craig Morford, Kelli Morford, Aaron Manfra, Victoria Manfra, Stacey Coppock, Rachel Goodrich, Brian Simonds, David Schiavi, Robyn Pirog, Zachary Scott Damm, Amanda Gates, Shari Techlin, Tyson John Batdorf, Anthony Cicero, David Gonzalez, Jeffery Hodges, Mark Kennedy, John Krecek, Tracey Ann Metro, Scott Pickering, and Kimberly Thomas bring this action individually and on behalf of all persons who purchased or leased in Arkansas, California, Colorado, Florida, Georgia, Illinois, Indiana, Kansas, Maryland, Michigan, Minnesota, Missouri, Nebraska, New Jersey, North Carolina, Ohio, Texas, Tennessee, Washington, and Wisconsin, certain vehicles equipped uniformly with defective engines that were designed, manufactured, distributed, and sold/leased by Ford Motor Company and/or its related subsidiaries or affiliates ("Ford"), as further described below ("Class Members").

## II.    NATURE OF THE ACTION

2.    The vehicles at issue in this action include certain Ford vehicles equipped with 1.5L, 1.6L, or 2.0L EcoBoost engines (the "EcoBoost engines"). These vehicles are 2013-2019 Ford Escapes, 2013-2019 Ford Fusions, 2015-2018 Ford Edges, 2016-2019 Lincoln MKCs, and 2016-2019 Lincoln MKZs (the "Class Vehicles").

3.    The EcoBoost engines in each of the Class Vehicles are substantially the same, from an engineering standpoint, notwithstanding their varying sizes. The EcoBoost engines in the Class Vehicles contain the same relevant components, made of the same materials.

4.    The EcoBoost engines in the Class Vehicles have a critical defect that causes engine coolant—which is vital to the safety and functionality of the engine—to leak into the engine's cylinders (the "Engine Defect"). The lack of coolant created by the leaks causes overheating, and can, even at low mileages, result in the cylinder head cracking and, in some instances, can cause total engine failures and engine fires. Presence of coolant within the cylinders of the engine, alone, can also cause corrosion, oil dilution and contamination, and engine failure.

5.    Ford has failed to provide an effective solution to consumers who purchased or leased Class Vehicles. Further, Ford has not satisfactorily or effectively addressed the source of the defect for those consumers, including for those whose vehicles remain in warranty. Instead of replacing

the engine block, Ford merely applies superficial stopgap, "Band-Aid" remedies such as installing coolant level sensors. This sensor alerts consumers when their coolant has been depleted, so that they can replenish it. It does not, however, prevent further future coolant depletion, or do anything to prevent the coolant from seeping into the engine cylinders. In some instances, Ford just replaces certain parts other than the defective engine block, thereby failing to address the root cause of the Engine Defect.

6.      These half measures force consumers to return repeatedly for service and to continue driving a vehicle at risk of future damage to the engine and components, engine failure, and engine fires.

7.      Consumers whose EcoBoost engines overheat or fail when the vehicle is out of warranty must pay out-of-pocket for the necessary repairs and, again, may have to return for repeated service if Ford does not replace the defective engine with a non-defective engine block. These repairs, including a full engine replacement, can cost thousands of dollars.

8.      The Engine Defect interferes with Plaintiffs' and Class Members' safe, comfortable, and expected use of their Class Vehicles. It exposes them to severe risk created by engine failures and engine fires, and it requires them to pay for repairs and/or engine replacement.

9.      Discovery will show that before selling or leasing the Class Vehicles, Ford knew about the Engine defect through sources including pre-production testing, pre-production design failure mode analysis, pre-release evaluation and testing; repair and warranty data; replacement part sales data; high failure rates and analysis in response; early consumer complaints made directly to Ford and/or posted on public online vehicle owner forums; consumer complaints made to Ford's authorized dealerships, who are Ford's agents for vehicle sales, leases, servicing, and repairs, testing done in response to those complaints; aggregate data from Ford dealers; and other internal sources.

10.      Yet despite its knowledge, Ford failed to disclose and actively concealed the Engine Defect from Class Members and the public, and Ford has continued to market and advertise the Class Vehicles as safe, comfortable, and of high quality.

11.      As a result of Ford's alleged misconduct, Plaintiffs and Class Members were harmed and suffered actual damages, including that the Class Vehicles contain the Engine Defect, have

2

manifested, and continue to manifest, the Engine Defect, and that Ford has not provided a permanent, no-cost remedy for this Defect within a reasonable amount of time. Furthermore, Plaintiffs and Class Members have incurred, and will continue to incur, out-of-pocket, unreimbursed costs and expenses relating to the Engine Defect.

## III.  PARTIES

### A.  Plaintiff Vanessa Miller

12.  Plaintiff Vanessa Miller is an individual residing in Sacramento, California.

13.  Ms. Miller owns a 2017 Ford Edge with a 2.0L EcoBoost engine, which she purchased used on November 22, 2017 from Enterprise Car Sales in Sacramento, California. The vehicle had 20,699 miles at the time of purchase. The warranty start date for the vehicle was on or around January 13, 2007. Ms. Miller purchased the vehicle for personal, family, and household use.

14.  Passenger safety and reliability were important factors to Ms. Miller's decision to purchase the vehicle. Prior to purchasing the 2017 Ford Edge, Ms. Miller researched the vehicle by, among other things, visiting a Ford dealership, conducting substantial internet research, and visiting Ford's website to view the specifications, features, options, and configurations for the Ford Edge. Based on Ford's representations, Ms. Miller was led to believe that the 2017 Ford Edge was, among other things, a safe, reliable, and high quality vehicle.

15.  Despite Ms. Miller's research prior to purchasing the vehicle, Ford never disclosed at the time of purchase that the 2017 Ford Edge contained the Engine Defect, which could cause the vehicle's engine to leak coolant, overheat, fail, and even potentially ignite into an engine fire. Indeed, Ford concealed this information from consumers, and Ms. Miller was not aware of, and did not have any reason to anticipate that her vehicle was afflicted by the Engine Defect when she purchased the vehicle.

16.  Ford's omissions were material to Ms. Miller. If Ford had adequately disclosed these facts before Ms. Miller purchased the vehicle, she would have learned of the concealed information and would not have bought the vehicle or would have paid less for it.

17.  Shortly after her purchase, in June 2018 (and with her vehicle at approximately 36,000 miles), the "check engine" alert light came on and the engine began to shake violently while the

vehicle was in use. On June 14, 2018, Ms. Miller took the vehicle to a Ford dealership, which replaced the engine. The initial repair was covered under warranty and took approximately three weeks, during which time Ms. Miller was not able to use her vehicle.

18.     Less than two years later, in November 2019 (and with her vehicle at approximately 84,000 miles), Ms. Miller's 2017 Ford Edge began manifesting the same problems in the replacement engine as the vehicle's original engine had displayed in 2018, including total engine failure. On December 9, 2019, Ms. Miller's husband contacted Ford directly and spoke with a customer service representative. He alerted the representative that Ms. Miller had experienced yet another engine failure in her 2017 Ford Edge. Ford informed Ms. Miller's husband that there were "no coverages for the engine" in her vehicle. Ford eventually agreed to pay a small portion—$1,500—of the repair costs, which totaled $7,579.19. This left Ms. Miller still forced to spend $6,079.19 out of pocket. Furthermore, this amount does not include the costs Ms. Miller had to bear related to being without the use of her vehicle for the time required to conduct the repairs.

19.     Despite complaining to Ford about the Engine Defect, Ms. Miller's vehicle has never been adequately and permanently repaired, as Ford has failed to issue a recall or other form of satisfactory repair for the Engine Defect.

20.     As a result of Ford's misconduct and concealment of the Engine Defect Ms. Miller has overpaid for her 2017 Ford Edge, incurred out of pocket losses to repair the engine, and did not receive the full benefit of the bargain in purchasing the vehicle.

21.     Ms. Miller has lost confidence in the ability of her Class Vehicle to provide safe and reliable transportation for ordinary and advertised purposes. Further, based on her experience, Ms. Miller is not confident that she will be able to rely on Ford's advertising and labeling in the future for the potential purchase of another Ford vehicle.

22.     At all times, Ms. Miller, like all Class Members, has driven her vehicle in a manner both foreseeable and in which it was intended to be used.

**B.     <u>Plaintiff Patsy Lund</u>**

23.     Plaintiff Patsy Lund is an individual residing in Fort Smith, Arkansas.

24.     Ms. Lund owned a 2016 Ford Escape with a 2.0L EcoBoost Engine, which she

4

purchased used on October 21, 2016 from Fort City Motors in Fort Smith, Arkansas. The vehicle had 14,532 miles at the time of purchase. The warranty start date for the vehicle was on or around December 9, 2015. Ms. Lund purchased the vehicle for personal, family, and household use.

25.   Passenger safety and reliability were important factors to Ms. Lund's decision to purchase the vehicle. Prior to purchasing the 2016 Ford Escape, Ms. Lund researched the vehicle by looking at the vehicle's safety features on Ford's website. Based on Ford's representations, Ms. Lund was led to believe that the 2016 Ford Escape was, among other things, a safe, reliable, and high-quality vehicle.

26.   Despite Ms. Lund's research prior to purchasing the vehicle, Ford never disclosed at the time of purchase that the 2016 Ford Escape contained the Engine Defect, which could cause the vehicle's engine to leak coolant, overheat, fail, and even potentially ignite into an engine fire. Indeed, Ford concealed this information from consumers, and Ms. Lund was not aware of, and did not have any reason to anticipate, that her vehicle was afflicted by the Engine Defect when she purchased the vehicle.

27.   Ford's omissions were material to Ms. Lund. If Ford had adequately disclosed these facts before Ms. Lund purchased the vehicle, she would have learned of the concealed information and would not have bought the vehicle or would have paid less for it.

28.   On November 6, 2020, Ms. Lund took her vehicle in for service at Randall Ford in Fort Smith, Arkansas, to diagnose a check engine light. At the time, Ms. Lund's vehicle had 49,815 miles on the odometer and was under warranty.

29.   The Ford Dealership told Ms. Lund her vehicle was low on engine coolant, and it was leaking into the engine. The Ford Dealership told Ms. Lund the engine in those vehicles was obsolete and that her vehicle would need another engine that would not be available until summer of 2021. The Dealership said that Ms. Lund could not continue a loaner vehicle for that long and the best they could do was offer a trade in because her vehicle could not be repaired.

30.   Ms. Lund paid Randall Ford for their diagnostic work.

31.   Despite complaining to Ford about the Engine Defect, Ms. Lund's vehicle has never been adequately and permanently repaired, as Ford has failed to issue a recall or other form of

satisfactory repair for the Engine Defect.

32.     As a result of Ford's misconduct and concealment of the Engine Defect, Ms. Lund has overpaid for her 2016 Ford Escape, incurred out-of-pocket expenses, and did not receive the full benefit of the bargain in purchasing the vehicle.

33.     Ms. Lund has lost confidence in the ability of her Class Vehicle to provide safe and reliable transportation for ordinary and advertised purposes. Further, Ms. Lund will be unable to rely on Ford's advertising and labelling in the future for the potential purchase of another Ford vehicle.

34.     At all times, Ms. Lund, like all Class Members, has driven her vehicle in a manner both foreseeable and in which it was intended to be used.

### C.     **Plaintiffs Amber and Evan West**

35.     Plaintiffs Amber and Evan West are individuals residing in Palmdale, California.

36.     The Wests owned a 2013 Ford Fusion with a 1.6L EcoBoost engine, which they purchased new on May 27, 2013 from Antelope Valley Ford, an authorized Ford dealer in Palmdale, California. The Wests purchased the vehicle for personal, family, and household use.

37.     Passenger safety and reliability were important factors to the Wests' decision to purchase the vehicle. Based on the representations Ford made on its website and in advertisements, the Wests believed that the 2013 Ford Fusion was safe, reliable, and utilized state-of-the-art safety technology. In addition, when they went to Antelope Valley Ford to purchase their vehicle on May 27, 2013, the Wests met with a Ford sales representative at the dealership. The sales representative told the Wests that Ford's EcoBoost engine that came standard with the Ford Fusion was state of the art. He also stressed that the vehicle was one of the safest on the highway with a five-star safety rating from the National Highway Traffic Safety Administration (NHTSA). This five-star NHTSA rating was also prominently displayed on a sticker in the vehicle's window. These representations concerning the quality of the EcoBoost engine, and the safety of this vehicle, were consistent with Ford's marketing of its vehicles, were important to the Wests' purchasing decision, and were substantial factors that caused them to purchase the 2013 Ford Fusion.

38.    Despite the Wests' research prior to purchasing the vehicle, Ford never disclosed at the time of purchase that the 2013 Ford Fusion contained the Engine Defect, which could cause the vehicle's engine to leak coolant, overheat, fail, and even potentially ignite into an engine fire. Indeed, Ford concealed this information from consumers, and the Wests were not aware of and did not have any reason to anticipate that their vehicle was afflicted by the Engine Defect when they purchased the vehicle.

39.    Ford's omissions were material to the Wests. If Ford had adequately disclosed these facts before the Wests purchased the vehicle, they would have learned of the concealed information and would not have bought the vehicle or would have paid less for it.

40.    In September 2016, when the Wests' 2013 Ford Fusion had approximately 47,712 miles on the odometer and was still under warranty, the vehicle suddenly lost all power when being driven by Mr. West on the highway. Mr. West had the vehicle towed to Antelope Valley Ford, which informed him that that there was a problem with the coolant sensor. Ford replaced the coolant sensor and told the Wests to add more coolant to the engine. Ford did not tell the Wests that their vehicle was suffering from the Engine Defect.

41.    Installing the new sensor and adding more coolant failed to fix the Engine Defect. The Wests continued to experience problems with their car: the car would overheat and stop working shortly after starting up, and the "check engine" alert light was frequently illuminated. The Wests brought their 2013 Ford Fusion to the dealership three more times during the vehicle's warranty period for repairs related to the loss of coolant from the vehicle's engine. Rather than actually repairing the vehicle, however, the Ford dealership merely told the Wests to add more coolant to the engine during each of these visits.

42.    The Wests' problems with their vehicle continued. After the vehicle's warranty expired, Antelope Valley Ford finally told the Wests that their vehicle (which by this point had 86,950 miles) was suffering from a coolant leak and needed a new engine. Faced with no other choice, the Wests paid $6,800 to repair their engine. In addition, they have spent approximately $1,500 on motor oil, coolant, and sparkplugs trying to fix the Engine Defect since they first brought their vehicle in for repairs in 2016.

43.     Despite complaining to Ford about the Engine Defect, the Wests' vehicle has never been adequately and permanently repaired, as Ford has failed to issue a recall or other form of satisfactory repair for the Engine Defect.

44.     As a result of Ford's misconduct and concealment of the Engine Defect, the Wests overpaid for their 2013 Ford Fusion, incurred out of pocket losses to repair the engine, and did not receive the full benefit of the bargain in purchasing the vehicle.

45.     The Wests have lost confidence in the ability of their Class Vehicle to provide safe and reliable transportation for ordinary and advertised purposes. Further, based on their experience, the Wests are not confident that they will be able to rely on Ford's advertising and labeling in the future for the potential purchase of another Ford vehicle.

46.     At all times, the Wests, like all Class Members, have driven their vehicle in a manner both foreseeable and in which it was intended to be used.

**D.     Plaintiff Darrick Christodaro**

47.     Plaintiff Darrick Christodaro is an individual residing in Fredonia, New York.

48.     Mr. Christodaro owns a 2017 Ford Escape with a 1.5L EcoBoost engine. He purchased the vehicle new on March 25, 2017 from Western Slope Auto, an authorized Ford dealership in Grand Junction, Colorado. Mr. Christodaro purchased the vehicle for personal, family, and household use.

49.     Passenger safety and reliability were important factors to Mr. Christodaro's decision to purchase the vehicle. Prior to purchasing the 2017 Ford Escape, Mr. Christodaro researched the vehicle on the internet, reviewed Ford advertisements and sales brochures, discussed the vehicle with a Ford representative at Western Slope Auto, and test drove the vehicle. Based on Ford's representations, Mr. Christodaro was led to believe that the 2017 Ford Escape was, among other things, a safe, reliable, and high quality vehicle.

50.     Despite Mr. Christodaro's research prior to purchasing the vehicle, Ford never disclosed at the time of purchase that the 2017 Ford Escape contained the Engine Defect, which could cause the vehicle's engine to leak coolant, overheat, fail, and even potentially ignite into an engine fire. Indeed, Ford concealed this information from consumers, and Mr. Christodaro was not

8

aware of, and did not have any reason to anticipate that his vehicle was afflicted by the Engine Defect when he purchased the vehicle.

51.     Ford's omissions were material to Mr. Christodaro. If Ford had adequately disclosed these facts before Mr. Christodaro purchased the vehicle, he would have learned of the concealed information and would not have bought the vehicle or would have paid less for it.

52.     On February 14, 2020, Mr. Christodaro brought his vehicle in for a service appointment at Shults Ford-Lincoln, an authorized Ford dealership in Jamestown, New York. At this time, the vehicle had only 59,918 miles on it. As such, the vehicle was still covered by Ford's warranty. Mr. Christodaro asked Shults Ford-Lincoln to check his car for signs of the issues described in CSP #19B37, which warned that "affected vehicles may exhibit coolant intrusion into the cylinder bores." Shults Ford-Lincoln did nothing other than reprogram Mr. Christodaro's vehicle's PCM.

53.     Less than a month later, Mr. Christodaro attempted to turn his vehicle on. The vehicle, which had been working normally, was suddenly without power. When Mr. Christodaro finally got the vehicle to start, it started shaking violently and shut down again. The "check engine" alert light then illuminated.

54.     Mr. Christodaro brought his vehicle back to Shults Ford-Lincoln on March 10, 2020. By this point, Mr. Christodaro's vehicle had 61,272 miles on it and was therefore barely out of warranty. Shults Ford-Lincoln informed Mr. Christodaro they would have to perform a pressure check on his vehicle. Shults Ford-Lincoln did not replace Mr. Christodaro's engine or otherwise remedy the Engine Defect.

55.     Throughout that spring, Mr. Christodaro's vehicle continued to regularly refuse to start or misfire. He brought the vehicle back to Shults Ford-Lincoln, which informed Mr. Christodaro that he would have to pay to replace his vehicle's engine. Mr. Christodaro requested that Ford cover the cost of this repair, but Ford refused. Mr. Christodaro did not undergo the repair procedure at this time.

56.     In mid-July 2020, Mr. Christodaro's vehicle again failed to start, this time for good. Mr. Christodaro arranged to have his vehicle towed (at his own expense) to Gowanda Ford, which

quoted Mr. Christodaro $5,098.37 to replace his vehicle's engine plus the cost of towing his vehicle. Left without any alternative, Mr. Christodaro had to pay out of pocket for the repairs.

57.    Despite complaining to Ford about the Engine Defect, Mr. Christodaro's vehicle has never been adequately and permanently repaired, as Ford has failed to issue a recall or other form of satisfactory repair for the Engine Defect.

58.    As a result of Ford's misconduct and concealment of the Engine Defect, Mr. Christodaro has overpaid for his 2017 Ford Escape, incurred out of pocket losses to repair the engine, and did not receive the full benefit of the bargain in purchasing the vehicle.

59.    Mr. Christodaro has lost confidence in the ability of his Class Vehicle to provide safe and reliable transportation for ordinary and advertised purposes. Further, Mr. Christodaro will be unable to rely on Ford's advertising and labeling in the future for the potential purchase of another Ford vehicle.

60.    At all times, Mr. Christodaro, like all Class Members, has driven his vehicle in a manner both foreseeable and in which it was intended to be used.

**E.    <u>Plaintiff Amy Hoffer</u>**

61.    Plaintiff Amy Hoffer is an individual residing in Jacksonville, Florida.

62.    Ms. Hoffer owns a 2017 Ford Edge with a 2.0L EcoBoost engine, which she, with her husband Kevin Hoffer, purchased used in or around May 2018, from Arlington Toyota in Jacksonville, Florida. The vehicle had approximately 34,000 miles on the odometer at the time of purchase. Plaintiff Hoffer purchased her 2017 Ford Edge primarily for personal, family, or household use.

63.    Passenger safety and reliability were important factors in Plaintiff Hoffer's decision to purchase her vehicle. Prior to purchasing her 2017 Ford Edge, Plaintiff Hoffer researched her vehicle. Plaintiff Hoffer's husband, Kevin Hoffer, did a general online search for information on the vehicle, visited the manufacturer's website, reviewed the window sticker and documents provided at the dealership, and went on a test drive. Based on Ford's representations, Plaintiff Hoffer was led to believe that her 2017 Ford Edge was, among other things, a safe, reliable, and high quality vehicle.

64.     Despite Ms. Hoffer and her husband's research prior to purchasing the vehicle, Ford never disclosed at the time of purchase that the 2017 Ford Edge contained the Engine Defect, which could cause the vehicle's engine to leak coolant, overheat, fail, and even potentially ignite into an engine fire. Indeed, Ford concealed this information from consumers, and Ms. Hoffer was not aware of, and did not have any reason to anticipate that her vehicle was afflicted by the Engine Defect when she purchased the vehicle.

65.     Ford's omissions were material to Plaintiff Hoffer. Had Ford disclosed its knowledge of the Engine Defect before she purchased her 2017 Ford Edge, Plaintiff Hoffer would have learned of the concealed information and would not have bought the vehicle or would have paid less for it.

66.     On or around February 15, 2021, when the vehicle had approximately 67,000 miles on the odometer, the check engine light illuminated while driving. Plaintiff Hoffer brought her vehicle to Ford Duval, an authorized Ford dealership in Jacksonville, Florida. The dealership stated that the engine block was cracked, causing coolant to leak on the pistons and the only solution was installing a new engine. The dealership further stated that a used engine was not an option because it would also fail and recommended a new, redesigned engine. Plaintiff Hoffer brought her vehicle to an independent mechanic who installed the redesigned engine. To date, Plaintiff Hoffer has paid over $5,800 for repairs.

67.     Despite complaining to Ford about the Engine Defect, Plaintiff Hoffer's vehicle was never adequately and permanently repaired despite the engine replacement, as Ford has failed to issue a recall or other form of satisfactory repair for the Engine Defect.

68.     As a result of Ford's misconduct and concealment of the Engine Defect, Ms. Hoffer has overpaid for her 2017 Ford Edge, incurred out of pocket losses to entirely replace the engine, and did not receive the full benefit of the bargain in purchasing the vehicle.

69.     Despite purchasing a new engine, Ms. Hoffer has lost confidence in the ability of her Class Vehicle to provide safe and reliable transportation for ordinary and advertised purposes. Further, Ms. Hoffer will be unable to rely on Ford's advertising and labelling in the future for the potential purchase of another Ford vehicle.

70.     At all times, Ms. Hoffer, like all Class Members, has driven her vehicle in a manner

both foreseeable and in which it was intended to be used.

**F.**    **Plaintiff Jillian Constable**

71.    Plaintiff Jillian Constable is an individual residing in St. Augustine, Florida.

72.    Ms. Constable owns a 2016 Ford Edge with a 2.0L EcoBoost engine, which she purchased used on August 25, 2017 from Chestatee Ford, an authorized Ford dealer in Dahlonega, Georgia. The vehicle had approximately 29,000 miles at the time of purchase. Ms. Constable purchased the vehicle for personal, family, and household use. The warranty start date for the vehicle was on or around July 4, 2016.

73.    Passenger safety and reliability were important factors to Ms. Constable's decision to purchase the vehicle. Prior to purchasing the 2016 Ford Edge, Ms. Constable researched the vehicle by conducting general online searches on Google, visiting the dealership website, reviewing the Monroney label (window sticker), test driving the vehicle, discussing the vehicle with the salesperson who informed her it was a good family car, and comparing models in Kelley Blue Book. Based on Ford's representations, Ms. Constable was led to believe that the 2016 Ford Edge was, among other things, a safe, reliable, and high quality vehicle.

74.    Despite Ms. Constable's research prior to purchasing the vehicle, Ford never disclosed at the time of purchase that the 2016 Ford Edge contained the Engine Defect, which could cause the vehicle's engine to leak coolant, overheat, fail, and even potentially ignite into an engine fire. Indeed, Ford concealed this information from consumers, and Ms. Constable was not aware of, and did not have any reason to anticipate that her vehicle was afflicted by the Engine Defect when she purchased the vehicle.

75.    Ford's omissions were material to Ms. Constable. If Ford had adequately disclosed these facts before Ms. Constable purchased the vehicle, she would have learned of the concealed information and would not have bought the vehicle or would have paid less for it.

76.    On or around December 25, 2020, Ms. Constable first started experiencing problems with the engine in her vehicle, including the vehicle idling when driving. On or around December 29, 2020, the car engine light illuminated, and Ms. Constable brought her vehicle to an independent mechanic who found that the diagnostic trouble codes indicated a cylinder misfire. The independent

mechanic advised that this was common issue and scheduled a repair for the next week.  On or around January 2, 2021 at 73,866 miles, after the car engine light illuminated a second time and before the scheduled the repair, Ms. Constable brought her vehicle to Auto Nation Ford Dealership. The dealership said the engine failed due to overheating and an internal leak resulting in no coolant in the vehicle and coolant found in the oil and replaced the engine.

77.    Ms. Constable spent approximately $5,800 on repairs, including replacing the engine, in an attempt to fix the issue.

78.    Despite complaining to Ford about the Engine Defect, Ms. Constable's vehicle has never been adequately and permanently repaired, as Ford has failed to issue a recall or other form of satisfactory repair for the Engine Defect.

79.    As a result of Ford's misconduct and concealment of the Engine Defect, Ms. Constable has overpaid for her 2016 Ford Edge, incurred out of pocket losses to repair the engine, and did not receive the full benefit of the bargain in purchasing the vehicle.

80.    Ms. Constable has lost confidence in the ability of her Class Vehicle to provide safe and reliable transportation for ordinary and advertised purposes. Further, Ms. Constable will be unable to rely on Ford's advertising and labeling in the future for the potential purchase of another Ford vehicle.

81.    At all times, Ms. Constable, like all Class Members, has driven her vehicle in a manner both foreseeable and in which it was intended to be used.

### G.    **Plaintiff Monterio Butcher**

82.    Plaintiff Monterio Butcher is an individual residing in Hampton, Georgia.

83.    Mr. Butcher owned a 2013 Ford Escape with a 2.0L EcoBoost, which he purchased used on or around November 30, 2020 from Autodeals in Jonesboro, Georgia. Mr. Butcher purchased the vehicle for personal, family, and household use.

84.    Passenger safety and reliability were important factors to Mr. Butcher's decision to purchase the vehicle. Prior to purchasing the vehicle, Mr. Butcher conducted research on the internet about the vehicle, visited Ford's website, and saw Ford advertisements. All of the research and advertising caused Butcher to believe that the vehicle was safe, reliable, and built with quality

13

components. These were critical factors in Mr. Butcher's purchasing decision because he intended to utilize the vehicle to transport children. Based on Ford's representations, Mr. Butcher was led to believe that the 2013 Ford Escape was, among other things, a safe, reliable, and high quality vehicle.

85.    Despite Mr. Butcher's research prior to purchasing the vehicle, Ford never disclosed at the time of purchase that the 2013 Ford Escape contained the Engine Defect, which could cause the vehicle's engine to leak coolant, overheat, fail, and even potentially ignite into an engine fire. Indeed, Ford concealed this information from consumers, and Mr. Butcher was not aware of, and did not have any reason to anticipate that his vehicle was afflicted by the Engine Defect when he purchased the vehicle.

86.    Ford's omissions were material to Mr. Butcher. If Ford had adequately disclosed these facts before Mr. Butcher purchased the vehicle, he would have learned of the concealed information and would not have bought the vehicle or would have paid less for it. Safety and reliability were Mr. Butcher's prime concerns when making this purchase.

87.    On January 1, 2021, just a month after purchasing his vehicle, Mr. Butcher was driving in the vehicle with his girlfriend and daughter. The check engine light came on and white smoke was exiting the engine. Mr. Butcher realized the vehicle was overheating so he pulled into a parking lot. He opened the hood of the car and, shortly thereafter, the engine caught fire causing a total loss of the car. Prior to this incident, Mr. Butcher had experienced coolant leaking from his vehicle on numerous occasions. Mr. Butcher had to replace the coolant three times in one month because so much had leaked from the engine.

88.    Mr. Butcher complained about the engine fire to an authorized Ford dealership. Although the car was a total loss, the dealership refused to cover the cost of replacement because the vehicle was no longer in warranty.

89.    Despite complaining to Ford about the Engine Defect, Mr. Butcher's vehicle has never been adequately and permanently repaired, as Ford has failed to issue a recall or other form of satisfactory repair for the Engine Defect.

90.    As a result of Ford's misconduct and concealment of the Engine Defect, Mr. Butcher overpaid for his 2013 Ford Escape, lost the use of his vehicle, incurred costs related to the loss of

14

1    use of his vehicle, and did not receive the full benefit of the bargain in purchasing the vehicle.

2        91.    Mr. Butcher lost confidence in the ability of his Class Vehicle to provide safe and

3    reliable transportation for ordinary and advertised purposes. Further, Mr. Butcher will be unable to

4    rely on Ford's advertising and labeling in the future for the potential purchase of another Ford

5    vehicle.

6        92.    Mr. Butcher provided Ford with notice of the defect through written correspondence

7    dated May 21, 2021 and delivered to Ford via certified mail. Ford has not responded to Mr.

8    Butcher's demand that Ford correct or repair the Engine Defect and compensate Mr. Butcher and

9    all others who were similarly harmed by the Defect.

10       93.    At all times, Mr. Butcher, like all Class Members, has driven his vehicle in a manner

11   both foreseeable and in which it was intended to be used.

12       **H.    Plaintiff Harlampi Bozhinov**

13       94.    Plaintiff Harlampi Bozhinov is an individual residing in Willowbrook, Illinois.

14       95.    Mr. Bozhinov owns a 2018 Ford Fusion with a 1.5L EcoBoost engine, which he

15   purchased new on August 1, 2018 from Willowbrook Ford, an authorized Ford dealer in

16   Willowbrook, Illinois. Mr. Bozhinov purchased the vehicle for personal, family, and household use.

17       96.    Passenger safety and reliability were important factors to Mr. Bozhinov's decision to

18   purchase the vehicle. Prior to purchasing the 2018 Ford Fusion, Mr. Bozhinov researched the vehicle

19   by doing general online searches on Google, watching in excess of 20 commercials, visiting the

20   dealership website, reviewing the Monroney Label (window sticker), receiving a recommendation

21   from the salesperson to purchase the vehicle, researching the vehicle on Edmunds.com, and test

22   driving the vehicle.  Based on Ford's representations, Mr. Bozhinov was led to believe that the 2018

23   Ford Fusion was, among other things, a safe, reliable, and high quality vehicle.

24       97.    Despite Mr. Bozhinov's research prior to purchasing the vehicle, Ford never disclosed

25   at the time of purchase that the 2018 Ford Fusion contained the Engine Defect, which could cause

26   the vehicle's engine to leak coolant, overheat, fail, and even potentially ignite into an engine fire.

27   Indeed, Ford concealed this information from consumers, and Mr. Bozhinov was not aware of, and

28

did not have any reason to anticipate, that his vehicle was afflicted by the Engine Defect when he purchased the vehicle.

98.    Ford's omissions were material to Mr. Bozhinov. If Ford had adequately disclosed these facts before Mr. Bozhinov purchased the vehicle, he would have learned of the concealed information and would not have bought the vehicle or would have paid less for it.

99.    On or around May 10, 2019, Plaintiff Bozhinov was driving on a highway at a speed of approximately seventy-five miles per hour when the engine block cracked. He brought his vehicle to the dealership who found that coolant in the third cylinder caused the engine block to crack. The dealership replaced the entire system, keeping his car for two months.

100.    Despite complaining to Ford about the Engine Defect, Mr. Bozhinov's vehicle has never been adequately and permanently repaired, as Ford has failed to issue a recall or other form of satisfactory repair for the Engine Defect.

101.    As a result of Ford's misconduct and concealment of the Engine Defect, Mr. Bozhinov has overpaid for his 2018 Ford Fusion and did not receive the full benefit of the bargain in purchasing the vehicle.

102.    Mr. Bozhinov has lost confidence in the ability of his Class Vehicle to provide safe and reliable transportation for ordinary and advertised purposes. Further, Mr. Bozhinov will be unable to rely on Ford's advertising and labeling in the future for the potential purchase of another Ford vehicle.

103.    At all times, Mr. Bozhinov, like all Class Members, has driven his vehicle in a manner both foreseeable and in which it was intended to be used.

**I.    Plaintiff Mary Glade**

104.    Plaintiff Mary Glade is an individual residing in Fox Lake, Illinois.

105.    Ms. Glade owns a 2017 Ford Escape with a 1.5L EcoBoost engine, which she purchased used in October of 2019 from Sherman Dodge in Skokie, Illinois. The vehicle had approximately 52,000 miles at the time of purchase. Ms. Glade purchased the vehicle for personal, family, and household use. The vehicle had a warranty start date of July 15, 2017.

106.    Passenger safety and reliability were important factors to Ms. Glade's decision to

16

purchase the vehicle. Prior to purchasing the 2017 Ford Escape, Ms. Glade researched the vehicle by conducting a general online search for information on the vehicle, visited the dealership's website, reviewing the Monroney Label (window sticker) and documents provided at the dealership, and went on a test. Based on Ford's representations, Ms. Glade was led to believe that the 2017 Ford Escape was, among other things, a safe, reliable, and high quality vehicle.

107.    Despite Ms. Glade's research prior to purchasing the vehicle, Ford never disclosed at the time of purchase that the 2017 Ford Escape contained the Engine Defect, which could cause the vehicle's engine to leak coolant, overheat, fail, and even potentially ignite into an engine fire. Indeed, Ford concealed this information from consumers, and Ms. Glade was not aware of, and did not have any reason to anticipate that her vehicle was afflicted by the Engine Defect when she purchased the vehicle.

108.    Ford's omissions were material to Ms. Glade. If Ford had adequately disclosed these facts before Ms. Glade purchased the vehicle, she would have learned of the concealed information and would not have bought the vehicle or would have paid less for it.

109.    On or about September 29, 2020, Plaintiff Glade was driving her vehicle when the engine light illuminated. She immediately pulled to the side of the road and called a tow truck to take her vehicle to an independent mechanic. The mechanic initially diagnosed the issue as a misfire in the cylinder, but upon further investigation, the mechanic found a Ford technical service bulletin ("TSB") stating there was an issue with coolant leaking into the engine block and confirmed that was the issue with Ms. Glade's vehicle. Ford informed the mechanic that the engine would need a rebuild and sold the mechanic an updated version of the engine to be installed in Ms. Glade's vehicle. Ms. Glade contacted Ford directly and requested that it cover the repair, but Ford refused, instead offering to sell Ms. Glade a new engine at her own expense.

110.    To date, Plaintiff Glade has paid over $4,800 for repairs.

111.    Despite complaining to Ford about the Engine Defect, Ms. Glade's vehicle has never been adequately and permanently repaired, as Ford has failed to issue a recall or other form of satisfactory repair for the Engine Defect.

112.    As a result of Ford's misconduct and concealment of the Engine Defect, Ms. Glade

17

has overpaid for her 2017 Ford Escape, incurred out of pocket losses to repair the engine, and did not receive the full benefit of the bargain in purchasing the vehicle.

113.    Ms. Glade has lost confidence in the ability of her Class Vehicle to provide safe and reliable transportation for ordinary and advertised purposes. Further, Ms. Glade will be unable to rely on Ford's advertising and labelling in the future for the potential purchase of another Ford vehicle.

114.    At all times, Ms. Glade, like all Class Members, has driven her vehicle in a manner both foreseeable and in which it was intended to be used.

**J.    Plaintiff Teresa Balaszek**

115.    Plaintiff Teresa Balaszek is an individual residing in Hobart, Indiana.

116.    Ms. Balaszek owns a 2017 Ford Escape with a 1.5L EcoBoost engine, which she purchased new on November 23, 2016 from Webb Ford, Inc., an authorized Ford dealership in Highland, Indiana. Ms. Balaszek purchased the vehicle for personal, family, and household use.

117.    Passenger safety and reliability were important factors to Ms. Balaszek's decision to purchase the vehicle. Prior to purchasing the 2017 Ford Escape, Ms. Balaszek researched the vehicle by visiting the dealership's website and the manufacturer's website, performing a general online search for information on the vehicle, reviewing documents provided at the dealership, and test driving the vehicle. Based on Ford's representations, Ms. Balaszek was led to believe that the 2017 Ford Escape was, among other things, a safe, reliable, and high quality vehicle.

118.    Despite Ms. Balaszek's research prior to purchasing the vehicle, Ford never disclosed at the time of purchase that the 2017 Ford Escape contained the Engine Defect, which could cause the vehicle's engine to leak coolant, overheat, fail, and even potentially ignite into an engine fire. Indeed, Ford concealed this information from consumers, and Ms. Balaszek was not aware of, and did not have any reason to anticipate that her vehicle was afflicted by the Engine Defect when she purchased the vehicle.

119.    Ford's omissions were material to Ms. Balaszek. If Ford had adequately disclosed these facts before Ms. Balaszek purchased the vehicle, she would have learned of the concealed information and would not have bought the vehicle or would have paid less for it.

18

120.    On or around December 27, 2019, with approximately 80,000 miles on the odometer, Ms. Balaszek took her vehicle to Take 5 Oil Change to change her vehicle's oil. During the visit, Ms. Balaszek heard the technicians state that her coolant was completely empty, which they refilled. Subsequently, in or around September 2020, with approximately 90,000 miles on the odometer, Ms. Balaszek noticed a substantial amount of white smoke emerging from the hood of her vehicle when she started the vehicle. She called Webb Ford, Inc. and spoke with the salesperson who sold her the vehicle. She was informed that to even look over the vehicle, she would have to pay $100 diagnostic fee, and that they would not waive this fee even after she asked specifically. Shortly thereafter, Ms. Balaszek brought her vehicle to an independent mechanic for an oil change and asked about the smoke.  She was informed that the issue causing the smoke was not worth fixing and she was advised to trade in her vehicle. On or around September 22, 2020, Ms. Balaszek took her vehicle to Dean's Auto Repair, an independent mechanic, who found coolant had leaked into the engine cylinders and that the engine would have to be rebuilt.

121.    To date, Ms. Balaszek has paid $682.88 for repairs. In addition, Ms. Balaszek lost use of her vehicle for approximately one month while it was being repaired and incurred approximately $1,182 in out-of-pocket expenses in connection with using a rental vehicle.

122.    Despite complaining to Ford about the Engine Defect, Ms. Balaszek's vehicle has never been adequately and permanently repaired, as Ford has failed to issue a recall or other form of satisfactory repair for the Engine Defect.

123.    As a result of Ford's misconduct and concealment of the Engine Defect, Ms. Balaszek has overpaid for her 2017 Ford Escape, incurred $682.88 in out of pocket losses to repair the engine as well as approximately $1,182 in additional costs for a rental vehicle and loss of use of her vehicle while it was being repaired, and did not receive the full benefit of the bargain in purchasing the vehicle.

124.    Ms. Balaszek has lost confidence in the ability of her Class Vehicle to provide safe and reliable transportation for ordinary and advertised purposes. Further, Ms. Balaszek will be unable to rely on Ford's advertising and labelling in the future for the potential purchase of another Ford vehicle.

1    125.   At all times, Ms. Balaszek, like all Class Members, has driven her vehicle in a manner

2    both foreseeable and in which it was intended to be used.

3    **K.**    <u>**Plaintiffs Craig and Kelly Morford**</u>

4    126.   Plaintiffs Craig and Kelly Morford are individuals residing in Lee's Summit,

5    Missouri.

6    127.   The Morfords own a 2017 Ford Escape with a 2.0L EcoBoost engine, which they

7    purchased new on or around April 18, 2017, from Shawnee Mission Ford, a Ford authorized

8    dealership located in Shawnee, Kansas.

9    128.   The Morfords purchased their 2017 Ford Escape primarily for personal, family, or

10   household use.

11   129.   Passenger safety and reliability were important factors in the Morfords' decision to

12   purchase their vehicle. Before making their purchase, the Morfords spent four months researching

13   the 2017 Ford Escape and comparing it to other vehicles including visiting Ford's website. They

14   viewed commercials and advertisements, reviewed brochures and the window sticker, spoke with a

15   salesperson at the dealership regarding the 2017 Ford Escape, and went on a test drive with the

16   dealership salesperson. Based on Ford's representations, the Morfords were led to believe that the

17   2017 Ford Escape was, among other things, a safe, reliable, and high quality vehicle.

18   130.   Despite the Morfords' research prior to purchasing the vehicle, Ford never disclosed

19   at the time of purchase that the 2017 Ford Escape contained the Engine Defect, which could cause

20   the vehicle's engine to leak coolant, overheat, fail, and even potentially ignite into an engine fire.

21   Indeed, Ford concealed this information from consumers, and the Morfords were not aware of, and

22   did not have any reason to anticipate that her vehicle was afflicted by the Engine Defect when she

23   purchased the vehicle

24   131.   Ford's omissions were material to the Morfords. Had Ford disclosed its knowledge of

25   the Engine Defect before they purchased their 2017 Ford Escape, the Morfords would have learned

26   of the concealed information and would not have bought the vehicle or would have paid less for it.

27   132.   In or around October of 2020, with approximately 66,331 miles on the odometer, the

28   Morfords began to experience the Engine Defect. The car would idle rough and seem to misfire

20

while driving. Plaintiff Craig Morford delivered the vehicle to Bob Sight Auto Group, an authorized Ford repair facility. He complained that his vehicle's check engine light was illuminated, and that the vehicle seemed to shake at idle. The technician noted: "RAN ON IDS. P0302, P0316 IN SYSTEM, COOLANT LEVEL LOW, PRESSURE TEST SYSTEM. REMOVE SPARK PLUG AND INSPECT CYLINDERS FOR COOLANT. FOUND COOLANT LEAKING INTO CYLINDER."

133.   Plaintiff Craig Morford was informed that he would have to pay $5,950.00 to "REPLACE LONG BLOCK DUE TO COOLANT INRUSTION [INTRUSION] INTO CYLINDER #2." He was charged $100.00 for the diagnosis. The Morfords' vehicle has never been repaired or the engine replaced, and it continues to be defective.

134.   Despite complaining to Ford about the Engine Defect, Plaintiff Morfords' vehicle was never adequately and permanently repaired despite the engine replacement, as Ford has failed to issue a recall or other form of satisfactory repair for the Engine Defect.

135.   As a result of Ford's misconduct and concealment of the Engine Defect, the Morfords overpaid for their 2017 Ford Escape, incurred out of pocket losses, and did not receive the full benefit of the bargain in purchasing the vehicle.

136.   The Morfords have lost confidence in the ability of their Class Vehicle to provide safe and reliable transportation for ordinary and advertised purposes. Further, the Morfords will be unable to rely on Ford's advertising and labeling in the future for the potential purchase of another Ford vehicle.

137.   At all times, the Morfords, like all Class Members, have driven their vehicle in a manner both foreseeable and in which it was intended to be used.

**L.    Plaintiffs Aaron and Victoria Manfra**

138.   Plaintiffs Aaron and Victoria Manfra are individuals residing in Westminster, Maryland.

139.   The Manfras own a 2017 Ford Fusion with a 1.5L EcoBoost Engine, which they purchased on or about February 18, 2017, from Len Stoler Ford, an authorized Ford dealership in Owings Mills, Maryland.

140.   The Manfra Plaintiffs purchased their 2017 Ford Fusion primarily for personal, family, or household use.

141.   Passenger safety and reliability were important factors in the Manfra Plaintiffs' decision to purchase their vehicle. Prior to purchasing their 2017 Ford Fusion, the Manfra Plaintiffs researched their vehicle. Aaron Manfra did a general online search for information on the vehicle, viewed YouTube videos about the vehicle, reviewed the window sticker and documents provided at the dealership, and went on a test drive. They also spoke with a salesperson at the dealership regarding the 2017 Ford Fusion who stated that it had a 5-star crash rating. Based on Ford's representations, the Manfras were led to believe that the 2017 Ford Fusion was, among other things, a safe, reliable, and high quality vehicle.

142.   Despite the Manfras' research prior to purchasing the vehicle, Ford never disclosed at the time of purchase that the 2017 Ford Fusion contained the Engine Defect, which could cause the vehicle's engine to leak coolant, overheat, fail, and even potentially ignite into an engine fire. Indeed, Ford concealed this information from consumers, and the Manfras were not aware of, and did not have any reason to anticipate, that their vehicle was afflicted by the Engine Defect when they purchased the vehicle.

143.   Ford's omissions were material to the Manfra Plaintiffs. Had Ford disclosed its knowledge of the Engine Defect before they purchased their 2017 Ford Fusion, Plaintiffs Manfra would have learned of the concealed information and would not have bought the vehicle or would have paid less for it.

144.   In or around early October 2020, Plaintiffs were driving their vehicle on the highway when the engine light came on and the engine lost about 50% of its power. The vehicle also began to ride rough. They had it towed to a local, independent mechanic who found that there had been a misfire in cylinder 2. After pulling the spark plug, the mechanic observed coolant in the cylinder and then advised Plaintiffs to take the vehicle to an authorized Ford dealership. On or about October 6, 2020, Plaintiffs had the vehicle towed to Crouse Ford, an authorized Ford dealership in Taneytown, Maryland. Plaintiffs were then informed that the EcoBoost engine in their vehicle has a defect in the short block, which over time caused coolant to leak into the cylinder. Plaintiffs were

22

also told that the dealership had seen five or six other vehicles come in with the same problem. Plaintiffs asked if the repair would be done under warranty, because Ford had known of the Defect, but Ford declined to provide the repair free of cost because Plaintiffs' vehicle had 64,500 miles on the odometer. As a result, Plaintiffs were forced to pay nearly $4,000 to have the short block replaced and their engine clean and rebuilt.

145.   Despite complaining to Ford about the Engine Defect, Plaintiffs Manfras' vehicle was never adequately and permanently repaired despite the engine replacement, as Ford has failed to issue a recall or other form of satisfactory repair for the Engine Defect.

146.   As a result of Ford's misconduct and concealment of the Engine Defect, the Manfras have overpaid for their 2017 Ford Fusion, incurred out of pocket losses to entirely replace the engine, and did not receive the full benefit of the bargain in purchasing the vehicle.

147.   Despite purchasing a new engine, the Manfras lost confidence in the ability of their Class Vehicle to provide safe and reliable transportation for ordinary and advertised purposes. Further, the Manfras will be unable to rely on Ford's advertising and labeling in the future for the potential purchase of another Ford vehicle.

148.   At all times, the Manfras, like all Class Members, have driven their vehicle in a manner both foreseeable and in which it was intended to be used.

**M.     Plaintiff Stacey Coppock**

149.   Plaintiff Stacey Coppock is an individual residing in Howell, Michigan.

150.   On or around September 6, 2017, Plaintiff Coppock purchased a new 2017 Ford Edge with a 2.0L EcoBoost engine from Brighton Ford, a Ford authorized dealership located in Brighton, Michigan. Ms. Coppock purchased her 2017 Ford Edge primarily for personal, family, or household use.

151.   Passenger safety and reliability were important factors in Plaintiff Coppock's decision to purchase her vehicle. Before making her purchase, Plaintiff Coppock spent approximately two weeks researching and comparing the 2017 Ford Edge and visiting dealer websites. Plaintiff Coppock reviewed the window sticker, vehicle information sheet and vehicle information brochure, and spoke with a salesperson at the dealership regarding the 2017 Ford Edge and went on a test

23

drive of the vehicle. Plaintiff Coppock believed that the 2017 Ford Edge would be a safe and reliable vehicle.

152.   Despite Ms. Coppock's research prior to purchasing the vehicle, Ford never disclosed at the time of purchase that the 2017 Ford Edge contained the Engine Defect, which could cause the vehicle's engine to leak coolant, overheat, fail, and even potentially ignite into an engine fire. Indeed, Ford concealed this information from consumers, and Ms. Coppock was not aware of, and did not have any reason to anticipate that her vehicle was afflicted by the Engine Defect when she purchased the vehicle.

153.   Ford's omissions were material to Plaintiff Coppock. Had Ford disclosed its knowledge of the Engine Defect before she purchased her 2017 Ford Edge, Plaintiff Coppock would have seen and been aware of the disclosures. Furthermore, had she known of the Engine Defect, Plaintiff Coppock would not have purchased her vehicle or would have paid less for her vehicle.

154.   On or around October 8, 2019, with approximately 64,041 miles on the odometer, Plaintiff Coppock began to experience the Engine Defect. On that date, Plaintiff Coppock delivered her vehicle to Brighton Ford complaining that her engine light was illuminated, and that the vehicle had a coolant smell. The technician found that diagnostic trouble codes P0301, P0012, and P0217, confirmed that the D8 Block was cracked in cylinder number 1, and low coolant levels. The technician noted: "VERIFIED CHECK ENGINE LIGHT IS ON DTC P0012, P0217, P0301 AND LOW COOLANT ADD AND PRESSURE TESTED COOLING SYSTEM LOOSING (sp) 4PSI AFTER 5HRS REMOVED SPARK PLUG FOUND COOLANT NO1 CYLINDER WITH BORE SCOPE. FOUND TSB 19-2346. REMOVED ENGINE AND REPLACED LONG BLOCK ENGINE AND ALL GASKET FITTING LINES BOLTES PER TSB AND WORSHOP [WORKSHOP] MANUAL, RE-ASSEMBLED INSTALLED AND CLAR DTC RESET MISFIRE PROFILE AND ROAD TESTED AND RETESTED PASSED." Plaintiff Coppock was forced to pay $3,314.00 for the repair.

155.   Despite complaining to Ford about the Engine Defect, Plaintiff Coppock's vehicle was never adequately and permanently repaired despite the engine replacement, as Ford has failed to issue a recall or other form of satisfactory repair for the Engine Defect.

156. As a result of Ford's misconduct and concealment of the Engine Defect, Plaintiff Coppock overpaid for her 2017 Ford Edge, incurred out of pocket losses to replace the engine, and did not receive the full benefit of the bargain in purchasing the vehicle.

157. Despite purchasing a new engine, Plaintiff Coppock lost confidence in the ability of her Class Vehicle to provide safe and reliable transportation for ordinary and advertised purposes. Further, Plaintiff Coppock will be unable to rely on Ford's advertising and labeling in the future for the potential purchase of another Ford vehicle.

158. At all times, Plaintiff Coppock, like all Class Members, has driven her vehicle in a manner both foreseeable and in which it was intended to be used.

**N.    Plaintiff Rachel Goodrich**

159. Plaintiff Rachel Goodrich is an individual residing in Muskegon, Michigan.

160. Ms. Goodrich owned a 2017 Ford Fusion with a 1.5L EcoBoost engine, which she purchased used on or about August 29, 2018, from Preferred Chrysler in Muskegon, Michigan, which is a companion dealership to Preferred Ford in Grand Haven, Michigan, an authorized Ford dealer. The vehicle had approximately 33,000 miles at the time of purchase. The warranty start date for the vehicle was on or around August 19, 2016. Ms. Goodrich purchased the vehicle for personal, family, and household use.

161. Passenger safety and reliability were important factors in Plaintiff Goodrich's decision to purchase her vehicle. Prior to purchasing her 2017 Ford Fusion, Plaintiff Goodrich researched the vehicle by reviewing the window sticker and her husband test drove the vehicle. She also spoke to a salesperson at the dealership regrading her vehicle, who told her that there was nothing wrong with the vehicle and that it had never been in an accident. Based on Ford's representations, Ms. Goodrich was led to believe that the 2017 Ford Fusion was, among other things, a safe, reliable, and high quality vehicle.

162. Despite Ms. Goodrich's research prior to purchasing the vehicle, Ford never disclosed at the time of purchase that the 2017 Ford Fusion contained the Engine Defect, which could cause the vehicle's engine to leak coolant, overheat, fail, and even potentially ignite into an engine fire. Indeed, Ford concealed this information from consumers, and Ms. Goodrich was not aware of, and

did not have any reason to anticipate that her vehicle was afflicted by the Engine Defect when she purchased the vehicle.

163.  Ford's omissions were material to Plaintiff Goodrich. Had Ford disclosed its knowledge of the Engine Defect before she purchased her 2017 Ford Fusion, Plaintiff Goodrich would have learned of the concealed information and would not have bought the vehicle or would have paid less for it.

164.  On or about September 5, 2018, just days after purchasing her vehicle, Plaintiff Goodrich was driving her vehicle when the check engine light illuminated, and the engine overheated, resulting in the vehicle stalling. The vehicle had less than 36,000 miles at that time and was still covered under warranty. Ms. Goodrich took her vehicle to Preferred Ford, where a technician found engine codes P1299 and P1285, as well as no coolant in the engine. The technician reset the codes and filled the engine with coolant. A few days later, with less than 36,000 miles on the vehicle, Plaintiff Goodrich was driving her vehicle when the check engine light illuminated again, and the engine overheated again, resulting in the vehicle stalling again, and she brought the vehicle back to Preferred Ford and a technician there filled the engine with coolant again and gave the vehicle back to her. Since that time, Plaintiff has repeatedly taken her vehicle to Preferred Ford because the vehicle has overheated, and she has spent about $1,000 on repairs such as new spark plugs and coils in an attempt to fix the issue.

165.  On or about October 29, 2020, the check engine light illuminated in Plaintiff Goodrich's vehicle once again while it was being driven and the vehicle began overheating. The vehicle stalled and white smoke came from the dash. Ms. Goodrich took her vehicle to Preferred Ford, where a technician found low coolant and the codes P0300 and P0316. The vehicle also failed the pressure test. The dealership advised Plaintiff the vehicle needs a new engine and quoted a cost of approximately $8,700. Because she could not afford such a costly repair, the vehicle was inoperable for several months. On or about January 5, 2021, Plaintiff Goodrich took her vehicle to Great Lakes Ford of Muskegon, who confirmed that she needed a new engine due to an internal coolant leak. Plaintiff Goodrich was forced to pay approximately $6,700 for the repair.

166.   Despite complaining to Ford about the Engine Defect, Plaintiff Goodrich's vehicle was never adequately and permanently repaired despite the engine replacement, as Ford has failed to issue a recall or other form of satisfactory repair for the Engine Defect.

167.   As a result of Ford's misconduct and concealment of the Engine Defect, Ms. Goodrich has overpaid for her 2017 Ford Fusion, incurred out of pocket losses to entirely replace the engine, and did not receive the full benefit of the bargain in purchasing the vehicle.

168.   Despite purchasing a new engine, Ms. Goodrich has lost confidence in the ability of her Class Vehicle to provide safe and reliable transportation for ordinary and advertised purposes. Further, Ms. Goodrich will be unable to rely on Ford's advertising and labeling in the future for the potential purchase of another Ford vehicle.

169.   At all times, Ms. Goodrich, like all Class Members, has driven her vehicle in a manner both foreseeable and in which it was intended to be used.

**O.    Plaintiff Brian Simonds**

170.   Plaintiff Brian Simonds is an individual residing in Minnesota.

171.   Mr. Simonds owns a 2015 Ford Fusion with a 1.5L EcoBoost engine, which he purchased new on December 7, 2015 from Superior Ford, an authorized Ford dealer in Plymouth, Minnesota. Mr. Simonds purchased the vehicle for personal, family, and household use.

172.   Plaintiff Simonds purchased his 2015 Ford Fusion primarily for personal, family, or household use.

173.   Passenger safety and reliability were important factors to Mr. Simonds's decision to purchase the vehicle. Prior to purchasing the 2015 Ford Fusion, Mr. Simonds researched the vehicle by reviewing the Monroney Label (window sticker), documents provided at the dealership, speaking with a salesperson at the dealership regarding the 2015 Ford Fusion, and he took the vehicle on a test drive. Based on Ford's representations, Mr. Simonds was led to believe that the 2015 Ford Fusion was, among other things, a safe, reliable, and high quality vehicle.

174.   Despite Mr. Simonds's research prior to purchasing the vehicle, Ford never disclosed at the time of purchase that the 2015 Ford Fusion contained the Engine Defect, which could cause the vehicle's engine to leak coolant, overheat, fail, and even potentially ignite into an engine fire.

27

Indeed, Ford concealed this information from consumers, and Mr. Simonds was not aware of, and did not have any reason to anticipate that his vehicle was afflicted by the Engine Defect when he purchased the vehicle.

175.   Ford's omissions were material to Mr. Simonds. If Ford had adequately disclosed these facts before Mr. Simonds purchased the vehicle, he would have learned of the concealed information and would not have bought the vehicle or would have paid less for it.

176.   On or around December 7, 2020, when there were approximately 64,000 miles on the odometer, Mr. Simonds started to drive his vehicle when the vehicle started shaking badly and emitting a burning smell. Later that day, the check engine light illuminated, and Mr. Simonds brought his vehicle to the dealership. The dealership informed Mr. Simonds that his vehicle needed the engine replaced because there was a coolant leak into the cylinders resulting in engine failure and quoted a cost of approximately $7,200 to replace the long block. Ford has refused to cover the cost of the repair. Plaintiff Simonds was forced to pay approximately $7,200 for the repair.

177.   Despite complaining to Ford about the Engine Defect, Mr. Simonds's vehicle has never been adequately and permanently repaired, as Ford has failed to issue a recall or other form of satisfactory repair for the Engine Defect.

178.   As a result of Ford's misconduct and concealment of the Engine Defect, Mr. Simonds has overpaid for his 2015 Ford Fusion, incurred out of pocket losses to repair the engine, and did not receive the full benefit of the bargain in purchasing the vehicle.

179.   Mr. Simonds has lost confidence in the ability of his Class Vehicle to provide safe and reliable transportation for ordinary and advertised purposes. Further, based on his experience, Mr. Simonds is not confident that he will be able to rely on Ford's advertising and labeling in the future.

180.   At all times, Mr. Simonds, like all Class Members, has driven his vehicle in a manner both foreseeable and in which it was intended to be used.

**P.     Plaintiff David Schiavi**

181.   Plaintiff David Schiavi is an individual residing in Basking Ridge, New Jersey.

182.   Mr. Schiavi owns a 2015 Ford Escape with a 1.6L EcoBoost engine, which he

28

purchased new on July 29, 2015 from Fullerton Ford, an authorized Ford dealer in Sommerville, New Jersey. Mr. Schiavi purchased the vehicle for personal, family, and household use.

183.    Passenger safety and reliability were important factors to Mr. Schiavi's decision to purchase the vehicle. Prior to purchasing the 2015 Ford Escape, Mr. Schiavi researched the vehicle by watching television advertisements, reviewed the Monroney Label (window sticker), reviewed documents associated with the sale of the vehicle, and discussed the power and efficiency of the EcoBoost engine with the salesperson who informed him that the EcoBoost was just as powerful and reliable as the six-cylinder engines of previous years. Based on Ford's representations, Mr. Schiavi was led to believe that the 2015 Ford Escape was, among other things, a safe, reliable, and high quality vehicle.

184.    Despite Mr. Schiavi's research prior to purchasing the vehicle, Ford never disclosed at the time of purchase that the 2015 Ford Escape contained the Engine Defect, which could cause the vehicle's engine to leak coolant, overheat, fail, and even potentially ignite into an engine fire. Indeed, Ford concealed this information from consumers, and Mr. Schiavi was not aware of, and did not have any reason to anticipate that his vehicle was afflicted by the Engine Defect when he purchased the vehicle.

185.    Ford's omissions were material to Mr. Schiavi. If Ford had adequately disclosed these facts before Mr. Schiavi purchased the vehicle, he would have learned of the concealed information and would not have bought the vehicle or would have paid less for it.

186.    On or around October 28, 2020, with approximately 55,265 miles on the odometer, Plaintiff Schiavi began to experience the Engine Defect. He delivered his vehicle to Fullerton Ford complaining that the engine light was illuminated and that "ROUGH IDLE ADNLOSS [AND LOSS] OF HEAT ALL STARTED AT THE SAME TIME." The technician noted: "Verified customer concern. Tch scanned vehicle for codes found P0303, P0316, and overtemp codes for cylinder head and coolant temp sensor. Tech found the degas bottle had little to no coolant present in the bottle. Tech toppf (sic) off the coolant, pressure tested the system but found no leaks. Tech then removed the spark plug on cylinder 3 and removed the spark plugs on the 2 adjacent cylinders. Tech pressure tested the cooling system over night to see if coolant was present in the cylinders.

29

Tech came back the next day, used a bore scope on all 3 cylinders and found the pressure dropped from 25 psi to 20 psi and then cylinders had coolant present. Tech recommended a new engine along with all the hardware and gaskets recommend to be replaced when replacing the engine as per Ford. Customer declined work at this time."

187.   The dealership informed Plaintiff Schiavi he would need to pay to replace his engine and charged him $169.00 for diagnosing the vehicle. Plaintiff Schiavi's vehicle has never been repaired and continues to be defective. Despite complaining to Ford about the Engine Defect, Mr. Schiavi's vehicle has never been adequately and permanently repaired, as Ford has failed to issue a recall or other form of satisfactory repair for the Engine Defect.

188.   As a result of Ford's misconduct and concealment of the Engine Defect, Mr. Schiavi has overpaid for his 2015 Ford Escape, incurred out of pocket losses to repair the engine, and did not receive the full benefit of the bargain in purchasing the vehicle.

189.   Mr. Schiavi has lost confidence in the ability of his Class Vehicle to provide safe and reliable transportation for ordinary and advertised purposes. Further, based on his experience, Mr. Schiavi is not confident that he will be able to rely on Ford's advertising and labeling in the future.

190.   At all times, Mr. Schiavi, like all Class Members, has driven his vehicle in a manner both foreseeable and in which it was intended to be used. At all times, Plaintiff Schiavi, like other class members, has attempted to drive his vehicle in a manner that was both foreseeable and in which it was intended to be used.

Q.   **Plaintiff Robyn Pirog**

191.   Plaintiff Robyn Pirog is an individual residing in Myrtle Beach, South Carolina.

192.   Ms. Pirog owns a 2016 Ford Edge with a 2.0L EcoBoost engine, which she purchased new on July 18, 2016 from Crossroads Ford, an authorized Ford dealership in Wake Forest, North Carolina. Ms. Pirog purchased the vehicle for personal, family, and household use.

193.   Passenger safety and reliability were important factors in Plaintiff Pirog's decision to purchase her vehicle. Prior to purchasing her 2016 Ford Edge, Plaintiff Pirog researched her vehicle by conducting general online search for information on the vehicle, visiting the dealership website and the manufacturer's website, reviewing the window sticker and documents provided at the

30

dealership, and going on a test drive with an employee of the authorized Ford dealership. Based on Ford's representations, Ms. Pirog was led to believe that her 2016 Ford Edge was, among other things, a safe, reliable, and high quality vehicle.

194.    Despite Ms. Pirog's research prior to purchasing the vehicle, Ford never disclosed at the time of purchase that the 2016 Ford Edge contained the Engine Defect, which could cause the vehicle's engine to leak coolant, overheat, fail, and even potentially ignite into an engine fire. Indeed, Ford concealed this information from consumers, and Ms. Pirog was not aware of, and did not have any reason to anticipate that her vehicle was afflicted by the Engine Defect when she purchased the vehicle.

195.    Ford's omissions were material to Plaintiff Pirog. If Ford had adequately disclosed these facts before Ms. Pirog purchased the vehicle, she would have learned of the concealed information and would not have bought the vehicle or would have paid less for it

196.    On or about December 30, 2020, with approximately 73,000 miles on the odometer, the check engine light illuminated in Plaintiff Pirog's vehicle while she was driving. She called her local authorized Ford dealership, Jones Ford, in Shallotte, North Carolina, and was told to bring in her vehicle for an oil change the next day. Plaintiff Pirog dropped off her vehicle to Jones Ford on December 31, 2020. When she called later in the day to pay for the oil change, she was told she needed a new engine in her vehicle and the cost would be thousands of dollars, despite the fact that she had properly maintained her vehicle. The technician at Jones Ford found that coolant had intruded into the engine at cylinder #3, causing engine failure. Jones Ford replaced the long block of the engine and installed a completely new engine, for a cost to Ms. Pirog of over $5,000.

197.    Despite complaining to Ford about the Engine Defect, Ms. Pirog's vehicle has never been adequately and permanently repaired despite the full engine replacement, as Ford has failed to issue a recall or other form of satisfactory repair for the Engine Defect.

198.    As a result of Ford's misconduct and concealment of the Engine Defect, Ms. Pirog has overpaid for her 2016 Ford Edge, incurred out of pocket losses to replace the engine, and did not receive the full benefit of the bargain in purchasing the vehicle.

199.   Ms. Pirog has lost confidence in the ability of her Class Vehicle to provide safe and reliable transportation for ordinary and advertised purposes. Further, Ms. Pirog will be unable to rely on Ford's advertising and labeling in the future for the potential purchase of another Ford vehicle.

200.   At all times, Ms. Pirog like all Class Members, has driven her vehicle in a manner both foreseeable and in which it was intended to be used.

**R.     Plaintiff Zachary Scott Damm and Amanda Gates**

201.   Plaintiffs Zachary Scott Damm and Amanda Gates are individuals residing in Kenmore, Washington.

202.   Mr. Damm and Ms. Gates owned a 2016 Ford Fusion with a 2.0L EcoBoost engine, which they purchased pre-owned on December 7, 2016 from Enterprise Car Sales in Shoreline, Washington. The vehicle had approximately 32,000 miles at the time of purchase. Mr. Damm and Ms. Gates purchased the vehicle for personal, family, and household use. The vehicle had a warranty start date of September 2, 2015.

203.   Passenger safety and reliability were important factors to Mr. Damm and Ms. Gates's decision to purchase the vehicle. Prior to purchasing the 2016 Ford Fusion, Mr. Damm and Ms. Gates researched the vehicle by visited the dealership's website, reviewed the Monroney Label (window sticker) and documents provided at the dealership, and went on a test drive with a dealership employee. Based on Ford's representations, Mr. Damm and Ms. Gates were led to believe that the 2016 Ford Fusion was, among other things, a safe, reliable, and high quality vehicle.

204.   Despite Mr. Damm and Ms. Gates's research prior to purchasing the vehicle, Ford never disclosed at the time of purchase that the 2016 Ford Fusion contained the Engine Defect, which could cause the vehicle's engine to leak coolant, overheat, fail, and even potentially ignite into an engine fire. Indeed, Ford concealed this information from consumers, and Mr. Damm and Ms. Gates were not aware of, and did not have any reason to anticipate that their vehicle was afflicted by the Engine Defect when they purchased the vehicle.

205.   Ford's omissions were material to Mr. Damm and Ms. Gates. If Ford had adequately disclosed these facts before Mr. Damm and Ms. Gates purchased the vehicle, they would have

1     learned of the concealed information and would not have bought the vehicle or would have paid

2     less for it.

3         206.    On or about May 17, 2021, Mr. Damm and Ms. Gates brought their vehicle to Harris

4     Ford Lincoln because the check engine light illuminated. The dealership found diagnosis code

5     P0302 and discovered coolant leaking into the cylinders. The dealership advised them that the

6     vehicle needs a new engine and quoted a cost of approximately $9,000. Because they could not

7     afford such a costly repair, they continued to use their vehicle on an infrequent basis for relatively

8     short distances, despite the risk of catastrophic engine failure, until finally selling it.

9         207.    Despite complaining to Ford about the Engine Defect, Mr. Damm and Ms. Gates's

10    vehicle has never been adequately and permanently repaired, as Ford has failed to issue a recall or

11    other form of satisfactory repair for the Engine Defect.

12         208.    As a result of Ford's misconduct and concealment of the Engine Defect, Mr. Damm

13    and Ms. Gates have overpaid for their 2016 Ford Fusion and did not receive the full benefit of the

14    bargain in purchasing the vehicle.

15         209.    Mr. Damm and Ms. Gates have lost confidence in the ability of their Class Vehicle to

16    provide safe and reliable transportation for ordinary and advertised purposes. Further, Mr. Damm

17    and Ms. Gates will be unable to rely on Ford's advertising and labeling in the future for the potential

18    purchase of another Ford vehicle.

19         210.    At all times, Mr. Damm and Ms. Gates, like all Class Members, have driven their

20    vehicle in a manner both foreseeable and in which it was intended to be used.

21       **S.**     **Plaintiff Shari Techlin**

22         211.    Plaintiff Shari Techlin is an individual residing in Neenah, Wisconsin.

23         212.    Ms. Techlin owns a 2017 Ford Escape with a 2.0L EcoBoost Engine, which she

24    purchased used on April 24, 2020 from Carvana, LLC, in Oak Creek, Wisconsin. The vehicle had

25    approximately 29,828 miles at the time of purchase. Ms. Techlin purchased the vehicle for personal,

26    family, and household use.

27         213.    Passenger safety and reliability were important factors to Ms. Techlin's decision to

28    purchase the vehicle. Prior to purchasing the 2017 Ford Escape, Ms. Techlin researched the vehicle

by searching the internet and looking at customer reviews of the 2017 Ford Escapes with 2.0L EcoBoost Engines. Before purchasing the Vehicle, Ms. Techlin obtained the VIN from Carvana, went to the website http://ford.com/support/warranty, entered the VIN, and looked at the vehicle's warranty and manual. Based on Ford's representations, Ms. Techlin was led to believe that the 2017 Ford Escape was, among other things, a safe, reliable, and high-quality vehicle.

214.    Despite Ms. Techlin's research prior to purchasing the vehicle, Ford never disclosed at the time of purchase that the 2017 Ford Escape contained the Engine Defect, which could cause the vehicle's engine to leak coolant, overheat, fail, and even potentially ignite into an engine fire. Indeed, Ford concealed this information from consumers, and Ms. Techlin was not aware of, and did not have any reason to anticipate that her vehicle was afflicted by the Engine Defect when she purchased the vehicle.

215.    Ford's omissions were material to Ms. Techlin. If Ford had adequately disclosed these facts before Ms. Techlin purchased the vehicle, she would have learned of the concealed information and would not have bought the vehicle or would have paid less for it.

216.    Shortly after purchasing her vehicle, the engine chugged and misfired. The vehicle's check engine light illuminated, and Ms. Techlin smelled antifreeze.

217.    On April 22, 2021, Ms. Techlin took her vehicle to Bergstrom Ford-Lincoln of the Fox Valley. The Ford Dealership told Ms. Techlin she needed a new engine at a cost of $5,970.18. Her vehicle had 69,150 miles at the time.

218.    The Ford Dealership noted that the vehicle was "throwing p0303 and random other codes." The Ford Dealership noted there was an "occasional strong whiff of coolant at startup." The Ford Dealership inspected the Vehicle and found no coolant in the bottle and "P0303 stored in the PCM." The Ford Dealership found "TSB 19-2346 applies . . . proceeded with replacing long block and all corresponding components."

219.    Despite complaining to Ford about the Engine Defect, Ms. Techlin's vehicle has never been adequately and permanently repaired, as Ford has failed to issue a recall or other form of satisfactory repair for the Engine Defect.

220.    As a result of Ford's misconduct and concealment of the Engine Defect, Ms. Techlin

has overpaid for her 2017 Ford Escape, incurred thousands of dollars of out of pocket losses to repair the engine, and did not receive the full benefit of the bargain in purchasing the vehicle.

221.   Ms. Techlin has lost confidence in the ability of her Class Vehicle to provide safe and reliable transportation for ordinary and advertised purposes. Further, Ms. Techlin will be unable to rely on Ford's advertising and labeling in the future for the potential purchase of another Ford vehicle.

222.   At all times, Ms. Techlin, like all Class Members, has driven her vehicle in a manner both foreseeable and in which it was intended to be used.

**T.    Plaintiff Tyson John Batdorf**

223.   Plaintiff Tyson John Batdorf is an individual residing in Gallatin, Tennessee.

224.   Mr. Batdorf owns a 2017 Lincoln MKC with a 2.0L EcoBoost engine, which he purchased certified pre-owned on December 7, 2020 from BMW of Nashville in Nashville, Tennessee. The vehicle had 60,322 miles at the time of purchase. Mr. Batdorf purchased the vehicle for personal, family, and household use. The vehicle had a warranty start date of October 5, 2016.

225.   Passenger safety and reliability were important factors to Mr. Batdorf's decision to purchase the vehicle. Prior to purchasing the 2017 Lincoln MKC, Mr. Batdorf researched the vehicle by reviewing the Monroney Label (window sticker) and discussed the vehicle with the salesperson who informed him it was clean and runs great. Based on Ford's representations, Mr. Batdorf was led to believe that the 2017 Lincoln MKC was, among other things, a safe, reliable, and high quality vehicle.

226.   Despite Mr. Batdorf's research prior to purchasing the vehicle, Ford never disclosed at the time of purchase that the 2017 Lincoln MKC contained the Engine Defect, which could cause the vehicle's engine to leak coolant, overheat, fail, and even potentially ignite into an engine fire. Indeed, Ford concealed this information from consumers, and Mr. Batdorf was not aware of, and did not have any reason to anticipate that his vehicle was afflicted by the Engine Defect when he purchased the vehicle.

227.    Ford's omissions were material to Mr. Batdorf. If Ford had adequately disclosed these facts before Mr. Batdorf purchased the vehicle, he would have learned of the concealed information and would not have bought the vehicle or would have paid less for it.

228.    In early 2022, with approximately 77,000 miles on the odometer, Plaintiff Batdorf began to experience the Engine Defect. Plaintiff Batdorf's engine began sputtering and overheating. As a result, on or around May 21, 2022, Plaintiff Batdorf delivered his vehicle to Miracle Ford, an authorized Ford dealership located in Gallatin, Tennessee. The technician "VERIFIED" Mr. Batdorf's concerns of "MISFIRE...OVERHEATING [and] CHECK ENGINE LIGHT." The repair order further noted that the technician "FOUND NO COOLANT IN RESERVOIR, PRESSURE TESTED AND COLLANT [COOLANT] LEAKING INTERNAL TO ENGINE @2 PLUG SEIZED DUE TO COOLANT ENTRY WILL NEED ENGINE REPLACED." However, Ford refused to cover the suggested repair and instead sought to charge $8,270.00 for the suggested repair and the vehicle was returned to Plaintiff Batdorf without being repaired.

229.    Despite complaining to Ford about the Engine Defect, Mr. Batdorf's vehicle has never been adequately and permanently repaired, as Ford has failed to issue a recall or other form of satisfactory repair for the Engine Defect.

230.    As a result of Ford's misconduct and concealment of the Engine Defect, Mr. Batdorf has overpaid for her 2017 Lincoln MKC, incurred out of pocket losses to repair the engine, and did not receive the full benefit of the bargain in purchasing the vehicle.

231.    Mr. Batdorf has lost confidence in the ability of his Class Vehicle to provide safe and reliable transportation for ordinary and advertised purposes. Further, based on his experience, Mr. Batdorf is not confident that he will be able to rely on Ford's advertising and labeling in the future.

232.    At all times, Mr. Batdorf, like all Class Members, has driven his vehicle in a manner both foreseeable and in which it was intended to be used.

**U.    Plaintiff Anthony Cicero**

233.    Plaintiff Anthony Cicero is an individual residing in Carol Stream, Illinois.

1    234.    Mr. Cicero owns a 2017 Ford Escape with a 1.5L EcoBoost engine, which he

2    purchased new on January 1, 2017 from Zeigler Ford, an authorized Ford dealer in North Riverside,

3    Illinois. Mr. Cicero purchased the vehicle for personal, family, and household use.

4    235.    Passenger safety and reliability were important factors to Mr. Cicero's decision to

5    purchase the vehicle. Prior to purchasing the 2017 Ford Escape, Mr. Cicero researched the vehicle

6    by watching multiple Ford commercials, reviewed the Monroney label (window sticker), and

7    conferred with the dealership personnel who recommended the vehicle. Based on Ford's

8    representations, Mr. Cicero was led to believe that the 2017 Ford Escape was, among other things,

9    a safe, reliable, and high quality vehicle.

10    236.    Despite Mr. Cicero's research prior to purchasing the vehicle, Ford never disclosed at

11    the time of purchase that the 2017 Ford Escape contained the Engine Defect, which could cause the

12    vehicle's engine to leak coolant, overheat, fail, and even potentially ignite into an engine fire.

13    Indeed, Ford concealed this information from consumers, and Mr. Cicero was not aware of, and did

14    not have any reason to anticipate that his vehicle was afflicted by the Engine Defect when he

15    purchased the vehicle.

16    237.    Ford's omissions were material to Mr. Cicero. If Ford had adequately disclosed these

17    facts before Mr. Cicero purchased the vehicle, he would have learned of the concealed information

18    and would not have bought the vehicle or would have paid less for it.

19    238.    On or about January 21, 2022, Mr. Cicero took his vehicle to Bob Rohrman

20    Schaumburg Ford, an authorized Ford dealership located in Schaumburg, Illinois and complained

21    that the engine was misfiring, the Check Engine light was illuminated, and the car was in limp mode.

22    At the time, the vehicle had approximately 51,208 miles on the odometer. The technician found that

23    there were misfires in cylinder #3, coolant intrusion into the piston, cracks, and damage to the

24    cylinder head resulting in chips falling into the engine. The technician replaced the short block and

25    associated parts, but the repair was not complete until March 15, 2022. Mr. Cicero was charged

26    $311.64 for the repair and was without his vehicle for two months. This did not repair the Defect.

27    239.    On March 23, 2022, Mr. Cicero returned his vehicle to Rohrman Ford, complaining

28    that the Check Engine light had illuminated over the weekend and that an auto-parts store had found

DTC P0300, indicating misfires in the engine. The dealership found DTC P0316 indicating random misfires had been detected over 1,000 revolutions. The dealership followed the instructions on TSB 17-0041 and updated the powertrain control module. This did not repair the Defect.

240.    On June 22, 2022, Mr. Cicero took his vehicle to Packey Webb Ford, an authorized Ford dealership located in Downers Grove, Illinois. At the time, his vehicle had approximately 55,400 miles on the odometer. He complained that the vehicle was making odd noises, including a low tone sputter when the vehicle was stopped. The dealership denied finding any problem with his vehicle, but at the same time reprogramed the powertrain control module in his vehicle and "CLEARED DTCS PER PROGRAM 19B37."

241.    Subsequently, on July 6, 2022, Mr. Cicero returned his vehicle to Rohrman Ford, complaining that the vehicle was running roughly and losing power while being driven. The technician verified Mr. Cicero's concerns and also found a rattling noise upon cold start-up. The noises were coming from the variable camshaft timing system and the technician diagnosed the engine as needing new variable camshaft timing phaser, timing belt tensioner, and related parts. Mr. Cicero was without his vehicle for an additional 22 days.

242.    In total Mr. Cicero paid $311.64 to repair his vehicle.

243.    Despite complaining to Ford about the Engine Defect, Mr. Cicero's vehicle has never been adequately and permanently repaired, as Ford has failed to issue a recall or other form of satisfactory repair for the Engine Defect.

244.    As a result of Ford's misconduct and concealment of the Engine Defect Mr. Cicero has overpaid for his 2017 Ford Escape, incurred out of pocket losses to repair the engine, and did not receive the full benefit of the bargain in purchasing the vehicle.

245.    Mr. Cicero has lost confidence in the ability of his Class Vehicle to provide safe and reliable transportation for ordinary and advertised purposes. Further, based on his experience, Mr. Cicero is not confident that he will be able to rely on Ford's advertising and labeling in the future.

246.    At all times, Mr. Cicero, like all Class Members, has driven his vehicle in a manner both foreseeable and in which it was intended to be used.

### V.    **Plaintiff David Gonzalez**

247.    Plaintiff David Gonzalez is an individual residing in Austin, Texas.

248.    Mr. Gonzalez owns a 2014 Ford Escape with a 1.6L EcoBoost engine, which he purchased new on September 20, 2014 from Five Star Ford, an authorized Ford dealer in North Richland Hills, Texas. Mr. Gonzalez purchased the vehicle for personal, family, and household use.

249.    Passenger safety and reliability were important factors to Mr. Gonzalez's decision to purchase the vehicle. Prior to purchasing the 2014 Ford Escape, Mr. Gonzalez researched the vehicle by researching the vehicle online, reviewing the Monroney Label (window sticker), and brochures for the vehicle. Mr. Gonzalez also test drove the vehicle with the salesperson and discussed the vehicle's safety ratings, reliability, and gas mileage. Based on Ford's representations, Mr. Gonzalez was led to believe that the 2014 Ford Escape was, among other things, a safe, reliable, and high quality vehicle.

250.    Despite Mr. Gonzalez's research prior to purchasing the vehicle, Ford never disclosed at the time of purchase that the 2014 Ford Escape contained the Engine Defect, which could cause the vehicle's engine to leak coolant, overheat, fail, and even potentially ignite into an engine fire. Indeed, Ford concealed this information from consumers, and Mr. Gonzalez was not aware of, and did not have any reason to anticipate that his vehicle was afflicted by the Engine Defect when he purchased the vehicle.

251.    Ford's omissions were material to Mr. Gonzalez. If Ford had adequately disclosed these facts before Mr. Gonzalez purchased the vehicle, he would have learned of the concealed information and would not have bought the vehicle or would have paid less for it.

252.    In 2021, with approximately 105,000 miles on the odometer, Plaintiff Gonzalez began to experience the Engine Defect. Plaintiff Gonzalez's engine began overheating, misfiring, sputtering smoke, leaking, and dying. As a result, on or around February 15, 2022 and at 125,536 miles, Plaintiff Gonzalez delivered his vehicle to Leif Johnson Ford, an authorized Ford dealership located in Austin, Texas. The technician "VERIFIED CUSTOMER'S CONCERNS" and stated, "found coolant in #4 cylinder, needs new long block." However, Ford refused to cover the suggested

repair and instead Plaintiff Gonzalez was forced to pay $8,297.27 to have the engine replaced. Thereafter, Plaintiff Gonzalez's vehicle continues to suffer from the Engine Defect.

253.   Not long after, on April 1, 2022 and at 126,750 miles, Mr. Gonzalez returned to Leif Johnson Ford complaining that the engine light was illuminated, and that the coolant looked very diluted. The technician "verified the customer concern, checked for codes, has code P26B7 engine coolant bypass valve C control circuit. ran (sic) pin point test, needs new coolant bypass valve, replaced bypass vale (sic), cleared code, test drove."  Mr. Gonzalez paid $575.83 for a new coolant bypass valve.

254.   Despite complaining to Ford about the Engine Defect, Mr. Gonzalez's vehicle has never been adequately and permanently repaired, as Ford has failed to issue a recall or other form of satisfactory repair for the Engine Defect.

255.   As a result of Ford's misconduct and concealment of the Engine Defect, Mr. Gonzalez has overpaid for his 2014 Ford Escape, incurred out of pocket losses to repair the engine, and did not receive the full benefit of the bargain in purchasing the vehicle.

256.   Mr. Gonzalez has lost confidence in the ability of his Class Vehicle to provide safe and reliable transportation for ordinary and advertised purposes. Further, based on his experience, Mr. Gonzalez is not confident that he will be able to rely on Ford's advertising and labeling in the future.

257.   At all times, Mr. Gonzalez, like all Class Members, has driven his vehicle in a manner both foreseeable and in which it was intended to be used.

**W.    <u>Plaintiff Jeffery Hodges</u>**

258.   Plaintiff Jeffrey Hodges is an individual residing in Lakeside, California.

259.   Mr. Hodges owns a 2019 Ford Fusion with a 1.5L EcoBoost engine, which he purchased new on January 22, 2020 from Penske Ford, an authorized Ford dealer in La Mesa, California. Mr. Hodges purchased the vehicle for personal, family, and household use.

260.   Passenger safety and reliability were important factors to Mr. Hodges's decision to purchase the vehicle. Prior to purchasing the 2019 Ford Fusion, Mr. Hodges researched the vehicle by reviewing the Monroney Label (window sticker), discussed the vehicle's efficiency with

dealership personnel who recommended that specific model he purchased, and test drove the vehicle. Based on Ford's representations, Mr. Hodges was led to believe that the 2019 Ford Fusion was, among other things, a safe, reliable, and high quality vehicle.

261.   Despite Mr. Hodges's research prior to purchasing the vehicle, Ford never disclosed at the time of purchase that the 2019 Ford Fusion contained the Engine Defect, which could cause the vehicle's engine to leak coolant, overheat, fail, and even potentially ignite into an engine fire. Indeed, Ford concealed this information from consumers, and Mr. Hodges was not aware of, and did not have any reason to anticipate that his vehicle was afflicted by the Engine Defect when he purchased the vehicle.

262.   Ford's omissions were material to Mr. Hodges. If Ford had adequately disclosed these facts before Mr. Hodges purchased the vehicle, he would have learned of the concealed information and would not have bought the vehicle or would have paid less for it.

263.   On July 6, 2022, Mr. Hodges received an alert on the Ford Pass application which was linked with his 2019 Ford Fusion informing him that it had detected a misfire in the engine. In addition, the Service Engine Soon light illuminated in his vehicle. Mr. Hodges took his vehicle to the closest Ford dealership at the time, Gene Messer Ford, an authorized Ford dealership located in Lubbock, Texas. At the time, his vehicle had approximately 29,500 miles on the odometer and was under warranty. The Texas dealership changed four spark plugs in the engine and charged Mr. Hodges $647.80. Subsequently, on July 11, 2022, Mr. Hodges received another alert on the Ford Pass application informing him that it had detected a misfire in the engine. In addition, the Service Engine Soon light illuminated in his vehicle. Mr. Hodges took his vehicle to Penske Ford in La Mesa, California for diagnosis and repair. At the time, his vehicle had approximately 31,500 miles on the odometer. And was under warranty. The technician at Penske Ford found DTC P0304 and that coolant was low in the reservoir. The technician checked the engine with a borescope and found coolant leaking into cylinder #4. The damage to the engine was significant and the vehicle's short block was replaced.

264.   In total to date, Mr. Hodges has paid $647.50 to repair his vehicle.

265.    Despite complaining to Ford about the Engine Defect, Mr. Hodges's vehicle has never been adequately and permanently repaired, as Ford has failed to issue a recall or other form of satisfactory repair for the Engine Defect.

266.    As a result of Ford's misconduct and concealment of the Engine Defect, Mr. Hodges has overpaid for his 2019 Ford Fusion, incurred out of pocket losses to repair the engine, and did not receive the full benefit of the bargain in purchasing the vehicle.

267.    Mr. Hodges has lost confidence in the ability of his Class Vehicle to provide safe and reliable transportation for ordinary and advertised purposes. Further, based on his experience, Mr. Hodges is not confident that he will be able to rely on Ford's advertising and labeling in the future.

268.    At all times, Mr. Hodges, like all Class Members, has driven his vehicle in a manner both foreseeable and in which it was intended to be used.

## X.    Plaintiff Mark Kennedy

269.    Plaintiff Mark Kennedy is an individual residing in Wayzata, Minnesota.

270.    Mr. Kennedy owns a 2016 Ford Edge with a 2.0L EcoBoost engine, which he purchased pre-owned on November 24, 2020 from BMW of Minnetonka, in Minnetonka, Minnesota. The vehicle had 34,156 miles at the time of purchase. Mr. Kennedy purchased the vehicle for personal, family, and household use. The vehicle had a warranty start date of November 28, 2016.

271.    Passenger safety and reliability were important factors to Mr. Kennedy's decision to purchase the vehicle. Prior to purchasing the 2016 Ford Edge, Mr. Kennedy researched the vehicle by viewing multiple (approximately six (6)) advertisements, reviewing the Monroney Label (window sticker), and test driving the vehicle with a salesperson while discussing the vehicle's basic features. Based on Ford's representations, Mr. Kennedy was led to believe that the 2016 Ford Edge was, among other things, a safe, reliable, and high quality vehicle.

272.    Despite Mr. Kennedy's research prior to purchasing the vehicle, Ford never disclosed at the time of purchase that the 2016 Ford Edge contained the Engine Defect, which could cause the vehicle's engine to leak coolant, overheat, fail, and even potentially ignite into an engine fire. Indeed, Ford concealed this information from consumers, and Mr. Kennedy was not aware of, and

42

did not have any reason to anticipate that his vehicle was afflicted by the Engine Defect when he purchased the vehicle.

273.   Ford's omissions were material to Mr. Kennedy. If Ford had adequately disclosed these facts before Mr. Kennedy purchased the vehicle, he would have learned of the concealed information and would not have bought the vehicle or would have paid less for it.

274.   In early 2022, with approximately 50,000 miles on the odometer, Plaintiff Kennedy began to experience the Engine Defect. Plaintiff Kennedy's engine began overheating and leaking. As a result, on or around January 15, 2022, Plaintiff Kennedy delivered his vehicle to Morrie's Minnetonka Ford, an authorized Ford dealership located in Minnetonka, Minnesota. The technician verified Mr. Kennedy's concerns and stated, "VERIFIED COOLANT DRIPPING INTO CYLINDER 4, WILL NEED LONG BLOCK REPLACEMENT." However, Ford refused to cover the suggested repair and instead sought to charge $8,270.00 for the suggested repair.

275.   Plaintiff Kennedy was forced to pay $5,992.77 to have the engine replaced.

276.   Despite complaining to Ford about the Engine Defect, Mr. Kennedy's vehicle has never been adequately and permanently repaired, as Ford has failed to issue a recall or other form of satisfactory repair for the Engine Defect.

277.   As a result of Ford's misconduct and concealment of the Engine Defect, Mr. Kennedy has overpaid for his 2016 Ford Edge, incurred out of pocket losses to repair the engine, and did not receive the full benefit of the bargain in purchasing the vehicle.

278.   Mr. Kennedy has lost confidence in the ability of his Class Vehicle to provide safe and reliable transportation for ordinary and advertised purposes. Further, based on his experience, Mr. Kennedy is not confident that he will be able to rely on Ford's advertising and labeling in the future.

279.   At all times, Mr. Kennedy, like all Class Members, has driven his vehicle in a manner both foreseeable and in which it was intended to be used.

**Y.     Plaintiff John Krecek**

280.   Plaintiff John Krecek is an individual residing in Omaha, Nebraska.

281. Mr. Krecek owns a 2017 Ford Edge with a 2.0L EcoBoost engine, which he purchased new on October 7, 2017 from Woodhouse Ford, an authorized Ford dealership in Blair, Nebraska. Mr. Krecek purchased the vehicle for personal, family, and household use.

282. Passenger safety and reliability were important factors to Mr. Krecek's decision to purchase the vehicle. Prior to purchasing the 2017 Ford Edge, Mr. Krecek researched the vehicle by viewing commercials extolling the virtues of the EcoBoost Engine, and that they offer good gas mileage and power. Further, Mr. Krecek browsed several dealership websites, reviewed the Monroney label (window sticker) on multiple Ford Edge models for engine type and equipment package, and asked dealership personnel whether a four-cylinder engine can provide reliability for the vehicle compared to the available six-cylinder, which the salesperson extolled the benefits of the EcoBoost, and test drove the vehicle. Based on Ford's representations, Mr. Krecek was led to believe that the 2017 Ford Edge was, among other things, a safe, reliable, and high quality vehicle.

283. Despite Mr. Krecek's research prior to purchasing the vehicle, Ford never disclosed at the time of purchase that the 2017 Ford Edge contained the Engine Defect, which could cause the vehicle's engine to leak coolant, overheat, fail, and even potentially ignite into an engine fire. Indeed, Ford concealed this information from consumers, and Mr. Krecek was not aware of, and did not have any reason to anticipate that his vehicle was afflicted by the Engine Defect when he purchased the vehicle.

284. Ford's omissions were material to Mr. Krecek. If Ford had adequately disclosed these facts before Mr. Krecek purchased the vehicle, he would have learned of the concealed information and would not have bought the vehicle or would have paid less for it.

285. In or around September 2021, with approximately 70,000 miles on the odometer, Mr. Krecek began to experience the Engine Defect. Mr. Krecek's coolant began leaking. As a result, on or around October 28, 2021, with 70,532 miles on the odometer, Mr. Krecek delivered his vehicle to Woodhouse Ford, located in Omaha, Nebraska. The technician verified Mr. Krecek's concern, noting "DETERMINED INTERNAL COOLANT LEAK, LONG BLOCK REPLACEMENT." Ford, however, refused to cover the full repair: "An approval code has been generated in the FLL Request form based on the following participation: Customer Share: $3,014.34."

286.    The dealer went on to replace the vehicle's engine, returning the vehicle to Mr. Krecek, with his out-of-pocket cost totaling $3,014.34.

287.    Despite complaining to Ford about the Engine Defect, Mr. Krecek's vehicle has never been adequately and permanently repaired, as Ford has failed to issue a recall or other form of satisfactory repair for the Engine Defect.

288.    As a result of Ford's misconduct and concealment of the Engine Defect, Mr. Krecek has overpaid for his 2017 Ford Edge, incurred out of pocket losses to repair the engine, and did not receive the full benefit of the bargain in purchasing the vehicle.

289.    Mr. Krecek has lost confidence in the ability of his Class Vehicle to provide safe and reliable transportation for ordinary and advertised purposes. Further, based on his experience, Mr. Krecek is not confident that he will be able to rely on Ford's advertising and labeling in the future.

290.    At all times, Mr. Krecek, like all Class Members, has driven his vehicle in a manner both foreseeable and in which it was intended to be used.

### Z.    **Plaintiff Tracey Ann Metro**

291.    Plaintiff Tracey Ann Metro is an individual residing in Almont, Michigan.

292.    Ms. Metro owns a 2018 Ford Edge with a 2.0L EcoBoost engine, which she purchased new on January 22, 2018 from Suburban Ford, an authorized Ford dealer in Romeo, Michigan. Ms. Metro purchased the vehicle for personal, family, and household use.

293.    Passenger safety and reliability were important factors to Ms. Metro's decision to purchase the vehicle. Prior to purchasing the 2018 Ford Edge, Ms. Metro researched the vehicle by reviewing the Monroney Label (window sticker), test driving the vehicle and requesting explanation of the workings of the EcoBoost engine from the salesperson. Based on Ford's representations, Ms. Metro was led to believe that the 2018 Ford Edge was, among other things, a safe, reliable, and high quality vehicle.

294.    Despite Ms. Metro's research prior to purchasing the vehicle, Ford never disclosed at the time of purchase that the 2018 Ford Edge contained the Engine Defect, which could cause the vehicle's engine to leak coolant, overheat, fail, and even potentially ignite into an engine fire. Indeed, Ford concealed this information from consumers, and Ms. Metro was not aware of, and did

not have any reason to anticipate that her vehicle was afflicted by the Engine Defect when she purchased the vehicle.

295.   Ford's omissions were material to Ms. Metro. If Ford had adequately disclosed these facts before Ms. Metro purchased the vehicle, she would have learned of the concealed information and would not have bought the vehicle or would have paid less for it.

296.   In or around August 2021, when the vehicle had less than 60,000 miles and was under warranty, the Check Engine light illuminated in her vehicle and the vehicle began to run roughly. Ms. Metro took her vehicle to Romeo Ford, an authorized Ford dealership in Romeo, Michigan. The dealership diagnosed her vehicle as needing a new O2 sensor but refused to replace the component because the vehicle "drove fine" and the Check Engine light did not stay illuminated. Ms. Metro had the O2 sensor replaced at an independent mechanic at her cost. This did not repair the Defect.

297.   In March 2022, the engine began to misfire, particularly in cylinder #2. As a result, Ms. Metro had the spark plugs replaced at an independent mechanic. This did not repair the Defect.

298.   On or about July 28, 2022, when the vehicle had approximately 98,200 miles on the odometer, Ms. Metro had the vehicle towed to Imlay City Ford after the vehicle stalled. In particular, coolant was low from the reservoir but was not leaking and there were misfire codes in the engine's computer for cylinders #1 and #2. The dealership found bad compression rings, pitting on the valve seat and corrosion on the valve and informed Ms. Metro she needed a new engine.

299.   Ms. Metro ultimately paid $8,124.55 for a new engine.

300.   Despite complaining to Ford about the Engine Defect, Ms. Metro's vehicle has never been adequately and permanently repaired, as Ford has failed to issue a recall or other form of satisfactory repair for the Engine Defect.

301.   As a result of Ford's misconduct and concealment of the Engine Defect, Ms. Metro has overpaid for her 2018 Ford Edge, incurred out of pocket losses to repair the engine, and did not receive the full benefit of the bargain in purchasing the vehicle.

302.   Ms. Metro has lost confidence in the ability of her Class Vehicle to provide safe and reliable transportation for ordinary and advertised purposes. Further, based on her experience, Ms. Metro is not confident that she will be able to rely on Ford's advertising and labeling in the future.

303.   At all times, Ms. Metro, like all Class Members, has driven her vehicle in a manner both foreseeable and in which it was intended to be used.

**AA.   Plaintiff Scott Pickering**

304.   Plaintiff Scott Pickering is an individual residing in Valparaiso, Indiana.

305.   Mr. Pickering owns a 2014 Ford Fusion with a 1.5L EcoBoost engine, which he purchased pre-owned on January 27, 2016 from Fieldhouse Ford, an authorized Ford dealer in Demotte, Indiana. The vehicle had 20,674 miles at the time of purchase. Mr. Pickering purchased the vehicle for personal, family, and household use. The vehicle had a warranty start date of November 25, 2013.

306.   Passenger safety and reliability were important factors to Mr. Pickering's decision to purchase the vehicle. Prior to purchasing the 2014 Ford Fusion, Mr. Pickering researched the vehicle by viewing multiple weekly ads for the model, reviewing the Monroney Label (Window Sticker) and test drove the vehicle. Based on Ford's representations, Mr. Pickering was led to believe that the 2014 Ford Fusion was, among other things, a safe, reliable, and high quality vehicle.

307.   Despite Mr. Pickering's research prior to purchasing the vehicle, Ford never disclosed at the time of purchase that the 2014 Ford Fusion contained the Engine Defect, which could cause the vehicle's engine to leak coolant, overheat, fail, and even potentially ignite into an engine fire. Indeed, Ford concealed this information from consumers, and Mr. Pickering was not aware of, and did not have any reason to anticipate that his vehicle was afflicted by the Engine Defect when he purchased the vehicle.

308.   Ford's omissions were material to Mr. Pickering. If Ford had adequately disclosed these facts before Mr. Pickering purchased the vehicle, he would have learned of the concealed information and would not have bought the vehicle or would have paid less for it.

309.   In February 2016, with approximately 21,000 miles on the odometer, Plaintiff Pickering began to experience the Engine Defect. Plaintiff Pickering's engine began stalling, dying,

smoking, and sputtering. As a result, on or around February 10, 2016, Plaintiff Pickering delivered his vehicle to Fieldhouse Ford. The technician "INSPECT[ED] TO FIND COOLANT LEAKING[.]" The repair order further noted that the technician "REPLAC[ED] TEMP SENSOR" and repaired "COOLANT HOSE CONNECTION," replaced the "CLAMP," and refilled "COOLANT AND RETEST OK." Thereafter, Plaintiff Pickering continued experiencing the Engine Defect.

310.   On or around July 12, 2021, with 71,500 miles on the odometer, Plaintiff Pickering took his vehicle to Currie Motors Ford, an authorized Ford dealership in Valparaiso, Indiana and again the technician verified his concerns. The repair order further noted that the technician found coolant leaking into cylinder 4 and replaced the engine block.

311.   Mr. Pickering was forced to pay $5,000.00 out of pocket for this repair.

312.   Despite complaining to Ford about the Engine Defect, Mr. Pickering's vehicle has never been adequately and permanently repaired, as Ford has failed to issue a recall or other form of satisfactory repair for the Engine Defect.

313.   As a result of Ford's misconduct and concealment of the Engine Defect, Mr. Pickering has overpaid for his 2014 Ford Fusion, incurred out of pocket losses to repair the engine, and did not receive the full benefit of the bargain in purchasing the vehicle.

314.   Mr. Pickering has lost confidence in the ability of his Class Vehicle to provide safe and reliable transportation for ordinary and advertised purposes. Further, based on his experience, Mr. Pickering is not confident that he will be able to rely on Ford's advertising and labeling in the future.

315.   At all times, Mr. Pickering, like all Class Members, has driven his vehicle in a manner both foreseeable and in which it was intended to be used.

**BB.    Plaintiff Kimberly Thomas**

316.   Plaintiff Kimberly Thomas is an individual residing in Brunswick, Ohio.

317.   Ms. Thomas owns a 2018 Lincoln MKC with a 2.0L EcoBoost engine, which she purchased new on May of 2018 from Ganley Lincoln, an authorized Lincoln dealer in Middleburgh, Ohio. Ms. Thomas purchased the vehicle for personal, family, and household use.

318.    Passenger safety and reliability were important factors to Ms. Thomas's decision to purchase the vehicle. Prior to purchasing the 2018 Lincoln MKC, Ms. Thomas researched the vehicle by viewing multiple commercials, reviewed the Monroney Label (window sticker) and brochures, and discussed the vehicle with the salesperson who informed Mr. Thomas that the vehicle was very dependable and great on gas mileage. Ms. Thomas also test drove the vehicle and discussed the warranty, gas mileage, safety features such as the backup camera and side mirror detection, and reliability of the vehicle including national crash ratings.  Based on Ford's representations, Ms. Thomas was led to believe that the 2018 Lincoln MKC was, among other things, a safe, reliable, and high quality vehicle.

319.    Despite Ms. Thomas's research prior to purchasing the vehicle, Ford never disclosed at the time of purchase that the 2018 Lincoln MKC contained the Engine Defect, which could cause the vehicle's engine to leak coolant, overheat, fail, and even potentially ignite into an engine fire. Indeed, Ford concealed this information from consumers, and Ms. Thomas was not aware of, and did not have any reason to anticipate that her vehicle was afflicted by the Engine Defect when she purchased the vehicle.

320.    Ford's omissions were material to Ms. Thomas. If Ford had adequately disclosed these facts before Ms. Thomas purchased the vehicle, she would have learned of the concealed information and would not have bought the vehicle or would have paid less for it.

321.    Beginning on or around October 9, 2019, Ms. Thomas' vehicle began to lag and jerk. At the time, the vehicle only had 37,700 miles on the odometer and she took her vehicle to Ganley Lincoln Mercury, an authorized Lincoln dealership in Middleburg Heights, OH, who advised her that nothing was wrong with her vehicle and performed no repairs.

322.    On or about January 30, 2020, when the vehicle had approximately 44,100 miles on the odometer, she returned the vehicle to the dealership with the same complaints. The dealership again told her nothing was wrong with her vehicle but performed an update to the powertrain control module. This did not repair the Defect. Ms. Thomas complained several more times at the dealership, but aside from the updates to the powertrain control modules, no repairs were attempted.

323.   Finally, on or around January 24, 2022, the transmission in her vehicle failed and had to be replaced. While the transmission was being replaced in March 2022, the dealership informed her that coolant had intruded into the cylinders of the engine and damaged the engine enough that the vehicle needed a brand-new engine.

324.   Ms. Thomas had to pay $3,200 for the new engine.

325.   Despite complaining to Ford about the Engine Defect, Ms. Thomas's vehicle has never been adequately and permanently repaired, as Ford has failed to issue a recall or other form of satisfactory repair for the Engine Defect.

326.   As a result of Ford's misconduct and concealment of the Engine Defect Ms. Thomas has overpaid for her 2018 Lincoln MKC, incurred out of pocket losses to repair the engine, and did not receive the full benefit of the bargain in purchasing the vehicle.

327.   Ms. Thomas has lost confidence in the ability of her Class Vehicle to provide safe and reliable transportation for ordinary and advertised purposes. Further, based on her experience, Ms. Thomas is not confident that she will be able to rely on Ford's advertising and labeling in the future.

328.   At all times, Ms. Thomas, like all Class Members, has driven her vehicle in a manner both foreseeable and in which it was intended to be used.

**CC.   Defendant Ford Motor Company**

329.   Defendant Ford Motor Company is a Delaware limited liability company with its Corporate Headquarters located at 1 American Road, Dearborn, Michigan 48126. Ford Motor Company is registered to do business in the State of Delaware. Ford Motor Company designs and manufactures motor vehicles, parts, and other products for sale in the United States and throughout the world. Ford Motor Company is the warrantor and distributor of the Class Vehicles in California and throughout the United States.

330.   At all relevant times, Ford was and is engaged in the business of designing, manufacturing, constructing, assembling, marketing, distributing, and selling automobiles and motor vehicle components in Delaware and throughout the United States of America.

331.   In order to sell vehicles to the general public, Defendant enters into agreements with dealerships who are then authorized to sell its branded vehicles such as Fords and Lincolns to

50

consumers such as Plaintiffs. In return for the exclusive right to sell new Ford and/or Lincoln vehicles in a geographic area, authorized dealerships are also permitted to service and repair these vehicles under the warranties Defendant provides directly to consumers. These contracts give Defendant a significant amount of control over the actions of the dealerships, including sale and marketing of vehicles and parts for those vehicles. All service and repair at an authorized dealership are also completed according to Defendant's explicit instructions, issued through service manuals, technical service bulletins, and other documents. Per the agreements between Defendant and the authorized dealers, consumers such as Plaintiffs can receive services under Defendant's issued warranties at dealer locations that are convenient to them.

332.  Defendant also develops and disseminates the owners' manual, warranty booklets, maintenance schedules, advertisements, and other promotional materials relating to the Class Vehicles. Defendant is also responsible for the production and content of the information on the Monroney Stickers.

333.  Defendant is the drafter of the warranties it provides to consumers nationwide, the terms of which unreasonably favor Defendant. Consumers are not given a meaningful choice in the terms of the warranties provided by Defendant, and those warranties are offered on a "take it or leave it" basis.

**IV.     JURISDICTION AND VENUE**

334.  The Court has diversity jurisdiction over this action under 28 U.S.C. § 1332(d) and the Class Action Fairness Act ("CAFA"). Plaintiffs and other Class Members are residents and citizens of states different from the home states of the Defendant, and the amount in controversy in this action for the Class exceeds $5,000,000.00.

335.  Venue is proper in this District pursuant to 28 U.S.C. § 1391 because Plaintiff Miller resides in this District, purchased her vehicle in this District and a substantial portion of the events or omissions giving rise to this Action occurred in this District. Furthermore, Defendant conducts substantial business in, and has gained substantial benefit from, doing business in this District.

336.  Defendant markets, sells, and leases vehicles to consumers throughout this District, a significant number of Defendant's customers are residents of this District, and the wrongful acts

and omissions alleged herein have affected consumers in this District. Defendant is therefore subject to personal jurisdiction in this District.

337.   Plaintiff Miller's venue declaration pursuant to Cal. Civ. Code § 1780(d) is attached hereto as **Exhibit 1**.

## V.    FACTUAL ALLEGATIONS

338.   In 2009, Ford began producing the EcoBoost engine, which are gasoline-fueled, turbocharged, direct-injection (also called "GTDI") engines. EcoBoost engines are marketed as providing low-emissions, fuel-efficient alternative to hybrid or electric vehicles.

339.   Because of the Engine Defect, the EcoBoost engines in Class Vehicles are predisposed to leak coolant, allowing coolant to seep into the engine cylinder, causing the engines in the Class Vehicles to overheat and ultimately causing engine fires and/or total engine failure, thereby compromising the comfort, safety, and enjoyment of Plaintiffs and Class Members, and requiring them to pay out-of-pocket to temporarily ameliorate the problem and/or replace the defective EcoBoost engine with an equally defective engine, leaving the Class Vehicle susceptible to repeated failures like those experienced by Plaintiffs.

### A.    The Engine Defect

340.   Discovery will show that the Engine Defect is the result of the design of the engine block and cylinder head, including an inadequate seal on the cylinder head. This design includes grooves at the point where the engine's cylinder head attaches to the engine block, as seen here:

1
2
3
4
5
6
7
8
9
10



341.  In a non-defective engine, liquid coolant is used to ensure that the engine does not overheat. The coolant circulates through a set path within the engine block and cylinder head, cooling the engine. The liquid gathers heat due to contact with the engine and then flows through a hose and into the radiator to cool back down. Once its temperature has lowered, the coolant returns to the engine, and continues to circulate.

342.  In the Class Vehicles, however, as the coolant circulates through the engine, it seeps through the grooves present on the cylinder head, and pools there. The coolant pooling contributes to the seal degrading, eventually allowing the coolant to leak into the engine's cylinders. The degraded seals can be seen below:



343.   The coolant leak causes two related problems. First, the leak results in insufficient coolant levels and, consequently, engine overheating. Engine overheating is well known to cause catastrophic damage to an engine. For example, overheating can cause the cylinder head to crack. Engine overheating can also warp other internal components, such as pistons. Additionally, when an engine overheats sufficiently, it causes a loss of oil viscosity, which can lead the engine to completely seize. In some instances, engine overheating can result in engine fire.

344.   The second related problem caused by the coolant leak occurs as a result of the coolant leaking *into* the cylinders. Coolant should not enter the cylinders, and when it does, it causes the engine to misfire. Coolant in the cylinders is burned through the combustion chamber and exits through the vehicle's exhaust, sometimes resulting in smoke emitting from the vehicles' exhaust. In addition, coolant that enters the cylinders mixes with the oil on the cylinder walls, causing oil dilution and contamination, which in turn cause corrosion and excessive wear on bearings and other internal engine surfaces.

345.   The Engine Defect can occur at low mileage, often while the vehicle remains within the warranty period.

346.   Ford's insufficient Band-Aid repair measures, such as installing a low coolant sensor, and/or the replacement of faulty EcoBoost engines in Class Vehicles with equally defective replacement engines leave Class Vehicles susceptible to repeated failure.

347.   Because of the Engine Defect, consumers are forced to pay thousands of dollars out of pocket, despite the fact that the repair does not remedy the Engine Defect and leaves consumers still subject to future risk of failure.

348.   Ford has apparently developed a feasible alternative design for an EcoBoost engine that does not contain the defect Class Vehicles suffer from but has not used these newly-developed non-defective engines to replace failed EcoBoost engines installed in Class Vehicles, leaving Class Members to face the specter of repeated engine failure and engine fires.

**B.**     **The Engine Defect Poses a Safety Risk to Vehicle Drivers, Passengers, and the Public.**

349.   The Engine Defect poses a safety hazard to drivers, passengers, and the public because

54

an engine with insufficient coolant and/or coolant in its cylinders can misfire, suddenly fail, catch on fire while the vehicle is otherwise in normal operation. Sudden engine failures and engine fires create serious risks of injury or death to those inside the vehicle and to others nearby.

350.   For instance, one complaint filed with NHTSA detailed a consumer's experience while driving a 2017 Ford Edge with their family in the car. The driver pulled over to the side of the road and saw smoke coming out of the car. Within minutes after the family evacuated the vehicle, "the entire car was engulfed in flames."[1]

351.   Another 2017 Ford Edge owner described experiencing complete engine failure while on the highway: "Suddenly the car basically went dead while in motion going 75 miles per hour. I had to steer it off the highway and turn it off, leaving us stranded on the side of the highway for 4 hours." This event occurred after the driver had received a check engine alert, and had the engine's head gasket replaced due to coolant in the cylinder. Following the total engine failure, it was determined that coolant had leaked into the cylinder, causing misfiring and engine failure, for the second time in less than 12 months. The complaint stated that the author was forced to pay $7,000.00 for a full engine replacement.[2]

352.   As these instances demonstrate, engine failures put the vehicle occupants and others on the road in extreme risk of accidents, and engine fires pose a potentially lethal hazard.

353.   As further detailed below, the NHTSA website is replete with similar complaints of smoking vehicles, engine failures while the car is in operation on the road, and fires. Additionally, these complaints highlight that the Engine Defect often requires repeated repairs, each of which can cost consumers thousands of dollars.

**C.   Ford Knew That the EcoBoost Engines in the Subject Vehicles Were Defective Since At Least 2012, But It Continued to Sell These Engines Anyway.**

**1.   Over the Past Decade, Ford Has Issued Multiple Ineffective Recalls for Issues Relating to Coolant Leaks and Overheating in EcoBoost Engines.**

354.   Consumers began to experience failures with the EcoBoost Engine almost

---

[1] NHTSA ID No. 11020178, Complaint Date Aug. 28, 2017.

[2] NHTSA ID No. 11338725, Complaint Date July 11, 2020.

immediately after Ford released it into the market in 2012, which prompted Ford to subsequently issue a series of inadequate, piecemeal recalls.  Ford has known about the Engine Defect since at least June 2012, when it received an unusually high number of complaints that revealed serious safety issues with the EcoBoost Engine. Indeed, as Ford later informed NHTSA, between September 7, 2012 and November 29, 2012, Ford was aware of at least nine incidents during which vehicles with the EcoBoost engine caught on fire.

355.   In light of the mounting engine failures from the problematic launch of the EcoBoost Engine, Ford issued Recall Campaign 12S41 (NHTSA Recall No. 12V551) (the "2012 Recall") on November 30, 2012, and announced that vehicles equipped with the 1.6L EcoBoost engine "may experience engine overheating that can lead to fluid leaks that may come into contact with the hot exhaust system that may result in a fire."  As explained in the chronology Ford submitted to NHTSA along with notice of the problem, Ford prepared for this recall at least several months in advance, given the time it takes to prepare a fix for vehicles already operating in the field.

356.   Ford limited the 2012 Recall to only certain 2013 Ford Escape and 2013 Ford Fusion vehicles with the 1.6L EcoBoost engine.  Thus, rather than recalling the full fleet of Ford vehicles on the market that were equipped with the defective EcoBoost engine—including the 1.5L and 2.0L EcoBoost Engines that were built on the same design and made from the same materials—Ford chose to recall only a portion of Escapes and Fusions with the EcoBoost Engine, and it continued to sell the Class Vehicles despite the ongoing danger of the Engine Defect.

357.   Ford's supposed "fix" with the 2012 Recall was ineffective.  Rather than redesigning and replacing the EcoBoost Engine to address the root cause of the problem, Ford's recall servicing involved a mere check for diagnostic trouble codes and engine fluid leaks, and a reprogram of the vehicle's powertrain control module. In other words, the remedy was ineffective because it merely attempted to address the symptoms of the Engine Defect but not its actual cause.

358.   As part of the 2012 Recall, Ford established a "cross functional task force to further investigate these fires." Testing conducted as part of this investigation "indicated engine overheating and cracked cylinder heads that allowed oil to leak." Indeed, on November 18, 2013—

56

nearly a year after Ford rolled out the 2012 Recall— Ford's Field Review Committee "determined that a safety defect exists, and that a voluntary safety recall should be conducted."

359.   On November 25, 2013, Ford initiated Recall Campaign 13S12 (NHTSA Recall No. 13V583) (the "2013 Recall"). As indicated in the chronology Ford submitted to NHTSA along with notice of the problem, its investigation was linked to the 2012 Recall, and further, Ford had been involved in an ongoing investigation which led to the 2013 Recall since that time.  Further, Ford prepared for this recall at least several months in advance, given the time it takes to prepare a fix for vehicles already operating in the field. As with the 2012 Recall, Ford failed to extend a fix to all of the Class Vehicles and instead limited the recall to 2013 Ford Escapes with the 1.6L EcoBoost engine (approximately 139,917 vehicles). The 2013 Recall again warned of the risk of "localized overheating of the engine cylinder head," which "may cause the cylinder head to crack, causing an oil leak that may result in a fire in the engine compartment." The 2013 Recall superseded the 2012 Recall.

360.   Ford's solution in the 2013 Recall was to add "a new engine temperature sensor."[3] This sensor could detect when the engine was overheating but it did nothing to prevent the coolant leaks.  Again, Ford's recall remedy was ineffective because it attempted to address only the symptoms of the Engine Defect and not its root cause.

361.   Because the 2012 Recall and the 2013 Recall were ineffective and incomplete, owners of vehicles equipped with the EcoBoost Engine continued to experience problems with overheating and fluid leaks.  In 2016, Ford again investigated an ongoing series of numerous complaints about engine fires.  As Ford later informed NHTSA, starting in June 2016 Ford's North American Critical Concern Review Group "reviewed data related to underhood fire allegations on 2014 Escape vehicles equipped with 1.6L GTDI [EcoBoost] engines."  This data included dozens of customer reports of engine overheating caused by coolant loss from a cracked cylinder head.  Based on this data, Ford ultimately concluded the EcoBoost Engines were experiencing yet another safety defect,

---

[3] Letter from Ford to All U.S. Ford and Lincoln Dealers, "SUBJECT: STOP SALE / DEMONSTRATION / DELIVERY HOLD" (Jan. 23, 2014), available at https://static.nhtsa.gov/odi/rcl/2013/RCRIT-13V583-1656.pdf (last accessed Sept. 27, 2022).

which was evidently caused by the same root cause: the Engine Defect. Despite receipt of this data confirming that the EcoBoost Engines were continuing to experience the Engine Defect, Ford did not attempt to take steps to remedy the issue for nearly a year.

362.  On March 27, 2017, Ford informed NHTSA that vehicles equipped with the 1.6L EcoBoost engine "may experience underhood fires due to localized overhearing of the engine cylinder head, potentially leading to cracks and resulting in oil leaks." Indications of a possible engine overeat include "[a] visible coolant leak, an engine overheat warning message in the instrument cluster, repeatedly refilling coolant, or a low level in the coolant bottle."

363.  Ford's Field Review Committee reviewed the data from these incidents and concluded that it would be necessary to issue a safety recall for "all vehicles in North America equipped with a 1.6L GTDI engine built prior to February 14, 2014." Accordingly, on December 13, 2017, Ford issued Recall Campaign 17S09 (NHTSA Recall No. 17V209) (the "2017 Recall"). As indicated in the chronology Ford submitted to NHTSA along with notice of the problem, its investigation was linked to the 2013 Recall, and further, Ford had been involved in an ongoing investigation which dated from June 2016. That investigation included a review of reports of engine overheating in the winter months of early 2016. Further, Ford prepared for this recall at least several months in advance, given the time it takes to prepare a fix for vehicles already operating in the field. The 2017 Recall applied to the following vehicle models equipped with the 1.6L EcoBoost engine: 2014 Ford Escape, 2014-2015 Ford Fiesta ST, 2013-2014 Ford Fusion, and 2013-2015 Ford Transit Connect.

364.  The 2017 Recall called for the installation of a coolant level sensor in the recalled vehicles to alert drivers when the engine coolant needed to be refilled. As with the prior recalls, Ford once again failed to address the root cause of the Engine Defect with the 2017 Recall. The coolant level sensor did nothing to prevent the continued coolant leaks and was yet another woefully inadequate recall strategy. And like the previous recalls, Ford continued to limit the recall to only certain vehicles with the 1.6L EcoBoost engines, even though the 1.5L and 2.0L EcoBoost engines were designed with the same engine block design, are made from the same materials, and suffer from the same Engine Defect.

365.  Despite receiving complaints regarding vehicles with the 1.5L and 2.0L EcoBoost

Engines, Ford has never expanded its recalls to all vehicle models and model years that suffer from the Engine Defect.

366.    The 2012, 2013, and 2017 Recalls were insufficient to address the underlying Engine Defect and do not come close to remedying the ongoing harm to Plaintiffs and Class Members. Ford knew about the dangers of the Engine Defect but still proceeded to sell Class Vehicles to Plaintiffs and Class Members without disclosing the true defective nature of the EcoBoost Engine.  Rather than warning the public about the Engine Defect and issuing a comprehensive recall that would tackle the root cause in the EcoBoost Engine's design for all Class Vehicles, Ford chose to put profits over safety so it could boost its profits in vehicles sales.

### 2.    Ford Knew of the Engine Defect from Its Pre-Release Design, Manufacture, Engineering, and Testing Data.

367.    During the pre-release process of designing, manufacturing, engineering, and testing the Class Vehicles, Ford necessarily would have gained comprehensive and exclusive knowledge about the EcoBoost Engine, particularly the basic engineering principles behind the construction and function of the engine and the expected conditions and uses the engine would encounter in ordinary use.

368.    An adequate pre-release analysis of the design, engineering, and manufacture of the EcoBoost Engine in the Class Vehicles would have revealed to Ford that the engine was defective and susceptible to leaking coolant, thus causing the Vehicle to overheat.

369.    Ford is experienced in the design and manufacture of consumer vehicles. As an experienced manufacturer, Ford conducts tests, including pre-sale durability testing, on incoming components, including the engines, to verify the parts are free from defect and align with Ford's specifications.[4]  This is particularly true of components and systems which Ford intends to put in millions of its vehicles, as the company intended with the EcoBoost engine.

---

[4] Akweli Parker, *How Car Testing Works*, HowStuffWorks.com, http://auto.howstuffworks.com/car-driving-safety/safety-regulatory-devices/car-testing.htm ("The idea behind car testing is that it allows manufactures to work out all the kinks and potential problems of a model before it goes into full production.") (last visited Sept. 27, 2022).

370.    In particular, Ford has extensive proving grounds and testing facilities to ensure that prototype engines and other vehicle components meet specifications and to test for unforeseen defects in design and manufacture. Ford has such facilities in Thailand, India, Australia, the Middle East, China, and throughout the United States, including the extensive Dearborn Development Center located in Dearborn, Michigan, and Mexico, where "Ford vehicles and components are 'shaken, rattled and rolled' in a variety of tests, some conducted in temperatures ranging from an arctic minus 40 degrees Celsius, to desert-scorching heat of over 50 degrees Celsius."[5]

371.    One of the test protocols is the Total Durability Cycle. As described by Ford, prototype and pre-production vehicles go through:

> sped-up evaluation runs around the clock, day and night, to simulate 10 years, or 240,000km, of severe customer usage in just a few weeks. Gravel roads, cobblestones, pot-holes, curbs and water baths feature in this grueling test. Just for good measure, environmental factors like dust, water and mud are thrown in, while dynamometers simulate towing heavy loads in traffic and over mountain passes.[6]

372.    Ford has standard durability and reliability testing for all its produced engines, per Ford's Advanced Engine Design and Development manager, Brett Hinds.[7] This includes 20 different dynamometer tests to verify the reliability of the engine under maximum speeds and loads, as well as coolant and oil temperatures.[8]

373.    One such test is the Road Cycle Durability test, which is designed to replicate customer driving and maintenance patterns. This test includes one thousand cold starts, followed by sustained operation at peak torque and power. During the course of this test, the coolant temperature can range from 53 degrees Fahrenheit to 203 degrees Fahrenheit. Ford runs this test for

---

[5] Testing in the Extremes: How Ford's Multiple Testing Facilities Push Vehicles to the Limit, Ford Media Center (July 10, 2019), https://media.ford.com/content/fordmedia/img/me/en/news/2019/10/07/testing-in-the-extremes--how-fords-multiple-testing-facilities-p.html (last visited Sept. 27, 2022).

[6] Id.

[7] Ford EcoBoost Engines Cruise 1 Million Miles in in Testing, Delivering Fuel Economy, Performance, Automotive-Fleet.com, (Sept. 5, 2008), https://www.automotive-fleet.com/62083/ford-ecoboost-engines-cruise-1-million-miles-in-testing-delivering-fuel-economy-performance (last visited Sept. 27, 2022).

[8] Id.

1,000 hours, ultimately simulating 60,000 road miles under the most extreme conditions. This test in particular would have revealed the Defect, which often manifests prior to 60,000 miles during typical vehicle operations.[9]

374.  Ford has confirmed that such tests are global and were done on all the EcoBoost engines, including the 1.5L, 1.6L, and 2.0L capacity models. In a 2014 *Car & Driver* article, Mike Herr, an engine durability specialist at Ford, stated that Ford's engine tests "incorporate[e] the most-extreme tests for each operation."[10] The article goes on to describe the global thermal test, in which engineers run an engine up to peak power and when the water temperature hits 230 degrees, they turn off the engine and pump minus-22-degree coolant through the engine for 15 minutes. They then turn on the engine, allow it to rest for 20 seconds, then rev to top performance, so that the temperature rises to 230 degrees once more and oil temperature rises to 280. This process is repeated five times, and any given engine undergoes this process 350 times during the full durability test.[11] This testing would have necessarily revealed the Engine Defect before Ford began selling the Class Vehicles.

375.  Such testing is required on all Ford engines but was especially important on the EcoBoost engine. As described by Jeff Kolodziejczyk, a Ford engine-development supervisor, "Our EcoBoost engines have more-complex cooling systems to cope with integrated exhaust manifolds, turbochargers, and local hot spots. Our 1.6-liter has four separate valves to regulate cooling flow."[12]

376.  As a result, discovery will show that Ford's durability and reliability testing, done both before EcoBoost engines were built into the first of the Class Vehicles and after they were installed in Class Vehicles, revealed the existence of the Defect to Ford. Such testing was repeated

_____

[9] *Id.*

[10] Csaba Csere, How Powertrain Development Teams Ensure Durability by Beating the Crap Out of Engines, CAR & DRIVER, Feb. 2014, *available at*, https://www.caranddriver.com/news/a15366911/how-powertrain-development-teams-ensure-durability-by-beating-the-crap-out-of-engines/ (last visited Sept. 27, 2022).

[11] *Id.*

[12] *Id.*

for each production model year, and was particularly robust in 2013 as the re-designed 4-cylinder EcoBoost engines were to be installed in model year 2015 vehicles built in 2014.[13]  As such, Ford would have been made aware of the Defect prior to sale of the first Class Vehicles.

### 3. Ford Knew About the Engine Defect from Voluminous Internal Data on Repairs and Consumer Complaints.

377.   Ford was also aware of the Engine Defect through repair data, warranty data, and other internal processes. Indeed, shortly after Ford released the EcoBoost Engine, customers began to request warranty repairs and complained to Ford dealers, personnel, and other sources about coolant leaks in their Class Vehicles.

378.   One of Ford's internal processes for reviewing complaints related to defects like the Engine Defect is Ford's Critical Concern Review Group (CCRG).  When Ford becomes aware of a safety-related defect—whether through warranty repair data, customer service reports, or other sources—the CCRG will investigate the issue, review and assess the problem, and recommend corrective actions including recalls.

379.   On information and belief, the level of warranty claims, consumer complaints, and comments from Ford dealers and technicians would have informed the CCRG and other Ford employees and quality-control entities of the Engine Defect.  Indeed, as discussed above, Ford informed NHTSA that the CCRG analyzed incident data relevant to the Engine Defect and ultimately helped conclude that Ford should issue numerous recalls related to this issue.

380.   Preliminary discovery bears out the assertion that the CCRG or other internal Ford processes have known about the Engine Defect at least since Ford released the EcoBoost Engine. For example, according to data Ford submitted to NHTSA in connection with the agency's investigation of the Engine Defect, between 2012 and 2018, MY2013 and MY2014 Ford Escape owners and lessees filed over ***24,000*** warranty claims.   FORD-MILLER 00007087. Based on

---

[13] Richard Truett, *Ford to replace 2.0-liter EcoBoost after just 4 years*, Automotive News, (June 30, 2014), available at https://www.autonews.com/article/20140630/OEM06/306309977/ford-to-replace-2-0-liter-ecoboost-after-just-4-years (last visited Sept. 27, 2022).

Plaintiffs' initial review of these materials, at least several thousands of these claims appear to relate to the Engine Defect.

381.    As a further example, Ford's Common Quality Indicator System (CQIS), which collects data from more than 40 Ford sources (including customer surveys, field service and quality engineers, and reports from Ford technical hotlines), received over **1,400** reports for issues in MY2013 and MY2014 Ford Escapes between 2012 and 2018.  FORD-MILLER 00007087.

382.    In sum, from 2012 to 2018, Ford received thousands of internal complaints about and performed service on thousands of EcoBoost Engine-equipped vehicles leaking coolant and overheating.  Despite this, Ford did not notify consumers about the scope of the Engine Defect. When Ford did issue recalls, it did not extend them to the full scope of affected vehicles, nor did its solution effectively fix the Engine Defect.  Although the existing data demonstrates the severity of the problem and Ford's early knowledge of these issues, further discovery will reveal the full magnitude of the complaints.

### 4.    Ford Was Aware of the Engine Defect from Class Member Complaints Collected by NHTSA.

383.    Ford also knew or should have known about the Engine Defect based on the unusually high volume of consumer complaints submitted to NHTSA.

384.    Consumers began filing complaints to NHTSA about issues relating to the Engine Defect as early as October 16, 2012, when one owner of a 2013 Ford Escape with a 1.6L EcoBoost Engine, reported that the car "burst into flames and was destroyed" after "the high engine temperature warning light came on" while driving on the highway and the vehicle coasted to a stop. (NHTSA Complaint ID 10480692).

385.    Over the next decade, consumers continued to complain about coolant leaks and overheating in vehicles equipped with the EcoBoost Engine. These complaints are spread consistently over the Class Period across the various Class Vehicles, and all reported serious problems with the EcoBoost Engine.  A selection of these complaints follows.

a.    April 11, 2013 (NHTSA Complaint ID 10505960; 2013 Ford Escape, 1.6L): "VEHICLE REPORTED ENGINE TEMPERATURE TOO HIGH AND THAT I SHOULD PULL

OVER SAFELY. THIS IS THE SAME ENGINE OVERHEATING / FIRE HAZARD PROBLEM SUPPOSEDLY FIXED DURING DECEMBER 2012 RECALL."

      b.     June 26, 2013 (NHTSA Complaint ID 10521995; 2013 Ford Escape, 1.6L): "MY CAR HAS OVERHEATED TWICE AFTER THE RECALL FIX.  MY COOLANT WAS VIOLENTLY BOILING OVER.   MY TRANSMISSION IS ALSO GROSSLY SHIFTING INCORRECTLY.  I ALMOST GOT HIT BY ANOTHER CAR WHEN I WAS TRYING TO MERGE ONTO THE FREEWAY SINCE IT WASN'T GOING TO THE NEXT GEAR.  THE TRANSMISSION REDLINED AND THEN SHIFTED.  I CHECKED MY OBT AND I'M NOT GETTING ANY CODES FOR THESE PROBLEMS.      I'M NOT SURE WHAT TO DO ANYMORE SINCE ANYTIME I'VE BROUGHT MY CAR IN THEY HAVEN'T FOUND ANY ISSUES.  I'VE BROUGHT MY CAR IN SEVERAL TIMES ABOUT THE ENGINE AND TRANSMISSION AND NO ISSUES HAVE BEEN FOUND.  I DRIVE THROUGH THE SANTA CRUZ MOUNTAINS EVERY WEEK AND I'M AFRAID ONE DAY MY ENGINE WILL CATCH ON FIRE (HILLY ROADS AND LOW SPEEDS CAUSE THE ENGINE TO RUN HOT). IT WOULD BE DISASTROUS FOR THE STATE OF CALIFORNIA IF A WILDFIRE WAS STARTED DUE TO THIS CAR.  *TR"

      c.     November 19, 2013 (NHTSA Complaint ID 10552925; 2013 Ford Escape, 1.6L): "MY CAR IS STILL OVERHEATING AFTER BRINGING IT INTO THE DEALER 6 TIMES.  THEY HAVE DONE THE RECALL FIX TWICE NOW.  THERE APPEARS TO BE SMOKE COMING OUT OF MY HOOD NOW WITH A BURNT SMELL.  THE BURNING AND COOLANT SMELL IS TRIGGERING MY ASTHMA WHILE DRIVING.   *TR"

      d.     January 27, 2014 (NHTSA Complaint ID 10561719; 2013 Ford Escape, 1.6L): "I PURCHASED MY 2013 FORD ESCAPE IN SEPT 2012. SINCE THAT TIME THE VEHICLE HAS BEEN RECALLED 5 TIMES FOR FIRE HAZARDS. I HAVE TAKEN IT IN TWICE FOR THE SMELL OF ANTIFREEZE AND A CHECK ENGINE LIGHT. I WAS TOLD THE SMELL WAS MY AIR FRESHENER, I THEN TOOK IT BACK A SECOND TIME WITH THE CHECK ENGINE LIGHT ON AND HAS A SENSOR REPLACED THAT I WAS TOLD WOULD BE THE REASON I WAS SMELLING ANTIFREEZE. IT HAS BEEN RECALLED SEVERAL

TIMES FOR FIRE HAZARDS THAT ARE VERY SIMILAR TO THE CURRENT RECALL. I AM VERY CONCERNED ABOUT THE MULTITUDE OF RECALLS FOR FIRE HAZARDS ON THIS CAR. I DRIVE A LOT OF MILES AS I AM A HOME HEALTH CARE NURSE AND ARE FREQUENTLY IN VERY RURAL AREAS. MY CONCERN IS THIS,1. HOW CAN I TRUST THAT MY VEHICLE WILL SAFELY GET ME TO MY TWO JOBS.  2. THE NUMBER OF RECALLS FOR FIRE HAZARDS LETS ME KNOW THAT THEY HAVE NOT PROPERLY FIXED MY CAR IN THE PAST RECALLS. 3. I AM A MOTHER OF A CHILD THAT IS VERY INVOLVED IN SPORTS THAT REQUIRES ME TO TRANSPORT MANY TEENAGERS TO MULTIPLE MEETS, SOME MANY MILES FROM HOME.  I HAVE TALKED TO FORD MOTOR COMPANY WITH MY CONCERNS AND THEY HAVE ONLY TOLD ME THAT THERE IS NOTHING I CAN DO ABOUT THIS. THEY HAVE NO SOLUTION TO THIS AND STATED THAT I COULD NOT FILE LEMON LAW BECAUSE IN  TN IT HAS TO BE IN THE SHOP FOR MORE THAT 30 DAYS. I ASKED IF THEY WOULD REPLACE IT WITH A .2.0 LITER CAR AS THEY HAVE NOT HAD THE RECALLS THAT MY CURRENT 1.6L HAS BUT I WAS LAUGHED AT. I AM VERY CONCERNED ABOUT MY AND MY FAMILIES SAFETY.  *TR"

e.     May 23, 2017 (NHTSA Complaint ID 10991197; 2013 Ford Fusion, 1.6L): "TL* THE CONTACT OWNS A 2013 FORD FUSION. WHILE DRIVING AT ANY SPEED, THE VEHICLE OVERHEATED AND SHUT OFF. THE VEHICLE WAS PUSHED TO THE SIDE OF THE ROAD AND RESTARTED. THE VEHICLE WAS TAKEN TO THE DEALER WHERE IT WAS DIAGNOSED THAT THERE WAS A LEAK IN THE COOLING SYSTEM. THE COOLING SYSTEM WAS CLEANED AND THE WATER PUMP WAS REPLACED, BUT THE FAILURE RECURRED. THE VEHICLE WAS TAKEN BACK TO THE DEALER AND THE BATTERY WAS REPLACED, BUT THE FAILURE RECURRED AND THE CHECK ENGINE INDICATOR ILLUMINATED. THE CONTACT TOOK THE VEHICLE TO THE DEALER.     THE     TECHNICIAN     REPLACED     THE     COOLANT     VALVE     AND REPROGRAMMED THE COMPUTER SYSTEM. A FEW MONTHS LATER, THE ENGINE VIBRATED WHEN THE AIR CONDITIONER WAS ACTIVATED. THE VEHICLE WAS

65

TAKEN TO THE DEALER AND THE AIR CONDITIONING COMPRESSOR WAS REPLACED. THE FAILURE RECURRED AND THE CHECK ENGINE INDICATOR ILLUMINATED. THE VEHICLE WAS TAKEN BACK TO THE DEALER AND THE TECHNICIAN REPLACED THE SOLENOID, BUT THE FAILURE RECURRED. THE VEHICLE WAS NOT REPAIRED. THE MANUFACTURER WAS NOT MADE AWARE OF THE FAILURES. THE CONTACT LATER RECEIVED NOTIFICATION OF NHTSA CAMPAIGN NUMBER: 17V209000 (ENGINE AND ENGINE COOLING). THE FAILURE MILEAGE WAS 17,000. VIN TOOL CONFIRMS PARTS NOT AVAILABLE.  ...UPDATED 07/20/17 *BF  UPDATED 9/28/18*JB"

f.    August 30, 2017 (NHTSA Complaint ID 11020539; 2015 Ford Fusion, 1.5L): "TL* THE CONTACT OWNS A 2015 FORD FUSION. THE CONTACT STATED THAT WHILE DRIVING AT 40 MPH, THE VEHICLE LOST POWER WITHOUT WARNING. THE VEHICLE WAS TOWED TO AN INDEPENDENT MECHANIC WHERE THE MECHANIC WAS UNABLE TO PROVIDE A DIAGNOSIS. THE VEHICLE WAS THEN TOWED TO SAYVILLE FORD LOCATED AT 5686 SUNRISE HWY, SAYVILLE, NY 11782 WHERE IT WAS DIAGNOSED THAT COOLANT WAS LEAKING AND BEING BURNED INSIDE THE ENGINE MANIFOLD AND THE COOLER INTAKE MANIFOLD, RELATED GASKETS AND SEALS NEEDED TO BE REPLACED. THE VEHICLE WAS REPAIRED, HOWEVER, THE CHECK ENGINE LIGHT ILLUMINATED AND THE VEHICLE WAS TAKEN BACK TO SABLE FORD, WHERE THE VEHICLE HAD NOT YET BEEN DIAGNOSED OR REPAIRED. THE MANUFACTURER WAS MADE AWARE OF THE FAILURE AND ADVISED THE CONTACT TO FILE A COMPLAINT WITH NHTSA. THE APPROXIMATE FAILURE MILEAGE WAS 83,000.  ..UPDATED 10/25/17 *BF  *JS"

386.  In total, there were over 2,000 NHTSA complaints reporting problems with Class Vehicles related to the Engine Defect. Plaintiffs have identified at least 230 such complaints submitted between 2012 and 2017 alone, which are compiled and attached as **Exhibit 2**.

387.  Furthermore, on July 16, 2018, NHTSA's Office of Defects Investigation (ODI) announced it received 40 Vehicle Owner Questionnaire (VOQ) reports for 2013 Ford Escape

66

vehicles equipped with the 1.6L EcoBoost engine.[14] These individuals reported "that the vehicle will suddenly stall without warning while driving" and that the "stalling was caused by overheating of the engine resulting in delayed or no restart possible." As a result of these reports, NHTSA opened Investigation PE18-007 in order "to investigate allegations of loss of motive power" in these vehicles.[15] This investigation remains ongoing.

388.   As is made apparent by the above examples and those discussed earlier in this Complaint, consumers have repeatedly and clearly alerted NHTSA ODI about the Engine Defect and Ford was, or should have been, aware of and monitoring those complaints. Given the volume of complaints, Ford was surely aware of the defect plaguing EcoBoost Engines in the Class Vehicles.

389.   Moreover, the large number and consistency of Class Member complaints describing the propensity of EcoBoost engines in Class Vehicles to leak coolant, expel white smoke, shut down while in use, and/or spontaneously catch fire—as a result of the Engine Defect— demonstrate that Class Members consider the Engine Defect to be a material safety issue to the reasonable consumer.

**5.     Ford is Well Aware that Its Recalls Have Been Ineffective and It Continues to Issue Technical Service Bulletins Regarding the Engine Defect.**

390.   Since 2018, Ford has issued nearly a dozen technical service bulletins (TSBs) to address the Engine Defect. A TSB is a communication issued by a manufacturer that advises a repair shop that many owners of the vehicles at issue are experiencing a similar problem and, like recall notices, includes recommended technical steps as to how to address the problem. Ford's multiple and ongoing release of these TSBs demonstrate that Ford is well are of the Engine Defect but has still been unable to address the problem. Plaintiffs have copied the language of the various TSBs below.

---

[14] NHTSA, ODI Resume (Investigation PE 18-007), opened July 16, 2018, *available at* https://static.nhtsa.gov/odi/inv/2018/INOA-PE18007-9851.pdf (last visited Sept. 27, 2022)

[15] Letter to Todd Fronckowiak, Assistant Global Director, Automotive Safety Office, Ford Motor Co., NHTSA (Aug. 2, 2018), *available at* https://static.nhtsa.gov/odi/inv/2018/INIM-PE18007-72978.pdf (last visited Sept. 27, 2022)

1    a.    3/30/2018 SSM 47204 – Some 2015-2018    Fusion/MKZ/MKC/Escape/

2    Edge vehicles equipped with a 2.0L EcoBoost engine may exhibit a runs rough condition with DTCs

3    P0300, P0301, P0302, P0303, P0304 and/or P0316. This may be due to coolant intrusion due to

4    corrosion on the engine block. To diagnose this concern, with the engine at normal operating

5    temperature, pressurize the cooling system to 138 kPa (20 psi) and hold for 5 hours. If the coolant

6    pressure drops 27.57 kPa (4psi), remove the spark plugs and inspect for coolant in the cylinders. If

7    coolant is found in any of the cylinders, replace the engine long block assembly. Follow normal

8    prior approval process for your Dealership. However, follow the diagnostic repair procedure in this

9    article to determine correct repair. For claiming, use causal part 6006 and applicable labor

10   operations in Section 6 of the SLTS Manual.

11    b.    8/13/2018 SSM 47462 – 2015-2018 Edge, Fusion, Focus, MKZ, MKC,

12   Escape vehicles equipped with a 2.0L EcoBoost engine may exhibit coolant consumption, white

13   smoke and/or a runs rough condition. Refer to the extended coolant pressure test and checking for

14   combustion gases in Workshop Manual (WSM), Section 303-03A. If internal coolant loss is

15   confirmed, further investigation of the head gasket interface is required. Carefully inspect the

16   cylinder block and head for erosion, pitting, and flatness defects, primarily between the cylinder to

17   cylinder bore bridges. If defects to the aluminum surface on the cylinder block and/or cylinder head

18   are found, follow the cost cap tool for component replacement. Follow WSM, Section 303-01A for

19   the repair procedures

20    c.    10/30/2018 SSM 47625 – Some 2014-2019    Fusion    and    2017-2019

21   Escape vehicles equipped with a 1.5L EcoBoost engine may exhibit coolant consumption and white

22   smoke concern. Follow the Cooling System Pressure Test procedure in Workshop Manual (WSM),

23   Section 303-03, pressurize the cooling system to 138 kPa (20 psi) and hold for 5 hours. If cooling

24   system pressure drops 27.57kPa(4psi) after 5 hours and internal engine coolant loss is confirmed,

25   further investigation of the head gasket interface is required. Carefully inspect cylinder block for

26   erosion, pitting, and flatness. Defects will be between the engine block cylinders and cylinder bore

27   bridges. If defects with the surface of the cylinder block and/or cylinder head are identified, follow

28   WSM, Section 303-01A procedures for repairs. Complete cost cap as needed to determine the most

68

cost-effective repair.

d.     3/7/2019 SSM 47849 – Some 2014-2019 Fusion and 2017-2019 Escape equipped with 1.5L EcoBoost engine may exhibit coolant consumption and white smoke concern. Follow the Cooling System Pressure Test procedure in WSM, Section 303-03, pressurize the cooling system to 138kPa(20 psi) and hold for 5 hours. If cooling system pressure drops 27.57kPa(4psi) after 5 hours and internal engine coolant loss is confirmed, further investigation of the engine block surface to head gasket interface is required. Carefully inspect engine block cylinders and cylinder bore bridges for erosion, pitting, and flatness. If defects with the cylinder block surface are identified, follow WSM, Section 303-01A procedures for repairs. Complete cost cap as needed to determine the most cost-effective repair. Ford has found that all returned cylinder heads pass inspection and may have been reused.

e.     12/11/2019 TSB 19-2375 – 2017-2019 Ford Escape; 2014-2019 Ford Fusion. This article supersedes TSB 19-2139 to update the production fix date. Some 2014-2019 Fusion vehicles built on or before 10-Jun-2019 and 2017-2019 Escape vehicles built on or before 08-Apr-2019 equipped with a 1.5L EcoBoost engine may exhibit low coolant level, white exhaust smoke and/or runs rough condition with or without an illuminated malfunction indicator light (MIL) with only diagnostic trouble codes (DTCs) P0300, P0301-P0304, P0316, P0217, P1285 and/or P1299 stored in powertrain control module (PCM). This may be due to coolant intrusion into the cylinder. To resolve the condition, replace the short block and head gasket.

f.     12/20/2019 TSB 19-2346 – 2015-2018 Ford Edge; 2017-2019 Ford Escape, Fusion; 2017-2019 Lincoln MKC, MKZ. Some 2015-2018 Edge and 2017-2019 Fusion/MKZ/Escape/MKC vehicles equipped with a 2.0L EcoBoost engine may exhibit a low coolant level, white exhaust smoke and/or a runs rough condition with or without an illuminated malfunction indicator lamp (MIL). Diagnostic trouble codes (DTCs) may include P0300, P0301-P0304, P0316, P0217, P1285 and/or P1299 stored in powertrain control module (PCM). This may be due to coolant intrusion into the cylinder. To correct the condition, follow the Service Procedure steps to replace the long block engine assembly.

g.     4/2/2020 TSB 20-2100 – Some 2014-2019 Fusion vehicles built on or before

10-Jun-2019 and 2017-2019 Escape vehicles built on or before 08-Apr-2019 equipped with a 1.5L EcoBoost engine may exhibit low coolant level, white exhaust smoke and/or runs rough condition with or without an illuminated malfunction indicator light (MIL) with only diagnostic trouble codes (DTCs) P0300, P0301-P0304, P0316, P0217, P1285 and/or P1299 stored in powertrain control module (PCM). This may be due to coolant intrusion into the cylinder. To resolve the condition, follow the Service Procedure to replace the short block and head gasket.

h.    7/10/2020  SSM  48991 – Some 2015-2020  F150/Edge/Fusion,  2016-2018 MKX, 2019-2020 Nautilus, and 2017-2020 Continental vehicles equipped with 2.7L EcoBoost engines may exhibit an illuminated malfunction indicator lamp (MIL) and/or Engine Coolant Over Temperature warning with diagnostic trouble codes (DTCs) P0116, P0117, P0118, P0119, P0128, P0217, P0330, P1026, P1299, and/or P130D. This may be due to the engine coolant temperature (ECT) sensor or knock sensor wiring harness. To correct the condition, replace the 12A648 ECT sensor and 12A699 knock sensor. Do not disconnect the ECT sensor from the knock sensor harness in case parts are called back for analysis. For claiming, use causal part 12A699 and applicable labor operations in Section 10 of the Service Labor Time Standards (SLTS) Manual.

i.    9/8/2021 TSB 21-2269 – Some 2014-2019 Fusion vehicles built on or before 10-Jun-2019 and 2017-2019 Escape vehicles built on or before 08-Apr-2019 equipped with a 1.5L EcoBoost engine may exhibit low coolant level, white exhaust smoke and/or runs rough condition with or without an illuminated malfunction indicator light (MIL) with only diagnostic trouble codes (DTCs) P0300, P0301-P0304, P0316, P0217, P1285 and/or P1299 stored in powertrain control module (PCM). This may be due to coolant intrusion into the cylinder. To resolve the condition, follow the Service Procedure to replace the short block and head gasket.

j.    4/14/2022 TSB 22-2134 – Some 2014-2019 Fusion vehicles built on or before 10-Jun-2019 and 2017-2019 Escape vehicles built on or before 08-Apr-2019 equipped with a 1.5L EcoBoost engine may exhibit low coolant level, white exhaust smoke and/or runs rough condition with or without an illuminated malfunction indicator light (MIL) with only diagnostic trouble codes (DTCs) P0300, P0301-P0304, P0316, P0217, P1285 and/or P1299 stored in powertrain control

module (PCM). This may be due to coolant intrusion into the cylinder. To resolve the condition, follow the Service Procedure to replace the short block and head gasket.

391.   On information and belief, it took Ford a significant amount of time to develop and implement the technical fixes recommended in the TSBs described above.  Preliminary discovery shows that Ford does not issue a TSB or equivalent bulletin without consulting with the CCRG, the Field Review Committee, and other internal entities that evaluate and consider the propriety of field action.  In the similar context of recalls, and as discussed above, documents Ford submitted to NHTSA demonstrate that Ford knew about the Engine Defect for several months to a year before it informed vehicle owners.  Thus, even though Ford issued its first Engine Defect-related TSB in March 2018, on information and belief, Ford's development of this TSB dates back to at least September 2017.

### 6.    Ford Created a Customer Service Program for the Defect.

392.   On December 21, 2019, Ford rolled out Customer Service Program (CSP) 19B37 for 2017-2019 Fusion and Escape vehicles equipped with a 1.5L GTDI engine. The program notice stated, "Some of the affected vehicles may exhibit coolant intrusion into the cylinder bores. Customer symptoms include coolant loss, excessive tailpipe smoke, or illuminated malfunction indicator lights (MIL) due to engine misfire. Over time, this condition my damage the engine, requiring replacement of the engine short block." Ford directed dealers to reprogram the Powertrain Control Module. This service program has been extended beyond its original term and is now in effect through November 30, 2022. The CSP is offered to vehicle owners, free of charge, with no mileage limitation.

393.   On June 9, 2022, Ford issued the fourth supplement to CSP 19B37.  This supplement, CSP 21N12, allows customers whose vehicles were subject to CSP 19B37 to receive a free engine short block replacement if the vehicle was damaged by the Engine Defect within 7 years of 84,000 miles from the warranty start date and the engine short block is no longer covered under the powertrain warranty.  Even though Ford apparently agrees the Engine Defect is serious enough that it will offer out-of-warranty repairs to certain affected vehicle owners, Ford is still refusing to offer

a permanent or sufficient fix to the vast majority of Class Vehicle owners and has not addressed the harm for consumers who already paid out-of-pocket for their repairs.

394.  The Customer Service Program, including the supplements, is insufficient to address the underlying Engine Defect and does not come close to adequately and wholly compensating Plaintiffs and Class Members for the injuries caused by the Engine Defect and Ford's related acts and omissions.  To the contrary, Ford continues to conceal the true nature of the Engine Defect from Class Members.

395.  Since 2012, Ford has issued recalls, TSBs, and CSPs covering every capacity of EcoBoost Engine at issue (1.5L, 1.6L, 2.0L).  Despite this, Ford has failed to permanently or sufficiently remedy the Engine Defect for customers with the EcoBoost Engine.  This ongoing concealment continues to harm Class Members.

### D.  Ford's Marketing and Concealment

396.  Discovery will show that Ford knowingly marketed, advertised, and sold/leased the Class Vehicles with the Engine Defect while willfully concealing the true—defective—quality and safety risks of the EcoBoost engines installed in these Vehicles.

397.  Ford markets the Class Vehicles directly to consumers through nationwide multimedia advertising campaigns on television, the Internet, billboards, print publications, mailings, and through other mass media. Ford touts the safety and quality of Class Vehicles, despite its knowledge that the Vehicles are equipped with an Engine Defect that poses severe risks to drivers, passengers, and the public.

398.  For instance, in a brochure marketing the 2018 Fusion, Ford describes itself as "steadfast about safety," and specifically identifies the Fusion as "proof of [the company's] commitment to safety." In brochures advertising the 2013 Ford Fusion and 2014 Ford Escape, Ford markets the vehicle as "Quality, Green, Safe, Smart." The 2014 Escape, according to Ford, "proves you can get style, function, and fun in one well-priced package." And the EcoBoost engine, according to Ford, "offer[s] a no-compromise combination of power and efficiency."

399.  But in actuality, the Class Vehicles fall far short of these promises. Ford failed to inform consumers of the Engine Defect, which causes coolant to leak into the cylinders, leads to

smoke emitting from the exhaust, requires repeated and frequent coolant replacement, and results in cracked cylinder heads, engine overheating, total engine failure—at times while the car is moving at high speeds—and spontaneous engine fires.

400.   These hazards do not live up to Ford's assurances of its "commitment to safety" and the "confidence" that Ford promoted to its customers. Ford concealed from consumers the Engine Defect and its outcomes, and misled the public about the actual quality of the Class Vehicles.

401.   Plaintiffs and Class Members were exposed to Ford's long-term, national, multimedia marketing campaign touting the supposed quality, safety, and comfort of the Class Vehicles, and Class Members, including Plaintiffs, justifiably made their decisions to purchase or lease their Class Vehicles based on Ford's misleading marketing that concealed the true, defective nature of the Class Vehicles.

402.   As detailed above, discovery will show that Ford has been aware of the Engine Defect since at least 2012, and certainly well before Plaintiffs and Class Members purchased or leased their Class Vehicles, through pre-release evaluation and testing; the high number of repairs and replacement part sales related to the Engine Defect; and the numerous and consistent complaints about the Engine Defect collected by NHTSA.

403.   Through its acts and omissions, Ford has actively concealed the existence and natures of the Engine Defect from Class Members, including Plaintiffs, since at least 2012. Specifically, Ford:

a.   Failed to disclose, and actively concealed, before, at the time of, and after the purchase, lease, and/or service of the Vehicles, any and all known material defects of the Class Vehicles, including the Engine Defect;

b.   Failed to disclose, at the time of and after the purchase, lease, and or service, that the EcoBoost engines installed in Class Vehicles were defective and not fit for their intended purpose;

c.   Failed to disclose, and actively concealed, the existence and pervasiveness of the Engine Defect even when Class Members directly inquired about potential defects affecting their EcoBoost engines during communications with Ford, Ford dealerships, and Ford service

1  centers;

2       d.    Actively concealed the Engine Defect by forcing Class Members to bear the

3  cost of stop-gap "solutions" that only temporarily alleviated the symptoms of the defect without

4  permanently and effectively curing the defect;

5       e.    Actively concealed the Engine Defect by failing to issue a comprehensive and

6  effective Recall providing for the replacement of the defective EcoBoost engines with non-defective

7  engine blocks, and instead, only when the Vehicles remained under warranty, providing for the

8  replacement of one defective, failed engine block with yet another similarly and equally defective

9  engine block.

10      404.   By engaging in the conduct described above, Ford has concealed, and continues to

11  conceal, the Engine Defect from Class Members. If Class Members had had knowledge of the

12  information Ford concealed, they would not have purchased or leased the Class Vehicles or would

13  have paid less to do so.

14  **VI.   FRAUDULENT CONCEALMENT ALLEGATIONS**

15      405.   Plaintiffs' claims arise out of Ford's fraudulent concealment of the Engine Defect,

16  and its representations about the quality, safety, and comfort of the Class Vehicles. To the extent

17  that Plaintiffs' claims arise from Ford's fraudulent concealment, there is no one document or

18  communication, and no one interaction, upon which Plaintiffs base their claims. Absent discovery,

19  Plaintiffs are unaware of and unable through reasonable investigation to obtain the true names and

20  identities of those individuals at Ford responsible for disseminating false and misleading marketing

21  materials regarding the Class Vehicles. Ford necessarily is in possession of all of this relevant

22  information.

23      406.   Plaintiffs allege that at all relevant times, including specifically at the time they and

24  other Class Members purchased or leased their Class Vehicles, Ford knew or should have known of

25  the Engine Defect; Ford was under a duty to disclose the Defect based upon its exclusive knowledge

26  of it, and its concealment of it; and Ford never disclosed the Defect to Plaintiffs, Class Members, or

27  the public at any time or place or in any manner other than an inadequate and ineffective recall of a

28  small subset of the Class Vehicles.

407.  Plaintiffs make the following specific fraud allegations with as much specificity as possible absent access to the information necessarily available only to Ford:

a.  ***Who***: Ford actively concealed the Engine Defect from Plaintiffs and Class Members while simultaneously touting the safety, comfort, and quality of the Class Vehicles, including as alleged in paragraphs 354-404, above. Discovery will show the true names and identities of those specific individuals at Ford responsible for such decisions.

b.  ***What***: Ford knew, or was reckless or negligent in not knowing, that the Class Vehicles contain the Engine Defect, including as alleged above in paragraphs 296-347. Ford concealed the Defect and made representations about the safety, comfort, quality, and other attributes of the Class Vehicles, including as alleged above in paragraphs 348-356.

c.  ***When***: Ford concealed material information regarding the Defect at all times and made representations about the quality, safety, and comfort of the Class Vehicles, starting no later than 2012, or at the subsequent introduction of certain models of Class Vehicles to the market, continuing through the time of sale/lease, and on an ongoing basis, and continuing to this day, including as alleged above in paragraphs 348-356. Ford still has not disclosed the truth about the full scope of the Defect in the Class Vehicles to anyone outside of Ford. Ford has never taken any action to inform consumers about the true nature of the Defect in Class Vehicles. And when consumers brought their Vehicles to Ford complaining of the problems with their EcoBoost engines, including recurrent coolant leakage, smoking, failures, and fires, Ford denied any knowledge of or responsibility for the Engine Defect.

d.  ***Where***: Ford concealed material information regarding the true nature of the Defect in every communication it had with Plaintiffs and Class Members and made representations about the quality, safety, and comfort of the Class Vehicles. Plaintiffs are aware of no document, communication, or other place or thing, in which Ford disclosed the truth about the full scope of the Defect in the Class Vehicles to anyone outside of Ford. Such information is not adequately disclosed in any sales documents, displays, stickers, advertisements, warranties, owner's manuals, on Ford's website, or by any salesperson at a Ford dealership.

e.  ***How***: Ford concealed the Engine Defect from Plaintiffs and Class Members

and made representations about the quality, safety, and comfort of the Class Vehicles. Ford actively concealed the truth about the existence, scope, and nature of the Defect from Plaintiffs and Class Members at all times, even though it knew about the Defect and knew that information about the Defect would be material to a reasonable consumer, and Ford promised in its marketing materials that Class Vehicles have qualities that they do not have.

    f. *Why*: Ford actively concealed material information about the Engine Defect in the Class Vehicles for the purpose of inducing Plaintiffs and Class Members to purchase and/or lease Class Vehicles, rather than purchasing or leasing competitors' vehicles and made representations about the quality, safety, and comfort of the Class Vehicles. Had Ford disclosed the truth—for example, in its advertisements or other materials or communications—Plaintiffs and Class Members (all reasonable consumers) would have been aware of it, and would not have bought or leased the Class Vehicles or would have paid less for them.

## VII. TOLLING AND THE STATUTE OF LIMITATIONS

### A. Fraudulent Concealment and Equitable Tolling

 408. Discovery will show that Ford has known of the Engine Defect in the Class Vehicles since at least 2012, and certainly well before Plaintiffs and Class Members purchased or leased their Class Vehicles, and yet has concealed from or failed to notify Plaintiffs, Class Members, and the public of the full and complete nature of the Engine Defect. Ford continues to conceal the scope and extent of the Defect to this day, as detailed above.

 409. Moreover, Ford's attempts to conceal the defect also include conducting insufficient "Band Aid" repairs during the warranty period, including replacing only certain components, adding a low coolant sensor, and otherwise failing to replace the defective parts with non-defective parts.

 410. Any applicable statute of limitations has been tolled by Ford's knowledge, active concealment, and denial of the facts alleged herein, which behavior is ongoing.

### B. Estoppel

 411. Ford was and is under a continuous duty to disclose to Plaintiffs and Class Members the true character, quality, and nature of the Class Vehicles. Ford actively concealed – and continues to conceal – the true character, quality, and nature of the Class Vehicles and, despite its awareness

of the Engine Defect, knowingly made representations about the quality, sophistication, state-of-the-art safety, and comfort of the Class Vehicles. Plaintiffs and Class Members reasonably relied upon Ford's knowing representations and active concealment of these facts. Based on the foregoing, Ford is estopped from relying on any statutes of limitations in defense of this action.

### C.     **Discovery Rule**

412.     The causes of action alleged herein did not accrue until Plaintiffs and Class Members discovered that their Class Vehicles contained the Engine Defect.

413.     Plaintiffs and Class Members had no realistic ability to discern that the Class Vehicles were defective until—at the earliest—after the Engine Defect caused their EcoBoost engines to leak coolant, overheat (leading to, among other things, the cylinder heading cracking), misfire, totally fail, and/or ignite. Even then, Plaintiffs and Class Members had no reason to know the EcoBoost engine failures were caused by a defect in the Class Vehicles because of Ford's active concealment of the Engine Defect.

414.     Plaintiffs and Class Members were not reasonably able to discover the Engine Defect until after they had purchased or leased their Class Vehicles, despite their exercise of due diligence, and their causes of action did not accrue until they discovered that the Engine Defect caused their Vehicles' EcoBoost engines to leak coolant fluid, misfire, overheat, catch on fire, and totally fail.

## VIII.  **CLASS ACTION ALLEGATIONS**

415.     Plaintiffs bring this lawsuit as a class action on behalf of themselves and all other Class Members similarly situated pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3), (b)(2), and/or (c)(4). This Action satisfies the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements of those provisions.

416.     Plaintiffs bring this class action, including all causes of action stated below, on behalf of themselves and all other similarly situated members of the proposed Sub-Classes (referred to herein as "Class Members") defined as follows:

Arkansas Sub-Class:

> All persons who purchased or leased a 2013-2019 Ford Escape, 2013-2019 Ford Fusion, 2015-2018 Ford Edge, 2016-2019 Lincoln MKC, or 2016-2019 Lincoln MKZ equipped with a 1.5L, 1.6L, or 2.0L EcoBoost

77

engine (the "Class Vehicles") in the State of Arkansas.

California Sub-Class:

    All persons who purchased or leased a Class Vehicle in the State of California.

Colorado Sub-Class:

    All persons who purchased or leased a Class Vehicle in the State of Colorado.

Florida Sub-Class:

    All persons who purchased or leased a Class Vehicle in the State of Florida.

Georgia Sub-Class:

    All persons who purchased or leased a Class Vehicle in the State of Georgia.

Illinois Sub-Class:

    All persons who purchased or leased a Class Vehicle in the State of Illinois.

Indiana Sub-Class:

    All persons who purchased or leased a Class Vehicle in the State of Indiana.

Kansas Sub-Class:

    All persons who purchased or leased a Class Vehicle in the State of Kansas.

Maryland Sub-Class:

    All persons who purchased or leased a Class Vehicle in the State of Maryland.

Michigan Sub-Class:

    All persons who purchased or leased a Class Vehicle in the State of Michigan.

Minnesota Sub-Class:

    All persons who purchased or leased a Class Vehicle in the State of Minnesota.

Nebraska Sub-Class:

    All persons who purchased or leased a Class Vehicle in the State of Nebraska.

New Jersey Sub-Class:

> All persons who purchased or leased a Class Vehicle in the State of New Jersey.

North Carolina Sub-Class:

> All persons who purchased or leased a Class Vehicle in the State of North Carolina.

Ohio Sub-Class:

> All persons who purchased or leased a Class Vehicle in the State of Ohio.

Tennessee Sub-Class:

> All persons who purchased or leased a Class Vehicle in the State of Tennessee.

Texas Sub-Class:

> All persons who purchased or leased a Class Vehicle in the State of Texas.

Washington Sub-Class:

> All persons who purchased or leased a Class Vehicle in the State of Washington.

Wisconsin Sub-Class:

> All persons who purchased or leased a Class Vehicle in the State of Wisconsin.

417.   Plaintiffs intend to seek certification of a "Damages Subclass" under 23(b)(3) for all Class Members who have experienced Engine Defects and an "Owner Subclass" under Rule 23(b)(2) for purposes of declaratory relief as to future Engine Defects, as well as certification of other subclasses and particular issues under Rule 23(c)(4), as warranted.

418.   Excluded from the proposed Class are:  (1) Ford, any entity or division in which Ford has a controlling interest, and its legal representatives, officers, directors, assigns, and successors; (2) the judicial officer(s) to whom this case is assigned, and the judicial officer(s) staff; (3) government entities; and (4) those persons who have suffered personal injuries as a result of the facts alleged herein. Plaintiffs reserve the right to amend the Class definition if discovery and further investigation reveal that the Class should be expanded, otherwise divided into subclasses, or

modified in any other way.

### A. **Numerosity**

419.   Although the exact number of Class Members is uncertain and can only be ascertained through appropriate discovery, the number is great enough such that joinder is impracticable. The disposition of the claims of these Class Members in a single action will provide substantial benefits to all parties and to the Court. Class Members are readily identifiable from information and records in Ford's possession, custody, and/or control, as well as from records kept by the Department of Motor Vehicles.

### B. **Typicality**

420.   The claims of Plaintiffs are typical of the claims of Class Members in that Plaintiffs, like all Class Members, purchased or leased a Class Vehicle designed, manufactured, marketed, distributed, warranted, sold/leased, and serviced by Ford. Plaintiffs, like all Class Members, have been damaged by Ford's misconduct in that they purchased/leased a Vehicle they would not have purchased/leased, or would not have purchased/leased at the price they paid, or incurred or will incur the cost of repairs relating to and caused by the Engine Defect. Furthermore, the factual bases of Ford's misconduct are common to all Class Members and represent a common thread of misconduct resulting in injury to all Class Members.

### C. **Adequate Representation**

421.   Plaintiffs will fairly and adequately represent and protect the interests of the Class Members. Plaintiffs have retained counsel with substantial experience in prosecuting consumer class actions, including actions involving defective vehicles.

422.   Plaintiffs and their counsel are committed to vigorously prosecuting this action on behalf of Class Members and have the financial resources to do so. Neither Plaintiffs nor their counsel have interests adverse to those of Class Members.

### D. **Predominance of Common Issues**

423.   There are numerous questions of law and fact common to Plaintiffs and Class Members that predominate over any question affecting only individual Class Members, the answers to which will advance resolution of the litigation as to all Class Members. These common legal and

factual issues include:

a.    whether the subject engines in the Class Vehicles are defective;

b.    whether Ford knew or should have known about the Engine Defect, and, if so, how long Ford has known of the defect;

c.    whether the defective nature of the Class Vehicles constitutes a material fact reasonable consumers would have considered in deciding whether to purchase or lease a Class Vehicle;

d.    whether Ford had a duty to disclose the defective nature of the Class Vehicles to Plaintiffs and Class Members;

e.    whether Ford omitted and failed to disclose material facts about the Class Vehicles;

f.    whether Ford's concealment of the true defective nature of the Class Vehicles induced Plaintiffs and Class Members to act to their detriment by purchasing or leasing Class Vehicles;

g.    whether Ford's representations and omissions about the true defective nature of the Class Vehicles were likely to mislead or deceive, and therefore fraudulent, within the meaning of California's Unfair Competition Law ("UCL");

h.    whether Ford's representations and omissions about the true defective nature of the Class Vehicles were and are unfair within the meaning of the UCL;

i.    whether Ford represented, through its words and conduct, that the Class Vehicles had characteristics, uses, or benefits that they did not actually have;

j.    whether Ford represented, through its words and conduct, that the Class Vehicles were of a particular standard, quality, or grade when they were of another;

k.    whether Ford advertised the Class Vehicles with the intent not to sell/lease them as advertised;

l.    whether Ford's representations and omissions about the true defective nature of the Class Vehicles were likely to create confusion or misunderstanding;

m.    whether Ford's representations and omissions about the true defective nature

81

of the Class Vehicles were and are deceptive;

n. whether the Class Vehicles were unfit for the ordinary purposes for which they were used, in violation of the implied warranty of merchantability;

o. whether Plaintiffs and the other Class Members are entitled to a declaratory judgment stating that the EcoBoost engines in Class Vehicles are defective and/or not merchantable;

p. whether Plaintiffs and the other Class Members are entitled to equitable relief, including, but not limited to, a preliminary and/or permanent injunction;

q. whether Ford should be declared financially responsible for notifying all Class Members of the problems with the Class Vehicles and for the costs and expenses of permanently remedying the Engine Defect in the Class Vehicles;

r. whether Ford is obligated to inform Class Members of their right to seek reimbursement for having paid to diagnose, repair, or replace the defective EcoBoost engines.

**E.    Superiority**

424.   Plaintiffs and Class Members have all suffered and will continue to suffer harm and damages as a result of Ford's unlawful and wrongful conduct. A class action is superior to other available methods for fair and efficient adjudication of this controversy.

425.   Absent a class action, most Class Members would likely find the cost of litigating their claims prohibitively high and would therefore have no effective remedy at law. Because of the relatively small size of the individual Class Members' claims (compared to the cost of litigation), it is likely that only a few Class Members could afford to seek legal redress for Ford's misconduct. Absent a class action, Class Members will continue to incur damages, and Ford's misconduct will continue without remedy.

426.   Class treatment of common questions of law and fact would also be a superior method to multiple individual actions or piecemeal litigation in that class treatment will conserve the resources of the courts and the litigants, and will promote consistency and efficiency of adjudication.

## IX.    CAUSES OF ACTION

### FIRST CAUSE OF ACTION
**Violation of California's Consumer Legal Remedies Act ("CLRA"),**
**Cal Civ. Code § 1750, *et seq.***
**(On behalf of the California Sub-Class)**

427.    Plaintiffs incorporate by reference each allegation set forth in paragraphs 1-426, above.

428.    Plaintiffs Vanessa Miller, Amber West, Evan West, and Jeffery Hodges ("California Plaintiffs") bring this cause of action individually and on behalf of the Class Members.

429.    Ford is a "person" as defined by the CLRA. Cal. Civ. Code § 1761(c).

430.    Plaintiffs and Class Members are "consumers" within the meaning of the CLRA. Cal. Civ. Code § 1761(d).

431.    The purchase and leases of Class Vehicles by Plaintiffs and the Class Members constitute "transactions" as defined by the CLRA. Cal. Civ. Code § 1761(e).

432.    The Class Vehicles constitute "goods" or "services" as defined by the CLRA. Cal. Civ. Code § 1761(a) and (b).

433.    Plaintiffs and Class Members purchased or leased the Class Vehicles primarily for personal, family, and household purposes as meant by the CLRA. Cal. Civ. Code § 1761(d).

434.    Ford's representations, active concealments, omissions, and failures to disclose regarding the Class Vehicles violated the CLRA in the following ways:

a.    Ford misrepresented the Class Vehicles had characteristics, uses, or benefits Class Vehicles did not in fact have (Cal. Civ. Code § 1770(a)(5));

b.    Ford misrepresented that the Class Vehicles were of a particular standard, quality, or grade when they were of another (Cal. Civ. Code § 1770(a)(7));

c.    Ford advertised the Class Vehicles with the intent not to sell/lease them as advertised (Cal. Civ. Code § 1770(a)(9));

d.    Ford misrepresented that the Class Vehicles and the warranties conferred or involved rights, remedies, or obligations that they did not (Cal. Civ. Code§ 1770(a)(14)); and

e.    Ford misrepresented that the Class Vehicles were supplied in accordance with

previous representations when they were not (Cal. Civ. Code § 1770(a)(16)).

435.   Ford repeatedly engaged in these unfair and deceptive acts or practices in the course of its trade or business. These acts or practices were material, capable of deceiving a substantial portion of the purchasing public, and caused economic harm to purchasers and lessees of the Class Vehicles, including the Plaintiffs.

436.   By 2012, and well before the sale or lease of Class Vehicles, Ford knew or should have known about the Engine Defect affecting the Class Vehicles. Ford further knew or should have known that the Class vehicles were defectively designed or manufactured, that, as a result of this defect, the EcoBoost engines would repeatedly fail, and that they were not suitable for their intended use.

437.   Ford had exclusive knowledge of material facts concerning the existence of the Engine Defect in the Class Vehicles, and actively concealed that defect from consumers. It did so by denying the existence of a defect to consumers—such as Plaintiffs—who contacted Ford about the failures of their EcoBoost engines. Ford also concealed the Engine Defect by failing to provide an effective and permanent remedy to all of the Class Vehicles and by replacing failed engines with equally defective engines, bound to suffer from the same failures.

438.   Ford was under a duty to Plaintiffs and Class Members to disclose the defective nature of the EcoBoost engines, as well as the associated costs that would have to be repeatedly expended in order to temporarily address the failures caused by the Engine Defect, because:

a.   Ford was in a superior position to know the true state of facts about the Engine Defect in the Class Vehicles;

b.   Plaintiffs and Class Members could not reasonably have been expected to learn or discover that the Class Vehicles suffered from the Engine Defect until, at the earliest, the manifestation of the Defect; and

c.   Ford knew that Plaintiffs and Class Members could not reasonably have been expected to learn or discover the Engine Defect prior to its manifestation.

439.   In failing to disclose the defective nature of the Class Vehicles, Ford knowingly and intentionally concealed material facts and breached its duty not to do so.

440.   The facts concealed or not disclosed by Ford to Plaintiffs and Class Members are material in that a reasonable consumer would have considered them to be important in deciding whether or not to purchase or lease a Class Vehicle. Moreover, a reasonable consumer would consider the Engine Defect to be an undesirable quality, as Plaintiffs and Class Members did. Had Plaintiffs and other Class Members known that the Class Vehicles had the Engine Defect, they would not have purchased or leased a Class Vehicle, or would have paid less for it.

441.   Plaintiffs and Class Members are reasonable consumers who did not expect their Class Vehicles to contain a defective EcoBoost engine. It is a reasonable and objective consumer expectation for consumers to expect that the engine will not suffer from repeated and continual coolant leakage into the cylinders, causing overheating and leading the cylinder head to crack and misfire, the vehicle to emit white smoke, and the engine to fail or spontaneously catch fire.

442.   As a result of Ford's misconduct, Plaintiffs and Class Members have been harmed in that the Class Vehicles contain defective EcoBoost engines and suffer from repeated and continual coolant leakage into the cylinders, causing overheating and leading the cylinder head to crack, causing misfires, the vehicle to emit white smoke, and the engine to fail or spontaneously catch fire—all of which create a grave risk of serious injury to person and property and cause Class Members to spend money to attempt to remedy the Defect.

443.   As a direct and proximate result of Ford's unfair or deceptive acts or practices, Plaintiffs and Class Members have suffered and will continue to suffer harm in that they have a Vehicle with a defective EcoBoost engine and they have experienced and may continue to experience their Class Vehicles' engines leaking coolant into the cylinders, causing overheating and leading the cylinder head to crack, misfire, the vehicle to emit white smoke, and the engine to fail or spontaneously catch fire, for which Ford has refused to provide and effective and permanent fix.

444.   Plaintiffs and the Class seek to recover actual damages, an order enjoining Ford's unfair or deceptive acts or practices and equitable relief under Cal. Civ. Code § 1780(e), and any other just and proper relief available under the CLRA.

445.   In accordance with section 1782(a) of the CLRA, Plaintiffs' counsel has served Ford with notice of its alleged violations of Cal. Civ. Code § 1770(a) relating to the Class Vehicles

85

purchased by Plaintiffs and Class Members, and demanded that Ford, within thirty (30) days of such notice, correct or agree to correct the actions described therein and agree to reimburse associated out-of-pocket costs. To date, Ford has not agreed to correct the actions described therein, to reimburse associated out-of-pocket costs, or otherwise to remedy the harm alleged. Plaintiff sent a second letter on September 1, 2022, which Ford has not responded to, though any response would be futile because of Ford's continued refusal to remedy the harm alleged.

**SECOND CAUSE OF ACTION**
**Violation of California's Unfair Competition Law,**
**Cal. Bus. & Prof. Code § 17200,** *et seq.*
**(On behalf of the California Sub-Class)**

446. Plaintiffs incorporate by reference each allegation set forth in paragraphs 1-426, above.

447. Plaintiffs Vanessa Miller, Amber West, Evan West, and Jeffery Hodges ("California Plaintiffs") bring this cause of action individually and on behalf of Class Members.

448. California Business & Professions Code § 17200 prohibits "unfair competition" including any "unlawful, unfair, or fraudulent business practice" and "unfair, deceptive, untrue or misleading advertising." Ford engaged in conduct that violated each of this statute's three prongs.

449. Ford committed an unlawful business act or practice in violation of Cal. Bus. & Prof. Code § 17200, *et seq.*, by systematically breaching its warranty obligations and by violating the CLRA and the Song-Beverly Consumer Warranty Act as alleged above and below.

450. Ford committed unfair business acts and practices in violation of Cal. Bus. & Prof. Code § 17200, *et seq.*, because the acts and practices described herein, including but not limited to Ford's failure to provide a permanent remedy to fix the Engine Defect, where immoral, unethical, oppressive, unscrupulous, unconscionable, and/or substantially injurious to Plaintiffs and Class Members. Ford's acts and practices were additionally unfair because the harm to Plaintiffs and Class Members is substantial and is not outweighed by any countervailing benefits to consumers or competition. Further, Ford's acts and practices were unfair in that they were contrary to legislatively declared or public policy.

451. Ford committed fraudulent business acts and practices in violation of Cal. Bus. &

Prof. Code § 17200, *et seq.*, when it concealed the existence and nature of the Engine Defect, while representing in its marketing, advertising, and other broadly disseminated representations that the Class Vehicles were, for example, high quality, functional, and "proof of [Ford's] commitment to safety," and that Ford itself is "steadfast about safety," when, in fact, the Engine Defect creates a significant and material safety hazard and inhibits the quality and functionality of the Class Vehicles. Ford's representations, omissions, and active concealments about the Engine Defect are likely to mislead the public with regard to the true defective nature of Class Vehicles.

452.   Ford's unfair or deceptive acts or practices occurred repeatedly in the course of Ford's trade or business, and were likely to mislead a substantial portion of the purchasing public.

453.   Plaintiffs relied on Ford's material representations and nondisclosures and would not have purchased/leased, or would have paid less for, the Class Vehicles had he known the truth.

454.   As a direct and proximate result of Ford's unfair, unlawful, and deceptive practices, Plaintiffs have lost money.

455.   Plaintiffs would consider purchasing or leasing similar Ford vehicles in the future if Plaintiffs could rely on Ford's representations regarding the vehicles.

456.   Plaintiffs and Class Members seek an order enjoining Ford from committing such unlawful, unfair, and fraudulent business practices, and seek restitution pursuant to Cal. Bus. & Prof. Code § 17203.

**THIRD CAUSE OF ACTION**
**California Breach of Express Warranty**
**(On behalf of the California Sub-Class)**

457.   Plaintiffs incorporate by reference each allegation set forth in paragraphs 1-426, above.

458.   Plaintiffs Vanessa Miller, Amber West, Evan West, and Jeffery Hodges ("California Plaintiffs") bring this cause of action individually and on behalf of California Class Members.

459.   Ford provided all purchasers and lessees of the Class Vehicles with the express warranty described herein, which became a material part of the bargain.

460.   Ford provided all purchasers and lessees of Lincoln-branded Class Vehicles with the Lincoln warranty and all purchasers and lessees of Ford or Ford-branded Class Vehicles with the

Ford/Ford warranty.

461.   Ford sold and leased the Class Vehicles with a written express warranty covering the Vehicles for three years or 36,000 miles, whichever comes first.

462.   Ford's New Vehicle Limited Warranty expressly states that Ford will "without charge, repair, replace, or adjust all parts on your vehicle that malfunction or fail during normal use during the applicable coverage period due to a manufacturing defect in factory-supplied materials or factory workmanship" so long the Vehicle is properly operated and maintained and taken to a Ford dealership for repair within the warranty period.

463.   Ford further provides powertrain warranty coverage, which is applicable to "the Engine: all internal lubricated parts, cylinder block, cylinder heads, electrical fuel pump, powertrain control module, engine mounts, flywheel, injection pump, manifold (exhaust and intake), manifold bolts, oil pan, oil pump, seals and gaskets, engine thermostat, engine, thermostat housing, timing chain cover, timing chain (gears or belt), turbocharger/supercharger unit, valve covers, water pump" as well as the components in the transmission, front-wheel drive, rear-wheel drive, and four-wheel/all-wheel drive. This coverage applies for 5-years or up to 60,000 miles, whichever comes first.

464.   For certified pre-owned ("CPO") Vehicles, Ford offers an additional limited warranty covering CPO Vehicles for 12 months or 12,000 miles, whichever comes first.

465.   Ford's CPO Vehicle warranty states that a dealer will replace "all covered components . . . that are found to be defective in factory-supplied materials or workmanship during the applicable warranty periods." The engine and its components—including the cylinder block and cylinder heads—are included in Ford's list of "covered components."

466.   Ford manufactured and/or installed the engines and the engines' component parts in the Class Vehicles, and the engines and their component parts are covered by the express Warranties.

467.   Ford provides additional general warranty coverage for Ford and Motorcraft parts sold on or after 2013 for a period of 24 months and unlimited miles.

468.  The Engine Defect at issue in this litigation was present at the time the Class Vehicles were sold or leased to California Plaintiffs and the California Sub-Class Members.

469.  As described herein, the Class Vehicles were manufactured with defective material and such defect existed at the time the Vehicles left the manufacturing plant.  California Plaintiffs and Class Members submitted their Vehicles for warranty repairs as referenced herein.  Ford failed to comply with the terms of the express written warranty provided to each Class member, by failing and/or refusing to repair the subject materials defect under the Vehicle's warranty as described herein.

470.  California Plaintiffs and the California Sub-Class Members relied on Ford's express warranties, which were a material part of the bargain, when purchasing or leasing their Class Vehicles.

471.  Under the express Warranties, Ford was obligated to correct the Engine Defect in the vehicles owned or leased by California Plaintiffs and the California Sub-Class Members.

472.  Although Ford was obligated to correct the Engine Defect, none of the attempted fixes to the engines are adequate under the terms of the Warranties, as they did not cure the defect.

473.  Ford breached the express Warranties by performing illusory repairs. Rather than repairing the vehicles pursuant to the express Warranties, Ford falsely informed California Sub-Class Members that there was no problem with their Class Vehicles, performed ineffective procedures including software updates, and/or replaced defective components in the engines with equally defective components, without actually repairing the Class Vehicles.

474.  Ford and its agent dealers have failed and refused to conform the engines to the express Warranties. Ford's conduct, as discussed throughout this Complaint, has voided any attempt on its part to disclaim liability for its actions.

475.  Moreover, Ford's attempt to disclaim or limit these express Warranties vis-à-vis consumers is unconscionable and unenforceable under the circumstances here. Specifically, Ford's warranty limitation is unenforceable because it knowingly sold a defective product without informing consumers about the defect.

476.   The time limits contained in Ford's warranty period were also unconscionable and inadequate to protect California Plaintiffs and the California Sub-Class Members. Among other things, California Plaintiffs and the California Sub-Class Members had no meaningful choice in determining these time limitations, the terms of which unreasonably favored Ford. A gross disparity in bargaining power existed between Ford and the Class members, and Ford knew or should have known that the Class Vehicles were defective at the time of sale.

477.   California Plaintiffs and the California Sub-Class Members have complied with all obligations under the Warranties, or otherwise have been excused from performance of said obligations as a result of Ford's conduct described herein.

478.   California Plaintiffs and the California Sub-Class Members were not required to notify Ford of the breach because affording Ford a reasonable opportunity to cure its breach of written warranty would have been futile. Ford was also on notice of the Engine Defect from the complaints and service requests it received from Plaintiff and the Class Members, from repairs and/or replacements of the engines or components thereof, and through other internal and external sources.

479.   Because Ford, through its conduct and exemplified by its own service bulletins, has covered repairs of the Engine Defect if Ford determines the repairs are appropriately covered under the Warranties, Ford cannot now deny that the Warranties cover the Engine Defect.

480.   Because Ford has not been able remedy the Engine Defect, any limitation on remedies included in the Warranties causes the Warranties to fail their essential purposes, rendering them null and void.

481.   As a direct and proximate cause of Ford's breach, California Plaintiffs and the California Sub-Class Members suffered damages and continue to suffer damages, including economic damages at the point of sale or lease and diminution of value of their Class Vehicles. Additionally, California Plaintiffs and the California Sub-Class Members have incurred or will incur economic damages at the point of repair in the form of the cost of repair.

482.   As a direct and proximate result of Ford's breach of express warranties, California Plaintiffs and the California Sub-Class Members have been damaged in an amount to be determined at trial.

483.   Ford's acts in failing and/or refusing to repair the materials defect during the warranty period so as to bring the Vehicles into conformity with the express warranties, deprived Plaintiffs and members of the Class of their rights guaranteed them under the express warranties offered by Ford.

484.   As a direct and proximate result of the willful failure of Ford to comply with its obligations under the express warranties, Plaintiffs and members of the Class have suffered actual and consequential damages.  Such damages include, but are not limited to, the cost of repairing the Vehicles, the loss of the use and enjoyment of the subject Vehicle, and a diminution in the value of the Vehicle containing the materials defects identified herein.  The precise amount of these damages is unknown at the present time but is in excess of the jurisdictional limits of this Court.

**FOURTH CAUSE OF ACTION**
**Breach of Implied Warranty**
**Under the Song-Beverly Consumer Warranty Act**
**Cal. Civ. Code §§ 1790, *et seq.***
**(On behalf of the California Sub-Class)**

485.   Plaintiffs incorporate by reference each allegation set forth in paragraphs 1-426, above.

486.   Plaintiffs Jeffery Hodges, Amber West, and Evan West bring this cause of action individually and on behalf of Class Members.

487.   Ford's Class Vehicles are "consumer goods" within the meaning of Cal. Civ. Code § 1791(a).

488.   Ford is a manufacturer within the meaning of Cal. Civ. Code § 1791(j).

489.   Plaintiffs and Class Members who purchased or leased their Class Vehicles within the State of California are "buyers" and "lessees" within the meaning of Cal. Civ. Code §§ 1791(b) and (h).

490.   Ford impliedly warranted to Plaintiffs and Class Members that its Vehicles were "merchantable" within the meaning of Cal. Civ. Code §§ 1791(a) and 1792.

491.   Ford impliedly warranted to Plaintiffs and Class Members that it would repair or replace any defective products, including the EcoBoost engine.

492.   The propensity of the Engine Defect to cause coolant to leak, seep into the cylinders, cause the cylinder head to crack, cause misfiring, cause white smoke to emit from the vehicle, cause the engine to fail and/or ignite renders the Class Vehicles to not be of the quality that a buyer or lessee would reasonably expect, and therefore not merchantable.

493.   The Engine Defect is latent and was present at the time of the sale/lease of Class Vehicles, and therefore the Vehicles were not merchantable at the time of sale/lease.

494.   The Class Vehicles do not conform to the promises and affirmations of fact made by Ford in its promotional materials and vehicle owner manuals in that the Engine Defect creates a safety hazard contrary to Ford's assurances that, among other things, it is "steadfast about safety" and that the Vehicles are "quality, comfortable, and "proof of [Ford's] commitment to safety."

495.   In violation of Cal. Civ. Code § 1791(a), Ford breached its implied warranty by selling/leasing defective Class Vehicles and refusing to permanently replace and/or repair the defective EcoBoost engines.

496.   The Engine Defect has deprived Plaintiffs and Class Members of the benefit of their bargain, and has caused the Class Vehicles to depreciate in value.

497.   Any attempt by Ford to limit or disclaim the implied warranties in a manner that would exclude coverage of the Engine Defect is unenforceable and void pursuant to Cal. Civ. Code §§ 1790.1, 1792.3, and 1793.

498.   As a result of Ford's breach of its implied warranties, Plaintiffs and Class Members have been damaged in an amount to be proven at trial and are entitled to incidental, consequential, and other damages and other legal and equitable relief, as well as costs and attorneys' fees, pursuant to Cal. Civ. Code §§ 1794 and 1795.4.

**FIFTH CAUSE OF ACTION**
**California Breach of Implied Warranty**
**(On behalf of the California Sub-Class)**

499.   Plaintiffs incorporate by reference each allegation set forth in paragraphs 1-426, above.

500.    Plaintiff Jeffery Hodges brings this cause of action individually and on behalf of Class Members.

501.    The Class Vehicles are and were at all relevant times "goods" within the meaning of, *inter alia*, Cal. Com. Code §§ 2105(1) and 10103(a)(8).

502.    Ford is and was at all relevant times a "merchant" with respect to the Class Vehicles, under, *inter alia*, Cal. Com. Code §§ 2104(1) and 10103(c), and a "seller" of the Class Vehicles, under § 2103(1)(d); and, with respect to leases, is and was at all relevant time a "lessor" of the Class Vehicles, under, *inter alia*, Cal. Com. Code § 10103(a)(16).

503.    Plaintiff Hodges and Class Members are "buyers" or "lessees" within the meaning of, *inter alia*, Cal. Com. Code §§ 2103(a) and 10103(a)(14).

504.    When it sold or leased its Class Vehicles, Ford extended an implied warranty to Class Members that the Class Vehicles were merchantable and fit for the ordinary purpose for which they were sold or leased, pursuant to Cal. Com. Code §§ 2314, 10212, and 10214.

505.    Because Plaintiff Hodges and the California Sub-Class Members purchased their vehicles from an authorized Ford dealership, they are in privity with Defendant. Plaintiff Hodges and the California Sub-Class Members have had sufficient direct dealings with Ford and its agents for the purposes of fulfilling its responsibilities under the express warranty (dealerships and customer support personnel) to establish privity of contract between Ford, on one hand, and Plaintiff Hodges and the California Sub-Class Members, on the other hand.  Furthermore, Ford provided warranties directly to Plaintiff Hodges and the California Sub-Class Members and Plaintiff Hodges and the California Sub-Class Members are the intended beneficiaries of Ford's express and implied warranties.  The dealers were not intended to be the ultimate consumers of their vehicles and have no rights under the warranty agreements provided with provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit the consumer only.

506.    Nonetheless, privity is not required here because Plaintiff Hodges and the California Sub-Class Members are the intended third-party beneficiaries of contracts between Ford and its dealerships.  These contracts give the dealerships the right to sell Ford and Lincoln brand vehicles,

as well as service and perform warranty repairs on Ford's behalf.  Plaintiff Hodges and the California Sub-Class Members are the beneficiaries of these contracts, because they are the intended end-consumers and users of the products Ford distributes to its authorized dealerships.  Plaintiff Hodges and the California Sub-Class Members also have the right to receive service and warranty work at dealerships located more conveniently to them than Ford's headquarters.

507.   Plaintiff Hodges and other Class Members who purchased or leased a Class Vehicle directly from Ford are entitled to the benefit of their bargain:  a Vehicle with a nondefective EcoBoost engine that does not leak coolant and cause coolant to seep into the cylinders, resulting in the engine overheating, the cylinder head cracking, the engine misfiring, the engine totally failing, and/or the engine igniting.

508.   Plaintiff Hodges and the Class Members who purchased or leased Certified Pre-Owned Class Vehicles are likewise entitled to the benefit of their bargains:  a Vehicle with a nondefective EcoBoost engine that does not leak coolant and cause coolant to seep into the cylinders, resulting in the engine overheating, the cylinder head cracking, the engine misfiring, the engine totally failing, and/or the engine igniting.

509.   Class Members who purchased Certified Pre-Owned Class Vehicles are the intended ultimate consumers of the Class Vehicles, and therefore are third-party beneficiaries for the purposes of implied warranty claims.

510.  Ford breached this implied warranty in that its Class Vehicles are (1) not fit for ordinary use, and (2) not of a merchantable quality.

511.  The Engine Defect is latent and was present at the time of the sale/lease, and therefore the Vehicles were not merchantable at the time of the sale/lease.

512.  Had the Engine Defect that existed at the time of sale/lease been known, the Class Vehicles would not have been sold or leased, or would not have been sold or leased at the same price for which Class Members paid.

513.  As a direct and proximate result of Ford's breach of the implied warranty of merchantability, Plaintiff Hodges and Class Members have been damaged in an amount to be proven at trial.

**SIXTH CAUSE OF ACTION**
**Violation of the Arkansas Deceptive Trade Practices Act**
**Ark. Code Ann. §§ 4-88-101, *et seq.***
**(On behalf of the Arkansas Sub-Class)**

514. Plaintiffs incorporate by reference each allegation set forth in paragraphs 1-426, above.

515. Plaintiff Patricia Lund ("Arkansas Plaintiff") brings this cause of action individually and on behalf of the members of the Arkansas Sub-Class.

516. Ford is a "person" within the meaning of the Arkansas Deceptive Trade Practices Act ("Arkansas DTPA"), Ark. Code Ann. § 4-88-102(5).

517. The Arkansas DTPA prohibits a person from engaging in a "deceptive trade practice," including, *inter alia*, "knowingly making a false representation as to the characteristics, ingredients, uses, benefits, alterations, source, sponsorship, approval, or certification of goods or services or as to whether goods are original or new or of a particular standard, quality, grade, style, or model;" and "advertising the goods or services with the intent not to sell them as advertised." Ark. Code Ann. § 4-88-102(a)(1) and (a)(3). Ford engaged in unfair and deceptive practices that violated the Arkansas DTPA as described above.

518. Ford participated in and engaged in deceptive business or trade practices prohibited by the Arkansas DTPA by failing to disclose and actively concealing that the Class Vehicles contained the Engine Defect, by marketing their Class Vehicles as safe and of high quality, and by presenting themselves as a reputable manufacturer that valued safety and stood behind its vehicles after they were sold.

519. Ford knowingly and intentionally misrepresented and omitted material facts in connection with the sale or lease of the Class Vehicles by, among other things, failing to disclose the Engine Defect; concealing the Engine Defect; promoting and selling or leasing Class Vehicles it knew were defective, including by marketing its vehicles as safe, reliable, easily operable, efficient, and of high quality; presenting itself as a reputable manufacturer that valued safety, reliability, performance and efficiency, and stood behind its vehicles after they were sold; failing to make repairs or making repairs and providing replacements that caused Arkansas Plaintiff and the Arkansas Sub-Class Members to experience repeated instances of failure, rendering the New

95

Vehicle Limited Warranty useless; and minimizing the scope and severity of the problems with the Class Vehicles, refusing to acknowledge that they are defective, and failing to provide adequate relief to consumers. Ford misrepresented and omitted such material facts with the intent to mislead Arkansas Plaintiff and the Arkansas Sub-Class Members about the true nature of the Class Vehicles.

520.    Ford systematically misrepresented, concealed, suppressed, or omitted material facts relating to the Class Vehicles and Engine Defect in the course of its business.

521.    Ford also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Class Vehicles.

522.    Ford's unfair and deceptive acts or practices occurred repeatedly in Ford's trade or business, were capable of deceiving a substantial portion of the purchasing public, and imposed a serious safety risk on the public.

523.    Ford knew that the Class Vehicles and their engines suffered from an inherent defect, were defectively designed or manufactured, and were not suitable for their intended use.

524.    Ford knew or should have known that its conduct violated the Arkansas DTPA.

525.    Arkansas Plaintiff and the Arkansas Sub-Class Members reasonably relied on Ford's misrepresentations and omissions of material facts in its advertisements of the Class Vehicles and in the purchase of the Class Vehicles.

526.    Arkansas Plaintiff and the Arkansas Sub-Class Members had no way of discerning that Ford's misrepresentations were false and misleading when they acquired their Class Vehicles because Arkansas Plaintiff and the Arkansas Sub-Class Members did not have access to Ford's exclusive and superior knowledge about the Class Vehicles' design and the Engine Defect.

527.    Had Arkansas Plaintiff and the Arkansas Sub-Class Members known that the Class Vehicles contained and/or would exhibit the Engine Defect, they would not have purchased or leased the Class Vehicles or would have paid less for them. Plaintiff did not receive the benefit of their bargain as a result of Ford's misconduct.

528.    Ford owed Arkansas Plaintiff and the Arkansas Sub-Class Members a duty to disclose

the truth about the Engine Defect because Ford:

     a.   possessed exclusive and superior knowledge of the design and manufacture of the Class Vehicles and the Engine Defect;

     b.   intentionally concealed the foregoing from Arkansas Plaintiff and the Arkansas Sub-Class Members; and/or

     c.   made incomplete representations regarding the quality and durability of the Class Vehicles, while purposefully withholding material facts from Arkansas Plaintiff and the Arkansas Sub-Class Members that contradicted these representations.

529.   Due to Ford's specific and superior knowledge that the Engines in the Class Vehicles will fail due to the Engine Defect, its false representations regarding the increased durability of the Class Vehicles, and reliance by Arkansas Plaintiff and the Arkansas Sub-Class Members on these material representations, Ford had a duty to disclose to Class members that the Engine Defect will cause engine failure in Class Vehicles, that Class Vehicles do not have the expected durability, reliability, and/or safety over other vehicles or of their predecessor engines, that failure of the Engines will cause damage to Class Vehicle, and that Class members would be required to bear the cost of the damage to their vehicles. Having volunteered to provide information to Arkansas Plaintiff and the Arkansas Sub-Class Members, Ford had the duty to disclose not just the partial truth, but the entire truth. These omitted and concealed facts were material because they directly impact the value of the Class Vehicles purchased or leased by Arkansas Plaintiff and the Arkansas Sub-Class Members. Longevity, durability, performance, and safety are material concerns to Ford consumers. Ford represented to Arkansas Plaintiff and the Arkansas Sub-Class Members that they were purchasing or leasing vehicles that were durable, reliable, safe, efficient, of high quality, and containing engines of advanced and superior characteristics and technology as alleged throughout this Complaint, when in fact it is only a matter of time before the engines fail due to the Engine Defect.

530.   Arkansas Plaintiff and the Arkansas Sub-Class Members suffered injury in fact to a legally protected interest. As a result of Ford's conduct, Arkansas Plaintiff and the Arkansas Sub-Class Members were harmed and suffered actual damages in the form of the costs of diagnosis and

repair of their vehicles, and the diminished value of their vehicles.

531.   As a direct and proximate result of Ford's unfair or deceptive acts or practices, Arkansas Plaintiff and the Arkansas Sub-Class Members suffered and will continue to suffer injury in fact and/or actual damages.

532.   Defendant's violations present a continuing risk to Arkansas Plaintiff and the Arkansas Sub-Class Members as well as to the general public. Defendant's unlawful acts and practices complained of herein affect the public interest.

533.   As a proximate and direct result of Ford's unfair and deceptive trade practices, Arkansas Plaintiff and members of the Arkansas Sub-Class purchased or leased Class Vehicles and suffered an ascertainable loss and financial harm. These ascertainable losses include, among other things, overpayment at the time of purchase or lease, the cost to repair the Engine Defect, replacement of the damaged related system components, diminution of Class Vehicle resale value, increased repair and maintenance costs, and other substantial monetary damages and inconvenience.

534.   Ford was on notice of the Engine Defect from the pre-suit notices from Plaintiffs, the complaints and service requests Ford received from consumers, from repairs and/or replacements of the engines or components thereof, and through other internal and external sources. Arkansas Plaintiff and members of the Arkansas Sub-Class seek all damages and relief to which they are entitled because Ford failed to remedy its unlawful conduct.

535.   As a direct and proximate result of Ford's unfair or deceptive acts or practices alleged herein, Arkansas Plaintiff and other members of the Arkansas Sub-Class suffered and will continue to suffer actual damages and are entitled to recover actual damages to the extent permitted by law, including class action rules, in an amount to be proven at trial. In addition, Arkansas Plaintiff and the putative Class seek equitable and injunctive relief against Ford on terms that the Court considers reasonable, and reasonable attorneys' fees.

**SEVENTH CAUSE OF ACTION**
**Breach of Express Warranty**
**Ark. Code Ann. §§ 4-2-313 and 4-2A-210**
**(On behalf of the Arkansas Sub-Class)**

536.   Plaintiffs incorporate by reference each allegation set forth in paragraphs 1-426,

98

above.

537.   Arkansas Plaintiff brings this cause of action individually and on behalf of the members of the Arkansas Sub-Class.

538.   Ford is and was at all relevant times a "merchant" with respect to motor vehicles Ark. Code Ann. §§ 4-2-104(1) and 4-2A-103(3), and a "seller" of motor vehicles under § 4-2-103(1)(d).

539.   With respect to leases, Ford is and was at all relevant times a "lessor" of motor vehicles under Ark. Code Ann. § 4-2A-103(1)(p).

540.   The Class Vehicles are and were at all relevant times "goods" within the meaning of Ark. Code Ann. §§ 4-2-105(1) and 4-2A-103(1)(h).

541.   Ford provided all purchasers and lessees of the Class Vehicles with the express warranty described herein, which became a material part of the bargain.

542.   Ford provided all purchasers and lessees of Lincoln-branded Class Vehicles with the Lincoln warranty and all purchasers and lessees of Ford or Ford-branded Class Vehicles with the Ford/Ford warranty.

543.   Ford sold and leased the Class Vehicles with a written express warranty covering the Vehicles for three years or 36,000 miles, whichever comes first.

544.   Ford's New Vehicle Limited Warranty expressly states that Ford will "without charge, repair, replace, or adjust all parts on your vehicle that malfunction or fail during normal use during the applicable coverage period due to a manufacturing defect in factory-supplied materials or factory workmanship" so long the Vehicle is properly operated and maintained and taken to a Ford dealership for repair within the warranty period.

545.   Ford further provides powertrain warranty coverage, which is applicable to "the Engine: all internal lubricated parts, cylinder block, cylinder heads, electrical fuel pump, powertrain control module, engine mounts, flywheel, injection pump, manifold (exhaust and intake), manifold bolts, oil pan, oil pump, seals and gaskets, engine thermostat, engine, thermostat housing, timing chain cover, timing chain (gears or belt), turbocharger/supercharger unit, valve covers, water pump" as well as the components in the transmission, front-wheel drive, rear-wheel drive, and four-wheel/all-wheel drive. This coverage applies for 5-years or up to 60,000 miles, whichever comes

99

first.

546.   For certified pre-owned ("CPO") Vehicles, Ford offers an additional limited warranty covering CPO Vehicles for 12 months or 12,000 miles, whichever comes first.

547.   Ford's CPO Vehicle warranty states that a dealer will replace "all covered components . . . that are found to be defective in factory-supplied materials or workmanship during the applicable warranty periods." The engine and its components—including the cylinder block and cylinder heads—are included in Ford's list of "covered components."

548.   Ford manufactured and/or installed the engines and the engines' component parts in the Class Vehicles, and the engines and their component parts are covered by the express Warranties.

549.   The Engine Defect at issue in this litigation was present at the time the Class Vehicles were sold or leased to Arkansas Plaintiff and the Arkansas Sub-Class Members.

550.   Plaintiff relied on Ford's express warranties, which were a material part of the bargain, when purchasing or leasing their Class Vehicles.

551.   Under the express Warranties, Ford was obligated to correct the Engine Defect in the vehicles owned or leased by Arkansas Plaintiff and the Arkansas Sub-Class Members.

552.   Although Ford was obligated to correct the Engine Defect, none of the attempted fixes to the engines are adequate under the terms of the Warranties, as they did not cure the defect.

553.   Ford breached the express Warranties by performing illusory repairs. Rather than repairing the vehicles pursuant to the express Warranties, Ford falsely informed Arkansas Sub-Class Members that there was no problem with their Class Vehicles, performed ineffective procedures including software updates, and/or replaced defective components in the engines with equally defective components, without actually repairing the Class Vehicles.

554.   Ford and its agent dealers have failed and refused to conform the engines to the express Warranties. Ford's conduct, as discussed throughout this Complaint, has voided any attempt on its part to disclaim liability for its actions.

555.   Moreover, Ford's attempt to disclaim or limit these express Warranties vis-à-vis consumers is unconscionable and unenforceable under the circumstances here. Specifically, Ford's

warranty limitation is unenforceable because it knowingly sold a defective product without informing consumers about the defect.

556.   The time limits contained in Ford's warranty period were also unconscionable and inadequate to protect Arkansas Plaintiff and the Arkansas Sub-Class Members. Among other things, Arkansas Plaintiff and the Arkansas Sub-Class Members had no meaningful choice in determining these time limitations, the terms of which unreasonably favored Ford. A gross disparity in bargaining power existed between Ford and the Class members, and Ford knew or should have known that the Class Vehicles were defective at the time of sale.

557.   Arkansas Plaintiff and the Arkansas Sub-Class Members have complied with all obligations under the Warranties, or otherwise have been excused from performance of said obligations as a result of Ford's conduct described herein.

558.   Arkansas Plaintiff and the Arkansas Sub-Class Members were not required to notify Ford of the breach because affording Ford a reasonable opportunity to cure its breach of written warranty would have been futile. Ford was also on notice of the Engine Defect from the complaints and service requests it received from Plaintiff and the Class Members, from repairs and/or replacements of the engines or components thereof, and through other internal and external sources.

559.   Because Ford, through its conduct and exemplified by its own service bulletins, has covered repairs of the Engine Defect if Ford determines the repairs are appropriately covered under the Warranties, Ford cannot now deny that the Warranties cover the Engine Defect.

560.   Because Ford has not been able remedy the Engine Defect, any limitation on remedies included in the Warranties causes the Warranties to fail their essential purposes, rendering them null and void.

561.   As a direct and proximate cause of Ford's breach, Arkansas Plaintiff and the Arkansas Sub-Class Members suffered damages and continue to suffer damages, including economic damages at the point of sale or lease and diminution of value of their Class Vehicles. Additionally, Arkansas Plaintiff and the Arkansas Sub-Class Members have incurred or will incur economic damages at the point of repair in the form of the cost of repair.

562.   As a direct and proximate result of Ford's breach of express warranties, Arkansas

Plaintiff and the Arkansas Sub-Class Members have been damaged in an amount to be determined at trial.

**EIGHTH CAUSE OF ACTION**
**Breach of the Implied Warranty of Merchantability**
**Ark. Code Ann. §§ 4-2-313 and 4-2A-212**
**(On behalf of the Arkansas Sub-Class)**

563.   Plaintiffs incorporate by reference each allegation set forth in paragraphs 1-426, above.

564.   Arkansas Plaintiff brings this cause of action individually and on behalf of the members of the Arkansas Sub-Class.

565.   Ford is and was at all relevant times a "merchant" with respect to motor vehicles under Ark. Code Ann. §§ 4-2-104(1) and 4-2A-103(3), and a "seller" of motor vehicles under § 4-2-103(1)(d).

566.   With respect to leases, Ford is and was at all relevant times a "lessor" of motor vehicles under Ark. Code Ann. § 4-2A-103(1)(p).

567.   The Class Vehicles are and were at all relevant times "goods" within the meaning of Ark. Code Ann. §§ 4-2-105(1) and 4-2A-103(1)(h).

568.   A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law under Ark. Code Ann. §§ 4-2-313 and 4-2A-212.

569.   Ford knew or had reason to know of the specific use for which the Class Vehicles were purchased or leased. Ford directly sold and marketed vehicles equipped with the engines to customers through authorized dealers, like those from whom Arkansas Plaintiff and the Arkansas Sub-Class Members bought or leased their vehicles, for the intended purpose of consumers purchasing the vehicles. Ford knew that the Class Vehicles would and did pass unchanged from Ford to the authorized dealers to Arkansas Plaintiff and the Arkansas Sub-Class Members, with no modification to the defective engines.

570.   Ford provided Plaintiff and Class Members with an implied warranty that the Class Vehicles and their components and parts are merchantable and fit for the ordinary purposes for

1    which they were sold.

2        571.   This implied warranty included, among other things: (i) a warranty that the Class

3    Vehicles and their engines that were manufactured, supplied, distributed, and/or sold by Ford were

4    safe and reliable for providing transportation; and (ii) a warranty that the Class Vehicles and their

5    engines would be fit for their intended use while the Class Vehicles were being operated.

6        572.   Contrary to the applicable implied warranties, the Class Vehicles and their engines at

7    the time of sale and thereafter were not fit for their ordinary and intended purpose of providing

8    Plaintiff and Class Members with reliable, durable, and safe transportation. Instead, the Class

9    Vehicles are defective, including, but not limited to, the defective design and manufacture of their

10    engines and the existence of the Engine Defect at the time of sale or lease and thereafter. Ford knew

11    of this defect at the time these sale or lease transactions occurred.

12        573.   As a result of Ford's breach of the applicable implied warranties, Arkansas Plaintiff

13    and the Arkansas Sub-Class Members suffered an ascertainable loss of money, property, and/or

14    value of their Class Vehicles. Additionally, as a result of the Engine Defect, Arkansas Plaintiff and

15    the Arkansas Sub-Class Members were harmed and suffered actual damages in that the Class

16    Vehicles' engine components are substantially certain to fail before their expected useful life has

17    run.

18        574.   Ford's actions, as complained of herein, breached the implied warranty that the Class

19    Vehicles were of merchantable quality and fit for such use in violation of Ark. Code Ann. §§ 4-2-

20    313 and 4-2A-212.

21        575.   Arkansas Plaintiff and the Arkansas Sub-Class Members have complied with all

22    obligations under the warranty, or otherwise have been excused from performance of said

23    obligations as a result of Ford's conduct described herein.

24        576.   Arkansas Plaintiff and the Arkansas Sub-Class Members were not required to notify

25    Ford of the breach because affording Ford a reasonable opportunity to cure its breach of implied

26    warranty would have been futile. Ford was also on notice of the Engine Defect from the complaints

27    and service requests it received from Plaintiff and the Class Members, from repairs and/or

28    replacements of the engines or components thereof, and through other internal sources.

577.   As a direct and proximate cause of Ford's breach, Arkansas Plaintiff and the Arkansas Sub-Class Members suffered damages and continue to suffer damages, including economic damages at the point of sale or lease and diminution of value of their Class Vehicles. Additionally, Arkansas Plaintiff and the Arkansas Sub-Class Members have incurred or will incur economic damages at the point of repair in the form of the cost of repair.

578.   As a direct and proximate result of Ford's breach of the implied warranty of merchantability, Arkansas Plaintiff and the Arkansas Sub-Class Members have been damaged in an amount to be proven at trial.

**NINTH CAUSE OF ACTION**
**Violation of the Colorado Consumer Protection Act**
**Colo. Rev. Stat. §§ 6-1-101, *et seq.***
**(On behalf of the Colorado Sub-Class)**

579.   Plaintiffs incorporate by reference each allegation set forth in paragraphs 1-426, above.

580.   Plaintiff Darrick Christodaro ("Colorado Plaintiff") brings this cause of action individually and on behalf of the members of the Colorado Sub-Class.

581.   Colorado Plaintiff and the Colorado Sub-Class Members are "consumer[s]" under the Colorado Consumer Protection Act ("Colorado CPA"), Colo. Rev. Stat. § 6-1-101 *et seq.*

582.   Ford is a "person" within the meaning of the Colorado CPA. *See* Colo. Rev. Stat. § 6-1-102(6).

583.   The Colorado CPA prohibits a person from engaging in a "deceptive trade practice," including (1) knowingly "mak[ing] a false representation as to the source, sponsorship, approval, or certification of goods, services, or property," (2) representing "that goods, food, services, or property are of a particular standard, quality, or grade . . . if he knows or should know that they are of another," (3) advertising "goods, services, or property with intent not to sell them as advertised," and (4) failing "failure "to disclose material information concerning goods, services, or property which information was known at the time of an advertisement or sale if such failure to disclose such information was intended to induce the consumer to enter into a transaction." Colo. Rev. Stat. § 6-1-105(1)(e), (g), (*i*), (u). The Colorado CPA also provides that no person may "[e]ither knowingly

or recklessly engage[] in any unfair, unconscionable, deceptive, deliberately misleading, false, or fraudulent act or practice." Colo. Rev. Stat. § 6-1-105(kkk).

584.   Ford participated in and engaged in deceptive business or trade practices prohibited by the Colorado CPA by failing to disclose and actively concealing that the Class Vehicles contained the Engine Defect, by marketing their Class Vehicles as safe and of high quality, and by presenting themselves as a reputable manufacturer that valued safety and stood behind its vehicles after they were sold.

585.   Ford knowingly and intentionally misrepresented and omitted material facts in connection with the sale or lease of the Class Vehicles by, among other things, failing to disclose the Engine Defect; concealing the Engine Defect; promoting and selling or leasing Class Vehicles it knew were defective, including by marketing its vehicles as safe, reliable, easily operable, efficient, and of high quality; presenting itself as a reputable manufacturer that valued safety, reliability, performance and efficiency, and stood behind its vehicles after they were sold; by failing to make repairs or making repairs and providing replacements that caused Colorado Plaintiffs and the Colorado Sub-Class Members to experience repeated instances of failure, rendering the New Vehicle Limited Warranty useless; and minimizing the scope and severity of the problems with the Class Vehicles, refusing to acknowledge that they are defective, and failing to provide adequate relief to consumers.  Ford misrepresented and omitted such material facts with the intent to mislead Colorado Plaintiff and the Colorado Sub-Class Members about the true nature of the Class Vehicles.

586.   Ford systematically misrepresented, concealed, suppressed, or omitted material facts relating to the Class Vehicles and Engine Defect in the course of its business.

587.   Ford also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Class Vehicles.

588.   Ford's unfair and deceptive acts or practices occurred repeatedly in Ford's trade or business, were capable of deceiving a substantial portion of the purchasing public, and imposed a serious safety risk on the public.

589. Ford knew that the Class Vehicles and their engines suffered from an inherent defect, were defectively designed or manufactured, and were not suitable for their intended use.

590. Ford knew or should have known that its conduct violated the Colorado CPA.

591. Colorado Plaintiff and the Colorado Sub-Class Members reasonably relied on Ford's misrepresentations and omissions of material facts in its advertisements of the Class Vehicles and in the purchase of the Class Vehicles.

592. Colorado Plaintiff and the Colorado Sub-Class Members had no way of discerning that Ford's misrepresentations were false and misleading when they acquired their Class Vehicles because Colorado Plaintiff and the Colorado Sub-Class Members did not have access to Ford's exclusive and superior knowledge about the Class Vehicles' design and the Engine Defect.

593. Had Colorado Plaintiff and the Colorado Sub-Class Members known that the Class Vehicles contained and/or would exhibit the Engine Defect, they would not have purchased or leased the Class Vehicles or would have paid less for them. Colorado Plaintiff and the Colorado Sub-Class Members did not receive the benefit of their bargain as a result of Ford's misconduct.

594. Ford owed Colorado Plaintiff and the Colorado Sub-Class Members a duty to disclose the truth about the Engine Defect because Ford:

    a.    possessed exclusive and superior knowledge of the design and manufacture of the Class Vehicles and the Engine Defect;

    b.    intentionally concealed the foregoing from Colorado Plaintiff and the Colorado Sub-Class Members; and/or

    c.    made incomplete representations regarding the quality and durability of the Class Vehicles, while purposefully withholding material facts from Colorado Plaintiff and the Colorado Sub-Class Members that contradicted these representations.

595. Due to Ford's specific and superior knowledge that the Engines in the Class Vehicles will fail due to the Engine Defect, its false representations regarding the increased durability of the Class Vehicles, and reliance by Colorado Plaintiff and the Colorado Sub-Class Members on these material representations, Ford had a duty to disclose to Class members that the Engine Defect will cause engine failure in Class Vehicles, that Class Vehicles do not have the expected durability,

106

reliability, and/or safety over other vehicles or of their predecessor engines, that failure of the Engines will cause damage to Class Vehicle, and that Class members would be required to bear the cost of the damage to their vehicles. Having volunteered to provide information to Colorado Plaintiff and the Colorado Sub-Class Members, Ford had the duty to disclose not just the partial truth, but the entire truth. These omitted and concealed facts were material because they directly impact the value of the Class Vehicles purchased or leased by Colorado Plaintiff and the Colorado Sub-Class Members. Longevity, durability, performance, and safety are material concerns to Ford consumers. Ford represented to Colorado Plaintiff and the Colorado Sub-Class Members that they were purchasing or leasing vehicles that were durable, reliable, safe, efficient, of high quality, and containing engines of advanced and superior characteristics and technology as alleged throughout this Complaint, when in fact it is only a matter of time before the engines fail due to the Engine Defect.

596.    As a direct and proximate result of Ford's unfair or deceptive acts or practices, Colorado Plaintiff and the Colorado Sub-Class Members suffered and will continue to suffer injury in fact and/or actual damages.

597.    Defendant's violations present a continuing risk to Colorado Plaintiff and the Colorado Sub-Class Members as well as to the general public. Defendant's unlawful acts and practices complained of herein affect the public interest.

598.    As a proximate and direct result of Ford's unfair and deceptive trade practices, Colorado Plaintiff and members of the Colorado Sub-Class purchased or leased Class Vehicles and suffered an ascertainable loss and financial harm. These ascertainable losses include, among other things, overpayment at the time of purchase or lease, the cost to repair the Engine Defect, replacement of the damaged related system components, diminution of Class Vehicle resale value, increased repair and maintenance costs, and other substantial monetary damages and inconvenience.

599.    Ford was on notice of the Engine Defect from the pre-suit notices from Plaintiffs, the complaints and service requests Ford received from consumers, from repairs and/or replacements of the engines or components thereof, and through other internal and external sources. Colorado Plaintiff and members of the Colorado Sub-Class seek all damages and relief to which they are

1    entitled because Ford failed to remedy its unlawful conduct.

2        600.   Colorado Plaintiff and the Colorado Sub-Class Members seek an order enjoining

3    Ford's unfair, unlawful, and/or deceptive practices, declaratory relief, attorneys' fees, and any other

4    just and proper relief available under the Colorado CPA.

5                            **TENTH CAUSE OF ACTION**
                             **Breach of Express Warranty**
6                      **Colo. Rev. Stat. §§ 4-2-313 and 4-2.5-210**
                        **(On behalf of the Colorado Sub-Class)**
7

8        601.   Plaintiffs incorporate by reference each allegation set forth in paragraphs 1-426,

9    above.

10       602.   Colorado Plaintiff brings this cause of action individually and on behalf of the

11   members of the Colorado Sub-Class.

12       603.   Ford is and was at all relevant times a "merchant" with respect to motor vehicles Colo.

13   Rev. Stat. §§ 4-2-104(1) and 4-2.5-103(3), and a "seller" of motor vehicles under § 4-2-103(1)(d).

14       604.   With respect to leases, Ford is and was at all relevant times a "lessor" of motor

15   vehicles under Colo. Rev. Stat. § 4-2.5-103(1)(p).

16       605.   The Class Vehicles are and were at all relevant times "goods" within the meaning of

17   Colo. Rev. Stat. §§ 4-2-105(1) and 4-2.5-103(1)(h).

18       606.   Ford provided all purchasers and lessees of the Class Vehicles with the express

19   warranty described herein, which became a material part of the bargain.

20       607.   Ford provided all purchasers and lessees of Lincoln-branded Class Vehicles with the

21   Lincoln warranty and all purchasers and lessees of Ford or Ford-branded Class Vehicles with the

22   Ford/Ford warranty.

23       608.   Ford sold and leased the Class Vehicles with a written express warranty covering the

24   Vehicles for three years or 36,000 miles, whichever comes first.

25       609.   Ford's New Vehicle Limited Warranty expressly states that Ford will "without charge,

26   repair, replace, or adjust all parts on your vehicle that malfunction or fail during normal use during

27   the applicable coverage period due to a manufacturing defect in factory-supplied materials or factory

28   workmanship" so long the Vehicle is properly operated and maintained and taken to a Ford

dealership for repair within the warranty period.

610. Ford further provides powertrain warranty coverage, which is applicable to "the Engine: all internal lubricated parts, cylinder block, cylinder heads, electrical fuel pump, powertrain control module, engine mounts, flywheel, injection pump, manifold (exhaust and intake), manifold bolts, oil pan, oil pump, seals and gaskets, engine thermostat, engine, thermostat housing, timing chain cover, timing chain (gears or belt), turbocharger/supercharger unit, valve covers, water pump" as well as the components in the transmission, front-wheel drive, rear-wheel drive, and four-wheel/all-wheel drive. This coverage applies for 5-years or up to 60,000 miles, whichever comes first.

611. For certified pre-owned ("CPO") Vehicles, Ford offers an additional limited warranty covering CPO Vehicles for 12 months or 12,000 miles, whichever comes first.

612. Ford's CPO Vehicle warranty states that a dealer will replace "all covered components . . . that are found to be defective in factory-supplied materials or workmanship during the applicable warranty periods." The engine and its components—including the cylinder block and cylinder heads—are included in Ford's list of "covered components."

613. Ford manufactured and/or installed the engines and the engines' component parts in the Class Vehicles, and the engines and their component parts are covered by the express Warranties.

614. The Engine Defect at issue in this litigation was present at the time the Class Vehicles were sold or leased to Colorado Plaintiff and the Colorado Sub-Class Members.

615. Colorado Plaintiff relied on Ford's express warranties, which were a material part of the bargain, when purchasing or leasing their Class Vehicles.

616. Colorado Plaintiff and the Colorado Sub-Class Members are the intended ultimate consumers of the Class Vehicles and therefore have standing to sue Ford for breach of its express warranty. Colo. Rev. Stat. §§ 4-2-318, 4-2.5-216.

617. Under the express Warranties, Ford was obligated to correct the Engine Defect in the vehicles owned or leased by Colorado Plaintiff and the Colorado Sub-Class Members.

618. Although Ford was obligated to correct the Engine Defect, none of the attempted fixes

to the engines are adequate under the terms of the Warranties, as they did not cure the defect.

619.   Ford breached the express Warranties by performing illusory repairs. Rather than repairing the vehicles pursuant to the express Warranties, Ford falsely informed Colorado Sub-Class Members that there was no problem with their Class Vehicles, performed ineffective procedures including software updates, and/or replaced defective components in the engines with equally defective components, without actually repairing the Class Vehicles.

620.   Ford and its agent dealers have failed and refused to conform the engines to the express Warranties. Ford's conduct, as discussed throughout this Complaint, has voided any attempt on its part to disclaim liability for its actions.

621.   Moreover, Ford's attempt to disclaim or limit these express Warranties vis-à-vis consumers is unconscionable and unenforceable under the circumstances here. Specifically, Ford's warranty limitation is unenforceable because it knowingly sold a defective product without informing consumers about the defect.

622.   The time limits contained in Ford's warranty period were also unconscionable and inadequate to protect Colorado Plaintiff and the Colorado Sub-Class Members. Among other things, Colorado Plaintiff and the Colorado Sub-Class Members had no meaningful choice in determining these time limitations, the terms of which unreasonably favored Ford. A gross disparity in bargaining power existed between Ford and the Class members, and Ford knew or should have known that the Class Vehicles were defective at the time of sale.

623.   Colorado Plaintiff and the Colorado Sub-Class Members have complied with all obligations under the Warranties, or otherwise have been excused from performance of said obligations as a result of Ford's conduct described herein.

624.   Colorado Plaintiff and the Colorado Sub-Class Members were not required to notify Ford of the breach because affording Ford a reasonable opportunity to cure its breach of written warranty would have been futile. Ford was also on notice of the Engine Defect from the complaints and service requests it received from Plaintiff and the Class Members, from repairs and/or replacements of the engines or components thereof, and through other internal and external sources.

625.   Because Ford, through its conduct and exemplified by its own service bulletins, has

covered repairs of the Engine Defect if Ford determines the repairs are appropriately covered under the Warranties, Ford cannot now deny that the Warranties cover the Engine Defect.

626.   Because Ford has not been able remedy the Engine Defect, any limitation on remedies included in the Warranties causes the Warranties to fail their essential purposes, rendering them null and void.

627.   As a direct and proximate cause of Ford's breach, Colorado Plaintiff and the Colorado Sub-Class Members suffered damages and continue to suffer damages, including economic damages at the point of sale or lease and diminution of value of their Class Vehicles. Additionally, Colorado Plaintiff and the Colorado Sub-Class Members have incurred or will incur economic damages at the point of repair in the form of the cost of repair.

628.   As a direct and proximate result of Ford's breach of express warranties, Colorado Plaintiff and the Colorado Sub-Class Members have been damaged in an amount to be determined at trial.

**ELEVENTH CAUSE OF ACTION**
**Breach of the Implied Warranty of Merchantability**
**Colo. Rev. Stat. §§ 4-2-313 and 4-2.5-212**
**(On behalf of the Colorado Sub-Class)**

629.   Plaintiffs incorporate by reference each allegation set forth in paragraphs 1-426, above.

630.   Colorado Plaintiff brings this cause of action individually and on behalf of the members of the Colorado Sub-Class.

631.   Ford is and was at all relevant times a "merchant" with respect to motor vehicles under Colo. Rev. Stat. §§ 4-2-104(1) and 4-2.5-103(3), and a "seller" of motor vehicles under § 4-2-103(1)(d).

632.   With respect to leases, Ford is and was at all relevant times a "lessor" of motor vehicles under Colo. Rev. Stat. § 4-2.5-103(1)(p).

633.   The Class Vehicles are and were at all relevant times "goods" within the meaning of Colo. Rev. Stat. §§ 4-2-105(1) and 4-2.5-103(1)(h).

634.   A warranty that the Class Vehicles were in merchantable condition and fit for the

ordinary purpose for which vehicles are used is implied by law under Colo. Rev. Stat. §§ 4-2-314 and 4-2.5-212.

635.   Ford knew or had reason to know of the specific use for which the Class Vehicles were purchased or leased. Ford directly sold and marketed vehicles equipped with the engines to customers through authorized dealers, like those from whom Colorado Plaintiff and the Colorado Sub-Class Members bought or leased their vehicles, for the intended purpose of consumers purchasing the vehicles. Ford knew that the Class Vehicles would and did pass unchanged from Ford to the authorized dealers to Colorado Plaintiff and the Colorado Sub-Class Members, with no modification to the defective engines.

636.   Ford provided Plaintiff and Class Members with an implied warranty that the Class Vehicles and their components and parts are merchantable and fit for the ordinary purposes for which they were sold.

637.   This implied warranty included, among other things: (i) a warranty that the Class Vehicles and their engines that were manufactured, supplied, distributed, and/or sold by Ford were safe and reliable for providing transportation; and (ii) a warranty that the Class Vehicles and their engines would be fit for their intended use while the Class Vehicles were being operated.

638.   Contrary to the applicable implied warranties, the Class Vehicles and their engines at the time of sale and thereafter were not fit for their ordinary and intended purpose of providing Plaintiff and Class Members with reliable, durable, and safe transportation. Instead, the Class Vehicles are defective, including, but not limited to, the defective design and manufacture of their engines and the existence of the Engine Defect at the time of sale or lease and thereafter. Ford knew of this defect at the time these sale or lease transactions occurred.

639.   As a result of Ford's breach of the applicable implied warranties, Colorado Plaintiff and the Colorado Sub-Class Members suffered an ascertainable loss of money, property, and/or value of their Class Vehicles. Additionally, as a result of the Engine Defect, Colorado Plaintiff and the Colorado Sub-Class Members were harmed and suffered actual damages in that the Class Vehicles' engine components are substantially certain to fail before their expected useful life has run.

640. Ford's actions, as complained of herein, breached the implied warranty that the Class Vehicles were of merchantable quality and fit for such use in violation of Colo. Rev. Stat. §§ 4-2-314 and 4-2.5-212.

641. Colorado Plaintiff and the Colorado Sub-Class Members have complied with all obligations under the warranty, or otherwise have been excused from performance of said obligations as a result of Ford's conduct described herein.

642. Colorado Plaintiff and the Colorado Sub-Class Members were not required to notify Ford of the breach because affording Ford a reasonable opportunity to cure its breach of implied warranty would have been futile. Ford was also on notice of the Engine Defect from the complaints and service requests it received from Plaintiff and the Class Members, from repairs and/or replacements of the engines or components thereof, and through other internal sources.

643. As a direct and proximate cause of Ford's breach, Colorado Plaintiff and the Colorado Sub-Class Members suffered damages and continue to suffer damages, including economic damages at the point of sale or lease and diminution of value of their Class Vehicles. Additionally, Colorado Plaintiff and the Colorado Sub-Class Members have incurred or will incur economic damages at the point of repair in the form of the cost of repair.

644. Plaintiff and Class Members are the intended ultimate consumers of the Class Vehicles and therefore have standing to sue Ford for breach of its implied warranty. Colo. Rev. Stat. §§ 4-2-318, 4-2.5-216.

645. As a direct and proximate result of Ford's breach of the implied warranty of merchantability, Colorado Plaintiff and the Colorado Sub-Class Members have been damaged in an amount to be proven at trial.

## TWELFTH CAUSE OF ACTION
### Violations of the Florida Deceptive and Unfair Trade Practices Act,
### Fla. Stat. § 501.201, *et seq.*
### (On Behalf of the Florida Sub-Class)

646. Plaintiffs incorporate by reference each allegation set forth in paragraphs 1-426, above.

647. Plaintiff Amy Hoffer ("Florida Plaintiff") brings this cause of action individually and

on behalf of the Florida Sub-Class.

648.   Florida Plaintiff and the Florida Sub-Class Members are "consumers[s]" under the Florida Deceptive and Unfair Trade Practices Act ("FDUPTA"), Fla. Stat. § 501.203(7).

649.   Ford engaged in "trade or commerce" in Florida within the meaning of the FDUPTA. *See* Fla. Stat. § 501.203(8).

650.   The FDUPTA prohibits "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce." Fla. Stat. § 501.204(1). Ford engaged in unfair and deceptive practices that violated the FDUPTA as described above.

651.   Ford participated in and engaged in deceptive business or trade practices prohibited by the FDUPTA by failing to disclose and actively concealing that the Class Vehicles contained the Engine Defect, by marketing their Class Vehicles as safe and of high quality, and by presenting themselves as a reputable manufacturer that valued safety and stood behind its vehicles after they were sold.

652.   Ford knowingly and intentionally misrepresented and omitted material facts in connection with the sale or lease of the Class Vehicles by, among other things, failing to disclose the Engine Defect; concealing the Engine Defect; promoting and selling or leasing Class Vehicles it knew were defective, including by marketing its vehicles as safe, reliable, easily operable, efficient, and of high quality; presenting itself as a reputable manufacturer that valued safety, reliability, performance and efficiency, and stood behind its vehicles after they were sold; by failing to make repairs or making repairs and providing replacements that caused Florida Plaintiff and the Florida Sub-Class Members to experience repeated instances of failure, rendering the New Vehicle Limited Warranty useless; and minimizing the scope and severity of the problems with the Class Vehicles, refusing to acknowledge that they are defective, and failing to provide adequate relief to consumers. Ford misrepresented and omitted such material facts with the intent to mislead Florida Plaintiff and the Florida Sub-Class Members about the true nature of the Class Vehicles.

653.   Ford systematically misrepresented, concealed, suppressed, or omitted material facts relating to the Class Vehicles and Engine Defect in the course of its business.

654.   Ford also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Class Vehicles.

655.   Ford's unfair and deceptive acts or practices occurred repeatedly in Ford's trade or business, were capable of deceiving a substantial portion of the purchasing public, and imposed a serious safety risk on the public.

656.   Ford knew that the Class Vehicles and their engines suffered from an inherent defect, were defectively designed or manufactured, and were not suitable for their intended use.

657.   Ford knew or should have known that its conduct violated the FDUPTA.

658.   Florida Plaintiff and the Florida Sub-Class Members reasonably relied on Ford's misrepresentations and omissions of material facts in its advertisements of the Class Vehicles and in the purchase of the Class Vehicles.

659.   Florida Plaintiff and the Florida Sub-Class Members had no way of discerning that Ford's misrepresentations were false and misleading when they acquired their Class Vehicles because Florida Plaintiff and the Florida Sub-Class Members did not have access to Ford's exclusive and superior knowledge about the Class Vehicles' design and the Engine Defect.

660.   Had Florida Plaintiff and the Florida Sub-Class Members known that the Class Vehicles contained and/or would exhibit the Engine Defect, they would not have purchased or leased the Class Vehicles or would have paid less for them. Plaintiffs did not receive the benefit of their bargain as a result of Ford's misconduct.

661.   Ford owed Florida Plaintiff and the Florida Sub-Class Members a duty to disclose the truth about the Engine Defect because Ford:

a.   possessed exclusive and superior knowledge of the design and manufacture of the Class Vehicles and the Engine Defect;

b.   intentionally concealed the foregoing from Florida Plaintiff and the Florida Sub-Class Members; and/or

c.   made incomplete representations regarding the quality and durability of the

Class Vehicles, while purposefully withholding material facts from Florida Plaintiff and the Florida Sub-Class Members that contradicted these representations.

662.    Due to Ford's specific and superior knowledge that the Engines in the Class Vehicles will fail due to the Engine Defect, its false representations regarding the increased durability of the Class Vehicles, and reliance by Florida Plaintiff and the Florida Sub-Class Members on these material representations, Ford had a duty to disclose to Class members that the Engine Defect will cause engine failure in Class Vehicles, that Class Vehicles do not have the expected durability, reliability, and/or safety over other vehicles or of their predecessor engines, that failure of the Engines will cause damage to Class Vehicle, and that Class members would be required to bear the cost of the damage to their vehicles. Having volunteered to provide information to Florida Plaintiff and the Florida Sub-Class Members, Ford had the duty to disclose not just the partial truth, but the entire truth. These omitted and concealed facts were material because they directly impact the value of the Class Vehicles purchased or leased by Florida Plaintiff and the Florida Sub-Class Members. Longevity, durability, performance, and safety are material concerns to Ford consumers. Ford represented to Florida Plaintiff and the Florida Sub-Class Members that they were purchasing or leasing vehicles that were durable, reliable, safe, efficient, of high quality, and containing engines of advanced and superior characteristics and technology as alleged throughout this Complaint, when in fact it is only a matter of time before the engines fail due to the Engine Defect.

663.    Florida Plaintiff and the Florida Sub-Class Members suffered injury in fact to a legally protected interest. As a result of Ford's conduct, Florida Plaintiff and the Florida Sub-Class Members were harmed and suffered actual damages in the form of the costs of diagnosis and repair of their vehicles, and the diminished value of their vehicles.

664.    As a direct and proximate result of Ford's unfair or deceptive acts or practices, Florida Plaintiff and the Florida Sub-Class Members suffered and will continue to suffer injury in fact and/or actual damages.

665.    Defendant's violations present a continuing risk to Florida Plaintiff and the Florida Sub-Class Members as well as to the general public. Defendant's unlawful acts and practices complained of herein affect the public interest.

666.   As a proximate and direct result of Ford's unfair and deceptive trade practices, Florida Plaintiff and members of the Florida Sub-Class purchased or leased Class Vehicles and suffered an ascertainable loss and financial harm. These ascertainable losses include, among other things, overpayment at the time of purchase or lease, the cost to repair the Engine Defect, replacement of the damaged related system components, diminution of Class Vehicle resale value, increased repair and maintenance costs, and other substantial monetary damages and inconvenience.

667.   Ford was on notice of the Engine Defect from the pre-suit notices from Plaintiffs, the complaints and service requests Ford received from consumers, from repairs and/or replacements of the engines or components thereof, and through other internal and external sources. Florida Plaintiff and members of the Florida Sub-Class seek all damages and relief to which they are entitled because Ford failed to remedy its unlawful conduct.

668.   Florida Plaintiff and the Florida Sub-Class Members seek, *inter alia*, actual damages in an amount to be determined at trial, reasonable attorneys' fees; and any other just and proper relief available under the FDUPTA. Because Ford acted with willful and conscious disregard of the rights and safety of others, Ford's conduct constitutes malice, oppression, and fraud warranting punitive damages.

### THIRTEENTH CAUSE OF ACTION
**Breach of Express Warranty**
**Fla. Stat. §§ 672.313 and 680.21**
**(On behalf of the Florida Sub-Class)**

669.   Plaintiffs incorporate by reference each allegation set forth in paragraphs 1-426, above.

670.   Plaintiff Constable brings this cause of action individually and on behalf of the members of the Florida Sub-Class.

671.   Ford is and was at all relevant times a "merchant" with respect to motor vehicles under Fla. Stat. §§ 672.104(1) and 680.1031(3)(k), and a "seller" of motor vehicles under § 672.103(1)(d).

672.   With respect to leases, Ford is and was at all relevant times a "lessor" of motor vehicles under Fla. Stat. § 680.1031(1)(p).

673.   The Class Vehicles are and were at all relevant times "goods" within the meaning of

Fla. Stat. §§ 672.105(1) and 680.1031(1)(h).

674. Ford provided all purchasers and lessees of the Class Vehicles with the express warranty described herein, which became a material part of the bargain.

675. Ford provided all purchasers and lessees of Lincoln-branded Class Vehicles with the Lincoln warranty and all purchasers and lessees of Ford or Ford-branded Class Vehicles with the Ford/Ford Warranty.

676. Ford sold and leased the Class Vehicles with a written express warranty covering the Vehicles for three years or 36,000 miles, whichever comes first.

677. Ford's New Vehicle Limited Warranty expressly states that Ford will "without charge, repair, replace, or adjust all parts on your vehicle that malfunction or fail during normal use during the applicable coverage period due to a manufacturing defect in factory-supplied materials or factory workmanship" so long the Vehicle is properly operated and maintained and taken to a Ford dealership for repair within the warranty period.

678. Ford further provides powertrain warranty coverage, which is applicable to "the Engine: all internal lubricated parts, cylinder block, cylinder heads, electrical fuel pump, powertrain control module, engine mounts, flywheel, injection pump, manifold (exhaust and intake), manifold bolts, oil pan, oil pump, seals and gaskets, engine thermostat, engine, thermostat housing, timing chain cover, timing chain (gears or belt), turbocharger/supercharger unit, valve covers, water pump" as well as the components in the transmission, front-wheel drive, rear-wheel drive, and four-wheel/all-wheel drive. This coverage applies for 5-years or up to 60,000 miles, whichever comes first.

679. For certified pre-owned ("CPO") Vehicles, Ford offers an additional limited warranty covering CPO Vehicles for 12 months or 12,000 miles, whichever comes first.

680. Ford's CPO Vehicle warranty states that a dealer will replace "all covered components . . . that are found to be defective in factory-supplied materials or workmanship during the applicable warranty periods." The engine and its components—including the cylinder block and cylinder heads—are included in Ford's list of "covered components."

681. Ford manufactured and/or installed the engines and the engines' component parts in

the Class Vehicles, and the engines and their component parts are covered by the express Warranties.

682.   The Engine Defect at issue in this litigation was present at the time the Class Vehicles were sold or leased to Plaintiff Constable and the Florida Sub-Class Members.

683.   Plaintiffs relied on Ford's express warranties, which were a material part of the bargain, when purchasing or leasing their Class Vehicles.

684.   Under the express Warranties, Ford was obligated to correct the Engine Defect in the vehicles owned or leased by Plaintiff Constable and the Florida Sub-Class Members.

685.   Although Ford was obligated to correct the Engine Defect, none of the attempted fixes to the engines are adequate under the terms of the Warranties, as they did not cure the defect.

686.   Ford breached the express Warranties by performing illusory repairs. Rather than repairing the vehicles pursuant to the express Warranties, Ford falsely informed Florida Sub-Class Members that there was no problem with their Class Vehicles, performed ineffective procedures including software updates, and/or replaced defective components in the engines with equally defective components, without actually repairing the Class Vehicles.

687.   Ford and its agent dealers have failed and refused to conform the engines to the express Warranties. Ford's conduct, as discussed throughout this Complaint, has voided any attempt on its part to disclaim liability for its actions.

688.   Moreover, Ford's attempt to disclaim or limit these express Warranties vis-à-vis consumers is unconscionable and unenforceable under the circumstances here. Specifically, Ford's warranty limitation is unenforceable because it knowingly sold a defective product without informing consumers about the defect.

689.   The time limits contained in Ford's warranty period were also unconscionable and inadequate to protect Plaintiff Constable and the Florida Sub-Class Members. Among other things, Plaintiff Constable and the Florida Sub-Class Members had no meaningful choice in determining these time limitations, the terms of which unreasonably favored Ford. A gross disparity in bargaining power existed between Ford and the Class members, and Ford knew or should have known that the Class Vehicles were defective at the time of sale.

690.   Plaintiff Constable and the Florida Sub-Class Members have complied with all obligations under the Warranties, or otherwise have been excused from performance of said obligations as a result of Ford's conduct described herein.

691.   Plaintiff Constable and the Florida Sub-Class Members were not required to notify Ford of the breach because affording Ford a reasonable opportunity to cure its breach of written warranty would have been futile. Ford was also on notice of the Engine Defect from the complaints and service requests it received from Plaintiffs and the Class Members, from repairs and/or replacements of the engines or components thereof, and through other internal and external sources.

692.   Because Ford, through its conduct and exemplified by its own service bulletins, has covered repairs of the Engine Defect if Ford determines the repairs are appropriately covered under the Warranties, Ford cannot now deny that the Warranties cover the Engine Defect.

693.   Because Ford has not been able remedy the Engine Defect, any limitation on remedies included in the Warranties causes the Warranties to fail their essential purposes, rendering them null and void.

694.   As a direct and proximate cause of Ford's breach, Plaintiff Constable and the Florida Sub-Class Members suffered damages and continue to suffer damages, including economic damages at the point of sale or lease and diminution of value of their Class Vehicles. Additionally, Plaintiff Constable and the Florida Sub-Class Members have incurred or will incur economic damages at the point of repair in the form of the cost of repair.

695.   As a direct and proximate result of Ford's breach of express warranties, Plaintiff Constable and the Florida Sub-Class Members have been damaged in an amount to be determined at trial.

**FOURTEENTH CAUSE OF ACTION**
**Breach of the Implied Warranty of Merchantability**
**Fla. Stat. §§ 672.314 and 680.212**
**(On behalf of the Florida Sub-Class)**

696.   Plaintiffs incorporate by reference each allegation set forth in paragraphs 1-426, above.

697.   Plaintiff Constable bring this cause of action individually and on behalf of the

members of the Florida Sub-Class.

698.   Ford is and was at all relevant times a "merchant" with respect to motor vehicles under Fla. Stat. §§ 672.104(1) and 680.1031(3)(k), and a "seller" of motor vehicles under § 672.103(1)(d ).

699.   With respect to leases, Ford is and was at all relevant times a "lessor" of motor vehicles under Fla. Stat. § 680.1031(1)(p).

700.   The Class Vehicles are and were at all relevant times "goods" within the meaning of Fla. Stat. §§ 672.105(1) and 680.1031(1)(h).

701.   A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law under Fla. Stat. §§ 672.314 and 680.212.

702.   Ford knew or had reason to know of the specific use for which the Class Vehicles were purchased or leased. Ford directly sold and marketed vehicles equipped with the engines to customers through authorized dealers, like those from whom Plaintiff Constable and the Florida Sub-Class Members bought or leased their vehicles, for the intended purpose of consumers purchasing the vehicles. Ford knew that the Class Vehicles would and did pass unchanged from Ford to the authorized dealers to Plaintiff Constable and the Florida Sub-Class Members, with no modification to the defective engines.

703.   Ford provided Plaintiffs and Class Members with an implied warranty that the Class Vehicles and their components and parts are merchantable and fit for the ordinary purposes for which they were sold.

704.   This implied warranty included, among other things: (i) a warranty that the Class Vehicles and their engines that were manufactured, supplied, distributed, and/or sold by Ford were safe and reliable for providing transportation; and (ii) a warranty that the Class Vehicles and their engines would be fit for their intended use while the Class Vehicles were being operated.

705.   Contrary to the applicable implied warranties, the Class Vehicles and their engines at the time of sale and thereafter were not fit for their ordinary and intended purpose of providing Plaintiffs and Class Members with reliable, durable, and safe transportation. Instead, the Class Vehicles are defective, including, but not limited to, the defective design and manufacture of their

121

engines and the existence of the Engine Defect at the time of sale or lease and thereafter. Ford knew of this defect at the time these sale or lease transactions occurred.

706.   As a result of Ford's breach of the applicable implied warranties, Plaintiff Constable and the Florida Sub-Class Members suffered an ascertainable loss of money, property, and/or value of their Class Vehicles. Additionally, as a result of the Engine Defect, Plaintiff Constable and the Florida Sub-Class Members were harmed and suffered actual damages in that the Class Vehicles' engine components are substantially certain to fail before their expected useful life has run.

707.   Ford's actions, as complained of herein, breached the implied warranty that the Class Vehicles were of merchantable quality and fit for such use in violation of Fla. Stat. §§ 672.314 and 680.212.

708.   Plaintiff Constable and the Florida Sub-Class Members have complied with all obligations under the warranty, or otherwise have been excused from performance of said obligations as a result of Ford's conduct described herein.

709.   Plaintiff Constable and the Florida Sub-Class Members were not required to notify Ford of the breach because affording Ford a reasonable opportunity to cure its breach of implied warranty would have been futile. Ford was also on notice of the Engine Defect from the complaints and service requests it received from Plaintiffs and the Class Members, from repairs and/or replacements of the engines or components thereof, and through other internal sources.

710.   Because Plaintiff Constable and the Florida Sub-Class Members purchased their vehicles from authorized Ford dealers, they are in privity with Ford since (1) an agency relationship establishes privity for purposes of the breach of implied warranty claims and (2) privity is not required where plaintiffs are intended third-party beneficiaries of a defendant's implied warranties and of the contracts between Ford and its authorized dealers.

711.   As a direct and proximate cause of Ford's breach, Plaintiff Constable and the Florida Sub-Class Members suffered damages and continue to suffer damages, including economic damages at the point of sale or lease and diminution of value of their Class Vehicles. Additionally, Plaintiff Constable and the Florida Sub-Class Members have incurred or will incur economic damages at the point of repair in the form of the cost of repair.

712.  As a direct and proximate result of Ford's breach of the implied warranty of merchantability, Plaintiff Constable and the Florida Sub-Class Members have been damaged in an amount to be proven at trial.

### FIFTEENTH CAUSE OF ACTION
**Violations of the Georgia Fair Business Practices Act,**
**Ga. Code Ann. § 10-1-390, *et seq.***
**(On Behalf of the Georgia Sub-Class)**

713.  Plaintiffs incorporate by reference each allegation set forth in paragraphs 1-426 above.

714.  Plaintiffs Jillian Constable and Monterio Butcher ("Georgia Plaintiffs") bring this cause of action individually and on behalf of the Georgia Sub-Class.

715.  Georgia's Fair Business Practices Act ("GFBPA") declares "[u]nfair or deceptive acts or practices in the conduct of consumer transactions and consumer acts or practices in trade or commerce" to be unlawful. Ga. Code Ann. § 10-1-393(a).

716.  Unfair or deceptive acts or practices are defined to include, "representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have," "[r]epresenting that goods or services are of a particular standard, quality, or grade … if they are of another," and [a]dvertising goods or services with intent not to sell them as advertised." Ga. Code Ann. § 10-1-393(b). Ford engaged in unfair and deceptive practices that violated the GFBPA as described above.

717.  Ford participated in and engaged in deceptive business or trade practices prohibited by the GFBPA by failing to disclose and actively concealing that the Class Vehicles contained the Engine Defect, by marketing their Class Vehicles as safe and of high quality, and by presenting themselves as a reputable manufacturer that valued safety and stood behind its vehicles after they were sold.

718.  By failing to disclose the Engine Defect; by concealing the Engine Defect; by promoting and selling or leasing Class Vehicles it knew were defective, including by marketing its vehicles as safe, reliable, easily operable, efficient, and of high quality; by presenting itself as a reputable manufacturer that valued safety, reliability, performance and efficiency, and stood behind its vehicles after they were sold; by failing to make repairs or making repairs and providing

replacements that caused Georgia Plaintiffs and the Georgia Sub-Class Members to experience repeated instances of failure, rendering the New Vehicle Limited Warranty useless; and by minimizing the scope and severity of the problems with the Class Vehicles, refusing to acknowledge that they are defective, and failing to provide adequate relief to consumers, Ford knowingly and intentionally misrepresented and omitted material facts in connection with the sale or lease of the Class Vehicles.

719.  Ford systematically misrepresented, concealed, suppressed, or omitted material facts relating to the Class Vehicles and Engine Defect in the course of its business.

720.  Ford also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Class Vehicles.

721.  Ford's unfair and deceptive acts or practices occurred repeatedly in Ford's trade or business, were capable of deceiving a substantial portion of the purchasing public, and imposed a serious safety risk on the public.

722.  Ford knew that the Class Vehicles and their engines suffered from an inherent defect, were defectively designed or manufactured, and were not suitable for their intended use.

723.  Ford knew or should have known that its conduct violated the GFBPA.

724.  Georgia Plaintiffs and the Georgia Sub-Class Members reasonably relied on Ford's misrepresentations and omissions of material facts in its advertisements of the Class Vehicles and in the purchase of the Class Vehicles.

725.  Had Georgia Plaintiffs and the Georgia Sub-Class Members known that the Class Vehicles contained and/or would exhibit the Engine Defect, they would not have purchased or leased the Class Vehicles or would have paid less for them. Plaintiff did not receive the benefit of their bargain as a result of Ford's misconduct.

726.  Ford owed Georgia Plaintiffs and the Georgia Sub-Class Members a duty to disclose the truth about the Engine Defect because Ford:

a.    possessed exclusive and superior knowledge of the design and manufacture of

the Class Vehicles and the Engine Defect;

      b.    intentionally concealed the foregoing from Georgia Plaintiffs and the Georgia Sub-Class Members; and/or

      c.    made incomplete representations regarding the quality and durability of the Class Vehicles, while purposefully withholding material facts from Georgia Plaintiffs and the Georgia Sub-Class Members that contradicted these representations.

727.   Due to Ford's specific and superior knowledge that the Engines in the Class Vehicles will fail due to the Engine Defect, its false representations regarding the increased durability of the Class Vehicles, and reliance by Georgia Plaintiffs and the Georgia Sub-Class Members on these material representations, Ford had a duty to disclose to Class members that the Engine Defect will cause engine failure in Class Vehicles, that Class Vehicles do not have the expected durability, reliability, and/or safety over other vehicles or of their predecessor engines, that failure of the Engines will cause damage to Class Vehicle, and that Class members would be required to bear the cost of the damage to their vehicles. Having volunteered to provide information to Georgia Plaintiffs and the Georgia Sub-Class Members, Ford had the duty to disclose not just the partial truth, but the entire truth. These omitted and concealed facts were material because they directly impact the value of the Class Vehicles purchased or leased by Georgia Plaintiffs and the Georgia Sub-Class Members. Longevity, durability, performance, and safety are material concerns to Ford consumers. Ford represented to Georgia Plaintiffs and the Georgia Sub-Class Members that they were purchasing or leasing vehicles that were durable, reliable, safe, efficient, of high quality, and containing engines of advanced and superior characteristics and technology as alleged throughout this Complaint, when in fact it is only a matter of time before the engines fail due to the Engine Defect.

728.   Georgia Plaintiffs and the Georgia Sub-Class Members suffered injury in fact to a legally protected interest. As a result of Ford's conduct, Georgia Plaintiffs and the Georgia Sub-Class Members were harmed and suffered actual damages in the form of the costs of diagnosis and repair of their vehicles, and the diminished value of their vehicles.

729.   As a direct and proximate result of Ford's unfair or deceptive acts or practices,

Georgia Plaintiffs and the Georgia Sub-Class Members suffered and will continue to suffer injury in fact and/or actual damages.

730.   Defendant's violations present a continuing risk to Georgia Plaintiffs and the Georgia Sub-Class Members as well as to the general public. Defendant's unlawful acts and practices complained of herein affect the public interest.

731.   As a proximate and direct result of Ford's unfair and deceptive trade practices, Georgia Plaintiffs and members of the Georgia Sub-Class purchased or leased Class Vehicles and suffered an ascertainable loss and financial harm. This included ascertainable losses in the form of actual damages in the amount of overpayment at the time of purchase or lease, the cost to attempt to repair the Engine Defect, replaced the damaged related system components, diminution of Class Vehicle resale value, increased repair and maintenance costs, and other substantial monetary damages and inconvenience.

732.   Pursuant to statute, Georgia Plaintiffs provided notice of her their claims by letter dated May 19 and May 21, 2021. Ford was also on notice of the Engine Defect from the prior pre-suit notices from other Plaintiffs, the complaints and service requests Ford received from consumers, from repairs and/or replacements of the engines or components thereof, and through other internal and external sources. Plaintiff and members of the Georgia Sub-Class seek all damages and relief to which they are entitled to because Ford failed to remedy its unlawful conduct within the requisite time period.

733.   Georgia Plaintiffs and members of the Georgia Sub-Class seek monetary relief against Ford in the amount of damages, exemplary damages for intentional violations, injunctive relief, attorneys' fees, and any other just and proper relief available under Ga. Code Ann. § 10-1-399(a).

### SIXTEENTH CAUSE OF ACTION
**Violations of the Georgia Uniform Deceptive Trade Practices Act,
Ga. Code Ann. § 10-1-370, *et seq.*
(On Behalf of the Georgia Sub-Class)**

734.   Plaintiffs incorporate by reference each allegation set forth in paragraphs 1-426, above.

126

735. Georgia Plaintiffs bring this cause of action individually and on behalf of the Georgia Sub-Class.

736. The Georgia Uniform Deceptive Trade Practices Act ("GUDTPA") prohibits "deceptive trade practices," which include the "misrepresentation of standard or quality of goods or services," and "engaging in any other conduct which similarly creates a likelihood of confusion or of misunderstanding." Ga. Code Ann. § 10-1-372(a). Ford engaged in unfair and deceptive practices that violated the GUDTPA as described above.

737. Ford, Georgia Plaintiffs and the members of the Georgia Sub-Class are "persons" within the meaning of the GUDTPA, GA. Code Ann. § 10-1-471(5).

738. Ford participated in and engaged in deceptive business or trade practices prohibited by the GUDTPA by failing to disclose and actively concealing that the Class Vehicles contained the Engine Defect, by marketing their Class Vehicles as safe and of high quality, and by presenting themselves as a reputable manufacturer that valued safety and stood behind its vehicles after they were sold.

739. Ford knowingly and intentionally misrepresented and omitted material facts in connection with the sale or lease of the Class Vehicles by, among other things, failing to disclose the Engine Defect; concealing the Engine Defect; promoting and selling or leasing Class Vehicles it knew were defective, including by marketing its vehicles as safe, reliable, easily operable, efficient, and of high quality; presenting itself as a reputable manufacturer that valued safety, reliability, performance and efficiency, and stood behind its vehicles after they were sold; by failing to make repairs or making repairs and providing replacements that caused Georgia Plaintiffs and the Georgia Sub-Class Members to experience repeated instances of failure, rendering the New Vehicle Limited Warranty useless; and minimizing the scope and severity of the problems with the Class Vehicles, refusing to acknowledge that they are defective, and failing to provide adequate relief to consumers. Ford misrepresented and omitted such material facts with the intent to mislead Georgia Plaintiffs and the Georgia Sub-Class Members about the true nature of the Class Vehicles.

740. Ford systematically misrepresented, concealed, suppressed, or omitted material facts relating to the Class Vehicles and Engine Defect in the course of its business.

741.   Ford also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Class Vehicles.

742.   Ford's unfair and deceptive acts or practices occurred repeatedly in Ford's trade or business, were capable of deceiving a substantial portion of the purchasing public, and imposed a serious safety risk on the public.

743.   Ford knew that the Class Vehicles and their engines suffered from an inherent defect, were defectively designed or manufactured, and were not suitable for their intended use.

744.   Ford knew or should have known that its conduct violated the GUDTPA.

745.   Georgia Plaintiffs and the Georgia Sub-Class Members reasonably relied on Ford's misrepresentations and omissions of material facts in its advertisements of the Class Vehicles and in the purchase of the Class Vehicles.

746.   Georgia Plaintiffs and the Georgia Sub-Class Members had no way of discerning that Ford's misrepresentations were false and misleading when they acquired their Class Vehicles because Georgia Plaintiffs and the Georgia Sub-Class Members did not have access to Ford's exclusive and superior knowledge about the Class Vehicles' design and the Engine Defect.

747.   Had Georgia Plaintiffs and the Georgia Sub-Class Members known that the Class Vehicles contained and/or would exhibit the Engine Defect, they would not have purchased or leased the Class Vehicles or would have paid less for them. Plaintiff did not receive the benefit of their bargain as a result of Ford's misconduct.

748.   Ford owed Georgia Plaintiffs and the Georgia Sub-Class Members a duty to disclose the truth about the Engine Defect because Ford:

a.    possessed exclusive and superior knowledge of the design and manufacture of the Class Vehicles and the Engine Defect;

b.    intentionally concealed the foregoing from Georgia Plaintiffs and the Georgia Sub-Class Members; and/or

c.    made incomplete representations regarding the quality and durability of the

128

Class Vehicles, while purposefully withholding material facts from Georgia Plaintiffs and the Georgia Sub-Class Members that contradicted these representations.

749.   Due to Ford's specific and superior knowledge that the Engines in the Class Vehicles will fail due to the Engine Defect, its false representations regarding the increased durability of the Class Vehicles, and reliance by Georgia Plaintiffs and the Georgia Sub-Class Members on these material representations, Ford had a duty to disclose to Class members that the Engine Defect will cause engine failure in Class Vehicles, that Class Vehicles do not have the expected durability, reliability, and/or safety over other vehicles or of their predecessor engines, that failure of the Engines will cause damage to Class Vehicle, and that Class members would be required to bear the cost of the damage to their vehicles. Having volunteered to provide information to Georgia Plaintiffs and the Georgia Sub-Class Members, Ford had the duty to disclose not just the partial truth, but the entire truth. These omitted and concealed facts were material because they directly impact the value of the Class Vehicles purchased or leased by Georgia Plaintiffs and the Georgia Sub-Class Members. Longevity, durability, performance, and safety are material concerns to Ford consumers. Ford represented to Georgia Plaintiffs and the Georgia Sub-Class Members that they were purchasing or leasing vehicles that were durable, reliable, safe, efficient, of high quality, and containing engines of advanced and superior characteristics and technology as alleged throughout this Complaint, when in fact it is only a matter of time before the engines fail due to the Engine Defect.

750.   Georgia Plaintiffs and the Georgia Sub-Class Members suffered injury in fact to a legally protected interest. As a result of Ford's conduct, Georgia Plaintiffs and the Georgia Sub-Class Members were harmed and suffered actual damages in the form of the costs of diagnosis and repair of their vehicles, and the diminished value of their vehicles.

751.   As a direct and proximate result of Ford's unfair or deceptive acts or practices, Georgia Plaintiffs and the Georgia Sub-Class Members suffered and will continue to suffer injury in fact and/or actual damages.

752.   Defendant's violations present a continuing risk to Georgia Plaintiffs and the Georgia Sub-Class Members as well as to the general public. Defendant's unlawful acts and practices

complained of herein affect the public interest.

753.   As a proximate and direct result of Ford's unfair and deceptive trade practices, Georgia Plaintiff and members of the Georgia Sub-Class purchased or leased Class Vehicles and suffered an ascertainable loss and financial harm. These ascertainable losses include, among other things, overpayment at the time of purchase or lease, the cost to repair the Engine Defect, replacement of the damaged related system components, diminution of Class Vehicle resale value, increased repair and maintenance costs, and other substantial monetary damages and inconvenience.

754.   Georgia Plaintiffs provided notice of their claims by letters dated May 19 and May 21, 2021.

755.   Georgia Plaintiffs and members of the Georgia Sub-Class seek monetary relief against Ford in the amount of actual damages, injunctive relief, attorneys' fees, and any other just and proper relief available under Ga. Code Ann. § 10-1-373.

**SEVENTEENTH CAUSE OF ACTION**
**Violations of the Illinois Consumer Fraud and Deceptive Business Practices Act,**
**815 ILCS 505/1, *et seq.***
**(On Behalf of the Illinois Sub-Class)**

756.   Plaintiffs incorporate by reference each allegation set forth in paragraphs 1-426, above.

757.   Plaintiffs Harlampi Bozhinov, Anthony Cicero, and Mary Glade ("Illinois Plaintiffs") bring this cause of action individually and on behalf of the Illinois Sub-Class.

758.   Ford is a "person" as that term is defined in 815 ILCS 505/1(c).

759.   The Illinois Plaintiffs and the Illinois Sub-Class members are "consumers" as that term is defined in 815 ILCS 505/1(e).

760.   The purpose of the Illinois Consumer Fraud and Deceptive Business Practices Act ("Illinois CFA") is to enjoin trade practices which confuse or deceive the consumer. The Illinois CFA prohibits  "unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression, or omission of any material fact, with intent that others rely upon the concealment, suppression, or omission of such material fact … in the conduct of trade or

commerce … whether any person has in fact been misled, deceived or damaged thereby." 815 ILCS 505/2. Ford engaged in unfair and deceptive practices that violated the Illinois CFA as described above.

761.   Ford participated in and engaged in deceptive business or trade practices prohibited by the Illinois CFA by failing to disclose and actively concealing that the Class Vehicles contained the Engine Defect, by marketing their Class Vehicles as safe and of high quality, and by presenting themselves as a reputable manufacturer that valued safety and stood behind its vehicles after they were sold.

762.   By failing to disclose the Engine Defect; by concealing the Engine Defect; by promoting and selling or leasing Class Vehicles it knew were defective, including by marketing its vehicles as safe, reliable, easily operable, efficient, and of high quality; by presenting itself as a reputable manufacturer that valued safety, reliability, performance and efficiency, and stood behind its vehicles after they were sold; by failing to make repairs or making repairs and providing replacements that caused Illinois Plaintiffs and the Illinois Sub-Class Members to experience repeated instances of failure, rendering the New Vehicle Limited Warranty useless; and by minimizing the scope and severity of the problems with the Class Vehicles, refusing to acknowledge that they are defective, and failing to provide adequate relief to consumers, Ford knowingly and intentionally misrepresented and omitted material facts in connection with the sale or lease of the Class Vehicles.

763.   Ford systematically misrepresented, concealed, suppressed, or omitted material facts relating to the Class Vehicles and Engine Defect in the course of its business.

764.   Ford also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Class Vehicles.

765.   Ford's unfair and deceptive acts or practices occurred repeatedly in Ford's trade or business, were capable of deceiving a substantial portion of the purchasing public, and imposed a serious safety risk on the public.

766.   Ford knew that the Class Vehicles and their engines suffered from an inherent defect, were defectively designed or manufactured, and were not suitable for their intended use.

767.   Ford knew or should have known that its conduct violated the Illinois CFA.

768.   Illinois Plaintiffs and the Illinois Sub-Class Members reasonably relied on Ford's misrepresentations and omissions of material facts in its advertisements of the Class Vehicles and in the purchase of the Class Vehicles.

769.   Had Illinois Plaintiffs and the Illinois Sub-Class Members known that the Class Vehicles contained and/or would exhibit the Engine Defect, they would not have purchased or leased the Class Vehicles or would have paid less for them. Plaintiffs did not receive the benefit of their bargain as a result of Ford's misconduct.

770.   Ford owed Illinois Plaintiffs and the Illinois Sub-Class Members a duty to disclose the truth about the Engine Defect because Ford:

a.   possessed exclusive and superior knowledge of the design and manufacture of the Class Vehicles and the Engine Defect;

b.   intentionally concealed the foregoing from Illinois Plaintiffs and the Illinois Sub-Class Members; and/or

c.   made incomplete representations regarding the quality and durability of the Class Vehicles, while purposefully withholding material facts from Illinois Plaintiffs and the Illinois Sub-Class Members that contradicted these representations.

771.   Due to Ford's specific and superior knowledge that the Engines in the Class Vehicles will fail due to the Engine Defect, its false representations regarding the increased durability of the Class Vehicles, and reliance by Illinois Plaintiffs and the Illinois Sub-Class Members on these material representations, Ford had a duty to disclose to Class members that the Engine Defect will cause engine failure in Class Vehicles, that Class Vehicles do not have the expected durability, reliability, and/or safety over other vehicles or of their predecessor engines, that failure of the Engines will cause damage to Class Vehicle, and that Class members would be required to bear the cost of the damage to their vehicles. Having volunteered to provide information to Illinois Plaintiffs and the Illinois Sub-Class Members, Ford had the duty to disclose not just the partial truth, but the

entire truth. These omitted and concealed facts were material because they directly impact the value of the Class Vehicles purchased or leased by Illinois Plaintiffs and the Illinois Sub-Class Members. Longevity, durability, performance, and safety are material concerns to Ford consumers. Ford represented to Illinois Plaintiffs and the Illinois Sub-Class Members that they were purchasing or leasing vehicles that were durable, reliable, safe, efficient, of high quality, and containing engines of advanced and superior characteristics and technology as alleged throughout this Complaint, when in fact it is only a matter of time before the engines fail due to the Engine Defect.

772.    Illinois Plaintiffs and the Illinois Sub-Class Members suffered injury in fact to a legally protected interest. As a result of Ford's conduct, Illinois Plaintiffs and the Illinois Sub-Class Members were harmed and suffered actual damages in the form of the costs of diagnosis and repair of their vehicles, and the diminished value of their vehicles.

773.    As a direct and proximate result of Ford's unfair or deceptive acts or practices, Illinois Plaintiffs and the Illinois Sub-Class Members suffered and will continue to suffer injury in fact and/or actual damages.

774.    Defendant's violations present a continuing risk to Illinois Plaintiffs and the Illinois Sub-Class Members as well as to the general public. Defendant's unlawful acts and practices complained of herein affect the public interest.

775.    As a proximate and direct result of Ford's unfair and deceptive trade practices, Illinois Plaintiffs and members of the Illinois Sub-Class purchased or leased Class Vehicles and suffered an ascertainable loss and financial harm. This included ascertainable losses include, among other things, overpayment at the time of purchase or lease, the cost to attempt to repair the Engine Defect, replaced the damaged related system components, diminution of Class Vehicle resale value, increased repair and maintenance costs, and other substantial monetary damages and inconvenience.

776.    The Illinois Plaintiffs provided notice of their claims by letters dated June 14, 2021 and May 21, 2021.

777.    The Illinois Plaintiffs and members of the Illinois Sub-Class seek monetary relief against Ford in the amount of actual damages, as well as punitive damages because Ford act with fraud and/or malice and/or was grossly negligent.

778. The Illinois Plaintiffs and the Illinois Sub-Class Members also seeks attorneys' fees, and any other just and proper relief available under 815 Ill. Comp. Stat. § 505/1, *et seq.*

## EIGHTEENTH CAUSE OF ACTION
### Breach of Express Warranty
### Ill. Comp. Stat. §§ 5/2-313 and 5/2A-210
### (On behalf of the Illinois Sub-Class)

779. Plaintiffs incorporate by reference each allegation set forth in paragraphs 1-426, above.

780. Plaintiff Cicero brings this cause of action individually and on behalf of the members of the Illinois Sub-Class.

781. Ford is and was at all relevant times a "merchant" with respect to motor vehicles under 810 Ill. Comp. Stat. §§ 5/2-104(1) and 5/2A-103(3), and a "seller" of motor vehicles under § 5/2-103(1)(d).

782. With respect to leases, Ford is and was at all relevant times a "lessor" of motor vehicles under 810 Ill. Comp. Stat. § 5/2A-103(1)(p).

783. The Class Vehicles are and were at all relevant times "goods" within the meaning of 810 Ill. Comp. Stat. §§ 5/2-105(1) and 5/2A-103(1)(h).

784. Ford provided all purchasers and lessees of the Class Vehicles with the express warranty described herein, which became a material part of the bargain.

785. Ford provided all purchasers and lessees of Lincoln-branded Class Vehicles with the Lincoln Warranty and all purchasers and lessees of Ford or Ford-branded Class Vehicles with the Ford/Ford Warranty.

786. Ford sold and leased the Class Vehicles with a written express warranty covering the Vehicles for three years or 36,000 miles, whichever comes first.

787. Ford's New Vehicle Limited Warranty expressly states that Ford will "without charge, repair, replace, or adjust all parts on your vehicle that malfunction or fail during normal use during the applicable coverage period due to a manufacturing defect in factory-supplied materials or factory workmanship" so long the Vehicle is properly operated and maintained and taken to a Ford dealership for repair within the warranty period.

788.    Ford further provides powertrain warranty coverage, which is applicable to "the Engine: all internal lubricated parts, cylinder block, cylinder heads, electrical fuel pump, powertrain control module, engine mounts, flywheel, injection pump, manifold (exhaust and intake), manifold bolts, oil pan, oil pump, seals and gaskets, engine thermostat, engine, thermostat housing, timing chain cover, timing chain (gears or belt), turbocharger/supercharger unit, valve covers, water pump" as well as the components in the transmission, front-wheel drive, rear-wheel drive, and four-wheel/all-wheel drive. This coverage applies for 5-years or up to 60,000 miles, whichever comes first.

789.    For certified pre-owned ("CPO") Vehicles, Ford offers an additional limited warranty covering CPO Vehicles for 12 months or 12,000 miles, whichever comes first.

790.    Ford's CPO Vehicle warranty states that a dealer will replace "all covered components . . . that are found to be defective in factory-supplied materials or workmanship during the applicable warranty periods." The engine and its components—including the cylinder block and cylinder heads—are included in Ford's list of "covered components."

791.    Ford manufactured and/or installed the engines and the engines' component parts in the Class Vehicles, and the engines and their component parts are covered by the express Warranties.

792.    The Engine Defect at issue in this litigation was present at the time the Class Vehicles were sold or leased to Plaintiff Cicero and the Illinois Sub-Class Members.

793.    Plaintiffs relied on Ford's express warranties, which were a material part of the bargain, when purchasing or leasing their Class Vehicles.

794.    Under the express Warranties, Ford was obligated to correct the Engine Defect in the vehicles owned or leased by Plaintiff Cicero and the Illinois Sub-Class Members.

795.    Although Ford was obligated to correct the Engine Defect, none of the attempted fixes to the engines are adequate under the terms of the Warranties, as they did not cure the defect.

796.    Ford breached the express Warranties by performing illusory repairs. Rather than repairing the vehicles pursuant to the express Warranties, Ford falsely informed Illinois Sub-Class Members that there was no problem with their Class Vehicles, performed ineffective procedures

including software updates, and/or replaced defective components in the engines with equally defective components, without actually repairing the Class Vehicles.

797.   Ford and its agent dealers have failed and refused to conform the engines to the express Warranties. Ford's conduct, as discussed throughout this Complaint, has voided any attempt on its part to disclaim liability for its actions.

798.   Moreover, Ford's attempt to disclaim or limit these express Warranties vis-à-vis consumers is unconscionable and unenforceable under the circumstances here. Specifically, Ford's warranty limitation is unenforceable because it knowingly sold a defective product without informing consumers about the defect.

799.   The time limits contained in Ford's warranty period were also unconscionable and inadequate to protect Plaintiff Cicero and the Illinois Sub-Class Members. Among other things, Plaintiff Cicero and the Illinois Sub-Class Members had no meaningful choice in determining these time limitations, the terms of which unreasonably favored Ford. A gross disparity in bargaining power existed between Ford and the Class members, and Ford knew or should have known that the Class Vehicles were defective at the time of sale.

800.   Plaintiff Cicero and the Illinois Sub-Class Members have complied with all obligations under the Warranties, or otherwise have been excused from performance of said obligations as a result of Ford's conduct described herein.

801.   Plaintiff Cicero and the Illinois Sub-Class Members were not required to notify Ford of the breach because affording Ford a reasonable opportunity to cure its breach of written warranty would have been futile. Ford was also on notice of the Engine Defect from the complaints and service requests it received from Plaintiffs and the Class Members, from repairs and/or replacements of the engines or components thereof, and through other internal and external sources.

802.   Because Ford, through its conduct and exemplified by its own service bulletins, has covered repairs of the Engine Defect if Ford determines the repairs are appropriately covered under the Warranties, Ford cannot now deny that the Warranties cover the Engine Defect.

803.   Because Ford has not been able remedy the Engine Defect, any limitation on remedies included in the Warranties causes the Warranties to fail their essential purposes, rendering them null

1   and void.

2   804.   As a direct and proximate cause of Ford's breach, Illinois Plaintiffs and the Illinois

3   Sub-Class Members suffered damages and continue to suffer damages, including economic

4   damages at the point of sale or lease and diminution of value of their Class Vehicles. Additionally,

5   Illinois Plaintiffs and the Illinois Sub-Class Members have incurred or will incur economic damages

6   at the point of repair in the form of the cost of repair.

7   805.   As a direct and proximate result of Ford's breach of express warranties, Illinois

8   Plaintiffs and the Illinois Sub-Class Members have been damaged in an amount to be determined at

9   trial.

10   <u>**NINETEENTH CAUSE OF ACTION**</u>
**Breach of the Implied Warranty of Merchantability**
11   **Ill. Comp. Stat. §§ 5/2-314 and 5/2A-212**
**(On behalf of the Illinois Sub-Class)**
12

13   806.   Plaintiffs incorporate by reference each allegation set forth in paragraphs 1-426,

14   above.

15   807.   Plaintiff Cicero brings this cause of action individually and on behalf of the members

16   of the Illinois Sub-Class.

17   808.   Ford is and was at all relevant times a "merchant" with respect to motor vehicles under

18   810 Ill. Comp. Stat. §§ 5/2-104(1) and 5/2A-103(3), and a "seller" of motor vehicles under § 5/2-

19   103(1)(d).

20   809.   With respect to leases, Ford is and was at all relevant times a "lessor" of motor

21   vehicles under 810 Ill. Comp. Stat. § 5/2A-103(1)(p).

22   810.   The Class Vehicles are and were at all relevant times "goods" within the meaning of

23   810 Ill. Comp. Stat. §§ 5/2-105(1) and 5/2A-103(1)(h).

24   811.   A warranty that the Class Vehicles were in merchantable condition and fit for the

25   ordinary purpose for which vehicles are used is implied by law under 810 Ill. Comp. Stat. §§ 5/2-

26   314 and 5/2A-212.

27   812.   Ford knew or had reason to know of the specific use for which the Class Vehicles

28   were purchased or leased. Ford directly sold and marketed vehicles equipped with the engines to

137

customers through authorized dealers, like those from whom Plaintiff Cicero and the Illinois Sub-Class Members bought or leased their vehicles, for the intended purpose of consumers purchasing the vehicles. Ford knew that the Class Vehicles would and did pass unchanged from Ford to the authorized dealers to Plaintiff Cicero and the Illinois Sub-Class Members, with no modification to the defective engines.

813.   Because Plaintiff Cicero and the Illinois Sub-Class Members purchased their vehicles from an authorized Ford dealership, they are in privity with Defendant. Plaintiff Cicero and the Illinois Sub-Class Members have had sufficient direct dealings with Ford and its agents for the purposes of fulfilling its responsibilities under the express warranty (dealerships and customer support personnel) to establish privity of contract between Ford, on one hand, and Plaintiff Cicero and the Illinois Sub-Class Members, on the other hand.  Furthermore, Ford provided warranties directly to Plaintiff Cicero and the Illinois Sub-Class Members and Plaintiff Cicero and the Illinois Sub-Class Members are the intended beneficiaries of Ford's express and implied warranties.  The dealers were not intended to be the ultimate consumers of their vehicles and have no rights under the warranty agreements provided with provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit the consumer only.

814.   Nonetheless, privity is not required here because Plaintiff Cicero and the Illinois Sub-Class Members are the intended third-party beneficiaries of contracts between Ford and its dealerships.  These contracts give the dealerships the right to sell Ford and Lincoln brand vehicles, as well as service and perform warranty repairs on Ford's behalf.  Plaintiff Cicero and the Illinois Sub-Class Members are the beneficiaries of these contracts, because they are the intended end-consumers and users of the products Ford distributes to its authorized dealerships.  Plaintiff Cicero and the Illinois Sub-Class Members also have the right to receive service and warranty work at dealerships located more conveniently to them than Ford's headquarters.

815.   Ford provided Plaintiffs and Class Members with an implied warranty that the Class Vehicles and their components and parts are merchantable and fit for the ordinary purposes for which they were sold.

816.   This implied warranty included, among other things: (i) a warranty that the Class

Vehicles and their engines that were manufactured, supplied, distributed, and/or sold by Ford were safe and reliable for providing transportation; and (ii) a warranty that the Class Vehicles and their engines would be fit for their intended use while the Class Vehicles were being operated.

817.   Contrary to the applicable implied warranties, the Class Vehicles and their engines at the time of sale and thereafter were not fit for their ordinary and intended purpose of providing Plaintiffs and Class Members with reliable, durable, and safe transportation. Instead, the Class Vehicles are defective, including, but not limited to, the defective design and manufacture of their engines and the existence of the Engine Defect at the time of sale or lease and thereafter. Ford knew of this defect at the time these sale or lease transactions occurred.

818.   As a result of Ford's breach of the applicable implied warranties, Plaintiff Cicero and the Illinois Sub-Class Members suffered an ascertainable loss of money, property, and/or value of their Class Vehicles. Additionally, as a result of the Engine Defect, Plaintiff Cicero and the Illinois Sub-Class Members were harmed and suffered actual damages in that the Class Vehicles' engine components are substantially certain to fail before their expected useful life has run.

819.   Ford's actions, as complained of herein, breached the implied warranty that the Class Vehicles were of merchantable quality and fit for such use in violation of 810 Ill. Comp. Stat. §§ 5/2-314 and 5/2A-212.

820.   Plaintiff Cicero and the Illinois Sub-Class Members have complied with all obligations under the warranty, or otherwise have been excused from performance of said obligations as a result of Ford's conduct described herein.

821.   Plaintiff Cicero and the Illinois Sub-Class Members were not required to notify Ford of the breach because affording Ford a reasonable opportunity to cure its breach of implied warranty would have been futile. Ford was also on notice of the Engine Defect from the complaints and service requests it received from Plaintiffs and the Class Members, from repairs and/or replacements of the engines or components thereof, and through other internal sources.

822.   In addition, on or about June 14, 2021 and May 21, 2021 Plaintiff Cicero gave notice to Defendant that they intended to pursue her warranty claims on behalf of a class of similarly situated consumers.

823.   Because Plaintiff Cicero purchased their vehicles from authorized Ford dealers, they are in privity with Ford since (1) an agency relationship establishes privity for purposes of the breach of implied warranty claims and (2) privity is not required where plaintiffs are intended third-party beneficiaries of a defendant's implied warranties and of the contracts between Ford and its authorized dealers.

824.   As a direct and proximate cause of Ford's breach, Plaintiff Cicero and the Illinois Sub-Class Members suffered damages and continue to suffer damages, including economic damages at the point of sale or lease and diminution of value of their Class Vehicles. Additionally, Plaintiff Cicero and the Illinois Sub-Class Members have incurred or will incur economic damages at the point of repair in the form of the cost of repair.

825.   As a direct and proximate result of Ford's breach of the implied warranty of merchantability, Plaintiff Cicero and the Illinois Sub-Class Members have been damaged in an amount to be proven at trial.

## TWENTIETH CAUSE OF ACTION
### Violations of the Indiana Consumer Sales Act,
### Ind. Code § 24-5-0.5-3, *et seq.*
### (On Behalf of the Indiana Sub-Class)

826.   Plaintiffs incorporate by reference each allegation set forth in paragraphs 1-426, above.

827.   Plaintiffs Teresa Balaszek and Scott Pickering ("Indiana Plaintiffs") bring this cause of action individually and on behalf of the Indiana Sub-Class.

828.   Ford, Indiana Plaintiffs and the Indiana Sub-Class Members are "persons" as that term is defined in Ind. Code Ann. § 24-5-0.5-2.

829.   The Indiana Deceptive Consumer Sales Act, Ind. Code Ann. § 24-5-0.5-3(a) ("Indiana DCSA") prohibits "[u]nfair, abusive, or deceptive act[s], omission[s], or practice[s] by a supplier…before, during, or after the transaction," including if a supplier represents that goods have "performance, characteristics,…uses, or benefits [they do not have]", and that goods are "of a particular standard, quality, grade…if [they are] not." *Id.* at 24-5-0.5-3(a)(1), (2). Ford engaged in unfair and deceptive practices that violated the Indiana DCSA as described above.

830.   Ford participated in and engaged in deceptive business or trade practices prohibited by the Indiana DCSA by failing to disclose and actively concealing that the Class Vehicles contained the Engine Defect, by marketing their Class Vehicles as safe and of high quality, and by presenting themselves as a reputable manufacturer that valued safety and stood behind its vehicles after they were sold.

831.   Ford knowingly and intentionally misrepresented and omitted material facts in connection with the sale or lease of the Class Vehicles by, among other things, failing to disclose the Engine Defect; concealing the Engine Defect; promoting and selling or leasing Class Vehicles it knew were defective, including by marketing the Class Vehicles as safe, reliable, easily operable, efficient, and of high quality; presenting itself as a reputable manufacturer that valued safety, reliability, performance and efficiency, and stood behind its vehicles after they were sold; failing to make repairs or making repairs and providing replacements that caused Indiana Plaintiff and the Indiana Sub-Class Members to experience repeated instances of failure, rendering the New Vehicle Limited Warranty useless; and minimizing the scope and severity of the problems with the Class Vehicles, refusing to acknowledge that they are defective, and failing to provide adequate relief to consumers. Ford misrepresented and omitted such material facts with the intent to mislead Indiana Plaintiffs and the Indiana Sub-Class Members about the true nature of the Class Vehicles.

832.   Ford systematically misrepresented, concealed, suppressed, or omitted material facts relating to the Class Vehicles and Engine Defect in the course of its business.

833.   Ford also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Class Vehicles.

834.   Ford's unfair and deceptive acts or practices occurred repeatedly in Ford's trade or business, were capable of deceiving a substantial portion of the purchasing public, and imposed a serious safety risk on the public.

835.   Ford knew that the Class Vehicles and their engines suffered from an inherent defect, were defectively designed or manufactured, and were not suitable for their intended use.

836. Ford knew or should have known that its conduct violated the Indiana DCSA.

837. Indiana Plaintiffs and the Indiana Sub-Class Members reasonably relied on Ford's misrepresentations and omissions of material facts in its advertisements of the Class Vehicles and in the purchase of the Class Vehicles.

838. Indiana Plaintiffs and the Indiana Sub-Class Members had no way of discerning that Ford's misrepresentations were false and misleading when they acquired their Class Vehicles because Indiana Plaintiffs and the Indiana Sub-Class Members did not have access to Ford's exclusive and superior knowledge about the Class Vehicles' design and the Engine Defect.

839. Had Indiana Plaintiffs and the Indiana Sub-Class Members known that the Class Vehicles contained and/or would exhibit the Engine Defect, they would not have purchased or leased the Class Vehicles or would have paid less for them. Plaintiffs did not receive the benefit of their bargain as a result of Ford's misconduct.

840. Ford owed Indiana Plaintiffs and the Indiana Sub-Class Members a duty to disclose the truth about the Engine Defect because Ford:

a.    possessed exclusive and superior knowledge of the design and manufacture of the Class Vehicles and the Engine Defect;

b.    intentionally concealed the foregoing from Indiana Plaintiffs and the Indiana Sub-Class Members; and/or

c.    made incomplete representations regarding the quality and durability of the Class Vehicles, while purposefully withholding material facts from Indiana Plaintiffs and the Indiana Sub-Class Members that contradicted these representations.

841. Due to Ford's specific and superior knowledge that the Engines in the Class Vehicles will fail due to the Engine Defect, its false representations regarding the quality, reliability and increased durability of the Class Vehicles, and reliance by Indiana Plaintiffs and the Indiana Sub-Class Members on these material representations, Ford had a duty to disclose to Class members that the Engine Defect will cause engine failure in Class Vehicles, that Class Vehicles do not have the expected durability, reliability, and/or safety over other vehicles or of their predecessor engines, that failure of the Engines will cause damage to Class Vehicle, and that Class members would be

142

required to bear the cost of the damage to their vehicles. Having volunteered to provide information to Indiana Plaintiffs and the Indiana Sub-Class Members, Ford had the duty to disclose not just the partial truth, but the entire truth. These omitted and concealed facts were material because they directly impact the value of the Class Vehicles purchased or leased by Indiana Plaintiffs and the Indiana Sub-Class Members. Longevity, durability, performance, and safety are material concerns to Ford consumers. Ford represented to Indiana Plaintiffs and the Indiana Sub-Class Members that they were purchasing or leasing vehicles that were durable, reliable, safe, efficient, of high quality, and containing engines of advanced and superior characteristics and technology as alleged throughout this Complaint, when in fact it is only a matter of time before the engines fail due to the Engine Defect.

842.   Indiana Plaintiffs and the Indiana Sub-Class Members suffered injury in fact to a legally protected interest. As a result of Ford's conduct, Indiana Plaintiffs and the Indiana Sub-Class Members were harmed and suffered actual damages in the form of the costs of diagnosis and repair of their vehicles, and the diminished value of their vehicles.

843.   As a direct and proximate result of Ford's unfair or deceptive acts or practices, Indiana Plaintiffs and the Indiana Sub-Class Members suffered and will continue to suffer injury in fact and/or actual damages.

844.   Defendant's violations present a continuing risk to Indiana Plaintiffs and the Indiana Sub-Class Members as well as to the general public. Defendant's unlawful acts and practices complained of herein affect the public interest.

845.   As a proximate and direct result of Ford's unfair and deceptive trade practices, Indiana Plaintiffs and members of the Indiana Sub-Class purchased or leased Class Vehicles and suffered an ascertainable loss and financial harm. These ascertainable losses include, among other things, overpayment at the time of purchase or lease, the cost to repair the Engine Defect, replacement of the damaged related system components, diminution of Class Vehicle resale value, increased repair and maintenance costs, and other substantial monetary damages and inconvenience.

846.   Ford was on notice of the Engine Defect from the pre-suit notices from Plaintiffs, the complaints and service requests Ford received from consumers, from repairs and/or

replacements of the engines or components thereof, and through other internal and external sources. Plaintiff Pickering also provided notice of his claim by letter dated August 26, 2022. Indiana Plaintiffs and members of the Indiana Sub-Class seek all damages and relief to which they are entitled because Ford failed to remedy its unlawful conduct.

847.   As a direct and proximate result of Ford's unfair or deceptive acts or practices alleged herein, Indiana Plaintiffs and other members of the Indiana Sub-Class suffered and will continue to suffer actual damages and are entitled to recover actual damages to the extent permitted by law, including class action rules, in an amount to be proven at trial. In addition, Indiana Plaintiff and the putative Class seek equitable and injunctive relief against Ford on terms that the Court considers reasonable, and reasonable attorneys' fees.

### TWENTY-FIRST CAUSE OF ACTION
**Breach of Express Warranty**
**Ind. Code §§ 26-1-2-313 and 26-1-2.1-210**
**(On behalf of the Indiana Sub-Class)**

848.   Plaintiffs incorporate by reference each allegation set forth in paragraphs 1-426, above.

849.   Indiana Plaintiffs bring this cause of action individually and on behalf of the members of the Indiana Sub-Class.

850.   Ford is and was at all relevant times a "merchant" with respect to motor vehicles under Ind. Code §§ 26-1-2-104(1) and 26-1-2.1-103(3), and a "seller" of motor vehicles under § 26-1-2-103(1)(d).

851.   With respect to leases, Ford is and was at all relevant times a "lessor" of motor vehicles under Ind. Code § 26-1-2.1-103(1)(p).

852.   The Class Vehicles are and were at all relevant times "goods" within the meaning of Ind. Code §§ 26-1-2-105(1) and 26-1-2.1-103(1)(h).

853.   Ford provided all purchasers and lessees of the Class Vehicles with the express warranty described herein, which became a material part of the bargain.

854.   Ford provided all purchasers and lessees of Lincoln-branded Class Vehicles with the Lincoln Warranty and all purchasers and lessees of Ford or Ford-branded Class Vehicles with the

144

Ford/Ford Warranty.

855.  Ford sold and leased the Class Vehicles with a written express warranty covering the Vehicles for three years or 36,000 miles, whichever comes first.

856.  Ford's New Vehicle Limited Warranty expressly states that Ford will "without charge, repair, replace, or adjust all parts on your vehicle that malfunction or fail during normal use during the applicable coverage period due to a manufacturing defect in factory-supplied materials or factory workmanship" so long the Vehicle is properly operated and maintained and taken to a Ford dealership for repair within the warranty period.

857.  Ford further provides powertrain warranty coverage, which is applicable to "the Engine: all internal lubricated parts, cylinder block, cylinder heads, electrical fuel pump, powertrain control module, engine mounts, flywheel, injection pump, manifold (exhaust and intake), manifold bolts, oil pan, oil pump, seals and gaskets, engine thermostat, engine, thermostat housing, timing chain cover, timing chain (gears or belt), turbocharger/supercharger unit, valve covers, water pump" as well as the components in the transmission, front-wheel drive, rear-wheel drive, and four-wheel/all-wheel drive. This coverage applies for 5-years or up to 60,000 miles, whichever comes first.

858.  For certified pre-owned ("CPO") Vehicles, Ford offers a limited warranty covering CPO Vehicles for 12 months or 12,000 miles, whichever comes first.

859.  Ford's CPO Vehicle warranty states that a dealer will replace "all covered components . . . that are found to be defective in factory-supplied materials or workmanship during the applicable warranty periods." The engine and its components—including the cylinder block and cylinder heads—are included in Ford's list of "covered components."

860.  Ford manufactured and/or installed the engines and the engines' component parts in the Class Vehicles, and the engines and their component parts are covered by the express Warranties.

861.  The Engine Defect at issue in this litigation was present at the time the Class Vehicles were sold or leased to Indiana Plaintiffs and the Indiana Sub-Class Members.

862.  Indiana Plaintiffs relied on Ford's express warranties, which were a material part of

the bargain, when purchasing or leasing their Class Vehicles.

863.   Under the express Warranties, Ford was obligated to correct the Engine Defect in the vehicles owned or leased by Indiana Plaintiffs and the Indiana Sub-Class Members.

864.   Although Ford was obligated to correct the Engine Defect, none of the attempted fixes to the engines are adequate under the terms of the Warranties, as they did not cure the defect.

865.   Ford breached the express Warranties by performing illusory repairs. Rather than repairing the vehicles pursuant to the express Warranties, Ford falsely informed Indiana Sub-Class Members that there was no problem with their Class Vehicles, performed ineffective procedures including software updates, and/or replaced defective components in the engines with equally defective components, without actually repairing the Class Vehicles.

866.   Ford and its agent dealers have failed and refused to conform the engines to the express Warranties. Ford's conduct, as discussed throughout this Complaint, has voided any attempt on its part to disclaim liability for its actions.

867.   Moreover, Ford's attempt to disclaim or limit these express Warranties vis-à-vis consumers is unconscionable and unenforceable under the circumstances here. Specifically, Ford's warranty limitation is unenforceable because it knowingly sold a defective product without informing consumers about the defect.

868.   The time limits contained in Ford's warranty period were also unconscionable and inadequate to protect Indiana Plaintiffs and the Indiana Sub-Class Members. Among other things, Indiana Plaintiffs and the Indiana Sub-Class Members had no meaningful choice in determining these time limitations, the terms of which unreasonably favored Ford. A gross disparity in bargaining power existed between Ford and the Class members, and Ford knew or should have known that the Class Vehicles were defective at the time of sale.

869.   Indiana Plaintiffs and the Indiana Sub-Class Members have complied with all obligations under the Warranties, or otherwise have been excused from performance of said obligations as a result of Ford's conduct described herein.

870.   Indiana Plaintiffs and the Indiana Sub-Class Members were not required to notify Ford of the breach because affording Ford a reasonable opportunity to cure its breach of written

warranty would have been futile. Ford was also on notice of the Engine Defect from the complaints and service requests it received from Plaintiffs and the Class Members, from repairs and/or replacements of the engines or components thereof, and through other internal and external sources.

871.   Because Ford, through its conduct and exemplified by its own service bulletins, has covered repairs of the Engine Defect if Ford determines the repairs are appropriately covered under the Warranties, Ford cannot now deny that the Warranties cover the Engine Defect.

872.   Because Ford has not been able remedy the Engine Defect, any limitation on remedies included in the Warranties causes the Warranties to fail their essential purposes, rendering them null and void.

873.   As a direct and proximate cause of Ford's breach, Indiana Plaintiff and the Indiana Sub-Class Members suffered damages and continue to suffer damages, including economic damages at the point of sale or lease and diminution of value of their Class Vehicles. Additionally, Indiana Plaintiffs and the Indiana Sub-Class Members have incurred or will incur economic damages at the point of repair in the form of the cost of repair.

874.   As a direct and proximate result of Ford's breach of express warranties, Indiana Plaintiffs and the Indiana Sub-Class Members have been damaged in an amount to be determined at trial.

**TWENTY-SECOND CAUSE OF ACTION**
**Breach of the Implied Warranty of Merchantability**
**Ind. Code §§ 26-1-2-314 and 26-1-2.1-212**
**(On behalf of the Indiana Sub-Class)**

875.   Plaintiffs incorporate by reference each allegation set forth in paragraphs 1-426, above.

876.   Indiana Plaintiffs bring this cause of action individually and on behalf of the members of the Indiana Sub-Class.

877.   Ford is and was at all relevant times a "merchant" with respect to motor vehicles under Ind. Code §§ 26-1-2-104(1) and 26-1-2.1-103(3), and a "seller" of motor vehicles under § 26-1-2-103(1)(d).

878.   With respect to leases, Ford is and was at all relevant times a "lessor" of motor

147

vehicles under Ind. Code § 26-1-2.1-103(1)(p).

879.   The Class Vehicles are and were at all relevant times "goods" within the meaning of Ind. Code §§ 26-1-2-105(1) and 26-1-2.1-103(1)(h).

880.   A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law under Ind. Code §§ 26-1-2-314 and 26-1-2.1-212.

881.   Ford knew or had reason to know of the specific use for which the Class Vehicles were purchased or leased. Ford directly sold and marketed vehicles equipped with the engines to customers through authorized dealers, like those from whom Indiana Plaintiff and the Indiana Sub-Class Members bought or leased their vehicles, for the intended purpose of consumers purchasing the vehicles. Ford knew that the Class Vehicles would and did pass unchanged from Ford to the authorized dealers to Indiana Plaintiffs and the Indiana Sub-Class Members, with no modification to the defective engines.

882.   Ford provided Plaintiffs and Class Members with an implied warranty that the Class Vehicles and their components and parts are merchantable and fit for the ordinary purposes for which they were sold.

883.   This implied warranty included, among other things: (i) a warranty that the Class Vehicles and their engines that were manufactured, supplied, distributed, and/or sold by Ford were safe and reliable for providing transportation; and (ii) a warranty that the Class Vehicles and their engines would be fit for their intended use while the Class Vehicles were being operated.

884.   Contrary to the applicable implied warranties, the Class Vehicles and their engines at the time of sale and thereafter were not fit for their ordinary and intended purpose of providing Plaintiff and Class Members with reliable, durable, and safe transportation. Instead, the Class Vehicles are defective, including, but not limited to, the defective design and manufacture of their engines and the existence of the Engine Defect at the time of sale or lease and thereafter. Ford knew of this defect at the time these sale or lease transactions occurred.

885.   As a result of Ford's breach of the applicable implied warranties, Indiana Plaintiff and the Indiana Sub-Class Members suffered an ascertainable loss of money, property, and/or value of

their Class Vehicles. Additionally, as a result of the Engine Defect, Indiana Plaintiffs and the Indiana Sub-Class Members were harmed and suffered actual damages in that the Class Vehicles' engine components are substantially certain to fail before their expected useful life has run.

886.   Ford's actions, as complained of herein, breached the implied warranty that the Class Vehicles were of merchantable quality and fit for such use in violation of Ind. Code §§ 26-1-2-314 and 26-1-2.1-212.

887.   Indiana Plaintiffs and the Indiana Sub-Class Members have complied with all obligations under the warranty, or otherwise have been excused from performance of said obligations as a result of Ford's conduct described herein.

888.   Indiana Plaintiffs and the Indiana Sub-Class Members were not required to notify Ford of the breach because affording Ford a reasonable opportunity to cure its breach of implied warranty would have been futile. Ford was also on notice of the Engine Defect from the complaints and service requests it received from Plaintiffs and the Class Members, from repairs and/or replacements of the engines or components thereof, and through other internal sources.

889.   In addition, on or about December 8, 2020, Indiana Plaintiffs gave notice to Defendant that she intended to pursue her warranty claims on behalf of a class of similarly situated consumers.

890.   Because Indiana Plaintiffs purchased her vehicle from an authorized Ford dealer, she is in privity with Ford since (1) an agency relationship establishes privity for purposes of the breach of implied warranty claims and (2) privity is not required where plaintiffs are intended third-party beneficiaries of a defendant's implied warranties and of the contracts between Ford and its authorized dealers.

891.   As a direct and proximate cause of Ford's breach, Indiana Plaintiffs and the Indiana Sub-Class Members suffered damages and continue to suffer damages, including economic damages at the point of sale or lease and diminution of value of their Class Vehicles. Additionally, Indiana Plaintiffs and the Indiana Sub-Class Members have incurred or will incur economic damages at the point of repair in the form of the cost of repair.

892.   As a direct and proximate result of Ford's breach of the implied warranty of merchantability, Indiana Plaintiffs and the Indiana Sub-Class Members have been damaged in an

149

amount to be proven at trial.

### TWENTY-THIRD CAUSE OF ACTION
**Violations of the Kansas Consumer Protection Act,
Kan. Stat. § 50-623, *et seq.*
(On Behalf of the Kansas Sub-Class)**

893. Plaintiffs incorporate by reference each allegation set forth in paragraphs 1-426, above.

894. Plaintiffs Craig and Kelli Morford ("Kansas Plaintiffs") bring this cause of action individually and on behalf of the Kansas Sub-Class.

895. Kansas Plaintiffs and the Kansas Sub-Class Members are "consumers[s]" under the Kansas Consumer Protection Act ("Kansas CPA"), Kan. Stat. § 50-624(b).

896. Ford is a "supplier" within the meaning of the Kansas CPA. *See* Kan. Stat. § 50-624(l).

897. The Kansas CPA states that "[n]o supplier shall engage in any deceptive act or practice in connection with a consumer transaction," Kan. Stat. Ann. § 50- 626(a), and that deceptive acts or practices include: (1) knowingly making representations or with reason to know that "(A) Property or services have sponsorship, approval, accessories, characteristics, ingredients, uses, benefits or quantities that they do not have;" and "(D) property or services are of particular standard, quality, grade, style or model, if they are of another which differs materially from the representation;" "(2) the willful use, in any oral or written representation, of exaggeration, falsehood, innuendo or ambiguity as to a material fact;" and "(3) the willful failure to state a material fact, or the willful concealment, suppression, or omission of a material fact." The Kansas CPA also provides that "[n]o supplier shall engage in any unconscionable act or practice in connection with a consumer transaction." Kan. Stat. Ann. § 50-627(a). Ford engaged in unfair and deceptive practices that violated the Kansas CPA as described above.

898. Ford participated in and engaged in deceptive business or trade practices prohibited by the Kansas CPA by failing to disclose and actively concealing that the Class Vehicles contained the Engine Defect, by marketing their Class Vehicles as safe and of high quality, and by presenting themselves as a reputable manufacturer that valued safety and stood behind its vehicles after they were sold.

899.   Ford knowingly and intentionally misrepresented and omitted material facts in connection with the sale or lease of the Class Vehicles by, among other things, failing to disclose the Engine Defect; concealing the Engine Defect; promoting and selling or leasing Class Vehicles it knew were defective, including by marketing its vehicles as safe, reliable, easily operable, efficient, and of high quality; presenting itself as a reputable manufacturer that valued safety, reliability, performance and efficiency, and stood behind its vehicles after they were sold; failing to make repairs or making repairs and providing replacements that caused Kansas Plaintiffs and the Kansas Sub-Class Members to experience repeated instances of failure, rendering the New Vehicle Limited Warranty useless; and minimizing the scope and severity of the problems with the Class Vehicles, refusing to acknowledge that they are defective, and failing to provide adequate relief to consumers. Ford misrepresented and omitted such material facts with the intent to mislead Kansas Plaintiffs and the Kansas Sub-Class Members about the true nature of the Class Vehicles.

900.   Ford systematically misrepresented, concealed, suppressed, or omitted material facts relating to the Class Vehicles and Engine Defect in the course of its business.

901.   Ford also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Class Vehicles.

902.   Ford's unfair and deceptive acts or practices occurred repeatedly in Ford's trade or business, were capable of deceiving a substantial portion of the purchasing public, and imposed a serious safety risk on the public.

903.   Ford knew that the Class Vehicles and their engines suffered from an inherent defect, were defectively designed or manufactured, and were not suitable for their intended use.

904.   Ford knew or should have known that its conduct violated the Kansas CPA.

905.   Kansas Plaintiffs and the Kansas Sub-Class Members reasonably relied on Ford's misrepresentations and omissions of material facts in its advertisements of the Class Vehicles and in the purchase of the Class Vehicles.

906.   Kansas Plaintiffs and the Kansas Sub-Class Members had no way of discerning that

Ford's misrepresentations were false and misleading when they acquired their Class Vehicles because Kansas Plaintiffs and the Kansas Sub-Class Members did not have access to Ford's exclusive and superior knowledge about the Class Vehicles' design and the Engine Defect.

907.   Had Kansas Plaintiffs and the Kansas Sub-Class Members known that the Class Vehicles contained and/or would exhibit the Engine Defect, they would not have purchased or leased the Class Vehicles or would have paid less for them. Plaintiffs did not receive the benefit of their bargain as a result of Ford's misconduct.

908.   Ford owed Kansas Plaintiffs and the Kansas Sub-Class Members a duty to disclose the truth about the Engine Defect because Ford:

a.    possessed exclusive and superior knowledge of the design and manufacture of the Class Vehicles and the Engine Defect;

b.    intentionally concealed the foregoing from Kansas Plaintiffs and the Kansas Sub-Class Members; and/or

c.    made incomplete representations regarding the quality and durability of the Class Vehicles, while purposefully withholding material facts from Kansas Plaintiffs and the Kansas Sub-Class Members that contradicted these representations.

909.   Due to Ford's specific and superior knowledge that the Engines in the Class Vehicles will fail due to the Engine Defect, its false representations regarding the increased durability of the Class Vehicles, and reliance by Kansas Plaintiffs and the Kansas Sub-Class Members on these material representations, Ford had a duty to disclose to Class members that the Engine Defect will cause engine failure in Class Vehicles, that Class Vehicles do not have the expected durability, reliability, and/or safety over other vehicles or of their predecessor engines, that failure of the Engines will cause damage to Class Vehicle, and that Class members would be required to bear the cost of the damage to their vehicles. Having volunteered to provide information to Kansas Plaintiffs and the Kansas Sub-Class Members, Ford had the duty to disclose not just the partial truth, but the entire truth. These omitted and concealed facts were material because they directly impact the value of the Class Vehicles purchased or leased by Kansas Plaintiffs and the Kansas Sub-Class Members. Longevity, durability, performance, and safety are material concerns to Ford consumers. Ford

represented to Kansas Plaintiffs and the Kansas Sub-Class Members that they were purchasing or leasing vehicles that were durable, reliable, safe, efficient, of high quality, and containing engines of advanced and superior characteristics and technology as alleged throughout this Complaint, when in fact it is only a matter of time before the engines fail due to the Engine Defect.

910.   Kansas Plaintiffs and the Kansas Sub-Class Members suffered injury in fact to a legally protected interest. As a result of Ford's conduct, Kansas Plaintiffs and the Kansas Sub-Class Members were harmed and suffered actual damages in the form of the costs of diagnosis and repair of their vehicles, and the diminished value of their vehicles.

911.   As a direct and proximate result of Ford's unfair or deceptive acts or practices, Kansas Plaintiffs and the Kansas Sub-Class Members suffered and will continue to suffer injury in fact and/or actual damages.

912.   Defendant's violations present a continuing risk to Kansas Plaintiffs and the Kansas Sub-Class Members as well as to the general public. Defendant's unlawful acts and practices complained of herein affect the public interest.

913.   As a proximate and direct result of Ford's unfair and deceptive trade practices, Kansas Plaintiffs and members of the Kansas Sub-Class purchased or leased Class Vehicles and suffered an ascertainable loss and financial harm. These ascertainable losses include, among other things, overpayment at the time of purchase or lease, the cost to repair the Engine Defect, replacement of the damaged related system components, diminution of Class Vehicle resale value, increased repair and maintenance costs, and other substantial monetary damages and inconvenience.

914.   Ford was on notice of the Engine Defect from the pre-suit notices from Plaintiffs, the complaints and service requests Ford received from consumers, from repairs and/or replacements of the engines or components thereof, and through other internal and external sources. Kansas Plaintiff and members of the Kansas Sub-Class seek all damages and relief to which they are entitled because Ford failed to remedy its unlawful conduct.

915.   Pursuant to Kan. Stat. Ann. § 50-634, Kansas Plaintiffs and the Kansas Sub-Class Members seek monetary relief against Ford measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $10,000 for Kansas

Plaintiffs and each Kansas Sub-Class Member. Ford's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

916.  Kansas Plaintiffs and the Kansas Sub-Class Members also seek an order enjoining Ford's unfair, unlawful, and/or deceptive practices, declaratory relief, attorneys' fees, and any other just and proper relief available under Kan. Stat. Ann. § 50-623 *et seq.*

**TWENTY-FOURTH CAUSE OF ACTION**
**Breach of the Implied Warranty of Merchantability**
**Kan. Stat. §§ 84-2-314 and 84-2A-212**
**(On behalf of the Kansas Sub-Class)**

917.  Plaintiffs incorporate by reference each allegation set forth in paragraphs 1-426, above.

918.  Kansas Plaintiffs bring this cause of action individually and on behalf of the members of the Kansas Sub-Class.

919.  Ford is and was at all relevant times a "merchant" with respect to motor vehicles under Kan. Stat. § 84-2-104(1), and a "seller" of motor vehicles under § 84-2-103(1)(d).

920.  With respect to leases, Ford is and was at all relevant times a "lessor" of motor vehicles under Kan. Stat. § 84-2A-103(1)(p).

921.  The Class Vehicles are and were at all relevant times "goods" within the meaning of Kan. Stat. § 84-2-105(1) and Kan. Stat. § 84-2A-103(1)(h).

922.  A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law under Kan. Stat. § 84-2-314 and Kan. Stat. § 84-2A-212.

923.  Ford knew or had reason to know of the specific use for which the Class Vehicles were purchased or leased. Ford directly sold and marketed vehicles equipped with the engines to customers through authorized dealers, like those from whom Kansas Plaintiffs and the Kansas Sub-Class Members bought or leased their vehicles, for the intended purpose of consumers purchasing the vehicles. Ford knew that the Class Vehicles would and did pass unchanged from Ford to the authorized dealers to Kansas Plaintiffs and the Kansas Sub-Class Members, with no modification

154

to the defective engines.

924.   Ford provided Plaintiffs and Class Members with an implied warranty that the Class Vehicles and their components and parts are merchantable and fit for the ordinary purposes for which they were sold.

925.   This implied warranty included, among other things: (i) a warranty that the Class Vehicles and their engines that were manufactured, supplied, distributed, and/or sold by Ford were safe and reliable for providing transportation; and (ii) a warranty that the Class Vehicles and their engines would be fit for their intended use while the Class Vehicles were being operated.

926.   Contrary to the applicable implied warranties, the Class Vehicles and their engines at the time of sale and thereafter were not fit for their ordinary and intended purpose of providing Plaintiffs and Class Members with reliable, durable, and safe transportation. Instead, the Class Vehicles are defective, including, but not limited to, the defective design and manufacture of their engines and the existence of the Engine Defect at the time of sale or lease and thereafter. Ford knew of this defect at the time these sale or lease transactions occurred.

927.   As a result of Ford's breach of the applicable implied warranties, Kansas Plaintiffs and the Kansas Sub-Class Members suffered an ascertainable loss of money, property, and/or value of their Class Vehicles. Additionally, as a result of the Engine Defect, Kansas Plaintiffs and the Kansas Sub-Class Members were harmed and suffered actual damages in that the Class Vehicles' engine components are substantially certain to fail before their expected useful life has run.

928.   Ford's actions, as complained of herein, breached the implied warranty that the Class Vehicles were of merchantable quality and fit for such use in violation of Kan. Stat. § 84-2-314 and Kan. Stat. § 84-2A-212.

929.   Kansas Plaintiffs and the Kansas Sub-Class Members have complied with all obligations under the warranty, or otherwise have been excused from performance of said obligations as a result of Ford's conduct described herein.

930.   Kansas Plaintiffs and the Kansas Sub-Class Members were not required to notify Ford of the breach because affording Ford a reasonable opportunity to cure its breach of written warranty would have been futile. Ford was also on notice of the Engine Defect from the complaints and

service requests it received from Plaintiffs and the Class Members, from repairs and/or replacements of the engines or components thereof, and through other internal sources.

931.   As a direct and proximate cause of Ford's breach, Kansas Plaintiffs and the Kansas Sub-Class Members suffered damages and continue to suffer damages, including economic damages at the point of sale or lease and diminution of value of their Class Vehicles. Additionally, Kansas Plaintiffs and the Kansas Sub-Class Members have incurred or will incur economic damages at the point of repair in the form of the cost of repair.

932.   As a direct and proximate result of Ford's breach of the implied warranty of merchantability, Kansas Plaintiffs and the Kansas Sub-Class Members have been damaged in an amount to be proven at trial.

**TWENTY-FIFTH CAUSE OF ACTION**
**Violations of the Maryland Consumer Protection Act,**
**Md. Code Ann., Com. Law § 13-101, *et seq.***
**(On Behalf of the Maryland Sub-Class)**

933.   Plaintiffs incorporate by reference each allegation set forth in paragraphs 1-426, above.

934.   Plaintiffs Aaron and Victoria Manfra ("Maryland Plaintiffs") bring this cause of action individually and on behalf of the Maryland Sub-Class.

935.   Ford, the Maryland Plaintiffs and the Maryland Sub-Class members are "persons" within the meaning of Md. Code Ann., Com. Law § 13-101(h).

936.   The Maryland Consumer Protection Act ("Maryland CPA") provides that a person may not engage in any unfair and deceptive trade practice in the sale or lease of any consumer good, including representing that goods are of a particular standard, quality, or grade if they are not, advertising goods without intent to sell or lease them as advertised, selling goods knowing that a service, replacement or repair was needed, "failure to state a material fact if the failure deceives or tends to deceive," and "[d]eception, fraud, false pretense, false premise, misrepresentation, or knowing concealment, suppression, or omission of any material fact with the intent that a consumer rely on the same," Md. Code Ann., Com. Law § 13-301, regardless of whether the consumer is actually deceived or damaged, Md. Code Ann., Com. Law § 13-302. Ford engaged in unfair and

deceptive practices that violated the Maryland CPA as described above.

937.  Ford participated in and engaged in deceptive business or trade practices prohibited by the Maryland CPA by failing to disclose and actively concealing that the Class Vehicles contained the Engine Defect, by marketing their Class Vehicles as safe and of high quality, and by presenting themselves as a reputable manufacturer that valued safety and stood behind its vehicles after they were sold.

938.  Ford knowingly and intentionally misrepresented and omitted material facts in connection with the sale or lease of the Class Vehicles by, among other things, failing to disclose the Engine Defect; concealing the Engine Defect; promoting and selling or leasing Class Vehicles it knew were defective, including by marketing its vehicles as safe, reliable, easily operable, efficient, and of high quality; presenting itself as a reputable manufacturer that valued safety, reliability, performance and efficiency, and stood behind its vehicles after they were sold; failing to make repairs or making repairs and providing replacements that caused Maryland Plaintiffs and the Maryland Sub-Class Members to experience repeated instances of failure, rendering the New Vehicle Limited Warranty useless; and minimizing the scope and severity of the problems with the Class Vehicles, refusing to acknowledge that they are defective, and failing to provide adequate relief to consumers. Ford misrepresented and omitted such material facts with the intent to mislead Maryland Plaintiffs and the Maryland Sub-Class Members about the true nature of the Class Vehicles.

939.  Ford systematically misrepresented, concealed, suppressed, or omitted material facts relating to the Class Vehicles and Engine Defect in the course of its business.

940.  Ford also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Class Vehicles.

941.  Ford's unfair and deceptive acts or practices occurred repeatedly in Ford's trade or business, were capable of deceiving a substantial portion of the purchasing public, and imposed a serious safety risk on the public.

942.   Ford knew that the Class Vehicles and their engines suffered from an inherent defect, were defectively designed or manufactured, and were not suitable for their intended use.

943.   Ford knew or should have known that its conduct violated the Maryland CPA.

944.   Maryland Plaintiffs and the Maryland Sub-Class Members reasonably relied on Ford's misrepresentations and omissions of material facts in its advertisements of the Class Vehicles and in the purchase of the Class Vehicles.

945.   Maryland Plaintiffs and the Maryland Sub-Class Members had no way of discerning that Ford's misrepresentations were false and misleading when they acquired their Class Vehicles because Maryland Plaintiffs and the Maryland Sub-Class Members did not have access to Ford's exclusive and superior knowledge about the Class Vehicles' design and the Engine Defect.

946.   Had Maryland Plaintiffs and the Maryland Sub-Class Members known that the Class Vehicles would contain and/or exhibit the Engine Defect, they would not have purchased or leased the Class Vehicles or would have paid less for them. Plaintiffs did not receive the benefit of their bargain as a result of Ford's misconduct.

947.   Ford owed Maryland Plaintiffs and the Maryland Sub-Class Members a duty to disclose the truth about the Engine Defect because Ford:

    a.   possessed exclusive and superior knowledge of the design and manufacture of the Class Vehicles and the Engine Defect;

    b.   intentionally concealed the foregoing from Maryland Plaintiffs and the Maryland Sub-Class Members; and/or

    c.   made incomplete representations regarding the quality and durability of the Class Vehicles, while purposefully withholding material facts from Maryland Plaintiffs and the Maryland Sub-Class Members that contradicted these representations.

948.   Due to Ford's specific and superior knowledge that the Engines in the Class Vehicles will fail due to the Engine Defect, its false representations regarding the increased durability of the Class Vehicles, and reliance by Maryland Plaintiffs and the Maryland Sub-Class Members on these material representations, Ford had a duty to disclose to Class members that the Engine Defect will cause engine failure in Class Vehicles, that Class Vehicles do not have the expected durability,

reliability, and/or safety over other vehicles or of their predecessor engines, that failure of the Engines will cause damage to Class Vehicle, and that Class members would be required to bear the cost of the damage to their vehicles. Having volunteered to provide information to Maryland Plaintiffs and the Maryland Sub-Class Members, Ford had the duty to disclose not just the partial truth, but the entire truth. These omitted and concealed facts were material because they directly impact the value of the Class Vehicles purchased or leased by Maryland Plaintiffs and the Maryland Sub-Class Members. Longevity, durability, performance, and safety are material concerns to Ford consumers. Ford represented to Maryland Plaintiffs and the Maryland Sub-Class Members that they were purchasing or leasing vehicles that were durable, reliable, safe, efficient, of high quality, and containing engines of advanced and superior characteristics and technology as alleged throughout this Complaint, when in fact it is only a matter of time before the engines fail due to the Engine Defect.

949.   Maryland Plaintiffs and the Maryland Sub-Class Members suffered injury in fact to a legally protected interest. As a result of Ford's conduct, Maryland Plaintiffs and the Maryland Sub-Class Members were harmed and suffered actual damages in the form of the costs of diagnosis and repair of their vehicles, and the diminished value of their vehicles.

950.   As a direct and proximate result of Ford's unfair or deceptive acts or practices, Maryland Plaintiffs and the Maryland Sub-Class Members suffered and will continue to suffer injury in fact and/or actual damages.

951.   Defendant's violations present a continuing risk to Maryland Plaintiffs and the Maryland Sub-Class Members as well as to the general public. Defendant's unlawful acts and practices complained of herein affect the public interest.

952.   As a proximate and direct result of Ford's unfair and deceptive trade practices, Maryland Plaintiffs and members of the Maryland Sub-Class purchased or leased Class Vehicles and suffered an ascertainable loss and financial harm. These ascertainable losses include, among other things, overpayment at the time of purchase or lease, the cost to repair the Engine Defect, replacement of the damaged related system components, diminution of Class Vehicle resale value, increased repair and maintenance costs, and other substantial monetary damages and inconvenience.

953.    The Maryland Plaintiffs provided notice of their claims by letter dated December 18, 2020.

954.    Pursuant to Md. Code Ann., Com. Law § 13-408, the Maryland Plaintiffs and members of the Maryland Sub-Class seek monetary relief against Ford in the amount of actual damages, attorneys' fees, and any other just and proper relief available under the Maryland CPA.

### TWENTY-SIXTH CAUSE OF ACTION
**Breach of the Implied Warranty of Merchantability**
**Md. Com. Law §§ 2-314 and 2A-212**
**(On behalf of the Maryland Sub-Class)**

955.    Plaintiffs incorporate by reference each allegation set forth in paragraphs 1-426, above.

956.    Maryland Plaintiffs bring this cause of action individually and on behalf of the members of the Maryland Sub-Class.

957.    Ford is and was at all relevant times a "merchant" with respect to motor vehicles under Md. Com. Law §§ 2-104(1) and 2A-103(3), and a "seller" of motor vehicles under § 2-103(1)(d).

958.    With respect to leases, Ford is and was at all relevant times a "lessor" of motor vehicles under Md. Com. Law § 2A-103(1)(p).

959.    The Class Vehicles are and were at all relevant times "goods" within the meaning of Md. Com. Law §§ 2-105(1) and 2A-103(1)(h).

960.    A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law under Md. Com. Law §§ 2-314 and 2A-212.

961.    Ford knew or had reason to know of the specific use for which the Class Vehicles were purchased or leased. Ford directly sold and marketed vehicles equipped with the engines to customers through authorized dealers, like those from whom Maryland Plaintiffs and the Maryland Sub-Class Members bought or leased their vehicles, for the intended purpose of consumers purchasing the vehicles. Ford knew that the Class Vehicles would and did pass unchanged from Ford to the authorized dealers to Maryland Plaintiffs and the Maryland Sub-Class Members, with no modification to the defective engines.

962.   Ford provided Plaintiffs and Class Members with an implied warranty that the Class Vehicles and their components and parts are merchantable and fit for the ordinary purposes for which they were sold.

963.   This implied warranty included, among other things: (i) a warranty that the Class Vehicles and their engines that were manufactured, supplied, distributed, and/or sold by Ford were safe and reliable for providing transportation; and (ii) a warranty that the Class Vehicles and their engines would be fit for their intended use while the Class Vehicles were being operated.

964.   Contrary to the applicable implied warranties, the Class Vehicles and their engines at the time of sale and thereafter were not fit for their ordinary and intended purpose of providing Plaintiffs and Class Members with reliable, durable, and safe transportation. Instead, the Class Vehicles are defective, including, but not limited to, the defective design and manufacture of their engines and the existence of the Engine Defect at the time of sale or lease and thereafter. Ford knew of this defect at the time these sale or lease transactions occurred.

965.   As a result of Ford's breach of the applicable implied warranties, Maryland Plaintiffs and the Maryland Sub-Class Members suffered an ascertainable loss of money, property, and/or value of their Class Vehicles. Additionally, as a result of the Engine Defect, Maryland Plaintiffs and the Maryland Sub-Class Members were harmed and suffered actual damages in that the Class Vehicles' engine components are substantially certain to fail before their expected useful life has run.

966.   Ford's actions, as complained of herein, breached the implied warranty that the Class Vehicles were of merchantable quality and fit for such use in violation of Md. Com. Law §§ 2-314 and 2A-212.

967.   Maryland Plaintiffs and the Maryland Sub-Class Members have complied with all obligations under the warranty, or otherwise have been excused from performance of said obligations as a result of Ford's conduct described herein.

968.   Maryland Plaintiffs and the Maryland Sub-Class Members were not required to notify Ford of the breach because affording Ford a reasonable opportunity to cure its breach of implied warranty would have been futile. Ford was also on notice of the Engine Defect from the complaints

and service requests it received from Plaintiffs and the Class Members, from repairs and/or replacements of the engines or components thereof, and through other internal sources.

969.  As a direct and proximate cause of Ford's breach, Maryland Plaintiffs and the Maryland Sub-Class Members suffered damages and continue to suffer damages, including economic damages at the point of sale or lease and diminution of value of their Class Vehicles. Additionally, Maryland Plaintiffs and the Maryland Sub-Class Members have incurred or will incur economic damages at the point of repair in the form of the cost of repair.

970.  As a direct and proximate result of Ford's breach of the implied warranty of merchantability, Maryland Plaintiffs and the Maryland Sub-Class Members have been damaged in an amount to be proven at trial.

**TWENTY-SEVENTH CAUSE OF ACTION**
**Violations of the Michigan Consumer Protection Law,**
**Mich. Comp. Laws § 445.903, *et seq.***
**(On Behalf of the Michigan Sub-Class)**

971.  Plaintiffs incorporate by reference each allegation set forth in paragraphs 1-426, above.

972.  Plaintiffs Stacey Coppock Rachel Goodrich, and Travey Ann Metro ("Michigan Plaintiffs") bring this cause of action individually and on behalf of the Michigan Sub-Class.

973.  Michigan Plaintiffs and the Michigan Sub-Class Members are "person[s]" within the meaning of the Mich. Comp. Laws § 445.902(1)(d).

974.  Ford is a "person" engaged in "trade or commerce" within the meaning of the Mich. Comp. Laws § 445.902(1)(d).

975.  The Michigan Consumer Protection Act ("Michigan CPA") prohibits "[u]nfair, unconscionable, or deceptive methods, acts, or practices in the conduct of trade or commerce," including: "(s) Failing to reveal a material fact, the omission of which tends to mislead or deceive the consumer, and which fact could not reasonably be known by the consumer;" and "(cc) Failing to reveal facts that are material to the transaction in light of representations of fact made in a positive manner." Mich. Comp. Laws § 445.903(1). Ford engaged in unfair and deceptive practices that violated the Michigan CPA as described above.

976.   Ford participated in and engaged in deceptive business or trade practices prohibited by the Michigan CPA by failing to disclose and actively concealing that the Class Vehicles contained the Engine Defect, by marketing their Class Vehicles as safe and of high quality, and by presenting themselves as a reputable manufacturer that valued safety and stood behind its vehicles after they were sold.

977.   Ford knowingly and intentionally misrepresented and omitted material facts in connection with the sale or lease of the Class Vehicles by, among other things, failing to disclose the Engine Defect; concealing the Engine Defect; promoting and selling or leasing Class Vehicles it knew were defective, including by marketing its vehicles as safe, reliable, easily operable, efficient, and of high quality; presenting itself as a reputable manufacturer that valued safety, reliability, performance and efficiency, and stood behind its vehicles after they were sold; failing to make repairs or making repairs and providing replacements that caused Michigan Plaintiff and the Michigan Sub-Class Members to experience repeated instances of failure, rendering the New Vehicle Limited Warranty useless; and minimizing the scope and severity of the problems with the Class Vehicles, refusing to acknowledge that they are defective, and failing to provide adequate relief to consumers. Ford misrepresented and omitted such material facts with the intent to mislead Michigan Plaintiffs and the Michigan Sub-Class Members about the true nature of the Class Vehicles.

978.   Ford systematically misrepresented, concealed, suppressed, or omitted material facts relating to the Class Vehicles and Engine Defect in the course of its business.

979.   Ford also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Class Vehicles.

980.   Ford's unfair and deceptive acts or practices occurred repeatedly in Ford's trade or business, were capable of deceiving a substantial portion of the purchasing public, and imposed a serious safety risk on the public.

981.   Ford knew that the Class Vehicles and their engines suffered from an inherent defect,

were defectively designed or manufactured, and were not suitable for their intended use.

982.    Ford knew or should have known that its conduct violated the Michigan CPA.

983.    Michigan Plaintiffs and the Michigan Sub-Class Members reasonably relied on Ford's misrepresentations and omissions of material facts in its advertisements of the Class Vehicles and in the purchase of the Class Vehicles.

984.    Michigan Plaintiffs and the Michigan Sub-Class Members had no way of discerning that Ford's misrepresentations were false and misleading when they acquired their Class Vehicles because Michigan Plaintiffs and the Michigan Sub-Class Members did not have access to Ford's exclusive and superior knowledge about the Class Vehicles' design and the Engine Defect.

985.    Had Michigan Plaintiffs and the Michigan Sub-Class Members known that the Class Vehicles contained and/or would exhibit the Engine Defect, they would not have purchased or leased the Class Vehicles or would have paid less for them. Plaintiffs did not receive the benefit of their bargain as a result of Ford's misconduct.

986.    Ford owed Michigan Plaintiffs and the Michigan Sub-Class Members a duty to disclose the truth about the Engine Defect because Ford:

a.      possessed exclusive and superior knowledge of the design and manufacture of the Class Vehicles and the Engine Defect;

b.      intentionally concealed the foregoing from Michigan Plaintiffs and the Michigan Sub-Class Members; and/or

c.      made incomplete representations regarding the quality and durability of the Class Vehicles, while purposefully withholding material facts from Michigan Plaintiffs and the Michigan Sub-Class Members that contradicted these representations.

987.    Due to Ford's specific and superior knowledge that the Engines in the Class Vehicles will fail due to the Engine Defect, its false representations regarding the increased durability of the Class Vehicles, and reliance by Michigan Plaintiffs and the Michigan Sub-Class Members on these material representations, Ford had a duty to disclose to Class members that the Engine Defect will cause engine failure in Class Vehicles, that Class Vehicles do not have the expected durability, reliability, and/or safety over other vehicles or of their predecessor engines, that failure of the

164

Engines will cause damage to Class Vehicle, and that Class members would be required to bear the cost of the damage to their vehicles. Having volunteered to provide information to Michigan Plaintiffs and the Michigan Sub-Class Members, Ford had the duty to disclose not just the partial truth, but the entire truth. These omitted and concealed facts were material because they directly impact the value of the Class Vehicles purchased or leased by Michigan Plaintiffs and the Michigan Sub-Class Members. Longevity, durability, performance, and safety are material concerns to Ford consumers. Ford represented to Michigan Plaintiffs and the Michigan Sub-Class Members that they were purchasing or leasing vehicles that were durable, reliable, safe, efficient, of high quality, and containing engines of advanced and superior characteristics and technology as alleged throughout this Complaint, when in fact it is only a matter of time before the engines fail due to the Engine Defect.

988.   Michigan Plaintiffs and the Michigan Sub-Class Members suffered injury in fact to a legally protected interest. As a result of Ford's conduct, Michigan Plaintiffs and the Michigan Sub-Class Members were harmed and suffered actual damages in the form of the costs of diagnosis and repair of their vehicles, and the diminished value of their vehicles.

989.   As a direct and proximate result of Ford's unfair or deceptive acts or practices, Michigan Plaintiff and the Michigan Sub-Class Members suffered and will continue to suffer injury in fact and/or actual damages.

990.   Defendant's violations present a continuing risk to Michigan Plaintiffs and the Michigan Sub-Class Members as well as to the general public. Defendant's unlawful acts and practices complained of herein affect the public interest.

991.   As a proximate and direct result of Ford's unfair and deceptive trade practices, Michigan Plaintiffs and members of the Michigan Sub-Class purchased or leased Class Vehicles and suffered an ascertainable loss and financial harm. These ascertainable losses include, among other things, overpayment at the time of purchase or lease, the cost to repair the Engine Defect, replacement of the damaged related system components, diminution of Class Vehicle resale value, increased repair and maintenance costs, and other substantial monetary damages and inconvenience.

992.   Ford was on notice of the Engine Defect from the pre-suit notices from Plaintiffs,

the complaints and service requests Ford received from consumers, from repairs and/or replacements of the engines or components thereof, and through other internal and external sources. Plaintiff Metro provided notice of her claim by letter to Ford dated September 1, 2022. Michigan Plaintiff and members of the Michigan Sub-Class seek all damages and relief to which they are entitled because Ford failed to remedy its unlawful conduct.

993.   Michigan Plaintiffs and the Michigan Sub-Class Members seek monetary relief measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $250 each; and reasonable attorneys' fees; and any other just and proper relief available under Mich. Comp. Laws. Because Ford acted with willful and conscious disregard of the rights and safety of others, Ford's conduct constitutes malice, oppression, and fraud warranting punitive damages.

**TWENTY-EIGHTH CAUSE OF ACTION**
**Breach of Express Warranty**
**Mich. Comp. Laws §§ 440.2313 and 440.2860**
**(On behalf of the Michigan Sub-Class)**

994.   Plaintiffs incorporate by reference each allegation set forth in paragraphs 1-426, above.

995.   Plaintiffs Goodrich and Metro bring this cause of action individually and on behalf of the members of the Michigan Sub-Class.

996.   Ford is and was at all relevant times a "merchant" with respect to motor vehicles under Mich. Comp. Laws §§ 440.2104(1) and a "seller" of motor vehicles under § 440.2103(1)(c).

997.   With respect to leases, Ford is and was at all relevant times a "lessor" of motor vehicles under Mich. Comp. Laws § 440.2803(1)(p).

998.   The Class Vehicles are and were at all relevant times "goods" within the meaning of Mich. Comp. Laws §§ 440.2105(1) and 440.2803(1)(h).

999.   Ford provided all purchasers and lessees of the Class Vehicles with the express warranty described herein, which became a material part of the bargain.

1000. Ford provided all purchasers and lessees of Lincoln-branded Class Vehicles with the Lincoln Warranty and all purchasers and lessees of Ford or Ford-branded Class Vehicles with the

Ford/Ford Warranty.

1001. Ford sold and leased the Class Vehicles with a written express warranty covering the Vehicles for three years or 36,000 miles, whichever comes first.

1002. Ford's New Vehicle Limited Warranty expressly states that Ford will "without charge, repair, replace, or adjust all parts on your vehicle that malfunction or fail during normal use during the applicable coverage period due to a manufacturing defect in factory-supplied materials or factory workmanship" so long the Vehicle is properly operated and maintained and taken to a Ford dealership for repair within the warranty period.

1003. Ford further provides powertrain warranty coverage, which is applicable to "the Engine: all internal lubricated parts, cylinder block, cylinder heads, electrical fuel pump, powertrain control module, engine mounts, flywheel, injection pump, manifold (exhaust and intake), manifold bolts, oil pan, oil pump, seals and gaskets, engine thermostat, engine, thermostat housing, timing chain cover, timing chain (gears or belt), turbocharger/supercharger unit, valve covers, water pump" as well as the components in the transmission, front-wheel drive, rear-wheel drive, and four-wheel/all-wheel drive. This coverage applies for 5-years or up to 60,000 miles, whichever comes first.

1004. For certified pre-owned ("CPO") Vehicles, Ford offers a limited warranty covering CPO Vehicles for 12 months or 12,000 miles, whichever comes first.

1005. Ford's CPO Vehicle warranty states that a dealer will replace "all covered components . . . that are found to be defective in factory-supplied materials or workmanship during the applicable warranty periods." The engine and its components—including the cylinder block and cylinder heads—are included in Ford's list of "covered components."

1006. Ford manufactured and/or installed the engines and the engines' component parts in the Class Vehicles, and the engines and their component parts are covered by the express Warranties.

1007. The Engine Defect at issue in this litigation was present at the time the Class Vehicles were sold or leased to Plaintiffs Goodrich and Metro and the Michigan Sub-Class Members.

1008. Plaintiffs relied on Ford's express warranties, which were a material part of the

1    bargain, when purchasing or leasing their Class Vehicles.

2    1009. Under the express Warranties, Ford was obligated to correct the Engine Defect in the

3    vehicles owned or leased by Plaintiffs Goodrich and Metro and the Michigan Sub-Class Members.

4    1010. Although Ford was obligated to correct the Engine Defect, none of the attempted fixes

5    to the engines are adequate under the terms of the Warranties, as they did not cure the defect.

6    1011. Ford breached the express Warranties by performing illusory repairs. Rather than

7    repairing the vehicles pursuant to the express Warranties, Ford falsely informed Michigan Sub-

8    Class Members that there was no problem with their Class Vehicles, performed ineffective

9    procedures including software updates, and/or replaced defective components in the engines with

10   equally defective components, without actually repairing the Class Vehicles.

11   1012. Ford and its agent dealers have failed and refused to conform the engines to the

12   express Warranties. Ford's conduct, as discussed throughout this Complaint, has voided any attempt

13   on its part to disclaim liability for its actions.

14   1013. Moreover, Ford's attempt to disclaim or limit these express Warranties vis-à-vis

15   consumers is unconscionable and unenforceable under the circumstances here. Specifically, Ford's

16   warranty limitation is unenforceable because it knowingly sold a defective product without

17   informing consumers about the defect.

18   1014. The time limits contained in Ford's warranty period were also unconscionable and

19   inadequate to protect Plaintiffs Goodrich and Metro and the Michigan Sub-Class Members. Among

20   other things, Plaintiffs Goodrich and Metro and the Michigan Sub-Class Members had no

21   meaningful choice in determining these time limitations, the terms of which unreasonably favored

22   Ford. A gross disparity in bargaining power existed between Ford and the Class members, and Ford

23   knew or should have known that the Class Vehicles were defective at the time of sale.

24   1015. Plaintiffs Goodrich and Metro and the Michigan Sub-Class Members have complied

25   with all obligations under the Warranties, or otherwise have been excused from performance of said

26   obligations as a result of Ford's conduct described herein.

27   1016. Plaintiffs Goodrich and Metro and the Michigan Sub-Class Members were not

28   required to notify Ford of the breach because affording Ford a reasonable opportunity to cure its

breach of written warranty would have been futile. Ford was also on notice of the Engine Defect from the complaints and service requests it received from Plaintiffs and the Class Members, from repairs and/or replacements of the engines or components thereof, and through other internal and external sources.

1017. Because Ford, through its conduct and exemplified by its own service bulletins, has covered repairs of the Engine Defect if Ford determines the repairs are appropriately covered under the Warranties, Ford cannot now deny that the Warranties cover the Engine Defect.

1018. Because Ford has not been able remedy the Engine Defect, any limitation on remedies included in the Warranties causes the Warranties to fail their essential purposes, rendering them null and void.

1019. As a direct and proximate cause of Ford's breach, Plaintiffs Goodrich and Metro and the Michigan Sub-Class Members suffered damages and continue to suffer damages, including economic damages at the point of sale or lease and diminution of value of their Class Vehicles. Additionally, Plaintiffs Goodrich and Metro and the Michigan Sub-Class Members have incurred or will incur economic damages at the point of repair in the form of the cost of repair.

1020. As a direct and proximate result of Ford's breach of express warranties, Plaintiffs Goodrich and Metro and the Michigan Sub-Class Members have been damaged in an amount to be determined at trial.

**TWENTY-NINTH CAUSE OF ACTION**
**Breach of the Implied Warranty of Merchantability**
**Mich. Comp. Laws §§ 440.2314 and 440.2860**
**(On behalf of the Michigan Sub-Class)**

1021. Plaintiffs incorporate by reference each allegation set forth in paragraphs 1-426, above.

1022. Plaintiffs Goodrich and Metro bring this cause of action individually and on behalf of the members of the Michigan Sub-Class.

1023. Ford is and was at all relevant times a "merchant" with respect to motor vehicles under Mich. Comp. Laws §§ 440.2104(1) and a "seller" of motor vehicles under § 440.2103(1)(c).

1024. With respect to leases, Ford is and was at all relevant times a "lessor" of motor

169

vehicles under Mich. Comp. Laws § 440.2803(1)(p).

1025. The Class Vehicles are and were at all relevant times "goods" within the meaning of Mich. Comp. Laws §§ 440.2105(1) and 440.2803(1)(h).

1026. A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law under Mich. Comp. Laws §§ 440.2314 and 440.2862.

1027. Ford knew or had reason to know of the specific use for which the Class Vehicles were purchased or leased. Ford directly sold and marketed vehicles equipped with the engines to customers through authorized dealers, like those from whom Plaintiffs Goodrich and Metro and the Michigan Sub-Class Members bought or leased their vehicles, for the intended purpose of consumers purchasing the vehicles. Ford knew that the Class Vehicles would and did pass unchanged from Ford to the authorized dealers to Plaintiffs Goodrich and Metro and the Michigan Sub-Class Members, with no modification to the defective engines.

1028. Ford provided Plaintiffs and Class Members with an implied warranty that the Class Vehicles and their components and parts are merchantable and fit for the ordinary purposes for which they were sold.

1029. This implied warranty included, among other things: (i) a warranty that the Class Vehicles and their engines that were manufactured, supplied, distributed, and/or sold by Ford were safe and reliable for providing transportation; and (ii) a warranty that the Class Vehicles and their engines would be fit for their intended use while the Class Vehicles were being operated.

1030. Contrary to the applicable implied warranties, the Class Vehicles and their engines at the time of sale and thereafter were not fit for their ordinary and intended purpose of providing Plaintiffs and Class Members with reliable, durable, and safe transportation. Instead, the Class Vehicles are defective, including, but not limited to, the defective design and manufacture of their engines and the existence of the Engine Defect at the time of sale or lease and thereafter. Ford knew of this defect at the time these sale or lease transactions occurred.

1031. As a result of Ford's breach of the applicable implied warranties, Plaintiffs Goodrich and Metro and the Michigan Sub-Class Members suffered an ascertainable loss of money, property,

and/or value of their Class Vehicles. Additionally, as a result of the Engine Defect, Plaintiffs Goodrich and Metro and the Michigan Sub-Class Members were harmed and suffered actual damages in that the Class Vehicles' engine components are substantially certain to fail before their expected useful life has run.

1032. Ford's actions, as complained of herein, breached the implied warranty that the Class Vehicles were of merchantable quality and fit for such use in violation of under Mich. Comp. Laws §§ 440.2314 and 440.2862.

1033. Plaintiffs Goodrich and Metro and the Michigan Sub-Class Members have complied with all obligations under the warranty, or otherwise have been excused from performance of said obligations as a result of Ford's conduct described herein.

1034. Plaintiffs Goodrich and Metro and the Michigan Sub-Class Members were not required to notify Ford of the breach because affording Ford a reasonable opportunity to cure its breach of implied warranty would have been futile. Ford was also on notice of the Engine Defect from the complaints and service requests it received from Plaintiffs and the Class Members, from repairs and/or replacements of the engines or components thereof, and through other internal sources.

1035. As a direct and proximate cause of Ford's breach, Plaintiffs Goodrich and Metro and the Michigan Sub-Class Members suffered damages and continue to suffer damages, including economic damages at the point of sale or lease and diminution of value of their Class Vehicles. Additionally, Plaintiffs Goodrich and Metro and the Michigan Sub-Class Members have incurred or will incur economic damages at the point of repair in the form of the cost of repair.

1036. As a direct and proximate result of Ford's breach of the implied warranty of merchantability, Plaintiffs Goodrich and Metro and the Michigan Sub-Class Members have been damaged in an amount to be proven at trial.

### THIRTIETH CAUSE OF ACTION
**Violations of the Minnesota Prevention of Consumer Fraud Act,
Minn. Stat. § 325F.68, *et seq.*
(On Behalf of the Minnesota Sub-Class)**

1037. Plaintiffs incorporate by reference each allegation set forth in paragraphs 1-426,

1    above.

2        1038. Plaintiffs Brian Simonds and Mark Kennedy ("Minnesota Plaintiffs") bring this cause

3    of action individually and on behalf of the Minnesota Sub-Class.

4        1039. The Class Vehicles constitute "merchandise" within the meaning of Minn. Stat. §

5    325F.68.

6        1040. The Minnesota Prevention of Consumer Fraud Act ("Minnesota CFA") prohibits

7    "[t]he act, use, or employment by any person of any fraud, false pretense, false promise,

8    misrepresentation, misleading statement or deceptive practice, with the intent that others rely

9    thereon in connection with the sale of any merchandise, whether or not any person has in fact been

10   misled, deceived, or damaged thereby …." Minn. Stat. § 3 25F.69(1). Ford engaged in unfair and

11   deceptive practices that violated the Minnesota CFA as described above.

12       1041. Ford participated in and engaged in deceptive business or trade practices prohibited

13   by the Minnesota CFA by failing to disclose and actively concealing that the Class Vehicles

14   contained the Engine Defect, by marketing their Class Vehicles as safe and of high quality, and by

15   presenting themselves as a reputable manufacturer that valued safety and stood behind its vehicles

16   after they were sold.

17       1042. Ford knowingly and intentionally misrepresented and omitted material facts in

18   connection with the sale or lease of the Class Vehicles by, among other things, failing to disclose

19   the Engine Defect; concealing the Engine Defect; promoting and selling or leasing Class Vehicles

20   it knew were defective, including by marketing its vehicles as safe, reliable, easily operable,

21   efficient, and of high quality; presenting itself as a reputable manufacturer that valued safety,

22   reliability, performance and efficiency, and stood behind its vehicles after they were sold; failing to

23   make repairs or making repairs and providing replacements that caused Minnesota Plaintiffs and

24   the Minnesota Sub-Class Members to experience repeated instances of failure, rendering the New

25   Vehicle Limited Warranty useless; and minimizing the scope and severity of the problems with the

26   Class Vehicles, refusing to acknowledge that they are defective, and failing to provide adequate

27   relief to consumers. Ford misrepresented and omitted such material facts with the intent to mislead

28   Minnesota Plaintiffs and the Minnesota Sub-Class Members about the true nature of the Class

Vehicles.

1043. Ford systematically misrepresented, concealed, suppressed, or omitted material facts relating to the Class Vehicles and Engine Defect in the course of its business.

1044. Ford also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Class Vehicles.

1045. Ford's unfair and deceptive acts or practices occurred repeatedly in Ford's trade or business, were capable of deceiving a substantial portion of the purchasing public, and imposed a serious safety risk on the public.

1046. Ford knew that the Class Vehicles and their engines suffered from an inherent defect, were defectively designed or manufactured, and were not suitable for their intended use.

1047. Ford knew or should have known that its conduct violated the Minnesota CFA.

1048. Minnesota Plaintiffs and the Minnesota Sub-Class Members reasonably relied on Ford's misrepresentations and omissions of material facts in its advertisements of the Class Vehicles and in the purchase of the Class Vehicles.

1049. Minnesota Plaintiffs and the Minnesota Sub-Class Members had no way of discerning that Ford's misrepresentations were false and misleading when they acquired their Class Vehicles because Minnesota Plaintiffs and the Minnesota Sub-Class Members did not have access to Ford's exclusive and superior knowledge about the Class Vehicles' design and the Engine Defect.

1050. Had Minnesota Plaintiffs and the Minnesota Sub-Class Members known that the Class Vehicles would contain and/or exhibit the Engine Defect, they would not have purchased or leased the Class Vehicles or would have paid less for them. Plaintiffs did not receive the benefit of their bargain as a result of Ford's misconduct.

1051. Ford owed Minnesota Plaintiffs and the Minnesota Sub-Class Members a duty to disclose the truth about the Engine Defect because Ford:

    a.    possessed exclusive and superior knowledge of the design and manufacture of the Class Vehicles and the Engine Defect;

b.    intentionally concealed the foregoing from Minnesota Plaintiffs and the Minnesota Sub-Class Members; and/or

c.    made incomplete representations regarding the quality and durability of the Class Vehicles, while purposefully withholding material facts from Minnesota Plaintiffs and the Minnesota Sub-Class Members that contradicted these representations.

1052. Due to Ford's specific and superior knowledge that the Engines in the Class Vehicles will fail due to the Engine Defect, its false representations regarding the increased durability of the Class Vehicles, and reliance by Minnesota Plaintiffs and the Minnesota Sub-Class Members on these material representations, Ford had a duty to disclose to Class members that the Engine Defect will cause engine failure in Class Vehicles, that Class Vehicles do not have the expected durability, reliability, and/or safety over other vehicles or of their predecessor engines, that failure of the Engines will cause damage to Class Vehicle, and that Class members would be required to bear the cost of the damage to their vehicles. Having volunteered to provide information to Minnesota Plaintiffs and the Minnesota Sub-Class Members, Ford had the duty to disclose not just the partial truth, but the entire truth. These omitted and concealed facts were material because they directly impact the value of the Class Vehicles purchased or leased by Minnesota Plaintiffs and the Minnesota Sub-Class Members. Longevity, durability, performance, and safety are material concerns to Ford consumers. Ford represented to Minnesota Plaintiff and the Minnesota Sub-Class Members that they were purchasing or leasing vehicles that were durable, reliable, safe, efficient, of high quality, and containing engines of advanced and superior characteristics and technology as alleged throughout this Complaint, when in fact it is only a matter of time before the engines fail due to the Engine Defect.

1053. Minnesota Plaintiffs and the Minnesota Sub-Class Members suffered injury in fact to a legally protected interest. As a result of Ford's conduct, Minnesota Plaintiffs and the Minnesota Sub-Class Members were harmed and suffered actual damages in the form of the costs of diagnosis and repair of their vehicles, and the diminished value of their vehicles.

1054. As a direct and proximate result of Ford's unfair or deceptive acts or practices, Minnesota Plaintiffs and the Minnesota Sub-Class Members suffered and will continue to suffer

174

injury in fact and/or actual damages.

1055. Defendant's violations present a continuing risk to Minnesota Plaintiffs and the Minnesota Sub-Class Members as well as to the general public. Defendant's unlawful acts and practices complained of herein affect the public interest.

1056. As a proximate and direct result of Ford's unfair and deceptive trade practices, Minnesota Plaintiff and members of the Minnesota Sub-Class purchased or leased Class Vehicles and suffered an ascertainable loss and financial harm. These ascertainable losses include, among other things, overpayment at the time of purchase or lease, the cost to repair the Engine Defect, replacement of the damaged related system components, diminution of Class Vehicle resale value, increased repair and maintenance costs, and other substantial monetary damages and inconvenience.

1057. As a direct and proximate result of Ford's unfair or deceptive acts or practices alleged herein, Minnesota Plaintiffs and other members of the Minnesota Sub-Class suffered and will continue to suffer actual damages and are entitled to recover actual damages to the extent permitted by law, including class action rules, in an amount to be proven at trial. In addition, Minnesota Plaintiffs and the putative Class seek equitable and injunctive relief against Ford on terms that the Court considers reasonable, and reasonable attorneys' fees.

1058. Minnesota Plaintiffs provided notice of their claims by letters dated May 19, 2021 and August 26, 2022.

1059. Pursuant to Minn. Stat. § 8.31(3a), Minnesota Plaintiffs and the Minnesota Sub-Class Members seek damages in an amount to be proven at trial, including but not limited to actual damages and attorneys' fees, under the Minnesota CFA.

1060. Minnesota Plaintiffs and the Minnesota Sub-Class Members also seek punitive damages under Minn. Stat. § 549.20(1)(a) given the clear and convincing evidence that GM's acts show deliberate disregard for the rights or safety of others.

### THIRTY-FIRST CAUSE OF ACTION
#### Violations of the Minnesota Deceptive Trade Practices Act,
#### Minn. Stat. § 325D.43-48, *et seq.*
#### (On Behalf of the Minnesota Sub-Class)

1061. Plaintiffs incorporate by reference each allegation set forth in paragraphs 1-426,

above.

1062. Minnesota Plaintiffs bring this cause of action individually and on behalf of the Minnesota Sub-Class.

1063. The Class Vehicles constitute "merchandise" within the meaning of Minn. Stat. § 325F.68.

1064. The Minnesota Deceptive Trade Practices Act ("Minnesota DTPA") prohibits deceptive trade practices, which occur when a person "(5) represents that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation, or connection that the person does not have;" "(7) represents that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another;" and "(9) advertises goods or services with intent not to sell them as advertised." Minn. Stat. § 325D.44. Ford engaged in unfair and deceptive practices that violated the Minnesota DTPA as described above.

1065. Ford participated in and engaged in deceptive business or trade practices prohibited by the Minnesota DTPA by failing to disclose and actively concealing that the Class Vehicles contained the Engine Defect, by marketing their Class Vehicles as safe and of high quality, and by presenting themselves as a reputable manufacturer that valued safety and stood behind its vehicles after they were sold.

1066. Ford knowingly and intentionally misrepresented and omitted material facts in connection with the sale or lease of the Class Vehicles by, among other things, failing to disclose the Engine Defect; concealing the Engine Defect; promoting and selling or leasing Class Vehicles it knew were defective, including by marketing its vehicles as safe, reliable, easily operable, efficient, and of high quality; presenting itself as a reputable manufacturer that valued safety, reliability, performance and efficiency, and stood behind its vehicles after they were sold; by failing to make repairs or making repairs and providing replacements that caused Minnesota Plaintiffs and the Minnesota Sub-Class Members to experience repeated instances of failure, rendering the New Vehicle Limited Warranty useless; and minimizing the scope and severity of the problems with the Class Vehicles, refusing to acknowledge that they are defective, and failing to provide adequate

relief to consumers. Ford misrepresented and omitted such material facts with the intent to mislead Minnesota Plaintiffs and the Minnesota Sub-Class Members about the true nature of the Class Vehicles.

1067. Ford systematically misrepresented, concealed, suppressed, or omitted material facts relating to the Class Vehicles and Engine Defect in the course of its business.

1068. Ford also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Class Vehicles.

1069. Ford's unfair and deceptive acts or practices occurred repeatedly in Ford's trade or business, were capable of deceiving a substantial portion of the purchasing public, and imposed a serious safety risk on the public.

1070. Ford knew that the Class Vehicles and their engines suffered from an inherent defect, were defectively designed or manufactured, and were not suitable for their intended use.

1071. Ford knew or should have known that its conduct violated the Minnesota DTPA.

1072. Minnesota Plaintiffs and the Minnesota Sub-Class Members reasonably relied on Ford's misrepresentations and omissions of material facts in its advertisements of the Class Vehicles and in the purchase of the Class Vehicles.

1073. Minnesota Plaintiffs and the Minnesota Sub-Class Members had no way of discerning that Ford's misrepresentations were false and misleading when they acquired their Class Vehicles because Minnesota Plaintiffs and the Minnesota Sub-Class Members did not have access to Ford's exclusive and superior knowledge about the Class Vehicles' design and the Engine Defect.

1074. Had Minnesota Plaintiffs and the Minnesota Sub-Class Members known that the Class Vehicles would contain and/or exhibit the Engine Defect, they would not have purchased or leased the Class Vehicles or would have paid less for them. Plaintiff did not receive the benefit of their bargain as a result of Ford's misconduct.

1075. Ford owed Minnesota Plaintiffs and the Minnesota Sub-Class Members a duty to disclose the truth about the Engine Defect because Ford:

a. possessed exclusive and superior knowledge of the design and manufacture of the Class Vehicles and the Engine Defect;

b. intentionally concealed the foregoing from Minnesota Plaintiffs and the Minnesota Sub-Class Members; and/or

c. made incomplete representations regarding the quality and durability of the Class Vehicles, while purposefully withholding material facts from Minnesota Plaintiffs and the Minnesota Sub-Class Members that contradicted these representations.

1076. Due to Ford's specific and superior knowledge that the Engines in the Class Vehicles will fail due to the Engine Defect, its false representations regarding the increased durability of the Class Vehicles, and reliance by Minnesota Plaintiffs and the Minnesota Sub-Class Members on these material representations, Ford had a duty to disclose to Class members that the Engine Defect will cause engine failure in Class Vehicles, that Class Vehicles do not have the expected durability, reliability, and/or safety over other vehicles or of their predecessor engines, that failure of the Engines will cause damage to Class Vehicle, and that Class members would be required to bear the cost of the damage to their vehicles. Having volunteered to provide information to Minnesota Plaintiffs and the Minnesota Sub-Class Members, Ford had the duty to disclose not just the partial truth, but the entire truth. These omitted and concealed facts were material because they directly impact the value of the Class Vehicles purchased or leased by Minnesota Plaintiffs and the Minnesota Sub-Class Members. Longevity, durability, performance, and safety are material concerns to Ford consumers. Ford represented to Minnesota Plaintiffs and the Minnesota Sub-Class Members that they were purchasing or leasing vehicles that were durable, reliable, safe, efficient, of high quality, and containing engines of advanced and superior characteristics and technology as alleged throughout this Complaint, when in fact it is only a matter of time before the engines fail due to the Engine Defect.

1077. Minnesota Plaintiffs and the Minnesota Sub-Class Members suffered injury in fact to a legally protected interest. As a result of Ford's conduct, Minnesota Plaintiffs and the Minnesota Sub-Class Members were harmed and suffered actual damages in the form of the costs of diagnosis and repair of their vehicles, and the diminished value of their vehicles.

178

1078. As a direct and proximate result of Ford's unfair or deceptive acts or practices, Minnesota Plaintiff and the Minnesota Sub-Class Members suffered and will continue to suffer injury in fact and/or actual damages.

1079. Defendant's violations present a continuing risk to Minnesota Plaintiffs and the Minnesota Sub-Class Members as well as to the general public. Defendant's unlawful acts and practices complained of herein affect the public interest.

1080. As a proximate and direct result of Ford's unfair and deceptive trade practices, Minnesota Plaintiffs and members of the Minnesota Sub-Class purchased or leased Class Vehicles and suffered an ascertainable loss and financial harm. These ascertainable losses include, among other things, overpayment at the time of purchase or lease, the cost to attempt to repair the Engine Defect, replacement of the damaged related system components, diminution of Class Vehicle resale value, increased repair and maintenance costs, and other substantial monetary damages and inconvenience.

1081. Minnesota Plaintiffs provided notice of their claims by letter dated May 19, 2021 and August 26, 2022.

1082. Pursuant to Minn. Stat. §§ 8.31(3a) and 325D.45, Minnesota Plaintiffs and the Minnesota Sub-Class Members seek damages in an amount to be proven at trial, including but not limited to actual damages and attorneys' fees, under the Minnesota DTPA.

1083. Minnesota Plaintiffs and the Minnesota Sub-Class Members also seek punitive damages under Minn. Stat. § 549.20(1)(a) given the clear and convincing evidence that GM's acts show deliberate disregard for the rights or safety of others.

**THIRTY-SECOND CAUSE OF ACTION**
**Violations of the Minnesota False Statement in Advertising Act,**
**Minn. Stat. § 325F.67, *et seq.***
**(On Behalf of the Minnesota Sub-Class)**

1084. Plaintiffs incorporate by reference each allegation set forth in paragraphs 1-426, above.

1085. Minnesota Plaintiffs bring this cause of action individually and on behalf of the Minnesota Sub-Class.

1086. The Minnesota False Statement in Advertising Act ("Minnesota FSAA") prohibits "any material assertion, representation, or statement of fact which is untrue, deceptive, or misleading" in connection with the disposition of merchandise or services. Minn. Stat. Ann. § 325F.67. Ford engaged in unfair and deceptive practices that violated the Minnesota FSAA as described above.

1087. Ford participated in and engaged in deceptive business or trade practices prohibited by the Minnesota FSAA by failing to disclose and actively concealing that the Class Vehicles contained the Engine Defect, by marketing their Class Vehicles as safe and of high quality, and by presenting themselves as a reputable manufacturer that valued safety and stood behind its vehicles after they were sold.

1088. Ford knowingly and intentionally misrepresented and omitted material facts in connection with the sale or lease of the Class Vehicles by, among other things, failing to disclose the Engine Defect; concealing the Engine Defect; promoting and selling or leasing Class Vehicles it knew were defective, including by marketing its vehicles as safe, reliable, easily operable, efficient, and of high quality; presenting itself as a reputable manufacturer that valued safety, reliability, performance and efficiency, and stood behind its vehicles after they were sold; failing to make repairs or making repairs and providing replacements that caused Minnesota Plaintiffs and the Minnesota Sub-Class Members to experience repeated instances of failure, rendering the New Vehicle Limited Warranty useless; and minimizing the scope and severity of the problems with the Class Vehicles, refusing to acknowledge that they are defective, and failing to provide adequate relief to consumers. Ford misrepresented and omitted such material facts with the intent to mislead Minnesota Plaintiffs and the Minnesota Sub-Class Members about the true nature of the Class Vehicles.

1089. Ford systematically misrepresented, concealed, suppressed, or omitted material facts relating to the Class Vehicles and Engine Defect in the course of its business.

1090. Ford also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the

180

1    sale of the Class Vehicles.

2    1091. Ford's unfair and deceptive acts or practices occurred repeatedly in Ford's trade or

3    business, were capable of deceiving a substantial portion of the purchasing public, and imposed a

4    serious safety risk on the public.

5    1092. Ford knew that the Class Vehicles and their engines suffered from an inherent defect,

6    were defectively designed or manufactured, and were not suitable for their intended use.

7    1093. Ford knew or should have known that its conduct violated the Minnesota FSAA.

8    1094. Minnesota Plaintiffs and the Minnesota Sub-Class Members reasonably relied on

9    Ford's misrepresentations and omissions of material facts in its advertisements of the Class Vehicles

10   and in the purchase of the Class Vehicles.

11   1095. Minnesota Plaintiffs and the Minnesota Sub-Class Members had no way of discerning

12   that Ford's misrepresentations were false and misleading when they acquired their Class Vehicles

13   because Minnesota Plaintiffs and the Minnesota Sub-Class Members did not have access to Ford's

14   exclusive and superior knowledge about the Class Vehicles' design and the Engine Defect.

15   1096. Had Minnesota Plaintiffs and the Minnesota Sub-Class Members known that the Class

16   Vehicles would contain and/or exhibit the Engine Defect, they would not have purchased or leased

17   the Class Vehicles or would have paid less for them. Plaintiff did not receive the benefit of their

18   bargain as a result of Ford's misconduct.

19   1097. Ford owed Minnesota Plaintiffs and the Minnesota Sub-Class Members a duty to

20   disclose the truth about the Engine Defect because Ford:

21       a.    possessed exclusive and superior knowledge of the design and manufacture of

22   the Class Vehicles and the Engine Defect;

23       b.    intentionally concealed the foregoing from Minnesota Plaintiffs and the

24   Minnesota Sub-Class Members; and/or

25       c.    made incomplete representations regarding the quality and durability of the

26   Class Vehicles, while purposefully withholding material facts from Minnesota Plaintiffs and the

27   Minnesota Sub-Class Members that contradicted these representations.

28   1098. Due to Ford's specific and superior knowledge that the Engines in the Class Vehicles

181

will fail due to the Engine Defect, its false representations regarding the increased durability of the Class Vehicles, and reliance by Minnesota Plaintiffs and the Minnesota Sub-Class Members on these material representations, Ford had a duty to disclose to Class members that the Engine Defect will cause engine failure in Class Vehicles, that Class Vehicles do not have the expected durability, reliability, and/or safety over other vehicles or of their predecessor engines, that failure of the Engines will cause damage to Class Vehicle, and that Class members would be required to bear the cost of the damage to their vehicles. Having volunteered to provide information to Minnesota Plaintiffs and the Minnesota Sub-Class Members, Ford had the duty to disclose not just the partial truth, but the entire truth. These omitted and concealed facts were material because they directly impact the value of the Class Vehicles purchased or leased by Minnesota Plaintiffs and the Minnesota Sub-Class Members. Longevity, durability, performance, and safety are material concerns to Ford consumers. Ford represented to Minnesota Plaintiffs and the Minnesota Sub-Class Members that they were purchasing or leasing vehicles that were durable, reliable, safe, efficient, of high quality, and containing engines of advanced and superior characteristics and technology as alleged throughout this Complaint, when in fact it is only a matter of time before the engines fail due to the Engine Defect.

1099. Minnesota Plaintiffs and the Minnesota Sub-Class Members suffered injury in fact to a legally protected interest. As a result of Ford's conduct, Minnesota Plaintiffs and the Minnesota Sub-Class Members were harmed and suffered actual damages in the form of the costs of diagnosis and repair of their vehicles, and the diminished value of their vehicles.

1100. As a direct and proximate result of Ford's unfair or deceptive acts or practices, Minnesota Plaintiffs and the Minnesota Sub-Class Members suffered and will continue to suffer injury in fact and/or actual damages.

1101. Defendant's violations present a continuing risk to Minnesota Plaintiffs and the Minnesota Sub-Class Members as well as to the general public. Defendant's unlawful acts and practices complained of herein affect the public interest.

1102. As a proximate and direct result of Ford's unfair and deceptive trade practices, Minnesota Plaintiffs and members of the Minnesota Sub-Class purchased or leased Class Vehicles

and suffered an ascertainable loss and financial harm. These ascertainable losses include, among other things, overpayment at the time of purchase or lease, the cost to repair the Engine Defect, replacement of the damaged related system components, diminution of Class Vehicle resale value, increased repair and maintenance costs, and other substantial monetary damages and inconvenience.

1103. As a direct and proximate result of Ford's unfair or deceptive acts or practices alleged herein, Minnesota Plaintiffs and other members of the Minnesota Sub-Class suffered and will continue to suffer actual damages and are entitled to recover actual damages to the extent permitted by law, including class action rules, in an amount to be proven at trial. In addition, Minnesota Plaintiffs and the putative Class seek equitable and injunctive relief against Ford on terms that the Court considers reasonable, and reasonable attorneys' fees.

1104. Minnesota Plaintiffs provided notice of their claims by letters dated May 19, 2021 and August 26, 2022.

1105. Pursuant to Minn. Stat. § 8.31(3a), Minnesota Plaintiffs and the Minnesota Sub-Class Members seek damages in an amount to be proven at trial, including but not limited to actual damages and attorneys' fees, under the Minnesota CFA.

1106. Minnesota Plaintiffs and the Minnesota Sub-Class Members also seek punitive damages under Minn. Stat. § 549.20(1)(a) given the clear and convincing evidence that GM's acts show deliberate disregard for the rights or safety of others.

### THIRTY-THIRD CAUSE OF ACTION
**Breach of Express Warranty**
**Minn. Stat. §§ 336.2-313 and 336.2A-210**
**(On behalf of the Minnesota Sub-Class)**

1107. Plaintiffs incorporate by reference each allegation set forth in paragraphs 1-426, above.

1108. Plaintiff Kennedy brings this cause of action individually and on behalf of the members of the Minnesota Sub-Class.

1109. Ford is and was at all relevant times a "merchant" with respect to motor vehicles under Minn. Stat. §§ 336.2-104(1) and a "seller" of motor vehicles under § 336.2-103(1)(d).

1110. With respect to leases, Ford is and was at all relevant times a "lessor" of motor

vehicles under Minn. Stat. § 336.2A-103(1)(p).

1111. The Class Vehicles are and were at all relevant times "goods" within the meaning of Minn. Stat. §§ 336.2-105(1) and 336.2A-103(1)(h).

1112. Ford provided all purchasers and lessees of the Class Vehicles with the express warranty described herein, which became a material part of the bargain.

1113. Ford provided all purchasers and lessees of Lincoln-branded Class Vehicles with the Lincoln Warranty and all purchasers and lessees of Ford or Ford-branded Class Vehicles with the Ford/Ford Warranty.

1114. Ford sold and leased the Class Vehicles with a written express warranty covering the Vehicles for three years or 36,000 miles, whichever comes first.

1115. Ford's New Vehicle Limited Warranty expressly states that Ford will "without charge, repair, replace, or adjust all parts on your vehicle that malfunction or fail during normal use during the applicable coverage period due to a manufacturing defect in factory-supplied materials or factory workmanship" so long the Vehicle is properly operated and maintained and taken to a Ford dealership for repair within the warranty period.

1116. Ford further provides powertrain warranty coverage, which is applicable to "the Engine: all internal lubricated parts, cylinder block, cylinder heads, electrical fuel pump, powertrain control module, engine mounts, flywheel, injection pump, manifold (exhaust and intake), manifold bolts, oil pan, oil pump, seals and gaskets, engine thermostat, engine, thermostat housing, timing chain cover, timing chain (gears or belt), turbocharger/supercharger unit, valve covers, water pump" as well as the components in the transmission, front-wheel drive, rear-wheel drive, and four-wheel/all-wheel drive. This coverage applies for 5-years or up to 60,000 miles, whichever comes first.

1117. For certified pre-owned ("CPO") Vehicles, Ford offers a limited warranty covering CPO Vehicles for 12 months or 12,000 miles, whichever comes first.

1118. Ford's CPO Vehicle warranty states that a dealer will replace "all covered components . . . that are found to be defective in factory-supplied materials or workmanship during the applicable warranty periods." The engine and its components—including the cylinder block and

cylinder heads—are included in Ford's list of "covered components."

1119. Ford manufactured and/or installed the engines and the engines' component parts in the Class Vehicles, and the engines and their component parts are covered by the express Warranties.

1120. The Engine Defect at issue in this litigation was present at the time the Class Vehicles were sold or leased to Plaintiff Kennedy and the Minnesota Sub-Class Members.

1121. Plaintiff relied on Ford's express warranties, which were a material part of the bargain, when purchasing or leasing their Class Vehicles.

1122. Under the express Warranties, Ford was obligated to correct the Engine Defect in the vehicles owned or leased by Plaintiff Kennedy and the Minnesota Sub-Class Members.

1123. Although Ford was obligated to correct the Engine Defect, none of the attempted fixes to the engines are adequate under the terms of the Warranties, as they did not cure the defect.

1124. Ford breached the express Warranties by performing illusory repairs. Rather than repairing the vehicles pursuant to the express Warranties, Ford falsely informed Minnesota Sub-Class Members that there was no problem with their Class Vehicles, performed ineffective procedures including software updates, and/or replaced defective components in the engines with equally defective components, without actually repairing the Class Vehicles.

1125. Ford and its agent dealers have failed and refused to conform the engines to the express Warranties. Ford's conduct, as discussed throughout this Complaint, has voided any attempt on its part to disclaim liability for its actions.

1126. Moreover, Ford's attempt to disclaim or limit these express Warranties vis-à-vis consumers is unconscionable and unenforceable under the circumstances here. Specifically, Ford's warranty limitation is unenforceable because it knowingly sold a defective product without informing consumers about the defect.

1127. The time limits contained in Ford's warranty period were also unconscionable and inadequate to protect Plaintiff Kennedy and the Minnesota Sub-Class Members. Among other things, Plaintiff Kennedy and the Minnesota Sub-Class Members had no meaningful choice in determining these time limitations, the terms of which unreasonably favored Ford. A gross disparity

185

in bargaining power existed between Ford and the Class members, and Ford knew or should have known that the Class Vehicles were defective at the time of sale.

1128. Plaintiff Kennedy and the Minnesota Sub-Class Members have complied with all obligations under the Warranties, or otherwise have been excused from performance of said obligations as a result of Ford's conduct described herein.

1129. Plaintiff Kennedy and the Minnesota Sub-Class Members were not required to notify Ford of the breach because affording Ford a reasonable opportunity to cure its breach of written warranty would have been futile. Ford was also on notice of the Engine Defect from the complaints and service requests it received from Plaintiff and the Class Members, from repairs and/or replacements of the engines or components thereof, and through other internal and external sources.

1130. Because Ford, through its conduct and exemplified by its own service bulletins, has covered repairs of the Engine Defect if Ford determines the repairs are appropriately covered under the Warranties, Ford cannot now deny that the Warranties cover the Engine Defect.

1131. Because Ford has not been able remedy the Engine Defect, any limitation on remedies included in the Warranties causes the Warranties to fail their essential purposes, rendering them null and void.

1132. As a direct and proximate cause of Ford's breach, Plaintiff Kennedy and the Minnesota Sub-Class Members suffered damages and continue to suffer damages, including economic damages at the point of sale or lease and diminution of value of their Class Vehicles. Additionally, Plaintiff Kennedy and the Minnesota Sub-Class Members have incurred or will incur economic damages at the point of repair in the form of the cost of repair.

1133. As a direct and proximate result of Ford's breach of express warranties, Plaintiff Kennedy and the Minnesota Sub-Class Members have been damaged in an amount to be determined at trial.

**THIRTY-FOURTH CAUSE OF ACTION**
**Breach of the Implied Warranty of Merchantability**
**Minn. Stat. §§ 336.2-314 and 336.2A-212**
**(On behalf of the Minnesota Sub-Class)**

1134. Plaintiffs incorporate by reference each allegation set forth in paragraphs 1-426,

above.

1135. Plaintiff Kennedy brings this cause of action individually and on behalf of the members of the Minnesota Sub-Class.

1136. Ford is and was at all relevant times a "merchant" with respect to motor vehicles under Minn. Stat. §§ 336.2-104(1) and a "seller" of motor vehicles under § 336.2-103(1)(d).

1137. With respect to leases, Ford is and was at all relevant times a "lessor" of motor vehicles under Minn. Stat. § 336.2A-103(1)(p).

1138. The Class Vehicles are and were at all relevant times "goods" within the meaning of Minn. Stat. §§ 336.2-105(1) and 336.2A-103(1)(h).

1139. A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law under Minn. Stat. §§ 336.2-314 and 336.2A-212.

1140. Ford knew or had reason to know of the specific use for which the Class Vehicles were purchased or leased. Ford directly sold and marketed vehicles equipped with the engines to customers through authorized dealers, like those from whom Plaintiff Kennedy and the Minnesota Sub-Class Members bought or leased their vehicles, for the intended purpose of consumers purchasing the vehicles. Ford knew that the Class Vehicles would and did pass unchanged from Ford to the authorized dealers to Plaintiff Kennedy and the Minnesota Sub-Class Members, with no modification to the defective engines.

1141. Ford provided Plaintiff and Class Members with an implied warranty that the Class Vehicles and their components and parts are merchantable and fit for the ordinary purposes for which they were sold.

1142. This implied warranty included, among other things: (i) a warranty that the Class Vehicles and their engines that were manufactured, supplied, distributed, and/or sold by Ford were safe and reliable for providing transportation; and (ii) a warranty that the Class Vehicles and their engines would be fit for their intended use while the Class Vehicles were being operated.

1143. Contrary to the applicable implied warranties, the Class Vehicles and their engines at the time of sale and thereafter were not fit for their ordinary and intended purpose of providing

Plaintiff and Class Members with reliable, durable, and safe transportation. Instead, the Class Vehicles are defective, including, but not limited to, the defective design and manufacture of their engines and the existence of the Engine Defect at the time of sale or lease and thereafter. Ford knew of this defect at the time these sale or lease transactions occurred.

1144. As a result of Ford's breach of the applicable implied warranties, Plaintiff Kennedy and the Minnesota Sub-Class Members suffered an ascertainable loss of money, property, and/or value of their Class Vehicles. Additionally, as a result of the Engine Defect, Plaintiff Kennedy and the Minnesota Sub-Class Members were harmed and suffered actual damages in that the Class Vehicles' engine components are substantially certain to fail before their expected useful life has run.

1145. Ford's actions, as complained of herein, breached the implied warranty that the Class Vehicles were of merchantable quality and fit for such use in violation of Minn. Stat. §§ 336.2-314 and 336.2A-212.

1146. Plaintiff Kennedy and the Minnesota Sub-Class Members have complied with all obligations under the warranty, or otherwise have been excused from performance of said obligations as a result of Ford's conduct described herein.

1147. Plaintiff Kennedy and the Minnesota Sub-Class Members were not required to notify Ford of the breach because affording Ford a reasonable opportunity to cure its breach of implied warranty would have been futile. Ford was also on notice of the Engine Defect from the complaints and service requests it received from Plaintiff and the Class Members, from repairs and/or replacements of the engines or components thereof, and through other internal sources.

1148. In addition, on or about August 26, 2022, Plaintiff Kennedy gave notice to Ford that she intended to pursue her warranty claims on behalf of a class of similarly situated consumers.

1149. Because Plaintiff Kennedy purchased his vehicle from an authorized Ford dealer, she is in privity with Ford since (1) an agency relationship establishes privity for purposes of the breach of implied warranty claims and (2) privity is not required where plaintiffs are intended third-party beneficiaries of a defendant's implied warranties and the contracts between Ford and its authorized dealers.

1150. As a direct and proximate cause of Ford's breach, Plaintiff Kennedy and the Minnesota Sub-Class Members suffered damages and continue to suffer damages, including economic damages at the point of sale or lease and diminution of value of their Class Vehicles. Additionally, Plaintiff Kennedy and the Minnesota Sub-Class Members have incurred or will incur economic damages at the point of repair in the form of the cost of repair.

1151. As a direct and proximate result of Ford's breach of the implied warranty of merchantability, Plaintiff Kennedy and the Minnesota Sub-Class Members have been damaged in an amount to be proven at trial.

<u>**THIRTY-FIFTH CAUSE OF ACTION**</u>
**Violation of the New Jersey Consumer Fraud Act**
**N.J. Stat. Ann. §§ 56:8-1, *et seq.***
**(On behalf of the New Jersey Sub-Class)**

1152. Plaintiffs incorporate by reference each allegation set forth in paragraphs 1-426, above.

1153. Plaintiff David Schiavi ("New Jersey Plaintiff") brings this cause of action individually and on behalf of the members of the New Jersey Sub-Class.

1154. Ford, New Jersey Plaintiff, and the New Jersey Sub-Class Members "persons" within the meaning of the New Jersey Consumer Fraud Act ("New Jersey CFA"), N.J. Stat. Ann. § 56:8-1(d).

1155. Ford engaged in "sales" of "merchandise" within the meaning of N.J. Stat. Ann. § 56:8-1(c), (d).

1156. The New Jersey CFA makes unlawful "[t]he act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentations, or the knowing concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby…" N.J. Stat. Ann. § 56:8-2. Ford engaged in unfair and deceptive practices that violated the New Jersey CFA as described above.

1157. Ford participated in and engaged in deceptive business or trade practices prohibited

by the New Jersey CFA by failing to disclose and actively concealing that the Class Vehicles contained the Engine Defect, by marketing their Class Vehicles as safe and of high quality, and by presenting themselves as a reputable manufacturer that valued safety and stood behind its vehicles after they were sold.

1158. Ford knowingly and intentionally misrepresented and omitted material facts in connection with the sale or lease of the Class Vehicles by, among other things, failing to disclose the Engine Defect; concealing the Engine Defect; promoting and selling or leasing Class Vehicles it knew were defective, including by marketing its vehicles as safe, reliable, easily operable, efficient, and of high quality; presenting itself as a reputable manufacturer that valued safety, reliability, performance and efficiency, and stood behind its vehicles after they were sold; failing to make repairs or making repairs and providing replacements that caused New Jersey Plaintiff and the New Jersey Sub-Class Members to experience repeated instances of failure, rendering the New Vehicle Limited Warranty useless; and minimizing the scope and severity of the problems with the Class Vehicles, refusing to acknowledge that they are defective, and failing to provide adequate relief to consumers. Ford misrepresented and omitted such material facts with the intent to mislead New Jersey Plaintiff and the New Jersey Sub-Class Members about the true nature of the Class Vehicles.

1159. Ford systematically misrepresented, concealed, suppressed, or omitted material facts relating to the Class Vehicles and Engine Defect in the course of its business.

1160. Ford also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Class Vehicles.

1161. Ford's unfair and deceptive acts or practices occurred repeatedly in Ford's trade or business, were capable of deceiving a substantial portion of the purchasing public, and imposed a serious safety risk on the public.

1162. Ford knew that the Class Vehicles and their engines suffered from an inherent defect, were defectively designed or manufactured, and were not suitable for their intended use.

1163. Ford knew or should have known that its conduct violated the New Jersey CFA.

1164. New Jersey Plaintiff and the New Jersey Sub-Class Members reasonably relied on Ford's misrepresentations and omissions of material facts in its advertisements of the Class Vehicles and in the purchase of the Class Vehicles.

1165. New Jersey Plaintiff and the New Jersey Sub-Class Members had no way of discerning that Ford's misrepresentations were false and misleading when they acquired their Class Vehicles because New Jersey Plaintiff and the New Jersey Sub-Class Members did not have access to Ford's exclusive and superior knowledge about the Class Vehicles' design and the Engine Defect.

1166. Had New Jersey Plaintiff and the New Jersey Sub-Class Members known that the Class Vehicles would contain and/or exhibit the Engine Defect, they would not have purchased or leased the Class Vehicles or would have paid less for them. Plaintiff did not receive the benefit of their bargain as a result of Ford's misconduct.

1167. Ford owed New Jersey Plaintiff and the New Jersey Sub-Class Members a duty to disclose the truth about the Engine Defect because Ford:

  a. possessed exclusive and superior knowledge of the design and manufacture of the Class Vehicles and the Engine Defect;

  b. intentionally concealed the foregoing from New Jersey Plaintiff and the New Jersey Sub-Class Members; and/or

  c. made incomplete representations regarding the quality and durability of the Class Vehicles, while purposefully withholding material facts from New Jersey Plaintiff and the New Jersey Sub-Class Members that contradicted these representations.

1168. Due to Ford's specific and superior knowledge that the Engines in the Class Vehicles will fail due to the Engine Defect, its false representations regarding the increased durability of the Class Vehicles, and reliance by New Jersey Plaintiff and the New Jersey Sub-Class Members on these material representations, Ford had a duty to disclose to Class members that the Engine Defect will cause engine failure in Class Vehicles, that Class Vehicles do not have the expected durability, reliability, and/or safety over other vehicles or of their predecessor engines, that failure of the Engines will cause damage to Class Vehicle, and that Class members would be required to bear the

cost of the damage to their vehicles. Having volunteered to provide information to New Jersey Plaintiff and the New Jersey Sub-Class Members, Ford had the duty to disclose not just the partial truth, but the entire truth. These omitted and concealed facts were material because they directly impact the value of the Class Vehicles purchased or leased by New Jersey Plaintiff and the New Jersey Sub-Class Members. Longevity, durability, performance, and safety are material concerns to Ford consumers. Ford represented to New Jersey Plaintiff and the New Jersey Sub-Class Members that they were purchasing or leasing vehicles that were durable, reliable, safe, efficient, of high quality, and containing engines of advanced and superior characteristics and technology as alleged throughout this Complaint, when in fact it is only a matter of time before the engines fail due to the Engine Defect.

1169. New Jersey Plaintiff and the New Jersey Sub-Class Members suffered injury in fact to a legally protected interest. As a result of Ford's conduct, New Jersey Plaintiff and the New Jersey Sub-Class Members were harmed and suffered actual damages in the form of the costs of diagnosis and repair of their vehicles, and the diminished value of their vehicles.

1170. As a direct and proximate result of Ford's unfair or deceptive acts or practices, New Jersey Plaintiff and the New Jersey Sub-Class Members suffered and will continue to suffer injury in fact and/or actual damages.

1171. Defendant's violations present a continuing risk to New Jersey Plaintiff and the New Jersey Sub-Class Members as well as to the general public. Defendant's unlawful acts and practices complained of herein affect the public interest.

1172. As a proximate and direct result of Ford's unfair and deceptive trade practices, New Jersey Plaintiff and members of the New Jersey Sub-Class purchased or leased Class Vehicles and suffered an ascertainable loss and financial harm. These ascertainable losses include, among other things, overpayment at the time of purchase or lease, the cost to repair the Engine Defect, replacement of the damaged related system components, diminution of Class Vehicle resale value, increased repair and maintenance costs, and other substantial monetary damages and inconvenience.

1173. Ford was on notice of the Engine Defect from the pre-suit notices from Plaintiffs, the complaints and service requests Ford received from consumers, from repairs and/or replacements

of the engines or components thereof, and through other internal and external sources. New Jersey Plaintiff and members of the New Jersey Sub-Class seek all damages and relief to which they are entitled because Ford failed to remedy its unlawful conduct.

1174. Pursuant to N.J. Stat. Ann. § 56:8-19, New Jersey Plaintiff and the New Jersey Sub-Class Members seek an order enjoining Ford's unlawful conduct, actual damages, treble damages, attorneys' fees, costs, and any other just and proper relief available under the New Jersey CFA.

### THIRTY-SIXTH CAUSE OF ACTION
### Violations of the North Carolina Unfair and Deceptive Acts and Practices Act, N.C. Gen. Stat. § 75-1.1, *et seq.* (On Behalf of the North Carolina Sub-Class)

1175. Plaintiffs incorporate by reference each allegation set forth in paragraphs 1-426, above.

1176. Plaintiff Robyn Pirog ("North Carolina Plaintiff") brings this cause of action individually and on behalf of the North Carolina Sub-Class.

1177. Ford engaged in "commerce" within the meaning of the North Carolina Unfair and Deceptive Acts and Practices Act ("North Carolina UDTPA"), N.C. Gen. Stat. § 75-1.1(b).

1178. The North Carolina UDTPA broadly prohibits "unfair or deceptive acts or practices in or affecting commerce." N.C. Gen. Stat. § 75-1.1(a). Ford engaged in unfair and deceptive practices that violated the North Carolina UDTPA as described above.

1179. Ford participated in and engaged in deceptive business or trade practices prohibited by the North Carolina UDTPA by failing to disclose and actively concealing that the Class Vehicles contained the Engine Defect, by marketing their Class Vehicles as safe and of high quality, and by presenting themselves as a reputable manufacturer that valued safety and stood behind its vehicles after they were sold.

1180. Ford knowingly and intentionally misrepresented and omitted material facts in connection with the sale or lease of the Class Vehicles by, among other things, failing to disclose the Engine Defect; concealing the Engine Defect; promoting and selling or leasing Class Vehicles it knew were defective, including by marketing its vehicles as safe, reliable, easily operable, efficient, and of high quality; presenting itself as a reputable manufacturer that valued safety,

193

reliability, performance and efficiency, and stood behind its vehicles after they were sold; by failing to make repairs or making repairs and providing replacements that caused North Carolina Plaintiff and the North Carolina Sub-Class Members to experience repeated instances of failure, rendering the New Vehicle Limited Warranty useless; and minimizing the scope and severity of the problems with the Class Vehicles, refusing to acknowledge that they are defective, and failing to provide adequate relief to consumers. Ford misrepresented and omitted such material facts with the intent to mislead North Carolina Plaintiff and the North Carolina Sub-Class Members about the true nature of the Class Vehicles.

1181. Ford systematically misrepresented, concealed, suppressed, or omitted material facts relating to the Class Vehicles and Engine Defect in the course of its business.

1182. Ford also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Class Vehicles.

1183. Ford's unfair and deceptive acts or practices occurred repeatedly in Ford's trade or business, were capable of deceiving a substantial portion of the purchasing public, and imposed a serious safety risk on the public.

1184. Ford knew that the Class Vehicles and their engines suffered from an inherent defect, were defectively designed or manufactured, and were not suitable for their intended use.

1185. Ford knew or should have known that its conduct violated the North Carolina UDTPA.

1186. North Carolina Plaintiff and the North Carolina Sub-Class Members reasonably relied on Ford's misrepresentations and omissions of material facts in its advertisements of the Class Vehicles and in the purchase of the Class Vehicles.

1187. North Carolina Plaintiff and the North Carolina Sub-Class Members had no way of discerning that Ford's misrepresentations were false and misleading when they acquired their Class Vehicles because North Carolina Plaintiff and the North Carolina Sub-Class Members did not have access to Ford's exclusive and superior knowledge about the Class Vehicles' design and the Engine

194

1  Defect.

2      1188. Had North Carolina Plaintiff and the North Carolina Sub-Class Members known that

3  the Class Vehicles contained and/or would exhibit the Engine Defect, they would not have

4  purchased or leased the Class Vehicles or would have paid less for them. Plaintiff did not receive

5  the benefit of their bargain as a result of Ford's misconduct.

6      1189. Ford owed North Carolina Plaintiff and the North Carolina Sub-Class Members a duty

7  to disclose the truth about the Engine Defect because Ford:

8          a.    possessed exclusive and superior knowledge of the design and manufacture of

9  the Class Vehicles and the Engine Defect;

10          b.    intentionally concealed the foregoing from North Carolina Plaintiff and the

11  North Carolina Sub-Class Members; and/or

12          c.    made incomplete representations regarding the quality and durability of the

13  Class Vehicles, while purposefully withholding material facts from North Carolina Plaintiff and the

14  North Carolina Sub-Class Members that contradicted these representations.

15      1190. Due to Ford's specific and superior knowledge that the Engines in the Class Vehicles

16  will fail due to the Engine Defect, its false representations regarding the increased durability of the

17  Class Vehicles, and reliance by North Carolina Plaintiff and the North Carolina Sub-Class Members

18  on these material representations, Ford had a duty to disclose to Class members that the Engine

19  Defect will cause engine failure in Class Vehicles, that Class Vehicles do not have the expected

20  durability, reliability, and/or safety over other vehicles or of their predecessor engines, that failure

21  of the Engines will cause damage to Class Vehicle, and that Class members would be required to

22  bear the cost of the damage to their vehicles. Having volunteered to provide information to North

23  Carolina Plaintiff and the North Carolina Sub-Class Members, Ford had the duty to disclose not just

24  the partial truth, but the entire truth. These omitted and concealed facts were material because they

25  directly impact the value of the Class Vehicles purchased or leased by North Carolina Plaintiff and

26  the North Carolina Sub-Class Members. Longevity, durability, performance, and safety are material

27  concerns to Ford consumers. Ford represented to North Carolina Plaintiff and the North Carolina

28  Sub-Class Members that they were purchasing or leasing vehicles that were durable, reliable, safe,

195

efficient, of high quality, and containing engines of advanced and superior characteristics and technology as alleged throughout this Complaint, when in fact it is only a matter of time before the engines fail due to the Engine Defect.

1191. North Carolina Plaintiff and the North Carolina Sub-Class Members suffered injury in fact to a legally protected interest. As a result of Ford's conduct, North Carolina Plaintiff and the North Carolina Sub-Class Members were harmed and suffered actual damages in the form of the costs of diagnosis and repair of their vehicles, and the diminished value of their vehicles.

1192. As a direct and proximate result of Ford's unfair or deceptive acts or practices, North Carolina Plaintiff and the North Carolina Sub-Class Members suffered and will continue to suffer injury in fact and/or actual damages.

1193. Defendant's violations present a continuing risk to North Carolina Plaintiff and the North Carolina Sub-Class Members as well as to the general public. Defendant's unlawful acts and practices complained of herein affect the public interest.

1194. As a proximate and direct result of Ford's unfair and deceptive trade practices, North Carolina Plaintiff and members of the North Carolina Sub-Class purchased or leased Class Vehicles and suffered an ascertainable loss and financial harm. These ascertainable losses include, among other things, overpayment at the time of purchase or lease, the cost to repair the Engine Defect, replacement of these damaged related system components, diminution of Class Vehicle resale value, increased repair and maintenance costs, and other substantial monetary damages and inconvenience.

1195. North Carolina Plaintiff provided notice of her claims by letter dated January 26, 2021.

1196. As a direct and proximate result of Ford's unfair or deceptive acts or practices alleged herein, Plaintiff are entitled to recover actual damages to the extent permitted by law, including class action rules, in an amount to be proven at trial. In addition, Plaintiff and the putative Class seek equitable and injunctive relief against Ford on terms that the Court considers reasonable, and reasonable attorneys' fees.

1197. Because Ford's actions and conduct were willful, Plaintiffs seek an order for treble their actual damages, an order enjoining Ford's unlawful acts, court costs, attorneys' fees, and any

other just and proper relief available under the North Carolina Act, N.C. Gen. Stat. § 75-16.

### THIRTY-SEVENTH CAUSE OF ACTION
**Breach of Express Warranty**
**N.C. Gen. Stat. §§ 26-1-2-313 and 26-1-2.1-210**
**(On behalf of the North Carolina Sub-Class)**

1198. Plaintiffs incorporate by reference each allegation set forth in paragraphs 1-426, above.

1199. North Carolina Plaintiff brings this cause of action individually and on behalf of the members of the North Carolina Sub-Class.

1200. Ford is and was at all relevant times a "merchant" with respect to motor vehicles under N.C. Gen. Stat. § 25-2-104(1) and a "seller" of motor vehicles under § 25-2-103(1)(d).

1201. With respect to leases, Ford is and was at all relevant times a "lessor" of motor vehicles under N.C. Gen. Stat. § 25-2A-103(1)(p).

1202. The Class Vehicles are and were at all relevant times "goods" within the meaning of N.C. Gen. Stat. §§ 25-2-105(1) and 25-2A-103(1)(h).

1203. Ford provided all purchasers and lessees of the Class Vehicles with the express warranty described herein, which became a material part of the bargain.

1204. Ford provided all purchasers and lessees of Lincoln-branded Class Vehicles with the Lincoln Warranty and all purchasers and lessees of Ford or Ford-branded Class Vehicles with the Ford/Ford Warranty.

1205. Ford sold and leased the Class Vehicles with a written express warranty covering the Vehicles for three years or 36,000 miles, whichever comes first.

1206. Ford's New Vehicle Limited Warranty expressly states that Ford will "without charge, repair, replace, or adjust all parts on your vehicle that malfunction or fail during normal use during the applicable coverage period due to a manufacturing defect in factory-supplied materials or factory workmanship" so long the Vehicle is properly operated and maintained and taken to a Ford dealership for repair within the warranty period.

1207. Ford further provides powertrain warranty coverage, which is applicable to "the Engine: all internal lubricated parts, cylinder block, cylinder heads, electrical fuel pump, powertrain

control module, engine mounts, flywheel, injection pump, manifold (exhaust and intake), manifold bolts, oil pan, oil pump, seals and gaskets, engine thermostat, engine, thermostat housing, timing chain cover, timing chain (gears or belt), turbocharger/supercharger unit, valve covers, water pump" as well as the components in the transmission, front-wheel drive, rear-wheel drive, and four-wheel/all-wheel drive. This coverage applies for 5-years or up to 60,000 miles, whichever comes first.

1208. For certified pre-owned ("CPO") Vehicles, Ford offers a limited warranty covering CPO Vehicles for 12 months or 12,000 miles, whichever comes first.

1209. Ford's CPO Vehicle warranty states that a dealer will replace "all covered components . . . that are found to be defective in factory-supplied materials or workmanship during the applicable warranty periods." The engine and its components—including the cylinder block and cylinder heads—are included in Ford's list of "covered components."

1210. Ford manufactured and/or installed the engines and the engines' component parts in the Class Vehicles, and the engines and their component parts are covered by the express Warranties.

1211. The Engine Defect at issue in this litigation was present at the time the Class Vehicles were sold or leased to North Carolina Plaintiff and the North Carolina Sub-Class Members.

1212. Plaintiff relied on Ford's express warranties, which were a material part of the bargain, when purchasing or leasing their Class Vehicles.

1213. Under the express Warranties, Ford was obligated to correct the Engine Defect in the vehicles owned or leased by North Carolina Plaintiff and the North Carolina Sub-Class Members.

1214. Although Ford was obligated to correct the Engine Defect, none of the attempted fixes to the engines are adequate under the terms of the Warranties, as they did not cure the defect.

1215. Ford breached the express Warranties by performing illusory repairs. Rather than repairing the vehicles pursuant to the express Warranties, Ford falsely informed North Carolina Sub-Class Members that there was no problem with their Class Vehicles, performed ineffective procedures including software updates, and/or replaced defective components in the engines with equally defective components, without actually repairing the Class Vehicles.

1216. Ford and its agent dealers have failed and refused to conform the engines to the express Warranties. Ford's conduct, as discussed throughout this Complaint, has voided any attempt on its part to disclaim liability for its actions.

1217. Moreover, Ford's attempt to disclaim or limit these express Warranties vis-à-vis consumers is unconscionable and unenforceable under the circumstances here. Specifically, Ford's warranty limitation is unenforceable because it knowingly sold a defective product without informing consumers about the defect.

1218. The time limits contained in Ford's warranty period were also unconscionable and inadequate to protect North Carolina Plaintiff and the North Carolina Sub-Class Members. Among other things, North Carolina Plaintiff and the North Carolina Sub-Class Members had no meaningful choice in determining these time limitations, the terms of which unreasonably favored Ford. A gross disparity in bargaining power existed between Ford and the Class members, and Ford knew or should have known that the Class Vehicles were defective at the time of sale.

1219. North Carolina Plaintiff and the North Carolina Sub-Class Members have complied with all obligations under the Warranties, or otherwise have been excused from performance of said obligations as a result of Ford's conduct described herein.

1220. North Carolina Plaintiff and the North Carolina Sub-Class Members were not required to notify Ford of the breach because affording Ford a reasonable opportunity to cure its breach of written warranty would have been futile. Ford was also on notice of the Engine Defect from the complaints and service requests it received from Plaintiff and the Class Members, from repairs and/or replacements of the engines or components thereof, and through other internal and external sources.

1221. Because Ford, through its conduct and exemplified by its own service bulletins, has covered repairs of the Engine Defect if Ford determines the repairs are appropriately covered under the Warranties, Ford cannot now deny that the Warranties cover the Engine Defect.

1222. Because Ford has not been able remedy the Engine Defect, any limitation on remedies included in the Warranties causes the Warranties to fail their essential purposes, rendering them null and void.

1223. As a direct and proximate cause of Ford's breach, North Carolina Plaintiff and the North Carolina Sub-Class Members suffered damages and continue to suffer damages, including economic damages at the point of sale or lease and diminution of value of their Class Vehicles. Additionally, North Carolina Plaintiff and the North Carolina Sub-Class Members have incurred or will incur economic damages at the point of repair in the form of the cost of repair.

1224. As a direct and proximate result of Ford's breach of express warranties, North Carolina Plaintiff and the North Carolina Sub-Class Members have been damaged in an amount to be determined at trial.

### THIRTY-EIGHTH CAUSE OF ACTION
#### Breach of the Implied Warranty of Merchantability
#### N.C. Gen. Stat. §§ 26-1-2-314 and 26-1-2.1-212
#### (On behalf of the North Carolina Sub-Class)

1225. Plaintiffs incorporate by reference each allegation set forth in paragraphs 1-426, above.

1226. North Carolina Plaintiff brings this cause of action individually and on behalf of the members of the North Carolina Sub-Class.

1227. Ford is and was at all relevant times a "merchant" with respect to motor vehicles under N.C. Gen. Stat. § 25-2-104(1) and a "seller" of motor vehicles under § 25-2-103(1)(d).

1228. With respect to leases, Ford is and was at all relevant times a "lessor" of motor vehicles under N.C. Gen. Stat. § 25-2A-103(1)(p).

1229. The Class Vehicles are and were at all relevant times "goods" within the meaning of N.C. Gen. Stat. §§ 25-2-105(1) and 25-2A-103(1)(h).

1230. A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law under N.C. Gen. Stat. §§ 25-2-314 and 252A-212.

1231. Ford knew or had reason to know of the specific use for which the Class Vehicles were purchased or leased. Ford directly sold and marketed vehicles equipped with the engines to customers through authorized dealers, like those from whom North Carolina Plaintiff and the North Carolina Sub-Class Members bought or leased their vehicles, for the intended purpose of consumers

purchasing the vehicles. Ford knew that the Class Vehicles would and did pass unchanged from Ford to the authorized dealers to North Carolina Plaintiff and the North Carolina Sub-Class Members, with no modification to the defective engines.

1232. Ford provided Plaintiff and Class Members with an implied warranty that the Class Vehicles and their components and parts are merchantable and fit for the ordinary purposes for which they were sold.

1233. This implied warranty included, among other things: (i) a warranty that the Class Vehicles and their engines that were manufactured, supplied, distributed, and/or sold by Ford were safe and reliable for providing transportation; and (ii) a warranty that the Class Vehicles and their engines would be fit for their intended use while the Class Vehicles were being operated.

1234. Contrary to the applicable implied warranties, the Class Vehicles and their engines at the time of sale and thereafter were not fit for their ordinary and intended purpose of providing Plaintiff and Class Members with reliable, durable, and safe transportation. Instead, the Class Vehicles are defective, including, but not limited to, the defective design and manufacture of their engines and the existence of the Engine Defect at the time of sale or lease and thereafter. Ford knew of this defect at the time these sale or lease transactions occurred.

1235. As a result of Ford's breach of the applicable implied warranties, North Carolina Plaintiff and the North Carolina Sub-Class Members suffered an ascertainable loss of money, property, and/or value of their Class Vehicles. Additionally, as a result of the Engine Defect, North Carolina Plaintiff and the North Carolina Sub-Class Members were harmed and suffered actual damages in that the Class Vehicles' engine components are substantially certain to fail before their expected useful life has run.

1236. Ford's actions, as complained of herein, breached the implied warranty that the Class Vehicles were of merchantable quality and fit for such use in violation of N.C. Gen. Stat. §§ 25-2-314 and 252A-212.

1237. North Carolina Plaintiff and the North Carolina Sub-Class Members have complied with all obligations under the warranty, or otherwise have been excused from performance of said obligations as a result of Ford's conduct described herein.

1238. North Carolina Plaintiff and the North Carolina Sub-Class Members were not required to notify Ford of the breach because affording Ford a reasonable opportunity to cure its breach of implied warranty would have been futile. Ford was also on notice of the Engine Defect from the complaints and service requests it received from Plaintiff and the Class Members, from repairs and/or replacements of the engines or components thereof, and through other internal sources.

1239. In addition, on or about January 26, 2021, North Carolina Plaintiff gave notice to Defendant that they intended to pursue her warranty claims on behalf of a class of similarly situated consumers.

1240. Because North Carolina Plaintiff purchased her vehicle from an authorized Ford dealer, she is in privity with Ford since (1) an agency relationship establishes privity for purposes of the breach of implied warranty claims and (2) privity is not required where plaintiffs are intended third-party beneficiaries of a defendant's implied warranties and of the contracts between Ford and its authorized dealers.

1241. As a direct and proximate cause of Ford's breach, North Carolina Plaintiff and the North Carolina Sub-Class Members suffered damages and continue to suffer damages, including economic damages at the point of sale or lease and diminution of value of their Class Vehicles. Additionally, North Carolina Plaintiff and the North Carolina Sub-Class Members have incurred or will incur economic damages at the point of repair in the form of the cost of repair.

1242. As a direct and proximate result of Ford's breach of the implied warranty of merchantability, North Carolina Plaintiff and the North Carolina Sub-Class Members have been damaged in an amount to be proven at trial.

**THIRTY-NINTH CAUSE OF ACTION**
**Violations of the Washington Consumer Protection Act,**
**Wash. Rev. Code § 19.86.010,** *et seq.*
**(On Behalf of the Washington Sub-Class)**

1243. Plaintiffs incorporate by reference each allegation set forth in paragraphs 1-426, above.

1244. Plaintiffs Zachary Scott Damm and Amanda Gates ("Washington Plaintiffs") bring this cause of action individually and on behalf of the Washington Sub-Class.

202

1245. Ford, Washington Plaintiffs and Washington Sub-Class Members are "persons" within the meaning of Wash. Rev. Code § 19.86.010(2).

1246. Ford committed the acts complained of herein in the course of "trade" or "commerce" within the meaning of Wash. Rev. Code § 19.96.010.

1247. The Washington Consumer Protection Act ("Washington CPA") broadly prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Wash. Rev. Code § 19.86.020. Ford engaged in unfair and deceptive acts and practices that violated the Washington CPA as described above.

1248. Ford participated in and engaged in deceptive business or trade practices prohibited by the Washington CPA by failing to disclose and actively concealing that the Class Vehicles contained the Engine Defect, by marketing their Class Vehicles as safe and of high quality, and by presenting themselves as a reputable manufacturer that valued safety and stood behind its vehicles after they were sold.

1249. Ford knowingly and intentionally misrepresented and omitted material facts in connection with the sale or lease of the Class Vehicles by, among other things, failing to disclose the Engine Defect; concealing the Engine Defect; promoting and selling or leasing Class Vehicles it knew were defective, including by marketing its vehicles as safe, reliable, easily operable, efficient, and of high quality; presenting itself as a reputable manufacturer that valued safety, reliability, performance and efficiency, and stood behind its vehicles after they were sold; failing to make repairs or making repairs and providing replacements that caused Washington Plaintiffs and the Washington Sub-Class Members to experience repeated instances of failure, rendering the New Vehicle Limited Warranty useless; and minimizing the scope and severity of the problems with the Class Vehicles, refusing to acknowledge that they are defective, and failing to provide adequate relief to consumers. Ford misrepresented and omitted such material facts with the intent to mislead Washington Plaintiffs and the Washington Sub-Class Members about the true nature of the Class Vehicles.

1250. Ford systematically misrepresented, concealed, suppressed, or omitted material facts relating to the Class Vehicles and Engine Defect in the course of its business.

1251. Ford also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Class Vehicles.

1252. Ford's unfair and deceptive acts or practices occurred repeatedly in Ford's trade or business, were capable of deceiving a substantial portion of the purchasing public, and imposed a serious safety risk on the public.

1253. Ford knew that the Class Vehicles and their engines suffered from an inherent defect, were defectively designed or manufactured, and were not suitable for their intended use.

1254. Ford knew or should have known that its conduct violated the Washington CPA.

1255. Washington Plaintiffs and the Washington Sub-Class Members reasonably relied on Ford's misrepresentations and omissions of material facts in its advertisements of the Class Vehicles and in the purchase of the Class Vehicles.

1256. Washington Plaintiffs and the Washington Sub-Class Members had no way of discerning that Ford's misrepresentations were false and misleading when they acquired their Class Vehicles because Washington Plaintiffs and the Washington Sub-Class Members did not have access to Ford's exclusive and superior knowledge about the Class Vehicles' design and the Engine Defect.

1257. Had Washington Plaintiffs and the Washington Sub-Class Members known that the Class Vehicles contained and/or would exhibit the Engine Defect, they would not have purchased or leased the Class Vehicles or would have paid less for them. Plaintiff did not receive the benefit of their bargain as a result of Ford's misconduct.

1258. Ford owed Washington Plaintiffs and the Washington Sub-Class Members a duty to disclose the truth about the Engine Defect because Ford:

a.     possessed exclusive and superior knowledge of the design and manufacture of the Class Vehicles and the Engine Defect;

b.     intentionally concealed the foregoing from Washington Plaintiffs and the Washington Sub-Class Members; and/or

c.      made incomplete representations regarding the quality and durability of the Class Vehicles, while purposefully withholding material facts from Washington Plaintiffs and the Washington Sub-Class Members that contradicted these representations.

1259. Due to Ford's specific and superior knowledge that the Engines in the Class Vehicles will fail due to the Engine Defect, its false representations regarding the increased durability of the Class Vehicles, and reliance by Washington Plaintiffs and the Washington Sub-Class Members on these material representations, Ford had a duty to disclose to Class members that the Engine Defect will cause engine failure in Class Vehicles, that Class Vehicles do not have the expected durability, reliability, and/or safety over other vehicles or of their predecessor engines, that failure of the Engines will cause damage to Class Vehicle, and that Class members would be required to bear the cost of the damage to their vehicles. Having volunteered to provide information to Washington Plaintiffs and the Washington Sub-Class Members, Ford had the duty to disclose not just the partial truth, but the entire truth. These omitted and concealed facts were material because they directly impact the value of the Class Vehicles purchased or leased by Washington Plaintiffs and the Washington Sub-Class Members. Longevity, durability, performance, and safety are material concerns to Ford consumers. Ford represented to Washington Plaintiffs and the Washington Sub-Class Members that they were purchasing or leasing vehicles that were durable, reliable, safe, efficient, of high quality, and containing engines of advanced and superior characteristics and technology as alleged throughout this Complaint, when in fact it is only a matter of time before the engines fail due to the Engine Defect.

1260. Washington Plaintiffs and the Washington Sub-Class Members suffered injury in fact to a legally protected interest. As a result of Ford's conduct, Washington Plaintiffs and the Washington Sub-Class Members were harmed and suffered actual damages in the form of the costs of diagnosis and repair of their vehicles, and the diminished value of their vehicles.

1261. As a direct and proximate result of Ford's unfair or deceptive acts or practices, Washington Plaintiffs and the Washington Sub-Class Members suffered and will continue to suffer injury in fact and/or actual damages.

1262. Defendant's violations present a continuing risk to Washington Plaintiffs and the

Washington Sub-Class Members as well as to the general public. Defendant's unlawful acts and practices complained of herein affect the public interest.

1263. As a proximate and direct result of Ford's unfair and deceptive trade practices, Washington Plaintiffs and members of the Washington Sub-Class purchased or leased Class Vehicles and suffered an ascertainable loss and financial harm. These ascertainable losses include, among other things, overpayment at the time of purchase or lease, the cost to repair the Engine Defect, replacement of the damaged related system components, diminution of Class Vehicle resale value, increased repair and maintenance costs, and other substantial monetary damages and inconvenience.

1264. Ford was on notice of the Engine Defect from the pre-suit notices from Plaintiffs, the complaints and service requests Ford received from consumers, from repairs and/or replacements of the engines or components thereof, and through other internal and external sources. Washington Plaintiffs and members of the Washington Sub-Class seek all damages and relief to which they are entitled because Ford failed to remedy its unlawful conduct.

1265. Ford is liable to Washington Plaintiffs and the Washington Sub-Class for damages in amounts to be proven at trial, including punitive damages, attorneys' fees, costs, and any other remedies the Court may deem appropriate under Wash. Rev. Code § 19.86.090. Because Ford's actions were willful and knowing, Plaintiffs' damages should be trebled.

**FORTIETH CAUSE OF ACTION**
**Breach of Express Warranty**
**Wash. Rev. Code §§ 62A.2-313 and 62A.2A-210**
**(On behalf of the Washington Sub-Class)**

1266. Plaintiffs incorporate by reference each allegation set forth in paragraphs 1-426, above.

1267. Washington Plaintiffs bring this cause of action individually and on behalf of the members of the Washington Sub-Class.

1268. Ford is and was at all relevant times a "merchant" with respect to motor vehicles under Wash. Rev. Code §§ 62A.2-104(1) and 62A.2A-103(1)(t), and a "seller" of motor vehicles under § 2.103(a)(4).

206

1269. With respect to leases, Ford is and was at all relevant times a "lessor" of motor vehicles under Wash. Rev. Code § 62A.2A-103(1)(p).

1270. The Class Vehicles are and were at all relevant times "goods" within the meaning of Wash. Rev. Code §§ 62A.2-105(1) and 62A.2A-103(1)(h).

1271. Ford provided all purchasers and lessees of the Class Vehicles with the express warranty described herein, which became a material part of the bargain.

1272. Ford provided all purchasers and lessees of Lincoln-branded Class Vehicles with the Lincoln Warranty and all purchasers and lessees of Ford or Ford-branded Class Vehicles with the Ford/Ford Warranty.

1273. Ford sold and leased the Class Vehicles with a written express warranty covering the Vehicles for three years or 36,000 miles, whichever comes first.

1274. Ford's New Vehicle Limited Warranty expressly states that Ford will "without charge, repair, replace, or adjust all parts on your vehicle that malfunction or fail during normal use during the applicable coverage period due to a manufacturing defect in factory-supplied materials or factory workmanship" so long the Vehicle is properly operated and maintained and taken to a Ford dealership for repair within the warranty period.

1275. Ford further provides powertrain warranty coverage, which is applicable to "the Engine: all internal lubricated parts, cylinder block, cylinder heads, electrical fuel pump, powertrain control module, engine mounts, flywheel, injection pump, manifold (exhaust and intake), manifold bolts, oil pan, oil pump, seals and gaskets, engine thermostat, engine, thermostat housing, timing chain cover, timing chain (gears or belt), turbocharger/supercharger unit, valve covers, water pump" as well as the components in the transmission, front-wheel drive, rear-wheel drive, and four-wheel/all-wheel drive. This coverage applies for 5-years or up to 60,000 miles, whichever comes first.

1276. For certified pre-owned ("CPO") Vehicles, Ford offers a limited warranty covering CPO Vehicles for 12 months or 12,000 miles, whichever comes first.

1277. Ford's CPO Vehicle warranty states that a dealer will replace "all covered components . . . that are found to be defective in factory-supplied materials or workmanship during

the applicable warranty periods." The engine and its components—including the cylinder block and cylinder heads—are included in Ford's list of "covered components."

1278. Ford manufactured and/or installed the engines and the engines' component parts in the Class Vehicles, and the engines and their component parts are covered by the express Warranties.

1279. The Engine Defect at issue in this litigation was present at the time the Class Vehicles were sold or leased to Washington Plaintiffs and the Washington Sub-Class Members.

1280. Plaintiff relied on Ford's express warranties, which were a material part of the bargain, when purchasing or leasing their Class Vehicles.

1281. Under the express Warranties, Ford was obligated to correct the Engine Defect in the vehicles owned or leased by Washington Plaintiffs and the Washington Sub-Class Members.

1282. Although Ford was obligated to correct the Engine Defect, none of the attempted fixes to the engines are adequate under the terms of the Warranties, as they did not cure the defect.

1283. Ford breached the express Warranties by performing illusory repairs. Rather than repairing the vehicles pursuant to the express Warranties, Ford falsely informed Washington Sub-Class Members that there was no problem with their Class Vehicles, performed ineffective procedures including software updates, and/or replaced defective components in the engines with equally defective components, without actually repairing the Class Vehicles.

1284. Ford and its agent dealers have failed and refused to conform the engines to the express Warranties. Ford's conduct, as discussed throughout this Complaint, has voided any attempt on its part to disclaim liability for its actions.

1285. Moreover, Ford's attempt to disclaim or limit these express Warranties vis-à-vis consumers is unconscionable and unenforceable under the circumstances here. Specifically, Ford's warranty limitation is unenforceable because it knowingly sold a defective product without informing consumers about the defect.

1286. The time limits contained in Ford's warranty period were also unconscionable and inadequate to protect Washington Plaintiffs and the Washington Sub-Class Members. Among other things, Washington Plaintiffs and the Washington Sub-Class Members had no meaningful choice

in determining these time limitations, the terms of which unreasonably favored Ford. A gross disparity in bargaining power existed between Ford and the Class members, and Ford knew or should have known that the Class Vehicles were defective at the time of sale.

1287. Washington Plaintiffs and the Washington Sub-Class Members have complied with all obligations under the Warranties, or otherwise have been excused from performance of said obligations as a result of Ford's conduct described herein.

1288. Washington Plaintiffs and the Washington Sub-Class Members were not required to notify Ford of the breach because affording Ford a reasonable opportunity to cure its breach of written warranty would have been futile. Ford was also on notice of the Engine Defect from the complaints and service requests it received from Plaintiff and the Class Members, from repairs and/or replacements of the engines or components thereof, and through other internal and external sources.

1289. Because Ford, through its conduct and exemplified by its own service bulletins, has covered repairs of the Engine Defect if Ford determines the repairs are appropriately covered under the Warranties, Ford cannot now deny that the Warranties cover the Engine Defect.

1290. Because Ford has not been able remedy the Engine Defect, any limitation on remedies included in the Warranties causes the Warranties to fail their essential purposes, rendering them null and void.

1291. As a direct and proximate cause of Ford's breach, Washington Plaintiffs and the Washington Sub-Class Members suffered damages and continue to suffer damages, including economic damages at the point of sale or lease and diminution of value of their Class Vehicles. Additionally, Washington Plaintiffs and the Washington Sub-Class Members have incurred or will incur economic damages at the point of repair in the form of the cost of repair.

1292. As a direct and proximate result of Ford's breach of express warranties, Washington Plaintiffs and the Washington Sub-Class Members have been damaged in an amount to be determined at trial.

### FORTY-FIRST CAUSE OF ACTION
**Violations of the Wisconsin Deceptive Trade Practices Act,
Wisc. Stat. § 100.18, *et seq.*
(On behalf of the Wisconsin Sub-Class)**

1293. Plaintiffs incorporate by reference each allegation set forth in paragraphs 1-426, above.

1294. Plaintiff Shari Techlin ("Wisconsin Plaintiff") brings this cause of action individually and on behalf of the Wisconsin Sub-Class.

1295. Ford, Wisconsin Plaintiff and Wisconsin Sub-Class Members are "persons" within the meaning of Wis. Stat. § 100.18(1).

1296. The Wisconsin Deceptive Trade Practices Act ("Wisconsin DTPA") prohibits an "assertion, representation or statement of fact which is untrue, deceptive or misleading." WIS. STAT. § 100.18(1). Ford engaged in unfair and deceptive acts and practices that violated the Wisconsin DTPA as described above.

1297. Ford participated in and engaged in deceptive business or trade practices prohibited by the Wisconsin DTPA by failing to disclose and actively concealing that the Class Vehicles contained the Engine Defect, by marketing their Class Vehicles as safe and of high quality, and by presenting themselves as a reputable manufacturer that valued safety and stood behind its vehicles after they were sold,.

1298. Ford knowingly and intentionally misrepresented and omitted material facts in connection with the sale or lease of the Class Vehicles by, among other things, failing to disclose the Engine Defect; concealing the Engine Defect; promoting and selling or leasing Class Vehicles it knew were defective, including by marketing its vehicles as safe, reliable, easily operable, efficient, and of high quality; presenting itself as a reputable manufacturer that valued safety, reliability, performance and efficiency, and stood behind its vehicles after they were sold; failing to make repairs or making repairs and providing replacements that caused Wisconsin Plaintiff and the Wisconsin Sub-Class Members to experience repeated instances of failure, rendering the New Vehicle Limited Warranty useless; and minimizing the scope and severity of the problems with the Class Vehicles, refusing to acknowledge that they are defective, and failing to provide adequate

relief to consumers. Ford misrepresented and omitted such material facts with the intent to mislead Wisconsin Plaintiff and the Wisconsin Sub-Class Members about the true nature of the Class Vehicles.

1299. Ford systematically misrepresented, concealed, suppressed, or omitted material facts relating to the Class Vehicles and Engine Defect in the course of its business.

1300. Ford also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Class Vehicles.

1301. Ford's unfair and deceptive acts or practices occurred repeatedly in Ford's trade or business, were capable of deceiving a substantial portion of the purchasing public, and imposed a serious safety risk on the public.

1302. Ford knew that the Class Vehicles and their engines suffered from an inherent defect, were defectively designed or manufactured, and were not suitable for their intended use.

1303. Ford knew or should have known that its conduct violated the Wisconsin DTPA.

1304. Wisconsin Plaintiff and the Wisconsin Sub-Class Members reasonably relied on Ford's misrepresentations and omissions of material facts in its advertisements of the Class Vehicles and in the purchase of the Class Vehicles.

1305. Wisconsin Plaintiff and the Wisconsin Sub-Class Members had no way of discerning that Ford's misrepresentations were false and misleading when they acquired their Class Vehicles because Wisconsin Plaintiff and the Wisconsin Sub-Class Members did not have access to Ford's exclusive and superior knowledge about the Class Vehicles' design and the Engine Defect.

1306. Had Wisconsin Plaintiff and the Wisconsin Sub-Class Members known that the Class Vehicles contained and/or would exhibit the Engine Defect, they would not have purchased or leased the Class Vehicles or would have paid less for them. Plaintiff did not receive the benefit of their bargain as a result of Ford's misconduct.

1307. Ford owed Wisconsin Plaintiff and the Wisconsin Sub-Class Members a duty to disclose the truth about the Engine Defect because Ford:

a.    possessed exclusive and superior knowledge of the design and manufacture of the Class Vehicles and the Engine Defect;

b.    intentionally concealed the foregoing from Wisconsin Plaintiff and the Wisconsin Sub-Class Members; and/or

c.    made incomplete representations regarding the quality and durability of the Class Vehicles, while purposefully withholding material facts from Wisconsin Plaintiff and the Wisconsin Sub-Class Members that contradicted these representations.

1308.  Due to Ford's specific and superior knowledge that the Engines in the Class Vehicles will fail due to the Engine Defect, its false representations regarding the increased durability of the Class Vehicles, and reliance by Wisconsin Plaintiff and the Wisconsin Sub-Class Members on these material representations, Ford had a duty to disclose to Class members that the Engine Defect will cause engine failure in Class Vehicles, that Class Vehicles do not have the expected durability, reliability, and/or safety over other vehicles or of their predecessor engines, that failure of the Engines will cause damage to Class Vehicle, and that Class members would be required to bear the cost of the damage to their vehicles. Having volunteered to provide information to Wisconsin Plaintiff and the Wisconsin Sub-Class Members, Ford had the duty to disclose not just the partial truth, but the entire truth. These omitted and concealed facts were material because they directly impact the value of the Class Vehicles purchased or leased by Wisconsin Plaintiff and the Wisconsin Sub-Class Members. Longevity, durability, performance, and safety are material concerns to Ford consumers. Ford represented to Wisconsin Plaintiff and the Wisconsin Sub-Class Members that they were purchasing or leasing vehicles that were durable, reliable, safe, efficient, of high quality, and containing engines of advanced and superior characteristics and technology as alleged throughout this Complaint, when in fact it is only a matter of time before the engines fail due to the Engine Defect.

1309.  Wisconsin Plaintiff and the Wisconsin Sub-Class Members suffered injury in fact to a legally protected interest. As a result of Ford's conduct, Wisconsin Plaintiff and the Wisconsin Sub-Class Members were harmed and suffered actual damages in the form of the costs of diagnosis and repair of their vehicles, and the diminished value of their vehicles.

1310. As a direct and proximate result of Ford's unfair or deceptive acts or practices, Wisconsin Plaintiff and the Wisconsin Sub-Class Members suffered and will continue to suffer injury in fact and/or actual damages.

1311. Defendant's violations present a continuing risk to Wisconsin Plaintiff and the Wisconsin Sub-Class Members as well as to the general public. Defendant's unlawful acts and practices complained of herein affect the public interest.

1312. As a proximate and direct result of Ford's unfair and deceptive trade practices, Wisconsin Plaintiff and members of the Wisconsin Sub-Class purchased or leased Class Vehicles and suffered an ascertainable loss and financial harm.  These ascertainable losses include, among other things, overpayment at the time of purchase or lease, the cost to repair the Engine Defect, replacement of the damaged related system components, diminution of Class Vehicle resale value, increased repair and maintenance costs, and other substantial monetary damages and inconvenience.

1313. Ford was on notice of the Engine Defect from the pre-suit notices from Plaintiffs, the complaints and service requests Ford received from consumers, from repairs and/or replacements of the engines or components thereof, and through other internal and external sources. Wisconsin Plaintiff and members of the Wisconsin Sub-Class seek all damages and relief to which they are entitled because Ford failed to remedy its unlawful conduct.

1314. Ford is liable to Wisconsin Plaintiff and the Wisconsin Sub-Class for damages in amounts to be proven at trial, including punitive damages, attorneys' fees, costs, and any other remedies the Court may deem appropriate under Wis. Stat. § 100.18(11)(b)(2). Because Ford's actions were willful and knowing, Plaintiffs' damages should be trebled.

**FORTY-SECOND CAUSE OF ACTION**
**Violation of the Nebraska Consumer Protection Act**
**Neb. Rev. Stat. §§ 59-1601, *et seq.***
**(On behalf of the Nebraska Sub-Class)**

1315. Plaintiffs incorporate by reference each allegation set forth in paragraphs 1-426, above.

1316. Plaintiff John Krecek ("Nebraska Plaintiff") brings this cause of action individually and on behalf of the members of the Nebraska Sub-Class.

213

1317. Nebraska Plaintiff, the Nebraska Sub-Class Members, and Ford are "person[s]" within the meaning of the Nebraska Consumer Protection Act ("Nebraska CPA"), Neb. Rev. Stat. § 59-1601(1).

1318. Ford's actions as set forth herein occurred in the conduct of trade or commerce as defined under the Nebraska CPA, Neb. Rev. Stat. § 59-1601(2).

1319. The Nebraska CPA prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce." Neb. Rev. Stat. § 59-1602. Ford engaged in unfair and deceptive acts or practices that violated the Nebraska CPA as described above.

1320. Ford participated in and engaged in deceptive business or trade practices prohibited by the Nebraska CPA by failing to disclose and actively concealing that the Class Vehicles contained the Engine Defect, by marketing their Class Vehicles as safe and of high quality, and by presenting themselves as a reputable manufacturer that valued safety and stood behind its vehicles after they were sold.

1321. Ford knowingly and intentionally misrepresented and omitted material facts in connection with the sale or lease of the Class Vehicles by, among other things, failing to disclose the Engine Defect; concealing the Engine Defect; by promoting and selling or leasing Class Vehicles it knew were defective, including by marketing its vehicles as safe, reliable, easily operable, efficient, and of high quality; presenting itself as a reputable manufacturer that valued safety, reliability, performance and efficiency, and stood behind its vehicles after they were sold; failing to make repairs or making repairs and providing replacements that caused Nebraska Plaintiff and the Nebraska Sub-Class Members to experience repeated instances of failure, rendering the New Vehicle Limited Warranty useless; and minimizing the scope and severity of the problems with the Class Vehicles, refusing to acknowledge that they are defective, and failing to provide adequate relief to consumers. Ford misrepresented and omitted such material facts with the intent to mislead Nebraska Plaintiff and the Nebraska Sub-Class Members about the true nature of the Class Vehicles.

1322. Ford systematically misrepresented, concealed, suppressed, or omitted material facts relating to the Class Vehicles and Engine Defect in the course of its business.

1323. Ford also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Class Vehicles.

1324. Ford's unfair and deceptive acts or practices occurred repeatedly in Ford's trade or business, were capable of deceiving a substantial portion of the purchasing public, and imposed a serious safety risk on the public.

1325. Ford knew that the Class Vehicles and their engines suffered from an inherent defect, were defectively designed or manufactured, and were not suitable for their intended use.

1326. Ford knew or should have known that its conduct violated the Nebraska CPA.

1327. Nebraska Plaintiff and the Nebraska Sub-Class Members reasonably relied on Ford's misrepresentations and omissions of material facts in its advertisements of the Class Vehicles and in the purchase of the Class Vehicles.

1328. Nebraska Plaintiff and the Nebraska Sub-Class Members had no way of discerning that Ford's misrepresentations were false and misleading when they acquired their Class Vehicles because Nebraska Plaintiff and the Nebraska Sub-Class Members did not have access to Ford's exclusive and superior knowledge about the Class Vehicles' design and the Engine Defect.

1329. Had Nebraska Plaintiff and the Nebraska Sub-Class Members known that the Class Vehicles contained and/or would exhibit the Engine Defect, they would not have purchased or leased the Class Vehicles or would have paid less for them. Nebraska Plaintiff and the Nebraska Sub-Class Members did not receive the benefit of their bargain as a result of Ford's misconduct.

1330. Ford owed Nebraska Plaintiff and the Nebraska Sub-Class Members a duty to disclose the truth about the Engine Defect because Ford:

    a.    possessed exclusive and superior knowledge of the design and manufacture of the Class Vehicles and the Engine Defect;

    b.    intentionally concealed the foregoing from Nebraska Plaintiff and the Nebraska Sub-Class Members; and/or

    c.    made incomplete representations regarding the quality and durability of the

Class Vehicles, while purposefully withholding material facts from Nebraska Plaintiff and the Nebraska Sub-Class Members that contradicted these representations.

1331. Due to Ford's specific and superior knowledge that the Engines in the Class Vehicles will fail due to the Engine Defect, its false representations regarding the increased durability of the Class Vehicles, and reliance by Nebraska Plaintiff and the Nebraska Sub-Class Members on these material representations, Ford had a duty to disclose to Class members that the Engine Defect will cause engine failure in Class Vehicles, that Class Vehicles do not have the expected durability, reliability, and/or safety over other vehicles or of their predecessor engines, that failure of the Engines will cause damage to Class Vehicle, and that Class members would be required to bear the cost of the damage to their vehicles. Having volunteered to provide information to Nebraska Plaintiff and the Nebraska Sub-Class Members, Ford had the duty to disclose not just the partial truth, but the entire truth. These omitted and concealed facts were material because they directly impact the value of the Class Vehicles purchased or leased by Nebraska Plaintiff and the Nebraska Sub-Class Members. Longevity, durability, performance, and safety are material concerns to Ford consumers. Ford represented to Nebraska Plaintiff and the Nebraska Sub-Class Members that they were purchasing or leasing vehicles that were durable, reliable, safe, efficient, of high quality, and containing engines of advanced and superior characteristics and technology as alleged throughout this Complaint, when in fact it is only a matter of time before the engines fail due to the Engine Defect.

1332. Nebraska Plaintiff and the Nebraska Sub-Class Members suffered injury in fact to a legally protected interest. As a result of Ford's conduct, Nebraska Plaintiff and the Nebraska Sub-Class Members were harmed and suffered actual damages in the form of the costs of diagnosis and repair of their vehicles, and the diminished value of their vehicles.

1333. As a direct and proximate result of Ford's unfair or deceptive acts or practices, Nebraska Plaintiff and the Nebraska Sub-Class Members suffered and will continue to suffer injury in fact and/or actual damages.

1334. Defendant's violations present a continuing risk to Nebraska Plaintiff and the Nebraska Sub-Class Members as well as to the general public. Defendant's unlawful acts and

216

practices complained of herein affect the public interest.

1335. As a proximate and direct result of Ford's unfair and deceptive trade practices, Nebraska Plaintiff and members of the Nebraska Sub-Class purchased or leased Class Vehicles and suffered an ascertainable loss and financial harm. These ascertainable losses include, among other things, overpayment at the time of purchase or lease, the cost to repair the Engine Defect, replacement the damaged related system components, diminution of Class Vehicle resale value, increased repair and maintenance costs, and other substantial monetary damages and inconvenience.

1336. Nebraska Plaintiff provided notice of his claim by letter dated September 16, 2022. Ford was also on notice of the Engine Defect from the prior pre-suit notices from Plaintiffs, the complaints and service requests Ford received from consumers, from repairs and/or replacements of the engines or components thereof, and through other internal and external sources. Nebraska Plaintiff and members of the Nebraska Sub-Class seek all damages and relief to which they are entitled because Ford failed to remedy its unlawful conduct.

1337. As a direct and proximate result of Ford's violations of the Nebraska CPA, Plaintiff and Nebraska State Class members have suffered injury-in-fact and/or actual damage.

1338. As a direct and proximate result of Ford's unfair or deceptive acts or practices alleged herein, Nebraska Plaintiff and other members of the Nebraska Sub-Class suffered and will continue to suffer actual damages and are entitled to recover actual damages to the extent permitted by law, including class action rules, in an amount to be proven at trial. Because Ford's conduct caused injury to Nebraska Plaintiff and the Nebraska Sub-Class Members' property through violations of the Nebraska CPA, Nebraska Plaintiff and the Nebraska Sub-Class Members seek recovery of actual damages, as well as enhanced damages up to $1,000, an order enjoining Ford's unfair or deceptive acts and practices, costs of Court, reasonable attorneys' fees, and any other just and proper relief available under Neb. Rev. Stat. § 59-1609.

### FORTY-THIRD CAUSE OF ACTION
**Breach of Express Warranty,**
**Neb.Rev.St. U.C.C. §§ 2-313 and 2A-210**
**(On Behalf of the Nebraska Sub-Class)**

1339. Plaintiffs incorporate by reference each allegation set forth in paragraphs 1-426,

above.

1340. Nebraska Plaintiff brings this cause of action individually and on behalf of the Nebraska Sub-Class.

1341. Ford is and was at all relevant times a "merchant" with respect to motor vehicles under Neb.Rev.St. U.C.C. § 2-104(1) and "sellers" of motor vehicles under § 2-103(1)(d). 2111.

1342. With respect to leases, Ford is and was at all relevant times a "lessor" of motor vehicles under Neb.Rev.St. U.C.C. § 2A-103(1)(p).

1343. The Class Vehicles are and were at all relevant times "goods" within the meaning of Neb.Rev.St. U.C.C. §§ 2-105(1) and 2A-103(1)(h). 2113.

1344. The engines were manufactured and/or installed in the Class Vehicles by Defendant and are covered by the express warranty.

1345. Ford provided all purchasers and lessees of the Class Vehicles with the express warranty described herein, which became a material part of the bargain.

1346. Ford provided all purchasers and lessees of Lincoln-branded Class Vehicles with the Lincoln Warranty and all purchasers and lessees of Ford or Ford-branded Class Vehicles with the Ford/Ford Warranty.

1347. Ford sold and leased the Class Vehicles with a written express warranty covering the Vehicles for three years or 36,000 miles, whichever comes first.

1348. Ford's New Vehicle Limited Warranty expressly states that Ford will "without charge, repair, replace, or adjust all parts on your vehicle that malfunction or fail during normal use during the applicable coverage period due to a manufacturing defect in factory-supplied materials or factory workmanship" so long as the Vehicle is properly operated and maintained and taken to a Ford dealership for repair within the warranty period. Ford further provides powertrain warranty coverage, which is applicable to "the Engine: all internal lubricated parts, cylinder block, cylinder heads, electrical fuel pump, powertrain control module, engine mounts, flywheel, injection pump, manifold (exhaust and intake), manifold bolts, oil pan, oil pump, seals and gaskets, engine thermostat, engine, thermostat housing, timing chain cover, timing chain (gears or belt), turbocharger/supercharger unit, valve covers, water pump," as well as the components in the

transmission, front-wheel drive, rear-wheel drive, and four-wheel/all-wheel drive. This coverage applies for 5 years or up to 60,000 miles, whichever comes first.

1349. For certified pre-owned ("CPO") Vehicles, Ford offers a limited warranty covering CPO Vehicles for 12 months or 12,000 miles, whichever comes first.

1350. Ford's CPO Vehicle warranty states that a dealer will replace "all covered components . . . that are found to be defective in factory-supplied materials or workmanship during the applicable warranty periods." The engine and its components—including the cylinder block and cylinder heads—are included in Ford's list of "covered components."

1351. Ford manufactured and/or installed the engines and the engines' component parts in the Class Vehicles, and the engines and their component parts are covered by the express Warranties.

1352. The Engine Defect at issue in this litigation was present at the time the Class Vehicles were sold or leased to Nebraska Plaintiff and the Nebraska Sub-Class Members.

1353. Nebraska Plaintiff and the Nebraska Sub-Class Members relied on Ford's express warranties, which were a material part of the bargain, when purchasing or leasing their Class Vehicles.

1354. Under the express warranties, Ford was obligated to correct the Engine Defect in the vehicles owned or leased by Nebraska Plaintiff and the Nebraska Sub-Class Members.

1355. Although Ford was obligated to correct the Engine Defect, none of the attempted fixes to the engines are adequate under the terms of the Warranties, as they did not cure the defect.

1356. Ford breached the express Warranties by performing illusory repairs. Rather than repairing the Class Vehicles pursuant to the express Warranties, Ford falsely informed Nebraska Sub-Class Members that there was no problem with their Class Vehicles, performed ineffective procedures including software updates, and/or replaced defective components in the engines with equally defective components, without actually repairing the Class Vehicles.

1357. Ford and its dealers, its agents for the purposes of providing repairs under warranty, have failed and refused to conform the engines to the express Warranties. Ford's conduct, as discussed throughout this Complaint, has voided any attempt on its part to disclaim liability for its

1    actions.

2         1358. Moreover, Ford's attempt to disclaim or limit these express Warranties vis-à-vis

3    consumers is unconscionable and unenforceable under the circumstances here. Specifically, Ford's

4    warranty limitation is unenforceable because it knowingly sold a defective product without

5    informing consumers about the defect.

6         1359. The time limits contained in Ford's warranty period were also unconscionable and

7    inadequate to protect Nebraska Plaintiff and the Nebraska Sub-Class Members. Among other things,

8    Nebraska Plaintiff and the Nebraska Sub-Class Members had no meaningful choice in determining

9    these time limitations, the terms of which unreasonably favored Ford. A gross disparity in

10   bargaining power existed between Ford and the Class members, and Ford knew or should have

11   known that the Class Vehicles were defective at the time of sale.

12        1360. Nebraska Plaintiff and the Nebraska Sub-Class Members have complied with all

13   obligations under the Warranties, or otherwise have been excused from performance of said

14   obligations as a result of Ford's conduct described herein.

15        1361. Nebraska Plaintiff and the Nebraska Sub-Class Members were not required to notify

16   Ford of the breach because affording Ford a reasonable opportunity to cure its breach of implied

17   warranty would have been futile. Ford was also on notice of the Engine Defect from the complaints

18   and service requests it received from Nebraska Plaintiff and the Nebraska Sub-Class Members, from

19   repairs and/or replacements of the engines or components thereof, and through other internal and

20   external sources.

21        1362. Nonetheless, Nebraska Plaintiff provided notice to Ford of its breach of warranties by

22   letter dated September 16, 2022.

23        1363. Because Ford, through its conduct and exemplified by its own service bulletins, has

24   covered repairs of the Engine Defect if Ford determines the repairs are appropriately covered under

25   the Warranties, Ford cannot now deny that the Warranties cover the Engine Defect.

26        1364. Because Ford has not been able remedy the Engine Defect, any limitation on remedies

27   included in the Warranties causes the Warranties to fail their essential purposes, rendering them null

28   and void.

1365. As a direct and proximate cause of Ford's breach, Nebraska Plaintiff and the Nebraska Sub-Class Members suffered damages and continue to suffer damages, including economic damages at the point of sale or lease and diminution of value of their Class Vehicles. Additionally, Nebraska Plaintiff and the Nebraska Sub-Class Members have incurred or will incur economic damages at the point of repair in the form of the cost of repair.

1366. As a direct and proximate result of Ford's breach of express warranties, Nebraska Plaintiff and the Nebraska Sub-Class Members have been damaged in an amount to be determined at trial.

**FORTY-FOURTH CAUSE OF ACTION**
**Breach of the Implied Warranty of Merchantability,**
**Neb.Rev.St. U.C.C.§§ 2-314 and 2A-212**
**(On Behalf of the Nebraska Sub-Class)**

1367. Plaintiffs incorporate by reference each allegation set forth in paragraphs 1-426, above.

1368. Nebraska Plaintiff brings this cause of action individually and on behalf of the Nebraska Sub-Class.

1369. Ford is and was at all relevant times a "merchant" with respect to motor vehicles under Neb.Rev.St. U.C.C. § 2-104(1) and "sellers" of motor vehicles under § 2-103(1)(d). 2111.

1370. With respect to leases, Ford is and was at all relevant times a "lessor" of motor vehicles under Neb.Rev.St. U.C.C. § 2A-103(1)(p).

1371. The Class Vehicles are and were at all relevant times "goods" within the meaning of Neb.Rev.St. U.C.C. §§ 2-105(1) and 2A-103(1)(h). 2113.

1372. A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law under Neb.Rev.St. U.C.C.§§ 2-314 and 2A-212.

1373. Ford knew or had reason to know of the specific use for which the Class Vehicles were purchased or leased. Ford directly sold and marketed Class Vehicles to customers through authorized dealers, like those from whom Nebraska Plaintiff and members of the Nebraska Sub-Class bought or leased their vehicles, for the intended purpose of consumers purchasing the vehicles.

221

Ford knew that the Class Vehicles would and did pass unchanged from Ford to the authorized dealers to Nebraska Plaintiff and members of the Nebraska Sub-Class, with no modification to the defective Class Vehicles.

1374. Ford provided Nebraska Plaintiff and members of the Nebraska Sub-Class with an implied warranty that the Class Vehicles and their components and parts are merchantable and fit for the ordinary purposes for which they were sold.  However, the Class Vehicles are not fit for their ordinary purpose of providing reasonably reliable and safe transportation because, inter alia, the Class Vehicles and their engine suffered from an inherent defect at the time of sale and thereafter and are not fit for their particular purpose of providing safe and reliable transportation.

1375. This implied warranty included, among other things: (i) a warranty that the Class Vehicles that were manufactured, supplied, distributed, and/or sold by Ford were safe and reliable for providing transportation; and (ii) a warranty that the Class Vehicles would be fit for their intended use while the Class Vehicles were being operated.

1376. Contrary to the applicable implied warranties, the Class Vehicles at the time of sale and thereafter were not fit for their ordinary and intended purpose of providing Nebraska Plaintiff and the Nebraska Sub-Class Members with reliable, durable, and safe transportation. Instead, the Class Vehicles were and are defective at the time of sale or lease and thereafter as more fully described above. Ford knew of this defect at the time these sale or lease transactions occurred.

1377. As a result of Ford's breach of the applicable implied warranties, Nebraska Plaintiff and members of the Nebraska Sub-Class suffered an ascertainable loss of money, property, and/or value of their Class Vehicles. Additionally, as a result of the Engine Defect, Nebraska Plaintiff and members of the Nebraska Sub-Class were harmed and suffered actual damages in that the Class Vehicles are substantially certain to fail before their expected useful life has run.

1378. Ford's actions, as complained of herein, breached the implied warranty that the Class Vehicles were of merchantable quality and fit for such use in violation of the Uniform Commercial Code and relevant state law.

1379. Nebraska Plaintiff and members of the Nebraska Sub-Class have complied with all obligations under the warranty, or otherwise have been excused from performance of said

obligations as a result of GM's conduct described herein.

1380. Because Nebraska Plaintiff and Nebraska Sub-Class Members purchased their vehicles from an authorized Ford dealership, they are in privity with Defendant. Nebraska Plaintiff and Nebraska Sub-Class Members have had sufficient direct dealings with Ford and its agents for the purposes of fulfilling its responsibilities under the express warranty (dealerships and customer support personnel) to establish privity of contract between Ford, on one hand, and Nebraska Plaintiff and Nebraska Sub-Class Members, on the other hand. Furthermore, Ford provided warranties directly to Nebraska Plaintiff and Nebraska Sub-Class Members and Nebraska Plaintiff and Nebraska Sub-Class Members are the intended beneficiaries of Ford's express and implied warranties. The dealers were not intended to be the ultimate consumers of their vehicles and have no rights under the warranty agreements provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit the consumer only.

1381. Nonetheless, privity is not required here because Nebraska Plaintiff and Nebraska Sub-Class Members are the intended third-party beneficiaries of contracts between Ford and its dealerships. These contracts give the dealerships the right to sell Ford and Lincoln brand vehicles, as well as service and perform warranty repairs on Ford's behalf. Nebraska Plaintiff and Nebraska Sub-Class Members are the beneficiaries of these contracts, because they are the intended end-consumers and users of the products Ford distributes to its authorized dealerships. Nebraska Plaintiff and Nebraska Sub-Class Members also have the right to receive service and warranty work at dealerships located more conveniently to them than Ford's headquarters.

1382. Nebraska Plaintiff and members of the Nebraska Sub-Class were not required to notify Ford of the breach because affording Ford a reasonable opportunity to cure its breach of warranty would have been futile. Ford was also on notice of the Engine Defect from the complaints and service requests it received from Nebraska Plaintiff and the Class Members and through other internal sources.

1383. Nonetheless, Nebraska Plaintiff and members of the Nebraska Sub-Class provided notice to Ford of the breach of express warranties when they took their vehicles to Ford-authorized provider of warranty repairs. Nebraska Plaintiff also provided notice to Ford of its breach of express

warranty by letter dated September 16, 2022.

1384. As a direct and proximate cause of Ford's breach, Nebraska Plaintiff and members of the Nebraska Sub-Class suffered damages and continue to suffer damages, including economic damages at the point of sale or lease and diminution of value of their Class Vehicles. Additionally, Nebraska Plaintiff and members of the Nebraska Sub-Class have incurred or will incur economic damages at the point of repair in the form of the cost of repair as well as additional losses.

1385. As a direct and proximate result of Ford's breach of the implied warranty of merchantability, Nebraska Plaintiff and members of the Nebraska Sub-Class have been damaged in an amount to be proven at trial.

**FORTY-FIFTH CAUSE OF ACTION**
**Violation of the Tennessee Consumer Protection Act**
**Tenn. Code §§ 47-18-101, *et seq.***
**(On behalf of the Tennessee Sub-Class)**

1386. Plaintiffs incorporate by reference each allegation set forth in paragraphs 1-426, above.

1387. Plaintiff Tyson Batdorf ("Tennessee Plaintiff") brings this cause of action individually and on behalf of the members of the Tennessee Sub-Class.

1388. Tennessee Plaintiff and the Tennessee Sub-Class Members are "consumers" within the meaning of the Tennessee Consumer Protection Act ("Tennessee CPA"), Tenn. Code § 47-18-103(3).

1389. Ford is a "person" within the meaning of the Tennessee CPA, Tenn. Code § 47-18-103(14).

1390. Ford is engaged in "trade" or "commerce" within the meaning of Tenn. Code § 47-18-103(20).

1391. The Tennessee CPA prohibits "unfair or deceptive acts or practices affecting the conduct of any trade or commerce." Tenn. Code § 47-18-104. Ford engaged in unfair and deceptive practices that violated the Tennessee CPA as described above.

1392. Ford participated in and engaged in unfair or deceptive trade acts or practices prohibited by the Tennessee CPA by failing to disclose and actively concealing that the Class

224

Vehicles contained the Engine Defect, by marketing their Class Vehicles as safe and of high quality, and by presenting themselves as a reputable manufacturer that valued safety and stood behind its vehicles after they were sold.

1393. Ford knowingly and intentionally misrepresented and omitted material facts in connection with the sale or lease of the Class Vehicles by, among other things, failing to disclose the Engine Defect; concealing the Engine Defect; promoting and selling or leasing Class Vehicles it knew were defective, including by marketing its vehicles as safe, reliable, easily operable, efficient, and of high quality; presenting itself as a reputable manufacturer that valued safety, reliability, performance and efficiency, and stood behind its vehicles after they were sold; failing to make repairs or making repairs and providing replacements that caused Tennessee Plaintiff and the Tennessee Sub-Class Members to experience repeated instances of failure, rendering the New Vehicle Limited Warranty useless; and minimized the scope and severity of the problems with the Class Vehicles, refusing to acknowledge that they are defective, and failing to provide adequate relief to consumers. Ford misrepresented and omitted such material facts with the intent to mislead Tennessee Plaintiff and the Tennessee Sub-Class Members about the true nature of the Class Vehicles.

1394. Ford systematically misrepresented, concealed, suppressed, or omitted material facts relating to the Class Vehicles and Engine Defect in the course of its business.

1395. Ford also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of material facts with intent that others would rely upon such concealment, suppression or omission, in connection with the sale of the Class Vehicles.

1396. Ford's unfair and deceptive acts or practices occurred repeatedly in Ford's trade or business, were capable of deceiving a substantial portion of the purchasing public, and imposed a serious safety risk on the public.

1397. Ford knew that the Class Vehicles and their engines suffered from an inherent defect, were defectively designed or manufactured, and were not suitable for their intended use.

1398. Ford knew or should have known that its conduct violated the Tennessee CPA.

1399. Tennessee Plaintiff and the Tennessee Sub-Class Members reasonably relied on Ford's misrepresentations and omissions of material facts in its advertisements of the Class Vehicles and in the purchase of the Class Vehicles.

1400. Tennessee Plaintiff and the Tennessee Sub-Class Members had no way of discerning that Ford's misrepresentations were false and misleading when they acquired their Class Vehicles because Tennessee Plaintiff and the Tennessee Sub-Class Members did not have access to Ford's exclusive and superior knowledge about the Class Vehicles' design and the Engine Defect.

1401. Had Tennessee Plaintiff and the Tennessee Sub-Class Members known that the Class Vehicles contained and/or would exhibit the Engine Defect, they would not have purchased or leased the Class Vehicles or would have paid less for them. Tennessee Plaintiff and the Tennessee Sub-Class Members did not receive the benefit their bargain as a result of Ford's misconduct.

1402. Ford owed Tennessee Plaintiff and the Tennessee Sub-Class Members a duty to disclose the truth about the Engine Defect because Ford:

a.     possessed exclusive and superior knowledge of the design and manufacture of the Class Vehicles and the Engine Defect;

b.     intentionally concealed the foregoing from Tennessee Plaintiff and the Tennessee Sub-Class Members; and/or

c.     made incomplete representations regarding the quality and durability of the Class Vehicles, while purposefully withholding material facts from Tennessee Plaintiff and the Tennessee Sub-Class Members that contradicted these representations.

1403. Due to Ford's specific and superior knowledge that the Engines in the Class Vehicles will fail due to the Engine Defect, its false representations regarding the increased durability of the Class Vehicles, and reliance by Tennessee Plaintiff and the Tennessee Sub-Class Members on these material representations, Ford had a duty to disclose to Class members that the Engine Defect will cause engine failure in Class Vehicles, that Class Vehicles do not have the expected durability, reliability, and/or safety over other vehicles or of their predecessor engines, that failure of the Engines will cause damage to Class Vehicle, and that Class members would be required to bear the cost of the damage to their vehicles. Having volunteered to provide information to Tennessee

226

Plaintiff and the Tennessee Sub-Class Members, Ford had the duty to disclose not just the partial truth, but the entire truth. These omitted and concealed facts were material because they directly impact the value of the Class Vehicles purchased or leased by Tennessee Plaintiff and the Tennessee Sub-Class Members. Longevity, durability, performance, and safety are material concerns to Ford consumers. Ford represented to Tennessee Plaintiff and the Tennessee Sub-Class Members that they were purchasing or leasing vehicles that were durable, reliable, safe, efficient, of high quality, and containing engines of advanced and superior characteristics and technology as alleged throughout this Complaint, when in fact it is only a matter of time before the engines fail due to the Engine Defect.

1404. Tennessee Plaintiff and the Tennessee Sub-Class Members suffered injury in fact to a legally protected interest. As a result of Ford's conduct, Tennessee Plaintiff and the Tennessee Sub-Class Members were harmed and suffered actual damages in the form of the costs of diagnosis and repair of their vehicles, and the diminished value of their vehicles.

1405. As a direct and proximate result of Ford's unfair or deceptive acts or practices, Tennessee Plaintiff and the Tennessee Sub-Class Members suffered and will continue to suffer injury in fact and/or actual damages.

1406. Defendant's violations present a continuing risk to Tennessee Plaintiff and the Tennessee Sub-Class Members as well as to the general public. Defendant's unlawful acts and practices complained of herein affect the public interest.

1407. As a proximate and direct result of Ford's unfair and deceptive trade practices, Tennessee Plaintiff and members of the Tennessee Sub-Class purchased or leased Class Vehicles and suffered an ascertainable loss and financial harm. These ascertainable losses include, among other things, overpayment at the time of purchase or lease, the cost to repair the Engine Defect, replacement of the damaged related system components, diminution of Class Vehicle resale value, increased repair and maintenance costs, and other substantial monetary damages and inconvenience.

1408. Tennessee Plaintiff provided notice of his claim by letter dated September 16, 2022. Ford was also on notice of the Engine Defect from the prior pre-suit notices from Plaintiffs, the complaints and service requests Ford received from consumers, from repairs and/or replacements

of the engines or components thereof, and through other internal and external sources. Tennessee

Plaintiff and members of the Tennessee Sub-Class seek all damages and relief to which they are

entitled because Ford failed to remedy its unlawful conduct.

1409.  As a direct and proximate result of Ford's unfair or deceptive acts or practices alleged

herein, Tennessee Plaintiff and other members of the Tennessee Sub-Class suffered and will

continue to suffer actual damages and are entitled to recover actual damages to the extent permitted

by law, including class action rules, in an amount to be proven at trial. Pursuant to Tenn. Code § 47-

18-109, Tennessee Plaintiff and the Tennessee Sub-Class Members seek an order enjoining Ford's

unfair and/or deceptive acts or practices, damages, treble damages for willful and knowing

violations (pursuant to § 47-18-109(a)(3)), punitive damages, and attorneys' fees, costs, and any

other just and proper relief to the extent available under the Tennessee CPA.

## FORTY-SIXTH CAUSE OF ACTION
### Breach of Express Warranty,
### Tenn. Code §§ 47-2-313 and 47-2A-210
### (On Behalf of the Tennessee Sub-Class)

1410. Plaintiffs incorporate by reference each allegation set forth in paragraphs 1-426, above.

1411. Tennessee Plaintiff brings this cause of action individually and on behalf of the Tennessee Sub-Class.

1412. Ford is and was at all relevant times a "merchant" with respect to motor vehicles under Tenn. Code §§ 47-2-104(1) and 47-2A-103(1)(t), and "seller" of motor vehicles under § 47-2-103(1)(d).

1413. With respect to leases, Ford is and was at all relevant times a "lessor" of motor vehicles under Tenn. Code § 47-2A-103(1)(p).

1414. The Class Vehicles are and were at all relevant times "goods" within the meaning of Tenn. Code §§ 47-2-105(1) and 47-2A-103(1)(h).

1415. The engines were manufactured and/or installed in the Class Vehicles by Defendant and are covered by the express warranty.

1416. Ford provided all purchasers and lessees of the Class Vehicles with the express

228

1    warranty described herein, which became a material part of the bargain.

2        1417. Ford provided all purchasers and lessees of Lincoln-branded Class Vehicles with the

3    Lincoln Warranty and all purchasers and lessees of Ford or Ford-branded Class Vehicles with the

4    Ford/Ford Warranty.

5        1418. Ford sold and leased the Class Vehicles with a written express warranty covering the

6    Vehicles for three years or 36,000 miles, whichever comes first.

7        1419. Ford's New Vehicle Limited Warranty expressly states that Ford will "without charge,

8    repair, replace, or adjust all parts on your vehicle that malfunction or fail during normal use during

9    the applicable coverage period due to a manufacturing defect in factory-supplied materials or factory

10   workmanship" so long as the Vehicle is properly operated and maintained and taken to a Ford

11   dealership for repair within the warranty period. Ford further provides powertrain warranty

12   coverage, which is applicable to "the Engine: all internal lubricated parts, cylinder block, cylinder

13   heads, electrical fuel pump, powertrain control module, engine mounts, flywheel, injection pump,

14   manifold (exhaust and intake), manifold bolts, oil pan, oil pump, seals and gaskets, engine

15   thermostat, engine, thermostat housing, timing chain cover, timing chain (gears or belt),

16   turbocharger/supercharger unit, valve covers, water pump," as well as the components in the

17   transmission, front-wheel drive, rear-wheel drive, and four-wheel/all-wheel drive. This coverage

18   applies for 5 years or up to 60,000 miles, whichever comes first.

19       1420. For certified pre-owned ("CPO") Vehicles, Ford offers a limited warranty covering

20   CPO Vehicles for 12 months or 12,000 miles, whichever comes first.

21       1421. Ford's CPO Vehicle warranty states that a dealer will replace "all covered

22   components . . . that are found to be defective in factory-supplied materials or workmanship during

23   the applicable warranty periods." The engine and its components—including the cylinder block and

24   cylinder heads—are included in Ford's list of "covered components."

25       1422. Ford manufactured and/or installed the engines and the engines' component parts in

26   the Class Vehicles, and the engines and their component parts are covered by the express

27   Warranties.

28       1423. The Engine Defect at issue in this litigation was present at the time the Class Vehicles

were sold or leased to Tennessee Plaintiff and the Tennessee Sub-Class Members.

1424. Tennessee Plaintiff and the Tennessee Sub-Class Members relied on Ford's express warranties, which were a material part of the bargain, when purchasing or leasing their Class Vehicles.

1425. Under the express Warranties, Ford was obligated to correct the Engine Defect in the vehicles owned or leased by Wisconsin Plaintiff and the Wisconsin Sub-Class Members.

1426. Although Ford was obligated to correct the Engine Defect, none of the attempted fixes to the engines are adequate under the terms of the Warranties, as they did not cure the defect.

1427. Ford breached the express Warranties by performing illusory repairs. Rather than repairing the Class Vehicles pursuant to the express Warranties, Ford falsely informed Tennessee Sub-Class Members that there was no problem with their Class Vehicles, performed ineffective procedures including software updates, and/or replaced defective components in the engines with equally defective components, without actually repairing the Class Vehicles.

1428. Ford and its dealers, its agents for the purposes of providing repairs under warranty, have failed, and refused, to conform the engines to the express Warranties. Ford's conduct, as discussed throughout this Complaint, has voided any attempt on its part to disclaim liability for its actions.

1429. Moreover, Ford's attempt to disclaim or limit these express Warranties vis-à-vis consumers is unconscionable and unenforceable under the circumstances described throughout. Specifically, Ford's warranty limitation is unenforceable because it knowingly sold a defective product without informing consumers about the defect.

1430. The time limits contained in Ford's warranty period were also unconscionable and inadequate to protect Tennessee Plaintiff and the Tennessee Sub-Class Members. Among other things, Tennessee Plaintiff and the Tennessee Sub-Class Members had no meaningful choice in determining these time limitations, the terms of which unreasonably favored Ford. A gross disparity in bargaining power existed between Ford and the Class Members, and Ford knew or should have known that the Class Vehicles were defective at the time of sale.

1431. Tennessee Plaintiff and the Tennessee Sub-Class Members have complied with all

obligations under the Warranties, or otherwise have been excused from performance of said obligations as a result of Ford's conduct described herein.

1432. Tennessee Plaintiff and the Tennessee Sub-Class Members were not required to notify Ford of the breach because affording Ford a reasonable opportunity to cure its breach of written warranty would have been futile. Ford was also on notice of the Engine Defect from the complaints and service requests it received from Tennessee Plaintiff and the Tennessee Sub-Class Members, from repairs and/or replacements of the engines or components thereof, and through other internal and external sources.

1433. Nonetheless, Tennessee Plaintiff provided notice to Ford of its breach of warranties by letter dated August 26, 2022.

1434. Because Ford, through its conduct and exemplified by its own service bulletins, has covered repairs of the Engine Defect if Ford determines the repairs are appropriately covered under the Warranties, Ford cannot now deny that the Warranties cover the Engine Defect.

1435. Because Ford has not been able remedy the Engine Defect, any limitation on remedies included in the Warranties causes the Warranties to fail their essential purposes, rendering them null and void.

1436. As a direct and proximate cause of Ford's breach, Tennessee Plaintiff and the Tennessee Sub-Class Members suffered damages and continue to suffer damages, including economic damages at the point of sale or lease and diminution of value of their Class Vehicles. Additionally, Tennessee Plaintiff and the Tennessee Sub-Class Members have incurred or will incur economic damages at the point of repair in the form of the cost of repair.

1437. As a direct and proximate result of Ford's breach of express warranties, Tennessee Plaintiff and the Tennessee Sub-Class Members have been damaged in an amount to be determined at trial.

## FORTY-SEVENTH CAUSE OF ACTION
### Breach of the Implied Warranty of Merchantability, Tenn. Code §§ 47-2-314 and 47-2A-212
### (On Behalf of the Tennessee Sub-Class)

1438. Plaintiffs incorporate by reference each allegation set forth in paragraphs 1-426,

above.

1439. Tennessee Plaintiff brings this cause of action individually and on behalf of the Tennessee Sub-Class Members.

1440. Ford is and was at all relevant times a "merchant" with respect to motor vehicles under Tenn. Code §§ 47-2-104(1) and 47-2A-103(1)(t), and "seller" of motor vehicles under § 47-2-103(1)(d).

1441. With respect to leases, Ford is and was at all relevant times a "lessor" of motor vehicles under Tenn. Code § 47-2A-103(1)(p).

1442. The Class Vehicles are and were at all relevant times "goods" within the meaning of Tenn. Code §§ 47-2-105(1) AND 47-2A-103(1)(h).

1443. A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law under Tenn. Code §§ 47-2-314 and 47-2A-212.

1444. Ford knew or had reason to know of the specific use for which the Class Vehicles were purchased or leased. Ford directly sold and marketed Class Vehicles to customers through authorized dealers, like those from whom Tennessee Plaintiff and Tennessee Sub-Class Members bought or leased their vehicles, for the intended purpose of consumers purchasing the Vehicles. Ford knew that the Class Vehicles would and did pass unchanged from Ford to the authorized dealers to Tennessee Plaintiff and Tennessee Sub-Class Members, with no modification to the defective Class Vehicles.

1445. Ford provided Tennessee Plaintiff and Tennessee Sub-Class Members with an implied warranty that the Class Vehicles and their components and parts are merchantable and fit for the ordinary purposes for which they were sold.  However, the Class Vehicles are not fit for their ordinary purpose of providing reasonably reliable and safe transportation because, *inter alia*, the Class Vehicles and their engines suffered from an inherent defect at the time of sale and thereafter and are not fit for their particular purpose of providing safe and reliable transportation.

1446. This implied warranty included, among other things: (i) a warranty that the Class Vehicles that were manufactured, supplied, distributed, and/or sold by Ford were safe and reliable

for providing transportation; and (ii) a warranty that the Class Vehicles would be fit for their intended use while the Class Vehicles were being operated.

1447. Contrary to the applicable implied warranties, the Class Vehicles at the time of sale and thereafter were not fit for their ordinary and intended purpose of providing Tennessee Plaintiff and the Tennessee Sub-Class Members with reliable, durable, and safe transportation. Instead, the Class Vehicles were and are defective at the time of sale or lease and thereafter, as more fully described above. Ford knew of this defect at the time these sale or lease transactions occurred.

1448. As a result of Ford's breach of the applicable implied warranties, Tennessee Plaintiff and Tennessee Sub-Class Members suffered an ascertainable loss of money, property, and/or value of their Class Vehicles. Additionally, as a result of the Engine Defect, Tennessee Plaintiff and Tennessee Sub-Class Members were harmed and suffered actual damages in that the Class Vehicles are substantially certain to fail before their expected useful life has run.

1449. Ford's actions, as complained of herein, breached the implied warranty that the Class Vehicles were of merchantable quality and fit for such use in violation of the Uniform Commercial Code and relevant state law.

1450. Tennessee Plaintiff and Tennessee Sub-Class Members have complied with all obligations under the warranty, or otherwise have been excused from performance of said obligations as a result of GM's conduct described herein.

1451. Because Tennessee Plaintiff and the Tennessee Sub-Class Members purchased their vehicles from an authorized Ford dealership, they are in privity with Defendant. Tennessee Plaintiff and the Tennessee Sub-Class Members have had sufficient direct dealings with Ford and its agents for the purposes of fulfilling its responsibilities under the express warranty (dealerships and customer support personnel) to establish privity of contract between Ford, on one hand, and Tennessee Plaintiff and the Tennessee Sub-Class Members, on the other hand.  Furthermore, Ford provided warranties directly to Tennessee Plaintiff and the Tennessee Sub-Class Members and Tennessee Plaintiff and the Tennessee Sub-Class Members are the intended beneficiaries of Ford's express and implied warranties.  The dealers were not intended to be the ultimate consumers of their vehicles and have no rights under the warranty agreements provided with provided with the Class

Vehicles; the warranty agreements were designed for and intended to benefit the consumer only.

1452. Nonetheless, privity is not required here because Tennessee Plaintiff and the Tennessee Sub-Class Members are the intended third-party beneficiaries of contracts between Ford and its dealerships.  These contracts give the dealerships the right to sell Ford and Lincoln brand vehicles, as well as service and perform warranty repairs on Ford's behalf.  Tennessee Plaintiff and the Tennessee Sub-Class Members are the beneficiaries of these contracts, because they are the intended end-consumers and users of the products Ford distributes to its authorized dealerships. Tennessee Plaintiff and the Tennessee Sub-Class Members also have the right to receive service and warranty work at dealerships located more conveniently to them than Ford's headquarters.

1453. Tennessee Plaintiff and Tennessee Sub-Class Members were not required to notify Ford of the breach because affording Ford a reasonable opportunity to cure its breach of warranty would have been futile. Ford was also on notice of the Engine Defect from the complaints and service requests it received from Tennessee Plaintiffs and the Class Members and through other internal sources.

1454. Nonetheless, Tennessee Plaintiff and Tennessee Sub-Class Members provided notice to Ford of the breach of express warranties when they took their vehicles to Ford-authorized provider of warranty repairs.  Tennessee Plaintiff also provided notice to Ford of its breach of express warranty by letter dated August 26, 2022.

1455. As a direct and proximate cause of Ford's breach, Tennessee Plaintiff and Tennessee Sub-Class Members suffered damages and continue to suffer damages, including economic damages at the point of sale or lease and diminution of value of their Class Vehicles. Additionally, Tennessee Plaintiff and Tennessee Sub-Class Members have incurred or will incur economic damages at the point of repair in the form of the cost of repair as well as additional losses.

1456. As a direct and proximate result of Ford's breach of the implied warranty of merchantability, Tennessee Plaintiff and Tennessee Sub-Class Members have been damaged in an amount to be proven at trial.

**FORTY-EIGHTH CAUSE OF ACTION**
**Violation of the Texas Deceptive Trade Practices Act**
**Tex. Bus. & Com. Code §§ 17.41, *et seq.***
**(On behalf of the Texas Sub-Class)**

1457. Plaintiffs incorporate by reference each allegation set forth in paragraphs 1-426, above.

1458. Plaintiff David Gonzalez ("Texas Plaintiff") brings this cause of action individually and on behalf of the members of the Texas Sub-Class.

1459. Texas Plaintiff and the Texas Sub-Class Members are individuals, partnerships, or corporations and therefore are "consumers" pursuant to the Texas Deceptive Trade Practices – Consumer Protection Act ("Texas DTAP"), Tex. Bus. & Com. Code § 17.45(4).

1460. Ford is a "person" within the meaning of the Texas DTAP, Tex. Bus. & Com. Code § 17.45(3).

1461. Ford engaged in "trade" or "commerce" within the meaning of Tex. Bus. & Com. Code § 17.45(a).

1462. The Texas DTPA prohibits "[f]alse, misleading, or deceptive acts or practices in the conduct of any trade or commerce," Tex. Bus. & Com. Code § 17.46(a), and any "unconscionable action or course of action," which means "an act or practice which, to a consumer's detriment, takes advantage of the lack of knowledge, ability, experience, or capacity of the consumer to a grossly unfair degree." Tex. Bus. & Com. Code §§ 17.45(5) & 17.50(a)(3). Ford engaged in unfair and deceptive practices, as well as unconscionable actions or course of action, that violated the Texas DTPA as described above.

1463. Ford participated in and engaged in deceptive business or trade practices prohibited by the Texas DTPA by failing to disclose and actively concealing that the Class Vehicles contained the Engine Defect, by marketing their Class Vehicles as safe and of high quality, and by presenting themselves as a reputable manufacturer that valued safety and stood behind its vehicles after they were sold.

1464. Ford knowingly and intentionally misrepresented and omitted material facts in connection with the sale or lease of the Class Vehicles by, among other things, failing to disclose

the Engine Defect; concealing the Engine Defect; by promoting and selling or leasing Class Vehicles it knew were defective, including by marketing its vehicles as safe, reliable, easily operable, efficient, and of high quality; presenting itself as a reputable manufacturer that valued safety, reliability, performance and efficiency, and stood behind its vehicles after they were sold; failing to make repairs or making repairs and providing replacements that caused Texas Plaintiff and the Texas Sub-Class Members to experience repeated instances of failure, rendering the New Vehicle Limited Warranty useless; and minimized the scope and severity of the problems with the Class Vehicles, refusing to acknowledge that they are defective, and failing to provide adequate relief to consumers. Ford misrepresented and omitted such material facts with the intent to mislead Texas Plaintiff and the Texas Sub-Class Members about the true nature of the Class Vehicles.

1465. Ford systematically misrepresented, concealed, suppressed, or omitted material facts relating to the Class Vehicles and Engine Defect in the course of its business.

1466. Ford also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Class Vehicles.

1467. Ford's unfair and deceptive acts or practices occurred repeatedly in Ford's trade or business, were capable of deceiving a substantial portion of the purchasing public, and imposed a serious safety risk on the public.

1468. Ford knew that the Class Vehicles and their engines suffered from an inherent defect, were defectively designed or manufactured, and were not suitable for their intended use.

1469. Ford knew or should have known that its conduct violated the Texas DTPA.

1470. Texas Plaintiff and the Texas Sub-Class Members reasonably relied on Ford's misrepresentations and omissions of material facts in its advertisements of the Class Vehicles and in the purchase of the Class Vehicles.

1471. Texas Plaintiff and the Texas Sub-Class Members had no way of discerning that Ford's misrepresentations were false and misleading when they acquired their Class Vehicles because Texas Plaintiff and the Texas Sub-Class Members did not have access to Ford's exclusive

and superior knowledge about the Class Vehicles' design and the Engine Defect.

1472. Had Texas Plaintiff and the Texas Sub-Class Members known that the Class Vehicles contained and/or would exhibit the Engine Defect, they would not have purchased or leased the Class Vehicles or would have paid less for them. Texas Plaintiff and the Texas Sub-Class Members did not receive the benefit of their bargain as a result of Ford's misconduct.

1473. Ford owed Texas Plaintiff and the Texas Sub-Class Members a duty to disclose the truth about the Engine Defect because Ford:

a.     possessed exclusive and superior knowledge of the design and manufacture of the Class Vehicles and the Engine Defect;

b.     intentionally concealed the foregoing from Texas Plaintiff and the Texas Sub-Class Members; and/or

c.     made incomplete representations regarding the quality and durability of the Class Vehicles, while purposefully withholding material facts from Texas Plaintiff and the Texas Sub-Class Members that contradicted these representations.

1474. Due to Ford's specific and superior knowledge that the Engines in the Class Vehicles will fail due to the Engine Defect, its false representations regarding the increased durability of the Class Vehicles, and reliance by Texas Plaintiff and the Texas Sub-Class Members on these material representations, Ford had a duty to disclose to Class members that the Engine Defect will cause engine failure in Class Vehicles, that Class Vehicles do not have the expected durability, reliability, and/or safety over other vehicles or of their predecessor engines, that failure of the Engines will cause damage to Class Vehicle, and that Class members would be required to bear the cost of the damage to their vehicles. Having volunteered to provide information to Texas Plaintiff and the Texas Sub-Class Members, Ford had the duty to disclose not just the partial truth, but the entire truth. These omitted and concealed facts were material because they directly impact the value of the Class Vehicles purchased or leased by Texas Plaintiff and the Texas Sub-Class Members. Longevity, durability, performance, and safety are material concerns to Ford consumers. Ford represented to Texas Plaintiff and the Texas Sub-Class Members that they were purchasing or leasing vehicles that were durable, reliable, safe, efficient, of high quality, and containing engines

of advanced and superior characteristics and technology as alleged throughout this Complaint, when in fact it is only a matter of time before the engines fail due to the Engine Defect.

1475. Texas Plaintiff and the Texas Sub-Class Members suffered injury in fact to a legally protected interest. As a result of Ford's conduct, Texas Plaintiff and the Texas Sub-Class Members were harmed and suffered actual damages in the form of the costs of diagnosis and repair of their vehicles, and the diminished value of their vehicles.

1476. As a direct and proximate result of Ford's unfair or deceptive acts or practices, Texas Plaintiff and the Texas Sub-Class Members suffered and will continue to suffer injury in fact and/or actual damages.

1477. Defendant's violations present a continuing risk to Texas Plaintiff and the Texas Sub-Class Members as well as to the general public. Defendant's unlawful acts and practices complained of herein affect the public interest.

1478. As a proximate and direct result of Ford's unfair and deceptive trade practices, Texas Plaintiff and members of the Texas Sub-Class purchased or leased Class Vehicles and suffered an ascertainable loss and financial harm. These ascertainable losses include, among other things, overpayment at the time of purchase or lease, the cost to repair the Engine Defect, replacement the damaged related system components, diminution of Class Vehicle resale value, increased repair and maintenance costs, and other substantial monetary damages and inconvenience.

1479. Pursuant to Tex. Bus. & Com. Code § 17.505, Texas Plaintiff provided notice of his claim by letter dated August 26, 2022. Ford was also on notice of the Engine Defect from the prior pre-suit notices from Plaintiffs, the complaints and service requests Ford received from consumers, from repairs and/or replacements of the engines or components thereof, and through other internal and external sources. Texas Plaintiff and members of the Texas Sub-Class seek all damages and relief to which they are entitled because Ford failed to remedy its unlawful conduct within the requisite time period.

1480. As a direct and proximate result of Ford's unfair or deceptive acts or practices alleged herein, Texas Plaintiff and other members of the Texas Sub-Class suffered and will continue to suffer actual damages and are entitled to recover actual damages to the extent

permitted by law, including class action rules, in an amount to be proven at trial. Pursuant to Tex. Bus. & Com. Code § 17.50, Texas Plaintiff and the Texas Sub-Class seek an order enjoining Ford's unfair and/or deceptive acts or practices, damages, multiple damages for knowing and intentional violations (pursuant to § 17.50(b)(1)), punitive damages, and attorneys' fees, costs, and any other just and proper relief available under the Texas DTPA.

**FORTY-NINTH CAUSE OF ACTION**
**Breach of Express Warranty,**
**Ohio Rev. Code Ann. § 1302.26, *et seq.***
**(On Behalf of the Ohio Sub-Class)**

1481. Plaintiffs incorporate by reference each allegation set forth in paragraphs 1-426, above.

1482. Plaintiff Kimberly Thomas ("Ohio Plaintiff") brings this count cause of action individually and on behalf of the Ohio Sub-Class.

1483. Ford is and was at all relevant times a "merchant" with respect to motor vehicles under Ohio Rev. Code Ann. §§ 1302.01(5) and 1310.01(A)(20), and a "seller" of motor vehicles under § 1302.01(4).

1484. With respect to leases, Ford is and was at all relevant times a "lessor" of motor vehicles under Ohio Rev. Code Ann. § 1310.01(A)(20).

1485. The Class Vehicles are and were at all relevant times "goods" within the meaning of Ohio Rev. Code Ann. §§ 1302.01(8) and 1310.01(A)(8).

1486. The engines were manufactured and/or installed in the Class Vehicles by Defendant and are covered by the express warranty.

1487. Ford provided all purchasers and lessees of the Class Vehicles with the express warranty described herein, which became a material part of the bargain.

1488. Ford provided all purchasers and lessees of Lincoln-branded Class Vehicles with the Lincoln Warranty and all purchasers and lessees of Ford or Ford-branded Class Vehicles with the Ford/Ford Warranty.

1489. Ford sold and leased the Class Vehicles with a written express warranty covering the Vehicles for three years or 36,000 miles, whichever comes first.

239

1490. Ford's New Vehicle Limited Warranty expressly states that Ford will "without charge, repair, replace, or adjust all parts on your vehicle that malfunction or fail during normal use during the applicable coverage period due to a manufacturing defect in factory-supplied materials or factory workmanship" so long as the Vehicle is properly operated and maintained and taken to a Ford dealership for repair within the warranty period. Ford further provides powertrain warranty coverage, which is applicable to "the Engine: all internal lubricated parts, cylinder block, cylinder heads, electrical fuel pump, powertrain control module, engine mounts, flywheel, injection pump, manifold (exhaust and intake), manifold bolts, oil pan, oil pump, seals and gaskets, engine thermostat, engine, thermostat housing, timing chain cover, timing chain (gears or belt), turbocharger/supercharger unit, valve covers, water pump," as well as the components in the transmission, front-wheel drive, rear-wheel drive, and four-wheel/all-wheel drive. This coverage applies for 5 years or up to 60,000 miles, whichever comes first.

1491. For CPO Vehicles, Ford offers a limited warranty covering CPO Vehicles for 12 months or 12,000 miles, whichever comes first.

1492. Ford's CPO Vehicle warranty states that a dealer will replace "all covered components . . . that are found to be defective in factory-supplied materials or workmanship during the applicable warranty periods." The engine and its components—including the cylinder block and cylinder heads—are included in Ford's list of "covered components."

1493. Ford manufactured and/or installed the engines and the engines' component parts in the Class Vehicles, and the engines and their component parts are covered by the express Warranties.

1494. The Engine Defect at issue in this litigation was present at the time the Class Vehicles left the possession of Ford and were sold or leased to Ohio Plaintiff and the Ohio Sub-Class Members.

1495. Ohio Plaintiff and the Ohio Sub-Class Members relied on Ford's express warranties, which were a material part of the bargain, when purchasing or leasing their Class Vehicles.

1496. Under the express Warranties, Ford was obligated to correct the Engine Defect in the vehicles owned or leased by Ohio Plaintiff and the Ohio Sub-Class Members.

1497. Although Ford was obligated to correct the Engine Defect, none of the attempted fixes to the engines are adequate under the terms of the Warranties, as they did not cure the defect.

1498. Ford breached the express Warranties by performing illusory repairs. Rather than repairing the Class Vehicles pursuant to the express Warranties, Ford falsely informed Ohio Sub-Class Members that there was no problem with their Class Vehicles, performed ineffective procedures including software updates, and/or replaced defective components in the engines with equally defective components, without actually repairing the Class Vehicles.

1499. Ford and its dealers, its agents for the purposes of providing repairs under warranty, have failed and refused to conform the engines to the express Warranties. Ford's conduct, as discussed throughout this Complaint, has voided any attempt on its part to disclaim liability for its actions.

1500. Moreover, Ford's attempt to disclaim or limit these express Warranties vis-à-vis consumers is unconscionable and unenforceable under the circumstances here. Specifically, Ford's warranty limitation is unenforceable because it knowingly sold a defective product without informing consumers about the defect.

1501. The time limits contained in Ford's warranty period were also unconscionable and inadequate to protect Ohio Plaintiff and the Ohio Sub-Class Members. Among other things, Ohio Plaintiff and the Ohio Sub-Class Members had no meaningful choice in determining these time limitations, the terms of which unreasonably favored Ford. A gross disparity in bargaining power existed between Ford and the Class members, and Ford knew or should have known that the Class Vehicles were defective at the time of sale.

1502. Ohio Plaintiff and the Ohio Sub-Class Members have complied with all obligations under the Warranties, or otherwise have been excused from performance of said obligations as a result of Ford's conduct described herein.

1503. Ohio Plaintiff and the Ohio Sub-Class Members were not required to notify Ford of the breach because affording Ford a reasonable opportunity to cure its breach of implied warranty would have been futile. Ford was also on notice of the Engine Defect from the complaints and service requests it received from Ohio Plaintiff and the Ohio Sub-Class Members, from repairs

and/or replacements of the engines or components thereof, and through other internal and external sources.

1504. Nonetheless, Ohio Plaintiff provided notice to Ford of its breach of warranties by letter dated September 1, 2022.

1505. Because Ford, through its conduct and exemplified by its own service bulletins, has covered repairs of the Engine Defect if Ford determines the repairs are appropriately covered under the Warranties, Ford cannot now deny that the Warranties cover the Engine Defect.

1506. Because Ford has not been able to remedy the Engine Defect, any limitation on remedies included in the Warranties causes the Warranties to fail their essential purposes, rendering them null and void.

1507. As a direct and proximate cause of Ford's breach, Ohio Plaintiff and the Ohio Sub-Class Members suffered damages and continue to suffer damages, including economic damages at the point of sale or lease and diminution of value of their Class Vehicles. Additionally, Ohio Plaintiff and the Ohio Sub-Class Members have incurred or will incur economic damages at the point of repair in the form of the cost of repair.

1508. As a direct and proximate result of Ford's breach of express warranties, Ohio Plaintiff and the Ohio Sub-Class Members have been damaged in an amount to be determined at trial.

**FIFTIETH CAUSE OF ACTION**
**Breach of the Implied Warranty of Merchantability,**
**Ohio Rev. Code Ann. §§ 1302.27 and 1310.19**
**(On Behalf of the Ohio Sub-Class)**

1509. Plaintiffs incorporate by reference each allegation set forth in paragraphs 1-426, above.

1510. Ohio Plaintiff brings this cause of action individually and on behalf of the Ohio Sub-Class.

1511. Ford is and was at all relevant times a "merchant" with respect to motor vehicles under Ohio Rev. Code Ann. §§ 1302.01(5) and 1310.01(A)(20), and a "seller" of motor vehicles under § 1302.01(4).

242

1512. With respect to leases, Ford is and was at all relevant times a "lessor" of motor vehicles under Ohio Rev. Code Ann. § 1310.01(A)(20).

1513. The Class Vehicles are and were at all relevant times "goods" within the meaning of Ohio Rev. Code Ann. §§ 1302.01(8) and 1310.01(A)(8).

1514. A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law under Ohio Rev. Code Ann. §§ 1302.27 and 1310.19.

1515. Ford knew or had reason to know of the specific use for which the Class Vehicles were purchased or leased. Ford directly sold and marketed Class Vehicles to customers through authorized dealers, like those from whom Ohio Plaintiff and members of the Ohio Sub-Class bought or leased their vehicles, for the intended purpose of consumers purchasing the vehicles. Ford knew that the Class Vehicles would and did pass unchanged from Ford to the authorized dealers to Ohio Plaintiff and members of the Ohio Sub-Class, with no modification to the defective Class Vehicles.

1516. Ford provided Ohio Plaintiff and members of the Ohio Sub-Class with an implied warranty that the Class Vehicles and their components and parts are merchantable and fit for the ordinary purposes for which they were sold.  However, the Class Vehicles are not fit for their ordinary purpose of providing reasonably reliable and safe transportation because, inter alia, the Class Vehicles and their engines suffered from an inherent defect at the time of sale and thereafter and are not fit for their particular purpose of providing safe and reliable transportation.

1517. This implied warranty included, among other things: (i) a warranty that the Class Vehicles that were manufactured, supplied, distributed, and/or sold by Ford were safe and reliable for providing transportation; and (ii) a warranty that the Class Vehicles would be fit for their intended use while the Class Vehicles were being operated.

1518. Contrary to the applicable implied warranties, the Class Vehicles at the time they left the possession of Ford and thereafter were not fit for their ordinary and intended purpose of providing Ohio Plaintiff and the Ohio Sub-Class Members with reliable, durable, and safe transportation. Instead, the Class Vehicles were and are defective at the time they left the possession of Ford and thereafter as more fully described above. Ford knew of this defect at the time the sale

1    or lease transactions occurred.

2        1519. As a result of Ford's breach of the applicable implied warranties, Ohio Plaintiff and

3    members of the Ohio Sub-Class suffered an ascertainable loss of money, property, and/or value of

4    their Class Vehicles. Additionally, as a result of the Engine Defect, Ohio Plaintiff and members of

5    the Ohio Sub-Class were harmed and suffered actual damages in that the Class Vehicles are

6    substantially certain to fail before their expected useful life has run.

7        1520. Ford's actions, as complained of herein, breached the implied warranty that the Class

8    Vehicles were of merchantable quality and fit for such use in violation of the Uniform Commercial

9    Code and relevant state law.

10        1521. Ohio Plaintiff and members of the Ohio Sub-Class have complied with all obligations

11   under the warranty, or otherwise have been excused from performance of said obligations as a result

12   of GM's conduct described herein.

13        1522. Privity is not required here because Ohio Plaintiff and members of the Ohio Sub-

14   Class's claims sound in tort.  Alternatively, because Ohio Plaintiff and the Ohio Sub-Class Members

15   purchased their vehicles from an authorized Ford dealership, they are in privity with Defendant.

16   Ohio Plaintiff and the Ohio Sub-Class Members have had sufficient direct dealings with Ford and

17   its agents for the purposes of fulfilling its responsibilities under the express warranty (dealerships

18   and customer support personnel) to establish privity of contract between Ford, on one hand, and

19   Ohio Plaintiff and the Ohio Sub-Class Members, on the other hand.  Furthermore, Ford provided

20   warranties directly to Ohio Plaintiff and the Ohio Sub-Class Members and Ohio Plaintiff and the

21   Ohio Sub-Class Members are the intended beneficiaries of Ford's express and implied warranties.

22   The dealers were not intended to be the ultimate consumers of their vehicles and have no rights

23   under the warranty agreements provided with provided with the Class Vehicles; the warranty

24   agreements were designed for and intended to benefit the consumer only.

25        1523. Nonetheless, privity is not required here because Ohio Plaintiff and the Ohio Sub-

26   Class Members are the intended third-party beneficiaries of contracts between Ford and its

27   dealerships.  These contracts give the dealerships the right to sell Ford and Lincoln brand vehicles,

28   as well as service and perform warranty repairs on Ford's behalf.  Ohio Plaintiff and the Ohio Sub-

Class Members are the beneficiaries of these contracts, because they are the intended end-consumers and users of the products Ford distributes to its authorized dealerships. Ohio Plaintiff and the Ohio Sub-Class Members also have the right to receive service and warranty work at dealerships located more conveniently to them than Ford's headquarters.

1524. Ohio Plaintiff and members of the Ohio Sub-Class were not required to notify Ford of the breach because affording Ford a reasonable opportunity to cure its breach of warranty would have been futile. Ford was also on notice of the Engine Defect from the complaints and service requests it received from Ohio Plaintiff and the Class Members and through other internal sources.

1525. Nonetheless, Ohio Plaintiff and members of the Ohio Sub-Class provided notice to Ford of the breach of express warranties when they took their vehicles to Ford-authorized provider of warranty repairs. Ohio Plaintiff also provided notice to Ford of its breach of express warranty by letter dated September 1, 2022.

1526. As a direct and proximate cause of Ford's breach, Ohio Plaintiff and members of the Ohio Sub-Class suffered damages and continue to suffer damages, including economic damages at the point of sale or lease and diminution of value of their Class Vehicles. Additionally, Ohio Plaintiff and members of the Ohio Sub-Class have incurred or will incur economic damages at the point of repair in the form of the cost of repair as well as additional losses.

1527. As a direct and proximate result of Ford's breach of the implied warranty of merchantability, Ohio Plaintiff and members of the Ohio Sub-Class have been damaged in an amount to be proven at trial.

## FIFTY-FIRST CAUSE OF ACTION
### Violation of the Magnuson-Moss Warranty Act,
### 15 U.S.C. §§ 2301, *et seq.*

1528. Plaintiffs incorporate by reference each allegation set forth in paragraphs 1-426, above.

1529. Plaintiffs bring this cause of action individually.

1530. This Court has jurisdiction to decide claims brought under 15 U.S.C. § 2301 by virtue of 28 U.S.C. §§ 1332(a) and (d).

1531. Plaintiffs are "consumers" within the meaning of the Magnuson-Moss Warranty Act,

15 U.S.C. § 2301(3).

1532. Ford is a "supplier" and "warrantor" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. 2301(4)-(5).

1533. The Class Vehicles are "consumer products" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(1).

1534. 15 U.S.C. § 2301(d)(1) provides a cause of action for any consumer who is damaged by the failure of a warrantor to comply with a written warranty.

1535. In its Limited Warranty, Ford expressly warranted that it would repair or replace defects in material or workmanship free of charge if those defects became apparent during the warranty period.

1536. Ford's Limited Warranty is a written warranty within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(6). The Class Vehicles' implied warranty of merchantability is covered by 15 U.S.C. 2301(7).

1537. With respect to Plaintiffs' purchases of the Class Vehicles, the terms of Ford's written warranty and implied warranty became part of the basis of the bargain between Ford, on the one hand, and Plaintiffs, on the other.

1538. Ford breached the implied warranty of merchantability. Without limitation, the Class Vehicles have engines that leak coolant, overheat, fail, and in some instances catch fire, as described above, and which thus render the Class Vehicles unmerchantable.

1539. Ford breached its express Limited Warranty by refusing to repair the defective engines in the Class Vehicles. Plaintiffs presented their vehicles for repair and Ford failed to remedy the Engine Defect, whether by refusing to repair or replace the engine, providing ineffective repairs, installing another engine with the same Engine Defect, or otherwise.

1540. Plaintiff Miller, individually and on behalf of the members of the proposed Class, notified Ford of the Engine Defect in the Class Vehicles, and its corresponding breach of warranty, through a notice letter delivered by courier on July 10, 2020 to Ford's registered agent in Plymouth, Michigan. Ford acknowledged receipt through a response letter from its counsel, dated August 7, 2020.

1541. Ford was also provided notice of the defect through thousands of consumer complaints and information about service repairs from its dealerships. Ford has not remedied the breach.

1542. Further, Ford has refused to provide an adequate warranty repair for the Engine Defect, thus rendering the satisfaction of any notice requirement futile. As stated above, customers that have presented their vehicles for warranty repair due to engine overheating, smoke emission, and engine failure have simply been provided either coolant sensors, replacement parts that do nothing to fix the Engine Defect, or replacement defective engines.

1543. At the time of sale or lease of each Class Vehicle, Ford knew, should have known, or was reckless in not knowing of the Class Vehicles' inability to perform as warranted, but nonetheless failed to rectify the situation and/or disclose the Engine Defect. Under the circumstances, the remedies available under any informal settlement procedure would be inadequate and futile, and any requirement that Plaintiffs resort to an informal dispute resolution procedure and/or afford Ford a reasonable opportunity to cure its breach of warranties is excused and thus deemed satisfied.

1544. The amount in controversy of Plaintiffs' individual claims meet or exceed the sum of $25. The amount in controversy in this action exceeds the sum of $50,000, exclusive of interest and costs, computed on the basis of all claims to be determined in this lawsuit.

1545. As a direct and proximate result of Ford's breaches of its Limited Warranty and the implied warranty of merchantability, Plaintiffs have sustained damages in an amount to be determined at trial.

1546. Plaintiffs seek all damages permitted by law, including the diminution in value of their vehicles, in an amount to be proven at trial.

## X.   PRAYER FOR RELIEF

1547. Plaintiffs on behalf of themselves, and all others similarly situated, request the Court to enter judgment against Ford, as follows:

a.   an order certifying the proposed Class, any appropriate subclasses, and any appropriate classes with respect to particular issues, designating Plaintiffs as named representatives

of the Class, and designating the undersigned as Class Counsel;

   b. a declaration that the EcoBoost engines in the Class Vehicles are defective;

   c. a declaration that Ford is financially responsible for notifying all Class Members about the defective nature of the Class Vehicles;

   d. an order enjoining Ford from further deceptive distribution, sales, and lease practices with respect to the Class Vehicles;

   e. an order requiring Ford to permanently repair Class Vehicles, within a reasonable time period and at no cost to Class Members, so that they no longer possess the Engine Defect;

   f. an award to Plaintiffs and Class Members of compensatory, exemplary, and statutory damages, including interest, in an amount to be proven at trial;

   g. an award of attorneys' fees and costs, under Cal. Code Civ. Proc. § 1021.5, 15 U.S.C. § 2310(d)(1), and as otherwise allowed by law;

   h. an award of pre-judgment and post-judgment interest, as provided by law; and

   i. such other relief as may be appropriate under the circumstances.

## XI. DEMAND FOR JURY TRIAL

  1548. Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury of any and all issues in this action so triable of right.

Dated: September 28, 2022.   Respectfully submitted,

       */s/Laura E. Goolsby*
       Tarek H. Zohdy (SBN 247775)
       Cody R. Padgett (SBN 275553)
       Laura E. Goolsby (SBN 321721)
       **CAPSTONE LAW APC**
       1875 Century Park East, Suite 1000
       Los Angeles, California 90067
       Telephone: (310) 556-4811
       Facsimile: (310) 943-0396
       Tarek.Zohdy@capstonelawyers.com
       Cody.Padgett@capstonelawyers.com
       Laura.Goolsby@capstonelawyers.com

1
2
3
4
5
6
7

William A. Kershaw
Stuart C. Talley
Ian J. Barlow
**KERSHAW TALLEY BARLOW PC**
401 Watt Avenue
Sacramento, California 95864
Telephone: (916) 779-7000
Facsimile: (916) 244-4829
bill@ktblegal.com
stuart@ktblegal.com
ian@ktblegal.com

8
9
10
11
12

Mark P. Chalos (*pro hac vice*)
**LIEFF CABRASER HEIMANN & BERNSTEIN, LLP**
One Nashville Place
150 Fourth Avenue, Suite 1650
Nashville, TN  37219-2423
Telephone: (615) 313-9000
mchalos@lchb.com

13
14
15
16

Annika K. Martin
Gabriel A. Panek (*pro hac vice*)
**LIEFF CABRASER HEIMANN & BERNSTEIN, LLP**
250 Hudson Street, 8th Floor
New York, NY  10013-1413
akmartin@lchb.com
gpanek@lchb.com

17
18
19
20
21
22
23

Russell D. Paul (*pro hac vice*)
Abigail Gertner (*pro hac vice*)
Amey J. Park (*pro hac vice*)
**BERGER MONTAGUE PC**
1818 Market Street, Suite 3600
Philadelphia, PA 19103
Tel.:    (215) 875-3000
Fax:    (215) 875-4604
Email:  rpaul@bm.net
          agertner@bm.net
          apark@bm.net

24
25
26
27

Patrick Newsom (*pro hac vice*)
**NEWSOM LAW PLC**
40 Music Square East
Nashville, TN 37203
Telephone: 615-251-9500
patrick@newsom.law

28

First Amended Consolidated Class Action Complaint for Damages          Case No. 2:20-cv-01796-DAD-CKD

Thomas P. Thrash (*pro hac vice*)
Will T. Crowder (*pro hac vice*)
**THRASH LAW FIRM**
1101 Garland Street
Little Rock, AR 72201
501-374-1058
Fax: 501-374-2222
tomthrash@thrashlawfirmpa.com
willcrowder@thrashlawfirmpa.com

*Attorneys for Plaintiffs and the
Proposed Classes and Subclasses*