1

2

3

4

5

6

7

8                    UNITED STATES DISTRICT COURT

9                 FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   VANESSA MILLER, et al.,                No.  2:20-cv-01796-DAD-CKD

12              Plaintiffs,

13        v.                                ORDER GRANTING IN PART AND
                                            DENYING IN PART DEFENDANT'S
14   FORD MOTOR COMPANY,                     MOTION TO DISMISS CERTAIN CLAIMS
                                            BROUGHT BY PLAINTIFFS IN THE FIRST
15              Defendant.                   AMENDED CONSOLIDATED COMPLAINT

16                                          (Doc. No. 83)

17

18        This matter came before the court on March 7, 2023 for a hearing on defendant's motion

19   to dismiss certain claims brought in plaintiffs' first amended consolidated class action complaint.

20   (Doc. No. 83.)  Attorneys Stuart Talley, Tarek Zohdy, and Phong-Chau Nguyen appeared by

21   video on behalf of plaintiffs.  Attorney Amy Laurendeau appeared by video on behalf of

22   defendant.  For the reasons explained below, defendant's motion will be granted in part and

23   denied in part.

24                              **BACKGROUND**

25        On May 6, 2021, the previously-assigned district judge issued an order consolidating three

26   related cases, and plaintiffs filed the initial consolidated class action complaint on the docket in

27   this consolidated case on June 21, 2021.  (Doc. Nos. 36, 43.)  On August 10, 2022, the court

28   granted in part and denied in part defendant's motion to dismiss the initial consolidated class

1

1    action complaint, with leave to amend.  (Doc. No. 76.)  On September 28, 2022, plaintiffs filed

2    the operative first amended consolidated class action complaint ("FACC") against defendant Ford

3    Motor Company ("defendant" or "Ford").  (Doc. No. 81.)  Plaintiffs allege as follows in their

4    FACC.

5           This consolidated putative class action is brought by 32 individual plaintiffs from 19 states

6    who purchased new or used Ford Edge, Ford Escape, Ford Fusion, or Lincoln MKC[1] vehicles of

7    certain model years that were equipped with a 1.5L, 1.6L, or 2.0L "EcoBoost" engine (the "class

8    vehicles").[2]  (*Id.* at ¶¶ 1–2.)  These EcoBoost engines (regardless of the varying liter capacity and

9    vehicle model) are made of the same relevant components and same materials, and they all have

10   the same critical design defect that causes engine coolant to leak into the engine's cylinders (the

11   "Engine Defect"), which leads to overheating, engine fires, and engine failures.[3]  (*Id.* at ¶¶ 3–4.)

12   The Engine Defect interferes with plaintiffs' and the putative class members' "safe, comfortable,

13   and expected use of their class vehicles" and "exposes them to severe risk created by engine

14   failures."  (*Id.* at ¶ 8.)  Defendant "has failed to provide an effective solution" and "has not

15   satisfactorily or effectively addressed the source of the defect," choosing instead to apply

16   "superficial stopgap" remedies such as installing coolant sensors or replacing "certain parts other

17   than the defective engine block, thereby failing to address the root cause of the Engine Defect."

18   (*Id.* at ¶ 5.)  "These half measures force consumers to return repeatedly for service and to

19   _____

20   [1]  The term "Class Vehicles" is defined in the FACC as including 2016–2019 Lincoln MKZs
     (FACC at ¶ 2), but none of the named plaintiffs purchased a Lincoln MKZ.  At the hearing on the
21   pending motion, plaintiffs' counsel was asked whether plaintiffs agree that the Lincoln MKZ
     should be omitted from the definition of class vehicle, and plaintiffs' counsel responded in the
22   negative because, according to plaintiffs' counsel, the Lincoln MKZ has the same engine and
     chassis as the Ford Fusion, and the Lincoln MKZ and Ford Fusion vehicles are batch engineered
23   and have the same engine defect as the vehicles the named plaintiffs have purchased.

24   [2]  Plaintiffs seek to represent subclasses of persons who purchased *or leased* a class vehicle (*see*
     FACC at 83–85), but each of the named plaintiffs is alleged to be the owner of a class vehicle that
25   was purchased, not leased (*see id.* at 9–54).

26   [3]  In the FACC, plaintiffs describe the Engine Defect in detail, which they allege "is the result of
27   the design of the engine block and cylinder head, including an inadequate seal on the cylinder
     head," and they include photographs purportedly depicting degraded cylinder head seals in their
28   FACC.  (FACC at ¶¶ 340–348.)

1    continue driving a vehicle at risk of future damage to the engine and components, engine failure,

2    and engine fires." (*Id.* at ¶ 6.) Consumers must pay out-of-pocket for repairs if their EcoBoost

3    engines overheat or fail after their vehicle's warranty period, and these repairs, including a full

4    engine replacement, can cost thousands of dollars. (*Id.* at ¶ 7.)

5         In the FACC, plaintiffs describe in detail each of their alleged purchases of a class vehicle,

6    specifying their research efforts in deciding to purchase the vehicle, the vehicle model and year,

7    when the purchase was made, from what seller, in which state, and the applicable warranty start

8    date. (*See id.* at 9–54.) Plaintiffs also describe each of their individual experiences with the

9    alleged Engine Defect, including their attempts to obtain repairs, the quoted costs of such repairs,

10   the costs actually incurred for such repairs, the unsuccessful results of "band-aid" type repair

11   efforts, and the mileage on the vehicle at the time of relevant repair visits.[4] (*See id.*)

12   /////

13   /////

14   /////

15   /////

16   _____

17   [4] To the extent a plaintiff's personalized allegations are relevant to the court's analysis of a
     particular claim, the court will include pertinent individual facts in the analysis section below.

18   The court will not summarize each of the plaintiff's individual experiences in this background
     section. However, for context and by way of example, the court quotes the following

19   personalized allegations of plaintiff Mark Kennedy of Minnesota:

20              Mr. Kennedy owns a 2016 Ford Edge with a 2.0L EcoBoost engine,
                which he purchased pre-owned on November 24, 2020 from BMW
21              of Minnetonka, in Minnetonka, Minnesota. The vehicle had 34,156
                miles at the time of purchase. . . . The vehicle had a warranty start
22              date of November 28, 2016. . . . In early 2022, with approximately
                50,000 miles on the odometer, [he] began to experience the Engine
23              Defect. [His] engine began overheating and leaking. As a result,
                on or around January 15, 2022, [he] delivered his vehicle to
24              Morrie's Minnetonka Ford, an authorized Ford dealership located in
                Minnetonka, Minnesota. The technician verified [his] concerns and
25              stated, "VERIFIED COOLANT DRIPPING INTO CYLINDER 4,
                WILL NEED LONG BLOCK REPLACEMENT." However, Ford
26              refused to cover the suggested repair and instead sought to charge
                $8,270.00 for the suggested repair. [He] was forced to pay
27              $5,992.77 to have the engine replaced.

28   (FACC at ¶¶ 270, 274–75.)

                                            3

1    Plaintiffs allege that a material part of the bargain in their vehicle purchases was Ford's

2    express warranties (Ford New Vehicle Limited Warranty, Ford Powertrain Warranty, Lincoln

3    Warranty, and Certified Pre-Owned "CPO" warranty).  (*Id.* at ¶¶ 459–465.)[5]  Plaintiffs allege

4    that:  "Ford breached the express warranties by performing illusory repairs"; Ford falsely

5    informed class members "that there was no problem with the class vehicles"; and Ford

6    "performed ineffective procedures including software updates, and/or replaced defective

7    components in the engines with equally defective components, without actually repairing the

8    Class Vehicles."  (*Id.* at ¶ 473.)

9    Plaintiffs allege that before leasing or selling the class vehicles, defendant had knowledge

10   of the Engine Defect based on the following sources:  (1) testing, including "pre-production

11   testing, pre-production design failure mode analysis, pre-release evaluation and testing"; (2)

12   repair and warranty data; (3) replacement part sales data; (4) high failure rates and analysis in

13   response; (5) early consumer complaints made directly to Ford and/or posted on public online

14   vehicle owner forums; (6) consumer complaints made to Ford's authorized dealerships (who

15   plaintiffs allege are Ford's agents for vehicle sales, leases, servicing, and repairs) and testing done

16   in response to those complaints; (7) aggregate data from Ford dealers; and (8) other internal

17   sources.  (*Id.* at ¶ 9.)  Plaintiffs also allege that Ford knew of the Engine Defect based on

18   complaints collected by National Highway Traffic Safety Administration ("NHTSA"), and its

19   /////

20   /////

21   /////

22   /////

23   /////

24   /////

25   /////

26

27   ───────────────────
     [5]  The court cites only to the paragraphs pertaining to plaintiffs' third cause of action for breach of
     express warranty under California law, though these same allegations are re-alleged with respect
28   to all 13 breach of express warranty claims.

own internal investigations that led to recalls in 2012, 2013, and 2017 to address problems associated with the Engine Defect.[6]  (*Id.* at ¶¶ 354–366, 383–389.)

According to plaintiffs, Ford committed fraud by omission because Ford continued selling vehicles equipped with the defective EcoBoost engine (marketing those vehicles as safe and reliable), but Ford did not tell plaintiffs and other purchasers about the Engine Defect.  (*Id.* at ¶¶ 396–407.)  Despite its knowledge of the Engine Defect, "Ford failed to disclose and actively concealed the Engine Defect from [the putative class] and the public, and Ford has continued to market and advertise the class vehicles as safe, comfortable, and of high quality."  (*Id.* at ¶ 10.)

Plaintiffs allege that as a result of Ford's alleged misconduct, they and the putative class "were harmed and suffered actual damages, including that the class vehicles contain the Engine Defect, have manifested and continue to manifest, the Engine Defect, and that Ford has not provided a permanent, no-cost remedy for this Defect within a reasonable amount of time."  (*Id.* at ¶ 11)  Plaintiffs further allege that they and the putative class members "have incurred, and will continue to incur, out-of-pocket, unreimbursed costs and expenses relating to the Engine Defect."  (*Id.*)

In total, plaintiffs bring 51 separate causes of action in the FACC:  a federal breach of warranty claim under the Magnuson-Moss Warranty Act ("MMWA"), 15 U.S.C. §§ 2301, *et seq.*, and fifty claims under applicable state consumer protection laws (including claims for breach of express warranty, breach of implied warranty of merchantability, and fraud) brought by plaintiffs

---

[6]  Plaintiffs allege that the 2012 and 2013 recalls were limited to certain vehicles with the 1.6L EcoBoost engine and merely addressed the symptoms of the defect by reprogramming diagnostic codes and installing temperature sensors to detect engine overheating; they did not address the root cause of the defect.  (FACC at ¶¶ 354–361.)  Plaintiffs also allege that the 2017 Recall:

> called for the installation of a coolant level sensor in the recalled vehicles to alert drivers when the engine coolant needed to be refilled. . . .  The coolant level sensor did nothing to prevent the continued coolant leaks and was yet another woefully inadequate recall strategy. . . .  Ford continued to limit the recall to only certain vehicles with the 1.6L EcoBoost engines, even though the 1.5L and 2.0L EcoBoost engines were designed with the same engine block design, are made from the same materials, and suffer from the same Engine Defect.

(*Id.* at ¶ 364.)

1    individually and on behalf of state sub-classes, on a state-by-state basis.  (*Id.*)  For example, the

2    "California plaintiffs" (Vanessa Miller, Amber West, Evan West, and Jeffery Hodges) bring

3    claims under the Consumer Legal Remedies Act ("CLRA"), California Civil Code §§ 1750, *et*

4    *seq.*; the Unfair Competition Law ("UCL"), California Business & Professions Code §§ 17200, *et*

5    *seq.*; the Song-Beverly Consumer Warranty Act, California Civil Code §§ 1790, *et seq.*; as well

6    as claims for breach of express warranty and breach of implied warranty, all brought on behalf of

7    themselves individually and on behalf of the "California Sub-Class," which is defined as:

8
> All persons who purchased or leased a 2013-2019 Ford Escape,
9
> 2013-2019 Ford Fusion, 2015-2018 Ford Edge, 2016-2019 Lincoln
> MKC, or 2016-2019 Lincoln MKZ equipped with a 1.5L, 1.6L, or
10
> 2.0L EcoBoost engine (the "Class Vehicles") in the State of
> California.

11   (*Id.* at 84, 89–100.)

12        The FACC similarly defines state subclasses brought by at least one plaintiff from that

13   particular state, resulting in proposed subclasses for the following 19 states:  Arkansas,

14   California, Colorado, Florida, Georgia, Illinois, Indiana, Kansas, Maryland, Michigan, Minnesota,

15   Nebraska, New Jersey, North Carolina, Ohio, Tennessee, Texas, Washington, Wisconsin.  (*Id.* at

16   ¶ 416.)

17        On October 28, 2022, defendant Ford filed the pending motion to dismiss certain claims

18   brought in the FACC.  (Doc. No. 83.)  Defendant argues that plaintiffs have failed to cure the

19   deficiencies identified by the court in the August 10, 2022 order (Doc. No. 76), which granted

20   plaintiffs leave to amend as to certain claims.  (Doc. No. 83-1 at 10.)  Defendant also argues that

21   the allegations pertaining to the 9 new plaintiffs are similarly deficient and thus, the newly added

22   claims should be dismissed as well.  (*Id.*)  Plaintiffs filed their opposition on December 2, 2022,

23   and defendant filed its reply thereto on December 19, 2022.  (Doc. Nos. 85, 86.)  In their

24   opposition, plaintiffs concede that certain claims brought by certain plaintiffs are subject to

25   dismissal and they have opted to withdraw those claims.  (Doc. No. 85 at 21 n.12, 28 n.19.)  As

26   outlined below, the withdrawn claims will be dismissed.

27   /////

28   /////

1      **LEGAL STANDARD**

2    **A.      Motion to Dismiss Under Rule 12(b)(6)**

3          The purpose of a motion to dismiss pursuant to Rule 12(b)(6) is to test the legal

4    sufficiency of the complaint.  *N. Star Int'l v. Ariz. Corp. Comm'n*, 720 F.2d 578, 581 (9th Cir.

5    1983).  "Dismissal can be based on the lack of a cognizable legal theory or the absence of

6    sufficient facts alleged under a cognizable legal theory."  *Balistreri v. Pacifica Police Dep't*, 901

7    F.2d 696, 699 (9th Cir. 1990).  A plaintiff is required to allege "enough facts to state a claim to

8    relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  "A

9    claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw

10   the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v.*

11   *Iqbal*, 556 U.S. 662, 678 (2009).

12         In determining whether a complaint states a claim on which relief may be granted, the

13   court accepts as true the allegations in the complaint and construes the allegations in the light

14   most favorable to the plaintiff.  *Hishon v. King & Spalding*, 467 U.S. 69, 73 (1984).  However,

15   the court need not assume the truth of legal conclusions cast in the form of factual allegations.

16   *U.S. ex rel. Chunie v. Ringrose*, 788 F.2d 638, 643 n.2 (9th Cir. 1986).  While Rule 8(a) does not

17   require detailed factual allegations, "it demands more than an unadorned, the-defendant-

18   unlawfully-harmed-me accusation."  *Iqbal*, 556 U.S. at 678.  A pleading is insufficient if it offers

19   mere "labels and conclusions" or "a formulaic recitation of the elements of a cause of action."

20   *Twombly*, 550 U.S. at 555; *see also Iqbal*, 556 U.S. at 676 ("Threadbare recitals of the elements

21   of a cause of action, supported by mere conclusory statements, do not suffice.").  Moreover, it is

22   inappropriate to assume that the plaintiff "can prove facts that it has not alleged or that the

23   defendants have violated the . . . laws in ways that have not been alleged."  *Associated Gen.*

24   *Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 526 (1983).

25         In ruling on a motion to dismiss under Rule 12(b)(6), the court is permitted to consider

26   material that is properly submitted as part of the complaint, documents that are not physically

27   attached to the complaint if their authenticity is not contested and the plaintiffs' complaint

28   /////

7

1  necessarily relies on them, and matters of public record. *Lee v. City of Los Angeles*, 250 F.3d

2  668, 688–89 (9th Cir. 2001).

3  **B.     Heightened Pleading Standard Under Rule 9(b)**

4        "When an entire complaint, or an entire claim within a complaint, is grounded in fraud

5  and its allegations fail to satisfy the heightened pleading requirements of Rule 9(b), a district

6  court may dismiss the complaint or claim." *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1107

7  (9th Cir. 2003).  Under Rule 9(b), the "circumstances constituting the alleged fraud [must] be

8  specific enough to give defendants notice of its particular misconduct . . . so they can defend

9  against the charge and not just deny that they have done anything wrong." *Kearns v. Ford Motor*

10  *Co.*, 567 F.3d 1120, 1124 (9th Cir. 2009) (internal quotation marks omitted) (quoting *Bly-Magee*

11  *v. California*, 236 F.3d 1014, 1019 (9th Cir. 2001)).  To satisfy the particularity standard of

12  Rule 9(b), "a pleading must identify the who, what, when, where, and how of the misconduct

13  charged, as well as what is false or misleading about the purportedly fraudulent statement, and

14  why it is false." *Moore v. Mars Petcare US, Inc.*, 966 F.3d 1007, 1019 (9th Cir. 2020)

15  (quotations omitted) (quoting *Davidson v. Kimberley-Clark Corp.*, 889 F.3d 956, 964 (9th Cir.

16  2018)).  However, "[m]alice, intent, knowledge and other conditions of a person's mind may be

17  alleged generally." *Irving Firemen's Relief & Ret. Fund v. Uber Techs., Inc.*, 998 F.3d 397, 404

18  (9th Cir. 2021) (quoting Fed. R. Civ. P. 9(b)); *see also Klaehn v. Cali Bamboo LLC*, No. 21-

19  55738, 2022 WL 1830685, at *2 (9th Cir. 2022)[7] ("Under Fed. R. Civ. P. 9(b), a plaintiff must

20  plead circumstances from which a court can plausibly infer the defendant's knowledge.").

21                                    **ANALYSIS**

22        Given the large quantity of claims and the state-specific and plaintiff-specific arguments

23  presented by the parties with regard to each claim, the court will proceed by addressing each of

24  the 51 claims, albeit not in numerical order.  The court will begin with the express warranty

25  claims, followed by the implied warranty claims, then proceed to the federal warranty claim, and

26  end with the consumer protection fraud-based claims.  To the extent similar arguments are raised

27  _____

28  [7]  Citation to the unpublished Ninth Circuit opinions cited here and elsewhere in this order is
appropriate pursuant to Ninth Circuit Rule 36-3(b).

1    and the court's analysis is the same for multiple claims, the court will incorporate its prior

2    analysis as appropriate, to avoid repetition.

3    **A.      Express Warranty Claims**

4            Plaintiffs' express warranty claims are based on the following written warranties, as

5    applicable to their respective vehicle purchases:  Ford Limited Warranty, Ford Powertrain

6    Warranty, Lincoln Warranty, and CPO Warranty.

7            In connection with its motion to dismiss, defendant provided the court with copies of the

8    Ford Limited Warranty and the Lincoln Warranty (both of which include the powertrain warranty

9    coverage), as exhibits to the declaration of Jeff Williams, a technical leader in Ford's design

10   analysis engineering department.  (Doc. Nos. 83-2, 83-3, 83-4.)  The terms of those two

11   warranties confirm, as plaintiffs have alleged in the FACC, that Ford vehicles are covered "for

12   three years or 36,000 miles, whichever comes first," with the powertrain coverage "for 5 years or

13   up to 60,000 miles, whichever comes first," and Lincoln vehicles are covered for four years or up

14   to 50,000 miles, whichever comes first, with powertrain coverage for six years or 70,000 miles,

15   whichever occurs first.  (FACC at ¶¶ 461, 463; Doc. Nos. 83-3 at 14, 16; 83-4 at 12, 15.)

16   Plaintiffs allege that the warranties "expressly state that Ford will 'without charge, repair, replace,

17   or adjust all parts on your vehicle that malfunction or fail during normal use during the applicable

18   coverage period due to a manufacturing defect in factory-supplied materials or factory

19   workmanship' so long [as] the Vehicle is properly operated and maintained and taken to a Ford

20   dealership for repair within the warranty period."  (FACC at ¶ 462; *see also* Doc. Nos. 83-3 at

21   14–15; 83-4 at 13.)  Plaintiffs further allege that defendant "provides powertrain warranty

22   coverage, which is applicable to 'the Engine:  all internal lubricated parts, cylinder block, cylinder

23   heads, electrical fuel pump, powertrain control module, engine mounts, flywheel, injection pump,

24   manifold (exhaust and intake), manifold bolts, oil pan, oil pump, seals and gaskets, engine

25   thermostat, engine, thermostat housing, timing chain cover, timing chain (gears or belt),

26   turbocharger/supercharger unit, valve covers, water pump' as well as the components in the

27   transmission, front-wheel drive, rear-wheel drive, and four-wheel/all-wheel drive."  (FACC at

28   ¶ 463; *see also* Doc. Nos. 83-3 at 16–17; 83-4 at 15.)

Defendant notes that the FACC alleges the terms of the CPO warranty only for Ford vehicles, not Lincoln vehicles, which defendant contends have materially different terms, though neither party has provided the court with a copy of the CPO warranty for either Ford or Lincoln. (Doc. No. 83-1 at 13 n.13.)  According to defendant, the CPO warranty coverage for Lincoln vehicles "includes repair or replacement of covered components for six years from the original Lincoln Warranty start date, or up to 100,000 miles, whichever occurs first," (*id.* at 13), whereas the FACC alleges that "Ford offers an additional limited warranty covering CPO Vehicles for 12 months or 12,000 miles, whichever comes first," (FACC at ¶ 464).  The FACC also alleges that "Ford's CPO Vehicle warranty states that a dealer will replace 'all covered components . . . that are found to be defective in factory-supplied materials or workmanship during the applicable warranty periods'" and "[t]he engine and its components—including the cylinder block and cylinder heads—are included in Ford's list of 'covered components.'"  (FACC at ¶ 465.)

Plaintiffs maintain in their opposition to the pending motion to dismiss that they have "sufficiently alleged Ford's breach of express warranty because Ford did not honor the warranty's terms—Ford either charged plaintiffs for engine repairs or provided illusory 'fixes' that merely masked the Engine Defect long enough for the warranty to expire."  (Doc. No. 85 at 13.)  Plaintiffs further contend that "[e]ven in the limited situations where Ford replaced the engines, the vehicles remained at risk of unexpected failure and thus were not restored to proper function."  (*Id.* at 13–14.)  In addition, plaintiffs allege in their FACC that "[b]ecause Ford has not been able [to] remedy the Engine Defect, any limitation on remedies included in the Warranties causes the Warranties to fail their essential purposes, rendering them null and void."  (FACC at ¶ 480.)

1.    California Breach of Express Warranty (Claim 3)

The breach of express warranty claim under California law is brought by all four California plaintiffs (Vanessa Miller, Amber West, Evan West, and Jeffery Hodges) individually and on behalf of the California subclass.  (FACC at ¶ 458.)  Defendant moves to dismiss this claim only as to plaintiffs Miller and Hodges, but not as to plaintiffs Amber West and Evan West, whose express warranty claim survived defendant's prior motion to dismiss.  (Doc. No. 83-1 at 15–16.)  Defendant now argues that the express warranty claims of plaintiffs Miller and Hodges

10

1    "fail because they allege insufficient facts to show any breach by Ford." (*Id.* at 14.) Specifically,

2    according to defendant, they failed to allege either repeated unsuccessful in-warranty repair

3    attempts or Ford's refusal of in-warranty repairs, as required. (Doc. No. 86 at 9) (citing

4    *Philippine Nat. Oil Co. v. Garrett Corp.*, 724 F.2d 803, 808 (9th Cir. 1984) ("[T]he law is that a

5    repair or replace remedy fails of its essential purpose only if repeated repair attempts are

6    unsuccessful within a reasonable time.")).

7                          a.    *Plaintiff Hodges's Breach of Express Warranty Claim*

8              Plaintiff Hodges alleges that on July 6, 2022, he took his 2019 Ford Fusion (which he had

9    purchased new in January 2020 in California and which was still under warranty with 29,500

10   miles on the odometer) to the nearest authorized Ford dealership, in Lubbock, Texas, because he

11   received an alert detecting a misfire in the engine and the service engine light illuminated in his

12   vehicle. (FACC at ¶¶ 259, 263.) The Texas dealership charged plaintiff Hodges $647.80 to

13   change four spark plugs in the engine.[8] (*Id.* ¶ 263.) Five days later, plaintiff Hodges took his

14   vehicle (which was still under warranty) to a dealership in California for diagnosis and repair

15   because he had received another alert that a misfire in the engine had been detected and the

16   service engine light illuminated. (*Id.*) The dealership's technician found that coolant was low in

17   the reservoir and leaking into cylinder #4, and that the damage to the engine was significant, so

18   the vehicle's short block was replaced. (*Id.*) Plaintiff Hodges does not allege that he was charged

19   by the dealership for this diagnosis and replacement short block; rather, he alleges that the total

20   amount he paid "to repair his vehicle" was just the amount he paid the Texas dealership for spark

21   plugs, which suggests that he was not charged for the services he received from the California

22   dealership. (*Id.*)

23             Defendant argues that plaintiff Hodges's allegations are insufficient because he "does not

24   allege that he was charged for this in-warranty repair or that he has returned to Ford during the

25   vehicle's warranty period for further repairs (or has experienced any other issues)." (Doc. No.

26

27   _____
     [8] Plaintiff Hodges does not include any allegations suggesting that the spark plugs needed to be
     changed due to effects of the Engine Defect. Nor does plaintiff Hodges allege that the spark
28   plugs were covered by the warranty such that he should not have been charged to change them.

83-1 at 15.)  Defendant contends that "[a]t most, [plaintiff] Hodges has pled only one in-warranty misdiagnosis for his repair request in Texas," which is not sufficient to state a claim for breach of express warranty under California law.  (*Id.*) (citing *In re Seagate Tech. LLC Litig.*, 233 F. Supp. 3d 776, 784 (N.D. Cal. 2017) (dismissing an express warranty claim that was based on "a mere two successive failures within the warranty period—or in other words, only one unsuccessful replacement").  The court agrees with defendant in this regard.  Even if the first repair attempt was unsuccessful, there are no allegations that the replacement of the short block during plaintiff Hodges's second repair attempt was unsuccessful.  Thus, plaintiff Hodges's allegations fall short of meeting the applicable legal standard under California law, which requires him to allege and show "repeated repair attempts [that] are unsuccessful within a reasonable time." *See Philippine Nat. Oil Co.*, 724 F.2d at 808; *see also Clark v. Am. Honda Motor Co.*, No. 20-cv-03147-AB-MRW, 2021 WL 4260232, at *3 (C.D. Cal. Sept. 14, 2021) ("Plaintiffs' failure to make more than one repair presentation precludes them from arguing that the warranty failed of its essential purpose."); *cf. Madrigal v. Volkswagen Grp. of Am., Inc.*, No. 2:23-cv-01465-HDV-AS, 2023 WL 7280457, at *3 (C.D. Cal. Oct. 31, 2023) (finding that the plaintiff had "sufficiently alleged, at least for pleading purposes, repeated repair attempts" where the "plaintiff noted multiple appointments with an Audi servicer to address complaints, presenting defendant with opportunities to repair the defect at issue, only [for defendant] to refuse to pay for the repair or the diagnostic testing").

Moreover, the court is not persuaded by plaintiffs' argument that all repair attempts should be deemed "unsuccessful" because Ford "provided illusory 'fixes' that merely masked the Engine Defect long enough for the warranty to expire," and that vehicles with replacement engines remained at risk for the Engine Defect.  (Doc. No. 85 at 13–14.)  The two district court decisions that plaintiffs rely upon to support this argument are distinguishable.

First, the sudden unintended acceleration ("SUA") defect at issue in *In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Pracs., & Prod. Liab. Litig.*, 754 F. Supp. 2d 1145, 1156–60 (C.D. Cal. 2010) affected tens of millions of vehicles and led to massive recalls, congressional investigations, imposition of NHTSA civil penalties against the manufacturer, and

1    diminishing value of the affected vehicles.  The plaintiffs there essentially alleged that "with

2    respect to any SUA-related repair request, any purported repair was itself defective because no

3    adequate brake-override system was installed and/or because the repairs pursuant to the floor mat

4    and pedal recalls did not address the root cause of the SUA events."  *In re Toyota SUA*, 754 F.

5    Supp. 2d at 1178.  In this case, plaintiffs attempt to make a similar argument, but they lack

6    comparable factual support.  Notably, in *In re Toyota SUA*, the plaintiffs alleged that the

7    manufacturer was unable or unwilling to repair the defect as shown by the fact that the two wide-

8    scale recalls failed to repair the defect and the manufacturer's top officials publicly acknowledged

9    that its recalls would not completely remedy the SUA problem.  *Id.* at 1159–60, 1178.  Further,

10   they alleged that when consumers "sought to return their cars out of fear that SUA could occur

11   and cause catastrophic injury or death," the manufacturer refused to take the vehicles back and

12   refused to (and could not) provide an adequate repair.  *Id.* at 1159–60.  Here, in contrast, plaintiff

13   Hodges was not refused a repair—he received a replacement short block (free of charge)—and he

14   has not alleged any facts suggesting that this replacement was an unsuccessful repair or that he

15   experienced any further issues with his vehicle following this repair.  For these reasons, plaintiffs'

16   reliance on *In re Toyota SUA* is unavailing.

17        Second, plaintiffs' reliance on the district court's decision in *Horvath v. LG Elecs.*

18   *Mobilecomm U.S.A., Inc.*, No. 3:11-cv-01576-MLH-RBB, 2012 WL 2861160, *1, 6 (S.D. Cal.

19   Feb. 13, 2012) is a bit confounding because in that case, the four plaintiffs collectively made at

20   least *ten* repair attempts.  Therefore, the allegations in *Horvath* are readily distinguishable from

21   those advanced by plaintiff Hodges in alleging a single unsuccessful repair attempt.

