Mark P. Chalos (*pro hac vice*)
**LIEFF CABRASER HEIMANN & BERNSTEIN, LLP**
222 2nd Ave South, Suite 1640
Nashville, Tennessee 37219-2423
Telephone: (615) 313-9000
mchalos@lchb.com

[Additional Counsel on Signature Pages]

*Attorneys for Plaintiffs and the
Proposed Classes*

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| VANESSA MILLER, et al., as individuals and on behalf of all others similarly situated,<br><br>    Plaintiffs,<br><br>v.<br><br>FORD MOTOR COMPANY,<br><br>    Defendant. | Case No. 2:20-cv-01796-DAD-CKD (Consolidated with Nos. 2:21-cv-00417-DAD-CKD, 2:21-cv-00468-DAD-CKD) |
| TREVOR NELSON, et al., as individuals and on behalf of all others similarly situated,<br><br>    Plaintiffs,<br><br>v.<br><br>FORD MOTOR COMPANY,<br><br>    Defendant. | Case No. 2:24-cv-02231-DAD-CKD<br><br>**PLAINTIFFS' MEMORANDUM IN SUPPORT OF CONSOLIDATED MOTION FOR CLASS CERTIFICATION**<br><br>Date: September 21, 2026<br>Time: 1:30 p.m.<br>Judge: Hon. Dale A. Drozd<br>Courtroom: 4, 15th Floor |

**TABLE OF CONTENTS**

Page

I.    INTRODUCTION ...........................................................................................................1

II.   FACTUAL BACKGROUND .........................................................................................3

      A.   "EcoBoost" Design Phase: Ford ignores fundamental engineering principles and its own prior experience, and uses insufficient pre-release testing on the engines. ................4

           1.   The Class Engine's turbocharged design depends on managing higher heat and pressure. ................................................................................................................4

           2.   Ford designed the Class Engine with a saw-cut block that ████████████ ████████████████████ ..........................................................................6

      B.   "EcoBoost" Production Phase: Saw-Cut engines hit the road – and, predictably, start failing. ...............................................................................................................11

           1.   Problems from the start: ████████████████████████ ████████████████ ..........................................................................11

           2.   Class Engine coolant intrusion caused by the Saw Cut Defect: ██████████ ████ Ford had ever seen. ................................................................................13

           3.   The Saw Cut Defect puts drivers in danger. .........................................................15

      C.   ████████████████████████████████████████ ..16

           1.   ████████████████████████████████████████ ████ " ..........................................................................................................16

           2.   Ford knew the saw-cut Class Engine was doomed to fail, but it delayed implementing the cross-drill design due to cost concerns. ...................................17

           3.   ████████████████████████████ ..................................................18

           4.   Ford's eventual directive: ████████████████████ ...19

III.  PROCEDURAL HISTORY ...........................................................................................20

IV.   PROPOSED CLASSES ................................................................................................21

      A.   Sigma Classes ..............................................................................................................21

      B.   Duratec Classes ...........................................................................................................21

      C.   Summary of the Classes ..............................................................................................21

V.    ARGUMENT .................................................................................................................22

      A.   Plaintiffs' proposed Classes satisfy the Rule 23(a) prerequisites. ..............................23

           1.   Rule 23(a)(1): the Classes are sufficiently numerous. ..........................................23

           2.   Rule 23(a)(2): common questions of law and fact relating to the EcoBoost Engine and Ford's conduct have common answers for every Class. .......................23

           3.   Rule 23(a)(3): Plaintiffs' claims are typical of all Class members. .......................37

           4.   Rule 23(a)(4): Plaintiffs and their counsel will adequately protect the interests of the Class. .............................................................................................................37

      B.   Rule 23(b)(3) is satisfied for all of the proposed Classes. ..........................................38

**TABLE OF CONTENTS**
**(continued)**

Page

    1.    Common questions predominate for all the claims at issue. .................................38

    2.    Class treatment is the superior method of redressing the harm to Class Members. 41

C.    The Court should appoint Interim Lead Class Counsel as Class Counsel. ........................43

VI.    CONCLUSION ...................................................................................................................44

# TABLE OF AUTHORITIES

**Page**

**Cases**

*Abdullah v. U.S. Sec. Assocs., Inc.*,
731 F.3d 952 (9th Cir. 2013) ........................................................................................23

*Ahlman v. Barnes*,
445 F. Supp. 3d 671 (C.D. Cal. 2020) ...........................................................................43

*Alcantar v. Hobart Serv.*,
800 F.3d 1047 (9th Cir. 2015) .......................................................................................23

*Aldapa v. Fowler Packing Co.*,
323 F.R.D. 316 (E.D. Cal. 2018) .............................................................................23, 42

*Alger v. FCA US LLC*,
334 F.R.D. 415 (E.D. Cal. 2020) .......................................................................... passim

*Amaro v. Gerawan Farming, Inc.*,
2016 WL 3924400 (E.D. Cal. May 20, 2016) ...............................................................42

*Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*,
568 U.S. 455 (2013).......................................................................................................38

*Arthur v. Microsoft Corp.*,
676 N.W.2d 29 (Neb. 2004)...........................................................................................34

*Barboza v. Mercedes-Benz USA, LLC*,
2022 WL 17978408 (E.D. Cal. Dec. 28, 2022) .............................................................36

*Bassett v. Credit Bureau Servs., Inc.*,
554 F. Supp. 3d 1000 (D. Neb. 2021), *vacated on other grounds*, 60 F.4th 1132 (8th Cir.
2023) ..............................................................................................................................34

*Betts v. Reliable Collection Agency, Ltd.*,
659 F.2d 1000 (9th Cir. 1981) .......................................................................................23

*Bridge v. Phoenix Bond & Indem. Co.*,
553 U.S. 639 (2008).......................................................................................................31

*Brown v. Jungers*,
2009 WL 159700 (D. Neb. Jan. 22, 2009)......................................................................31

*Cadena v. Am. Honda Motor Co.*,
2024 WL 4005097 (C.D. Cal. July 2, 2024)............................................................ passim

*Callantine v. 4E Brands North America, LLC*,
2024 WL 4903361 (N.D. Ind. Nov. 27, 2024).................................................................29

**TABLE OF AUTHORITIES**
(continued)

Page

*Carriuolo v. Gen. Motors Co.*,
    823 F.3d 977 (11th Cir. 2016) ...............................................................................29, 40

*Castagna v. Newmar Corp.*,
    340 F. Supp. 3d 728 (N.D. Ind. 2018) ...........................................................................35

*Chamberlan v. Ford Motor Co.*,
    402 F.3d 952 (9th Cir. 2005) ...........................................................................................32

*Cole v. Hewlett Packard Co.*,
    2004 WL 376471 (Kan. Ct. App. Feb. 27, 2004) ..........................................................30

*Comcast Corp. v. Behrend*,
    569 U.S. 27 (2013) ....................................................................................................39, 40

*Daniel v. Ford Motor Co.*,
    2016 WL 2899026 (E.D. Cal. May 18, 2016) ................................................................41

*Daniel v. Ford Motor Co.*,
    806 F.3d 1217 (9th Cir. 2015) ..................................................................................33, 34

*Delcavo v. Tour Resource Consultants, LLC*,
    2022 WL 1062269 (D. Kan. Apr. 8, 2022) .....................................................................30

*Dzielak v. Whirlpool Corp.*,
    2017 WL 6513347 (D.N.J. Dec. 20, 2017) .....................................................................40

*Edwards v. Ford Motor Co.*,
    603 F. App'x 538 (9th Cir. 2015) ...................................................................................34

*Evon v. Law Offs. of Sidney Mickell*,
    688 F.3d 1015 (9th Cir. 2012) .........................................................................................37

*Falco v. Nissan N. Am. Inc.*,
    2016 WL 1327474 (C.D. Cal. Apr. 5, 2016) ........................................................ passim

*Francis v. Gen. Motors, LLC*,
    504 F. Supp. 3d 659 (E.D. Mich. 2020) ..........................................................................36

*Gold v. Lumber Liquidators, Inc.*,
    323 F.R.D. 280 (N.D. Cal. 2017) ..............................................................................28, 29

*Gunner Concrete, Inc. v. ProAll Int'l Mfr., Inc.*,
    2024 WL 2406651 (C.D. Cal. Apr. 18, 2024) ................................................................36

*Gutierrez v. Carmax Auto Superstores Cal.*,
    19 Cal. App. 5th 1234 (2018) .........................................................................................36

- iv -

**TABLE OF AUTHORITIES**
(continued)

Page

*Halliburton Co. v. Erica P. John Fund, Inc.*,
573 U.S. 258 (2014) ............................................................................................... 39

*Hanlon v. Chrysler Corp.*,
150 F.3d 1011 (9th Cir. 1998) ............................................................................... 37

*Harris v. D. Scott Carruthers & Assocs.*,
270 F.R.D. 446 (D. Neb. 2010) ............................................................................. 31

*Hodges v. Johnson*,
199 P.3d 1251 (Kan. 2009) .................................................................................... 40

*Horan v. Ford Motor Co.*,
2026 WL 395630 (N.D. Ill. Feb. 12, 2026) .......................................................... 41

*In re Bank of Am. Cal. Unemployment Benefits Litig.*,
2025 WL 2816808 (S.D. Cal. June 24, 2025) ....................................................... 44

*In re Cap. One 360 Sav. Acct. Interest Rate Litig.*,
779 F. Supp. 3d 666 (E.D. Va. 2024) .................................................................... 34

*In re Chrysler Pacifica Fire Recall Prods. Liab. Litig.*,
706 F. Supp. 3d 746 (E.D. Mich. 2023) ........................................................... 32, 33

*In re Dollar Gen. Corp. Motor Oil Mktg. & Sales Pracs. Litig.*,
2019 WL 1418292 (W.D. Mo. Mar. 21, 2019) .................................................. 31, 40

*In re FCA US LLC Monostable Elec. Gearshift Litig.*,
334 F.R.D. 96 (E.D. Mich. 2019) ..................................................................... 35, 36

*In re Honda Idle Stop Litig.*,
347 F.R.D. 528 (C.D. Cal. 2024) ................................................................ 33, 40, 43

*In re Marriott Int'l, Inc., Customer Data Sec. Breach Litig.*,
341 F.R.D. 128 (D. Md. 2022) .......................................................................... 30, 33

*In re MyFord Touch Consumer Litig.*,
46 F. Supp. 3d 936 (N.D. Cal. 2014) ..................................................................... 32

*In re Saturn L-Series Timing Chain Prods. Liab. Litig.*,
2008 WL 4866604 (D. Neb. Nov. 7, 2008) ....................................................... 33, 34

*In re SCBA Liquidation, Inc.*,
451 B.R. 747 (Bankr. W.D. Mich. 2011) ............................................................... 35

*In re Smitty's/Cam2 303 Tractor Hydraulic Fluid Mktg.*,
2023 WL 9064606 (W.D. Mo. Dec. 13, 2023) ...................................................... 40

PLS. MEM. IN SUPPORT OF MOTION FOR
CLASS CERTIFICATION
CASE NO. 2:20-CV-01796-DAD-CKD

**TABLE OF AUTHORITIES**
(continued)

Page

*In re Soc. Media Adolescent Addiction/Pers. Inj. Prods. Liab. Litig.*,
753 F. Supp. 3d 849 (N.D. Cal. 2024) ...............................................................................33

*In re Syngenta AG MIR 162 Corn Litig.*,
No. 2:14-md-2591-JWL-JPO (D. Kan. July 6, 2017) ........................................................42

*In re Volkswagen Timing Chain Prod. Liab. Litig.*,
2017 WL 1902160 (D.N.J. May 8, 2017) ..........................................................................32

*In re Whirlpool Corp. Front-Loading Washer Prods. Liability Litig.*,
No. 08-wp-65000-CAB (N.D. Ohio Mar. 31, 2009) ..........................................................42

*Int'l Petrol. Servs., Inc. v. S & N Well Serv., Inc.*,
639 P.2d 29 (Kan. 1982) ....................................................................................................35

*Isip v. Mercedes-Benz USA, LLC*,
155 Cal. App. 4th 19 (2007) ..............................................................................................35

*Jensen v. Ford Motor Co.*,
198 Cal. App. 4th 1478 (2011) ..........................................................................................36

*Johnson v. Nissan N. Am., Inc.*,
2022 WL 2869528 (N.D. Cal. July 21, 2022)............................................................... passim

*Johnson v. Nissan N. Am., Inc.*,
2024 WL 4784367 (9th Cir. Nov. 14, 2024)...........................................................27, 32, 37

*Just Film, Inc. v. Buomo*,
847 F.3d 1108 (9th Cir. 2017) ...........................................................................................37

*Kamara v. Shapiro Brown & Alt, LLP*,
2016 WL 1064432 (Md. Ct. Spec. App. Mar. 17, 2016) ...................................................31

*Keegan v. Am. Honda Motor Co.*,
838 F. Supp. 2d 929 (C.D. Cal. 2012) ..........................................................................35, 43

*Klay v. Humana, Inc.*,
382 F.3d 1241 (11th Cir. 2004) .........................................................................................31

*Lloyd v. Gen. Motors Corp.*,
916 A.2d 257 (Md. 2007) .........................................................................................35, 36, 40

*Mackinac v. Arcadia Nat'l Life Ins. Co.*,
648 N.E.2d 237 (Ill. App. Ct. 1995) ..................................................................................29

*Marksberry v. FCA US LLC*,
481 F. Supp. 3d 1229 (D. Kan. 2020) ................................................................................36

**TABLE OF AUTHORITIES**
(continued)

Page

*Martin v. Sysco Corp.*,
325 F.R.D. 343 (E.D. Cal. 2018) ...................................................................................38

*Millan v. Cascade Water Servs., Inc.*,
310 F.R.D. 593 (E.D. Cal. 2015) ...................................................................................39

*Miller v. Fuhu Inc.*,
2015 WL 7776794 (C.D. Cal. Dec. 1, 2015) .................................................................43

*Mirabelli v. Olson*,
350 F.R.D. 138 (S.D. Cal. 2025) ...................................................................................42

*Murtagh v. Bed Bath & Beyond Inc.*,
2020 WL 4195126 (D. Colo. July 3, 2020) ...................................................................35

*Nelson v. Lusterstone Surfacing Co.*,
605 N.W.2d 136 (Neb. 2000)...................................................................................34, 42

*Nguyen v. Nissan N. Am., Inc.*,
932 F.3d 811 (9th Cir. 2019) ...................................................................................32, 40

*Nieberding v. Barrette Outdoor Living, Inc.*,
302 F.R.D. 600 (D. Kan. 2014)......................................................................................30

*O'Connor v. BMW of N. Am., LLC*,
2020 WL 1303285 (D. Colo. Mar. 19, 2020) ................................................................36

*Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*,
31 F.4th 651 (9th Cir. 2022) (en banc) .....................................................................23, 39

*Pegg v. Nexus RVs LLC*,
2019 WL 2772444 (N.D. Ind. July 2, 2019)..................................................................40

*Perez v. Toyota Motor Sales, U.S.A., Inc.*,
2022 WL 17886035 (C.D. Cal July 1, 2022)..................................................................33

*Rahamankhan Tobacco Enters. Pvt. Ltd. v. Evans MacTavish Agricraft, Inc.*,
989 F. Supp. 2d 471 (E.D.N.C. 2013).............................................................................31

