RANDALL W. EDWARDS (S.B. #179053)
redwards@omm.com
O'MELVENY & MYERS LLP
Two Embarcadero Center, 28th Floor
San Francisco, CA 94111-3823
Tel: +1 (415) 984-8700
Fax: +1 (415) 984-8701

AMY J. LAURENDEAU (S.B. #198321)
alaurendeau@omm.com
O'MELVENY & MYERS LLP
610 Newport Center Drive, 17th Floor
Newport Beach, CA 92660
Tel: +1 (949) 823-6900
Fax: +1 (949) 823-6994

KELSEY M. LARSON (S.B. #267982)
klarson@omm.com
O'MELVENY & MYERS LLP
400 S. Hope St., 19th Floor
Los Angeles, CA 90071
Tel: +1 (213) 430-6000
Fax: +1 (213) 430-6407

*Counsel for Defendant
Ford Motor Company*

**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| VANESSA MILLER, et al., as individuals and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>FORD MOTOR COMPANY,<br><br>Defendant. | Case No. 2:20-cv-01796-DAD-CKD (Consolidated with Nos. 2:21-cv-00417-DAD-CKD, 2:21-cv-00468-DAD-CKD) |
| TREVOR NELSON, et al., as individuals and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>FORD MOTOR COMPANY,<br><br>Defendant. | Case No. 2:24-cv-02231-DAD-CKD<br><br>**DEFENDANT FORD MOTOR COMPANY'S OPPOSITION TO CONSOLIDATED MOTION FOR CLASS CERTIFICATION**<br><br>**[PUBLIC REDACTED VERSION]**<br><br>Date: September 21, 2026<br>Time: 1:30 p.m.<br>Judge: Hon. Dale A. Drozd<br>Courtroom: 4, 15th Floor |

**TABLE OF CONTENTS**

**Page**

I.  INTRODUCTION ................................................................................................. 1

II.  FACTUAL BACKGROUND .............................................................................. 2

    A.  The Four GTDI Engines Have Different Designs and Failure Mechanisms .......... 3

        1.  1.5L – 2014-2019 Fusions and 2017-2019 Escapes ................................... 3

            a.  Ford Learns of Increased Rates of Coolant Intrusion in the 2017-2019 1.5L Escapes and Fusions ............................................. 4

            b.  Customer Satisfaction Programs 19B37 and 21N12 ....................... 5

        2.  2.0L – 2015-2018 Edges, 2016-2019 Lincoln MKCs & MKZs ................. 5

        3.  2.3L Engine – 2015-2019 Mustang & Lincoln MKC, 2016-2019 Explorer ....................................................................................................... 7

        4.  Non-Class Vehicles with 1.6L Engine – 2013-2014 Escapes & Fusions ........................................................................................................ 8

    B.  Pre-Sale Testing Did Not Identify Classwide Coolant Intrusion Concerns ............. 9

    C.  Real-World Performance Data Showed Significant Variations over Time ........... 10

    D.  Coolant Intrusion Is Not a Safety Defect .................................................. 11

III.  PROCEDURAL HISTORY ............................................................................. 13

IV.  LEGAL STANDARD ...................................................................................... 14

V.  ARGUMENT ................................................................................................... 15

    A.  Plaintiffs' Theory of Defect Is Not Common in the Class Vehicles, as the Engine's Design, Root Causes, and Rates of Coolant Intrusion Varied Significantly Among Proposed Class Vehicles ..................................................... 15

        1.  Design and Performance Varied Across the Vehicles in Plaintiffs' 1.5L Engine Classes ................................................................................. 17

        2.  Design and Performance Varied Across the Vehicles in Plaintiffs' 2.0L and 2.3L Engine Classes ....................................................................... 18

        3.  The Evidence Refutes Plaintiffs' Assertion That Ford "Acknowledged" the Saw-Cut Was a Common Defect ............................ 20

        4.  Evidentiary Differences on the Question of Defect Defeat Predominance, Regardless of Plaintiffs' Allegations ................................ 21

        5.  A Common Repair Does Not Mean Common Defect .............................. 22

    B.  Individualized Issues Predominate as to the Remaining Elements of Plaintiffs' Consumer Fraud Claims Too ..................................................... 23

        1.  All Statutory Consumer Fraud Claims Require a Showing of Ford's Pre-Sale Knowledge, Which Varies over Time ...................................... 23

        2.  All Consumer Fraud Claims Have Reliance or Causation as an Element, Which Requires Individualized Inquiries ................................ 29

**TABLE OF CONTENTS**
(*continued*)

|  |  |  | Page |
|---|---|---|---|
| | a. | No Classwide Presumption of Reliance Allowed in Indiana | 29 |
| | b. | Plaintiffs Cannot Establish the Prerequisite for an Inference of Reliance Under California, Kansas, Maryland, and North Carolina Law | 30 |
| | c. | Florida, Illinois, and Nebraska Statutory Consumer Fraud Claims Require a Showing of Causation, Which Is Not Inferred Classwide | 31 |
| | 3. | The Consumer Fraud Claims Require Nondisclosure of a "Material" Fact, Which Also Varies Based on Failure Rates | 32 |
| | 4. | Actual Manifestation of a Defect Is Required for Each Class Member's Claim Under FDUTPA, Precluding Classwide Adjudication | 34 |
| C. | Individualized Inquiries Predominate Plaintiffs' Implied Warranty Claims | | 34 |
| | 1. | Individualized Inquiries Predominate When Determining If a Vehicle Was "Unmerchantable" | 35 |
| | 2. | Varying Manifestation Rates Also Defeat Certification of the Implied Warranty Claims | 37 |
| D. | Individualized Inquiries Predominate Plaintiffs' Claims Under the CA Song-Beverly Act & CLRA, IN DCSA, and MD CPA Because Those Claims Are Limited to Purchasers of Products for "Personal," Not Business, Use | | 38 |
| E. | Individualized Issues Relating to the Statutes of Limitations Further Show Predominance Is Lacking | | 39 |
| F. | Plaintiffs Fail to Put Forth a Cognizable Classwide Damages Model | | 40 |
| G. | Any Class Including 2.3L Engines Must Be Limited to California Only Because Non-California Vehicles with 2.3L Engines Are Not Included in Any Operative Complaint in *Miller* or *Nelson* | | 42 |
| H. | No California Class Can Be Certified for the 2.0L Engines Because Plaintiffs Have No Named Class Representative | | 43 |
| I. | Plaintiffs Subject to Summary Judgment Are Not Adequate or Typical Class Representatives | | 44 |
| J. | A Class Action Is Not Superior or Manageable | | 44 |
| VI. | CONCLUSION | | 45 |

## TABLE OF AUTHORITIES

**Page**

### CASES

*A.J.'s Auto. Sales, Inc. v. Freet*,
725 N.E.2d 955 (Ind. Ct. App. 2000)........................................................................ 39

*Algarin v. Maybelline, LLC*,
300 F.R.D. 444 (S.D. Cal. 2014)............................................................................... 32

*Allen v. Bank of Am., N.A.*,
933 F. Supp. 2d 716 (D. Md. 2013) .......................................................................... 23

*Am. Honda Motor Co. v. Superior Ct.*,
199 Cal. App. 4th 1367 (2011)................................................................................. 38

*Amchem Prods., Inc. v. Windsor*,
521 U.S. 591 (1997) ................................................................................................. 14

*Anderson v. Ford Motor Co.*,
2020 WL 1853321 (W.D. Mo. Feb. 14, 2020).......................................................... 33

*Arabian v. Sony Elecs., Inc.*,
2007 WL 627977 (S.D. Cal. Feb. 22, 2007) ............................................................. 39

*Bank of Am., N.A. v. Jill P. Mitchell Living Tr.*,
822 F. Supp. 2d 505 (D. Md. 2011) .......................................................................... 15

*Beaty v. Ford Motor Co.*,
2021 WL 3109661 (W.D. Wash. July 22, 2021) ....................................................... 28

*Bhaduri v. L.M.K. Constr., Inc.*,
2022 WL 3330116 (Kan. Ct. App. Aug. 12, 2022).................................................... 23

*Black Lives Matter L.A. v. City of Los Angeles*,
113 F.4th 1249 (9th Cir. 2024)........................................................................... 14, 22

*Black v. Union Pac. R.R.*,
2024 WL 1604620 (D. Kan. Apr. 12, 2024) ............................................................. 40

*Broussard v. Meineke Disc. Muffler Shops, Inc.*,
155 F.3d 331 (4th Cir. 1998)........................................................................ 14, 28, 36

*Butler v. Porsche Cars N.A.*,
2017 WL 1398316 (N.D. Cal. Apr. 19, 2017) ..................................................... 16, 21

*Cabrera v. Ford Motor Co.*,
2024 WL 4101907 (S.D. Cal. June 4, 2024).............................................................. 39

*Campbell v. Hubbard*,
201 P.3d 702 (Kan. Ct. App. 2008)........................................................................... 39

*Carroll v. BMW of N. Am., LLC*,
553 F. Supp. 3d 588 (S.D. Ind. 2021) ................................................................. 39, 40

**TABLE OF AUTHORITIES**
(continued)

Page

*Castaneda v. Amazon Inc.*,
2023 WL 4181275 (N.D. Ill. June 26, 2021) ................................................................ 23

*Castano v. Am. Tobacco Co.*,
84 F.3d 734 (9th Cir. 1996)........................................................................................... 45

*Cholakyan v. Mercedes-Benz, USA, LLC*,
281 F.R.D. 534 (C.D. Cal. 2012) .................................................................................. 22

*Collins v. eMachines, Inc.*,
202 Cal. App. 4th 249 (2011)........................................................................................ 15

*Comcast Corp. v. Behrend*,
569 U.S. 27 (2013) ................................................................................................. 14, 40

*Coppel v. SeaWorld Parks & Ent., Inc.*,
347 F.R.D. 338 (S.D. Cal. 2024).................................................................................. 43

*Corder v. Ford Motor Co.*,
283 F.R.D. 337 (W.D. Ky. 2012).................................................................................. 38

*Davidson v. Apple Inc.*,
2019 WL 2548460 (N.D. Cal. June 20, 2019) .............................................................. 41

*De Bouse v. Bayer*,
922 N.E.2d 309 (Ill. 2009) ........................................................................................... 31

*Delcavo v. Tour Res. Consultants, LLC*,
2022 WL 1062269 (D. Kan. Apr. 8, 2022) ................................................................... 30

*Doll v. Ford Motor Co.*,
814 F. Supp. 2d 526 (D. Md. 2011) .............................................................................. 40

*E. Tex. Motor Freight Sys. Inc. v. Rodriguez*,
431 U.S. 395 (1977)...................................................................................................... 43

*Ellis v. Costco Wholesale Corp.*,
657 F.3d 970 (9th Cir. 2011)................................................................................... 14, 22

*Est. of Pilgrim v. Gen. Motors LLC*,
344 F.R.D. 381 (E.D. Mich. 2023) ............................................................................... 40

*Fare Deals Ltd. v. World Choice Travel.Com, Inc.*,
180 F. Supp. 2d 678 (D. Md. 2001) .............................................................................. 38

*Farrel v. Gen. Motors Corp.*,
815 P.2d 538 (Kan. 1991) ............................................................................................. 15

*Finney v. Ford Motor Co.*,
2018 WL 2552266 (N.D. Cal. June 4, 2018) ................................................................ 40

*Ford Motor Co. Ignition Switch Prods. Liab. Litig.*,
174 F.R.D. 332 (D.N.J. 1997)....................................................................................... 45

FORD'S CLASS CERT. OPP.
NOS. 2:20-CV-01796 & 2:24-CV-02231

**TABLE OF AUTHORITIES**
(continued)

Page

*Fox v. Ritz-Carlton Hotel Co.*,
  345 F.R.D. 358 (S.D. Fla. 2024) ........................................................................... 31

*Gen. Tel. Co. of Sw. v. Falcon,|*
  457 U.S. 147 (1982) ............................................................................................... 43

*Grodzitsky v. Am. Honda Motor Co.*,
  2014 WL 718431 (C.D. Cal. Feb. 19, 2014) ......................................................... 21

*Hardy v. Volkswagen Grp. of Am., Inc.*,
  2025 WL 1409820 (D.N.J. May 14, 2025) ............................................................ 39

*Hauck v. Advanced Micro Devices*,
  2019 WL 1493356 (N.D. Cal. Apr. 4, 2019) ......................................................... 23

*Heckler & Koch, Inc. v. German Sport Guns GmbH*,
  2015 WL 13639195 (S.D. Ind. Apr. 21, 2015) ...................................................... 29

*Herron v. Best Buy Co.*,
  924 F. Supp. 2d 1161 (E.D. Cal. 2013) ................................................................. 23

*Hoosier Contractors, LLC v. Gardner*,
  212 N.E.3d 1234 (Ind. 2023) ................................................................................. 29

*In re Caterpillar, Inc., C13 & C15 Engine Prods. Liab. Litig.*,
  2015 WL 4591236 (D.N.J. July 29, 2015) ............................................................ 38

*In re Ford Motor Co. Vehicle Paint Litig.*,
  182 F.R.D. 214 (E.D. La. 1998) ............................................................................. 28

*In re Ford Motor Co.*,
  86 F.4th 723 (6th Cir. 2023) ............................................................................. 21, 24

*In re Gen. Motors LLC Ignition Switch Litig.*,
  427 F. Supp. 3d 374 (S.D.N.Y. 2019) ................................................................... 41

*In re Hitachi Television Optical Block Cases*,
  2011 WL 4499036 (S.D. Cal. Sept. 27, 2011) ...................................................... 21

*In re Honda Idle Stop Litig.*,
  347 F.R.D. 528 (C.D. Cal. 2024) ........................................................................... 29

*In re Hydrogen Peroxide Antitrust Litig.*,
  552 F.3d 305 (3d Cir. 2008) ................................................................................... 15

*In re Marriott Int'l, Inc., Customer Data Sec. Breach Litig.*,
  341 F.R.D. 128 (D. Md. 2022) ............................................................................... 30

*In re MyFord Touch Consumer Litig.*,
  2016 WL 6873453 (N.D. Cal. Nov. 22, 2016) .................................................. 24, 28

*In re MyFord Touch Consumer Litig.*,
  2018 WL 3646895 (N.D. Cal. Aug. 1, 2018) ......................................................... 28

FORD'S CLASS CERT. OPP.
NOS. 2:20-CV-01796 & 2:24-CV-02231

## TABLE OF AUTHORITIES
### (continued)

**Page**

*In re Nissan N. Am., Inc. Litig.*,
   122 F.4th 239 (6th Cir. 2024)..................................................................................... 28, 31

*In re OnStar Cont. Litig.*,
   278 F.R.D. 352 (E.D. Mich. 2011) ...................................................................................... 39

*In re Toyota Motor Corp. Hybrid Brake Mktg., Sales Pracs. & Prods. Liab. Litig.*,
   288 F.R.D. 445 (C.D. Cal. 2013), *aff'd sub nom. Kramer v. Toyota Motor
   Corp.*, 668 F. App'x 765 (9th Cir. 2016) ............................................................................ 42

*Isip v. Mercedes-Benz USA, LLC*,
   155 Cal. App. 4th 19 (2007)................................................................................................ 15

*Johnson v. Harley-Davidson Motor Co. Grp., LLC*,
   285 F.R.D. 573 (E.D. Cal. 2012) .............................................................................. 33, 39, 43

*Johnson v. Nissan N. Am., Inc.*,
   2022 WL 2869528 (N.D. Cal. July 21, 2022)................................................................. 22, 27

*Keegan v. Am. Honda Motor Co.*,
   838 F. Supp. 2d 929 (C.D. Cal. 2012)................................................................................. 34

*Kia Motors Am. Corp. v. Butler*,
   985 So. 2d 1133 (Fla. Dist. Ct. App. 2008) ........................................................................ 34

*Knights of Columbus Council 3152 v. KFS BD, Inc.*,
   791 N.W.2d 317 (Neb. 2010)............................................................................................... 15

*Kondash v. Kia Motors Am., Inc.*,
   2020 WL 5816228 (S.D. Ohio Sept. 30, 2020).................................................................... 28

*Kovack v. Daimler Chrysler Corp.*,
   2006 WL 1293213 (Mich. Ct. App. May 11, 2006) ........................................................ 16, 34

*Lessin v. Ford Motor Co.*,
   2026 WL 382608 (9th Cir. 2026)................................................................................... passim

*Lessin v. Ford Motor Co.*,
   756 F. Supp. 3d 885 (S.D. Cal. 2024) .............................................................................. 29, 44

*Lewis v. Mercedes-Benz USA, LLC*,
   530 F. Supp. 3d 1183 (S.D. Fla. 2021) ............................................................................. 39, 40

*Ludwig v. Ford Motor Co.*,
   510 N.E.2d 691 (Ind. Ct. App. 1987).................................................................................. 39

*Lyman v. Ford Motor Co.*,
   2022 WL 856393 (E.D. Mich. Mar. 22, 2022) .................................................................... 35

*Marksberry v. FCA US LLC*,
   606 F. Supp. 3d 1075 (D. Kan. 2022) .............................................................. 16, 34, 35, 39

**TABLE OF AUTHORITIES**
(continued)

Page

*Matray v. Ford Motor Co.*,
  2011 WL 13221015 (C.D. Cal. Nov. 9, 2011) ........................................................................ 39

*Mazur v. eBay Inc.*,
  257 F.R.D. 563 (N.D. Cal. 2009) ............................................................................................ 38

*McCabe v. Ford Motor Co.*,
  2025 WL 953064 (D. Mass. Mar. 28, 2025) ........................................................................... 35

*McCoy v. Samsung Elecs. Am., Inc.*,
  2023 WL 6140641 (D.N.J. Sept. 20, 2023) ............................................................................. 27

*McKinney v. State*,
  693 N.E.2d 65 (Ind. 1998) ...................................................................................................... 23

