# EXHIBIT 2

# PROPOSED TO BE FILED UNDER SEAL – PUBLIC REDACTED VERSION

**Lillo Engineering, Inc.**
5610 Scotts Valley Dr.
Suite B, PMB 571
Scotts Valley, CA 95066

# Expert Report of Peter Lillo, Ph.D., P.E.

## Vanessa Miller et al. v. Ford Motor Company, U.S.D.C. Eastern District of California, Case No.: 2:20-cv-01796-DAD-CKD

## and

## Trevor Nelson et al. v. Ford Motor Company, U.S.D.C. Central District of California, Case No.: 2:24-cv-02231-DAD-CKD

Prepared for

Randall Edwards, Esq.
O'Melveny & Myers LLP
Two Embarcadero Center, 28th Floor
San Francisco, CA 94111

Prepared by

Peter Lillo, Ph.D., P.E, A.S.E. Master Certified Technician
Principal Engineer
Lillo Engineering, Inc.

March 20, 2026

Lillo Engineering Project No.: 250647

# Contents


| | Page |
|---|---|
| **Declaration of Peter Lillo, Ph.D., P.E.** | **1** |
| **Summary of Opinions** | **2** |
| **Plaintiffs' Claims** | **7** |
| **Background** | **10** |
| Engine Cylinder Block and Head Assemblies | 10 |
| Cylinder Head Gasket Damage and Repair | 14 |
| Damage as a Secondary Effect of Engine Overheating Event(s) | 15 |
| Damage as a Result of Prolonged Operation with an Overheating Engine | 16 |
| Damage as a Result of Neglected Maintenance | 17 |
| Ford EcoBoost (GTDI) Engines | 17 |
| Subject Vehicles | 20 |
| **Analysis of Subject Vehicles** | **23** |
| Root Cause Investigation Methodology | 23 |
| 1.6-liter Subject Engines | 24 |
| Cylinder Head Cup Dislodging Concern and Ford's Resolution for It (Early Built 1.6-liter Subject Engines) | 29 |
| 1.6-liter Subject Engine Fire Incidents Resulting from Cylinder Head Cracking and Associated Recalls | 30 |
| Various 1.6-liter Subject Engine Cooling System and External Leakage Concerns | 34 |
| 1.6-liter Subject Engines Are Not Prone to Coolant Intrusion | 35 |
| 1.5-liter Subject Engines | 36 |
| 1.5-liter Subject Engine Coolant Intrusion Concerns | 41 |
| Actions Taken by Ford to Repair and Mitigate 1.5-liter Subject Engine Coolant Intrusion Concerns | 48 |
| 2.0-liter Subject Engines | 56 |
| 2.0-liter Subject Engine Coolant Intrusion Concerns | 62 |
| Actions Taken by Ford to Repair and Prevent 2.0-liter Coolant Intrusion Concerns | 70 |
| 2.3-liter Subject Engines | 72 |

Analysis of Warranty Repair Records 74

Analysis of the Experiences of the Named Plaintiffs 80
Spoliation of Evidence 81

Named Plaintiffs with a 1.6-liter Subject Engine Equipped Vehicle 87

Named Plaintiffs with a 1.5-liter Subject Engine Equipped Vehicle 92

Named Plaintiffs with a 2.0-liter Subject Engine Equipped Vehicle 102

Named Plaintiffs with a 2.3-liter Subject Engine Equipped Vehicle 118

**Conclusions 121**

**Exhibit A: Curriculum Vitae of Peter Lillo, Ph.D., P.E., A.S.E. Master Certified Automotive Technician A-1**

**Exhibit B: List of Materials B-1**

**Exhibit C: Testimony of Peter Lillo, Ph.D., in the Past Four Years C-1**

# Declaration of Peter Lillo, Ph.D., P.E.

I, Peter Lillo, declare as follows:

1. My name is Peter Lillo. I am the Principal Engineer at Lillo Engineering, Inc. an engineering consulting company located in Scotts Valley, California. I completed my B.S. (U.C. Berkeley), M.S. and Ph.D. (University of Michigan - Ann Arbor) in Mechanical Engineering, my minor in Chemical Engineering (U.C. Berkeley) and my A.S. in Automotive Chassis Systems, Automotive Engine Machining and Services, and Automotive Engine Performance. I am a licensed Professional Engineer in the State of California. I am also an ASE Master Certified Automotive Technician and have worked as a master technician in automotive and transmission repair shops. My experience includes the design and failure root cause analyses of products, including automotive engines and their components. I have personally diagnosed and repaired thousands of automotive issues, including engine coolant intrusion concerns and cylinder head gasket failures.

2. Attached and marked as **Exhibit A** to this Declaration is a copy of my current curriculum vitae. Lillo Engineering currently bills my time at the rate of $395 per hour. My compensation is not contingent on the outcome of this matter.

3. A list of materials that I considered for the preparation of this report are provided in **Exhibit B**. A list of my prior testimony in the last four years is provided in **Exhibit C.**

4. This report has been prepared in the matters of *Vanessa Miller et al. v. Ford Motor Company*, U.S.D.C. Eastern District of California, Case No.: 2:20-cv-01796-DAD-CKD (Consolidated with Nos. 2:21-cv-00417-DAD-CKD, 2:21-cv-00468-DAD-CKD) and *Trevor Nelson et al. v. Ford Motor Company*, U.S.D.C. Central District of California, Case No.: 2:24-cv-02231-DAD-CKD. The scope of services performed during this evaluation may not adequately address the needs of other users of this report, and any re-use of this report or its findings, conclusions, or recommendations presented herein are at the sole risk of the user.

5. I was asked by counsel for Ford Motor Company to provide my analysis on issues pertaining to mechanical engineering and automotive aspects of these matters, and regarding technical differences between the vehicles at-issue in Plaintiffs' complaint.

6. The opinions in this Declaration are provided to a reasonable degree of engineering certainty. I reserve the right to supplement this Declaration and to expand or modify opinions based on review of additional material as it becomes available through any additional work, or review of additional work performed by others. I understand that I may be asked to prepare additional reports to address issues as they arise in the future.

7. At trial, I may provide exhibits including excerpts from reference books, treatises and standards, documents produced by all parties in the matter as well as charts and diagrams

illustrating my analysis and opinions. I may also present my analysis and opinions that are discussed and shown in this, and prior, reports for the matter.

## Summary of Opinions

1. The following is a summary of my opinions in this matter. It is noted that this summary cannot contain all my technical evaluations, analysis, conclusions, and recommendations. Hence, this summary shall remain attached to and is intended to be read along with the main part of this report.

2. Opinion 1: The Plaintiffs' proposed classes include persons who owned or leased vehicles that differ in model, model-year, engine size, engine architecture, drivetrain type, and other features, and that evolved in design over the approximately eight years that they were manufactured. The 1.5-, 1.6-, 2.0-, and 2.3-liter GTDI engines equipped with a saw cut at issue in these matters ("subject engines") differ substantially in design both over time and among the different displacements, as do the vehicles' cooling systems. In fact, the design and part number of the very engine components that are at-issue in this matter, including the cylinder head gasket, cylinder block, and cylinder head assemblies, differ among the various versions of the 1.5-, 1.6-, 2.0-, and 2.3-liter subject engines and are not interchangeable.

3. Opinion 2: Coolant intrusion is the internal leakage of coolant into an engine's cylinder(s), where it often then burns or evaporates and is exhausted from the vehicle's tailpipe. *"Plaintiffs contend that the subject engines contain a critical common design defect as all the subject engine blocks were defectively designed with a saw cut in a bore bride which is too narrow to utilize a saw cut coolant passage at the bore bridge resulting in coolant leaking into the engine cylinders, loss of engine power and engine failure."*[1] However, due to the substantial differences in the designs of the 1.5-, 1.6-, 2.0-, and 2.3-liter engines, they cannot possibly contain what Plaintiffs allege is an identical "*defect that causes engine coolant—which is vital to the safety and functionality of the engine—to leak into the engine's cylinders."*[2] In fact, numerous versions of the subject engines (including all 1.6-liter ones) do not have a design that was found to subject them to an elevated rate of coolant intrusion for any reason. This is borne out in the real-world performance of those engines over many years and tens of thousands of miles.

4. Opinion 3: Due to the many differences in the design, manufacture and control of the class vehicles ("subject vehicles") and subject engines, the subject engines in different applications have experienced different operating conditions (e.g., histories of loads,

---

1 Vanessa Miller's Responses and Objections to Defendant Ford Motor Company's Third Set of Interrogatories, December 19, 2025, Vanessa Miller et al. v. Ford Motor Company, U.S.D.C. Eastern District of California, Case No. 2:20-cv-01796-DAD-CKD, Response to Interrogatory No. 12

2 First Amended Consolidated Class Action Complaint for Damages ("Miller Legal Complaint"), Vanessa Miller et al. v. Ford Motor Company, U.S.D.C. Eastern District of California, Case No. 2:20-cv-01796-DAD-CKD, September 28, 2022, Page 1

speeds, temperatures, and pressures), failure mechanisms, and field performances (e.g., rates of various types of concern or repair). No failure mechanism that affects all subject vehicles resulted in an elevated rate of coolant intrusion or incidents of fire.

5. Opinion 4: Coolant intrusion can occur as a result of the cylinder head gasket failing, or its ability to seal becoming compromised. Cylinder head gasket failure or compromise can occur in an automotive engine for many different reasons. Cylinder head gaskets often fail as a secondary result of a severe engine overheating event, for which there are many potential causes. Some of the most common causes for an engine to overheat include low coolant level due to an external leak (e.g., damaged hose or seal) or failure of a water pump, thermostat, radiator, radiator cap, cooling fan, temperature sensor, or other engine cooling system component(s). Factors related to improper maintenance (e.g., use of the wrong type or concentration of coolant, or overuse of coolant), customer misuse (e.g., towing an excessive load beyond the vehicles rated capacity) or abuse (e.g., ignoring overheating warnings, operating an engine for a prolonged period in a malfunctioning state) can contribute to the cause of cylinder intrusion issues and repairs. The cause for at-issue coolant intrusion concerns repairs can only be accurately assessed by performing technical investigations on a case-by-case basis, which often includes analysis of the vehicle's usage, service and repair history, and inspection of the at-issue engine and its potentially damaged components, among other individualized inquiries.

6. Opinion 5: The subject engines are equipped with saw-cut features on the bore bridge regions of the engine block deck, which improves cooling to that area. Similar saw-cut features are used in non-subject engines in both Ford and non-Ford vehicles, as well as subject engines that have not experienced elevated rates of coolant intrusion (e.g., 1.6-liter subject engines) and are not inherently defective.

7. Opinion 6: I have not identified evidence of an elevated rate of coolant intrusion repairs associated with the subject 1.6-liter subject engines. Plaintiffs' claim that 1.6-liter subject engines are abnormally prone to coolant intrusion (or suffer from an elevated rate), let alone prone to intrusion caused by Plaintiffs' theory of defect involving the saw cut on the bore bridge, is not supported by any engineering evidence.

8. Opinion 7: The cause (and associated failure mechanism) for the vast majority of coolant intrusion failures in 1.5-, 2.0- and 2.3-liter subject engines differs.

9. Opinion 8: The failure mechanism that led to an elevated rate of coolant intrusion in some 1.5-liter subject engines is initiated by coolant boiling within the saw-cut bore bridge region of the engine block assembly. The boiling often occurs when the engine is shut off while warm, which increased in frequency when automatic start-stop functionality was introduced as a standard feature in model-year 2017 vehicles. Hence, model-year 2017 vehicles are far more susceptible to the 1.5-liter subject engine coolant intrusion failure mechanism than earlier model-year (e.g., model-year 2013-2016) vehicles with the same size engine. Ford introduced a permanent corrective action in the form of a redesigned engine block around April 2019 that prevents the coolant intrusion failure mechanism from occurring in 1.5-liter subject engines manufactured after that date. To mitigate coolant intrusion concerns associated with model-year 2017-2019

vehicles on the road, Ford also introduced a revised cooling system control strategy (Customer Satisfaction Program 19B37) that reduced the potential for coolant intrusion to occur, and it also issued a warranty extension (Customer Satisfaction Program 21N12) to help cover the cost of coolant intrusion repairs, should they occur within a period beyond the standard powertrain warranty period.

10. Opinion 9: The coolant intrusion failures arising in certain 2.0-liter subject engines have a different mechanism (and were at a lower rate than 1.5-liter subject engines). These repairs began emerging with engines manufactured around or after March 2016 when Ford introduced a newly designed head gasket (corresponding to the part number changing from -CA to -DA). Although the cylinder head gasket design change was made with the intent of improving the gaskets' fatigue life, the new design enabled coolant to contact regions of the cylinder head that it had not previously, which in some cases resulted in accelerated head gasket wear/scrubbing, initiating a sequence of events that resulted in coolant intrusion. Ford introduced a permanent corrective action, in the form of a redesigned head gasket and engine block released on a rolling basis beginning with the 2019 Ford Edge to prevent the 2.0-liter subject engine coolant failure mechanism from occurring in engines manufactured after then.

11. Opinion 10: The 1.5- and 2.0-liter failure mechanisms both tend to lead to corrosive damage forming on components in or around the bore bridge region of the cylinder head gasket assembly. Due to the differences in the two failure mechanisms, the location and extent of corrosive damage differ between affected 1.5- and 2.0-liter subject engines, as do the repair actions necessary to fix the damage. More specifically:

   a. The failure mechanism affecting certain 2.0-liter subject engines can result in corrosive damage forming on the cylinder block, cylinder head, and cylinder head gasket assemblies. As such, 2.0-liter coolant intrusion issues are typically repaired by replacing the engine <u>long block assembly</u>, which includes both the cylinder block and cylinder head.

   b. The failure mechanism affecting certain 1.5-liter subject engines typically results in corrosive damage forming on the cylinder block and cylinder head gasket assembly, but not the cylinder head. As such, 1.5-liter coolant intrusion issues are typically repaired by replacing the engine <u>short block assembly</u>, which does not include the cylinder head.

12. Opinion 11: The available information and records show that Ford's knowledge of the coolant intrusion failure mechanisms that are at-issue in this matter changed over time. The 1.5- and 2.0-liter subject engine coolant intrusion failure mechanisms take time in service and mileage to develop and could not possibly have been identified by Ford immediately after the engines went onto the road. Ford's pre-release testing, while extensive, also did not uncover the failure mechanisms for the 1.5L and 2.0L. The records show that after recognizing coolant intrusion repairs, Ford quickly and thoroughly performed a root cause analysis to gain an understanding of the failure mechanisms and then developed resolutions for them.

13. Opinion 12: Most Subject Vehicles have not and will not have experience a coolant intrusion issue significant enough to impact the vehicle's operation or drivability. Coolant intrusion generally leads to mild symptoms such as driver warnings (e.g., illuminated check engine light) or a rough running engine – not the more severe symptoms such as complete engine failure that Plaintiffs suggest occurs. I have found no evidence to support the idea that most subject vehicles have experienced severe symptoms as a result of coolant intrusion. Many who have, likely only did as a result of ignoring warnings for a prolonged period of time.

14. Opinion 13: Some 1.6-liter subject engine equipped vehicles have experienced issues leading to <u>external</u> coolant or oil leaks, such as leaks originating from specific hoses, coolant reservoirs, or gaskets. Ford has introduced remedies, such as cooling system component upgrades, to address such issues. None of the 1.6-liter subject engine's external leakage issues or remedies are related to coolant intrusion or the Plaintiffs' theory of defect.

15. Opinion 14: A small number of certain 1.6-liter subject engine equipped vehicles, which constitute a very small fraction of the Subject Vehicles, have experienced an engine compartment fire caused by unique sequences of events that are unrelated to coolant intrusion or the Plaintiffs' theory of defect. For example, in some cases, a coolant leak (for which there are many potential sources and causes) led to a severe engine overheating event, which resulted in the cylinder head cracking and leaking oil externally from the engine onto a hot exhaust component, where it ignited and started an engine compartment fire. Ford remedied the 1.6-liter subject engine fire concerns through a series of permanent correction actions. The final permanent corrective design action occurred in February 2014. Ford also issued several recalls.

16. Opinion 15: Unlike 1.6-liter subject engines, the cylinder head assemblies used in the 1.5-, 2.0- and 2.3-liter subject engines are equipped with an integrated exhaust manifold. They do not have the boss (raised protrusion) feature that was found to sometimes crack and leak oil externally, potentially resulting in a fire, that existed in certain 1.6-liter subject engines. Accordingly, they are not susceptible to the 1.6-liter subject engine fire recall condition. I have not identified evidence of or data to support the Plaintiffs' theory that the 1.5-, 2.0-, or 2.3-liter subject engines are abnormally susceptible to fire incidents for any reason. Nor have I identified any evidence that a coolant intrusion concern has ever led to a fire in any subject vehicle.

17. Opinion 16: Plaintiffs' counsel or representatives collected evidence removed from four named Plaintiffs' vehicles during subject repairs including the 2.0-liter subject engine (long block assembly) removed from Ms. Miller's 2017 Ford Edge around January 2020, the 2.0-liter subject engine (long block assembly) removed from Mr. Mullen's 2017 Ford Edge around August 2021, and the 1.6-liter subject engine (long block assembly) removed from the Wests' 2013 Ford Fusion around November 2020. The Plaintiffs spoliated this evidence (long block assemblies) before I had an opportunity to inspect it. More specifically, without notice, someone disassembled the engines (e.g., removed the at-issue cylinder heads and gaskets), marked components, cleaned components, and even reassembled and tightened the dirty cylinder heads and gaskets (something that should

never be done, on an evidence engine or otherwise) – all of which inevitably led to the alteration of the evidence. The actions of whoever disassembled the evidence subject engines while they were in the Plaintiffs' possession and the alteration of some of the most important evidence items in this matter, including the named Plaintiffs' cylinder head gaskets and their sealing surfaces, before I had an opportunity to inspect them, limits the evidentiary value I have been able to gain from them, and per the American Society for Testing and Materials (ASTM) standards constitutes spoliation of evidence.

18. Opinion 17: Plaintiffs present the experiences of 25 named plaintiffs in *Miller* and two named plaintiffs in *Nelson* as examples of members of their proposed classes who have suffered from their alleged theory of common defect and associated damages. However, I investigated their experiences and found that they report different concerns and repairs, attributable to a variety of different causes. Their experiences demonstrate why the circumstances and cause of at-issue claims can only be accurately assessed on a case-by-case basis, and why they should not all be assumed attributable to Plaintiffs' theory of defect.

a. None of the named Plaintiffs report experiencing a fire incident, and the named Plaintiffs' experiences do not support Plaintiffs' claim that incidents of coolant intrusion (or their theory of defect) results in incidents of fire.

b. There are many reasons why the named Plaintiffs' experiences and repairs should not be assumed representative of those of the broader class of members that Plaintiffs propose. All twenty-five named Plaintiffs report experiencing coolant intrusion, which is atypical considering that most members of the Plaintiffs' proposed class have not. Plaintiffs' proposed class includes subject vehicles of a wide variety of make, model, model-year, and engine combinations, many of which are not owned or leased by any of the named Plaintiffs. For example, none of the 1.5-liter named Plaintiffs owned or leased a model-year 2018-2019 vehicle, yet four out of seven (57%) of them owned a model-year 2017 vehicle, most (75%) of which are more specifically Ford Escapes. The 2.0-liter class representatives that Plaintiffs selected predominantly own vehicles that are equipped with the redesigned cylinder head gasket (part number ending in -DA), and not earlier-built engines equipped with the better performing original (part number ending in -CA) gasket. These and the other factors, discussed in the body of this report, render the named Plaintiffs' experiences and repairs atypical and less representative of the broader class that they purportedly represent.

c. Based on my review of the available information and evidence, it is apparent that there have been a variety of causes for the named Plaintiffs' at-issue repairs. For example, Mr. Cicero's 1.5-liter subject engine required replacement due to suffering unique damage including cracked valves that the technician attributed to detonation/pre-ignition, which are types of abnormal combustion that occur for reasons unrelated to coolant intrusion; both Ms. Balaszek and Mr. Pickering report experiencing 1.5-liter subject engine overheating issue that likely resulted in warpage of the cylinder head and failure of the cylinder head gasket, for reasons that are likely unrelated to coolant intrusion and that resulted in unique repair actions; Ms.

Metro's 2.0-liter subject engine experienced piston ring damage, and oil and fuel (not coolant) contamination of one of the cylinders; and Ms. Constable's engine experienced an issue that resulted in coolant contamination of the engine oil and associated internal engine damage – all of which are issues unlikely to be related to coolant intrusion. The named Plaintiffs' experiences, and associated records and evidence, demonstrates that the cause of named Plaintiff subject repairs can only be accurately determined by performing technical investigations of them on a case-by-case basis.

d. The records show that there is no common repair action or cost associated with the named Plaintiffs' at-issue repairs. Some at-issue repairs have involved replacement of a subject engine short block assembly (Ford's recommended repair for a 1.5-liter subject engine coolant intrusion issues), others replacement of the entire engine long block assembly (Ford recommended repair for a 2.0-liter subject engine coolant intrusion issue), and others replacement of more select engine components such as the cylinder head and its gasket (repairs that are unlikely to be caused by the 1.5- or 2.0-liter subject engine coolant intrusion failure mechanisms). Some of the named Plaintiffs' at-issue repairs have been performed under warranty at little to no cost to the Plaintiffs; others have been performed at customer costs ranging between about $680-$8,300. In some cases, Ford has split the cost of at-issue repairs with named Plaintiffs, as a goodwill gesture, despite the vehicle being outside of warranty at the time of the repair. In some cases, third party insurance companies have paid repair costs. In some cases, named Plaintiffs have opted to continue driving their vehicle without repair. In fact, the Morfords have driven their subject vehicle more than 54,000 miles since it was diagnosed with coolant intrusion, and they have not repaired it (or been impacted by the associated repair costs). The named Plaintiffs' experience demonstrate that the extent and cost of at-issue repairs can only be accurately assessed on a case-by-case basis.

## Plaintiffs' Claims

19. The Plaintiffs in the matter of *Miller et al. v. Ford* ("Miller Plaintiffs'") allege *that "The EcoBoost engines in the class vehicles have a critical defect that causes engine coolant—which is vital to the safety and functionality of the engine—to leak into the engine's cylinders (the "engine defect"). The lack of coolant created by the leaks causes overheating, and can, even at low mileages, result in the cylinder head cracking and, in some instances, can cause total engine failures and engine fires. Presence of coolant within the cylinders of the engine, alone, can also cause corrosion, oil dilution and contamination, and engine failure."*[3]

[3] First Amended Consolidated Class Action Complaint for Damages ("Miller Legal Complaint"), Vanessa Miller et al. v. Ford Motor Company, U.S.D.C. Eastern District of California, Case No. 2:20-cv-01796-DAD-CKD, September 28, 2022, Page 1

20. They more specifically claim that *"the engine defect is the result of the design of the engine block and cylinder head, including an inadequate seal on the cylinder head. This design includes grooves at the point where the engine's cylinder head attaches to the engine block… In the class vehicles, however, as the coolant circulates through the engine, it seeps through the grooves present on the cylinder head, and pools there. The coolant pooling contributes to the seal degrading, eventually allowing the coolant to leak into the engine's cylinders."*[4]



Figure 1 Annotated photograph from the Miller Legal Complaint identifying the "grooves" (saw-cut features in the bore bridges) in the cylinder block, that they allege renders the at-issue EcoBoost engines defective.

21. In response to Interrogatories, the Plaintiffs further define their theory of defect to be that *"the subject engines contain a critical common design defect as all the subject engine blocks were defectively designed with a saw cut in a bore bride which is too narrow to utilize a saw cut coolant passage at the bore bridge resulting in coolant leaking into the engine cylinders, loss of engine power and engine failure."*[5]

22. The Plaintiffs also allege that, *"Ford has failed to provide an effective solution to consumers who purchased or leased class vehicles. Further, Ford has not satisfactorily or effectively addressed the source of the defect for those consumers, including for those whose vehicles remain in warranty. Instead of replacing the engine block, Ford merely applies superficial stopgap, 'Band-Aid' remedies such as installing coolant level*

---

[4] Miller Complaint, Page 52-53

[5] Vanessa Miller's Responses and Objections to Defendant Ford Motor Company's Third Set of Interrogatories, December 19, 2025, Vanessa Miller et al. v. Ford Motor Company, U.S.D.C. Eastern District of California, Case No. 2:20-cv-01796-DAD-CKD, Response to Interrogatory No. 12

*sensors. This sensor alerts consumers when their coolant has been depleted, so that they can replenish it. It does not, however, prevent further future coolant depletion, or do anything to prevent the coolant from seeping into the engine cylinders. In some instances, Ford just replaces certain parts other than the defective engine block, thereby failing to address the root cause of the engine defect."* [6]

23. They further claim that, *"Because of the engine defect, consumers are forced to pay thousands of dollars out of pocket, despite the fact that the repair does not remedy the engine defect and leaves consumers still subject to future risk of failure… Ford has apparently developed a feasible alternative design for an EcoBoost engine that does not contain the defect class vehicles suffer from but has not used these newly-developed non-defective engines to replace failed EcoBoost engines installed in class vehicles, leaving class members to face the specter of repeated engine failure and engine fires."* [7]

24. In other words, the Plaintiffs allege that the "grooves," which throughout this report will be referred to as "saw-cut" channel features in the bore bridges of the at-issue EcoBoost engines, render the engines defective and result in coolant leaking into the engines' cylinder (i.e., coolant intrusion) and a variety of subsequent symptoms and harms, including various forms of engine damage and failure requiring repair, and safety issues such as incidents of fire. They are also critical of Ford's responses and remedies to those alleged issues.

25. The Miller Plaintiffs define the class vehicles to be 1.5L, 1.6L, and 2.0L EcoBoost engine equipped vehicles of the following models, [8] limited to those engines that have "saw-cut" engines:

a. 2013-2019 Ford Escapes

b. 2013-2019 Ford Fusions

c. 2015-2018 Ford Edges

d. 2016-2019 Lincoln MKCs

e. 2016-2019 Lincoln MKZs

26. The Plaintiffs in the matter of *Nelson et al. v. Ford Motor Company* ("Nelson Plaintiffs") allege that 2.3L the EcoBoost engine suffer from the same engine defect as the smaller displacement (1.5-, 1.6- and 2.0-liter) versions that are at-issue in *Miller et al. v. Ford Motor Company*. The Nelson Complaint defines class vehicles to be 2.3-liter EcoBoost equipped vehicles of the following models: 2015-2024 Ford Mustang; 2019-2024 Ford Ranger; 2016-2024 Ford Explorer; 2021-2024 Ford Bronco; 2015-2020

[6] Miller Complaint, Page 1

[7] Miller Complaint, Page 54

[8] Miller Complaint, Page 1

Lincoln MKC, and 2020-2022 Lincoln Corsair.[9] Plaintiffs have represented through counsel that they are pursuing a class made of 2.3L engines that have the saw cut, which are limited to the following models and model-years:

a. 2015-2019 Ford Mustang

b. 2016-2024 Ford Explorer

c. 2015-2019 Lincoln MKC

27. In both the Miller and Nelson Complaints, as limited by the court's prior orders, Plaintiffs define their proposed classes to include all persons or entities that purchased or leased a class vehicle in various individual states (each likely to be a proposed state class or sub-class).[10] Their definition includes some persons whose subject vehicle experienced coolant intrusion and associated repairs at a variety of costs, including those covered fully by Ford under warranty, and many who never did and never will. In fact, many members of the Plaintiffs' proposed class owned or leased makes and models of subject vehicles (e.g., all those equipped with 1.6-liter subject engines) that are not abnormally susceptible to coolant intrusion for any reason

# Background

## Engine Cylinder Block and Head Assemblies

28. Most automotive engines, including those at issue in this matter, are powered by a four-stroke cycle. During operation, pistons continuously traverse back and forth inside each of the engine's cylinders while valves mounted in the cylinder head open and close, enabling fresh intake charges of air and fuel into the engine's combustion chamber, where they are then burned and exhausted. An illustration of the four-stroke engine cycle – including some of the key internal engine components such as pistons, connecting rods, the crankshaft, valves, and spark plugs – is shown in Figure 2.

[9] First Amended Class Action Complaint ("Nelson Complaint"), U.S.D.C. Eastern District of California, Case No. 2:24-cv-02231-DAD-CKD, December 16, 2024, page 1, 80

[10] Nelson Complaint, Page 38




Figure 2 Annotated illustration of the four-stroke cycle.[11]

29. Components in the lower end of the engine – including the pistons, connecting rods, and crankshaft, among others – are housed in the engine block assembly. The engine's cylinders, which are housed in the block, are where fuel is burned and power is produced. The block is equipped with coolant passages, which are sometimes referred to as coolant jackets, that surround the cylinders and the flow of coolant through them prevents the cylinders from overheating.

30. The top surface of the engine block is referred to as the "deck." On engine blocks with an "open deck" design, the coolant jackets are open and visible from the deck surface, and on blocks with a "closed deck" design they are not. There can be advantages and disadvantages to both types of design. The open deck design has the potential to provide optimal cooling to the uppermost portions of the cylinders where most of the combustion activity (and heat generation) occurs. The closed deck design can offer more structural stability. Some engine blocks are of a "semi-open" deck design and utilize aspects of both designs. Engines with open, closed, and partially open engine block decks, have all been effectively used in various applications throughout the automotive industry for decades.

[11] Erjavec, Jack, "Automotive Technology." Cengage Learning Inc, 2020, page 239.




Figure 3 Image of a cylinder block assembly identifying the deck surface, cylinder bore, cylinder head bolt hold, and core plugs (plugs used to seal coolant passages).[12]




Figure 4 Example of a six-cylinder engine block with open-decks (top) and one of the banks of an eight-cylinder engine with semi-open decks (bottom).[13]

---

[12] Halderman, James D., and Chase D. Mitchell. Automotive technology. Pearson, 2020, page 369.

[13] Open Deck example: 303-01B Engine - 3.5L EcoBoost (257kW/350PS), Engine Disassembly, Alldata.com (2017 Ford Truck Explorer 4WD V6-3.5L Turbo)

Semi-Open Deck example: 303-01D Engine - 5.2L 32V Ti-VCT, Engine Disassembly, Alldata.com (2016 Ford Mustang V8 5.2L)

31. Components in the upper end of the engine – including the spark plugs, as well as the intake and exhaust ports and valves – are housed in cylinder head assemblies. As can be seen in the diagram shown in Figure 5, cylinder head gaskets ("head gaskets") are installed between and used to seal the interface between the cylinder head and engine block assemblies.




Figure 5 Diagram showing the engine cylinder block, cylinder head, and cylinder head gasket assemblies for a 2.0-liter EcoBoost (subject) engine.[14]

32. The cylinder head gasket is one of many sealing components found within an automotive engine that is used to prevent gases (e.g., intake air, in-cylinder gases, or exhaust flows) or liquids (e.g., coolant or oil) from undesirably leaking internally or externally. The cylinder head gasket, in particular, is responsible for sealing engine coolant and engine oil that resides around and/or passes through the interface of the cylinder block and head assemblies, as well as combustion chamber gases that are at high pressures and temperatures at times during the engine cycle.

33. The design of automotive head gaskets has evolved over the last century or so, from basic soft metal gaskets to sophisticatedly designed multi-layer steel (MLS) gaskets, like those used in much of the automotive industry, including in the subject vehicles.

[14] 303-01A Engine - 2.0L EcoBoost (184kW/250PS) – MI4, Engine Component View, Alldata.com (2018 Ford Truck Edge AWD, L4-2.0L Turbo)



Figure 6 Example of a multilayer-steel (MLS) type head gasket.[15]

## Cylinder Head Gasket Damage and Repair

34. Cylinder head gaskets can become damaged, fail, or otherwise require replacement for a wide variety of reasons. Head gasket failure typically results in combustion gases, coolant, or oil leaking internally within the engine or externally into the engine compartment (or ground). The specific leak path that forms because of head gasket damage varies from case to case.

35. Cylinder head gasket damage and the associated leaks can lead to a variety of symptoms including reduced engine power (e.g., due to loss of compression in one or more cylinders), misfire and engine vibration (sometimes described as a rough running engine), and the illumination of warning lights.

36. The only way to reliably determine the cause of an incident of head gasket damage is to individually investigate the incident. Typically, such an investigation would include a review of pertinent documents including but not limited to the incident vehicle's service and repair records, as well as an inspection and testing of the vehicle and its damaged components, among other tasks.

37. Cylinder head gasket damage often occurs as a secondary effect of a problem that is unrelated to the design or manufacture of the head gasket itself. Sometimes it is attributable to improper or abusive owner or operator actions, such as neglected engine maintenance (e.g., failure to follow recommended service intervals), overloading of the engine (e.g., excessive towing), or failure to heed warnings and address an overheating problem in a timely manner. Hence, as is described in an automotive technology (repair)

[15] Engine Cylinder Head Gasket, Left Bank, 2017 Ford Explorer, 3.5L Turbo, Part Number BL3Z6051H. https://www.ford.com/product/cylinder-head-gasket-p4000123552

textbook, *"when a head gasket has failed, it is important to correct the problem that caused it."*[16] A few common causes for head gasket damage will now be discussed.

## Damage as a Secondary Effect of Engine Overheating Event(s)

38. Cylinder head gasket failures often occur in engine powered vehicles, of most if not all makes and models, as a secondary result of the engine severely or chronically overheating. As such, the cylinder head gasket is a victim of the failure event rather than a causal component.

39. Cylinder head gaskets are installed between the cylinder head and block assembly. They rely on a strong and well distributed clamping force, primarily provided by the tightness of the head bolts, to properly seal. The engine and cylinder head block assemblies are made of metal (e.g., aluminum) and dimensionally expand as they heat up during operation. When engine overheating occurs, not only is the head gasket exposed to higher-than-normal temperatures, but the thermal expansion and dimensional warpage of the cylinder head and block assemblies can cause a reduction of clamping force in areas of the cylinder head gasket, resulting in the gasket leaking and becoming damaged. In fact, this mode of damage is common enough that it is best practice for the technician to check the cylinder head and block for permanent warpage or other damage caused by overheating whenever replacing a cylinder head gasket.

40. Most automotive engines, including those at issue in this matter, are equipped with cooling systems that circulate a liquid coolant – typically a mixture of ethylene glycol, water and additives – throughout the engine to help components maintain proper temperatures. More specifically, the cooling system uses one or more pumps (often referred to as water pumps) to circulate the coolant throughout the engine to collect waste heat from components, then a radiator (liquid-to-air cooler) and cooling fan reject the waste heat into the environment. Engine cooling systems typically operate at temperatures of about 230 degrees Fahrenheit or less, and temperatures much in excess of that constitute overheating, which can result in damage to many of the engine's components, especially the cylinder head gasket. Some common causes for engine overheating concerns include but are not limited to:

    a. low coolant level (e.g., due to an unaddressed coolant leak or hose failure)

    b. water pump failure

    c. thermostat failure

    d. cooling fan failure

    e. coolant condition or composition problems (e.g., improper type or mixture of coolants, overused coolant)

---

[16] Erjavec, Jack, "Automotive Technology." Cengage Learning Inc, 2020, page 239

f. clogged or failed radiator

g. engine overloading or overly severe usage (e.g., excessive towing, abnormally high temperature and load conditions)

41. Whenever cylinder head gasket damage is discovered, the possibility that the damage resulted from the engine severely or repeatedly overheating – for which there are many potential causes unrelated to the design or manufacture of the cylinder block, cylinder head or cylinder head gasket itself – should be considered. The occurrence of prior overheating events, and the cause for them, can only be accurately assessed on a case-by-case basis by performing an investigation, which often includes tasks such as a technical review of the vehicle's service and repair records, an inspection of the vehicle and its damaged components, among others.

