Mark P. Chalos (*pro hac vice*)
**LIEFF CABRASER HEIMANN & BERNSTEIN, LLP**
222 2nd Ave South, Suite 1640
Nashville, Tennessee 37219-2423
Telephone: (615) 313-9000
mchalos@lchb.com

[Additional Counsel on Signature Pages]

*Attorneys for Plaintiffs and the Proposed Classes*

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

VANESSA MILLER, et al., as individuals and on behalf of all others similarly situated,

Plaintiffs,

v.

FORD MOTOR COMPANY,

Defendant.

Case No. 2:20-cv-01796-DAD-CKD (Consolidated with Nos. 2:21-cv-00417-DAD-CKD, 2:21-cv-00468-DAD-CKD)

**PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

Date: September 21, 2026
Time: 1:30 p.m.
Judge: Hon. Dale A. Drozd
Courtroom: 4, 15th Floor

# TABLE OF CONTENTS

**Page**


I. INTRODUCTION ..... 1
II. LEGAL STANDARD ..... 2
III. ARGUMENT ..... 2
A. Genuine Triable Issues of Fact Exist as to Whether the Morfords' (KS), Mullen's (OH), Metro's (MI), and Balaszek's (IN) Class Vehicles Were Unmerchantable. ..... 2
1. The Class Vehicles Were Not Fit For Their Ordinary Purpose of Providing Safe Transportation. ..... 3
2. Continued Use of the Class Vehicles Is Not Evidence of Merchantability. ..... 5
3. Every Plaintiff's Case Record Establishes a Triable Question of Merchantability. ..... 6
a. The Morfords' (KS) 2017 2.0L Ford Escape Was Not Merchantable. ..... 6
b. Brad Mullen's (OH) 2017 2.0L Ford Edge Was Not Merchantable. ..... 7
c. Tracey Metro's (MI) 2018 2.0L Ford Edge Was Not Merchantable. ..... 8
d. Teresa Balaszek's (IN) 2017 1.5L Ford Escape Was Not Merchantable. ..... 9
B. Durational Limits in Balaszek's Warranty Do Not Bar Her Implied Warranty Claim. ..... 9
C. The Magnuson-Moss Warranty Act Claims For Plaintiffs Morfords, Mullen, Metro, Balaszek, Lund, and Wests Go Hand-in-Hand With Their Implied Warranty Claims. ..... 10
D. Whether Plaintiffs Wests (CA), Miller (CA), and Pickering (IN) Purchased and Used Their Vehicles Primarily for Personal Use is a Triable Issue of Fact. ..... 10
E. There Is a Triable Issue of Fact as to Whether Ford Had a Duty to Disclose the Defect to Plaintiff Gonzalez under the Texas Deceptive Trades Act (DTPA). ..... 12
F. Plaintiffs' Claims Are Timely. ..... 13
1. Ford Fraudulently Concealed the Saw Cut Defect. ..... 14
2. Relevant State Law Supports Tolling under These Circumstances. ..... 15
a. Patsy Lund (AR) – Implied Warranty ..... 15
b. Amber and Evan West (CA) – CLRA and Song-Beverly Implied Warranty Claims ..... 16
c. Teresa Balaszek (IN) and Scott Pickering (IN) – Indiana Deceptive Consumer Sales Act ("IDCSA") and Implied Warranty Claims ..... 19
d. Aaron and Victoria Manfra (MD) – Implied Warranty ..... 21
e. Tracey Metro (MI) – Implied Warranty ..... 22
G. Ford's Summary Judgment Motion Does Not Bind the Class. ..... 25
IV. CONCLUSION ..... 25

## TABLE OF AUTHORITIES

**Page**

**Cases**

*Adams v. Nissan North America, Inc.*,
395 F. Supp. 3d 838 (S.D. Tex. 2018) ....13

*Alger v. FCA US LLC*,
334 F.R.D. 415 (E.D. Cal. 2020) ....6

*Aliff v. Vervent Inc.*,
2022 WL 3588322 (S.D. Cal. Aug. 22, 2022) ....25

*Allen v. Similasan Corp.*,
96 F. Supp. 3d 1063 (S.D. Cal. 2015) ....23

*Anderson v. Liberty Lobby Inc.*,
477 U.S. 242 (1986) ....2

*Baranco v. Ford Motor Co.*,
2018 WL 5474549 (N.D. Cal. Oct. 26, 2018) ....23, 24

*BK Trucking Co. v. Paccar, Inc.*,
2016 WL 3566723 (D.N.J. June 30, 2016) ....12

*Buraimoh v. BMW of N. Am., LLC*,
2020 WL 7711823 (W.D. Tex. Dec. 29, 2020) ....12, 13

*Cabrera v. Bayer Healthcare LLC*,
2024 WL 4228237 (C.D. Cal. June 24, 2024) ....25

*Carroll v. BMW of North America, LLC*,
553 F. Supp. 3d 588 (S.D. Ind. 2021) ....20, 21

*Castagna v. Newmar Corp.*,
340 F. Supp. 3d 728 (N.D. Ind. 2018) ....3

*In re Caterpillar, Inc., C13 & C15 Engine Prods. Liab. Litig.*,
2015 WL 4591236 (D.N.J. July 29, 2015) ....11, 19

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986) ....2

*Chapman v. Gen. Motors LLC*,
531 F. Supp. 3d 1257 (E.D. Mich. 2021) ....5

*Clarke v. Carmax Auto Superstores CA, LLC*,
2017 WL 3579554 (C.D. Cal. July 24, 2017) ....5

*Clarkson v. Alaska Airlines, Inc.*,
59 F.4th 424 (9th Cir. 2023) ....2

*Clemens v. DaimlerChrysler Corp.*,
534 F.3d 1017 (9th Cir. 2008) ....10

*Click v. General Motors LLC*,
2020 WL 3118577 (S.D. Tex. Mar. 27, 2020) ....13

## TABLE OF AUTHORITIES
**(continued)**

**Page**

*Counts v. Gen. Motors, LLC*,
606 F. Supp. 3d 678 (E.D. Mich. 2022)....................21

*Cwiakala v. Econ. Autos, Ltd.*,
587 F. Supp. 1462 (N.D. Ind. 1984)....................21

*Edwards v. Angeles Abbey Mem'l Park, Inc.*,
2009 WL 1971375 (C.D. Cal. July 2, 2009)....................25

*Elward v. Electrolux Home Products, Inc.*,
264 F. Supp. 3d 877 (N.D. Ill. 2017)....................19, 20

*Estakhrian v. Obenstine*,
859 F. App'x 121 (9th Cir. 2021)....................25

*In re FCA US LLC Monostable Elec. Gearshift Litig.*,
334 F.R.D. 96 (E.D. Mich. 2019)....................3

*Fedrick v. Mercedes-Benz USA, LLC*,
366 F. Supp. 2d 1190 (N.D. Ga. 2005)....................5

*Filipovic v. Fairchild Chevrolet*,
2001 WL 1141384 (Ohio Ct. App. Sept. 27, 2001)....................3, 7, 8

*Floyd v. Koenig*,
274 S.W.3d 339 (Ark. Ct. App. 2008)....................15, 16

*In re Ford Motor Co., Spark Plug & 3-Valve Engine Prods. Liab. Litig.*,
2014 WL 3778592 (N.D. Ohio July 30, 2014)....................3

*Francis v. Gen. Motors, LLC*,
504 F. Supp. 3d 659 (E.D. Mich. 2020)....................3

*Galvez v. Ford Motor Co.*,
2018 WL 4700001 (E.D. Cal. Sept. 30, 2018)....................18

*Garcia v. Gen. Motors LLC*,
2018 WL 6460196 (E.D. Cal. Dec. 10, 2018)....................17

*General Motors Corp. v. Bryant*,
285 S.W.3d 634 (Ark. 2008)....................16

*In re General Motors LLC CP4 Fuel Pump Litigation*,
393 F. Supp. 3d 871 (N.D. Cal. 2019)....................18

*Hamm v. Mercedes-Benz USA, LLC*,
2024 WL 3187364 (N.D. Cal. June 26, 2024)....................11

*Herremans v. BMW of N. Am., LLC*,
2014 WL 5017843 (C.D. Cal. Oct. 3, 2014)....................17

*Hobson v. Entergy Ark., Inc.*,
432 S.W.3d 117 (Ark. Ct. App. 2014)....................15

**TABLE OF AUTHORITIES**
**(continued)**

**Page**

*Holiday Inn Franchising, Inc. v. Hotel Assocs., Inc.*,
382 S.W.3d 6 (Ark. Ct. App. 2011) ....16

*In re Honda Idle Stop Litig.*,
2024 WL 5274644 (C.D. Cal. Dec. 26, 2024) ....11, 12

*Int'l Petrol. Servs., Inc. v. S & N Well Serv., Inc.*,
639 P.2d 29 (Kan. 1982) ....3

*Johnson v. Kody Domestics II, Inc.*,
2026 WL 1414042 (D. Md. May 20, 2026) ....21

*Kenworth of Indianapolis, Inc. v. Seventy-Seven Ltd.*,
134 N.E.3d 370 (Ind. 2019) ....9, 10

*Kovack v. Daimler Chrysler Corp.*,
2006 WL 1293213 (Mich. Ct. App. May 11, 2006) ....8, 9

*Lessin v. Ford Motor Co.*,
2021 WL 3810584 (S.D. Cal. Aug. 25, 2021) ....13

*Lloyd v. Gen. Motors Corp.*,
916 A.2d 257 (Md. 2007) ....21

*Ludwig v. FCA US LLC*,
795 F. Supp. 3d 525 (D.N.J. 2025) ....13

*Lyman v. Ford Motor Co.*,
2022 WL 856393 (E.D. Mich. Mar. 22, 2022) ....8, 9

*Marksberry v. FCA US LLC*,
481 F. Supp. 3d 1229 (D. Kan. 2020) ....3, 7

*Marksberry v. FCA US LLC*,
606 F. Supp. 3d 1075 (D. Kan. 2022) ....7

*Matanky v. Gen. Motors LLC*,
370 F. Supp. 3d 772 (E.D. Mich. 2019) ....5

*Mercedes-Benz of North America, Inc. v. Garten*,
618 A.2d 233 (Md. Ct. Spec. App. 1993) ....21

*Miller v. DaimlerChrysler Motors Corp.*,
2001 WL 587496 (Ohio Ct. App. May 31, 2001) ....8

*Miller v. Gen. Motors, LLC*,
773 F. Supp. 3d 461 (E.D. Mich. 2025) ....16, 24

*Mize v. BMW of N. Am., LLC*,
2020 WL 1526909 (N.D. Tex. Mar. 31, 2020) ....12, 13

*Murphy v. Toyota Motor Sales USA Inc.*,
2020 WL 10354129 (C.D. Cal. Nov. 24, 2020) ....5

**TABLE OF AUTHORITIES**
**(continued)**

**Page**

*In re MyFord Touch Consumer Litig.*,
291 F. Supp. 3d 936 (N.D. Cal. 2018) ....................5

