William A. Kershaw (S.B. #057486)
Stuart C. Talley (S.B. #180374)
Ian J. Barlow (S.B. #262213)
**KERSHAW TALLEY BARLOW PC**
401 Watt Avenue
Sacramento, California 95864
Telephone: (916) 779-7000
Facsimile: (916) 244-4829
bill@ktblegal.com
stuart@ktblegal.com
ian@ktblegal.com

[Additional Counsel on Signature Pages]

*Attorneys for Plaintiffs and the*
*Proposed Classes and Subclasses*

## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| VANESSA MILLER, et al., as individuals and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>FORD MOTOR COMPANY,<br><br>Defendant. | Case No. 2:20-cv-01796-DAD-CKD<br><br>(Consolidated with Nos. 2:21-cv-00417-DAD-CKD, 2:21-cv-00468-DAD-CKD)<br><br>**PLAINTIFFS' STATEMENT OF DISPUTED FACTS IN OPPOSITION TO DEFENDANT FORD MOTOR COMPANY'S MOTION FOR PARTIAL SUMMARY JUDGMENT**<br><br>Hearing: September 21, 2026<br>Time: 1:30 pm<br>Judge: Hon. Dale A. Drozd<br>Courtroom: 4, 15th Floor |

**PLAINTIFFS' RESPONSE TO FORD'S STATEMENT OF UNDISPUTED FACTS**

Pursuant to Federal Rule of Civil Procedure 56 and Eastern District of California Local Rule 260(b), Plaintiffs submit this concise Statement of Disputed Facts in opposition to Defendant Ford Motor Company's Motion for Partial Summary Judgment. The following additional material facts, and the cited portions of the record supporting them, demonstrate genuine disputes of material fact that preclude the summary judgment or adjudication sought by Ford.

| | Merchantability—Craig and Kelli Morford (KS). | |
|---|---|---|
| **No** | **Additional Material Fact** | **Supporting Evidence** |
| 1 | On October 31, 2020, when the Morfords' 2017 Ford Escape had 66,331 miles, they presented the vehicle to Bob Sight Ford after the check-engine light illuminated and the engine began shaking at idle. The dealership found diagnostic codes P0302 and P0316, a low coolant level, and coolant leaking into cylinder No. 2. Bob Sight Ford advised that replacement of the long-block assembly due to coolant intrusion would cost $5,950. However, since the replacement engine would be the exact same engine block that had the defect, there was no guarantee the replacement engine would be without defect. | Talley Decl., Ex. 10, C. Morford Dep. Tr. 24:25–25:13, 34:19–35:5, 114:19–115:23, 117:6–25;<br><br>Talley Decl., Ex. 18, PLTF_0000041;<br><br>Talley Decl., Ex. 11, K. Morford Dep. Tr. 25:23–26:2, 75:23–76:8, 105:17–19, 129:19–23. |
| 2 | As of his August 2024 deposition, Craig Morford testified that the Escape continued losing coolant, requiring him to add coolant approximately once a month because it either burned or leaked out. He also received check-engine notifications through Ford's app approximately every couple of months, after which he checked the vehicle's coolant level and added additional coolant as needed. | Talley Decl., Ex. 10, C. Morford Dep. Tr. 58:3–59:22, 60:15–61:18. |

PLAINTIFFS' STATEMENT
OF DISPUTED FACTS
NO. 2:20-CV-01796-DAD-CKD

| | Merchantability—Craig and Kelli Morford (KS). | |
|---|---|---|
| No | Additional Material Fact | Supporting Evidence |
| 3 | The Escape was Kelli Morford's primary vehicle, and she used it almost daily for personal and family transportation, including transporting her daughter and running errands. The Morfords did not obtain the recommended long-block replacement because they could not afford it. Kelli Morford testified that she was not comfortable driving the Escape without the recommended repair and believed that the vehicle was unsafe, but continued using it because the family had no other option and could not afford another vehicle. Craig Morford testified the defect was no longer a safe vehicle but the cost of repairs was more than the vehicle was worth. | Talley Decl., Ex. 11, K. Morford Dep. Tr. 54:1–55:1, 56:1–7, 113:3–114:9, 124:17–125:3, 125:20–126:3; <br><br>Talley Decl., Ex. 10, C. Morford Dep. Tr. 32:13–16. |
| 4 | Since October 2020, Kelli Morford experienced episodes of shaking and rough idling approximately once a month while driving the Escape. She described the vehicle as feeling as though it were misfiring, as though she were driving over small bumps or rocks, and as though the engine could shut off at any moment, although the engine had not actually shut off while she was driving. | Talley Decl., Ex. 11, K. Morford Dep. Tr. 128:22–130:4. |

