William A. Kershaw
Stuart C. Talley
Ian J. Barlow
**KERSHAW TALLEY BARLOW PC**
401 Watt Avenue
Sacramento, California 95864
Telephone: (916) 779-7000
Facsimile: (916) 244-4829
bill@ktblegal.com
stuart@ktblegal.com
ian@ktblegal.com

[Additional Counsel on Signature Pages]

*Attorneys for Plaintiffs and the
Proposed Classes*

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| VANESSA MILLER, et al., as individuals and on behalf of all others similarly situated,<br><br>    Plaintiffs,<br><br>v.<br><br>FORD MOTOR COMPANY,<br><br>    Defendant. | Case No. 2:20-cv-01796-DAD-CKD (Consolidated with Nos. 2:21-cv-00417-DAD-CKD, 2:21-cv-00468-DAD-CKD) |
| TREVOR NELSON, et al., as individuals and on behalf of all others similarly situated,<br><br>    Plaintiffs,<br><br>v.<br><br>FORD MOTOR COMPANY,<br><br>    Defendant. | Case No. 2:24-cv-02231-DAD-CKD<br><br>**PLAINTIFFS' REPLY IN SUPPORT OF CONSOLIDATED MOTION FOR CLASS CERTIFICATION**<br><br>Date: September 21, 2026<br>Time: 1:30 p.m.<br>Judge: Hon. Dale A. Drozd<br>Courtroom: 4, 15th Floor |

**TABLE OF CONTENTS**

**Page**

I. INTRODUCTION ...................................................................................................................1

II. PROPOSED CLASSES ........................................................................................................1

    A. Class Definitions ...........................................................................................................1

    B. The Duratec Classes are sufficiently cohesive..............................................................2

        1. Class definitions do not have to be identical to those in the complaints. ...............2

        2. 2.0L buyers can represent a class containing 2.3L buyers, and vice-versa. ...........3

III. ARGUMENT ........................................................................................................................3

    A. Common questions predominate within each of the proposed Classes. ..........................3

        1. The Saw Cut Defect is a common defect. ...............................................................3

            a. Every Class Vehicle has a saw-cut turbocharged engine with a too-narrow (<9mm) bore bridge, i.e. the Saw Cut Defect..................................3

            b. Any design variations across the Class Vehicles are immaterial.................4

            c. The Class Vehicles' in-warranty repair rate does not affect certification. .................................................................................................6

            d. Coolant intrusion in the Class Vehicles has a common root cause: the Saw Cut Defect. ....................................................................................8

        2. Common questions predominate for Plaintiffs' consumer protection claims..........8

            a. Common questions will resolve Ford's knowledge of the Defect...............8

            b. Reliance or causation can be inferred in each state where required. .........13

            c. Actual manifestation is not required under the FL DUTPA. .....................15

            d. Statutes that require "personal use" are susceptible to class certification. ...............................................................................................15

        3. Common questions predominate for the breach of implied warranty claims. .......15

        4. Plaintiffs' proposed damages model will calculate benefit-of-the-bargain damages for every class member using a common formula. ....................................17

        5. Ford's limitations defenses do not upset commonality or predominance..............18

    B. A class action is the superior method of resolving this litigation. ..................................19

    C. The proposed class representatives are typical and adequate. .........................................20

IV. CONCLUSION...................................................................................................................20

## TABLE OF AUTHORITIES

**Page**

**Cases**

*Algarin v. Maybelline, LLC,*
300 F.R.D. 444 (S.D. Cal. 2014) ...............................................................................................15

*Alger v. FCA,*
334 F.R.D. 415 (E.D. Cal. 2020) ........................................................................................ *passim*

*Amgen Inc. v. Conn. Ret. Plans,*
568 U.S. 455 (2013)...................................................................................................................6

*Arabian v. Sony Elecs.,*
2007 WL 627977 (S.D. Cal. Feb. 22, 2007)............................................................................15

*Bazarganfard v. Club 360 LLC,*
344 F.R.D. 411 (C.D. Cal. 2023)..............................................................................................20

*Beaty v. Ford Motor Co.,*
2021 WL 3109661 (W.D. Wash. July 22, 2021) ......................................................................12

*Bennett v. GoDaddy.com LLC,*
2019 WL 1552911 (D. Ariz. Apr. 8, 2019) ..............................................................................11

*Black Lives Matter L.A. v. City of L.A.,*
113 F.4th 1249 (9th Cir. 2024) ..................................................................................................3

*Broussard v. Meineke Discount Muffler Shops,*
155 F.3d 331 (4th Cir. 1998) .....................................................................................................6

*Butler v. Porsche,*
2017 WL 1398316 (N.D. Cal. Apr. 19, 2017) ...........................................................................4

*Cadena v. Am. Honda,*
2024 WL 4005097 (C.D. Cal. July 2, 2024).......................................................................16, 18

*Carlino v. CHG Med. Staffing,*
634 F. Supp. 3d 895 (E.D. Cal. 2022)........................................................................................2

*Carnegie v. Household Int'l, Inc.,*
376 F.3d 656 (7th Cir. 2004) ...................................................................................................19

*Carriuolo v. Gen. Motors,*
823 F.3d 977 (11th Cir. 2016) .............................................................................................14, 15

*Castano v. Am. Tobacco Co.,*
84 F.3d 734 (5th Cir. 1996) ......................................................................................................19

PLAINTIFFS' REPLY ISO CONSOLIDATED
MOT. FOR CLASS CERTIFICATION
CASE NO. 2:20-CV-01796-DAD-CKD

**TABLE OF AUTHORITIES**
**(continued)**

Page

*Chapman v. Gen. Motors*,
2023 WL 2746780 (E.D. Mich. Mar. 31, 2023) ..................................................15, 16

*Chapman v. Gen. Motors*,
531 F. Supp. 3d 1257 (E.D. Mich. 2021)..........................................................16

*Cholakyan v. Mercedes-Benz*,
281 F.R.D. 534 (C.D. Cal. 2012) ......................................................................8

*Coppel v. SeaWorld*,
347 F.R.D. 338 (S.D. Cal. 2024) ......................................................................2

*Corder v. Ford Motor Co.*,
283 F.R.D. 337 (W.D. Ky. 2012).....................................................................15

*Daniel v. Ford Motor Co.*,
2016 WL 8077932 (E.D. Cal. Sept. 23, 2016)................................................9, 13

*Daniel v. Ford Motor Co.*,
806 F.3d 1217 (9th Cir. 2015) .........................................................................13

*Davidson v. Apple, Inc.*,
2019 WL 2548460 (N.D. Cal. June 20, 2019) .................................................18

*Day v. Adv. Micro Devices, Inc.*,
2023 WL 6998188 (N.D. Cal. Oct. 23, 2023)..................................................16

*Delcavo v. Tour Res. Consultants*,
2022 WL 1062269 (D. Kan. Apr. 8, 2022).......................................................13

*In re Dollar Gen. Corp. Motor Oil Mktg. & Sales Pracs. Litig.*,
2019 WL 1418292 (W.D. Mo. Mar. 21, 2019)................................................14

*Edwards v. Angeles Abbey Mem'l Park*,
2009 WL 1971375 (C.D. Cal. July 2, 2009).....................................................20

*Est. of Pilgrim v. Gen. Motors*,
344 F.R.D. 381 (E.D. Mich. 2023) ..................................................................19

*Falco v. Nissan*,
2016 WL 1327474 (C.D. Cal. Apr. 5, 2016) .................................................3, 17

*In re Ford Motor Co.*,
86 F.4th 723 (6th Cir. 2023) ............................................................................12

*In re Ford Motor Co. Vehicle Paint*,
182 F.R.D. 214 (E.D. La. 1998)........................................................................12

**TABLE OF AUTHORITIES**
**(continued)**

**Page**

*Fox v. Ritz-Carlton Hotel*,
345 F.R.D. 358 (S.D. Fla. 2024)..................................................................................14

*Frasco v. Flo Health*,
349 F.R.D. 557 (N.D. Cal. 2025)................................................................................19

*In re Gen. Motors Ignition Switch Litig.*,
2016 WL 3920353 (S.D.N.Y. July 15, 2016) .............................................................15

*In re Gen. Motors Ignition Switch Litig.*,
339 F. Supp. 3d 262 (S.D.N.Y. 2018).........................................................................16

*Gold v. Lumber Liquidators*,
323 F.R.D. 280 (N.D. Cal. 2017)................................................................................14

*Heckler & Koch, Inc. v. German Sport Guns GmbH*,
2015 WL 13639195 (S.D. Ind. Apr. 21, 2015)...........................................................13

*J.L. v. Cissna*,
2019 WL 415579 (N.D. Cal. Feb. 1, 2019) ..................................................................2

*Johnson v. Harley-Davidson*,
285 F.R.D. 573 (E.D. Cal. 2012) ..................................................................................2

*Kalani v. Castle Vill. LLC*,
14 F. Supp. 3d 1359 (E.D. Cal. 2014).........................................................................17

*Keegan v. Am. Honda*,
284 F.R.D. 504 (C.D. Cal. 2012).....................................................................9, 13, 17

*Kia Motors v. Butler*,
985 So. 2d 1133 (Fla. Dist. Ct. App. 2008) ...............................................................15

*Kondash v. Kia Motors*,
347 F.R.D. 197 (S.D. Ohio 2020)...............................................................................12

*Lessin v. Ford Motor Co.*,
2026 WL 382608 (9th Cir. Feb. 11, 2026) .........................................................7, 9, 19

*Lloyd v. Gen. Motors Corp.*,
916 A.2d 257 (Md. 2007) ...........................................................................................16

*In re MacBook Keyboard Litig.*,
2019 WL 1765817 (N.D. Cal. Apr. 22, 2019).............................................................10

*In re MacBook Keyboard Litig.*,
2021 WL 1250378 (N.D. Cal. Apr. 5, 2021)................................................................8

**TABLE OF AUTHORITIES**
(continued)

Page

*MacDougall v. Am. Honda*,
2023 WL 9687349 (C.D. Cal. Oct. 3, 2023)...............................................................................18

*In re Marriott Int'l*,
341 F.R.D. 128 (D. Md. 2022)....................................................................................................13