22        Thus, the court finds that plaintiff Hodges has not sufficiently alleged a breach of express

23   warranty claim.  Because plaintiff Hodges was added as a new plaintiff to the FACC, his

24   allegations were not previously tested by defendant's prior motion to dismiss.  At the end of their

25   opposition to the pending motion, plaintiffs generally ask that leave to amend be granted if any

26   part of defendant's motion to dismiss is granted.  While the court recognizes that leave to amend

27   should be granted "freely" when justice so requires, Fed. R. Civ. P. 15(a), the court finds that

28   granting plaintiff Hodges leave to amend this claim would be futile.  Plaintiff Hodges does not

13

1  proffer any additional allegations that he would include in a further amended complaint to address

2  the deficiencies identified in defendant's motion.  More importantly, plaintiff Hodges alleges in

3  the FACC (which is dated September 28, 2022) that "[i]n total to date, [he] has paid $647.50 to

4  repair his vehicle," which reflects the amount he paid for the spark plugs replacement.  (FACC at

5  ¶ 264.)  This allegation indicates that plaintiff Hodges did not pay for any further repairs, strongly

6  suggesting he would not be able to amend his allegations to include additional unsuccessful in-

7  warranty repair attempts.  The court will therefore grant defendant's motion to dismiss plaintiff

8  Hodges's express warranty claim, without leave to amend.

9                    b.    *Plaintiff Miller's Breach of Express Warranty Claim*

10        Plaintiff Miller alleges that on November 22, 2017, she purchased a used 2017 Ford Edge

11  from Enterprise Car Sales in Sacramento, California, and the vehicle had 20,699 miles on the

12  odometer at that time and a warranty start date of January 13, 2017.[9]  (FACC at ¶ 13.)  On June

13  14, 2018, plaintiff Miller took her vehicle to a Ford dealership for an in-warranty repair because

14  her vehicle's check engine light illuminated and the engine shook violently when the car was in

15  use.  (*Id.* at ¶ 17.)  The dealership replaced the engine.  (*Id.*)  Less than two years later, in

16  November 2019 when the vehicle had 84,000 miles on the odometer, plaintiff's vehicle began

17  manifesting the same problem with the engine, including total engine failure.  (*Id.* at ¶ 18.)  On

18  December 9, 2019, plaintiff Miller's husband told a Ford customer service representative that the

19  vehicle experienced another engine failure and the representative told him that there were "no

20  coverages for the engine" in her vehicle.  (*Id.*)  Ford eventually agreed to pay $1,500 of the total

21  repair costs of $7,579.19, forcing plaintiff Miller to pay the remaining $6,079.19 for the repair.

22  (*Id.*)

23        Defendant argues that plaintiff Miller's allegations are insufficient to maintain an express

24  warranty claim because "she received a free covered repair during the warranty period," and "her

25  vehicle was out of warranty when she contacted Ford in [November/December] 2019 for repairs."

26  (Doc. No. 83-1 at 17.)  In their opposition, plaintiffs do not contest that plaintiff Miller's vehicle

27  ─────────────────

28  [9]  The court notes that the FACC states this warranty start date as January 13, 2007, which appears to be a typographical error.  (FACC at ¶ 13.)

                                                    14

1    was no longer under warranty when the engine was repaired in late 2019.  Rather, plaintiff Miller

2    argues that her express warranty claim is not foreclosed because Ford knew of a latent defect at

3    the time of sale, and thus breached the express warranty at that time.  (Doc. No. 85 at 14) (citing

4    *Alberti v. Gen. Motors Corp.*, 600 F. Supp. 1026, 1028 (D.D.C. 1985)).  However, as defendant

5    correctly notes in its reply brief, the D.C. district court decision that plaintiffs rely upon has been

6    expressly rejected by California courts.  (Doc. No. 86 at 9); *see Clemens v. DaimlerChrysler*

7    *Corp.*, 534 F.3d 1017, 1023 (9th Cir. 2008) (affirming the dismissal of express warranty claims

8    where the plaintiff's vehicle repairs "were made after the warranty period expired," and

9    recognizing that "the California Court of Appeal has joined the Second Circuit in rejecting the

10   holding of *Alberti*," which had "conflated notions of express and implied warranty and pushed the

11   definition of 'defect' to the breaking point") (citing *Daugherty v. Am. Honda Motor Co.*, 144 Cal.

12   App. 4th 824, 831 (2006) ("Several courts have expressly rejected the proposition that a latent

13   defect, discovered outside the limits of a written warranty, may form the basis for a valid express

14   warranty claim if the warrantor knew of the defect at the time of sale.")).  "The general rule is that

15   an express warranty 'does not cover repairs made after the applicable time or mileage periods

16   have elapsed.'"  *Daugherty*, 144 Cal. App. 4th at 830; *see also Baranco v. Ford Motor Co.*, 294

17   F. Supp. 3d 950, 973–74 (N.D. Cal. 2018) (dismissing an express warranty claim even though the

18   manufacturer's adjustment to a malfunctioning part "may not have prevented eventual recurrence

19   of corrosion and malfunctioning of the sensor after expiration of the warranty," i.e., "even where

20   eventual, post-warranty replacement is predictable").  Accordingly, plaintiffs' latent defect

21   argument fails under California law.

22       Plaintiffs also argue in their opposition that they have adequately pled that Ford's

23   warranty is unconscionable under the state laws of the ten states (AR, CA, CO, IL, IN, NE, NC,

24   OH, TN, and WA) that were not the subject of defendant's prior motion to dismiss and thus were

25   not analyzed in the court's August 10, 2022 order, which rejected plaintiffs' unconscionability

26   argument as to the eight states' laws at issue in that motion (FL, GA, KS, MD, MI, MN, NK, and

27   WI).  (Doc. Nos. 85 at 14–16; 83-1 at 17; 76 at 5–7.)  At the March 7, 2023 hearing, the court

28   asked plaintiffs' counsel why the analysis of unconscionability would be any different under the

1    ten states' laws now placed at issue by defendant's pending motion to dismiss.  Plaintiffs' counsel

2    responded merely that the difference is the particular state and the cause of action under that

3    state's law, but plaintiffs' counsel could not point to any differences in the legal standards

4    applicable under the various states' laws, nor how those differences would warrant a different

5    result on the question of whether the warranties in this case are unconscionable.  Indeed, in their

6    opposition brief, plaintiffs note that the applicable legal standard for these ten states all adopt the

7    same UCC standard.  (Doc. No. 85 at 14 n.4.)

8           Relevant to plaintiff Miller's express warranty claim, the court's August 10, 2022 order

9    outlined the legal standard under California law for procedural and substantive unconscionability

10   and cited several decisions from California state and federal courts to show that "similarly

11   standard warranties, despite generally being non-negotiable, have been routinely upheld absent

12   allegations the plaintiffs lacked other viable options to purchase a similar product or for obtaining

13   additional warranty protections from defendant."  (Doc. No. 76 at 6) (citing cases).  Further, in

14   that order, the court concluded that based on application of this legal standard, defendant's

15   warranties are not procedurally or substantively unconscionable.  (*Id.* at 6–7.)  None of the new

16   allegations in the FACC address the specific deficiencies identified by the court in its August 10,

17   2022 order.  In addition, although plaintiffs point to some decisions in which courts have found

18   express warranty claims adequately pled based on allegations of unconscionability, none of the

19   authorities cited by plaintiffs to support their renewed unconscionability argument analyze

20   California law.  Indeed, one of the out-of-circuit authorities cited by plaintiffs was expressly

21   rejected in a decision that this court cited in the August 10, 2022 order.  *See Smith v. Ford Motor

22   Co.*, 749 F. Supp. 2d 980, 994 (N.D. Cal. 2010), aff'd, 462 F. App'x 660 (9th Cir. 2011)

23   ("Relying on *Carlson v. General Motors Corp.*, 883 F.2d 287 (4th Cir. 1989), [plaintiff] argues

24   the durational limitation in his warranty is unconscionable because Ford knew of a latent defect at

25   the time of sale.  *Carlson*, however, was not based on California law, and concerned claims based

26   on an implied, rather than express, warranty.").  For these reasons, plaintiffs' renewed attempt to

27   challenge the warranties as being unconscionable under California law fails.

28   /////

1          Thus, the court finds that plaintiff Miller has also not sufficiently alleged a breach of

2   express warranty claim.  Because plaintiff Miller is not a newly added plaintiff, she already had

3   an opportunity to amend her allegations to state a cognizable express warranty claim and she has

4   failed to do so.  Although plaintiffs generally ask that leave to amend be granted if any part of

5   defendant's motion to dismiss is granted, plaintiff Miller does not proffer any additional

6   allegations that she would include in a further amended complaint.  She merely disagrees with the

7   court's analysis under the legal standard that has been applied by the court.  Accordingly, the

8   court will grant defendant's motion to dismiss plaintiff Miller's express warranty claim without

9   leave to amend.

10          2.          Arkansas Breach of Express Warranty (Claim 7)

11          The breach of express warranty claim under Arkansas law is brought by plaintiff Patricia

12  Lund individually and on behalf of the Arkansas subclass.  (FACC at ¶ 537.)  In its August 10,

13  2022 order, the court dismissed plaintiff Lund's express warranty claim, with leave to amend,

14  because she "failed to allege sufficient factual support demonstrating [her] engine problems

15  occurred within the warranty time and mileage limits or that defendant refused to provide a

16  covered repair."  (Doc. No. 76 at 9.)  Because the claim was dismissed on this basis, the court did

17  not address defendant's additional argument that plaintiff Lund failed to allege facts sufficient to

18  show individual reliance, which defendant contends is a required element of express warranty

19  claims under Arkansas law.  (*Id.* at 10 n.5.)  In the pending motion, defendant again moves to

20  dismiss plaintiff Lund's express warranty claim, contending that she still does not allege "that she

21  was refused a covered in-warranty repair" and that she "relied on or reviewed (or was even aware

22  of) the relevant warranties prior to [her] vehicle purchase[]," as purportedly required under

23  Arkansas law.  (Doc. No. 83-1 at 15–17.)

24          Plaintiff Lund alleges that on October 21, 2016, she purchased a used 2016 Ford Escape

25  with 14,532 miles on the odometer and a warranty start date of December 9, 2015.  (FACC ¶ 24.)

26  Prior to purchasing her vehicle, plaintiff Lund researched the vehicle's safety features on Ford's

27  website and based on Ford's representations, she believed the Ford Escape to be safe, reliable,

28  and high-quality vehicle.  (*Id.* at ¶ 25.)  On November 6, 2020, while her vehicle was still under

17

1   warranty, plaintiff Lund took her vehicle to a Ford dealership in Arkansas to diagnose a check

2   engine light, and she paid for the diagnostic work.  (*Id.* at ¶ 28.)  The dealership told plaintiff

3   Lund that the vehicle's engine coolant was low and leaking into the engine.  (*Id.* at ¶ 29.)  The

4   dealership explained that the vehicle needed a new engine but engines for her vehicle had become

5   obsolete, and another engine would not be available until approximately six months later in the

6   summer of 2021.  (*Id.*)  The dealership offered plaintiff Lund a trade-in because her vehicle could

7   not be repaired, and she could not continue using a loaner vehicle for that length of time.  (*Id.*)  In

8   her allegations, plaintiff Lund does not specify whether she accepted the dealership's trade-in

9   offer or whether she did something else with her vehicle at that point.

10      The Ford warranty covering plaintiff Lund's vehicle states under the section "[w]hat is

11   covered" that "[t]he remedy under this written warranty, and any implied warranty, is limited to

12   repair, replacement, or adjustment of defective parts" and "[t]his exclusive remedy shall not be

13   deemed to have failed its essential purpose so long as Ford, through its authorized dealers, is

14   willing and able to repair, replace, or adjust defective parts in the prescribed manner."  (Doc. No.

15   83-3 at 15.)  Neither defendant Ford nor plaintiff Lund point to any warranty provision that

16   pertains to trade-ins.  Importantly, defendant Ford does not point to any provision to suggest that

17   Ford's offer of a trade-in vehicle—in lieu of repairing or replacing the defective engine—

18   complies with Ford's obligations under the warranty.  The court has reviewed the warranty terms

19   and has not identified any such provision.[10]  Moreover, the court is not persuaded by defendant's

20   characterization of plaintiff Lund's allegations and its conclusion that she "was not refused a

21   repair; the engine was not in stock."  (Doc. No. 86 at 9 n.3.)  Further, defendant cites to a single

22   district court decision to support its conclusion in this regard, but that case has no relevance

23   legally or factually because the defendant in that case continued to provide replacement parts for

24   defective air conditioning units and the plaintiff sought damages based on lost home value and

---

25   [10]  The only mention of a "replacement vehicle" in the Ford warranty is under a section that

26   briefly acknowledges that some states have "lemon laws" that allow owners to receive a
    replacement vehicle under certain circumstances if written notice is provided to Ford, as required

27   by some state laws.  (Doc. No. 83-3 at 40.)  Plaintiff Lund does not invoke this provision in her
    allegations, nor cite to any specific Arkansas "lemon law," nor allege that she sought a

28   replacement vehicle pursuant to any such state law.

1   time spent coordinating repairs.  (Doc. No. 83-1 at 16) (citing *Kleef v. Goodman Mfg. Co., L.P.*,

2   No. 4:15-cv-00176-BSM, 2015 WL 4512200, at *3 (E.D. Ark. July 24, 2015)).

3          The court finds that plaintiff Lund has sufficiently alleged facts to state her express

4   warranty claim, specifically that her vehicle was still covered under warranty when the Ford

5   dealership diagnosed her vehicle as needing a replacement engine and told her that the vehicle

6   could not be repaired because a replacement engine would not be available for six months.

7   Plaintiff Lund's allegations do not, however, include any facts suggesting that she relied on the

8   warranty's terms in deciding to purchase her vehicle.  For this reason, defendant's motion to

9   dismiss plaintiff Lund's express warranty claim hinges on whether Arkansas law requires

10  allegations of individual reliance for such a claim—a question that has not been answered

11  consistently by Arkansas state courts and federal courts interpreting Arkansas state law.

12         Unsurprisingly, in its motion to dismiss and reply brief, defendant cites to a few decisions

13  that indicate individual reliance is an element of an express warranty claim.  (Doc. No. 83-1 at 18

14  n.16) (citing *Ciba-Geigy Corp. v. Alter*, 309 Ark. 426, 447 (1992) ("An affirmation of fact must

15  be part of the basis of the parties['] bargain to be an express warranty.  When a buyer is not

16  influenced by the statement in making his or her purchase, the statement is not a basis of the

17  bargain.") (internal citation omitted)); (Doc. No. 86 at 10) (citing *Brooks v. Remington Arms Co.,*

18  *Inc.*, No. 1:09-cv-01054, 2010 WL 6971894 at *5 (W.D. Ark. Oct. 27, 2010) (relying on the

19  decision in *Ciba-Geigy* and stating that "the Arkansas Supreme Court directly addressed this issue

20  and held that reliance is an essential element of an express warranty claim")).  In *Ciga-Geigy*, a

21  corn farmer brought an express warranty claim against an herbicide manufacturer for injuries to

22  his corn crop based in part on an express warranty contained in the manufacturer's advertising

23  materials.  309 Ark. at 447.  In giving guidance to the trial court on remand for a retrial, the

24  Arkansas Supreme Court explained that because the farmer could not recall reading any

25  advertising materials, he was clearly not influenced by them when purchasing the herbicide, and

26  "hence they were not a basis of the bargain."  *Id.* at 447–48.  For this reason, the farmer's express

27  warranty claim could not be maintained to the extent it was based on the warranty reflected in the

28  advertising materials.  *Id.*

1    In her opposition, plaintiff Lund cites to a decision by the Eighth Circuit Court of Appeals

2   that postdates the authorities cited by defendant and clarifies the circumstances under which

3   reliance is required. (Doc. No. 85 at 16) (citing *IPSCO Tubulars, Inc. v. Ajax TOCCO*

4   *Magnathermic Corp.*, 779 F.3d 744, 750 (8th Cir. 2015) (explaining that the Arkansas Supreme

5   Court's decision in *Ciba-Geigy* noted that reliance is relevant to determining whether an express

6   warranty had been created, i.e., whether a seller made statements that the buyer relied upon, but

7   the *Ciba-Geigy* decision does "not establish reliance as essential to a contractual warranty

8   claim")). In *IPSCO*, the defendant argued that the plaintiff "did not rely on any quality

9   guarantees when signing the contract" for defendant to provide specialized equipment because

10   plaintiff "was unsure from the start that the equipment could perform." 779 F.3d at 750. The

11   court rejected the defendant's argument because the plaintiff's "doubts before negotiating do not

12   render ineffective the bargained-for guarantees in the contract." *Id.* The court further rejected the

13   defendant's reliance on the decision in *Ciba-Geigy* because the parties' written contract provided

14   the warranty—the warranty's creation was not in question. *Id.* In *IPSCO*, reliance was not an

15   essential element for the plaintiff's express warranty claim because there was no question as to

16   the existence or creation of the express warranty in the parties' equipment contract, unlike a

17   situation in which a warranty is created by a seller's statements and a buyer's reliance thereon.

18   Exemplifying this latter situation, an Arkansas state court dismissed a breach of express warranty

19   claim due to the plaintiff's failure to plead reliance where "[t]he bill of sale contains no express

20   warranty other than the conveyance of good and marketable title" of the car sold, and "[t]he only

21   potential evidence that there was any other express warranty comes from plaintiff's testimony that

22   [the wholesaler's agent] told her that the car was a good vehicle that drove well." *Madden v.*

23   *Mercedes-Benz USA, Inc.*, 2016 Ark. App. 45, *13 (2016) (affirming the dismissal of a breach of

24   express warranty claim where the plaintiff "made no allegation that she relied on [defendant's]

25   statements").

26    Recently, a district court evaluated express warranty claims brought under several state

27   laws, including Arkansas, and found "that reliance is not an element in Arkansas, given the

28   /////

1   Eighth Circuit's holding" in *IPSCO*. *In re Smitty's/Cam2 303 Tractor Hydraulic Fluid Mktg.*,

2   No. 4:20-md-02936-SRB, 2023 WL 9064606, at *9–10 (W.D. Mo. Dec. 13, 2023).

3          Notably, none of these decisions have upheld a reliance requirement under circumstances

4   that are factually similar to plaintiff Lund's allegations.  Plaintiff Lund's express warranty claim

5   is based on the terms of the warranty that covered her vehicle; her claim is not predicated on

6   advertising materials, or statements made by the sales agent at the time she purchased the vehicle,

7   or any other statements made by defendant that would be considered by courts in determining

8   whether a warranty had been created.  For these reasons, the court finds that individual reliance is

9   not required for plaintiff Lund's express warranty claim brought under Arkansas law.

10         Therefore, the court will deny defendant's motion to dismiss plaintiff Lund's express

11  warranty claim.

12              3.      Colorado Breach of Express Warranty (Claim 10)

13         The breach of express warranty claim under Colorado law is brought by plaintiff Darrick

14  Christodaro individually and on behalf of the Colorado subclass.  (FACC at ¶ 602.)  In the August

15  10, 2022 order, the court dismissed plaintiff Christodaro's express warranty claim, with leave to

16  amend, and explained that "the warranty did not require Ford to go beyond repairs allowing the

17  vehicle to function properly during the warranty."  (Doc. No. 76 at 9.)  Plaintiff Christodaro's

18  allegations acknowledge that his 2017 Ford Escape had 61,272 miles on the odometer and was

19  "barely out of warranty" when he brought his vehicle back to a dealership on March 10, 2020

20  because the vehicle shook violently, shut down, and illuminated the check engine light.  (FACC

21  at ¶¶ 48, 54.)

22         Plaintiff Christodaro does not dispute that his vehicle was out-of-warranty, but he argues

23  that defendant's warranty is unconscionable.  (Doc. No. 85 at 14–16.)  Specifically, plaintiff

24  Christodaro alleges that a gross disparity in bargaining power existed between Ford and

25  consumers, "Ford's warranty limitation is unenforceable because it knowingly sold a defective

26  product without informing consumers about the defect," and the time limits were unconscionable

27  because consumers "had no meaningful choice in determining these time limitations, the terms of

28  which unreasonably favored Ford."  (FACC at ¶¶ 621–22.)  In their opposition to the pending

motion, plaintiffs assert that "[c]ourts routinely accept similar allegations to support a finding of substantive [and procedural] unconscionability." (Doc. No. 85 at 15.) But none of the authorities cited by plaintiffs pertain to Colorado law nor explain how Colorado law materially differs from the laws of the states that the court addressed in its August 10, 2022 order, which found that defendant's warranties are not unconscionable. (*See* Doc. No. 76 at 6.) Thus, plaintiffs' renewed attempt to challenge the warranties as being unconscionable under Colorado law also fails.

Accordingly, the court will grant defendant's motion to dismiss plaintiff Christodaro's express warranty claim brought under Colorado law. Because plaintiff Christodaro is not a newly added plaintiff, he too already had an opportunity to amend his allegations to state a cognizable express warranty claim and he has failed to do so. Although plaintiffs generally ask that leave to amend be granted if any part of defendant's motion to dismiss is granted, plaintiff Christodaro's unconscionability argument has already been rejected and allowing further leave to amend would be futile. For these reasons, plaintiff Christodaro's express warranty claim will be dismissed without leave to amend.

### 4.     Florida Breach of Express Warranty (Claim 13)

Plaintiffs have withdrawn the breach of express warranty claim brought under Florida law. (Doc. No. 85 at 21 n.12.) Accordingly, the court will dismiss this claim as having been withdrawn.

### 5.     Illinois Breach of Express Warranty (Claim 18)

The breach of express warranty claim under Illinois law is brought by plaintiff Anthony Cicero individually and on behalf of the Illinois subclass. (FACC at ¶ 780.) Defendant moves to dismiss this claim because plaintiff Cicero's allegations show that he first brought his 2017 Ford Escape to the dealership for repairs after the applicable five-year warranty period expired. (Doc. No. 83-1 at 14) (citing FACC ¶¶ at 234, 238). In plaintiffs' opposition, plaintiff Cicero contends that he has a viable express warranty claim regardless of whether he brought his vehicle in for repair during the warranty period because the Engine Defect is a latent defect that was not discoverable during a reasonable pre-sale or post-sale inspection. (Doc. No. 85 at 12.) Plaintiff Cicero argues that the doctrine of unconscionability allows warranty claims to proceed where

1   "plaintiffs' claims are premised on the discovery of a latent defect."  (*Id.* at 15) (quoting *Bossart*

2   *v. Gen. Motors LLC*, No. 20-cv-11057, 2021 WL 5278191, at *6 (E.D. Mich. May 19, 2021)).

3   However, the quoted portion of the *Bossart* decision pertained to a plaintiff who brought an

4   express warranty claim under South Carolina law, not the plaintiff who had brought a claim under

5   Illinois law.  *See* 2021 WL 5278191, at *6.  Further, in the only decision cited by plaintiffs that

6   analyzed an express warranty claim under Illinois law, the court found that unconscionability had

7   been sufficiently pled based on the plaintiffs' allegations of manipulation (e.g., that the

8   defendants "knew the timing chain tensioners would fail and manipulated the warranty terms to

9   avoid paying for it," and that the defendants told the plaintiffs misleading information which was

10  provided "intentionally to buy time until after they were no longer obligated by the warranty to

11  make the necessary repairs").  *See Skeen v. BMW of N. Am., LLC*, No. 2:13-cv-1531-WHW-

12  CLW, 2014 WL 283628, at *14–15 (D.N.J. Jan. 24, 2014).  Unlike in *Skeen*, here plaintiffs do not

13  allege manipulation of the warranty terms.

14          Simply put, plaintiff Cicero does not support his unconscionability argument with

15  citations to relevant authority analyzing express warranty claims under Illinois law or explain

16  how the analysis of unconscionability under Illinois law materially differs from that of the other

17  states that the court analyzed in its August 10, 2022 order, as discussed above.  The court has not

18  identified any such clear authority under Illinois law.  *See Drake v. Toyota Motor Corp.*, No.

19  2:20-cv-01421-SB-PLA, 2020 WL 7040125, at *8 (C.D. Cal. Nov. 23, 2020) ("Citing three

20  unpublished decisions from the District of New Jersey, plaintiffs argue that when a complaint

21  alleges an express warranty's limitations are unconscionable, it is inappropriate 'at the pleadings

22  stage' to bar a warranty claim.  But the court knows of no California, Illinois, or Ninth Circuit

23  authority establishing a similar 'unconscionability exception' for express-warranty claims.")

24  (internal citation omitted).

25          Accordingly, the court will grant defendant's motion to dismiss plaintiff Cicero's express

26  warranty claim brought under Illinois law.  Because plaintiff Cicero is not a newly added

27  plaintiff, he already had an opportunity to amend his allegations to state a cognizable express

28  warranty claim and he has failed to do so.  Although plaintiffs generally ask that leave to amend

be granted if any part of defendant's motion to dismiss is granted, plaintiff Cicero's unconscionability argument has already been rejected and allowing further leave to amend would be futile.  For these reasons, plaintiff Cicero's express warranty claim will be dismissed without leave to amend.

      6.      Indiana Breach of Express Warranty (Claim 21)

The breach of express warranty claim under Indiana law is brought by both Indiana plaintiffs (Teresa Balaszek and Scott Pickering) individually and on behalf of the Indiana subclass.  (FACC at ¶¶ 827, 849.)  Defendants move to dismiss this claim as to both Indiana plaintiffs.  (Doc. No. 83-1 at 14, 17.)

      a.     *Plaintiff Balaszek's Breach of Express Warranty Claim*

Plaintiff Balaszek's express warranty claim was previously dismissed with leave to amend because she had not alleged what the mileage was on her 2017 Ford Escape when she attempted to present her vehicle to a Ford dealership for repair in September 2020, so the court could not determine whether her vehicle was under warranty.  (Doc. No. 76 at 9.)  In the FACC, plaintiff Balaszek alleges that her vehicle had approximately 90,000 miles on the odometer at that time.  (FACC at ¶¶ 116, 120.)  In the pending motion, defendant argues that plaintiff Balaszek's express warranty claim fails because she has conceded that she did not seek a repair of her vehicle until after the warranty period had expired.  (Doc. No. 83-1 at 14.)  In their opposition, plaintiffs counter with the same latent defect and unconscionability argument discussed above.  (Doc. No. 85 at 12–13.)  The court incorporates that discussion here, and notes that none of the authorities cited by plaintiffs to support their renewed unconscionability argument pertain to express warranty claims brought under Indiana law.  Plaintiff Balaszek has, therefore, likewise failed to support her unconscionability argument with citation to relevant authority under Indiana law.

Accordingly, the court will grant defendant's motion to dismiss plaintiff Balaszek's express warranty claim brought under Indiana law, without further leave to amend.

      b.     *Plaintiff Pickering's Breach of Express Warranty Claim*

Plaintiff Pickering alleges that on January 27, 2016, he purchased a pre-owned 2014 Ford Fusion with a warranty start date of November 25, 2013.  (FACC at ¶ 305.)  Plaintiff Pickering

24

began experiencing the Engine Defect in February 2016 and brought the vehicle (which was still under warranty) to a Ford dealership for repairs.  (*Id.* at ¶ 309.)  The repair order notes that the technician inspected to find coolant leaking, replaced a temperature sensor, repaired coolant hose connection, replaced a clamp, and refilled the coolant.  (*Id.*)  In opposing defendant's motion to dismiss this claim, plaintiff Pickering argues that the February 2016 repair was not adequate and "merely masked the Engine Defect."  (Doc. No. 85 at 13.)  Plaintiffs' argument has already been rejected as discussed above with regard to plaintiff Miller's express warranty claim, and the court incorporates that discussion here.  Although plaintiff Pickering alleges that he continued experiencing the Engine Defect, he does not allege that he sought any further repairs during the warranty period; indeed, he alleges that he did not seek any further repair until over five years later, in July 2021, when the vehicle was no longer under warranty.  (*Id.* at ¶¶ 309, 310.)  Accordingly, plaintiff Pickering has failed to state an express warranty claim under Indiana law. *See Shea v. Gen. Motors LLC*, 567 F. Supp. 3d 1011, 1019 (N.D. Ind. 2021) ("[T]o proceed on their express warranty claims, the owners must show they sought and were denied repairs during the warranty term.").

For these reasons, the court will grant defendant's motion to dismiss plaintiff Pickering's express warranty claim brought under Indiana law.  The court recognizes that plaintiff Pickering was added as a new plaintiff to the FACC, and thus his allegations were not previously tested by defendant's prior motion to dismiss.  Nevertheless, in light of the guidance the court previously provided in the August 10, 2022 order as to other plaintiffs (such as plaintiff Miller) who similarly failed to allege more than one repair attempt during the warranty period, coupled with the fact that plaintiff Pickering has not proffered any allegations that he would include if he were granted leave to amend his express warranty claim, the court finds that the granting of leave to amend as to this claim would be futile.  Accordingly, plaintiff Pickering's express warranty claim will be dismissed without leave to amend.

7.    Michigan Breach of Express Warranty (Claim 28)

The breach of express warranty claim under Michigan law is brought by two of the three Michigan plaintiffs (Rachel Goodrich and Tracy Ann Metro) individually and on behalf of the

25

1   Michigan subclass.[11]  (FACC at ¶¶ 995.)  Defendant moves to dismiss these claims as to both

2   plaintiffs Goodrich and Metro on the ground that they have not sufficiently alleged "facts to show

3   any breach by Ford," and they have not alleged individual reliance on the applicable warranties,

4   as required by Michigan law.  (Doc. No. 83-1 at 14–18.)

5                 a.     *Plaintiff Goodrich's Breach of Express Warranty Claim*

6         The court previously dismissed plaintiff Goodrich's express warranty claim with leave to

7   amend because she had failed to "allege sufficient factual support demonstrating [her] engine

8   problems occurred within the warranty time and mileage limits."  (Doc. No. 76 at 9.)  Although

9   plaintiff Goodrich alleges that she took her used 2017 Ford Fusion to a Ford dealership on

10  October 29, 2020 and January 5, 2021 due to her vehicle's engine overheating and an illuminated

11  check engine light (FACC at ¶¶ 160, 165), she still does not allege in the FACC what the mileage

12  was on her vehicle's odometer at those times.  Thus, to the extent plaintiff Goodrich's claim is

13  predicated on those repair visits, her claim fails.  *See Weidman v. Ford Motor Co.*, No. 18-cv-

14  12719, 2020 WL 674348, at *3 (E.D. Mich. Feb. 11, 2020) ("[A]n express warranty does not

15  cover repairs made after the applicable time or mileage periods have elapsed.") (citation omitted).