*Rikos v. Procter & Gamble Co.*,
799 F.3d 497 (6th Cir. 2015) ...................................................................................28, 31

*Rowan Cnty. Bd. of Educ. v. U.S. Gypsum Co.*,
418 S.E.2d 648 (N.C. 1992)............................................................................................31

*Salas v. Toyota Motor Sales*,
2024 WL 608245 (C.D. Cal. Jan. 16, 2024)....................................................................41

**TABLE OF AUTHORITIES**
(continued)

Page

*Salas v. Toyota Motor Sales, U.S.A., Inc.*,
2019 WL 1940619 (C.D. Cal. Mar. 27, 2019)..............................................................27, 35

*Sanchez v. Kia Motors Am., Inc.*,
2024 WL 4730654 (C.D. Cal. Nov. 7, 2024).............................................................27, 38, 40

*Schiffner v. Motorola, Inc.*,
697 N.E.2d 868 (Ill. App. Ct. 1998) ...............................................................................40

*Smart v. Nat'l Collegiate Athletic Ass'n*,
2025 WL 1248794 (E.D. Cal. Apr. 30, 2025).....................................................................23

*Sowa v. Mercedes-Benz Grp. AG*,
764 F. Supp. 3d 1233 (N.D. Ga. 2024)........................................................................32, 33

*State Farm Mut. Auto. Ins. Co. v. Performance Orthopaedics & Neurosurgery, LLC*,
278 F. Supp. 3d 1307 (S.D. Fla. 2017) .............................................................................31

*Tait v. BSH Home Appliances Corp.*,
289 F.R.D. 466 (C.D. Cal. 2012)...........................................................................28, 29, 30

*Tapply v. Whirlpool Corp.*,
148 F.4th 407 (6th Cir. 2025) .........................................................................................33

*Taylor & Gaskin, Inc. v. Chris-Craft Indus.*,
732 F.2d 1273 (6th Cir. 1984) ........................................................................................40

*Tyson Foods, Inc. v. Bouaphakeo*,
577 U.S. 442 (2016).................................................................................................38, 39

*Ulrich v. Gen. Motors, LLC*,
2025 WL 629460 (E.D. Mich. Feb. 25, 2025)....................................................................36

*Vasquez v. Leprino Foods Co.*,
2020 WL 1527922 (E.D. Cal. Mar. 31, 2020) ...................................................................43

*Victorino v. FCA US LLC*,
2019 WL 5268670 (S.D. Cal. Oct. 17, 2019) ....................................................................40

*Wal-Mart Stores, Inc. v. Dukes*,
564 U.S. 338 (2011).................................................................................................23, 24

*Walter v. Leprino Foods Co.*,
670 F. Supp. 3d 1035 (E.D. Cal. 2023).........................................................................22, 42

*Witters v. Daniels Motors, Inc.*,
524 P.2d 632 (Colo. Ct. App. 1974) ................................................................................40

**TABLE OF AUTHORITIES**
**(continued)**

**Page**

*Wolin v. Jaguar Land Rover N. Am., LLC,*
617 F.3d 1168 (9th Cir. 2010) ........................................................................27, 32, 41, 42

**Statutes**

Cal. Civ. Code § 1791.1(a) ..................................................................................................36

Ind. Code § 24-5-0.5-3(a) ....................................................................................................29

Md. Code, Com. Law § 13–301(3) .......................................................................................30

Neb. Rev. Stat. § 59-1602 ....................................................................................................30

**Court Rules**

Fed. R. Civ. P. 23(a) .......................................................................................................22, 37

Fed. R. Civ. P. 23(b)(3)................................................................................................. passim

Fed. R. Civ. P. 23(g)(4)........................................................................................................43

**Treatises**

White & Summers, *Uniform Commercial Code,* § 9-8 ........................................................36

**Other Authorities**

NHTSA, *Track Recalls & Safety Issues by NHTSA ID* (Dec. 19, 2018) (NHTSA ID:
11162473), https://www.nhtsa.gov/?nhtsaId=11162473 ....................................................16

I.    **INTRODUCTION**

███████████████████████████████

—Vojo Bojicic, Ford's Global Powertrain Quality Chief Engineer[1]

████████████████████████████████████████

—Sara Selthofer, Ford's Core Quality & Warranty Spend Supervisor[2]

███████████████████████████

—Frank Abkenar, Ford's Global Engineering Director[3]

████████████████████████████████████████ but the question remains: what happens to all the Ford customers who bought the defective Ford vehicles? Ford should make it right by them.

Between 2013 and 2019, Ford manufactured and distributed millions of vehicles with a uniform defect: the "EcoBoost" turbo-charged engine Ford installed in these cars is prone to failure Ford sawed troughs into the aluminum engine block in the narrow sections between the cylinders (the "Saw Cut Defect"), which allows engine coolant to circulate in that area. The defective design is identical in all the subject engines, and results in engine coolant leaking into the engine cylinders, causing engine failure. It is no surprise that Ford's in-house technical expert in cylinder head and cylinder head gasket design agreed this was "a bad thing"—when coolant leaks internally, it causes corrosion, enters the engine cylinders causing misfire, and ultimately causes the engine to overheat and stop functioning.[4] ████████ ███████████████████████████████████████ [5]

███████████████████████████████████████████
███████████████████████████████████████████

---

[1] Ex. 5, Oct.–Nov. 2022 emails re: ████████████████████████████████ FORD-MILLER 00211810, at -10. Citations to "Ex. __" are exhibits attached to the Declaration of Stuart Talley. Page cites for Bates-stamped documents in this brief refer to the final digits of the Bates number stamped on the page.

[2] Ex. 6, Oct. 2018 emails re: ████████████████████████ NELSON-FORD 0011441, at -42.

[3] Ex. 7, Aug. 2020 emails re: ████████████████████, FORD-MILLER 00184459, at -59.

[4] Ex. 8, Dep. of Todd Brewer ("Brewer Dep.") 70:15-71:16.

[5] *Id.* 151:2–20.

[REDACTED]

This defect presents an obvious safety risk—engine coolant intrusion can cause loss of power while driving, loss of power-assisted systems (i.e. steering, brakes, etc.), unexpected deceleration, and other hazardous situations that leave drivers and the public vulnerable to increased risk of crashes. Ford's chief engineer for inline engines testified that vehicle engine stalling while on a roadway was considered [REDACTED] [7] And when asked whether "an engine quitting, failing catastrophically could cause a safety issue," Ford's corporate representative agreed.[8]

Once the corrosive damage from coolant leakage starts—which it inevitably does—it cannot be stopped.[9] Replacing the engine block, a repair costing thousands of dollars, simply installs another equally defective engine. The fallout from this costly Saw Cut Defect only worsens with time (as the vehicles age out of Ford's warranty), [REDACTED]

---

[6] Ex. 9, [REDACTED] (Dec. 10, 2018), FORD-MILLER 00174749, at -51.
[7] Ex. 10, Dep. of Robert Wade ("Wade Dep") 269:5–18
[8] Ex. 8, Brewer Dep. 174:13–16.
[9] Ex. 11, Dep. of John Dunahay ("Dunahay Dep.") at 26:24–27:4 [REDACTED] ); Ex. 12, Dep. of Joseph Henne ("Henne Dep.") at 139:5–6 ("Once the defect was in place, the gasket can't fill that void.")

- 2 -

PLS. MEM. IN SUPPORT OF MOTION FOR
CLASS CERTIFICATION
CASE NO. 2:20-CV-01796-DAD-CKD

[REDACTED] [10]

[REDACTED] [11]

Unfortunately for consumers, this is what happens when profits, rather than sound engineering principles, have the first and final say in design decisions. Ford knew these engines violated basic engineering principles, [REDACTED] [12] and then it chose not to disclose the known Defect to its customers before they bought their vehicles. [REDACTED] particularly for the Ford customers left holding the bag for Ford's gross design error.

To hold Ford accountable for its conduct in designing and selling these identically defective engines without disclosing the Defect to anyone prior to sale, Plaintiffs ask the Court to certify this case as a class action. This case is ideally situated for class treatment because of the uniform nature of the Defect, Ford's uniform failure to disclose the Defect pre-sale, and the straightforward economic harm Class members suffered as a result. Plaintiffs respectfully ask the Court to certify the proposed Classes, appoint Plaintiffs as Class representatives, and appoint their counsel as Class counsel.

## II.    FACTUAL BACKGROUND

This class action concerns a common defect in Ford's gasoline turbocharged direct injection ("GTDI") EcoBoost engine, which Ford installed in over a million vehicles across the United States between 2013 and 2019 (the "Class Vehicles").[13] During the relevant period, the EcoBoost engine in the Class Vehicles came in three displacements (i.e., sizes): 1.5L (also known as "Sigma"), and 2.0L and 2.3L ("Duratec").[14] The differences between the various displacements are irrelevant to this case; all of the engines are in the same "family of engines" because they "shared some similarities in the architecture and

---

[10] Ex. 13, "[REDACTED]" (Mar. 24, 2021), FORD-MILLER 00141197, at -202.

[11] *See, e.g.*, Ex. 14, [REDACTED] (Aug. 8, 2019), FORD-MILLER 00295598, at -603 ([REDACTED]), -607 ([REDACTED]).

[12] Ex. 15, Oct. 2018 emails re: [REDACTED] FORD-MILLER 00125169.

[13] The Class Vehicles are the 2017-2019 Ford Escape and 2014-2019 Ford Fusion with a 1.5L saw-cut EcoBoost engine, and the 2015-2018 Ford Edge, 2016-2019 Ford Explorer, 2015-2019 Ford Mustang, 2015-2019 Lincoln MKC, and 2016-2019 Lincoln MKZ with a 2.0L/2.3L saw-cut EcoBoost Engine. *See also infra* Section IV (Proposed Classes).

[14] Ford also sold vehicles with a saw-cut 1.6L "Sigma" EcoBoost engine, but it discontinued this displacement early in the class period. Plaintiffs do not seek to certify classes that include vehicles with the 1.6L EcoBoost engine.

design," including the same defective saw-cut cooling channel in the engine block.[15] Plaintiffs refer to the EcoBoost engine installed in the Class Vehicles as the "Class Engine."

    A.    **"EcoBoost" Design Phase: Ford ignores fundamental engineering principles and its own prior experience, and uses insufficient pre-release testing on the engines.**

    1.    **The Class Engine's turbocharged design depends on managing higher heat and pressure.**

Around 2010, Ford announced a new engine concept: "EcoBoost," a turbocharged direct-injection engine that the company promised would provide more power and better fuel economy in a small engine. By "boosting" its engines with a turbocharger and direct fuel injection, Ford could market EcoBoost-equipped vehicles as offering superior fuel economy, while also promising customers the power they were used to from larger engines.

Turbocharging significantly increases the thermal load on an engine, making the fundamentals of engine cooling—efficient heat transfer, robust coolant properties, and system integrity—even more critical.[16] Turbocharged engines compress intake air, increasing its temperature and allowing more fuel to be burned for greater power. *Id.* This results in higher combustion temperatures (more heat is generated in the cylinders) and additional heat from turbocharger: the turbo itself, driven by exhaust gases, becomes extremely hot and adds to the engine's overall thermal load. *Id.* Any failure in the cooling system can lead to rapid and severe engine overheating in a turbocharged setup. *Id.*

The turbocharged EcoBoost formulation means, ███████████████████████████████████ ███████████████████████████████████[17] Ford knew that the turbocharge tradeoff would make it difficult to cool and seal the engine cylinders. So during the EcoBoost's design and development phase, the company took "a number of design actions to understand how we were going to manage the increased energy level associated with [a] turbocharged engine."[18]

---

[15] Although the Class Engine came in multiple displacements (i.e. sizes), all of the engines are in the same "family of engines." Ex. 16, May 8, 2026 Dep. of Mark Tuneff ("May 2026 Tuneff Dep.") 7:12–13, 8:22–9:6.

[16] Ex. 17, Rebuttal Report of Dr. Colin Jordan, Ph.D., P.E. ("Jordan Rebuttal Report") at 6.

[17] Ex. 11, Dunahay Dep. 15:13–15; *see* Ex. 10, Wade Dep. 68:19–20 (turbocharged engines like the EcoBoost need "to accept higher pressures and temperatures to enhance the performance of the engine").

[18] Ex. 10, Wade Dep. 40:4-17.

- 4 -

Key to engine cooling and sealing are the walls between the engine's cylinders, known as the bore bridges.[19] The bore bridges separate the cylinders and provide flat sealing surfaces between the engine block and cylinder head.[20] In between the engine block and cylinder head is a thin strip of metal and polymer known as the "head gasket," which helps seal combustion pressure and prevent the flow of coolant and oil between the block and head.[21] Because the head gasket is affixed to the engine block, it needs the bore bridges to provide a sufficient surface to form a seal. These engine components are illustrated below.



*Figure 1 Simplified 4 Cylinder Components[22]*

The bore bridges are highly stressed. Located between cylinder combustion chambers, they experience high heat and pressure as fuel and air are ignited in the cylinders during the combustion stroke of an engine.[23] To relieve these conditions around the bore bridges in the Class Engine, Ford's engineers needed to find a pathway for coolant to flow directly through the bore bridges.

---

[19] Ex. 18, March 20, 2026 Declaration of Dr. Colin Jordan Ph.D., P.E. ("Jordan Report") ¶ 40.
[20] *Id.* ¶ 6(b).
[21] *Id.*
[22] *Id.*
[23] *Id.* ¶¶ 7, 40.

**2.     Ford designed the Class Engine with a saw-cut block that** ███████████ ████████████████████████[24]

Ford attempted to cool the extra heat generated in the EcoBoost engine by machining a "saw cut" passage through the bore bridges between the cylinders. The saw cut creates a channel along the narrow bore bridge that allows coolant to flow directly between the engine block and the head gasket, ████████████



[25]

Ford would later acknowledge internally that the saw cut in such a narrow bore bridge was ████████ [26] ████████████████████████████[27] But that wasn't news to Ford – it was something Ford already knew—or should have known—from prior experience.

**a.     Ford knew that using a saw cut in such a narrow bore bridge would limit "the reliability of the gasket" seal.[28]**

Ford recognized the problem with adding a saw cut to a small turbocharged engine with a narrow

---

[24] Ex. 19, ███████████████, FORD-MILLER 00139227, at -34.
[25] Ex. 20, ██████████████████████ (Dec. 2015), FORD-MILLER 00074856, at -90.
[26] Ex. 23, April 2018 emails re: ████████████, FORD-MILLER 00751671, at -73.
[27] *Id.* at -71 (emphasis added).
[28] Ex. 21, Bore Bridge and Cylinder Cooling, U.S. Patent No. 9,470,176 col. 1 ll. 22–23 (filed Aug. 1, 2014) (issued Oct. 18, 2016). These patents are quoted in Dr. Jordan's report and incorporated by reference therein. Ex. 18, Jordan Report ¶¶ 52–54

[black redaction bar] [29]

[black redaction bar] [30] leaving the surface of the bridge "untouched" and "undisturbed."[31]

In 2014, Ford Global Technologies filed a patent application that stated the bore bridge is "a stressed area with little packaging space," and that in "small, high output engines," thermal and mechanical stresses may be increased.[32] Ford acknowledged higher bore-bridge temperatures may weaken bore-bridge materials, reduce fatigue strength, cause bore distortion, impair sealing functionality, and limit "the reliability of the gasket in this zone," which in turn may cause "combustion gas and coolant leaks," reduced engine power, and overheating.[33] Ford's own patent therefore recognized the precise engineering causal chain at issue here: smaller high-output engines increase bore-bridge thermal and mechanical stress; high bore-bridge temperatures and super-narrow landing surfaces limit the gasket's ability to seal reliably; and this insufficient seal results in coolant leaks, reduced power, and overheating.