*McQueen v. Yamaha Motor Corp., U.S.A.*,
  488 F. Supp. 3d 848 (D. Minn. 2020) ..................................................................................... 15

*McVicar v. Goodman Glob., Inc.*,
  2015 WL 4945730 (C.D. Cal. Aug. 20, 2015) ........................................................................ 32

*Mem'l Hosp. v. Carrier Corp.*,
  844 F. Supp. 712 (D. Kan. 1994) ............................................................................................ 39

*Mercedes-Benz of N. Am., Inc. v. Garten*,
  618 A.2d 233 (Md. Ct. Spec. App. 1993) .......................................................................... 16, 34

*Michaud v. Ford Motor Co.*,
  2026 WL 325461 (C.D. Cal. Feb. 3, 2026) ............................................................................. 39

*Miller v. Ford Motor Co.*,
  2024 WL 1344597 (E.D. Cal. Mar. 29, 2024) ......................................................................... 23

*Miller v. Ford Motor Co.*,
  620 F. Supp. 3d 1045 (E.D. Cal. 2022) ................................................................................... 23

*Miller v. Gen. Motors, LLC*,
  773 F. Supp. 3d 461 (E.D. Mich. 2025) .................................................................................. 40

*Miller v. William Chevrolet/GEO, Inc.*,
  762 N.E.2d 1 (Ill. App. Ct. 2001) ........................................................................................... 15

*Munch v. Sears Roebuck & Co.*,
  2007 WL 2461660 (N.D. Ill. Aug. 27, 2007) .......................................................................... 33

*Neibarger v. Universal Coops.*,
  486 N.W.2d 612 (Mich. 1992) ................................................................................................ 39

*O'Connor v. BMW of N.A., LLC*,
  2020 WL 1303285 (D. Colo. Mar. 19, 2020) ........................................................... 16, 34, 35, 39

*O'Connor v. Boeing N. Am.*,
  197 F.R.D. 404 (C.D. Cal. 2000) ............................................................................................ 40

**TABLE OF AUTHORITIES**
(continued)

**Page**

*Ohio State Troopers Ass'n, Inc. v. Point Blank Enters., Inc.*,
  481 F. Supp. 3d 1258 (S.D. Fla. 2020) ................................................................ 34

*Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*,
  31 F.4th 651 (9th Cir. 2022) ................................................................ 15, 36, 37

*Oscar v. BMW of N. Am., LLC*,
  274 F.R.D. 498 (S.D.N.Y. 2011) ................................................................ 36

*Palmer v. A.H. Robins Co.*,
  684 P.2d 187 (Colo. 1984) ................................................................ 39

*Parkinson v. Hyundai Motor Am.*,
  258 F.R.D. 580 (C.D. Cal. 2008) ................................................................ 45

*Perisic v. Ashley Furniture Indus., Inc.*,
  2018 WL 3391359 (M.D. Fla. June 27, 2018) ................................................................ 32

*Philips v. Ford Motor Co.*,
  2016 WL 7428810 (N.D. Cal. Dec. 22, 2016) ................................................................ 30, 42

*Plascencia v. Lending 1st Mortg.*,
  259 F.R.D. 437 (N.D. Cal. 2009) ................................................................ 40

*Plumlee v. Pfizer, Inc.*,
  2014 WL 695024 (N.D. Cal. Feb. 21, 2014) ................................................................ 39

*Popham v. Keystone RV Co.*,
  2016 WL 4993393 (N.D. Ind. Sept. 19, 2016) ................................................................ 35

*Priebe v. Autobarn Ltd.*,
  240 F.3d 584 (7th Cir. 2001) ................................................................ 35

*Quackenbush v. Am. Honda Motor Co.*,
  2021 WL 6116949 (C.D. Cal. Dec. 27, 2021) ................................................................ 38

*Reserve at Heritage Vill. Ass'n v. Warren Fin. Acquisition, LLC*,
  850 N.W.2d 649 (Mich. Ct. App. 2014) ................................................................ 40

*Roe v. Ford Motor Co.*,
  2019 WL 3564589 (E.D. Mich. Aug. 6, 2019) ................................................................ 39

*Rowan Cnty. Bd. of Educ. v. U.S. Gypsum Co.*,
  418 S.E.2d 648 (N.C. 1992) ................................................................ 30

*Rutherford v. BMW of N. Am., LLC*,
  579 F. Supp. 3d 737 (D. Md. 2022) ................................................................ 39

*Salas v. Toyota Motor Sales, U.S.A.*,
  2019 WL 1940619 (C.D. Cal. Mar. 27, 2019) ................................................................ 22

*Sali v. Corona Reg'l Med. Ctr.*,
  909 F.3d 996 (9th Cir. 2018) ................................................................ 43

**TABLE OF AUTHORITIES**
(continued)

Page

*Sanchez v. Kia Motors Am.*,
  2024 WL 4730654 (C.D. Cal. Nov. 7, 2024) ................................................................... 22

*Sater v. Chrysler Grp. LLC*,
  2016 WL 7377126 (C.D. Cal. Oct. 25, 2016) .................................................................. 42

*Sharp v. Tom Wood E., Inc.*,
  822 N.E.2d 173 (Ind. Ct. App. 2004) ............................................................... 16, 34, 35

*Shea v. Gen. Motors*,
  567 F. Supp. 3d 1011 (N.D. Ind. 2021) ........................................................................... 29

*Sheris v. Nissan N. Am. Inc.*,
  2008 WL 2354908 (D.N.J. June 3, 2008) ........................................................................ 35

*Simmonds v. Ford Motor Co.*,
  592 F. Supp. 3d 1262 (S.D. Fla. 2022) ............................................................................ 36

*Sonneveldt v. Mazda Motor of Am., Inc.*,
  2023 WL 1812157 (C.D. Cal. Jan. 25, 2023) .................................................................. 38

*Speerly v. Gen. Motors, LLC*,
  143 F.4th 306 (6th Cir. 2025) ............................................................... 30, 31, 36, 37

*Stanley v. Nissan N.A., Inc.*,
  719 F. Supp. 3d 786 (M.D. Tenn. 2024) .......................................................................... 39

*Stearns v. Select Comfort Retail Corp.*,
  763 F. Supp. 2d 1128 (N.D. Cal. 2010) ........................................................................... 40

*Stockinger v. Toyota Motor Sales*,
  2020 WL 1289549 (C.D. Cal. Mar. 3, 2020) .............................................................. 16, 21

*Sweet v. Pfizer*,
  232 F.R.D. 360 (C.D. Cal. 2005) ..................................................................................... 44

*Tae Hee Lee v. Toyota Motor Sales, U.S.A., Inc.*,
  992 F. Supp. 2d 962 (C.D. Cal. 2014) ............................................................................. 35

*Torres v. Nissan N. Am. Inc.*,
  2015 WL 5170539 (C.D. Cal. Sept. 1, 2015) .................................................................. 38

*Townsend v. Monster Beverage Corp.*,
  303 F. Supp. 3d 1010 (C.D. Cal. 2018) ........................................................................... 32

*Tyson Foods, Inc. v. Bouaphakeo*,
  577 U.S. 442 (2016) ................................................................................................. 14, 37

*Valdez v. Ford Motor Co.*,
  2024 WL 1344420 (E.D. Cal. Mar. 29, 2024) ................................................................. 38

*Varner v. Domestic Corp.*,
  2017 WL 3730618 (S.D. Fla. Feb. 7, 2017) .................................................................... 23

**TABLE OF AUTHORITIES**
(continued)

Page

*Voth v. Chrysler Motor Corp.*,
545 P.2d 371 (Kan. 1976) ............................................................................................. 39

*Wal-Mart Stores, Inc. v. Dukes*,
564 U.S. 338 (2011) .................................................................................... 2, 14, 43, 45

*Wash. Freightliner, Inc. v. Shantytown Pier, Inc.*,
719 A.2d 541 (Md. 1998) ............................................................................................ 39

*Weidman v. Ford Motor Co.*,
2020 WL 674348 (E.D. Mich. Feb. 11, 2020) ............................................................ 35

*Weidman v. Ford Motor Co.*,
2022 WL 1071289 (E.D. Mich. Apr. 8, 2022) ............................................................ 34

*White v. Grant Mason Holdings, Inc.*,
741 F. App'x 631 (11th Cir. 2018) .............................................................................. 15

*Withers v. BMW of N. Am., LLC*,
560 F. Supp. 3d 1010 (W.D.N.C. 2021) ................................................................ 15, 23

*Wolin v. Jaguar Land Rover N. Am., LLC*,
617 F.3d 1168 (9th Cir. 2010) ..................................................................................... 22

*Wozniak v. Ford Motor Co.*,
2019 WL 108845 (E.D. Mich. Jan. 4, 2019) ............................................................... 23

*WWP, Inc. v. Wounded Warriors Fam. Support, Inc.*,
628 F.3d 1032 (8th Cir. 2011) ..................................................................................... 32

*Xu v. Porsche Cars N. Am., Inc.*,
655 F. Supp. 3d 1214 (N.D. Ga. 2023) ....................................................................... 40

*Zango, Inc. v. Kapersy Lab, Inc.*,
568 F.3d 1169 (9th Cir. 2009) ..................................................................................... 30

*Zinser v. Accufix Rsch. Inst., Inc.*,
253 F.3d 1180 (9th Cir. 2001) ..................................................................................... 44

*Zurn Constructors, Inc. v. B.F. Goodrich Co.*,
746 F. Supp. 1051 (D. Kan. 1990) .............................................................................. 40

**STATUTES**

28 U.S.C. § 2072 ................................................................................................................. 14

Cal. Civ. Code § 1761(d) .................................................................................................... 38

Cal. Civ. Code § 1783 ......................................................................................................... 39

Cal. Civ. Code § 1794(d) .................................................................................................... 45

Fla. Stat. Ann. § 95.11(3)(f) ............................................................................................... 39

FORD'S CLASS CERT. OPP.
NOS. 2:20-CV-01796 & 2:24-CV-02231

**TABLE OF AUTHORITIES**
**(continued)**

**Page**

Ind. Code § 24-5-0.5-2(a)(1) ................................................................................................ 38

Ind. Code § 24-5-0.5-5(b) .................................................................................................... 39

Mich. Comp. Laws § 440.2725 ............................................................................................ 39

FORD'S CLASS CERT. OPP.
NOS. 2:20-CV-01796 & 2:24-CV-02231

## I.   **<u>INTRODUCTION</u>**[1]

Class certification cannot be premised on ignoring evidence that is not common.  Yet that is the chief tactic Plaintiffs adopt in their motion, which seeks to certify two separate classes with three separate engines over ten total states.  They fail to grapple with the mountain of evidence showing major differences in design, failure mode, and real-world performance across different engines, different model years, and different models spanning the ten state classes Plaintiffs propose here.  Plaintiffs likewise ignore the self-evident fact—confirmed again and again by the testimony and documents—that Ford's knowledge of an alleged "Saw Cut Defect" changed significantly over time from the first vehicles sold in 2013 to the last vehicles sold in 2019, and it varied further across different model vehicles and engines.  Plaintiffs' narrative instead is based largely on evidence that post-dates the first sale of the proposed class vehicles or applies only to limited vehicles, sometimes not even vehicles within the proposed classes.  Plaintiffs thus attempt to rely on the very type of "fictional composite" that other courts reject as a basis for class certification.

Neither the proposed classes targeting vehicles with the 1.5L engine in four states, nor the other proposed classes targeting vehicles with the 2.0L and 2.3L engines in six different states, present a predominance of common issues.  Not only does the evidence about the alleged defect and Ford's knowledge vary dramatically as to different portions of the proposed classes, but individualized issues overwhelm other claim elements as well.  Engine replacement rates for different vehicle groups within the proposed classes vary significantly, with some differing over ten-fold in the first five years.  And Plaintiffs' own experiences with their vehicles also differed widely, with some Plaintiffs driving their vehicles for many years and over a hundred thousand miles without ever needing to pay for an engine replacement.  These and other differences show the questions of materiality and reliance on the alleged "omission" are not common based on classwide evidence, nor is the question of merchantability for purposes of the implied warranty claims.  Plaintiffs offer no answer for how those issues are common, other than to argue that the

---

[1] For quoted passages, all emphasis is added, and all citations, alterations, and internal quotation marks are omitted unless otherwise noted.

differences do not matter. But the law confirms otherwise, recognizing the obvious point that when differences exist in evidence bearing on the viability of multiple elements of any given class members' claims, common questions do not predominate. And, as discussed further below, additional critical issues also cannot be decided using classwide evidence, including injury, personal-use, and application of the statutes of limitations.

Supreme Court and Ninth Circuit authority require a rigorous analysis of the evidence that both sides will present at trial, looking to see whether common evidence yields common answers on the elements of Plaintiffs' claims and Ford's defenses. *E.g., Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 352 (2011). But no one class member could have relied on Plaintiffs' collection of evidence had he or she brought a case individually, and the law does not allow them to do so by invoking the class action procedure. A rigorous analysis of the evidence here leaves no doubt that certification of any class is unwarranted.

Separately, an additional problem exists with Plaintiffs' certification bid. They improperly attempt to include vehicles with the 2.3L engine in five proposed state classes that did not include those vehicles in either the *Miller* or *Nelson* complaints (FL, KS, MI, NC, and NE), while conversely including vehicles with the 2.0L engine in the proposed CA class pled in *Miller* without having any proposed class representative from *Miller* for that class.

## II.    FACTUAL BACKGROUND

Plaintiffs propose ten single-state classes. Four states (Colorado, Illinois, Indiana, and Maryland) involve original purchasers of 2014-2019 model-year Ford vehicles equipped with a saw-cut 1.5L gasoline turbo direct injection (GTDI) engine, specifically certain 2014-2019 1.5L Ford Fusions and 2017-2019 1.5L Ford Escapes. Dkt. 162-1 (Plaintiffs' Memorandum in Support of Consolidated Motion for Class Certification ("Mot.")) at 3 n.3 & 21.[2] Six states (California, Florida, Kansas, Michigan, Nebraska, and North Carolina) involve original purchasers of 2015-2019 model year Ford and Lincoln vehicles equipped with a saw-cut 2.0L or 2.3L GTDI engine, specifically certain 2015-2018 2.0L Ford Edges, 2016-2019 2.0L Lincoln MKCs and Lincoln

---

[2] As Plaintiffs' expert Dr. Jordan identified, for the 2019 MY, only vehicles built before January 2019 had a saw-cut version of the 1.5L GTDI. Only they are in the proposed classes. Ex. 1, Jordan Rpt. ¶ 6.

MKZs, 2016-2019 2.3L Ford Explorers, 2015-2019 2.3L Ford Mustangs, and 2015-2019 2.3L Lincoln MKCs. *Id.*[3] These vehicles span the gamut from luxury sedans (the Lincoln MKZs), to SUVs (Edge, Explorer), to sports cars (Mustang). The 1.5L engines and the 2.0L and 2.3L engines were designed at different times by different teams within Ford, and are two distinct engine "families." Ex. 2[4], Expert Report of Peter Lillo ("Lillo Rpt.") ¶¶ 106, 151.

Plaintiffs contend all vehicles in the proposed classes have a design commonality: that they each used saw-cut cooling channels on the deck face of the engine block, which allowed for coolant to circulate. Plaintiffs assert that this "saw cut" on too narrow a bore bridge allowed for coolant to seep into the cylinders, causing engine damage that necessitated a replacement. Mot. at 1. But as Ford engineer after Ford engineer testified, the saw-cut itself was not the defect: the saw-cut had previously been used in other Ford vehicles (and competitors) without issue. *E.g.*, Ex. 2, Lillo Rpt. ¶ 80; Ex. 3, FORD-MILLER 00360118 at 11, Ex. 4, Brewer Dep. 164:18-20 (Q: "Did all engines with the saw-cut design experience coolant intrusion? A: No.").

### A.   The Four GTDI Engines Have Different Designs and Failure Mechanisms

#### 1.   1.5L – 2014-2019 Fusions and 2017-2019 Escapes

The earliest 1.5L vehicle in Plaintiffs' proposed classes is the 2014 Ford Fusion, first released in mid- to late-2013. The 1.5L engine has dual overhead camshafts, four valves per cylinder, a composite intake manifold, an aluminum cylinder block and head, gasoline turbocharged direct injection (GTDI), and twin independent variable cam timing (Ti-VCT). Ex. 2, Lillo Rpt. ¶ 106. The 1.5L also has an integrated exhaust manifold, which increased cooling capabilities that allowed the GTDI engine to function at higher temperatures and pressures. *Id.* ¶ 114. Ford did not see increased rates of coolant intrusion in 2014-2016 model year ("MY") 1.5L vehicles. Ex. 5, Dunahay Dep. 86:11-24; Ex.6, Knott Dep. 78:5-25.

---

[3] For the 2019 MY, only vehicles built before January 2019 had a saw-cut version of the 2.3L GTDI. Ex. 2 (Jordan Rpt.) ¶ 6. Thus, only they are in the proposed classes.

[4] All references to "Ex." refer to the exhibits attached to the concurrently filed Declaration of Randall W. Edwards in Support of Defendant Ford Motor Company's Opposition to Plaintiffs' Consolidated Motion for Class Certification.

FORD'S CLASS CERT. OPP.
NOS. 2:20-CV-01796 & 2:24-CV-02231

a.   **Ford Learns of Increased Rates of Coolant Intrusion in the 2017-2019 1.5L Escapes and Fusions**

Beginning in MY 2017, Ford released automatic start/stop functionality, which shut down the engine when stopped at a red light or stop sign. Ex. 7, FORD-MILLER 00221220. Plaintiffs incorrectly suggest that "start/stop" refers to when a customer parked their vehicle, turned off the engine, remained parked with the engine off, and later restarted the engine (Mot. at 9), but the engineering evidence related to start/stop refers explicitly to automated stopping of the engine each time it idled. Ex.4, Brewer Dep. 164:21-165:24. Automatic start/stop increased fuel economy, but also meant that the engine shut down while the engine was hot, which stopped the auxiliary pump that circulated coolant. *Id.* These events resulted in ███████████████ ███████████████████████████████████████████████. Ex. 8, FORD-MILLER 00140639 at 6; Ex. 2, Lillo Rpt. ¶¶ 135-36.