## Damage as a Result of Prolonged Operation with an Overheating Engine

42. Many automobiles, including subject vehicles, are equipped with engine temperature sensors and warning systems that are designed to alert a driver to engine overheating conditions, should they begin to occur. Such warnings provide the driver with an opportunity to stop and remedy the problem before progressive damage, such as a cylinder head gasket failure, occurs.

43. Many vehicles, including subject vehicles, are also equipped with protective engine overtemperature control strategies (i.e., fail-safe modes) that are implemented by the vehicle's computer system if engine overheating occurs to minimize the chance of engine damage, such as head gasket failure. For example, the computer system of some vehicles is programmed to reduce the engine's power output, limit air conditioner usage, or, in the case of hybrids, discontinue usage of the engine and revert to electric drive to minimize the amount of heat generated within the engine when it begins to get too hot. Some vehicles implement progressive strategies that become more aggressive in their intervention with prolonged usage (e.g., if a driver ignores earlier warnings and continues driving) to help limit the severity of the overheating event.

44. Typically, if a driver of an automobile encounters the onset of an engine overheating condition but heeds warnings and stops an automobile as soon as possible and remedies the overheating issues (e.g., seeks repair), then the overheating problem is unlikely to result in cylinder head gasket damage. However, when overheating warnings are ignored, and an automobile continues to be driven, either repeatedly or for more than a short period, with an engine overheating problem, then internal engine damage and/or head gasket failure is likely to eventually occur.

45. Whenever cylinder head damage is discovered, the possibility that the damage was caused by prolonged usage of the vehicle in an overheating state (i.e., improper operator action) should be considered.

## Damage as a Result of Neglected Maintenance

46. Automotive engines, including their cooling systems, require maintenance, and failing to properly maintain an engine can result in head gasket damage.

47. For example, engine coolants have a finite service life and require periodic checks and replacement. Neglected coolant maintenance can lead to negative effects, such as corrosion and deposits forming within the cooling system (including at the head gasket), resulting in the engine overheating and, subsequently, the head gasket failing. Similarly, neglecting to replace degraded cooling hoses or a variety of other engine components has the potential to result in the same outcome.

48. Whenever head gasket damage is discovered, the possibility that the damage was caused by neglected maintenance should be considered.

# Ford EcoBoost (GTDI) Engines

49. The Ford EcoBoost line of engines are turbocharged ("boosted") engines equipped with gasoline turbo direct injection ("GTDI") and variable camshaft timing systems.

50. Ford does extensive preproduction durability and validation testing of new engines, such as new variants of the EcoBoost engines, before introducing them onto the road. Ford documents preproduction test plans and results in DVP&Rs ("Design Verification Plan and Report"). The DVP&Rs produced for the subject engines demonstrates compliance (or a passing result) for a wide variety of performance and durability tests.

51. In deposition, Mr. Guinta described some of the preproduction testing that his team at Ford does to make sure that the cooling system they design for a new engine works properly. He described performing extensive analysis to ensure that an engine cooling system is sized and designed to meet flow and temperature targets. He also described the many different component and system-level tests, including some engine dynamometer-based tests, that are performed, before the engine is introduced to a vehicle and subjected to a wide variety of vehicle level tests, including durability driving tests at Ford's proving grounds, and worst-case scenario tests the subject the vehicle to extreme conditions such as severe trailer towing in Arizona.[17]

52. In deposition, Mr. Wade and Mr. Brewer described the extensive amount of pre-release testing was specifically performed on the engines at-issue in this lawsuit, before they were released to the road. They explained that pre-production testing occurred over an approximately four-year period. After Ford engineers had reviewed the design objectives (e.g., improved fuel economy and performance) and Ford's design rules for the new engines, they created initial designs, manufactured the engine components as prototypes, and then tested components individually (i.e., performed component level testing). Computer-aided engineering (CAE) modeling analysis was used to help assess the

[17] Deposition of Michael Giunta, August 20, 2025, page 13:25-17:15

performance of components. Then, prototype engines were assembled and tested on a dynamometer, which is like a treadmill for an engine (i.e., engine level testing was performed). Then eventually the engines were installed and tested in vehicles (i.e., vehicle level testing was performed). As the subject engines neared the production phase, Ford performed additional "production verification" testing to ensure that subject engines produced via the manufacturing process exhibited the same performance as the engines so extensively tested during the design phase. According to Mr. Wade, in total, the subject engines were put through about 530 tests before being released to the road, including a variety of durability and fatigue testes, and severe thermal cycling tests to ensure the head gasket and block joint integrity is sufficient.[18]

53. Ford, like most of the automotive industry, has transitioned towards the use of downsized (smaller number of cylinders and displacement) turbocharged engines, like the EcoBoost line of engines, in many applications. This transition is in part because they are capable of providing improved fuel economy associated with a smaller engine while also producing as much power as a larger engine.

54. Engine size is often characterized in terms of the number of cylinders and displacement, which is the total volume swept by the engine's pistons in the cylinder bores. Ford has manufactured three-, four- and six-cylinder EcoBoost engines in a variety of displacements including the 1.5, 1.6, 2.0, and 2.3-liter engines at issue in this case, as well as larger displacements such as the 3.5-liter engine.

55. Like much of the automotive industry, Ford equips the subject engines with cylinder block and cylinder head assemblies that are made of aluminum, and a multilayer steel head gasket to seal the interface between them.

56. All automotive engines have a cooling system that helps maintain the proper temperature of engine components by circulating a liquid coolant through them. Some of the key components in an engine cooling system include the water pump, which pumps coolant through the system; the air cooled radiator, which dissipates heat to the environment; the cooling fan, which blows air through the radiator; the thermostat, which regulates the flow of coolant through the radiator; the coolant reservoir or sump, which stores coolant; the coolant cap, which enables the system to develop and hold pressure (often up to about 15 psig); hoses which connect the various components; and many internal engine passages that enable coolant to reach areas inside the engine that require cooling, such as the cylinder and cylinder head assemblies. The cooling system typically also provides coolant flow (and waste heat) to the heater core that provides heat to the cabin, and sometimes it also provides coolant flow to auxiliary heat exchanges such as transmission and/or engine oil coolers. Modern cooling systems also contain a variety of control valves that are controlled, and sensors that are monitored by the vehicle's computer control system.

---

[18] Deposition of Todd Brewer, September 17, 2025, page 11:2-18:3
Deposition of Robert Wade, October 17, 2025, page 274:15-281:17



FIGURE 14-29 The cooling system circulates coolant through the engine's water jackets.

Figure 7 Simplified diagram of an automotive cooling system from a textbook.[19]

57. The specific design of EcoBoost engine cooling systems, including the components used and the routing of coolant between them, varies from vehicle to vehicle depending on the model, model-year, engine, and optional features.

58. Like most automotive engines, the Ford EcoBoost engine's cooling systems are designed to be filled with a mixture of a specific type of ethylene glycol-based coolant and water. Use of the wrong type or concentration of coolant in an EcoBoost engine (or any automotive engine) cooling system can result in cooling system and/or engine damage, including the type of damage at-issue in this matter.[20]

---

[19] Erjavec, Jack, "Automotive Technology." Cengage Learning Inc, 2020, page 413

[20] Most EcoBoost engines manufactured for the model-years at issue in this matter were originally filled with Motorcraft Orange Antifreeze/Coolant (Specification WSS-M97B44-D). In about 2020, Ford introduced a newly designed Motorcraft Yellow Antifreeze/Coolant (Specification WSS-M97B57-A). Ford recommends that the yellow coolant now be used in systems originally designed for orange coolant. Both the yellow and orange are ethylene glycol-based coolants with organic acid technology additives that are specified to be mixed approximately 50/50 (min 40%, max 60%) with distilled water before being added to the cooling system.

Motorcraft Engine Antifreeze/Coolants – Usage Chart, https://www.fcsdchemicalsandlubricants.com/quickref/coolantsEN.pdf

Alldata.com (OEM specifications for later model vehicles not included on the usage chart)

Motorcraft Bulletin on "Backward Compatibility/Use of Motorcraft Yellow Antifreeze/Coolant within/in place of Motorcraft Orange Antifreeze/Coolant and Motorcraft Specialty Green Engine Coolant with Bittering Agent

https://www.fcsdchemicalsandlubricants.com/quickref/FCSD%20Motorcraft%20Yellow%20Antifreeze-Coolant%20Backward%20Compatability.pdf

59. Like all engine cooling systems, the EcoBoost engine cooling system requires maintenance including frequent checks (e.g., for level and condition) and periodic fluid changes (about every 100,000 miles). Over usage or contamination of the coolant can cause cooling system damage, overheating, and the type of engine damage and concerns that are at-issue in this matter.

## Subject Vehicles

60. The Plaintiffs' proposed class includes a diverse collection of vehicles that differ in design. The Plaintiffs define the EcoBoost engines included in their proposed class to be certain 1.5-, 1.6-, 2.0- and 2.3-liter EcoBoost engines found in the subject vehicles but not EcoBoost engines in other sizes or EcoBoost engines without the saw cut channel. Plaintiffs represented through counsel that they only intend to include vehicles with subject engines equipped with a saw-cut feature, in their proposed class, which Ford has identified and are listed in Table 1 and Table 2, below.

Table 1 List of subject vehicles manufactured with a 1.5-, 1.6-, or 2.0-liter subject engine, produced by Ford.[21]

| Miller Subject Vehicles Manufactured with a 1.5L, 1.6L, or 2.0L GTDI Engine and a Saw Cut | | |
|---|---|---|
| 2017-2019 | Escape | 1.5L |
| 2013-2016 | Escape | 1.6L |
| 2016-2019 | Escape | 2.0L |
| 2014-2019 | Fusion | 1.5L |
| 2013-2014 | Fusion | 1.6L |
| 2016-2019 | Fusion | 2.0L |
| 2015-2018 | Edge | 2.0L |
| 2016-2019 | MKC | 2.0L |
| 2016-2019 | MKZ | 2.0L |

Table 2 List of subject vehicles manufactured with a 1.5-, 1.6-, or 2.0-liter subject engine, produced by Ford.[22]

| Subject Vehicles Manufactured with a 2.3L GTDI Engine and a Saw Cut | | |
|---|---|---|
| 2015-2019 | MKC | 2.3L |
| 2015-2019 | Mustang | 2.3L |
| 2016-2019 | Explorer | 2.3L |

61. Throughout this report, the vehicles listed in Table 1 and Table 2 will be referred to as "subject vehicles" and their EcoBoost engines, as "subject engines." However, it should

[21] Defendant Ford Motor Company's Amended Answers and Objections to Plaintiffs' Interrogatories, Set Two, Vanessa Miller et al. v. Ford Motor Company, U.S.D.C. Eastern District of California, Case No. 2:20-cv-01796-TLN-CKD

[22] Included in and Email from Sherry Rozell (counsel for Ford) on February 2, 2024 transmitting Defendant Ford Motor Company's Amended Answers and Objections to Plaintiffs' Interrogatories, Set Two to the Plaintiffs

be recognized that the Plaintiffs' broadly proposed class includes subject vehicles and engines that differ substantially in their design and field performance (e.g., the mechanism and rate of various type of concerns).

62. The Plaintiffs' proposed class includes vehicles of a wide variety of model types, including sports coupes (e.g., Mustangs), midsize sedans (e.g., Fusions), luxury midsize sedans (e.g., MKZs), compact SUVs (e.g., Escapes), compact luxury SUVs (e.g., MKCs), and mid-size SUVs (e.g., Edges) and larger SUVs (e.g., Explorer).




Figure 8 Photographs of six different subject vehicles.

63. Although the Plaintiffs have defined their classes to include vehicles equipped with subject engines encompassing four different displacements (1.5-, 1.6-, 2.0-liter, and 2.3L) – those different displacement engines are distinct in many ways. The design of the subject vehicles, their engines, and their calibrations (i.e., how they are electronically

controlled), evolved throughout the approximately eight-year period that the class vehicles were manufactured.

64. Many of the subject vehicles differ in size and aerodynamics. For example, the curb weight of the 2018 Explorer is about 1,000 lbs. more than the 2017 Fusion.[23] The Explorer is designed to be capable of towing trailers with weight of up to 3,000 lbs.[24] The Explorer (a midsize SUV) is also likely less aerodynamic than the Mustang (a sports car) and is likely to demand more power from the engine to maintain the same speed on the highway. The subject vehicles with heavier weights and payloads, or worse aerodynamics, will tend to lead to additional demands (e.g., for more power) on its engine and its cooling system. Added engine power and cooling system demands can contribute to the cause of engine and cooling system failures, like the coolant intrusion issues that are at-issue in this matter.

65. Many of the subject vehicles also differ in drivetrain type, which can affect the conditions experienced by the engine. Some trim levels of the 2018 Edge are standardly equipped and others are optionally equipped with an all-wheel drive (AWD) drivetrain.[25]

66. Many features of the subject vehicles differ. For example, they have engines and cooling systems that differ in size and design. Some vehicles came equipped (optionally, or standard) with automatic engine start-stop ("auto-start-stop") technology that help reduce the engine's fuel consumption and emissions by automatically stopping the engine when the vehicle comes to a stop and then restarting it again when needed for driving. As will be discussed later in this report, some subject vehicles equipped with the 1.5-liter engine experienced a coolant intrusion failure mechanism agitated specifically by the auto-start-stop feature, so it is necessary to consider the (not always present) feature when evaluating the failure mechanisms and rates, pertinent to this matter.

67. Aside from the many obvious differences in the design and calibration of the subject engines included in the Plaintiffs' proposed class, more details of which will be discussed later in this report, the many differences in the overall design of the subject vehicles – such as in vehicle type, size, and drivetrain – results in their engines being subjected to different operating conditions, including different power and torque demands, speed (engine RPM) histories, also resulting in their internal components being subject to different temperatures, pressures, mechanical stresses, and strains. Thus, the engines in the different at-issue applications (e.g., make/model/mode-year subject vehicles) experience wear and other forms of degradation at varying rates and are not equally susceptible to a variety of unique failure mechanisms, including the coolant

---

[23] https://www.edmunds.com/ford/explorer/2018/features-specs/https://www.edmunds.com/ford/fusion/2017/features-specs/

The curb weight of the 2018 Explorer and 2017 Fusion and 2016 Fiesta ST is 4,453 lbs. and 3,472 lbs., respectively.

[24] 2018 Explorer Trailer Towing Guide https://www.ford.com/cmslibs/content/dam/brand_ford/en_us/brand/resources/general/pdf/guides/18RV&TT_Ford_Explorer_Oct9.pdf?srsltid=AfmBOoosStvNuqAaMNFrOtwwB-XGKvs5HMuF9C7eqbf2or--gwXvVq9H

[25] https://cdn.dealereprocess.org/cdn/brochures/ford/2018-escape.pdf

intrusion failure mechanisms that are at issue in this case and discussed later in this report.

# Analysis of Subject Vehicles

68. In addition to reviewing and analyzing the documents set out in Exhibit B of my report, my analysis and investigation included:

a. Acquisition, disassembly, and inspection of exemplar 1.5-, 1.6-, and 2.0-liter EcoBoost engines removed from well-running, high-mileage subject vehicles.[26]

b. Inspection of the available components from subject engines that had been removed (and then disassembled and tampered without notice to Ford) from four of the named Plaintiffs' vehicles.

c. Review of documentation, including photographs, from inspections of named Plaintiffs' vehicles.

d. Inspection of new exemplar subject engine cylinder head gaskets.

e. Review and analysis of a variety of information from a variety of other sources, including but not limited to textbooks, scientific publications, and the service and repair information (via Alldata.com) as well as the manuals for subject vehicles.

## Root Cause Investigation Methodology

69. When investigating the root cause of an issue or failure, such as an engine concern or failure, the scientific method that I utilize is the method widely accepted by the investigative community as yielding the most reliable results. The basic steps in the scientific method are:[27]

a. Recognize and define the problem (e.g., an engine performance problem or failure).

[26] The exemplar vehicles acquired by Lillo Engineering include a 2015 Ford Escape with a 2.0-liter subject engine and 191,805 miles of prior usage (VIN: [redacted] a 2016 Ford Escape with a 1.6-liter subject engine and 148,562 miles of prior usage (VIN: [redacted] a 2018 Ford Fusion with a 1.5-liter subject engine and 157,298 miles of prior usage (VIN: [redacted] The vehicles were confirmed to be in good operating condition before their engines were removed and disassembled. For example, before disassembly they were test driven, their computer system scanned (checked for diagnostic trouble codes), their cooling system pressure tested (confirmed to not exhibit external leakage or coolant intrusion), and their engine oil and coolant sampled and tested in a laboratory.

[27] NFPA Standard 921: Guide for Fire and Explosion Investigations, Figure 4.3, 2017.

b. Collect and analyze data (e.g., inspect the damaged components, review service records).

c. Develop hypotheses (e.g., specific causes of the failure).

d. Test the hypotheses (rule out as many hypotheses as possible based on the data and evidence).

e. Select final hypothesis (determine if the hypothesis is consistent with the known data and that alternative hypotheses can be ruled out).

70. An accurate root cause investigation for an engine issue or failure typically involves the following, when possible:

a. Verification of the performance issues and symptoms (e.g., engine operability, system and/or component testing).

b. A scan of the equipment's computer system and review of any trouble codes or other pertinent information stored within it, if applicable.

c. Testing of system and/or components.

d. A review of the equipment's service and maintenance records.

e. A review of the equipment's technical information (including technical service and recall bulletins published by the manufacturer that may pertain to the issue).

f. A thorough inspection and measurements of all components that may be damaged.

g. Sometimes, laboratory testing (e.g., chemical testing) and/or engineering analysis of components or materials (e.g., microscopy).

71. After completing all inspections, reviews, tests, and other forms of data collection, the facts and potential causes (theories) of failure are considered. Theories that are inconsistent with the facts are deemed incorrect and ruled out as potential causes. If, after ruling out all incorrect theories, only one theory remains and it is supported by the evidence, then that theory is selected as the root cause.

## 1.6-liter Subject Engines

72. The 1.6-liter subject engine is part of Ford's Sigma family of engines. [28] The design responsibility of the 1.6-liter subject engine began in Brazil before being transferred to Ford engineers located in Dagenham, United Kingdom.[29]

[28] Deposition of Michael Giunta, August 20, 2025, page 9:15-10:18

[29] Deposition of Randy Hansen, September 10, 2025, page 2:21-25:13



Figure 9 Image of a Ford 1.6-liter EcoBoost I4 ("Subject") engine.[30]

73. The 1.6-liter subject engine was first used in the 2013 Ford Escape, [31] where it produced best in class fuel economy. As Ford describes in a brochure for the vehicle, *"Our state-of-the-art, turbocharged, direct injection 1.6L EcoBoost® I-4 engine makes Escape the most fuel-efficient automatic in its class on the highway. Using twin independent variable camshaft timing (Ti-VCT) to enhance fuel economy and performance, the 1.6L helps Escape achieve 33 mpg hwy and 23 city."*[32]

74. The 1.6-liter subject engine was later used in other model vehicles, including the Ford Fusion and Fiesta ST. [33] Ford began phasing out usage of the 1.6-liter subject engine while making generational design changes to model-year 2014 vehicles and began using the smaller displacement 1.5-liter subject engine in many of those applications instead.[34] Ford last used the 1.6-liter subject engine in the 2019 Fiesta ST.

---

[30] https://fordauthority.com/fmc/ford-motor-company-engines/ford-ecoboost-family/ford-1-6l-ecoboost-engine/#google_vignette

[31] Deposition of Randy Hansen, September 10, 2025, page 22:1-23:19, 25:14-33:5, 47:2-7

[32] Ford Brochure for 2013 Ford Escape, https://cdn.dealereprocess.org/cdn/brochures/ford/2013-escape.pdf

[33] Deposition of Randy Hansen, September 10, 2025, page 32:17-24

[34] Deposition of Randy Hansen, September 10, 2025, page 33:16-35:4

75. Ford used the 1.6-liter EcoBoost engine in the following vehicles:

a. **2013-2016 Ford Escape**

b. **2013-2014 Ford Fusion**

c. 2014-2019 Ford Fiesta ST

d. 2014-2016 Ford Transit Connect

76. However, the Plaintiffs only include the Escape and Fusion (not the Fiesta ST or Transit Connect) model vehicles in their proposed class.

77. The 1.6-liter subject engine is equipped with dual overhead camshafts and a twin independent variable cam timing (Ti-VCT) system, four valves per cylinder, a composite intake manifold, an aluminum cylinder head and cylinder block, and gasoline turbocharged direct injection (GTDI).[35]

78. As can be seen in Figure 10, the 1.6-liter subject engine's cylinder block is of an open deck face design and features three "saw-cut" coolant passages – one each in the bore bridge region between every two cylinders.

[35] 303-01A Engine - 1.6L EcoBoost (132kW/180PS) – Sigma, Description and Operation Alldata.com (2015 Ford Escape 2WD, L4-1.6L Turbo and other model-years)




Figure 10 Annotated photographs of the cylinder block deck and saw-cut bore bridge of an exemplar 1.6-liter subject engine removed from a used 2016 Ford Escape.[36]

79. During operation, fuel burns inside the engine's cylinders, and it is critical that many regions of the engine, including the bore bridge regions of the engine block which resides between firing cylinders, receives adequate cooling so that it does not overheat. The saw-cut was included in the engine block to improve cooling (via the flow of coolant) in the bore bridge area.

80. Plaintiffs allege that the saw-cut features below a certain width used in subject engines render them defective. However, it should be recognized that similar saw-cut features are successfully utilized in many subject and non-subject engines. In fact, as can be seen in the benchmark data shown in Figure 11, numerous OEMs other than Ford use cylinder blocks with saw-cut bore bridges of similar width to the subject engines. As will be discussed later in this report, there is no evidence to suggest that those specific features were the cause of any widespread coolant intrusion issues associated with versions of the 1.6-liter subject engine. Similarly, Ford has utilized saw-cut cylinder blocks in 3.5- and 7.3-liter engines, neither of which have not experienced an elevated rate of coolant intrusion concerns or repairs, either.[37] As such, the subject engine's cylinder block saw-cuts are not a unique or inherently defective type of feature and are not a type of feature

[36] LILLO_2025-8-28_IMG_0064.JPG, LILLO_2025-8-28_IMG_0072.JPG

[37] Deposition of Todd Brewer, September 17, 2025, page 171:19-172:3

that an automotive manufacturer would have reason to believe will result in coolant intrusion into the cylinders.

[redacted]

Figure 11 Ford slide regarding cylinder block bore bridge benchmarking showing that many automotive OEM's use a saw-cut in the bore bridge of their cylinder blocks for cooling, and that the bridge width of the subject engines is typical.[38]

81. Like most modern automotive engines, the 1.6-liter subject engine is equipped with a multi-layer steel type cylinder head gasket. The gasket was supplied to Ford by Federal-Mogul.[39]

82. The 1.6-liter engine's cooling system contains dozens of components including a coolant reservoir (Degas bottle), radiator, heater core, thermostat, control valves, engine oil and transmission coolers, many hoses, a coolant temperature sensor, and a mechanical (engine driven) water pump that circulates coolant throughout engine cylinder block and head, turbocharger, and many other components. The specific cooling system

---

[38] FORD-MILLER 00360118, slide 11 of 37

[39] Deposition of Joseph Henne, August 13, 2025, page 23:16-25

components used and their routing varies from application to application (e.g., model to model). As an example, Figure 12 shows a diagram of the cooling system in the 1.6-liter subject engine equipped 2015 Ford Escape with annotations identifying a few major components.




Figure 12 Annotated diagram of the cooling system for a 1.6-liter subject engine in a 2015 Escape.[40]

83. Some, but certainly not all, members of the proposed class with 1.6-liter subject engine equipped vehicles have experienced cooling system concerns such as external leaks requiring repair. A very small number experienced cooling system issues that resulted in a fire incident. Some of these various issues will now be discussed.

## Cylinder Head Cup Dislodging Concern and Ford's Resolution for It (Early Built 1.6-liter Subject Engines)

84. On August 8, 2012, Ford was contacted by a dealer who reported an under-hood fire that occurred during a pre-delivery test drive. Subsequent investigation of the incident revealed that dislodging of a 1.6L GTDI engine head cup (a cap that seals a coolant passage in the head) as the cause of the fire. Upon further inquiry, Ford identified a few other reports of head cup plugs coming loose without resulting in a fire, and one other fire incident that may have resulted from a dislodged plug.[41] Upon further analysis, Ford determined that the root cause of the plug dislodging issue was overstrike of the plug

[40] 303-03A Engine Cooling - 1.6L EcoBoost (132kW/180PS) – Sigma, Engine Cooling – Component Location, Alldata.com (2015 Ford Escape 2WD, L4-1.6L Turbo)

[41] 12S39 FCSD Subject to PO.pdf, page 15 of 58

when being manually inserted during assembly (i.e., a unique manufacturing problem).[42] They resolved the issue by [redacted][43]

85. To prevent plug dislodging incidents from occurring in the 1.6-liter subject engines already on the road with manually installed plugs, Ford initiated Safety Recall 12S39. Ford informed the United States National Highway Traffic Safety Administration (NHTSA) that it was conducting the voluntary safety recall for the approximately 6,214 affected model-year 2013 Ford Escapes on September 4, 2012.[44] On September 5, 2012, Ford sent its dealers a bulletin informing them of Safety Recall 12S39 that specified that the condition only affected certain 2013 model-year Escape vehicles equipped with a 1.6L Engine built at the Louisville Assembly Plant through August 31, 2012. For affected vehicles, it prescribed that the cylinder head cup plug located between cylinder #2 spark plug and cylinder #3 fuel injector be checked for coolant leakage and repaired, if necessary. If no leakage was found, then a sealant and a secondary cylinder head cup plug was to be installed on top of the original plug, providing secondary containment in case the original plug leaks. In September 2012, Ford also sent owners of affected vehicles a letter informing them of the safety recall and encouraging them to bring their vehicle to a dealership for the free repairs associated with it.[45]

86. The cylinder head cup dislodging concern that was resolved by manufacturing process improvements and recall 12S39 only potentially affected a small fraction of the Plaintiffs' proposed class who owned or leased a subject vehicle specifically equipped with an early (pre-September 2012) built 1.6-liter subject engine. In my investigation, I have found no evidence that this unique cup dislodging issue occurred in any subject vehicle other than the early built, 1.6-liter subject engine equipped, 2013 Ford Escapes that 12S39 is specifically applicable to.

## 1.6-liter Subject Engine Fire Incidents Resulting from Cylinder Head Cracking and Associated Recalls

87. Ford became aware of an engine compartment fire that occurred in model-year 2013 Ford Escapes equipped with a 1.6-liter subject engine in September 2012.[46] By November 2012, Ford had received additional similar reports and formed a task force to investigate them. The task force found a pattern of overheating and fluid leaks leading

---

[42] August 2012 N.A. Field Review Committee – Summary of Approved Field Service Actions (FSA) page 2 or 3 (12S39 FCSD Subject to PO.pdf, page 9 of 58)

[43] FORD-MILLER 00180657- FORD-MILLER 00180662

[44] Letter from Ford to NHTSA regarding "Ford Motor Company (Ford) Recall No. 12SS39 – Certain 2013 model-year Escape vehicle equipped with 1.6L engines – engine cylinder head cup plug," September 4, 2012 (R12S39BS.pdf)

[45] Safety Recall Notice 12S39 / NHTAS Recall 12V-431 Owner's Bulletin, September 2012 (R12S39C1.pdf)

[46] 49 CFR Part 573 – Defect Information Report, 12S41 – Certain 2013 Escape and Fusion Vehicles with 1.6L Engine – Engine Overheating that May Result in a Fire 14S41.pdf (page 33 of 63)

up to the fires, and so Ford engineers developed field action 12S41 to address the issue.[47]

88. On November 30, 2012, Ford informed NHTSA of their intent to issue Safety Recall 12S41.[48] Further, on November 30, 2012, Ford sent their dealers an advance bulletin informing them of the recall which affected all model-year 2013 Ford Escapes equipped with 1.6-liter subject engine built at the Louisville Assembly plant from Job 1 through November 26, 2012 and all 2013 Ford Fusion vehicles built at the Hermosillo Assembly Plant from Job 1 through November 29, 2012. The bulletin states that *"In some of the affected vehicles, engine overheating can lead to fluid leaks that may come into contact with the hot exhaust system, resulting in a fire"* and that prior to the fire, the overheating may be indicated by instrument cluster messages such as *"Power reduced to lower temperature," "High engine temperature Stop safely,"* and *"Engine Coolant Overtemperature."* For affected vehicles, the recall prescribed that a technician check for fluid leaks or diagnostic trouble codes stored in the computer system and fix those issues, if discovered. It also specified that the vehicle's computer system should be reprogrammed with updated software.[49] Ford also sent owners of affected vehicles a recall letter in December 2012. [50]

89. According to Ford, the upgraded cooling system software installed as part of Recall 12S41 was implemented *"to better manage engine temperature during a unique overheating condition"* because the *"original cooling software was not robust to a loss of coolant system pressure under certain operating conditions."*[51]

90. After issuing the recall, Ford continued to monitor the affected vehicles for incidents of fire. Between August and September 2013, Ford received a series of reports of additional engine compartment fires, which they immediately investigated. Disassembly of engines involved in the fire incidents revealed that the engines had been overheated and subsequently sustained crack damage to the cylinder head. The fires likely then resulted from oil leaking from the cracked cylinder head and igniting on the hot surface of an exhaust component. With that understanding, Ford engineers proceeded to perform testing and modeling, to better understand and remedy the root cause of the failure mode.[52]

---

47 November 30, 2012, N.A. Field Review Committee – Summary of Approved Field Service Actions (FSA). (12S41 FCSD – Subject to Protective Order.pdf, page 4 of 40)

48 FORD-MILLER 00174345

49 Stop Sale / Demonstration / Delivery Hold – Safety Recall 12S41, All 2013 Model-year Escape and Fusion Vehicles Equipped with a 1.6L Engine Risk of Overheating that May Result in Engine Fires, December 19, 2012. (R12S41.pdf)

50 Safety Recall Notice 12S41 / NHTSA Recall 12V-551, December 2012 (R12S41C1.pdf)

51 Ford New – Ford Produces Fix in Voluntary Safety Recall of 2013 Escapes, 2013 Fusions with 1.6liter engines. (https://www.prnewswire.com)

52 49 CFR Part 573 – Defect Information Report, 2013 Model-year Ford Escape 1.6 Safety Recall #13S12. (13S12.pdf, page 13 of 108)

91. By November 2013, about a year after introducing the initial 12S41 recall, Ford was aware of about thirteen reports of under-hood fires in 2013 Escapes. By that time, they had determined that the fires were more specifically occurring [redacted][53] In other words, they found that the 1.6-liter engine's coolant temperature sensor [redacted]

92. To remedy the problem, Ford issued Safety Recall 13S12 on November 25, 2013, which is applicable to model-year 2013 Ford Escapes equipped with 1.6-liter subject engines. As part of the recall repair, Ford instructed technicians to perform numerous checks, engine modifications, and extensive cooling system upgrades, including: [54]

a. Replacement of the coolant degas bottle, bottle cap, and coolant hoses.

b. Installation of a coolant standpipe equipped with a coolant level sensor.

c. Installation of a wiring harness and upgraded computer software (to enable the computer control system to register coolant level and subsequently warn the driver and implement fail-safe cooling modes if the coolant level becomes low).

d. Replacement of the cooling system thermostat with one that has a lower opening temperature (on vehicles built on or before April 2013).

e. Installation of shield to prevent fluids from being able to contact hot exhaust components.

f. Modification of an underbody shield (air defector) to prevent fluids from potentially accumulating on top of it.

g. Removal of a grill shutter to improve airflow in the engine compartment.

93. To protect newly-manufactured Escape vehicles from similar overheating induced cylinder head crack damage and fire concerns, Ford not only implemented the previously discussed cooling system upgrade, but also equipped model-year 2014 1.6-liter Escapes with a cylinder head temperature sensor that could better detect (and react and warn the driver of) an overheating condition caused by a low coolant level. As described by Ford, [redacted]

---

[53] Field Review Committee – Fact Sheet, 13X57: 2013 Escape – 1.6L Underhood Fires (13S12_13X57 Fact Sheet.pdf)

[54] R13S123.pdf

*This improved sensing capability allows the control system to prevent the high stress condition that the localized overheating of the cylinder head could previously induce."*[55]

94. Additionally, in February 2014, the design of the 1.6-liter subject engine cylinder head was revised to [redacted][56] so that newly manufactured cylinder heads would not crack in the area even if severely overheated. In other words, the design of the engine cylinder head assembly was changed so that newly manufactured 1.6-liter subject engines could not possibly experienced the crack-based failure mechanism that led to risk of external oil leaks and thus the fire-related recall actions.

95. Ford continued to monitor for incidents of fire associated with the different versions of the 1.6-subject engine. In June 2016, Ford received reports of under-hood fires occurring in model-year 2014 Escapes equipped with the 1.6-liter subject engine manufactured before the February 2014 cylinder head redesign in North America. By March 2017, Ford had identified [redacted].[57]

96. Ford engineers investigated the additional fire incidents and concluded that [redacted][58]

97. In other words, Ford discovered that the failure mechanism that led to fires occurring as a result of the cylinder head cracking under low coolant/overheating conditions in 1.6-liter subject engines in 2013 Escapes was also occurring in some 2014 Escapes and some 2013-14 Fusions that were also equipped with a version of the 1.6-liter subject engine before the February 2014 cylinder head redesign, and that the introduction of a cylinder head temperature sensor earlier in the model-year 2014 Escape, although an improvement, did not completely prevent the failure mechanism from occurring (likely due people continuing to drive the vehicles under severe overheat conditions for

---

[55] 13S12 14D.pdf

[56] 17S09 FCSD -Subject to Protective Order.pdf, page 28 of 113

[57] 17S09 FCSD -Subject to Protective Order.pdf, page 26 of 113

[58] 17S09 FCSD -Subject to Protective Order.pdf, page 27 of 113

prolonged periods despite overheating warnings and drivability symptoms). Accordingly, Ford issued a further recall (17S09) that expanded the scope to take similar actions for other vehicles that were equipped with 1.6L engines manufactured before the cylinder head was redesigned in February 2014. Recall 17S09 included subject vehicles like the 1.6L 2014 Ford Escape and the 2013-2014 Ford Fusion.[59] Like in the earlier Safety Recall 13S12 (applicable to only 2013 Escapes), the repairs prescribed in the recall included performing numerous checks, engine modifications and extensive cooling system upgrades, including replacement of cooling system components (e.g., degas bottle, hoses), installation of a coolant level sensor, and an update of the cooling control system software.[60]

98. As was previously mentioned, many later model (e.g., model-years manufactured after February 2014) 1.6-liter subject engine equipped vehicles have redesigned cylinder heads that were bolstered to avoid cracking under overheat condition, and to eliminate the risk of fire associated with the cracked cylinder head leading to oil contacting the exhaust system. Although those vehicles are included in the Plaintiffs' proposed class, there is no evidence to suggest that they are susceptible to catching on fire due to the cylinder head crack condition that resulted in Safety Recalls 13S12 and 17S09.

## Various 1.6-liter Subject Engine Cooling System and External Leakage Concerns

99. Some vehicles equipped with versions of the 1.6-liter subject engine experienced external coolant or oil leakage or overheating issues. Often those issues resulted in visible leaks, driver warnings, and mild drivability concerns (e.g., engine derating). On some select model and model-year subject vehicles, in severe cases, they contributed to the cause of the previously discussed cylinder head cracking and fire concerns.