*In re MyFord Touch Consumer Litig.*,
46 F. Supp. 3d 936 (N.D. Cal. 2014) ....................10

*Nelson v. Ford Motor Co.*,
2025 WL 2581611 (E.D. Cal. Sept. 5, 2025)....................17, 24

*Nelson v. Ford Motor Co.*,
No. 2:24-cv-02231-DAD-CKD ....................17

*In re Packaged Seafood Prods. Antitrust Litig.*,
2022 WL 439452 (S.D. Cal. Feb. 11, 2022)....................15

*Paydar v. Jaguar Land Rover N. Am., LLC*,
2019 WL 3253068 (S.D. Cal. July 19, 2019) ....................11

*Philips v. Ford Motor Co.*,
2015 WL 4111448 (N.D. Cal. July 7, 2015)....................16, 17, 18

*Philips v. Ford Motor Co.*,
2016 WL 1745948 (N.D. Cal. May 3, 2016)....................16, 17

*Popham v. Keystone RV Co.*,
2016 WL 4993393 (N.D. Ind. Sept. 19, 2016) ....................9, 10

*Priebe v. Autobarn, Ltd.*,
240 F.3d 584 (7th Cir. 2001) ....................5

*Reed v. Ford Motor Co.*,
No. 2:21-cv-00417-DAD-CKD ....................23

*Robinson v. Gen. Motors LLC*,
2021 WL 3036353 (D. Del. July 19, 2021) ....................19, 20

*Sanchez v. Kia Motors Am., Inc.*,
2021 WL 4816834 (C.D. Cal. Aug. 9, 2021)....................12

*In re SCBA Liquidation, Inc.*,
451 B.R. 747 (Bankr. W.D. Mich. 2011)....................3

*Schwarzschild v. Tse*,
69 F.3d 293 (9th Cir. 1995) ....................25

*Sharkus v. Daimler Chrysler Corp.*,
2002 WL 31319119 (Ohio Ct. App. Oct. 17, 2002) ....................8

*Sharp v. Tom Wood East, Inc.*,
822 N.E.2d 173 (Ind. Ct. App. 2004)....................9

*Shea v. General Motors LLC*,
567 F. Supp. 3d 1011 (N.D. Ind. 2021) ....................10

## TABLE OF AUTHORITIES
## (continued)

**Page**


*Sheris v. Nissan N. Am. Inc.*,
2008 WL 2354908 (D.N.J. June 3, 2008) ........ 6

*In re Syntex Corp. Sec. Litig.*,
95 F.3d 922 (9th Cir. 1996) ........ 23

*In re Takata Airbag Prods. Liab. Litig.*,
2017 WL 2406711 (S.D. Fla. June 1, 2017) ........ 19

*Ulrich v. Gen. Motors, LLC*,
2025 WL 629460 (E.D. Mich. Feb. 25, 2025) ........ 3, 9

*Ussery v. Mercedes-Benz USA LLC*,
2024 WL 4882856 (E.D. Cal. Nov. 25, 2024) ........ 11

*Weidman v. Ford Motor Co.*,
2020 WL 674348 (E.D. Mich. Feb. 11, 2020) ........ 8, 9

*White v. DePuy, Inc.*,
129 Ohio App. 3d 472 (1998) ........ 3

**Statutes**

15 U.S.C. § 2310(d) ........ 10

Ark. Code § 4-2-725(2) ........ 15

Ind. Code § 26-1-2-725(4) ........ 9

Ind. Code § 34-11-5-1 ........ 10

Md. Code Ann., Cts. & Jud. Proc. § 5-203 ........ 21

Mich. Comp. Laws § 440.2725 ........ 22

Mich. Comp. Laws § 600.5855 ........ 22

**Court Rules**

L.R. 260(b) ........ 1

## I. INTRODUCTION

Ford's Motion for Partial Summary Judgment (Dkt. No. 161-1, the "Motion" or "Mot.") downplays and distracts from the seriousness of the saw-cut design defect in Ford's EcoBoost Engines (the "Saw Cut Defect" or "Defect"), a defect that Ford's global powertrain quality chief engineer called [redacted] the company had seen.[1] Try as it might, Ford cannot avoid facing a jury over this [redacted][2] Notably, the majority of the claims Ford seeks to dismiss are made by Plaintiffs who are *not* proposed class representatives in Plaintiffs' pending motion for class certification, which means that the outcome of Ford's Motion for those Plaintiffs will have no impact on the proposed classes. As for the few remaining Plaintiffs subject to the Motion who are proposed class representatives—Teresa Balaszek (IN), Craig and Kelli Morford (KS), Aaron and Victoria Manfra (MD), and Tracey Metro (MI)—dismissal at summary judgment still would not have any preclusive effect because the Court has not yet certified a class. Furthermore, Ford does not challenge the Morfords' and the Manfras' consumer protection act claims, so those Plaintiffs would proceed through class certification even if Ford prevailed on the instant Motion.

In any event, Ford's scattershot challenges to the various Plaintiffs' claims at best raise triable issues of fact for the jury.[3] On implied warranty, testimony from Plaintiffs Morfords (KS), Mullen (OH), Metro (MI), and Balaszek (IN), as well as Ford's records, confirm that the Plaintiffs' Class Vehicles were unmerchantable at the point of sale—and ultimately required an engine replacement because of the common Saw Cut Defect. Disputed material facts likewise apply to the grab-bag of state law issues Ford raises for Plaintiffs Gonzalez (TX), Pickering (IN), the Wests (CA), and Miller's (CA) deceptive practices statutory

---

[1] Ex. 1, Oct.-Nov. 2022 emails re: "Status 1.5L/2.0L Engine FSA Closure Investigation on DFMEA/Design Rules/Requirement PRA updates", FORD-MILLER 00211810, at -10. Citations to "Ex. __" are exhibits attached to the Declaration of Stuart Talley in Support of Plaintiffs' Opposition to Ford's Motion for Partial Summary Judgment. Page cites for Bates-stamped documents in this brief refer to the final digits of the Bates number stamped on the page. Additionally, Plaintiffs have attached to this Opposition their response to Ford's Separate Statement of Undisputed Facts as well as their own Statement of Disputed Facts. *See* L.R. 260(b).

[2] Ex. 2, Oct. 2018 emails re: "Coolant Options for Quality Issue", NELSON-FORD 0011441, at -42.

[3] Plaintiffs do not contest Ford's summary judgment arguments for the express warranty claims of Amber and Evan West (CA) or Brad Mullen (OH) (Mot. at 5-8); the Minnesota False Statement in Advertising Act claim for Mark Kennedy (MN) (Mot. at 14-15); and the UCL restitution claim for the Wests (CA) and Vanessa Miller (CA) (Mot. at 16). Each of these Plaintiffs still have other live claims that are not subject to Ford's Motion. Plaintiffs intend to dismiss Tyson Batdorf (TN) (Mot. at 22-23). None of these Plaintiffs are proposed class representatives in Plaintiffs' Motion for Class Certification.

claims, and the Wests' (CA) Song-Beverly implied warranty claim. And because Ford fraudulently concealed the Saw Cut Defect, its statute of limitations arguments fail for each claim it challenges.

Taken together, the record for summary judgment, including Ford's own documents and testimony, and the sworn testimony of each affected Plaintiff, establishes numerous disputed issues of fact that Ford fails to overcome in its Motion. Ford rests on selective characterizations of the record, authorities addressing materially different facts, and arguments that, even if accepted, would not moot, defeat, or otherwise resolve Plaintiffs' pending Motion for Class Certification. The Court should view Ford's Motion for what it is: a distraction from the central controversy in this case. Ford's Motion should be denied.

## II. LEGAL STANDARD

Under Federal Rule of Civil Procedure 56, summary judgment may be granted "only where there is no genuine issue of any material fact or where viewing the evidence and the inferences which may be drawn therefrom in the light most favorable to the adverse party, the movant is clearly entitled to prevail as a matter of law." *Clarkson v. Alaska Airlines, Inc.*, 59 F.4th 424, 432 (9th Cir. 2023) (citation omitted). As the moving party, Ford bears the burden of producing evidence to establish the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Moreover, "in ruling on a motion for summary judgment, the judge must view the evidence presented through the prism of the substantive evidentiary burden." *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 254 (1986). Credibility determinations, weighing of evidence, and the drawing of inferences from the facts, are functions for the jury. *Id.* at 255.

## III. ARGUMENT

Ford's Motion for Partial Summary Judgment asks the Court to adjudicate numerous disputed questions of fact relevant for approximately half of the named plaintiffs in this action. As set forth below—in the order in which Ford presented its arguments, for the Court's convenience—a reasonable jury could find for Plaintiffs on the factual questions Ford raises in its motion. In addition, Ford's legal quibbles are wrong and, in any event, ill-suited for summary judgment.

### A. Genuine Triable Issues of Fact Exist as to Whether the Morfords' (KS), Mullen's (OH), Metro's (MI), and Balaszek's (IN) Class Vehicles Were Unmerchantable.

Ford asks this Court to grant summary judgment on the implied warranty claims of the Morfords, Mullen, Metro, and Balaszek on the ground that these Plaintiffs' vehicles were technically drivable, so they

must have been fit for their ordinary purpose. Mot. at 8. Not only is this premise inconsistent with the established legal standard for merchantability, it ignores the extensive evidence that Plaintiffs' Class Vehicles were unmerchantable from the point of sale due to the Saw Cut Defect, which made them unsafe and unreliable for basic transportation. Indeed, each of these Plaintiffs testified about the problems they experienced from the Defect, which required them to replace the engines in their vehicles.

### 1. <u>The Class Vehicles Were Not Fit For Their Ordinary Purpose of Providing Safe Transportation.</u>

The core test for breach of implied warranty in the states at issue here is whether the vehicle is fit for the ordinary purpose for which it is used.[4] When it comes to automotive defect cases, all these states recognize that "'merchantability' of an automobile requires a showing that the vehicle operates in a 'safe condition' or provides 'safe transportation,'" not simply that it is capable of providing transportation.[5] *In re FCA US LLC Monostable Elec. Gearshift Litig.*, 334 F.R.D. 96, 112 (E.D. Mich. 2019) (collecting cases).