- 2 -

| Merchantability—Bradley Mullen (OH) | | |
|---|---|---|
| No | Additional Material Fact | Supporting Evidence |
| 5 | Beginning in April 2021, Plaintiff Mullen's Ford Edge repeatedly failed to start. By mid-July 2021, Mullen observed steam and coolant loss, added coolant, asked Pallotta Ford to examine the vehicle for fluid intrusion, and parked the Edge while awaiting the dealership appointment, borrowing another vehicle for his wife to use. Mullen authorized multiple repairs but none addressed the root cause of the problem. | Talley Decl., Ex. 12, B. Mullen Dep. Tr. 29:10–12, 128:16–129:3, 131:22–132:3, 146:11–23, 143:1–11, 172:6–22, 175:18–176:21, 203:23–206:16;<br><br>Talley Decl., Ex. 19, PLTF_0005029–5030. |
| 6 | On or about August 2, 2021, when the Mullen Edge had 67,128 miles, Pallotta Ford diagnosed coolant leaking into cylinder No. 1 and determined that the engine needed to be replaced. The dealership's repair invoice records that it pressure-tested the cooling system, removed the spark plugs, found coolant in cylinder No. 1, and replaced the short-block assembly. Mullen paid the repair invoice himself on August 27, 2021. | Talley Decl., Ex. 12, B. Mullen Dep. Tr. 239:13–241:10, 242:17–243:14, 244:11–20;<br><br>Talley Decl., Ex. 20, PLTF_0005026, at -26–28. |
| 7 | The Mullens purchased the Edge in May 2020 with 43,956 miles. Its original short-block assembly required replacement in August 2021 at 67,128 miles—approximately fifteen months and 23,000 miles after purchase. The Mullens' vehicle contained an engine with the Saw Cut Defect when it was originally sold and at the time it was sold to them. | Talley Decl., Ex. 12, B. Mullen Dep. Tr. 29:25–30:3, 101:20–24;<br><br>Talley Decl., Ex. 51, PLTF_0005063, at -63–69;<br><br>Talley Decl., Ex. 20, PLTF_0005026, at -26–28. |
| 8 | Mullen paid $6,683.80 out of pocket for the August 2021 engine replacement. | Talley Decl., Ex. 12, B. Mullen Dep. Tr. 245:15–24;<br><br>Talley Decl., Ex. 20, PLTF_0005026, at -26–28. |
| 9 | The Mullens' use of the Edge after August 2021 occurred only after Pallotta Ford replaced the failed short-block assembly. Mullen testified that the replacement adequately repaired that particular engine problem, and the Mullens thereafter drove the Edge until September 2025 when he gifted the vehicle to his daughter. | Talley Decl., Ex. 12, B. Mullen Dep. Tr. 36:18–37:6, 57:8–24, 247:16–248:2, 244:23–245:2. |

- 3 -

| **Merchantability—Tracey Metro (MI)** |||
|---|---|---|
| **No** | **Additional Material Fact** | **Supporting Evidence** |
| 10 | Metro purchased her vehicle in January 2018. Also, in 2018, Metro began experiencing hesitation with the Edge which persisted periodically but consistently from 2018 through 2021. | Talley Decl., Ex. 13, T. Metro Dep. Tr. 125:19–21, 139:19–141:2;<br><br>Dkt. 81 ¶ 292. |
| 11 | In 2021, Metro presented the Edge to Romeo Ford after the check-engine light illuminated and the vehicle exhibited hesitation and rough running. Romeo Ford identified an oxygen-sensor code but declined to replace the sensor because the warning light would not remain illuminated and the vehicle drove normally during the dealership's testing. An independent mechanic later replaced the sensor, but the improvement lasted only approximately one week; the hesitation and rough running returned and worsened into spring 2022. Metro continued driving the Edge because it was her only vehicle. | Talley Decl., Ex. 13, T. Metro Dep. Tr. 147:15–149:22, 157:14–158:13, 158:4–13, 160:14–162:20, 170:2–20, 195:14–20. |
| 12 | By March 2022, the Edge's hesitation had progressed to the point that the vehicle nearly stalled when accelerating from a stop and entering traffic. An independent mechanic replaced spark plugs and ignition coils, but the repair did not improve the vehicle's performance; the coolant problem and hesitation continued. The Edge also lost power while traveling at a constant speed, and Metro had to pull over and restart it on one or two occasions. | Talley Decl., Ex. 13, T. Metro Dep. Tr. 168:1–17, 170:2–20, 173:17–175:1, 175:14–177:12. |
| 13 | On July 27, 2022, the Edge lost the ability to accelerate beyond approximately 25 to 27 miles per hour. Metro and her husband parked the vehicle rather than continue driving it, and Metro had it towed to Imlay City Ford the following day. The dealership's repair order recorded 98,203 miles on the odometer and reported that the Edge had been towed in after running roughly and stalling. | Talley Decl., Ex. 13, T. Metro Dep. Tr. 184:15–185:20, 187:9–25;<br><br>Talley Decl., Ex. 21, PLTF_0002604. |