*McCoy v. Samsung*,
2023 WL 6140641 (D.N.J. Sept. 20, 2023) ...............................................................................10

*Miller v. Ford Motor Co.*,
620 F. Supp. 3d 1045 (E.D. Cal. 2022).................................................................................2, 13

*In re MyFord Touch*,
2016 WL 7734558 (N.D. Cal. Sept. 14, 2016) ..........................................................................15

*In re MyFord Touch*,
2018 WL 3646895 (N.D. Cal. Aug. 1, 2018) .............................................................................12

*In re MyFord Touch*,
291 F. Supp. 3d 936 (N.D. Cal. 2018) .......................................................................................16

*Nguyen v. Nissan*,
932 F.3d 811 (9th Cir. 2019) ...............................................................................................17, 18

*In re Nissan*,
122 F.4th 239 (6th Cir. 2024) ..............................................................................................12, 14

*Nuwer v. FCA*,
2023 WL 8698327 (S.D. Fla. Dec. 15, 2023)......................................................................10, 12

*O'Connor v. Boeing*,
197 F.R.D. 404 (C.D. Cal. 2000)...............................................................................................19

*Olean v. Bumble Bee*,
31 F.4th 651 (9th Cir. 2022) (en banc) .....................................................................................18

*In re OnStar Contract Litig.*,
278 F.R.D. 352 (E.D. Mich. 2011) ............................................................................................15

*Parkinson v. Hyundai*,
258 F.R.D. 580 (C.D. Cal. 2008)...............................................................................................20

*Patten v. Vertical Fitness Grp.*,
2013 WL 12069031 (S.D. Cal. Nov. 8, 2013) .............................................................................2

*Philips v. Ford*,
2015 WL 4111448 (N.D. Cal. July 7, 2015)..............................................................................10

**TABLE OF AUTHORITIES**
(continued)

Page

*Philips v. Ford*,
2016 WL 7428810 (N.D. Cal. Dec. 22, 2016)................................................3, 6, 12, 13

*Plascencia v. Lending 1st Mortg.*,
259 F.R.D. 437 (N.D. Cal. 2009)................................................................................19

*Quackenbush v. Am. Honda*,
2021 WL 6116949 (N.D. Cal. Dec. 27, 2021)............................................................17

*Rowan Cnty. Bd. of Educ. v. U.S. Gypsum*,
418 S.E.2d 648 (N.C. 1992)........................................................................................13

*Salas v. Toyota*,
2019 WL 1940619 (C.D. Cal. Mar. 27, 2019)....................................................4, 5, 13

*Sanchez v. Kia Motors*,
2024 WL 4730654 (C.D. Cal. Nov. 7, 2024)..................................................7, 8, 15, 18

*Schwarzschild v. Tse*,
69 F.3d 293 (9th Cir. 1995) ........................................................................................20

*Shea v. Gen. Motors LLC*,
567 F. Supp. 3d 1011 (N.D. Ind. 2021) ......................................................................14

*Siqueiros v. Gen. Motors*,
2022 WL 3974752 (N.D. Cal. Aug. 31, 2022) ............................................................12

*Sloan v. Gen. Motors*,
287 F. Supp. 3d 840 (N.D. Cal. 2018) ........................................................................13

*Sonneveldt v. Mazda*,
2023 WL 1812157 (C.D. Cal. Jan. 25, 2023) ..............................................................17

*Speerly v. Gen. Motors*,
143 F.4th 306 (6th Cir. 2025) (en banc) ....................................................................13

*Sriver v. Maley*,
151 N.E.2d 518 (Ind. App. 1958) ........................................................................13, 14

*Stearns v. Select Comfort Retail*,
763 F. Supp. 2d 1128 (N.D. Cal. 2010) ......................................................................19

*Stockinger v. Toyota*,
2020 WL 1289549 (C.D. Cal. Mar. 3, 2020)................................................................4

*Sweet v. Pfizer*,
232 F.R.D. 360 (C.D. Cal. 2005)................................................................................20

**TABLE OF AUTHORITIES**
(continued)

Page

*In re Tesla*,
350 F.R.D. 119 (N.D. Cal. 2025).................................................................................18, 19

*Torres v. Nissan*,
2015 WL 5170539 (C.D. Cal. Sept. 1, 2015) ....................................................................17

*United States v. Blondeau*,
2016 WL 1072849 (S.D. Cal. Mar. 15, 2016) ...................................................................17

*Victorino v. FCA*,
2022 WL 3691642 (S.D. Cal. Aug. 25, 2022) ...................................................................18

*Wolin v. Jaguar Land Rover N. Am., LLC*,
617 F.3d 1168 (9th Cir. 2010) .............................................................................3, 6, 7, 9

*WWP v. Wounded Warriors Fam. Support*,
628 F.3d 1032 (8th Cir. 2011) .........................................................................................14

**Statutes**

Colo. Rev. Stat. § 13-80-108(6)................................................................................................19

**Court Rules**

Fed. R. Civ. P. 23 .......................................................................................................................1, 3

Fed. R. Civ. P. 23(b)(3)................................................................................................................19

Fed. R. Civ. P. 42 .........................................................................................................................3

## I.   INTRODUCTION

*Every* vehicle at issue in this class action was manufactured by Ford and outfitted with an "EcoBoost" engine. *Every* one of these EcoBoost engines is designed with a "saw-cut" channel that is intended to cool the engine's "bore bridge" (which has a tendency to overheat in turbocharged engines like the EcoBoost) by circulating coolant through it. *Every* engine also has a narrow bore bridge that is not wide enough to accommodate the saw cut while also performing the critical job of sealing the head gasket and keeping coolant out of the cylinders. *Every* Class Vehicle model at issue experienced significant issues with coolant intrusion into the cylinders caused by this defective design. *Every* Class member received the same pre-purchase information from Ford about this Defect—that is, none—even though Ford knew these engines were prone to failure. *Every* class member was therefore harmed at the point of sale by purchasing a Ford vehicle with one of these defective engines, and *every* class member's damages will be calculated through application of a uniform formula.

Ford's unwitting customers should not be left holding the bag for a problem Ford caused and then hid from them. Rule 23 allows a jury to decide these common questions in a single straightforward proceeding. *Every* Class member's claims will rise or fall together, and class certification should be granted.

## II.   PROPOSED CLASSES

### A.   Class Definitions

As set forth in their motion, Plaintiffs seek to certify state-by-state classes consisting of individuals who purchased new Ford vehicles equipped with engines from the same "family,"[1] either the "Sigma" (1.5L) or "Duratec" (2.0L/2.3L) saw-cut EcoBoost engine. Mot. 22.[2] The **Sigma Class Vehicles** are: 2017-2019 Ford Escape (1.5L) and 2014-2019 Ford Fusion (1.5L). The **Duratec Class Vehicles** are: 2015-2018 Ford Edge (2.0L), 2016-2019 Ford Escape (2.0L),[3] 2016-2019 Ford Fusion (2.0L), 2016-2019 Ford

---

[1] Mot. Ex. 16 at 7:12–13, 8:22–9:6 (all of the engines are in the same "family of engines" because they "shared some similarities in the architecture and design"). "Mot. Ex." refers to exhibits to the Declaration of Stuart Talley in Support of Plaintiffs' Motion for Class Certification (Dkt. 162-2 *et seq.*). "Opp. Ex." refers to exhibits to the Declaration of Randall Edwards in Support of Ford's Opposition to the Motion for Class Certification (Dkt. 169-1 *et seq.*). "Reply Ex." refers to exhibits to the Declaration of Mark Chalos in Support of Plaintiffs' Reply in Support of Class Certification, attached to this reply brief. All exhibits cited herein were filed under seal with at least some redactions; Plaintiffs' challenges to those redactions are pending.

[2] "Mot." refers to Plaintiffs' Memorandum in Support of Motion for Class Certification (Dkt. 162-1). "Opp." refers to Ford's Opposition to Plaintiffs' Motion for Class Certification (Dkt. 169).

[3] Plaintiffs' Motion inadvertently excluded the 2016-2019 Escape and 2016-2019 Fusion. Mot. 21. Both sides

- 1 -

Explorer (2.3L), 2015-2019 Ford Mustang (2.3L), 2015-2019 Lincoln MKC (2.0L or 2.3L), and 2016-2019 Lincoln MKZ (2.0L). A chart summarizing these proposed Classes and the claims is attached as **Exhibit A**.

### B.    The Duratec Classes are sufficiently cohesive.

#### 1.    Class definitions do not have to be identical to those in the complaints.

Ford's argument is essentially that because the class definition of the 2.3L Vehicles in the *Nelson* complaint was limited to California-purchased vehicles, and the Duratec Class representatives from the *Miller* complaint do not include any California purchasers, Plaintiffs cannot now proceed with a class definition for 2.3L outside California (or a California class that covers 2.0L vehicles). Opp. 42–44.

To the contrary, courts may allow certification of a "modified" class definition like this one if the "proposed modifications are minor, require no additional discovery, and cause no prejudice to defendants." *J.L. v. Cissna*, 2019 WL 415579, at *5 (N.D. Cal. Feb. 1, 2019); *see Patten v. Vertical Fitness Grp.*, 2013 WL 12069031, at *4 (S.D. Cal. Nov. 8, 2013) (allowing expanded class definition). For nearly the entire discovery period, the Parties treated *Miller* and *Nelson* as one. After *Nelson* was transferred, the Parties agreed "discovery produced in *Miller* can be used in" *Nelson* and the two cases should be on "the same case schedule." *Nelson*, Dkt. 34 at 4–5. Plaintiffs cross-noticed every Ford deposition across both actions, reflecting the overlap of the substance. And every one of both sides' experts were disclosed in both cases.