16        Plaintiff Goodrich also alleges, however, two repair visits during the warranty period, the

17  first on September 5, 2018, and the second "a few days later," in which she brought her vehicle to

18  the Ford dealership due to the engine overheating and the illuminated check engine light.  (FACC

19  ¶¶ at 164.)  On both occasions, the technician reset the engine codes and refilled the engine's

20  coolant.  (*Id.*)  Plaintiff Goodrich further alleges that "[s]ince that time, [she] has repeatedly taken

21  her vehicle to [the dealership] because the vehicle has overheated, and she has spent about $1,000

22  on repairs such as new spark plugs and coils in an attempt to fix the issue."  (*Id.*)  Based on these

23  allegations, the court finds that plaintiff Goodrich has alleged repeated unsuccessful, in-warranty

24  repair attempts sufficient to state a cognizable express warranty claim.  The only remaining

25  question is whether plaintiff Goodrich's express warranty claim nonetheless fails due to

26  _____

27  [11]  The third Michigan plaintiff, Stacey Coppock, previously asserted an express warranty claim
    under Michigan law as well, but the court dismissed that claim without leave to amend in its
    August 10, 2022 order because she sought repair of her vehicle after the warranty period expired

28  and the warranty was not unconscionable.  (Doc. No. 76 at 7.)

1    insufficient allegations of her reliance on the warranty's terms in deciding to purchase the vehicle,

2    which defendant contends is a required element for an express warranty claim under Michigan

3    law.  (Doc. Nos. 83-1 at 18; 86 at 10.)

4           Defendant cites two decisions, one from a state appellate court in Michigan and another

5    from a federal district court in Michigan, both of which support defendant's assertion that reliance

6    is a required element for an express warranty under Michigan law.  *See Berg v. Invacare Corp.*,

7    No. 17-cv-12362, 2020 WL 8408966, at *2 (E.D. Mich. Feb. 25, 2020) (denying the plaintiff's

8    motion for leave to amend her complaint, explaining that "under Michigan law, an express

9    warranty claim only exists where the buyer of the product actually relied on the warranty," and

10   allowing the plaintiff to add an "express warranty claim based on representations in the owner's

11   manual would be futile . . . because she testified that she did not read the owner's manual

12   containing the alleged express warranties"); *see also Monte v. Toyota Motor Corp.*, No. 220671,

13   2001 WL 1152901, at *3 (Mich. Ct. App. Sept. 28, 2001) ("The 'affirmation' that comprises the

14   express warranty at issue in the case at bar derives collectively from the Owners Manuel [sic] and

15   the Owner[']s Guide both provided to plaintiff[] upon leasing the vehicle," and the plaintiff

16   "could not have relied on *any* of the statements included in either the Owner's Manuel [sic] or

17   Owner's Guide considering that he received both *after* the bargain was already struck").  In their

18   opposition, plaintiffs do not squarely address these decisions.  Moreover, the sole authority they

19   cite to rebut the existence of a reliance requirement under Michigan law is a decision from the

20   Northern District of Ohio, in which that court merely asserted that Michigan and four other states

21   have "abandoned reliance as a required element of a written express warranty claim," but there

22   are no citations to any Michigan authority to support that assertion.  (Doc. No. 85 at 16) (citing *In

23   re Ford Motor Co., Spark Plug & 3-Valve Engine Prod. Liab. Litig.*, No. 1:12-md-2316, 2014

24   WL 3778592, at *38 (N.D. Ohio July 30, 2014)).  The court is therefore not persuaded by

25   plaintiffs' rebuttal and concludes instead that to state a cognizable express warranty claim under

26   Michigan law, a plaintiff must plead reliance on the warranty, and plaintiff Goodrich has not done

27   so here.

28   /////

27

1   For this reason, the court will grant defendant's motion to dismiss plaintiff Goodrich's

2   express warranty claim brought under Michigan law.  Because plaintiff Goodrich does not contest

3   that she did not rely on the warranties, and instead only argues that no such reliance requirement

4   applies, the court finds that granting plaintiff Goodrich leave to amend this claim would be futile.

5   Thus, this claim will be dismissed without leave to amend.

6                    b.    *Plaintiff Metro's Breach of Express Warranty Claim*

7          Plaintiff Metro alleges that on January 22, 2018, she purchased a new 2018 Ford Edge

8   from a Ford dealership.  (FACC at ¶ 292.)  In August 2021, plaintiff Metro took her vehicle

9   (which was still under warranty) to a Ford dealership because the vehicle began running roughly

10  and the check engine light illuminated.  (*Id.* at ¶ 296.)  The dealership diagnosed her vehicle as

11  needing a new O2 sensor but refused to replace the component because the vehicle "drove fine"

12  and the check engine light did not stay illuminated.  (*Id.*)  Plaintiff Metro paid an independent

13  mechanic to replace her O2 sensor, and she alleges that this replaced part "did not repair the

14  defect."  (*Id.*)  Based on this alleged refusal by Ford to replace the O2 sensor, despite the vehicle

15  being under warranty, the court finds that plaintiff Metro has sufficiently alleged that Ford

16  breached the warranty.  However, plaintiff Metro has not alleged that she read or reviewed or

17  otherwise relied on the warranty in deciding to purchase the vehicle.  For this reason, as explained

18  above with respect to plaintiff Goodrich, plaintiff Metro's express warranty claim likewise fails

19  due to her failure to plead reliance as required under Michigan law.

20         Accordingly, the court will grant defendant's motion to dismiss plaintiff Metro's express

21  warranty claim brought under Michigan law, without leave to amend.

22         8.    Minnesota Breach of Express Warranty (Claim 33)

23         The breach of express warranty claim under Minnesota law is brought by one of the two

24  Minnesota plaintiffs (Mark Kennedy) individually and on behalf of the Minnesota subclass.[12]

25  (FACC at ¶ 1108.)  Defendant moves to dismiss plaintiff Kennedy's express warranty claim

26  _____

27  [12]  The second Minnesota plaintiff, Brian Simonds, previously asserted an express warranty claim under Minnesota law as well, but the court dismissed that claim without leave to amend in its August 10, 2022 order because he sought repair of his vehicle after the warranty period expired

28  and the warranty was not unconscionable.  (Doc. No. 76 at 7.)

1   because he had not sought (and was thus not refused) an in-warranty repair.  (Doc. No. 83-1 at

2   14.)  Plaintiff Kennedy alleges that he sought repair of his certified pre-owned 2016 Ford Fusion

3   in early 2022, which is after the expiration of the applicable five-year warranty period that

4   commenced on November 28, 2016.  (*Id.* at ¶¶ 270, 274.)  Though plaintiff Kennedy is a newly

5   added plaintiff to the FACC and his allegations have not previously been addressed by the court,

6   his allegations suffer from the same deficiencies (namely, seeking repairs after the warranty

7   period) that led the court to dismiss plaintiff Simonds's express warranty claim without leave to

8   amend.  (*See* Doc. No. 76 at 7.)

9           In their opposition, plaintiffs renew their argument that plaintiffs have a viable express

10  warranty claim even if they did not seek in-warranty repairs because the Engine Defect is a latent

11  defect, rendering the warranty unconscionable.  (Doc. No. 85 at 12.)  However, that argument was

12  already rejected in the court's August 10, 2022 order (*see* Doc. No. 76 at 6), and plaintiffs do not

13  articulate any new basis or reason that the court should conclude otherwise as to the newly added

14  plaintiffs.  Plaintiffs also do not cite any authority pertaining to Minnesota law, which requires

15  owners to present their vehicle to a dealership for repairs.  *See Knotts v. Nissan N. Am., Inc.*, 346

16  F. Supp. 3d 1310, 1321 (D. Minn. 2018) ("[Nissan] cannot have breached the Warranty if [the

17  plaintiff] did not submit his vehicle to a Nissan-authorized dealer for repair.")  Further, in their

18  opposition brief, plaintiffs cite to only one decision to support their latent defect argument, but

19  that case involved express warranty claims brought under the laws of California, Florida, and

20  /////

21  /////

22  /////

23  /////

24  /////

25  /////

26  /////

27  /////

28  /////

1    Alabama, not Minnesota.  (Doc. No. 85 at 12) (citing *Benkle v. Ford Motor Co.*, No. 16-cv-

2    01569-DOC-JCG, 2017 WL 9486154, at *12 (C.D. Cal. Dec. 22, 2017)).[13]

3          Accordingly, defendant's motion to dismiss plaintiff Kennedy's express warranty claim

4    brought under Minnesota law will be granted, without leave to amend.

5          9.    North Carolina Breach of Express Warranty (Claim 37)

6          The breach of express warranty claim under North Carolina law is brought by plaintiff

7    Robyn Pirog individually and on behalf of the North Carolina subclass.  (FACC at ¶ 1176.)  In its

8    August 10, 2022 order, the court dismissed plaintiff Pirog's express warranty claim, with leave to

9    amend, because she had "failed to allege sufficient factual support demonstrating [her] engine

10   problems occurred within the warranty time and mileage limits or that defendant refused to

11   provide a covered repair."  (Doc. No. 76 at 9.)  In the pending motion, defendant moves to

12   dismiss plaintiff Pirog's express warranty claim because her 2016 Ford Edge had approximately

13   73,000 miles on the odometer and was thus no longer under warranty when she brought it to a

14   Ford dealership on December 31, 2020 for service due to an illuminated check engine light.

15   (Doc. No. 83-1 at 14.)  Defendant also argues that plaintiff Pirog failed to plead individual

16   reliance as required for express warranty claims brought under North Carolina law.  (*Id.* at 18.)

17   In opposition, plaintiff Pirog counters that she has adequately pled reliance (though plaintiff Pirog

18   does not concede that reliance is required by North Carolina law), and that the warranties are

19   ───────────────

20   [13]  In their opposition brief, plaintiffs also assert that they need not have presented their vehicles
     for repair during the warranty period because doing so would be futile.  (Doc. No. 85 at 12 n.2.)
21   However, the sole authority plaintiffs cite in support of this argument—*In re Caterpillar, Inc.,
     C13 & C15 Engine Prod. Liab. Litig.*, No. 1:14-cv-03722-JBS-JS, 2015 WL 4591236 (D.N.J.
22   July 29, 2015)—does not address futility at all.  Rather, in *In re Caterpillar*, the court noted with
     regard to allegations of latent defects that "courts have granted dismissal motions where plaintiffs
23   alleged a manufacturer's knowledge of a latent defect that would manifest outside the warranty
     period," and that "rejecting conclusory allegations of unconscionability based on knowledge of a
24   latent defect[] represents the recent trend in this District and is consistent with the prevailing
     approach elsewhere."  2015 WL 4591236, at *20–21.  Thus, plaintiffs' futility argument fails.  *Cf.
25   In re Myford Touch Consumer Litig.*, No. 13-cv-03072-EMC, 2015 WL 5118308, at *5 (N.D.
     Cal. Aug. 31, 2015) ("Plaintiffs suggest that this Court should create a 'futility' doctrine out of
26   whole cloth, and then find that [plaintiff] Mitchell alleges sufficient facts to plausibly demonstrate
     that it would have been futile for him to bring his 2014 Lincoln in for warranty service because
27   Ford would have been unable to repair the vehicle even if it had been given the chance.  The
     Court declines to do so.").
28

1   unconscionable under North Carolina law because the Engine Defect is a latent defect.  (Doc. No.

2   85 at 12, 14–17.)

3       Contrary to plaintiff Pirog's contention, plaintiffs bringing express warranty claims under

4   North Carolina law must allege reliance on the warranty.  *See Diop v. BMW of N. Am., LLC*, 511

5   F. Supp. 3d 679, 686 (E.D.N.C. 2021) ("To state a claim for breach of an express warranty under

6   North Carolina law, a party must show '(1) an express warranty as to a fact or promise relating to

7   the goods, (2) which was relied upon by the plaintiff in making his decision to purchase, (3) and

8   that this express warranty was breached by the defendant.'") (quoting *Harbor Point*

9   *Homeowners' Ass'n, Inc. ex rel. Bd. of Dirs. v. DJF Enters., Inc.*, 206 N.C. App. 152, 162

10  (2010)).  Plaintiff Pirog merely alleges in conclusory fashion the same boilerplate allegation

11  included as to the other plaintiffs, that "[p]laintiff relied on Ford's express warranties, which were

12  a material part of the bargain, when purchasing or leasing their class vehicles."  (FACC at

13  ¶ 1212.)  Plaintiff Pirog does allege that prior to purchasing her vehicle, she "researched her

14  vehicle by conducting general online search for information on the vehicle, visiting the dealership

15  website and the manufacturer's website, reviewing the window sticker and documents provided at

16  the dealership, and going on a test drive with an employee of the authorized Ford dealership."

17  (FACC at ¶ 193.)  However, plaintiff Pirog's allegations do not include any facts suggesting that

18  she relied on the terms of the warranty in deciding to purchase her vehicle.

19      Moreover, the court is not persuaded by plaintiff Pirog's argument that her allegations are

20  sufficient to state a viable express warranty claim under North Carolina law because "the element

21  of reliance can often be inferred from allegations of mere purchase or use if the natural tendency

22  of the representations made is such as to induce such purchase or use."  (Doc. No. 85 at 16–17)

23  (quoting *Bernick v. Jurden*, 293 S.E.2d 405, 413 (N.C. 1982)).  The *Bernick* decision by the

24  North Carolina Supreme Court that plaintiff Pirog cites in support of her argument is

25  distinguishable.  As the court explained in *Bernick*, the defendant manufacturers of a mouthguard

26  "promoted their product through hockey catalog advertisements and parent guides" as providing

27  "maximum protection to the lips and teeth," and "[w]ithout a doubt, the natural tendency of a

28  representation of 'maximum protection to the lips and teeth' is such as to induce the purchase of a

31

1    hockey mouthguard by a mother for her son's use while playing [hockey]." 293 S.E.2d at 448.

2    Under those factual circumstances, the court in *Bernick* concluded that "[c]onsidering the family

3    purpose of the mother's purchase, reliance may be inferred in this case." *Id.* Plaintiff Pirog has

4    not articulated how the Ford warranty itself had a "natural tendency" to promote her purchase

5    akin to the mouthguard advertisement in a hockey magazine. *See In re Nexus 6P Prod. Liab.*

6    *Litig.*, 293 F. Supp. 3d 888, 918 (N.D. Cal. 2018) (applying North Carolina law and dismissing

7    express warranty claims because the plaintiffs did "not argue or allege that the natural tendency of

8    [the defendant's] representation [in a written Limited Warranty] that the Nexus 6P phones are

9    'free from material defects' in normal operation was to induce them to purchase the phone").

10   Importantly, plaintiff Pirog does not allege that the research she undertook prior to purchasing the

11   vehicle included reviewing the warranty or that she was otherwise aware of the warranty and its

12   terms, and thus there are no comparable allegations from which the court could simply infer her

13   reliance on the warranty.

14          Because plaintiff Pirog has failed to sufficiently allege reliance on the warranty, as

15   required under North Carolina law, and her express warranty claim will be dismissed on this

16   basis, the court need not address whether the warranty is unconscionable under North Carolina

17   law. Further, because plaintiff Pirog is not a newly added plaintiff, she already had an

18   opportunity to amend her allegations to state a cognizable express warranty claim and she failed

19   to do so. Although plaintiffs generally ask that leave to amend be granted if any part of

20   defendant's motion to dismiss is granted, plaintiff Pirog has not proffered any additional

21   allegations that she would include in a further amended complaint. For these reasons, defendant's

22   motion to dismiss plaintiff Pirog's express warranty claim will be granted, without leave to

23   amend.

24          10.    Washington Breach of Express Warranty (Claim 40)

25          The breach of express warranty claim under Washington law is brought by plaintiffs

26   Zachary Scott Damm and Amanda Gates individually and on behalf of the Washington subclass.

27   (FACC ¶ 1267.) In its August 10, 2022 order, the court dismissed their express warranty claim,

28   with leave to amend, because plaintiffs Damm and Gates "failed to allege sufficient factual

1    support demonstrating their engine problems occurred within the warranty time and mileage

2    limits or that defendant refused to provide a covered repair." (Doc. No. 76 at 9.) Because this

3    claim was dismissed on that basis, the court did not address defendant's additional argument that

4    plaintiffs Damm and Gates failed to allege facts sufficient to show individual reliance, which

5    defendant contends is a required element for express warranty claims brought under Washington

6    law. (*Id.* at 10 n.5.)

7         In the FACC, plaintiffs Damm and Gates allege that they purchased a pre-owned 2016

8    Ford Fusion on December 7, 2016 from Enterprise Car Sales, and the vehicle had a warranty start

9    date of September 2, 2015. (FACC at ¶ 202.) Plaintiffs Damm and Gates further allege that

10   "[p]rior to purchasing the 2016 Ford Fusion, [they] researched the vehicle by visited [sic] the

11   dealership's website, reviewed the Monroney Label (window sticker) and documents provided at

12   the dealership, and went on a test drive with a dealership employee." (*Id.* at ¶ 203.) On May 17,

13   2021, plaintiffs Damm and Gates brought their vehicle to a Ford dealership because the check

14   engine light illuminated, and the dealership diagnosed the vehicle as needing a new engine. (*Id.*

15   at ¶ 206.)

16        In the pending motion, defendant emphasizes that plaintiffs Damm and Gates concede that

17   they first sought repairs after the expiration of the applicable five-year warranty period, and thus

18   their express warranty claim fails. (Doc. No. 83-1 at 14.) In their opposition, plaintiffs Damm

19   and Gates offer the same latent defect and unconscionability argument discussed above with

20   respect to other plaintiffs. (Doc. No. 85 at 12–13.) The court incorporates that discussion here,

21   and notes that none of the authorities cited by plaintiffs to support their renewed

22   unconscionability argument pertain to express warranty claims brought under Washington law.

23   Plaintiffs Damm and Gates have, therefore, likewise failed to support their unconscionability

24   /////

25   /////

26   /////

27   /////

28   /////

1   argument with citation to authority under Washington law.  On this basis alone, the express

2   warranty claim brought by plaintiffs Damm and Gates should be dismissed.[14]

3          For this reason, the court will grant defendant's motion to dismiss the express warranty

4   claim brought by plaintiffs Damm and Gates, without leave to amend.

5          11.   Nebraska Breach of Express Warranty (Claim 43)

6          The breach of express warranty claim under Nebraska law is brought by plaintiff John

7   Krecek individually and on behalf of the Nebraska subclass.  (FACC ¶ 1340.)  Defendant moves

8   to dismiss plaintiff Krecek's express warranty claim because he sought his first repair on October

9   28, 2021, when his 2017 Ford Edge had 70,532 miles on the odometer and was thus no longer

10  under warranty.  (Doc. No. 83-1 at 14.)  Defendant also argues that plaintiff Krecek fails to allege

11  individual reliance as required for an express warranty claim under Nebraska law.  (*Id.* at 18)

12  (citing *Hillcrest Country Club v. N.D. Judds Co.*, 236 Neb. 233, 241 (1990) (holding that "since

13  an express warranty must have been 'made part of the basis of the bargain,' it is essential that the

14  plaintiffs prove reliance upon the warranty") (citation omitted)).  In their opposition, plaintiffs

15  assert that plaintiff Krecek has sufficiently alleged reliance because all plaintiffs allege that they

16  "relied on Ford's express warranties, which were a material part of the bargain, when purchasing

---

18  [14]  Though not required for the disposition of defendant's motion to dismiss this claim, the court
    will briefly address defendant's reliance argument as well.  Defendant argues that plaintiffs

19  Damm and Gates failed to plead individual reliance as required.  (*Id.* at 18.)  In opposition,
    plaintiffs Damm and Gates counter that reliance is not a required element for an express warranty

20  claim under Washington law.  (Doc. No. 85 at 12, 14–17.)  While it is true that "Washington
    courts sometimes require a form of reliance" for express warranty claims, they do not "require a

21  showing of awareness [of the warranty] when the plaintiffs base their claims on an express
    written warranty, rather than other representations (such as advertising statements), to form the

22  basis of the bargain."  *In re Nexus 6P Prod. Liab. Litig.*, 293 F. Supp. 3d 888, 919 (N.D. Cal.
    2018) (applying Washington law) (citing *Baughn v. Honda Motor Co.*, 107 Wash. 2d 127 (1986)

23  ("Although the UCC does not require a plaintiff to show reliance on the manufacturer's
    statements, he or she must at least be aware of such representations to recover for their breach."));

24  *see also In re Myford Touch Consumer Litig.*, No. 13-cv-3072-EMC, 2015 WL 5118308, at *6

25  (N.D. Cal. Aug. 31, 2015) (explaining that under Washington law, "'awareness' must be shown if
    the plaintiff intends to argue that other types of 'representation[s]' (e.g., advertising statements)

26  form part of the express warranty; *i.e.*, where the representations are used by the plaintiff to
    define the scope of the warranty").  Because plaintiffs Damm and Gates base their express

27  warranty claim on the written Ford warranty, not on advertising by Ford, defendant's reliance

28  argument fails.

or leasing their class vehicles." (Doc. No. 85 at 17.)  However, plaintiffs do not cite any authority, from Nebraska or otherwise, to suggest that such a conclusory allegation is sufficient to satisfy the reliance requirement under Nebraska law.  Though plaintiff Krecek details the research he undertook prior to purchasing his vehicle (FACC at ¶ 282), those allegations do not include any facts suggesting that he relied on the warranty in deciding to purchase his vehicle.  For these reasons, the court finds that plaintiff Krecek has not sufficiently alleged individual reliance and therefore has not stated a cognizable express warranty claim under Nebraska law.

In addition, plaintiff Krecek's latent defect and unconscionability argument, like those discussed above, fails for similar reasons.  The court incorporates that discussion here, and notes that none of the authorities cited by plaintiffs to support their renewed unconscionability argument pertain to express warranty claims brought under Nebraska law.  Plaintiff Krecek has, therefore, also failed to support his unconscionability argument with citation to relevant authority under Nebraska law.

For these reasons, the court will grant defendant's motion to dismiss plaintiff Krecek's express warranty claim, without leave to amend.

12.    Tennessee Breach of Express Warranty (Claim 46)

The breach of express warranty claim under Tennessee law is brought by plaintiff Tyson Batdorf individually and on behalf of the Tennessee subclass.  (FACC at ¶ 1411.)  In moving to dismiss this claim, defendant argues that plaintiff Batdorf has failed to allege individual reliance as required for an express warranty claim under Tennessee law.  (*Id.* at 18) (citing *Bearden v. Honeywell Int'l Inc.*, No. 3:09-1035, 2010 WL 3239285, at *5 (M.D. Tenn. Aug. 16, 2010) (explaining that for an express warranty claim under Tennessee law, "the plaintiff must have been aware of the warranty and must have relied on it when deciding to purchase the product")).

In their opposition, plaintiffs assert that reliance is not required under Tennessee law for written warranties.  (Doc. No. 85 at 16.)  The only authority plaintiff Batdorf cites to support this assertion is a decision by the Southern District of Indiana, in which the district court explained that in seeking class certification, the plaintiffs would not be required to demonstrate individualized reliance on written warranties, and the court emphasized that the "defendants have

1    cited no case in which a court has ruled that an express warranty provided to a consumer upon the

2    purchase of a product was unenforceable by the consumer because it was not part of the basis of

3    the bargain." *In re Bridgestone/Firestone Inc. Tires Prod. Liab. Litig.*, 205 F.R.D. 503, 527 (S.D.

4    Ind. 2001), *rev'd in part sub nom. In re Bridgestone/Firestone, Inc.*, 288 F.3d 1012 (7th Cir.

5    2002).  Plaintiff Batdorf's reliance on this decision in *In re Bridgestone/Firestone* is unavailing

6    because that decision pre-dates the decision in *Bearden* (cited by defendant) by almost a decade,

7    and in *Bearden*, the district court in applying Tennessee law dismissed an express warranty claim

8    because "the plaintiffs did not read the product manual before purchasing the air cleaners, so they

9    could not have directly relied on the express warranty." 2010 WL 3239285, at *5–6.  Thus, under

10   Tennessee law, plaintiff Batdorf must plead reliance on the warranty to state an express warranty

11   claim, and he has not done so.

12        In addition, plaintiff Batdorf's latent defect and unconscionability argument, like those

13   discussed above, fails for similar reasons.  The court incorporates that discussion here, and notes

14   that none of the authorities cited by plaintiffs to support their renewed unconscionability

15   argument pertain to express warranty claims brought under Tennessee law.  Plaintiff Batdorf has,

16   therefore, likewise failed to support her conscionability argument with citation to authority under

17   Tennessee law.

18        For these reasons, the court will grant defendant's motion to dismiss plaintiff Batdorf's

19   express warranty claim, without leave to amend.

20        13.   Ohio Breach of Express Warranty (Claim 49)

21        The breach of express warranty claim under Ohio law is brought by plaintiff Kimberly

22   Thomas individually and on behalf of the Ohio subclass.  (FACC at ¶ 1482.)  Defendant does not

23   move to dismiss plaintiff Thomas's express warranty claim, though defendant does argue in the

24   pending motion that the court should reject plaintiffs' argument that the warranty is

25   unconscionable under Ohio law.  (Doc. No. 83-1 at 17.)  Given that plaintiffs do not support their

26   unconscionability argument with any citation to authority analyzing express warranty claims

27   under Ohio law, the court readily rejects plaintiffs' argument in this regard.

28   /////

1    **B.**    **Implied Warranty Claims**

2        1.    <u>California Song-Beverly Consumer Warranty Act (Claim 4)</u>

3        Plaintiffs Amber West, Evan West, and Jeffery Hodges bring a claim for breach of

4 implied warranty under California's Song-Beverly Consumer Warranty Act, California Civil

5 Code §§ 1790, *et seq.*, individually and on behalf of the California subclass.  (FACC at ¶ 486.)

6 This claim brought by plaintiffs Amber West and Evan West survived defendant's prior motion to

7 dismiss and is therefore not challenged in the pending motion.  (*See* Doc. No. 76 at 38.)  Even

8 though plaintiff Hodges is a newly added plaintiff and his Song-Beverly Act claim has not been

9 previously addressed by the court, defendant does not move to dismiss this claim as to him either.

10        2.    <u>California Breach of Implied Warranty (Claim 5)</u>

11        The breach of implied warranty claim under California law is brought only by plaintiff

12 Hodges individually and on behalf of the California subclass.[15]  (FACC at ¶ 500.)  Defendant

13 moves to dismiss plaintiff Hodges's implied warranty claim because his allegation that he

14 purchased his vehicle from an authorized Ford dealer does not satisfy the privity requirement due

15 to the fact that dealerships are not agents of Ford for privity purposes under California law.  (Doc.

16 No. 83-1 at 20.)  Defendant had advanced this same argument in its prior motion to dismiss the

17 implied warranty claims brought by plaintiffs Miller and the Wests, and the court dismissed those

18 claims, without leave to amend, due to a lack of privity.  (Doc. No. 76 at 16–17) (citing *Clemens*

19 *v. DaimlerChrysler Corp.*, 534 F.3d 1017, 1023 (9th Cir. 2008) ("Under California Commercial

20 Code [§] 2314 . . . a plaintiff asserting breach of warranty claims must stand in vertical

21 contractual privity with the defendant," meaning buyer and seller "are in adjoining links of the

22 distribution chain.")).

23        In their opposition, plaintiffs argue (as they did previously) that some courts in California

24 recognize a third-party exception to the privity requirement.  (Doc. No. 85 at 19.)  However, in its

25 August 10, 2022 order, the court acknowledged that "California district courts are split on the

26 application of the third-party beneficiary exception to the privity requirement," and explained that

27

28      [15]  The implied warranty claims brought by the other California plaintiffs (Miller, and the Wests) were dismissed without leave to amend in the court's August 10, 2022 order.  (Doc. No. 76 at 38.)

1   "the Ninth Circuit's omission of a third-party beneficiary exception in its list of exceptions to the

2   rule of privity persuades this Court and others that '*Clemens* forecloses a third-party beneficiary

3   exception to the rule of privity.'"  (Doc. No. 76 at 16) (quoting *Stewart v. Electrolux Home Prod.,*

4   *Inc.*, No. 1:17-cv-01213-LJO-SKO, 304 F. Supp. 3d 894, 915 (E.D. Cal. Jan. 9, 2018)).  For these

5   same reasons, defendant's motion to dismiss plaintiff Hodges's implied warranty claim due to a

6   lack of privity will be granted, without leave to amend.

7          3.     Arkansas Breach of Implied Warranty of Merchantability (Claim 8)

8         The breach of implied warranty claim under Arkansas law is brought by plaintiff Lund

9   individually and on behalf of the Arkansas subclass.  (FACC at ¶ 564.)  Defendant does not move

10   to dismiss this claim, which survived defendant's prior motion to dismiss.  (*See* Doc. No. 76 at

11   38.)

12          4.     Colorado Breach of Implied Warranty of Merchantability (Claim 11)

13         The breach of implied warranty claim under Colorado law is brought by plaintiff

14   Christodaro individually and on behalf of the Colorado subclass.  (FACC at ¶ 630.)  Defendant

15   does not move to dismiss this claim, which survived defendant's prior motion to dismiss.  (*See*

16   Doc. No. 76 at 39.)

17          5.     Florida Breach of Implied Warranty of Merchantability (Claim 14)

18         Plaintiffs have withdrawn the breach of implied warranty claim brought under Florida

19   law. (Doc. No. 85 at 21 n.12.)  Accordingly, the court will dismiss this claim.

20          6.     Illinois Breach of Implied Warranty of Merchantability (Claim 19)

21         The breach of implied warranty claim under Illinois law is brought by plaintiff Cicero

22   individually and on behalf of the Illinois subclass.[16]  (FACC at ¶ 807.)  Defendant moves to

23   dismiss plaintiff Cicero's implied warranty claim because his allegation that he purchased his

24   vehicle from an authorized Ford dealer does not satisfy the privity requirement due to the fact that

25   dealerships are not agents of Ford for privity purposes under Illinois law.  (Doc. No. 83-1 at 20)

26

27   [16]  The implied warranty claims brought by the other Illinois plaintiffs (Harlampi Bozhinov and
     Mary Glade) were dismissed without leave to amend in the court's August 10, 2022 order. (*See*
28   Doc. No. 76 at 39.)