Ford's patent application was in keeping with the automotive industry's recognition of the risks inherent in Ford's saw cut engine design. One patent filed in 2001 and issued in 2004 explained that a saw cut cooling channel "weakens the interbore bridge" because the bore bridge has "high thermal concentration," "can easily be overheated," and in aluminum blocks can weaken and distort under high temperatures.[34]

A 2012 patent application from Toyota reinforced this general understanding: "if a coolant passage that enables coolant to pass through this center portion is formed"—*i.e.* if a saw cut is made through the bore bridge—"strength is no longer able to be ensured."[35] In other words, the industry literature recognized the central design problem Ford ignored: the bore bridge needs cooling, but the cooling passage cannot

[29] Ex. 22, [black redaction bar] (Oct. 3, 2022), FORD-MILLER00203226, at -29.
[30] Ex. 23, Apr. 2018 emails re: [black redaction bar], at -71.
[31] Ex. 12, Henne Dep. 84:21-24.
[32] Ex. 21, '176 Patent col. 1 ll. 14–16.
[33] *Id.* col. 1 ll. 16–26.
[34] Ex. 24, Interbore Cooling System, U.S. Patent No. 6,776,127 col. 1 ll. 20–22, 34–39, col. 2 ll. 19–23 (filed Dec. 20, 2001) (issued Aug. 17, 2004).
[35] Ex. 25, Cylinder Block and Manufacturing Method Thereof, U.S. Patent No. 9,353,701 col. 1 ll. 24–27 (filed Feb. 17, 2012) (issued May 31, 2016).

- 7 -

undermine the narrow structural and sealing surface where the head gasket seals.

b.  **Ford's insufficient pre-production testing failed to test real-world conditions – and still the EcoBoost engines performed dismally:** ████ [36]

Prior to releasing the saw-cut EcoBoost engines into production, Ford conducted design validation ("DV") testing, a critical step intended to see how the engines would perform in the real world. Notwithstanding that Ford's insufficient DV testing did not actually test real-world conditions (so it did not capture the full impact of the Defect) the saw-cut EcoBoost performed dismally. Yet Ford released it anyway.

i.  ██████████████████████████████
████████ ██.

In designing the EcoBoost engines, Ford ███████████████████████████
████████████████████████████████████████████
██████████████████████████████████████ [38] As Ford later conceded, ████████████████████████████████████
████ [39] Indeed, Ford chose not to ██████████████████████████████
████████████ [40] Instead, the company simply ██████████████
████████████████████████████████████████████████
██ [41] As Ford's director of Global Engine Engineering admitted, ████████████ [42]
████████████████████████████████████████████████
██████████████ [43] Ford engineers were eager—too eager—to apply the saw cut to the nascent EcoBoost. As engineer Todd Brewer put it, the "obvious[]" question was, "why can't we do it" with

---

[36] Ex. 29, Mar. 2018 emails re: ████████████████████████, NELSON-FORD 0010971, at -72.
[37] Ex. 7, Aug. 2020 emails re: ████████████████, at -59.
[38] *Id.*
[39] Ex. 26, ██████████████████ (Aug. 13, 2020), FORD-MILLER 00184461, at 3–4; *see also infra* Section II.B.2.b.ıı.
[40] Ex. 7, Aug. 2020 emails re: ████████████████, at -59.
[41] *Id.*
[42] *Id.*
[43] Ex. 8, Brewer Dep. at 144:17–18.

the EcoBoost?[44] But the equally obvious answer was that the Class Engine's bore bridges—approximately 8.5mm in width—are narrower than those in most other engines.[45] ███████████████████████████████ ██████████████████████████████████████████████████████[46]████████████ ████████████████████████████████████████████████████████████████[47] The 7.3L engine, meanwhile, was an iron block, which makes it "structurally stronger" than the aluminum used in the Class Engine.[48]

The DV testing Ford did do was inexplicably insufficient, in large part because it did not test real-world conditions. It relied on so-called "dynamometer" tests, which run the engine at a set speed and pressure for a certain amount of time.[49] ███████████████████████████████ ████████████████████████████████████████████████████████████████ █████████████████████████[50] As Ford engineer Joseph Henne explained, such testing was designed only to test the "accumulated use of the vehicle."[51]

This myopic testing would—and did—miss issues that occur during normal use of the vehicle, including those related to everyday engine start/shutdown. As engineer Robert Wade testified, Ford knew start/stop was part of the design intent for the Class Vehicles[52] (because people start and stop, sometimes multiple times a day, as they start the engine to go somewhere and stop the engine when they arrive), but Ford's dynamometer tests "inadequately emulated Start-Stop shutdowns."[53] Engineer Joseph Henne also admitted Ford's DV testing failed to mimic real world driving, agreeing that customers do not normally drive five to ten hours at a time, or the equivalent of approximately 2,500 miles, without stopping, and that

---

[44] *Id.* 144:24–25.

[45] Ex. 23, Apr. 2018 emails re: █████████████████ at -73

[46] Ex. 27, 6-Panel: █████████████████████████████ (Nov. 29, 2017), FORD-MILLER 00181824, at -34.

[47] *Id.* at -32.

[48] Ex. 12, Henne Dep. 74:10 ("[I]ron blocks are structurally stronger.").

[49] Ex. 32, ████████████████████████ (Sept. 3, 2019), FORD-MILLER 00179951, at -53.

[50] *Id.*; Ex. 33, Dep. of Michael Giunta ("Giunta Dep.") at 69:10–12 ██████████████ ████████████████████████ ).

[51] Ex. 12, Henne Dep. 78:17–18.

[52] Ex. 10, Wade Dep. 216:11–25.

[53] Ex. 26, ██████████████████ (Aug. 13, 2020), at 3–4.

such operation is not "normal use" of a vehicle.[54]



[55] Under Ford's current-day testing protocols, an engine with such results would not have been released into production: anything with a crack would today be considered a major failure (*i.e.* unacceptable).[56]

[57]

Prototype EcoBoost engines also experienced coolant-loss-related overheating.

[58]

[59] The pre-release overheating issues in the EcoBoost program led one Ford engineer to describe the Class Engine as "     ."[60]

   **c.**                                      [61]

Despite these obvious and pervasive issues pre-release, Ford barreled on with the saw cut in the Class Engine, because it was cheaper to produce. Ford engineer Joseph Henne confirmed that Ford chose the saw cut for cost-related reasons: "*[S]aw cut was chosen because [] it was inexpensive to manufacture.* . . . [T]he saw cut replaced the manufacturing process where they cast a hole that allowed coolant to flow

---

[54] Ex. 12, Henne Dep. 77:16-78:18.
[55] *Id.*; *see also* Ex. 27,                                  (Nov. 29, 2017), at -36 (                                                ).
[56] Ex. 12, Henne Dep. 164:1-8.
[57] *Id.* 164:9-19.
[58] Ex. 30, May 2012 emails re:                                                , FORD-MILLER 00277179, at -81.
[59] *Id.* at -79.
[60] Ex. 31, Oct. 2013 emails re:                              ", FORD-MILLER 00328952, at -52.
[61] Ex. 15, Oct. 2018 emails re:                                   , at -69.

- 10 -

through the bore bridge. *That was a very expensive process, and that was replaced with the saw cut.*[62]

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████[63] i.e. costs more.

**B.    "EcoBoost" Production Phase: Saw-Cut engines hit the road – and, predictably, start failing.**

**1.    Problems from the start:** ████████████████████████ █

In 2012, Ford released the 1.6L EcoBoost "Sigma," which had the same small-displacement saw-cut design as the Class Engine. But the problems in the design and development of the EcoBoost engine (described above) destined it to fail upon release—and previewed the problems that would persist for the Class Engine.

Coolant-related concerns cropped up early and often in the 1.6L. By March 2013, shortly after the engine's release, ████████████████████████████████████[65] Ford began to investigate cracked cylinder heads in October 2013.[66] Ford also realized the saw-cut was problematic and started measuring saw-cut depth on engine blocks and tracking at least three confirmed broken bore liners.[67] By mid-2014, one of the "[p]rimary causes" of warranty spend on the 1.6L EcoBoost was "internal coolant leaks at the head to block joint,"[68] which is where the saw cut is located.[69]

By August 2014, Chief Engineer Rick Renwick had admitted that this condition was ███████████

███████████████████████████████████████████████████████████

---

[62] Ex. 12, Henne Dep. 85:3–10 (emphases added).
[63] Ex. 28, ████████████████████████████████ (Nov. 17, 2015), FORD-MILLER 00353886, at -906.
[64] Ex. 35, Feb. 2017 emails re: ████████████, FORD-MILLER 00173711.
[65] *E.g.*, Ex. 36, Mar. 2013 emails re: ██████████████████████, FORD-MILLER00171397, at -97.
[66] Ex. 31, Oct. 2013 emails re: ██████████████████████████████, at -52–56.
[67] Ex. 37, ██████████████ FORD-MILLER 00260950, at -53–55.
[68] Ex. 38, July 2014 emails re: "████████████████████, FORD-MILLER 00122453, at -53–54.
[69] Ex. 39, Dep. of Randy Hansen ("Hansen Dep.") at 78:12–80:4 (Ford witness circled the saw cuts in the engine block when asked to identify "where are we seeing coolant leaks").

[REDACTED] [70]

[REDACTED]

[REDACTED] [72]

[REDACTED]

[REDACTED] [73]

In some instances, vehicles equipped with the 1.6L EcoBoost caught on fire. Ford documents show Ford engineers tracing back the causal chain as follows: Engine fires in the 1.6L were caused by engine overheating caused by coolant loss.[74] [REDACTED]

[REDACTED] [76]

[REDACTED] [77] And the internal coolant leaks in the 1.6L were due to the same root cause as in the 1.5L: the saw-cut block.

Ford spent the better part of the decade attempting to patch up the issues with the saw-cut 1.6L engines, including by issuing a patchwork of piecemeal and ineffective recalls aimed at fixing coolant leaks in that engine.[78] Eventually, after the 2016 model year, Ford withdrew the 1.6L engine from production and replaced it with the saw-cut 1.5L engine.[79]

---

[70] Ex. 40, Aug. 2014 emails re: [REDACTED], FORD-Miller 00074514, at -14.

[71] Id.

[72] See supra Section II.A.

[73] Ex. 41, [REDACTED] (Aug. 27, 2014), FORD-MILLER00334431, at -33, -37.

[74] Ex. 45, Sept. 28, 2018 Letter from Ford to NHTSA, FORD-MILLER 00000225, at -30 ("2013 model year 1.6L Escape vehicles operating with coolant levels significantly below the minimum specified amount can lead to a localized overheating of the engine cylinder head which can result in a crack and pressurized oil leak."); Ex. 8, Brewer Dep. 157:20-158:14 ("[T]he engine started overheating in the vehicle. So we had lost control of the engine coolant temperature.").

[75] [REDACTED] Ex. 11, Dunahay Dep. 17:6–11 (emphasis added).

[76] Ex. 46, [REDACTED] (Nov. 24, 2013), FORD-MILLER 0028161, at -61 [REDACTED] FORD-MILLER 00175314, at -14 [REDACTED]).

[77] Ex. 17, Jordan Rebuttal Report at 5.

[78] Ex. 33, Giunta Dep. 90:16–98:25 (discussing recalls).

[79] Ex. 10, Wade Dep. 43:23–44:6.

- 12 -

It wasn't much of a change: the 1.6L was so similar to the 1.5L that they shared an engine assembly document; in other words, the instruction manual for putting the engine together was the same for both the 1.6L and 1.5L.[80] ██████████████████████████████████████████████ [81] it failed to apply the lessons learned from this canary-in-the-coal-mine as it continued to insufficiently DV test the Class Engines and then sell them to unsuspecting consumers.

Ford engineer Todd Brewer testified that Ford has processes in place "to document our corporate knowledge and make sure we do not repeat mistakes," including evaluating new design standards against "everything you have in production and everything in pre-production."[82] Based on these principles, Ford would—or should—have used information it learned at the time in connection with the 1.6L engine "when evaluating" coolant intrusion issues in "the 1.5[L] or the 2.0 or the 2.3."[83]

2. **Class Engine coolant intrusion caused by the Saw Cut Defect:** ████████ ███ **Ford had ever seen.**[84]

████████████████████████████████████████████████ ████████████████████████████████████ [85] It was already obvious that the Saw Cut Defect was to blame. Both Ford's and external analyses traced this coolant intrusion to the same root cause: the Saw Cut Defect.

██████████████████████████████████████████████████
██████████████████████████████████████████████████
█████████████████████ [86] ████████████████████████
██████████████████████████████████████████████

---

[80] Ex. 39, Hansen Dep. 77:6–14.
[81] Ex. 17, Jordan Rebuttal Report at 5.
[82] Ex. 8, Brewer Dep. 25:7–23.
[83] *Id.* 25:25–26:4.
[84] Ex. 5, Oct.–Nov. 2022 emails re: ██████████████████████████ at -10; *see also* Ex. 17, Jordan Rebuttal Report at 5.
██
██████████████████████████████.
[85] Ex. 48, ████████████████████████ (Mar. 6, 2023), FORD-MILLER00441286, at -87.
[86] Ex. 49, May 2020 emails re: ████████████████████ FORD-MILLER 00139453, at -53.

PLS. MEM. IN SUPPORT OF MOTION FOR
CLASS CERTIFICATION
CASE NO. 2:20-CV-01796-DAD-CKD



The Automotive Engine Rebuilders Association ("AERA") came to the same conclusion. Analyzing the 1.6L, 2.0L, and 2.3L engines, AERA determined that "[t]his failure seems to be caused by the coolant groove (aka saw-cut) in the block that is between each cylinder. This area has very little land area to compress and seal the head gasket. The coolant running in the groove can get past the head gasket seal and enter the cylinders in operation."[89]

Within a few years, the immense scale of the Defect became apparent.

[93] Unfortunately, since the problem was with the design of the engine, this "repair" was ineffective. For customers whose vehicles were out of warranty, this meant they were paying thousands of

---

[87] Ex. 34, July 2019 emails re: ⬛⬛⬛⬛⬛, NELSON-FORD 0168618, at -18.
[88] Ex. 50, June 2019 emails re: ⬛⬛⬛⬛⬛, FORD-MILLER 00885935, at -35.
[89] Ex. 18, Jordan Report ¶ 44.
[90] Ex. 42, Aug. 2018 emails re: ⬛⬛⬛⬛⬛, FORD-MILLER 00780776, at -78.
[91] Ex. 43, Aug. 2018 emails re: ⬛⬛⬛⬛⬛ FORD-MILLER 00780595, at -95; *see also* Ex. 44, July 2020 emails re: ⬛⬛⬛⬛⬛, FORD-MILLER 00220521, at -21 (⬛⬛⬛⬛⬛).
[92] Ex. 6, Oct. 2018 emails re: ⬛⬛⬛⬛⬛, at -42.
[93] *Id.*

dollars to replace one defective part *with the exact same defective part*.[94] Thus, ████████████████████████████████████████████████████████[95]

Ford knew the defective engines were doomed: "███████████████████████████ ████████."[96] Plaintiffs' warranty statistics expert, Dr. Allise Wachs, analyzed Ford's warranty data and found high probabilities for coolant intrusion in engines across all Class Vehicles. Based on Ford's data, Dr. Wachs conservatively estimated that "by 10 years in service, all the 1.5 and 2.0L saw cut engines had failure rates exceeding ████████████████."[97] The 2.3L engines similarly had a high failure probability after 10 years in service, reaching up to ██.[98] Even worse, when the Class Vehicles' warranty claims for engine coolant intrusion are compared to their non-saw-cut equivalent, the Class Vehicles failed *20 to 200 times more* than the comparator vehicles[99]—and that's just for in-warranty failures, not including failures outside of the warranty period and/or paid for by consumers.