Ex. 7, FORD-MILLER 00221220

Upon learning increased rates of coolant intrusion were seen in mid-2017, Ford investigated vigorously. Ex. 9, FORD-MILLER 00140733 at -734. Ford only identified the root cause, i.e., ███████████████████████████████, toward the end of 2017, years after the proposed class periods here. Ex. 7, FORD-MILLER 00221220. By January 2018, Ford had decided for future vehicle designs to switch to a cross-drill block, eliminating the site of the boiling phenomenon. *Id.* The cross-drill was effective, which Plaintiffs do not dispute. Ex. 10, FORD-

FORD'S CLASS CERT. OPP.
NOS. 2:20-CV-01796 & 2:24-CV-02231

MILLER 00441286 at -292-93; Mot. at 20.

### b.    Customer Satisfaction Programs 19B37 and 21N12

Once Ford determined that the cause of coolant intrusion in the 1.5L was due to the start/stop mechanism, Ford engineers investigated ways to remedy that issue in the field.  Ford determined that reprogramming the Powertrain Control Module to run the auxiliary water pump after shutdown could reduce boiling in the saw-cut.  The fix was rolled out to customers via Customer Satisfaction Program ("CSP") 19B37.  Ex. 11, FORD-MILLER 00085244.  CSP 19B37 successfully reduced the rates of coolant intrusion in the ████████████████████ with the introduction of CSP 19B37.  Ex. 10, FORD-MILLER 00441286, at -300.  While the fix reduced coolant boiling in the saw-cut, if coolant intrusion had already begun before a vehicle got the fix, the issue was not reversible.

Upon learning that some vehicles eligible for the calibration change in CSP 19B37 still experienced coolant intrusion in some cases, Ford released 21N12 in June 2022.  Program 21N12 provided a free engine replacement on the 2017-2019 Ford Escapes and Fusions up to 7 years or 84,000 miles, an extension of the standard 5-year/60,000-mile powertrain warranty.  Ex. 12, FORD-MILLER 00117526.  CSP 19B37 was limited only to 2017-2019 MY Escapes and Fusions because those were the 1.5Ls that had the highest rates of coolant intrusion and the PCM reprogramming was unnecessary for the MY 2014-2016 1.5Ls, since they lacked an auxiliary pump and automated start/stop.  Ex. 2, Lillo Rpt. ¶¶ 135, 147.

### 2.    2.0L – 2015-2018 Edges, 2016-2019 Lincoln MKCs & MKZs

The 2.0L GTDI saw-cut engine was first released for the 2015 Edge.  The 2.0L engines differ from the 1.5L engines in several key ways.  The 2.0L has three exhaust ports in its integrated exhaust manifold, as well having a larger displacement.  Ex. 2, Lillo Rpt. ¶¶ 154, 159.  Most significantly, the 2.0L engine had a completely different head gasket design that was larger and geometrically distinct from the 1.5L engine.  *Id.* ¶ 160.

The mechanism for coolant intrusion is also different for the 2.0L: while the root cause for coolant intrusion for the 1.5L was ████████████████████████ ████████ the cause of coolant intrusion in the 2.0L was ████████████████ Ex. 8, FORD-

5

MILLER 00140639. This ███████████████████████████████████ ██████████████████████████████████ *Id.* While the goal of the ███████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████. *Id.*; Ex. 13, Henne Dep. 216:6-14.

███████████████████████████████████████████████████████████████

Ex. 8, FORD-MILLER 00140639

This difference between the head gasket engineering designs resulted in significant differences in failure rates:

███████████████████████████████████████████████████████████████

Ex. 8, FORD-MILLER 00140639

Rates of coolant intrusion on the 2.0L engine, even of the same model year, also varied based on the specific model at issue. As shown below, the ██████████████████████ ████████████████████████████, but this factor took some time for Ford's

6

engineers to identify.  Ex.14, FORD-MILLER 00421043.

Substantial evidence from Ford engineers shows that coolant intrusion in the 2.0L engine was caused by a different failure mechanism than in the 1.5L engine.  Ex. 15, FORD-MILLER 00209559; Ex. 4, Brewer Dep. 161:3-162:16; Ex. 5, Dunahay Dep. 19:24-21:9.  The chances of engine failure for the 2.0L were significantly lower, as both Ford's data and both parties' experts showed.  Ex. 16, FORD-MILLER 00081693; Ex. 17, Lennox Rpt. Table 5; Ex. 18, Wachs Rpt. at 24-25.



Ex. 10, FORD-MILLER 00441286

While Ford elected to switch the different engines to the cross-drill block, the cross-drill design was effective for different reasons: for the 1.5L engines, the change to the cross-drill removed the coolant from the area where it could boil; however, for the 2.0L engines, the cross-drill was effective because it added structure to the bore bridge, reducing motion in the head gasket and preventing scrubbing.  Ex. 4, Brewer Dep. 161:23-162:16.

### 3.   2.3L Engine – 2015-2019 Mustang & Lincoln MKC, 2016-2019 Explorer

In addition to vehicles with 2.0L engines, six of Plaintiffs' proposed classes also include vehicles with saw-cut 2.3L engines: 2015-2019 Ford Mustangs and Lincoln MKCs and MY 2016-2019 Explorers.  The larger displacement 2.3L engine had a different architecture than the 2.0L

engine, including having a longer stroke length and cylinder block.  Ex. 4, Brewer Dep. 19:10-20, 76:19-77:6, 104:24-105:8.  These differences meant the 2.3L engine was subjected to a lower load than the 2.0L engine, reducing the likelihood of the ███████████████████████████, and resulting in much lower failure rates.  *Id*. 74:7-13, 163:24-164:16, 132:24-133:9 (different rates of coolant intrusion "due to the differences in structure"); Ex. 2,  Lillo Rpt. ¶ 182; Ex. 17, Lennox Rpt. App'x E; Ex. 18, Wachs Rpt. at 24-25 (rate under █ percent for the 2.3L Explorer, compared to █ percent for the 2.0L Edge).

### 4.    Non-Class Vehicles with 1.6L Engine – 2013-2014 Escapes & Fusions

Despite not including vehicles with the 1.6L engine in any proposed class, Plaintiffs discuss issues with this non-class engine at length, citing multiple exhibits. Mot. at 11-13.  The 1.6L engine had a completely different design and experienced completely different failure mechanisms than the engines in the proposed class vehicles.  Plaintiffs assert the "1.6L was so similar to the 1.5L that they shared an engine assembly document" (Mot. at 13), but the two engines had many key design differences.  The 1.5L engine had an integrated exhaust manifold, a significant difference from the cooling architecture on the 1.6L engine, and the 1.6L engine cooling system had ██████ ███████████████████████████████████ than the 1.5L engine.  Ex. 19, FORD-MILLER 00181468.  Plaintiffs also have no argument that the 1.6L engine shared a common design with the 2.0L or 2.3L engines.  Ford's witnesses were unequivocal that the fire concerns present in certain 2013-2014 MY 1.6L engines could not occur in the engines in the proposed class vehicles for multiple reasons, including the absence of the boss that could crack in the 1.6L engine and a different shell.  Ex. 4, Brewer Dep. 156:2-157:6; Ex. 13, Henne Dep. 220:25-222:5.

Plaintiffs assert that "coolant intrusion" issues were seen in the 1.6L engine, Mot. at 11, but their only support for that is a ██████████████████████████████████████, with no evidence linking it to the primary failure mechanism for the 1.5L engine.  Pls. Ex. 36. Plaintiffs also assert that a "███████████████" was seen in a single Ford Escape (Mot. at 11, Pls. Ex. 31), but offer no explanation of how that ██████████████ is related to the internal coolant intrusion issue seen in the 1.5L engines.  Plaintiffs also assert that there were ████████████████ ██████████████████████ seen in the 1.6L (Mot. at 11, Pls. Ex. 38) but ***that same*** document notes

8

that ███████████████████████████████████ i.e., manufacturing issues at the plant, not any design issue. *See* Ex. 9, FORD-MILLER 00140733 at -734 (noting ███████████████ █████████████████████████████████). Plaintiffs cite a ███████ ████████████████████████████ (Pls. Ex. 41) for evidence that problems seen in the 1.6L are related to the 2.0L, but offer no explanation as to how ███████████████ is in any way related to internal coolant intrusion.

The various recalls related to the 1.6L engine that Plaintiffs discuss are also irrelevant. Mot. at 12 & n.78. The recalls related to the risk of external leaks, not coolant intrusion. In the 1.6L engine, coolant loss could occur through various mechanisms unrelated to the alleged "Saw Cut Defect," including through a ████████████████████████████████ ████████████████████████████████. Ex. 2, Lillo Rpt. ¶¶ 88-93, 96-97. In rare instances, MY 2013-2014 vehicles with the 1.6L engine had an engine fire, but the fire risk was limited to that engine: the design of that earlier engine included an ███████████ ████████████████████████████████████████ ██████████ *Id.* ¶¶ 94-95; Ex. 20, FORD-MILLER 00084658 (13S12 recall); Ex. 21, FORD-MILLER 00016358 (17S09 recall). This ████████████████████, resolving the fire risk. *Id.* Plaintiffs present no evidence that the 1.6L engine was susceptible to coolant intrusion through the "Saw Cut Defect;" but multiple Ford witnesses testified that the fire issues seen in the 1.6L were unrelated to coolant intrusion in the 1.5Ls, 2.0Ls, and 2.3Ls, and that the external coolant leaks that occurred in the 1.6L could not occur in the 1.5Ls, 2.0Ls, or 2.3Ls. Ex. 4, Brewer Dep. 160:5-161:2; Ex. 5, Dunahay Dep. 97:17-24, 99:14-23 ("I do not know of a single fire[] associated with a 1.5- or 2.0-liter, not a single one"); Ex. 22, Tuneff Oct. 15, 2025 Dep. 163:18-164:18; Ex. 13, Henne Dep. 220:25-222:5.

## B.    Pre-Sale Testing Did Not Identify Classwide Coolant Intrusion Concerns

Ford's pre-release testing data did not identify coolant intrusion as a common problem in the proposed class vehicles. Plaintiffs do not cite any evidence that showed Ford's knowledge about the actual mechanism of coolant intrusion seen in the 1.5L, 2.0L, or 2.3L engines. Plaintiffs' expert testified that he did not review any of Ford's testing data. Ex. 23, Jordan Dep. 72:2-11,

72:18-73:5. Plaintiffs instead cite out of context a handful of documents discussing discrete testing issues regarding *different* problems in the engines—that do not cover all the engine displacements included in the proposed classes. For example, when Plaintiffs claim that testing in 2014 showed risks of coolant intrusion, they cite to Exhibit 41, which describes ▮▮▮▮▮▮▮▮▮▮▮ Plaintiffs have no argument as to how ▮▮▮▮▮▮ is in any way related to internal coolant intrusion. Ford had thorough and robust testing processes, Ex. 2, Lillo Rpt. ¶ 52, but it is an inherent part of vehicle manufacture and design that testing cannot identify every possible failure mode, particularly when the failure mode is heavily dependent on an individual's driving patterns and history. *Id.* ¶¶ 148-49. Ford also did not believe, and had no reason to believe, that the use of the saw-cut cooling would lead to elevated rates of coolant intrusion in the 1.5L, 2.0L, or 2.3L engines. As Ford's engineers testified, the saw-cut design had been used previously without issue in other applications. Ex. 4, Brewer Dep. 22:2-23:13; Ex. 24, Wade Dep. 193:25-194:1. Ford's witnesses also testified that pre-release testing did not identify coolant intrusion for these engines. Ex. 24, Wade Dep. 211:5-212:15, 217:5-14; Ex. 25, Giunta Dep. 58:21-59:2.

## C.    Real-World Performance Data Showed Significant Variations over Time

Significant differences also are clear in real-world performance data about the vehicles, which was available to Ford contemporaneously and validated by both Ford's and Plaintiffs' warranty experts. For example, December 2020 warranty analysis indicated significant differences in actual and projected warranty claim rates for the 1.5L and 2.0L, and between vehicle makes and model years within the 1.5L and 2.0L. Ex. 26, FORD-MILLER 00140648 at -453-456; Ex. 8, FORD-MILLER 00140639. Ford's analysis further demonstrated the actual and projected warranty claim rates for the 2.0L and 2.3L varied between the engines, and varied by vehicle make and model year within the engine types. Ex. 27, FORD-MILLER 00124957-4986. Dr. Lennox, Ford's data expert, concluded that during the 5-year/60,000 mile standard warranty period, warranty claim rates "differ significantly" between not only the 1.5L, 2.0L, and 2.3L engines, but also between the different vehicle model and model year combinations for any given engine size. Ex. 17, Lennox Rpt. at 4, 11-14. As Dr. Lennox showed, warranty rate data for the 2014-2015 1.5L was between ▮▮▮ percent and ▮▮▮ percent at the end of the standard warranty period—much lower

FORD'S CLASS CERT. OPP.
NOS. 2:20-CV-01796 & 2:24-CV-02231

than for the 2017-2019 1.5L, where the warranty rate was as high as ███ percent. *Id.*, Fig. 2 and App'x E. This difference reflects the actual change in design, the introduction of automated start/stop technology, that led to higher rates of coolant boiling in the saw-cut. Ex. 2, Lillo Rpt. ¶¶ 135, 147. These stark warranty rate differences are apparent even between different model years of the same vehicle model with the same engine; for example, the 2015 2.0L Edge has a ███ percent warranty rate, while the 2017 2.0L Edge has a ███ percent warranty rate, reflecting the change in the head gasket discussed above. Ex. 17, Lennox Rpt., App'x E. Different models in the same model year with the same engine also show stark differences: the 2019 2.3L Explorer had a ███ percent warranty rate, compared to the ███ percent warranty rate of the 2019 2.3L Mustang, a fivefold difference. *Id.*

Plaintiffs' warranty expert Dr. Wachs does not dispute that warranty claims rates varied between the various model and vehicle lines—stating that "there's no homogeneity in this data." Ex. 28, Wachs Dep. 172:25-173:15; *see also id.* 92:23-93:6. She admitted she does not disagree with Dr. Lennox's calculations, and that her own analysis also indicates warranty claim rate variations between the different engine, vehicle make, and model year combinations. *Id.* 73:16-23, 109:16-110:8, 173:6-9, 173:19-174:3, 181:7-10, 194:3-22, 225:23-25; *see also* Ex. 23, Jordan Dep. 47:12-23 (Plaintiffs' engineering expert deferring to Dr. Wachs's analysis).

### D.   <u>Coolant Intrusion Is Not a Safety Defect</u>

Internal coolant intrusion was never perceived by Ford or the National Highway Traffic Safety Administration ("NHTSA") as a safety risk. Internal coolant intrusion does not create a fire risk in the proposed class vehicles. Plaintiffs discuss fires in vehicles with the 1.6L engine. Mot. at 12 n.76 (citing Pls. Exs. 46 and 47). But those fires in non-class vehicles were caused by a completely different issue than coolant intrusion, as discussed above. Internal coolant intrusion involves small leaks of coolant into the engines; the coolant combusts in the chamber. The problem is gradual and occurs over time; coolant intrusion does not cause a sudden loss of motive power with no prior warning. Ex. 2, Lillo Rpt. ¶ 122; Ex. 5, Dunahay Dep. 94:8-101:5. If warnings are consistently ignored, a vehicle at risk of overheating enters Failure Mode Effects Management ("FMEM" or "limp mode"), in which the vehicle's computer control system applies progressive

11

"fail safe cooling" modes when sensors detect overheating of the engine. Ex. 2, Lillo Rpt. ¶ 116; Ex. 29, Tuneff Rpt. at 4. When an engine overheat is detected, FMEM alerts the driver through the vehicle's temperature gauge on the instrument panel, then the check engine light, and eventually by "adjust[ing] the engine power available to allow limited continued operation and the vehicle to be driven to a safe location." *Id.* When a vehicle's power is reduced by FMEM, the "full power assisted steering and braking are available, and full lighting is maintained." *Id.*

Plaintiffs' testimony highlights the gradual nature of the problem. Some Plaintiffs were not aware of any problems at all, other than a check engine light or rough-running. *E.g.*, Ex. 30 S. Nelson Dep. 85:24-86:4, 87:10-15, 88:14-89:1. Others drove their vehicle for over 100,000 miles while experiencing symptoms of coolant intrusion—a decreasing coolant level and occasional check engine light; to address the issue, they would periodically add coolant, but took no steps to repair the engine. Ex. 31, C. Morford Dep. 59:2-22, 62:6-18; Ex. 32, Morford Interrog. Resp. 9. Another also continued to drive his vehicle while experiencing coolant intrusion, using water instead of antifreeze to keep the coolant bottle filled. Ex. 33, Speigner Dep. 106:22-107:8, 108:8-110:2. No Plaintiff experienced an accident or fire caused by internal coolant intrusion.

Despite having access to complaint and accident data, NHTSA never opened a safety investigation related to coolant intrusion in any class vehicles. And Ford's internal safety office concluded that internal coolant intrusion "███████████████████████ ████   because there was ██████████████████ "███████████████ and "████████████ ████████████   Ex. 34, FORD-MILLER 00085522 (CCRG N19-0910-02, 1.5L Coolant Intrusion). The proposed class vehicles have collectively accumulated tens of billions of miles traveled. Ex. 29, Tuneff Rpt. at 5; Ex. 35, Lennox Rebuttal Rpt. at 14. Despite the extremely high usage of the proposed class vehicles, Plaintiffs do not provide rates of any accidents, injuries, or engine fires caused by coolant intrusion in these vehicles. Plaintiffs highlight a single NHTSA VOQ customer complaint, where the owner of a 2018 Ford Escape with a 1.5L engine self-reported an incident where the vehicle decelerated but did not crash. Mot. at 16 (citing NHTSA ID: 11162473). The customer complaint also indicates the customer had several minor, discoverable symptoms that they had ignored "for weeks" preceding the FMEM engine slowing event. *Id.*

(stating the customer "had problems for weeks rough idling, stall warning code P0302," and "overheat[ing]] for 10-15 seconds daily").