100. Within approximately the first two years of production, Ford took numerous actions to improve the design and manufacture of the 1.6-liter subject engine to remedy external coolant and oil leakage concerns, including: [61]

a. [redacted]

b. [redacted]

---

[60] FORD-MILLER 00176026

[61] FORD-MILLER 00180657- FORD-MILLER 00180662

[redacted]. [redacted].

[redacted]. [redacted].

[redacted]. [redacted].

[redacted]. [redacted]

101. Ford also took additional actions to remedy cooling system functional concerns, including: [62]

[redacted]. [redacted], [redacted]

[redacted]. [redacted]

[redacted]. [redacted]

102. None of these external leakage concerns directly resulted in internal fluid leaks (e.g., coolant intrusion) and are not related to Plaintiffs' saw-cut feature-based theory of defect.

## 1.6-liter Subject Engines Are Not Prone to Coolant Intrusion

103. Based on my review of documents and testimony, Ford did not identify any widescale coolant intrusion issues associated with the 1.6-liter subject engines.[63] I have not identified evidence of elevated rates of coolant intrusion issues associated with the subject 1.6-liter subject engines. Plaintiffs appear to incorrectly assume that coolant intrusion concerns that affected some other (e.g., 1.5-liter) subject engines also affected the 1.6-liter subject engine – despite the evidence strongly indicating otherwise.

---

[62] FORD-MILLER 00180657- FORD-MILLER 00180662

[63] Deposition of Michael Giunta, August 20, 2025, page 23:23-24:14

Deposition of Joseph Henne, August 13, 2025, page 56:24-57:3

Deposition of John Dunahay, August 27, 2025, page 86:4-6

104. In particular, external leakage and fire related concerns that affected certain 1.6-liter subject engines, discussed earlier in this section, were not caused by and are completely unrelated to coolant intrusion (internal coolant leakage).

105. As was discussed in the background of this report, cylinder head gasket damage and subsequent coolant intrusion can occur in any automotive engine for many different reasons. Any mass-produced engine can be expected to have a non-zero rate of coolant intrusion concerns. As such, it should be expected that some small number of 1.6-liter subject engines have experienced coolant intrusion attributable to common causes that all automotive engines are susceptible to, such as the secondary result of head gasket damage due to severe overheating (e.g., due to a failed hose or seal).

## 1.5-liter Subject Engines

106. The 1.5-liter subject engine is a smaller displacement engine that replaced the 1.6-liter subject engine. It was originally designed by Ford engineers in Dagenham, UK.[64] It is equipped with dual overhead camshafts, four valves per cylinder, a composite intake manifold, an integrated exhaust manifold, an aluminum cylinder block and head, gasoline turbocharged direct injection (GTDI), and twin independent variable cam timing (Ti-VCT), among other modern features.

64 Deposition of Randy Hansen, September 10, 2025, page 20:25-22:7
Deposition of John Dunahay, August 27, 2025, page 43:6-18




Figure 13 Image of a Ford 1.5-liter EcoBoost I4 ("Subject") engine.[65]

107. The 1.5-liter subject engine was first used in the 2014 Ford Fusion, where it produces a maximum of 181 horsepower and 185 lb-ft of torque in that application while also exhibiting a combined fuel rating of 28 miles per gallon.[66] Ford last used the 1.5-liter subject engine in the 2020 Fusion. Aspects of the 1.5-liter's design (including its cylinder head gasket) evolved over the class period. The four-cylinder 1.5-liter subject engine was replaced in model-year 2021 by a 1.5-liter displacement three-cylinder (i.e., further downsized) engine of Ford's "Dragon" family of engine.[67]

108. Ford used the 1.5-liter subject engine in the following subject vehicles: [68]

a. 2014-2019 Ford Fusion

b. 2017-2019 Ford Escape

---

[65] https://fordauthority.com/fmc/ford-motor-company-engines/ford-ecoboost-family/ford-1-5l-ecoboost-i4-engine/

[66] Ford Brochure for 2014 Fusion, https://cdn.dealereprocess.org/cdn/brochures/ford/2014-fusionhybrid.pdf
https://www.caranddriver.com/reviews/a15108767/2014-ford-fusion-se-15l-ecoboost-automatic-test-review/

[67] Deposition of Randy Hansen, September 10, 2025, page 83:9-84:4

[68] Defendant Ford Motor Company's Amended Answers and Objections to Plaintiffs' Interrogatories, Set Two, Vanessa Miller et al. v. Ford Motor Company, U.S.D.C. Eastern District of California, Case No. 2:20-cv-01796-TLN-CKD

[redacted]

Figure 14 Ford slide describing some of the planned differences between the 1.5- and 1.6-liter subject engines (slide deck produced while the 1.5-liter was still in the pre-production phase).[69]

109. The 1.5-liter subject engines' cylinder blocks feature an open deck face design and feature three "saw-cut" coolant passages in the bore bridge regions between its cylinders. Like most modern automotive engines, it is equipped with a multilayer steel head gasket.

110. The cooling system of all 1.5-liter subject engines is equipped with dozens of components including a coolant reservoir (degas bottle), radiator, heater core, other coolers (charge air, engine oil, transmission, etc.), thermostat, among others, the composition and routing of which varies from application to application (e.g., model to model, model-year to model-year, and depending on optional features).

111. All 1.5-liter subject engines are equipped with a water pump that is mechanically driven by the engine, that circulates coolant throughout its cooling system when the engine is running.

112. Some 1.5-liter subject equipped vehicles are equipped with automatic engine start-stop ("auto-start-stop") functionality, and those vehicles are also equipped with additional electrically driven ("auxiliary") water pumps that can maintain flow through the cabin heater core (to maintain heater function), and other cooling system components when the engine is not running (e.g., during auto-start-stop events). The specific components and

[69] FORD-MILLER 00278714, page 4

routing of them varies from application to application, but as an example, an annotated diagram of the cooling system for a 1.5-liter subject engine used in an auto-start-stop equipped 2015 Ford Fusion is shown in Figure 15.




Figure 15 Annotated diagram of the cooling system for a 1.5-liter subject engine in a 2015 Fusion (with automatic engine start-stop functionality).[70]

113. Unlike many of the 1.6-liter subject engines, the 1.5-liter subject engines' cylinder heads are equipped with integrated exhaust manifolds (see Figure 16).

[70] 303-03A Engine Cooling - 1.6L EcoBoost (132kW/180PS) – Sigma, Engine Cooling – Component Location, Alldata.com (2015 Ford Escape 2WD, L4-1.6L Turbo)




Figure 16 Photograph of cylinder heads from an exemplar 1.6- and 1.5-liter subject engines with the integrated exhaust manifold (only present on the 1.5-liter subject engine) circled in red.[71]

114. In deposition, Ford engineer Mr. Brewer described Ford's motivation for using integrated exhaust manifold (IEM) on the 1.5-liter subject engine. He testified that *"When we do an integrated exhaust manifold and we integrated the exhaust manifold in the head, that is a very [e]ffective action for a turbocharged engine because it cools the exhaust gas off, lets you run higher cylinder pressures, higher cylinder temperatures, and still have the other components of the engine survive… as we went to integrated exhaust manifolds, fundamentally, the duty cycle of the engine will go up because the integrated exhaust manifold lets the rest of the components survive that. So, the 1.5 was running higher temperature and pressures than the 1.6 liter did."*[72]

115. His testimony demonstrates that although beneficial in many ways, the 1.5-liter engines' integrated exhaust manifold places additional demand on the engine's cooling system that the 1.6-liter engine was not exposed to.

116. However, the 1.5-liter subject engine is equipped with a robust system to detect and react to the onset of engine overheating. For example, it is equipped with both a metal temperature sensor (i.e., cylinder head temperature sensor, or CHT) mounted in the IEM that detects the temperature of the cylinder head assembly,[73] and an engine coolant temperature (ECT) sensor that detects the temperature of the engine's coolant. If either the ECT or CHT sensor detects abnormally high temperatures (i.e., the onset of an

---

[71] LILLO_2025-8-28_IMG_0758.JPG

[72] Deposition of Todd Brewer, September 17, 2025, page 170:24-171:18

[73] Deposition of John Rollinger, August 19, 2025, page 33:1-25

overheat event), then the vehicle's computer control system applies the following progressive "fail safe cooling" modes:[74]

a. Stage 0: If the engine's temperature increased beyond normal the temperature gauge on the vehicle's instrument panel moves into the red zone.

b. Stage 1: If engine temperatures continue to increase, then the Powertrain Check Lamp is illuminated, and a diagnostic trouble code (P1285) is stored in the vehicle's computer system.

c. Stage 2: If the driver ignores the Stage 0-1 warnings and continues driving the vehicle and engine temperatures continue to increase, then two out of four of the engine's cylinders are disabled and the engine's maximum speed is progressively limited from 3,000 to 800 rpm (i.e., the engine's power output is progressively derated). Also, an additional diagnostic trouble code (P1299) is stored in the vehicle's computer system.

d. Stage 3: If the driver continues to ignore the Stage 0-2 progressive warnings and symptoms and engine temperatures continues to rise then eventually the Powertrain Check Lamp will flash for 30 seconds, and then the engine will be switched off.

117. Considering the extensive engine temperature sensing, warning, and control systems that the 1.5-liter subject engine is equipped with, it is challenging, if not impossible, for a driver to severely overheat the 1.5-liter subject engine without ignoring numerous warnings and drivability symptoms for a prolonged period.

118. Although the Plaintiffs suggest that 1.5-liter subject engine equipped vehicles are prone to fire incidents due to coolant leaks, there is no evidence to support that theory. Nor are the 1.5-liter engines susceptible to the cylinder head cracking failure mechanism (and associated fire concerns) that some certain 1.6-liter subject engines experienced, due to their unique geometry. However, some, but certainly not all, members of the proposed class with 1.5-liter subject engine equipped vehicles have experienced coolant intrusion concerns that have led to engine repairs, which will now be discussed.

## 1.5-liter Subject Engine Coolant Intrusion Concerns

119. Ford has numerous processes to monitor for issues with their vehicles after sale.For example, Ford analyzes warranty data to try to identify any assembly or manufacturing issues that arise early in the life of their vehicles, and then it continues to monitor the data and try to identify any high-impact customer concerns that arise later in the life of their vehicles, so that they can be investigated and addressed, if needed.[75] Ford engineers

[74] Engine Cooling - System Operation and Component Description, Alldata.com (2014 Ford Fusion FWD, L4 1.5L Turbo)

[75] Deposition of John Dunahay, August 27, 2025, page 82:9-84:6

often request that parts replaced under warranty be returned to them so that they and/or their suppliers can inspect and test the parts and understand why they were replaced.[76]

120. Around August or September 2017, Ford engineers noticed the rate of 1.5-liter subject engine warranty exchanges were increasing. They began investigating and found that some of the engines were experiencing coolant leaking internally into their cylinders (i.e., coolant intrusion was occurring).[77] Affected vehicles were found to often experience depletion of coolant from the cooling system and symptoms associated with low coolant level such as overheating warnings, as well as white smoke (steam) emanating from the tailpipe as a result of coolant evaporating and burning in the engine's combustion chamber. They also found that often the coolant intrusion issue progressed to mild drivability concerns such as engine misfires (especially upon cold startup) and illumination of the check engine light. However, contrary to what the Plaintiffs suggest, 1.5-liter subject engine coolant intrusion issues were rarely found to result in severe internal engine damage or failure.[78]

121. With regards to the progression and symptoms associated with 1.5-liter subject engine coolant intrusion concerns,

a. Ford engineer Mr. Knott testified that, *"… these take so long to progress, right, you start out with probably some tailpipe smoke, actually steam, you may or may not notice that. It progresses to some coolant loss. If you're not checking your coolant regularly you wouldn't notice that. And then it progresses slowly all the way towards maybe you get a check engine light or something like that…"*[79]

b. Ford engineer Mr. Dunahay testified that *"this issue, coolant intrusion, begins very, very slowly. And I cannot remember hearing about any immediate failure associated with this engine – or with this particular design robustness issue. The engine eventually will start to smoke in the tailpipe, eventually get misfires. Et cetera. And the customer goes in gets it diagnosed. But I cannot remember an instance where there was an engine resulted in being a loss-of-mode-of-power."*[80]

c. Ford's Field Review Committee describes the 1.5-liter coolant intrusion condition as resulting in "[redacted]

[76] Deposition of Randy Hansen, September 10, 2025, page 37:1-40:18
Deposition of Timothy Knott, September 24, 2025, page 49:4-23
FORD-MILLER 00221021 Sept. 2019 6 Panel re 1.5L.pptx

[77] Deposition of Michael Giunta, August 20, 2025, page 23:23-24:14
Deposition of John Dunahay, August 27, 2025, page 31:19-35:24

[78] Deposition of John Dunahay, August 27, 2025, page 17:3-18:9

[79] Deposition of Timothy Knott, September 24, 2025, page 82:8-84:2

[80] Deposition of John Dunahay, August 27, 2025, page 94:8-101:5

[redacted]

122. The information and evidence that I have reviewed in this case supports the conclusion that the 1.5-liter subject engine coolant intrusion failure mechanism is slow to develop and results in warnings, such as illumination of the check engine light, and mild drivability symptoms, such as a rough running engine shortly after a cold startup, that should prompt a driver to seek repair long before any more severe symptoms occur.

123. In deposition, a Ford engineer, Mr. Hansen described that once the 1.5-liter subject engine's concerns were recognized, all replaced engines were returned to his laboratory for disassembly and inspection. During the teardowns, his team noticed head gasket damage and began to investigate the cause. He describes that then *"A lot of people (got) involved to make sure we did it the right way. A lot of analysis, a lot of testing. I mean, it was – a lot of work and we did it. We had to get it done. Everyone had that attitude. Let's get this resolved right now."*[82]

124. Indeed, the records show that once recognized, Ford performed extensive inspections, testing and analysis, to determine the root cause of 1.5-liter coolant intrusion concerns.

125. Ford engineers noticed that engines returned due to coolant intrusion exhibited corrosive damage on or around the bore bridge region of their cylinder block deck, like is shown in Figure 17, resulting in a coolant leak path forming between the saw-cut region of the cylinder block and a cylinder.

---

[81] FORD-MILLER 00456910

[82] Deposition of Randy Hansen, September 10, 2025, page 86:13-89:25

[redacted]

Figure 17 Photograph showing corrosive damage to the bore bridge area (left side of the image) of a cylinder block on a 1.5-liter subject engine which created a path for coolant to leak from the saw-cut region of the block into the cylinder. The bore bridge area on the right side of the image is healthy and undamaged. [83]

126. Ford engineers then evaluated the possibility that any of a wide variety of factors, some of which were related to manufacturing (e.g., damage introduced during assembly), cylinder head joint dynamics (e.g., wear/scrubbing), local flows and temperatures (e.g., coolant stagnation and boiling), chemistry (e.g., coolant composition) and electrochemistry (e.g., galvanic reactions), contributed to the corrosive failure mechanism.

127. Analysis of warranty data showed that the rate of exchange of 1.6-liter subject engine was much lower than that of the 1.5-liter subject engine and that similar corrosion and coolant intrusion issues were not occurring in the 1.6-liter subject engine. Rather, the coolant intrusion failure mechanism appeared to be unique to certain 1.5-liter variants of the Sigma engine family – and not the result of defect in shared design features (e.g., the saw-cut bore bridges).

[83] Ford 6-Panel Presentation titled “Coolant Intrusion Sigma 1.5L Engine,” September 3, 2019, Page 2 or 8. (FORD-MILLER 00221021)

[redacted]

Figure 18 [redacted]

128. Further analysis of warranty data revealed that the rate of repairs associated with 1.5-liter model-year 2017-2019 subject vehicles was substantially higher than earlier model-year vehicles that were also equipped with the 1.5-liter subject engine. As such, design or manufacturing changes implemented around model-year 2017 were suspected to be promoting the failure mechanism.

129. During their investigation, Ford engineers installed thermocouples inside the saw-cut region of a 1.5-liter subject engine and measured temperatures in the area during operation. Their measurements revealed that sometimes, and especially when the engine was shut down while hot and coolant flow through the block ceased (due to the mechanical water pump shutting off with the engine), coolant would boil within the saw cut region of the cylinder block, especially during automatic engine stop-start events. [85] It is undesirable for coolant to boil within an automotive engine cylinder block, as coolant boiling issues have the potential to create a corrosive environment among other undesirable affects.

---

[84] Ford FSQR Presentation, January 24, 2022, FORD-MILLER 00441292 (Exhibit 125 from the deposition of Timothy Knott, September 24, 2025)

[85] Deposition of Michael Giunta, August 20, 2025, page 43:18-45:4

Deposition of Joseph Henne, August 13, 2025, page 56:5-57:3

130. After considering many possible causes for the bore bridge corrosion damage and subsequent coolant intrusion observed in 1.5-liter subject engines, Ford determined that the [redacted], [86] which was the vast majority of the 1.5-liter subject vehicles affected by the coolant intrusion condition.

[redacted]

[redacted] [redacted]

131. Many Ford witnesses were questioned in deposition about the 1.5-liter subject engine coolant intrusion failure mechanism(s), and they all explained that coolant boiling in the saw-cut region of the cylinder block, especially during hot engine shutdown events, is the root cause of the coolant intrusion issues.[88] Furthermore, Ford has produced extensive documentation of their inspections, testing, and analysis that they performed to substantiate that conclusion.

---

[86] FORD-MILLER 00138279

[87] Ford FSQR Presentation, January 24, 2022, FORD-MILLER 00441299 (Exhibit 125 from the deposition of Timothy Knott, September 24, 2025)

[88] Deposition of Michael Giunta, August 20, 2025, page 24:15-25:1

Deposition of Joseph Henne, August 13, 2025, page 56:24-57:3

Deposition of Timothy Knott, September 24, 2025, page 101:4-25

Deposition of John Dunahay, August 27, 2025, page 19:15-20:18, 25:5-26:15

132. The 1.5-liter subject engine failure mechanism for vehicles equipped with auto-start-stop functionality can be summarized, as follows,

a. Coolant boils within the saw-cut region of the cylinder block during hot engine shutdowns (e.g., during automatic engine start/stop events)

b. As a result of the boiling coolant, corrosive damage forms in the cylinder bore bridge area of the cylinder block assembly.

c. The sealing ability of the cylinder head gasket in the area of the corrosive damage becomes compromised, and a leak path forms between the saw-cut region of the cylinder block and a power cylinder.

d. Engine coolant slowly leaks from the cylinder block into a cylinder (i.e., coolant intrusion occurs), resulting in a slow drop in engine coolant level, and possibly white smoke emanating from the tailpipe. If not addressed, the coolant intrusion eventually results in driver warnings (e.g., illumination of the check engine light) and mild drivability symptoms (e.g., engine misfires) that should prompt repair action.

133. 1.5-liter subject engine powered vehicles equipped with engine start-stop functionality are at higher risk of experiencing coolant intrusion, than those that are not. However, the propensity for coolant to boil within the saw cut region of any 1.5-liter subject engine cylinder block depends on the specific conditions (e.g., pressure, temperature, flow rate) that the engine experiences during operation, which is not just affected by start-stop operation but is also influenced by the overall design of the cooling system and the operating condition (e.g., torque and power demand) of the engine based on customer use, all of which differ from subject vehicle to subject vehicle.

134. Recall that the 1.5-liter subject engine features an integrated exhaust manifold that was not used in the 1.6-liter subject engine and that places additional demands on the cooling system. Some Ford engineers theorize that [redacted]

135. Nonetheless, the warm engine shutdown operating condition that was found to promote the coolant intrusion mechanism most commonly occurs during auto-stop-start events. As can be seen in Figure 20, nearly none (~2%) of the model-year 2014-2016 vehicles equipped with the 1.5-liter subject engine were equipped with an auxiliary water pump (and auto-stop-start), whereas all those manufactured in model-year 2017 or later were. As such, it makes sense that the model-year 2017-2019 vehicles that were standardly equipped with an auto-stop-start feature were found to be far more susceptible to the failure mechanism than earlier model-year vehicles, and that Ford engineers did not notice an elevated rate of coolant intrusion related repairs until model-year 2017 vehicles had been on the road for some time.

---

89 FORD-MILLER 00140733

| | | | | | | |
|---|---|---|---|---|---|---|
| Escape 1.5L Sigma | N/A - 1.5L Not Offered | | | 568k w/Pump | | |
| Fusion 1.5L Sigma | 192k w/o Pump<br>4300 w/Pump | | | 179k w/Pump | | |
| Model Year | 14MY | 15MY | 16MY | 17MY | 18MY | 19MY |

Figure 20 Chart listing the approximate count of 1.5-liter subject engine equipped vehicles (Escapes and Fusions) that are equipped with or without an auxiliary water pump.

136. Although the rate of coolant intrusion repairs associated with 1.5-liter subject engines that are not equipped with automatic engine stop-start is smaller than those with the feature, it is not zero. Although those engines do not experience coolant boiling within the saw-cut region during automatic engine stop-start events, as that function is not available, they may still be exposed to boiling coolant during operation or engine shutdown events, such as when the vehicle is parked and the engine shut off at the end of a trip. The 1.5-liter subject engines, like any automotive engine, can also experience coolant intrusion due to any of the many common causes for it, including as the secondary result of engine overheating problems (e.g., due to a failed hose or seal).

## Actions Taken by Ford to Repair and Mitigate 1.5-liter Subject Engine Coolant Intrusion Concerns

137. Ford provides technicians with guidance regarding how to properly diagnose and repair 1.5-liter subject engine coolant intrusion issues. For example, in technical service bulletin (TSB) 19-2139, they explain that some vehicles *"may exhibit low coolant level, white exhaust smoke and/or runs rough condition with or without an illuminated malfunction indicator light (MIL) with only diagnostic trouble codes (DTCs) P0300, P0301-P0304, P0316, P0217, P1285 and/or P1299 stored in powertrain control module (PCM). This may be due to coolant intrusion into the cylinder."* If one or more of those symptoms are present, then they recommend that diagnostics, including a five-hour coolant system pressure test, and inspection of the cylinders for signs of coolant intrusion (if warranted).[90]

[90] Cooling system is pressurized to 20 psi and left for 5 hours. If the pressure drops more than 4 psi over that period, then the spark plugs are removed and the cylinders inspected for signs of coolant intrusion.

138. Ford advises that 1.5-liter subject engine coolant intrusion issues should be repaired by replacing the engine short block assembly, which includes replacement of the cylinder block and the components inside it. Because the 1.5-liter subject engine failure mechanism does not typically result in cylinder head damage, they do not recommend that the complete engine long block assembly (including the cylinder head) be replaced.

139. After gaining an understanding of the failure mechanism that led to an elevated rate of 1.5-liter subject engine coolant intrusion concerns, Ford took numerous actions to remedy the issue.

140. In April-June 2019 (depending on the model of vehicle), Ford introduced a redesigned cylinder block assembly that utilizes cross drilled passages, rather than saw-cuts, to cool the bore bride regions of the engine block. The cross drilled design prevents coolant from contacting the bore bridge region affected by the coolant intrusion failure mode, and eliminates the possibility of the coolant intrusion failure mechanism from occurring. Hence, Ford deemed the cylinder block cross-drill change a permanent corrective action (PCA) for the issue.

141. Accordingly, vehicles equipped with 1.5-liter EcoBoost engines manufactured during or after about April 2019 are not susceptible to the coolant intrusion failure mechanism, nor are earlier vehicles equipped with a replacement engine with a cylinder block of the cross drilled design. Around the same time as the PCA was introduced, Ford also made changes to the design of the cylinder head gasket used in the 1.5-liter subject engine to improve its robustness. As can be seen in Figure 23, [redacted]

[91] Deposition of Timothy Knott, September 24, 2025, page 106:11-107:4

[redacted]

Figure 21 [redacted]

[redacted]

Figure 22 [redacted][93]

[92] Ford FSQR Presentation, January 24, 2022, FORD-MILLER 00441289 (Exhibit 125 from the deposition of Timothy Knott, September 24, 2025)

[93] Ford FSQR Presentation, January 24, 2022, FORD-MILLER 00441309-00441310 (Exhibit 125 from the deposition of Timothy Knott, September 24, 2025)

[redacted]

Figure 23 [redacted][94]

142. Ford also took action to mitigate coolant intrusion concerns for 1.5-liter subject vehicles manufactured before the PCA that were already on the road.

143. More specifically, the subject vehicles equipped with a 1.5-liter engine and the auto-start-stop feature that were most susceptible to coolant intrusion were also equipped with electric auxiliary water pump(s) capable of continuing engine coolant flow even when the engine is shut off. Ford engineers found that continued operation of the auxiliary water pump for a (longer than originally prescribed) period when the engine is shut off prevented the boiling within the saw-cut region of the engine block that was at the root of the issue. With that understanding, they developed, tested, and released a software-based remedy (field service action) that altered the operation of the auxiliary water pump to mitigate 1.5-liter coolant intrusion concerns.[95]

[94] FORD-MILLER 00441296 (slide 11 of Ford PowerPoint titled "FSQR: 24-Jan-2022")

[95] Deposition of Michael Giunta, August 20, 2025, page 45:5-48:16, 50:18-51:2
FORD-MILLER 00174856

[redacted]

Figure 24 [redacted] [96]

144. Ford released the following bulletins and programs to address coolant intrusion concerns associated with the 1.5-liter subject engine equipped vehicles manufactured before the PCA was applied:

a. Customer Satisfaction Program 19B37 was introduced on December 12, 2019, for the model-year 2017-2019 1.5-liter Ford Escape and Fusion. As part of the program, technicians were told *"to reprogram the Powertrain Control Module (PCM) using Integrated Diagnostic Software (IDS) release 116.02 or higher. The new PCM calibration will improve cooling and reduce the potential for coolant intrusion into the cylinders by operating the external coolant pump for a period of time following engine shut down. This service must be performed on all affected vehicles at no charge to the vehicle owner."* In other words, they were told to install the software (cooling system calibration) based fix that Ford developed for the coolant intrusion issue.

b. Customer Satisfaction Program 21N12 was introduced on June 9, 2022, for the model-year 2017-2019 1.5-liter Ford Escape and Fusion, which "*provides a no-cost, one-time repair (if needed) to the 1.5L short block, due to coolant intrusion to the cylinder bores, for 7 years of service or 84,000 miles from the warranty start date of the vehicle, whichever occurs first.*" In other words, Ford extended the engine warranty coverage for coolant intrusion related repairs.

[96] FORD-MILLER 00404777 (slide 3 of a Ford PowerPoint titled "Connected Vehicle and Coolant Intrusion")

145. Ford witnesses testified that the 19B37 campaign was highly affective at preventing coolant intrusion from occurring in 1.5-liter subject engines.[97] When describing the 19B37 fix in deposition, Ford engineer Mr. Dunahay testified that *"So the – on the 1.5-liter where the root cause is the stagnant coolant, we were able to keep the coolant moving with an auxiliary pump. And that eliminated the boiling in the saw cut which eliminated the root cause."*[98]

146. As can be seen in Figure 25, the rate of 1.5-liter subject engine coolant intrusion repairs substantially decreased following introduction of the 19B37 campaign (or FSA).

[redacted]

Figure 25 [redacted]

147. Many earlier (model-year 2014-2016) vehicles equipped with the 1.5-liter subject engine were not equipped with an auxiliary water pump, so they were not included in the FSA.[99] However, those earlier model subject vehicles also exhibited a much lower failure rate than the model-year 2017-2019 vehicles, because as discussed above, those

---

[97] Deposition of John Dunahay, August 27, 2025, page 31:2-18

[98] Deposition of John Dunahay, August 27, 2025, page 26:17-22

[99] Deposition of John Dunahay, August 27, 2025, page 29:9-25

vehicles were not equipped with the auto-stop-start functionality that promoted the coolant intrusion failure mechanism.[100]

148. Ford reports show that it did not recognize the 1.5-liter subject engine coolant intrusion failure mechanism during pre-production testing because the dynamometer testing that it performed on the engine did not replicate the precise vehicle operation that led to the failure mechanism, including the real-world cooling system pressures and engine start-stop dynamics.[101] Such challenges are reasonable even with diligent, extensive pre-production testing, as the 1.5-liter coolant intrusion failure mechanism is complex, unique, and operating condition dependent, and it is impossible for an automotive manufacture to test an engine under all conditions that it may experience in the field.

149. While, as discussed above, Ford's preproduction testing of the subject engines was extensive, not every failure possible failure mechanism can be identified prior to release. Ford, like other automobile manufacturers, has processes in place to monitor performance post-sale for purposes of continuous improvement and to detect quality issues that may need to be addressed. Ford, like other automobile manufacturers, also has processes in place to address issues that are identified post-sale, such as issuing technical service bulletins ("TSBs"), Customer Satisfaction Programs ("CSPs"), and recalls. The existence of such processes and improvements does not indicate that Ford's pre-production testing was inadequate, but rather the reality that new unforeseen issues can arise in the field after a vehicle has been on the road for tens of thousands of miles or several years.

150. The 1.5-liter subject engine coolant intrusion failure mechanism does not affect all vehicles with the engine and takes time and mileage in service to develop. It could not possibly have been recognized by Ford immediately after the vehicles with those engines were first sold. As can be seen in the timeline in Figure 26, after becoming aware of an elevated rate of 1.5-liter subject engine coolant intrusion repairs associated with model-year 2017 vehicles in late 2017, Ford acted quickly and gained an understanding of the cause for the repairs within a few months, and then addressed the issue with field and permanent corrective actions withing about a year and a half. Considering the type and complexity of the issue, and the scope of the corrective action (new design and manufacture of a complex component) Ford's response to the issue was impressively fast.

---

[100] Deposition of Timothy Knott, September 24, 2025, page 77:21-78:25

Deposition of John Dunahay, August 27, 2025, page 28:6-29:7, 86:7-24

[101] Todd Brewer Deposition Exhibit 114

[redacted]

[102] FORD-MILLER 00221220

## 2.0-liter Subject Engines

151. The 2.0-liter subject engine is part of Ford's Duratec family of engines.[103] It was originally designed by Mazda before its design responsibility was transferred to Ford staff in Europe and then in North America.[104]



Figure 27 Image of a 2.0-liter subject engine.[105]

152. Ford used the 2.0-liter EcoBoost engine in at least the following vehicles:

a. 2013-2019 Ford Escape

b. 2013-2020 Ford Fusion

c. 2013 Ford Transit Connect

d. 2015-2018 Ford Edge

e. 2016-2019 Lincoln MKC

[103] Deposition of Michael Giunta, August 20, 2025, page 9:15-10:18

[104] Deposition of John Dunahay, August 27, 2025, page 43:20-44:2
Deposition of Timothy Knott, September 24, 2025, page 17:20-19:19

[105] https://www.fordcomponentsalesllc.com/powertrain/ford-2-0l-ecoboost-engine/

f. 2016-2020 Lincoln MKZ

153. However, only the following subject vehicles equipped with saw-cut blocks are included in the Plaintiffs' proposed class,

a. 2016-2019 Ford Escape

b. 2016-2019 Ford Fusion

c. 2015-2018 Ford Edge

d. 2016-2019 Lincon MKC

e. 2016-2019 Lincoln MKZ

154. The 2.0-liter subject engine is larger and more powerful than the 1.5- and 1.6-liter subject engines and, in some subject vehicles, was an optional upgrade over a smaller displacement engine.

Table 3 Cylinder bore diameter, piston stroke length, and maximum power output of 1.5-, 1.6- and 2.0-liter subject engines.[106]

| | **Cylinder Bore Diameter [mm]** | **Piston Stroke Length [mm]** | **Maximum Power Output, MY 2017 [horsepower]** |
|---|---|---|---|
| **1.5-liter Subject Engine** | 79 | 76.4 | 181 |
| **1.6-liter Subject Engine** | 79 | 81.4 | 197 |
| **2.0-liter Subject Engine** | 87.5 | 83.1 | 245 |
| **2.3-liter Subject Engine** | 87.5 | 94.0 | 310 |

155. The 2.0-liter subject engine is equipped with dual overhead camshafts and a twin independent variable camshaft timing (Ti-VCT) system, a gasoline direct injection fuel system, a turbocharger and associated hardware, among other modern features.[107] Like

[106] Engine mechanical specifications from Alldata.com

[107] 303-01B Engine - 2.0L EcoBoost (177kW/240PS) – MI4, Engine Overview, Alldata.com (2015 Ford Escape FWD, L4 2.0L Turbo)

the 1.5-liter subject engine, but unlike the 1.6-liter subject engine, it is equipped with an integrated exhaust manifold and a cylinder head temperature (CHT) sensor.

156. The design of the 2.0-liter subject engine evolved over the period of the subject vehicles' manufacture; one component that changed was the cylinder head gasket that seals the portion of the cylinder block that the Plaintiffs allege is defectively designed.

157. Some 2.0-liter subject engines used in model-year 2015-2019 (starting and ending model-year depending on the model) subject vehicles are equipped with a cylinder block that features saw-cut bore bridges.[108] My understanding is that the Plaintiffs do not intend to include vehicles with earlier or later built 2.0-liter subject engines that are not equipped with saw-cut bore bridge in their proposed class, so those engines will not be discussed in detail or referred to as "subject" in this report.

158. As can be seen in Figure 28, the 2.0-liter subject engine cylinder block removed from named Plaintiff Mullens 2017 Ford Edge has saw cuts. The geometry of the cylinder block differs from that of the smaller displacement (1.5- and 1.6-liter) subject engines. For example, as can be seen in Figure 28, the deck is of a "semi-open" design (with bridges connecting the cylinders to the rest of the deck), rather than a fully open design.

[108] According to Ford, the Escape had a saw cut for a short period of time in 2015, identified by part number GN-388-AA

Defendant Ford Motor Company's Amended Answers and Objections to Plaintiffs' Interrogatories, Set Two, Vanessa Miller et al. v. Ford Motor Company, U.S.D.C. Eastern District of California, Case No. 2:20-cv-01796-TLN-CKD




Figure 28 Photographs of a 2.0-liter subject engine removed from a 2017 Ford Edge (owned by named Plaintiff Mullens) and its semi-open deck (with bridges connecting the cylinders to the rest of the deck) and saw-cuts in its bore bridges.[109]

159. Unlike the 1.6-liter subject engines, the 2.0-liter subject engine's cylinder head assembly is equipped with an integrated exhaust manifold (IEM) that is cooled by the cooling system and an engine cylinder head temperature sensor. As can be seen in Figure 29, the design of the 2.0-liter subject engines IEM differs from that of the 1.5-liter subject engines IEM, both of which differ from the design of the 1.6-liter engines exhaust port

[109] LILLO_2026-2-11_IMG_0435, LILLO_2026-2-11_IMG_0651, LILLO_2026-2-11_IMG_0668

and non-integrated manifold. The presence (or absence) and differing design of the subject engine IEM's impacts the heat loading the different displacement subject engines cooling system experiences, which has the potential to affect the coolant intrusion failure mechanisms at-issue in this matter.




Figure 29 Photograph of the exhaust ports in the integrated exhaust manifold (IEM) portion of 2.0-liter and 1.5-liter subject engine cylinder head assemblies, and the four exhaust ports of a 1.6-liter. Notice that the design of the IEM differs between the 1.5- and 2.0-liter subject engines, and that the 1.6-liter subject engine is not equipped with an IEM or cylinder head temperature sensor.[110]

160. 2.0-liter subject engines are equipped with MLS type cylinder head gaskets that evolved in design over the class period and differ in design from the 1.5- and 1.6-liter subject engines. As can be seen in Figure 30, not only are the 2.0-liter subject engine gaskets geometrically larger and laid out differently (e.g., with differently located coolant and oil passage opening) than the gaskets used in the smaller displacement subject engines, but it also features more metallic layers. It is obviously not interchangeable with the gaskets for the 1.5- and 1.6-liter subject engines (nor are the 1.5- and 1.6-liter subject gaskets interchangeable with each other, either).