The record is clear that the Plaintiffs' Class Vehicles were unmerchantable from the point of sale. Each of their cars was sold with engines that had the Saw Cut Defect,[6] a design flaw that Ford itself acknowledged was [redacted][7] Ford's engineers knew they had designed the EcoBoost engine with a saw-cut cooling channel that [redacted]

[4] **IN**: *Castagna v. Newmar Corp.*, 340 F. Supp. 3d 728, 736 (N.D. Ind. 2018) ("To be merchantable, goods must . . . be fit for the ordinary purpose for which such goods are used."); **KS**: *Int'l Petrol. Servs., Inc. v. S & N Well Serv., Inc.*, 639 P.2d 29, 37 (Kan. 1982) ("[T]he implied warranty of merchantability . . . covers fitness for ordinary purposes."); **MI**: *In re SCBA Liquidation, Inc.*, 451 B.R. 747, 772 n.65 (Bankr. W.D. Mich. 2011) ("[A] warranty that the goods are fit for the *ordinary* purpose for which they are used."); **OH:** *In re Ford Motor Co., Spark Plug & 3-Valve Engine Prods. Liab. Litig.*, 2014 WL 3778592, at *42 (N.D. Ohio July 30, 2014) (for implied warranty, a product is considered "defective" only if it "is not of good and merchantable quality, fit and safe for [its] ordinary purpose" (quoting *White v. DePuy, Inc.*, 129 Ohio App. 3d 472, 480 (1998)); *Filipovic v. Fairchild Chevrolet*, 2001 WL 1141384, at *3 (Ohio Ct. App. Sept. 27, 2001) (vehicle is unmerchantable when a defect interferes with its function).

[5] **IN**: *Ulrich v. Gen. Motors, LLC*, 2025 WL 629460, at *4 (E.D. Mich. Feb. 25, 2025) (vehicle must be "fit for the ordinary purpose of providing reasonably safe transportation"); **KS**: *Marksberry v. FCA US LLC*, 481 F. Supp. 3d 1229, 1237 (D. Kan. 2020) ("[A] car's ordinary purpose is not limited to its major components affecting transportation." (citation omitted)); **MI**: *Francis v. Gen. Motors, LLC*, 504 F. Supp. 3d 659, 676 (E.D. Mich. 2020) ("[A]n automobile is merchantable or fit for its intended purpose only where it is able reliably to operate in a 'safe condition' or to provide 'safe transportation.'"); **OH:** *In re Ford Motor Co.*, 2014 WL 3778592, at *42 (to be unmerchantable, vehicle must not be able to "carry[] the consumers from point A to point B in a safe and reliable manner").

[6] Ex. 3, Ford's Feb. 24, 2026 Amended Answers and Objections to Plaintiffs' Interrogatories, Set Two.

[7] Ex. 4, April 2018 emails re: "Saw cut block question," FORD-MILLER 00751671, at -73.

[redacted][8] Indeed, Ford's own internal analysis recognized that all Class Engines suffered from [redacted][9] Once the corrosive damage from coolant intrusion begins, which it inevitably does, it cannot be stopped.[10] Ford even projected that up to [redacted]% of some engines would fail within [redacted] years.[11] These are not vehicles that were merchantable at the time of sale; these are vehicles that were manufactured with a latent, progressive defect destined to cause failure.[12]

The safety hazards created by the Saw Cut Defect further confirm that the Class Vehicles were unfit for their ordinary purpose. As Plaintiffs' engineering expert, Dr. Colin Jordan, explained, the Saw Cut Defect "creates a safety concern" because engine failure can lead to "loss of power while driving," "loss of power-assisted systems," "unexpected deceleration," and "failure in hazardous situations"—all of which put drivers "at a higher risk for a collision" by "making it harder to control the vehicle."[13] Ford's chief engineer for inline engines testified that vehicle engine stalling while on a roadway was considered a safety issue with a [redacted][14] When asked whether "an engine quitting, failing catastrophically could cause a safety issue," Ford's corporate representative agreed.[15] Ford engineer Robert Wade also described the customer experience when engine failure causes the vehicle to operate in "limp home" mode: "[W]hat the customer often feels is, like I was cruising at 45 miles an hour, I wanted to accelerate, and as I tapped in, there was sort of no power there to accelerate."[16] In short, the Saw Cut Defect can cause loss of power while driving, loss of power-assisted systems such as steering and braking, unexpected deceleration, and engine

---

[8] Ex. 5, "Coolant Intrusion Update," FORD-MILLER 00139227, at -34.

[9] Ex. 6, 6-Panel: "Coolant Intrusion 15MY – 18MY Sigma & Duratec Cost Mitigation Strategy" (Dec. 10, 2018), FORD-MILLER 00174749, at -51.

[10] Ex. 7, Dep. of John Dunahay ("Dunahay Dep.") at 26:24–27:4; Ex. 8, Dep. of Joseph Henne ("Henne Dep.") at 139:5–6.

[11] Ex. 9, "1.5L & 2.0L Coolant Intrusion Status" (Mar. 24, 2021), FORD-MILLER 00141197, at -202.

[12] Each of the four named Plaintiffs testified that their Class Vehicles suffered from this Defect and described a persistent and worsening condition. Ex. 10, C. Morford Dep. 24:25–25:13; Ex. 11, K. Morford Dep. 25:23–26:2; 105:17–19, 129:19–23; Ex. 12, Mullen Dep. 29:10–12; 131:22–132:3, 146:11–23; Ex. 13, Metro Dep. 125:19–21, 140:25–141:2; Ex. 14, Balaszek Dep. 74:3–13, 84:19–85:2.

[13] Ex. 15, Dec. of Colin Jordan ¶ 21; *see also id.* ¶¶ 6, 20.

[14] Ex. 16, Dep. of Robert Wade ("Wade Dep.") 269:5-18.

[15] Ex. 17, Brewer Dep. 174:13-16.

[16] Ex. 16, Wade Dep. 51:22-25.

overheating. These are not mere inconveniences; they are the kinds of serious safety hazards that courts have consistently held render a vehicle unmerchantable. *See, e.g.*, *In re MyFord Touch Consumer Litig.*, 291 F. Supp. 3d 936, 947 n.5 (N.D. Cal. 2018) (collecting cases); *Matanky v. Gen. Motors LLC*, 370 F. Supp. 3d 772, 786 (E.D. Mich. 2019) (defect that caused vehicles to overheat, enter a forced reduced speed mode, and lose engine power, made them unfit for ordinary purpose of providing safe and reliable transportation); *Chapman v. Gen. Motors LLC*, 531 F. Supp. 3d 1257, 1276 (E.D. Mich. 2021) (defect that caused unexpected engine stalls and require extensive repairs could make trucks not safe and reliable).

**2. <u>Continued Use of the Class Vehicles Is Not Evidence of Merchantability.</u>**

Ford's only challenge to merchantability is that Plaintiffs continued to use their vehicles after they purchased them. Mot. at 8. Courts reject this argument. *See Clarke v. Carmax Auto Superstores CA, LLC*, 2017 WL 3579554, at *5 (C.D. Cal. July 24, 2017) ("That Plaintiff made extensive use of the Vehicle after its purchase is not dispositive of the implied warranty cause of action. Extensive use does not per se establish that the Vehicle could operate in a 'safe condition,' or that it was 'substantially free of defects.'") (citation omitted); *Murphy v. Toyota Motor Sales USA Inc.*, 2020 WL 10354129, at *4-6 (C.D. Cal. Nov. 24, 2020) (rejecting argument that plaintiffs' continued driving of car after learning of defect was dispositive of fitness for ordinary purpose); *In re MyFord Touch*, 291 F. Supp. 3d at 947 ("The law does not require Plaintiffs to introduce proof that the vehicles were not in fact used to demonstrate unmerchantability. They can also demonstrate unmerchantability by introducing evidence that their vehicles were affected by a persistent defect that so affected their safety, reliability, or operability as to render them unfit."); *see also* Dkt. 71 (Order Granting in Part and Denying in Part Ford's Motion to Dismiss) at 12 ("The ordinary purpose of a vehicle is not just to provide transportation, but rather safe and reliable transportation.").

In support of its argument, Ford relies principally on cases involving defects that were not present at the time of sale, that were fully and permanently repaired, or that never affected the safety or core function of the vehicle at issue. *See Priebe v. Autobarn, Ltd.*, 240 F.3d 584, 587-88 (7th Cir. 2001) (finding no breach where the buyer of a used car sold "as is," subject to a full warranty disclaimer, continued to drive it more than 30,000 miles without incident after repairing pre-existing collision damage that his own insurer had already paid to fix); *Fedrick v. Mercedes-Benz USA, LLC*, 366 F. Supp. 2d 1190, 1193, 1199-1200 (N.D. Ga. 2005) (granting summary judgment where the only alleged defects were "resolved within, at the

most, six [] months after [plaintiff] purchased the car," and she "admit[ted]" the vehicle "provides safe and reliable transportation"); *Sheris v. Nissan N. Am. Inc.*, 2008 WL 2354908, at *5-6 (D.N.J. June 3, 2008) (dismissing an implied warranty claim where the plaintiff pleaded only the bare "legal conclusion" that allegedly defective parts were "unsafe"). None of these decisions involved a record like the one here, where the evidence establishes that the Defect existed in every Class Vehicle at the point of sale and caused ongoing problems with safety and reliability.

**3. <u>Every Plaintiff's Case Record Establishes a Triable Question of Merchantability.</u>**

As discussed further below, there are abundant facts in the record for a reasonable jury to find that Plaintiffs' vehicles were unmerchantable, regardless of how much they drove them.

**a. <u>The Morfords' (KS) 2017 2.0L Ford Escape Was Not Merchantable.</u>**

Plaintiffs Craig and Kelli Morford's 2017 Ford Escape experienced coolant intrusion (a hallmark of the Saw Cut Defect), which called for an engine replacement when it had only around 66,000 miles.[17] Mrs. Morford testified that she did not believe the vehicle was safe and reliable, and prior to bringing it in, the car "was idling rough" and "felt like it was misfiring," with the check engine light on.[18] The Ford dealership quoted the engine replacement to cost $5,950,[19] which the Morfords had to decline because they could not afford it.[20] Even if they proceeded with the repair, the Ford mechanic informed Mr. Morford that Ford's replacement engine block would be "the exact same engine block that has a defect," which meant "they cannot promise or guarantee that it fixed the issue and that it could recur again within 100 miles or 5,000 miles."[21] Faced with these options, the Morfords were stuck with their vehicle. As Mr. Morford testified, "[d]ue to the defect of the engine, it is no longer a safe vehicle to drive and the cost of repairs was more than what the vehicle's worth."[22] And as Mrs. Morford testified, "I believe the vehicle is unsafe, but we do not have any other option. We can't afford another car, another vehicle."[23] Indeed, the high cost of repairing the Saw Cut Defect may, by itself, demonstrate the vehicle's unmerchantability. *See Alger v. FCA US LLC*, 334

---

[17] Ex. 18, Oct. 31, 2020 Repair Order Detail from Bob Sight Ford, PLTF_0000041.
[18] Ex. 11, K. Morford Dep. 75:23–76:8.
[19] Ex. 18, Oct. 31, 2020 Repair Order Detail from Bob Sight Ford, PLTF_0000041.
[20] Ex. 11, K. Morford Dep. 114:3–9.
[21] Ex. 10, C. Morford Dep. 34:19–35:5.
[22] *Id.* 32:13–16.
[23] Ex. 11, K. Morford Dep. 125:20–126:3.

F.R.D. 415, 426 (E.D. Cal. 2020) (Chrysler's "practice of refusing to cover the cost of a[ headrest] repair outside of the warranty period[] creates a potential safety risk since many consumers who cannot afford a repair may remove their headrests, drive with it deployed, or strap it shut.").