- 4 -

| Merchantability—Tracey Metro (MI) | | |
|---|---|---|
| No | Additional Material Fact | Supporting Evidence |
| 14 | Imlay City Ford found misfires in cylinders Nos. 1 and 2, a 16-percent compression loss in cylinder No. 1, an oil-fouled spark plug, bad compression rings, pitting on the valve seat, and corrosion on the valve. The dealership determined that the Edge required a new engine and removed and replaced the engine and associated hardware. | Talley Decl., Ex. 21, PLTF_0002604, at -07–08. |
| 15 | Metro paid $8,124.55 out of pocket for the August 2022 engine replacement. The Edge remained at Imlay City Ford for approximately three weeks while the replacement was performed, during which Metro shared another vehicle with her daughter. | Talley Decl., Ex. 13, T. Metro Dep. Tr. 218:15–219:18, 220:18–221:7; Talley Decl., Ex. 21, PLTF_0002604, at -04–05. |
| 16 | Metro stopped using the Edge for long trips when she could afford to rent or use another vehicle. | Talley Decl., Ex. 13, T. Metro Dep. Tr. 60:22–61:8. |

PLAINTIFFS' STATEMENT
OF DISPUTED FACTS
NO. 2:20-CV-01796-DAD-CKD

| Merchantability—Teresa Balaszek (IN) | | |
|---|---|---|
| No | Additional Material Fact | Supporting Evidence |
| 17 | Balaszek purchased her new 2017 1.5L Ford Escape on November 23, 2016. ████████████████ In Customer Satisfaction Program 19B37, Ford advised that affected vehicles could exhibit coolant intrusion and coolant loss and that, over time, the condition could damage the engine and require replacement of the short block. | Joint Statement of Undisputed Facts (Dkt. 161-2) Nos. 10–11; Talley Decl., Ex. 55, FORD-MILLER 00176145–00176146; Talley Decl., Ex. 37, Dep. of Michael Giunta 57:2–58:7; Talley Decl., Ex. 56, FORD-MILLER 00174867. |
| 18 | On December 27, 2019, at approximately 80,000 miles, Balaszek learned during a routine oil change that the Escape's coolant was completely empty and had to be refilled. Before that visit, she had never been told that the vehicle had low or no coolant. | Talley Decl., Ex. 14, T. Balaszek Dep. Tr. 75:3–22, 76:17–77:3. |
| 19 | In September 2020, Balaszek first observed smoke coming from the Escape. The vehicle thereafter required replacement of the complete engine and remained at Dean's Auto Repair for at least 30 days. | Talley Decl., Ex. 14, T. Balaszek Dep. Tr. 74:6–14, 78:18–80:11, 84:18–85:2, 89:16–90:22; Talley Decl., Ex. 22, PLTF_0000059. |
| 20 | In approximately August or September 2023, the Escape broke down again. The problem was ultimately diagnosed as a blown head gasket, and Balaszek purchased another vehicle the following day because she needed reliable transportation. | Talley Decl., Ex. 14, T. Balaszek Dep. Tr. 65:15–66:3. |
| 21 | Before the Escape could be returned to use following its 2023 breakdown, Balaszek had to have the blown head gasket repaired. By that time, she had already purchased another vehicle because she needed reliable transportation. | Talley Decl., Ex. 14, T. Balaszek Dep. Tr. 64:15–65:3, 69:9–18. |