In Ford's cases (Opp. 43), courts denied expanded class definitions that were based on facts nowhere present in the pleadings. *Coppel v. SeaWorld*, 347 F.R.D. 338, 350 (S.D. Cal. 2024) (plaintiff sought to certify class of retirement plan participants based on administrator not in the complaint); *Johnson v. Harley-Davidson*, 285 F.R.D. 573, 577 n.2 (E.D. Cal. 2012) (plaintiff sought to certify class that included engines not discussed in the pleadings); *cf. J.L.*, 2019 WL 415579, at *5 (distinguishing cases where "the broader class definition . . . added a wholly different group of people"). Both the *Miller* and *Nelson* complaints allege the same coolant intrusion issues caused by the same Defect, and the proposed Classes would not go beyond the universe of vehicles at issue in both complaints. *Miller*, Dkt. 144 ¶ 4; *Nelson*, Dkt. 33 ¶ 4.[4]

understand the 2016-2019 Escape and 2016-2019 Fusion are Duratec Class Vehicles. *See, e.g.*, Reply Ex. 67 (Ford's interrogatory response identifying that the 2016-2019 Escape and 2016-2019 Fusion with a 2.0L EcoBoost engine "were manufactured with a saw cut"); *see also, e.g.*, Opp. Ex. 2 ¶¶ 152–53 (Ford's expert considering these vehicles to be part of the putative class). Regardless, the Court has "broad discretion to modify class definitions," and Plaintiffs respectfully ask it to exercise that discretion here if necessary. *Carlino v. CHG Med. Staffing*, 634 F. Supp. 3d 895, 900 (E.D. Cal. 2022) (Drozd, J.).

[4] If the Court believes otherwise, Plaintiffs would request leave to amend the complaint and/or move for

- 2 -

**2.** **2.0L buyers can represent a class containing 2.3L buyers, and vice-versa.**

Ford also claims the 2.0L and 2.3L cannot share a class because they contain some parts that vary. Courts frequently reject this argument, holding the purchaser of one model can represent purchasers of other models with the same defect "[d]espite minor differences between [the] vehicles." *Philips v. Ford*, 2016 WL 7428810, at *10 (N.D. Cal. Dec. 22, 2016); *see Falco v. Nissan*, 2016 WL 1327474, at *5–7 (C.D. Cal. Apr. 5, 2016) (plaintiffs whose vehicles have "the same defective . . . system" can represent class that includes other vehicles with the defect). Thus, a "Duratec" class that encompasses both the 2.0L and 2.3L engines is appropriate because these engines share significant commonalities, including the Saw Cut Defect.

## III.   ARGUMENT

All the Rule 23 requirements are satisfied. Ford really only disputes commonality, predominance, and superiority, and those challenges fail. The Defect is common to every Class member, and every law at issue supports treating claims where an automaker fails to disclose a material defect on a classwide basis.

**A.** **Common questions predominate within each of the proposed Classes.**

**1.** **The Saw Cut Defect is a common defect.**

Plaintiffs' class claims require proof of a problem common to every Class Vehicle. Mot. 24. Here, that is the Saw Cut Defect: Ford's use of a saw-cut cooling channel in the EcoBoost engine, despite the engine's too-narrow bore bridge and turbocharged pressure. Critical questions such as whether the presence of the undisclosed Defect is material and whether it renders the vehicles unmerchantable will be resolved in one fell swoop as to every Class member.[5] Furthermore, alleged differences between the Sigma (1.5L) and Duratec (2.0L/2.3L) are irrelevant; each class consists only of *either* Sigma *or* Duratec Class Vehicles.

**a.** **Every Class Vehicle has a saw-cut turbocharged engine with a too-narrow (<9mm) bore bridge, i.e. the Saw Cut Defect.**

In cases where every vehicle has "the same alleged defect," commonality and predominance are "easily" satisfied. *Wolin v. Jaguar Land Rover N. Am., LLC*, 617 F.3d 1168, 1172 (9th Cir. 2010).[6]

---

formal Rule 42 consolidation of the actions, rather than outright narrowing of the classes.

[5] Ford relies on a stray cite to *Black Lives Matter L.A. v. City of L.A.*, 113 F.4th 1249 (9th Cir. 2024), which stands for the basic (and unchallenged) proposition that class certification requires "class-wide evidence." *Id.* at 1254. Such evidence did not exist there; the legality of the challenged police practices varied greatly, and "the record [did] not support" the plaintiffs' claims that the challenged arrest conditions "were uniform." *Id.* at 1260; *see id.* at 1259, 1262 (evidence resolving one claim would "do nothing for the other class members").
[6] *See also* Mot. 27 (collecting cases).

Ford does not deny the Class Vehicles all suffer from this combination. Instead, Ford claims "saw-cuts of a similar width did not have similar issues in competitor vehicles and non-class Ford vehicles." Opp. 16. First, that is not true. Ford's cite for this—a slide from a Ford 6-panel comparing bore bridge width to cylinder pressure[7]— shows "███████████████████████████████████████████

███████████████████████████████████████████

██████████"[8] Ford ignores that on the prior slide, its engineers concluded ████████████

██████████████████████████████████████████████████████████████████[9]

Even if it were true that saw cuts of a similar width worked fine in other vehicles, that would be irrelevant to whether it was defective in the EcoBoost. Besides, Ford later acknowledged it mindlessly chose the saw cut without properly evaluating how the design would work on the EcoBoost. Mot. 8. The cases Ford cites (Opp. 16) had much thinner records of defectiveness than here.[10]

### b.      Any design variations across the Class Vehicles are immaterial.

Ford cannot avoid certification by pointing to distinctions between the engines that "do not affect the design defect." *Salas v. Toyota*, 2019 WL 1940619, at *4 (C.D. Cal. Mar. 27, 2019).

***The Duratecs***:  Ford recites some differences between the 2.0L and 2.3L, Opp. 8. However, Ford does not dispute that both have a saw-cut engine block in a turbocharged engine with a too-narrow bore bridge. Nor does Ford dispute that it investigated the 2.0L and 2.3L as a single Defect—for instance, in the December 2017 6-Panel titled "Corrosion, 2.0L and 2.3L GTDI," Ford noted ███████████

██████████████████████████████████████████████████████████████████

███████████████████████████[11] Ford says "the actual and projected warranty claim rates for the 2.0L and 2.3L varied between the engines, and varied by vehicle make and

---

[7] Opp. 16 (citing Opp. Ex. 3 at -28). Ford also cites Dr. Lillo's rebuttal report, *id.*, which in turn relies entirely (in relevant part) on this same slide, Opp. Ex. 36 (Lillo Rebuttal Rep.) ¶¶ 19–20.

[8] Mot. Ex. 17 (Jordan Rebuttal Rep.) at 4; *see* Opp. Ex. 3 at -28; Reply Ex. 68, 6-Panel: "BEP Sigma 1.5L GTDi Block Bore Bridge Deck Surface Corrosion/erosion", FORD-MILLER 00124270, at -80 (████████████ ████████████████████████████████████ (emphasis added)).

[9] Opp. Ex. 3 at -27.

[10] In *Butler v. Porsche*, 2017 WL 1398316, at *7–8 (N.D. Cal. Apr. 19, 2017), plaintiff "failed to clearly articulate what, precisely, [was] defective" about the cars. In *Stockinger v. Toyota*, 2020 WL 1289549, at *7 (C.D. Cal. Mar. 3, 2020), plaintiffs' expert "[did] not explain his reasoning or provide analysis" for why the 88 vehicle models at issue were "similar enough to conclude the alleged defect is uniform across the class."

[11] Mot. Ex. 27 at -24–25, -40.

model year within the engine types," Opp. 10, but as noted below failure rates (to the extent they matter) were "unacceptably high" across all Vehicles.[12] The exhibit Ford cites undermines its point by admitting ████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████.[13]

*Design changes*:  Ford likewise cannot immunize itself from class certification because it made changes that *worsened* the Defect.[14] Design changes only potentially matter for class certification if they actually fixed the defect (or if the defendant had a good faith believe they did). Here, neither was true.

In the Sigmas, for model year ("MY") 2017, Ford introduced "automatic start/stop functionality" in the 1.5L that exacerbated coolant intrusion because "the engine shut down while the engine was hot, which stopped the auxiliary pump that circulated coolant." Opp. 4, 17. But the problems in the 1.5L did not begin with the start/stop redesign. Although Ford issued a (post-Class Period) customer satisfaction program that covered only the MY17-19 Sigma Class Vehicles (Opp. 18), Ford neglects to state that the company issued several dealership notifications and technical service bulletins that addressed the Defect in the MY14-16 Fusion.[15] These notifications admitted that ███████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████[16] Ford later said that, across all Sigma Class Vehicles, this issue was caused by the "████████████████████████████" and the solution was the "████████████████████████."[17] Ford may be right that "rates of coolant intrusion" in the MY14-16 1.5L were lower than after the "start/stop" introduction (Opp. 17), but varying manifestation rates do not preclude class certification.[18]

In the Duratecs, ████████████████████████████████████████████████████

---

[12] Mot. Ex. 51 (Wachs Rep.) ¶¶ 68, 98.

[13] Opp. Ex. 27 at -58, -73.

[14] *See Salas*, 2019 WL 1940619, at *4 (design change that "exacerbate[d] the problem" did not upset commonality). To the extent Ford may be arguing that the Class Vehicles were not defective prior to the design changes, that is unpersuasive and unsupported by the record, as discussed throughout this brief.

[15] Mot. Ex. 49 at -53 (collecting countermeasures that addressed the Defect in all Sigma Class Vehicles).

[16] *Id.*

[17] *Id.*

[18] Mot. Ex. 9 at -66 (2018 presentation admitting that 1.5L failure rate due to coolant intrusion was "high" throughout the Class Period, not just for MY17-19); *see also supra* Section III.A.1.b.

PLAINTIFFS' REPLY ISO CONSOLIDATED
MOT. FOR CLASS CERTIFICATION
CASE NO. 2:20-CV-01796-DAD-CKD

████████████████████████████████ Opp. 6. ████████████████████████████

[19] In other words, regardless of the ███████████, the defect was the same.