1  (citing *IWOI, LLC v. Monaco Coach Corp.*, 581 F. Supp. 2d 994, 1000 (N.D. Ill. 2008)

2  (explaining that "in Illinois, bare allegations of an agency relationship between the manufacturer

3  and dealer are insufficient" to satisfy the privity requirement)).  Defendant had advanced this

4  same argument in its prior motion to dismiss the implied warranty claims brought by plaintiffs

5  Bozhinov and Glade, and the court dismissed those claims, without leave to amend, due to a lack

6  of privity.  (Doc. No. 76 at 18–19) (citing *Neptun Light, Inc. v. Edison Opto USA Corp.*, No. 19-

7  cv-06865, 2020 WL 1042055, at *2 (N.D. Ill. Mar. 4, 2020) ("[U]nder Illinois law, a claim for

8  breach of implied warranty is a contract claim requiring privity of contract," and "[p]rivity means

9  that a plaintiff can only recover against his 'immediate seller.'") (citation omitted); *Chapman v.*

10  *Gen. Motors LLC*, 531 F. Supp. 3d 1257, 1278 (E.D. Mich. 2021) (dismissing implied warranty

11  claims brought under Illinois law "where no exceptions are recognized" because the plaintiffs

12  "fail[ed] to sufficiently allege privity")).  These cited authorities apply with the same force to

13  plaintiff Cicero's implied warranty claim, which must likewise be dismissed because he has failed

14  to allege privity as required under Illinois law.

15          Accordingly, the court will grant defendant's motion to dismiss plaintiff Cicero's implied

16  warranty claim due to a lack of privity, without leave to amend.[17]

17          7.      Indiana Breach of Implied Warranty of Merchantability (Claim 22)

18          The breach of implied warranty claim under Indiana law is brought by plaintiffs Balaszek

19  and Pickering individually and on behalf of the Indiana subclass.  (FACC at ¶ 876.)  Defendant

20  does not move to dismiss plaintiff Balaszek's implied warranty claim, which survived defendant's

21  prior motion to dismiss.  (*See* Doc. No. 76 at 40.)  Defendant also does not move to dismiss this

22  claim as brought by plaintiff Pickering.

23          8.      Kansas Breach of Implied Warranty of Merchantability (Claim 24)

24          The breach of implied warranty claim under Kansas law is brought by plaintiffs Craig

25  Morford and Kelli Morford individually and on behalf of the Kansas subclass.  (FACC at ¶ 918.)

26

27  [17]  In light of this conclusion, the court need not address defendant's additional argument that
    plaintiff Cicero's implied warranty claim fails because his engine problems occurred after the
28  powertrain warranty period had expired.  (Doc. No. 83-1 at 19.)

1   Defendant does not move to dismiss this claim, which survived defendant's prior motion to

2   dismiss.  (*See* Doc. No. 76 at 40.)

3           9.      Maryland Breach of Implied Warranty of Merchantability (Claim 26)

4           The breach of implied warranty claim under Maryland law is brought by plaintiffs Aaron

5   Manfra and Victoria Manfra individually and on behalf of the Maryland subclass.  (FACC at

6   ¶ 956.)  Defendant does not move to dismiss this claim, which survived defendant's prior motion

7   to dismiss.  (*See* Doc. No. 76 at 40.)

8           10.     Michigan Breach of Implied Warranty of Merchantability (Claim 29)

9           The breach of implied warranty claim under Michigan law is brought by plaintiffs

10  Goodrich and Metro individually and on behalf of the Michigan subclass.[18]  (FACC at ¶ 1022.)

11  Plaintiff Goodrich's implied warranty claim survived defendant's prior motion to dismiss.  (*See*

12  Doc. No. 76 at 40.)  Defendant does not move to dismiss this claim as to either plaintiff.

13          11.     Minnesota Breach of Implied Warranty of Merchantability (Claim 34)

14          The breach of implied warranty claim under Minnesota law is brought by plaintiff

15  Kennedy individually and on behalf of the Minnesota subclass.[19]  (FACC at ¶ 1135.)  Defendant

16  moves to dismiss plaintiff Kennedy's implied warranty claim because his engine problems

17  occurred after the powertrain warranty period had expired and durational limits on warranties are

18  enforceable under Minnesota law.  (Doc. No. 83-1 at 19.)  Defendant is correct that under

19  Minnesota law, an "implied warranty claim based on [a] latent defect would fail where [the]

20  implied warranty was limited to the time period covered by a written warranty and where a defect

21  manifested itself outside of that time period."  *Weske v. Samsung Elecs., Am., Inc.*, 42 F. Supp. 3d

22  599, 616 (D.N.J. 2014) (applying Minnesota law) (citing *Daigle v. Ford Motor Co.*, No. 09-cv-

23  03214-MJD, 2012 WL 3113854, at *3 (D. Minn. July 31, 2012) (concluding that "it is clear that a

24  claim of breach of implied warranty under Minnesota law would be limited to the life of the New

25  _____

26  [18]  The implied warranty claim brought by the other Michigan plaintiff (Coppock) was dismissed
    without leave to amend in the court's August 10, 2022 order.  (*See* Doc. No. 76 at 40.)

27  [19]  The implied warranty claim brought by the other Minnesota plaintiff (Simonds) was dismissed

28  without leave to amend in the court's August 10, 2022 order.  (*See* Doc. No. 76 at 40.)

1    Vehicle Warranty")).  Indeed, defendant had advanced this same argument in its prior motion to

2    dismiss the implied warranty claim brought by plaintiff Simonds, and the court dismissed that

3    claim, without leave to amend, due to the durational limits of the warranty.  (Doc. No. 76 at 14–

4    15.)

5         In their opposition, plaintiffs argue that the durational limit of the warranties is irrelevant

6    because the class vehicles were inherently unmerchantable at the time of sale due to the latency of

7    the Engine Defect.  (Doc. No. 85 at 17–18.)  However, none of the authorities plaintiffs cite to

8    support this argument pertain to Minnesota law.  Moreover, plaintiffs do not address, let alone

9    distinguish, the decisions cited by defendant in the pending motion and cited by the court in its

10   August 10, 2022 order.  Finally, the court has already rejected plaintiff Kennedy's latent defect

11   arguments with regard to his express warranty claim and incorporates that discussion here as well.

12        For these reasons, the court will grant defendant's motion to dismiss plaintiff Kennedy's

13   implied warranty claim, without leave to amend.

14        12.    North Carolina Breach of Implied Warranty of Merchantability (Claim 38)

15        The breach of implied warranty claim under North Carolina law is brought by plaintiff

16   Pirog individually and on behalf of the North Carolina subclass.  (FACC at ¶ 1226.)  Plaintiff

17   Pirog's implied warranty claim survived defendant's prior motion to dismiss because the court

18   declined to address defendant's unsupported argument that North Carolina law requires privity

19   for implied warranty claims.  (*See* Doc. No. 76 at 15, 19) (noting that defendant's motion lacked

20   thorough briefing on the purported privity requirements under North Carolina law).  In the

21   pending motion, defendant again moves to dismiss this claim based on a lack of privity, but this

22   time defendant does cite a few decisions that have applied North Carolina law.  (Doc. No. 83-1 at

23   20) (citing *In re ZF-TRW Airbag Control Units Prod. Liab. Litig.*, 601 F. Supp. 3d 625, 836 (C.D.

24   Cal. 2022) (dismissing an implied warranty claim brought under North Carolina law because the

25   complaint "does not adequately allege the requisite privity of contract" and "North Carolina law

26   requires 'privity . . .  to assert a claim for breach of an implied warranty involving only economic

27   loss'") (citation omitted)); *Francis v. Gen. Motors, LLC*, 504 F. Supp. 3d 659, 678 (E.D. Mich.

28   2020) ("[U]nder . . . North Carolina law, the lack of privity is fatal to implied warranty claims").

1    In their opposition, plaintiffs argue that North Carolina "recognize[s] a third party

2    beneficiary exception where the plaintiff is the intended beneficiary of a contract between the

3    manufacturer and the dealer that gives rise to an implied warranty." (Doc. No. 85 at 19) (citing

4    *Coastal Leasing Corp. v. O'Neal*, 405 S.E.2d 208, 236 (N.C. Ct. App. 1991); *In re MyFord*

5    *Touch Consumer Litig.*, 46 F. Supp. 3d 936, 985 (N.D. Cal. 2014) ("The third-party beneficiary

6    theory is valid under North Carolina law.")). Some federal courts outside of North Carolina have

7    relied on the North Carolina appellate court's decision in *Coastal Leasing* in concluding that

8    North Carolina recognizes such an exception to the privity requirement. *See Cadena v. Am.*

9    *Honda Motor Co.*, No. 18-cv-04007-MWF-PJW, 2021 WL 9839349, at *8 (C.D. Cal. Mar. 10,

10   2021) (citing cases). However,

> [a] district court in North Carolina analyzed *Coastal Leasing Corp.*
> and North Carolina's privity requirement in warranty claims and
> rejected the existence of a broad third-party beneficiary exception.
> *Kelly v. Georgia-Pac. LLC*, No. 7:08-cv-197-D, 2010 WL
> 11579013, at *5-7 (E.D.N.C. Aug. 31, 2010) (agreeing that the
> North Carolina Supreme Court's decisions "require actual privity to
> state an implied warranty claim for recovery of economic loss" and
> that "*Coastal Leasing* does not alter this conclusion"). The *Kelly*
> court reached this conclusion after analyzing a host of North
> Carolina appellate court decisions on the topic. *Id.* The *Kelly* court
> noted that *Coastal Leasing Corp.* involved "unique facts, where the
> restaurant owner directly participated in the sales transaction with
> the seller/manufacturer and was seeking more than economic loss."
> *Id.* at *7. The court determined that a third-party beneficiary
> exception does not apply where a plaintiff does not negotiate with
> the manufacturer and seeks only economic loss. *Id.*

20   *Cadena v. Am. Honda Motor Co.*, No. 18-cv-04007-MWF-PJW, 2021 WL 9839349, at *8 (C.D.

21   Cal. Mar. 10, 2021) (dismissing implied warranty claims brought under North Carolina law

22   without leave to amend because the court was persuaded by the reasoning in *Kelly* that the North

23   Carolina Supreme Court would likely not recognize a third-party beneficiary exception in this

24   context); *see also In re Evenflo Co., Inc. Mktg., Sales Pracs. & Prod. Liab. Litig.*, No. 20-md-

25   02938-DJC, 2023 WL 8810517, at *15 (D. Mass. Dec. 20, 2023) ("Courts [] evaluating privity

26   under North Carolina law have generally concluded that consumers are not third-party

27   beneficiaries of a manufacturer's agreements with its distributors."). This court recognizes that

28   courts have varied in their analyses and conclusions as to whether a third-party beneficiary

42

1    exception is recognized under North Carolina law, and ultimately agrees with those courts that

2    have determined a third-party beneficiary exception does not apply under the circumstances

3    alleged in this case.

4           Moreover, even the courts that have recognized a third-party beneficiary exception to the

5    privity requirement under similar circumstances still have required plaintiffs to allege facts

6    showing:  "(1) the existence of a contract between two other persons; (2) that the contract was

7    valid and enforceable; and (3) that the contract was entered into for [their] direct, and not

8    incidental, benefit."  *Gonzalez v. Mazda Motor Corp.*, No. 16-cv-02087-MMC, 2017 WL

9    3283957, at *6 (N.D. Cal. Aug. 1, 2017) (quoting *Metric Constructors, Inc. v. Indus. Risk

10   Insurers*, 102 N.C. App. 59, 63 (1991)) (dismissing the plaintiff's implied warranty claim under

11   North Carolina law because the complaint "lacks allegations sufficient to show the contracts

12   between Mazda and its dealers were entered into for the 'direct, and not incidental, benefit' of

13   plaintiffs and other Mazda consumers").  Plaintiff Pirog has not alleged such facts here.

14          For these reasons, the court will grant defendant's motion to dismiss plaintiff Pirog's

15   implied warranty claim under North Carolina, without leave to amend.

16          13.    Nebraska Breach of Implied Warranty of Merchantability (Claim 44)

17          The breach of implied warranty claim under Nebraska law is brought by plaintiff Krecek

18   individually and on behalf of the Nebraska subclass.  (FACC at ¶ 1368.)  Defendant moves to

19   dismiss plaintiff Krecek's implied warranty claim because his engine problems occurred after the

20   powertrain warranty period had expired, and durational limits on warranties are enforceable under

21   Nebraska law.  (Doc. No. 83-1 at 19.)  In their opposition, plaintiffs argue that the durational limit

22   of the warranties is irrelevant because the class vehicles were inherently unmerchantable at the

23   time of sale due to the latency of the Engine Defect.  (Doc. No. 85 at 17–18.)  However, none of

24   the authorities cited by plaintiffs to support this argument have applied Nebraska law.  Moreover,

25   the court has already rejected plaintiff Krecek's latent defect arguments with regard to his express

26   warranty claim and incorporates that discussion here as well.

27   /////

28   /////

43

1    For these reasons, the court will grant defendant's motion to dismiss plaintiff Krecek's

2    implied warranty claim, without leave to amend.[20]

3         14.    Tennessee Breach of Implied Warranty of Merchantability (Claim 47)

4    The breach of implied warranty claim under Tennessee law is brought by plaintiff Batdorf

5    individually and on behalf of the Tennessee subclass.  (FACC at ¶ 1439.)  Defendant moves to

6    dismiss plaintiff Batdorf's implied warranty claim due to a lack of privity because plaintiff

7    alleges that he purchased his pre-owned Lincoln MKC from a third-party retailer, BMW of

8    Nashville.  (Doc. No. 83-1 at 19) (citing *Chapman v. Gen. Motors LLC*, 531 F. Supp. 3d 1257,

9    1278 (E.D. Mich. 2021) (dismissing implied warranty claims brought under Tennessee law

10   "where no exceptions are recognized" because the plaintiffs "fail[ed] to sufficiently allege

11   privity")).  In their opposition, plaintiffs argue that because plaintiff Batdorf relied on the

12   Monroney sticker (a direct-to-consumer written label) in making his decision to purchase the

13   vehicle, he has sufficiently alleged privity.  (Doc. No. 85 at 18.)  However, neither of the two

14   cases that plaintiffs rely on in support of this argument pertains to Tennessee law or cite to

15   authority from Tennessee courts.  In the absence of any authority to the contrary, the court finds

16   that plaintiff Batdorf's alleged review of the Monroney label while purchasing his vehicle from a

17   third party BMW retailer is insufficient to satisfy the privity requirement under Tennessee law.

18   For this reason, the court will grant defendant's motion to dismiss plaintiff Batdorf's

19   implied warranty claim, without leave to amend.[21]

20        15.    Ohio Breach of Implied Warranty of Merchantability (Claim 50)

21   The breach of implied warranty claim under Ohio law is brought by plaintiff Thomas

22   individually and on behalf of the Ohio subclass.  (FACC at ¶ 1510.)  Defendant moves to dismiss

23   plaintiff Thomas's implied warranty claim because under Ohio law, tort-based implied warranty

24   _____

25   [20]  In light of this conclusion, the court need not address defendant's additional argument that
     because plaintiff Krecek does not allege that he stopped driving his vehicle due to the Engine

26   Defect, his vehicle was merchantable (i.e., provided basic transportation).  (Doc. No. 83-1 at 17.)

27   [21]  In light of this conclusion, the court need not address defendant's additional argument that
     because plaintiff Batdorf does not allege that he stopped driving his vehicle due to the Engine

28   Defect, his vehicle was merchantable (i.e., provided basic transportation).  (Doc. No. 83-1 at 17.)

1   claims[22] like hers are not available where a valid written contract exists that governs the parties'

2   relationship, such as the Lincoln Warranty defendant provided to plaintiff Thomas when she

3   purchased her new 2018 Lincoln MKC.  (Doc. No. 85 at 20) (citing *Risner v. Regal Marine*

4   *Indus., Inc.*, 8 F. Supp. 3d 959, 995 (S.D. Ohio 2014) ("'Implied warranty in tort' is a common

5   law cause of action that imposes liability upon a manufacturer or a seller for breach of an implied

6   representation that a product is 'of good and merchantable quality, fit and safe for its ordinary

7   intended use.'") (citation omitted); *Young v. Carrier Corp.*, No. 4:14-cv-00974, 2014 WL

8   6617650, at *7 (N.D. Ohio Nov. 21, 2014) ("Courts applying Ohio law hold that where a contract

9   spells out the parties' rights and responsibilities in a transaction for the sale of goods, parties

10  seeking economic loss only must seek their recovery under the UCC's contractual remedies, not

11  in tort or equity.")).  The court in *Risner* acknowledged that "[t]he law in Ohio 'is not well-

12  developed on whether a breach of an implied warranty in tort claim can exist in the presence of a

13  valid, enforceable written warranty,'" but the court was ultimately not "persuaded that Ohio

14  courts would recognize an implied warranty in tort claim when there is a valid, enforceable

15  written warranty that governs the parties' relationship."  8 F. Supp. 3d at 995.

16      However, other courts in Ohio and courts applying Ohio law have been reluctant to

17  dismiss such claims in the absence of clear authority by the Ohio Supreme Court dictating that

18  result.  *See, e.g.*, *Kondash v. Kia Motors Am., Inc.*, No. 1:15-cv-00506, 2016 WL 11246421, at

19  *18 (S.D. Ohio June 24, 2016) (disagreeing with the defendants' argument that the plaintiff's

20  implied warranty in tort claim must be dismissed because "the existence of the 10-year/100,000-

21  mile warranty is a valid, enforceable written warranty that governs this dispute"); *Pell v.*

22  *Durnell's RV Sales, Inc.*, No. 2:19-cv-02247, 2020 WL 13499488, at *6 (S.D. Ohio Mar. 24,

23  2020) (denying a motion to dismiss the plaintiff's implied warranty in tort claim even though the

24  plaintiff had a valid warranty); *Lessin v. Ford Motor Co.*, 600 F. Supp. 3d 1137, 1147 (S.D. Cal.

25  2022) (same); *Hartman v. Mercedes-Benz, U.S.A., L.L.C.*, No. 1:08-cv-03034, 2010 WL 907969,

26  _____

27  [22]  Under Ohio law, an implied warranty claim may be brought on a tort-based theory or a
    contract-based theory.  *In re Porsche Cars N. Am., Inc. Plastic Coolant Tubes Prods. Liab. Litig.*,
    880 F. Supp. 2d 801, 865 (S.D. Ohio 2012).  Plaintiff Thomas clarifies in the FACC that her

28  implied warranty claim sounds in tort, not in contract.  (FACC at ¶ 1522.)

1    at *7 (N.D. Ohio Mar. 11, 2010) (denying the defendant's motion for summary judgment as to the

2    plaintiff's implied warranty in tort claim because "Ohio law is unclear" on the question of

3    whether the plaintiff is barred from maintaining such a claim where "he has adequate remedies by

4    way of the express warranty claim").  In light of these decisions and in the absence of clear

5    authority—as opposed to dicta—from Ohio courts resolving this unsettled question, this court

6    likewise declines to dismiss plaintiff Thomas's implied warranty claim merely based upon the

7    fact that the Lincoln warranty exists.

8          Defendant also moves to dismiss plaintiff Thomas's implied warranty claim on the basis

9    that she did "not allege that [she] stopped driving [her] vehicle due to the alleged Engine Defect,"

10   and thus her vehicle was merchantable.  (Doc. No. 19 at 37.)  However, the only authority

11   pertaining to Ohio law that defendant cites to support this merchantability argument is an

12   inapposite decision involving allegedly defective medical devices, not vehicles.  (*Id.*) (citing *O.M.*

13   *Through McConnell v. KLS Martin LP*, 560 F. Supp. 3d 1084, 1086 (N.D. Ohio 2021)).  Further,

14   in the pending motion, defendant also cites a decision of a district court in California pertaining to

15   California law (Doc. No. 83-1 at 19 n.18), and then in its reply, defendant criticizes plaintiffs for

16   citing to that same decision in their opposition because that case was "decided under [] CA law,

17   and [is] therefore, inapplicable."  (Doc. No. 86 at 11.)  In short, the court is not persuaded by

18   defendant's unsupported argument that plaintiff Thomas's allegations are insufficient to support

19   her claim of breach of the implied warranty of merchantability under Ohio law.

20         For these reasons, the court will deny defendant's motion to dismiss plaintiff Thomas's

21   implied warranty claim.

22         14.    Defendant's Apparently Abandoned Argument Regarding Pre-Suit Notice

23         In the prior motion to dismiss, defendant urged the court to dismiss the express and

24   implied warranty claims brought by plaintiffs in Arkansas, Colorado, Florida, Indiana, Maryland,

25   Michigan, and Wisconsin because those states require plaintiffs to first provide individual pre-suit

26   notice of an alleged breach before filing suit against a manufacturer.  (Doc. No. 51-1 at 20–21,

27   24.)  In its August 10, 2022 order, the court concluded that dismissal of these claims on this

28   ground at the pleadings stage is inappropriate because, "though each state has different

46

1   requirements, plaintiffs' allegations are sufficient to create a question of fact as to whether their

2   conduct, typically bringing their vehicle to the dealer for repairs, is sufficient pre-suit notice such

3   that they have stated a plausible breach of warranty claim." (Doc. No. 76 at 10–11.)

4          In the pending motion to dismiss, defendant "seeks dismissal for lack of the required pre-

5   suit notice as to certain plaintiffs' warranty claims whose states have a notice of breach

6   requirement for warranty claims and whose law has not yet been ruled upon (CA, IL, MN, NC)."

7   (Doc. No. 83-1 at 22.)  However, defendant does not offer any basis or explanation as to why the

8   court's prior analysis and conclusion would not similarly apply to the claims brought under the

9   law of these four states.  In their opposition, plaintiffs emphasize that defendant's renewed pre-

10   suit notice arguments "raise the same factual issues that [the court] already found premature for

11   the pleading stage." (Doc. No. 85 at 20.)  Plaintiffs also point to the allegations in the FACC

12   regarding several pre-suit notice letters sent to defendant to inform defendant of the Engine

13   Defect and breaches of warranty in these four states.  (*Id.* at 20–21.)  Moreover, copies of these

14   notice letters are attached as exhibits to the declaration of attorney Tarek H. Zohdy, which

15   plaintiffs filed in support of their opposition to the pending motion.  (*See* Doc. Nos. 85-1, 85-3,

16   85-4, 85-5, 85-6.)  Defendant does not offer any rebuttal in its reply brief.  Indeed, there is no

17   discussion whatsoever in defendant's reply brief regarding pre-suit notice requirements for

18   warranty claims.  Thus, it appears that defendant has abandoned this argument altogether.  *See*

19   *Lou v. JP Morgan Chase Bank N.A.*, No. 3:17-cv-04157-WHO, 2018 WL 1070598, at *2 (N.D.

20   Cal. Feb. 26, 2018) ("Courts have found that a failure to oppose an argument serves as a

21   concession.").

22          To the extent defendant nevertheless maintains its pre-suit notice argument that the

23   warranty claims brought under the laws of California, Illinois, Minnesota, and North Carolina

24   should be dismissed, the court rejects that argument.  Defendant has simply offered no basis for

25   the undersigned to depart from the court's prior analysis and conclusion that, in light of plaintiffs'

26   allegations, dismissal of their warranty claims based on pre-suit notice requirements is not

27   appropriate at the pleadings stage.

28   /////

1    **C.      Federal Magnuson-Moss Warranty Act (Claim 51)**

2              In their FACC, plaintiffs bring a federal claim against defendant for violating the

3    Magnuson-Moss Warranty Act, 15 U.S.C. §§ 2301, *et seq.* ("MMWA") by allegedly breaching

4    the express warranties and the implied warranty of merchantability under their respective state

5    laws.  (FACC at 251.)  Plaintiffs bring their MMWA claim individually, not on behalf of any

6    subclass.  (*Id.* at ¶ 1529.)

7              The MMWA provides that "a consumer who is damaged by the failure of a supplier,

8    warrantor, or service contractor to comply with any obligation under this chapter, or under a

9    written warranty, implied warranty, or service contract, may bring suit for damages and other

10   legal and equitable relief."  15 U.S.C. § 2310(d).  MMWA claims are derivative of state law

11   claims of breach of express and implied warranties.  *Clemens v. DaimlerChrysler Corp.*, 534 F.3d

12   1017, 1022 (9th Cir. 2008) (explaining that "the claims under the Magnuson–Moss Act stand or

13   fall with [the plaintiff's] express and implied warranty claims under state law"); *id.* at 1022 n.3

14   (concluding that "the federal claims hinge on the state law warranty claims") (citing *Schimmer v.*

15   *Jaguar Cars, Inc.*, 384 F.3d 402, 405 (7th Cir. 2004) (noting that the Magnuson–Moss Act

16   borrows state law causes of action)).

17             In its pending motion to dismiss, defendant argues that the MMWA claim fails as to those

18   plaintiffs who have insufficiently alleged their express warranty and implied warranty claims.

19   (Doc. No. 83-1 at 22–23.)  Based on the court's analysis and sub-conclusions as to each of the

20   warranty claims discussed above, the following plaintiffs have insufficiently alleged a warranty

21   claim and have thus failed to sufficiently allege their derivative MMWA claim:  plaintiffs Miller

22   (CA), Hodges (CA), Cicero (IL), Kennedy (MN), Pirog (NC), Damm/Gates (WA), Krecek (NE),

23   and Batdorf (TN).  Conversely, for the plaintiffs who have had at least one warranty claim

24   survive defendant's motion to dismiss or whose warranty claim was not challenged in defendant's

25   motion to dismiss the FACC—plaintiffs Wests (CA), Lund (AR), Christodaro (CO), Balaszek

26   (IN), Pickering (IN), Morfords (KS), Manfras (MD), Goodrich (MI), Metro (MI), and Thomas

27   (OH)—the MMWA claim is not subject to dismissal on this derivative ground.

28   /////

                                                    48

1       However, defendant also argues that the MMWA claim necessarily fails as to *all* plaintiffs

2 based on the independent reason that none of them alleges that they complied with the informal

3 dispute resolution mechanism provided by the warranties, as required by the MMWA. (Doc. No.

4 83-1 at 23.) In the MMWA, Congress expressly "declare[d] it to be its policy to encourage

5 warrantors to establish procedures whereby consumer disputes are fairly and expeditiously settled

6 through informal dispute settlement mechanisms." 15 U.S.C. § 2310(a)(1). The MMWA

7 consequently outlines several requirements for warrantors to establish mechanisms for informal

8 dispute resolution. *See id.* § 2310. In its motion to dismiss, defendant argues that all plaintiffs

9 failed to exhaust the warranty's informal dispute resolution mechanism, which states that: "You

10 are required to submit your warranty dispute to the BBB Auto Line before exercising rights or

11 seeking remedies under the Federal Magnuson-Moss Warranty Act." (Doc. No. 83-1 at 23.)

12       In their opposition, plaintiffs contend that the provision in the warranty setting forth this

13 informal dispute resolution mechanism is buried and "not disclosed on the page on 'which the

14 warranty text begins.'" (Doc. No. 85 at 22.) But, as the court noted and plaintiffs' counsel

15 appeared to concede when questioned at the hearing on the pending motion, this provision is not

16 buried in the warranty. Rather, the provision does appear—bolded and in all-caps—on the page

17 just before the warranty text. (*See* Doc. No. 83-3 at 13 (Ford warranty) and Doc. No. 83-4 at 11

18 (Lincoln warranty.)) Thus, plaintiffs' contention that the dispute provision was not conspicuously

19 located in the warranty is unavailing.

20       Plaintiffs also contend that their admitted non-compliance with the warranty's informal

21 dispute resolution mechanism does not render their MMWA claim insufficiently alleged because

22 the MMWA does not require a plaintiff to follow an informal dispute procedure if doing so would

23 be futile. (Doc. No. 85 at 21) (citing *In re Toyota Motor Corp. Unintended Acceleration Mktg.,*

24 *Sales Pracs., & Prod. Liab. Litig.*, ("*In re Toyota SUA*"), 754 F. Supp. 2d 1145, 1189 (C.D. Cal.

25 2010) (following the lead of a few district courts in the Ninth Circuit who have recognized a

26 futility exception "in the absence of additional federal case law to the contrary," and drawing an

27 inference of futility based on the plaintiffs' allegations describing the defendant's response to

28 claims of sudden unintended acceleration ("SUA") events, including denying the existence of the

1  SUA defect, rejecting claimant's SUA claims, and issuing denials of those claims without

2  explaining its conclusions)); *see also McCarthy v. Toyota Motor Corp.*, No. 8:18-cv-00201-JLS-

3  KES, 2018 WL 6318841, at *10 (C.D. Cal. Sept. 14, 2018) (noting that "some courts have

4  recognized an exception where the plaintiffs plausibly allege that resort to the dispute resolution

5  procedures would have been futile").  In its reply and at the hearing on the pending motion,

6  defendant acknowledged that courts have recognized a "futility exception" to the MMWA's

7  informal dispute resolution requirement.  (Doc. No. 86 at 14) (citing *Parkinson v. Hyundai Motor*

8  *Am.*, 258 F.R.D. 580, 593 (C.D. Cal. 2008) (denying certification of plaintiffs' MMWA claims

9  "because plaintiffs have failed to resort to defendant's informal dispute settlement mechanism,

10  the BBB Auto Line," and they "do not allege any attempt to use the BBB Auto Line to resolve

11  their MMWA claims," alleging instead that such attempts are "unnecessary and/or futile")).  But

12  defendant maintains that plaintiffs' assertion of futility is conclusory and lacking factual

13  allegations to support such a conclusion.  (Doc. No. 86 at 14.)  According to defendant, "plaintiffs

14  fail to explain (much less allege) how using BBB Auto Line, an independent third-party, would

15  be futile, which dooms their contention that such compliance would be futile."  (*Id.*)

16       At the hearing on the pending motion, plaintiffs' counsel directed the court's attention to

17  the following allegations in the FACC, which plaintiffs contend provide a sufficient basis upon

18  which the court may infer futility with regard to their MMWA claim in this case:  (i) "Ford has

19  not agreed to correct the actions described [in plaintiffs' CLRA pre-litigation demand letter], to

20  reimburse associated out-of-pocket costs, or otherwise to remedy the harm alleged," and

21  defendant has not responded to plaintiffs' second letter "though any response would be futile

22  because of Ford's continued refusal to remedy the harm alleged"; and (ii) "[u]nder the

23  circumstances, the remedies available under any informal settlement procedure would be

24  inadequate and futile, and any requirement that plaintiffs resort to an informal dispute resolution

25  procedure and/or afford Ford a reasonable opportunity to cure its breach of warranties is excused

26  and thus deemed satisfied."  (FACC at ¶¶ 445, 1453.)  In addition, plaintiffs' counsel emphasized

27  that, for each state warranty claim, plaintiffs allege that "affording Ford a reasonable opportunity

28  /////

50

1   to cure its breach of written warranty would have been futile."  (*See e.g.*, FACC at ¶¶ 478, 558,

2   576.)