### 3.     The Saw Cut Defect puts drivers in danger.

Coolant intrusion into the cylinders of the Class Engine can cause loss of motive power[100] while driving, loss of power-assisted systems (i.e. steering, braking, etc.), unexpected deceleration, and engine overheating.[101] When coolant intrudes into the cylinders, the car can "become just dramatically restricted in how -- how fast you can go, . . . how fast the engine can rotate."[102] The speed loss is "immediate" and results in "[p]retty severely restricted" engine output.[103] Ford refers to this sudden "greatly restricted output" as "limp home" mode.[104] Ford engineer Robert Wade described the feeling of "limp home" mode: "[W]hat

---

[94] Ex. 8, Brewer Dep. 72:10–16 (Q: "[I]f a[n] owner of a vehicle had this coolant intrusion and had the engine block replaced -- long block or a short block, they would have gotten an engine with a saw cut. Is that true?" A: "That is true.").

[95] Ex. 6, Oct. 2018 emails re: ████████████████████, at -42.

[96] *Id.*

[97] Ex. 51, Expert Report of Dr. Allise Wachs ¶ 68.

[98] *Id.* ¶ 69. Regardless, the rate of engine failure due to coolant intrusion across *all* Class Vehicles was "unacceptably high" regardless of minor design variations. *Id.* ¶ 68.

[99] *Id.* ¶¶ 80–83.

[100] Loss of motive power refers to a vehicle unexpectedly losing its ability to generate the propulsive force needed to move. This sudden loss of propulsion causes the vehicle to lose speed and the ability to accelerate, creating a dangerous road hazard.

[101] Ex. 8, Brewer Dep. 70:16–71:6 (Q: "[C]oolant depletion can lead to overheating?" A: "It can, yes.").

[102] Ex. 12, Henne Dep. 57:15–18.

[103] *Id.* 132:8, 14.

[104] *Id.* 57:16, 58:22.

PLS. MEM. IN SUPPORT OF MOTION FOR
CLASS CERTIFICATION
CASE NO. 2:20-CV-01796-DAD-CKD

the customer often feels is, like I was cruising at 45 miles an hour, I wanted to accelerate, and as I tapped in, there was sort of no power there to accelerate."[105]



Customer complaints reflect the dangerous situation in which the Saw Cut Defect puts drivers. For instance, one owner of a 2018 Ford Escape with a 1.5L EcoBoost engine publicly complained to the National Highway Traffic Safety Administration about a terrifying incident consistent with coolant intrusion caused by the Saw Cut Defect: "I was going 70mph when it overheated and *it decelerated to 20mph in less than 10 seconds* and couldn't accelerate to get out of the other cars way going 70 plus mph swerving around me to pull over and *almost got into a crash* on the 4 lane freeway not good."[109] In this instance, and in others Plaintiffs identified in Ford's warranty databases and through public database searches, Ford's repair personnel confirmed the internal coolant intrusion and replaced the engine.

**C.** ███████████████████████████████

**1.** ███████████████████████████████

Although Ford had known about issues with coolant intrusion in the saw-cut EcoBoost engines for years (since at least 2011 DV testing for the 1.6L), its first public attempt to address the Saw Cut Defect came in December 2019, after all the Class Vehicles had already been sold. Ford issued Customer Satisfaction Program ("CSP") 19B37, a software update intended to ███████████████

███████████████████████████████

---

[105] Ex. 10, Wade Dep. 51:22–25.
[106] Ex. 18, Jordan Report ¶ 21.
[107] *Id.*
[108] *Id.*
[109] NHTSA, *Track Recalls & Safety Issues by NHTSA ID* (Dec. 19, 2018) (NHTSA ID: 11162473), https://www.nhtsa.gov/?nhtsaId=11162473 (emphases added) (capitalization adjusted).
[110] Ex. 57, Mar. 2019 emails re: ██████████████████, FORD-MILLER 00204782, at -82.

[REDACTED] [111] This CSP applied only to Model Year 2017-19 1.5L Class Vehicles.[112]

[REDACTED]

[REDACTED] [113] [REDACTED]

[REDACTED] [114] This was particularly problematic since corrosion "doesn't really require age to start" and it can happen "as soon as you start driving" the car.[115]

Ford eventually replaced CSP 19B37 with CSP 21N12, which offered a modest warranty extension and one-time out-of-warranty repair for any MY17-19 1.5L Class Vehicle whose engine failed due to coolant intrusion between June and November 2022.[116] Ford did not offer a CSP to the other 1.5L Class Vehicles. Furthermore, Ford never made any attempt to address the Saw Cut Defect in the 2.0L/2.3L Class Vehicles.[117]

2. **Ford knew the saw-cut Class Engine was doomed to fail, but it delayed implementing the cross-drill design due to cost concerns.**

[REDACTED]

[REDACTED] [118] In 2018, [REDACTED]

[REDACTED]

[REDACTED] [119] [REDACTED]

---

[111] Ex. 58, [REDACTED] (Dec. 12, 2019), FORD-MILLER 00174867, at -67.

[112] Id.

[113] Ex. 11, Dunahay Dep. 30:6–13 (emphasis added).

[114] Id.

[115] Ex. 33, Guinta Dep. 58:2–7.

[116] Ex. 59, "Customer Satisfaction Program 21N12" (June 9, 2022), FORD-MILLER 00117445, at -45.

[117] Ex. 60, Dep. of Tim Knott ("Knott Dep.") at 80:19–81:5 (agreeing that Ford did not offer a warranty extension for "1.5-liter engines, model years 2014 through 2016," 2.0L, or 2.3L Class Vehicles); Ex. 10, Wade Dep. 259:21–260:3 (agreeing that Ford did not offer a warranty extension to other 1.5L or any 2.0L Class Vehicle owners).

[118] Ex. 52, Jan. 2018 emails re: [REDACTED], FORD-MILLER 00258403, at -03, -05.

[119] Ex. 43, Aug. 2018 emails re: [REDACTED]

PLS. MEM. IN SUPPORT OF MOTION FOR
CLASS CERTIFICATION
CASE NO. 2:20-CV-01796-DAD-CKD



[121] This was in keeping with Ford's history of delaying and deferring solutions to serious issues for cost reasons:

*g*

[122]

3.

[123]

[124]

[125]

[126] And as Ford engineer Joseph Henne testified, there was no better head gasket that could have addressed the Saw Cut Defect

, at -95.

[120] *Id.*

[121] Ex. 52, Jan. 2018 emails re:
, at -05

[122] Ex. 53, May 2010 emails re:                , FORD-MILLER 00754858, at -58.

[123] Ex. 54,                        (July 31, 2020), FORD-MILLER 00175193, at -93.

[124] *Id.*

[125] Ex. 55, Dep. of Trevor Groh at 26:11–18.

[126] Ex. 56, July–Aug. 2020 emails re:
, FORD-MILLER 00175192.

because "[o]nce the defect was in place, the gasket can't fill that void," which is why Ford ultimately had to switch to the cross-drill design.[127] No matter how Ford tried to wriggle out of it, it ultimately was forced to conclude that its own saw cut design was the defect.

████████████████████████████████████████████████
████████████████████████████████████████████████
██████████████████████████████████████[128]

### 4.    Ford's eventual directive: ██████████████████████████.[129]

Finally, Ford just couldn't evade the truth any longer. Starting around 2019, Ford decided that future model years of the Class Vehicles would receive a cross-drilled block—not the defective saw-cut block. Ford referred to the cross-drill solution as the "PCA," or "permanent corrective action," for the Saw Cut Defect, noting: "███████████████████████████████████████████████████████████████"[130] Ford engineers agreed that after introduction of the cross-drill PCA, the coolant intrusion issue disappeared entirely in new production EcoBoost vehicles.[131]

████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
███████[132]

---

[127] Ex. 12, Henne Dep. 139:5–8.

[128] Ex. 19, ███████████████████████████, at -34.

[129] Ex. 34, July 2019 emails re: ███████████████, at -21.

[130] Ex. 61, Jan. 2023 emails re: ███████████████████████████ FORD-MILLER 00180175, at -75; *see* Ex. 10, Wade Dep. 302:9–13 (after introduction of the cross-drill, "there was no longer coolant exposed to the block surface" so the coolant intrusion issue went away); Ex. 48, ███████████████████████████ (Mar. 6, 2023), at -89 ("███████████████████████████████████").

[131] Ex. 11, Dunahay Dep. 66:21–67:1 (██████████████████████████████████████████████████████████████████); Ex. 10, Wade Dep. 301:22–302:2 (Q: "All of those events are downstream of the [] engine design, which is the saw cut block is allowing that to occur in that area in the inter bore space, meaning once you eliminated the saw cut block, these problems went away." A: "I do agree with that statement, yes.").

[132] Ex. 26, ███████████████████████████ (Aug. 13, 2020), at 1.



[134]

[135]

These changes meant that customers who replaced their EcoBoost engines after the PCA got nondefective cross-drilled engines, and customers who bought new production vehicles after the PCA would not suffer the saw-cut failures. Of course, this still left hundreds of thousands (or more) of Ford customers with doomed saw-cut Class Engines, and Ford's attitude was to "let customers deal with" their defective engines once they fail out of warranty.[136]

## III.   PROCEDURAL HISTORY

This litigation began as three related putative class actions—*Miller v. Ford Motor Company*, *Reed v. Ford Motor Company*, and *Lund v. Ford Motor Company*—asserting substantially overlapping claims that Ford failed to disclose a coolant-intrusion defect in certain saw cut EcoBoost engines. In May 2021, the Court consolidated those actions for all purposes under Federal Rule of Civil Procedure 42, directed that the consolidated action proceed under the *Miller* file number, and ordered Plaintiffs to file a consolidated complaint superseding the complaints in the three constituent actions. *Miller*, Dkts. 35, 36. The action now referred to as "*Miller*" is therefore the consolidated action arising from the original *Miller*, *Reed*, and *Lund* cases.

Plaintiffs later filed *Nelson v. Ford Motor Company* to assert materially similar claims on behalf of purchasers and lessees of vehicles equipped with Ford's saw cut 2.3L EcoBoost engines. *Nelson*, Dkt. 1. Although *Nelson* has not been formally consolidated with *Miller* for all purposes, the two actions concern the same alleged saw cut bore-bridge defect and substantially overlapping evidence regarding Ford's design, testing, knowledge, investigation, and corrective actions.

Recognizing that the class-certification issues in the two actions substantially overlap, the parties

---

[133] Ex. 10, Wade Dep. 218:3–15.
[134] Ex. 26, ███████████████████ (Aug. 13, 2020), at 1.
[135] Ex. 10, Wade Dep. 221:13–15; Ex. 26, ███████████████ (Aug. 13, 2020), at 3–4.
[136] Ex. 33, Giunta Dep. 123:9.

stipulated to consolidated class-certification briefing. The Court found that joint briefing would conserve judicial resources and avoid unnecessary duplication, and ordered the parties to file a single consolidated motion, opposition, and reply in the *Miller* action. *Miller*, Dkt. 159; *Nelson*, Dkt. 74. Accordingly, with this motion Plaintiffs seek certification pertaining to the saw cut EcoBoost engines in both actions. The cases otherwise remain procedurally distinct.

## IV.     PROPOSED CLASSES

Plaintiffs move to certify state-wide classes of individuals who bought new Ford vehicles with a 1.5L, 2.0L, or 2.3L EcoBoost Engine, as defined below.

### A.     Sigma Classes

The Class Vehicles with a saw-cut 1.5L EcoBoost Engine—the "Sigma Class Vehicles"—are 2017-2019 Ford Escape and 2014-2019 Ford Fusion. Plaintiffs seek certification on a state-by-state basis, with the following definition for each state Class (the "Sigma Classes"): **All persons who purchased a new Sigma Class Vehicle from an authorized Ford dealer in [state]**. The Sigma Class states are Colorado, Illinois, Indiana, and Maryland. Plaintiffs seek the appointment of Darrick Christodaro (CO), Harlampi Bozhinov (IL), Anthony Cicero (IL), Teresa Balaszek (IN), Aaron Manfra (MD), and Victoria Manfra (MD) as representatives of the respective Sigma Classes.

### B.     Duratec Classes

The Class Vehicles with a saw-cut 2.0L/2.3L EcoBoost engine—the "Duratec Class Vehicles"—are 2015-2018 Ford Edge, 2016-2019 Ford Explorer, 2015-2019 Ford Mustang, 2015-2019 Lincoln MKC, and 2016-2019 Lincoln MKZ. Plaintiffs seek certification on a state-by-state basis, with the following definition for each state Class (the "Duratec Classes"): **All persons who purchased a new Duratec Class Vehicle from an authorized Ford dealer in [state]**. The Duratec Class states are California, Florida, Kansas, Michigan, North Carolina, and Nebraska. Plaintiffs seek the appointment of Trevor Nelson (CA), Sarah Nelson (CA), David Speigner (FL), Craig Morford (KS), Kelli Morford (KS), Tracey Ann Metro (MI), Robyn Pirog (NC), and John Krecek (NE) as representatives of the respective Duratec Classes.