III.    **PROCEDURAL HISTORY**

The *Miller* action was first filed in September 2020, with one Plaintiff, Vanessa Miller, alleging express and implied warranty claims and consumer protection claims involving an alleged cooling defect in 1.6L, 1.5L, and 2.0L GTDI engines. Dkt. 1.[5] On November 5, 2020, Plaintiffs filed their First Amended Complaint, which added two Plaintiffs alongside Plaintiff Miller. *See* Dkt. 20. On May 6, 2021, two other cases brought by six other Plaintiffs (Dkts. 33, 34, 36) were consolidated with this case. After multiple motions to dismiss and amendments, the *Miller* case involved proposed class members from 17 states. *See* Dkts. 101, 119, 125. Plaintiffs filed the operative Second Amended Consolidated Complaint in January 2026. Dkt. 144.

In August 2024, a California couple with claims related to the 2.3L engine filed a separate lawsuit, *Nelson v. Ford*. *Nelson* Dkt. 1. Ford agreed to transfer the *Nelson* action to the Eastern District of California, to streamline discovery, as many of Ford's witnesses would be the same across both cases. *Nelson* Dkts. 19, 34 at 2-3 ("for interests of efficiency and to streamline discovery, Ford is open to coordinating discovery between *Miller* and *Nelson*, as there is overlap between Ford's witnesses"). Plaintiffs amended the *Nelson* complaint in December 2024, and added Florida and Michigan plaintiffs. *Nelson* Dkt. 33. After Ford's motion to dismiss, only California claims by the Nelsons remained. *Nelson* Dkt. 57. Plaintiffs had a further opportunity to amend in September 2025, but did not do so. *Id*.; *Nelson* Dkt. 58 (Pls.' Notice of Intent to Not File a Second Amended Complaint).

In June 2026, Ford and Plaintiffs agreed to combine the class certification briefing in the *Miller* and *Nelson* actions, but Ford made clear that it did not agree that certification of the same classes of vehicles for *Miller* and *Nelson* was "warranted or permitted." Dkt. 156 at 2-3.

Plaintiffs moved to certify 10 state classes with 14 claims. Mot. at 21-22. They proposed four state classes (CO, IL, IN, and MD) for certain MY 2014-2019 vehicles with 1.5L engines. *Id.* They seek certification for consumer fraud claims for IL, IN, and MD, and breach of implied

---

[5] "Dkt." refers to the *Miller v. Ford* docket; *Nelson* Dkt. refers to the *Nelson v. Ford* docket.

FORD'S CLASS CERT. OPP.
NOS. 2:20-CV-01796 & 2:24-CV-02231

warranty claims for CO, IN, and MD.  *Id.*  The six other proposed state classes (CA, FL, KS, MI, NE, and NC) cover certain 2015-2019 MY vehicles with 2.0L and 2.3L saw-cut engines.[6]  *Id.*  Plaintiffs seek certification of consumer fraud claims for CA, FL, KS, NE, and NC and breach of implied warranty claims for CA, KS, and MI.  *Id.*

## IV.   <u>LEGAL STANDARD</u>

A class action is an "exception to the usual rule that litigation is conducted by and on behalf of individual named parties only" and allows collective adjudication of claims that depend on evidence common to the class.  *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 348-50 (2011).  The class action device, like all rules of procedure, cannot "abridge, enlarge, or modify" any substantive rights, and it cannot impair Ford's right to assert individualized defenses.  28 U.S.C. § 2072; *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 613 (1997); *Dukes*, 564 U.S. at 367 ("class cannot be certified on premise that [Defendant] will not be entitled to litigate its statutory defenses to individual claims").  Plaintiffs have the burden of "affirmatively demonstrating" with "evidentiary proof" each requirement under Rule 23(a)—adequacy, typicality, numerosity, and commonality— and the relevant subsection of Rule 23(b)—in this case, Rule 23(b)(3)'s requirement that common issues predominate over individualized ones.  *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013).

To determine whether Plaintiffs have carried that burden, the Court must "probe behind the pleadings" to conduct a "rigorous analysis" of the evidence for each Rule 23 requirement.  *Dukes*, 564 U.S. at 350-51.  Plaintiffs "cannot plead their way to class certification through just allegations and assertion."  *Black Lives Matter L.A. v. City of Los Angeles*, 113 F.4th 1249, 1258 (9th Cir. 2024).  Nor can Plaintiffs use different evidence applicable to different proposed members or subgroups of the class to manufacture a "fictional composite" class plaintiff whose case is "stronger than any plaintiffs individual action would be."  *Broussard v. Meineke Disc. Muffler Shops, Inc.*, 155 F.3d 331, 345 (4th Cir. 1998).  To the contrary, a question is not common if the answer requires "evidence that varies from member to member."  *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016).  In evaluating whether the evidence is common classwide, courts must consider the evidence from both sides, not just assuming the plaintiffs' evidence will be accepted.  *Ellis v. Costco*

---

[6] California is the only remaining state in *Nelson*.  There is no California class representative from *Miller*.

FORD'S CLASS CERT. OPP.
NOS. 2:20-CV-01796 & 2:24-CV-02231

*Wholesale Corp.*, 657 F.3d 970, 983-84 (9th Cir. 2011) (court must consider both sides' evidence); *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 321 (3d Cir. 2008) ("proper analysis under Rule 23 requires rigorous consideration of all the evidence and arguments offered by the parties"). The analysis thus requires a close review of the supporting and opposing evidence on each element of each claim to ensure that the evidence deciding the plaintiffs' claims would be substantially identical to the evidence bearing on all other class members' own individual claims. *Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 667 (9th Cir. 2022) (class action permissible when "each class member could have relied on the plaintiffs' evidence to establish liability if he or she had brought an individual action").

## V.     ARGUMENT

Plaintiffs' consolidated motion for class certification must be denied because individualized issues predominate over common ones. Individualized evidence abounds, from the existence of the defect, to Ford's knowledge over time, to information each individual class member relied on, to class members' use and experience with their vehicles, to damages, and Ford's defenses.

### A.     Plaintiffs' Theory of Defect Is Not Common in the Class Vehicles, as the Engine's Design, Root Causes, and Rates of Coolant Intrusion Varied Significantly Among Proposed Class Vehicles

Plaintiffs cannot meet their burden of showing common issues predominate around the question of defect. The existence of a defect is the key element to each of Plaintiffs' six breach of implied warranty and eight consumer fraud claims, as Plaintiffs admit. Mot. at 24 ("Whether the Saw Cut Defect rendered the Class Engines defective is a question common to every Class claim at issue."); *id.* at 27. For every consumer fraud claim, Plaintiffs must show Ford failed to disclose the existence of a material fact, i.e., the alleged defect.[7] For every breach of implied warranty claim, Plaintiffs must show that the vehicle contained a defect such that it was "unmerchantable"

---

[7] **CA CLRA**: *Collins v. eMachines, Inc.*, 202 Cal. App. 4th 249, 255 (2011); **FL DUTPA**: *White v. Grant Mason Holdings, Inc.*, 741 F. App'x 631, 636-37 (11th Cir. 2018) (FL law); **IL CFA**: *Miller v. William Chevrolet/GEO, Inc.*, 762 N.E.2d 1, 12 (Ill. App. Ct. 2001); **IN DCSA**: *McQueen v. Yamaha Motor Corp., U.S.A.*, 488 F. Supp. 3d 848, 859 (D. Minn. 2020) (applying Indiana law); **KS CPA**: *Farrel v. Gen. Motors Corp.*, 815 P.2d 538, 547 (Kan. 1991); **MD CPA**: *Bank of Am., N.A. v. Jill P. Mitchell Living Tr.*, 822 F. Supp. 2d 505, 534 (D. Md. 2011); **NE CPA**: *Knights of Columbus Council 3152 v. KFS BD, Inc.*, 791 N.W.2d 317, 333-34 (Neb. 2010); **NC CPA**: *Withers v. BMW of N. Am., LLC*, 560 F. Supp. 3d 1010, 1020 (W.D.N.C. 2021).

FORD'S CLASS CERT. OPP.
NOS. 2:20-CV-01796 & 2:24-CV-02231

at the time of sale.[8]  Thus, showing that a common defect can be proven with classwide evidence is the first hurdle Plaintiffs must clear.  They cannot surmount it.

Plaintiffs assert that whether the so-called "Saw Cut Defect" exists is a common question: i.e., the existence of a "saw-cut" in "a small turbocharged engine with a narrow bore bridge," Mot. at 6-7, 25; Ex. 1, Jordan Rpt. ¶¶ 6-7.  But Plaintiffs ignore the other evidence that saw-cuts of a similar width did not have similar issues in competitor vehicles and non-class Ford vehicles.  Ex. 36, Lillo Rebuttal Rpt. ¶¶ 19-24; Ex. 3, FORD-MILLER 00360118 at 11; Ex. 23, Jordan Dep. 11:7-13, 220:17-21.  Plaintiffs' expert himself conceded that he would need to "look at the attributes" of an engine to determine if the saw-cut was the defect.  Ex. 23, Jordan Dep. 87:10-21.

Plaintiffs must do more than allege a superficially common question—they must show how that common question will have common answers—*see Dukes*—based on classwide evidence of "a common, class-wide defect present in all of the relevant products." *Butler v. Porsche Cars N.A.*, 2017 WL 1398316, at *6 (N.D. Cal. Apr. 19, 2017); *Stockinger v. Toyota Motor Sales*, 2020 WL 1289549, at *7 (C.D. Cal. Mar. 3, 2020) (no common defect for engines with "different air inlet design, orientation, and size"; location/ number of HVAC systems; and various cabin filters).  Although Plaintiffs use the capitalized term (Saw Cut Defect) they coined to refer to an alleged defect across 1.5L, 2.0L, and 2.3L engines (and more), they do not seek to certify a class covering all engines.  Rather, each proposed class involves either the 1.5L engine or the 2.0L and 2.3L engines combined.  Mot. at 21-22.  However, Plaintiffs do not show how truly classwide evidence exists on the issue of defect.  Many of Plaintiffs' exhibits on the issue relate solely to issues seen with 1.6L engines or non-class vehicles that had significant engineering differences from any—let alone all—proposed class vehicles.  *See* Pls. Exs. 31, 36, 38, 45, 46, 47, 53.  Plaintiffs also cite other exhibits that have nothing to do with coolant intrusion at all, e.g., Pls. Ex. 53 (discussing electric thermostat) and Pls. Ex. 41 (discussing pre-ignition testing).  None of Plaintiffs' exhibits

---

[8] **CA IW**: *Isip v. Mercedes-Benz USA, LLC*, 155 Cal. App. 4th 19, 26-27 (2007); **CO IW**: *O'Connor v. BMW of N.A., LLC*, 2020 WL 1303285, at *5 (D. Colo. Mar. 19, 2020); **IN IW**: *Sharp v. Tom Wood E., Inc.*, 822 N.E.2d 173, 174-75 (Ind. Ct. App. 2004); **KS IW**: *Marksberry v. FCA US LLC*, 606 F. Supp. 3d 1075, 1086-87 (D. Kan. 2022); **MD IW**: *Mercedes-Benz of N. Am., Inc. v. Garten*, 618 A.2d 233, 240 (Md. Ct. Spec. App. 1993); **MI IW**: *Kovack v. Daimler Chrysler Corp.*, 2006 WL 1293213, at *3 (Mich. Ct. App. May 11, 2006).

FORD'S CLASS CERT. OPP.
NOS. 2:20-CV-01796 & 2:24-CV-02231

show problems of coolant intrusion being widely seen in the 1.5L engine before the introduction of start/stop technology in 2017 MY 1.5L engines, or before the gasket change in the late 2016 MY 2.0L engines.  And they do not cite a single exhibit describing coolant intrusion problems seen with the class engines before the sale of the first proposed class vehicle, the 2014 1.5L Fusion first sold in 2013.  Plaintiffs weave a story premised on a composite of exhibits not applicable to all class vehicles and, often, not even applicable to any.

A further critical independent problem, beyond Plaintiffs' own failure to rely on classwide evidence, is that Plaintiffs fail to account for the significant body of relevant evidence of the design and performance differences among their proposed class vehicles.  This evidence clearly refutes their argument that the question of defect can be decided based on classwide evidence.

### 1. Design and Performance Varied Across the Vehicles in Plaintiffs' 1.5L Engine Classes

As discussed *supra*, significant variation exists within the proposed classes of vehicles with 1.5L engines with respect to engineering and vehicles' performance.  A major difference is the introduction of start/stop functionality in certain vehicles in MY 2017.

*2014-2016 MY 1.5L Engines*.  Multiple Ford witnesses have testified that coolant intrusion issues were significantly lower before the release of the 2017 MY, when automated start/stop functionality was first introduced, and that it was the automatic start/stop functionality that exacerbated boiling in the saw-cut, causing some engines to ultimately suffer coolant intrusion events.  Ex. 5, Dunahay Dep. 86:11-24; Ex. 6, Knott Dep. 78:5-25; Ex. 2, Lillo Rpt. ¶¶ 129-130.  Ford's warranty expert found that rates of coolant intrusion in the MY 2014-2016 1.5L Fusion were a third or half of rates in MY 2017-2019 vehicles with a similarly sized engine.  Ex. 17, Lennox Rpt. App'x E.  The different engine functionality and different performance of these earlier vehicles could allow a jury to reach a different conclusion on the question of defect based on different evidence applicable to different subgroups, meaning that the question is not classwide.

*2017-2019 MY Vehicles with 1.5L Engines*.  Coolant intrusion rates increased in MY 2017-2019 (vehicles first released in mid- to late-2016).  However, even within this time period, the evidence is not uniform.  Coolant intrusion rates took some time to develop—these failures did not

occur in the infancy of these vehicles. Ex. 2, Lillo Rpt. ¶ 150; Ex. 37, FORD -MILLER 00369617 at -24. By fall 2017, about a year after the first release of MY 2017 1.5L, Ford began to see increased rates of engine exchanges under warranty. Ex. 7, FORD-MILLER 00221220. After investigation, Ford homed in on the issue—the cause of coolant intrusion was "boiling" in the saw-cut, which could occur when coolant stopped flowing during an engine shut-down event. The boiling issue was unique to the 1.5L. Ex. 6, Knott Dep. 101:4-9.

Performance also varied for different model vehicles *within* the same model year. For example, the Escapes tended to have higher rates of coolant intrusion than the Fusions. Ex. 38, FORD-MILLER 00221021 at slide 5 (real-time warranty rates showing difference between 2017-2018 1.5L MY Fusions and Escapes); Ex. 39, FORD-MILLER 00218199 (warranty trends different for Escape vs. Fusion); Ex. 17, Lennox Rpt. Fig. 2 and Table 5 (warranty claims rate was ▮▮ for the 1.5L Escape vs. ▮ for the 1.5L Fusion). These differences were statistically significant. Ex. 17, Lennox Rpt. at 4, 11-14. The performance differences were likely due to differences in the vehicles' weight and aerodynamics. *See* Ex. 2, Lillo Rpt. ¶ 64. And these differences are further non-classwide evidence on the issue of alleged defect, even for vehicles with the same engine.

An additional issue that distinguishes the MY 2014-2016 vehicles from the MY 2017-2019 vehicles is that the latter were subject to Customer Service Programs 19B37 and 21N12, which provided (1) free reprogramming of the auxiliary water pump to extend circulation of coolant to prevent boiling in the saw-cut, and (2) extended coverage for an engine replacement up to 7-years/84,000 miles, rather than the standard 5-year/60,000 warranty. *Supra* at Section II.A.1.b. A jury could find that Ford's CSPs are evidence relevant to question of defect, given Ford's own conclusions, but that evidence is not classwide even for the proposed classes involving vehicles with the 1.5L engines.

**2.      Design and Performance Varied Across the Vehicles in Plaintiffs' 2.0L and 2.3L Engine Classes**

Significant differences also exist *among* the vehicles in Plaintiffs' proposed classes that combine the 2.0L and 2.3L engines over five model years.

*2.0L Engines.* The saw-cut 2.0L GTDI engine was first released with the 2015 Ford Edge.

18

Lillo Rpt. ¶ 152. The design of the engine's head gasket was different for the 2015 and early MY 2016 vehicles compared to later MY 2016-2019 vehicles with the 2.0L engine. Ex. 2, Lillo Rpt. ¶¶ 165-67; Ex. 8, FORD-MILLER 00140639. Specifically, the design on the earlier head gasket had additional material between the beads, which prevented the cylinder head from coming into contact with coolant. *Id.* The design change was made to improve fatigue life, but had the unexpected effect of increasing flexibility in the gasket, which led to the "scrubbing" phenomenon that Ford later identified as the cause of sealing loss and therefore coolant intrusion in some 2.0L engines. Ex. 2, Lillo Rpt. ¶ 165. Ford's internal analysis and Ford's performance data show this difference in design in the head gasket made a significant difference for rates of coolant intrusion for vehicles with the different head gaskets—as much as 15-fold for different vehicle lines with the 2.0L engine. Ex. 17, Lennox Rpt. App'x E (rate for 2015 2.0L Edge was ██ percent compared to ██ percent for the 2017 and 2018 MY Edge); Ex. 8, FORD-MILLER 00140639 (showing ██████ ████████████████████████████).