[110] LILLO_2026-2-11_IMG_0310.JPG, LILLO_2025-8-28_IMG_0528.JPG, LILLO_2026-2-11_IMG_0311.JPG




Figure 30 Photograph of the MLS cylinder head gaskets removed from a 1.6-liter and 2.0-liter subject engine. Notice the substantial difference in size, geometry and layout of the at-issue gaskets.[111]

[111] LILLO_2026-2-11_IMG_1194.JPG




Figure 31 Photograph of the MLS cylinder head gasket removed from a 1.6-liter and 2.0-liter subject engine. Notice that the 2.0-liter subject engine gasket contains more metallic layers than the 1.6-liter subject engine gasket.[112]

161. 2.0-liter subject engines are equipped with a water pump that is mechanically driven by the engine and circulates coolant throughout the engine's cooling system. Some later model-year 2.0-liter subject engine equipped vehicles have auto-stop-start functionality and electric auxiliary water pump(s) that can maintain coolant flow when the engine is shut off, such as during stop-start events. The components used in the cooling systems of 2.0-liter subject engines, and the routing of them, varies from subject vehicle to vehicle depending in part on the model, model-year, and features (e.g., with or without auto-stop start) of the vehicle.

162. Although the Plaintiffs suggest that 2.0-liter subject engine equipped vehicles are prone to fire incidents, there is no evidence to support that theory. However, some, but certainly not all, members of the proposed class with 2.0-liter subject engine equipped vehicles have experienced coolant intrusion concerns that have led to engine repairs, which will now be discussed.

## 2.0-liter Subject Engine Coolant Intrusion Concerns

163. In or around 2017, Ford warranty data showed an increase in engine exchanges (mostly due to coolant intrusion) in 2.0-liter subject engines manufactured during or after March

[112] LILLO_2026-2-11_IMG_0988.JPG, LILLO_2026-2-11_IMG_1145.JPG

2016, which coincided with when Ford had implemented a change in the design and supplier of the engine's cylinder head gasket. [113]

[redacted]

Figure 32 [redacted]

164. Ford found that owners or operators typically sought repair for the 2.0-liter subject engine's coolant intrusion due to concern about a low coolant level, white smoke from the exhaust, the check engine light or other warnings illuminated on the instrument panel, and/or mild drivability issues such as a rough running (e.g., misfiring) engine.

165. In mid-2016, which was before Ford began to observe the coolant intrusion concerns, Ford had introduced the newly designed cylinder head gasket (part number ending in -DA) into 2.0-liter subject engines. Ford made the cylinder head gasket change with the intent of improving the fatigue life of the gasket.[115] However, as will be further discussed, the change contributed to the cause of coolant intrusion issues, particularly in model-year 2017 vehicles. Because coolant intrusion takes some time to develop, there

---

[113] Deposition of Michael Giunta, August 20, 2025, page 23:23-24:14

Deposition of Joseph Henne, August 13, 2025, page 219:17-220:24

Deposition of John Dunahay, August 27, 2025, page 84:7-25

FORD-MILLER 00221434- FORD-MILLER 00221435

[114] FORD-MILLER 00139399 (April 2020 ppt re Gasket Scrubbing & Corrosion 2.0L MY2017-2019 Escape & Edge), slide 4 of 7.

[115] Deposition of Joseph Henne, August 13, 2025, page 165:10-166:6

was a delay between the change in the cylinder head gasket and when coolant intrusion began to develop in engines with the new cylinder head gasket.

166. As can be seen in Figure 33, the original 2.0-liter subject engine head gasket (part number ending in -CA, supplied by Dana) covered the top of the saw-cut in the bore bridge area, preventing coolant in the area from contacting the cylinder head. The newly designed -DA gasket featured a slot in the bore bridge area which improved the gaskets flexure and fatigue life. But, as Ford later discovered and as explained in the paragraphs below, it also caused greater incidents of coolant intrusion because it exposed the cylinder head surface above the saw-cut to contact with coolant.

[redacted]

Figure 33 [redacted]

167. When Ford inspected returned 2.0-liter subject engines, they found that leak paths formed between the saw-cut region of the cylinder block and cylinder(s) due to corrosive damage to the cylinder head or block in that area. [117]

[116] FORD-MILLER 00139399

[117] For example, FORD-MILLER 00221436

## Initial Engine Teardown Observations

[redacted]

Figure 34 [redacted].[118]

168. After further analysis, Ford discovered that the [redacted][119] which, in engines that were returned due to coolant intrusion, [redacted]

[118] FORD-MILLER 00360118 November 29, 2017, slide 3 of 37

[119] Ford FSQR Presentation, January 24, 2022, FORD-MILLER 00441292 (Exhibit 125 from the deposition of Timothy Knott, September 24, 2025), FORD-MILLER 00441293

Deposition of Joseph Henne, August 13, 2025, page 182:18-185:5

Ford witness, Mr. Henne testified that the coating used for the redesigned Dana supplied head gaskets in the 2.0-liter subject engines also was a contributor to the cause of coolant intrusion concerns, but that the coating used for the Federal-Mogul head gaskets in the Sigma subject engines is not thought to be a factor in coolant intrusion concerns. Both suppliers used fluoropolymer (rubber) materials for the coating, but the composition of those materials differed. The Dana gaskets were equipped with a coating called FKM, and the Federal-Mogul gaskets with coatings called FP 20 and FP 30. He explained that *"Federal-Mogul's fluoropolymer is much less sensitive to chemical reactions so… On the Dana gasket their coating, and I'll say it's a substandard coating to today's, you know, testing and evaluation, contributed to the issues. The Federal-Mogul coating is much better, performs much better."*

[redacted][120]

[redacted]

Figure 35 [redacted][121]

169. As described by Ford, [redacted][122]

170. One of the Ford witnesses for this matter, Mr. Brewer, co-authored a paper on the topic of gasket scrubbing in 2017. As he describes, *"Scrubbing and fretting of the cylinder head gasket joint can lead to gasket and/or cylinder head and cylinder block failures. As engine specific output and engine component temperatures continue to elevate with modern engine designs, this failure mode is becoming more common. The failure mode is a complex interaction of the cylinder head, cylinder block, head gasket, and head bolt*

---

[120] FORD-MILLER 00140382- FORD-MILLER 00140384

Deposition of Michael Giunta, August 20, 2025, page 24:15-25:1

Deposition of Joseph Henne, August 13, 2025, page 57:5-11, 83:7-90, 127:22-129:21

Deposition of John Dunahay, August 27, 2025, page 20:19-21:9

[121] FORD-MILLER 00226407 July 16, 2020, slide 11 of 24.

[122] FORD-MILLER 00140382

*behavior. It is a system level effect and cannot be studied or resolved by an individual component."*[123]

171. Notice that the 2.0-liter subject engine failure mechanism differs from the 1.5-liter subject engine and is initiated by cylinder head gasket scrubbing rather than coolant boiling within the engine block.

172. As shown in Figure 36, the 2.0-liter subject engine coolant intrusion failure mechanism is sensitive to factors that vary from subject vehicle to vehicle [redacted]

[redacted]

Figure 36 [redacted]

[123] Brewer, T. and Chen, X., "Cylinder Head Gasket Fretting/Scrub Mechanism Investigation and Analysis Procedure Developments," SAE Technical Paper 2017-01-1091, 2017, doi:10.4271/2017-01-1091.

[124] Ford slide deck titled "2.0L Coolant Intrusion Status" and dated 8/19/20 (slide 13 of 14), FORD-MILLER 00410890

[redacted]

Figure 37 [redacted][125]

173. Due to the nature of the failure mechanism, the rate of 2.0-liter subject engine coolant intrusion repairs has been found to vary substantially from model to model (e.g., Escape vs Edge) and model-year to year.[126] In fact, as can be seen in Figure 38, only select model-year (mostly model-year 2017-2018) vehicles equipped with the -DA cylinder head gasket [redacted] Also, as shown in Figure 39, some model vehicles (e.g., Edge) experienced repairs at a [redacted][127]

---

[125] FORD-MILLER 00441291 (slide 6 of a Ford PowerPoint titled "FSQR: 24-Jan-2022")

[126] Deposition of John Dunahay, August 27, 2025, page 88:5-12
FORD-MILLER 00139399, slide 5
FORD-MILLER 00139252-FORD-MILLER 00139253
Deposition of John Dunahay, August 27, 2025, page 88:13-24

[127] FORD-MILLER 00410878 , FORD-MILLER 00410880

[redacted]

Figure 38 Warranty data (R/1000 v Time in Service) chart produced by Ford for exchanges of 2.0-liter subject engines in model-year 2015-2019 vehicles.[128]

[redacted]8 FORD-MILLER 00140648December 15, 2020, page 9 of 9.

[redacted]

Figure 39 Warranty rate chart produced by Ford for exchange of 2.0-liter subject engines, by vehicle model (Escape, Focus, Fusion, Corsair) and month of engine production.[129]

## Actions Taken by Ford to Repair and Prevent 2.0-liter Coolant Intrusion Concerns

174. In response to the 2.0-liter subject engine coolant intrusion concerns, Ford engineers considered implementing a customer service action in the form of a software reflash that would reduce cylinder pressures in order to slow the rate of cylinder head gasket scrubbing. However, the rate of coolant intrusion concerns associated with the 2.0-liter subject engine equipped vehicles was lower than that of 1.5-liter subject engine, and

[129] FORD-MILLER 00139399, slide 5 of 7.

such a strategy would lead to some unfavorable impacts, such as reduced engine performance, so Ford ultimately decided not to proceed with that action. [130]

175. Ford began using a cylinder block with a cross-drilled (rather than saw-cut engine block) for all model-year 2019 Edges and the cross-drill design around May 2019 (exact date depending on the model of subject vehicle) for other 2.0-liter subject engines and all model-year 2020 and later vehicles.[131] The design change served as a permanent corrective action (PCA) for the coolant intrusion issue, as the redesigned cylinder block does not allow contact between coolant and the areas of the cylinder head gasket sealing surfaces that were susceptible to scrubbing and subsequent corrosive damage.[132] As such, vehicles produced with the 2.0-liter subject engine manufactured after the PCA was introduced cannot experience the coolant intrusion failure mechanism, nor can some earlier model-year vehicles equipped with a service (replacement) engine manufactured after the PCA was implemented. [133]

176. Ford provides technicians with guidance regarding how to properly diagnose 2.0-liter subject engine coolant intrusion issues. For example, in technical service bulletin (TSB) 22-2229, they state that *"Some 2015-2018 Edge and 2017-2019 Fusion/MKZ/Escape/MKC vehicles equipped with a 2.0L EcoBoost engine may exhibit a low coolant level, white exhaust smoke and/or a runs rough condition with or without an illuminated malfunction indicator lamp (MIL). Diagnostic trouble codes (DTCs) may include P0300, P0301-P0304, P0316, P0217, P1285 and/or P1299 stored in powertrain control module (PCM). This may be due to coolant intrusion into the cylinder. To correct the condition, follow the Service Procedure to replace the long block engine assembly."* If a technician is concerned that an engine might be experiencing coolant intrusion, then the TSB instructs them to perform diagnostics, including performing a five-hour cooling system pressure test, and if the system fails the test, proceeding to remove the spark plugs and using a borescope to inspect the cylinders for indications of coolant intrusion. If coolant intrusion is discovered, then Ford advises that the engine long block assembly, which includes the cylinder block and head, be replaced.

177. The repairs necessary to fix coolant intrusion in 1.5- and 2.0-liter subject engines differ. More specifically, 2.0-liter subject engine coolant intrusion concerns are repaired by replacing the entire engine <u>long-</u>block assembly (including the cylinder block and head assemblies), whereas 1.5-liter subject engine repairs typically include replacing only the engine <u>short-</u>block assembly (which does not include the cylinder head assembly). The reason for the difference in repair action is that the 2.0-liter subject engine failure mechanism [redacted].

---

[130] Deposition of John Dunahay, August 27, 2025, page 69:19-71:16, 86:25-88:4
FORD-MILLER 00081693

[131] Deposition of Joseph Henne, August 13, 2025, page 145:20-146:19

[132] Deposition of Joseph Henne, August 13, 2025, page 83:19-84:8

[133] Deposition of Joseph Henne, August 13, 2025, page 200:12-17

[redacted][134]

178. Ford reports show that they did not recognize the 2.0-liter subject engine coolant intrusion failure mechanism during pre-production testing because the [redacted][135] Such challenges are reasonable even with diligent, extensive pre-production testing, as the 2.0-liter coolant intrusion failure mechanism is complex, unique, and operating-condition dependent, and it is impossible for an automotive manufacturer to test an engine under all conditions that it may experience in the field.[136]

## 2.3-liter Subject Engines

179. The 2.3-liter subject engine is part of the same Duratec family of engines as the 2.0-liter subject engine. As was shown in Table 3, the 2.3-liter subject engine has the same bore diameter as the 2.0-liter engine. However, its pistons traverse a longer stroke length (distance swept in the bore), which results in a larger displacement and contributes to its ability to produce a higher maximum power output.

180. According to Ford engineer, Todd Brewer, the 2.3-liter subject engine has a similar or identical cylinder head, but a longer cylinder block than the 2.0-liter subject engine, which helps it accommodate for the longer stroke length.[137] In other words, the cylinder block assembly in the 2.3-liter engine (the very component the Plaintiffs suggest is defective) has a different design than the 2.0-liter subject engine and the other smaller displacement Sigma subject engines that are at-issue in this matter.

181. Ford used the 2.3-liter saw-cut EcoBoost engine in the following *Nelson* subject vehicles: [138]

a. 2015-2019 Lincoln MKC

b. 2015-2019 Ford Mustang

c. 2016-2019 Ford Explorer

---

[134] FORD-MILLER 00209559

[135] Todd Brewer Deposition Exhibit 114

[136] Todd Brewer Deposition Exhibit 115

[137] Deposition of Todd Brewer, September 17, 2025, page 18:4-19:20
Deposition of Sara Selthofer, August 28, 2025, page 44:18-21
Deposition of Michael Guinta, August 20, 2025, page 11:21-12:18

[138] Included in and Email from Sherry Rozell (counsel for Ford) on February 2, 2024 transmitting Defendant Ford Motor Company's Amended Answers and Objections to Plaintiffs' Interrogatories, Set Two to the Plaintiffs

182. Some 2.3-liter subject engines experienced coolant intrusion and repairs as a result of the previously discussed scrubbing/corrosion-based cylinder head gasket failure mechanism that affected some 2.0-liter subject engines.[139] Ford investigated coolant intrusion concerns associated with 2.3-liter subject engines. As described by Ford engineer, Mr. Brewer, in deposition, some 2.3-liter subject engines were found to have experienced coolant intrusion due to the same cylinder head gasket scrubbing based failure mechanism that affected some 2.0-liter subject engines, but at much lower rates than the 2.0L.[140]

*Q: Was the 2.3-liter engine also part of the 2.0-liter coolant intrusion investigation?*

*A: We looked at 2.3 significantly. The warranty we were seeing in the field said 2.3 did not have nearly as- nearly as many claims, as many failures as 2-liter. So, the concentration was on 2-liter, but the entire way we looked at 2.3 as well.*

…

*Q: So, what was the ultimate conclusion in terms of the root cause for the 2.3-liter?*

*A: Again, I will stress 2.3 never had anywhere close to the same amount of claims, the same amount of warranty claims or engine replacements as the 2 liter. But the ones we did have, again, was the scrubbing motion, which was much less significant on 2.3 liter because of the differences in the block and the differences in the stroke and structure that we talk about earlier. So, it was similar, but it was nowhere close to the same magnitude.*

…

*Q: Okay. And the root cause of the 2.0 liter and 2.3 liter was found to be the same?*

*A: Correct, with different magnitudes, as – as we just discussed.*

183. Ford's investigation effort into Duratec engine coolant intrusion concerns and the contribution of cylinder head gasket design changes, as well as the finding that the coolant intrusion was caused by a cylinder head gasket scrubbing based failure mechanism, was discussed in the previous section, so will not be repeated here.

184. It is unsurprising that Ford found that 2.3-liter subject engines experienced the scrubbing-based coolant intrusion failure mechanism at a different (lower) rate than some 2.0-liter subject engines, considering the differences in the design between the engines, including the difference in the size of the engine blocks.

185. Ford began using a cylinder block with a cross-drilled (rather than saw-cut) design for the at-issue 2.3L engines in mid-2019.[141] The design change served as a permanent

---

139 Deposition of Michael Guinta, August 20, 2025, page 27:21-28:8

140 Deposition of Todd Brewer, September 17, 2025, page 74:7-78:5

141 FORD-MILLER 00368712 - FORD-MILLER 00368725

corrective action (PCA) for the coolant intrusion issue, as the redesigned cylinder block does not allow contact between coolant and the areas of the cylinder head gasket sealing surfaces that were susceptible to scrubbing and subsequent corrosive damage.[142] As such, vehicles produced with the 2.3-liter subject engine manufactured after the PCA was introduced cannot experience the coolant intrusion failure mechanism, nor can some earlier model-year vehicles equipped with a service (replacement) engine manufactured after the PCA was implemented.[143]

186. There is no evidence to indicate that the 2.3-liter subject engines are abnormally susceptible to fire incidents for any reason, let alone as a result of coolant intrusion.[144]

## Analysis of Warranty Repair Records

187. I have reviewed and qualitatively analyzed warranty data produced in this matter ("warranty data"). The warranty data includes a variety of information about individual warranty claims, including but not limited to the vehicle identifying information (e.g., VIN number, model, model-year, etc.), as well as repair information such as the time in service and mileage at the time of the repair, the repair related costs (e.g., labor, materials, total), a narrative that sometimes describes the technicians' diagnostic findings and repair actions, as well as a causal part number associated with the repair.

188. Dr. Kristin Lennox of Exponent Inc. is performing a quantitative analysis of the warranty data. I have provided her with some engineering guidance, discussed in this section, so that she can best focus her statistical analysis on the warranty claims most relevant to this matter. More specifically, I provided her with a list of causal codes and cost parameters to use to help identify coolant intrusion repairs among non-intrusion related repairs also present in the dataset.

189. The coolant intrusion repairs that are at-issue in this matter are properly repaired by replacing the engine short block assembly or long block assembly. More specifically,

   a. Per TSB 19-2139, 1.5-liter subject engine coolant intrusion issues are properly repaired by replacing the engine short block. However, based on the records that I have reviewed in this matter, 1.5-liter coolant intrusion concerns are occasionally repaired by replacing the entire engine long block assembly.

   b. Per TSB 19-2346, 2.0-liter subject engine coolant intrusion issues are properly repaired by replacing the engine long block assembly.

---

[142] Deposition of Joseph Henne, August 13, 2025, page 83:19-84:8

[143] Deposition of Todd Brewer, September 17, 2025, page 33:8-14

[144] Ford witnesses, including Mr. Guinta, are unaware of any fire incident associated with 2.3-liter subject engine coolant leaks.

Deposition of Michael Guinta, August 20, 2025, page 181:11-13

c. 2.3-liter subject engine coolant intrusion issues should be repaired in the same manner as 2.0-liter subject engine coolant intrusion issues by replacing the engine long block assembly.

d. 1.6-liter subject engines are not known to have experienced widescale coolant intrusion issues. Nonetheless, a finding of coolant intrusion in a 1.6-liter subject engine is likely to result in an engine short or long block replacement.

190. Additionally, the Plaintiffs specifically allege that the subject engine cylinder block assembly is defective, so the repairs at-issue in this matter should involve replacement of that allegedly defective component (i.e. an engine short block or long block replacement).

191. Ford's warranty data produced in this matter includes a "causal part" identified by the servicing technician for each repair, and the warranty record narratives may indicate other replaced parts as well. There are specific causal part numbers that from a technical perspective, are most logically and likely associative with coolant intrusion repairs. For example, both the TSB 19-2139 and TSB 19-2346 explicitly state that a causal part number of 6009 (engine short block assembly) should be used for 1.5- and 2.0-liter subject engine coolant intrusion warranty claims. However, it's understandable that some dealerships may choose to use other causal codes, such as 6006 (engine long block), 6007 (service engine assembly, which is an engine long block with additional parts), or 6010 (engine block) for some repairs, instead. It would be reasonable to use those four causal parts to identify the most relevant repairs, for this matter.

192. The warranty data produced in this case also includes claims associated with a variety of other causal codes including 6051 (cylinder head gasket), 6049 (cylinder head assembly) and 6065 (cylinder head bolt), and 6011. I reviewed claims associated with those additional codes, and found some to be relevant to the failures at issue in this case, but also many to not be. As such, I advised Dr. Lennox that including repairs with those additional causal codes in her analysis will add some relevant repairs but will also reduce the fidelity of the dataset as a whole (i.e., it will result in a higher fraction of the repairs she analyzes being irrelevant, with inclusion likely to result in false positives in the repair counts). It would be reasonable to evaluate claims for all eight causal parts. However, it would inevitably lead to higher than actual at-issue repair counts and rates. One way to mitigate that issue is by identifying repairs with those causal parts that have costs that are unrealistically low for an engine replacement to be involved.

193. The total cost to replace subject engine short or long block assemblies under warranty is well more than $1,500. In reviewing warranty claims, I found that many of the least relevant repairs (e.g., rental car charges, spark plug replacements, oil leak and other minor repairs) were less than that. Dr. Lennox provided me with randomly selected samples of 100 repairs from the 1.6-, 1.5-, 2.0- and 2.3-liter subject engine warranty datasets (of causal code 6006, 6007, 6009, 6010 repairs). I found that none of the four hundred randomly sampled claims had a cost of repair less than $1,500 and likely documented a coolant intrusion repair. As such, I advised Dr. Lennox that from an automotive engineering perspective, it would be reasonable to exclude warranty claims

that have a total cost of less than $1,500 from that dataset in her analysis, as the vast majority, if not all, of those claims should not pertain to engine short or long block replacements. This is true as a logical matter and is corroborated by my data review.

194. I reviewed all four hundred of the randomly selected warranty claims that Dr. Lennox provided me with. Upon reviewing the datasets, I found that many of the claims in the dataset are unlikely to have been caused by coolant inclusion. This is to be expected, because engine short and long blocks can be replaced or coded as a causal part for many different reasons. The following are examples of some such claims (emphasis added):

a. 2015 Ford Escape, 1.6-liter subject engine, 0.5 year/14,103 miles (Claim Key 1142913) The narrative includes *"VERIFIED CONCERN,* ***VEHICLE WILL NOT START. CHECKED OIL. NO OIL SHOWN ON DIPSTICK. BROUGHT VEHICLE INTO SHOP AND INSPECTED. ATTEMPTED TO TURN ENGINE OVER MANUALLY. UNABLE TO TURN OVER ENGINE BY HAND. FOUND SOURCE OF ENGINE OIL LEAK IS UNDER FRONT TIMING COVER. REMOVED FRONT TIMING COVER IN VEHICLE AND PRESSURIZED OIL GALLEY WITH COMPRESSED AIR. FOUND LEAK COMING FROM OIL PUMP. FURTHER INSPECTION FOUND 2 LOOSE BOLTS ON THE TOP OF THE OIL PUMP ASSEMBLY.*** *REMOVED TIMING BELT AND FOUND CRANK AND BOTH CAMS WILL NOT TURN BY HAND."* Those notes indicate the subject vehicle experienced an engine failure from running out of oil due to an unaddressed oil leak caused by loose bolts. The repair is unrelated to coolant intrusion.

b. 2018 Ford Mustang, 2.3-liter subject engine, 3.8 years/47,151 miles (Claim Key 15488048): The narrative for the repair includes *"FOUND #3* ***PISTON ROD CAME APART*** *AND DAMAGED THE BLOCK AND THE CYLINDER HEAD. SENT METAL THROUGH THE INTAKE AND THE TURBO. REPLACED THE LONG BLOCK, TURBO, INTAKE AND ALL ONE TIME USE PARTS."* This describes a connecting rod failure (a "thrown rod"), a mechanical issue that can occur in any automotive engine for a variety of reasons but is unlikely to be related to coolant intrusion.

c. 2016 Lincoln MKC, 2.0-liter subject engine, 3.7 years/32,635 miles (Claim Key 16889274): *"VERIFIED ROLLING IDLE ,PERFORMED IGNITION TEST PASSED ,REMOVED INTAKE MANIFOLD VERIFIED* ***HEAVY CARBON ON INTAKE VALVE AND INTAKE PORTS,SOAKED AND CLEAN INTAKE VALVE CLEANED CARBON OF HEAD AND INTAKE MANIFOLD ,REINSTALLED REMOVED AND REPLACED SPARK PLUGS DUE TO HEAVY CARBON FOULING,****RESET KAM RETEST DRIVE OK AT THIS TIME."* Those notes describe a valve and spark plug carbon fouling issue and repair that is unrelated to coolant intrusion.

d. 2019 Ford Escape, 1.5-liter subject engine, 3.1 years/59,942 miles (Claim Key 11978573): The narrative for the repair states, *"VERIFIED CONCERN ON TEST DRIVE SHUDDER FEELING WHEN DRIVING, RETURNED TO SHOP, CONNECTED SCAN TOOL, PERFORMED SELF TEST NO CODES PRESENT. CHECKED MODE 6 DATA AND FOUND CYLINDER 4 SHOWING RECENT*

*MISFIRE. PERFORMED TEST DRIVE WHILE MONITORING POWER BALANCE AND VERIFIED MISFIRE IS PRESENT. SWAPPED CYLINDER 4 COIL WITH CYLINDER 1, PERFORMED TEST DRIVE CONCERN STILL PRESENT, REMOVED* ***CYLINDER 4 SPARK PLUG FOUND CRACKING ALONG THE PORCELAIN. REPLACED CYLINDER 4 SPARK PLUG****, REASSEMBLED, PERFORMED KAM RESET, MISFIRE PROFILE RELEARN THEN TEST DRIVE. VERIFIED REPAIR."* This indicates that the subject vehicle experienced a spark plug failure and repair for reasons unrelated to coolant intrusion.

e. 2013 Ford Escape, 1.6-liter subject engine, 0.1 year/641 miles (Claim Key 255471): *"ENG IDLES HIGH,SQUEEL NOISE. REMOVE ENG COVER DIAG NOISE W. STETHOSCOPE REATTACH BREATHER HOSE AT INTAKE TUBE."* These notes indicate this new vehicle had idle and noise concerns that were, at least in part, due to a disconnected crankcase hose, likely as a result of an initial assembly issue. There is no indication that the repair is related to coolant intrusion.

f. 2015 Ford Mustang, 2.3-liter subject engine, 4.3 years/58,041 miles (Claim Key 18470750): The narrative for the repair includes, *"WHEN STARTING ENGINE FOUND BLUE SMOKE FROM EXHAUST AND SMOKE AMOUNT DID NOT CHANGE WITH ENGINE TEMP OR RPM, PCM SELF TEST DTC P0302, REMOVED CYLINDER 2 SPARK PLUG FOUND COVERED IN OIL, INSERTED BORESCOPE INTO CYLINDER 2 AND FOUND OIL IN CYLINDER, REMOVED FROM BUMPER AND COOLING MODULE REMOVED ENGINE ASSEMBLY AND REMOVED CYLINDER HEAD INSPECTED HEAD AND FOUND NO PROBLEMS WITH CYLINDER HEAD, REMOVED CYLINDER 2 PISTON AND FOUND* ***OIL CONTROL RINGS BROKEN*** *ALLOWING OIL TO PASS INTO THE COMBUSTION CHAMBER, REMOVED AND REPLACED SHORT BLOCK, TEST DRIVE NO FURTHER ISSUES."* These notes describe a piston oil control ring failure which is unlikely to be related to coolant intrusion.

g. 2013 Ford Escape, 1.6-liter subject engine, 1.3 years/16,983 miles (Claim Key 6946860): *"NOISE COMIMG FROM LOWER ENGINE AREA AND TURBO ASSY,KOEO NO CODES P1000 PRESENT, OIL LEAK DEBRIS AROUND CYLINDER HEAD/TURBO AREA, CK OIL PRESSURE 45 PSI, POWER BALANCE TEST, R&R OIL PAN TO INSPECT CONECTING ROD.* ***FOUND #1 ROD DAMAGE AND CYLINDER BLOCK SCORED #1 CYLINDER WALLS****, DRAIN COOLANT AND RECLAIM FREON FROM A/C SYSTEM TO R&R ENGINE ASSY FROM VEHICLE TO REMOVE CYLINDER HEAD TO INSPECT* ***FOUND DAMAGE CAMSHAFTS AND CAPS****,PERORM ENGINE COST CAP, CONTACTED HOTLINE, APPOVAL TO REPLACE ENGINE ASSY WITH LONG BLOCK.*" The notes indicate that many of the engine's internal components suffered damage. There are many potential causes for the issue, including a lubrication system problem. However, based on this information, it is highly unlikely that the repair is related to coolant intrusion.

h. 2019 Ford Escape, 1.5-liter subject engine, 2.6 years/34,138 miles (Claim Key 11600157): The narrative includes, *"SCAN TEST AND DIAG NO CODES STORED*

*ROAD TEST.* ***UNABLE TO DUPLICATE ISSUE AT THIS TIME"*** These diagnostic notes indicate that a technician was unable to confirm any issue with the vehicle. There is no indication that the claim is related to a coolant intrusion repair.

i. 2015 Ford Mustang, 2.3-liter subject engine, 1.3 years/25,753 miles (Claim Key 6095734): The narrative for the repair includes *"VERIFY ENGINE NOISE AND CHECK OIL AND AND CHECK* ***COOLANT LEVEL OK*** *.WHILE ENGINE RUNNING TRYING TO ISOLATE NOISE .PISTON BROKE AND ENGINE SEIZED AND PISTON DAMAGE TO BLOCK .VERIFY WITH SHOP FOREMAN AND CUT OPEN FILTER AND FOUND METAL AND CHECK FOR CODES NO CODES FOUND .FOUND* ***ROOT CAUSED CYLENDER 3 PISTON ROD BROKEN*** *....OK TO REPLACE LONG BLOCK."* These notes indicate that the engines coolant level was found to be normal, which is inconsistent with an intrusion (or other coolant leakage) issue, and describe a connecting rod failure that is unlikely to be related to coolant intrusion.

j. 2013 Ford Escape, 1.6-liter subject engine, 0.8 years/29,668 miles (Claim Key 2328440): The narrative states *"MAINTENANCE PERFORM FUEL INDUCTION SERVICE,"* which indicates that the claim pertains to maintenance actions, not a coolant intrusion repair.

k. 2019 Lincoln MKC, 2.0-liter subject engine, 1 year/11,221 miles (Claim Key 6188078): The narrative states ***"SUPPLIED CUSTOMER WITH 2 DAY RENTAL"*** which indicates that the claim pertains to charges for a rental vehicle, and not a coolant intrusion repair.

l. 2016 Ford Mustang, 2.3-liter subject engine, 4.8 years/51,228 miles (Claim Key 19906239): The narrative for the repair includes, *"VERIFIED CONCERN OF KNOCKING NOISE WHEN ACCELERATING. NOISE SEEMS TO BE COMING FROM BOTTOM OF ENGINE. CANCELLED #1 INJECTOR AND NOISE WAS REDUCED. REMOVED OIL PAN AND INSPECTED BEARINGS OKAY, REMOVED ENGINE. PERFORMED INSPECT AND* ***FOUND #1 PISTON LOOSE IN CYLINDER BORE****. REPLACED SHORT BLOCK PER WORKSHOP."* These notes indicate that the engine was replaced due to an issue with the piston assembly, not coolant intrusion.

m. 2013 Ford Escape, 1.6-liter subject engine, 0.2 years/487 miles (Claim Key 1596390): The narrative includes *"TEST WITH IDS CODE P0127 0219 1299. REFILL COOLING SYSTEM AND BLOCK CHECK.* ***FOUND COMBUSTION IN COOLING SYSTEM AND COOLANT IN THE OIL SYSTEM. REMOVE CYLINDER HEAD. AND CHECK. FOUND CRACK IN #3 CYL WALL AND HEAD WARPED .030. REPLACE ENGINE WITH ASSEMBLY*** *AND TRANSFER PARTS."* Those notes indicate that the engine suffered failure early in its life (after less than 500 miles) due to a crack forming in one of its cylinders, likely a result of a unique manufacturing issue, not coolant intrusion from the head gasket interface.

195. I also found that even among the warranty repair records that included an indication of coolant intrusion; sometimes the finding of coolant intrusion, itself, was likely a secondary effect of other issues or component failures that are unrelated to the Plaintiffs' theory of defect, rather than being reflective of an engine replacement due to the failure mechanisms at issue in this case. For example, the following warranty repairs, although they involved a finding of coolant intrusion, likely resulted from severe overheating of the engine for reasons unrelated to the Plaintiffs' theory of defect:

a. 2016 Ford Escape, 1.6-liter subject engine, 1.8 years/57,049 miles (Claim Key 7555990): The narrative includes "C/S CHECK ENGINE LIGHT ON AND ENGINE OVERHEATING MEASSAGE ON DASH..." … "DTCS: P0303=CYLINDER#3 MISFIRE DETECTED. P1285=CYLINDER HEAD OVERTEMPERATURE CONDITION. P1299=OVERTEMPERATURE PRO- TECTION ACTIVE.HAD STEAM COMING OUT OF EXHAUST. CYL .#3 FULL OF COOLANT.PERFORMED TEARDOWN TO DETERMINE…" Those notes indicate that the engine suffered from a severe overheat condition which likely resulted in the cylinder head gasket acutely failing, and coolant flooding (or filling) one of the engines cylinders. The root cause of the engine failure is the underlying reason for the overheating event (e.g., a cooling system component failure), which is unlikely to be related to the Plaintiffs' theory of defect.

b. 2013 Ford Fusion, 1.6-liter subject engine, 3.8 years/54,047 miles (Claim Key 19321142): The narrative includes, C/S "VEHICLE IS STILL OVERHEATING" … "CHECKED FOR OVER HEATING CONCERN. PRESSURE CHECKED COOLING SYSTEM, CHECKED OIL PRESSURE, REMOVED SPARK PLUGS. FOUND COOLANT LEAKING INTO CYLINDER #4. REMOVED ENGINE, SET ON WORK BENCH. REMOVED CYLINDER HEAD. INSPECTED. FOUND CYLINDER AND ENGINE BLOCK WARPED (OUT OF SPECS). REPLACED ENGINE WITH LONG BLOCK ASSEMBLY ALSO REPLACED THERMOSTAT." Both the customer's stated concern of continued overheating and the technician finding of a warped cylinder head (typically caused by severe overheating) indicate that the vehicle had an unresolved overheating issue leading up to the repair. Although the technician found coolant intrusion, the intrusion was likely a secondary result of the head gasket failing because of a warped cylinder head from the unaddressed overheating issue, which is unlikely to be related to the Plaintiffs' theory of defect. It is possible that a faulty thermostat contributed to the cause of the overheating concern that was at the root of the engine failure, since the technician specifically noted replacing it along with the engine long block assembly.

196. Based on my review of the samples that Dr. Lennox provided me from the warranty datasets used in her analysis, the datasets of repairs are overinclusive in that they all contain coolant intrusion and some non-at-issue repairs.

197. However, importantly, my analysis of the individual warranty records also shows that the warranty claims produced in this matter document a variety of different diagnostic and repair actions that have been applied to variety of different vehicles, for a variety of

different reasons, and that have resulted in different repair actions and associated costs that can only be understood via technical analysis on a case-by-case basis.