Ford's citation to *Marksberry v. FCA US LLC*, 606 F. Supp. 3d 1075, 1087 (D. Kan. 2022), does not change this analysis. In *Marksberry*, the plaintiff identified no evidence that any defect existed in their truck at the time of sale, which ran trouble-free for over seven years before a single, minor repair produced a "ticking noise" that the court found had "no effect on the truck's operation." *Id.* at 1080. In contrast, the Morfords' car was afflicted by the latent and serious Saw Cut Defect from the outset.

**b. <u>Brad Mullen's (OH) 2017 2.0L Ford Edge Was Not Merchantable.</u>**

Plaintiff Brad Mullen kept an extensive log that detailed the recurring engine issues he experienced with his 2017 Ford Edge, ranging from rough idling to engine cylinder misfires.[24] After a series of ineffective repairs that failed to address the root cause of the problem,[25] Mullen eventually paid for a complete engine replacement after the dealership found coolant in the engine.[26] The vehicle had only approximately 67,000 miles before the engine failed.[27] While Ford claims that Mullen's use of the vehicle throughout this period shows that it was merchantable, the repeated repairs show the ongoing problems he experienced up until his engine was replaced. Ford's point that Mullen gave the car to his daughter fares no better—Mullen testified that he did not suffer any more problems after his engine was replaced (presumably because, by this point, Ford replaced the defective saw-cut engine with the  cross-drill), and he was able to drive it for another 75,000 miles before giving it to his daughter.[28]

Ford relies on three unreported Ohio appellate decisions to argue that Mullen's continued use establishes merchantability, but each is factually distinguishable. In *Filipovic v. Fairchild Chevrolet*, 2001 WL 1141384, at *1, *5 (Ohio Ct. App. Sept. 27, 2001), the court held that the plaintiff failed to prove any defect caused her Jeep's intermittent stalling; the dealer repeatedly serviced the vehicle and "road tested it,

---

[24] *See* Ex. 19, Mullen Misfire Notes Excel, PLTF_0005029.

[25] Ex. 12, Mullen Dep. 143:1-11 (reflash of transmission computer and test of cylinder 1 coil pack), 172:6–22, 175:18–176:21(replacement of cylinder coil packs and clearing codes).

[26] *Id.* 240:19–243:14, 282:8–12; Ex. 20, Aug. 2021 Service Record for coolant loss and engine replacement at Pallotta Ford, PLTF_0005026, at -27.

[27] Ex. 20, Aug. 2021 Service Record for coolant loss and engine replacement at Pallotta Ford, at -27.

[28] Ex. 12, Mullen Dep. 57:8–24, 244:23–245:2.

finding nothing wrong," and the plaintiff nonetheless drove the car more than 20,000 miles with no evidence that the stalling "interfere[d] with her ability to drive." In *Sharkus v. Daimler Chrysler Corp.*, 2002 WL 31319119, at *3-4 (Ohio Ct. App. Oct. 17, 2002), the dealer could not duplicate an intermittent screeching noise and gauge failure the plaintiff reported, and the court held that "sporadic noise and vibration" that does not "interfere[] with the functioning of the [vehicle]" does not render it unmerchantable. And in *Miller v. DaimlerChrysler Motors Corp.*, 2001 WL 587496, at *2, *4-5 (Ohio Ct. App. May 31, 2001), the court found no breach where the plaintiff's complaint of steering noise and vibration was "never diagnosed" despite "many, many" repair attempts, and there was no evidence that the symptoms "affected the safety of the vehicle" or "the engine, drive train, or mechanical functioning" of the car. Unlike the unexplained noises in *Filipovic*, *Sharkus*, and *Miller v. DaimlerChrysler*, the Defect caused Mullen an actual, diagnosed functional impairment that culminated in a full engine replacement—not a mere nuisance.

**c. <u>Tracey Metro's (MI) 2018 2.0L Ford Edge Was Not Merchantable.</u>**

Like Brad Mullen, Tracey Metro experienced ongoing engine issues with her 2018 Ford Edge, including engine misfires, hesitation at startup, and rough operation that worsened over time.[29] These issues persisted after multiple ineffective repairs,[30] and she ultimately had to tow her vehicle to a Ford dealership and pay out-of-pocket for a complete engine replacement in July 2022 when it was still under 100,000 miles.[31] While Ford argues that Metro's use of her vehicle defeats her claim that it was unmerchantable (it does not), the persistent engine problems she experienced show that a reasonable jury could conclude the vehicle was unfit for its ordinary purpose of providing reliable and safe transportation.

None of the Michigan cases Ford cites support summary judgment here. In *Kovack v. Daimler Chrysler Corp.*, 2006 WL 1293213, at *1, *3 (Mich. Ct. App. May 11, 2006), the plaintiff could not prove that a "defect" caused her car's pulling problem; her own expert's evidence was inconclusive, and the issue never recurred over the next seventeen months and 15,000 miles. *Lyman v. Ford Motor Co.*, 2022 WL 856393 (E.D. Mich. Mar. 22, 2022), and *Weidman v. Ford Motor Co.*, 2020 WL 674348 (E.D. Mich. Feb. 11, 2020), are even further afield: both were Rule 12(b)(6) pleading-stage dismissals in which the

---

[29] Ex. 13, Metro Dep. 161:8–162:20.

[30] *Id.* 157:14–158:13 (replacement of O2 sensor), 170:2–20 (replacement of spark plugs, ignition coil, and coils).

[31] Ex. 21, July 2022 Service Record from Imlay City Ford for engine replacement, PLTF_0002604.

complaints contained no allegation that the defect ever prevented the plaintiffs from driving at all. Unlike the unproven, inapposite allegations in *Kovack*, *Lyman*, and *Weidman*, Metro has sworn testimony and repair records, not mere allegations, documenting a diagnosed defect that caused her engine to fail.

**d. Teresa Balaszek's (IN) 2017 1.5L Ford Escape Was Not Merchantable.**

As with the other Plaintiffs, Teresa Balaszek's Class Vehicle had a defective engine that needed replacement. She observed white smoke being emitted from the hood of her 2017 Ford Escape on multiple occasions,[32] and she paid to replace the engine after only 90,000 miles.[33] The mileage that accrued on her vehicle does not change the merchantability analysis, especially when failures from the Saw Cut Defect (which was present in the vehicle from day one) typically manifest after years of continued use.[34]

Ford's citations to *Sharp v. Tom Wood East, Inc.*, 822 N.E.2d 173 (Ind. Ct. App. 2004), and *Popham v. Keystone RV Co.*, 2016 WL 4993393 (N.D. Ind. Sept. 19, 2016), are inapposite. In *Sharp*, the plaintiff purchased her vehicle used with 64,669 miles and the three repairs performed on the vehicle were successful, with the problem never recurring. 822 N.E.2d at 175.[35] *Popham* is likewise distinguishable because it addressed only whether an implied-warranty claim was timely brought within a contractually shortened one-year warranty and limitations period. 2016 WL 4993393, at *4-6. *Popham* did not hold that a vehicle exhibiting a known, safety-related defect from the date of sale is merchantable, nor did it hold that ongoing use of a vehicle defeats an unmerchantability claim.

**B. Durational Limits in Balaszek's Warranty Do Not Bar Her Implied Warranty Claim.**

Ford says Balaszek's implied warranty claim is untimely because it was brought outside the durational limits of her vehicle's express warranty. This argument overlooks that, under Indiana law, the limitations period for contractual claims can be "toll[ed] (or paus[ed]) . . . once the claim has accrued." *Kenworth of Indianapolis, Inc. v. Seventy-Seven Ltd.*, 134 N.E.3d 370, 382 (Ind. 2019) (citing Ind. Code § 26-1-2-725(4)); *see also* Ind. Code § 34-11-5-1. As the Indiana Supreme Court observed in *Kenworth*,

---

[32] Ex. 14, Balaszek Dep. 84:18–85:2.

[33] Ex. 22, Sept. 2020 Repair Record from Dean's Auto Repair, PLTF_0000059.

[34] Class Cert. Br. at 15; Ex. 23, Expert Report of Allise Wachs ¶ 65 (failure probability estimates).

[35] Furthermore, in the twenty years since *Sharp* was decided, courts have found that "the prevailing standard for assessing merchantability of automobiles" is whether it is "fit for the ordinary purpose of providing *reasonably safe* transportation" (*Ulrich*, 2025 WL 629460, at *4), rather than just serving a "primary purpose of transportation" as Ford suggests. Mot. at 11.

"Indiana law disfavors 'limitations of remedy' and so we strictly construe a contract's limiting provisions against the seller on the basis of public policy." *Id.* at 379 (citation omitted). Thus, even if the durational limits of the 5 year/60,000 mile powertrain warranty applied to Balaszek's implied warranty claim, it was tolled until she discovered the Saw Cut Defect due to Ford's fraudulent concealment. *Infra* Section III.F.2.c.

Ford says that a plaintiff must experience manifestation of a defect during the warranty period to maintain an implied warranty claim, but the cases it cites do not support so broad a rule. In *Shea v. General Motors LLC*, 567 F. Supp. 3d 1011, 1020-21 (N.D. Ind. 2021), the durational limit of the express warranty was relevant because the plaintiff purchased his vehicle used, after the express warranty had already expired. *Popham* is likewise distinguishable because the court rejected the plaintiff's claim that the RV defect in question "made the RV unmerchantable from the outset." 2016 WL 4993393, at *6 (citation omitted). As discussed above, *supra* Section III.A, that is not the case here.

### C. <u>**The Magnuson-Moss Warranty Act Claims For Plaintiffs Morfords, Mullen, Metro, Balaszek, Lund, and Wests Go Hand-in-Hand With Their Implied Warranty Claims.**</u>

The Magnuson-Moss Warranty Act ("MMWA") creates a federal cause of action for breach of written and implied warranties arising under state law, and it rises or falls with the underlying state-law warranty claim. *See* 15 U.S.C. § 2310(d); *Clemens v. DaimlerChrysler Corp.*, 534 F.3d 1017, 1022 (9th Cir. 2008) (the court's "disposition of the state law warranty claims determines the disposition of the Magnuson–Moss Act claims"). As set forth herein, the implied warranty claims for the Morford, Mullen, Metro, Balaszek, Lund, and the Wests all raise genuine disputes of material fact that preclude summary judgment. Ford identifies no independent basis for treating the MMWA claims differently from the warranty claims from which they derive, and its own authority confirms that the two rise and fall together. *See In re MyFord Touch Consumer Litig.*, 46 F. Supp. 3d 936, 985-86 (N.D. Cal. 2014). Because there are triable issues of fact for Plaintiffs' warranty claims, summary judgment on their MMWA claims should therefore be denied for the same reasons.