- 6 -

| 22 | At the time of Balaszek's deposition, the Escape's odometer showed approximately 150,000 miles. But the vehicle had not reached that mileage without major repairs: its complete engine had been replaced in 2020, and it later required repair of a blown head gasket following the 2023 breakdown. | Talley Decl., Ex. 14, T. Balaszek Dep. Tr. 33:3–34:6, 65:15–66:3, 70:9–18, 102:13–16;<br><br>Talley Decl., Ex. 23, Expert Report of Allise Wachs ¶ 65. |

| Merchantability—Common Evidence Concerning the Saw Cut Defect | | |
|---|---|---|
| No | Additional Material Fact | Supporting Evidence |
| 23 | Ford and its head-gasket supplier, Tenneco, concluded that the principal factor in the 1.5L Sigma coolant-intrusion warranty issue was the presence of coolant in the cylinder bore bridge due to the engine block's saw-cut design. Their analysis identified the narrow bore-bridge sealing area, high temperatures and coolant stagnation, localized sinkage of the engine-block material, gasket-coating wear, and pressurized coolant flow as factors that created an environment in which coolant could ultimately leak past the head gasket and into the cylinders. | Talley Decl., Ex. 52, FORD-MILLER 00175193, at -193–194<br><br>Talley Decl., Ex. 53, T. Groh Dep. Tr. 26:2–21. |
| 24 | Ford's internal review of 2.0L coolant intrusion identified rough running, a check-engine light with misfire codes, low coolant, coolant leakage into cylinders, and white tailpipe smoke as customer symptoms. Ford's analysis attributed the failure mechanism to localized degradation at the bore bridge—including corrosion or erosion of the aluminum, boiling or stagnant coolant, and movement or "scrubbing" at the gasket joint—that ultimately created a path for coolant to enter the cylinders. Ford's service direction required technicians to check for coolant in the cylinders and, when confirmed, replace the long-block assembly. | Talley Decl., Ex. 54, FORD-MILLER 00441286;<br><br>Talley Decl., Ex. 4, FORD-MILLER 00751671, at -73;<br><br>Talley Decl., Ex. 5, FORD-MILLER 00139227, at -34;<br><br>Talley Decl., Ex. 6, FORD-MILLER 00174749, at -51; |
| 25 | Ford engineer John Dunahay testified that further corrosion may be mitigated, but existing corrosion cannot be healed. Ford's gasket expert Joseph Henne likewise testified that, ██████████████ ██████████████████ ████████████████. Ford projected up to ██ % of some engines would fail within ████ years. | Talley Decl., Ex. 7, J. Dunahay Dep. Tr. 26:17–27:4;<br><br>Talley Decl., Ex. 8, J. Henne Dep. Tr. 139:2–8, 140:3–17;<br><br>Talley Decl., Ex. 9, FORD-MILLER 00141197, at -202. |

- 8 -

PLAINTIFFS' STATEMENT
OF DISPUTED FACTS
NO. 2:20-CV-01796-DAD-CKD

| Merchantability—Common Evidence Concerning the Saw Cut Defect | | |
|---|---|---|
| No | Additional Material Fact | Supporting Evidence |
| 26 | Ford identified replacing the saw-cut block with a cross-drilled block as the permanent corrective action for the coolant-intrusion condition in the 1.5L Sigma and 2.0L/2.3L engines. Henne testified that the cross-drilled design removes coolant from the deck face, eliminates the possibility of coolant intrusion through that pathway, and leaves the sealing interface between the gasket and cylinder block undisturbed. | Talley Decl., Ex. 8, J. Henne Dep. Tr. 83:19–22, 84:2–24. |
| 27 | Ford witnesses testified that an overheating engine may enter "limp-home" mode, dramatically restricting vehicle speed and engine output. Robert Wade described the typical experience as driving approximately 45 miles per hour but being unable to accelerate, requiring the driver to merge across traffic and pull off the road. Wade further testified that an engine stalling on a roadway is ███████ ████████████████████████. Ford's global powertrain quality chief engineer called the defect ██████████████████ the company had seen. | Talley Decl., Ex. 8, J. Henne Dep. Tr. 57:12–21, 58:14–22;<br><br>Talley Decl., Ex. 16, R. Wade Dep. Tr. 51:18–52:8, 269:5–18;<br><br>Talley Decl., Ex. 1, FORD-MILLER 00211810, at -10;<br><br>Talley Decl., Ex. 15, Declaration of Colin Jordan ¶ 6, 20-21;<br><br>Talley Decl., Ex. 17, Brewer Dep. Tr. 174:13-16. |