This case is thus nothing like the "fictional composite" class at issue in *Broussard v. Meineke Discount Muffler Shops*, 155 F.3d 331, 345 (4th Cir. 1998), which concerned a wide variety of franchise agreements that differed materially. Opp. 14. By contrast, due to the overwhelmingly common nature of the Saw Cut Defect, a plaintiff suing individually would be able to obtain and then use at trial all evidence relevant to any of the proposed Class Vehicles. *See Philips*, 2016 WL 7428810, at *10 (claims of plaintiff who owned a Fusion were "typical of the claims of owners of Focus vehicles because the same defect is alleged to exist in both vehicles"). Indeed, as Plaintiffs noted in their motion, Ford's investigation into coolant intrusion concerned all the Class Vehicles. Mot. 24–25.[20]

    c.    **The Class Vehicles' in-warranty repair rate does not affect certification.**

Ford attempts to avoid the common nature of the Defect by pointing to the Class Vehicles' slightly varied in-warranty repair rates.[21] The Ninth Circuit rejected this argument in *Wolin*. There, the automaker claimed (and the district court held) "that certification is inappropriate because [plaintiffs] did not prove that the defect manifested in a majority of the class's vehicles." 617 F.3d at 1173. The Ninth Circuit reversed because "proof of the manifestation of a defect is not a prerequisite to class certification." *Id.* This makes sense: class certification should be granted if "*questions* common to the class predominate;" plaintiffs need not demonstrate "that those questions will be answered, on the merits, in favor of the class." *Amgen Inc. v. Conn. Ret. Plans*, 568 U.S. 455, 459 (2013). If the *Wolin* plaintiffs "failed to prove" premature tire wear was due to the alleged common defect, it would resolve all the class claims in a single stroke. *Wolin*, 617 F.3d at

---

[19] Mot. Ex. 19 at -34; Mot. Ex. 12 (Henne Dep.) 139:2–8.

[20] Ford has no response to the fact that its 6-panel presentations analyzed both "Sigma & Duratec" together, instead arguing only that the evidence cited in these presentations shows varying manifestation rates or failure modes, Opp. 20–21. As discussed below, those distinctions do not affect commonality or predominance.

[21] Ford conflates actual engine failures over the useful life of the engine (10 years) with the far more limited set of in-warranty repair claims. *See, e.g.*, Opp. 20, 32, 34. As Ford itself found, ██████████████ ████████████████████████. *See, e.g.*, Mot. Ex. 13 at -210 (projecting █-year failure rates at up to ███% for 2.0L engines), -202 (failure rates up to ███% for 1.5L engines within █ years).

PLAINTIFFS' REPLY ISO CONSOLIDATED
MOT. FOR CLASS CERTIFICATION
CASE NO. 2:20-CV-01796-DAD-CKD

1173.[22]

In an effort to dodge the controlling precedent, *Wolin*, Ford seeks refuge in the Ninth Circuit's unpublished decision in *Lessin v. Ford Motor Co.*, 2026 WL 382608 (9th Cir. Feb. 11, 2026). Ford claims *Lessin* supports its view that "variance in failure rates across different vehicle groups independently defeats certification." Opp. 22, 37. *Lessin* says no such thing; what it does say is that it was erroneous for the district court to conclude that "manifestation evidence is *never* relevant at class certification." *Lessin*, 2026 WL 382608, at *2 (emphasis added). The district court's failure even to address manifestation in *Lessin* was problematic because that case involved numerous allegedly defectively designed (and redesigned) parts, manufactured by different suppliers over two decades. In *Wolin*, such variations were not an issue because "the alleged defect . . . was the same in all class vehicles." 2026 WL 382608, at *2. So too in the Ninth Circuit's opinion affirming class certification in *Johnson II*, which Ford does not address. And so too here.

Ford's reliance on the anemic analysis of its warranty expert, Dr. Lennox, to argue variation in warranty repair rates matters to certification is not compelling. Her analysis relies on "logistic regression," which can determine only "whether a vehicle appeared in the [warranty] claims data"; it does not calculate expected failure rate during the vehicle's useful life.[23] As such, Dr. Lennox's analysis only discussed the Class Vehicles' 5-year in-warranty repair rate,[24] even though what matters is that customers reasonably expect their vehicles' engines "to last for the intended useful life of the vehicle," i.e. over 10 years.[25]

Dr. Lennox also did not identify a "baseline" warranty repair rate by comparing the Class Vehicles to non-class (non-defective) equivalents, so even if her calculations are correct, the warranty repair rates that "may seem low" can "actually" be significant and obviously causally related to the Defect.[26] *Cf. Sanchez v. Kia Motors*, 2024 WL 4730654, at *13 (C.D. Cal. Nov. 7, 2024) ("much higher" replacement rate in class vehicles, compared to non-class equivalents). As Plaintiffs' statistician, Dr. Wachs explains, the projected

---

[22] *See also Johnson v. Nissan* ("*Johnson II*"), 2024 WL 4784367, at *1 (9th Cir. Nov. 14, 2024) ("[A]s our cases explain, proof of a defect is not required to establish class certification because that is a merits inquiry."); *Alger v. FCA*, 334 F.R.D. 415, 423–24 (E.D. Cal. 2020) (variable failure rates within a proposed class do not change the fact that the shared defective design is a predominating common question).

[23] Reply Ex. 76 (Wachs Rebuttal Rep.) ¶ 9.

[24] Opp. Ex. 17 (Lennox Rep.) at 4.

[25] Mot. Ex. 51 (Wachs Rep.) ¶ 16 & n.1 (footnote omitted) (citing Reply Ex. 69, 6-Panel: "C346RS Head Gasket Coolant in Cylinder", FORD-MILLER 00074856, at -82).

[26] Mot. Ex. 51 (Wachs Rep.) ¶ 75; *see* Reply Ex. 76 (Wachs Rebuttal Rep.) ¶¶ 11, 37–40 (Dr. Lennox "never identified a 'baseline' failure rate to know whether her calculated rates were high or typical").

PLAINTIFFS' REPLY ISO CONSOLIDATED
MOT. FOR CLASS CERTIFICATION
CASE NO. 2:20-CV-01796-DAD-CKD

10-year failure rates (based on Ford's data) for all the Class Vehicles were "unacceptably high," well above what "is generally accepted in the automotive industry,"[27] and in-class failure rates were "staggering[ly]" higher (20 to 200 times greater) than non-saw-cut Ford equivalents.[28] Thus, even if manifestation rates were relevant to class certification here, Plaintiffs have shown that common questions predominate. *Sanchez*, 2024 WL 4730654, at *13 (defect was common given, among other things, "the high rate of replacement for the Class Vehicles," including compared to non-class equivalents).

### d. Coolant intrusion in the Class Vehicles has a common root cause: the Saw Cut Defect.

Finally, "[t]he different ways in which the alleged defect manifested does not render the question of whether the *design* is defective an individualized question." *In re MacBook Keyboard Litig.*, 2021 WL 1250378, at *12 (N.D. Cal. Apr. 5, 2021) (emphasis added). Regardless of how the coolant intrusion arose, "the presence of a saw-cut cooling feature in the narrow bore bridge" was the ultimate root cause in *all* Class Vehicles.[29] And within each class (Sigma or Duratec), the failure mode was the same, so commonality is satisfied on a class-by-class basis.[30]

### 2. Common questions predominate for Plaintiffs' consumer protection claims.

All Plaintiffs' statutory consumer protection claims will be resolved via common elements. Mot. 27–28. Ford's claimed variations in knowledge, reliance, and materiality are wrong factually and legally.

### a. Common questions will resolve Ford's knowledge of the Defect.

### i. Pre-sale knowledge is a common question.

For all claims that require it, Ford's pre-sale knowledge is a common question.[31] What matters at this

---

[27] Mot. Ex. 51 (Wachs Rep.) ¶¶ 68, 90; *see id.* ¶ 70.

[28] *Id.* ¶¶ 73–82; *see* Reply Ex. 76 (Wachs Rebuttal Rep.) ¶ 39 ("[T]he Class Vehicles failed at rates 20 to 200 times higher than similar vehicles without the saw cut on the engine block bore bridge.").

[29] Mot. Ex. 18 (Jordan Rep.) ¶ 47; *see* Mot. Ex. 6 at -42 (email by Ford engineer Sara Selthofer discussing how the coolant intrusion issues in "1.5, 2.0/2.3L engines" have an "established root cause" that will be fixed by the "new block and head gasket coming into production to contain the issue").

[30] Ford says the fact it instituted the same "permanent corrective action" for the coolant intrusion issues in every Class Vehicle is not evidence of a common root cause. Opp. 22. But in the only case it cites, the court rejected plaintiffs' reliance on dealer communications (not a common fix) because the bulletins "discuss[ed] a range of different vehicle parts" and were "limited to certain subsets of putative class vehicles, meaning that no single [bulletin] applies to all of the class vehicles." *Cholakyan v. Mercedes-Benz*, 281 F.R.D. 534, 555 (C.D. Cal. 2012). Here, the cross-drill PCA implicated a single part (the engine block) and fixed the Defect in every Class Vehicle, regardless of displacement or model.

[31] Plaintiffs and Ford disagree about whether the FL DUTPA, MD CPA, or NE CPA require knowledge.

juncture is not whether Plaintiffs have *proven* Ford's pre-sale knowledge, but rather whether Plaintiffs have put forward evidence that the fact finder *could* use to "determine what [Ford] knew about the alleged defect, when it knew what, and at what point that knowledge was no longer exclusive . . . for all class members." *Daniel v. Ford Motor Co.*, 2016 WL 8077932, at *7 (E.D. Cal. Sept. 23, 2016). Because this case involves a uniform defect, "what [Ford] knew or did not know" about the Defect "can be proved with common evidence." *Keegan v. Am. Honda*, 284 F.R.D. 504, 534 (C.D. Cal. 2012); *accord Alger*, 334 F.R.D. at 426 (same); *see Wolin*, 617 F.3d at 1173 ("Common issues predominate such as whether Land Rover was aware of the existence of the alleged defect . . . ."); *Johnson II*, 2024 WL 4784367, at *1 (similar).

Ford says its knowledge of the Defect changed over time, destroying commonality. Opp. 27. Courts reject this hail-Mary argument; even if "evidence of [Ford's] knowledge may [have] change[d] over time, . . . it will be uniform as it relates to the claims at each period in time, and [Ford] has pointed to no concrete evidence to the contrary." *Johnson v. Nissan* ("*Johnson I*"), 2022 WL 2869528, at *22 (N.D. Cal. July 21, 2022), *aff'd*, *Johnson II*, 2024 WL 4784367.[32] Put another way, Ford developed pre-sale knowledge of the Defect at *a* point in time; whatever that point was, it applies classwide, and every Class member who bought their vehicle after that point in time can establish Ford's pre-sale knowledge with that common evidence. That is the basic and unchallenged point that *Lessin* stands for. 2026 WL 382608, at *4 (pre-sale knowledge established if automaker "knew about the alleged defect prior to" selling vehicles that contain the defect).