3          Having considered these allegations along with the FACC's detailed descriptions of

4   Ford's alleged knowledge of the Engine Defect, Ford's alleged denial of the existence of the

5   Engine Defect, and Ford's allegedly inadequate response to the Engine Defect, the court

6   concludes that plaintiffs' allegations "are sufficient at the pleading stage, where the inferences

7   from the allegations in the [FACC] allow for a futility exception."  *McCarthy*, 2018 WL 6318841,

8   at *10.  Similar to plaintiffs' allegations in this case, the plaintiffs in *McCarthy* had alleged that

9   "resort to Toyota's procedures would have been futile because Toyota knew of the nature of the

10  inverter defect and refused to provide a suitable repair or replacement of the inverters, as shown

11  by Toyota's ineffective 2014 Safety Recall," and the court deemed those allegations to be

12  sufficient for the plaintiffs' MMWA claim to survive the defendant's motion to dismiss.  *Id.*

13  (citing *In re Toyota SUA*, 754 F. Supp. 2d at 1189).

14         "Courts in the Ninth Circuit have held that where plaintiffs make factual allegations

15  showing resort to an informal dispute resolution process under the Magnuson Moss Warranty Act

16  would be futile, futility is a question of fact and cannot be decided on a motion to dismiss."

17  *Stockinger v. Toyota Motor Sales USA Inc*, No. 17-cv-00035-VAP-KLS, 2017 WL 10574372, at

18  *15 (C.D. Cal. July 7, 2017) (denying the defendant's motion to dismiss the plaintiffs' MMWA

19  claim because "an inference that pursuing defendant's informal dispute resolution process would

20  be futile" arises from plaintiffs allegations regarding defendant's knowledge of the HVAC defect,

21  defendant's issuance of technical service bulletins regarding the defect, NHTSA consumer

22  complaints of defendant's refusal to remedy the defect, and the lack of a permanent mechanical

23  repair to fix the defect); *see also Tsonev v. Kia Motors Am., Inc.*, No. 16-cv-01020-CJC-DFM,

24  2016 WL 10000244, at *4 (C.D. Cal. Nov. 9, 2016) (concluding that plaintiff's allegations of

25  "repeated attempts to convince Kia to resolve the dispute by providing non-soy wiring, allowing

26  him to exit the lease, providing him a non-Kia loaner car, and covering the repairs under the

27  warranty" are sufficient to "allow for the inference that any informal dispute resolution attempt

28  /////

1   would be futile" even though plaintiff admittedly "did not utilize BBB Auto Line prior to filing

2   this action").

3        Accordingly, the court will grant in part and deny in part defendant's motion to dismiss

4   plaintiffs' MMWA claim.  As for defendant's challenge based on the MMWA claim being

5   derivative of the warranty claims, the MMWA claim brought by plaintiffs Miller (CA), Hodges

6   (CA), Cicero (IL), Kennedy (MN), Pirog (NC), Damm/Gates (WA), Krecek (NE), and Batdorf

7   (TN) is dismissed because none of those plaintiffs has sufficiently alleged a warranty claim.

8   However, to the extent defendant's challenge is based on the undisputed fact that none of the

9   plaintiffs complied with the informal dispute resolution mechanism provided in the warranty,

10   defendant's motion to dismiss this claim is denied.  Therefore, the MMWA claim brought by

11   plaintiffs Wests (CA), Lund (AR), Christodaro (CO), Balaszek (IN), Pickering (IN), Morfords

12   (KS), Manfras (MD), Goodrich (MI), Metro (MI), and Thomas (OH) survives the pending motion

13   to dismiss.

14   **D.    Consumer Protection Fraud Claims**

15        Defendant moves to dismiss most of the fraud-based consumer protection claims brought

16   by plaintiffs under their respective state's laws.  (Doc. No. 83-1 at 23–34.)  Each of the state

17   statutes at issue require plaintiffs bringing such claims to allege (and ultimately prove) either an

18   affirmative misrepresentation or an omission of material fact.[23]  *See Williams v. Yamaha Motor*

19   _____

20   [23]  In its prior motion to dismiss, one of defendant's arguments was that plaintiffs' consumer
    protection claims fail because plaintiffs did not allege affirmative misrepresentations, i.e.,
    misstatements that plaintiffs relied on in making their purchases.  (*See* Doc. No. 76 at 21.)  In the
21   August 10, 2022 order, the court rejected this argument and explained that plaintiffs had
    sufficiently alleged the "who, what, when, where, and how" to support their fraud-based claims,
22   which were predicated on an omission theory of liability, not affirmative misrepresentations.  (*Id.*
    at 22.)  In the pending motion, defendant reasserts the same argument that the consumer
23   protection claims fail because "plaintiffs do not allege any affirmative misrepresentations" (Doc.
    No. 83-1 at 23–25), apparently raising this argument as to all plaintiffs, including those whose
24   consumer protection claims survived defendant's prior motion to dismiss (*see id.* at 35–37).  In
    their opposition, plaintiffs again clarify that their consumer protection claims are based on a
25   theory of fraud by omission, not affirmative misrepresentation, and thus defendant's rehashed
    argument is again misplaced.  (Doc. No. 85 at 22.)  In its reply, defendant tacitly abandons this
26   argument after acknowledging that plaintiffs "are proceeding solely on an omissions, not
    affirmative representation, theory."  (Doc. No. 86 at 14.)  Therefore, the court will not address
27   defendant's affirmative misrepresentation arguments any further.

28

1   *Co.*, 851 F.3d 1015, 1025 (9th Cir. 2017) (relevant here, citing the state statutes of California,

2   North Carolina, Washington, Florida, Texas, Maryland, and New Jersey); *see also In re Toyota*

3   *RAV4 Hybrid Fuel Tank Litig.*, 534 F. Supp. 3d 1067, 1094 (N.D. Cal. 2021) (relevant here,

4   addressing omission-based claims brought under consumer protection statutes of California,

5   Colorado, Florida, Michigan, Nebraska, Illinois, Minnesota, New Jersey, Texas, and North

6   Carolina.  As the court explained in the August 10, 2022 order (Doc. No. 76 at 22), the

7   heightened pleading standards under Rule 9(b) are "relaxed" when applied to omission-based

8   fraud claims regarding vehicle defects.  *See Gamez v. Toyota Motor Sales, U.S.A., Inc.*, No. 23-

9   cv-01464-DAD-KJN, 2024 WL 86320, at *14 (E.D. Cal. Jan. 8, 2024) ("[T]he court agrees with

10  the vast majority of district courts that Rule 9(b)'s 'who, what, when, where, and how' test must

11  be applied while mindful of the [ ] 'inherent limitations of an omission claim.'") (citation and

12  internal quotations marks omitted).

13          The gravamen of plaintiffs' consumer protection claims is that Ford had a duty to disclose

14  the Engine Defect and failed to do so.  (Doc. No. 85 at 22–23.)  "[A] fraudulent omission claim

15  requires proof that a defendant was aware of the defect at the time of sale to establish defendant

16  had a duty to disclose."  *Sloan v. Gen. Motors LLC*, No. 16-cv-07244-EMC, 2017 WL 3283998,

17  at *5 (N.D. Cal. Aug. 1, 2017) (noting that "common sense would indicate" that this knowledge

18  requirement applies not only under California law, but also under the laws of Arkansas, Colorado,

19  Florida, Georgia, Illinois, Indiana, Kansas, Minnesota, Nebraska, North Carolina, Tennessee, and

20  Washington); *see also In re Gen. Motors Air Conditioning Mktg. & Sales Pracs. Litig.*, 406 F.

21  Supp. 3d 618, 642 (E.D. Mich. 2019) (denying the defendant's motion to dismiss state consumer

22  protection claims brought under the laws of California, Florida, New Jersey, Tennessee, Texas,

23  Washington, Michigan, and Georgia because the "plaintiffs do sufficiently allege that GM had

24  knowledge of the AC Defect before plaintiffs purchased their vehicles").  "To be liable for a

25  failure to disclose, a defendant must have pre-sale knowledge of the defect."  *Sloan v. Gen.*

26  *Motors LLC*, 287 F. Supp. 3d 840, 865 (N.D. Cal. 2018) (concluding that "[a]t this pleading

27  stage, plaintiffs have included sufficient allegations to support a plausible inference that

28  /////

1  defendant was aware of the oil consumption defect with respect to the Class Vehicles prior to

2  their sale").

3      Defendant argues in the pending motion, as it did in its prior motion to dismiss, that

4  "plaintiffs do not sufficiently plead Ford's exclusive knowledge of a material fact to support their

5  omissions theory." (Doc. No. 83-1 at 25.) In addressing this argument in the August 10, 2022

6  order, the court separately analyzed each of the five sources of knowledge alleged by plaintiffs in

7  their original consolidated complaint (testing and repair data; consumer complaints; technical

8  service bulletins; consumer service program, and recalls[24]). (Doc. No. 76 at 26–31.) The court

9  concluded that only the eight technical service bulletins ("TSBs")[25] Ford issued between March

10  30, 2018 and July 10, 2020 sufficed as a basis upon which to allege defendant's knowledge of the

11  Engine Defect at the time of sale and only as to the claims brought by plaintiffs Hoffer, Padgett,[26]

12  Butcher, Bozhinov, Glade, Goodrich, and Techlin because those plaintiffs had purchased their

13  vehicles after the first TSB was issued. (*Id.* at 28–29.) The court also found that those TSBs

14  were not sufficient to allege defendant's knowledge of the defect at the time of sale of the

15  vehicles purchased by plaintiffs Miller, the Wests, Coppock, the Morfords, Schiavi, Lund,

16  Christodaro, Constable, Balaszek, the Manfras, Simonds, Pirog, and Damm/Gates. (*Id.*) For

17  those reasons, the court denied defendant's prior motion to dismiss the consumer protection

18  /////

19  /////

20  /////

---

21  [24] In the August 10, 2022 order, the court explained that it did not substantively address the sole
22  recall alleged by plaintiffs in their original consolidated complaint because plaintiffs' opposition
   to the prior motion to dismiss did not respond to defendant's arguments with regard to that recall.
23  (Doc. No. 76 at 30.)

24  [25] Plaintiffs allege in their FACC that "[a] TSB is a communication issued by a manufacturer that
   advises a repair shop that many owners of the vehicles at issue are experiencing a similar problem
25  and, like recall notices, includes recommended technical steps as to how to address the problem."
26  (FACC at ¶ 390.)

27  [26] Plaintiff James Padgett is no longer named as a plaintiff in the FACC. Accordingly, the court
   will terminate Padgett as a named plaintiff in this action and will direct the Clerk of the Court to
28  update the docket accordingly.

1    claims brought by plaintiffs Hoffer, Padgett, Butcher, Bozhinov, and Goodrich[27] (*id.* at 39–40)

2    and granted defendant's prior motion to dismiss the consumer protection claims brought by

3    plaintiffs Miller, the Wests, Coppock, the Morfords, Schiavi, Lund, Christodaro, Constable,

4    Balaszek, the Manfras, Simonds, Pirog, and Damm/Gates—with leave to amend.  (*Id.* at 38–41.)

5            In light of the foregoing, even though defendant appears to assert some of its arguments

6    against *all* plaintiffs notwithstanding the court's August 10, 2022 order, the court does not

7    interpret the pending motion to dismiss as seeking dismissal of the consumer protection claims

8    brought by the plaintiffs for whom such claims have already been found to be sufficiently pled—

9    plaintiffs Hoffer, Butcher, Bozhinov, and Goodrich.  Rather, defendant's pending motion

10   challenges the consumer protection claims brought by the newly added plaintiffs and the plaintiffs

11   whose consumer protection claims had previously been dismissed with leave to amend.  Aside

12   from several state-specific arguments that defendant raises to challenge certain plaintiffs'

13   consumer protection claims, defendant's sole argument in support of dismissal of these new and

14   amended consumer protection claims is that plaintiffs have not alleged facts sufficient to show

15   that Ford had exclusive knowledge of the Engine Defect at the time of sale of their vehicles.

16   (Doc. No. 83-1 at 25–34.)

17           In opposing the pending motion, plaintiffs counter defendant's state-specific arguments

18   and assert that they "have more than adequately pled Ford's pre-sale knowledge and have cured

19   any gaps in knowledge that were missing from the prior complaint."  (Doc. No. 85 at 23.)

20   Further, plaintiffs emphasize that contrary to defendant's misconstrued pleading standard for the

21   knowledge requirement, they are not required to plead that Ford had "exclusive" knowledge of

22   the defect.  (*Id.* at 22–23.)  Plaintiffs also argue that the sources of knowledge should be "taken

23   together" and reviewed "holistically" as opposed to in isolation.  (*Id.*)  According to plaintiffs, the

24   "appropriate inquiry here is whether plaintiffs' allegations of multiple recalls, technical services

25   bulletins, customer complaints, pre-release testing, and repair data—when taken *together*—

26

27   [27]  In the August 10, 2022 order, the court dismissed the consumer protection claims brought by
     plaintiffs Glade and Techlin, with leave to amend, based on state-specific arguments that
28   defendant had raised in its prior motion to dismiss.  (Doc. No. 76 at 32, 35.)

1     plausibly allege that Ford knew about the Engine Defect" and that this knowledge "accrued

2     before plaintiffs purchased their vehicles." (*Id.* at 24.)

3        As a preliminary matter, and as defendant acknowledges in its reply brief (*see* Doc. No.

4     86 at 15), "[p]laintiffs need not plead exclusive knowledge; it is generally sufficient to plead that

5     defendants have superior knowledge, and that the information was not 'reasonably discoverable

6     by the plaintiffs.'" *Flier v. FCA US LLC*, No. 21-cv-02553-CRB, 2022 WL 16823042, at *5

7     (N.D. Cal. Nov. 8, 2022) (citation omitted). "Exclusive knowledge is properly pleaded where a

8     plaintiff alleges facts that show the defendants had superior knowledge." *Chillon v. Ford Motor*

9     *Co.*, No. 22-cv-02111-DSF-AGR, 2022 WL 19569545, at *5–6 (C.D. Cal. Dec. 2, 2022) (citing

10     *In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Pracs., & Prod. Liab. Litig.*, 754

11     F. Supp. 2d 1145, 1174 (C.D. Cal. 2010) ("Plaintiffs establish a duty to disclose because they

12     allege that Toyota has superior knowledge of the SUA defects")). "'Exclusive knowledge' does

13     not mean facts known only to [the defendant manufacturer]"; rather, "what is required [] is that

14     [the defendant manufacturer] had knowledge of any putative defect *superior* to that of ordinary

15     customers." *Zurba v. FCA US LLC*, No. 5:21-cv-01824-JLS-SHK, 2022 WL 17363073, at *5

16     (C.D. Cal. Nov. 10, 2022) (explaining that the court disagreed with defendant's argument that "a

17     'public' recall defeats any showing of [defendant's] superior knowledge sufficient to create a duty

18     to disclose") (citing *Clenney v. FCA US LLC*, No. 22-cv-00547-VC, 2022 WL 2197074, at *4

19     (N.D. Cal. June 20, 2022) (rejecting a similar argument when the plaintiffs partially relied on

20     publicly available materials to establish knowledge)). "[E]ven if the information was technically

21     discoverable, 'the presence of the information from publicly available sources—for instance,

22     online—does not automatically foreclose an exclusive-knowledge claim.'" *Crump v. FCA US*

23     *LLC*, No. 5:22-cv-01266-MCS-SP, 2022 WL 19569517, at *3–4 (C.D. Cal. Oct. 31, 2022)

24     (quoting *Anderson v. Apple Inc.*, 500 F. Supp. 3d 993, 1015 (N.D. Cal. 2020)).

25        The court next addresses the parties' respective arguments with regard to each of the

26     consumer protection claims and analyzes the sources of pre-sale knowledge as applicable,

27     depending on the date of each plaintiff's vehicle purchase.

28     /////

1    1.    California Consumer Legal Remedies Act (Claim 1)

2        The claim under the California Consumer Legal Remedies Act ("CLRA"), California

3    Civil Code §§ 1750, *et seq.*, is brought by all four California plaintiffs (Hodges, Miller, and the

4    Wests) individually and on behalf of the California subclass.  (FACC at ¶ 428.)  "Under the

5    CLRA, plaintiffs must sufficiently allege that a defendant was aware of a defect at the time of

6    sale to survive a motion to dismiss."  *Wilson v. Hewlett-Packard Co.*, 668 F.3d 1136, 1145 (9th

7    Cir. 2012).  Defendant moves to dismiss all California plaintiffs' CLRA claims on the ground that

8    they have not sufficiently alleged Ford's pre-sale knowledge of the Engine Defect.  (Doc. No. 83-

9    1 at 25–29.)  Defendant also argues that plaintiff Miller's CLRA claim fails because she

10    purchased her vehicle from a third party with no connection to Ford, and thus "has not alleged a

11    'transaction' as the CLRA requires."  (*Id.* at 29.)

12        a.    *Plaintiff Hodges's CLRA Claim*

13        Plaintiff Hodges alleges that he purchased his vehicle—a new 2019 Ford Fusion with a

14    1.5L EcoBoost engine—from an authorized Ford dealer on January 22, 2020.  (FACC at ¶ 259.)

15    Based on the same analysis and reasoning applied by the court in the August 10, 2022 order

16    regarding plaintiffs' allegations of Ford's knowledge based on the TSBs issued by Ford beginning

17    on March 30, 2018, plaintiff Hodges has sufficiently alleged the defendant had knowledge of the

18    Engine Defect prior to his vehicle purchase.  Thus, defendant's motion to dismiss plaintiff

19    Hodges's CLRA claim will be denied.

20        b.    *Plaintiff Miller's CLRA Claim*

21        Plaintiff Miller alleges that she purchased her vehicle—a used 2017 Ford Edge with a

22    2.0L EcoBoost engine—from Enterprise Car Sales on November 22, 2017.  (FACC at ¶ 13.)  In

23    the August 10, 2022 order, the court reasoned, based on the authorities cited by the parties, that

24    plaintiffs' allegations of the TSB issued by Ford on March 30, 2018 are sufficient to support a

25    reasonable inference of Ford's knowledge of the defect five months prior to that issuance date.

26    (Doc. No. 76 at 29.)  Applying that same analysis and reasoning, plaintiff Miller has sufficiently

27    alleged defendant's pre-sale knowledge of the defect based on the TSBs because she purchased

28    her vehicle four months before the first TSB issued.  (*See id.*) (citing *MacDonald v. Ford Motor*

1    *Co.*, 37 F. Supp. 3d 1087, 1094 (2014) (finding knowledge was sufficiently alleged where there

2    was a post-sale TSB issued five months after the last relevant purchase); *Parrish v. Volkswagen*

3    *Grp. of Am., Inc.*, 463 F. Supp. 3d 1043, 1057–58 (C.D. Cal. 2020) (finding knowledge of the

4    defect five months prior to release of the TSB to be plausible at the motion to dismiss stage)).

5         Defendant also argues that plaintiff Miller's CLRA claim fails for an independent reason

6    that she purchased her vehicle from a third party, not an authorized Ford dealer.  (Doc. No. 83-1

7    at 29.)  The CLRA prohibits "unfair methods of competition and unfair or deceptive acts or

8    practices . . . undertaken by any person in a transaction intended to result or that results in the sale

9    or lease of goods or services to any consumer . . . ."  Cal. Civ. Code § 1770(a).  "Transaction" is

10   defined in the statute as "an agreement between a consumer and another person, whether or not

11   the agreement is a contract enforceable by action, and includes the making of, and the

12   performance pursuant to, that agreement."  *Id.* § 1761(e).  Defendant essentially contends that

13   plaintiff Miller cannot state a cognizable CLRA claim because she did not transact with Ford

14   directly.  (Doc. Nos. 83-1 at 29; 86 at 18.)  However, the two district court decisions defendant

15   cites to support its argument are factually dissimilar, cursory, and ultimately unpersuasive.[28]  In

16   contrast, as plaintiffs emphasize in their opposition (Doc. No. 85 at 28), "California courts have

17   rejected the contention that purchasers of used vehicles have no cause of action [under the CLRA]

18   ─────────────────────
     [28]  The decision in *Fulford v. Logitech, Inc.*, No. 08-cv-2041-MMC, 2008 WL 4914416, at *1
19   (N.D. Cal. Nov. 14, 2008), a case involving remote controls, lacks any factual background or
     context and provides no analysis to support its conclusion that "[a]lthough [plaintiff] Fulford has
20   alleged he suffered damage as a result of [defendant] Logitech's deceptive acts, he has failed to
     allege that Logitech engaged in such acts in the course of a transaction with him."  The decision
21   in *Green v. Canidae Corp.*, No. 09-cv-0486-GAF-PLA, 2009 WL 9421226, at *4 (C.D. Cal. June
     9, 2009), a case involving pet food, provides a cursory analysis and concluded that "[t]he CLRA
22   does not provide a cause of action for consumers against the supplier of goods and services to a
     retailer from whom the consumer purchased."  This court joins other district courts in finding that
23   these decisions are not persuasive.  *See Korolshteyn v. Costco Wholesale Corp.*, No. 3:15-cv-
     00709-CAB-RBB, 2016 WL 11787990, at *6 (S.D. Cal. Sept. 14, 2016) ("The Court does not
24   find Defendant's argument or the [*Fulford* and *Green*] cases they rely on persuasive."); *see also*
     *Philips v. Ford Motor Co.*, No. 14-cv-02989-LHK, 2015 WL 4111448, at *15 (N.D. Cal. July 7,
25   2015) (rejecting the so-called direct-transaction requirement set forth in *Green*, and criticizing
     that opinion as "cursory," "unpersuasive," and contrary to "the weight of the persuasive
26   authority"); *In re Fluidmaster, Inc.*, 149 F. Supp. 3d 940, 953–54 (N.D. Ill. 2016) (applying
27   California law and rejecting "any bright-line assertion that all 'transactions' must occur directly
     with a product's manufacturer in order to fall within the purview of the CLRA").

28

1    against the car's manufacturer," *Cholakyan v. Mercedes-Benz USA, LLC*, 796 F. Supp. 2d 1220,

2    1238 (C.D. Cal. 2011).  Indeed, "[a] majority of courts have held that a plaintiff need not allege a

3    direct transaction with a manufacturer" to state a CLRA claim.  *Korolshteyn v. Costco Wholesale*

4    *Corp.*, No. 3:15-cv-00709-CAB-RBB, 2016 WL 11787990, at *5 (S.D. Cal. Sept. 14, 2016); *see*

5    *also Butler v. Porsche Cars N. Am., Inc.*, No. 16-cv-02042-LHK, 2016 WL 4474630, at *7 (N.D.

6    Cal. Aug. 25, 2016) (concluding that the plaintiff's "purchase of the vehicle satisfies the

7    'transaction' requirement of the CLRA even if plaintiff did not purchase the vehicle directly from

8    defendant"); *Callaway v. Mercedes-Benz USA, LLC*, No. 14-cv-02011-JVS-DFM, 2016 WL

9    11756827, at *7 (C.D. Cal. May 12, 2016) (noting that "district courts have consistently held that

10   purchasers of used cars may bring fraudulent non-disclosure claims under the CLRA against

11   defendant car manufacturers or distributors like Mercedes-Benz, even when there is no direct sale

12   between the plaintiff and defendant").

13          For these reasons, defendant's motion to dismiss plaintiff Miller's CLRA claim will be

14   denied.

15               c.      *Plaintiffs Amber and Evan West's CLRA Claim*

16          Plaintiffs Amber and Evan West allege that they purchased their vehicle—a new 2013

17   Ford Fusion with a 1.6L EcoBoost engine—from an authorized Ford dealer on May 27, 2013.

18   (FACC at ¶ 36.)  In opposing defendant's motion to dismiss, the Wests contend that they have

19   sufficiently alleged that defendant had knowledge of the defect prior to their vehicle purchase

20   based in part on their allegations of Ford's early recalls relating to coolant leaks and overheating

21   in EcoBoost Engines.  (Doc. No. 85 at 24–25.)  Specifically, in their FACC, plaintiffs include the

22   following new allegations regarding two recalls not previously alleged in their consolidated

23   complaint.  Shortly after Ford's release of the EcoBoost engine into the market in 2012, Ford

24   informed NHTSA between September 7, 2012 and November 29, 2012, that "Ford was aware of

25   at least nine incidents during which vehicles with the EcoBoost engine caught on fire."  (*Id.* at

26   ¶ 354.)  "In light of the mounting engine failures from the problematic launch of the EcoBoost

27   Engine, Ford issued Recall Campaign 12S41 (NHTSA Recall No. 12V551) on November 30,

28   2012, and announced that vehicles equipped with the 1.6L EcoBoost engine 'may experience

59

engine overheating that can lead to fluid leaks that may come into contact with the hot exhaust

system that may result in a fire,'" (the "2012 Recall"). *Id.* Plaintiffs further allege that:

> Ford's supposed "fix" with the 2012 Recall was ineffective. Rather than redesigning and replacing the EcoBoost Engine to address the root cause of the problem, Ford's recall servicing involved a mere check for diagnostic trouble codes and engine fluid leaks, and a reprogram of the vehicle's powertrain control module. In other words, the remedy was ineffective because it merely attempted to address the symptoms of the Engine Defect but not its actual cause. . . .
>
> As part of the 2012 Recall, Ford established a "cross functional task force to further investigate these fires." Testing conducted as part of this investigation "indicated engine overheating and cracked cylinder heads that allowed oil to leak." Indeed, on November 18, 2013—nearly a year after Ford rolled out the 2012 Recall—Ford's Field Review Committee "determined that a safety defect exists, and that a voluntary safety recall should be conducted." . . . .
>
> On November 25, 2013, Ford initiated Recall Campaign 13S12 (NHTSA Recall No. 13V583) (the "2013 Recall") . . . As with the 2012 Recall, Ford failed to extend a fix to all of the Class Vehicles and instead limited the recall to 2013 Ford Escapes with the 1.6L EcoBoost engine (approximately 139,917 vehicles). The 2013 Recall again warned of the risk of "localized overheating of the engine cylinder head," which "may cause the cylinder head to crack, causing an oil leak that may result in a fire in the engine compartment." . . . . Ford's solution in the 2013 Recall was to add "a new engine temperature sensor." This sensor could detect when the engine was overheating but it did nothing to prevent the coolant leaks.

(*Id.* at ¶¶ 357–360.)

Defendant does not offer any counterargument to suggest that the allegations of the 2012

Recall and the related 2013 Recall are an insufficient basis upon which to allege Ford's pre-sale

knowledge of the defect. Rather, defendant only argues that the recalls of certain class vehicles

with 1.6L engines cannot serve as a basis of Ford's knowledge of a defect in other class vehicle

models and class vehicles with a 1.5L and 2.0L engine. (Doc. No. 86 at 15–16.) Defendant

essentially concedes that the 2012 and 2013 recalls (both of which pertain to the alleged Engine

Defect and to the Wests' specific vehicle model and engine liter capacity) are sufficient to allege

the requisite pre-sale knowledge for the Wests' CLRA claim.

For these reasons, defendant's motion to dismiss plaintiffs Wests' CLRA claim will be

denied.

1            2.      California Unfair Competition Law (Claim 2)

2            The claim under the California Unfair Competition Law ("UCL"), California Business &

3    Professions Code §§ 17200, *et seq.*, is brought by all four California plaintiffs (Miller, the Wests,

4    and Hodges) individually and on behalf of the California subclass.  (FACC at ¶ 447.)  California's

5    UCL prohibits "any unlawful, unfair, or fraudulent business act or practice."  Cal. Bus. & Prof.

6    Code § 17200.  Plaintiffs allege that defendant violated all three prongs of the UCL.

7            As a preliminary matter, because the court has already found that the California plaintiffs

8    have each sufficiently stated their CLRA and Song-Beverly Act claims, they have also

9    sufficiently alleged their UCL claim under the unlawful prong, which "borrows violations of

10   other laws and treats them as unlawful practices that the [UCL] makes independently actionable."

11   *AMN Healthcare, Inc. v. Aya Healthcare Servs., Inc.*, 28 Cal. App. 5th 923, 950 (2018) (citations

12   omitted); *see also Enea v. Mercedes-Benz USA, LLC*, No. 18-cv-02792-HSG, 2019 WL 402315,

13   at *2 (N.D. Cal. Jan. 31, 2019) ("Because the Court finds that Plaintiff has plausibly alleged a

14   breach of implied warranty claim, the Court also finds that Plaintiff has plausibly alleged a

15   violation of the unlawful prong of the UCL.").