### C.     Summary of the Classes

Each Class asserts claims under state consumer protection and/or breach of implied warranty law. The proposed Classes, their representatives, and the claims at issue in each are:

PLS. MEM. IN SUPPORT OF MOTION FOR
CLASS CERTIFICATION
CASE NO. 2:20-CV-01796-DAD-CKD

| State Class | Representative(s) | Class Vehicles | Claim(s) |
|---|---|---|---|
| **California** | Trevor Nelson<br>Sara Nelson | Duratec Class Vehicles | Implied Warranty (Song-Beverly Act)<br>Consumer Protection (CLRA) |
| **Colorado** | Darrick Christodaro | Sigma Class Vehicles | Implied Warranty (UCC) |
| **Florida** | David Speigner | Duratec Class Vehicles | Consumer Protection (FDUTPA) |
| **Illinois** | Harlampi Bozhinov<br>Anthony Cicero | Sigma Class Vehicles | Consumer Protection (ICFA) |
| **Indiana** | Teresa Balaszek | Sigma Class Vehicles | Consumer Protection (IDCSA)<br>Implied Warranty (UCC) |
| **Kansas** | Craig Morford<br>Kelli Morford | Duratec Class Vehicles | Consumer Protection (KCPA)<br>Implied Warranty (UCC) |
| **Maryland** | Aaron Manfra<br>Victoria Manfra | Sigma Class Vehicles | Consumer Protection (MCPA)<br>Implied Warranty (UCC) |
| **Michigan** | Tracey Ann Metro | Duratec Class Vehicles | Implied Warranty (UCC) |
| **Nebraska** | John Krecek | Duratec Class Vehicles | Consumer Protection (NCPA) |
| **North Carolina** | Robyn Pirog | Duratec Class Vehicles | Consumer Protection (NCUDTPA) |

# V.    ARGUMENT

Federal Rule of Civil Procedure 23 provides a simple "two-step" framework for considering whether to certify a class. *Walter v. Leprino Foods Co.*, 670 F. Supp. 3d 1035, 1045–46 (E.D. Cal. 2023). First, "the court determines whether the moving party has established" four prerequisites under Rule 23(a): (1) "the class is so numerous that joinder of all members is impracticable" (**numerosity**); (2) "there are questions of law or fact common to the class" (**commonality**); (3) "the claims or defenses of the representative parties are typical of the claims or defenses of the class" (**typicality**); and (4) "the representative parties will fairly and adequately protect the interests of the class" (**adequacy**). *Id.* at 1046 (quoting Fed. R. Civ. P. 23(a)). "If the prerequisites of Rule 23(a) are met, the court considers whether the proposed action meets at least one of the three provisions of Rule 23(b)." *Id.* Here, Plaintiffs seek certification under Rule 23(b)(3), which "states that a class action may be maintained if 'the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members [**predominance**], and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy [**superiority**].'" *Id.* (quoting Fed. R. Civ. P. 23(b)(3)).

Each of Plaintiffs' proposed state Classes must "independently meet the requirements of Rule 23 for

the maintenance of a class action." *Aldapa v. Fowler Packing Co.*, 323 F.R.D. 316, 326 (E.D. Cal. 2018) (Drozd, J.) (quoting *Betts v. Reliable Collection Agency, Ltd.*, 659 F.2d 1000, 1005 (9th Cir. 1981)). This means that the Court should grant class certification for any classes that satisfy Rule 23, even if some of the proposed classes may fall short. Here, many of the arguments for certification overlap across the Classes, and Plaintiffs address them separately where appropriate. Regardless, every Class satisfies all the applicable Rule 23 requirements, making certification proper across the board.

**A.    Plaintiffs' proposed Classes satisfy the Rule 23(a) prerequisites.**

**1.    Rule 23(a)(1): the Classes are sufficiently numerous.**

The proposed Classes satisfy the numerosity requirement because Ford sold hundreds of thousands of Class Vehicles spread across the states Plaintiffs seek to certify, making joinder impractical. *See Alger v. FCA US LLC*, 334 F.R.D. 415, 422 (E.D. Cal. 2020) (a proposed class of at least 40 class members satisfies numerosity); *Smart v. Nat'l Collegiate Athletic Ass'n*, 2025 WL 1248794, at *2 (E.D. Cal. Apr. 30, 2025) (putative class of approximately 1,000 members satisfies numerosity). Based on Ford's sales volume data for the Class Vehicles, the proposed state classes range from approximately 6,000 to over 250,000 Class members. *See* Ex. 3, Decl. of Stuart Talley Regarding Excel Workbooks Available Upon Request ("Talley Excel Decl."). Accordingly, numerosity is satisfied.

**2.    Rule 23(a)(2): common questions of law and fact relating to the EcoBoost Engine and Ford's conduct have common answers for every Class.**

Commonality tests "the capacity of a classwide proceeding to generate common ***answers*** apt to drive the resolution of the litigation." *Alcantar v. Hobart Serv.*, 800 F.3d 1047, 1052 (9th Cir. 2015). A question is "common" for purposes of Rule 23(a)(2) if "determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011). The Court's commonality analysis "is limited to resolving whether the evidence establishes that a common question is ***capable*** of class-wide resolution, not whether the evidence in fact establishes that plaintiffs would win at trial." *Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 667 (9th Cir. 2022) (en banc).

Here, there are several "***significant*** issue[s] of law or fact" common to the members of every class. *Alger*, 334 F.R.D. at 423 (quoting *Abdullah v. U.S. Sec. Assocs., Inc.*, 731 F.3d 952, 957 (9th Cir. 2013));

*see Dukes*, 564 U.S. at 359 ("[E]ven a single common question will do."). A question central to all of Plaintiffs' claims is whether the saw-cut design of the Class Engine is defective. The consumer protection claims have common elements suitable for classwide proof, including whether Ford disclosed the Saw Cut Defect, Ford's knowledge of the Defect, and the materiality of the Defect. The implied warranty claims will also be governed by common proof since the merchantability of the Class Vehicles is an objective inquiry with a single answer.

### a.   The Saw Cut Defect is common to all Class Vehicles.

Whether the Saw Cut Defect rendered the Class Engines defective is a question common to every Class claim at issue. The engines in all the Class Vehicles are in the same GTDI "family of engines" that "shared some similarities in the architecture and design," including most notably the saw-cut engine block.[137] In "all of the Ford engines that have a saw cut design, the coolant is exposed to the cylinder head, the cylinder block, the head gasket."[138] The combination of high temperature/pressure, narrow bore bridges, and the saw cut in these EcoBoost engines resulted in coolant corroding and eroding the head/block joint surfaces and leaking into the engine cylinders.[139]

Ford has consistently acknowledged the Saw Cut Defect was common to all Class Vehicles. For instance, a ███████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████[140] In email discussions, Ford engineers defined the issue ████████████████████████████ ███████████████████████████████████[141] Regardless of Class Vehicle, ██ ███████████████████████████████[142]████████████████████████████████ ████████████████████████████████████████████████████████████████████ ███████████████████████████████████████████

---

[137] Ex. 16, May 2026 Tuneff Dep. 7:12–13, 8:22–9:6.

[138] Ex. 10, Wade Dep. 131:14–16.

[139] *See supra* Section II.A.

[140] Ex. 62, ████████████████████████████████████████████ (Dec. 10, 2018), at -50.

[141] Ex. 63, Oct. 2018 emails re: ████████████████████████████, FORD-MILLER 00125096, at -96–97.

[142] Ex. 62, ████████████████████████████████████████████ (Dec. 10, 2018), at -51.

PLS. MEM. IN SUPPORT OF MOTION FOR
CLASS CERTIFICATION
CASE NO. 2:20-CV-01796-DAD-CKD

[143]

[144]

Also, Ford continued to investigate the Saw Cut Defect as a single defect. For instance,

[145] The same core team investigated the Saw Cut Defect across all the Class Vehicles, and they carried out that investigation in a "[v]ery, very similar" manner, regardless of the displacement.[146]

[148]

[149]

Ford eventually propounded the same permanent corrective action for the Saw Cut Defect in all Class Vehicles: a design change from the saw cut to the cross-drill engine block.[150]

[151] Ford engineers agreed that after

---

[143] Ex. 19, ███████████████, at -34; Ex. 54, ████████████ (July 31, 2020), FORD-MILLER 00175193, at -93.

[144] Ex. 62, ████████████████████████ (Dec. 10, 2018), at -50–51.

[145] Ex. 64, Apr. 2019 emails re: ███████████, FORD-MILLER 00214591 (emphasis added).

[146] Ex. 8, Brewer Dep. 74:14–24; *see also* Ex. 17, Jordan Rebuttal Report at 5 ████████████████████ ).

[147] Ex. 43, Aug. 2018 emails re: ████████████████████████, at -95; *see also* Ex. 44, July 2020 emails re: ███████████████, FORD-MILLER 00220521, at -21 ██████ ).

[148] Ex. 65, June 2020 emails re: ████████████, FORD-MILLER 00405228, at -29.

[149] *Id.* at -28 (emphasis added).

[150] Ex. 60, Knott Dep. 97:14–18 ( ████████████████████████ ).

[151] Ex. 61, Jan. 2023 emails re: ███████████, at -75; *see* Ex. 10, Wade Dep. 302:9–13 (after introduction of the cross-drill, "there was no longer coolant exposed to the block surface" so the coolant intrusion issue went away); Ex. 48, ████████████████████ (Mar. 6,

introduction of the cross-drill PCA, the coolant intrusion issue disappeared entirely from EcoBoost vehicles with that non-defective engine.[152]

While there may be some minor differences in the exact way the internally leaking coolant corrodes/erodes the block/head and intrudes into the cylinder via the saw cut, these minor variances do not affect either the cause of or solution to the Saw Cut Defect. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮[153] "[T]hat boiling would boil off the water in the coolant and ultimately leave a[n] acidic deposit on the head and block deck, which would ultimately eat away at the aluminum."[154] ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

For the Duratec 2.0L/2.3L engines, Ford determined there was excessive "scrubbing," meaning "too much horizontal motion in the [head-to-block] joint, which would ultimately wear out the head gasket and wear out the mating surfaces on the head and the block."[156] The scrubbing could only happen because of the saw cut: "the saw cut is right at the block deck. . . . So that's the hottest part of the block. You try to get coolant there and cool [it] -- but when you take that saw cut, you're also taking material away. . . . So you're taking structure away; therefore, you're allowing more movement."[157] Regardless of the mechanism of intrusion, the ultimate source of the coolant intrusion failures in every Class Vehicle was Ford's saw-cut design.[158]

---

2023), at -89 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮).
[152] Ex. 10, Wade Dep. 301:22–302:2 (Q: "All of those events are downstream of the [] engine design, which is the saw cut block is allowing that to occur in that area in the inter bore space, meaning once you eliminated the saw cut block, these problems went away." A: "I do agree with that statement, yes."); Ex. 11, Dunahay Dep. 66:21–67:1 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ).
[153] Ex. 66, ▮▮▮▮▮▮▮▮▮▮▮▮ (Oct. 29, 2019), FORD-MILLER 00176145, at -46.
[154] Ex. 8, Brewer Dep. 69:5–8.
[155] Ex. 66, ▮▮▮▮▮▮▮▮▮▮▮▮ (Oct. 29, 2019), at -46.
[156] Ex. 8, Brewer Dep. 75:22–76:6.
[157] Id. 115:22–116:3.
[158] Ex. 10, Wade Dep. 301:22–302:2 (Q: "All of those events are downstream of the [] engine design, which is the saw cut block is allowing that to occur in that area in the inter bore space, meaning once you eliminated the saw cut block, these problems went away." A: "I do agree with that statement, yes."); see also Ex. 17, Jordan Rebuttal Report at 5–6 (▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ).

- 26 -

Commonality is therefore satisfied for all claims because, regardless of the cause of action, "the same alleged defect" is at issue. *Wolin v. Jaguar Land Rover N. Am., LLC*, 617 F.3d 1168, 1172 (9th Cir. 2010); *accord Alger*, 334 F.R.D. at 423 ("Principally, a common question exists as to whether Class Vehicles suffered from a defective AHR System design."); *Sanchez v. Kia Motors Am., Inc.*, 2024 WL 4730654, at *13 (C.D. Cal. Nov. 7, 2024) ("Plaintiffs have adduced sufficient evidence of a common defect."); *Johnson v. Nissan N. Am., Inc.* ("*Johnson I*"), 2022 WL 2869528, at *18 (N.D. Cal. July 21, 2022) (common questions included "factual issues of the nature of the alleged defect"), *aff'd*, *Johnson v. Nissan N. Am., Inc.* ("*Johnson II*"), 2024 WL 4784367 (9th Cir. Nov. 14, 2024); *Salas v. Toyota Motor Sales, U.S.A., Inc.*, 2019 WL 1940619, at *5 (C.D. Cal. Mar. 27, 2019) (common proof would determine "the existence of an HVAC defect" in the class vehicles).

### b. Common questions govern the elements of Plaintiffs' consumer protection claims.

Plaintiffs seek certification of eight states' statutory consumer protection claims for monetary damages: California (CLRA), Florida, Illinois, Indiana, Kansas, Maryland, Nebraska, and North Carolina. Common proof will drive the resolution of all of these claims, further satisfying commonality. Common questions relevant to these claims include (a) whether Ford committed a deceptive act by failing to disclose the Saw Cut Defect; (b) whether Ford knew about the Saw Cut Defect; (c) whether the Saw Cut Defect was a material safety defect Ford had a duty to disclose; (d) whether the Court can presume Class members' reliance on Ford's failure to disclose this material safety defect; and (e) in Nebraska, whether Ford's omission of the Saw Cut Defect affected the public interest. These are all objective questions with a single answer for all Class members in states where these elements are relevant (as set forth in the table below).

| Common Question[159] | Analysis | CA | FL | IL | IN | KS | MD | NE | NC |
|---|---|---|---|---|---|---|---|---|---|
| Whether Ford committed a deceptive act by failing to disclose the Saw Cut Defect | V.A.2.b.i | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ |
| Whether Ford knew about the Saw Cut Defect | V.A.2.b.ii | ✓ | — | ✓ | ✓ | ✓ | — | — | ✓ |
| Whether the Saw Cut Defect is a material safety defect Ford was obligated to disclose | V.A.2.b.iii | ✓ | — | — | ✓ | ✓ | ✓ | — | ✓ |
| Whether Class members presumably relied on Ford's failure to disclose the Saw Cut Defect | V.A.2.b.iv | ✓ | — | — | ✓ | — | — | — | ✓ |
| Whether Ford's omission of the Saw Cut Defect affected the public interest | V.A.2.b.v | — | — | — | — | — | — | ✓ | — |
| Whether Ford's deception caused Class damages | V.B.1.b | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ |

> **i.  Under every state's consumer protection law, an objective inquiry will determine if Ford committed an unfair or deceptive practice by failing to disclose the Saw Cut Defect.**

Plaintiffs will establish at trial that Ford violated all of the consumer protection statutes at issue by failing to disclose the Saw Cut Defect to the vehicle-buying public. In every state at issue, deceptiveness is an objective inquiry that asks whether a reasonable consumer would have been deceived. That question has a single answer here because the Saw Cut Defect is common to every Class Vehicle, so the reasonable consumer test does not vary by Class member. In other words, the test does not depend on individualized proof of whether consumers were deceived, and so it is subject to common Class-wide proof.

**California**'s Consumers Legal Remedies Act (CLRA) relies on an "objective test, that is, whether members of the public are likely to be deceived." *Gold v. Lumber Liquidators, Inc.*, 323 F.R.D. 280, 290 (N.D. Cal. 2017). "Consequently, these statutes are particularly amenable to class certification 'because they will not require the court to investigate class members' individual interaction with the product, and 'courts in California routinely certify consumer class actions arising from alleged violations of the CLRA . . . .'" *Id.* (quotation marks omitted) (quoting *Tait v. BSH Home Appliances Corp.*, 289 F.R.D. 466, 480 (C.D. Cal. 2012)); *accord Rikos v. Procter & Gamble Co.*, 799 F.3d 497, 512 (6th Cir. 2015) (CLRA does not "require

---

[159] "✓" indicates that this state's law requires the element at issue, which can be answered with common proof. "—" indicates that this state's law does not require Plaintiffs to establish the element at issue.

PLS. MEM. IN SUPPORT OF MOTION FOR
CLASS CERTIFICATION
CASE NO. 2:20-CV-01796-DAD-CKD

individualized proof of reliance or causation such that classwide proof will never suffice").