**2.3L Engines.** While the design of the 2.3L engine was in some ways similar to the 2.0L engine, which was in the same engine family, the two engine displacements varied both in terms of engineering and real-world performance. The 2.3L engine has different architecture and a longer stroke length, which results in larger displacement and more power, and a different engine block architecture. Ex. 2, Lillo Rpt. ¶¶ 170-80; Ex. 4, Brewer Dep. 76:19-77:6, 104:24-105:8, 132:24-133:9. Those differences translated into different performance. As one Ford engineer testified—and Plaintiffs' and Ford's warranty experts confirmed—"the warranty we were seeing in the field said 2.3 did not have . . . nearly as many claims, as many failures as 2 liter." Ex. 4, Brewer Dep. 74:7-12; Ex. 18, Wachs Rpt. at pp. 24-25; Ex. 17, Lennox Rpt. Fig. 1 & Table 5; Ex. 2, Lillo Rpt. ¶ 184.

Failure rates also varied *among* models in the same model year in Plaintiffs' proposed classes of vehicles with the 2.0L and 2.3L engines. For example, warranty claims rates on the 2017 2.0L Edge were ██ percent, compared to less than ██ percent for the 2017 2.3L Explorer. Ex 17, Lennox Rpt. App'x E. This is not surprising: Ford's engineers testified that multiple factors influence when and if a vehicle will suffer coolant intrusion, including consumer driving patterns,

use of the vehicle, and the vehicle's weight.  Ex. 6, Knott Dep. 99:2-23; Ex. 10, FORD-MILLER 00441286 (showing relationship between ██████████████████ on the 2.0L vehicles); Ex. 14, FORD-MILLER 00421043 ████████████████████████ ████████████████."  This difference in field performance underscores that the evidence for the vehicles within the class is *not* common.  If "all" vehicles with the saw-cut are defective, then similar performance rates would be expected.  However, Ford's expert shows that failure rates vary more than tenfold across vehicles, which means that the evidence of "defect" is not classwide, and a jury might reach different conclusions as to different vehicle lines and model years within the class, based on the different evidence available to each subgroup.  Ex. 17, Lennox Rpt. App'x E.

**3.      The Evidence Refutes Plaintiffs' Assertion That Ford "Acknowledged" the Saw-Cut Was a Common Defect**

Plaintiffs' assertion that "Ford has consistently acknowledged the Saw Cut Defect was common to all Class Vehicles" (Mot. at 24) is wrong.  The exhibits cited by Plaintiffs do not relate to all the proposed class vehicles and reinforce that the issues occurred differently as to different vehicles.  Pls. Ex. 62 is a 6-Panel presentation showing that the ████████████████ ████████████, and noting the ██████████████████████████████.  Pls. Ex. 62 at -764, -767.  Pls. Ex. 63 explicitly states, "████████████████████████ ████████████████████████████████████████████████ ████████████████████████ to identify the root cause.  Pls. Ex. 19 explicitly states that the ██████████████████████████, and the slide Plaintiffs cite addressed a ████████████ ████████████████████████—a design change *not* present in all model years of vehicles with the 2.0L engines, and a gasket *not used* in the vehicles with 1.5L engines.  Finally, Pls. Ex. 54 describes ██████████████████████████████████████ and how those ██████████████████████████.

It is true that all the engines in the proposed class vehicles—like all engines in other vehicles (as explained by Ford's expert, Dr. Lillo, Ex. 2, Lillo Rpt. ¶¶ 34-41)—could experience coolant intrusion.  But that ultimate problem itself does not mean a common defective design exists and is the cause—for example, flat tires can be caused by multiple causes: whether a tire is defectively

designed, whether there is a problem in the vehicle's alignment, or a driver runs over a nail. A tire needing to be replaced does not mean that the tire itself is "defective." As Ford's engineers repeatedly testified, the "root cause" of coolant intrusion was ***not*** the "Saw Cut." *E.g.*, Ex. 24, Wade Dep. 301:3-19 ("true root cause is not directly related to having a saw cut"); Ex. 5, Dunahay Dep. 93:17-94:1 (engines experienced "independent issues" regarding coolant intrusion). Instead, the evidence on the defect question varies based on engine, model year, and model.

Plaintiffs' argument that Ford analyzed the issues in the 1.5L and 2.0L using the same methodology (Mot. at 25, citing Pls. Ex. 64) is similarly irrelevant. The email actually just says that the ████████████████████████████████████████████████████████████ ████████████████████—hardly a surprise or evidence of a common defect. Plaintiffs also claim that Ford gave dealerships the "same" message to address coolant intrusion (Mot. at 25, citing Pls. Ex. 43), but Ford's messaging did not say the root causes were the same. A Ford engineer explained that ████████████████████████████████████████████████████████████ ████████████████████████ Ex. 40, FORD-MILLER 00124872.

### 4. Evidentiary Differences on the Question of Defect Defeat Predominance, Regardless of Plaintiffs' Allegations

Plaintiffs' failure to address the differing evidence about different vehicles—including the design and performance differences—defeats commonality. *In re Hitachi Television Optical Block Cases*, 2011 WL 4499036, at *3-*5 (S.D. Cal. Sept. 27, 2011) (certification is improper if "there are differences in the product design, or differences in the product parts that make up the design"); *Butler*, 2017 WL 1398316, at *6 ("class treatment inappropriate where the relevant components of a device differ across class members such that proof that one device is defective may not lend itself to establishing that another device is defective"); *Grodzitsky v. Am. Honda Motor Co.*, 2014 WL 718431, at *5 (C.D. Cal. Feb. 19, 2014); *Stockinger*, 2020 WL 1289549, at *13; *In re Ford Motor Co.*, 86 F.4th 723, 727-28 (6th Cir. 2023) ("*Weidman*") (reversing grant of class certification because a defect is only common if it was the same defect in all class vehicles).

By seeking to certify two separate types of classes, Plaintiffs concede from the outset that evidence of the existence of the defect is not common across the 1.5L, 2.0L, and 2.3L engines.

FORD'S CLASS CERT. OPP.
NOS. 2:20-CV-01796 & 2:24-CV-02231

Plaintiffs also admit that there are "differences in the exact way the internally leaking coolant corrodes/erodes the block/head and intrudes into the cylinders." Mot. at 26. They claim that such differences do not matter, relying on *Wolin v. Jaguar Land Rover North America, LLC*, 617 F.3d 1168, 1172 (9th Cir. 2010) (Mot. at 27), to support their claim that all that is necessary for class certification is that "the same alleged defect is at issue." But allegations are not enough, as the Ninth Circuit's more recent decision in *Black Lives Matter*, 113 F.4th at 1258, makes clear. And, as the Ninth Circuit recently explained in *Lessin v. Ford Motor Co.*, *Wolin* does not stand for the proposition that merely claiming the existence of a common defect is sufficient for class certification. *Wolin* involved "only one platform[] and limited model years (2004-2006)." 2026 WL 382608, at *2 (9th Cir. 2026). Here, in contrast, "where the parties do dispute whether the alleged defect is identical across all Class Vehicles and, consequently, whether Plaintiffs can demonstrate the alleged defect with common evidence" *id.*, the variations in the engines' design and the causes and rates of coolant intrusion are highly relevant. Ford's evidence that the existence of the saw-cut defect cannot be established with common proof should be given equal weight as Plaintiffs' evidence. *Ellis*, 657 F.3d at 983-84.[9]

### 5.    A Common Repair Does Not Mean Common Defect

Finally, that Ford utilized what Plaintiffs call a "common fix," i.e., change to the cross-drill design, does not mean that the defect was common. *See Cholakyan v. Mercedes-Benz, USA, LLC*, 281 F.R.D. 534, 554–55 (C.D. Cal. 2012) (issuing of service bulletins addressing similar problems not "conclusive proof that a common defect affects all the vehicles in question"). As Ford's expert Dr. Lillo explained, the change to the cross-drill was not the only possible fix for coolant intrusion in any of the vehicles. Ex. 36, Lillo Rebuttal Rpt. ¶ 50. And, as explained above, the switch to the cross-drills was effective for different reasons in different engines. *Supra* Section II.A. And, in any event, Plaintiffs' argument about a "common fix" does not predominate over the vast amount

---

[9] The other cases cited by Plaintiffs (Mot. at 27) are unpersuasive too: *Sanchez v. Kia Motors Am.*, 2024 WL 4730654, at *1, *13 (C.D. Cal. Nov. 7, 2024), only involved 3 model years of the same vehicle, all of which had the same windshield. *Salas v. Toyota Motor Sales, U.S.A.*, 2019 WL 1940619, at *5 (C.D. Cal. Mar. 27, 2019), also only involved a single model. *Johnson v. Nissan N. Am., Inc.*, 2022 WL 2869528 (N.D. Cal. July 21, 2022), is flawed in that it cites no case law for its conclusion that all that is required are allegations of a common defect and makes the same logical fallacy rejected later by the Ninth Circuit in *Lessin*.

of non-common evidence regarding the alleged defect.

### B. Individualized Issues Predominate as to the Remaining Elements of Plaintiffs' Consumer Fraud Claims Too

In addition to the non-common issue of defect, non-classwide evidence overwhelms the other elements of Plaintiffs' claims under California's, Florida's, Illinois's, Indiana's, Kansas's, Maryland's, Nebraska's, and North Carolina's consumer fraud acts. The evidence related to Ford's pre-sale knowledge of the alleged defect varies over time and across vehicle lines. Materiality, which also depends on rates that the defect manifests, also necessarily varies across each proposed class. Furthermore, individualized inquiries are necessary on the questions of reliance and causation: some statutes, such as the Indiana DCSA, do not allow for a class-wide presumption of reliance, while others require a uniform misrepresentation or a uniform exposure to materials that did not include the undisclosed information; other states, such as California, additionally allow for an inference to be rebutted. And, as discussed in Section V.A., harm cannot be established using classwide evidence and, as discussed in Sections V.A., V.C., V.D., and V.E., other state-specific claim elements and defenses depend on individualized inquiries as well.

### 1. All Statutory Consumer Fraud Claims Require a Showing of Ford's Pre-Sale Knowledge, Which Varies over Time

As this Court already held, the consumer fraud claims of all eight states that Plaintiffs seek to certify require a showing of pre-sale knowledge for omission-based claims like those asserted here.[10] Ford has no liability for not disclosing facts that it was not aware of. *Hauck v. Advanced Micro Devices*, 2019 WL 1493356, at *11 (N.D. Cal. Apr. 4, 2019). Plaintiffs identified no

---

[10] *Miller v. Ford Motor Co.*, 620 F. Supp. 3d 1045, 1068 (E.D. Cal. 2022) (duty to disclose for an omissions-based fraud claim arises when defendant had superior pre-sale knowledge of facts for all states in *Miller* case). *See also Wozniak v. Ford Motor Co.*, 2019 WL 108845, at 3 n.5 (E.D. Mich. Jan. 4, 2019) ("to succeed on an omission theory, each state consumer protection act . . . requires knowledge of the defect by the defendant") (covering CA, FL, IL, MD, and NC law); **CA**: *Herron v. Best Buy Co.*, 924 F. Supp. 2d 1161, 1174–75 (E.D. Cal. 2013); **FL**: *Varner v. Domestic Corp.*, 2017 WL 3730618, at *15 (S.D. Fla. Feb. 7, 2017); **IL**: *Castaneda v. Amazon Inc.*, 2023 WL 4181275, at *9-10 (N.D. Ill. June 26, 2021) (discussing scienter requirement difference for ICFA claims under omissions versus misrepresentation theories); **IN**: *McKinney v. State*, 693 N.E.2d 65, 68-69 (Ind. 1998); **KS**: *Bhaduri v. L.M.K. Constr., Inc.*, 2022 WL 3330116, at * 6 (Kan. Ct. App. Aug. 12, 2022); **MD**: *Allen v. Bank of Am., N.A.*, 933 F. Supp. 2d 716, 727 (D. Md. 2013); **NE**: *Miller v. Ford Motor Co.*, 2024 WL 1344597, at *29 (E.D. Cal. Mar. 29, 2024); **NC**: *Withers*, 560 F. Supp. 3d at 1020.

classwide evidence that shows Ford had knowledge of the alleged defect predating the first sale of *all* vehicles in any of their ten proposed classes, i.e., pre-2013 (when MY 2014 vehicles with 1.5L engines were sold in Illinois, Indiana, and Maryland) and pre-2014 (when MY 2015 vehicles with 2.0L engines were sold in California, Florida, Kansas, Nebraska, and North Carolina).  Significant differences in Ford's knowledge over time necessarily mean that evidence as to Ford's pre-sale knowledge is not common across any proposed class.  The Ninth Circuit and other courts recognize that this itself defeats certification of claims under consumer fraud statutes for failure to disclose an alleged defect.  *E.g.*, *Lessin*, 2026 WL 382608, at *4 (evidence that post-dates sale of certain vehicles in a proposed class not "common" classwide evidence because "[l]ogically, any evidence that post-dates the P131 platform concerns Ford's knowledge only with respect to the P558; this is not generalized, class-wide proof"); *In re MyFord Touch Consumer Litig.*, 2016 WL 6873453, at *3 (N.D. Cal. Nov. 22, 2016) (rejecting certification of consumer fraud claims based, in part, on varying knowledge over time); *see also Weidman*, 86 F.4th at 728 (class certification inappropriate when district court failed to address evidence showing Ford's knowledge changed over time).

Significant evidence shows Ford's knowledge of problems changed over time, and as to different model years and models, for both the proposed classes involving the 1.5L engine and proposed classes involving the 2.0L and 2.3L engines.  As many Ford witnesses testified, the coolant intrusion issues in different vehicles were unexpected and had never been seen before the class vehicles had been sold and experienced significant time in service.  *E.g.*, Ex. 25, Giunta Dep. 58:21-59:2 (coolant intrusion "                                        previously); Ex. 24, Wade Dep. 211:5-212:15 (boiling in the saw-cut—the failure mode on the 1.5L engines—was                                        ); *id.* 217:5-14 (coolant intrusion did not appear during vehicle testing); Ex. 41, FORD-MILLER 00174819 at -831 ("                            addressing 1.5L engines).  As Ford's documents show, Ford first became aware in August/September 2017 of elevated rates of coolant intrusion in the 1.5L engine (and specifically the 2017 MY vehicles)—years after the first sale in 2014 of the vehicles with 1.5L engines included in the proposed CO, IL, IN, and MD classes.  Ex. 7, FORD-MILLER 00221220. And, even then, Ford's knowledge continued to evolve during its months-long investigation of the

root cause.  Ford's 14D comprehensive analysis regarding coolant intrusion in the 1.5L engine states that testing had not previously identified the coolant boiling issue before the vehicles were sold.  Ex. 42, FORD-MILLER 00212436.  *See also* Exs. 43 & 44, Brewer Dep. Exs. 114 & 115 (showing ███████████████████████████).  As late as 2021, Ford's emails show that ███████████████████████████████████████ ██████████████████████████████████████████████████ ████.  Ex. 9, FORD-MILLER 00140733 at -734.  None of this evidence suggests that Ford had common classwide knowledge of a defect before the sale of all proposed class vehicles with the 1.5L engines.  Ford's documents explicitly noted differences between models in the same model year—for example, between the █████████████.  Ex. 39, FORD-MILLER 00218199.

Similar non-uniformity in Ford's knowledge exists for the vehicles with the 2.0L and 2.3L engines.  In late 2017, Ford began seeing higher rates of coolant intrusion concerns on the 2.0L and 2.3L vehicles.  Ex. 3, FORD-MILLER 00360118.  Ford's investigation looked at multiple potential causes, including ███████████████████████████ ████████████n.  *Id*.  At that time, Ford also noted that coolant intrusion was █████████ █████████████████████████████████ *Id.* at -151.  In October 2018, Ford's knowledge was still evolving, and engineers ██████████████ ███████████████████████████████████████████████████. Ex. 45, FORD-MILLER 00125179 (email noting "██████████████████████████ ███████████████████████).  Ford also consistently noted differences between the 2.0L engine performance in the Edge versus and vehicles.  Ex. 46, FORD-MILLER 00139252; Ex. 47, FORD-MILLER-00139787 at slide 8-9; *see also* Ex. 14, FORD-MILLER 00421043; Ex. 10, FORD-MILLER  00441286 ███████████████████████████████ ██████████████████).  Ford's comprehensive 14D analysis in 2020 for the 2.0L also stated, "███████████████████████████████████████████ Ex. 48, FORD-MILLER 00790256 at -257, further establishing the lack of classwide evidence on pre-sale knowledge.

Likewise, the sources of pre-sale knowledge alleged in the operative complaints are

25

inherently the type that varied over time as well. Plaintiffs alleged that "*Discovery will show that before selling or leasing the Class Vehicles, Ford knew about the Engine defect through sources including pre-production testing, pre-production design failure mode analysis, pre-release evaluation and testing; repair and warranty data; replacement part sales data; high failure rates and analysis in response; early consumer complaints made directly to Ford and/or posted on public online vehicle owner forums; consumer complaints made to Ford's authorized dealerships, who are Ford's agents for vehicle sales, leases, servicing, and repairs, testing done in response to those complaints; aggregate data from Ford dealers; and other internal sources.*" *Miller* Dkt. 144 ¶ 9; *Nelson* Dkt. 33 ¶ 9. But their class certification motion does not deliver this promise of classwide evidence. It does not present evidence of pre-production testing and failure mode analysis showing Ford's knowledge of a common defect before the sales of all class vehicles. And the other alleged sources of knowledge—repair and warranty data, replacement part sales, failure rates, complaints, and dealer data—by their nature are not facts known before initial sale of all class vehicles and, in any event, are not uniform across the class. *E.g.*, Ex. 17, Lennox Rpt. Table 5 and App'x E (showing differences in warranty rates).