## Analysis of the Experiences of the Named Plaintiffs

198. I have investigated the named Plaintiffs' experiences and the cause of their at-issue repairs. My effort has included analysis of all the available information including but not limited to their deposition testimony and vehicle repair records, as well as physical inspection of all the available engine and/or engine components reportedly removed from certain named Plaintiffs' vehicles. I have also reviewed documentation from the inspections of the named Plaintiffs' vehicles that James Engle of Superior Forensic Engineering performed between 2022-2025.

199. The vast majority of the named Plaintiffs' vehicles were operable at the time of Mr. Engle's inspection. Per the protocol agreed upon by both parties, the inspection activities were limited to non-destructive activities, such as a scan of the computer system and cooling system pressure testing. Documentation shows that non-destructive methods were used to check the vehicle's engine for a current coolant intrusion issue, including in some cases, by performing borescope imaging of the engine's cylinders. My understanding is that at least one of the named Plaintiffs, Mr. Batdorf, has never made his vehicle available for inspection. As such, it has not been possible to inspect his subject engine for coolant intrusion, or to assess the condition of his vehicle.

200. The Plaintiffs' proposed class includes many different models of vehicles manufactured over six different model-years, as well as engines of a variety of different designs and displacement that have experienced different failure mechanisms and field performances. In the following sections, I discuss the experiences of named Plaintiffs—who owned 1.6-, 1.5-, 2.0-, and 2.3-liter subject engines—in four separate sub-sections. As will be seen, even among the sub-groups, the named Plaintiffs report experiencing a variety of different concerns (i.e., symptoms) that occurred for a variety of causes, resulting in a variety of repair actions and associated repair costs. In my investigation, I have found no evidence of a singular failure mechanism (coolant intrusion or otherwise), repair action, or cost experienced by all named Plaintiffs, let alone one that could potentially impact all members of the Plaintiffs' broadly proposed class.

201. My understanding is that there are currently 25 named Plaintiffs and several others who were once class representatives but are no longer involved in this at-issue lawsuit. In each sub-section, I provide a summary of all 25 named Plaintiffs' experiences and repairs (in tables), followed by a more detailed discussion of select named Plaintiff experiences and their repairs.

202. Before discussing the named Plaintiffs' experiences, some brief discussion regarding the issue of spoliation of evidence in this matter, including the Plaintiffs (or their experts) unnoticed disassembly and tampering with of engines removed from named Plaintiffs' subject vehicles) is warranted.

## Spoliation of Evidence

203. Plaintiffs' counsel or representatives collected evidence removed from four named Plaintiffs' vehicles during subject repairs including at least the following:

a. The 1.5-liter subject engine short block assembly replaced from Mr. Christodaro's 2017 Ford Escape in October 2020,[145] collected by a representative for the Plaintiffs.

b. The 2.0-liter subject engine (long block assembly) replaced from Ms. Miller's 2017 Ford Edge around January 2020,[146] collected by a representative for the Plaintiffs.

c. The 2.0-liter subject engine (long block assembly) replaced from Mr. Mullen's 2017 Ford Edge around August 2021,[147] collected by a representative for the Plaintiffs.

d. The 1.6-liter subject engine (long block assembly) replaced from the Wests' 2013 Ford Fusion around November 2020, picked up by Lieff, Cabraser & Bernstein, according to records.[148]

204. Plaintiffs spoliated the evidence (engine long block assemblies) from Ms. Miller's, Mr. Mullen's, and the Wests' subject vehicles before I had an opportunity to inspect them.

205. More specifically, the Plaintiffs hosted a multiparty inspection of the evidence on February 11, 2026. For planning purposes (e.g., to determine what tools might be needed), I requested that Ford's counsel request any photographs or documentation of the evidence collected by Plaintiffs' counsel or experts. About a week before the multiparty inspection was scheduled to start, the Plaintiffs produced seven photographs, some of which showed clear indications that the three engine long block assemblies removed from Ms. Miller's, Mr. Mullen's, and the Wests' subject vehicles had been previously disassembled and tampered with.[149] For example, they showed that timing system components and camshafts had been removed from the engines, which are not actions documented in the repair records, or actions that a technician typically would take when performing a long block replacement.

206. After receiving the seven photographs, I asked defense counsel to request more information and documentation pertaining to any prior evidence disassembly efforts that the Plaintiffs or their experts may have performed. My understanding is that, to this date, the Plaintiffs still have not provided any such information or documentation.

207. On the day of the multiparty inspection, I joined Plaintiffs' counsel and two Plaintiffs' experts, Dr. Colin Jordan and Scott Marshall, at SAFE Laboratories in Goleta, CA. At that time, I confirmed that all three of the evidence long block assemblies had already

---

145 PLTF_0004157-PLTF_0004161 (Darrick Christodaro Deposition Exhibit 13)

146 PLTF_0003247-PLTF_0003246 (Vanessa Miller Deposition Exhibit 9)

147 PLTF_0005026- PLTF_0005028

148 PLTF_0004869-PLTF_0004877 (Amber West Deposition Exhibit 6)

149 Ford Engines for Inspection.pdf (seven photographs that Plaintiffs' counsel shared of the evidence engines)

been extensively disassembled and tampered with and that many of their internal components had been stored separately in boxes. I asked the Plaintiffs' counsel and experts for information regarding prior engine disassembly effort(s), but none provided any. I also asked them whether they had any chain-of-custody documents pertaining to the handling of the evidence over the 5 or 6 years since it was collected. They did not report having any.




Figure 40 Annotated photograph of the 1.6-liter engine long block assembly (less the many components that someone previously removed) from the Wests subject vehicle, taken at the start of the multiparty inspection on February 11, 2026.[150]

[150] LILLO_2026-2-11_IMG_0025




Figure 41 Photograph of a box with many engine components removed by someone from the 1.6-liter subject engine supposedly replaced from the Wests' subject vehicle taken at the start of the multiparty inspection on February 11, 2026.[151]

208. During the multiparty inspection, the cylinder head and cylinder head gaskets were removed from all three-evidence subject engine long assemblies. During that process, it was further apparent that the heads and gaskets had already been removed at least once prior to the multiparty inspection and then re-installed. For example, after removing the cylinder head from Ms. Miller's subject engine, I found the pistons to be labeled by a number handwritten in ink, which proved that the head had been previously removed.

[151] LILLO_2026-2-11_IMG_0035




Figure 42 Photograph of the cylinder block assembly and pistons in the engine removed from Ms. Miller's subject engine, as taken shortly after the cylinder head was removed during the multiparty inspection on February 11, 2026. Notice that the pistons are labeled by cylinder number (1-4), which proves that the cylinder head had already been removed at least once by someone prior to the multiparty inspection.[152]

209. The process of disassembling engines is inherently destructive and necessarily leads to the loss and mixing of fluids, and to material changes to components at-issue such as the head gasket. Hence, it is standard practice for experts to work with counsel to notify all involved parties before disassembling evidence engines associated with litigation matters, as often they want to attend such activities and have input on the inspection protocol. As part of the disassembly efforts that were performed prior to the multiparty inspection, someone separated, cleaned, and certainly altered (possibly damaged) the engine components directly at-issue in this matter, including the cylinder blocks, cylinder heads, and cylinder head gaskets in Ms. Miller's, Mr. Mullen's, and the Wests' subject engines, and they did so in a manner that resulted in the material alteration and destruction of evidence with no documentation of their activities produced.

210. It should be recognized that MLS cylinder head gaskets, like those at-issue in this matter, have elastomer sealant that necessarily become damaged during disassembly. Often (and on the evidence engines), some of the sealant rips from the gasket and remains affixed to the cylinder head and block as a result of disassembly. In my analysis,

[152] LILLO_2026-2-11_IMG_0321

it would have been helpful to view the as-removed condition of the cylinder head gasket, and its sealing surfaces. However, because these components were tampered with before the multiparty inspection, that will never be possible.

211. Unfortunately, whoever performed the undisclosed disassembly not only removed the at-issue cylinder head and gasket assemblies, but they also made the poor decision to reinstall them, rather than preserve them as separate evidence items. The subject engine cylinder head gaskets are not intended for reusage and should never be reinstalled on an engine, as someone did before the multiparty inspection. A head gasket (new or used) should never be installed on an engine with dirty cylinder head and/or block surfaces, like was as done, as doing so can lead to damage of the sealing surfaces. Some of the physical features on the cylinder head gasket sealing surfaces that I am, and the Plaintiffs' experts likely are, interpreting in this matter are small (e.g., surface scratching or pitting). Due to the improper reinstallation of the cylinder heads and gaskets, I and other experts are now in the position of trying to interpret whether any damage found on the engines' cylinder head gasket sealing surfaces occurred as a result of engine operation (e.g., an engine failure mechanism) or due to the undisclosed Plaintiffs' investigator's destructive, un-noticed, and improper disassembly actions.

212. The American Society for Testing and Materials (ASTM) issues standards, including ASTM E860-22 (Standard Practice for Examining and Preparing Items That Are or May Become Involved in Criminal or Civil Litigation) and ASTM E1188-23 (Standard Practice for Collection and Preservation of Information and Physical Items by a Technical Investigator), which relate to the proper evaluation of technical information and the handling, collection, documentation, preservation, and transfer of evidence to prevent spoliation.

213. Statements in ASTM E860-22 include (bold emphasis added):

***This practice covers procedures for the examination and testing of evidence items or systems that may have been involved in a specific incident which are, or may be reasonably expected to be, the subject of civil or criminal litigation.***

***This practice is applicable when it is determined that examination or testing of evidence is required, and such examination is likely to change the nature, state, or condition of the evidence.***

*This practice is intended for use by competent forensic science practitioners with the requisite formal education, discipline-specific training (see Practice E2917), and demonstrated proficiency to perform forensic casework.*

*Definitions…*

> ***destructive testing, n—testing, examination, re-examination, disassembly, or other actions likely to alter the original, as-found nature, state, or condition of items of evidence so as to preclude or adversely affect additional examination and testing.***

> ***spoliation of evidence, n—the loss, destruction, or material alteration of an object or document that is evidence or potential evidence in a legal proceeding by one who has the responsibility for its preservation.***
>
> ***Discussion—Spoliation of evidence may occur when the movement, change, or destruction of evidence, or alteration of the scene significantly impairs the opportunity of other interested parties to obtain the same evidentiary value from the evidence as did any prior investigator.***

*This practice establishes procedures to be followed by the forensic science practitioner to document the nature, state, or condition of items of evidence. It also describes specific actions that are required for destructive testing if planned testing, examination, disassembly, or other actions are likely to alter the nature, state, or condition of the evidence so as to preclude or adversely limit additional examination or testing.*

***When the forensic science practitioner observes any change(s), alteration(s) or contamination of the evidence subsequent to the incident or collection of the evidence at the scene, such observations and findings are documented.***

***If proposed tests, examinations, or other actions are likely to cause spoliation of evidence so as to preclude additional examination or testing, the forensic science practitioner planning to perform the proposed action should take the following steps:***

> …
>
> ***Recommend that its client, or current owner of the evidence, notify other known interested parties of the proposed testing or examination, and,***
>
> ***Recommend to its client, or current owner of the evidence, that other known interested parties be given the opportunity to participate in the procedures described in 5.3 or to witness and record any such actions that may result in spoliation of evidence.***
>
> ***If compelling reasons exist for performing the actions without notifying other parties, then the forensic science practitioner, firm, or agency planning the actions should document in writing, and preserve documentation, supporting the compelling reasons for such action.***

*Forensic science practitioners working on evidence collected for criminal or civil cases should understand that there may be parties to a related potential civil or criminal case whose interests could be prejudiced if evidence is not handled in conformance with applicable standards.*

214. The actions of whoever disassembled the evidence subject engines while they were in the Plaintiffs' possession and alteration of some of the most important evidence items in

this matter, including the named Plaintiffs' cylinder head gaskets and their sealing surfaces, before I had an opportunity to inspect them, limits the evidentiary value I have been able to gain from them and, per the ASTM standards, constitutes spoliation of evidence.

## Named Plaintiffs with a 1.6-liter Subject Engine Equipped Vehicle

215. Three class representatives, including Mr. Gonzalez and Mr. and Mrs. West, had 1.6-liter subject engine equipped subject vehicles ("1.6-liter named Plaintiffs"). A brief summary of information about their subject vehicles and repairs is provided in Table 4 through Table 6, and a more in-depth discussion of their repairs is provided in the following sections.

216. All the 1.6-liter named Plaintiffs owned an earlier model-year (MY 2013-2014) vehicle, and none owned a later model (MY 2015-2016) vehicle, despite those later model-year vehicles being included in the Plaintiffs' proposed class. Recall that the 1.6-liter subject engine equipped vehicles evolved in design over the at-issue model-years. As such, the 1.6-liter named Plaintiffs' experiences should not be assumed representative of all those who owned later model-year (MY 2015-2016) vehicles that the 1.6-liter named Plaintiffs have never owned or leased.

217. None of the 1.6-liter named Plaintiffs report experiencing fire incidents. In fact, more generally, none of the class representatives with subject engines of any size (1.5-, 1.6-, 2.0-, or 2.3-liter) in the at-issue lawsuits report experiencing a fire incident. As such, the named Plaintiffs' experiences do not support the Plaintiffs' claim that incidents of coolant intrusion (or their theory of defect) results in incidents of fire.

218. All of the 1.6-liter named Plaintiffs report experiencing coolant intrusion resulting in replacement of the engine long block at a cost of about $8,000-$8,300. Recall that 1.5-liter subject engine coolant intrusion concerns are typically fixed with a lesser repair, of replacing just the engine short block assembly. In fact, as will be shown in the next section, none of the seven 1.5-liter named Plaintiffs report paying as much as either of the 1.6-liter named Plaintiffs, for their at-issue repair.

219. The 1.6-liter named Plaintiffs' experiences or reportedly experiencing coolant intrusion are highly atypical. As was previously discussed, Ford did not identify any widescale coolant intrusion issues associated with the 1.6-liter subject engines.[153] I have not identified evidence of elevated rates of coolant intrusion issues associated with the subject 1.6-liter subject engines. Nonetheless, it should be recognized that coolant intrusion concerns can occur in an automotive engine for a wide variety of reasons (e.g., head gasket damage as a secondary result of an engine overheating event, which can occur due to many different reasons), and so it is unsurprising that the Plaintiffs have

[153] Deposition of Michael Giunta, August 20, 2025, page 23:23-24:14
Deposition of Joseph Henne, August 13, 2025, page 56:24-57:3
Deposition of John Dunahay, August 27, 2025, page 86:4-6

been able to identify a few such reports. However, the cause for the 1.6-liter named Plaintiffs' subject repairs should not be assumed to be due to the Plaintiffs' theory of defect or either of the two different failure mechanisms that Ford has found to be responsible for coolant intrusion repairs in 1.5- and 2.0-liter subject engines, or any specific cause, without thorough investigation on a case-by-case basis.

Table 4 Named Plaintiffs with a 1.6-liter Subject Engine equipped vehicle

| Name | State of Residence | Vehicle | Purchased New or Used |
|---|---|---|---|
| **Gonzalez, David** | Texas | 2014 Ford Escape | New |
| **West, Amber and Evan** | California | 2013 Ford Fusion | New |

Table 5 Vehicle age and mileage at time of 1.6-liter subject engine repair or incident

| Name | Age / Mileage at Time of Subject Repair | Description of Subject Repair |
|---|---|---|
| **Gonzalez, David** | 7.4 years / 125,536 miles | C/S MIL on, engine runs poor. Technician found P0304 (misfire cyl#4) and coolant intruding into cyl#4.[154] |
| **West, Amber and Evan** | 7.4 years / 86,950 miles | C/S MIL on after extensive repairs and diag. Technician found P0304 (misfire cyl#4) and coolant intruding into cyl#4. [155] |

Table 6 Extent and cost of the 1.6-liter named Plaintiffs' Subject Repair

| Name | Extent of Subject Repair | Parts and Labor Cost of Subject Repair |
|---|---|---|
| **Gonzalez, David** | Engine long block replaced. [156] | $8,297 |
| **West, Amber** | Engine long block replaced.[157] | $7,964 |

[154] PLTF_0001 802-PLTF_0001 804 (Gonzalez Deposition Exhibit 10)

[155] PLTF_0004869-PLTF_0004877 (Amber West Deposition Exhibit 6)

[156] PLTF_0001 802-PLTF_0001 804 (Gonzalez Deposition Exhibit 10)

[157] PLTF_0004869-PLTF_0004877 (Amber West Deposition Exhibit 6)

## Mr. Gonzalez's Subject Repair

220. Mr. Gonzalez purchased a 1.6-liter subject-engine equipped 2014 Ford Escape new in September 2014. In 2021, the year prior to Mr. Gonzalez's subject repair, he reports, *"So all throughout 2021 there was a coolant leak, and I believe I replaced some parts related to the coolant leak and constantly checking the coolant levels."* He described how engine symptoms then developed, and he began noticing white smoke coming out of his vehicles' exhaust about 20,000 miles before he took the vehicle in for the subject repair.[158]

221. In February 2022, Mr. Gonzelez brought his subject vehicle to a Ford dealership with concerns that the check engine light was on, the engine ran poorly and died at idle after being started cold, and that smoke was coming from the exhaust. A technician found a P0304 (misfire cylinder #4) diagnostic trouble code stored in the computer system. He pressure-tested the cooling system, removed the spark plugs, and used a borescope to look into the engine cylinders, finding coolant inside cylinder #4. He fixed the issue by replacing the engine long block at a cost of $8,297.

222. Shortly after (about 1,200 miles) Mr. Gonzalez's subject repair, the coolant bypass valve was found to be failed,[159] a problem that could have contributed to overheating issues.

223. The 1.6-liter subject engine replaced from Mr. Gonzalez's subject vehicle has not been made available for inspection, and the cause for its replacement cannot be definitively determined. However, based on the sequence of events leading up to a following Mr. Gonzalez's subject repair, it is possible that one or more of these numerous cooling system problems, which are unrelated to the Plaintiffs' theory of defect, contributed to the cause of the repair. For example, the possibility that one or more of those cooling system problems resulted in a severe overheating event that damaged the engines cylinder head gasket and resulted in coolant intrusion, cannot be ruled out.

224. Mr. Gonzalez's subject vehicle was inspected in November 2024 when it had 177,649 miles of prior usage.[160] It did not have any engine related diagnostic troubles stored in its computer system at the time,[161] nor did borescope imaging of the cylinders reveal any indications of coolant intrusion.

## Mr. and Ms. West's Subject Repair

225. The Wests purchased a new 2013 Ford Fusion in May 2013, and they experienced a repair requiring replacement of the vehicle's engine long block assembly in October 2020, when it had 86,950 miles of prior usage.

[158] Deposition of David A. Gonzaelz, March 27, 2025, page 94:16-120:14

[159] PLTF_0001 795-PLTF_0001 796 (Gonzalez Deposition Exhibit 11)

[160] GONZALEZ_SFE_PB240169

[161] GONZALEZ_SFE_PB240180 - GONZALEZ_SFE_PB240181

226. The Wests' subject vehicle had a history of unique issues leading up their subject repair. For example, the Wests' subject vehicle was towed into a Ford dealership with 47,812 miles of prior usage because it reportedly stalled and could not be restarted after 10 minutes. A technician inspected the vehicle and was unable to duplicate the concern.[162] Records show that the vehicle was then brought to an independent repair shop on September 22, 2020, when it had 86,840 miles of prior usage, with its check engine light illuminated. A technician found diagnostic codes including P0304 (Cylinder #4 Misfire Detected), P0316 (Misfire Detected on Startup), P2560 (Engine Coolant Level Low) stored in the computer system and recommended that the vehicle be brought to a dealership for diagnosis.[163] After driving the vehicle about 100 more miles, the Wests brought it to a dealership and expressed concern that the check engine light was illuminated again despite extensive prior repairs (#3 ignition coil, valve cover, spark plugs, and all injectors replaced). A technician found a P0304 (Cylinder #4 Misfire Detected) trouble code stored in the computer system and determined via a borescope inspection that coolant was leaking into the #4 cylinder.[164]

227. Sometime after the replacement was completed, representatives for the Plaintiffs collected the 1.6-liter subject engine long block assembly removed from the Wests' vehicle to be retained as evidence. The Plaintiffs have not produced any chain-of-custody documents or photographs documenting their collection and handling of the evidence prior to the multiparty inspection that I attended on February 11, 2026.

228. I inspected the 1.6-liter subject engine that was removed from the Wests' vehicle during the multiparty inspection on February 11, 2026. Unfortunately, the engine had already been extensively disassembled, re-assembled, and tampered with prior to the inspection. As such, the condition of the engine should not be assumed the same as when it was removed.

229. After removing the cylinder head and gasket assemblies from the Wests' subject engine, I observed the damage circled in Figure 43 on the bore bridge region separating cylinder #3 and #4. Recall that the technician who performed the subject repair reports finding coolant intrusion in cylinder #4.

---

[162] PLTF_0003280-PLTF_0003281 (Amber West Deposition Exhibit 3)

[163] PLTF_0003334 (Amber West Deposition Exhibit 4)

[164] PLTF_0003263 (Amber West Deposition Exhibit 5)
PLTF_0004869-PLTF_0004877 (Amber West Deposition Exhibit 6)




Figure 43 Photograph of the damage found on the 1.6-liter subject engine cylinder block (3-4 bore bridge) removed from named Plaintiff Ms. West's vehicle.[165]

230. Unlike the previously shown examples of damage caused by the 1.5-liter (coolant boiling in the saw-cut) or 2.0-liter (scrubbing based) failure mechanisms, the cylinder block surface damage found in the Wests' engine is focused at or around interface of the cylinder head gasket and the cylinder itself, rather than closer to the saw-cut like the previously discussed failure mechanisms.

[165] LILLO_2026-2-11_IMG_0443, LILLO_2026-2-11_IMG_1465

a. For example, the damage is further away from the saw-cut and closer to the cylinder itself than the 1.5-liter subject engine cylinder block damage shown in Ford presentations (e.g., Figure 17) or found on the engine block removed from named Plaintiff Mr. Christodaro's vehicle (Figure 44); and further away than the 2.0-liter subject engine cylinder block damage shown in Ford presentations (e.g., Figure 34) or found on the engine block removed from named Plaintiff Mr. Mullen's vehicle (Figure 46).

231. Further analysis of the damage on the Wests' cylinder block would be needed before the cause could potentially be determined. However, the Wests' engine was extensively tampered with prior to my inspecting it, and all the damage found on it should not be assumed to have been the result of operation (rather than spoliation) or to have resulted from the Plaintiffs' theory of defect rather than alternative causes.

232. The Wests' subject vehicle was inspected by Ford's representative in 2022 when it had 95,290 miles of prior usage.[166] There were no misfire-related diagnostic trouble codes found stored in the vehicle's computer system, at the time.

## Named Plaintiffs with a 1.5-liter Subject Engine Equipped Vehicle

233. The Plaintiffs present seven class representatives who owned or leased a 1.5-liter subject engine equipped vehicle (1.5-liter named Plaintiffs).

234. Only one out of seven (14%) of the 1.5-liter named Plaintiffs owned or leased a model-year 2014 vehicle, one out of seven (14%) a model-year 2015, one out of seven (14%) a model-year 2016 vehicle, and none (0%) a model-year 2018-2019 vehicle. Yet, four out of seven (57%) of the persons chosen to be named Plaintiffs specifically own a model-year 2017 vehicle, most of which (75%) are, even more specifically, 2017 Ford Escapes.

235. The named Plaintiffs' collection of 1.5-liter subject engine equipped vehicles that are predominantly model-year 2017 and mostly Ford Escapes, should not be assumed representative of the Plaintiffs' much more broadly proposed class. Especially considering coolant intrusion warranty repair rates are known to have increased in model-year 2017 subject vehicles when engine-start-stop technology became a standard feature. This technology was later found to aggravate the 1.5-liter subject engine coolant intrusion failure mechanism.

236. The available evidence is consistent with a few, but not all, of the 1.5-liter named Plaintiffs having experienced coolant intrusion repairs due to the previously discussed coolant boiling/corrosion-based failure mechanism. However, only the engine short block assembly removed from Mr. Christodaro's engine was retained by the Plaintiffs as evidence, and no components from the other named Plaintiffs' engines have been made available for inspection. As such, the only subject engine that I have been able to inspect

[166] WEST_SFE_1033

and confirm to have experienced a repair due to the coolant boiling/corrosion-based failure mechanism is Mr. Christodaro's.

237. Based on my review of the available information and evidence, it is apparent that there have been a variety of causes for the 1.5-liter named Plaintiffs' at-issue repairs. For example, Mr. Cicero's 1.5-liter subject engine required replacement due to suffering unique damage including cracked valves that the technician attributed to detonation/pre-ignition, which are types of abnormal combustion. Both Ms. Balaszek and Mr. Pickering reported experiencing overheating issues that likely resulted in warpage of the cylinder head and failure of the cylinder head gasket for reasons that are likely unrelated to coolant intrusion from the saw cut, and that resulted in unique repair actions. Detonation/preignition and severe overheating (and associated head gasket damage) are failure mechanisms that can affect any downsized-turbocharged engine, like the subject engines. The fact that a variety of causes for the named Plaintiffs' at-issue repairs is evident, despite the relatively small sample size of 1.5-liter named Plaintiffs, demonstrates why all subject repairs should not be assumed to have occurred due to any specific cause—whether the Plaintiffs' theory of defect, or the coolant boiling/corrosion-based failure mechanism known by Ford, or otherwise. Rather, the cause of named Plaintiff subject repairs can only be accurately determined by performing technical investigations of them on a case-by-case basis.

238. The records show that there is no common repair action or cost associated with the 1.5-liter named Plaintiffs' at-issue repairs. Some at-issue repairs have involved replacement of a 1.5-liter subject engine short block assembly (Ford's recommended repair for a coolant intrusion concern caused by Plaintiffs' alleged failure mechanism), others replacement of the entire engine long block assembly, and others replacement of more select engine components such as the cylinder head and its gasket. Some of the 1.5-liter named Plaintiffs' at-issue repairs have been performed under warranty at little to no cost to the Plaintiff; others have been performed at customer costs ranging between about $680-$7,300. In some cases, Ford has split the cost of at-issue repairs with named Plaintiffs as a goodwill gesture, despite the vehicle being outside of warranty at the time of the repair. In some cases, third party insurance companies have paid repair costs. The 1.5-liter named Plaintiffs' experiences demonstrate that the extent and cost of at-issue repairs can only be accurately assessed on a case-by-case basis.

Table 7 Named Plaintiffs with a 1.5-liter subject engine equipped vehicle

| Name | State of Residence | Vehicle | Purchased New or Used |
|---|---|---|---|
| **Balaszek, Teresa** | Indiana | 2017 Escape | New |
| **Bozhinov, Harlampi** | Illinois | 2018 Fusion | New |
| **Christodaro, Darrick** | New York | 2017 Escape | New |
| **Cicero, Anthony** | Illinois | 2017 Escape | New |

| | | | |
|---|---|---|---|
| **Manfra, Aaron and Victoria** | Maryland | 2017 Fusion | New |
| **Pickering, Scott** | Indiana | 2014 Fusion | Used with 20,664 miles[167] |
| **Simonds, Brian** | Minnesota | 2015 Fusion | New |

Table 8 Vehicle age and mileage at time of 1.5-liter subject engine repair or incident

| **Name** | **Age / Mileage at Time of Subject Repair** | **CSP 19B37 Completed?** | **Description of Subject Repair Symptoms and Diagnostics** |
|---|---|---|---|
| **Balaszek, Teresa** | 1st Repair: 3.5 years/ 90,814 miles<br><br>2nd Repair: 7.3 years/ 145,287 miles | No[168] | 1st Repair: No description of customer concern or diagnostics on the invoice.[169] Ms. Balaszek describes noticing white smoke emerging from the hood,[170] which is consistent with an external (rather than an internal/intrusion) coolant leak.<br><br>2nd Repair: No description of customer concern or diagnostics on the invoice.[171] Ms. Balaszek describes an engine overheating incident.[172] |
| **Bozhinov, Harlampi** | 0.8 years/ 11,963 miles | Yes, at 21,715 miles[173] | C/S check Engine Light is Illuminated. Technician found P0301 (misfire cyl #1) and coolant leaking into cylinder #3. Disassembled engine and found |

[167] CARFAX Report for Mr. Pickering's Subject Vehicle, downloaded 3/15/2026

[168] Deposition of Teresa Balaszek, August 6, 2024, page 125:2-6

[169] PLTF_0000059 (Teresa Balaszek Deposition Exhibit 5)
FORD-MILLER 00085725- FORD-MILLER 00085727 (Standard Claims List for Balaszek Subject Vehicle)

[170] Deposition of Teresa Balaszek, August 6, 2024, page 78:18-85:2

[171] PLTF_0004473 (Teresa Balaszek Deposition Exhibit 3)

[172] Deposition of Teresa Balaszek, August 6, 2024, page 66:11-70:25

[173] FORD-MILLER 00455407- FORD-MILLER 00455416 (Standard Claims List for Bozhinov Subject Vehicle)

| | | | |
|---|---|---|---|
| | | | leak to be the result of a crack in the cylinder block.[174] |
| **Christodaro, Darrick** | 3.5 years/ 64,048 miles | Yes, at 51,918 miles[175] | C/S engine overheating. Technician found P0301 (misfire cyl#1), P0303 (misfire cyl#3), P1299 (Cylinder Head Overtemperature Protection Active), and cooling leaking into cylinder #1 and #3.[176] |
| **Cicero, Anthony** | 5.0 years/ 51,208 miles | Yes, at 55,373 miles[177] | C/S loosing coolant. Technician found the engine coolant level to be low, P0303 (misfire cyl#3), coolant intruding into cylinders. He disassembled the engine and found cylinder head damage, including a cracked valve, which he attributed to detonation or preignition (abnormal combustion).[178] |
| **Manfra, Aaron and Victoria** | 3.6 years/ 64,518 miles | Yes, at 59,428 miles[179] | Vehicle was brought to a Ford dealership running rough. Technician found white smoke coming from the exhaust, and coolant leaking into cylinder #2.[180] |
| **Pickering, Scott** | 1st Repair: 0.9 years/ 21,452 miles<br><br>2nd Repair: 5.5 years/ 70,590 | Not applicable.[181] | 1st Repair: C/S engine runs rough when started cold, check engine light on, blue colored smoke from the exhaust. Technician found P0303 (misfire cyl#3), coolant in cylinder #3. He disassembled the engine and found a failed head |

[174] PLTF_0000396- PLTF_0000398 (Harlampi Bozhinov Deposition Exhibit 3)
FORD-MILLER 00455407- FORD-MILLER 00455416 (Standard Claims List for Bozhinov Subject Vehicle)

[175] Deposition of Darrick Christodaro, page 93:4-95:8

[176] PLTF_0004157- PLTF_0004161 (Darrick Christodaro Deposition Exhibit 13)

[177] FORD-MILLER 00085894- FORD-MILLER 00085907 (Standard Claims List for Cicero Subject Vehicle)

[178] PLTF_0004255 - PLTF_0004265 (Anthony Cicero Deposition Exhibit 7)
FORD-MILLER 00085894- FORD-MILLER 00085907 (Standard Claims List for Cicero Subject Vehicle)

[179] FORD-MILLER 00455653 - FORD-MILLER 00455656 (Standard Claims List for Manfra Subject Vehicle)

[180] PLTF_0002281 - PLTF_0002282

[181] FORD-MILLER 00455792 - FORD-MILLER 00455816 (Standard Claims List for Pickering Subject Vehicle)

| | | | |
|---|---|---|---|
| | | | gasket and warped cylinder head.[182]<br><br>2nd Repair: C/S check engine light on, has stalled and runs rough when started in the morning, white smoke from exhaust. Technician found P0304 (misfire cyl#4) and P0316 (misfire during startup), and found coolant intrusion in cylinder #4.[183] |
| **Simonds, Brian** | 5.0 years/ 64,727 miles | Not applicable.[184] | C/S vehicle is shaking, smells of burning, and check engine light is illuminated. Technician found P0304 (misfire cyl#4) and coolant inside cylinder #4.[185] |

Table 9 Extent and cost of 1.5-liter named Plaintiffs' Subject Repairs

| Name | Extent of Subject Repair | Parts and Labor Cost of Subject Repair |
|---|---|---|
| **Balaszek, Teresa** | 1st Repair: Engine long block replacement.[186]<br><br>2nd Repair: Cylinder head gasket (but <u>not the engine short or long block</u>) replaced, along with a few other components, at a shop owned by a family member.[187] The head gasket damage that was repaired likely occurred as a secondary effect of the severe engine overheating event that reportedly preceded it. | 1st Repair: $682 paid by customer, $5,587 covered by insurance.<br><br>2nd Repair: No ($0) cost to the customer, $2,698 P&L cost discounted by the shop reportedly as part of a trade-in deal for another vehicle. |

[182] PLTF_0002648 - PLTF_0002649 (Scott Pickering Deposition Exhibit 8)

[183] PLTF_0002643 - PLTF_0002646 (Scott Pickering Deposition Exhibit 9)

[184] FORD-MILLER 00455707 - FORD-MILLER 00455723 (Standard Claims List for Simonds Subject Vehicle)

[185] PLTF_0003865 - PLTF_0003866 (Brian Simonds Deposition Exhibit 3)

[186] PLTF_0004473 (Teresa Balaszek Deposition Exhibit 3)

[187] PLTF_0004473 (Teresa Balaszek Deposition Exhibit 3)
Deposition of Teresa Balaszek, August 6, 2024, page 66:6-70:25

| | | |
|---|---|---|
| **Bozhinov, Harlampi** | Engine long block replaced. [188] | Warranty repair performed at no ($0) cost to the customer. Loaner vehicle provided during the repair. |
| **Christodaro, Darrick** | Engine short block replaced. [189] | $5,098 |
| **Cicero, Anthony** | Engine short block and cylinder head replaced.[190] The cylinder head damage (cracked valve) that was repaired is atypical for 1.5-liter subject repairs. The technician attributed to the that damage to the occurrence of detonation/preignition (abnormal combustion), which is unrelated to the Plaintiffs' theory of damage. | Warranty repair performed at no ($0) cost to the customer. Loaner vehicle provided for some of the duration of the repair. |
| **Manfra, Aaron and Victoria** | Engine short block replaced.[191] | $3,990 |
| **Pickering, Scott** | 1st Repair: Engine cylinder head and gasket assembly replaced. [192] It is likely that the cylinder head damage (warpage) that was repaired was caused by a severe overheating event, and not the failure mechanism that has led to most 1.5-liter subject engine coolant intrusion issues. The overheating may have been caused by a recently repaired external coolant leakage issue.[193] Hence, the technician replaced the warped cylinder head assembly, but not the short block assembly.<br><br>2nd Repair: Engine short block replaced.[194] | 1st Repair: Warranty repair performed at no ($0) cost to the customer.<br><br>2nd Repair: $5,384 |
| **Simonds, Brian** | Engine long block replaced.[195] (There is no explanation on the invoice as to why the entire engine long block was replaced, rather | $7,289 |

[188] PLTF_0000396- PLTF_0000398 (Harlampi Bozhinov Deposition Exhibit 3)
FORD-MILLER 00455407- FORD-MILLER 00455416 (Standard Claims List for Bozhinov Subject Vehicle)

[189] PLTF_0004157- PLTF_0004161 (Darrick Christodaro Deposition Exhibit 13)

[190] PLTF_0004255 - PLTF_0004265 (Anthony Cicero Deposition Exhibit 7)
FORD-MILLER 00085894- FORD-MILLER 00085907 (Standard Claims List for Cicero Subject Vehicle)

[191] PLTF_0002281 - PLTF_0002282

[192] PLTF_0002648 - PLTF_0002649 (Scott Pickering Deposition Exhibit 8)

[193] PLTF_0002652 - PLTF_0002653, PLTF_0002650 - PLTF_0002651 (Scott Pickering Deposition Exhibit 7 & 8)

[194] PLTF_0002643 - PLTF_0002646 (Scott Pickering Deposition Exhibit 9)

[195] PLTF_0003865 - PLTF_0003866 (Brian Simonds Deposition Exhibit 3)

| | | |
|---|---|---|
| | than just the short block assembly, as would typically be recommended) | |

## Mr. Bozhinov's Subject Repair

239. Mr. Harlampi Bozhinov purchased a 2018 Ford Fusion new in August 2018. After driving it for a little less than a year and 11,963 miles, the vehicle broke down and required an engine repair. More specifically, Mr. Bozhinov testified that while driving the vehicle on the freeway, the car started shaking, smoke began emanating from the hood, and the check engine light illuminated, so he pulled over to the side of the road. He then drove the vehicle to a Ford dealership for diagnosis and repair.[196]

240. Records show that a technician at the Ford dealership found an engine misfire related diagnostic trouble code (P0301 – misfire cylinder #1) stored in the computer system, and coolant leaking into the engine's cylinder #1. The technician removed the cylinder head and found that coolant was leaking into the cylinder due to a crack in the engine block and repaired the issue by replacing the engine's long block assembly. The repair was performed under warranty at no cost to Mr. Bozhinov. The Ford dealership also provided Mr. Bozhinov with a rental car for use while the repair was being completed.