### D. <u>**Whether Plaintiffs Wests (CA), Miller (CA), and Pickering (IN) Purchased and Used Their Vehicles Primarily for Personal Use is a Triable Issue of Fact.**</u>

Ford's argument that the Wests, Miller, and Pickering are precluded from pursuing certain claims because they also used their vehicles for business purposes (Mot. at 13-14) disregards the legal standard and testimony that shows each Plaintiff's substantial personal, family, and household use of their vehicle.

The statutes at issue protect goods bought or used *primarily* for personal, family, or household purposes, and courts applying them ask which purpose predominates, not whether any business use exists at all. *See Paydar v. Jaguar Land Rover N. Am., LLC*, 2019 WL 3253068, at *3-4 (S.D. Cal. July 19, 2019) (Song-Beverly Act); *Ussery v. Mercedes-Benz USA LLC*, 2024 WL 4882856, at *4-5 (E.D. Cal. Nov. 25, 2024) (Song-Beverly Act); *Hamm v. Mercedes-Benz USA, LLC*, 2024 WL 3187364, at *6 (N.D. Cal. June 26, 2024) (CLRA); *In re Caterpillar, Inc., C13 & C15 Engine Prods. Liab. Litig.*, 2015 WL 4591236, at *33 (D.N.J. July 29, 2015) (IDCSA). The evidence Ford cites just shows that the Wests, Miller, and Pickering all used their cars for *both* personal and some business use, which is not enough to preclude their claims.

The Wests testified that their 2013 1.6L Ford Fusion was selected and used as a family car, for family trips, and for daily personal errands.[36] Ms. West's inability to assign a precise work-use percentage (Mot. at 13) is not an admission of primarily business use. To the contrary, her work use included her daily commute,[37] which may not qualify as business use. *See In re Honda Idle Stop Litig.*, 2024 WL 5274644, at *7 (C.D. Cal. Dec. 26, 2024) (plaintiff's mixed use of vehicle, including for commuting, was a triable fact).

Miller testified that her 2017 2.0L Ford Edge was intended for both personal and work use, and the work use reduced significantly (down to 0%) over time.[38] She considered it to be her "personal car" and never stopped using it for personal purposes, including for groceries and road trips.[39] Even if she used her vehicle for business purposes 50 percent of the time for the duration of her vehicle ownership—as Ford suggests, though this is inaccurate—that would still not make business the *primary* use.

Finally, Pickering testified that he used his 2014 1.5L Ford Fusion daily for general and personal use, as well as work.[40] Although he estimated his work use at 75-80% at the time of purchase (Mot. at 14), the Fusion was his sole vehicle and used for all personal purposes as well. In addition, Pickering testified that this estimated percentage included "driving back and forth . . . from home to the office,"[41] which does not qualify as business use that would preclude his IDCSA claim. *See In re Honda Idle Stop Litig.*, 2024

[36] Ex. 24, A. West Dep. 21:15–20; 33:3–17; 37:6–38:11; Ex. 25, E. West Dep. 22:6–16, 23:4–12.
[37] Ex. 24, A. West Dep. 33:14–35:5.
[38] Ex. 26, Miller Dep. 103:18–105:18.
[39] *Id.* 165:16–167:11.
[40] Ex. 27, Pickering Dep. 24:5–13, 26:19–27:5, 80:15–81:15, 81:16–19, 81:20–82:17.
[41] *Id.* 80:15–24.

WL 5274644, at *7. Which purpose predominated, based on the totality of the record, is a jury question.

### E. There Is a Triable Issue of Fact as to Whether Ford Had a Duty to Disclose the Defect to Plaintiff Gonzalez under the Texas Deceptive Trades Act (DTPA).

Plaintiff Gonzalez's claim under the Texas DTPA requires him to prove "(1) [he] is a consumer, (2) [Ford] engaged in false, misleading, or deceptive acts, and (3) these acts constituted a producing cause of [his] damages." *Sanchez v. Kia Motors Am., Inc.*, 2021 WL 4816834, at *7 (C.D. Cal. Aug. 9, 2021) (citation omitted). For omissions-based claims such as this, the defendant must generally be under a duty to disclose. The duty to disclose may arise if an automaker possesses "material information about the vehicle" at the time of sale but "withh[olds] the information of the defect." *Mize v. BMW of N. Am., LLC*, 2020 WL 1526909, at *9 (N.D. Tex. Mar. 31, 2020); *see BK Trucking Co. v. Paccar, Inc.*, 2016 WL 3566723, at *9 (D.N.J. June 30, 2016) (denying motion to dismiss DTPA claim and noting "it would defy reason if there were no duty for a manufacturer to disclose a *known* defect at the time of purchase"). That is precisely what Gonzalez claims here: Ford knew at the time of sale that the 2014 Ford Escape's defective saw-cut engine was prone to internal coolant intrusion.[42] It had a duty to disclose that fact, and a jury could find that its failure to do so was a deceptive practice that violated the DTPA.

Ford says a duty to disclose arises only if there is a "fiduciary and confidential relationship." Mot. at 15. Even cases that (incorrectly) require more than an automaker's superior knowledge don't go that far. A duty to disclose can also arise "where one voluntarily discloses partial information, but fails to disclose the whole truth," "where one makes a representation and fails to disclose new information that makes the earlier representation misleading or untrue," or "where one makes a partial disclosure and conveys a false impression." *Buraimoh v. BMW of N. Am., LLC*, 2020 WL 7711823, at *4 (W.D. Tex. Dec. 29, 2020), *adopted by* 2021 WL 2189176 (W.D. Tex. Jan. 26, 2021). Ford had multiple opportunities to disclose the Saw Cut Defect to Gonzalez: when he bought his car from an authorized Ford dealership in 2014;[43] when he sought service work at an authorized Ford dealership in March 2021;[44] and when he brought his car in to an authorized Ford dealership to fix the Saw Cut Defect in early 2022.[45] *Buraimoh*, 2020 WL 7711823, at *5

---

[42] *See* Class Cert. Br. at 6–13 (discussing Ford's early knowledge of the Saw Cut Defect).
[43] Ex. 28, 2014 Vehicle Sales Contract with Five Star Ford of Texas, PLTF_0001849.
[44] Ex. 29, March 2021 Service Record from Covert Ford-Lincoln, PLTF_0001806.
[45] Ex. 30, March 2022 Service Record from Leif Johnson Ford, PLTF_0001802.

(automaker "concealed the defect when its authorized dealer sold the car to" plaintiff); *see Mize*, 2020 WL 1526909, at *8–9 (duty to disclose satisfied when automaker failed to disclose defect at sale).

Ford's cases do not vitiate its duty to disclose. Mot. at 15. In *Adams v. Nissan North America, Inc.*, 395 F. Supp. 3d 838 (S.D. Tex. 2018), "none of the Plaintiffs purchased or leased their cars directly from Nissan." *Id.* at 850. Because the plaintiffs did not have direct dealings with Nissan, they did "not allege any other facts supporting the inference that a duty may arise by some other circumstance, such that Nissan made any other voluntary or partial disclosure or representation that would give rise to a duty." *Id.* Two of Ford's cases relied entirely on *Adams* when dismissing DTPA claims, and those courts did not analyze the other circumstances giving rise to a duty to disclose. *Ludwig v. FCA US LLC*, 795 F. Supp. 3d 525, 555 (D.N.J. 2025); *Lessin v. Ford Motor Co.*, 2021 WL 3810584, at *12 (S.D. Cal. Aug. 25, 2021). Ford also cites *Click v. General Motors LLC*, 2020 WL 3118577 (S.D. Tex. Mar. 27, 2020), where the court actually rejected the absolute requirement of a confidential or fiduciary relationship and denied the motion to dismiss because "the question of duty to disclose is so closely related to the facts of the case." *Id.* at *7–8. That case did involve affirmative misrepresentations, while Gonzalez's case is premised on Ford's omissions, but that is immaterial: Gonzalez had direct dealings with Ford, but Ford failed to disclose the Saw Cut Defect despite its superior and exclusive knowledge. *Id.* That is enough to succeed on a DTPA claim.

### F. <u>Plaintiffs' Claims Are Timely.</u>

The challenged claims of Plaintiffs Lund (AR), the Wests (CA), Balaszek (IN), Pickering (IN), the Manfras (MD), and Metro (MI) are timely because Ford fraudulently concealed the Saw Cut Defect.[46]

As set forth below, the record permits a reasonable jury to find, as to each of these Plaintiffs, that: (1) Ford actively concealed the Defect through a systemic pattern of misleading partial disclosures, incomplete recalls, symptom-treating repairs, and suppression of diagnostic information; (2) each Plaintiff lacked actual or constructive knowledge of the Defect as a result of the concealment; and (3) each Plaintiff exercised reasonable diligence under the circumstances. All of the challenged Plaintiffs' states recognize that this pattern of fraudulent concealment tolls the limitations periods for breach of implied warranty and

[46] Ford says these Plaintiffs' claims for breach of implied warranty of merchantability under Arkansas, California, Indiana, Maryland, and Michigan law, and arising under California's CLRA and UCL, and Indiana's IDCSA, are time-barred. Mot. at 2. Although Ford's argument section briefly mentions Kansas law, *id.* at 16, it does not actually move on this basis as to the Morfords' (KS) implied warranty claim.

the consumer-protection statutes at issue, making these claims timely.

**1. Ford Fraudulently Concealed the Saw Cut Defect.**

The record shows Ford's extensive knowledge of problems with the saw-cut EcoBoost engines before releasing them into production, which it concealed from consumers.[47] Ford's pre-release design validation testing failed to test the EcoBoost engines in real-world conditions, and the limited testing it performed still showed coolant leaking into the cylinders and other indicators of coolant intrusion.[48] Prototype EcoBoost engines also experienced coolant-loss-related overheating, and a May 2012 Ford global product-investigation record reported [redacted][49] These failures raised concerns for Ford's engineers, and as one Ford engineering manager noted, [redacted][50]

Once the EcoBoost engines were first sold to the public (starting with the 1.6L EcoBoost "Sigma" engine), the problems only worsened. Ford's engineers saw presence of [redacted]—a symptom of the Saw Cut Defect—by March 2013, before any Plaintiff purchased their vehicle.[51] And in 2014, as Ford proceeded with the development for the 2.0L and 1.5L EcoBoost engines (which contained the same defective saw-cut design as the 1.6L engine), Ford's engineers again observed similar issues with the structural integrity and operating temperatures of those engines that could lead to engine failure.[52] Despite these early warning signs, Ford continued to sell vehicles with the defective EcoBoost engines without disclosing the dangers of its design, despite the mounting problems with the vehicles. To this day,

---

[47] *See* Class Cert Br. at 6–11.

[48] *See* Ex. 8, Henne Dep. 77:16–78:18; Ex. 31, 6-Panel: "CEP I4 Block Bore Bridge Corrosion, 2.0L and 2.3L GTDI" (Nov. 29, 2017), FORD-MILLER 00181824, at -36 ([redacted]).

[49] Ex. 32, May 2012 emails re: "23May gPIR 7:30AM US Time Start: 1.5L GTDI Overheats and Next Steps for CD4.2 M1 and CD4.1 CD391E VP / CD391C HB1", FORD-MILLER 00277179, at -81.