- 9 -

| Personal, Family, or Household Use – The Wests, Miller, and Pickering | | |
|---|---|---|
| No | Additional Material Fact | Supporting Evidence |
| 28 | The Wests selected the Fusion as a safe, reliable, and fuel-efficient vehicle in which to transport their two young children. They used it as their family car, typically drove it on family trips, and also used it for daily personal errands and weekend drives in their community. Amber West's work use of the vehicle included her daily commute. | Talley Decl., Ex. 24, A. West Dep. Tr. 16:11–14, 21:15–20, 33:3–35:5, 37:6–38:11;<br><br>Talley Decl., Ex. 25, E. West Dep. Tr. 22:6–16, 23:4–12. |
| 29 | At the time of purchase, Miller intended to use the Edge for both personal and work purposes. She testified that neither purpose was more important and estimated the intended use as 50 percent personal and 50 percent work. Her work-related use later declined to approximately 25 percent during 2021 through 2023 and ultimately to zero percent. She considered the vehicle her personal car and never stopped using it for personal purposes. | Talley Decl., Ex. 26, V. Miller Dep. Tr. 103:18–105:18, 165:16–167:11. |
| 30 | Pickering expected to use the Fusion for outside-sales trips, commuting between his home and office, and general personal use. Although he estimated that approximately 75 to 80 percent of his use around the time of purchase was business-related, the Fusion was registered to him rather than his business, remained his only vehicle, and was driven daily for both business and personal purposes. | Talley Decl., Ex. 27, S. Pickering Dep. Tr. 24:5–13, 26:19–27:5, 80:15–82:17, 82:10–17; |

PLAINTIFFS' STATEMENT
OF DISPUTED FACTS
NO. 2:20-CV-01796-DAD-CKD

| No | Additional Material Fact | Supporting Evidence |
|---|---|---|
|  | **Gonzalez—Texas Deceptive Trade Practices Act** | |
| 31 | Gonzalez decided to purchase his first new vehicle after his prior vehicle became unreliable and left him stranded. He sought safe and reliable transportation, and safety and reliability were important factors in his decision to purchase the Escape. Before purchasing, Gonzalez researched the Escape online, including through Ford's website and Ford-provided materials, and reviewed the vehicle's Monroney label and brochures provided at the dealership. | Talley Decl., Ex. 57, D. Gonzalez Dep. Tr. 56:16–20, 57:1–12, 61:2–21, 63:13–64:3, 67:15–68:22, 69:9–14. |
| 32 | At Five Star Ford, the salesperson discussed the Escape's crash-safety rating and safety features and represented that the Escape was a "highly reliable car," adding that the salesperson also owned an Escape. Gonzalez testified that safety, reliability, gas mileage, and package options were factors leading him to choose the Escape, and he decided to purchase it after the dealership's presentation and test drive. | Talley Decl., Ex. 57, D. Gonzalez Dep. Tr. 59:5–11, 70:15–23, 71:6–13, 72:19–73:6. |
| 33 | Gonzalez did not believe at the time of purchase that the salesperson's reliability representation was false. After experiencing the engine failure, however, Gonzalez testified that the reliability discussion had omitted engine-mechanical issues affecting vehicles of the same make, model, and engine type, and that those issues should have been disclosed to him. Ford had multiple opportunities to disclose the Defect to Gonzalez but never did. | Talley Decl., Ex. 57, D. Gonzalez Dep. Tr. 172:9–25, 173:1–6;<br><br>Talley Decl., Ex. 28, PLTF_0001849;<br><br>Talley Decl., Ex. 29, PLTF_0001806;<br><br>Talley Decl., Ex. 30, PLTF_0001802. |