### ii.     Ford knew about the Saw Cut Defect before it sold any Class Vehicles.

In any event, the evidence overwhelmingly establishes that Ford knew prior to selling every Class Vehicle (i.e. before August 12, 2013) that the EcoBoost engines in the Class Vehicles were "prone to failure" because "of the tendency" of these engines to overheat and leak coolant into the cylinders.[33] *See*

---

*Compare* Mot. 31 n.160, *with* Opp. 23 & n.10. The knowledge inquiry does not vary by state, so Plaintiffs' analysis of this element would be the same regardless of who is right.

[32] Ford asks this Court to ignore the analysis in *Johnson I*, even though it is in line with the considered thoughts of nearly every court to address this question. Additionally, Ford does not acknowledge that *Johnson I* was affirmed by the Ninth Circuit, including on pre-sale knowledge. *Johnson II*, 2024 WL 4784367, at *1 ("Nissan's knowledge (or lack thereof) about the alleged defect" was a common question).

[33] The earliest Class Vehicle sold to a customer was the 1.5L MY14 Fusion, on August 12, 2013. The Duratec vehicles entered the market on February 18, 2014 (2.3L MY15 MKC), with the first 2.0L (MY15 Edge) sold on February 23, 2015. This information comes from Ford's NAVIS databases, which as noted previously are too large to attach, but Plaintiffs can provide them upon request. Dkt. 162-5 (Talley Excel Decl.) ¶ 3.

PLAINTIFFS' REPLY ISO CONSOLIDATED
MOT. FOR CLASS CERTIFICATION
CASE NO. 2:20-CV-01796-DAD-CKD

*Nuwer v. FCA*, 2023 WL 8698327, at *2 (S.D. Fla. Dec. 15, 2023). This evidence is collected in Plaintiffs' motion (at 4–13) and summarized in the attached timeline (**Exhibit B**), as well as briefly below.

In 2011, Ford approved a " ████████ " that ███████████████████████████████ ████████████████████████████████████"[34] Ford itself filed a patent in mid-2014 (and thus the patent was likely in draft prior to the Class Period[35]) recognizing the bore bridge is "a stressed area with little packaging space," and that in "small, high output engines," thermal and mechanical stresses may be increased, which can limit "the reliability of the gasket in this zone" and cause "combustion gas and coolant leaks," reduced engine power, and overheating.[36] Ford claims the company's own patent does not demonstrate its knowledge of the Defect because the document does not use the words "saw cut" (Opp. 27) but it did not need to; the core principle—that increased pressure in a narrow bore bridge compromises gasket sealing and, if not approached correctly, can lead to leakage-related failures—is the same.[37] *See In re MacBook*, 2019 WL 1765817, at *6 (patent application recognized risks associated with defective design).

Ford's pre-sale testing of the Class Vehicles bore out these risks. In January 2013, a prototype 2.3L engine " ████████████████████████████ ."[38] Ford engineer Ted Beyer noted the presence of a saw cut and added: " █████████████████████████████████████ ████████ "[39] The next month, Beyer again shared these concerns in the context of poor testing results in the

---

[34] Mot. Ex. 22 at -29. Ford takes issue with this and several other exhibits, which it incorrectly classifies as relating only to "2018 or later." Opp. 26. To the contrary, these documents contain discussions of Ford's pre-sale knowledge, even if the discussions themselves occurred later in time. Mot. Ex. 7 at -59 (when designing the saw-cut EcoBoost, "we looked at the competition and decided to implement what we saw, but did not correctly assess all the boundary conditions"); Mot. Ex. 15 at -69 (Ford chose the "saw cut to reduce cost"); Mot. Ex. 26 at 3–4 ("prevent action closure" paper stating Ford's *pre-sale testing* did not "capture[] worst case coolant pressure conditions" and "inadequately emulated Start-Stop shutdowns"); Mot. Ex. 29 at -72 (2020 email thread discussing 2012/2013 testing on Duratec engines); Mot. Ex. 32 at -53 (discussing the "design validation," i.e. *pre-sale*, testing on the 1.5L).

[35] *See Philips v. Ford*, 2015 WL 4111448, at *9 (N.D. Cal. July 7, 2015) ("it is reasonable to infer" technical service bulletins that post-date sale "were [preceded] by an accretion of knowledge"); *see also In re MacBook Keyboard Litig.*, 2019 WL 1765817, at *1, *6 (N.D. Cal. Apr. 22, 2019) (pre-sale knowledge established where computers went on sale in May 2015 and patent application was filed on May 13, 2015).

[36] Mot. Ex. 21 at col. 1 ll.14–26 (Ford patent filed in 2014).

[37] Mot. Ex. 18 (Jordan Rep.) ¶ 54. In the only case Ford cites, plaintiffs attempted to use a patent application to demonstrate the "importance" of a particular part, not that Samsung knew the design in question was defective. *McCoy v. Samsung*, 2023 WL 6140641, at *5 n.9 (D.N.J. Sept. 20, 2023).

[38] Reply Ex. 70, Jan. 7, 2013 email re: "178Hr. ENGINE FAILURE 2.3L C489 EFT XBC73920 AD1821 29D", NELSON-FORD 0165195, at -95.

[39] *Id.* (emphasis added).

2.0L and 2.3L: "█████████████████████████"[40] He also noted "████████████████████████"[41] which is where the saw cut is located. This was in keeping with negative head gasket design validation testing results from 2012 and 2013; as a Ford engineer would later state, "███████████████████"[42] Ford likewise knew, for the 1.5L engines, "████████████████████████████"[43]

The materially similar 1.6L engine saw coolant intrusion issues related to the saw cut during pre-release testing and shortly after it was introduced in 2012, i.e. before any of the Class Vehicles went on sale.[44] As Ford's engineers noted in 2014, one of the largest 1.6L warranty spend categories during its early years was "████████████████████" (the location of the saw cut).[45] Ford speculates "possible machining issues" were to blame, Opp. 9, but the cited email thread offered this as one possibility—before concluding "████████████████████████."[46] Ford engineers also observed "████████████████████."[47] Ford notes the quoted study concerned "███████," Opp. 10, "██████████████████████."[48] Ford also denies coolant intrusion in the 1.6L, *id.* at 8, but as Ford concluded: "██████████████████████"[49] and "███████████████████████████████"[50] Ford's awareness of this issue in the 1.6L thus shows knowledge of the Defect in Class Vehicles. *See*

---

[40] Reply Ex. 71, Feb. 19, 2013 email re: "DV Planning Meeting -- 2.3L GTDI / 2.0L GTDI FE", FORD-MILLER 00748061, at -61 (emphasis added).

[41] *Id.*

[42] Mot. Ex. 29 at -72; *see* Reply Ex. 72, spreadsheet summarizing results, FORD-MILLER 00222901.

[43] Reply Ex. 73, June 27, 2015 email re: "Collapsed Liners on 1.5L and 1.6L SGDI Sigma", FORD-MILLER 00203531, at -31.

[44] Despite the large overlap between the 1.6L and the other Class Engines, Mot. Ex. 18 (Jordan Rep.) ¶¶ 5, 41, pp.26–27, the 1.6L has certain aspects that make it potentially ill-suited for inclusion in a putative class. Ford tries to weaponize that decision against Plaintiffs (Opp. 16, 27), but there is no rule that Plaintiffs must seek to certify "the broadest possible class." *Bennett v. GoDaddy.com LLC*, 2019 WL 1552911, at *12 (D. Ariz. Apr. 8, 2019). That said, Plaintiffs do not concede any arguments relating to the 1.6L engine.

[45] Mot. Ex. 38 at -53.

[46] Opp. Ex. 9 at -33. The 1.6L engine never received a cross-drill because the 1.6L was taken out of production and replaced with the 1.5L Class Engine for MY17. Mot. Ex. 17 (Jordan Rebuttal Rep.) at 5.

[47] Mot. Ex. 41 at -37. Although this document was created in August 2014, it discusses low-mileage failures in engines that were built in 2013. *See id.* at -32.

[48] Reply Ex. 74, Potential Failure Mode and Effects Analysis, FORD-MILLER 00210017, at -86.

[49] Reply Ex. 68 at -71 (emphasis added); *see* Mot. Ex. 62 at -66 (6-panel slide analyzing "█████████" in "██████████"), -69 (██████████████).

[50] Reply Ex. 68 at -80.

PLAINTIFFS' REPLY ISO CONSOLIDATED
MOT. FOR CLASS CERTIFICATION
CASE NO. 2:20-CV-01796-DAD-CKD

*Siqueiros v. Gen. Motors*, 2022 WL 3974752, at \*11 (N.D. Cal. Aug. 31, 2022) (denying motion to exclude "evidence relating to non-Class vehicles" because the part was materially identical).

### iii.   Ford's knowledge is a common question despite the company's multiyear Defect investigation.

Although Ford says its "understanding of [the Defect] changed over time," Opp. 28, that is not the question. Once Ford knew that the Class Engines were "prone to failure," *Nuwer*, 2023 WL 8698327, at \*2, and that it was not "appropriate[]" to use a saw cut in the EcoBoost engine given its boosted pressure and too-narrow bore bridge, *Philips*, 2016 WL 7428810, at \*17, *that* understanding never changed, even as Ford investigated and ultimately remedied the Defect at the end of the Class Period. Given this, Ford's pre-sale knowledge is "susceptible to generalized proof." *Philips*, 2016 WL 7428810, at \*17.

Ford's argument about a shifting "understanding" of the Defect is only relevant to class certification if it had a good faith belief the issue was fixed during the Class Period. Ford does not make this claim. Ford never instituted *any* countermeasures for the defective engines until after it already sold all the Class Vehicles, and there is no evidence Ford believed it fixed the Defect before the cross-drill. This distinguishes Ford's cases, where automakers instituted countermeasures that gave them reason to believe the defect was fixed. *In re Nissan*, 122 F.4th 239, 251–52 (6th Cir. 2024) (software updates where the automaker attempted to fix the alleged defect, and even "*stopped* the defect for some claimants"; vacating class certification because the district court did not address this fact); *In re MyFord Touch*, 2018 WL 3646895, at \*3–4 (N.D. Cal. Aug. 1, 2018) (similar); *In re Ford Motor Co.*, 86 F.4th 723, 728 (6th Cir. 2023) ("Ford may well have believed any existing problem was fixed by Hitachi after the manufacturer altered its cylinder design.").