16           As to the unfair and fraudulent prongs, defendant moves to dismiss all UCL claims based

17   on its argument that plaintiffs failed to allege defendant's pre-sale knowledge of the defect—an

18   argument the court has already rejected above with regard to the California plaintiffs, and the

19   court incorporates that analysis herein as well.  Defendant also argues that the UCL claims fail

20   because plaintiffs "do not allege any funds paid to purchase their vehicles were transmitted

21   directly or indirectly to Ford."  (Doc. No. 83-1 at 29.)  Although defendant is not entirely clear in

22   its motion, the decisions it cites indicate that defendant's argument in this regard challenges

23   plaintiffs' UCL claim to the extent they seek restitution as a remedy.  (Doc. No. 83-1 at 30)

24   (citing *Asghari v. Volkswagen Grp. of Am., Inc.*, 42 F. Supp. 3d 1306, 1324 (C.D. Cal. 2013)

25   (dismissing the plaintiff's "UCL claim for restitution" because the plaintiff alleged that she

26   bought her vehicle from a third party and she did not allege "that defendants obtained [her]

27   money or property nor that defendants are in possession of funds rightfully belonging to her");

28   *Acedo v. DMAX, Ltd.*, No. 15-cv-02443-MMM-AS, 2015 WL 12912365, at *16 (C.D. Cal. July

31, 2015) ("[Plaintiff] Acedo specifically alleges that he paid GM dealerships, not defendants, for his vehicles.  Because Acedo has not alleged facts indicating that defendants, as opposed to independent GM dealers, obtained Acedo's money or property, or that defendants are in possession of funds that rightly belong to Acedo, he has failed to state a plausible claim for restitution under the UCL.")).  Because plaintiffs seek injunctive relief as well as restitution (*see* FACC at ¶ 456), defendant's argument that plaintiffs must allege a direct transaction with Ford in order to obtain restitution—even if true—does not serve as a basis to dismiss the UCL claims entirely.

For a UCL claim, "the remedy the plaintiff seeks must be truly 'restitutionary in nature'— that is, it must represent the return of money or property the defendant acquired through its unfair practices." *Shersher v. Superior Ct.*, 154 Cal. App. 4th 1491, 1498 (2007) (reinstating a UCL restitution claim brought against defendant Microsoft, even though the plaintiffs had purchased the computer products from third party retailers).  Courts have reached "divergent conclusions concerning whether a plaintiff who seeks restitution based on the purchase of a used car can properly bring a UCL restitution claim." *Cabebe v. Nissan of N. Am., Inc.*, No. 18-cv-00144-WHO, 2018 WL 5617732, at *5 (N.D. Cal. Oct. 26, 2018) (citing cases).  Unsurprisingly, defendant relies on a few decisions (*Asghari* and *Acedo*, discussed above) in which the courts concluded that purchasers of used cars from third-party retailers cannot maintain a UCL claim again the manufacturer.  However, several other courts have reached the opposite conclusion.  *See Aberin v. Am. Honda Motor Co., Inc.*, No. 16-cv-04384-JST, 2018 WL 1473085, at *8 (N.D. Cal. Mar. 26, 2018) (declining to strike a UCL restitution claim and rejecting the defendant's argument that "because it obtained no money from the purchases of used vehicles, restitution is not an available remedy for those plaintiffs who purchased used vehicles"); *Cabebe*, 2018 WL 5617732, at *5 (distinguishing the decision in *Asghari* and denying a motion to dismiss a restitution-based UCL claim even though the plaintiffs "bought their vehicles from a third-party and do not allege that Nissan received any money or property as a result of that transaction"); *Johnson v. Nissan N. Am., Inc.*, 272 F. Supp. 3d 1168, 1179, 1184 (N.D. Cal. 2017) (denying motion to dismiss the plaintiff's UCL claim even though the plaintiff "purchased her car through

1 CarMax, a third-party reseller"); *Cf. Shersher v. Superior Ct.*, 154 Cal. App. 4th 1491, 1498

2 (2007) (reinstating a UCL restitution claim against defendant Microsoft, even though the

3 plaintiffs had purchased the computer products from third party retailers). The court finds these

4 latter cases to be more persuasive, especially at the pleadings stage and particularly as to plaintiffs

5 Wests and Hodges who purchased their vehicles from authorized Ford dealerships. In addition,

6 although plaintiff Miller purchased her vehicle from an unaffiliated third-party retailer, Enterprise

7 Car Sales, she alleges that she paid $6,079.19 in repair costs to the authorized Ford dealer,

8 incurring out of pocket losses to repair the engine of her vehicle. (FACC at ¶¶ 18, 20.) At the

9 pleadings stage, the undersigned concludes that these allegations are sufficient to allege that

10 plaintiff Miller lost money that defendant acquired through its unfair practices. *See Wilson v.*

11 *Hyundai Motor Am.*, No. 8:22-cv-00771-JLS-JDE, 2023 WL 3025376, at *9 (C.D. Cal. Mar. 14,

12 2023) (explaining that the allegation that the plaintiffs "patronized their authorized dealerships

13 when their engines failed or malfunctioned" was itself insufficient to state their UCL restitution

14 claim because those plaintiffs did not also allege that they "paid any money at defendant's

15 authorized dealerships," as opposed to being provided those repairs at no charge).

16      For these reasons, the court will deny defendant's motion to dismiss the restitution-based

17 UCL claim brought by plaintiffs Wests, Hodges, and Miller.

18           3.      Arkansas Deceptive Trade Practices Act  (Claim 6)

19      The claim under the Arkansas Deceptive Trade Practices Act  ("DTPA"), Arkansas Code

20 Annotated §§ 4-88-101, *et seq*., is brought by plaintiff Lund individually and on behalf of the

21 Arkansas subclass. (FACC at ¶ 515.) The court previously dismissed plaintiff Lund's DTPA

22 claim with leave to amend. (Doc. No. 76 at 38.) Defendant moves to dismiss plaintiff Lund's

23 DTPA claim on two grounds: first, because she failed to allege that defendant had knowledge of

24 the defect prior to her vehicle purchase; and second, because defendant had no duty to disclose

25 the defect under Arkansas law because there was no fiduciary or contractual relationship between

26 plaintiff Lund and Ford. (Doc. No. 83-1 at 25–29, 33–34.)

27      Plaintiff Lund alleges that she purchased her vehicle—a used 2016 Ford Escape with a

28 2.0L EcoBoost engine—on October 21, 2016 from Fort City Motors, a third-party retailer that

1   plaintiff Lund does not allege to be an authorized Ford dealership.  (FACC at ¶ 24.)  Several

2   alleged sources of Ford's knowledge of the Engine Defect existed at the time of plaintiff Lund's

3   purchase; namely, the 2012 Recall, the 2013 Recall, and an investigation started by Ford in June

4   2016 into "an ongoing series of numerous complaints about engine fires."  (*Id.* at ¶ 361.)

5   Specifically, plaintiffs allege the following:

> As Ford later informed NHTSA, starting in June 2016 Ford's North American Critical Concern Review Group "reviewed data related to underhood fire allegations on 2014 Escape vehicles equipped with 1.6L GTDI [EcoBoost] engines."  This data included dozens of customer reports of engine overheating caused by coolant loss from a cracked cylinder head.  Based on this data, Ford ultimately concluded the EcoBoost Engines were experiencing yet another safety defect, which was evidently caused by the same root cause: the Engine Defect.  Despite receipt of this data confirming that the EcoBoost Engines were continuing to experience the Engine Defect, Ford did not attempt to take steps to remedy the issue for nearly a year.

13   (*Id.*)  Plaintiffs further allege that on March 27, 2017 (approximately five months after plaintiff

14   Lund's vehicle purchase), "Ford informed NHTSA that vehicles equipped with the 1.6L

15   EcoBoost engine 'may experience underhood fires due to localized overheating [sic] of the

16   engine cylinder head, potentially leading to cracks and resulting in oil leaks.'"  (*Id.* at ¶ 362.)

17       As to pre-sale knowledge, the court has already discussed the 2012 and 2013 Recalls

18   above with regard to the California plaintiffs and incorporates that discussion here as well.  As

19   noted above, defendant argues that the 2012 Recall and 2013 Recall cannot serve as the basis for

20   Ford's knowledge of the defect in vehicles of different models, years, and engine capacities.

21   (Doc. No. 83-1 at 28–29.)  However, in the August 10, 2022 order, the court rejected this

22   argument with regard to the TSBs serving as a source of pre-sale knowledge for vehicles of

23   different models and years, because each vehicle contains an EcoBoost engine, and plaintiffs

24   allege that those "engines have the same engine block design, are made from the same materials,

25   and likewise suffer from the Engine Defect."  (Doc. No. 76 at 29.)  In the FACC, plaintiffs allege:

26   "The EcoBoost engines in each of the Class Vehicles are substantially the same, from an

27   engineering standpoint, notwithstanding their varying sizes.  The EcoBoost engines in the class

28   vehicles contain the same relevant components, made of the same materials."  (FACC at ¶ 3.)

1    Plaintiffs further allege that "the 1.5L and 2.0L EcoBoost Engines [] were built on the same

2    design and made from the same materials" as the 1.6L engine.  (FACC at ¶ 356.)  Thus, for the

3    same reason, the court again rejects defendant's argument and finds that plaintiffs' allegations

4    regarding the 2012 Recall, the 2013 Recall, and Ford's 2016 investigation and resulting

5    communications to NHTSA, provide a sufficient basis upon which to allege Ford's knowledge of

6    the Engine Defect, even for class vehicles other than 2014 Ford Escapes with 1.6L engine

7    capacity.  These alleged sources of information are therefore also sufficient to allege Ford's pre-

8    sale knowledge for plaintiff Lund's DTPA claim, even though her vehicle is a 2016 Escape with a

9    2.0L engine capacity.  *See McCarthy v. Toyota Motor Corp.*, No. 8:18-cv-00201-JLS-KES, 2019

10   WL 3220579, at *4 (C.D. Cal. Apr. 9, 2019) (where the plaintiffs had alleged that boosted

11   converters caused a high voltage defect in both Highlander hybrids and Priuses, the court rejected

12   the defendant's argument that "because the Highlander/RX400 hybrids and the 2010-2014 Priuses

13   are different vehicle models, knowledge of a defect in the Highlander/RX400 hybrids cannot

14   establish knowledge of a defect in the 2010-2014 Priuses").

15          Defendant also argues that under Arkansas law, "one owes a duty to disclose 'only when

16   there is an established relationship between the parties, such as a contractual relationship or a

17   fiduciary relationship," and plaintiff Lund's DTPA claim fails because she does not allege such a

18   relationship in the FACC.  (Doc. No. 83-1 at 33) (quoting *White v. Volkswagen Grp. of Am., Inc.*,

19   No. 2:11-cv-02243, 2013 WL 685298, at *9 (W.D. Ark. Feb. 25, 2013)); (Doc. No. 86 at 21)

20   (citing *Cohen v. Subaru of Am., Inc.*, No. 1:20-cv-08442-JHR-AMD, 2022 WL 714795, at *19

21   (D.N.J. Mar. 10, 2022) ("Under Arkansas law, omissions are not actionable unless an

22   'established' 'contractual' or 'fiduciary' relationship exists between the parties that gives rise to a

23   duty to disclose.")).

24          In their opposition, plaintiffs argue that a fiduciary or contractual relationship is just one

25   type of special relationship that may impose a duty to disclose, and they point to two decisions in

26   which courts applied Arkansas law and concluded that "[t]he duty to disclose is not limited to

27   confidential or fiduciary relationships."  *Roe v. Ford Motor Co.*, No. 18-cv-12528-LJM, 2021 WL

28   2529825, at *12 (E.D. Mich. June 21, 2021) (quoting *Holiday Inn Franchising, Inc. v. Hotel*

1   *Assocs., Inc.*, 2011 Ark. App. 147, *12 (2011) (explaining that "[t]here may be a special

2   relationship or special circumstances requiring disclosure")). However, as defendant emphasizes

3   in their reply brief, the court in *Holiday Inn* found that "substantial evidence supports the

4   existence of a duty on Holiday Inn's part to disclose" a pertinent report to the defendant because

5   the defendant's owner "had a long-term relationship with Holiday Inn characterized by honesty,

6   trust, and the free flow of pertinent information." 2011 Ark. App. 147 at *12. Because plaintiff

7   Lund does not allege any facts suggesting the existence of a special relationship between her and

8   Ford, plaintiffs' reliance on the decision in *Holiday Inn* is unavailing. Plaintiffs' reliance on the

9   decision in *Roe* fares no better because the court in that case merely concluded, without any

10  discussion or analysis of the plaintiff's allegations, that "Ford has not shown that it did not have a

11  duty to disclose the water-pump defect under Arkansas law." *Roe*, 2021 WL 2529825, at *12.

12  Moreover, several courts have dismissed DTPA claims under similar circumstances, where a

13  plaintiff purchased a vehicle from a dealership that was not affiliated with the defendant

14  manufacturer. *See Pinon v. Daimler AG*, No. 1:18-cv-03984-MHC, 2019 WL 11648560, at *30

15  (N.D. Ga. Nov. 4, 2019) (dismissing the plaintiff's DTPA claim because "[n]othing indicates that

16  [the plaintiff] had a 'relationship or contact' with defendants at the time she purchased her

17  vehicle," and "[u]nder Arkansas law, liability for fraud-based nondisclosure requires that the

18  parties be in a special relationship"); *Perez v. Volkswagen Grp. of Am., Inc.*, No. 2:12-cv-02289,

19  2013 WL 1661434, at *10 (W.D. Ark. Apr. 17, 2013) (dismissing a DTPA claim and explaining

20  that "even if [the plaintiff] had made an adequate showing that defendant knew or should have

21  known of a latent defect in the transmission systems of her vehicles, it is clear that there was no

22  privity of contract at any time between defendant and [the plaintiff], and no confidential or

23  fiduciary relationship exists or existed between them"); *Cf. Siqueiros v. Gen. Motors LLC*, No.

24  16-cv-07244-EMC, 2021 WL 2115400, at *5 (N.D. Cal. May 25, 2021) (granting summary

25  judgment in favor of the defendant manufacturer on the plaintiff's DTPA claim because the

26  plaintiff "was not in a special relationship with GM that would require GM to disclose its

27  knowledge of the alleged oil-consumption defect"). Accordingly, the court finds that plaintiff

28  /////

1    Lund has not sufficiently alleged that she has the requisite "special relationship" with Ford to

2    maintain her DTPA claim.

3            For this reason, the court will grant defendant's motion to dismiss plaintiff Lund's

4    Arkansas Deceptive Trade Practices Act claim, without leave to amend.  The court finds that

5    granting plaintiff Lund further leave to amend this claim would be futile.  Importantly, plaintiff

6    Lund maintains that her allegations of Ford's knowledge of the defect and her lack of knowledge

7    of the defect at the time of sale are themselves sufficient allegations to establish a special

8    relationship—a contention the court has already rejected.  Moreover, plaintiff Lund does not

9    proffer any additional allegations that she would include in a further amended complaint.

10                   4.      Colorado Consumer Protection Act (Claim 9)

11           The claim under the Colorado Consumer Protection Act ("CCPA"), Colorado Revised

12   Statutes §§ 6-1-101, *et seq*., is brought by plaintiff Christodaro individually and on behalf of the

13   Colorado subclass.  (FACC at ¶ 580.)  The court previously dismissed plaintiff Christodaro's

14   CCPA claim with leave to amend.  (Doc. No. 76 at 39.)  Defendant moves to dismiss plaintiff

15   Christodaro's CCPA claim on two grounds:  first, that he failed to allege that defendant had

16   knowledge of the defect prior to his vehicle purchase; and second, the CCPA bars class claims for

17   money damages.  (Doc. No. 83-1 at 25–30.)  As to the latter argument, because plaintiffs also

18   seek injunctive relief as a remedy (FACC at ¶ 600), plaintiff Christodaro's CCPA claim would

19   not be subject to dismissal entirely even if, as defendant contends, money damages are not

20   authorized under that statute.

21           Plaintiff Christodaro alleges that he purchased his vehicle—a new 2017 Ford Escape with

22   a 1.5L EcoBoost engine—on March 25, 2017 from an authorized Ford dealership.  (FACC at

23   ¶ 48.)  As to defendant's pre-sale knowledge argument, the court incorporates its above analysis

24   with regard to the California plaintiffs (Wests) and plaintiff Lund and concludes here too that the

25   2012 Recall, 2013 Recall, and Ford's 2016 investigation and resulting communications to

26   NHTSA, are a sufficient basis upon which to allege Ford's knowledge of the Engine Defect prior

27   to plaintiff Christodaro's vehicle purchase.

28   /////

                                                          67

As to defendant's argument that plaintiff Christodaro cannot maintain his class claim for money damages under the CCPA, the court agrees that the weight of authority supports this conclusion. *In re Myford Touch Consumer Litig.*, No. 13-cv-03072-EMC, 2016 WL 7734558, at *26 (N.D. Cal. Sept. 14, 2016) ("Colorado law prohibits class actions for monetary damages based on the Consumer Protection Act"); *Davidson v. Apple, Inc.*, No. 16-cv-04942-LHK, 2018 WL 2325426, at *11 (N.D. Cal. May 8, 2018) (noting that "[p]laintiffs do not dispute that the CCPA contains a bar on class actions for damages," "[p]laintiffs point to no Colorado decision actually holding that the CCPA bar is inapplicable or explaining why the CCPA bar can be ignored," and "[a]bsent such authority, the Court is not inclined to overlook the statute's plain language"); *Reynolds v. FCA US LLC*, 546 F. Supp. 3d 635, 658 (E.D. Mich. 2021) (applying Colorado law and concluding that the plaintiff's "CCPA claim can proceed only if based upon a viable claim for injunctive relief"). Indeed, the decision cited by plaintiffs in their opposition brief likewise supports this conclusion. *See Martinez v. Nash Finch Co.*, No. 11-cv-02092-MSK-KLM, 2013 WL 1313899, at *3 (D. Colo. Mar. 29, 2013) (concluding that the CCPA "is clear and unambiguous, stating that 'except in a class action, [items of monetary relief, including actual damages, are available under the CCPA].' The only reasonable reading of the statutory language is that the enumerated items of monetary relief are not available in class actions. The Plaintiffs offer no argument whatsoever as to why the statute should be read differently than its plain language directs.").

For these reasons, defendant's motion to dismiss plaintiff Christodaro's Colorado Consumer Protection Act claim *in its entirety* based on a failure to allege pre-sale knowledge is denied. However, defendant's motion to dismiss plaintiff Christodaro's class claim for money damages under the Colorado Consumer Protection Act is granted, without leave to amend.

### 5.   Florida Deceptive and Unfair Trade Practices Act (Claim 12)

The claim under the Florida Deceptive and Unfair Trade Practices Act, Florida Statutes §§ 501.201, *et seq.*, is brought by plaintiff Amy Hoffer individually and on behalf of the Florida subclass. (FACC at ¶ 647.) Defendant Ford does not move to dismiss this claim, which survived defendant's prior motion to dismiss. (*See* Doc. No. 76 at 39.)

1          6.      Georgia Fair Business Practices Act (Claim 15)

2          The claim under the Georgia Fair Business Practices Act ("FBPA"), Georgia Code

3   Annotated §§ 10-1-390, *et seq*., is brought by plaintiffs Jillian Constable and Monterio Butcher

4   individually and on behalf of the Georgia subclass.  (FACC at ¶ 714.)  Defendant does not move

5   to dismiss plaintiff Butcher's FBPA claim, which survived defendant's prior motion to dismiss.

6   (*See* Doc. No. 76 at 39.)  Defendant moves to dismiss plaintiff Constable's FBPA claim on the

7   ground that she did not allege that Ford had knowledge of the defect before she purchased her

8   vehicle.  (Doc. No. 83-1 at 23–29.)

9          Plaintiff Constable alleges that she purchased her vehicle—a used 2016 Ford Edge with a

10  2.0L EcoBoost engine—on August 25, 2017 from an authorized Ford dealership.  (FACC at

11  ¶ 72.)  Thus, the sources of knowledge discussed above with regard to the California plaintiffs

12  (Wests) and plaintiff Lund existed at the time of plaintiff Constable's vehicle purchase as well.

13  The court incorporates that analysis herein and likewise concludes that the 2012 Recall, 2013

14  Recall, and Ford's 2016 investigation and resulting communications to NHTSA are a sufficient

15  basis upon which to allege Ford's knowledge of the Engine Defect prior to plaintiff Constable's

16  vehicle purchase.  Moreover, plaintiffs allege that on December 13, 2017, Ford issued another

17  recall (linked to the 2012 and 2013 Recalls)— Recall Campaign 17S09 (NHTSA Recall No.

18  17V209) (the "2017 Recall")—and "Ford prepared for this recall at least several months in

19  advance, given the time it takes to prepare a fix for vehicles already operating in the field."

20  (FACC at ¶ 363.)  Plaintiffs do not specify how many months Ford had spent preparing for the

21  2017 Recall.  Nevertheless, a reasonable inference can be drawn from these allegations that the

22  2017 Recall was another source of Ford's knowledge of the defect when plaintiff Constable

23  purchased her vehicle approximately four months prior to the issuance of the 2017 Recall.

24         For these reasons, defendant's motion to dismiss plaintiff Constable's Georgia Fair

25  Business Practices Act claim will be denied.

26         7.      Georgia Uniform Deceptive Trade Practices Act (Claim 16)

27         The claim under the Georgia Uniform Deceptive Trade Practices Act ("GUDTPA"),

28  Georgia Code Annotated §§ 10-1-370, *et seq*., is brought by plaintiffs Jillian Constable and

1    Monterio Butcher individually and on behalf of the Georgia subclass.  (FACC at ¶ 735.)  Plaintiff

2    Butcher's GUDTPA claim survived defendant's prior motion to dismiss.  (*See* Doc. No. 76 at 39.)

3    Nevertheless, defendant now moves to dismiss the GUDTPA claim as to both plaintiffs Constable

4    and Butcher based on a standing argument that was not raised by defendant in its prior motion to

5    dismiss.[29]  (Doc. No. 83-1 at 30.)  Specifically, defendant contends that plaintiffs Constable and

6    Butcher both fail to allege "facts showing that they are 'likely to be damaged' in the future."  (Id.)

7    (quoting *Silverstein v. Procter & Gamble Mfg. Co.*, No. 1:08-cv-00003-LGW, 2008 WL

8    4889677, at *4 (S.D. Ga. Nov. 12, 2008) ("In order to obtain an injunction under Georgia's

9    UDTPA, a plaintiff must show that he is 'likely to be damaged' by the defendant's deceptive

10   trade practice") (citing O.C.G.A. § 10–1–373(a))).

11         In their opposition, plaintiffs argue that because Ford has refused to acknowledge the

12   existence of the Engine Defect or permanently fix it, plaintiffs "continue to suffer from the loss of

13   confidence in their vehicles" and "face the prospect of paying out-of-pocket" for repairs when the

14   Engine Defect next manifests.  (Doc. No. 85 at 29.)  However, plaintiffs do not cite any authority

15   that supports their argument in circumstances similar to those here.  Rather, they rely on a

16   decision that only briefly analyzed the question of standing to bring a GUDTPA claim and did so

17   in the context of allegedly hidden settlement fees and kickbacks in brokers' commission

18   agreements.  (*Id.*) (citing *Bolinger v. First Multiple Listing Serv., Inc.*, 838 F. Supp. 2d 1340,

19   1364 (N.D. Ga. 2012)).  In contrast, the decision cited by defendant pertains to a case involving

20   vehicle defects and solidly supports defendant's argument.  (Doc. No. 83-1 at 30) (citing *Matanky

21   v. Gen. Motors LLC*, 370 F. Supp. 3d 772, 801 (E.D. Mich. 2019)).

22         In *Matanky*, the plaintiffs alleged that the defendant manufacturer "continues to install

23   defective cooling systems in new [Corvette] Z06s" and "has failed to adequately fix or replace the

24   . . . cooling systems installed in existing Z06s."  370 F. Supp. 3d at 800–01.  The court in

25   *Matanky* found these allegations insufficient to allege "ongoing or future harm" because

26

27   _____

     [29]  To the extent defendant also seeks dismissal of plaintiff Constable's GUDTPA claim based on
28   its pre-sale knowledge argument, that argument fails for the same reasons discussed above as to
     plaintiff Constable's Georgia Fair Business Practices Act claim.

1    "[p]laintiffs have already bought a Z06, are now aware of the alleged defect, and do not allege

2    they are likely to buy another Z06." *Id.* (citing *Amin v. Mercedes-Benz USA, LLC*, 301 F.Supp.3d

3    1277, 1294 (N.D. Ga. 2018) ("Plaintiffs have not alleged that they will likely buy another class

4    vehicle.  They do not allege that putative class members are likely to again be misled by

5    Mercedes' advertising.  In short, Plaintiffs have plausibly alleged that they have been damaged,

6    but they have not sufficiently alleged that they are 'likely to be damaged' again by Mercedes

7    advertising and marketing.")  The district court in *Matanky* went on to explain that "[a]lthough

8    Plaintiffs allege they will suffer ongoing and future harm because of the alleged defect, that harm

9    is the result of GM's previous alleged deceptive trade practice, and an injunction would not

10   prevent the reoccurrence of the harm alleged."  *Id.* at 801.  The reasoning in *Matanky* has been

11   adopted by other courts addressing GUDTPA claims in vehicle defect cases as well.  *See*

12   *Reynolds v. FCA US LLC*, 546 F. Supp. 3d 635, 658 (E.D. Mich. 2021) (dismissing the plaintiff's

13   GUDTPA claim and explaining that "[w]here a plaintiff does not allege that they intend to

14   purchase from a defendant manufacturer again, they cannot maintain a claim for injunctive relief

15   as to that defendant's advertising or marketing."); *Est. of Pilgrim v. Gen. Motors LLC*, 596 F.

16   Supp. 3d 808, 832 (E.D. Mich. 2022) (dismissing the plaintiff's GUDTPA claim and explaining

17   that "because the GUDTPA is specifically about 'trade practices,' the fact that the valve guide

18   defect could appear in a car at some point in the future is not enough to make a claim given the

19   statute's conception of future harm resulting from deceptive trade practices").

20           In light of this relevant authority applying Georgia law, the court concludes that plaintiffs

21   Constable and Butcher have not sufficiently alleged their claims brought under the Georgia

22   Uniform Deceptive Trade Practices Act.  Accordingly, defendant's motion to dismiss this claim

23   as to both plaintiffs Constable and Butcher will be granted.  The court also finds that the granting

24   of leave to amend as to this claim would be futile because plaintiffs Constable and Butcher do not

25   proffer any additional allegations they would include in a further amended complaint, and most

26   importantly, they do not acknowledge the *Matanky* decision in their opposition brief, let alone

27   attempt to distinguish it.  Accordingly, this claim will be dismissed without leave to amend.

28   /////

1    8.    <u>Illinois Consumer Fraud and Deceptive Business Practices Act (Claim 17)</u>

2    The claim under the Illinois Consumer Fraud and Deceptive Business Practices Act

3    ("ICFA"), 815 Illinois Compiled Statutes 505/1, *et seq*., is brought by all three Illinois plaintiffs

4    (Bozhinov, Glade, and Cicero) individually and on behalf of the Illinois subclass.  (FACC at

5    ¶ 757.)  Plaintiff Bozhinov's ICFA claim survived defendant's prior motion to dismiss. (Doc.

6    No. 76 at 39.)  Plaintiff Glade's ICFA claim was dismissed with leave to amend, even though the

7    court found that plaintiff Glade had sufficiently alleged Ford's pre-sale knowledge of the defect,

8    because plaintiff Glade purchased her vehicle from a third-party retailer and had not alleged that

9    "she saw or read any of defendant's communications or advertisements.  (*Id.* at 31, 32) (citing *De*

10   *Bouse v. Bayer*, 922 N.E.2d 309, 316 (Ill. 2009) ("A consumer cannot maintain an action under

11   the [ICFA] when the plaintiff does not receive, directly or indirectly, communication or

12   advertising from the defendant.").

13   In the pending motion, defendant argues that the ICFA claim brought by plaintiffs Glade

14   and Cicero should be dismissed because "Illinois does not impose a duty on remote

15   manufacturers (like Ford) to disclose to individual consumers who purchased their products

16   through independent retailers (like Glade) or dealerships (like Cicero)."  (Doc. No. 83-1 at 33)

17   (citing *Connick v. Suzuki Motor Co.*, 174 Ill. 2d 482, 499 (1996)).  However, the portion of the

18   decision in *Connick* that defendant cites in support of this argument pertains to the plaintiffs'

19   common law fraud claim, not the ICFA claim, which was analyzed separately in subsequent

20   pages of that decision.  Indeed, as plaintiffs note in their opposition (Doc. No. 85 at 33), in its

21   discussion of the ICFA claim, the Illinois Supreme Court in *Connick* stated that "it is unnecessary

22   to plead a common law duty to disclose in order to state a valid claim of consumer fraud based on

23   an omission or concealment."  174 Ill. 2d at 505.  Accordingly, defendant's reliance on the

24   decision in *Connick* actually serves to defeat its argument rather than support it.

25   a.    *Plaintiff Glade's ICFA Claim*

26   Defendant also moves to dismiss plaintiff Glade's ICFA claim on the ground that she has

27   not cured the deficiencies identified by the court in the August 10, 2022 order.  (Doc. No. 83-1 at

28   30–31.)  The court agrees.  Plaintiff Glade alleged in the original complaint that she "did a

72

1    general online search for information on the vehicle, visited the dealership's website, reviewed

2    the window sticker and documents provided at the dealership, and went on a test drive," and she

3    "believed that the 2017 Ford Escape would be a safe and reliable vehicle."  (Doc. No. 43 at ¶ 94.)

4    In the FACC, plaintiff Glade similarly alleges the following:

5               Prior to purchasing the 2017 Ford Escape, Ms. Glade researched the
                vehicle by conducting a general online search for information on
6               the vehicle, visited the dealership's website, reviewing the
                Monroney Label (window sticker) and documents provided at the
7               dealership, and went on a test [drive].   Based on Ford's
                representations, Ms. Glade was led to believe that the 2017 Ford
8               Escape was, among other things, a safe, reliable, and high quality
                vehicle.
9

10   (FACC at ¶ 106.)  The only real difference in the amended allegations is that plaintiff Glade

11   specifies that the "window sticker" refers to the "Monroney Label," but that addition does not

12   alter the court's analysis.[30]  Notably, because plaintiff Glade purchased her vehicle from a Dodge

13   dealership, not an authorized Ford dealership, references to "the dealership" in her allegations do

14   not suffice to allege direct or indirect communications with Ford, as required for an ICFA claim.

15   *See De Bouse*, 922 N.E.2d at 316.