Under the **Florida** Deceptive and Unfair Trade Practices Act (FDUTPA), "the plaintiff must only establish three *objective* elements: (1) a deceptive act or unfair practice; (2) causation; and (3) actual damages." *Carriuolo v. Gen. Motors Co.*, 823 F.3d 977, 985–86 (11th Cir. 2016). Because the first element focuses on defendants' conduct, rather than the mental state of any Class member, "the first FDUTPA element is amenable to class-wide resolution: the factfinder must only determine whether [the alleged deceptive act] would deceive an objectively reasonable observer." *Id.* at 986.

In **Illinois**, a plaintiff making a claim under the Illinois Consumer Fraud and Deceptive Practices Act (ICFA) "based on the misrepresentation, concealment, or omission of a material fact . . . must prove: (1) the misrepresentation or concealment of a material fact; (2) an intent by the defendant that plaintiff rely on that misrepresentation or concealment; and (3) the deception occurred in the course of conduct involving trade or commerce." *Gold*, 323 F.R.D. at 291 (citing *Mackinac v. Arcadia Nat'l Life Ins. Co.*, 648 N.E.2d 237 (Ill. App. Ct. 1995)). Because the defendant's conduct and materiality (as discussed below) are objective tests, an ICFA claim based upon material omission "is subject to proof by common evidence." *Id.*; *accord Tait*, 289 F.R.D. at 483 ("The Court agrees with Plaintiffs that the ICFA statute imposes an objective test and thus, as with the California statutes under which Plaintiffs sue, Defendant's liability to the Illinois class will not require individual inquiries.").

Under the **Indiana** Deceptive Consumer Sales Act (IDCSA), "[a] supplier may not commit an unfair, abusive, or deceptive act, omission, or practice in connection with a consumer transaction." Ind. Code § 24-5-0.5-3(a). This framework, similar to the analogous California, Florida, and Illinois codes, focuses on the conduct of the seller and is subject to common proof. In *Callantine v. 4E Brands North America, LLC*, 2024 WL 4903361 (N.D. Ind. Nov. 27, 2024), for example, the court determined that whether the defendant "represented in writing that its hand sanitizer was ethanol-based, safe, and effective, although it knew or should have known the product instead contained methanol, was unsafe, and was ineffective," was a common question. *Id.* at *7. Here, too, Plaintiffs can establish on a Class-wide basis that Ford failed to disclose the Saw Cut Defect despite knowing that it rendered the Class Vehicles prone to engine failure.

Under the **Kansas** Consumer Protection Act (KCPA), to state a claim for willful omission a

- 29 -

"plaintiff must show that (1) plaintiff and the class members were consumers under the KCPA, (2) defendants were suppliers under the KCPA, (3) defendants willfully omitted a fact about a purchase or sale, and (4) the fact stated or concealed was material." *Nieberding v. Barrette Outdoor Living, Inc.*, 302 F.R.D. 600, 613 (D. Kan. 2014) (citing *Cole v. Hewlett Packard Co.*, 2004 WL 376471, at *7 (Kan. Ct. App. Feb. 27, 2004)). In *Nieberding*, the Court certified a class under the KCPA because the claim was subject to common proof: "Plaintiff asserts that defendants owed a duty to the putative class members to disclose that the brackets were defective. Defendants essentially have conceded that they did not disclose that the brackets were defective—indeed, defendants continue to deny that a defect exists. Thus, the Court need not delve into individual interactions between Home Depot and the class members." *Id.* at 614. Moreover, under the KCPA "[a] factfinder will not have to determine whether each plaintiff subjectively relied on the omissions, but will have to determine only whether those omissions were likely to deceive and influence a reasonable person." *Id.* at 616. "As a result, individual issues do not predominate the causation inquiry— whether the allegedly omitted fact was material is a question that can be proved or disproved by evidence common to the class." *Id.* Similarly, in *Delcavo v. Tour Resource Consultants, LLC*, 2022 WL 1062269 (D. Kan. Apr. 8, 2022), the court adopted the reasoning of the *Nieberding* court to hold that "Plaintiff's claim under the KCPA based on alleged omissions . . . may be proved on a class-wide basis." *Id.* at *9.

The **Maryland** Consumer Protection Act (MCPA) similarly imposes an objective test. The MCPA prohibits "[u]nfair or deceptive trade practices," which includes "[f]ailure to state a material fact if the failure deceives or tends to deceive." Md. Code, Com. Law § 13–301(3). Although a minority of courts have identified reliance as an individualized inquiry that precludes class certification, most courts have held that a "plaintiff's reliance can be presumed where a defendant's omission is material." *Tait*, 289 F.R.D. at 484; *accord In re Marriott Int'l, Inc., Customer Data Sec. Breach Litig.*, 341 F.R.D. 128, 160 (D. Md. 2022) (collecting cases).

Under the **Nebraska** Consumer Protection Act (NCPA), "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce shall be unlawful." Neb. Rev. Stat. § 59-1602. Courts have held that Nebraska does not require an individualized showing of reliance, and thus that "substantially similar labeling and product placement practices utilized by Defendants can be used as evidence common to all members in the proposed subclasses to prove to make a prima facie showing of

- 30 -

consumer fraud." *In re Dollar Gen. Corp. Motor Oil Mktg. & Sales Pracs. Litig.*, 2019 WL 1418292, at *26 (W.D. Mo. Mar. 21, 2019); *accord Harris v. D. Scott Carruthers & Assocs.*, 270 F.R.D. 446, 453 (D. Neb. 2010) (finding that common questions predominate under NCPA where communications were common to the class).

Claims under the **North Carolina** Unfair and Deceptive Trade Practices Act (UDTPA) must allege "(1) an unfair or deceptive act or practice (2) in or affecting commerce (3) which proximately caused injury to the plaintiff or his business." *Rikos*, 799 F.3d at 517 (quoting *Rahamankhan Tobacco Enters. Pvt. Ltd. v. Evans MacTavish Agricraft, Inc.*, 989 F. Supp. 2d 471, 477 (E.D.N.C. 2013)). In *Rikos*, the Sixth Circuit noted that "the North Carolina Supreme Court has held that reliance can be proved circumstantially, not just from direct testimony from the plaintiff." *Id.* (citing *Rowan Cnty. Bd. of Educ. v. U.S. Gypsum Co.*, 418 S.E.2d 648, 661 (N.C. 1992)). Accordingly, where "the defendant made a uniform representation to class members," circumstantial evidence "'could lead a reasonable factfinder to conclude beyond a preponderance of the evidence that each individual plaintiff relied on the defendants' representations.'" *Id.* at 518 (quoting and applying logic *of Klay v. Humana, Inc.*, 382 F.3d 1241, 1259 (11th Cir. 2004), *abrogated in part on other grounds by Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639 (2008)).

Each consumer protection Class claim thus presents an objective inquiry: were the Class Vehicles defective? Did Ford know about the Saw Cut Defect Should Ford have informed consumers of this defect? Was the uniform omission the sort that a reasonable consumer would rely upon? These questions are each subject to Class-wide proof in every state at issue.

### ii.    Ford's knowledge of the Saw Cut Defect is a common question.

Several of the state consumer protection statutes at issue here require Plaintiffs to prove Ford knew about the Saw Cut Defect.[160] Here, Ford uniformly failed to disclose the Saw Cut Defect, which takes individual Class members' subjective knowledge of the Defect off the table. Courts frequently find that an automaker's knowledge is a common question where a common defect is at issue, because whether the defendant knew about the Defect is a "common question[] [that] can be answered in a way that necessarily

---

[160] Florida, Maryland, and Nebraska do not require knowledge. **FL**: *State Farm Mut. Auto. Ins. Co. v. Performance Orthopaedics & Neurosurgery, LLC*, 278 F. Supp. 3d 1307, 1316 (S.D. Fla. 2017); **MD**: *Kamara v. Shapiro Brown & Alt, LLP*, 2016 WL 1064432, at *10 n.7 (Md. Ct. Spec. App. Mar. 17, 2016); **NE**: *Brown v. Jungers*, 2009 WL 159700, at *5 (D. Neb. Jan. 22, 2009).

holds across the whole class." *Johnson II*, 2024 WL 4784367, at *1; *see Wolin*, 617 F.3d at 1173 ("Common issues predominate such as whether Land Rover was aware of the existence of the alleged defect . . . ."); *Alger*, 334 F.R.D. at 427 ("[T]he question of whether Chrysler knew about and failed to disclose the defect predominates . . . ."); *Chamberlan v. Ford Motor Co.*, 402 F.3d 952, 962 (9th Cir. 2005) (common nature of "whether Ford was aware of alleged design defects" was "plain enough" and "obvious"). Given the uniform Saw Cut Defect, that rule holds true here: either Ford knew about the Defect, or it did not. Regardless, this is a common question with a single answer for all Class members.

Ford may try to present a counterfactual framework and even suggest that its knowledge of the Saw cut Defect evolved over time. But that is beside the point and does not affect class certification: "[I]f [Ford]'s knowledge changed over time, then common proof as to the whole class will show it. [Ford] is a single company; evidence of its knowledge may change over time, but it will be uniform as it relates to the claims at each period in time . . . ." *Johnson I*, 2022 WL 2869528, at *22. What matters for class certification is that "common evidence will be used to prove [Ford's knowledge and subsequent actions] either way." *Falco v. Nissan N. Am. Inc.*, 2016 WL 1327474, at *8 (C.D. Cal. Apr. 5, 2016). Actually establishing that knowledge—or, as Ford will surely claim, the lack thereof—is a "merits inquir[y] unrelated to class certification." *Nguyen v. Nissan N. Am., Inc.*, 932 F.3d 811, 821 (9th Cir. 2019).

### iii.    Ford had a common duty to disclose the material Saw Cut Defect.

As a general rule, "a manufacturer has a duty to disclose product defects when (1) it has superior knowledge of the problem, or (2) the defect implicates product safety." *In re Chrysler Pacifica Fire Recall Prods. Liab. Litig.*, 706 F. Supp. 3d 746, 770 (E.D. Mich. 2023). This principle "is recognized nearly universally" across the consumer protection statutes under which Plaintiffs assert claims. *Id.*; *see Sowa v. Mercedes-Benz Grp. AG*, 764 F. Supp. 3d 1233, 1286-87 (N.D. Ga. 2024) (surveying consumer protection statutes and concluding that a duty to disclose arises under the laws of California, Colorado, Illinois, Indiana, Kansas, Maryland, Michigan, North Carolina, and others where the manufacturer has superior knowledge of a defect or the defect implicates product safety); *In re Volkswagen Timing Chain Prod. Liab. Litig.*, 2017 WL 1902160, at *19–20 (D.N.J. May 8, 2017) (same, surveying over twenty states); *In re MyFord Touch Consumer Litig.*, 46 F. Supp. 3d 936, 960 (N.D. Cal. 2014) (a "safety concern . . . gives rise to a duty to disclose" under the laws of numerous states).

For the states that do require a duty to disclose (California (CLRA), Indiana, Kansas, Maryland, and North Carolina), both prongs of the inquiry—superior knowledge and product safety—present common questions that do not disturb the common nature of Ford's duty to disclose. *See, e.g.*, *Sowa*, 764 F. Supp. 3d at 1286–87; *In re Chrysler Pacifica*, 706 F. Supp. 3d at 770–71.[161] First, whether Ford possessed superior and exclusive knowledge of the Saw Cut Defect is a Class-wide question with a single answer: Ford either knew about the Saw Cut Defect from its pre-production testing, warranty data, and internal engineering communications, or it did not. That answer does not vary by Class member. *See Sowa*, 764 F. Supp. 3d at 1287–88 (finding superior and exclusive knowledge where manufacturer had pre-sale testing data, consumer complaints, replacement part orders, and technical service bulletins); *Alger*, 334 F.R.D. at 427.

Second, whether the Saw Cut Defect constitutes a material safety defect is likewise a common question. The Defect is uniform across the Class and its safety implications do not depend on the identity of any individual Class member. *See In re Chrysler Pacifica*, 706 F. Supp. 3d at 770. As the court explained in *Johnson*, this inquiry is well suited to Class-wide adjudication: "The jury will be asked whether a reasonable consumer would find the nondisclosure material. The jury will also be asked whether [Ford] knew of the alleged defect, which also turns on common proof, rather than anything individualized." 2022 WL 2869528, at *20. Here, as in *Johnson*, the common nature of these questions is "reinforced by the nature of the alleged problem . . . : that something in th[e] [Class Engine's] ***design***" is defective. *Id.* In other words, because the Defect is common to every Class Vehicle, the common question of whether Ford was obligated to disclose the Defect has an identical answer for every Class member. *Id*

### iv. <u>Reliance on Ford's failure to disclose the safety-related Saw Cut Defect is presumed.</u>

For Plaintiffs' claims under the consumer protection statutes of California (CLRA), Indiana, Maryland, and North Carolina, reliance is presumed when there is an omission of a material defect.[162] "An omission is material if a reasonable consumer would attach importance to its existence or nonexistence in

---

[161] The other states—Florida, Illinois, and Nebraska—do not require a duty to disclose. **FL**: *Perez v. Toyota Motor Sales, U.S.A., Inc.*, 2022 WL 17886035, at *2-3 (C.D. Cal July 1, 2022); **IL**: *Tapply v. Whirlpool Corp.*, 148 F.4th 407, 422 (6th Cir. 2025); **NE**: *In re Saturn L-Series Timing Chain Prods. Liab. Litig.*, 2008 WL 4866604, at *22 (D. Neb. Nov. 7, 2008).

[162] **CA CLRA**: *Daniel*, 806 F.3d at 1225; **IN**: *In re Honda Idle Stop Litig.*, 347 F.R.D. 528, 544 n.8 (C.D. Cal. 2024); **MD**: *Marriott*, 341 F.R.D. at 160; **NC**: *In re Soc. Media Adolescent Addiction/Pers. Inj. Prods. Liab. Litig.*, 753 F. Supp. 3d 849, 922 (N.D. Cal. 2024).

PLS. MEM. IN SUPPORT OF MOTION FOR
CLASS CERTIFICATION
CASE NO. 2:20-CV-01796-DAD-CKD

determining his choice of action in the transaction in question." *Daniel v. Ford Motor Co.*, 806 F.3d 1217, 1225 (9th Cir. 2015) (citation omitted). In general, "materiality is governed by an objective 'reasonable person' standard," making this element suitable for Class-wide adjudication. *See Edwards v. Ford Motor Co.*, 603 F. App'x 538, 541 (9th Cir. 2015); *Cadena v. Am. Honda Motor Co.*, 2024 WL 4005097, at *9 (C.D. Cal. July 2, 2024); *Johnson I*, 2022 WL 2869528, at *23.