Even Plaintiffs' own cherry-picked evidence submitted with their class certification brief confirms the lack of commonality as to evidence of Ford's knowledge over time. They make no effort to confine their evidence to classwide evidence. The vast majority of the documents—two dozen—relied on by Plaintiffs regarding Ford's knowledge of problems in the 1.5L, 2.0L, and 2.3L are dated from **2018 or later**—many years *after* most proposed class vehicles were first sold, and plainly not classwide evidence of Ford's knowledge. *E.g*, Pls. Exs. 6, 7, 13, 14, 15, 19, 22, 23, 26, 29, 32, 34, 42, 43, 44, 48, 49, 50, 52, 54, 56, 57, 58, 59 (discussed in Mot. at 3, 6-19). Only **three** (6 percent) of the exhibits relating to the class vehicles that plaintiffs claim to show knowledge predate 2015, and **none** of them say coolant intrusion or the alleged defect failure mechanisms were involved. *See* Pls. Exs. 30, 41, 40 (discussing ███████████████████████████████████████████████████████████████████████ ████████████████████ ).

Although the bulk of their evidence on pre-sale knowledge post-dates the beginning of the

class period and cannot have classwide application, Plaintiffs cite to a few out of context documents that they claim show Ford's knowledge before 2013 (date of sale of 2014 MY 1.5L) and 2014 (date of sale of 2015 MY 2.0L).  These limited documents also do not supply the common pre-sale knowledge.  Several did not discuss any problem with the saw-cut cooling channels and others involve vehicles that are not part of Plaintiffs' proposed classes, such as the 1.6L, which never experienced widespread coolant intrusion issues.  *E.g.*, Pls. Exs. 31, 36, 45, 46, 47, 53.  Other exhibits discuss one-off problems unrelated to the alleged "Saw Cut Defect."  *See* Pls. Exs. 40, 41 (describing ███████████████████████████████ not coolant intrusion).

Plaintiffs also assert that the existence of certain patents (Mot. at 6 n.28, 7)—*none* of which involve the vehicles in this case—is classwide evidence that Ford "knew" of the alleged "Saw Cut Defect."  In addition to the patents' irrelevance, and minimal part of Plaintiffs' proposed evidence of knowledge, even that evidence is not common across the class because Plaintiffs do not show that Ford knew about the patents during the entire class periods, let alone that Ford believed the patents show that saw-cut engines were defective.  Still further, indeed, such evidence could not be sufficient to establish pre-sale knowledge in any event.  *See McCoy v. Samsung Elecs. Am., Inc.*, 2023 WL 6140641, at *5 n.9 (D.N.J. Sept. 20, 2023) (existence of patents relating to alleged defective part did not give rise to "inference" that component part was defective).

In the face of obvious non-common evidence related to Ford's knowledge over time, Plaintiffs argue that Ford's changing knowledge is "beside the point and does not affect class certification."  Mot. at 32.  But that argument makes no sense and is contrary to a long line of authority, including from the Ninth Circuit.  Evidence cannot be "common" if a jury could come to different conclusions regarding liability as to some vehicles in the class versus others.  The outlier case that Plaintiffs cite in support, *Johnson*, 2022 WL 2869528, at *22, itself recognizes that knowledge will not be the same across the entire period; but with no analysis, states "it does not mean that any individualized issue predominates."  *Johnson* is also further distinguishable in that it does not address varying knowledge as to different vehicle lines over time.  As the Ninth Circuit held in a decision that post-dates *Johnson*, evidence that predated the sale of some but not all putative class vehicles could not be "common" classwide.  *Lessin*, 2026 WL 382608, at *4.  That

holding is in accord with other cases. *E.g., In re MyFord Touch Consumer Litig.*, 2018 WL 3646895, at *3 (N.D. Cal. Aug. 1, 2018) (that "Ford engaged in ongoing post-release tracking of [vehicle] performance, including analysis of customer contacts, dealership contacts, warranty claims, and other sources of information and metrics related to the rate of problems," meant that "the state of information known to Ford was [] in flux at all times throughout the Class Period"); *Beaty v. Ford Motor Co.*, 2021 WL 3109661, at *12 (W.D. Wash. July 22, 2021) (similar); *In re Ford Motor Co. Vehicle Paint Litig.*, 182 F.R.D. 214, 220 (E.D. La. 1998) (similar); *Kondash v. Kia Motors Am., Inc.*, 2020 WL 5816228, at *12 (S.D. Ohio Sept. 30, 2020) (denying class certification; "knowledge of defect in one model line does not establish knowledge of a defect in a different model line"); *Lessin*, 2026 WL 382608, at *4; *In re Nissan N. Am., Inc. Litig.*, 122 F.4th 239, 252 (6th Cir. 2024) (reversing class certification when manufacturers' understanding of alleged defect changed over time). If adopted, Plaintiffs' amorphous approach to knowledge, aggregating together non-common evidence and imputing it to Ford at every point in time across the class period, would improperly "foreclose Ford's defense that its scienter changed over time." *In re MyFord Touch*, 2016 WL 6873453, at *3 (denying certification of fraud claims due to varying Ford knowledge over time). That is the very "fictional composite" approach to class certification that courts reject. *Broussard*, 155 F.3d at 345.

Plaintiffs also argue that Ford had knowledge of problems with coolant intrusion but failed to act due to "cost concerns" (Mot. at 10, 17-18), but their evidence is neither classwide nor an accurate description of their exhibits. Plaintiffs assert that Ford discussed ███████████████ of a fix for the "Class vehicles" to "███████████████ (*id*. at 18), but the sentence they refer to describes a possibility proposed for certain 2.3Ls only (Pls. Ex. 52)—and even then Plaintiffs have no evidence that Ford decided to delay. Moreover, the decision to use a saw-cut cooling design was not solely due to cost reduction. As multiple Ford witnesses testified, using the saw-cut coolant method provided certain functional advantages, since it put the coolant directly at the hottest part of the engine. *E.g.*, Ex. 4, Brewer Dep. 22:7-11 ("the main engineering reason to choose a saw cut is the hottest part of the cylinder board is the very top, right at the head deck, and a saw cut is the only design that gets coolant to the very top of the . . . block deck"); Ex. 24, Wade Dep.

95:19-96:15.  Plaintiffs also absurdly claim that Ford had "a history of delaying and deferring solutions to serious issues for cost reasons" (Mot. at 18), but their only citation in support is to a single email from 2010, discussing the ███████████████████████████ in a non-class vehicle.

## 2.    All Consumer Fraud Claims Have Reliance or Causation as an Element, Which Requires Individualized Inquiries

### a.    No Classwide Presumption of Reliance Allowed in Indiana

Plaintiffs are wrong to assert that every consumer fraud claim they seek to certify allows a presumption of classwide reliance.  Mot. at 33-34.  Courts reject that argument for Indiana DCSA claims, declining to certify them because reliance is an individualized inquiry and cannot be presumed classwide.  *Lessin v. Ford Motor Co.*, 756 F. Supp. 3d 885, 945-46 (S.D. Cal. 2024) (declining to certify IDCSA claim because reliance cannot be presumed classwide); *see generally Hoosier Contractors, LLC v. Gardner*, 212 N.E.3d 1234, 1240 (Ind. 2023) (reliance is a required element); *Shea v. Gen. Motors*, 567 F. Supp. 3d 1011, 1024 (N.D. Ind. 2021) ("IDCSA only confers a cause of action on persons *relying upon* an . . . incurable deceptive act")(emphasis in original).

Plaintiffs' only support for their assertion that a classwide inference of reliance is available in Indiana is a footnote in *In re Honda Idle Stop Litigation*, 347 F.R.D. 528, 544 n.8 (C.D. Cal. 2024) (Mot. at 33 n.162).  But that case cannot bear the weight Plaintiffs place upon it.  First, the case involves a mixed misrepresentation/omission claim, not a pure omissions claim as at issue here.  *Id.* at 544-45 (discussing alleged representation that the vehicle was safe and omission of alleged safety defect).  Second, the case bases the foundation for the presumption on the complaint's *allegations*, *id.*, which the Ninth Circuit has made clear is not proper as explained above.  *Supra* at Section IV.  Third, the lone case cited in *In re Honda* says no such thing: *Heckler & Koch, Inc. v. German Sport Guns GmbH* only discusses (and rejects) presuming reliance on summary judgment in an individual action based on circumstantial evidence applicable to a single plaintiff; the case says nothing about whether reliance can be presumed classwide.  *Heckler & Koch, Inc.*, 2015 WL 13639195, at *4 (S.D. Ind. Apr. 21, 2015).

FORD'S CLASS CERT. OPP.
NOS. 2:20-CV-01796 & 2:24-CV-02231

  **b.**  **Plaintiffs Cannot Establish the Prerequisite for an Inference of Reliance Under California, Kansas, Maryland, and North Carolina Law**

Plaintiffs do not dispute that reliance is a required element for the consumer fraud claims under California, Kansas, Maryland, and North Carolina law; they only contend that a classwide presumption of reliance is allowed. Mot. at 30, 33-34. But in those states, an inference of reliance applies only when there is some uniform misrepresentation, or a representation omitting the allegedly material fact, that all proposed class members were exposed to. "If different buyers heard different pitches from different dealers about different cars, they experienced the misrepresentation differently too." *Speerly v. Gen. Motors, LLC*, 143 F.4th 306, 331 (6th Cir. 2025).[11] An inference is thus not available in *any* of these states, because Plaintiffs make no attempt to identify classwide that class members were exposed to the same representation that lacked the required disclosure.

For all states in which Plaintiffs claim allow a presumption of reliance under some circumstances, Plaintiffs have failed to meet that showing. The Sixth Circuit has explained that in the car-purchasing context, plaintiffs would need to prove that "hundreds of thousands of plaintiffs all saw and relied on something that [Ford] said." *Speerly*, 143 F.4th at 333 (addressing KS and NC, and other laws). Here, Plaintiffs have identified no common representation that all proposed class members were exposed to.[12] Plaintiffs only assert that "Ford did not disclose the Defect to Class members"—with no citation as to how this disclosure should have been made, or how all purchasers could have been exposed to it. And it would be impossible to do so: as multiple Plaintiffs in this case have testified, they each relied on a different range of information when deciding whether to buy a Ford vehicle and had varying reasons for their purchases. Some testified

---

[11] **CA CLRA**: *Philips v. Ford Motor Co.*, 2016 WL 7428810, at*16 (N.D. Cal. Dec. 22, 2016) ("a presumption of reliance for an omissions case is not permitted if "the information to which class members were exposed was not uniform"); **KS CPA**: *Speerly*, 143 F.4th at 333 (presumption of reliance under the KS CPA requires a showing that "each class member relied on the same communication") (citing *Delcavo v. Tour Res. Consultants, LLC*, 2022 WL 1062269, at *9 (D. Kan. Apr. 8, 2022)); **MD CPA:** *In re Marriott Int'l, Inc., Customer Data Sec. Breach Litig.*, 341 F.R.D. 128, 160 (D. Md. 2022) (presumption of reliance is only permitted when "the alleged omission is uniformly applicable to the putative class"); **NC CPA**: *Rowan Cnty. Bd. of Educ. v. U.S. Gypsum Co.*, 418 S.E.2d 648, 661 (N.C. 1992) (presumption of reliance permitted when there is a uniform exposure to information).

[12] Plaintiffs cannot identify in reply what this "uniform" information may be. Arguments raised for the first time on reply are waived. *Zango, Inc. v. Kapersy Lab, Inc.*, 568 F.3d 1169, 1177 n.8 (9th Cir. 2009) ("arguments not raised by a party in an opening brief are waived").

they did not view any advertisements or information on Ford's website at all, or did not look at any pertaining to their class vehicle. Ex. 49, Mullen Dep. 79:3-11; Ex. 50, Kennedy Dep. 100:25-101:6, 102:8-16. Others testified that they "owned practically nothing but Fords all my life" and were only considering Ford vehicles. Ex. 51, Krecek Dep. 15:13-15, 43:22-44:8; *see also* Ex. 52, Pirog Dep. 54:11-18 (was "damn determined" to buy a Ford because Ford did not accept bail out money during the financial crisis); Ex. 53, Balaszek Dep. 49:3-18 (was only considering MY 2017 Escapes); Ex. 54, Christodaro Dep. 69:5-15 (decided to buy a Ford because his grandfather owned Ford trucks); Ex. 33, Speigner Dep. 43:3-16 (decided to buy a Ford because Ford did not take federal bailout money). Some testified they did no research at all, and only looked at Ford's website to view the price and available color options. Ex. 52, Pirog Dep. 54:20-55:8. Plaintiffs' *own testimony* emphasizes the varying information they were exposed to and relied upon. If the evidence of exposure to representations is not common among ***14 plaintiffs***, it is assuredly not common across the hundreds of thousands of proposed class members.

>           **c.**     **Florida, Illinois, and Nebraska Statutory Consumer Fraud Claims Require a Showing of Causation, Which Is Not Inferred Classwide**

The Florida, Illinois, and Nebraska consumer fraud statutes require causation, which similarly involves similar individualized inquiries because causation functions much like reliance in an omissions case. For example, the Illinois CFA describes the causation requirement as a "buyer 'must have relied on the wrong to some extent in order to establish proximate cause.'" *Speerly*, 143 F.4th at 330 (ICFA); *In re Nissan*, 122 F.4th at 250 (reversing grant of certification of ICFA claim because proximate cause requirement requires "individual determinations"); *see also De Bouse v. Bayer*, 922 N.E.2d 309, 315 (Ill. 2009) ("It is not possible for a plaintiff to establish proximate causation unless the plaintiff can show that he or she was, 'in some manner, deceived' by the misrepresentation."). Similarly, a Florida DUTPA claim requires causation, or a showing that "the deceptive act 'was likely to deceive a consumer acting reasonably in the *same* circumstances.'" *Fox v. Ritz-Carlton Hotel Co.*, 345 F.R.D. 358, 369 (S.D. Fla. 2024); *see also id.* at 370 (individualized issues predominated for FDUTPA claim when consumers' exposure to restaurants' disclosure of gratuity policy varied by restaurant); *Perisic v. Ashley Furniture Indus.,*

*Inc.*, 2018 WL 3391359, at \*6 (M.D. Fla. June 27, 2018) (individualized inquiries predominated under FDUTPA when plaintiffs had varying exposures to company's representations regarding its furniture). The Nebraska CPA likewise requires causation, *WWP, Inc. v. Wounded Warriors Fam. Support, Inc.*, 628 F.3d 1032, 1042 (8th Cir. 2011), and Ford is unaware of authority allowing that causation to be presumed in a class case.

For the same reasons that Plaintiffs fail to establish classwide reliance, they also cannot establish causation. Any showing of causation necessarily requires examination of the circumstances surrounding a consumer's purchase, including what information they reviewed.

### 3.   The Consumer Fraud Claims Require Nondisclosure of a "Material" Fact, Which Also Varies Based on Failure Rates

It is an incomplete analysis to argue, as Plaintiffs do, that materiality is common because "materiality is governed by an objective 'reasonable person' standard." Mot. at 33-34. Information is material if it is important to a consumer's purchase decision, and an objective standard applied to any given consumer evaluates what would be material to a reasonable consumer in that plaintiff's circumstances. But materiality can vary under an objective standard if consumers' circumstances vary, and courts have held that if materiality "would vary from consumer to consumer, the issue is not subject to common proof, and the action is properly not certified as a class action." *Algarin v. Maybelline, LLC*, 300 F.R.D. 444, 453 (S.D. Cal. 2014). In the context of an allegedly concealed defect in a product, materiality necessarily depends on the actual rates that a problem will occur, as the Ninth Circuit and other courts have recognized. *E.g.*, *Lessin*, 2026 WL 382608, at \*3 ("Whether the alleged defect's materiality varies across Class Vehicles is relevant when considering whether common questions predominate"); *Townsend v. Monster Beverage Corp.*, 303 F. Supp. 3d 1010, 1043 (C.D. Cal. 2018) (denying certification). Here, the risk of failure varies as much as tenfold across different vehicle groups within each proposed class. Ex. 17, Lennox Rpt. at App'x E. Indeed, failure rates for some vehicle lines in some model years are so low they may even be immaterial as a matter of law. *E.g.*, *McVicar v. Goodman Glob., Inc.*, 2015 WL 4945730, at \*13 (C.D. Cal. Aug. 20, 2015) (rejecting class where 1 percent defect rate was so low, "plaintiffs have not shown that consumers would uniformly find any alleged 'defect' material"). Other vehicles in

FORD'S CLASS CERT. OPP.
NOS. 2:20-CV-01796 & 2:24-CV-02231

the proposed classes have different risks, which means a jury could reach different conclusions on this element. *E.g.*, *Munch v. Sears Roebuck & Co.*, 2007 WL 2461660, at *3 (N.D. Ill. Aug. 27, 2007) (materiality depends on many factors, including failure rate); *Anderson v. Ford Motor Co.*, 2020 WL 1853321, at *3 (W.D. Mo. Feb. 14, 2020) ("reasonable consumer would not consider the risk . . . to be material to her decision to purchase a vehicle if the chance of [the problem occurring] were miniscule").