241. All the available evidence and information indicates that Mr. Bozhinov's repair was prompted by a sudden event that resulted in a crack forming in the cylinder block of his 1.5-liter subject engine. Although his subject engine experienced coolant intrusion, neither the timeline of events (e.g., acute onset of symptoms) or physical findings associated with the repair effort (e.g., cracked cylinder block) are consistent with the engine having suffered from the slowly developing, coolant boiling-based (and corrosion inducing) failure mechanism that is known to have led to most 1.5-liter subject engine coolant intrusion repairs and that is Plaintiffs' theory of defect in this case for those engines. Ultimately, the cause for Mr. Bozhinov's subject repair cannot be definitively determined without disassembling and inspecting the reportedly damaged engine, which will likely never be possible since the engine has not been retained as evidence. However, based on the available information, the repair was likely caused by a different failure mechanism than has led to most 1.5-liter subject repairs, and there is no indication that the saw-cut feature in the cylinder block was a causal factor. Mr. Bozhinov's experience demonstrates why it is inaccurate to assume that all subject repairs have occurred due to the same cause (whether related to the Plaintiffs' theory of defect or otherwise).

242. Additionally, due to the unique circumstances associated with the damage found on Mr. Bozhinov's subject engine, the technician who performed the at-issue repair replaced the entire subject engine long block assembly, rather than just replacing the short block assembly (and reusing the cylinder head assembly), as is typically done during 1.5-liter subject repairs. Those atypical repair actions were performed under warranty and Mr.

[196] Deposition of Harlampi Bozhinov, August 9, 2024, page 84:5-94:21

Bozhinov's does not report experiencing any cost related to the repair that could possibly be common to all members of the Plaintiffs' proposed class.

243. Mr. Bozhinov's subject vehicle was inspected in December 2025 when it had 103,910 miles of prior usage.[197] There were no powertrain related diagnostic trouble codes stored in the computer system, at the time, but borescope imaging of the cylinders revealed what may be some minor leakage of coolant into one of the cylinders.[198] However, that did not appear to result in any operational issues, and a CARFAX report shows that the vehicle passed an emissions inspection a few months later in February 2026, and continued to be driven thereafter.[199]

## Mr. Christodaro's Subject Repair

244. Mr. Darrick Christodaro purchased a new 1.5-liter subject engine equipped 2017 Ford Escape in March 2017. Records show that CSPB37 (Powertrain Control Module Reprogramming) was completed on his vehicle in February 2020. Mr. Christodaro reports that about a month later, around March 2020, he began to experience engine related concerns such as shaking and starting difficulties. Records show that he brought the vehicle into a dealership with its check engine light on in March 2020 and that a technician found an engine misfire related diagnostic code stored in the computer system and an indication of coolant on one of the spark plugs. The cooling system passed a pressure check, so the technician was unable to confirm a coolant intrusion concern. He proceeded to replace the fouled spark plug.[200]

245. Mr. Christodaro reported continuing to experience similar engine concerns. Records show that in June 2020, when his vehicle had about 63,395 miles of prior usage, he brought it to a Ford dealership with a concern that the check engine light was illuminated. A technician found a P0303 (misfire cylinder #3) trouble code stored in the computer system and suspected coolant intrusion but was unable to check for it due to the cylinder #3 spark plug being seized in the cylinder head.[201]

246. Records show that a short time later, in September 2022, Mr. Christodaro brought his subject vehicle into a Ford dealership when it had 64,048 miles of prior usage with a concern that the engine was overheating. A technician found P0301 (misfire cylinder #1), P0303 (misfire cylinder #3), and P1299 (cylinder head overtemperature protection active) diagnostic codes stored in the computer system, indicating that the engine had been overheated and was experiencing misfires in two cylinders. The technician then

---

[197] Bozhinov_SFE_PC150177

[198] Bozhinov_SFE_PC150173

[199] CARAX Report for Mr. Bozhinov's Subject Vehicle, downloaded 3/15/2026

[200] Deposition of Darrick Christodaro, June 13, 2025, page 93:4-116:24
Darrick Christodaro Deposition Exhibit 4

[201] Darrick Christodaro Deposition Exhibit 6

found coolant leaking into cylinders #1 and #3. He proceeded to repair the issue by replacing the engine short block assembly at a total parts and labor cost of $5,098.

247. Sometime after the repair was completed, the Plaintiffs collected the 1.5-liter subject engine short block assembly removed from Mr. Christodaro's vehicle to be retained as evidence. The Plaintiffs have not produced any chain-of-custody documents or photographs documenting their collection and handling of the evidence prior to the multiparty inspection that I attended on February 11, 2026.

248. During the multiparty inspection, I inspected the short block assembly. As can be seen in Figure 44 (especially in comparison with Figure 17 and Figure 19), the cylinder 2-3 bore bridge region of the cylinder block from Mr. Christodaro's subject vehicle exhibits damage patterns that are consistent with the coolant boiling/corrosion-based failure mechanism that was found to be the cause of most 1.5-liter subject engine coolant intrusion repairs, and is discussed in detail earlier in this report.



Figure 44 Photograph of the cylinder block damage and coolant leak path (circled in red) found in the 1.5-liter subject engine removed from named Plaintiff Mr. Christodaro's subject engine.[202]

249. Based on all the available information and evidence, including the repair records, Mr. Christodaro's testimony, and the findings of my inspection of his subject vehicle, it is likely that his 1.5-liter subject engine began experiencing coolant intrusion as a result of the failure mechanism that prompted Ford to develop and issue CSP 19B37 (Powertrain Control Module Reprogramming) around the time that the CSP was completed on the vehicle. The issue appears to have been resolved by the subject repair in September in 2022 and the application of CSP 19B37, as there is no record of the vehicle having

[202] LILLO_2026-2-11_IMG_0151, LILLO_2026-2-11_IMG_0131

recurring coolant intrusion concerns before the vehicle was declared a total loss as a result of a collision in or around June 2023.[203]

250. Mr. Christodaro's subject vehicle was inspected in August 2023 when it had 103,144 miles of prior usage. Its engine cooling system passed a pressure test, and there was no indication of a subject engine coolant intrusion concern found at the time.[204]

## Named Plaintiffs with a 2.0-liter Subject Engine Equipped Vehicle

251. The Plaintiffs present eleven class representatives who owned or leased a 2.0-liter subject engine equipped vehicle (2.0-liter named Plaintiffs).

252. None (0%) of the 2.0-liter named Plaintiffs owned or leased a model-year 2014-2015 or model-year 2019 subject vehicle. The 2.0-liter subject engine and vehicles evolved over the class period, and their experiences should not be assumed representative of all those who owned or leased other model-year vehicles.

253. Recall that the cylinder head gasket scrubbing based coolant intrusion failure mechanism that led to most 2.0-liter subject repairs was agitated by the introduction of the redesigned cylinder head gasket in or around March 2016. Notice that ten out of eleven (90%) of the subject vehicles owned or leased by the 2.0-liter named Plaintiffs were manufactured after March 2016. The only subject vehicle manufactured before 2016, owned by Ms. Lund, experienced a cylinder head gasket failure early in this life of his vehicle (at 14,532 miles) that likely resulted from a severe overheating event, not the failure mechanism known to have resulted in most 2.0-liter subject engine coolant intrusion repairs.

254. The experience of the 2.0-liter class representatives who predominantly own vehicles that are equipped with the redesigned (part number ending in -DA) cylinder head gasket, and not earlier-built engines equipped with the better performing original (part number ending in -CA) gasket, should not be assumed representative of the Plaintiffs' more broadly proposed class of 2.0-liter Plaintiffs, which includes model-year 2014-2016 subject vehicles with the original (-CA) gasket.

255. The 2.0-liter named Plaintiffs' experiences demonstrate that members of the Plaintiffs' proposed class have experienced at-issue repairs for a wide variety of reasons. Although some, such as Ms. Miller and Mr. Mullen, report experiencing at least one engine repair that is consistent with coolant intrusion having occurred due to the scrubbing-based failure mechanism known to Ford, some at-issue repairs likely also occurred due to other causes. For example, aside from Ms. Lund's previously discussed engine overheating

---

[203] CARFAX Report for Mr. Christodaro's 2017 Ford Escape SE (1FMCU9GD5HUD28657), downloaded 3/12/2026

Mr. Christodoaro's subject vehicle was also inspected on August 2, 2023, when it's odometer rated 103,144 miles, and it still had unrepaired collision damage, and it's cooling system was found to hold pressure (CHRISTODARO_SFE_1001 - CHRISTODARO_SFE_1159)

[204] CHRISTODARO_SFE_1104

repair; Ms. Metro's 2.0-liter subject engine experienced piston ring damage, oil and fuel (not coolant) contamination of one of the cylinders; and Ms. Constable's engine experienced an issue that resulted in coolant contamination of the engine oil and associated internal engine damage – all of which are issues unlikely to be related to coolant intrusion. The named Plaintiffs' experiences and associated records and evidence demonstrate that the cause of named Plaintiffs' subject repairs can only be accurately determined by performing technical investigations of them on a case-by-case basis.

256. The records also show that there is no common repair action or cost associated with the 2.0-liter named Plaintiffs' at-issue repairs. Unlike the 1.5-liter named Plaintiffs, none of the 2.0-liter named Plaintiffs' repairs have involved replacement of a 2.0-liter subject engine short block assembly. Some of the 2.0-liter named Plaintiffs have experienced engine long block replacements, the cost of which has varied based on a variety of factors. For example, some named Plaintiffs, such as Ms. Miller, had a long block replaced under warranty at little to no cost. At least one named Plaintiff has continued driving their subject vehicle without repair (or associated cost) for more than 54,000 miles since it was diagnosed with coolant intrusion. Some of the named Plaintiffs have had engine long blocks replaced at customer costs varying from about $3,000-$8,125, depending on the circumstances, including whether Ford provided some goodwill cost assistance for the repair, despite the vehicle being outside of warranty at the time of the repair. The 2.0-liter named Plaintiffs' experiences demonstrate that the extent and cost of at-issue repairs can only be accurately assessed on a case-by-case basis.

Table 10 Named Plaintiffs with a 2.0-liter Subject Engine equipped vehicle

| **Name** | **State of Residence** | **Vehicle**<br><br>**(Manufacture Date)** | **Purchased New or Used** |
|---|---|---|---|
| **Batdorf, Tyson** | Tennessee | 2017 Lincoln MKC | Used with 60,3222 miles[205] |
| **Constable, Jillian** | Florida | 2016 Ford Edge<br><br>(MFG 6/18/2016)[206] | Used with 29,807 miles[207] |
| **Kennedy, Mark** | Minnesota | 2016 Ford Edge<br><br>(MFG 8/23/2016)[208] | Used with 34,156 miles[209] |

[205] PLTF_0000044 - PLTF_0000045 (Tyson Batdorf Deposition Exhibit 3)

[206] FORD-MILLER 00456037 (Vehicle Information Report)

[207] PLTF_0000825 - PLTF_0000826 (Jillian Constable Deposition Exhibit 2)
CARFAX Report for Mr. Constable's 2016 Ford Edge Titanium, downloaded 3/3/2026

[208] FORD-MILLER 00455892 (Vehicle Information Report)

[209] PLTF_0004579 (Mark Kennedy Deposition Exhibit 2)

| | | | |
|---|---|---|---|
| **Krecek, John** | Nebraska | 2017 Ford Edge | New |
| **Lund, Patsy** | Arkansas | 2016 Ford Escape<br><br>(MFG 11/24/2015)[210] | Used with 14,532 miles[211] |
| **Metro, Tracy** | Michigan | 2018 Ford Edge | New |
| **Miller, Vanessa** | California | 2017 Ford Edge | Used with 20,699 miles[212] |
| **Morford, Craig and Kelli** | Missouri | 2017 Ford Escape | New |
| **Mullen, Bradley** | Ohio | 2017 Ford Edge | Used with 43,956 miles[213] |
| **Pirog, Robyn** | South Carolina | 2016 Ford Edge<br><br>(MFG 5/31/2016)[214] | New |
| **Speigner, David** | Florida | 2017 Ford Escape | New |

Table 11 Vehicle age and mileage at time of 2.0-liter subject engine repair or incident

| **Name** | **Age / Mileage at Time of Subject Repair** | **Description of Subject Repair** |
|---|---|---|
| **Batdorf, Tyson** | 5.6 years/ 77,582 miles | C/S overheating, replaced thermostat, cylinder #2 misfire and that they could not remove the spark plug. Technician found P0217 (engine coolant overtemperature, P0302 (misfire cyl#2), P0316 (misfire during startup), among other trouble codes stored in the computer system. He also found the coolant level to be low, the cooling system failed a pressure test, but he was unable to remove spark plugs to check for |

210 7_1FMCU9G95GUB74249-VehicleInfoReport.pdf

211 PLTF_0000015 (Patsy Lund Deposition Exhibit 1)

212 PLTF_0003253 - PLTF_0003254 (Vanessa Miller Deposition Exhibit 5)

213 CARFAX Report for Mr. Mullen's Subject Vehicle, downloaded 3/14/2026

214 [redacted] - Vehicle Info Report

| | | |
|---|---|---|
| | | coolant intrusion. Nonetheless, the technician guessed that the engine had an internal coolant leak and recommended that the engine long block be replaced.[215] |
| **Constable, Jillian** | 4.6 years/ 73,866 miles | C/S check engine light is illuminated. The invoice contains limited discussion of the diagnostics performed, but notes that the coolant was found in the engine oil, so the engine needed to be replaced. It does not note a finding of coolant intruding into any of the cylinders. [216] |
| **Kennedy, Mark** | 5.1 years/ 52,714 miles | C/S OBD-II light is on so the remove start will not work, thinks it is emission related. Technician found P0304 (misfire cyl#4) and P0316 (misfire during startup), and coolant leaking into cylinder #4.[217] |
| **Krecek, John** | 4.1 years/ 70,532 miles | C/S Check for coolant leak and possible engine issue. Technician performed coolant pressure test and reportedly verified coolant leaking into a combustion chamber, but does not report borescopically confirming intrusion in any of the cylinders.[218] |
| **Lund, Patsy** | 4.9 years/ 49,992 miles | C/S coolant level is low. Technician found the coolant level to be low, head gasket to be failed (block tester changed color) and coolant in cylinder #2. The technician removed the cylinder head an found it to be warped,[219] which is indicative of the engine having been severely overheated. |
| **Metro, Tracy** | 4.5 years/ 98,203 miles | C/S misfire code, runs rough and stalls, found oil on cylinder #1 spark plug, low coolant level, already installed new spark plugs. Technician found misfire codes stored in the computer system related to cylinder #1 and #2, and the spark plug in cylinder #1 to be fouled with oil. He used a borescope to inspect the cylinders and found cylinder #1 to be washed with fuel, and pitting and corrosion on exhaust valve(s) and seat(s). He performed a relative compression test and found cylinder #1 to exhibit low compression. He performed a cylinder leakage test and found that the engines piston rings were leaking excessively. The technician <u>does not report discovering coolant intrusion,</u>[220] but recommended replacing |

[215] PLTF_0000042 (Tyson Batdorf Deposition Exhibit 5)

[216] PLTF_0000818 - PLTF_0000824 (Jillian Constable Deposition Exhibit 3)

[217] PLTF_0004576 (Mark Kennedy Deposition Exhibit 5)
PLTF_0004577 (Mark Kennedy Deposition Exhibit 6)

[218] PLTF_0001916 - PLTF_0001919 (John Krecek Deposition Exhibit 6)
FORD-MILLER 00455944 - FORD-MILLER 00455950 (Standard Claims List for the Krecek Subject Vehicle)

[219] FORD-MILLER 00085816 - FORD-MILLER 00085831 (Standard Claims List for the Lund Subject Vehicle)

[220] PLTF_0002604 - PLTF_0002610 (Tracey Metro Deposition Exhibit 8)

| | | |
|---|---|---|
| | | the engine long block in order to fix the piston and valve damage that was discovered. |
| **Miller, Vanessa** | 1st Repair: 1.4 years/ 36,853 miles<br><br>2nd Repair: 2.9 years/ 84,622 miles | 1st Repair: C/S engine shakes after started. Technician found P0302 (misfire cyl#2). He performed an engine compression test and found cylinder gasses leaking into the cooling system. He does not report discovering coolant intruding into any of the engine's cylinders.[221]<br><br>2nd Repair: C/S MIL on, engine runs rough. Technician found P0303 and P0316 (cyl#3 misfire codes) and coolant leaking into cylinder #3.[222] |
| **Mullen, Bradley** | 4.3 years/ 67,128 miles | C/S check for coolant loss. Technician pressure tested the cooling system, removed the spark plug for cylinder #1 and found coolant inside the cylinder.[223] |
| **Morford, Craig** | 4.5 years/ 66,331 miles | C/S check engine light was on, went off 4-5 days ago, and the vehicle seems to shake at idle. Technician found low coolant level, P0302 and P0316 (cyl#3 misfire codes) and coolant leaking into cylinder #2.[224] |
| **Pirog, Robyn** | 4.5 years/ 73,375 miles | C/S check engine light is on. Technician found P0303 and P0316 (cylinder #3 misfire codes). The cooling system failed a pressure test so he removed the spark plug in cylinder #3 and inspected the cylinder with a borescope. He found coolant in cylinder #3.[225] |
| **Speigner, David** | 5.9 years/ 62,008 miles | C/S vehicle has used 2 gallons in the last week and half, runs rough after starting. Technician pressurized the engine cooling system and found intrusion into cylinder #2.[226] |

Table 12 Extent and cost of 2.0-liter named Plaintiffs' Subject Repairs

| **Name** | **Extent of Subject Repair** | **Parts and Labor Cost of Subject Repair** |
|---|---|---|
| **Batdorf, Tyson** | No repair performed. Mr. Batdorf continued driving the vehicle until selling it to CARMAX in | Not repaired ($0) but the customer cost of the |

[221] PLTF_0003236 - PLTF_0003235 (Vanessa Miller Deposition Exhibit 7)
FORD-MILLER 00085658 - FORD-MILLER 00085667 (Standards Claim List for the Miller Subject Vehicle)

[222] PLTF_0003247 - PLTF_0003246 (Vanessa Miller Deposition Exhibit 9)

[223] PLTF_0005026 - FLTF_0005028

[224] PLTF_000041 (Crain Morford Deposition Exhibit 4)

[225] PLTF_0002830 - PLTF_0002834 (Robyn Pirog Deposition Exhibit 3)

[226] PLTF_0005105 - PLTF_0005106 (David Speigner Deposition Exhibit 8)

| | | |
|---|---|---|
| | late 2022.[227] The vehicle currently has more than 105,000 miles and there is no record of it ever experiencing a coolant intrusion repair.[228] | diagnostics performed in 5/2022 was $145. |
| **Constable, Jillian** | Engine long block replaced. [229] | $5,840 |
| **Kennedy, Mark** | Engine long block replaced.[230] | $6,398 |
| **Krecek, John** | Engine long block replaced. [231] | Ford covered some of the cost of the repair. The customer cost was $3,014. |
| **Lund, Patsy** | No repair performed while the vehicle was in Mrs. Lund's possession. [232] Engine long block was replaced after the vehicle was traded in. | Not repaired ($0) before being traded in. The vehicle was likely repaired under warranty, after the trade in. |
| **Metro, Tracy** | Engine long block replaced.[233] | $8,125 |
| **Miller, Vanessa** | 1st Repair: Engine long block replaced. [234]<br><br>2nd Repair: Engine long block replaced. [235] | 1st Repair: Warranty repair performed at no cost ($0) to the customer.<br><br>2nd Repair: $6,079 |
| **Mullen, Bradley** | Engine long block and air filter (maintenance) replaced. [236] | $6,684 |
| **Morford, Craig and Kelli** | No repair performed. The Morfords have continued driving the vehicle for more than 54,000 miles since it was diagnosed with coolant intrusion. [237] | No ($0) repair cost. Diagnostic charge of $100.[238] |

[227] Deposition of Tyson John Batdorf, page 30:11-33:17

[228] CARFAX Report for Mr. Batdorf's 2017 Lincoln MKC Reserve, downloaded 3/12/2026

[229] PLTF_0000818 - PLTF_0000824 (Jillian Constable Deposition Exhibit 3)

[230] PLTF_0004576 (Mark Kennedy Deposition Exhibit 5)
PLTF_0004577 (Mark Kennedy Deposition Exhibit 6)

[231] PLTF_0001916 - PLTF_0001919 (John Krecek Deposition Exhibit 6)

[232] FORD-MILLER 00085816 - FORD-MILLER 00085831 (Standard Claims List for the Lund Subject Vehicle)

[233] PLTF_0002604 - PLTF_0002610 (Tracey Metro Deposition Exhibit 8)

[234] PLTF_0003236 - PLTF_0003235 (Vanessa Miller Deposition Exhibit 7)

[235] PLTF_0003247- PLTF_0003246 (Vanessa Miller Exhibit 9)

[236] FLTF_0005026 - FLTF_0005028

[237] PLTF_000041 (Crain Morford Deposition Exhibit 4)

[238] Deposition of Craig Morford, August 23, 2024, page 38:7-21

| | | |
|---|---|---|
| **Pirog, Robyn** | Engine long block replaced.[239] | Most of the cost was paid by an insurance company. The customer cost was $76. |
| **Speigner, David** | Engine long block replaced. | $4,461 for the repair, and $168 for the diagnosis. Mr. Speigler claims an additional $1,275 of out-of-pocket expenses related to interest accrued as a result of the repair cost.[240] |

## Ms. Constable's Subject Repair

257. Ms. Constable purchased a used 2.0-liter subject-engine equipped 2016 Ford Edge in August 2017 after it had acquired about 29,087 miles of prior usage as a rental car.[241] Rental cars often experience atypical use and associated wear and tear and are often retired from rental fleets after only a few years of use. Ms. Constable's subject vehicle's unique usage as a rental car renders it less representative of other subject vehicles included in the Plaintiffs' proposed class.

258. Ms. Constable reports that in December 2020 she noticed the vehicle had a rough idle upon start up, and then the check engine light illuminated. She says that she brought the vehicle to a local mechanic who told her that a cylinder misfire diagnostic trouble code was stored in the vehicle's computer system. Shortly after, the check engine light illuminated again, so she made an appointment with a Ford dealership. She says that after inspecting the vehicle, the Ford dealership informed her that the engine ran out of coolant, was in the early stages of failure, and required replacement.[242]

259. A repair invoice shows that Ms. Constable's subject vehicle was brought to the Ford dealership with concern that the check engine light was illuminated on January 2, 2021, when it had 73,866 miles of prior usage. The invoice contains limited diagnostic discussion but notes that the engine's oil was found to be contaminated with coolant, a condition that can occur for a variety of reasons (e.g., a cracked head or block) and can lead to damage of many of the engine's internal components that rely on engine oil for lubrication. A technician repaired the issue by replacing the engine long block assembly.

---

[239] PLTF_0002826 - PLTF_0002829 (Robyn Pirog Deposition Exhibit 5)

[240] Deposition of David Speigner, February 11, 2026, page 110:20-118:12

[241] PLTF_0000825 - PLTF_0000826 (Jillian Constable Deposition Exhibit 2)
CARFAX Report for Mr. Constable's 2016 Ford Edge Titanium, downloaded 3/3/2026

[242] PLTF_0004213 - PLTF_0004215 (Jillian Constable Deposition Exhibit 4)

The cost of the parts and labor associated with the engine replacement was about $5,839.[243]

260. Incidents of 2.0-liter subject engine coolant intrusion do not typically result in contamination of the engine's oil, as described by the technician who repaired Ms. Constable's subject vehicle. The Ford technician who diagnosed and repaired Ms. Constable's engine failure did not report identifying coolant intruding into any of the engine's cylinders. It is unlikely that Ms. Constable's engine replacement was prompted by coolant intrusion, let alone intrusion caused specifically by the Plaintiffs' theory of defect. Ms. Constable's experience demonstrates why all subject engine replacements should not be assumed attributable to coolant intrusion (for any reason) rather than the many alternative causes for engine replacement.

261. Ms. Constable's subject vehicle was inspected in December 2025 when it had 120,909 miles of prior usage. It did not have any powertrain related diagnostic trouble codes stored in its computer system, it passed a cooling system pressure test, and it did not exhibit any indication of coolant intrusion at the time.[244]

## Ms. Metro's Subject Repair

262. Ms. Metro purchased a 2.0-liter subject engine equipped 2018 Ford Edge new in December 2018.[245] She claims that she began experiencing issues with her vehicle, including hesitation, shortly after purchasing the vehicle and eventually experienced issues resulting in the engine running rough and the check engine light illuminating.[246] Records show that Ms. Metro's subject engine experienced repairs unrelated to coolant intrusion during her first four years of owning the vehicle. For example, the vehicle's spark plugs and ignition coils were reportedly replaced around March 2022 to resolve an engine misfire concern.[247]

263. Records show that after driving the vehicle for about 4.5 years, Ms. Metro brought her vehicle to a Ford dealership in July 2022 when it had 98,203 miles of prior usage with a concern that the vehicle had a misfire code stored in its computer system, the engine ran rough and oil was found on the cylinder #1 spark plug, and that the coolant level was low. A technician found cylinder #1 and cylinder #2 misfire codes stored in the computer system, and the spark plugs in cylinder #1 and #2 to be fouled with oil. He used a borescope to inspect the cylinders and found cylinder #1 to be washed with fuel, and he also noticed pitting and corrosion to be present on the exhaust valve and seat. He performed a relative compression test and found the compression in cylinder #1 to be low. He proceeded to perform a cylinder leakage test and determined that the engine's

243 PLTF_0003247- PLTF_0003246 (Vanessa Miller Exhibit 9)

244 Constable_SFE_PC170174

245 PLTF_0002596 - PLTF_0002597 (Tracey Metro Deposition Exhibit 4)

246 Deposition of Tracey Ann Metro, October 28, 2025, page 134:9-199:3

247 PLTF_0004586 (Tracey Metro Deposition Exhibit 6)

piston rings were leaking excessively. To repair the issue, he replaced the engine long block at a cost of about $8,125.

264. The technician who performed Ms. Metro's at-issue repair does not report finding coolant intrusion, and based on his findings (damaged piston rings, valves, and fuel washing of a cylinder), it is highly unlikely that the repair was related to coolant intrusion. There is no information or evidence to support the idea that the saw-cut features in Ms. Metro's cylinder block was a causal factor in her July 2022 repair.

265. Ms. Metro's subject vehicle was inspected in March 2025 when it had 157,128 miles of prior usage. During the inspection, the cylinders of its subject engine were inspected and confirmed to not be experiencing coolant intrusion.[248] A CARFAX report shows that the vehicle now has more than 8 years and 164,126 miles.[249] There remains no record of the vehicle ever experiencing coolant intrusion or a coolant intrusion related repair. Ms. Metro's experience of never experiencing a repair attributable to coolant intrusion, despite extensive use of her vehicle, does not support the Plaintiffs' claims in this matter.

## Ms. Miller's Subject Repair

266. Ms. Vanessa Miller purchased a used 2017 Ford Edge from Enterprise Car Sales in November 2017 when it had 20,699 miles of prior usage as a rental car. [250] Its previous usage as a rental car renders it less representative of other subject vehicles included in the Plaintiffs' proposed class.

267. Repair records show that Ms. Miller brought her subject vehicle to Ford dealership in June 2018 when it had 36,853 miles of prior usage, with concern that the engine shakes after being started. A technician found a P0302 (misfire cylinder #2) diagnostic trouble code stored in the vehicle's computer system. He performed an engine compression test and found that combustion chamber gasses were leaking into the cooling system. He fixed the issue by replacing the engine long block assembly. The repair was performed under warranty at no cost to Ms. Miller.

268. The technician who performed the June 2018 repair did not report discovering coolant intrusion. More specifically, he reported finding pressurized cylinder gasses leaking into the cooling system rather than coolant leaking into the cylinders. The damaged engine that was removed during this first repair has not been made available for inspection, and without doing so, it will not be possible to definitively determine the cause for its replacement. However, based on the available information, it is possible that it experienced failure due to a different mechanism than the scrubbing-based coolant intrusion failure mechanism discussed earlier in this report that is known to have resulted in most 2.0-liter coolant repairs.

---

[248] METRO_SFE_P7300181

[249] CARFAX Report for Ms. Metro's 2018 Ford Edge SEL, downloaded 3/14/2026

[250] PLTF_0003253 - PLTF_0003254 (Vanessa Miller Deposition Exhibit 5)

269. Repair records show that Ms. Miller brought her subject vehicle to a Ford dealership again in November 2019 when it had 84,662 miles of prior usage with a concern that coolant was leaking into the engine. A technician found the check engine light to be illuminated and P0303 and P0316 (both misfire cylinder #3 related) diagnostic trouble codes stored in the vehicle's computer system. He also verified that the subject engine was running rough during startup, and that there were white smoke and the smell of coolant emanating from the exhaust pipe. He proceeded to pressure test the cooling system and inspect the cylinders with a borescope and found coolant leaking into cylinder #3. He fixed the issue by replacing the engine long block assembly at a cost of $6,079.

270. Sometime after the repair was completed, representatives for the Plaintiffs collected the 2.0-liter subject engine long block assembly removed from Ms. Miller's vehicle to be retained as evidence. The Plaintiffs have not produced any chain-of-custody documents, or photographs documenting their collection and handling of the evidence prior to the multiparty inspection that I attended on February 11, 2026.

271. I inspected the 2.0-liter subject engine that was removed from Ms. Miller's vehicle during the multiparty inspection on January 11, 2026. Unfortunately, the engine had already been extensively disassembled, re-assembled, and tampered with prior to the inspection. As such, the condition of the engine should not be assumed the same as when it was removed.

272. After removing the cylinder head and gasket assemblies from Ms. Miller's subject engine, I observed the damage circled in Figure 45 on the region of the cylinder head deck surface separating cylinder #2 and #3. Recall that the technician who performed the subject repair reported finding coolant intrusion in cylinder #3.



Figure 45 Photographs of the cylinder head damage and coolant leak path (circled in red) found in the 2.0-liter subject engine removed from named Plaintiff Ms. Miller's vehicle taken during the multiparty inspection on January 11, 2026.[251]

273. Notice that the damage, circled in Figure 45, that likely resulted in Ms. Miller's subject repair was sustained on and around the engine cylinder head sealing surface, rather than on and around the cylinder block surface. Recall that cylinder head damage, like that found in Ms. Miller's engine, is known to sometimes occur due to the cylinder head

[251] LILLO_2026-2-11_IMG_0500, LILLO_2026-2-11_IMG_0507

gasket scrubbing-based coolant intrusion failure mechanism that led to most 2.0-liter subject repairs, but has not been found to occur due to the coolant boiling/coolant intrusion failure mechanism that led to most 1.5-liter subject engine repairs. Hence, the cylinder head damage found in Ms. Miller's subject engine serves as an example of why Ford advises that 2.0-liter coolant intrusion repairs include replacement of the entire engine long block assembly (including the potentially damaged cylinder head), rather than just the short block assembly (with re-use of the cylinder head).

274. In other words, the type of cylinder head damage found in Ms. Miller's 2.0-liter subject engine is not known to occur in either the 1.5- or 1.6-liter subject engines. Although the Plaintiffs suggest that all subject engines are susceptible to a common failure mechanism, I have not found any evidence to support the idea that 1.5- or 1.6-liter subject engines have experienced widescale (or any) coolant intrusion concerns due cylinder head damage like Ms. Miller's engine experienced. Hence, many 1.5-liter subject engines' coolant intrusion concerns have been successfully repaired without replacement of the cylinder head assembly.

275. Ms. Miller's subject vehicle was inspected in February 2025 when its odometer read 170,522 miles.[252] At the time, it was found to have a minor external coolant leak,[253] but did not exhibit indications of coolant intrusion.

## Mr. Mullen's Subject Repair

276. Mr. Mullen purchased a 2017 Ford Edge used in about June 2020 with approximately 43,956 of prior usage.[254]

277. Mr. Mullen produced notes reporting that his subject vehicle began idling rough around April (presumably 2021), and that over the next few months he experienced numerous symptoms including a cylinder #1 misfire diagnostic code storing his vehicle's computer system (and presumably an illuminated check engine light), rough starting, loss of coolant, and white steam emanating from the exhaust after startup.[255]

278. A repair record shows that Mr. Mullen brought his subject vehicle to a Ford dealership around August 2021, when it had 67,128 miles of prior usage, with concern that the engine was losing coolant. A technician pressure tested the cooling system and removed the spark plug from cylinder #1 and found coolant inside the cylinder. He repaired the issue by replacing the engine long block assembly at a cost of $6,684.[256]

279. Sometime after the repair was completed, representatives for the Plaintiffs collected the 2.0-liter subject engine long block assembly removed from Mr. Mullen's vehicle to be

[252] MILLER_SFE_P2170012

[253] MILLER_SFE_P2170043

[254] CARFAX Report for Mr. Mullen's Subject Vehicle, downloaded 3/14/2026

[255] PLTF_0005029 - PLTF_0005030

[256] PLTF_0005026 - FLTF_0005028

retained as evidence. The Plaintiffs have not produced any chain-of-custody documents or photographs documenting their collection and handling of the evidence prior to the multiparty inspection that I attended on February 11, 2026.

280. I inspected the 2.0-liter subject engine that was removed from Mr. Mullen's vehicle during the multiparty inspection on February 11, 2026. Unfortunately, the engine had already been extensively disassembled, re-assembled, and tampered with prior to the inspection. As such, the condition of the engine should not be assumed the same as when it was removed.

281. After removing the cylinder head and gasket assemblies from Mr. Mullen's subject engine, I observed the damage circled in Figure 46 on the region of the cylinder head deck surface separating cylinder #1 and #2. Recall that the technician who performed the subject repair reports finding coolant intrusion in cylinder #1.



Figure 46 Photographs of the cylinder block damage and coolant leak path (circled in red) found in the 2.0-liter subject engine removed from named Plaintiff Mr. Mullen's vehicle taken during the multiparty inspection on January 11, 2026.[257]

282. The damage found on Mr. Mullen's 2.0-liter subject engine cylinder block, which likely resulted in his subject repair, is consistent with that caused by the cylinder head gasket scrubbing-based 2.0-liter coolant intrusion failure mechanism described earlier in this report. For example, it appears similar to the damage shown in Figure 34.