[50] *Id.* at -79.

[51] Ex. 33, Mar. 2013 emails re: "Report Summary for the CQIS Report#DCDDF031", FORD-MILLER 00171397, at -97.

[52] Ex. 34, Aug. 2014 emails re: "VP Quality Meeting August 7", FORD-MILLER 00074514, at -14; Ex. 35, "Sigma GTDI Pre-Ignition/Detonation Study Status" (Aug. 27, 2014), FORD-MILLER 00334431, at -33, -37.

Ford still has not publicly admitted that the saw-cut design of the EcoBoost engines is defective, nor has it issued a recall to replace the engines.

**2. Relevant State Law Supports Tolling under These Circumstances.**

Ford's fraudulent concealment tolls the applicable statute of limitations for each claim at issue. At minimum, whether fraudulent concealment tolling is available "is a material question of fact unresolvable on a Rule 56 motion." *In re Packaged Seafood Prods. Antitrust Litig.*, 2022 WL 439452, at *4 (S.D. Cal. Feb. 11, 2022); *see id.* at *3 (recounting the numerous "triable issues of fact" regarding tolling).

**a. Patsy Lund (AR) – Implied Warranty**

Arkansas's statute of limitations for breach of implied warranty is four years from tender of delivery. Ark. Code § 4-2-725(2). However, fraudulent concealment may toll the statute of limitations. *Floyd v. Koenig*, 274 S.W.3d 339, 342 (Ark. Ct. App. 2008); *see id.* at 343 ("[U]nder Arkansas law, a party may have an obligation to speak rather than remain silent, when a failure to speak is the equivalent of fraudulent concealment."). Here, Ford had a duty to disclose the Defect based on the "inequality of condition and knowledge" between it and Lund. *Hobson v. Entergy Ark., Inc.*, 432 S.W.3d 117, 125 (Ark. Ct. App. 2014). Indeed, when Lund purchased her 2016 2.0L Ford Escape in October 2016,[53] Ford had not disclosed the Saw Cut Defect in her vehicle—even though, by this time, Ford had already issued multiple piecemeal and ineffective safety recalls aimed at fixing coolant leaks in the similarly-designed 1.6L EcoBoost engine,[54] and [redacted][55] Ford did not even disclose the Defect when Lund brought it to Randall Ford for diagnosis of internal coolant intrusion in November 2020—the dealership simply told her the engine was "obsolete" (much to her confusion, given that the car was only four years old) and the replacement part was "back-ordered and not available" for months.[56] This imbalance of information and Ford's failure to disclose the Defect tolled the limitations period, making her implied warranty claim timely.

Ford argues no duty to disclose existed because Lund purchased her vehicle used from a third-party dealer. Mot. at 17. However, "[t]he duty to disclose is not limited to confidential or fiduciary relationships."

---

[53] Ex. 36, Oct. 2016 Retail Installment Contract, PLTF_0004662.

[54] Ex. 37, Dep. of Michael Giunta 90:16–98:25 (discussing recalls).

[55] Ex. 34, Aug. 2014 emails re: "VP Quality Meeting August 7", at -14.

[56] Ex. 38, Lund Dep. 43:19–45:5, 47:13–24.

*Holiday Inn Franchising, Inc. v. Hotel Assocs., Inc.*, 382 S.W.3d 6, 12 (Ark. Ct. App. 2011). Ford cites to *Miller v. Gen. Motors, LLC*, 773 F. Supp. 3d 461 (E.D. Mich. 2025), but the plaintiffs there did "not allege that they had any direct contact with GM prior to purchasing their cars" and did "not allege that they saw any . . . statements" that GM made prior to purchase. *Id.* at 507. In contrast, Lund researched her car on Ford's website and her local authorized Ford dealership's website prior to purchasing it.[57] Ford did not disclose the Saw Cut Defect in any of these representations. Furthermore, Arkansas does not require proof of an affirmative misrepresentation in every case; silence alone satisfies fraudulent concealment wherever, as here, a duty to speak exists. *Floyd*, 274 S.W.3d at 343.

This case is more like *General Motors Corp. v. Bryant*, 285 S.W.3d 634, 637, 642-43 (Ark. 2008), where the Arkansas Supreme Court affirmed certification of implied warranty and fraudulent concealment claims after GM allegedly learned of a latent brake defect, redesigned the component, delayed notifying dealers, and recalled only a small subset of affected vehicles. As in *Bryant*, whether Ford's conduct—and Randall Ford's representations specifically—concealed the Saw Cut Defect and tolled the statute of limitations is, at minimum, a question for the jury, not a basis for summary judgment.

**b. <u>Amber and Evan West (CA) – CLRA and Song-Beverly Implied Warranty Claims</u>**

In California, fraudulent concealment tolls the four-year statute of limitations under the Song-Beverly Warranty Act, and the three-year statute of limitations under the CLRA. *See Philips v. Ford Motor Co.*, 2015 WL 4111448, at *7 (N.D. Cal. July 7, 2015) (tolling CLRA claim); *Philips v. Ford Motor Co.*, 2016 WL 1745948, at *15 (N.D. Cal. May 3, 2016) (tolling Song-Beverly implied warranty claim). "This doctrine requires the plaintiff [to] (1) plead with particularity the facts giving rise to the fraudulent concealment claim and (2) demonstrate that he or she used due diligence in an attempt to uncover the facts." *Philips*, 2016 WL 1745948, at *13 (citation omitted). The similar "discovery rule" also tolls the CLRA's limitations period "until [a] plaintiff discovers, or has reason to discover, the cause of action." *Philips*, 2015 WL 4111448, at *7 (citation omitted). To apply the discovery rule, "a plaintiff must plead facts showing (1) the time and manner of discovery and (2) the inability to have made earlier discovery despite reasonable diligence in investigating." *Id.* (citation omitted).

[57] *Id.* 29:3–10, 72:5–15.

First, fraudulent concealment tolling is available. As set forth above, Ford knew about issues relating to the EcoBoost engine in the Wests' vehicle before they bought their new 2013 Ford Fusion on May 27, 2013. *Supra* Section III.F.1 (collecting evidence that Ford knew about, but failed to disclose, the Saw Cut Defect prior to the first sale of any vehicle with the Defect). Despite this knowledge, Ford failed to disclose the Defect at the point of sale or any point thereafter. The Wests first discovered the Defect no earlier than around October 2020, when technicians at Antelope Valley Ford (an authorized Ford dealership) diagnosed their Fusion with "possible coolant intrusion" and eventually replaced the Wests' engine long block at the cost of $2375.[58] The Wests first filed suit just weeks later on November 5, 2020 (after the diagnosis but before they approved the replacement engine), well in advance of the multi-year statute of limitations for any of their claims. Dkt. 20. "Because [the Wests] have sufficiently alleged fraudulent concealment as a basis for tolling, . . . the statute of limitations was tolled until plaintiffs' alleged discovery of the defect." *Nelson v. Ford Motor Co.*, 2025 WL 2581611, at *14 (E.D. Cal. Sept. 5, 2025) (Drozd, J.) (citation omitted); *see Philips*, 2016 WL 1745948, at *13; *see also* Dkt. 101 at 59–60 (denying motion to dismiss Wests' CLRA claim and holding pre-sale knowledge was alleged).

Ford says fraudulent concealment tolling isn't available for the Wests "[g]iven the absence of any affirmative misleading act by Ford" (Mot. at 19), but the Court already ***rejected*** that interpretation of California law last year. In the parallel *Nelson* action arising out of the same Saw Cut Defect, the Court held that Ford's concealment of "a safety issue giving rise to a duty to disclose" tolls the statute of limitations under California law, even in the absence of "affirmative deceptive conduct." 2025 WL 2581611, at *14 (citation omitted). In its *Nelson* motion to dismiss, Ford cited the same two cases it now relies on. *Nelson v. Ford Motor Co.*, No. 2:24-cv-02231-DAD-CKD, Dkt. 37-1 at 10 (citing *Herremans v. BMW of N. Am., LLC*, 2014 WL 5017843, at *5 (C.D. Cal. Oct. 3, 2014), and *Garcia v. Gen. Motors LLC*, 2018 WL 6460196, at *7 (E.D. Cal. Dec. 10, 2018)). Ford does not acknowledge that the Court singled out *Herremans* as standing for the incorrect proposition it declined to adopt. *See Nelson*, 2025 WL 2581611, at *13–14.

Second, the discovery rule applies to the Wests' CLRA claim. The Wests did not begin to experience serious, ongoing issues with their vehicle until early 2020, when the vehicle's check engine light would

[58] Ex. 39, Nov. 2020 Service Record from Antelope Valley Ford, PLTF_0004875.

illuminate repeatedly, it began to run rough constantly, and it stalled at least once.[59] Despite these issues, the Wests did not receive a diagnosis of internal coolant intrusion until October 2020, when they had their engine replaced.[60] Their claims therefore did not accrue until they discovered this defect in October 2020.

Ford says the Wests should have known about the Saw Cut Defect as early as 2016, and therefore they cannot demonstrate diligence. Mot. at 18. While the Wests' vehicle experienced a stalling incident in September 2016, the cause of that incident was unclear and the issue appeared to resolve itself without any Ford intervention.[61] Ford does not cite any authority that says a plaintiff is not diligent if he fails to sue an automaker based on a single issue with his vehicle. Ford intimates that the September 2016 incident was not an isolated problem, based on Mr. West's deposition testimony that he and his wife "experienced a reduction in motive power 'every three to six months.'" Mot. at 18 (quoting E. West Dep. 88:13-17). It is apparent that this was a misstatement by Mr. West, based on his testimony that the stalling issues did not recur for over two years after this point.[62] Even Ford recognizes that "the stalling issue" with the Wests' car did not recur until November 2018 at the earliest. Mot. at 6. Even if Ford were right that the Wests' claim accrued in November 2018, with the second stalling incident, November 2018 is two years before they filed suit, so this trigger date would still make their CLRA claim timely under the discovery rule.

Ford's cases are easily distinguishable. In *Galvez v. Ford Motor Co.*, 2018 WL 4700001, at *5 (E.D. Cal. Sept. 30, 2018), the plaintiff waited six years after Ford reportedly fixed the issue before filing suit, during which time numerous other class action lawsuits related to the defect were filed. *Id.* Ford also relies on *Philips*, 2015 WL 4111448, at *4, and *In re General Motors LLC CP4 Fuel Pump Litigation*, 393 F. Supp. 3d 871 (N.D. Cal. 2019), both of which found diligence *was* established. In the latter case, the court concluded that plaintiffs do "not have reason to discover the defects in their vehicles until they experienced adverse effects resulting from those defects or were informed by counsel of said defects." *In re Gen. Motors LLC CP4 Fuel Pump Litig.*, 393 F. Supp. 3d at 884. The earliest issue in the Wests' vehicle clearly related

[59] Ex. 25, E. West Dep. 164:7–165:5 (discussing February and March 2020 incidents).