- 11 -

PLAINTIFFS' STATEMENT
OF DISPUTED FACTS
NO. 2:20-CV-01796-DAD-CKD

| Ford Concealed the Saw-Cut Defect | | |
|---|---|---|
| **No** | **Additional Material Fact** | **Supporting Evidence** |
| 34 | Ford manufactured and sold Plaintiffs Craig and Kelli Morford's 2017 2.0L Ford Escape, Brad Mullen's 2017 2.0L Ford Edge, Tracey Metro's 2018 2.0L Ford Edge, Teresa Balaszek's 2017 1.5L Ford Escape, Patsy Lund's 2016 2.0L Ford Escape, Aaron and Victoria Manfra's 2017 2.0L Ford Edge, Scott Pickering's 2014 1.5L Ford Fusion, Vanessa Miller's 2017 2.0L Ford Edge, Evan and Amber West's 2013 1.6L Ford Fusion, and David Gonzalez's 2014 1.6L Ford Escape, with a saw-cut EcoBoost engine. | Talley Decl., Ex. 3, Ford's Feb. 24, 2026 Amended Answers and Objections to Plaintiffs' Interrogatories, Set Two. |
| 35 | Pre-release, limited testing conducted by Ford for the EcoBoost engines still showed coolant leaking into the cylinders, and other indicators of coolant intrusion including tail pipe smoke, and corrosion/erosion at the cylinder bore bridge. In May 2012, Ford global reported ███████████████ ███████. Ford's engineers were aware of these failures, but were not tasked by Ford to fix them. | Talley Decl., Ex. 6, FORD-MILLER 00174749, at -51; Talley Decl., Ex. 32, FORD-MILLER 00277179, at -81, -79. |
| 36 | By 2013, when the EcoBoost engines were first offered for sale to the public, and before any Plaintiff had purchased their vehicle, Ford's engineers observed symptoms of the Saw Cut Defect manifest when they saw presence of coolant in the cylinders. In 2014, Ford's engineers observed similar issues with the structural integrity and operating temperatures leading to engine failure of the 2.0L and 1.5L EcoBoost engines. | Talley Decl., Ex. 33, FORD-MILLER 00171397, at -97; Talley Decl., Ex. 34, FORD-MILLER 00074514, at -14; Talley Decl., Ex. 35, FORD-MILLER 00334431, at -33, - 37. |

- 12 -

| Ford Concealed the Saw-Cut Defect | | |
|---|---|---|
| No | Additional Material Fact | Supporting Evidence |
| 37 | On December 12, 2019, Ford issued Customer Satisfaction Program 19B37 for only certain model-year 2017–2019 Fusion and Escape vehicles equipped with the 1.5L engine. Ford informed dealers that those vehicles could exhibit coolant intrusion, coolant loss, excessive tailpipe smoke, and engine misfires and that, over time, the condition could damage the engine and require short-block replacement. The service action Ford offered under the program, however, was reprogramming the Powertrain Control Module to operate the external coolant pump after engine shutdown. | Talley Decl., Ex. 56, FORD-MILLER 00174867. |
| 38 | Ford knew the 19B37 software reflash did not repair corrosion that had already developed and did not eliminate the risk that affected vehicles would later experience coolant intrusion. Ford did not offer the reflash to model-year 2014–2016 1.5L Fusion vehicles. | Talley Decl., Ex. 7, J. Dunahay Dep. Tr. 27:1–13, 29:9–30:16. |
| 39 | In September 2016, Ford published an internal bulletin relating ███████ ███████ and instructed dealerships to ███████ ███████ . | Talley Decl., Ex. 46, FORD-MILLER 00139468, at -68–69. |

- 13 -

| Ford Concealed the Saw-Cut Defect | | |
|---|---|---|
| No | Additional Material Fact | Supporting Evidence |
| 40 | In August 2018, Ford engineers considered issuing a Special Service Message that would provide dealership technicians with coolant-intrusion diagnostic instructions. ██████████████████████████████████████████████████████████████████████. Ford continued having these internal discussions through October 2018. | Talley Decl., Ex. 58, FORD-MILLER 00780595;<br><br>Talley Decl., Ex. 2, NELSON-FORD 0011441, at -42. |

- 14 -

| Plaintiffs Lund, West, Pickering, Balaszek, Manfras, and Metro – Delayed Discovery | | |
|---|---|---|
| No | Additional Material Fact | Supporting Evidence |
| 41 | Lund researched the vehicle on Ford's website and her local authorized Ford dealership website prior to her purchase but did not see any disclosures regarding the Saw Cut Defect. Ford did not disclose the Saw Cut Defect to Lund when she purchased her vehicle in 2016, though they were already aware of the Defect and had already issued multiple but ineffective safety calls intended to fix coolant leaks in EcoBoost engines. Lund first experienced symptoms in approximately early November 2020, when the check-engine light illuminated in her Escape. Later that month, Randall Ford informed her that coolant had leaked into the engine and that the vehicle required an engine replacement costing approximately $8,000. Randall Ford did not tell Lund that the failure resulted from an engine-design defect or that other vehicles experienced the same problem. Before November 2020, no one at Randall Ford had told Lund that her coolant was low, despite years of routine service there, and Lund conducted no independent research concerning the engine issue before filing suit. | Talley Decl., Ex. 36, PLTF_0004662; Talley Decl., Ex. 37, Dep. of Michael Giunta 90:16–98:25; Talley Decl., Ex. 38, P. Lund Dep. Tr. 29:3–10, 37:4–8, 43:15–45:5, 47:13–24, 62:6–15, 62:23–24, 68:24–25, 72:5–15; |