Ford also cites cases where the underlying defect was not common, which is not the situation with the uniform defect at issue here.[51] Ford's accumulation of knowledge "over time"—which concluded with Ford "learning" what it already knew: saw cut engine blocks should not be used in turbocharged engines with a too-narrow bore bridge—does not destroy commonality; it supports it, since whether that evidence shows Ford's knowledge has a "uniform" classwide answer. *Johnson I*, 2022 WL 2869528, at \*22.[52]

---

[51] *Beaty v. Ford Motor Co.*, 2021 WL 3109661, at \*12 (W.D. Wash. July 22, 2021), and *Kondash v. Kia Motors*, 347 F.R.D. 197, 211 (S.D. Ohio 2020), concerned alleged defects in very different model sunroofs that were not common across the class vehicles. Same with *In re Ford Motor Co. Vehicle Paint*, 182 F.R.D. 214, 220 (E.D. La. 1998), where there was no common defect and "Ford's paint processes changed over time."

[52] Ford characterizes *Johnson I* as an "outlier," Opp. 27, neglecting to mention that it was affirmed by the

PLAINTIFFS' REPLY ISO CONSOLIDATED
MOT. FOR CLASS CERTIFICATION
CASE NO. 2:20-CV-01796-DAD-CKD

**b.      Reliance or causation can be inferred in each state where required.**

**i.      Ford's omission was uniform, allowing a presumption of reliance in California, Indiana, Kansas, Maryland, and North Carolina.**

Because Ford "allegedly provided the same information to the entire class, i.e., no information, concerning the [Defect]," "[a]s long as plaintiffs can prove that this omission was material, therefore, they will have met their burden of proving causation as to the entire class." *Keegan*, 284 F.R.D. at 531; *see also Daniel v. Ford Motor Co.*, 806 F.3d 1217, 1227 (9th Cir. 2015) (factfinder can find that plaintiffs would have been made aware of disclosure through authorized dealers).[53] Because omissions are inherently uniform, such claims are susceptible to classwide resolution. *See, e.g.*, *Salas*, 2019 WL 1940619, at *9. None of the cases Ford points to for the states at issue (Opp. 30 n.11) changes this basic principle.[54]

Ford raises an array of issues that purportedly affect the uniformity of its failure to disclose the Defect. Opp. 31. But reliance is presumed on an omission of material fact, and "[m]ateriality is judged from the perspective of a 'reasonable consumer.'" *Daniel*, 806 F.3d at 1226; *Johnson I*, 2022 WL 2869528, at *23 ("[T]he question is whether the omitted information would be material to a *reasonable consumer*—and the presumption of reliance that follows."). That is doubly so when, as here, all class members purchased their vehicles at authorized Ford dealerships. *Daniel*, 806 F.3d at 1226–27. These principles clearly allow reliance to be presumed and decided on a classwide basis. *Salas*, 2019 WL 1940619, at *9; *see Sloan v. Gen. Motors*, 287 F. Supp. 3d 840, 875 (N.D. Cal. 2018) (denying motion to dismiss on this basis).

In Indiana, reliance "may be inferred from other facts, although not directly proved; for example, it will be assumed, in the absence of evidence to the contrary, that a transaction was induced by a representation material to it." *Sriver v. Maley*, 151 N.E.2d 518, 521 (Ind. App. 1958); *see Heckler & Koch, Inc. v. German Sport Guns GmbH*, 2015 WL 13639195, at *4 (S.D. Ind. Apr. 21, 2015) (discussing *Sriver*).

---

Ninth Circuit including as to the uniformity of classwide knowledge. 2024 WL 4784367, at *1.

[53] Ford's claim that Plaintiffs must identify a "common representation that all proposed class members were exposed to," Opp. 30 & n.12, is the same red herring that the Court rightly rejected previously. *Miller v. Ford Motor Co.*, 620 F. Supp. 3d 1045, 1067–68 (E.D. Cal. 2022).

[54] **CA CLRA**: *Philips*, 2016 WL 7428810, at *15–16 (Ford *had* disclosed that the defective part "might fail and pose a safety danger"); **KS CPA**: *Speerly v. Gen. Motors*, 143 F.4th 306, 333 (6th Cir. 2025) (en banc) (relying on *Delcavo v. Tour Res. Consultants*, 2022 WL 1062269, at *8 (D. Kan. Apr. 8, 2022), which in turn recognized "individual showings of reliance" are only required for "claims involving affirmative misrepresentations"); **MD CPA**: *In re Marriott Int'l*, 341 F.R.D. 128, 159–60 (D. Md. 2022) ("failure to state a material fact" is "an objective test [that] allows courts to presume classwide reliance"); **NC UDTPA**: *Rowan Cnty. Bd. of Educ. v. U.S. Gypsum*, 418 S.E.2d 648, 661 (N.C. 1992) (affirmative misrepresentations at issue).

PLAINTIFFS' REPLY ISO CONSOLIDATED
MOT. FOR CLASS CERTIFICATION
CASE NO. 2:20-CV-01796-DAD-CKD

As discussed in this section, statutes that presume reliance on a "material" misrepresentation are well suited to class certification.[55]

### ii.    Causation can similarly be inferred from a uniform omission for Florida, Illinois, and Nebraska.

Ford's arguments regarding causation suffer from the same error: conflating misrepresentations, which may vary, *see, e.g.*, *Fox v. Ritz-Carlton Hotel*, 345 F.R.D. 358, 369 (S.D. Fla. 2024), with omissions, in which each consumer was told the same thing: nothing. *Speerly,* 143 F.4th at 330, and *In re Nissan*, 122 F.4th at 250, involved misstatements, which necessitated individualized inquiries into exposure and reliance.

By contrast where, as here, "the alleged wrongful conduct is an omission of material fact," all elements of the **IL CFA** are "provable through common evidence." *Gold v. Lumber Liquidators*, 323 F.R.D. 280, 291 (N.D. Cal. 2017). So too under the **FL DUTPA**, which has an "objective" causation element that does not require proof of "the plaintiffs' subjective reliance on the alleged inaccuracy." *Carriuolo v. Gen. Motors*, 823 F.3d 977, 986 (11th Cir. 2016); *see id.* at 985. Finally, while case law interpreting the **NE CPA** is sparse, what does exist supports Plaintiffs. *In re Dollar Gen. Corp. Motor Oil Mktg. & Sales Pracs. Litig.*, 2019 WL 1418292, at *26 (W.D. Mo. Mar. 21, 2019) (common evidence of marketing and labeling can "make a [classwide] prima facie showing of consumer fraud" for NE CPA). Ford's citation does not hold otherwise. *WWP v. Wounded Warriors Fam. Support*, 628 F.3d 1032, 1042 (8th Cir. 2011).

### iii.    The Saw Cut Defect is a material defect.

Whether Ford's failure to disclose the Saw Cut Defect was material depends on whether the omission was "material to or likely to mislead a 'reasonable consumer.'" *Johnson I*, 2022 WL 2869528, at *14; *see* Mot. 29–31.[56] This is an "objective standard" with a single classwide answer. *Johnson I*, 2022 WL 2869528, at *14. A jury could determine that the Defect is material to an objective, reasonable consumer "both for its own sake (as it requires replacing a car part) but also because [of the] obvious safety issue[s]."

---

[55] Ford's cited case of *Shea v. Gen. Motors LLC*, 567 F. Supp. 3d 1011, 1023 (N.D. Ind. 2021), was a dismissal on the pleadings; by contrast, Plaintiffs here have a mountain of evidence establishing the materiality of the Saw Cut Defect. In addition, *Shea* did not cite any Indiana state case law for its heightened reliance requirement. *Cf. Sriver*, 151 N.E.2d at 521 (rejecting heightened reliance requirement).

[56] Plaintiffs are not aware of any case requiring materiality to succeed on a **NE CPA** claim. *Dollar Gen.*, 2019 WL 1418292, at *26 (Nebraska "do[es] not require reliance" and "prima facie" CPA claim can succeed based on showing of "substantially similar labeling and product placement practices").

*Id.*[57] Ford notes that materiality may not be subject to common proof *if* materiality can vary consumer-to-consumer, Opp. 32, but unlike in *Algarin v. Maybelline, LLC*, 300 F.R.D. 444, 453 (S.D. Cal. 2014), Ford has not put forward evidence that consumers do not consider a high probability of engine replacement and/or sudden loss of power to be material.

Ford's manifestation-rate arguments fail for the reasons discussed above. *Supra* Section III.A.1.b. Ford also makes fact-bound arguments about the Defect's safety risk and says the weight of the evidence suggests the risk is not great enough to be material. "[T]hese are the sort of contextual, fact-laden, and contested considerations that a jury, not a judge, must consider." *Johnson I*, 2022 WL 2869528, at *14.

### c.   Actual manifestation is not required under the FL DUTPA.

FL DUTPA does not require actual manifestation of a defect. *Carriuolo*, 823 F.3d at 986 (FDUTPA claim established even if allegedly defective part "never malfunctioned"); *Johnson I*, 2022 WL 2869528, at *19. Ford cites *Kia Motors v. Butler*, 985 So. 2d 1133 (Fla. Dist. Ct. App. 2008), and two cases that relied on it (Opp. 34), but this minority view is unpersuasive. *In re Gen. Motors Ignition Switch Litig.*, 2016 WL 3920353, at *26–27 (S.D.N.Y. July 15, 2016) (explaining that *Carriuolo* and the cases it cites "have the better of the argument" compared to *Kia* and its progeny); *Johnson I*, 2022 WL 2869528, at *19.