16         For this reason, the court will grant defendant's motion to dismiss plaintiff Glade's Illinois

17   Consumer Fraud and Deceptive Business Practices Act claim.  The court finds that the granting of

18   leave to amend this claim would be futile because plaintiff Glade has already had an opportunity

19   to amend her allegations as to this claim and she failed to do so.  Accordingly, dismissal of this

20   claim will be without further leave to amend.

21              b.     *Plaintiff Cicero's ICFA Claim*

22         As a preliminary matter, in the pending motion, defendant does not challenge plaintiff

23   Cicero's ICFA claim as insufficiently alleging direct or indirect communications with Ford;

24   defendant's argument in this regard is limited to plaintiff Glade's ICFA claim.  (See Doc. No. 83-

25   1 at 30–31.)  However, in its reply brief, defendant appears to suggest that the same argument

26

27   ───────────────
     [30]  Plaintiffs allege in the FACC, as they had in the original complaint, that "[d]efendant is []
     responsible for the production and content of the information on the Moroney Stickers."  (FACC
28   at ¶ 332); (Doc. No. 43 at ¶ 175).

1   applies to plaintiff Cicero's ICFA claim.  (Doc. No. 86 at 22.)  Yet plaintiff Cicero's allegations

2   do not suffer from the deficiencies the court identified in plaintiff Glade's allegations.  Rather,

3   plaintiff Cicero alleges that he purchased his vehicle from an authorized Ford dealer, and he

4   "researched the vehicle by watching multiple Ford commercials, reviewed the Monroney label

5   (window sticker), and conferred with the dealership personnel who recommended the vehicle."

6   (FACC at ¶ 235.)  Thus, to the extent defendant is challenging the sufficiency of plaintiff Cicero's

7   allegations in this regard, the court rejects defendant's argument.

8          Defendant also argues that plaintiff Cicero's ICFA claim should be dismissed on the

9   ground that he did not sufficiently allege that Ford had knowledge of the Engine Defect before his

10  vehicle purchase.  (Doc. No. 83-1 at 23–29.)  Plaintiff Cicero alleges that he purchased his

11  vehicle—a new 2017 Ford Escape with a 1.5L EcoBoost engine—on January 1, 2017 from an

12  authorized Ford dealership.  (FACC at ¶ 234.)  Thus, the sources of knowledge discussed above

13  with regard to the California plaintiffs (Wests) and plaintiff Lund existed at the time of plaintiff

14  Cicero's vehicle purchase as well.  The court incorporates that analysis herein and likewise

15  concludes that the 2012 Recall, 2013 Recall, and Ford's 2016 investigation and resulting

16  communications to NHTSA provide a sufficient basis upon which to allege Ford's knowledge of

17  the Engine Defect prior to plaintiff Cicero's vehicle purchase.

18         Accordingly, the court will deny defendant's motion to dismiss plaintiff Cicero's Illinois

19  Consumer Fraud and Deceptive Business Practices Act claim.

20         9.      Indiana Deceptive Consumer Sales Act (Claim 20)

21         The claim under the Indiana Deceptive Consumer Sales Act ("DCSA"), Indiana Code

22  Annotated §§ 24-5-0.5-3, *et seq*., is brought by plaintiffs Balaszek and Pickering individually and

23  on behalf of the Indiana subclass.  (FACC at ¶ 827.)  The court previously dismissed plaintiff

24  Balaszek's DCSA claim with leave to amend.  (Doc. No. 76 at 40.)  Defendant now moves to

25  dismiss the DCSA claim as to both plaintiffs Balaszek and Pickering on the ground that they both

26  have failed to sufficiently allege that Ford had knowledge of the Engine Defect before their

27  respective vehicle purchases.  (Doc. No. 83-1 at 23–29.)

28  /////

1              a.      *Plaintiff Balaszek's DCSA Claim*

2          Plaintiff Balaszek alleges that she purchased her vehicle—a new 2017 Ford Escape with a

3    1.5L EcoBoost engine—on November 23, 2016 from an authorized Ford dealership.  (FACC at

4    ¶ 116.)  Thus, the sources of knowledge discussed above with regard to the California plaintiffs

5    (Wests) and plaintiff Lund existed at the time of plaintiff Balaszek's vehicle purchase as well.

6    The court incorporates that analysis herein and likewise concludes that the 2012 Recall, 2013

7    Recall, and Ford's 2016 investigation and resulting communications to NHTSA provide a

8    sufficient basis upon which to allege Ford's knowledge of the Engine Defect prior to plaintiff

9    Balaszek's vehicle purchase.

10         Accordingly, the court will deny defendant's motion to dismiss plaintiff Balaszek's

11   Indiana Deceptive Consumer Sales Act claim.

12             b.      *Plaintiff Pickering's DCSA Claim*

13         Plaintiff Pickering alleges that he purchased his vehicle—a pre-owned 2014 Ford Fusion

14   with a 1.5L EcoBoost engine—on January 27, 2016 from an authorized Ford dealership.  (FACC

15   at ¶ 305.)  Thus, the sources of knowledge discussed above with regard to the California plaintiffs

16   (Wests) existed at the time of plaintiff Pickering's vehicle purchase as well.  The court

17   incorporates that analysis herein and likewise concludes that the 2012 Recall and 2013 Recall

18   provide a sufficient basis upon which to allege Ford's knowledge of the Engine Defect prior to

19   plaintiff Pickering's vehicle purchase.

20         Accordingly, the court will deny defendant's motion to dismiss plaintiff Pickering's

21   Indiana Deceptive Consumer Sales Act claim.

22         10.     Kansas Consumer Protection Act (Claim 23)

23         The claim under the Kansas Consumer Protection Act ("KCPA"), Kansas Statutes §§ 50-

24   623, *et seq.*, is brought by plaintiffs Craig Morford and Kelli Morford individually and on behalf

25   of the Kansas subclass.  (FACC at ¶ 894.)  The court previously dismissed the Morfords' KCPA

26   claim with leave to amend.  (Doc. No. 76 at 40.)  Defendant again moves to dismiss the

27   Morfords' KCPA claim on the grounds that they have not sufficiently alleged that Ford had

28   /////

                                              75

1    knowledge of the Engine Defect before their vehicle purchase, and their claim is time-barred by

2    the KCPA's three-year statute of limitations.  (Doc. No. 83-1 at 23–29, 31.)

3          The Morfords allege that they purchased their vehicle—a new 2017 Ford Escape with a

4    2.0L EcoBoost engine—on April 18, 2017 from an authorized Ford dealership.  (FACC at ¶ 127.)

5    Thus, the sources of knowledge discussed above with regard to the California plaintiffs (Wests)

6    and plaintiff Lund existed at the time of the Morford's vehicle purchase as well.  The court

7    incorporates that analysis herein and likewise concludes that the 2012 Recall, 2013 Recall, and

8    Ford's 2016 investigation and resulting communications to NHTSA provide a sufficient basis

9    upon which to allege Ford's knowledge of the Engine Defect prior to the Morfords' vehicle

10   purchase.

11         As for defendant's statute of limitations argument, defendant contends that the three-year

12   limitations period under the KCPA began to run on April 18, 2017, because the Morfords allege

13   that Ford engaged in a deceptive practice in connection with the consumer transaction of their

14   vehicle purchase.  (Doc. No. 31-1 at 31) (citing *Campbell v. Hubbard*, 41 Kan. App. 2d 1, 7

15   (2008) ("[T]he time limit for bringing a claim under the KCPA begins when the KCPA violation

16   occurs.").  Plaintiffs counter in their opposition that the relevant question in determining the

17   commencement of the limitations period under the KCPA is on what date they were "aggrieved"

18   by defendant's alleged conduct.  (Doc. No. 85 at 30) (citing *Marksberry v. FCA US LLC*, 481 F.

19   Supp. 3d 1229, 1235 (D. Kan. 2020) ("The statute of limitations begins to run when the consumer

20   is 'aggrieved.'")).  According to the Morfords, the statute of limitations did not begin to run until

21   October 2020 when they began to experience the Engine Defect, brought the vehicle to the Ford

22   dealership for repairs, had to pay $100 to the dealership for the diagnosis, and were informed that

23   they would have to pay $5,950.00 to replace the engine.  (Doc. No. 85 at 30.)  These allegations

24   by the Morfords are similar to the allegations asserted by the plaintiffs in *Marksberry*—a decision

25   relied on by plaintiffs and ignored by defendant.  The district court in *Marksberry* concluded that

26   the plaintiff's KCPA claim was not barred by the statute of limitations and explained as follows:

27                [T]o determine when the statute of limitations began running, the
               relevant question is when Plaintiff was aggrieved.  The Court
28             concludes that the date is May 10, 2016.  On that date, Plaintiff

1
2
3
4
5
6
7

sustained monetary damages because he had to pay to have the vehicle repaired instead of having it covered by the lifetime warranty. Although the accrual of a claim under the KCPA is not delayed until its discovery or when the plaintiff suffers monetary damages, in this case, Plaintiff was "aggrieved" on the same date as discovery and the imposition of monetary damages. He was aggrieved on May 10, 2016 because he suffered a loss when the repair was not covered by the warranty. In addition, he was denied the right to the warranty, and an obligation or burden was imposed upon him because he had to pay for the repair. Prior to May 10, 2016, he had not been aggrieved. Thus, because Plaintiff filed suit within three years of that date, his suit his timely and not barred by the statute of limitations.

8  481 F. Supp. 3d at 1235. This court similarly finds that the Morfords have sufficiently alleged

9  that they were "aggrieved" in October 2020 and thus the filing of their original complaint on

10  November 30, 2020 asserting their KCPA claim was timely.

11      For these reasons, the court will deny defendant's motion to dismiss the Morfords' Kansas

12  Consumer Protection Act claim.

13      11.    Maryland Consumer Protection Act (Claim 25)

14      The claim under the Maryland Consumer Protection Act ("MCPA"), Maryland Code

15  Annotated Commercial Law §§ 13-101, *et seq*., is brought by plaintiffs Aaron Manfra and

16  Victoria Manfra individually and on behalf of the Maryland subclass. (FACC at ¶ 934.) The

17  court previously dismissed the Manfras' MCPA claim with leave to amend. (Doc. No. 76 at 40.)

18  Defendant again moves to dismiss the Manfras' MCPA claim on the ground that they did not

19  sufficiently allege that Ford had knowledge of the Engine Defect before their vehicle purchase.

20  (Doc. No. 83-1 at 23–29.)

21      The Manfras allege that they purchased their vehicle—a new 2017 Ford Fusion with a

22  1.5L EcoBoost engine—on February 18, 2017 from an authorized Ford dealership. (FACC at

23  ¶ 139.) Thus, the sources of knowledge discussed above with regard to the California plaintiffs

24  (Wests) and plaintiff Lund existed at the time of the Manfras' vehicle purchase as well. The court

25  incorporates that analysis herein and likewise concludes that the 2012 Recall, 2013 Recall, and

26  Ford's 2016 investigation and resulting communications to NHTSA provide a sufficient basis

27  upon which to allege Ford's knowledge of the Engine Defect prior to the Manfras' vehicle

28  purchase.

77

1    Accordingly, the court will deny defendant's motion to dismiss the Manfras' Maryland

2  Consumer Protection Act claim.

3        12.    Michigan Consumer Protection Act (Claim 27)

4    The claim under the Michigan Consumer Protection Act ("MCPA"), Michigan Compiled

5  Laws §§ 445.903, *et seq*., is brought by all three Michigan plaintiffs (Coppock, Goodrich, and

6  Metro) individually and on behalf of the Michigan subclass.  (FACC at ¶ 972.)  Plaintiff

7  Goodrich's MCPA claim survived defendant's prior motion to dismiss. (Doc. No. 76 at 40.)

8  Plaintiff Coppock's MCPA claim was dismissed with leave to amend.  (*Id.*)  Defendant now

9  moves to dismiss the MCPA claim brought by plaintiffs Coppock and Metro on the grounds that

10  (i) they have failed to allege that they made inquiries directly to Ford regarding the safety of their

11  vehicles and the existence of any potential defects to which Ford responded with incomplete or

12  misleading statements; (ii) vehicle sales are exempt from the MCPA; and (iii) they each have

13  failed to sufficiently allege that Ford had knowledge of the Engine Defect before their respective

14  vehicle purchases.  (Doc. No. 83-1 at 23–29, 31, 33.)

15    Defendant's first argument—that fraudulent concealment, called "silent fraud" in

16  Michigan, requires proof of misleading statements given by the defendant in response to an

17  inquiry by the plaintiff—is misplaced in this case because plaintiffs Coppock and Metro bring an

18  MCPA claim, not a common law fraud claim.  Notably, defendant cites only two decisions to

19  support this argument.  The first decision makes no mention of the MCPA whatsoever, and the

20  second analyzes the plaintiffs' MCPA claim and common-law fraud claim separately, and only

21  the latter analysis is cited by defendant in the pending motion.  (Doc. No. 83-1 at 34) (citing

22  *M&D, Inc. v. W.B. McConkey*, 231 Mich. App. 22, 31 (1998) (addressing "three theories to

23  establish fraud:  (1) traditional common-law fraud, (2) innocent misrepresentation, and (3) silent

24  fraud"—not the MCPA) and *MacDonald v. Thomas M. Cooley L. Sch.*, 724 F.3d 654, 662–66

25  (6th Cir. 2013) (affirming dismissal of the MCPA claim because the MCPA did not cover the

26  plaintiffs' purchase of legal education for a business purpose, and addressing whether the district

27  court erred in dismissing the plaintiffs' common-law fraudulent concealment claim)).

28  /////

1        Moreover, defendant's argument is not saved by its footnote noting that Michigan "uses

2    common law to interpret the MCPA." (Doc. No. 83-1 at 34 n.32) (citing *Zine v. Chrysler Corp.*,

3    236 Mich. App. 261, 283 (1999)). The court in *Zine* noted that it was proper to "construe the

4    provisions of the MCPA 'with reference to the common-law tort of fraud,'" and it did so in that

5    case to determine the definition of "material," as that term was used in the relevant provision of

6    the MCPA. *Zine*, 236 Mich. App. at 278, 282–83 (quoting Mich. Comp. Laws Ann.

7    § 445.903(1)(s)) ("Unfair, unconscionable, or deceptive methods, acts, or practices in the conduct

8    of trade or commerce are unlawful and are defined as follows: . . . Failing to reveal a material

9    fact, the omission of which tends to mislead or deceive the consumer, and which fact could not

10    reasonably be known by the consumer."). But as a Michigan state appellate court has explained,

11    "the panel in *Zine* did not hold or imply that a plaintiff must plead and prove all elements of

12    fraud, . . . when asserting a claim under the MCPA, even if certain provisions of the act contain

13    fraud-based language; there are no published cases from this Court or our Supreme Court that

14    state this proposition." *Brownlow v. McCall Enters., Inc.*, 315 Mich. App. 103, 121–22, 125

15    (2016) (rejecting the defendant's argument as "erroneously interpret[ing] the rule of law stated in

16    *Zine*, and writ[ing] elements of fraud into the provisions of the MCPA that do not, and should not,

17    exist"). Rather, the court in *Brownlow* clarified that "consistent[] with our holding in *Zine* and

18    longstanding principles of statutory interpretation, we may refer to the common-law tort of fraud

19    for guidance when interpreting ambiguous provisions of the MCPA, but only if necessary, i.e.,

20    when the act contains a technical term that has acquired a peculiar meaning under the law." 315

21    Mich. App. at 124–45.

22        Next, defendant argues that the vehicle purchases by plaintiffs Coppock and Metro are

23    exempt from the MCPA based on the exemption provision in Michigan Compiled Laws

24    § 445.904(1), which states that the MCPA "does not apply to . . . [a] transaction or conduct

25    specifically authorized under laws administered by a regulatory board or officer acting under

26    statutory authority of this state or the United States." (Doc. No. 83-1 at 31.) Defendant

27    previously raised this argument in its prior motion to dismiss, but the court rejected the argument

28    at that time because defendant had not identified or analyzed any specific law or statutory

1   provision that purports to specifically authorize the transactions at issue (i.e., the vehicle sales to

2   plaintiffs Coppock and Metro, who both purchased their vehicles from authorized Ford

3   dealerships).  (Doc. No. 76 at 31–32.)  In the pending motion, defendant argues that it "has now

4   identified specific Michigan regulations that govern vehicle advertising—and the Michigan

5   Plaintiffs' deceptive conduct claims are premised on allegations of Ford's deceptive advertising

6   related to the purported engine defect."  (Doc. No. 83-1 at 31–32) (citing Mich. Comp. Laws

7   Ann. §§ 257.248d; 445.315).

8         Defendant also cites to several decisions in which MCPA claims have been dismissed in

9   vehicle defect cases because vehicle sales are exempt under MCPA.  (*Id.*) (citing cases).  Indeed,

10  "[s]everal courts applying the MCPA have found this provision of the MCPA exempts motor

11  vehicle sales."  *Tijerina v. Volkswagen Grp. of Am., Inc.*, No. 2:21-cv-18755-BRM-LDW, 2023

12  WL 6890996, at *29 (D.N.J. Oct. 19, 2023) (citing cases); *see also Cyr v. Ford Motor Co.*,

13  No. 345751, 2019 WL 7206100, at *3 (Mich. Ct. App. Dec. 26, 2019) (concluding that "Ford is

14  exempt from plaintiffs' MCPA claims under MCL 445.904(1)"); *Droesser v. Ford Motor Co.*,

15  No. 19-cv-12365, 2023 WL 2746792, at *22 (E.D. Mich. Mar. 31, 2023) (agreeing with Ford that

16  dismissal of the plaintiffs' MCPA claim "is appropriate because the manufacture and sale of

17  vehicles is specifically authorized under federal and state law"); *Gregorio v. Ford Motor Co.*, 522

18  F. Supp. 3d 264, 276 (E.D. Mich. 2021) ("Based on the Michigan Court of Appeals' current

19  interpretation of the MCPA, and that of courts in this District, this Court finds that Ford's motor

20  vehicle sales to Plaintiffs are exempt from the MCPA."); *In re Chevrolet Bolt EV Battery Litig.*,

21  633 F. Supp. 3d 921, 970 (E.D. Mich. 2022) (explaining that "vehicle sales are exempted from

22  the [MCPA] law"); *Gant v. Ford Motor Co.*, 517 F. Supp. 3d 707, 719 (E.D. Mich. 2021)

23  (dismissing MCPA claims because MCPA exempts motor vehicle sales); *Sweeny v. Toyota Motor*

24  *Sales, U.S.A., Inc.*, No. 2:22-cv-00949-SPG-JEM, 2023 WL 2628697, at *13 (C.D. Cal. Feb. 9,

25  2023) ("[B]ecause the manufacture and sale of automobiles is exempt from the MCPA, the Court

26  grants Toyota's motion to dismiss Plaintiffs' MCPA claim with prejudice.").

27         In their opposition, plaintiffs quibble over the statutory basis offered by defendant, but

28  they do not meaningfully confront the weight of authority concluding that vehicle sales are

1   exempt from the MCPA.  (Doc. No. 85 at 30–31.)  In addition, plaintiffs notes that the analysis in

2   one of the decisions relied upon by defendant was relatively cursory, but that was just one of

3   many decisions cited in the motion.  Further, courts relying on the Michigan appellate court's

4   decision in *Cyr* have noted that that "decision thoroughly reviews various state and federal laws

5   related to automobile sales before deciding that automobile sales are 'specifically authorized'

6   such that they qualify for the MCPA exception."  *Chapman v. Gen. Motors LLC*, 531 F. Supp. 3d

7   1257, 1302 (E.D. Mich. 2021); *see also In re Chevrolet Bolt EV Battery Litig.*, 633 F. Supp. 3d at

8   970 (noting that the Michigan Supreme Court declined to hear the appeal in *Cyr* and "unless and

9   until the Michigan Supreme Court revisits the issue, this Court may not interpret Michigan law in

10  a manner contrary to the decisions of Michigan's highest court").  Plaintiffs do not cite to any

11  case in which the court reached the opposite conclusion, i.e., that vehicle sales are *not* exempt

12  from the MCPA.  Rather, plaintiffs cite only to a decision in which the court found dismissal of

13  the plaintiff's MCPA claims at the pleadings stage inappropriate because it was unclear whether

14  the defendant's business (manufacturing and selling "float juice," a carbonated juice with pieces

15  of fruit) is specifically authorized by law.  (Doc. No. 85 at 30) (citing *Golden Star Wholesale, Inc.*

16  *v. ZB Importing, Inc.*, 531 F. Supp. 3d 1231, 1253 (E.D. Mich. 2021)).  That decision carries no

17  persuasive weight when compared to the plethora of decisions in which courts have dismissed

18  such MCPA claims in vehicle defect cases.

19        For these reasons, defendant's motion to dismiss the Michigan Consumer Protection Act

20  claims brought by plaintiffs Coppock and Metro will be granted.[31]  In addition, because vehicle

21  sales are exempt under the MCPA, dismissal of the MCPA claim brought by all three Michigan

22  plaintiffs is appropriate.  Therefore, even though plaintiff Goodrich's MCPA claim survived

23  defendant's prior motion to dismiss because she had sufficiently alleged Ford's pre-sale

24  knowledge of the defect (Doc. No. 76 at 31), plaintiff Goodrich's MCPA claim will be dismissed

25  at this time as will the MCPA claim brought by plaintiffs Coppock and Metro.

26  /////

27

28  [31]  In light of this conclusion, the court need not address defendant's third argument that plaintiffs
    Coppock and Metro failed to sufficiently allege Ford's pre-sale knowledge of the defect.

1          13.     Minnesota Prevention of Consumer Fraud Act (Claim 30)

2          The claim under the Minnesota Prevention of Consumer Fraud Act ("MPCFA"),

3   Minnesota Statutes §§ 325F.68, *et seq.*, is brought by plaintiffs Simonds and Kennedy

4   individually and on behalf of the Minnesota subclass.  (FACC at ¶ 1038.)  The court previously

5   dismissed plaintiff Simonds's MPCFA claim with leave to amend.  (Doc. No. 76 at 40.)

6   Defendant now moves to dismiss the MPCFA claim as to both plaintiffs Simonds and Kennedy

7   on the ground that they each did not sufficiently allege that Ford had knowledge of the Engine

8   Defect before their respective vehicle purchases.  (Doc. No. 83-1 at 23–29.)

9                  a.     *Plaintiff Simonds's MPCFA Claim*

10         Plaintiff Simonds alleges that he purchased his vehicle—a new 2015 Ford Fusion with a

11  1.5L EcoBoost engine—on December 7, 2015 from an authorized Ford dealership.  (FACC at

12  ¶ 171.)  Thus, the sources of knowledge discussed above with regard to the California plaintiffs

13  (Wests) existed at the time of plaintiff Simonds's vehicle purchase as well.  The court

14  incorporates that analysis herein and likewise concludes that the 2012 Recall and 2013 Recall

15  provide a sufficient basis upon which to allege Ford's knowledge of the Engine Defect prior to

16  plaintiff Simonds's vehicle purchase.

17         Accordingly, the court will deny defendant's motion to dismiss plaintiff Simonds's

18  Minnesota Prevention of Consumer Fraud Act claim.

19                 b.     *Plaintiff Kennedy's MPCFA Claim*

20         Plaintiff Kennedy alleges that he purchased his vehicle—a pre-owned 2016 Ford Edge

21  with a 2.0L EcoBoost engine—on November 24, 2020 from a BMW dealership.  (FACC at

22  ¶ 270.)  Thus, the sources of knowledge discussed above with regard to the California plaintiffs,

23  plaintiff Lund, and plaintiff Constable, as well as the TSBs issued by Ford beginning on

24  March 30, 2018, existed at the time of plaintiff Kennedy's vehicle purchase.  The court

25  incorporates that analysis herein and likewise concludes that the 2012 Recall, the 2013 Recall,

26  Ford's 2016 investigation and resulting communications to NHTSA, the 2017 Recall, and the

27  TSBs provide more than a sufficient basis upon which to allege Ford's knowledge of the Engine

28  Defect prior to plaintiff Kennedy's vehicle purchase.

1       Accordingly, the court will deny defendant's motion to dismiss plaintiff Kennedy's

2   Minnesota Prevention of Consumer Fraud Act claim.

3           14.     Minnesota Deceptive Trade Practices Act (Claim 31)

4       The claim under the Minnesota Deceptive Trade Practices Act ("MDTPA"), Minnesota

5   Statutes §§ 325D.43-48, *et seq*., is brought by plaintiffs Simonds and Kennedy individually and

6   on behalf of the Minnesota subclass.  (FACC at ¶ 1062.)  The court previously dismissed plaintiff

7   Simonds's MDTPA claim with leave to amend.  (Doc. No. 76 at 40.)  In the pending motion to

8   dismiss, defendant moves to dismiss the MDTPA claim brought by plaintiffs Simonds and

9   Kennedy.  (Doc. No. 83-1 at 23–29.)  In their opposition, plaintiffs state that they have withdrawn

10  their MDTPA claim but only to the extent money damages were sought as relief.  (Doc. No. 85 at

11  28 n.19.)  Plaintiffs Simonds and Kennedy maintain their MDTPA claim for injunctive relief.

12  (*Id.*)  At the hearing on the pending motion, the court asked plaintiffs' counsel whether this claim

13  is withdrawn in full given that none of the allegations supporting this claim address injunctive

14  relief.  Plaintiffs' counsel clarified that because the FACC includes a prayer for injunctive relief,

15  this claim is not withdrawn as to injunctive relief.[32]

16      Because defendant only moves to dismiss the MDTPA claim for injunctive relief on the

17  ground that plaintiffs Simonds and Kennedy each did not sufficiently allege that Ford had

18  knowledge of the Engine Defect before their respective vehicle purchases (Doc. No. 83-1 at 23–

19  29)—an argument the court has rejected above—the court will likewise deny defendant's motion

20  to dismiss this claim.

21          15.     Minnesota False Statement in Advertising Act (Claim 32)

22      The claim under the Minnesota False Statement in Advertising Act ("MFSAA"),

23  Minnesota Statutes §§ 325F.67, *et seq*., is brought by plaintiffs Simonds and Kennedy

24  individually and on behalf of the Minnesota subclass.  (FACC at ¶ 1085.)  The court previously

25

26  [32]  The court notes that the prayer for relief in the FACC states, in relevant part, that plaintiffs
    seek "an order enjoining Ford from further deceptive distribution, sales, and lease practices with
27  respect to the Class Vehicles; [and] an order requiring Ford to permanently repair Class Vehicles,
    within a reasonable time period and at no cost to Class Members, so that they no longer possess
28  the Engine Defect."  (FACC at ¶ 1547.)

1   dismissed plaintiff Simonds's MFSAA claim with leave to amend.  (Doc. No. 76 at 40.)  In the

2   pending motion to dismiss, defendant moves to dismiss the MFSAA claim brought by plaintiffs

3   Simonds and Kennedy on the ground that they each have failed to sufficiently allege that Ford

4   had knowledge of the Engine Defect before their respective vehicle purchases.  (Doc. No. 83-1 at

5   23–29.)  As discussed above, that argument has already been rejected as to plaintiff Simonds and

6   Kennedy and does not serve as a basis to dismiss their MFSAA claim either.

7       Defendant also argues that under the MFSAA, "a plaintiff must allege reliance on a

8   misleading advertisement."  (Doc. No. 83-1 at 32) (citing *Thompson v. Am. Tobacco Co.*, 189

9   F.R.D. 544, 552 (D. Minn. 1999)).  However, the *Thompson* decision relied upon by defendant

10  was subsequently rejected by the Supreme Court of Minnesota.  *See Grp. Health Plan, Inc. v.*

11  *Philip Morris Inc.*, 621 N.W.2d 2, 14 (Minn. 2001) ("[W]e reject the view expressed in two

12  federal court decisions that our misrepresentation in sales laws require proof of individual

13  reliance in all actions seeking damages.").  In addition, defendant's argument in this regard

14  presupposes that plaintiffs' claim is based on affirmative misrepresentations, but as plaintiffs and

15  the court have already explained, plaintiffs' claims are based on alleged omissions.  Even after

16  plaintiffs made this clarification in their opposition, defendant cited in its reply brief to a portion

17  of a decision in which a court analyzed whether the plaintiff had sufficiently "plead[ed] an

18  affirmative, deceptive statement in violation of the MFSAA."  *Knotts v. Nissan N. Am., Inc.*, 346

19  F. Supp. 3d 1310, 1325–26 (D. Minn. 2018).

20      The court in *Knotts* also addressed the plaintiff's omission-based claim, and that portion

21  of the decision is relevant to the court's analysis of plaintiffs' claims here.  The court in *Knotts*

22  concluded that the complaint "sufficiently identifies the allegedly omitted information as

23  'information about the defective nature of the CVTs in the Vehicles, and defendant's knowledge

24  of those defects,'" but the complaint did not identify whether and when the plaintiff viewed

25  defendant's website, which the court assumed was "the source of the allegedly false-by-omission

26  advertisements."  *Id.* at 1326.  Defendant argues that plaintiff Kennedy's MFSAA similarly fails

27  because he did not allege *when* he viewed the six advertisements he purportedly saw.  (Doc. No.

28  86 at 20.)  But that argument is not persuasive because in *Knotts*, the court was not concerned

1    with specific dates in a vacuum, but rather only with whether the plaintiff viewed the website

2    "prior to purchasing his car."  346 F. Supp. 3d at 1327.  Plaintiff Kennedy alleges that he

3    researched the vehicle in part by viewing approximately six advertisements prior to purchasing

4    his vehicle (FACC at ¶ 271), and those allegations are sufficient to support his MFSAA claim.

5    The same cannot be said for plaintiff Simonds, however, because plaintiff Simonds does not

6    allege that he viewed any advertisements at all, let alone prior to purchasing his vehicle.  (*See*

7    FACC at ¶ 173.)

8           For these reasons, the court will deny defendant's motion to dismiss plaintiff Kennedy's

9    Minnesota False Statement in Advertising Act claim.  The court will, however, grant defendant's

10   motion to dismiss plaintiff Simonds's Minnesota False Statement in Advertising Act claim,

11   without leave to amend, because plaintiff Simonds has already had an opportunity to amend his

12   allegations as to this claim.