The Saw Cut Defect can cause the Class Vehicles to overheat and experience engine shutdown. *Supra* Section II.B.3. A jury could certainly determine that these dangerous circumstances are "unreasonable safety risks" that "are considered material," and that yes-or-no question has an answer common to all Class members. *Daniel*, 806 F.3d at 1225. And Ford did not disclose the Defect to Class members; indeed, it continues to deny the saw-cut design that exists in every Class Engine is a defect at all.[163] The presumption of reliance on Ford's failure to disclose the Saw Cut Defect thus applies Class-wide, supporting class certification in any state that may require reliance. *See Daniel*, 806 F.3d at 1225; *Falco*, 2016 WL 1327474, at *11; *Johnson I*, 2022 WL 2869528, at *23.

v. **Nebraska's "public interest" element is an objective inquiry with a single answer.**

Courts construing the Nebraska CPA's public interest element have found it satisfied where plaintiffs allege a widespread deceptive practice that affected thousands of individuals in Nebraska.[164] *See, e.g.*, *Saturn L-Series Timing Chain*, 2008 WL 4866604, at *23 (alleged defect "affected thousands of cars that consumers purchased, thereby constituting 'an impact on consumers at large'" (citation omitted)); *Arthur v. Microsoft Corp.*, 676 N.W.2d 29, 38 (Neb. 2004) (public interest was affected where the alleged conducted affected a class of over 4,000 class members); *Bassett v. Credit Bureau Servs., Inc.*, 554 F. Supp. 3d 1000, 1018 (D. Neb. 2021) (element satisfied because "[t]his case is a certified class action with 3,662 members"), *vacated on other grounds*, 60 F.4th 1132 (8th Cir. 2023); *In re Cap. One 360 Sav. Acct. Interest Rate Litig.*, 779 F. Supp. 3d 666, 738 (E.D. Va. 2024) (alleged deceptive conduct with "widespread effects" on customers "across the country" affected public interest).

This case concerns a nationwide scheme to conceal a material safety defect, and Plaintiffs seek to

---

[163] *Miller*, Dkt. 147 (Answer) ¶¶ 4, 339; *Nelson*, Dkt. 59 (Answer) ¶¶ 4, 55.

[164] The Nebraska Consumer Protection Act applies "to unfair or deceptive acts or practices that affect the public interest." *Nelson v. Lusterstone Surfacing Co.*, 605 N.W.2d 136, 141 (Neb. 2000).

certify a Nebraska Class with over 5,000 members.[165] Thus, not only is the public interest impact of Ford's omissions easily shown, it is satisfied equally with respect to every Nebraska Class member.

### c. Whether the Class Vehicles were merchantable is also a common question.

Finally, the implied warranty claims will require Plaintiffs to prove the Saw Cut Defect rendered the Class Vehicles unmerchantable. This question, too, satisfies commonality, since it turns on common proof applicable to every Class Vehicle. *Alger*, 334 F.R.D. at 424; *Salas*, 2019 WL 1940619, at *5.

| Common Question | Analysis | CA | CO | IN | KS | MD | MI |
|---|---|---|---|---|---|---|---|
| Whether the Class Vehicles were unfit for their ordinary purpose | V.A.2.c | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ |
| Whether the Class Vehicles' unfitness caused Class damages | V.B.1.b | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ |

As the Court noted in its order denying Ford's first motion to dismiss the implied warranty claims, "For all claims, whether or not it is based on the UCC, Plaintiffs generally offer the same basic theory — the vehicles were not fit for their ordinary purpose." *Miller*, Dkt. 76 at 12. And indeed, the core test for breach of implied warranty in each state is whether the vehicle is fit for the ordinary purpose for which it is used. *See In re FCA US LLC Monostable Elec. Gearshift Litig.*, 334 F.R.D. 96, 111–13 (E.D. Mich. 2019) (collecting cases); *Johnson I*, 2022 WL 2869528, at *21 ("The question under each state's law for those claims will be whether the vehicles were fit for ordinary purpose.").[166] That is because each of Plaintiffs' implied warranty claims are based upon the UCC as enacted in each state, *Miller*, Dkt. 76 at 12, except for the California Song-Beverly Act claims, which presents the same test, *see Keegan v. Am. Honda Motor Co.*,

---

[165] Ford produced sizable Excel databases containing information about every Class Vehicle. Although these databases are too large to attach to this motion, Plaintiffs would be happy to provide them upon the Court's request. Ex. 3, Talley Excel Decl. ¶ 3.

[166] **CA**: *Isip v. Mercedes-Benz USA, LLC*, 155 Cal. App. 4th 19, 26 (2007) ("The core test of merchantability is fitness for the ordinary purpose for which such goods are used."); **CO**: *Murtagh v. Bed Bath & Beyond Inc.*, 2020 WL 4195126, at *4 (D. Colo. July 3, 2020) ("The warranty of merchantability implies that goods are fit for their ordinary purposes."); **IN**: *Castagna v. Newmar Corp.*, 340 F. Supp. 3d 728, 736 (N.D. Ind. 2018) ("To be merchantable, goods must pass without objection in the trade and be fit for the ordinary purpose for which such goods are used."); **KS**: *Int'l Petrol. Servs., Inc. v. S & N Well Serv., Inc.*, 639 P.2d 29, 37 (Kan. 1982) ("[T]he implied warranty of merchantability . . . covers fitness for ordinary purposes."); **MD**: *Lloyd v. Gen. Motors Corp.*, 916 A.2d 257, 287 (Md. 2007) ("[T]he seller warrants that goods are fit for the ordinary purpose for which goods of its kind are intended,"); **MI**: *In re SCBA Liquidation, Inc.*, 451 B.R. 747, 772 n.65 (Bankr. W.D. Mich. 2011) ("warranty that the goods are fit for the ordinary purpose for which they are used").

PLS. MEM. IN SUPPORT OF MOTION FOR
CLASS CERTIFICATION
CASE NO. 2:20-CV-01796-DAD-CKD

838 F. Supp. 2d 929, 944 (C.D. Cal. 2012) ("Under the act, an implied warranty of merchantability guarantees that 'consumer goods . . . [a]re fit for the ordinary purposes for which such goods are used . . . .'" (quoting Cal. Civ. Code § 1791.1(a) and discussing, *inter alia*, 1 White & Summers, *Uniform Commercial Code,* § 9-8 at 523)).[167] All of these states recognize that "'merchantability' of an automobile requires a showing that the vehicle operates in a 'safe condition' or provides 'safe transportation,'" *Monostable*, 334 F.R.D. at 112, not merely that it "is capable of providing transportation from point A to point B," *Gutierrez v. Carmax Auto Superstores Cal.*, 19 Cal. App. 5th 1234, 1247 (2018).[168]

Whether the Class Vehicles were merchantable when Ford distributed them is an "objective" inquiry that "can be answered through common proof." *Cadena*, 2024 WL 4005097, at *12. Here, that common proof will consist of evidence "that the [C]lass [V]ehicles were sold with the same latent defect." *Falco*, 2016 WL 1327474, at *9; *see also id.* at *10 (accepting plaintiffs' argument that "there is the same defect for all the alleged class vehicles when they left Nissan's factory, and this common defect . . . is sufficient for showing common questions of fact and law predominate."). The jury will determine whether that common defect impaired the ability of the Class Vehicles to provide safe transportation, thus resolving all of the Class members' implied warranty claims in one fell swoop.

To the extent Ford offers any evidence to argue that the Class Vehicles were merchantable, that argument does not affect class certification "[s]ince this merits question would be answered either way in a

---

[167] *See also Gunner Concrete, Inc. v. ProAll Int'l Mfr., Inc.*, 2024 WL 2406651, at *7 (C.D. Cal. Apr. 18, 2024) ("The Act 'broadens a buyer's remedies to include costs, attorney's fees, and civil penalties. It supplements, rather than supersedes, the provisions of the California Uniform Commercial Code.'" (quoting *Jensen v. Ford Motor Co.*, 198 Cal. App. 4th 1478, 1486 (2011))); *accord Barboza v. Mercedes-Benz USA, LLC*, 2022 WL 17978408, at *2 (E.D. Cal. Dec. 28, 2022) ("The Song-Beverly Act, which is popularly known as California's automobile lemon law, is a strongly pro-consumer law aimed at protecting consumers.").

[168] **CA**: *Gutierrez*, 19 Cal. App. 5th at 1248 ("[A]llegations showing an alleged defect that created a substantial safety hazard would sufficiently allege the vehicle was not 'fit for the ordinary purposes for which such goods are used' and, thus, breached the implied warranty of merchantability."); **CO**: *O'Connor v. BMW of N. Am., LLC*, 2020 WL 1303285, at *5 (D. Colo. Mar. 19, 2020) ("The case law is consistent that, although a vehicle is operable, it may still be unsafe and unfit for ordinary use."); **IN**: *Ulrich v. Gen. Motors, LLC*, 2025 WL 629460, at *4 (E.D. Mich. Feb. 25, 2025) (vehicle must be "fit for the ordinary purpose of providing reasonably safe transportation"); **KS**: *Marksberry v. FCA US LLC*, 481 F. Supp. 3d 1229, 1237 (D. Kan. 2020) ("[A] car's ordinary purpose is not limited to its major components affecting transportation." (quotation marks omitted)); **MD**: *Lloyd*, 916 A.2d at 285 ("[T]he implied warranty of merchantability not only warrants that the automobile will operate effectively, but that it will provide reasonably safe transportation."); **MI**: *Francis v. Gen. Motors, LLC*, 504 F. Supp. 3d 659, 676 (E.D. Mich. 2020) ("[A]n automobile is merchantable or fit for its intended purpose only where it is able reliably to operate in a 'safe condition' or to provide 'safe transportation.'").

manner common to the class." *Id.* at \*10. And regardless, the proper audience for any such evidence is the jury. *See, e.g.*, *Alger*, 334 F.R.D. at 428.

### 3. Rule 23(a)(3): Plaintiffs' claims are typical of all Class members.

Plaintiffs satisfy Rule 23(a)(3)'s typicality requirement because their claims and defenses "are 'reasonably coextensive with those of absent class members.'" *Id.* at 424 (quoting *Just Film, Inc. v. Buomo*, 847 F.3d 1108, 1116 (9th Cir. 2017)). Every Plaintiff's claim against Ford arises from the same course of events: Ford's failure to disclose the Saw Cut Defect in the Class Vehicles prior to selling these cars to the public. *Id.* Every Plaintiff and every Class member owned a vehicle with an engine in the same "family of engines" with the same defective saw cut design.[169] *See Johnson II*, 2024 WL 4784367, at \*2 (typicality satisfied when all plaintiffs and class members own vehicles with "the same [allegedly defective] design"). Furthermore, Plaintiffs and Class members all "seek to recover damages pursuant to the same legal theories": violation of state consumer protection laws and breach of implied warranty stemming from the common "design defect" in the Class Engine. *Cadena*, 2024 WL 4005097, at \*9. Given the overlap between Plaintiffs' claims and those of the absent Class members, typicality is satisfied.

### 4. Rule 23(a)(4): Plaintiffs and their counsel will adequately protect the interests of the Class.

The final Rule 23(a) requirement—adequacy—is also satisfied. "In making this determination, courts must consider two questions: '(1) do the named plaintiffs and their counsel have any conflicts of interest with other class members and (2) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class?'" *Evon v. Law Offs. of Sidney Mickell*, 688 F.3d 1015, 1031 (9th Cir. 2012) (quoting *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1020 (9th Cir. 1998)). The answers here are "no" and "yes," respectively.

First, Plaintiffs and their counsel are directly aligned with the interests of absent Class members in proving Ford's wrongful conduct and seeking redress for the harm. Plaintiffs are not aware of any conflicts between themselves or their counsel and the Class members. Second, Plaintiffs have vigorously prosecuted this action through this point and they will continue to do so. Over the course of the previous five years, every plaintiff responded to written discovery, worked with counsel to produce documents in response to

---

[169] Ex. 16, May 2026 Tuneff Dep. 7:12–13, 9:2–6.

PLS. MEM. IN SUPPORT OF MOTION FOR
CLASS CERTIFICATION
CASE NO. 2:20-CV-01796-DAD-CKD

Ford's requests for production, and sat for a deposition. *See* Ex. 1, Decl. of Mark P. Chalos ("Chalos Decl.") ¶ 9; *see, e.g.*, *Johnson I*, 2022 WL 2869528, at *20 (plaintiffs were adequate class representatives because they "prosecuted the action for five years, including sitting for depositions").

Interim Lead Class Counsel "have also shown that they are adequate to represent the Classes based on their vigorous prosecution of the action and their extensive experience with consumer protection class actions." *Sanchez*, 2024 WL 4730654, at *15; *see generally* Ex. 1, Chalos Decl.; Ex. 2, Decl. of Cody R. Padgett ("Padgett Decl."); *see also Miller*, Dkts. 60, 122 (orders appointing Interim Lead Class Counsel).

**B.      Rule 23(b)(3) is satisfied for all of the proposed Classes.**

The claims of every named Plaintiff and Class member arise out of a critical safety defect common to every Class Vehicle. This case therefore satisfies Rule 23(b)(3), which permits class certification if "questions of law or fact common to class members predominate over any questions affecting only individual members" and "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).

**1.      Common questions predominate for all the claims at issue.**

Rule 23(b)(3)'s "predominance inquiry asks whether the common, aggregation-enabling, issues in the case are more prevalent or important than the non-common, aggregation-defeating, individual issues." *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016). Importantly, "Rule 23(b)(3) requires a showing that *questions* common to the class predominate, not that those questions will be answered, on the merits, in favor of the class." *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 459 (2013).[170]

**a.      Common questions predominate over individualized ones.**

Predominance is satisfied for all of the claims and putative Classes. As set forth above, the elements of Plaintiffs' consumer protection and implied warranty claims are shot through with common questions that have a single answer for every Class member, including the existence of the Saw Cut Defect in every Class Vehicle. To the extent any of Plaintiffs' claims contain additional elements, such as duty to disclose or reliance, those elements are resolvable in a single stroke with Class-wide proof. *Supra* Section V.A.2.b.

---

[170] Thus, any arguments Ford may make about how it supposedly did not violate the consumer protection and implied warranty laws at issue are beside the point and may even reinforce Plaintiffs' arguments: merits issues that "are readily resolvable across all class members" support class certification. *Martin v. Sysco Corp.*, 325 F.R.D. 343, 352 (E.D. Cal. 2018) (Drozd, J.).

Even if Ford, in response, attempts to identify "some issues that affect some class members but not others," such as statutes of limitations or individualized damages, "such issues do not make class certification inappropriate." *Alger*, 334 F.R.D. at 431. Rule 23(b)(3) predominance is satisfied even if "important matters will have to be tried separately, such as damages or some affirmative defenses particular to some individual class members." *Tyson Foods*, 577 U.S. at 453; *see Olean*, 31 F.4th at 668 ("Nor can a district court decline to certify a class that will require determination of some individualized questions at trial, so long as such questions do not predominate over the common questions.").

Here, Plaintiffs are not aware of any "individualized questions" that "'will overwhelm common ones and render class certification inappropriate under Rule 23(b)(3).'" *Olean*, 31 F.4th at 669 (quoting *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 276 (2014)). The issues common to every Class member "present a significant aspect of the case" and will resolve the elements of every Class claim "in a single action." *Millan v. Cascade Water Servs., Inc.*, 310 F.R.D. 593, 606 (E.D. Cal. 2015); *see supra* Section V.A.2.b. To the extent any individualized issues, including the quantum of damages each Class member will receive, exist, they "are insignificant relative to the central, common questions that will drive resolution of class members' claims." *Alger*, 334 F.R.D. at 431. Thus, common questions predominate and Rule 23(b)(3) is satisfied.

### b. <u>Plaintiffs have proposed a common damages methodology in line with their theory of liability.</u>

Rule 23(b)(3) is also satisfied because Plaintiffs will prove damages measured on a Class-wide basis consistent with their theory of liability. *See Comcast Corp. v. Behrend*, 569 U.S. 27, 34 (2013). Plaintiffs allege they overpaid for their Class Vehicles because Ford did not disclose the Saw Cut Defect at the point of sale, and therefore Plaintiffs did not receive the benefit of their bargain (a vehicle without that defect).