Plaintiffs attempt to sidestep the fact that rates of coolant intrusion indisputably vary classwide by claiming that it is material because it presents a "safety risk." Mot. at 33-34. Allegations that a defect could pose a hypothetical safety risk are not sufficient to trump the individualized issues of materiality: in *Johnson v. Harley-Davidson Motor Co. Group, LLC*, 285 F.R.D. 573, 581 (E.D. Cal. 2012), plaintiffs alleged that risks of overheating in motorcycles presented a "safety risk," but the court still found that the materiality of the defect varied based on class members' experiences with their motorcycles, since "there are numerous individualized issues as to whether the reasonable consumer purchasing one of Defendants' motorcycles would find the excessive heat material." As discussed above, Plaintiffs decided to purchase Ford vehicles for varying reason. *Supra* at Section V.B.2.b. As in *Johnson*, no classwide evidence exists here to support that the risks of coolant intrusion presented a classwide safety risk. As discussed *supra*, coolant intrusion was never considered by NHTSA to be a safety risk, and there is no classwide evidence that in the billions of vehicle miles driven, it has resulted in accidents or injuries in class vehicles. Plaintiffs argue the alleged defect is unsafe because it "can cause loss of power while driving, loss of power-assisted systems (i.e. steering, brakes, etc.), [and] unexpected deceleration." Mot. at 2. This does not fit the actual evidence in this case. Plaintiffs do not cite any evidence that internal coolant intrusion causes loss of power-assisted systems. And all Plaintiffs who experienced FMEM slowing of their vehicle maintained steering and braking capabilities, and were able to safely pull over. Ex. 53, Balaszek Dep. 66:11-70:25; Ex. 55, Cicero Dep. 102:10-107:13, 110:4-111:19, 114:19-118:9; Ex. 56, A. Manfra Dep. 111:1-18. While Ford's representatives do testify about the potential safety risks of engines stalling, quitting, or failing, their testimony is about generalized treatment of safety risks—*not* any of the internal coolant intrusion issues observed in

the proposed class vehicles.  Ex. 24, Wade Dep. 269:5-18; Ex. 4, Brewer Dep. 174:13-16.  This disconnect between what Plaintiffs assert—that coolant intrusion presents a safety risk—and the actual evidence— defeats Plaintiffs' argument that materiality is a classwide issue.

**4.      Actual Manifestation of a Defect Is Required for Each Class Member's Claim Under FDUTPA, Precluding Classwide Adjudication**

Certification of the FDUTPA class also fails because some courts have recognized that the claim of each proposed class member requires proof that a defect has actually manifested.  *Kia Motors Am. Corp. v. Butler*, 985 So. 2d 1133, 1138-39, 1139 n.5 (Fla. Dist. Ct. App. 2008) (denying certification when not all class members experience the defect); *Ohio State Troopers Ass'n, Inc. v. Point Blank Enters., Inc.*, 481 F. Supp. 3d 1258, 1283-84 (S.D. Fla. 2020) (denying class certification when defect did not manifest in all class vehicles); *Weidman v. Ford Motor Co.*, 2022 WL 1071289, at *14 (E.D. Mich. Apr. 8, 2022) (other portions of order vacated on other grounds) (denying certification of FDUTPA claim because manifestation was a required element).  As discussed *supra*, the undisputed warranty evidence shows that even in vehicles that had higher rates of engine replacements, the vast majority of them (nearly ■ percent) did not experience failure within the warranty period.  Ex. 17, Lennox Rpt. Table 5 (showing rates for vehicles with 2.0L and 2.3L engines, which are the proposed class vehicles for Florida).  Even Plaintiffs' expert Dr. Wachs estimated that most proposed class vehicles would not experience a failure within 15 years, which she contended was their expected life.  Ex. 18, Wachs Rpt. ¶¶ 65-66.

**C.      Individualized Inquiries Predominate Plaintiffs' Implied Warranty Claims**

Plaintiffs face additional hurdles in seeking to certify all of their implied warranty class claims under California, Colorado, Indiana, Kansas, Maryland, and Michigan law.  All six states require that a vehicle be "unmerchantable," which means that it was not fit for ordinary use.[13]  This

---

[13] **CA**: *Keegan v. Am. Honda Motor Co.*, 838 F. Supp. 2d 929, 945 (C.D. Cal. 2012) (a new car need not "be perfect in every detail"; rather, its implied merchantability "requires only that a vehicle be reasonably suited for ordinary use"); **CO**: *O'Connor*, 2020 WL 1303285, at *5 (product must be "fit for the ordinary purposes for which such goods are used"); **IN**: *Sharp*, 822 N.E.2d at 175 ("The ordinary purpose of a privately owned vehicle is to provide transportation."); **KS**: *Marksberry*, 606 F. Supp. 3d at 1086 ("a good is merchantable if it is 'fit for the ordinary purposes for which such goods are used'"); **MD**: *Mercedes-Benz*, 618 A.2d at 240; **MI**: *Kovack*, 2006 WL 1293213, at *3 (vehicle must be "reasonably fit for its intended, anticipated, or reasonably foreseeable use").

necessitates an inquiry into each owners' use of their vehicle. California law also requires a showing that the product defect is "substantially" certain to fail, requiring further non-classwide inquiries into the actual failure rates in different models, model years, and engines.

### 1. Individualized Inquiries Predominate When Determining If a Vehicle Was "Unmerchantable"

Plaintiffs do not dispute that each of their breach of implied warranty claims requires a showing that a vehicle was "unfit" for its ordinary purpose. Mot. at 35. Whether a given vehicle was "unfit" depends on individualized, vehicle-specific facts about the vehicle's mileage when an engine problem occurred, how the owner reacted to the problems, whether she could continue to use the vehicle, and related facts. *E.g.*, *Sheris v. Nissan N. Am. Inc.*, 2008 WL 2354908, at *6 (D.N.J. June 3, 2008) (the "weight of authority, from courts across the country, indicates that plaintiffs may not recover for breach of the implied warranty of merchantability under the facts where plaintiffs have driven their cars without problems for years").[14]

The testimony of the Plaintiffs in this case, including both those now offered as implied warranty class representatives and other Plaintiffs, highlights the wide variation of their use and experiences. Some experienced failures within warranty that were successfully repaired, and those Plaintiffs continued to drive their vehicles. Ex. 57, Bozhinov Dep. 94:19-21. Others continued to use their allegedly "unmerchantable" vehicles to drive family members, including children, for many years and thousands of miles. Ex. 49, Mullen Dep. 250:12-19, 255:14-22; Ex. 53, Balaszek Dep. 44:7-10; Ex. 58, K. Morford Dep. 55:1-14, 55:24-56:12, 57:1-7. Another chose to drive his

---

[14] *See also, e.g.*, *Tae Hee Lee v. Toyota Motor Sales, U.S.A., Inc.*, 992 F. Supp. 2d 962, 979-80 (C.D. Cal. 2014); *O'Connor*, 2020 WL 1303285, at *5 (CO law); *Sharp*, 822 N.E.2d at 174-75 (IN law); *Popham v. Keystone RV Co.*, 2016 WL 4993393, at *6 (N.D. Ind. Sept. 19, 2016) (RV merchantable when used "for nearly two years" without incident); *Marksberry*, 606 F. Supp. 3d at 1080, 1087 (vehicle found merchantable as a matter of law when "Plaintiff had driven his truck for more than 11 years and 80,000 miles [and] Plaintiff's truck has met his transportation needs") (KS law); *Lyman v. Ford Motor Co.*, 2022 WL 856393, at *8 (E.D. Mich. Mar. 22, 2022) ("a plaintiff cannot maintain an implied warranty claim when he or she does not allege that the defect prevented an ability to drive the vehicle"); *Weidman v. Ford Motor Co.*, 2020 WL 674348, at *3-4 (E.D. Mich. Feb. 11, 2020) (Michigan plaintiff's implied warranty claims fail where plaintiff did not stop using the vehicle); *McCabe v. Ford Motor Co.*, 2025 WL 953064, at *17 (D. Mass. Mar. 28, 2025) (problems that arose "after years of serviceable driving" did not mean vehicle was unmerchantable at time of sale); *Priebe v. Autobarn Ltd.*, 240 F.3d 584, 588 (7th Cir. 2001) (no breach of implied warranty claim when plaintiff "continued to drive the car" and vehicle had "more than 30,000 miles" despite plaintiff claiming it was "dangerous to drive").

FORD'S CLASS CERT. OPP.
NOS. 2:20-CV-01796 & 2:24-CV-02231

2.0L vehicle on a 700-mile road trip while experiencing symptoms of coolant intrusion because he considered it better than his other vehicle.  Ex. 49, Mullen Dep. 193:20-23.  Two others gave their alleged unmerchantable vehicles to their children to drive.  Ex. 53, Balaszek Dep. 33:3-6, 32:12-16, 43:18-22; Ex. 49, Mullen Dep. 258:15-19.  Another couple drove their vehicle over 100,000 miles while experiencing coolant intrusion, and never repaired their vehicle.  Ex. 31, C. Morford Dep. 59:2-22, 62:6-18, 120:22-25, 121:21-122:9; Ex. 32, Morford Interrog. Resp. 9.   Other Plaintiffs, including the proposed class representatives in Indiana and Michigan, have driven over *150,000 miles* in their alleged "unmerchantable" vehicles.  *E.g.*, Ex. 59, Metro Interrog. Resp. 9 (over 164,000 miles); Ex. 60, Balaszek Interrog. Resp. 9) (over 163,000 miles).  Still other Plaintiffs had less favorable experiences with their vehicles.  Ex. 33, Speigner Dep. 29:13-17, 100:22-101:2, 102:3-103:21; Ex. 54, Christodaro Dep. 30:20-24, 108:4-111:1, 158:5-160:2.

These disparate experiences among the Plaintiffs show that merchantability is not subject to classwide evidence—had each brought an individual case, their experiences would be relevant to their claims.  The class action procedure cannot alter that substantive point.  *See Olean*, 31 F.4th at 667 (class evidence must be the same as what could be presented in an individual action).  Specifically, proposed class members who were able to drive their vehicles without incident for years, and those that continue to drive their vehicles, cannot rely on the negative experiences of some others to prove their claims.  *Broussard*, 155 F.3d at 345 ("fictional composite" plaintiff not permitted).

The variation in use of Plaintiffs' vehicles—including when engine issues arose, the symptoms of coolant intrusion, and Plaintiffs' continued use of their vehicles, emphasizes that whether a vehicle is "merchantable" necessarily depends on highly individualized, plaintiff-specific facts.  *Speerly*, 143 F.4th at 325 (reversing certification of implied warranty claims because "individualized inquiries, which require assessing the presence and extent of the defect, vary from class member to class member"); *Oscar v. BMW of N. Am., LLC*, 274 F.R.D. 498, 510-12 (S.D.N.Y. 2011) (declining to certify breach of implied warranty class because individualized issues of causation related to vehicle usage would swamp the common inquiry); *Simmonds v. Ford Motor Co.*, 592 F. Supp. 3d 1262, 1289 (S.D. Fla. 2022) (finding factual issues associated with

environmental and use factors lead to significant individualized questions, thereby declining to hold that legal issues predominate). *See also Tyson*, 577 U.S. at 453 (question not common if proposed class members must present "evidence that varies from member to member"); *Olean*, 31 F.4th at 667.

Plaintiffs also cannot establish classwide that the vehicles are unmerchantable based on a supposed safety risk (Mot. at 36 n.168) because, as discussed above, they lack evidence to establish a classwide safety risk. As the Sixth Circuit held unambiguously in *Speerly*, 143 F.4th at 318, whether a defect presents a safety risk and makes a vehicle "unmerchantable" depends on the individualized circumstances, because the existence of "some customers' transmission problems might not seriously disrupt the safety and comfort of ***each*** class vehicle" depending on how the defect manifested. (Emphasis added.) Certification is thus not appropriate for Plaintiffs' implied warranty claims under California, Colorado, Indiana, Kansas, Maryland, and Michigan law.

### 2.   Varying Manifestation Rates Also Defeat Certification of the Implied Warranty Claims

Another body of non-classwide evidence is also highly relevant to Plaintiffs' implied warranty claims: as discussed above, manifestation rates vary significantly between the class vehicles. *Supra* at Section II.C. Whether and how often a defect manifests is relevant to whether a vehicle is "merchantable." *Lessin*, 2026 WL 382608, at *3 (district court must evaluate manifestation evidence to determine if it affects predominance inquiry required for implied warranty claims); *see also Speerly*, 143 F.4th at 325 (merchantability inquiry requires analysis of rates and causes of manifestation of defect). In *Lessin*, the Ninth Circuit explained that its earlier decision in *Wolin* did not hold that manifestation rates were irrelevant to the class action inquiry for implied warranty claims. *Lessin*, 2026 WL 382608, at *2. The variance in failure rates across different vehicle groups independently defeats certification of the proposed implied warranty classes).

Differing manifestation rates defeat certification of a California breach of implied warranty claim for an additional reason as well. To certify a claim for California breach of implied warranty, plaintiffs must show that the defect is "substantially certain" to manifest. *Am. Honda Motor Co. v.*

*Superior Ct.*, 199 Cal. App. 4th 1367, 1375 (2011). Plaintiffs cannot do so: as discussed above, *supra* at Section II.C., warranty claim rates vary significantly across the model years in Plaintiffs' proposed California class (vehicles with 2.0L and 2.3L engines). Such variability defeats certification of the California implied warranty claim. *See Torres v. Nissan N. Am. Inc.*, 2015 WL 5170539, at *5 (C.D. Cal. Sept. 1, 2015) (denying certification because "Plaintiffs have failed to provide evidence that all class members are substantially certain to experience a malfunction from the alleged defect"); *Sonneveldt v. Mazda Motor of Am., Inc.*, 2023 WL 1812157, at *6-7 (C.D. Cal. Jan. 25, 2023) (decertifying Song-Beverly implied warranty class); *Quackenbush v. Am. Honda Motor Co.*, 2021 WL 6116949, at *6 (C.D. Cal. Dec. 27, 2021) (denying certification where "the rate of warranty repair varies by model and countermeasure").

**D.    Individualized Inquiries Predominate Plaintiffs' Claims Under the CA Song-Beverly Act & CLRA, IN DCSA, and MD CPA Because Those Claims Are Limited to Purchasers of Products for "Personal," Not Business, Use**

Five of Plaintiffs' claims—under the CA Song-Beverly Act, CA CLRA, IN DCSA, and MD CPA—also require individualized inquiries because those statutes each require that a vehicle be used primarily for "personal," as opposed to business, use.[15] But Plaintiffs' proposed classes for include all purchasers of a new class vehicle, with no restriction to personal users. Proposed class members who purchased their vehicle for work purposes could sustain a claim under these statutes, but whether someone purchased a vehicle "primarily" for personal use can only be established through individualized inquiries. The individualized nature of the question is illustrated by the deposition testimony of certain Plaintiffs, who testified that they purchased their vehicles for work purposes. *E.g.*, Ex. 61, Miller Dep. 67:15-20; Ex. 62, A. West Dep. 33:10-13, 83:1-4; Ex. 63, Pickering Dep. 80:15-81:15. This defeats predominance because the claims pose "the question of why any particular customer purchased" their vehicle—a question that cannot be adjudicated on a classwide basis. *Corder v. Ford Motor Co.*, 283 F.R.D. 337, 341 (W.D. Ky. 2012) (primary-use issue precludes certification); *Arabian v. Sony Elecs., Inc.*, 2007 WL 627977, at *14 (S.D. Cal. Feb.

---

[15] **CLRA**: Cal. Civ. Code § 1761(d); *Mazur v. eBay Inc.*, 257 F.R.D. 563, 568 (N.D. Cal. 2009); **CA Song-Beverly**: *Valdez v. Ford Motor Co.*, 2024 WL 1344420, at *7 (E.D. Cal. Mar. 29, 2024); **IN DCSA**: Ind. Code § 24-5-0.5-2(a)(1); *In re Caterpillar, Inc., C13 & C15 Engine Prods. Liab. Litig.*, 2015 WL 4591236, at *33 (D.N.J. July 29, 2015); **MD CPA**: *Fare Deals Ltd. v. World Choice Travel.Com, Inc.*, 180 F. Supp. 2d 678, 692 (D. Md. 2001).

FORD'S CLASS CERT. OPP.
NOS. 2:20-CV-01796 & 2:24-CV-02231

22, 2007) (same); *In re OnStar Cont. Litig.*, 278 F.R.D. 352, 381 (E.D. Mich. 2011) (same); *Johnson*, 285 F.R.D. at 582–83 (same under CLRA).

> **E. Individualized Issues Relating to the Statutes of Limitations Further Show Predominance Is Lacking**

Statute of limitations presents another individualized issue. Nine of Plaintiffs' claims accrue at the time of sale: CA implied warranty, CA CLRA, CO implied warranty, FL DUTPA, IN DCSA, IN implied warranty, KS implied warranty, MD implied warranty, and MI implied warranty.[16] Plaintiffs first filed this lawsuit in 2020, with many states and plaintiffs not added until 2021 or 2022. Many proposed class members' claims are thus barred on their face, as the proposed classes date back to those who first purchased their vehicles in mid-2013 (for MY 2014) and the applicable statutes of limitations for these claims are 2 to 4 years.[17]

Plaintiffs may argue some form of tolling applies, but, for many claims, tolling due to discovery is not available (e.g., CA, CO, IN, KS, MD, and MI implied warranty, FL DUTPA, and IN DCSA).[18] For tolling based on fraudulent concealment, state laws require individualized inquiries, such as (i) "whether the plaintiff exercised reasonable care and diligence in seeking to discover the facts," (ii) whether "the plaintiff took action in justifiable reliance on the concealment,"

---

[16] **CA CLRA**: *Plumlee v. Pfizer, Inc.*, 2014 WL 695024, at *7 (N.D. Cal. Feb. 21, 2014); **CA IW**: *Matray v. Ford Motor Co.*, 2011 WL 13221015, at *2 (C.D. Cal. Nov. 9, 2011); **CO IW**: *Palmer v. A.H. Robins Co.*, 684 P.2d 187, 213 (Colo. 1984); **FL DUTPA**: *Lewis v. Mercedes-Benz USA, LLC*, 530 F. Supp. 3d 1183, 1228 (S.D. Fla. 2021); **IN DCSA**: *Carroll v. BMW of N. Am., LLC*, 553 F. Supp. 3d 588, 612 (S.D. Ind. 2021); **IN IW**: *A.J.'s Auto. Sales, Inc. v. Freet*, 725 N.E.2d 955, 965 (Ind. Ct. App. 2000); **KS IW**: *Mem'l Hosp. v. Carrier Corp.*, 844 F. Supp. 712, 716 (D. Kan. 1994); **MD IW**: *Rutherford v. BMW of N. Am., LLC*, 579 F. Supp. 3d 737, 746 (D. Md. 2022); **MI IW**: Mich. Comp. Laws § 440.2725.