[257] LILLO_2026-2-11_IMG_0435, LILLO_2026-2-11_IMG_0441

283. Mr. Mullen's subject vehicle was inspected in September 2025 when its odometer read 143,530 miles.[258] Its cylinders were inspected with a borescope and confirmed to not show any indication of coolant intrusion. As such, his subject repair appears to have successfully resolved his coolant intrusion concern.

## The Morford's Subject Repair

284. Mr. and Mrs. Morford purchased a 2017 Ford Escape new in or around April 2017.[259] Repair records show that Mr. Morford brought his subject vehicle to a Ford dealership in October 2020 when it had 66,321 miles of prior usage with concern that the check engine light was on and the engine seemed to vibrate some at idle. A technician found the coolant level to be low, and found P0302 and P0316 (both cylinder #3 misfire related) diagnostic codes stored in the vehicle's computer system. He removed the engine's spark plugs and found coolant leaking into a cylinder. He recommended that the engine long block be replaced due to coolant intrusion into cylinder #2.[260]

285. Rather than perform the recommended repair, the Morfords opted to continue driving the vehicle with coolant intruding into the engine.

286. The Morfords' subject vehicle was inspected in December 2025 when it had 118,880 miles of prior usage. It did not have any misfire related diagnostic trouble codes stored in its computer system, at the time.[261] However, as can be seen in Figure 47, indications of minor coolant leakage or seepage (intrusion) into cylinder #2 emanating from at or near the head gasket sealing surface was identified via borescope imaging of the cylinder. As such, the diagnosis of coolant intrusion into cylinder #2, which Mr. Morford was told about five years prior to the inspection, was confirmed. However, that leak was also recognized to be very small and to not result in any severe symptoms. The leakage has not prevented the Morfords from continuing to extensively use the vehicle.

[258] MULLEN_SFE_P9230176

[259] FORD-MILLER 00455518 - FORD-MILLER 00455518

CARFAX Report for the Morford Subject Vehicle, downloaded 3/14/2026

[260] PLTF_0000041 (Craig Morford Deposition Exhibit 4)

[261] Morford_SFE_PC110170, Morford_SFE_PC110175




Figure 47 Borescope image showing minor coolant intrusion in cylinder #2 of Mr. Morford's 2.0-liter subject engine. The image was taken during a vehicle inspection in December 2025, about 5 years and 52,500 miles after the engine was diagnosed with coolant intruding into the cylinder.[262]

287. A CARFAX report shows that the Morfords' vehicle currently has more than 120,000 miles. Mr. Morford testified that his wife drives the vehicle daily, including to transport their child.[263] His continued use of the vehicle for more than 54,000 miles since being diagnosed with coolant intrusion is inconsistent with the Plaintiffs' suggestion that the symptoms associated with coolant intrusion are severe or render a subject vehicle unusable for transportation.[264]

288. Most members of the Plaintiffs' proposed class have not experienced coolant intrusion. However, the Morfords' experience demonstrates that some of the members who have had 2.0-liter subject engines diagnosed with coolant intrusion have opted to continue to

---

[262] Morford_SFE_Cylinder 2-7

[263] Deposition of Craig Morford, August 23, 2024, page 32:11-34:10

[264] Miller Legal Complaint, Page 1-3, 20-21

drive their vehicle without repair. Those members have not dealt with any (let alone a common) repair actions or costs.

## Named Plaintiffs with a 2.3-liter Subject Engine Equipped Vehicle

289. The Plaintiffs present a single couple (Ms. and Mr. Nelson) as representatives for their proposed class of persons who owned or leased 2.3-liter subject engine equipped vehicles.

Table 13 Named Plaintiffs with a 2.3-liter Subject Engine equipped vehicle

| **Name** | **State of Residence** | **Vehicle** | **Purchased New or Used** |
|---|---|---|---|
| **Nelson, Sarah and Trevor** | California | 2018 Ford Mustang | New |

Table 14 Vehicle age and mileage at time of 2.3-liter subject engine repair or incident

| **Name** | **Age / Mileage at Time of Subject Repair** | **Description of Subject Repair** |
|---|---|---|
| **Nelson, Sarah and Trevor** | 6.5 years/ 82,765 miles | C/S does not start smoothly, and after reversing when the car is put into drive it lurches, sometimes car shakes, check engine light is illuminated. Technician found misfire diagnostic trouble codes stored in the computer system. He performed a cooling system pressure test, removed the spark plugs, used a borescope to view the cylinder and found indications of coolant intrusion.[265] |

Table 15 Extent and cost of 2.3-liter named Plaintiffs' Subject Repairs

| **Name** | **Extent of Subject Repair** | **Parts and Labor Cost of Subject Repair** |
|---|---|---|

[265] N_PLTF_0000137 - N_PLTF_0000140 (Sarah Nelson Deposition Exhibit 5)
N_PLTF_0000141 - N_PLTF_0000142 (Sarah Nelson Deposition Exhibit 6)
N_PLTF_0000157 - N_PLTF_0000156 (Sarah Nelson Deposition Exhibit 7)

| | | |
|---|---|---|
| **Nelson, Sarah and Trevor** | Engine long block replaced. [266] | $9,460 |

## Mr. and Ms. Nelson's Subject Repair

290. The Nelsons purchased a new 2.3-liter subject engine equipped 2017 Ford Mustang in July 2017. About six and a half years later, in December 2023 when the vehicle had 82,765 miles of prior usage, they brought it to a Ford dealership with concern that the vehicle did not start smoothly and sometimes shakes, the check engine light was on, and it lurched sometimes when put into drive after reversing. An invoice for the repair shows that a technician inspected the vehicle and recommended replacing the engine long block, but the invoice provides limited discussion of diagnostic procedures performed. It also notes that "CUSTOMER DOES NOT WANT WORK DONE."[267]

291. The Nelsons then took their subject vehicle to an independent repair shop for a second diagnostic opinion. The technician at the independent repair shop noted that he was told that a dealership had said the Nelsons' engine had fluid intrusion. He inspected the vehicle and noted that the Nelsons' subject vehicle did not exhibit any symptoms other than an occasional lurch when shifting from reverse to drive. He did find excessive hydrocarbons in the cooling system (i.e., the cooling system failed a block test), which typically occurs due to a cylinder head gasket leak. [268]

292. In March 2024, the Nelsons then brought the subject vehicle back to the Ford dealership with continued concern that it did not start smoothly, it lurched after reversing when the car was put into drive, the car sometimes shakes, and that the check engine light was illuminated. A technician found misfire diagnostic trouble codes stored in the computer system. He then performed a cooling system pressure test, removed the spark plugs, used a borescope to view the cylinder and found indications of coolant intrusion. He recommended that the coolant intrusion issue be fixed by replacing the engine long block.[269]

293. The Nelsons' subject vehicle was inspected on March 13, 2024 when it had 82,775 miles of prior usage before the subject repair was performed.[270] P0303 (misfire cylinder #3) and P0316 (misfire detected on startup) diagnostic trouble codes were found stored in the vehicle's computer system. As can be seen in Figure 48, a cooling system pressure test and borescope imaging of the engine cylinders confirmed that a small amount of

[266] N_PLTF_0000137 - N_PLTF_0000140 (Sarah Nelson Deposition Exhibit 5)
N_PLTF_0000141 - N_PLTF_0000142 (Sarah Nelson Deposition Exhibit 6)
N_PLTF_0000157 - N_PLTF_0000156 (Sarah Nelson Deposition Exhibit 7)

[267] N_PLTF_0000137 - N_PLTF_0000140 (Sarah Nelson Deposition Exhibit 5)

[268] N_PLTF_0000141 - N_PLTF_0000142 (Sarah Nelson Deposition Exhibit 6)

[269] N_PLTF_0000157 - N_PLTF_0000156 (Sarah Nelson Deposition Exhibit 7)

[270] NELSON_SFE_1019

coolant was leaking into the engines cylinder #3 from at or around the cylinder head gasket interface.




Figure 48 Borescope image showing coolant intrusion in cylinder #3 of the Nelson's 2.3-liter subject engine. The image was taken during a vehicle inspection in March 2024, shortly before the engine was replaced due to coolant intrusion.[271]

294. The Nelsons' long block was replaced on March 18, 2024.[272]

295. Unfortunately, despite planning to file a lawsuit, the Nelsons (and/or their counsel and experts) did not retain the 2.3-liter subject engine removed or replaced during the Nelsons' subject repair.[273] As such, it has not been possible for me to disassemble and inspect the engine's internal components (e.g., cylinder block, gasket, and cylinder head surfaces) and potentially determine the cause for the coolant intrusion issue.

296. The Nelsons are the only class representatives with surviving claims for a theory of defect pertaining to 2.3-liter subject engines. The vast majority of members of the Plaintiffs' proposed class who own vehicles equipped with 2.3-liter subject engines have not reported experiencing coolant intrusion or related repairs. The Nelsons' atypical experience undergoing a subject repair, the cause for which cannot be determined (since the engine was disposed of before being disassembled and inspected), should not be assumed the same as all members of the Plaintiffs' proposed class, nor should their subject repair be assumed to have occurred due to the Plaintiffs' (or any specific) causal theory.

[271] NELSON_SFE_Cylinder 3-7

[272] N_PLTF_0000157 (Sarah Nelson Deposition Exhibit 7)

[273] Deposition of Sarah Nelson, November 20, 2025, page 115:1-116:2

# Conclusions

297. The following is a restatement of the summary of my opinions in this matter. It is noted that this summary cannot contain all of my technical evaluations, analyses, conclusions, and recommendations. Hence, this summary shall remain attached to and is intended to be read along with the main part of this report.

298. Opinion 1: The Plaintiffs' proposed classes include persons who owned or leased vehicles that differ in model, model-year, engine size, engine architecture, drivetrain type, and other features, and that evolved in design over the approximately eight years that they were manufactured. The 1.5-, 1.6-, 2.0-, and 2.3-liter GTDI engines equipped with a saw cut at issue in these matters ("subject engines") differ substantially in design both over time and among the different displacements, as do the vehicles' cooling systems. In fact, the design and part number of the very engine components that are at-issue in this matter, including the cylinder head gasket, cylinder block, and cylinder head assemblies, differ among the various versions of the 1.5-, 1.6-, 2.0-, and 2.3-liter subject engines and are not interchangeable.

299. Opinion 2: Coolant intrusion is the internal leakage of coolant into an engine's cylinder(s), where it often then burns or evaporates and is exhausted from the vehicle's tailpipe. *"Plaintiffs contend that the subject engines contain a critical common design defect as all the subject engine blocks were defectively designed with a saw cut in a bore bride which is too narrow to utilize a saw cut coolant passage at the bore bridge resulting in coolant leaking into the engine cylinders, loss of engine power and engine failure."*[274] However, due to the substantial differences in the designs of the 1.5-, 1.6-, 2.0-, and 2.3-liter engines, they cannot possibly contain what Plaintiffs allege is an identical "*defect that causes engine coolant—which is vital to the safety and functionality of the engine—to leak into the engine's cylinders.*"[275] In fact, numerous versions of the subject engines (including all 1.6-liter ones) do not have a design that was found to subject them to an elevated rate of coolant intrusion for any reason. This is borne out in the real-world performance of those engines over many years and tens of thousands of miles.

300. Opinion 3: Due to the many differences in the design, manufacture and control of the class vehicles ("subject vehicles") and subject engines, the subject engines in different applications have experienced different operating conditions (e.g., histories of loads, speeds, temperatures, and pressures), failure mechanisms, and field performances (e.g.,

[274] Vanessa Miller's Responses and Objections to Defendant Ford Motor Company's Third Set of Interrogatories, December 19, 2025, Vanessa Miller et al. v. Ford Motor Company, U.S.D.C. Eastern District of California, Case No. 2:20-cv-01796-DAD-CKD, Response to Interrogatory No. 12

[275] First Amended Consolidated Class Action Complaint for Damages ("Miller Legal Complaint"), Vanessa Miller et al. v. Ford Motor Company, U.S.D.C. Eastern District of California, Case No. 2:20-cv-01796-DAD-CKD, September 28, 2022, Page 1

rates of various types of concern or repair). No failure mechanism that affects all subject vehicles resulted in an elevated rate of coolant intrusion or incidents of fire.

301. Opinion 4: Coolant intrusion can occur as a result of the cylinder head gasket failing, or its ability to seal becoming compromised. Cylinder head gasket failure or compromise can occur in an automotive engine for many different reasons. Cylinder head gaskets often fail as a secondary result of a severe engine overheating event, for which there are many potential causes. Some of the most common causes for an engine to overheat include low coolant level due to an external leak (e.g., damaged hose or seal) or failure of a water pump, thermostat, radiator, radiator cap, cooling fan, temperature sensor, or other engine cooling system component(s). Factors related to improper maintenance (e.g., use of the wrong type or concentration of coolant, or overuse of coolant), customer misuse (e.g., towing an excessive load beyond the vehicles rated capacity) or abuse (e.g., ignoring overheating warnings, operating an engine for a prolonged period in a malfunctioning state) can contribute to the cause of cylinder intrusion issues and repairs. The cause for at-issue coolant intrusion concerns repairs can only be accurately assessed by performing technical investigations on a case-by-case basis, which often includes analysis of the vehicle's usage, service and repair history, and inspection of the at-issue engine and its potentially damaged components, among other individualized inquiries.

302. Opinion 5: The subject engines are equipped with saw-cut features on the bore bridge regions of the engine block deck, which improves cooling to that area. Similar saw-cut features are used in non-subject engines in both Ford and non-Ford vehicles, as well as subject engines that have not experienced elevated rates of coolant intrusion (e.g., 1.6-liter subject engines) and are not inherently defective.

303. Opinion 6: I have not identified evidence of an elevated rate of coolant intrusion repairs associated with the subject 1.6-liter subject engines. Plaintiffs' claim that 1.6-liter subject engines are abnormally prone to coolant intrusion (or suffer from an elevated rate), let alone prone to intrusion caused by Plaintiffs' theory of defect involving the saw cut on the bore bridge, is not supported by any engineering evidence.

304. Opinion 7: The cause (and associated failure mechanism) for the vast majority of coolant intrusion failures in 1.5-, 2.0- and 2.3-liter subject engines differs.

305. Opinion 8: The failure mechanism that led to an elevated rate of coolant intrusion in some 1.5-liter subject engines is initiated by coolant boiling within the saw-cut bore bridge region of the engine block assembly. The boiling often occurs when the engine is shut off while warm, which increased in frequency when automatic start-stop functionality was introduced as a standard feature in model-year 2017 vehicles. Hence, model-year 2017 vehicles are far more susceptible to the 1.5-liter subject engine coolant intrusion failure mechanism than earlier model-year (e.g., model-year 2013-2016) vehicles with the same size engine. Ford introduced a permanent corrective action in the form of a redesigned engine block around April 2019 that prevents the coolant intrusion failure mechanism from occurring in 1.5-liter subject engines manufactured after that date. To mitigate coolant intrusion concerns associated with model-year 2017-2019 vehicles on the road, Ford also introduced a revised cooling system control strategy

(Customer Satisfaction Program 19B37) that reduced the potential for coolant intrusion to occur, and it also issued a warranty extension (Customer Satisfaction Program 21N12) to help cover the cost of coolant intrusion repairs, should they occur within a period beyond the standard powertrain warranty period.

306. Opinion 9: The coolant intrusion failures arising in certain 2.0-liter subject engines have a different mechanism (and were at a lower rate than 1.5-liter subject engines). These repairs began emerging with engines manufactured around or after March 2016 when Ford introduced a newly designed head gasket (corresponding to the part number changing from -CA to -DA). Although the cylinder head gasket design change was made with the intent of improving the gaskets' fatigue life, the new design enabled coolant to contact regions of the cylinder head that it had not previously, which in some cases resulted in accelerated head gasket wear/scrubbing, initiating a sequence of events that resulted in coolant intrusion. Ford introduced a permanent corrective action, in the form of a redesigned head gasket and engine block released on a rolling basis beginning with the 2019 Ford Edge to prevent the 2.0-liter subject engine coolant failure mechanism from occurring in engines manufactured after then.

307. Opinion 10: The 1.5- and 2.0-liter failure mechanisms both tend to lead to corrosive damage forming on components in or around the bore bridge region of the cylinder head gasket assembly. Due to the differences in the two failure mechanisms, the location and extent of corrosive damage differ between affected 1.5- and 2.0-liter subject engines, as do the repair actions necessary to fix the damage. More specifically:

a. The failure mechanism affecting certain 2.0-liter subject engines can result in corrosive damage forming on the cylinder block, cylinder head, and cylinder head gasket assemblies. As such, 2.0-liter coolant intrusion issues are typically repaired by replacing the engine <u>long block assembly</u>, which includes both the cylinder block and cylinder head.

b. The failure mechanism affecting certain 1.5-liter subject engines typically results in corrosive damage forming on the cylinder block and cylinder head gasket assembly, but not the cylinder head. As such, 1.5-liter coolant intrusion issues are typically repaired by replacing the engine <u>short block assembly</u>, which does not include the cylinder head.

308. Opinion 11: The available information and records show that Ford's knowledge of the coolant intrusion failure mechanisms that are at-issue in this matter changed over time. The 1.5- and 2.0-liter subject engine coolant intrusion failure mechanisms take time in service and mileage to develop and could not possibly have been identified by Ford immediately after the engines went onto the road. Ford's pre-release testing, while extensive, also did not uncover the failure mechanisms for the 1.5L and 2.0L. The records show that after recognizing coolant intrusion repairs, Ford quickly and thoroughly performed a root cause analysis to gain an understanding of the failure mechanisms and then developed resolutions for them.

309. Opinion 12: Most Subject Vehicles have not and will not have experience a coolant intrusion issue significant enough to impact the vehicle's operation or drivability. Coolant intrusion generally leads to mild symptoms such as driver warnings (e.g., illuminated check engine light) or a rough running engine – not the more severe symptoms such as complete engine failure that Plaintiffs suggest occurs. I have found no evidence to support the idea that most subject vehicles have experienced severe symptoms as a result of coolant intrusion. Many who have, likely only did as a result of ignoring warnings for a prolonged period of time.

310. Opinion 13: Some 1.6-liter subject engine equipped vehicles have experienced issues leading to external coolant or oil leaks, such as leaks originating from specific hoses, coolant reservoirs, or gaskets. Ford has introduced remedies, such as cooling system component upgrades, to address such issues. None of the 1.6-liter subject engine's external leakage issues or remedies are related to coolant intrusion or the Plaintiffs' theory of defect.

311. Opinion 14: A small number of certain 1.6-liter subject engine equipped vehicles, which constitute a very small fraction of the Subject Vehicles, have experienced an engine compartment fire caused by unique sequences of events that are unrelated to coolant intrusion or the Plaintiffs' theory of defect. For example, in some cases, a coolant leak (for which there are many potential sources and causes) led to a severe engine overheating event, which resulted in the cylinder head cracking and leaking oil externally from the engine onto a hot exhaust component, where it ignited and started an engine compartment fire. Ford remedied the 1.6-liter subject engine fire concerns through a series of permanent correction actions. The final permanent corrective design action occurred in February 2014. Ford also issued several recalls.

312. Opinion 15: Unlike 1.6-liter subject engines, the cylinder head assemblies used in the 1.5-, 2.0- and 2.3-liter subject engines are equipped with an integrated exhaust manifold. They do not have the boss (raised protrusion) feature that was found to sometimes crack and leak oil externally, potentially resulting in a fire, that existed in certain 1.6-liter subject engines. Accordingly, they are not susceptible to the 1.6-liter subject engine fire recall condition. I have not identified evidence of or data to support the Plaintiffs' theory that the 1.5-, 2.0-, or 2.3-liter subject engines are abnormally susceptible to fire incidents for any reason. Nor have I identified any evidence that a coolant intrusion concern has ever led to a fire in any subject vehicle.

313. Opinion 16: Plaintiffs' counsel or representatives collected evidence removed from four named Plaintiffs' vehicles during subject repairs including the 2.0-liter subject engine (long block assembly) removed from Ms. Miller's 2017 Ford Edge around January 2020, the 2.0-liter subject engine (long block assembly) removed from Mr. Mullen's 2017 Ford Edge around August 2021, and the 1.6-liter subject engine (long block assembly) removed from the Wests' 2013 Ford Fusion around November 2020. The Plaintiffs spoliated this evidence (long block assemblies) before I had an opportunity to inspect it. More specifically, without notice, someone disassembled the engines (e.g., removed the at-issue cylinder heads and gaskets), marked components, cleaned components, and even reassembled and tightened the dirty cylinder heads and gaskets (something that should

never be done, on an evidence engine or otherwise) – all of which inevitably led to the alteration of the evidence. The actions of whoever disassembled the evidence subject engines while they were in the Plaintiffs' possession and the alteration of some of the most important evidence items in this matter, including the named Plaintiffs' cylinder head gaskets and their sealing surfaces, before I had an opportunity to inspect them, limits the evidentiary value I have been able to gain from them, and per the American Society for Testing and Materials (ASTM) standards constitutes spoliation of evidence.

314. Opinion 17: Plaintiffs present the experiences of 25 named plaintiffs in *Miller* and two named plaintiffs in *Nelson* as examples of members of their proposed classes who have suffered from their alleged theory of common defect and associated damages. However, I investigated their experiences and found that they report different concerns and repairs, attributable to a variety of different causes. Their experiences demonstrate why the circumstances and cause of at-issue claims can only be accurately assessed on a case-by-case basis, and why they should not all be assumed attributable to Plaintiffs' theory of defect.

a. None of the named Plaintiffs report experiencing a fire incident, and the named Plaintiffs' experiences do not support Plaintiffs' claim that incidents of coolant intrusion (or their theory of defect) results in incidents of fire.

b. There are many reasons why the named Plaintiffs' experiences and repairs should not be assumed representative of those of the broader class of members that Plaintiffs propose. All twenty-three named Plaintiffs report experiencing coolant intrusion, which is atypical considering that most members of the Plaintiffs' proposed class have not. Plaintiffs' proposed class includes subject vehicles of a wide variety of make, model, model-year, and engine combinations, many of which are not owned or leased by any of the named Plaintiffs. For example, none of the 1.5-liter named Plaintiffs owned or leased a model-year 2018-2019 vehicle, yet four out of seven (57%) of them owned a model-year 2017 vehicle, most (75%) of which are more specifically Ford Escapes. The 2.0-liter class representatives that Plaintiffs selected predominantly own vehicles that are equipped with the redesigned cylinder head gasket (part number ending in -DA), and not earlier-built engines equipped with the better performing original (part number ending in -CA) gasket. These and the other factors, discussed in the body of this report, render the named Plaintiffs' experiences and repairs atypical and less representative of the broader class that they purportedly represent.

c. Based on my review of the available information and evidence, it is apparent that there have been a variety of causes for the named Plaintiffs' at-issue repairs. For example, Mr. Cicero's 1.5-liter subject engine required replacement due to suffering unique damage including cracked valves that the technician attributed to detonation/pre-ignition, which are types of abnormal combustion that occur for reasons unrelated to coolant intrusion; both Ms. Balaszek and Mr. Pickering report experiencing 1.5-liter subject engine overheating issue that likely resulted in warpage of the cylinder head and failure of the cylinder head gasket, for reasons that are likely unrelated to coolant intrusion and that resulted in unique repair actions; Ms.

Metro's 2.0-liter subject engine experienced piston ring damage, and oil and fuel (not coolant) contamination of one of the cylinders; and Ms. Constable's engine experienced an issue that resulted in coolant contamination of the engine oil and associated internal engine damage – all of which are issues unlikely to be related to coolant intrusion. The named Plaintiffs' experiences, and associated records and evidence, demonstrates that the cause of named Plaintiff subject repairs can only be accurately determined by performing technical investigations of them on a case-by-case basis.

d. The records show that there is no common repair action or cost associated with the named Plaintiffs' at-issue repairs. Some at-issue repairs have involved replacement of a subject engine short block assembly (Ford's recommended repair for a 1.5-liter subject engine coolant intrusion issues), others replacement of the entire engine long block assembly (Ford recommended repair for a 2.0-liter subject engine coolant intrusion issue), and others replacement of more select engine components such as the cylinder head and its gasket (repairs that are unlikely to be caused by the 1.5- or 2.0-liter subject engine coolant intrusion failure mechanisms). Some of the named Plaintiffs' at-issue repairs have been performed under warranty at little to no cost to the Plaintiffs; others have been performed at customer costs ranging between about $680-$8,300. In some cases, Ford has split the cost of at-issue repairs with named Plaintiffs, as a goodwill gesture, despite the vehicle being outside of warranty at the time of the repair. In some cases, third party insurance companies have paid repair costs. In some cases, named Plaintiffs have opted to continue driving their vehicle without repair. In fact, the Morfords have driven their subject vehicle more than 54,000 miles since it was diagnosed with coolant intrusion, and they have not repaired it (or been impacted by the associated repair costs). The named Plaintiffs' experience demonstrate that the extent and cost of at-issue repairs can only be accurately assessed on a case-by-case basis.

# Exhibit A: Curriculum Vitae of Peter Lillo, Ph.D., P.E., A.S.E. Master Certified Automotive Technician

**Lillo Engineering, Inc.**
5610 Scotts Valley Dr.
Suite B, PMB 571
Scotts Valley, CA 95066

## Peter Lillo, Ph.D., P.E., C.F.E.I.

Principal Engineer

Scotts Valley, CA
plillo@lilloeng.com
office: (831)588-3978
www.lilloengineering.com



## Professional Profile

Dr. Lillo is a mechanical engineer who specializes in failure analysis and the assessment of issues involving vehicles, engines, machines, fires, explosions, or any combination of those topics. His professional background is in mechanical engineering, automotive technology, and the thermal sciences. Dr. Lillo often investigates the root cause of failures, as well as claims of defect and issues involving automobiles, trucks, buses, tractors, ATVs, and other types of vehicles or machinery. Dr. Lillo obtained his Ph.D. in the fields of thermal sciences and combustion. He has experience investigating the cause, origin and progression of fires, explosions, and other thermal events in a variety of environments including residential and commercial structures, vehicles, and machinery. As an expert in both vehicles and fire, he often analyzes complex vehicle fire incidents or issues.

Dr. Lillo is trained in the field of automotive repair, and he practiced as a master certified technician. He is also a professional mechanical engineer. He has diagnosed the cause of thousands of vehicle failures and issues and has been solving automotive problems for more than twenty years. He has expertise in the fields of engines, fuel systems, emissions control devices, automatic and manual transmissions, brakes, steering and suspension systems, HVAC systems, electrical and computer systems, drivability, among others. His experiences include working with many different types of light and heavy-duty vehicles, tractors, as well as engines in both mobile and stationary applications. He has performed smog related inspections and repairs in the state of California. He often analyzes records and data to gain an

understanding of real-world failure modes, failure rates, repairs, and their outcomes, as well as to assess vehicle or machine performance and trends. He has extensive experience inspecting and testing vehicles and their components. He consults on best practices, standard of care, warranty issues, preventative maintenance, or other topics in the field of vehicle service and repair. He frequently investigates and determines the root cause of vehicle and engine failures and issues.

Dr. Lillo also carries out work relating to combustion, fluid flow, thermodynamic, heat transfer processes, mechanical engineering, and product safety. For example, he performs engineering analysis of power producing devices such as engines and turbines, as well as appliances, gas utilities and pipelines, consumer devices, hydraulic and pneumatic systems, boilers, heating/cooling systems, and combustion emissions issues such as carbon monoxide poisoning incidents. He conducts proactive work, such as product evaluations and testing, as well as reactive work, such as failure analysis and product recall investigations. Dr. Lillo has extensive experience designing and performing scientific tests, measurements, and research. He has published peer-reviewed articles on the topics of engines, combustion strategies, fuel sprays, ignition processes and mechanical and optical diagnostics.

Prior to founding Lillo Engineering, Inc., Dr. Lillo was a Senior Managing Engineer at Exponent. During the eight years he worked there, he investigated the cause of hundreds of failures and fires and consulted on wide variety of engineering and automotive topics.

Dr. Lillo earned an A.S. in Automotive and Engine Technologies (De Anza College), a B.S. in Mechanical Engineering (U.C. Berkeley), and an M.S and Ph.D. in Mechanical Engineering (University of Michigan - Ann Arbor). While at the University of Michigan, he used advanced laser based optical diagnostics to study flame, airflow and fuel spray development inside automotive engines. He has also worked in combustion laboratories at both Sandia National Laboratories and UC Berkeley.

## Academic Credentials & Professional Honors

Ph.D., Mechanical Engineering, University of Michigan, Ann Arbor, 2016

M.S., Mechanical Engineering, University of Michigan, Ann Arbor, 2013

B.S., Mechanical Engineering, University of California, Berkeley, 2010

A.S., Automotive Chassis Systems, De Anza College, 2005

A.S., Automotive Engine Performance, De Anza College, 2005

A.S., Engine Machining and Service, De Anza College, 2005

Graduate Research Fellowship, National Science Foundation, 2011-2014

Alternate Member: Technical Committee on Automotive and Marine Service Stations (AUV-AAA), NFPA 30A Code for Motor Fuel Dispensing Facilities and Repair Garages, National Fire Protection Association,

2018-present

Alternate Member: Technical Committee on Internal Combustion Engines (INT-AAA), NFPA 37 Standard for the Installation and Use of Stationary Engines and Gas Turbines, National Fire Protection Association, 2017-present

## Licenses and Certifications

Licensed Professional Mechanical Engineer, California, M39287

ASE Certified Master Automotive Technician

ASE Certified Medium/Heavy Truck Technician

ASE Certified Advanced Level Engine Performance Specialist

Certified Fire and Explosion Investigator (CFEI)

Certified Vehicle Fire Investigator (CVFI)

Fire Investigation 1A (Cause and Origin), California Office of State Fire Marshal

## Experience

President and Principal Engineer, Lillo Engineering Inc., Scotts Valley, CA 2024-present

Senior Managing Engineer, Exponent, Menlo Park, CA, 2016-2024

Graduate Student Researcher, Quantitative Laser Diagnostics Laboratory, University of Michigan, 2011-2016

Combustion Research Intern, Sandia National Laboratories, 2010-2011

Student Researcher, Combustion Analysis Laboratory, University of California, Berkeley, 2008-2010

Master Automotive Technician, Dirks Automotive and Transmission Repair, Oroville, CA, 2006-2007

Master Automotive Technician, J.P. Automotive, San Jose, CA, 2002-2006

## Professional Affiliations

Society of Automotive Engineers

National Associate of Fire Investigators

National Fire Protection Agency

## Publications

Kazmouz SJ, Haworth DC, Lillo PM, Sick V. Extension of a thickened flame model to highly stratified combustion—Application to a spark-ignition engine. Combustion and Flame, 236, 111798, 2022.

Kazmouz, Samuel J., Daniel C. Haworth, Peter Lillo, and Volker Sick. Large-eddy simulations of a stratified-charge direct-injection spark-ignition engine: Comparison with experiment and analysis of cycle to-cycle variations. Proceedings of the Combustion Institute, 2020.

Lillo PM, Zhuang H, Sick V. Topological development of homogeneous-charge and spray-guided stratified-charge flames in an internal combustion engine. International Journal of Engine Research 2017, 1468087417727192.

Lillo PM. Topological development of homogeneous-charge and stratified-charge flames in an internal combustion engine. Ph.D. dissertation., University of Michigan, 2016.

Chen H, Lillo PM, Sick V. Single-shot 3D imaging of fuel injection in a spark-ignited direct-injected gasoline engine. International Journal of Engine Research in press.

Lillo PM, Greene ML, Sick V. Plenoptic single-shot 3D imaging of in-cylinder fuel spray geometry. Zeitschrift für Physikalische Chemie (Journal of Physical Chemistry), 2015.

Lillo PM, et al. Diesel spray ignition detection and spatial/temporal correction. No. 2012-01-1239. SAE Technical Paper, 2012.

Polonowski CJ, Mueller CJ, Gehrke CR, Bazyn T, Martin GC, Lillo PM. An experimental investigation of low-soot and soot-free combustion strategies in a heavy-duty, single-cylinder, direct-injection, optical diesel engine. (No. 2011-01-1812). SAE Technical Paper, 2011.

# Exhibit B: List of Materials

Materials I considered for the preparation of this Declaration include,

All documents discussed and referenced in this report including all footnoted documents and documentation, such as photographs, videos, and notes, from the inspections that Lillo Engineering performed of exemplar and evidence engines and components including those removed from four named Plaintiffs subject vehicles; the three exemplar subject vehicles and engines that Lillo Engineering acquired and disassembled; and exemplar cylinder head gaskets.