[60] *Id.* 178:1–25; Ex. 39, Nov. 2020 Service Record from Antelope Valley Ford, PLTF_0004875.

[61] Ex. 40, September 2016 Service Record from Antelope Valley Ford, PLTF_0003280 (noting that the "car stalled out" while driving and was towed in); *see* Ex. 25, E. West Dep. 94:8–10 ("[The dealership] test drove it. . . . I just remember them telling me they couldn't find the problem.").

[62] Ex. 25, E. West Dep. 128:4–12, 135:17 ("I believe this was the second time, yes.").

to the Saw Cut Defect occurred in 2020; the discovery rule is satisfied.

c. **Teresa Balaszek (IN) and Scott Pickering (IN) – Indiana Deceptive Consumer Sales Act ("IDCSA") and Implied Warranty Claims**

Ford argues that the four-year statute of limitations for breach of implied warranty and two-year statute of limitations for claims under the IDCSA bar Balaszek and Pickering's claims. Mot. at 19. Again, Ford's fraudulent concealment tolled these limitations periods until no earlier than when each plaintiff's car was diagnosed with internal coolant intrusion necessitating an engine replacement. *See, e.g.*, *In re Takata Airbag Prods. Liab. Litig.*, 2017 WL 2406711, at *11 (S.D. Fla. June 1, 2017) (fraudulent concealment tolling available under Indiana law because automakers "knowingly and actively concealed the defect from Plaintiffs for many years"); *Robinson v. Gen. Motors LLC*, 2021 WL 3036353, at *13 (D. Del. July 19, 2021) (denying motion to dismiss IDCSA claim as untimely where GM failed to disclose defect despite exclusive and extensive pre-sale knowledge), *adopted by* 2021 WL 7209365 (D. Del. Nov. 30, 2021).

Balaszek bought her 2017 Ford Escape new from a Ford dealership in November 2016.[63] In September 2020, her Escape began to exhibit symptoms of coolant intrusion (including white smoke), necessitating an engine replacement, which she paid for at least partly out of pocket.[64] She filed suit shortly after, in June 2021. Dkt. 43. Pickering bought his 2014 Ford Fusion certified pre-owned from a Ford dealership in January 2016.[65] In July 2021, his Fusion was diagnosed with coolant intrusion, necessitating an engine replacement, which he paid for entirely out of pocket.[66] He filed suit shortly after, in September 2022. Dkt. 81. Both of these Plaintiffs' claims were timely, since less than two years elapsed between when their vehicles were diagnosed with coolant intrusion and when they brought suit against Ford for the Defect.

Ford says fraudulent concealment tolling does not apply because it "did not actively conceal anything from Balaszek or Pickering to prevent them from discovering their claims." Mot. at 20. In *Elward v. Electrolux Home Products, Inc.*, 264 F. Supp. 3d 877 (N.D. Ill. 2017), the court denied a motion to dismiss an IDCSA claim when Electrolux "had knowledge of the defect . . . , yet continued to sell dishwashers that it represented to be safe enough to run while the owners were away or sleeping." *Id.* at

[63] Ex. 41, Balaszek's vehicle retail installment contract, PLTF_0000084.
[64] Ex. 14, Balaszek Dep. 78:18–80:11, 90:19–91:14.
[65] Ex. 42, Pickering's vehicle invoice, PLTF_0002634.
[66] Ex. 43, July 2021 repair invoice, PLTF_0002643.

891; *see id.* at 892–93. Balaszek and Pickering—both of whom bought their vehicles from authorized Ford dealerships—testified they reviewed the original window sticker on their vehicles before purchase.[67] These window stickers would have identified the EcoBoost engine, along with the vehicle's fuel economy and performance.[68] Pickering additionally testified "what really jumped out at [him] was the fuel efficiency, and the safety ratings," making it clear he absorbed the misleading statements by Ford about its supposedly superior EcoBoost engine.[69] To the extent Indiana law requires affirmative misstatements to accompany Ford's "multiyear concealment of the defect [that] could plausibly have prevented [Plaintiffs] from discovering their cause[s] of action," *Elward*, 264 F. Supp. 3d at 892, these representations qualify. *See also Robinson*, 2021 WL 3036353, at *5, *13 (denying motion to dismiss fraudulent concealment claims because plaintiffs alleged "various channels through which GM could have disclosed the Defect but did not, for example, press releases, Monroney stickers, dealership brochures, and dealership salespeople"; relying on this analysis when applying fraudulent concealment tolling under Indiana law).

Ford's lone cited case is distinguishable. In *Carroll v. BMW of North America, LLC*, 553 F. Supp. 3d 588 (S.D. Ind. 2021), the automaker's internal documents demonstrated that the alleged defect "was only one of several potential causes" of the problem plaintiff's vehicle suffered. *Id.* at 614. In September 2016, Ford published an internal bulletin relating to [redacted] that instructed dealerships to [redacted][70] Ford did not seriously consider root causes other than the defective saw cut during its root cause analysis—and, as set forth above in Section III.F.1, Ford knew much earlier, before it sold ***any*** Class Vehicles, that the saw-cut design would likely lead to widespread internal coolant intrusion. In addition, in *Carroll*, "the undisputed facts demonstrate[d] that Mr. Carroll did not exercise due diligence, which is a prerequisite for applying the fraudulent concealment doctrine." 553 F. Supp. 3d at 615. Ford makes no such argument here. Mot. at 19-20.

---

[67] Ex. 27, Pickering Dep. 61:4-11; Ex. 14, Balaszek Dep. 57:19-25.

[68] *See* Ex. 44, window sticker for Pickering's 2014 Ford Fusion, PLTF_0002636, at -37 (stating that the vehicle has a "1.5L I4 GTDI" engine, i.e. the EcoBoost engine); *see also* Ex. 45, window sticker for 2017 Ford Escape produced by Plaintiff Speigner (FL), PLTF_0005088.

[69] Ex. 27, Pickering Dep. 61:15-16.

[70] Ex. 46, General Service Bulletin re: 1.5L GTDI Coolant Consumption, FORD-MILLER 00139468, at -68–69 (emphasis added).

At the end of the day, Ford's arguments raise only "question[s] of fact to be determined by a jury." *Cwiakala v. Econ. Autos, Ltd.*, 587 F. Supp. 1462, 1466 (N.D. Ind. 1984).

**d. Aaron and Victoria Manfra (MD) – Implied Warranty**

In Maryland, fraudulent concealment tolls the four-year statute of limitations for breach of implied warranty claims. *See Johnson v. Kody Domestics II, Inc.*, 2026 WL 1414042, at *7-8 (D. Md. May 20, 2026) (fraudulent concealment tolled Plaintiffs' implied warranty claims arising from engine defect); Md. Code Ann., Cts. & Jud. Proc. § 5-203 ("If the knowledge of a cause of action is kept from a party by the fraud of an adverse party, the cause of action shall be deemed to accrue at the time when the party discovered, or by the exercise of ordinary diligence should have discovered the fraud.").

Ford claims that it did not make any misrepresentations to the Manfras that would trigger fraudulent concealment tolling (Mot. at 21), but that argument is legally and factually incorrect. The conduct giving rise to fraudulent concealment need not be an affirmative misrepresentation. *See Lloyd v. Gen. Motors Corp.*, 916 A.2d 257, 274-75 (Md. 2007) (fraudulent concealment includes "conduct which prevents another from acquiring knowledge of a fact, such as diverting the attention of a prospective buyer from a defect" and is "caused, in part, by the intentional failure to warn.") (citation omitted).

Mr. Manfra testified that prior to purchasing the 2017 1.5L Ford Fusion, he reviewed Ford's website to check the financial incentives that Ford offered, which enticed him to pick the Fusion over other cars.[71] While Ford's website lured consumers like the Manfras with purchase incentives, nowhere on Ford's website did it disclose that the vehicle had the Saw Cut Defect, which is precisely the diverting conduct that gives rise to fraudulent concealment under Maryland law. *See Lloyd*, 916 A.2d at 274; *see also Counts v. Gen. Motors, LLC*, 606 F. Supp. 3d 678, 712 (E.D. Mich. 2022) (denying summary judgment after applying fraudulent concealment analysis and noting that "Plaintiffs can establish a fraudulent-concealment claim for nondisclosure without a fiduciary or confidential relationship").

Mr. Manfra further testified that he felt misled by the Ford salesperson about the reliability of the Fusion in light of the faulty engine (which Ford concealed).[72] While Ford cites to *Mercedes-Benz of North America, Inc. v. Garten*, 618 A.2d 233 (Md. Ct. Spec. App. 1993), for the notion that no agency relationship

[71] Ex. 47, A. Manfra Dep. 81:10–82-10, 85:7–9, 87:3–5, 88:2–8, 91:1–5.

[72] *Id.* 30:1-6.

between dealer and manufacturer exists in Maryland, the court there engaged in an extensive review of the factual record to evaluate the relationship. In contrast, Ford has provided no evidence here to uphold its burden to show that it had no influence over the messaging, selling points, or factual information that its dealers relayed to consumers to sell Ford vehicles. At the very least, this is a question for the jury.

In addition to Mr. Manfra's interactions with Ford, Victoria Manfra also called Ford's customer service on September 17, 2020 to complain about the shutdown she experienced in the 2017 Fusion.[73] Ford, however, merely informed her that the vehicle was no longer covered under warranty and did not have any pending recall (despite Ford's extensive knowledge of the Saw Cut Defect by this time).[74] The Manfras had to tow their vehicle to a Ford dealership and replace the engine shortly thereafter.[75]

Altogether, the record shows that the Manfras tried to make informed decisions based on their interactions with Ford, only to be deceived by Ford's concealment of the Saw Cut Defect. Mr. Manfra testified he learned about the engine design flaw only through his own research in "late November or early December 2020"—after the engine had already been replaced—and that Ford never disclosed the Defect to him.[76] In light of Ford's conduct, the Manfras' implied warranty claim was at least tolled until then.

#### e. <u>Tracey Metro (MI) – Implied Warranty</u>

Michigan sets a four-year statute of limitations for breach of implied warranty (Mich. Comp. Laws § 440.2725), but also provides for tolling of the statute of limitations "[i]f a person who is or may be liable for any claim fraudulently conceals the existence of the claim or the identity of any person who is liable for the claim from the knowledge of the person entitled to sue on the claim." Mich. Comp. Laws § 600.5855. Ford says that Metro's claim is time-barred because she bought her new 2018 Ford Edge in January 2018 and first filed suit in August 2022 (Dkt. 81). Ford is wrong; Metro's claim is timely.

First, tolling need not even apply because Metro's claim relates back to earlier-filed Michigan claims in this litigation. "An amendment adding a party plaintiff relates back to the date of the original pleading only when: 1) the original complaint gave the defendant adequate notice of the claims of the newly proposed plaintiff; 2) the relation back does not unfairly prejudice the defendant; and 3) there is an identity

[73] Ex. 48, V. Manfra Dep. 91:7–92:19.