- 15 -

| | Plaintiffs Lund, West, Pickering, Balaszek, Manfras, and Metro – Delayed Discovery | |
|---|---|---|
| No | Additional Material Fact | Supporting Evidence |
| 42 | From late 2016 through late 2020, the Wests experienced intermittent incidents approximately every three to six months in which the Fusion's engine continued running but the accelerator produced no power. In September 2016, the Wests experienced a stalling incident with the vehicle, which resolved without intervention from Ford and did not recur for over two years. When Antelope Valley Ford performed Recall 17S09 in May 2018, it replaced leaking heater-hose components but did not disclose an engine-design defect. During 2020, the Wests presented the Fusion for multiple additional repairs in which different components were replaced, but none of the service providers identified or disclosed the saw-cut engine-block defect. | Talley Decl., Ex. 25, E. West Dep. Tr. 88:13–89:7; Talley Decl., Ex. 59, PLTF_0003297–3298; Talley Decl., Ex. 25, E. West Dep. Tr. 94:8–10, 128:4–14, 129:14–15, 135:17, 154:9–12, 155:14–16, 163:1–2, 164:7–165:5, 189:4–7; Talley Decl., Ex. 39, PLTF_0004875; Talley Decl., Ex. 40, PLTF_0003280. |
| 43 | Pickering purchased his certified pre-owned Ford Fusion from an authorized Ford dealership in 2016, ensuring he had reviewed the original window sticker for the vehicle before completing his purchase. Pickering testified he recalled seeing the fuel efficiency and safety ratings included on the window sticker. Pickering sought multiple repairs for recurring problems with the Fusion, including repairs and component replacements performed under warranty, before the vehicle ultimately required a short-block replacement in July 2021. Pickering testified that it was only at approximately the time of that replacement that he became "acutely aware of this coolant intrusion issue" through his own online research; the dealerships that had previously serviced the vehicle had not disclosed the engine-design defect to him. | Talley Decl., Ex. 27, S. Pickering Dep. Tr. 18:18–20, 61:4–11, 61:15–16, 94:6–12, 96:3–6, 106:7–10, 110:12–24, 113:15–17, 129:10–12, 130:6–10; Talley Decl., Ex. 42, PLTF_0002634; Talley Decl., Ex. 43, PLTF_0002643; Talley Decl., Ex. 44, PLTF_0002636, at -37. |

| Plaintiffs Lund, West, Pickering, Balaszek, Manfras, and Metro – Delayed Discovery | | |
|---|---|---|
| No | Additional Material Fact | Supporting Evidence |
| 44 | In 2016, Balaszek purchased her new vehicle from an authorized Ford dealership. Balaszek ensured she reviewed the original window sticker for the vehicle before completing her purchase. Before December 27, 2019, no service provider had informed Balaszek that the Escape's coolant was low or empty. Although she learned during a routine oil change that day that the coolant was completely empty, she was not informed of a known engine problem until September 2020, when a technician gave her a document showing a "known issue with these engines." | Talley Decl., Ex. 14, T. Balaszek Dep. Tr. 57:19–25, 75:3–8, 75:17–22, 82:14–83:16;<br><br>Talley Decl., Ex. 41, PLTF_0000084;<br><br>Talley Decl., Ex. 45, PLTF_0005088. |
| 45 | Aaron Manfra reviewed Ford's website for financial incentives, which enticed him to purchase the Fusion over other available vehicles. The Manfras experienced no engine problems before September 2020. When the engine subsequently lost substantial power and the vehicle was taken to Crouse Ford, Aaron Manfra did not know what was wrong with the engine; Crouse Ford diagnosed coolant in cylinder No. 2 and replaced the short block. When Victoria Manfra contacted Ford's customer-service line, Ford told her only that the vehicle was outside the warranty and that the repair would be the Manfras' responsibility. In 2020, the Manfras had to have their vehicle towed to a Ford authorized dealership and ultimately authorized an engine replacement shortly thereafter. Aaron Manfra learned of the engine-design flaw through his own research in late November or early December 2020, after the repair had been completed, and testified that Ford had never disclosed the defect to him. Mr. Manfra testified he felt misled regarding the vehicle's reliability by the salesperson who sold him the vehicle. | Talley Decl., Ex. 47, A. Manfra Dep. Tr. 30:1–6, 81:10–82:10, 85:7–9, 87:3–5, 88:2–8, 91:1–5, 106:4–16, 109:1–8, 113:15–16, 121:1–3, 122:1–124:6, 138:1–15;<br><br>Talley Decl., Ex. 48, V. Manfra Dep. Tr. 88:23–89:1, 91:7–92:19;<br><br>Talley Decl., Ex. 49, FORD-MILLER 00455630;<br><br>Talley Decl., Ex. 50, PLTF_0002281. |