### d.   Statutes that require "personal use" are susceptible to class certification.

The CA CLRA, IN DCSA, and MD CPA apply to purchasers for "personal" use. This simple "damages allocation" question does not pose a barrier to class certification. *Chapman v. Gen. Motors*, 2023 WL 2746780, at *10 n.1 (E.D. Mich. Mar. 31, 2023). "This showing, while individualized, is relatively simple and will not defeat predominance." *In re MyFord Touch*, 2016 WL 7734558, at *24 (N.D. Cal. Sept. 14, 2016).[58]

### 3.   Common questions predominate for the breach of implied warranty claims.

Ford acknowledges the same inquiry governs each implied warranty claim: "All six states require

---

[57] Mot. 15–16 (discussing safety risks); *see* Mot. Ex. 10 (Wade Dep.) 269:5–18; Mot. Ex. 8 (Brewer Dep.) 174:13–16 (both acknowledging safety risk of sudden vehicle engine stalling). The fact that NHTSA did not itself investigate the Defect is not evidence of the absence of a safety issue; moreover, any such dispute goes to the merits rather than class certification.

[58] Ford's cases are distinguishable. *See Corder v. Ford Motor Co.*, 283 F.R.D. 337, 341 (W.D. Ky. 2012) ("large pickup trucks" "are not the type of product about which it may be inferred that all, or even the vast majority, were purchased primarily for a personal, family, or household purpose"); *Arabian v. Sony Elecs.*, 2007 WL 627977, at *12–13 (S.D. Cal. Feb. 22, 2007) (no common defect); *In re OnStar Contract Litig.*, 278 F.R.D. 352, 379 (E.D. Mich. 2011) (some class members "had full information" of the deceptive practice).

PLAINTIFFS' REPLY ISO CONSOLIDATED
MOT. FOR CLASS CERTIFICATION
CASE NO. 2:20-CV-01796-DAD-CKD

that a vehicle be 'unmerchantable,' which means that it was not fit for ordinary use." Opp. 34 & n.13. As Plaintiffs explained, the implied warranty states (CA, CO, IN, KS, MD, MI) recognize an automobile is merchantable if it operates in safe condition or provides safe transportation, not merely if it is capable of providing transportation from Point A to Point B. Mot. 36 & n.168.

Ford disputes whether the Class Vehicles were unmerchantable at the point of sale; either way, this question is "objective" and "can be answered through common proof." *Cadena v. Am. Honda*, 2024 WL 4005097, at *12 (C.D. Cal. July 2, 2024); *accord Johnson II*, 2024 WL 4784367, at *1. Besides, loss of power while driving,[59] unexpected deceleration,[60] and engine overheating[61] are serious safety hazards that render a vehicle unmerchantable. *See, e.g.*, *In re MyFord Touch*, 291 F. Supp. 3d 936, 947 n.5 (N.D. Cal. 2018); *Chapman v. Gen. Motors*, 531 F. Supp. 3d 1257, 1276 (E.D. Mich. 2021) (defect caused unexpected engine stalls and could require extensive repairs).[62] Ford questions the seriousness of these issues (Opp. 35–37), but the merchantability of the Class Vehicles is based on "a common sense view informed by *reasonable consumers*"—not Ford's—"expectations about the function of the type of product." *Day v. Adv. Micro Devices, Inc.*, 2023 WL 6998188, at *1 (N.D. Cal. Oct. 23, 2023) (emphasis added).

Ford's reliance on *Speerly*, where the Sixth Circuit concluded individualized inquiries about whether a defect manifested could predominate for implied warranty claims in certain states, 143 F.4th at 325, is off-base because manifestation of a defect is not an element of Plaintiffs' class claims.[63]

Nor do variations in the warranty claims rates for different vehicle models present issues with class certification of Plaintiffs' implied warranty claims. The rate that coolant intrusion manifested in the Class Vehicles is not relevant to the Defect's existence or the vehicles' merchantability. *Supra* Section III.A.1.c; *see Cadena*, 2024 WL 4005097, at *12 (rejecting this argument); *Alger*, 334 F.R.D. at 428 (same).

---

[59] Mot. Ex. 10 (Wade Dep.) 51:22–25 ("[W]hat the customer often feels is, like I was cruising at 45 miles an hour, I wanted to accelerate, and as I tapped in, there was sort of no power there to accelerate.").

[60] Mot. Ex. 12 (Henne Dep.) 132:4–15 (speed loss from coolant intrusion is "immediate" and result in "severely restricted" engine output).

[61] Mot. Ex. 8 (Brewer Dep.) 70:16–71:6 (Q: "[C]oolant depletion can lead to overheating?" A: "It can, yes.").

[62] As Plaintiffs explained in their summary judgment opposition, Ford is wrong that a vehicle is merchantable unless its owner stopped using it. Dkt. 175 (Pls. Opp. to Ford's Mot. for Summ. J.) at 5–6 (distinguishing Ford's case law on this point); *see also MyFord Touch*, 291 F. Supp. 3d at 947 ("[T]he law does not require Plaintiffs to introduce proof that the vehicles were not in fact used to demonstrate unmerchantability.").

[63] **CA**: *Chapman*, 2023 WL 2746780, at *11. **CO**, **IN**, **KS**, **MI**: *In re Gen. Motors Ignition Switch Litig.*, 339 F. Supp. 3d 262, 302, 304 (S.D.N.Y. 2018). **MD**: *Lloyd v. Gen. Motors Corp.*, 916 A.2d 257, 287 (Md. 2007).

PLAINTIFFS' REPLY ISO CONSOLIDATED
MOT. FOR CLASS CERTIFICATION
CASE NO. 2:20-CV-01796-DAD-CKD

With respect to Plaintiffs' Song-Beverly Act claim, whether the Defect is "substantially certain" to result in internal coolant intrusion is a "merits question [that] would be answered either way in a manner common to the class." *Falco*, 2016 WL 1327474, at \*10; *see Keegan*, 284 F.R.D. at 536 ("A merits inquiry will resolve that question in one stroke . . . ."). Ford's cited cases failed due to lack of evidence,[64] a shortcoming that this case does not possess. *Cf. supra* Section III.A.1.

### 4.    Plaintiffs' proposed damages model will calculate benefit-of-the-bargain damages for every class member using a common formula.

Finally, Plaintiffs' damages model will calculate benefit-of-the-bargain damages for every Class member using a straightforward formula consistent with their theory of liability. *Nguyen v. Nissan*, 932 F.3d 811, 821 (9th Cir. 2019) (affirming class certification and holding that "Plaintiff has demonstrated the nexus between his legal theory—that Nissan violated California law by selling vehicles with a defective clutch system that was not reflected in the sale price—and his damages model—the average cost of repair").

Incredibly, Ford's opposition does not once mention *Nguyen*, even though that case is binding appellate precedent upholding at class certification precisely the type of damages model Plaintiffs propose here.[65] Opp. 40–42. Instead, Ford makes three arguments that are at odds with *Nguyen* and other cases approving benefit-of-the-bargain damages models, to say nothing of the facts of this case.

First, Ford says some "consumers may be aware of potential issues in their vehicles due to the existence of the warranty." Opp. 41. The question is whether "a reasonable person would have considered the fact of [the Defect] to be important in deciding whether to purchase . . . Class Vehicles, and thus that Plaintiff[s] and class members would not have purchased . . . Class Vehicles . . . or would have paid less for them." *Nguyen*, 932 F.3d at 819–20. This is an objective question with a single answer. *See id.* Besides, whether "Plaintiffs' model misperceives the bargain because [Ford] did not promise that the Class Vehicles

---

[64] *See Torres v. Nissan*, 2015 WL 5170539, at \*5 (C.D. Cal. Sept. 1, 2015) (plaintiff's evidence of defectiveness was limited to public media coverage, the issuance of TSBs, and a relatively small number of consumer complaints); *Sonneveldt v. Mazda*, 2023 WL 1812157, at \*1–2, \*5 (C.D. Cal. Jan. 25, 2023) (plaintiffs did not "proffer[] any evidence of their own regarding failure rates" and thus could not contest Mazda's evidence that failures were "rare"); *Quackenbush v. Am. Honda*, 2021 WL 6116949, at \*6 (N.D. Cal. Dec. 27, 2021) (plaintiffs did not provide evidence of post-warranty period failures).

[65] *See Kalani v. Castle Vill. LLC*, 14 F. Supp. 3d 1359, 1369 n.26 (E.D. Cal. 2014) (it was "somewhat surprising[]" that defendants did not "cite or discuss . . . the controlling Ninth Circuit authority on the issue," even after plaintiff identified it as such in his motion); *see also United States v. Blondeau*, 2016 WL 1072849, at \*2 (S.D. Cal. Mar. 15, 2016) (collecting cases)

PLAINTIFFS' REPLY ISO CONSOLIDATED
MOT. FOR CLASS CERTIFICATION
CASE NO. 2:20-CV-01796-DAD-CKD

were free of defects" is a "merits argument[]" the Court need not address now. *Id.* at 822 n.8.[66]

Second, Ford cites Dr. Rossi's finding that "the market value of class vehicles as promised did not differ from the market value as delivered." Opp. 41. But Plaintiffs' rebuttal expert, Dr. Huang, found that Dr. Rossi's tests "lack power to reject the Defendant's claim of no damage to consumer value."[67] At best, Ford's "battle of the experts" is a matter for the merits. *Sanchez*, 2024 WL 4730654, at *16; *see Cadena*, 2024 WL 4005097, at *6, *15 (supply-side arguments "go to the weight, not the admissibility, of the proposed survey"; granting class certification). Additionally, Plaintiffs' damages model "does not need to account for the probability that a Class Vehicle's [engine] will require repair because the theory of harm is not based on the out-of-pocket costs a Class Member paid to replace an [engine] after it [fails]." *Sanchez*, 2024 WL 4730654, at *16. And even if it did, that discount could be applied formulaically during trial.

Ford's third argument, that the damages methodology does not account for "numerous individual issues," is unavailing. Opp. 42. Any post-sale activity, including resale or free repairs, "[does] not undermine the damages calculation." *MacDougall v. Am. Honda*, 2023 WL 9687349, at *14 (C.D. Cal. Oct. 3, 2023) (certifying class). *Nguyen* confirmed this position, holding the sale of a vehicle with a defect is the "liability-triggering event" and the "loss was suffered at the moment of purchase." 932 F.3d at 820; *see also Victorino v. FCA*, 2022 WL 3691642, at *3 (S.D. Cal. Aug. 25, 2022) (resale is immaterial). Even if Ford were correct that post-sale repairs can affect damages, certification is proper "even if plaintiffs may have to prove individualized damages at trial." *Olean v. Bumble Bee*, 31 F.4th 651, 669 (9th Cir. 2022) (en banc).