13              16.    New Jersey Consumer Fraud Act (Claim 35)

14          The claim under the New Jersey Consumer Fraud Act ("NJCFA"), New Jersey Statutes

15   Annotated §§ 56:8-1, *et seq*., is brought by plaintiff David Schiavi individually and on behalf of

16   the New Jersey subclass.  (FACC at ¶ 1153.)  The court previously dismissed plaintiff Schiavi's

17   NJCFA claim with leave to amend.  (Doc. No. 76 at 41.)  Defendant now moves to dismiss

18   plaintiff Schiavi's NJCFA claim on two grounds:  first, because he cannot establish that he

19   suffered "an ascertainable loss of moneys or property" as required under the NJCFA; and second,

20   because he has failed to allege that defendant had knowledge of the defect prior to his vehicle

21   purchase.  (Doc. No. 83-1 at 25–29, 33.)  As to the first argument, defendant contends that "New

22   Jersey courts have found that a product that outperformed its warranty cannot provide the

23   predicate 'loss' under the NCFJA."  (*Id.* at 33) (citing *Perkins v. DaimlerChrysler Corp.*, 383 N.J.

24   Super. 99, 111–12 (App. Div. 2006); *Noble v. Porsche Cars N. Am., Inc.*, 694 F. Supp. 2d 333,

25   337 (D.N.J. 2010)).  In *Noble*, the plaintiff had claimed an ascertainable loss for an allegedly

26   dangerous and defective automobile (due to a defective water-cooled engine), and the court

27   dismissed the plaintiff's NCFJA claim because the "Porsche 911's 'defective' engine

28   outperformed its limited warranty."  694 F. Supp. 2d at 334, 338.  Here, defendant emphasizes

1    that plaintiff Schiavi's allegations similarly demonstrate that his vehicle outperformed his 5-

2    year/60,000-mile powertrain warranty because he alleges that he began experiencing the Engine

3    Defect more than five years after his purchase.  (Doc. No. 83-1 at 33) (citing FACC at ¶¶ 182,

4    186).

5           In their opposition, plaintiff Schiavi argues that his allegations are sufficient to state a

6    NCFJA claim because the Engine Defect implicates a safety concern (Doc. No. 85 at 32), and the

7    *Perkins* decision relied upon by defendant specifically states that the court offered no view as to

8    "circumstances in which safety concerns might be implicated," *Perkins*, 383 N.J. Super. at 111–

9    12.  However, "[s]everal courts have cited *Perkins* approvingly in dismissing NJCFA claims

10   similar to [plaintiff Schiavi's] claim here." *See Chiarelli v. Nissan N. Am., Inc.*, No. 14-cv-04327-

11   NGG-VVP, 2015 WL 5686507, at *2, *14 (E.D.N.Y. Sept. 25, 2015) (citing cases) ("The court

12   has performed a careful review of *Perkins* and the relevant case law, and concludes that *Perkins*

13   compels the dismissal of Plaintiffs' [NJCFA] claims," which are based on an allegedly defective

14   timing chain tensioning system, the failure of which "risks occupant safety, as drivers can

15   experience an inability to accelerate, an inability to maintain speed, and catastrophic engine

16   failure, possibly rendering a moving vehicle inoperable, which could lead to a collision."); *see*

17   *also Grodzitsky v. Am. Honda Motor Co.*, No. 2:12-cv-01142-SVW-PLA, 2013 WL 2631326, at

18   *9 (C.D. Cal. June 12, 2013) (dismissing NJCFA claim where the defect did not occur during the

19   warranty period and noting that "it is of no moment [to a NJCFA claim] that plaintiffs allege that

20   defendant concealed defects and allege safety concerns") (quoting *Nobile v. Ford Motor Co.*, No.

21   10-cv-01890-POS, 2011 WL 900119, at *6 (D.N.J. Mar. 14, 2011)).  This court is likewise

22   compelled to dismiss plaintiff Schiavi's NJCFA claim for this reason.[33]

23          Thus, the court will grant defendant's motion to dismiss plaintiff Schiavi's New Jersey

24   Consumer Fraud Act claim, without leave to amend.

25   /////

26   /////

27

28

---

[33]  In light of this conclusion, the court need not address defendant's argument that plaintiff
Schiavi failed to sufficiently allege Ford's pre-sale knowledge of the Engine Defect.

17.     North Carolina Unfair and Deceptive Acts and Practices Act (Claim 36)

The claim under the North Carolina Unfair and Deceptive Acts and Practices Act

("NCUDA"), North Carolina General Statutes §§ 75-1.1, *et seq.*, is brought by plaintiff Pirog

individually and on behalf of the North Carolina subclass.  (FACC at ¶ 1176.)  The court

previously dismissed plaintiff Pirog's NCUDA claim with leave to amend.  (Doc. No. 76 at 41.)

Defendant now moves to dismiss plaintiff Pirog's NCUDA claim on the grounds that her claim is

barred by the economic loss doctrine under North Carolina law, and she has not sufficiently

alleged that Ford had knowledge of the Engine Defect before her vehicle purchase.  (Doc. No. 83-

1 at 23–29, 34.)

As to the first argument, defendant asserts that North Carolina bars statutory fraud claims

"based purely on economic loss from the product itself under the economic loss doctrine," which

applies when "the same alleged conduct underlies the warranty and fraud-based claims."  (*Id.* at

34) (citing *Ellis v. Louisiana-Pac. Corp.*, No. 3:11-cv-00191-GM, 2011 WL 5402878, at *2

(W.D.N.C. Nov. 8, 2011), aff'd, 699 F.3d 778 (4th Cir. 2012) (dismissing the plaintiffs' NCUDA

claim because that "claim is intertwined with their breach of warranty claim and is therefore

barred by the economic loss rule").  However, the district court's decision in *Ellis* was appealed

to the Fourth Circuit, which declined to reach the issue of whether the NCUDA claim was barred

by the economic loss rule and affirmed dismissal of that claim on separate grounds.  *Ellis v.

Louisiana-Pac. Corp.*, 699 F.3d 778, 786 (4th Cir. 2012).  In doing so, the circuit court in *Ellis*

noted that "the North Carolina courts have never addressed whether UDTPA claims are subject to

the [economic loss doctrine], and in the absence of such direction, we are well-advised to rely on

other grounds."  *Id.* at 786 n.5 (citing *Time Warner Entm't–Advance/Newhouse P'ship v.

Carteret–Craven Elec. Membership Corp.*, 506 F.3d 304, 315 (4th Cir.2007) ("[A]s a court sitting

in diversity, we should not create or extend the North Carolina common law[.]"))  Relying on the

Fourth Circuit's reasoning in *Ellis*, other courts have declined to dismiss NCUDA claims as

barred by the economic loss doctrine.  *See In re MyFord Touch Consumer Litig.*, 46 F. Supp. 3d

936, 967 (N.D. Cal. 2014) (denying the defendant's motion to dismiss the plaintiff's NCUDA

claim as barred by the economic loss doctrine because that consumer protection statute "gives rise

87

1    to  duty independent of the contract"); *Sanchez v. Kia Motors Am., Inc.*, No. 8:20-cv-01604-JLS-

2    KES, 2021 WL 4816834, at *8 (C.D. Cal. Aug. 9, 2021) (denying the defendant's motion to

3    dismiss the plaintiff's UDTPA claim in a vehicle defect case because that claim, which is based

4    on the defendant's knowing failure to disclose the defect, "rests on a fraudulent concealment

5    theory and is not a repackaged express warranty claim," which is instead based on defendant's

6    alleged failure to repair the defect).  In light of these authorities, this court likewise finds that

7    plaintiff Pirog's NCUDA claim is not subject to dismissal pursuant to the economic loss doctrine.

8            As for defendant's second argument—that plaintiff Pirog has not sufficiently alleged that

9    Ford had pre-sale knowledge of the defect—the court similarly finds that this argument fails.

10   Plaintiff Pirog alleges that she purchased her vehicle—a new 2016 Ford Edge with a 2.0L

11   EcoBoost engine—on July 18, 2016 from an authorized Ford dealership.  (FACC at ¶ 192.)  Thus,

12   the sources of knowledge discussed above with regard to the California plaintiffs (Wests) and

13   plaintiff Lund existed at the time of plaintiff Pirog's vehicle purchase as well.  The court

14   incorporates that analysis herein and likewise concludes that the 2012 Recall, 2013 Recall, and

15   Ford's 2016 investigation and resulting communications to NHTSA provide a sufficient basis

16   upon which to allege Ford's knowledge of the Engine Defect prior to plaintiff Pirog's vehicle

17   purchase.

18           For these reasons, the court will deny defendant's motion to dismiss plaintiff Pirog's

19   North Carolina Unfair and Deceptive Acts and Practices Act claim.

20           18.    <u>Washington Consumer Protection Act (Claim 39)</u>

21           The claim under the Washington Consumer Protection Act ("WCPA"), Washington

22   Revised Code §§ 19.86.010, *et seq*., is brought by plaintiffs Damm and Gates individually and on

23   behalf of the Washington subclass.  (FACC at ¶ 1244.)  The court previously dismissed the

24   WCPA claim with leave to amend.  (Doc. No. 76 at 41.)  Defendant again moves to dismiss the

25   WCPA claim brought by plaintiffs Damm and Gates on the ground that they did not sufficiently

26   allege that Ford had knowledge of the Engine Defect before their vehicle purchase.  (Doc. No. 83-

27   1 at 23–29.)

28   /////

1    Plaintiffs Damm and Gates allege that they purchased their vehicle—a pre-owned 2016

2    Ford Fusion with a 2.0L EcoBoost engine—on December 7, 2016 from Enterprise Car Sales.

3    (FACC at ¶ 202.)  Thus, the sources of knowledge discussed above with regard to the California

4    plaintiffs (Wests) and plaintiff Lund existed at the time plaintiffs Damm and Gates purchased

5    their vehicle as well.  The court incorporates that analysis herein and likewise concludes that the

6    2012 Recall, 2013 Recall, and Ford's 2016 investigation and resulting communications to

7    NHTSA provide a sufficient basis upon which to allege Ford's knowledge of the Engine Defect

8    prior to the vehicle purchase by plaintiffs Damm and Gates.

9    Accordingly, the court will deny defendant's motion to dismiss the Washington Consumer

10   Protection Act claim brought by plaintiffs Damm and Gates.

11   19.    Wisconsin Deceptive Trade Practices Act (Claim 41)

12   The claim under the Wisconsin Deceptive Trade Practices Act ("WDTPA"), Wisconsin

13   Statutes §§ 100.18, *et seq.*, is brought by plaintiff Shari Techlin individually and on behalf of the

14   Wisconsin subclass.  (FACC at ¶ 1294.)  In their opposition, plaintiffs state that they withdraw

15   the WDTPA claim, which is the only claim brought by plaintiff Techlin.  (Doc. No. 85 at 28

16   n.19.)  Accordingly, the court will dismiss this claim as withdrawn and will terminate plaintiff

17   Techlin from this action.

18   20.    Nebraska Consumer Protection Act (Claim 42)

19   The claim under the Nebraska Consumer Protection Act ("NCPA"), Nebraska Revised

20   Statutes §§ 59-1601, *et seq.*, is brought by plaintiff Krecek individually and on behalf of the

21   Nebraska subclass.  (FACC at ¶ 1316.)  Defendant moves to dismiss plaintiff Krecek's NCPA

22   claim on the grounds that the NCPA does not apply to automobile sales, and he has failed to

23   allege that defendant had knowledge of the defect prior to his vehicle purchase.  (Doc. No. 83-1 at

24   25–29, 32–33.)

25   First, defendant contends that Nebraska law does not allow an NCPA claim where the

26   alleged conduct is specifically governed by another statutory scheme.  (*Id.* at 32); *see* Neb. Rev.

27   Stat. § 59-1617(1) ("[T]he Consumer Protection Act shall not apply to actions or transactions

28   otherwise permitted, prohibited, or regulated . . . under statutory authority of this state or the

89

United States."). Relevant here, defendant points to Nebraska Revised Statutes § 60-1411.03(23), which covers deceptive practices related to automobile sales. (*Id.* at 32) (citing *In re Toyota RAV4 Hybrid Fuel Tank Litig.*, 534 F. Supp. 3d 1067, 1111 (N.D. Cal. 2021)). The court in *In re Toyota RAV4* explained that this referenced statutory provision "governs motor vehicles and makes it unlawful '[t]o advertise or to make any statement, declaration, or representation in any advertisement that cannot be substantiated in fact,'" and "[t]he plain terms of the statute strongly suggest that the false advertising of automobiles is covered by this provision and that such conduct is therefore exempt under the Nebraska Consumer Protection Act." 534 F. Supp. 3d at 1111. While the two-sentence analysis in the *In re Toyota RAV4* decision may be on-point and relevant in cases where plaintiffs bring NCPA claims based on affirmative misrepresentations,[34] the same cannot be said for omissions-based claims such as plaintiff Krecek's NCPA claim here. As plaintiffs points out in their opposition, defendant has not cited to any decision in which an omissions-based NCPA claim was dismissed based on this reasoning. In the absence of such authority, defendant has not carried its burden of persuading the court that plaintiff Krecek's NCPA claim is not authorized and is subject to dismissal under that statute.

Second, defendant's argument that plaintiff Krecek has not sufficiently alleged that Ford had pre-sale knowledge of the defect likewise fails. Plaintiff Krecek alleges that he purchased his vehicle—a new 2017 Ford Edge with a 2.0L EcoBoost engine—on October 7, 2017 from an authorized Ford dealer. (FACC at ¶ 281.) Thus, the sources of knowledge discussed above with regard to the California plaintiffs and plaintiff Lund existed at the time plaintiff Krecek purchased his vehicle as well. The court incorporates that analysis herein and likewise concludes that the 2012 Recall, 2013 Recall, and Ford's 2016 investigation and resulting communications to NHTSA provide a sufficient basis upon which to allege Ford's knowledge of the Engine Defect prior to the vehicle purchase by plaintiff Krecek.

/////

---

[34] The gravamen of the plaintiffs' NCPA claims based on affirmative misrepresentations in the defendant's marketing and ownership materials in *In re Toyota RAV4* was that the fuel tank capacity was 14.5 gallons when it was actually only 8–11 gallons. 534 F. Supp. 3d at 1077.

1    For these reasons, the court will deny defendant's motion to dismiss plaintiff Krecek's

2    Nebraska Consumer Protection Act claim.

3         21.    Tennessee Consumer Protection Act (Claim 45)

4    The claim under the Tennessee Consumer Protection Act ("TCPA"), Tennessee Code

5    §§ 47-18-101, *et seq*., is brought by plaintiff Batdorf individually and on behalf of the Tennessee

6    subclass.  (FACC at ¶ 1387.)  Defendant moves to dismiss plaintiff Batdorf's TCPA claim on the

7    grounds that he failed to allege that defendant had knowledge of the defect prior to his vehicle

8    purchase, and that he does not specify which section of the TCPA defendant purportedly violated.

9    (Doc. No. 83-1 at 25–29, 33.)

10   Defendant's first argument, that plaintiff Batdorf has not sufficiently alleged that Ford had

11   pre-sale knowledge of the defect, fails.  Plaintiff Batdorf alleges that he purchased his vehicle—a

12   pre-owned 2017 Lincoln MKC with a 2.0L EcoBoost engine—on December 7, 2020 from a

13   BMW dealership.  (FACC at ¶ 224.)  Thus, the sources of knowledge discussed above with

14   regard to the California plaintiffs, plaintiff Lund, and plaintiff Constable, as well as the TSBs

15   issued by Ford beginning on March 30, 2018, existed at the time of plaintiff Batdorf's vehicle

16   purchase.  The court incorporates that analysis herein and likewise concludes that the 2012

17   Recall, the 2013 Recall, Ford's 2016 investigation and resulting communications to NHTSA, the

18   2017 Recall, and the TSBs are more than sufficient to provide a basis upon which to allege Ford's

19   knowledge of the Engine Defect prior to plaintiff Batdorf's vehicle purchase.

20   As for defendant's second argument, defendant contends that plaintiff Batdorf's

21   allegations consist of a "laundry list of conclusory deceptive practices," which is insufficient to

22   show how Ford violated a specific subsection of the TCPA.  (Doc. No. 83-1 at 33) (citing

23   *Harding v. BMW of N. Am., LLC*, No. 3:20-cv-00061-AAT, 2020 WL 5039439, at *3 (M.D.

24   Tenn. Aug. 26, 2020) (explaining that an individual's claim under the TCPA is limited "to

25   damage he has suffered due to an unfair or deceptive act or practice as described in Tennessee

26   Code § 47-18-101(b)")).  In the FACC, plaintiff Batdorf does not specifically identify the

27   subsections of § 47-18-101(b) that his claim is based upon.  Rather, he alleges the following:

28   /////

1

2

3

4

5

The Tennessee CPA prohibits "unfair or deceptive acts or practices affecting the conduct of any trade or commerce." Tenn. Code § 47-18-104.  Ford engaged in unfair and deceptive practices that violated the Tennessee CPA as described above, [and] . . . by failing to disclose and actively concealing that the Class Vehicles contained the Engine Defect, by marketing their Class Vehicles as safe and of high quality, and by presenting themselves as a reputable manufacturer that valued safety and stood behind its vehicles after they were sold.

6

7

8

9

10

11

12

13

14

Ford knowingly and intentionally misrepresented and omitted material facts in connection with the sale or lease of the Class Vehicles by, among other things, failing to disclose the Engine Defect; concealing the Engine Defect; promoting and selling or leasing Class Vehicles it knew were defective, including by marketing its vehicles as safe, reliable, easily operable, efficient, and of high quality; presenting itself as a reputable manufacturer that valued safety, reliability, performance and efficiency, and stood behind its vehicles after they were sold; failing to make repairs or making repairs and providing replacements that caused Tennessee Plaintiff and the Tennessee Sub-Class Members to experience repeated instances of failure, rendering the New Vehicle Limited Warranty useless; and minimized the scope and severity of the problems with the Class Vehicles, refusing to acknowledge that they are defective, and failing to provide adequate relief to consumers.

15  (FACC at ¶¶ 1391–1393).  In their opposition, plaintiffs contend that these allegations are

16  sufficient to state their TCPA claim, and argue that the decision in *Harding* does not suggest

17  otherwise because that decision does not stand for the proposition that the allegations must

18  identify the specific subsections of the TCPA that plaintiffs contend the defendant has violated.

19  (Doc. No. 85 at 33.)  Further, plaintiffs contend that these allegations "establish that Ford violated

20  at least subsections § 47-18-104(b)(5) (prohibiting "[r]epresenting that goods or services have . . .

21  characteristics . . . that they do not have"), § 47-18-104(b)(7) (prohibiting "[r]epresenting that

22  goods or services are of a particular standard, quality or grade . . . if they are of another"), and

23  § 47-18-104(b)(19) (prohibiting "[r]epresenting that a guarantee or warranty confers or involves

24  rights or remedies which it does not have or involve").  (*Id.*)  In its reply, defendant counters that

25  plaintiffs cannot "redraft their FACC" via their opposition, and that specifying the subsections in

26  the opposition cannot cure the FACC's shortcomings.  (Doc. No. 86 at 12.)  While the court

27  appreciates defendant's point, the court does not agree that the TCPA requires plaintiffs to specify

28  /////

92

1    the specific subsections of § 47-18-104(b) under which their claims are brought in order to state

2    such claims.  Accordingly, the court is not persuaded by defendant's argument in this regard.

3        For these reasons, the court will deny defendant's motion to dismiss plaintiff Batdorf's

4    Tennessee Consumer Protection Act ("TCPA") claim.

5        22.    Texas Deceptive Trade Practices Act (Claim 48)

6        The claim under the Texas Deceptive Trade Practices Act ("TDTPA"), Texas Business &

7    Commerce Code §§ 17.41, *et seq*., is brought by plaintiff David Gonzalez individually and on

8    behalf of the Texas subclass.  (FACC at ¶ 1458.)  Defendant moves to dismiss plaintiff

9    Gonzalez's TDTPA claim on the ground that he did not sufficiently allege that Ford had

10    knowledge of the Engine Defect before his vehicle purchase.  (Doc. No. 83-1 at 23–29.)

11        Plaintiff Gonzalez alleges that he purchased his vehicle—a new 2014 Ford Escape with a

12    1.6L EcoBoost engine—on September 20, 2014 from an authorized Ford dealership.  (FACC at

13    ¶ 248.)  Thus, the sources of knowledge discussed above with regard to the California plaintiffs

14    (Wests) existed at the time of plaintiff Gonzalez's vehicle purchase as well.  The court

15    incorporates that analysis herein and likewise concludes that the 2012 Recall and 2013 Recall

16    provide a sufficient basis upon which to allege Ford's knowledge of the Engine Defect prior to

17    plaintiff Gonzalez's vehicle purchase.

18        Accordingly, the court will deny defendant's motion to dismiss plaintiff Gonzalez's Texas

19    Deceptive Trade Practices Act claim.

20                **CONCLUSION**

21    For the reasons explained above,

22    1.    Defendant's motion to dismiss (Doc. No. 83) is granted in part and denied in part

23        as follows:

24    2.    Defendant's motion to dismiss is <u>granted</u>, without leave to amend, as to the

25        following claims:

26        a.    Plaintiff Hodges's express warranty claim (Claim 3);

27        b.    Plaintiff Miller's express warranty claim (Claim 3);

28        c.    Plaintiff Christodaro's express warranty claim (Claim 10);

d.      Plaintiff Cicero's express warranty claim (Claim 18);

e.      Plaintiff Balaszek's express warranty claim (Claim 21);

f.      Plaintiff Pickering's express warranty claim (Claim 21);

g.      Plaintiff Goodrich's express warranty claim (Claim 28);

h.      Plaintiff Metro's express warranty claim (Claim 28);

i.      Plaintiff Kennedy's express warranty claim (Claim 33);

j.      Plaintiff Pirog's express warranty claim (Claim 37);

k.      Plaintiffs Damm and Gates's express warranty claim (Claim 40);

l.      Plaintiff Krecek's express warranty claim (Claim 43);

m.      Plaintiff Batdorf's express warranty claim (Claim 46);

n.      Plaintiff Hodges's implied warranty claim (Claim 5);

o.      Plaintiff Cicero's implied warranty claim (Claim 19);

p.      Plaintiff Kennedy's implied warranty claim (Claim 34);

q.      Plaintiff Pirog's implied warranty claim (Claim 38);

r.      Plaintiff Krecek's implied warranty claim (Claim 44);

s.      Plaintiff Batdorf's implied warranty claim (Claim 47);

t.      The MMWA claim (Claim 51) brought by plaintiffs Miller (CA), Hodges (CA), Cicero (IL), Kennedy (MN), Pirog (NC), Damm/Gates (WA), Krecek (NE), and Batdorf (TN)

u.      Plaintiff Lund's Arkansas Deceptive Trade Practices Act claim (Claim 6);

v.      Plaintiff Christodaro's class claim for money damages under the Colorado Consumer Protection Act (Claim 9);

w.      Plaintiff Constable's Georgia Uniform Deceptive Trade Practices Act claim (Claim 16);

x.      Plaintiff Butcher's Georgia Uniform Deceptive Trade Practices Act claim (Claim 16);

y.      Plaintiff Glade's Illinois Consumer Fraud and Deceptive Business Practices Act claim (Claim 17);

94

z.     Plaintiff Coppock's Michigan Consumer Protection Act claim (Claim 27);

aa.    Plaintiff Metro's Michigan Consumer Protection Act claim (Claim 27);

bb.    Plaintiff Goodrich's Michigan Consumer Protection Act claim (Claim 27);

cc.    Plaintiff Simonds's Minnesota False Statement in Advertising Act claim (Claim 32); and

dd.    Plaintiff Schiavi's New Jersey Consumer Fraud Act claim (Claim 35);

3.    Defendant's motion to dismiss is <u>denied</u> as to the following claims:

a.    Plaintiff Lund's express warranty claim (Claim 7);

b.    Plaintiff Thomas's implied warranty claim (Claim 50);

c.    The MMWA claim (Claim 51) brought by plaintiffs Wests (CA), Lund (AR), Christodaro (CO), Balaszek (IN), Pickering (IN), Morfords (KS), Manfras (MD), Goodrich (MI), Metro (MI), and Thomas (OH);

d.    Plaintiff Hodges's Consumer Legal Remedies Act claim (Claim 1);

e.    Plaintiff Miller's Consumer Legal Remedies Act claim (Claim 1);

f.    Plaintiffs Amber and Evan West's Consumer Legal Remedies Act claim (Claim 1);

g.    Plaintiff Hodges's California Unfair Competition Law claim (Claim 2);

h.    Plaintiff Miller's California Unfair Competition Law claim (Claim 2);

i.    Plaintiffs Amber and Evan West's California Unfair Competition Law claim (Claim 2);

j.    Plaintiff Constable's Georgia Fair Business Practices Act claim (Claim 15);

k.    Plaintiff Cicero's Illinois Consumer Fraud and Deceptive Business Practices Act claim (Claim 17);

l.    Plaintiff Balaszek's Indiana Deceptive Consumer Sales Act claim (Claim 20);

m.    Plaintiff Pickering's Indiana Deceptive Consumer Sales Act claim (Claim 20);

n.    Plaintiff Morfords' Kansas Consumer Protection Act claim (Claim 23);

95

1          o.      Plaintiff Manfras' Maryland Consumer Protection Act claim (Claim 25);

2          p.      Plaintiff Simonds's Minnesota Prevention of Consumer Fraud Act claim

3                  (Claim 30);

4          q.      Plaintiff Kennedy's Minnesota Prevention of Consumer Fraud Act claim

5                  (Claim 30);

6          r.      Plaintiffs Simonds's Minnesota Deceptive Trade Practices Act claim, but

7                  only as to injunctive relief (Claim 31, in part);

8          s.      Plaintiff Kennedy's Minnesota Deceptive Trade Practices Act claim, but

9                  only as to injunctive relief (Claim 31, in part);

10         t.      Plaintiff Kennedy's Minnesota False Statement in Advertising Act claim

11                 (Claim 32);

12         u.      Plaintiff Pirog's North Carolina Unfair and Deceptive Acts and Practices

13                 Act claim (Claim 36);

14         v.      Plaintiff Damm and Gates' Washington Consumer Protection Act claim

15                 (Claim 39);

16         w.      Plaintiff Krecek's Nebraska Consumer Protection Act claim (Claim 42);

17         x.      Plaintiff Batdorf's Tennessee Consumer Protection Act claim (Claim 45);

18                 and

19         y.      Plaintiff Gonzalez's Texas Deceptive Trade Practices Act claim (Claim

20                 48);

21    4.   The following claims are dismissed as having been withdrawn by plaintiffs:

22         a.      The breach of express warranty claim under Florida law (Claim 13);

23         b.      The breach of implied warranty of merchantability under Florida law

24                 (Claim 14);

25         c.      The Minnesota Deceptive Trade Practices Act claim, but only as to money

26                 damages, not injunctive relief (Claim 31, in part); and

27         d.      The Wisconsin Deceptive Trade Practice Act claim (Claim 41);

28    /////

5.      Defendant shall file an answer to the FACC, as to the claims that have not been dismissed or withdrawn, by no later than **twenty-one (21) days** from the date of entry of this order;

6.      The court acknowledges that the previously assigned district judge may have issued a scheduling order at the outset of these cases prior to consolidation. However, the undersigned has different scheduling practices and intends to issue a scheduling order accordingly.  To facilitate the issuing of an updated scheduling order, within **thirty-five (35) days** from the date of entry of this order, the parties shall file a joint status report that includes the Rule 26(f) discovery plan, with all named parties participating in the preparation and completion of the report.  The status report shall address the following matters:

      a.    the statutory bases for jurisdiction and venue;

      b.    anticipated discovery and the scheduling of discovery, including:

            i.    what changes, if any, should be made in the timing, form, or requirement for disclosures under Rule 26(a), including a statement as to when disclosures under Rule 26(a)(1) were made or will be made, and whether further discovery conferences should be held;

            ii.    the subjects on which discovery may be needed, when discovery should be completed, and whether discovery should be conducted in phases;

            iii.    what changes, if any, should be made in the limitations on discovery imposed under the Civil Rules and what other limitations, if any, should be imposed;

            iv.    the timing of the disclosure of expert witnesses and information required by Rule 26(a)(2); and

            v.    proposed dates for discovery cut−off;

      c.    contemplated dispositive or other motions and a proposed date by which all non-discovery motions shall be heard;

1           d.     methods that can be used from the outset to avoid unnecessary proof and

2                  cumulative evidence, and anticipated limitations or restrictions on the use

3                  of testimony under Federal Rule of Evidence 702;

4           e.     a proposed date for final pretrial conference;

5           f.     a proposed date for trial, estimated number of days of trial, and whether

6                  any party has demanded a jury;

7           g.     appropriateness of special procedures such as reference to a special master

8                  or agreement/consent to try the matter before the assigned magistrate judge

9                  pursuant to 28 U.S.C. § 636(c);

10          h.     proposed modification of standard pretrial procedures because of the

11                 simplicity or complexity of the case;

12          i.     whether the case is related to any other case pending in this district,

13                 including the bankruptcy court of this district;

14          j.     optimal timing and method for settlement discussions, including whether a

15                 court-convened settlement conference should be scheduled, whether in the

16                 case of a jury trial the parties will stipulate to the trial judge acting as a

17                 settlement judge, and the parties' positions with respect to Voluntary

18                 Dispute Resolution (VDRP) as required by Local Rule 271(d); and

19          k.     any other matters that may be conducive to the just and expeditious

20                 disposition of the case;

21       7.   The Clerk of the Court is directed to update the docket to reflect that plaintiff

22           James Padgett was terminated as of September 28, 2022, the date plaintiffs filed

23           the first amended consolidated complaint, because he was no longer named as a

24           plaintiff in that operative complaint; and

25   /////

26   /////

27   /////

28   /////

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

8.      The Clerk of the Court is also directed to update the docket to reflect the
termination of plaintiffs Shari Techlin, Mary Glade, Stacey Coppock, and David
Schiavi, as of the date of this order, because all claims brought by these plaintiffs
have been dismissed or withdrawn.

IT IS SO ORDERED.

Dated:   **March 28, 2024**

DALE A. DROZD
UNITED STATES DISTRICT JUDGE

99