As Plaintiffs' damages expert, Steven Boyles, explains in his report, "because there is a defect that was undisclosed to the buyer, the buyer did not receive that for which they bargained."[171] Mr. Boyles proposes to calculate those "benefit of the bargain" damages by comparing "the difference in the value represented and the value received (what the vehicle is worth with and without the Defect)."[172] In this case,

---

[171] Ex. 4, Expert Report of Steven B. Boyles ¶ 21.
[172] *Id.* ¶ 33.

every Class member was denied the benefit of their bargain in an amount equal to cost of repairing the Saw Cut Defect.[173] These "cost of repair" damages will "provide the class the benefit of their bargain because they would be in the same position they would have had the car not been sold with a defective engine."[174]

Mr. Boyles presents a straightforward formula to measure these benefit-of-the-bargain damages: **PC + (LC x LT)**, where "PC" is the engine assembly part cost, "LC" is the average labor cost, and "LT" is the total hours necessary to perform the repair procedures.[175] ███████████████████ ██████████████████████████████████████████████ ████████████████████[176] The formula is also informed by the repair procedures for fixing the Saw Cut Defect, as described by Dr. Colin Jordan, Plaintiffs' liability expert.[177]

Mr. Boyles's straightforward formula for calculating Class members' benefit of the bargain damages readily satisfies Rule 23 for every Class at issue.[178] In *Nguyen*, the Ninth Circuit held in no uncertain terms that a damages model that uses "the average cost of repair" to calculate "the amount [every class member] purportedly overpaid in purchasing [an allegedly defective] vehicle" passes muster under *Comcast*. 932 F.3d at 821. Not only is a cost-of-repair formula easy to apply, but there is a valid "nexus between" this measure of damages and Plaintiffs' "legal theory" that Ford violated various states' laws "by selling vehicles with a defective [engine] that was not reflected in the sale price." *Id.* Therefore, courts frequently certify classes where—as here—plaintiffs propose to measure benefit-of-the-bargain damages based on the cost of repair. *See, e.g., Sanchez*, 2024 WL 4730654, at *17–18 (holding that benefit-of-the-bargain theory of recovery, measured by the cost of repair, is an appropriate class-wide damages methodology for implied warranty and

---

[173] *Id.* ¶ 18.

[174] *Id.*

[175] *Id.* ¶ 41.

[176] *Id.* ¶¶ 43–49.

[177] *Id.* ¶ 40.

[178] All the causes of action for which Plaintiffs seek class certification permit benefit-of-the-bargain damages. **Consumer Protection**: **CA**: *Nguyen*, 932 F.3d at 818; **FL**: *Carriuolo*, 823 F.3d at 986; **IL**: *Schiffner v. Motorola, Inc.*, 697 N.E.2d 868, 874 (Ill. App. Ct. 1998); **IN**: *Dzielak v. Whirlpool Corp.*, 2017 WL 6513347, at *10, *21 (D.N.J. Dec. 20, 2017); **KS**: *In re Smitty's/Cam2 303 Tractor Hydraulic Fluid Mktg.*, 2023 WL 9064606, at *16, *19 (W.D. Mo. Dec. 13, 2023); **MD**: *In re Honda Idle Stop*, 347 F.R.D. at 548; **NE**: *Dollar Gen.*, 2019 WL 1418292, at *20; **NC**: *Sanchez*, 2024 WL 4730654, at *18. **Implied Warranty**: **CA**: *Victorino v. FCA US LLC*, 2019 WL 5268670, at *7 (S.D. Cal. Oct. 17, 2019); **CO**: *Witters v. Daniels Motors, Inc.*, 524 P.2d 632, 635 (Colo. Ct. App. 1974); **IN**: *Pegg v. Nexus RVs LLC*, 2019 WL 2772444, at *9 (N.D. Ind. July 2, 2019); **KS**: *Hodges v. Johnson*, 199 P.3d 1251, 1261–62 (Kan. 2009); **MD**: *Lloyd*, 916 A.2d at 287; **MI**: *Taylor & Gaskin, Inc. v. Chris-Craft Indus.*, 732 F.2d 1273, 1277 (6th Cir. 1984).

consumer protection claims for numerous states); *Falco*, 2016 WL 1327474, at *12 (similar); *see also Salas v. Toyota Motor Sales*, 2024 WL 608245, at *4 (C.D. Cal. Jan. 16, 2024) (denying Toyota's motion to exclude damages expert who proposed a "repair-based approach to measuring the benefit of the bargain"); *Daniel v. Ford Motor Co.*, 2016 WL 2899026, at *7 (E.D. Cal. May 18, 2016) ("[A] reasonable jury could conclude that a consumer would demand that the purchase price of a vehicle with a defect be reduced by the cost of remedying that defect.").

### 2. Class treatment is the superior method of redressing the harm to Class Members.

### a. The proposed Classes are manageable.

The final Rule 23(b)(3) requirement is "that a class action be a superior method for resolving Plaintiffs' claims." *Cadena*, 2024 WL 4005097, at *14. Rule 23 requires courts to consider the following non-exhaustive list of factors when assessing the superiority of class treatment:

> (A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b)(3); *accord Wolin*, 617 F.3d at 1175 (factors not exhaustive).

*First*, the cost of litigating this action—which has involved years of intensive discovery, including dozens of depositions and several expert reports per side—greatly outweighs "recovery on an individual basis." *Wolin*, 617 F.3d at 1175; *see Cadena*, 2024 WL 4005097, at *15 ("[I]t is unlikely that the vast majority of individual members are interested in prosecuting separate actions. Each putative class member's claim is likely too small to justify the cost or risk of litigation.").

*Second*, there are no other actions pending involving the subject matter at issue.[179]

*Third*, "concentrating the litigation in this Court would eliminate the risk of inconsistent adjudication and promote the fair and efficient use of the judicial system." *Cadena*, 2024 WL 4005097, at *15. The judicial economy benefits from proceeding in a single action are particularly large here given the

---

[179] There was one case filed by an Illinois plaintiff on behalf of a putative Illinois class that concerned the external coolant leak in 1.6L EcoBoost engines. *Horan v. Ford Motor Co.*, 2026 WL 395630 (N.D. Ill. Feb. 12, 2026) (granting motion to dismiss), *appeal filed*, No. 26-1730 (7th Cir. Apr. 10, 2026). As discussed above, Plaintiffs do not seek certification of class members with 1.6L engines.

PLS. MEM. IN SUPPORT OF MOTION FOR
CLASS CERTIFICATION
CASE NO. 2:20-CV-01796-DAD-CKD

number of putative state Classes at issue, as well as "Plaintiffs' reliance on expert testimony, which would be wholly inefficient to replicate in each individual case." *Id.*; *see Johnson I*, 2022 WL 2869528, at *21 ("This case, moreover, has required significant expert evidence; it would not be feasible for each individual consumer to replicate that in each case."). Indeed, the Parties stipulated at the outset of this litigation to litigating in this forum due to the efficiency gains from this streamlined approach. *Miller*, Dkt. 35 at 3; *Nelson*, Dkt. 19 at 3.

*Finally*, there are no "management difficulties that will preclude this action from being maintained as a class action." *Cadena*, 2024 WL 4005097, at *15. Ford's liability in this action turns primarily on whether the EcoBoost Engines were defective when Ford sold them. *See Wolin*, 617 F.3d at 1176 (common question of defect was "the basis for [plaintiffs'] claim"). As discussed above, that is a single question with a single answer for all Class members.

To the extent other issues may be central to the determination of Ford's liability, Plaintiffs have demonstrated how these common questions will be answered by a jury on a Class-wide basis. The Court can resolve Plaintiffs' class claims in one trial or alternatively select one statewide class as a bellwether to guide the parties towards resolution for the remaining state classes.[180]

### b.    The Classes satisfy any ascertainability requirement.

As this Court has observed, "[t]he Ninth Circuit and the Supreme Court have not explicitly acknowledged in any published opinion that 'ascertainability' or 'definiteness' is a required element of class certification that imposes obligations independent of the enumerated Rule 23 factors." *Amaro v. Gerawan Farming, Inc.*, 2016 WL 3924400, at *12 (E.D. Cal. May 20, 2016) (Drozd, J.) (alterations adopted). Nevertheless, as part of assessing the "administrative feasibility or manageability" of a proposed class under Rule 23(b)(3)'s superiority requirement, some Ninth Circuit courts (including this one) have asked whether a class is ascertainable by reference to objective criteria. *Aldapa*, 323 F.R.D. at 343; *see also Walter*, 670 F. Supp. 3d at 1046 (asking whether proposed class is "ascertainable by reference to objective criteria, at least for class certification under Rule 23(b)(3)"). *But see Mirabelli v. Olson*, 350 F.R.D. 138, 146 (S.D. Cal.

---

[180] *See, e.g.*, *In re Syngenta AG MIR 162 Corn Litig.*, No. 2:14-md-2591-JWL-JPO, Dkt. 3319 (D. Kan. July 6, 2017) (determining remaining state class trials following bellweather trial of Kansas class (the case ultimately reached a global settlement)), https://www.ksd.uscourts.gov/sites/ksd/files/14-2591-doc-3319-consolidated-trial-order.pdf; *In re Whirlpool Corp. Front-Loading Washer Prods. Liability Litig.*, No. 08-wp-65000-CAB, Dkt. 34-1 (N.D. Ohio Mar. 31, 2009) (scheduling lead Ohio trial in multistate class action).

2025) ("Ascertainability is not required at the certification stage . . . ."); *Ahlman v. Barnes*, 445 F. Supp. 3d 671, 683 n.8 (C.D. Cal. 2020) ("While some circuits have adopted an 'ascertainability' prerequisite to certification, the Ninth Circuit has not.").

Here, the Classes are ascertainable. Courts frequently hold that ascertainability is satisfied in defective products cases, including when automobiles are at issue. *See Falco*, 2016 WL 1327474, at *14 (accepting argument that "class members are ascertainable through ownership and lease records from Nissan, dealerships, and the Department of Motor Vehicles," as well as "through records concerning diagnosis and repair of" the alleged defect); *Miller v. Fuhu Inc.*, 2015 WL 7776794, at *7 (C.D. Cal. Dec. 1, 2015) ("[T]he class definition . . . allows class members to be identified by objective criteria, *i.e.* a clear date range, place of purchase, and type of purchase."). That is particularly so here given that membership in the proposed Classes is limited to individuals who bought their cars new from an authorized Ford dealership, an "objective" criterion that is "verifiable through documentation of a purchase . . . of a class vehicle." *In re Honda Idle Stop*, 347 F.R.D. at 540 (quoting *Keegan*, 284 F.R.D. at 521–22).

### C.    The Court should appoint Interim Lead Class Counsel as Class Counsel.

Finally, the Court should appoint Interim Lead Class Counsel—Mark Chalos and Cody Padgett—as Class Counsel.

Rule 23(g) instructs courts to appoint class counsel who will "fairly and adequately represent the interests of the class." Fed. R. Civ. P. 23(g)(4). This Court already made that determination with respect to Mr. Chalos and Mr. Padgett when it appointed them to the positions of interim leadership in this case. Dkt. 60 at 2 (appointing Mark P. Chalos); Dkt. 122 at 2 (appointing Cody R. Padgett). Since then, Interim Lead Class Counsel have led this complex action through substantive challenges to the pleadings and significant fact and expert discovery. Ex. 1, Chalos Decl. ¶¶ 9–11; Ex. 2, Padgett Decl. ¶¶ 3–6, 11–12. In addition, both counsel and their firms have devoted (and will continue to devote) significant resources and expertise to prosecuting this case. *Id.*

Taken together, these efforts demonstrate that Mr. Chalos and Mr. Padgett should be appointed as counsel for the certified Classes. *See, e.g.*, *Vasquez v. Leprino Foods Co.*, 2020 WL 1527922, at *12 (E.D. Cal. Mar. 31, 2020) (appointing class counsel who "sufficiently identified and investigated potential claims in this lawsuit," "have sufficient experience litigating class actions," "appear to have sufficient knowledge

of the applicable . . . laws," and "appear to be willing and able to commit sufficient resources to representing the proposed class"); *see also In re Bank of Am. Cal. Unemployment Benefits Litig.*, 2025 WL 2816808, at *20 (S.D. Cal. June 24, 2025) (appointing interim co-lead counsel as class counsel).

## VI.    CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court certify the proposed Classes as defined herein, appoint Plaintiffs Darrick Christodaro, Harlampi Bozhinov, Anthony Cicero, Teresa Balaszek, Aaron Manfra, Victoria Manfra, Trevor Nelson, Sarah Nelson, David Speigner, Craig Morford, Kelli Morford, Tracey Ann Metro, Robyn Pirog, and John Krecek to serve as Class Representatives, and appoint Interim Lead Counsel to serve as Class Counsel.

Dated:  June 22, 2026

Respectfully submitted,

LIEFF CABRASER HEIMANN & BERNSTEIN, LLP

/s/ *Mark P. Chalos*

Mark P. Chalos (*pro hac vice*)
222 2nd Ave South, Suite 1640
Nashville, Tennessee  37219-2423
Telephone: (615) 313-9000
mchalos@lchb.com

Phong-Chau G. Nguyen (S.B. #286789)
LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, California 94111-3339
Telephone: (415) 956-1000
pgnguyen@lchb.com

Annika K. Martin (*pro hac vice*)
Gabriel Panek (*pro hac vice*)
LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
250 Hudson Street, 8th Floor
New York, New York  10013-1413
akmartin@lchb.com
gpanek@lchb.com

Cody R. Padgett (S.B. #275553)
Majdi Y. Hijazin (*pro hac vice*)
Abigail J. Gertner (*pro hac vice*)
1875 Century Part East, Suite 1000
Los Angeles, California 90067
Telephone: (310) 556-4811
cody.padgett@Capstonelawyers.com
majdi.hijazin@capstonelawyers.com
abigail.gertner@capstonelawyers.com

William A. Kershaw
Stuart C. Talley
Ian J. Barlow
KERSHAW TALLEY BARLOW PC
401 Watt Avenue
Sacramento, California 95864
Telephone: (916) 779-7000
Facsimile: (916) 244-4829
bill@ktblegal.com
stuart@ktblegal.com
ian@ktblegal.com

Russell D. Paul (*pro hac vice*)
Amey J. Park (*pro hac vice*)
Natalie Lesser (*pro hac vice*)
BERGER MONTAGUE PC
1818 Market Street, Suite 3600

- 45 -

Philadelphia, PA 19103
Telephone: (215) 875-3000
rpaul@bm.net
apark@bm.net
nlesser@bm.net

Thomas P. Thrash (*pro hac vice*)
William T. Crowder (*pro hac vice*)
THRASH LAW FIRM PA
1101 Garland Street
Little Rock, AR 72201
Telephone: (501) 374-1058
tomthrash@sbcglobal.net
willcrowder@thrashlawfirmpa.com

Patrick Newsom (*pro hac vice*)
NEWSOM LAW PLC
40 Music Square East
Nashville, Tennessee 37203
Telephone: 615-251-9500
patrick@newsom.law

*Attorneys for Plaintiffs and the Proposed Classes*

PLS. MEM. IN SUPPORT OF MOTION FOR
CLASS CERTIFICATION
CASE NO. 2:20-CV-01796-DAD-CKD