[17] **CA CLRA**: Cal. Civ. Code § 1783 (3 years); **CA IW**: *Michaud v. Ford Motor Co.*, 2026 WL 325461, at *3–4 (C.D. Cal. Feb. 3, 2026) (4 years); **CO IW**: *O'Connor*, 2020 WL 1303285, at *4 (3 years); **FL DUTPA**: Fla. Stat. Ann. § 95.11(3)(f) (4 years); **IN DCSA**: Ind. Code § 24-5-0.5-5(b) (2 years); **IN IW**: *Ludwig v. Ford Motor Co.*, 510 N.E.2d 691, 696 (Ind. Ct. App. 1987) (4 years); **KS IW**: *Voth v. Chrysler Motor Corp.*, 545 P.2d 371, 375 (Kan. 1976) (4 years); **MD IW**: *Rutherford*, 579 F. Supp. 3d at 746 (4 years); **MI IW**: *Roe v. Ford Motor Co.*, 2019 WL 3564589, at *13 (E.D. Mich. Aug. 6, 2019) (4 years).

[18] **CA IW**: *Cabrera v. Ford Motor Co.*, 2024 WL 4101907, at *6 (S.D. Cal. June 4, 2024); **CO IW**: *Stanley v. Nissan N.A., Inc.*, 719 F. Supp. 3d 786, 810 (M.D. Tenn. 2024); **FL DUTPA**: *Hardy v. Volkswagen Grp. of Am., Inc.*, 2025 WL 1409820, at *9 (D.N.J. May 14, 2025); **KS IW**: *Marksberry*, 606 F. Supp. 3d at 1087; **KS CPA**: *Campbell v. Hubbard*, 201 P.3d 702, 706 (Kan. Ct. App. 2008); **IN IW**: *Carroll*, 553 F. Supp. 3d at 612–13; **MD IW**: *Wash. Freightliner, Inc. v. Shantytown Pier, Inc.*, 719 A.2d 541, 544 (Md. 1998); **MI IW**: *Neibarger v. Universal Coops.*, 486 N.W.2d 612, 613 (Mich. 1992).

FORD'S CLASS CERT. OPP.
NOS. 2:20-CV-01796 & 2:24-CV-02231

or (iii) "whether the plaintiff failed to discover facts within the statutory period." [19]   These individualized issues preclude certification.  *See Stearns v. Select Comfort Retail Corp.*, 763 F. Supp. 2d 1128, 1152-53 (N.D. Cal. 2010) (individualized issues predominated where proposed class "encompasse[d] individuals who purchased their [products] as long as twenty years ago"); *O'Connor v. Boeing N. Am.*, 197 F.R.D. 404, 414 (C.D. Cal. 2000); *Plascencia v. Lending 1st Mortg.*, 259 F.R.D. 437, 444 (N.D. Cal. 2009).

While in some circumstances, individualized statutes of limitations defenses may not defeat class certification, statute of limitations issues become more pronounced when large portions of the class are barred on their face, as is the case here.  *See Plascencia*, 259 F.R.D at 444 (finding that statutes of limitations issues could defeat class certification since class members would need to prove that an exception to the statute of limitations applied); *Stearns*, 763 F. Supp. 2d at 1152-53 (individualized inquiries predominated in determining whether the discovery rule applied).  And even if statute of limitations issues on their own do not preclude class certification, they are relevant to the overall question of predominance, as well as typicality.  *See Est. of Pilgrim v. Gen. Motors LLC*, 344 F.R.D. 381, 398 (E.D. Mich. 2023).

**F.      Plaintiffs Fail to Put Forth a Cognizable Classwide Damages Model**

Plaintiffs also cannot "establish that damages are susceptible of measurement across the entire class" using a model that fits the claims, as required for this element to present a common question.  *Comcast*, 569 U.S. at 35.  Plaintiffs' damages expert Mr. Boyles proposes a "repair cost"

---

[19] **CA IW**:  *Xu v. Porsche Cars N. Am., Inc.*, 655 F. Supp. 3d 1214, 1229 (N.D. Ga. 2023) ("Plaintiff must show . . . an excuse for late discovery of the facts"); **CA CLRA**:  *Finney v. Ford Motor Co.*, 2018 WL 2552266, at *3 (N.D. Cal. June 4, 2018) (same); **CO IW**:  *Miller v. Gen. Motors, LLC*, 773 F. Supp. 3d 461, 521 (E.D. Mich. 2025) (plaintiff must show "ignorance of that fact on the part of the one from whom the fact is concealed"); **FL DUTPA**:  *Lewis*, 530 F. Supp. 3d at 1228 (plaintiff must show "plaintiff exercised reasonable care and diligence in seeking to discover the facts that form the basis of his claim"); **IN IW**:  *Carroll*, 553 F. Supp. 3d at 614 (plaintiff must show party was induced to rely or act upon the representation or concealment to his detriment); **IN DCSA**:  *Id.* (plaintiff must show they "exercised due diligence to discover the cause of action"); **KS IW**:  *Zurn Constructors, Inc. v. B.F. Goodrich Co.*, 746 F. Supp. 1051, 1054 (D. Kan. 1990) (fraudulent concealment may toll implied warranty claims); *see also Black v. Union Pac. R.R.*, 2024 WL 1604620, at *4 (D. Kan. Apr. 12, 2024) (plaintiff must show they "reasonably relied and acted upon such belief and would now be prejudiced if the other party were permitted to deny the existence of such facts"); **MD IW**:  *Doll v. Ford Motor Co.*, 814 F. Supp. 2d 526, 537 (D. Md. 2011) (plaintiff must show they "took action in justifiable reliance on the concealment"); **MI IW**:  *Reserve at Heritage Vill. Ass'n v. Warren Fin. Acquisition, LLC*, 850 N.W.2d 649, 665 (Mich. Ct. App. 2014) (plaintiff must allege the fraud induced reliance).

measure for what he says are "benefit of the bargain" damages. Ex. 64, Boyles Rpt. ¶¶ 33-34. Several problems prevent this theory from providing a classwide methodology to evaluate damages.

First, Boyles's model ignores the actual bargain struck by proposed class members. Boyles conducted no analysis and had no expertise in consumer expectations to support his assumption about the supposed bargain. Ex. 65, Boyles Dep. 162:7-11. He simply assumes proposed class members expected, and Ford agreed, to sell a vehicle that would experience no defects. *Id.* at 112:4-10. But he acknowledged that Ford's warranty was part of the bargain (*Id.* at 200:23-201:16), and that warranty does not promise zero defects (Ex. 66, FORD-MILLER 00086420 (Ford's New Vehicle Limited Warranty) at FORD-MILLER 00086433 ("This warranty does not mean that each Ford vehicle is defect free")). Boyles further acknowledged that consumers may be aware of potential issues in their vehicles due to the existence of the warranty, which could affect expectations. Ex. 65, Boyles Dep. 186:15-187:3. Plaintiffs thus have not presented any classwide evidence that proposed class members all bargained for a vehicle that would never experience any defect or otherwise did not get the benefit of their bargain. *Davidson v. Apple Inc.*, 2019 WL 2548460, at *14 (N.D. Cal. June 20, 2019) (rejecting plaintiffs' expert damages model under *Comcast* because it failed to account for warranty on the phones in the consumers' purchase decision). Nor do Plaintiffs offer any classwide empirical evidence related to vehicle value or failure to meet consumer expectations. As Ford's expert Dr. Rossi explained, the market value of class vehicles as promised did not differ from the market value as delivered because class vehicles have not shown any unusual depreciation. Ex. 67, Rossi Rpt. ¶¶ 101-103.

Second, Boyles's "cost of repair" theory is not consistent with applicable law or basic economic theory. Benefit of the bargain damages are measured by the difference in market value between the product as promised and the product as delivered, both of which Boyles admitted he did not calculate. Ex. 65, Boyles Dep. 130:8-20. Market value is determined by the interaction of supply and demand. "Evidence that fails to account for both supply and demand is not evidence of market value." *In re Gen. Motors LLC Ignition Switch Litig.*, 427 F. Supp. 3d 374, 383 (S.D.N.Y. 2019) (CA law) (citing Black's Law Dictionary for the definition of fair market value). By his own admission, Boyles did not analyze any supply or demand factors or consider Ford's willingness to

supply vehicles regardless of price.  Ex. 65, Boyles Dep. 164:2-16.

Moreover, as a matter of basic economic theory, the negative effect on market value of an unmanifested defect would depend on the probability of manifestation (Ex. 68, Rossi Rebuttal Rpt. ¶¶ 43, 66, 72), which Boyles did not analyze.  Ex. 65, Boyles Dep. 176:20-177:13.  Boyles opines that someone would be damaged the same amount, whether they purchased a vehicle with a ▮ vs. ▮ percent chance of engine failure, and that he did not take into account the differing rates of coolant intrusion.  *Id.* 176:2-1.  Such an opinion is contrary to law, which holds that damages models must account for a risk of failure.  *Philips*, 2016 WL 7428810, at *21 (damages model insufficient where it did not quantify "the risk of failure").

Third, Boyles's model cannot account for numerous individual issues raised by his "cost of repair" theory.  For example, a former owner who never experienced the alleged defect still would be compensated the cost of repair under Boyles's model.  An owner who sells his or her vehicle only suffers a diminution-of-value injury if they had to discount the sales price of the car because the second buyer knows about the "defect."  But determining in each case (i) what the second buyer paid, (ii) what the second buyer knew about the "defect," and (iii) whether the second buyer negotiated a lower price to account for the defect are individualized questions that Boyles's model does not resolve.

Boyles's damages theory also does not address individual issues raised by purchasers who received a free repair from Ford through the extended-warranty program 21N12, which applied to some but not all vehicles in the proposed CO, IL, IN, and MD classes.  *In re Toyota Motor Corp. Hybrid Brake Mktg., Sales Pracs. & Prods. Liab. Litig.*, 288 F.R.D. 445, 449-50 (C.D. Cal. 2013), *aff'd sub nom. Kramer v. Toyota Motor Corp.*, 668 F. App'x 765 (9th Cir. 2016) ("benefit of the bargain" damages are not appropriate where a defendant has remedied the alleged problem); *Sater v. Chrysler Grp. LLC*, 2016 WL 7377126, at *7 (C.D. Cal. Oct. 25, 2016) (same).

G. **Any Class Including 2.3L Engines Must Be Limited to California Only Because Non-California Vehicles with 2.3L Engines Are Not Included in Any Operative Complaint in *Miller* or *Nelson***

For yet another independent reason, Plaintiffs cannot obtain certification of their FL, KS, MI, NC, and NE classes that include vehicles with 2.3L engines because neither *Miller* nor *Nelson*

includes allegations related to those vehicles in those states. The *Miller* complaint does not cover vehicles with 2.3L engines at all. Dkt. 144 ¶ 2 (class vehicles defined as 1.6L, 1.5L, and 2.0L vehicles). And the proposed class in the operative *Nelson* complaint is limited to "All persons or entities that purchased or leased a Class Vehicle within California," with the definition of Class Vehicle limited to vehicles with 2.3L engines. *Nelson* Dkt. 33 ¶ 137. After this Court's order on Ford's motion to dismiss in *Nelson*, the only remaining plaintiffs in the *Nelson* case were Mr. and Ms. Nelson from California. When given the opportunity to amend, Plaintiffs chose not to. *Nelson* Dkt. 58. A class cannot be expanded beyond that which is proposed in the complaint. *Coppel v. SeaWorld Parks & Ent., Inc.*, 347 F.R.D. 338, 350 (S.D. Cal. 2024) ("The Court is bound to class definitions provided in the complaint and, absent an amended complaint, will not consider certification beyond it."); *Johnson*, 285 F.R.D. at 577 n.2 (limiting class certification analysis to the classes originally proposed in plaintiffs complaint). Plaintiffs cannot now expand their proposed class to cover 2.3L vehicles for those five states, after failing to amend their complaints despite opportunity to do so.

## H.   No California Class Can Be Certified for the 2.0L Engines Because Plaintiffs Have No Named Class Representative

Relatedly, because the *Nelson* complaint does not contain allegations encompassing a proposed class that includes vehicles with the 2.0L engine, and because Plaintiffs propose no California class representative in *Miller* to represent a class of vehicles with 2.0L engines, class certification is unavailable for a proposed class that includes California vehicles with 2.0L engines.[20] It is axiomatic that a class representative must be a member of the class they seek to represent. *E.g.*, *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 156 (1982) ("We have repeatedly held that a class representative must be part of the class[.]"); *E. Tex. Motor Freight Sys. Inc. v. Rodriguez*, 431 U.S. 395, 403 (1977) ("As this Court has repeatedly held, a class representative must be part of the class[.]"); *Dukes*, 564 U.S. at 348-49 ("a class representative must be part of the class"); *Sali v. Corona Reg'l Med. Ctr.*, 909 F.3d 996, 1007 (9th Cir. 2018) ("named plaintiff must

---

[20] Plaintiff Miller is not part of the proposed California class and cannot serve as a class representative, as she purchased a ***used*** 2.0L Ford Edge, while Plaintiffs' class definition for California is limited to "All persons who purchased a new Duratec Class Vehicle."

be a member of the class she seeks to represent"). Because Plaintiffs lack a California class representative who purchased a vehicle with the 2.0L engine when new, the proposed California class fails for that reason as well.

### I. Plaintiffs Subject to Summary Judgment Are Not Adequate or Typical Class Representatives

Ford has concurrently moved for summary judgment as to the implied warranty claims of Balaszek (IN), Metro (MI), the Morfords (KS), and the Manfras (MD), as well as Balaszek's IN DCSA claim. Dkt. 161. If Ford prevails on its motion, no Indiana, Kansas, Maryland, or Michigan implied warranty classes could be certified, and no IN DCSA class could be certified, because no adequate class representative exists. *Lessin*, 756 F. Supp. 3d at 947 n.7 (declining to certify implied warranty classes where the named plaintiffs' claims were dismissed at summary judgment).

### J. A Class Action Is Not Superior or Manageable

Plaintiffs assert that a class action is "superior" and "manageable" (Mot. at 41-42), but they fail to grapple with the case complexities. They propose certification of ten state classes—four involving claims of vehicles with the 1.5L engine and six involving claims of the different 2.0L and 2.3L engines—and they have a total of 14 different state-law claims. Plaintiffs present no proposal to manage simultaneous trials for different classes involving vehicles with different types of engines, or any way they will manage intra-class differences in evidence. Plaintiffs' class definitions require parsing of various Ford models, model years, and engine sizes, which all have significant engineering differences *within* the various classes. Plaintiffs' proposed classes could devolve into at least 10 "mini-trials" focusing on state- and vehicle-specific information.

Plaintiffs do not meet their burden to put forth a manageable trial plan that takes into account state-law variations and the due process rights of class members and Ford. *See Zinser v. Accufix Rsch. Inst., Inc.*, 253 F.3d 1180, 1189 (9th Cir. 2001) (plaintiff "bears the burden of demonstrating a suitable and realistic plan for trial of the class claims"); *Sweet v. Pfizer*, 232 F.R.D. 360, 369 (C.D. Cal. 2005) (refusing to consider trial plan filed with reply). The verdict form alone would be a staggering multidimension matrix, involving 14 claims (each with multiple elements) and needing to allow for potentially different determinations depending on the vehicle's build date, engine type,

FORD'S CLASS CERT. OPP.
NOS. 2:20-CV-01796 & 2:24-CV-02231

inclusion in the customer satisfaction program, manifestation of coolant intrusion (or not), whether the engine was repaired under warranty (or not), among other variables, as well as for non-uniform defenses.   *See Ford Motor Co. Ignition Switch Prods. Liab. Litig.*, 174 F.R.D. 332, 350 (D.N.J.1997).   And Plaintiffs have not explained how a class trial would allow Ford to challenge each putative class member about individualized issues like reliance, statute of limitations, and injury—a right that Ford does not lose just because Plaintiffs styled this lawsuit as a class action. *Dukes*, 564 U.S. at 267.   Plaintiffs' only concession to the manageability is to posit, in a single sentence, that "[t]he Court can resolve Plaintiffs' class claims in one trial or alternatively select one statewide class as a bellwether to guide the parties towards resolution for the remaining state classes."   Mot. at 42.   Plaintiffs have no argument as to how a "bellwether" would resolve multiple claims, or even propose any suggestion for which state and which law should be used for this hypothetical bellwether.

Nor have Plaintiffs shown why the class mechanism is superior to any alternative.   Fee shifting and other statutory provisions make individual litigation viable, *Castano v. Am. Tobacco Co.*, 84 F.3d 734, 748 (9th Cir. 1996), and proposed class members who are dissatisfied with their vehicles may pursue individual claims under their respective states' lemon or consumer protection laws, which provide for attorneys' fees for prevailing plaintiffs.   *E.g.*, Cal. Civ. Code § 1794(d). No-cost access to the BBB arbitration services is also available, as provided in Ford's New Vehicle Limited Warranty.   Ex. 66, Limited Warranty, at 8.   *Parkinson v. Hyundai Motor Am.*, 258 F.R.D. 580, 595 (C.D. Cal. 2008) (availability of free dispute mechanism weighs against superiority of class action).

## VI.       CONCLUSION

Plaintiffs' class certification motion should be denied in full.

FORD'S CLASS CERT. OPP.
NOS. 2:20-CV-01796 & 2:24-CV-02231

Dated:  July 15, 2026                    O'MELVENY & MYERS LLP

                                         By:    /s/ *Randall W. Edwards*
                                                Randall W. Edwards

                                         *Counsel for Defendant*
                                         Ford Motor Company

FORD'S CLASS CERT. OPP.
NOS. 2:20-CV-01796 & 2:24-CV-02231