**Pleadings**
First Amended Consolidated Class Action Complaint for Damages, Vanessa Miller et al. v. Ford Motor Company, U.S.D.C. Eastern District of California, Case No. 2:20-cv-01796-DAD-CKD, September 28, 2022

First Amended Class Action Complaint, U.S.D.C. Eastern District of California, Case No. 2:24-cv-02231-DAD-CKD, December 16, 2024

Defendant Ford Motor Company's Amended Answers and Objections to Plaintiffs' Interrogatories, Set Two, Vanessa Miller et al. v. Ford Motor Company, U.S.D.C. Eastern District of California, Case No. 2:20-cv-01796-TLN-CKD, February 24, 2026

Included in and Email from Sherry Rozell (counsel for Ford) on February 2, 2024 transmitting Defendant Ford Motor Company's Amended Answers and Objections to Plaintiffs' Interrogatories, Set Two to the Plaintiffs

Vanessa Miller's Responses and Objections to Defendant Ford Motor Company's Third Set of Interrogatories, December 19, 2025, Vanessa Miller et al. v. Ford Motor Company, U.S.D.C. Eastern District of California, Case No. 2:20-cv-01796-DAD-CKD

Order Granting in Part and Denying in Part Defendant's Motion to Dismiss Certain Claims Brought by Plaintiffs in the First Amended Consolidated Complaint, Vanessa Miller et al. v. Ford Motor Company, U.S.D.C. Eastern District of California, Case No. 2:20-cv-01796-DAD-CKD, March 28, 2024

Order Granting in Part and Denying in Part Defendant's Motion to Dismiss Plaintiffs' First Amended Consolidated Complaint, Vanessa Miller et al. v. Ford Motor Company, U.S.D.C. Eastern District of California, Case No. 2:20-cv-01796-DAD-CKD, September 4, 2025

Minute Order Granting Stipulation to Dismiss Named Plaintiffs Monterio Butcher, Rachel Goodrich, and Jeffrey Hodges, Vanessa Miller et al. v. Ford Motor Company, U.S.D.C. Eastern District of California, Case No. 2:20-cv-01796-DAD-CKD, October 1, 2025

Minute Order on Joint Stipulation including Court's Ruling on Plaintiffs Motion to Substitute Named Plaintiffs, Vanessa Miller et al. v. Ford Motor Company, U.S.D.C. Eastern District of California, Case No. 2:20-cv-01796-DAD-CKD, November 25, 2025

Order Granting Plaintiffs' Motions to Substitute Named Plaintiffs and Class Representatives, Vanessa Miller et al. v. Ford Motor Company, U.S.D.C. Eastern District of California, Case No. 2:20-cv-01796-DAD-CKD, December 23, 2025

**Depositions and Exhibits**

Ford Witnesses

- Brewer, Todd, 9/17/2025
- Dunahay, John, 8/27/2025
- Giunta, Michael, 8/20/2025
- Hansen, Randy, 9/10/2025
- Henne, Joseph, 8/13/2025
- Knott, Tim, 9/24/2025
- Push, Jeff, 9/25/2025
- Rollinger, John, 8/19/2025
- Selthofer, Sara, 8/28/2025
- Steslicki, Michael, 9/30/2025
- Tuneff, Mark, 10/15/2025
- Wade, Robert, 10/17/2025

Named Plaintiffs

- Balaszek, Teresa, 8/6/2024
- Batdorf, Tyson J., 4/8/2025
- Bozhinov, Harlampi, 8/9/2024
- Christodaro, Darrick, 6/13/2025
- Cicero, Anthony, 10/22/2025
- Constable, Jillian, 9/16/2024
- Gonzalez, David, 3/27/2025
- Hoffer, Amy, 11/8/2024
- Hoffer, Kevin, 1/31/2025
- Kennedy, Mark, 10/21/2025
- Krecek, John, 12/12/2024
- Lund, Patsy, 6/12/2025
- Manfra, Aaron, 11/13/2024
- Manfra, Victoria, 11/15/2024
- Metro, Tracey Ann, 10/28/2025
- Miller, Vanessa, 6/4/2025
- Morford, Craig, 8/23/2024
- Morford, Kelli, 8/21/2024
- Nelson, Sarah, 11/20/2025
- Nelson, Trevor, 12/3/2025
- Pickering, Scott, 3/12/2025
- Pirog, Robyn, 8/16/2024
- Simonds, Brian, 10/14/2024
- Speigner, David, 2/11/2026
- West, Amber, 9/5/2025

- West, Evan, 9/4/2025

**Production Documents**
FORD-MILLER 00081693
FORD-MILLER 00125829
FORD-MILLER 00125891
FORD-MILLER 00125892 - FORD-MILLER 00125899
FORD-MILLER 00138279 - FORD-MILLER 00138280
FORD-MILLER 00139252 - FORD-MILLER 00139253
FORD-MILLER 00139399.pptx
FORD-MILLER 00139453 - FORD-MILLER 00139454
FORD-MILLER 00140035 - FORD-MILLER 00140049
FORD-MILLER 00140079
FORD-MILLER 00140080.pptx
FORD-MILLER 00140381 - FORD-MILLER 00140384
FORD-MILLER 00140648.pptx
FORD-MILLER 00140733 - FORD-MILLER 00140735
FORD-MILLER 00141099.pptx
FORD-MILLER 00173790 - FORD-MILLER 00173791
FORD-MILLER 00173792.pptx
FORD-MILLER 00174345.pdf
FORD-MILLER 00174856.pdf
FORD-MILLER 00176026.pdf
FORD-MILLER 00180024
FORD-MILLER 00180025 - FORD-MILLER 00180033
FORD-MILLER 00182218
FORD-MILLER 00182219.pptx
FORD-MILLER 00204082
FORD-MILLER 00204083.pptx
FORD-MILLER 00209559 - FORD-MILLER 00209560
FORD-MILLER 00209713
FORD-MILLER 00209714.xlsx
FORD-MILLER 00217949 - FORD-MILLER 00217950
FORD-MILLER 00218199.pptx
FORD-MILLER 00221021.pptx
FORD-MILLER 00221434 - FORD-MILLER 00221435
FORD-MILLER 00221436.pdf
FORD-MILLER 00222971
FORD-MILLER 00222972.xlsx
FORD-MILLER 00223924 - FORD-MILLER 00223925
FORD-MILLER 00223928.pdf
FORD-MILLER 00226044.pdf
FORD-MILLER 00226405 - FORD-MILLER 00226406
FORD-MILLER 00226407.pptx
FORD-MILLER 00278714.pdf
FORD-MILLER 00326594- FORD-MILLER 00326625

FORD-MILLER 00360118.ppt
FORD-MILLER 00382243 - FORD-MILLER 00382245
FORD-MILLER 00382246.pptx
FORD-MILLER 00404775- FORD-MILLER 00404783
FORD-MILLER 00410875 - FORD-MILLER 00410877
FORD-MILLER 00410878 - FORD-MILLER 00410891
FORD-MILLER 00441286- FORD-MILLER 00441313
FORD-MILLER 00456910
FORD-MILLER 00471363.pptx
NELSON-FORD 0060497 - NELSON-FORD 0060501
NELSON-FORD 0060502.pptx
FORD-MILLER 00744695
FORD-MILLER 00756042.pdf
DFMEA Documents

- FORD-MILLER 00456540
- FORD-MILLER 00457405 - FORD-MILLER 00457585
- FORD-MILLER 00457086 - FORD-MILLER 00457118
- FORD-MILLER 00456975 - FORD-MILLER 00457071
- FORD-MILLER 00457207 - FORD-MILLER 00457223
- FORD-MILLER00040567 - FORD-MILLER 00040615
- NELSON-FORD 0052707 - NELSON-FORD 0052711
- NELSON-FORD 0052707 - NELSON-FORD 0052711
- FORD-MILLER 00040616 - FORD-MILLER 00040622
- FORD-MILLER 00457072 - FORD-MILLER 00457085
- FORD-MILLER 00457586 - FORD-MILLER 00457592
- FORD-MILLER 00457313 - FORD-MILLER 00457404
- FORD-MILLER 00457231 - FORD-MILLER 00457308
- FORD-MILLER 00457119 - FORD-MILLER 00457122
- NELSON-FORD 0052712 - NELSON-FORD 0052716
- FORD-MILLER 00457224 - FORD-MILLER 00457230

DVPR Documents

- FORD-MILLER 00019332 - FORD-MILLER 00019334
- FORD-MILLER00019355 - FORD-MILLER 00019374
- FORD-MILLER 00457138 - FORD-MILLER 00457206
- FORD-MILLER00019335 - FORD-MILLER 00019346
- FORD-MILLER00019381 - FORD-MILLER 00019392
- NELSON-FORD 0052865
- FORD-MILLER 00457123 - FORD-MILLER 00457137
- FORD-MILLER 00457158 - FORD-MILLER 00457177
- FORD-MILLER00018724 - FORD-MILLER 00018739
- FORD-MILLER00019329 - FORD-MILLER 00019334
- FORD-MILLER00019347 - FORD-MILLER 00019354
- FORD-MILLER00019375 - FORD-MILLER 00019377
- FORD-MILLER 00019378 - FORD-MILLER 00019380

- FORD-MILLER00019393 - FORD-MILLER 00019400
- NELSON-FORD 0052865
- NELSON-FORD 0052870
- FORD-MILLER00018740 - FORD-MILLER 00018753
- FORD-MILLER00019329 - FORD-MILLER 00019331
- NELSON-FORD 0052869
- NELSON-FORD 0052866
- NELSON-FORD 0052717
- NELSON-FORD 0052729
- NELSON-FORD 0052740
- NELSON-FORD 0052786
- NELSON-FORD 0052751
- NELSON-FORD 0052786
- NELSON-FORD 00528212015
- NELSON-FORD 0052821
- FORD-MILLER00040623

**Named Plaintiff Records**
Balaszek
- [redacted] FORD-MILLER 00116091
- 5_[redacted]OASIS.pdf
- 5_[redacted]VehicleInfoReport.pdf
- 06_[redacted]FactoryInvoice.pdf
- 06_[redacted]NonWarranty.pdf
- 06_[redacted]TSBSSMGSB.pdf
- 06_[redacted]Warranty.pdf
- 11_[redacted]QLSInfo.pdf
- 11_[redacted]WindowSticker.pdf

Batdorf
- FORD-MILLER 00455550 (New Vehicle Invoice)
- FORD-MILLER 00455551 (VIN FSA Details)
- FORD-MILLER 00455555 (Repair Orders Details by VIN Chart)
- FORD-MILLER 00455556 (OASIS Results)
- FORD-MILLER 00455558 (QLS Concern List)
- FORD-MILLER 00455560 (TSB SSM GSB - 2017 MKC [redacted]
- FORD-MILLER 00455570 (Vehicle Information Report)
- FORD-MILLER 00455576 (Standard Claims List)
- FORD-MILLER 00455586 (Monroney Sticker)

Bozhinov
- [redacted] - Factory Invoice
- [redacted] - FSA History
- [redacted] - GCCT
- [redacted] - Non Warranty
- [redacted] - OASIS

- [redacted] - QLS
- - TSB SSM GSB
- - Vehicle Info Report
- - Warranty
- - Window Sticker

Christodaro

- 1FMCU9GD5HUD28657 FORD-MILLER 00116086
- 03_1FMCU9GD5HUD28657-QLSInfo.pdf
- 03_1FMCU9GD5HUD28657-WindowSticker.pdf
- 6_1FMCU9GD5HUD28657-OASIS.pdf
- 6_1FMCU9GD5HUD28657-VehicleInfoReport.pdf
- 07_1FMCU9GD5HUD28657-FactoryInvoice.pdf
- 07_1FMCU9GD5HUD28657-NonWarranty.pdf
- 07_1FMCU9GD5HUD28657-TSBSSMGSB.pdf
- 07_1FMCU9GD5HUD28657-Warranty.pdf

Cicero

- [redacted] FORD-MILLER 00116074
- 4_[redacted]GCQIS.pdf
- 9_[redacted]OASIS.pdf
- 9_[redacted]VehicleInfoReport.pdf
- 10_[redacted]FactoryInvoice.pdf
- 10_[redacted]NonWarranty.pdf
- 10_[redacted]TSBSSMGSB.pdf
- 10_[redacted]Warranty.pdf
- 15_[redacted]QLSInfo.pdf
- 15_[redacted]WindowSticker.pdf

Constable

- FORD-MILLER 00456000 (New Vehicle Invoice)
- FORD-MILLER 00456001 (VIN FSA Details)
- FORD-MILLER 00456013 (Warranty Claims and Customer Case Records)
- FORD-MILLER 00456022 (Repair Orders Details by VIN for United States)
- FORD-MILLER 00456024 (OASIS Results)
- FORD-MILLER 00456025 (QLS Concern List)
- FORD-MILLER 00456028 (TSB SSM GSB - 2016 Edge [redacted]
- FORD-MILLER 00456037 (Vehicle Information Report)

Gonzalez

- FORD-MILLER 00456043 (New Vehicle Invoice)
- FORD-MILLER 00456044 (VIN FSA Details)
- FORD-MILLER 00456055 (Warranty Claims and Customer Case Records)
- FORD-MILLER 00456059 (Repair Orders Details by VIN for United States)
- FORD-MILLER 00456060 (OASIS Results)
- FORD-MILLER 00456062 (QLS Concern List)
- FORD-MILLER 00456063 (TSB SSM GSB – 2014 Escape [redacted]
- FORD-MILLER 00456074 (Vehicle Information Report)

- FORD-MILLER 00456078 (Standard Claims List)

Kennedy

- FORD-MILLER 00455861 (New Vehicle Invoice)
- FORD-MILLER 00455862 (VIN FSA Details)
- FORD-MILLER 00455873 (Repair Orders Details by VIN for United States)
- FORD-MILLER 00455874 (OASIS Results)
- FORD-MILLER 00455876 (QLS Concern List)
- FORD-MILLER 00455882 (TSB SSM GSB - 2016 Edge [redacted]
- FORD-MILLER 00455892 (Vehicle Information Report)
- FORD-MILLER 00455898 (Standard Claims List)
- FORD-MILLER 00455906 (Monroney Sticker)

Krecek

- FORD-MILLER 00455907 (New Vehicle Invoice)
- FORD-MILLER 00455908 (VIN FSA Details)
- FORD-MILLER 00455915 (Warranty Claims and Customer Case Records)
- FORD-MILLER 00455919 (CQIS Detail Report)
- FORD-MILLER 00455921 (Repair Orders Details by VIN for United States)
- FORD-MILLER 00455924 (OASIS Results)
- FORD-MILLER 00455925 (QLS Concern List)
- FORD-MILLER 00455930 (TSB SSM GSB - 2017 Edge [redacted]
- FORD-MILLER 00455938 (Vehicle Information Report)
- FORD-MILLER 00455944 (Standard Claims List)
- FORD-MILLER 00455951 (Monroney Sticker)

Lund

- 1FMCU9G95GUB74249 FORD-MILLER 00116138
- 02_1FMCU9G95GUB74249-QLSInfo.pdf
- 02_1FMCU9G95GUB74249-WindowSticker.pdf
- 3_1FMCU9G95GUB74249-GCQIS.pdf
- 7_1FMCU9G95GUB74249-OASIS.pdf
- 7_1FMCU9G95GUB74249-VehicleInfoReport.pdf
- 08_1FMCU9G95GUB74249-FactoryInvoice.pdf
- 08_1FMCU9G95GUB74249-NonWarranty.pdf
- 08_1FMCU9G95GUB74249-TSBSSMGSB.pdf
- 08_1FMCU9G95GUB74249-Warranty.pdf

Manfra, Aaron & Victoria

- FORD-MILLER 00455620 (New Vehicle Invoice)
- FORD-MILLER 00455621 (VIN FSA Details)
- FORD-MILLER 00455630 (September 2020 Customer Complaint)
- FORD-MILLER 00455634 (Repair Orders Details by VIN for United States)
- FORD-MILLER 00455635 (OASIS Results)
- FORD-MILLER 00455637 (QLS Concern List)
- FORD-MILLER 00455640 (TSB SSM GSB - 2017 Fusion [redacted]
- FORD-MILLER 00455648 (Vehicle Information Report)
- FORD-MILLER 00455653 (Standard Claims List)

- FORD-MILLER 00455657 (Monroney Sticker)

Metro

- [redacted] FORD-MILLER 00116096
- 4_[redacted]OASIS.pdf
- 4_[redacted]VehicleInfoReport.pdf
- 05_[redacted]FactoryInvoice.pdf
- 05_[redacted]NonWarranty.pdf
- 05_[redacted]TSBSSMGSB.pdf
- 05_[redacted]Warranty.pdf
- 10_[redacted]QLSInfo.pdf
- 10_[redacted]WindowSticker.pdf
- D192381-Miller-[redacted]Tracey Ann Metro-Vehicle Information

Miller

- 2_2FMPK4K96HBB28812-GCQIS.pdf
- 2FMPK4K96HBB28812 FORD-MILLER 00116103
- 3_2FMPK4K96HBB28812-OASIS.pdf
- 3_2FMPK4K96HBB28812-VehicleInfoReport.pdf
- 04_2FMPK4K96HBB28812-FactoryInvoice.pdf
- 04_2FMPK4K96HBB28812-NonWarranty.pdf
- 04_2FMPK4K96HBB28812-QLSInfo.pdf
- 04_2FMPK4K96HBB28812-TSBSSMGSB.pdf
- 04_2FMPK4K96HBB28812-Warranty.pdf
- 04_2FMPK4K96HBB28812-WindowSticker.pdf

Morford, Kelli & Craig

- [redacted] - Factory Invoice
- - FSA History
- - Non Warranty
- – OASIS
- – QLS
- - TSB SSM GSB
- - Vehicle Info Report
- – Warranty
- - Window Sticker
- FORD-MILLER 00456137 (New Vehicle Invoice)
- FORD-MILLER 00456138 (VIN FSA Details)
- FORD-MILLER 00456141 (Repair Orders Details by VIN for United States)
- FORD-MILLER 00456142 (OASIS Results)
- FORD-MILLER 00456144 (QLS Concern List)
- FORD-MILLER 00456147 (TSB SSM GSB – 2017 Escape [redacted]
- FORD-MILLER 00456159 (Vehicle Information Report)
- FORD-MILLER 00456167 (Standard Claims List)
- FORD-MILLER 00456170 (Monroney Sticker)

Mullen

- FORD-MILLER 00905609

- FORD-MILLER 00905656
- FORD-MILLER 00905660

Pickering

- FORD-MILLER 00455725 (New Vehicle Invoice)
- FORD-MILLER 00455726 (VIN FSA Details)
- FORD-MILLER 00455742 (Warranty Claims and Customer Case Records)
- FORD-MILLER 00455758 (CQIS Detail Report)
- FORD-MILLER 00455766 (Repair Orders Details by VIN for United States)
- FORD-MILLER 00455769 (OASIS Results)
- FORD-MILLER 00455771 (QLS Concern List)
- FORD-MILLER 00455774 (TSB SSM GSB - 2014 Fusion [redacted]
- FORD-MILLER 00455787 (Vehicle Information Report)
- FORD-MILLER 00455792 (Standard Claims List)
- FORD-MILLER 00455817 (Monroney Sticker)

Pirog

- [redacted] - Factory Invoice
- - FSA History
- – GCCT
- - Non Warranty
- – OASIS
- – QLS
- - TSB SSM GSB
- - Vehicle Info Report
- – Warranty
- - Window Sticker

Simonds

- FORD-MILLER 00455658 (New Vehicle Invoice)
- FORD-MILLER 00455659 (VIN FSA Details)
- FORD-MILLER 00455672 (Warranty Claims and Customer Case Records)
- FORD-MILLER 00455684 (CQIS Detail Report - Dec. 2020)
- FORD-MILLER 00455687 (Repair Orders Details by VIN for United States)
- FORD-MILLER 00455690 (OASIS Results)
- FORD-MILLER 00455691 (QLS Concern List)
- FORD-MILLER 00455693 (TSB SSM GSB - 2015 Fusion [redacted]
- FORD-MILLER 00455702 (Vehicle Information Report)
- FORD-MILLER 00455707 (Standard Claims List)
- FORD-MILLER 00455724 (Monroney Sticker)

Speigner

- FORD-MILLER 00905564
- FORD-MILLER 00905607
- FORD-MILLER 00905608

West, Amber & Evan

- FORD-MILLER 00116120 (FSA History The Wests)

**Service Bulletin, Service Program and Recall Documents**

CSP 13B13

- FORD-MILLER 00084689
- FORD-MILLER 00085355
- FORD-MILLER 00085359
- FORD-MILLER 00085369
- FORD-MILLER 00117452
- FORD-MILLER 00117459
- FORD-MILLER 00117461
- FORD-MILLER 00117451

CSP 19B37

- 14D Printable View 19X91 w attachments.pdf
- 19B37 - FCSD Backup File.pdf
- 19X91 Fact Sheet - 20XX 1.5L GTDI Coolant Intrusion_- REVIEWED.pdf
- 19B37 S1.pdf
- 19B37 S2.pdf
- 19B37 S3.pdf
- 19B37.pdf
- R19B373V1.pdf
- r19B37C1-S2.pdf
- r19B37C1-S2_SP.pdf
- r19B37PC_ESCAPE.pdf
- r19B37PC_FUSION.pdf
- R19B37S3V4.pdf
- RATTV.pdf
- RATTVI.pdf
- RCUSTOMERREMINDLTRv2.pdf

21N12 Recall

- 21-615 Fact Sheet DRAFT - 1.5L vehicles repaired under 19B37 - one time repair.pdf
- 21N12 ASO Backup File.pdf
- 21N12 FCSD Backup File Subject to Protective Order.pdf
- R19B37C1ENGLISHv3.pdf
- R19B37C1SPANISHv3.pdf
- R21N123.pdf
- R21N12BULL.pdf

FSA 12S39

- 12S39 ASO.pdf
- 12S39 FCSD Subject to Po.pdf
- 12S39_12X38 Fact Sheet.pdf
- 12S39_12X38.pdf
- 12S39_14D_Final w attachments.pdf
- R12S39.pdf
- R12S393.pdf

- R12S39BS.pdf
- R12S39C1.pdf

FSA 12S41

- 12S41 FCSD -Subject to Protective Order.pdf
- 12S41_12X53 Fact Sheet.pdf
- 12S41_14D_Final w attachments.pdf
- 12S41-S1.pdf
- 12S41-S2.pdf
- 12S41-S3.pdf
- 12S41-S4.pdf
- 12S41-S5.pdf
- 12S41.pdf

FSA 13S12

- 13S12 14D.pdf
- 13S12 FCSD -Subject to Protective Order.pdf
- 13S12_13X57 Fact Sheet.pdf
- 13S12-S1.pdf
- 13S12-S2.pdf
- 13S12-S3.pdf
- 13S12.pdf
- R13S12.pdf
- R13S123.pdf
- R13S124.pdf
- R13S125.pdf
- R13S12ES.pdf
- R13S12F1.pdf
- R13S12F2.pdf
- R13S12QA.pdf
- R13S12VD.pdf

FSA 17S09

- 17S09 FCSD -Subject to Protective Order.pdf
- 17S09_16X85 Fact sheet.pdf
- 17S09-S1.pdf
- 17S09-S2.pdf
- 17S09-S3.pdf
- 17S09.pdf
- 16X85 - FSA Financial Estimate.xlsx
- 17S09 14D.pdf
- 17S09-S3-A4.pdf
- 17S09-S3-A5.pdf
- 17S09-S3-A6.pdf
- 17S09-S3-A7.pdf
- 17S09-S3-A8.pdf
- 17S09-S3V2.pdf

- 17S09-S3_Fiesta_JUL13.pdf
- 17S09C1-P_2019.pdf
- PART 573 DEFECT INFORMATION REPORT.pdf
- r17S09-Jun18-E.pdf
- r17S09.pdf
- r17S093.pdf
- r17S09c1.pdf
- r17S09C1_P_S_2019.pdf
- r17S09C1_RA_2019.pdf
- r17S09C1_RA_S_2019.pdf
- r17S09RR.pdf
- r17S09_ESCAPE_CHECK.pdf
- r17S09_FIESTA_CHECK.pdf
- r17S09_FUSION_CHECK.pdf
- r17S09_TC_CHECK.pdf
- RCONL-17V209-7053.pdf
- RCONL-17V209-5855.pdf

GSBs

- FORD-MILLER 00143263
- FORD-MILLER 00143266

SSMs

- 32040.pdf
- 44479.pdf
- 44517.pdf
- 44849.pdf
- 45887.pdf
- 47462.pdf
- 47625.pdf
- 47826.pdf
- 47849.pdf
- 48106.pdf
- 48150.pdf

TSBs

- 16-0130.pdf
- 16-0150.pdf
- 17-0028.pdf
- 17-2270.pdf
- 18-2353.pdf
- 19-2139.pdf
- 19-2172.pdf
- 19-2208.pdf
- 19-2346.pdf
- 19-2375.pdf
- 20-2100.pdf

- 21-2269.pdf
- 22-2133.pdf
- 22-2134.pdf
- 22-2229.pdf
- 22-2322.pdf

**CARFAX Reports**
Bardorf Subject Vehicle, [redacted] 3/18/26
Bozhinov Subject Vehicle, [redacted] 3/15/26
Christodaro Subject Vehicle, 1FMCU9GD5HUD28657, 3/12/26
Constable Subject Vehicle, [redacted] 3/13/26
Gonzalez Subject Vehicle, [redacted] 3/15/26
Lund Subject Vehicle, 1FMCU9G95GUB74249, 3/13/26
Metro Subject Vehicle, [redacted] 3/18/26
Morford Subject Vehicle, [redacted] 3/14/26
Mullen Subject Vehicle, [redacted] 3/14/26

**Exemplar Vehicle Fluid Test Results - Bureau Veritas Sample Analysis Reports**
2015 Escape with 2.0-liter subject engine, Coolant (Lab No. 202507300892)
2015 Escape with 2.0-liter subject engine, Engine Oil (Lab No. 202507292476)
2016 Escape with 1.6-liter subject engine, Coolant (Lab No. 202507300891)
2016 Escape with 1.6-liter subject engine, Engine Oil (Lab No. 202507292474)
2018 Fusion with a 1.5-liter subject engine, Coolant (Lab No. 202507300890)
2018 Fusion with a 1.5-liter subject engine, Engine Oil (Lab No. 202507292478)
New Motorcraft Engine Oil (Lab No. 202507300893)
New Motorcraft Coolant (Lab No. 202507292477)

**Manuals and Brochures**
Owner's Manual and Brochure for all Subject Vehicles

**Service and Repair Information**
Ford Service and Repair Information for all Subject Vehicles (Alldata.com)

**Warranty Data**
Miller GSAR Data

- FORD-MILLER 00905692
- FORD-MILLER 00905693
- FORD-MILLER 00905694
- FORD-MILLER 00905695
- FORD-MILLER 00905696

Nelson GSAR Data

- NELSON-FORD 0297724
- NELSON-FORD 0297725
- NELSON-FORD 0297726

**Superior Forensic Engineering Inspection Photographs and Documents**

Balaszek (IN) 2023.08.15
- BALASZEK_SFE_1001- BALASZEK_SFE_1123
- BALASZEK_SFE_CYLINDER1_1001- BALASZEK_SFE_CYLINDER1_1005
- BALASZEK_SFE_CYLINDER2_2001- BALASZEK_SFE_CYLINDER2_2005
- BALASZEK_SFE_CYLINDER3_3001- BALASZEK_SFE_CYLINDER3_3004
- BALASZEK_SFE_CYLINDER4_4001- BALASZEK_SFE_CYLINDER4_4006

Christodaro (CO) 2023.08.02
- CHRISTODARO_SFE_1001- CHRISTODARO_SFE_1159

Cicero (IL) 2022.10.18
- CICERO_SFE_1001- CICERO_SFE1097 Cylinder 1-2

Manfras (MD) 2023.04.26
- MANFRA_SFE_1001- MANFRA_SFE_1071

Wests (CA) Part 1 - 2022.03.10
- WEST_SFE_1001- WEST_SFE_1059

Wests (CA) Part 2 - 2022.04.04
- WEST_SFE_2001- WEST_SFE_2068

Gonzalez (2025.11.24)
- GONZALEZ_SFE_PB240163- GONZALEZ_SFE_PB240197
- GONZALEZ_SFE_Cylinder 1-1- GONZALEZ_SFE_Cylinder 1-7
- GONZALEZ_SFE_Cylinder 2-1- GONZALEZ_SFE_Cylinder 2-7
- GONZALEZ_SFE_Cylinder 3-1- GONZALEZ_SFE_Cylinder 3-9
- GONZALEZ_SFE_Cylinder 4-1- GONZALEZ_SFE_Cylinder 4-8

Kennedy (2025.12.03)
- KENNEDY_SFE_PC040229- KENNEDY_SFE_PC040280

Krecek (2025.11.10)
- KRECEK_SFE_PB100322- KRECEK_SFE_PB100382

Metro (2025.07.30)
- METRO_SFE_P7300163- METRO_SFE_P7300214
- METRO_SFE_Cylinder 1-1- METRO_SFE_Cylinder 1-7
- METRO_SFE_Cylinder 2-1- METRO_SFE_Cylinder 2-7
- METRO_SFE_Cylinde 3-1- METRO_SFE_Cylinder 3-6
- METRO_SFE_Cylinder 4-1- METRO_SFE_Cylinder 4-7

Miller (2025.02.17)
- MILLER_SFE_P2170001- MILLER_SFE_P2170068

Mullen (2025.09.24)
- MULLEN_SFE_P9230163- MULLEN_SFE_P9230219
- MULLEN_SFE_Cylinder 1-1- MULLEN_SFE_Cylinder 1-11
- MULLEN_SFE_Culinder 2-4- MULLEN_SFE_Cylinder 2-14
- MULLEN_SFE_Cylinder 3-1- MULLEN_SFE_Cylinder 3-8
- MULLEN_SFE_Cylinder 4-1- MULLEN_SFE_Cylinder 4-6

Nelson (CA)-prospective 2024.03.13
- NELSON_SFE_1001- NELSON_SFE_1068
- NELSON_SFE_Cylinder 1-1- NELSON_SFE_Cylinder 1-6
- NELSON_SFE_Cylinder 2-1- NELSON_SFE_Cylinder 2-6

- NELSON_SFE_Cylinder 3-1- NELSON_SFE_Cylinder 3-9
- NELSON_SFE_Cylinder 4-1- NELSON_SFE_Cylinder 4-11

Pickering (2025.11.07)
- PICKERING_SFE_PB070259- PICKERING_SFE_PB070321
- PICKERING_SFE_Cylinder 1-1- PICKERING_SFE_cylinder 2-7
- PICKERING_SFE_Cylinder 2-1- PICKERING_SFE_cylinder 2-7
- PICKERING_SFE_Cylinder 3-1- PICKERING_SFE_Cylinder 3-7
- PICKERING_SFE_Cylinder 4-1- PICKERING_SFE_Cylinder 4-9

Simmonds (2025.12.04)
- SIMMONDS_SFE_Cylinder 1-3- SIMMONDS_SFE_PC040228
- SIMMONDS_SFE_Cylinder 1-1- SIMMONDS_SFE_Cylinder 1-9
- SIMMONDS_SFE_Cylinder 2-1- SIMMONDS_SFE_Cylinder 2-8
- SIMMONDS_SFE_Cylinder 3-1- SIMMONDS_SFE_Cylinder 3-8
- SIMMONDS_SFE_Cylinder 4-1- SIMMONDS_SFE_Cylinder 4-8

Bozhinov (2025.12.15)
- Bozhinov_SFE_PC150164- Bozhinov_SFE_PC150202
- Bozhinov_SFE_Cylinder 1-1- Bozhinov_SFE_Cylinder 1-8
- Bozhinov_SFE_Cylinder 2-1- Bozhinov_SFE_Cylinder2-7
- Bozhinov_SFE_Cylinder 3-1- Bozhinov_SFE_Cylinder3-3
- Bozhinov_SFE_Cylinder 4-1- Bozhinov_SFE_Cylinder 4-8

Constable 2025.12.17
- Constable_SFE_PC170164- Constable_SFE_PC170221

Morford (2025.12.11)
- Morford_SFE_PC110164- Morford_SFE_PC110203
- Morford_SFE_Cylinder 1-1- Morford_SFE_Cylinder 1-8
- Morford_SFE_Cylinder 2-1- Morford_SFE_Cylinder 2-13
- Morford_SFE_Cylinder 3-1- Morford_SFE_Cylinder 3-12
- Morford_SFE_Cylinder 4-1- Morford_SFE_Cylinder 4-14

Pirog (2025.12.18)
- Pirog_SFE_PC180222- Pirog_SFE_PC180253
- Pirog_SFE_Cylinder 1-1- Pirog_SFE_Cylinder 1-7
- Pirog_SFE_Cylinder 2-1- Pirog_SFE_Cylinder 2-8
- Pirog_SFE_Cylinder 3-1- Pirog_SFE_Cylinder 3-9
- Pirog_SFE_Cylinder 4-1- Pirog_SFE_Cylinder 4-12

**Photographs of the Named Plaintiffs' Evidence Engines Shared by Plaintiffs Counsel Shortly Before the Multiparty Inspection**
- Ford Engines for Inspection.pdf (7 photographs)

**References**

Erjavec, Jack, "Automotive Technology." Cengage Learning Inc, 2020

Halderman, James D., and Chase D. Mitchell, "Automotive Technology", Pearson, 2020

Heywood, John, "Internal Combustion Engine Fundamentals", 2018

Greuter, Ernst, and Stefan Zima, "Engine Failure Analysis", SAE International, 2012

National Fire Protection Association (NFPA) 921 – Guide for Fire and Explosion Investigations, 2024
Kestly, Mike, et al. Accelerated testing of multi-layer steel cylinder head gaskets. No. 2000-01-1188. SAE Technical Paper, 2000.
Brewer, T. and Chen, X., "Cylinder Head Gasket Fretting/Scrub Mechanism Investigation and Analysis Procedure Developments," SAE Technical Paper 2017-01-1091, 2017, doi:10.4271/2017-01-1091.

# Exhibit C: Testimony of Peter Lillo, Ph.D., in the Past Four Years

*In Re: Kia Hyundai Vehicle Theft Marketing, Sales Practices, and Product Liability Litigation – All Subrogation Claims,* U.S.D.C. Central District of California Southern Division, No. 22-ML-03052-JVS-KES, James M. Sabovich, Callahan & Blaine, Counsel for Hyundai Motor America and Kia America, March 6, 2026, Deposition.

*In Re: Kia Hyundai Vehicle Theft Marketing, Sales Practices, and Product Liability Litigation - Government Entities Track,* U.S.D.C. Central District of California Southern Division, No. 8:22-ML-03052-JVS-KES, Justin Griffin, Quinn Emanuel Urquhart & Sullivan LLP, Counsel for Hyundai Motor America and Kia America, March 5, 2026, Deposition.

*Droesser et al. v. Ford Motor Company*, U.S.D.C. Eastern District of Michigan, Case No.: 2:23-cv-11744-LJM-APP, Brian Schmalzbach, McGuireWoods LLP, Counsel for Ford Motor Company, October 3, 2025, Deposition.

*Baus et al. v. Ford Motor Company*, U.S.D.C. Eastern District of Michigan, Case No.: 2:21-cv-10024-GAD-EAS, Ian Edwards, Klein Thomas Lee & Fresard, Counsel for Ford Motor Company, August 7, 2025, Deposition.

*Lena Jamil et al. v. Mercedes-Benz USA, Inc.,* U.S.D.C. Central District of California, Case No.: 2:22-cv-08130-FLA-AJR, Eric Knapp, Winston & Strawn LLP, Counsel for Mercedes-Benz USA, Inc., May 30, 2025, Deposition.

*Graves et al. v. Smitty's Supply, Inc., et al.*, U.S.D.C. Western District of Missouri, Case No.: 4:20-MD-02936-SRB, Nikki Cannezzaro, Cannezzaro Marvel LLC, Counsel for Smitty's Supply Inc., and CAM2 International LLC, May 23, 2024, Deposition.

*Employers Mutual Casualty Company v. Roll-Rite and Safe Fleet Acquisition Corp.*, U.S.D.C. Utah, Central Division, Case No. 2:22-cv-00393-DAO, John Zidow, Strong & Hanni PC, Counsel for Roll-Rite and Safe Fleet Acquisition Corp., February 23, 2024, Deposition.

*Kai Lee v. State Farm General Insurance Company*, Case No. 3:22-cv-00548-LB, U.S.D.C. Northern District of California, Ronald D. Schivo, Utrecht & Lenvin LLP, Counsel for Kai Lee, December 7, 2023, Deposition.

*In Re: Smitty's/CAM2 303 Tractor Hydraulic Fluid Marketing, Sales Practices, and Products Liability Litigation*, U.S.D.C. Western District of Missouri, Case No.: 4:20-MD-02936-SRB, Nikki Cannezzaro, Cannezzaro Marvel LLC, Counsel for Smitty's Supply Inc., and CAM2 International LLC, February 21, 2023, Deposition.

*Markeith Mitchell et al. v. Harbor Freight Tools USA, Inc.,* U.S.D.C. Central District of California, Case No.:2:20-CV-05451-DMG-KK, Michael Roth, King & Spalding LLP, Counsel for Harbor Freight Tools USA, January 4, 2023, Deposition.

*NGL Energy Partners v Regent Equipment Leasing*, District Court, City and County of Denver, State of Colorado, Case No. 2020CV33354, David Hansen, Kumpf Charsley & Hansen, Counsel for Regent Equipment Leasing, February 9, 2022, Deposition.

*Eric Stevens et al. v. Ford Motor Company*, Case No. 2:18-cv-00456, U.S.D.C. Southern District of Texas, Corpus Christy Division, Cole Geddy, McGuireWoods LLP, Counsel for Ford Motor Company, June 9, 2021, Deposition.

*William Edward Baker v. Alpha Consolidated Holdings, Inc., and Illinois Tool Works, Inc. d/b/a Gumout*, U.S.D.C. Delaware, Case No. 18-976 (LPS)(CJB), Thomas W. Yeh, Latham & Watkins LLP, Counsel for Alpha Consolidated Holdings, April 14, 2021, Deposition.

*Rosa Cheung v. Kai Lee,* CGC-19-578079, State of California, County of San Francisco, Michael Bracamontes, Bracamontes & Vlasak P.C., Counsel for Plaintiff, September 10, 2020, Deposition.

*In Re Dollar General Corp. Motor Oil Marketing and Sales Practice Litigation,* U.S.D.C. Western District of Missouri, Western Division, MDL No. 2709, R. Trent Taylor, McGuireWoods LLP, Counsel for Dollar General Corp., July 13, 2018, Deposition.