[74] Ex. 49, Ford Customer Complaint Record, FORD-MILLER 00455630.

[75] Ex. 50, Oct. 2020 Service Record from Crouse Ford, PLTF_0002281; Ex. 47, A. Manfra Dep. 122:1–124:6.

[76] Ex. 47, A. Manfra Dep. 138:1–15, 106:4–16.

of interests between the original and newly proposed plaintiff." *In re Syntex Corp. Sec. Litig.*, 95 F.3d 922, 935 (9th Cir. 1996); *see Baranco v. Ford Motor Co.*, 2018 WL 5474549, at *3 (N.D. Cal. Oct. 26, 2018) (applying same analysis to evaluate timeliness of new plaintiff's claim). All three prongs are satisfied here.

***First***, Ford had notice of claims for breach of implied warranty under Michigan law no later than November 2020, when Stacey Coppock filed suit relating to the Saw Cut Defect. *Reed v. Ford Motor Co.*, No. 2:21-cv-00417-DAD-CKD, Dkt. 1 ¶¶ 21–27. After the *Reed* action was transferred into this District and consolidated with the *Miller* action, Plaintiffs filed a consolidated complaint in June 2021 that included Michigan breach of warranty class claims by Coppock as well as Rachel Goodrich. Dkt. 43 ¶¶ 120–34; *see id.* ¶¶ 922–37 (breach of implied warranty). Coppock and Goodrich asserted this claim on behalf of a sub-class of all individuals "who purchased or leased their [Class Vehicles] in the State of Michigan," which includes Metro. *Id.* ¶¶ 264, 923; *see also* Dkt. 81 ¶ 292 ("Ms. Metro owns a 2018 Ford Edge with a 2.0L EcoBoost engine, which she purchased new on January 22, 2018 from Suburban Ford, an authorized Ford dealer in Romeo, Michigan.").[77] These allegations "put Ford on notice that a [Michigan] purchaser of a [2018 Ford Edge] could bring claims based on the same alleged defect as the original named plaintiff[s]." *Baranco*, 2018 WL 5474549, at *3. Thus, whether the relevant date is November 2020 or June 2021, Ford was on notice of Metro's potential implied warranty claim less than four years from her 2018 purchase, and her claim relates back to those earlier-filed ones.

***Second***, Ford cannot claim any prejudice from the relation back. Metro's claim "depends on the same conduct by [Ford] set forth in the original complaint," so at no point did or would Ford "have to radically change litigation strategy to defend against this additional plaintiff." *Id.* at *4 (citation modified).

***Third***, Metro shares an identity of interests with Coppock and Goodrich. "Case law in this circuit suggests that plaintiffs share an identity of interest if the alleged defect underlying their claims is the same, notwithstanding that they did not purchase the exact same product at the exact same time and place." *Id.*; *see Allen v. Similasan Corp.*, 96 F. Supp. 3d 1063, 1069 (S.D. Cal. 2015) (finding there was an identity of interests between two plaintiffs who purchased different products, where plaintiffs alleged that defendant falsely labeled all of its products). Metro and Coppock both bought a new Ford Edge with a 2.0L saw-cut

[77] The original *Reed* complaint also asserted a claim for breach of implied warranty on behalf of a putative national class as well as "the Sub-Classes," including "[a]ll individuals who purchased or leased any Class Vehicle in the State of Michigan." *Reed*, Dkt. 1 ¶¶ 101, 139.

EcoBoost Engine from an authorized Ford dealership. Dkt. 43 ¶ 121 (Coppock); Dkt. 81 ¶ 292 (Metro). Although Goodrich bought her car used (Dkt. 43 ¶ 128), this is immaterial because Michigan law does not require privity for breach of implied warranty. Dkt. 76 at 15 ("Defendant does not cite any supporting authority for its contention that [Michigan] law require[s] privity for an implied warranty claim."). "Thus, Ford's [inevitable] contention that there is no identity of interest between [Metro, Coppock, and Goodrich] because they purchased different vehicle models . . . , at different times and in different conditions, is unavailing." *Baranco*, 2018 WL 5474549, at *4.[78] Metro's claim relates back to the earlier complaints.

Regardless, fraudulent concealment tolling applies. Fraudulent concealment tolling under Michigan law requires the plaintiff to "prove that the defendant committed affirmative acts of misrepresentation that were designed to prevent subsequent discovery. Mere silence is not enough." *Nelson*, 2025 WL 2581611, at *15 (quoting *Miller*, 773 F. Supp. 3d at 522–23). During her pre-purchase test drive, Metro and the employee at Ford's authorized dealership "talked about safety because it was one of the top features that they were" touting in the Ford Edge she ended up buying.[79] They also "talked about what to expect out of the EcoBoost and the four-cylinder," and the Ford employee described "how the EcoBoost would still give it oomph because I [Metro] have to pull out into traffic on an expressway.[80] Metro further reviewed "Ford's website to give me pricing, give me details about safety."[81] In none of these representations did Ford disclose that Metro's Ford Edge suffered from the Saw Cut Defect, even though Ford knew this at the time.

Ford continued to conceal the Saw Cut Defect from Metro over the following years. When the check engine light eventually came on, she took the vehicle to an authorized Ford dealership, which read the code for oxygen sensors but "refused to fix it" because the light would not stay on during inspection.[82] An independent mechanic then replaced her O2 sensors, but the problem persisted and worsened by spring

[78] In this Court's order granting Plaintiffs' motion to substitute new named Florida and Ohio plaintiffs, it intimated that relation back would be satisfied because the amended Ohio plaintiff "appears to have been a member of the proposed Ohio Sub-Class" as set forth in the then-operative complaint. Dkt. 143 at 6 n.1. Nevertheless, the Court did not conclusively decide "whether Mullen shares an identity of interests with [prior] plaintiff Thomas," though it did cite *Baranco* approvingly for the points set forth above. *Id.*

[79] Ex. 13, Metro Dep. 93:23-25.

[80] *Id.* 94:2-7.

[81] *Id.* 116:20-23.

[82] *Id.* 126:7–11, 147:24–150:8.

2022, with coolant visibly leaking.[83] In March 2022, she had spark plugs, ignition coils, and coils replaced—again to no avail.[84] On July 27, 2022, the vehicle stalled entirely and was towed to Imlay City Ford, which diagnosed misfires in cylinders 1 and 2, low coolant, and required a full engine replacement.[85] This course of conduct amounted to further active fraudulent concealment of the defect.

### G. Ford's Summary Judgment Motion Does Not Bind the Class.

When a defendant obtains summary judgment before a class has been properly certified, "the district court's decision binds only the named plaintiffs." *Schwarzschild v. Tse*, 69 F.3d 293, 297 (9th Cir. 1995); *see also Estakhrian v. Obenstine*, 859 F. App'x 121, 122-23 (9th Cir. 2021) (affirming grant of leave to add a new class representative after the close of discovery). Thus, even if Ford were to prevail on summary judgment for any Plaintiff who is also a putative class representative[86] (which it should not), that outcome is not binding on the putative classes, and Plaintiffs should be allowed to seek leave to substitute new plaintiffs. *See Edwards v. Angeles Abbey Mem'l Park, Inc.*, 2009 WL 1971375, at *1 (C.D. Cal. July 2, 2009) (noting court had granted summary judgment against the three named class representatives while expressly preserving the class claims, and subsequently granted leave to substitute new class representatives and amend the complaint); *see also Cabrera v. Bayer Healthcare LLC*, 2024 WL 4228237, at *5 (C.D. Cal. June 24, 2024) (granting motion to substitute named plaintiff after denial of class certification based on finding of inadequacy); *Aliff v. Vervent Inc.*, 2022 WL 3588322, at *1, *9–10 (S.D. Cal. Aug. 22, 2022) (declining to grant summary judgment on claims where "there are currently no appropriate class representatives," and instead directing plaintiff to seek leave to amend to add new named plaintiffs to represent the putative class).

## IV. CONCLUSION

For the foregoing reasons, the Court should deny Ford's Motion. The extensive record leaves genuine issues of material fact for the jury to decide. Even if any of Ford's arguments were successful, the Motion does not touch Plaintiffs' class certification motion pending before this Court.

---

[83] *Id.* 161:8–23; 170:2–20.

[84] *Id.* 174:5–175:1.

[85] *Id.* 190:18–191:15; Ex. 21, July 2022 Service Record, at -04, -08.

[86] Those Plaintiffs are: Teresa Balaszek (IN), Craig and Kelli Morford (KS), Aaron and Victoria Manfra (MD), and Tracey Metro (MI)

Dated: July 22, 2026

Respectfully submitted,

/s/ *Mark P. Chalos*

Mark P. Chalos (*pro hac vice*)
LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
222 2nd Ave South, Suite 1640
Nashville, Tennessee 37219-2423
Telephone: (615) 313-9000
mchalos@lchb.com

Phong-Chau G. Nguyen (S.B. #286789)
Clare D. Perez (S.B. #363027)
LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, California 94111-3339
Telephone: (415) 956-1000
pgnguyen@lchb.com
cdperez@lchb.com

Annika K. Martin (*pro hac vice*)
Gabriel Panek (*pro hac vice*)
Lucas Issacharoff (*pro hac vice*)
LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
250 Hudson Street, 8th Floor
New York, New York 10013-1413
akmartin@lchb.com
gpanek@lchb.com

Cody R. Padgett (S.B. #275553)
Majdi Y. Hijazin (*pro hac vice*)
Abigail J. Gertner (*pro hac vice*)
Kathy Pham (S.B. # 329345)
1875 Century Park East, Suite 1000
Los Angeles, California 90067
Telephone: (310) 556-4811
cody.padgett@capstonelawyers.com
majdi.hijazin@capstonelawyers.com
abigail.gertner@capstonelawyers.com
kathy.pham@capstonelawyers.com

William A. Kershaw
Stuart C. Talley
Ian J. Barlow
KERSHAW TALLEY BARLOW PC
401 Watt Avenue
Sacramento, California 95864
Telephone: (916) 779-7000
Facsimile: (916) 244-4829
bill@ktblegal.com
stuart@ktblegal.com
ian@ktblegal.com

Russell D. Paul (*pro hac vice*)
Amey J. Park (*pro hac vice*)

Natalie Lesser (*pro hac vice*)
BERGER MONTAGUE PC
1818 Market Street, Suite 3600
Philadelphia, PA 19103
Telephone: (215) 875-3000
rpaul@bm.net
apark@bm.net
nlesser@bm.net

Thomas P. Thrash (*pro hac vice*)
William T. Crowder (*pro hac vice*)
THRASH LAW FIRM PA
1101 Garland Street
Little Rock, AR 72201
Telephone: (501) 374-1058
tomthrash@sbcglobal.net
willcrowder@thrashlawfirmpa.com

Patrick Newsom (*pro hac vice*)
NEWSOM LAW PLC
40 Music Square East
Nashville, Tennessee 37203
Telephone: 615-251-9500
patrick@newsom.law

*Attorneys for Plaintiffs and the Proposed Classes*