PLAINTIFFS' STATEMENT
OF DISPUTED FACTS
NO. 2:20-CV-01796-DAD-CKD

| Plaintiffs Lund, West, Pickering, Balaszek, Manfras, and Metro – Delayed Discovery | | |
|---|---|---|
| No | Additional Material Fact | Supporting Evidence |
| 46 | Metro spoke with a salesperson at the Ford authorized dealership regarding the safety and power features of the Ford Edge, all of which enticed her to purchase the Ford Edge. Metro also reviewed Ford's website for pricing and safety specifications of the Ford Edge. Metro noticed hesitation and a tendency to stall early in her ownership of the Edge, but she attributed those characteristics to its four-cylinder engine and no warning light illuminated. When a check-engine light later appeared, Romeo Ford identified an oxygen-sensor code but did not perform a repair because the light would not remain illuminated during the inspection. Metro thereafter had oxygen sensors, spark plugs, and ignition coils replaced, but the hesitation and other symptoms persisted. It was not until the vehicle lost power and stalled in July 2022 that Imlay City Ford diagnosed cylinder misfires, low coolant, and an internal engine condition requiring complete engine replacement. | Talley Decl., Ex. 13, T. Metro Dep. Tr. 93:23–25, 94:2–7, 116:20–23, 124:17–20, 126:7–11, 137:16–24, 147:24–150:8, 169:9–10, 173:17–174:12, 190:18–191:15, 210:5–11. |

Dated: July 22, 2026

Respectfully submitted,

/s/ Stuart C. Talley

Stuart C. Talley
William A. Kershaw
Ian J. Barlow
401 Watt Avenue
Sacramento, California 95864
Telephone: (916) 779-7000
Facsimile: (916) 244-4829
stuart@ktblegal.com
bill@ktblegal.com
ian@ktblegal.com

Mark P. Chalos (*pro hac vice*)
LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
222 2nd Avenue South, Suite 1640
Nashville, Tennessee 37201
Telephone: (615) 313-9000
mchalos@lchb.com

- 18 -

Phong-Chau G. Nguyen (S.B. #286789)
Clare D. Perez (S.B. #363027)
LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, California 94111-3339
Telephone: (415) 956-1000
pgnguyen@lchb.com
cdperez@lchb.com

Annika K. Martin (*pro hac vice*)
Gabriel Panek (*pro hac vice*)
LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
250 Hudson Street, 8th Floor
New York, New York 10013
akmartin@lchb.com
gpanek@lchb.com

Cody R. Padgett (S.B. #275553)
Abigail J. Gertner (*pro hac vice*)
Majdi Y. Hijazin (*pro hac vice*)
CAPSTONE LAW, APC
1875 Century Park East, Suite 1860
Los Angeles, California 90067
Telephone: (310) 556-4811
cody.padgett@capstonelawyers.com
majdi.hijazin@capstonelawyers.com
abigail.gertner@capstonelawyers.com

Russell D. Paul (*pro hac vice*)
Amey J. Park (*pro hac vice*)
Natalie Lesser (*pro hac vice*)
BERGER MONTAGUE PC
1818 Market Street, Suite 3600
Philadelphia, PA 19103
Telephone: (215) 875-3000
rpaul@bm.net
apark@bm.net
nlesser@bm.net

Thomas P. Thrash (*pro hac vice*)
William T. Crowder (*pro hac vice*)
THRASH LAW FIRM PA
1101 Garland Street
Little Rock, AR 72201
Telephone: (501) 374-1058
tomthrash@sbcglobal.net
willcrowder@thrashlawfirmpa.com

PLAINTIFFS' STATEMENT
OF DISPUTED FACTS
NO. 2:20-CV-01796-DAD-CKD

Patrick Newsom (*pro hac vice*)
NEWSOM LAW PLC
40 Music Square East
Nashville, Tennessee 37203
Telephone: 615-251-9500
patrick@newsom.law

*Attorneys for Plaintiffs and the Proposed Classes and Subclasses*

PLAINTIFFS' STATEMENT
OF DISPUTED FACTS
NO. 2:20-CV-01796-DAD-CKD