### 5. <u>Ford's limitations defenses do not upset commonality or predominance.</u>

"[C]ourts have been nearly unanimous in holding that possible differences in the application of a statute of limitations to individual class members, including the named plaintiffs, does not preclude certification of a class action so long as the necessary commonality and . . . predominance[] are otherwise present." *In re Tesla*, 350 F.R.D. 119, 135 (N.D. Cal. 2025) (alteration adopted); *Alger*, 334 F.R.D. at 430.

Ford's fraudulent concealment of the Defect from the public tolled the limitations period for all

---

[66] The problem with the damages model in Ford's cited case was not that it failed to "account for [the] warranty" (Opp. 41) but rather the expert's conjoint analysis (a method not at issue here) varied in whether it informed survey participants about the warranty. *Davidson v. Apple, Inc.*, 2019 WL 2548460, at *14 (N.D. Cal. June 20, 2019).

[67] Reply Ex. 75 (Expert Rebuttal Report of Dr. Guofang Huang, Ph.D.) ¶ 48.

PLAINTIFFS' REPLY ISO CONSOLIDATED
MOT. FOR CLASS CERTIFICATION
CASE NO. 2:20-CV-01796-DAD-CKD

claims.[68] Fraudulent concealment tolling is a classwide question because it "involve[s] proof common to the defendants, namely, the act of concealing defendant's wrong." *Alger*, 334 F.R.D. at 430 (quotation marks omitted). "That is particularly true when, as here, [Ford's] representations to each class member [about the Defect] were the same"—nothing—"which permits the question of fraudulent concealment to be answered on a classwide basis." *See Frasco v. Flo Health*, 349 F.R.D. 557, 576 (N.D. Cal. 2025).

Some states also recognize the delayed discovery rule,[69] which "turn[s] primarily on the objective inquiry of whether" Ford's failure to disclose the Defect "stopped a consumer from discovering the cause of action or pursuing a lawsuit." *In re Tesla*, 350 F.R.D. at 135. In *Lessin*, which Ford cites frequently throughout its brief, the Ninth Circuit held that any "individual issues of compliance with" the discovery rule "do[] not necessarily defeat the predominance of the common questions." 2026 WL 382608, at *4.[70]

**B.     A class action is the superior method of resolving this litigation.**

Superiority asks whether a class action is a better way to resolve these claims than the available alternatives. Fed. R. Civ. P. 23(b)(3). In cases like this one, because of the burdens of litigation and relatively small damages, "[t]he *realistic* alternative to a class action is not [hundreds of thousands of] individual suits, but zero individual suits." *Carnegie v. Household Int'l, Inc.*, 376 F.3d 656, 661 (7th Cir. 2004) (Posner, J.); *accord Johnson I*, 2022 WL 2869528, at *21 ("This case . . . has required significant expert evidence; it would not be feasible for each individual consumer to replicate that in each case."). *Castano v. Am. Tobacco Co.* relied upon the availability of punitive damages against the tobacco companies, 84 F.3d 734, 748 (5th Cir. 1996)—here, no such potential award exists sufficient to offset the hundreds of thousands of dollars in expert costs required to litigate this type of case. Nor does the fact that some class members might qualify for individual arbitration under the express warranty affect the

---

[68] Dkt. 175 at 14–25 (addressing the substantive elements of fraudulent concealment tolling).

[69] Ford claims Colorado doesn't recognize the discovery rule for implied warranty claims, but an implied warranty claim accrues "on the date the breach is discovered or should have been discovered by the exercise of reasonable diligence." Colo. Rev. Stat. § 13-80-108(6).

[70] Ford's cases are distinguishable. *Stearns v. Select Comfort Retail*, 763 F. Supp. 2d 1128, 1134 (N.D. Cal. 2010) (progressive mold issue that occurred at varying times); *Plascencia v. Lending 1st Mortg.*, 259 F.R.D. 437, 444 (N.D. Cal. 2009) (TILA tolling turned on when each individual received certain documents); *O'Connor v. Boeing*, 197 F.R.D. 404, 411 (C.D. Cal. 2000) (personal injury case where the court granted decertification following a grant of summary judgment); *Est. of Pilgrim v. Gen. Motors*, 344 F.R.D. 381, 398 (E.D. Mich. 2023) (discussing whether *American Pipe* tolling applied to claims in earlier-filed case).

superiority of litigation to resolve consumer protection and implied warranty claims.[71]

Given the obvious superiority of the class action in a case such as this, Ford turns its attention to manageability. Ford decries the number of classes and claims but, as Plaintiffs noted, "[t]he Court can resolve Plaintiffs' class claims in one trial or alternatively select one statewide class as a bellwether to guide the parties towards resolution for the remaining state classes." Mot. 42 & n.180. To the extent a trial plan would assist the Court in evaluating manageability, Plaintiffs have submitted one attached as **Exhibit C**.[72]

Finally, Ford asks how it will raise purportedly individualized defenses relating to reliance, statute of limitations, and injury. Opp. 45. As discussed, common evidence will govern the resolution of all these issues. *See Bazarganfard v. Club 360 LLC*, 344 F.R.D. 411, 426 (C.D. Cal. 2023) ("Defendants cannot defeat predominance based on speculation regarding individualized issues unsupported by evidence.").

### C.     The proposed class representatives are typical and adequate.

Ford briefly incorporates its arguments for summary judgment in claiming that, if its motion is granted, "no Indiana, Kansas, Maryland, or Michigan implied warranty classes could be certified, and no IN DCSA class could be certified, because no adequate class representative exists." Opp. 44. Even if the Court does grant summary judgment as to any of the putative representatives,[73] that would not doom the class claims because, when a defendant obtains summary judgment before a class has been certified, "the district court's decision binds only the named plaintiffs." *Schwarzschild v. Tse*, 69 F.3d 293, 297 (9th Cir. 1995); Dkt. 175 at 25. In that event, Plaintiffs should be allowed leave to substitute new representatives. *Edwards v. Angeles Abbey Mem'l Park*, 2009 WL 1971375, at *1 (C.D. Cal. July 2, 2009).

## IV.     CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court grant Plaintiffs' motion for class certification.

---

[71] In *Parkinson v. Hyundai*, Ford's only case for this proposition, arbitration was a minor factor in the court's denial of certification as to express warranty claims, 258 F.R.D. 580, 595 (C.D. Cal. 2008); by contrast, the court found superiority met as to plaintiffs' consumer protection claims and certified a CLRA class, *id.* at 597.

[72] This trial plan follows Plaintiffs' existing argument. Mot. 42. *Sweet v. Pfizer* refused to consider a trial plan with a new bifurcated structure to address individualized issues. 232 F.R.D. 360, 369 (C.D. Cal. 2005).

[73] Those Plaintiffs are: Teresa Balaszek (IN), Craig and Kelli Morford (KS), Aaron and Victoria Manfra (MD), and Tracey Metro (MI). Plaintiffs oppose the motion, of course. Dkt. 175.

Dated: July 29, 2026

Respectfully submitted,

LIEFF CABRASER HEIMANN & BERNSTEIN, LLP

*/s/ Mark P. Chalos*

Mark P. Chalos (*pro hac vice*)
222 2nd Ave South, Suite 1640
Nashville, Tennessee  37219-2423
Telephone: (615) 313-9000
mchalos@lchb.com

Phong-Chau G. Nguyen (S.B. #286789)
Clare D. Perez (S.B. #363027)
LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, California 94111-3339
Telephone: (415) 956-1000
pgnguyen@lchb.com
cdperez@lchb.com

Annika K. Martin (*pro hac vice*)
Gabriel Panek (*pro hac vice*)
Lucas Issacharoff (*pro hac vice*)
LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
250 Hudson Street, 8th Floor
New York, New York  10013-1413
akmartin@lchb.com
gpanek@lchb.com
lissacharoff@lchb.com

Cody R. Padgett (S.B. #275553)
Majdi Y. Hijazin (*pro hac vice*)
Abigail J. Gertner (*pro hac vice*)
CAPSTONE LAW APC
1875 Century Park East, Suite 1000
Los Angeles, California 90067
Telephone: (310) 556-4811
cody.padgett@Capstonelawyers.com
majdi.hijazin@capstonelawyers.com
abigail.gertner@capstonelawyers.com

William A. Kershaw
Stuart C. Talley
Ian J. Barlow
KERSHAW TALLEY BARLOW PC
401 Watt Avenue
Sacramento, California 95864
Telephone: (916) 779-7000
Facsimile: (916) 244-4829
bill@ktblegal.com
stuart@ktblegal.com
ian@ktblegal.com

PLAINTIFFS' REPLY ISO CONSOLIDATED
MOT. FOR CLASS CERTIFICATION
CASE NO. 2:20-CV-01796-DAD-CKD

Russell D. Paul (*pro hac vice*)
Amey J. Park (*pro hac vice*)
Natalie Lesser (*pro hac vice*)
BERGER MONTAGUE PC
1818 Market Street, Suite 3600
Philadelphia, PA 19103
Telephone: (215) 875-3000
rpaul@bm.net
apark@bm.net
nlesser@bm.net

Thomas P. Thrash (*pro hac vice*)
William T. Crowder (*pro hac vice*)
THRASH LAW FIRM PA
1101 Garland Street
Little Rock, AR 72201
Telephone: (501) 374-1058
tomthrash@sbcglobal.net
willcrowder@thrashlawfirmpa.com

Patrick Newsom (*pro hac vice*)
NEWSOM LAW PLC
40 Music Square East
Nashville, Tennessee 37203
Telephone: 615-251-9500
patrick@newsom.law

*Attorneys for Plaintiffs and the Proposed Classes*

PLAINTIFFS' REPLY ISO CONSOLIDATED
MOT. FOR CLASS CERTIFICATION
CASE NO. 2:20-CV-01796-DAD-CKD