RANDALL W. EDWARDS (S.B. #179053)
redwards@omm.com
O'MELVENY & MYERS LLP
Two Embarcadero Center, 28th Floor
San Francisco, CA 94111-3823
Tel: +1 (415) 984-8700
Fax: +1 (415) 984-8701

AMY J. LAURENDEAU (S.B. #198321)
alaurendeau@omm.com
O'MELVENY & MYERS LLP
610 Newport Center Drive, 17th Floor
Newport Beach, CA 92660
Tel: +1 (949) 823-6900
Fax: +1 (949) 823-6994

KELSEY M. LARSON (S.B. #267982)
klarson@omm.com
O'MELVENY & MYERS LLP
400 S. Hope St., 19th Floor
Los Angeles, CA 90071
Tel: +1 (213) 430-6000
Fax: +1 (213) 430-6407

*Counsel for Defendant*
*Ford Motor Company*

# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| VANESSA MILLER, et al., as individuals and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>FORD MOTOR COMPANY,<br><br>Defendant. | Case No. 2:20-cv-01796-DAD-CKD<br><br>(Consolidated with Nos. 2:21-cv-00417-DAD-CKD, 2:21-cv-00468-DAD-CKD)<br><br>**DEFENDANT FORD MOTOR COMPANY'S RESPONSE TO PLAINTIFFS' STATEMENT OF DISPUTED FACTS IN OPPOSITION TO DEFENDANT FORD MOTOR COMPANY'S MOTION FOR PARTIAL SUMMARY JUDGMENT**<br><br>**[PUBLIC REDACTED VERSION]**<br><br>Hearing: September 21, 2026<br>Time: 1:30 pm<br>Judge: Hon. Dale A. Drozd<br>Courtroom: 4, 15th Floor |

**DEFENDANT'S RESPONSE TO PLAINTIFFS' STATEMENT OF DISPUTED**

**FACTS**

Pursuant to Federal Rule of Civil Procedure 56, Ford submits this response to Plaintiffs' Statement of Disputed Facts submitted in Opposition to Ford Motor Company's Motion for Partial Summary Judgment.

Ford objects to the submission of Plaintiffs' Statement of Disputed Facts, many of which Plaintiffs do not rely upon in their Opposition to Ford's Motion for Summary Judgment and which contains largely legal argument as opposed to statements of factual disputes relevant to the issues presented in Ford's motion. Plaintiffs should not be permitted to avoid this Court's page limits by filing a 25-page opposition and then including paragraphs of additional argument in Separate Statement of Disputed Facts. Local Rule 260(b) provides that a party may file such document containing "all additional material facts as to which there is a genuine issue precluding summary judgment or adjudication." The rule does not allow the non-moving party to circumvent the page limitation for oppositions by using its statement of undisputed facts to make further argument.

Ford's additional, specific responses to Plaintiffs' individual facts are set forth in the below chart:

| Merchantability—Craig and Kelli Morford (KS). | | |
|---|---|---|
| No | Additional Material Fact | Ford's Response |
| 1 | On October 31, 2020, when the Morfords' 2017 Ford Escape had 66,331 miles, they presented the vehicle to Bob Sight Ford after the check-engine light illuminated and the engine began shaking at idle. The dealership found diagnostic codes P0302 and P0316, a low coolant level, and coolant leaking into cylinder No. 2. Bob Sight Ford advised that replacement of the long-block assembly due to coolant intrusion would cost $5,950. However, since the replacement engine would be the exact same engine block that had the defect, there was no guarantee the replacement engine would be without defect. | **Immaterial to Ford's Motion and disputed.** Immaterial as to the Morfords' dealership visit conducted after their vehicle incurred over 66,000 miles, which bears no significance as to whether or not their vehicle was merchantable. Disputed because Plaintiffs' supporting evidence does not state nor support any inference that "there was no guarantee the replacement engine would be without defect." Plaintiffs rely solely on Plaintiff Craig Morford's beliefs which lack any support or foundation attributable to Ford. When asked for the basis of this belief, Mr. Morford stated "I looked on the Google search." |

- 1 -

| | **Merchantability—Craig and Kelli Morford (KS).** | |
|---|---|---|
| **No** | **Additional Material Fact** | **Ford's Response** |
| | Talley Decl., Ex. 10, C. Morford Dep. Tr 24:25–25:13, 34:19–35:5, 114:19–115:23, 117:6–25;<br><br>Talley Decl., Ex. 18, PLTF_0000041;<br><br>Talley Decl., Ex. 11, K. Morford Dep. Tr. 25:23–26:2, 75:23–76:8, 105:17–19, 129:19–23. | Sinclair Decl. Ex. GG (Additional Excerpts), C. Morford Dep. 35:13-21. |
| 2 | As of his August 2024 deposition, Craig Morford testified that the Escape continued losing coolant, requiring him to add coolant approximately once a month because it either burned or leaked out.  He also received check-engine notifications through Ford's app approximately every couple of months, after which he checked the vehicle's coolant level and added additional coolant as needed.<br><br>Talley Decl., Ex. 10, C. Morford Dep. Tr. 58:3–59:22, 60:15–61:18. | **Immaterial to Ford's Motion but undisputed.** Evidence the Morfords' periodically had to add coolant to their vehicle, without more, is immaterial to their vehicle's merchantability. |
| 3 | The Escape was Kelli Morford's primary vehicle, and she used it almost daily for personal and family transportation, including transporting her daughter and running errands.  The Morfords did not obtain the recommended long-block replacement because they could not afford it.  Kelli Morford testified that she was not comfortable driving the Escape without the recommended repair and believed that the vehicle was unsafe, but continued using it because the family had no other option and could not afford another vehicle.  Craig Morford testified the defect was no longer a safe vehicle but the cost of repairs was more than the vehicle was worth.<br><br>Talley Decl., Ex. 11, K. Morford Dep. Tr. 54:1–55:1, 56:1–7, 113:3–114:9, 124:17–125:3, 125:20–126:3;<br><br>Talley Decl., Ex. 10, C. Morford Dep. Tr. 32:13–16. | **Immaterial to Ford's Motion but undisputed.** Undisputed as to the fact that the Morfords used their Escape as their daily driver and continued to drive it without replacing the engine.<br><br>Immaterial as to Plaintiffs' personal beliefs on whether or not their vehicle was safe.  Plaintiffs' personal reasons or finances for not obtaining the recommended long-block replacement are immaterial to its safety and therefore, its merchantability.<br><br>Sinclair Decl. Ex. Q, K. Morford Dep. 55:1-56:1; 57:1-7; 69:13-16; Ex. N, C. Morford Dep. 55:17-56:17. |
| 4 | Since October 2020, Kelli Morford experienced episodes of shaking and rough idling approximately once a month while driving the Escape.  She described the vehicle as feeling as though it were misfiring, as though she were driving over | **Immaterial to Ford's Motion but undisputed.** Undisputed as to the symptoms experienced by Kelli Morford. Immaterial as to the implied warranty of merchantability analysis because it does not establish the vehicle was inoperable |

- 2 -

| Merchantability—Craig and Kelli Morford (KS). | | |
|---|---|---|
| No | Additional Material Fact | Ford's Response |
| | small bumps or rocks, and as though the engine could shut off at any moment, although the engine had not actually shut off while she was driving.<br><br>Talley Decl., Ex. 11, K. Morford Dep. Tr. 128:22–130:4. | or actually performed in an unsafe manner. |

| Merchantability – Bradley Mullen (OH) | | |
|---|---|---|
| No | Additional Material Fact | Ford's Response |
| 5 | Beginning in April 2021, Plaintiff Mullen's Ford Edge repeatedly failed to start.  By mid-July 2021, Mullen observed steam and coolant loss, added coolant, asked Pallotta Ford to examine the vehicle for fluid intrusion, and parked the Edge while awaiting the dealership appointment, borrowing another vehicle for his wife to use.  Mullen authorized multiple repairs but none addressed the root cause of the problem.<br><br>Talley Decl., Ex. 12, B. Mullen Dep. Tr. 29:10–12, 128:16–129:3, 131:22–132:3, 146:11–23, 143:1–11, 172:6–22, 175:18–176:21, 203:23–206:16;<br><br>Talley Decl., Ex. 19, PLTF_0005029–5030. | **Immaterial to Ford's Motion and disputed.** Plaintiffs mischaracterize the cited evidence. Mr. Mullen testified that in all the times the vehicle initially did not start, the vehicle did ultimately start.<br><br>Talley Decl. Ex. 12, Mullen Dep. 131:14-18.<br><br>Mr. Mullen's prior repairs occurring after his vehicle had 56,000 miles on it is immaterial as repairs do not render a vehicle unmerchantable. Rather, Mr. Mullen's vehicle was successfully repaired in August 2021 and Mr. Mullen did not encounter any further problems with the Ford Edge's engine. |
| 6 | On or about August 2, 2021, when the Mullen Edge had 67,128 miles, Pallotta Ford diagnosed coolant leaking into cylinder No. 1 and determined that the engine needed to be replaced.  The dealership's repair invoice records that it pressure-tested the cooling system, removed the spark plugs, found coolant in cylinder No. 1, and replaced the short-block assembly.  Mullen paid the repair invoice himself on August 27, 2021.<br><br>Talley Decl., Ex. 12, B. Mullen Dep. Tr. 239:13–241:10, 242:17–243:14, 244:11–20;<br><br>Talley Decl., Ex. 20, PLTF_0005026, at -26–28. | **Immaterial to Ford's Motion but undisputed.** Plaintiff Mullen's repair, occurring after his vehicle had over 67,000 miles on it, is immaterial as to whether or not his vehicle was merchantable. |
| 7 | The Mullens purchased the Edge in May 2020 with 43,956 miles.  Its original short-block assembly required replacement in August 2021 at 67,128 miles— | **Immaterial to Ford's Motion and disputed.** Ford disputes any characterization of a "Saw Cut Defect." The cited evidence does not support the |

FORD'S RESPONSE TO PLAINTIFFS'
STATEMENT
OF DISPUTED FACTS
NO. 2:20-CV-01796-DAD-CKD

| | Merchantability – Bradley Mullen (OH) | |
|---|---|---|
| **No** | **Additional Material Fact** | **Ford's Response** |
| | approximately fifteen months and 23,000 miles after purchase. The Mullens' vehicle contained an engine with the Saw Cut Defect when it was originally sold and at the time it was sold to them.<br><br>Talley Decl., Ex. 12, B. Mullen Dep. Tr. 29:25–30:3, 101:20–24;<br><br>Talley Decl., Ex. 51, PLTF_0005063, at -63–69;<br><br>Talley Decl., Ex. 20, PLTF_0005026, at -26–28. | existence of a "Saw Cut Defect" at the time of sale. The time or mileage after a used vehicle purchase from a third party, *see* Talley Decl. Ex. 51, before a repair was made is not a material measure of merchantability of the vehicle at the time of original sale by Ford. Plaintiffs also do not contest that Mr. Mullen drove over 20,000 miles until replacing the engine. |
| 8 | Mullen paid $6,683.80 out of pocket for the August 2021 engine replacement.<br><br>Talley Decl., Ex. 12, B. Mullen Dep. Tr. 245:15–24;<br><br>Talley Decl., Ex. 20, PLTF_0005026, at -26–28. | **Immaterial to Ford's Motion but undisputed.** Plaintiff Mullen's payments for his engine replacement are immaterial to whether or not his vehicle was merchantable. |
| 9 | The Mullens' use of the Edge after August 2021 occurred only after Pallotta Ford replaced the failed short-block assembly. Mullen testified that the replacement adequately repaired that particular engine problem, and the Mullens thereafter drove the Edge until September 2025 when he gifted the vehicle to his daughter.<br><br>Talley Decl., Ex. 12, B. Mullen Dep. Tr. 36:18–37:6, 57:8–24, 247:16–248:2, 244:23–245:2. | **Conditionally Undisputed.** Undisputed that Mr. Mullen received an engine replacement in August 2021 and all driving that occurred after August 2021 occurred after the engine replacement. To the extent the purported fact implies the Mullens did not drive their vehicle before August 2021, Ford disputes this characterization.<br><br>Talley Decl. Ex. 12, Mullen Dep. 37:2-6; Sinclair Decl. Ex. HH (Additional Excerpts), Mullen Dep. 65:20-66:6. |

| | Merchantability – Tracey Metro (MI) | |
|---|---|---|
| **No** | **Additional Material Fact** | **Ford's Response** |
| 10 | Metro purchased her vehicle in January 2018. Also, in 2018, Metro began experiencing hesitation with the Edge which persisted periodically but consistently from 2018 through 2021.<br><br>Talley Decl., Ex. 13, T. Metro Dep. Tr. 125:19–21, 139:19–141:2;<br><br>Dkt. 81 ¶ 292. | **Immaterial to Ford's Motion but undisputed.** Plaintiff Metro's experiencing "hesitation" in her vehicle did not impact her ability to operate her vehicle for years. Plaintiffs do not dispute that Ms. Metro continued driving her Ford Edge after she first experienced symptoms and did not seek a repair for three years until 2021. |
| 11 | In 2021, Metro presented the Edge to | **Immaterial to Ford's Motion but** |

| | Merchantability – Tracey Metro (MI) | |
|---|---|---|
| No | Additional Material Fact | Ford's Response |
| | Romeo Ford after the check-engine light illuminated and the vehicle exhibited hesitation and rough running. Romeo Ford identified an oxygen-sensor code but declined to replace the sensor because the warning light would not remain illuminated and the vehicle drove normally during the dealership's testing. An independent mechanic later replaced the sensor, but the improvement lasted only approximately one week; the hesitation and rough running returned and worsened into spring 2022. Metro continued driving the Edge because it was her only vehicle. Talley Decl., Ex. 13, T. Metro Dep. Tr. 147:15–149:22, 157:14–158:13, 158:4–13, 160:14–162:20, 170:2–20, 195:14–20. | **undisputed.** Plaintiff Metro's repair of the oxygen-sensor is irrelevant to her claims. Further, Plaintiffs do not dispute that Ms. Metro continued driving her Ford Edge, making the remainder of this purported fact immaterial. |
| 12 | By March 2022, the Edge's hesitation had progressed to the point that the vehicle nearly stalled when accelerating from a stop and entering traffic. An independent mechanic replaced spark plugs and ignition coils, but the repair did not improve the vehicle's performance; the coolant problem and hesitation continued. The Edge also lost power while traveling at a constant speed, and Metro had to pull over and restart it on one or two occasions. Talley Decl., Ex. 13, T. Metro Dep. Tr. 168:1–17, 170:2–20, 173:17–175:1, 175:14–177:12. | **Immaterial to Ford's Motion but undisputed.** Undisputed that Ms. Metro states she experienced hesitation upon acceleration in March 2022 and undisputed that on one or two separate instances during her seven years of ownership, Ms. Metro states she had to pull over to restart her vehicle. Ford disputes any characterization that the March 2022 incident and the other two instances that occurred at unknown times are related or necessarily implicate the same alleged defect.<br><br>Further, Ms. Metro's repairs to her vehicle when the vehicle had over 98,000 miles is immaterial to Ms. Metro's claims regarding merchantability. |
| 13 | On July 27, 2022, the Edge lost the ability to accelerate beyond approximately 25 to 27 miles per hour. Metro and her husband parked the vehicle rather than continue driving it, and Metro had it towed to Imlay City Ford the following day. The dealership's repair order recorded 98,203 miles on the odometer and reported that the Edge had been towed in after running roughly and stalling.<br><br>Talley Decl., Ex. 13, T. Metro Dep. Tr. 184:15–185:20, 187:9–25; | **Immaterial to Ford's Motion and disputed.** Plaintiffs' cited evidence does not support the purported fact. Ms. Metro was not operating the vehicle on July 27, 2022 and did not personally experience the vehicle's performance on July 27, 2022. Further, the issues to the Metro's Edge occurring after the vehicle had over 98,000 miles on it are irrelevant to Ms. Metro's claims regarding merchantability. |

- 5 -

| Merchantability – Tracey Metro (MI) | | |
|---|---|---|
| No | Additional Material Fact | Ford's Response |
|  | Talley Decl., Ex. 21, PLTF_0002604. |  |
| 14 | Imlay City Ford found misfires in cylinders Nos. 1 and 2, a 16-percent compression loss in cylinder No. 1, an oil-fouled spark plug, bad compression rings, pitting on the valve seat, and corrosion on the valve. The dealership determined that the Edge required a new engine and removed and replaced the engine and associated hardware.<br><br>Talley Decl., Ex. 21, PLTF_0002604, at -07–08. | **Immaterial to Ford's Motion but undisputed.** The issues with Ms. Metro's Edge occurring after the vehicle had over 98,000 miles on it are immaterial as to whether or not the vehicle was merchantable at the time of sale. Plaintiffs also provide no evidence that the bad compression rings and pitting on the valve seal are related to what they term the "Saw Cut Defect." |
| 15 | Metro paid $8,124.55 out of pocket for the August 2022 engine replacement. The Edge remained at Imlay City Ford for approximately three weeks while the replacement was performed, during which Metro shared another vehicle with her daughter.<br><br>Talley Decl., Ex. 13, T. Metro Dep. Tr. 218:15–219:18, 220:18–221:7;<br><br>Talley Decl., Ex. 21, PLTF_0002604, at -04–05. | **Irrelevant to Ford's Motion but undisputed.** The duration of time Ms. Metro's vehicle was undergoing repairs and the fact Ms. Metro shared another vehicle during that time are irrelevant to the legal issues presented in Ford's Motion. |
| 16 | Metro stopped using the Edge for long trips when she could afford to rent or use another vehicle.<br><br>Talley Decl., Ex. 13, T. Metro Dep. Tr. 60:22–61:8. | **Undisputed, but misleading.** Plaintiff Metro stated she has driven 150,000 miles in the Ford Edge since January 2018. Sinclair Decl. Ex. U, Metro Dep. 54:19-23. She testified that she switched to driving rental cars for vacations for a variety of reasons, including for vacations taken prior to experiencing any issues with the Ford Edge.<br><br>Talley Decl., Ex. 13, Metro Dep. 61:1-16. |

| Merchantability – Teresa Balaszek (IN) | | |
|---|---|---|
| No | Additional Material Fact | Ford's Response |
| 17 | Balaszek purchased her new 2017 1.5L Ford Escape on November 23, 2016. ███████ ████████████████████ ████████████████████ ████████████████████ ████████████████████ In Customer | **Immaterial and irrelevant to Ford's Motion but undisputed.** Undisputed as to Balaszek purchasing her 2017 1.5L on November 23, 2016. The purported fact is immaterial and irrelevant to Ford's Motion as Plaintiffs provide no explanation or argument as to why Ford's internal analyses and 19B37 CSP program are relevant to the issues presented in Ford's motion with respect |

FORD'S RESPONSE TO PLAINTIFFS'
STATEMENT
OF DISPUTED FACTS
NO. 2:20-CV-01796-DAD-CKD

| Merchantability – Teresa Balaszek (IN) | | |
|---|---|---|
| No | Additional Material Fact | Ford's Response |
| | Satisfaction Program 19B37, Ford advised that affected vehicles could exhibit coolant intrusion and coolant loss and that, over time, the condition could damage the engine and require replacement of the short block.<br><br>Joint Statement of Undisputed Facts (Dkt. 161-2) Nos. 10–11;<br><br>Talley Decl., Ex. 55, FORD-MILLER 00176145–00176146;<br><br>Talley Decl., Ex. 37, Dep. of Michael Giunta 57:2–58:7;<br><br>Talley Decl., Ex. 56, FORD-MILLER 00174867. | to Balaszek's merchantability claim, which requires a showing that each vehicle was "unmerchantable" and necessarily depends on how his vehicle performed. |
| 18 | On December 27, 2019, at approximately 80,000 miles, Balaszek learned during a routine oil change that the Escape's coolant was completely empty and had to be refilled.  Before that visit, she had never been told that the vehicle had low or no coolant.<br><br>Talley Decl., Ex. 14, T. Balaszek Dep. Tr. 75:3–22, 76:17–77:3. | **Undisputed.** |
| 19 | In September 2020, Balaszek first observed smoke coming from the Escape.  The vehicle thereafter required replacement of the complete engine and remained at Dean's Auto Repair for at least 30 days.<br><br>Talley Decl., Ex. 14, T. Balaszek Dep. Tr. 74:6–14, 78:18–80:11, 84:18–85:2, 89:16–90:22;<br><br>Talley Decl., Ex. 22, PLTF_0000059. | **Immaterial to Ford's Motion but undisputed.** The information is immaterial because it lacks full context and does not establish unmerchantability. Ms. Balaszek testified the white smoke "didn't last long" and she continued to "dr[i]ve it wherever [she] was going." Talley Decl. Ex. 14, Balaszek Dep. Tr. 79:21-25. Days later, Ms. Balaszek took her vehicle in to All American Tire. *Id.* at 81:11-24. Ms. Balaszek continued to drive her vehicle after the visit to All American Tire. *Id.* at 84:15-17. Only thereafter did Ms. Balaszek take her vehicle in to Dean's Auto Repair who performed the engine replacement. *Id.* at 88:8-11. |
| 20 | In approximately August or September 2023, the Escape broke down again.  The problem was ultimately diagnosed as a blown head gasket, and Balaszek purchased another vehicle the following day because she needed reliable transportation. | **Immaterial to Ford's Motion but undisputed.** Ms. Balaszek's repairs related to the head gasket nearly seven years after her purchase are immaterial to whether or not her vehicle was merchantable at the time of sale. |

- 7 -

FORD'S RESPONSE TO PLAINTIFFS'
STATEMENT
OF DISPUTED FACTS
NO. 2:20-CV-01796-DAD-CKD

| | | Merchantability – Teresa Balaszek (IN) | |
|---|---|---|---|
| | **No** | **Additional Material Fact** | **Ford's Response** |
| | | Talley Decl., Ex. 14, T. Balaszek Dep. Tr. 65:15–66:3. | Plaintiffs have no argument that the head gasket repair was related to the alleged engine defect. *See* Sinclair Decl. Ex. EE, Balaszek Dep. 111:24-112:4 ("Q. In terms of the head gasket of the engine blowing in September 2023, is that something you are seeking to recover as part of this lawsuit against Ford? A. No."). In addition, Ms. Balaszek continued to drive her vehicle after August 2023. Talley Decl. Ex. 14, Balaszek Dep. 33:3-6. |
| | 21 | Before the Escape could be returned to use following its 2023 breakdown, Balaszek had to have the blown head gasket repaired. By that time, she had already purchased another vehicle because she needed reliable transportation.<br><br>Talley Decl., Ex. 14, T. Balaszek Dep. Tr. 64:15–65:3, 69:9–18. | **Immaterial to Ford's Motion but undisputed.** Ms. Balaszek's repairs related to the head gasket are immaterial to her claims regarding the merchantability of her vehicle. Plaintiffs have no argument that the head gasket repair was related to the alleged engine defect. In addition, Ms. Balaszek continued to drive her vehicle after August 2023. Talley Decl. Ex. 14, Balaszek Dep. 33:3-6. |
| | 22 | At the time of Balaszek's deposition, the Escape's odometer showed approximately 150,000 miles. But the vehicle had not reached that mileage without major repairs: its complete engine had been replaced in 2020, and it later required repair of a blown head gasket following the 2023 breakdown.<br><br>Talley Decl., Ex. 14, T. Balaszek Dep. Tr. 33:3–34:6, 65:15–66:3, 70:9–18, 102:13–16;<br><br>Talley Decl., Ex. 23, Expert Report of Allise Wachs ¶ 65. | **Immaterial to Ford's Motion but undisputed.** Undisputed that at the time of Ms. Balaszek's deposition, the Escape had approximately 150,000 miles on it. However, repairs occurring after the vehicle had over 80,000 miles are immaterial as to whether or not the vehicle was merchantable at the time of sale.<br><br>Talley Decl., Ex. 14, Balaszek Dep. 75:3-16. |

| | | Merchantability—Common Evidence Concerning the Saw Cut Defect | |
|---|---|---|---|
| | **No** | **Additional Material Fact** | **Ford's Response** |
| | 23 | Ford and its head-gasket supplier, Tenneco, concluded that the principal factor in the 1.5L Sigma coolant-intrusion warranty issue was the ███████████████████████ ███████████ Their analysis identified the ███████████████████ | **Immaterial to Ford's Motion but undisputed.** Ford and Tenneco's retrospective conclusions developed in July 2020 are immaterial to Plaintiffs' breach of implied warranty of merchantability claims, which relate to how individual Plaintiffs' vehicles performed. |

FORD'S RESPONSE TO PLAINTIFFS'
STATEMENT
OF DISPUTED FACTS
NO. 2:20-CV-01796-DAD-CKD

| Merchantability—Common Evidence Concerning the Saw Cut Defect | | |
|---|---|---|
| **No** | **Additional Material Fact** | **Ford's Response** |
| | ██████████████████████████ ██████████████████████████ <br><br> Talley Decl., Ex. 52, FORD-MILLER 00175193, at -193–194 <br><br> Talley Decl., Ex. 53, T. Groh Dep. Tr. 26:2–21. | |
| 24 | Ford's internal review of 2.0L coolant intrusion identified rough running, a check-engine light with misfire codes, low coolant, coolant leakage into cylinders, and white tailpipe smoke as customer symptoms. Ford's analysis attributed the failure mechanism to localized degradation at the bore bridge—including corrosion or erosion of the aluminum, boiling or stagnant coolant, and movement or "scrubbing" at the gasket joint—that ultimately created a path for coolant to enter the cylinders. Ford's service direction required technicians to check for coolant in the cylinders and, when confirmed, replace the long-block assembly. <br><br> Talley Decl., Ex. 54, FORD-MILLER 00441286; <br><br> Talley Decl., Ex. 4, FORD-MILLER 00751671, at -73; <br><br> Talley Decl., Ex. 5, FORD-MILLER 00139227, at -34; <br><br> Talley Decl., Ex. 6, FORD-MILLER 00174749, at -51; | **Immaterial to Ford's Motion but undisputed.** Ford's retrospective conclusions developed in December 2018 regarding failure modes that could affect some but not all engines are immaterial to Plaintiffs' breach of implied warranty of merchantability claims, which relate to how individual Plaintiffs' vehicles performed. |
| 25 | Ford engineer John Dunahay testified that further corrosion may be mitigated, but existing corrosion cannot be healed. Ford's gasket expert Joseph Henne likewise testified that ██████████████ ███████████████████████████ ███████████████████████████ ██████████ Ford projected up to ██% of some engines would fail within ██ years. | **Irrelevant to Ford's Motion and disputed.** The cited evidence does not support the purported fact, specifically the document does not state that ██ of ███████████████ would fail within ██ years. The purported fact also is irrelevant because it does not relate to the actual performance of the individual Plaintiffs' vehicles. |

FORD'S RESPONSE TO PLAINTIFFS'
STATEMENT
OF DISPUTED FACTS
NO. 2:20-CV-01796-DAD-CKD

| Merchantability—Common Evidence Concerning the Saw Cut Defect | | |
|---|---|---|
| No | Additional Material Fact | Ford's Response |
| | Talley Decl., Ex. 7, J. Dunahay Dep. Tr. 26:17–27:4;<br><br>Talley Decl., Ex. 8, J. Henne Dep. Tr. 139:2–8, 140:3–17;<br><br>Talley Decl., Ex. 9, FORD-MILLER 00141197, at -202. | |
| 26 | Ford identified replacing the saw-cut block with a cross-drilled block as the permanent corrective action for the coolant-intrusion condition in the 1.5L Sigma and 2.0L/2.3L engines.  Henne testified that the cross-drilled design removes coolant from the deck face, eliminates the possibility of coolant intrusion through that pathway, and leaves the sealing interface between the gasket and cylinder block undisturbed.<br><br>Talley Decl., Ex. 8, J. Henne Dep. Tr. 83:19–22, 84:2–24. | **Irrelevant to Ford's Motion but undisputed.**  Ford's engine design changes are irrelevant to Plaintiffs' breach of implied warranty of merchantability claims because it does not relate to the actual performance of the individual Plaintiffs' vehicles. |
| 27 | Ford witnesses testified that an overheating engine may enter "limphome" mode, dramatically restricting vehicle speed and engine output.  Robert Wade described the typical experience as driving approximately 45 miles per hour but being unable to accelerate, requiring the driver to merge across traffic and pull off the road.  Wade further testified that an engine stalling on a roadway is a ██████████████████ ████████████████████████████<br><br>Ford's global powertrain quality chief engineer called the defect "one of the ugliest issues" the company had seen.<br><br>Talley Decl., Ex. 8, J. Henne Dep. Tr. 57:12–21, 58:14–22;<br><br>Talley Decl., Ex. 16, R. Wade Dep. Tr. 51:18–52:8, 269:5–18;<br><br>Talley Decl., Ex. 1, FORD-MILLER 00211810, at -10;<br><br>Talley Decl., Ex. 15, Declaration of Colin Jordan ¶ 6, 20-21;<br><br>Talley Decl., Ex. 17, Brewer Dep. Tr. 174:13-16. | **Disputed in part.** Mr. Wade testified as to his personal experience, noting that a customer may experience a similar situation where they "maintain[ed]..cruise speed, but [they] couldn't accelerate into a passing speed." Talley Decl. Ex. 16, R. Wade Dep. 51:18-52:6. Plaintiffs mischaracterize Mr. Wade's testimony regarding stalling. Mr. Wade was asked whether "vehicles stalling…in traffic, and they have to put the vehicle in park" would be considered a safety issue, which is wholly separate from "limphome" mode. Sinclair Decl. Ex. JJ, Wade Dep. 268:10-269:18. Ford disputes any characterization that "limphome mode" is a ████████████ ███████████████████████████ and Plaintiffs' cited evidence does not indicate that it is. |

FORD'S RESPONSE TO PLAINTIFFS'
STATEMENT
OF DISPUTED FACTS
NO. 2:20-CV-01796-DAD-CKD

| Personal, Family, or Household Use – The Wests, Miller, and Pickering | | |
|---|---|---|
| No | Additional Material Fact | Ford's Response |
| 28 | The Wests selected the Fusion as a safe, reliable, and fuel-efficient vehicle in which to transport their two young children. They used it as their family car, typically drove it on family trips, and also used it for daily personal errands and weekend drives in their community. Amber West's work use of the vehicle included her daily commute.<br><br>Talley Decl., Ex. 24, A. West Dep. Tr. 16:11–14, 21:15–20, 33:3–35:5, 37:6–38:11;<br><br>Talley Decl., Ex. 25, E. West Dep. Tr. 22:6–16, 23:4–12. | **Immaterial to Ford's Motion and disputed**. Immaterial to the extent it discusses personal use but does not address the CLRA statutory issue of whether the personal use was the primary purchase reason for the vehicle. Disputed to the extent the purported fact seeks to establish the Wests' vehicle use as solely personal use. Amber West testified that the Wests purchased their Fusion in part for Ms. West's use as a business vehicle to visit clients as part of her job as a social worker.<br><br>Sinclar Decl. Ex. D, A. West. Dep. 33:10-13, 34:14-21, 83:1-4. |
| 29 | At the time of purchase, Miller intended to use the Edge for both personal and work purposes. She testified that neither purpose was more important and estimated the intended use as 50 percent personal and 50 percent work. Her work-related use later declined to approximately 25 percent during 2021 through 2023 and ultimately to zero percent. She considered the vehicle her personal car and never stopped using it for personal purposes.<br><br>Talley Decl., Ex. 26, V. Miller Dep. Tr. 103:18–105:18, 165:16–167:11. | **Immaterial to Ford's Motion in part but undisputed**. Material that Plaintiffs admit Ms. Miller testified her intended use was 50 percent work. Immaterial as to fact that Ms. Miller's work use declined over time. A CLRA claim requires that a vehicle be purchased "primarily" for personal, family, or household use. Cal. Civ. Code § 1761; *Mazur v. eBay Inc.*, 257 F.R.D. 563, 568 (N.D. Cal. 2009). Ms. Miller testified she purchased her vehicle for use as a work vehicle and used her Edge 50% of the time for business uses.<br><br>Sinclair Decl. Ex. H, Miller Dep. 67:15-20, 103:18-23, 105:2-4. |
| 30 | Pickering expected to use the Fusion for outside-sales trips, commuting between his home and office, and general personal use. Although he estimated that approximately 75 to 80 percent of his use around the time of purchase was business-related, the Fusion was registered to him rather than his business, remained his only vehicle, and was driven daily for both business and personal purposes.<br><br>Talley Decl., Ex. 27, S. Pickering Dep. Tr. 24:5–13, 26:19–27:5, 80:15–82:17, 82:10–17; | **Immaterial to Ford's Motion but undisputed**. Immaterial as to the fact that Pickering's vehicle was registered to his name and he used it for some personal uses. An Indiana DCSA claim requires a vehicle be purchased "predominantly" for personal use. *See In re Caterpillar, Inc., C13 & C15 Engine Prods. Liab. Litig.*, 2015 WL 4591236, at *33 (D.N.J. July 29, 2015). In fact, Mr. Pickering testified that he purchased the Fusion for use as a work vehicle and approximately 75-80% of his use was for business purposes.<br><br>Sinclair Decl. Ex. M, Pickering Dep. 80:15-81:15. |

FORD'S RESPONSE TO PLAINTIFFS'
STATEMENT
OF DISPUTED FACTS
NO. 2:20-CV-01796-DAD-CKD

| Gonzalez—Texas Deceptive Trade Practices Act | | |
|---|---|---|
| No | Additional Material Fact | Ford's Response |
| 31 | Gonzalez decided to purchase his first new vehicle after his prior vehicle became unreliable and left him stranded.  He sought safe and reliable transportation, and safety and reliability were important factors in his decision to purchase the Escape.  Before purchasing, Gonzalez researched the Escape online, including through Ford's website and Ford-provided materials, and reviewed the vehicle's Monroney label and brochures provided at the dealership.<br><br>Talley Decl., Ex. 57, D. Gonzalez Dep. Tr. 56:16–20, 57:1–12, 61:2–21, 63:13– 64:3, 67:15–68:22, 69:9–14. | **Irrelevant to Ford's Motion but disputed in part.**  Plaintiffs have no argument as to why the reasons for Mr. Gonzalez's purchase are relevant to his Texas DTPA claim.<br><br>Disputed to the extent this purported fact identifies safety and reliability as the only factors in Mr. Gonzalez' decision to purchase his Escape. Mr. Gonzalez testified that "price and gas mileage" were also two main factors in purchasing his Escape.<br><br>Sinclair Decl. Ex. II (Additional Excerpts), Gonzalez Dep. 60:9-12 ("Why did you decide to go with the smaller SUV when you purchased the Ford Escape? A. Price and gas mileage were two main factors."). |
| 32 | At Five Star Ford, the salesperson discussed the Escape's crash-safety rating and safety features and represented that the Escape was a "highly reliable car," adding that the salesperson also owned an Escape. Gonzalez testified that safety, reliability, gas mileage, and package options were factors leading him to choose the Escape, and he decided to purchase it after the dealership's presentation and test drive.<br><br>Talley Decl., Ex. 57, D. Gonzalez Dep. Tr. 59:5–11, 70:15–23, 71:6–13, 72:19–73:6. | **Irrelevant to Ford's Motion but undisputed.** The salesperson's statements at Five Star Ford are irrelevant to Plaintiffs' claims as Five Star Ford is not an agent or representative of Ford Motor Company and statements made by Five Star Ford are not attributable to Ford Motor Company. |
| 33 | Gonzalez did not believe at the time of purchase that the salesperson's reliability representation was false.  After experiencing the engine failure, however, Gonzalez testified that the reliability discussion had omitted engine-mechanical issues affecting vehicles of the same make, model, and engine type, and that those issues should have been disclosed to him. Ford had multiple opportunities to disclose the Defect to Gonzalez but never did.<br><br>Talley Decl., Ex. 57, D. Gonzalez Dep. Tr. 172:9–25, 173:1–6;<br><br>Talley Decl., Ex. 28, PLTF_0001849; | **Irrelevant to Ford's Motion and disputed in part.** The salesperson's statements at Five Star Ford are irrelevant to Plaintiffs' claims as Five Star Ford is not an agent or representative of Ford Motor Company and statements made by Five Star Ford are not attributable to Ford Motor Company.<br><br>Ford disputes any characterization of a "Defect" and any implication that Ford "had multiple opportunities" or any duty to disclose information to Mr. Gonzalez. |

FORD'S RESPONSE TO PLAINTIFFS' STATEMENT OF DISPUTED FACTS NO. 2:20-CV-01796-DAD-CKD

| | Gonzalez—Texas Deceptive Trade Practices Act | | |
|---|---|---|---|
| **No** | **Additional Material Fact** | | **Ford's Response** |
| | Talley Decl., Ex. 29, PLTF_0001806;<br><br>Talley Decl., Ex. 30, PLTF_0001802. | | |

| | Ford Concealed the Saw-Cut Defect | | |
|---|---|---|---|
| **No** | **Additional Material Fact** | | **Ford's Response** |
| 34 | Ford manufactured and sold Plaintiffs Craig and Kelli Morford's 2017 2.0L Ford Escape, Brad Mullen's 2017 2.0L Ford Edge, Tracey Metro's 2018 2.0L Ford Edge, Teresa Balaszek's 2017 1.5L Ford Escape, Patsy Lund's 2016 2.0L Ford Escape, Aaron and Victoria Manfra's 2017 2.0L Ford Edge, Scott Pickering's 2014 1.5L Ford Fusion, Vanessa Miller's 2017 2.0L Ford Edge, Evan and Amber West's 2013 1.6L Ford Fusion, and David Gonzalez's 2014 1.6L Ford Escape, with a saw-cut EcoBoost engine.<br><br>Talley Decl., Ex. 3, Ford's Feb. 24, 2026 Amended Answers and Objections to Plaintiffs' Interrogatories, Set Two. | | **Undisputed.** |
| 35 | Pre-release, limited testing conducted by Ford for the EcoBoost engines still showed coolant leaking into the cylinders, and other indicators of coolant intrusion including tail pipe smoke, and corrosion/erosion at the cylinder bore bridge. In May 2012, Ford global reported ███████████████ ████████████████████ Ford's engineers were aware of these failures, but were not tasked by Ford to fix them.<br><br>Talley Decl., Ex. 6, FORD-MILLER 00174749, at -51;<br><br>Talley Decl., Ex. 32, FORD-MILLER 00277179, at -81, -79. | | **Irrelevant to Ford's Motion and disputed.** Immaterial as to whether Plaintiffs' claims are time-barred, as Ford's alleged knowledge is insufficient to establish fraudulent concealment tolling. Ford disputes that the cited evidence establishes Ford's pre-sale knowledge of coolant intrusion as to any putative class vehicle. Exhibit 6 is a document dated December 2018. Exhibit 32 is irrelevant as it does not discuss coolant intrusion caused by plaintiffs' alleged defect. Plaintiffs' evidence does not support this purported fact. |
| 36 | By 2013, when the EcoBoost engines were first offered for sale to the public, and before any Plaintiff had purchased their vehicle, Ford's engineers observed symptoms of the Saw Cut Defect manifest when they saw presence of coolant in the cylinders. In 2014, Ford's engineers observed similar issues with the structural integrity and operating temperatures leading to engine failure of the 2.0L and 1.5L EcoBoost engines. | | **Irrelevant to Ford's Motion and disputed** as to whether Plaintiffs' claims are time-barred, as Ford's alleged knowledge is insufficient to establish fraudulent concealment tolling.<br><br>Plaintiffs' evidence does not support the purported fact. Further, Exhibit 33 and 34, email threads regarding the 1.6L engine from 2014, are irrelevant to |

FORD'S RESPONSE TO PLAINTIFFS'
STATEMENT
OF DISPUTED FACTS
NO. 2:20-CV-01796-DAD-CKD

| | Ford Concealed the Saw-Cut Defect | |
|---|---|---|
| **No** | **Additional Material Fact** | **Ford's Response** |
| | Talley Decl., Ex. 33, FORD-MILLER 00171397, at -97; <br><br> Talley Decl., Ex. 34, FORD-MILLER 00074514, at -14; <br><br> Talley Decl., Ex. 35, FORD-MILLER 00334431, at -33, - 37. | Ford's knowledge at time of sale in 2013. |

| | Ford Concealed the Saw-Cut Defect | |
|---|---|---|
| **No** | **Additional Material Fact** | **Ford's Response** |
| 37 | On December 12, 2019, Ford issued Customer Satisfaction Program 19B37 for only certain model-year 2017–2019 Fusion and Escape vehicles equipped with the 1.5L engine. Ford informed dealers that those vehicles could exhibit coolant intrusion, coolant loss, excessive tailpipe smoke, and engine misfires and that, over time, the condition could damage the engine and require short-block replacement. The service action Ford offered under the program, however, was reprogramming the Powertrain Control Module to operate the external coolant pump after engine shutdown. <br><br> Talley Decl., Ex. 56, FORD-MILLER 00174867. | **Immaterial to Ford's Motion but undisputed.** Plaintiffs have no argument as to why CSP 19B37 is relevant to fraudulent concealment tolling. Plaintiffs also do not discuss CSP 21N12, which provided a free short-block replacement to owners of 2017-2019 1.5L Escapes and Fusions up to years/84,000 miles. |
| 38 | Ford knew the 19B37 software reflash did not repair corrosion that had already developed and did not eliminate the risk that affected vehicles would later experience coolant intrusion. Ford did not offer the reflash to model-year 2014–2016 1.5L Fusion vehicles. <br><br> Talley Decl., Ex. 7, J. Dunahay Dep. Tr. 27:1–13, 29:9–30:16. | **Irrelevant to Ford's Motion and disputed.** Plaintiffs have no argument as to why CSP 19B37 is relevant to fraudulent concealment tolling. Disputed because the cited evidence does not support the purported fact. Mr. Dunahay only stated that Ford "believed at the time" that the software reflash would address the affected vehicles "in time and inside warranty." <br><br> Talley Decl. Ex. 7, Dunahay Dep. 30:1-13. |
| 39 | In September 2016, Ford published an internal bulletin relating to the ███████ ███████████████ and instructed dealerships to ███████████████████████████ | **Immaterial to Ford's Motion and disputed.** Irrelevant as to whether Plaintiffs' claims are time-barred, as Ford's alleged knowledge is insufficient to establish fraudulent concealment tolling. Disputed to the extent the document relates to the "root cause" of |

- 14 -

| Ford Concealed the Saw-Cut Defect | | |
|---|---|---|
| No | Additional Material Fact | Ford's Response |
| | ████████████████████ | ████ of coolant intrusion in 1.5L engines. |
| | Talley Decl., Ex. 46, FORD-MILLER 00139468, at -68–69. | |

| Ford Concealed the Saw-Cut Defect | | |
|---|---|---|
| No | Additional Material Fact | Ford's Response |
| 40 | In August 2018, Ford engineers considered issuing a Special Service Message that would provide dealership technicians with coolant-intrusion diagnostic instructions. Ford's Core Quality and Warranty Spend Supervisor directed the engineers to ██████████ ██████████ ██████████ ██████████ Ford continued having these internal discussions through October 2018.<br><br>Talley Decl., Ex. 58, FORD-MILLER 00780595;<br><br>Talley Decl., Ex. 2, NELSON-FORD 0011441, at -42. | **Irrelevant to Ford's Motion and disputed.** Ford disputes Plaintiffs' characterization of these documents, which are selectively quoted and taken out of context. Plaintiffs have no argument as to why Ford's actions taken between August 2018 and October 2018 are relevant to the tolling of the statute of limitations of any Plaintiffs' claims.<br><br>In addition, this purported fact is not relevant to Ford's Motion and Plaintiffs do not rely on this purported fact in their Opposition. |

| Plaintiffs Lund, West, Pickering, Balaszek, Manfras, and Metro – Delayed Discovery | | |
|---|---|---|
| No | Additional Material Fact | Ford's Response |
| 41 | Lund researched the vehicle on Ford's website and her local authorized Ford dealership website prior to her purchase but did not see any disclosures regarding the Saw Cut Defect. Ford did not disclose the Saw Cut Defect to Lund when she purchased her vehicle in 2016, though they were already aware of the Defect and had already issued multiple but ineffective safety calls intended to fix coolant leaks in EcoBoost engines. Lund first experienced symptoms in approximately early November 2020, when the check-engine light illuminated in her Escape. Later that month, Randall Ford informed her that coolant had leaked into the engine and that the vehicle required an engine replacement costing approximately $8,000. Randall Ford did not tell Lund that the failure | **Disputed, and irrelevant to Ford's Motion.** Ford disputes any characterization of a "Saw Cut Defect" and the cited evidence does not support any allegation of an engine-wide "Saw Cut Defect." Further, the cited evidence does not support the purported fact. None of the evidence supports the inference that "Ford was already aware" of the alleged defect.<br><br>Irrelevant as to whether Plaintiffs' claims are time-barred, as Ford's alleged knowledge is insufficient to establish fraudulent concealment tolling. In addition, Randall Ford's statements or omissions are irrelevant to Plaintiffs' claims as Randall Ford is not an agent or representative of Ford Motor Company |

- 15 -

| Plaintiffs Lund, West, Pickering, Balaszek, Manfras, and Metro – Delayed Discovery | | |
|---|---|---|
| No | Additional Material Fact | Ford's Response |
| | resulted from an engine-design defect or that other vehicles experienced the same problem.  Before November 2020, no one at Randall Ford had told Lund that her coolant was low, despite years of routine service there, and Lund conducted no independent research concerning the engine issue before filing suit.<br><br>Talley Decl., Ex. 36, PLTF_0004662;<br><br>Talley Decl., Ex. 37, Dep. of Michael Giunta 90:16–98:25;<br><br>Talley Decl., Ex. 38, P. Lund Dep. Tr. 29:3–10, 37:4–8, 43:15–45:5, 47:13–24, 62:6–15, 62:23–24, 68:24–25, 72:5–15; | and statements made by Randall Ford are not attributable to Ford Motor Company. |
| 42 | From late 2016 through late 2020, the Wests experienced intermittent incidents approximately every three to six months in which the Fusion's engine continued running but the accelerator produced no power.  In September 2016, the Wests experienced a stalling incident with the vehicle, which resolved without intervention from Ford and did not recur for over two years.  When Antelope Valley Ford performed Recall 17S09 in May 2018, it replaced leaking heater-hose components but did not disclose an engine-design defect.  During 2020, the Wests presented the Fusion for multiple additional repairs in which different components were replaced, but none of the service providers identified or disclosed the saw-cut engine-block defect.<br><br>Talley Decl., Ex. 25, E. West Dep. Tr. 88:13–89:7;<br><br>Talley Decl., Ex. 59, PLTF_0003297–3298;<br><br>Talley Decl., Ex. 25, E. West Dep. Tr. 94:8–10, 128:4–14, 129:14–15, 135:17, 154:9–12, 155:14–16, 163:1–2, 164:7–165:5, 189:4–7;<br><br>Talley Decl., Ex. 39, PLTF_0004875;<br><br>Talley Decl., Ex. 40, PLTF_0003280. | **Disputed in part.**  Undisputed to the extent the Wests' were aware of problems with their engines dating back to 2016 and experienced intermittent issues every 3 to 6 months and undisputed as to the Wests' various repairs on their Fusion, though these repairs are immaterial to Plaintiffs' claims, as Plaintiffs do not contest that Ford should be granted summary judgment as to the Wests' breach of express warranty claim.<br><br>Ford disputes any characterization of a "saw-cut engine-block defect." |

FORD'S RESPONSE TO PLAINTIFFS' STATEMENT OF DISPUTED FACTS NO. 2:20-CV-01796-DAD-CKD

| Plaintiffs Lund, West, Pickering, Balaszek, Manfras, and Metro – Delayed Discovery | | |
|---|---|---|
| No | Additional Material Fact | Ford's Response |
| 43 | Pickering purchased his certified pre-owned Ford Fusion from an authorized Ford dealership in 2016, ensuring he had reviewed the original window sticker for the vehicle before completing his purchase. Pickering testified he recalled seeing the fuel efficiency and safety ratings included on the window sticker. Pickering sought multiple repairs for recurring problems with the Fusion, including repairs and component replacements performed under warranty, before the vehicle ultimately required a short-block replacement in July 2021. Pickering testified that it was only at approximately the time of that replacement that he became "acutely aware of this coolant intrusion issue" through his own online research; the dealerships that had previously serviced the vehicle had not disclosed the engine-design defect to him.<br><br>Talley Decl., Ex. 27, S. Pickering Dep. Tr. 18:18–20, 61:4–11, 61:15–16, 94:6–12, 96:3–6, 106:7–10, 110:12–24, 113:15–17, 129:10–12, 130:6–10;<br><br>Talley Decl., Ex. 42, PLTF_0002634;<br><br>Talley Decl., Ex. 43, PLTF_0002643;<br><br>Talley Decl., Ex. 44, PLTF_0002636, at -37. | **Irrelevant and immaterial to Ford's Motion and disputed in part.** Undisputed as to Mr. Pickering's various repairs on his Fusion, but these repairs are irrelevant to Plaintiffs' claims because Plaintiffs do not contest that the discovery rule does not apply to Indiana implied warranty or DCSA claims and Plaintiffs do not identify any statements from the dealership that "actively concealed" Pickering's cause of action. Ford disputes any characterization of a "engine-design defect" |
| 44 | In 2016, Balaszek purchased her new vehicle from an authorized Ford dealership. Balaszek ensured she reviewed the original window sticker for the vehicle before completing her purchase. Before December 27, 2019, no service provider had informed Balaszek that the Escape's coolant was low or empty. Although she learned during a routine oil change that day that the coolant was completely empty, she was not informed of a known engine problem until September 2020, when a technician gave her a document showing a "known issue with these engines."<br><br>Talley Decl., Ex. 14, T. Balaszek Dep. Tr. 57:19–25, 75:3–8, 75:17–22, 82:14–83:16; | **Irrelevant and immaterial to Ford's Motion and disputed in part.** Undisputed as to Ms. Balaszek's various repairs on her Escape, but these repairs are irrelevant l to Plaintiffs' claims because Plaintiffs do not contest that the discovery rule does not apply to Indiana implied warranty or DCSA claims and Plaintiffs do not identify any statements from the dealership that "actively concealed" Balaszek's cause of action Ford disputes any characterization of a "known engine problem." Ford disputes the contention that the unaffiliated "Take 5" service provider and independent mechanic that changed Balaszek's oil can be considered an agent of Ford. |

FORD'S RESPONSE TO PLAINTIFFS'
STATEMENT
OF DISPUTED FACTS
NO. 2:20-CV-01796-DAD-CKD

| Plaintiffs Lund, West, Pickering, Balaszek, Manfras, and Metro – Delayed Discovery | | |
|---|---|---|
| No | Additional Material Fact | Ford's Response |
| | Talley Decl., Ex. 41, PLTF_0000084; <br><br> Talley Decl., Ex. 45, PLTF_0005088. | |
| 45 | Aaron Manfra reviewed Ford's website for financial incentives, which enticed him to purchase the Fusion over other available vehicles.  The Manfras experienced no engine problems before September 2020.  When the engine subsequently lost substantial power and the vehicle was taken to Crouse Ford, Aaron Manfra did not know what was wrong with the engine; Crouse Ford diagnosed coolant in cylinder No. 2 and replaced the short block.  When Victoria Manfra contacted Ford's customer-service line, Ford told her only that the vehicle was outside the warranty and that the repair would be the Manfras' responsibility.  In 2020, the Manfras had to have their vehicle towed to a Ford authorized dealership and ultimately authorized an engine replacement shortly thereafter.  Aaron Manfra learned of the engine-design flaw through his own research in late November or early December 2020, after the repair had been completed, and testified that Ford had never disclosed the defect to him.  Mr. Manfra testified he felt misled regarding the vehicle's reliability by the salesperson who sold him the vehicle. <br><br> Talley Decl., Ex. 47, A. Manfra Dep. Tr. 30:1–6, 81:10–82:10, 85:7–9, 87:3–5, 88:2–8, 91:1–5, 106:4–16, 109:1–8, 113:15–16, 121:1–3, 122:1–124:6, 138:1–15; <br><br> Talley Decl., Ex. 48, V. Manfra Dep. Tr. 88:23–89:1, 91:7–92:19; <br><br> Talley Decl., Ex. 49, FORD-MILLER 00455630; <br><br> Talley Decl., Ex. 50, PLTF_0002281. | **Immaterial to Ford's Motion and disputed in part.**  Immaterial as to Mr. Manfra's personal feelings regarding his vehicle. In addition, the salesperson's statements or omissions are irrelevant to Plaintiffs' claims as the salesperson is not an agent or representative of Ford Motor Company and statements made by the salesperson are not attributable to Ford Motor Company. Further, Ford disputes any characterization of an "engine-design flaw."  Disputed as to any characterization that any financial incentives from Ford Motor Company "enticed" Mr. Manfra to purchase his vehicle.  Mr. Manfra only testified that the dealership he purchased his Fusion from offered a sale for the President's Day holiday. |
| 46 | Metro spoke with a salesperson at the Ford authorized dealership regarding the safety and power features of the Ford Edge, all of which enticed her to purchase the Ford Edge.  Metro also reviewed Ford's website for pricing and safety specifications of the Ford Edge.  Metro noticed hesitation and a | **Immaterial to Ford's Motion and disputed.**  The fact that Metro required certain repairs to her vehicle is irrelevant to her tolling claim. In addition, The dealership's statements or omissions are irrelevant to Plaintiffs' claims as the dealership is not an agent or |

FORD'S RESPONSE TO PLAINTIFFS'
STATEMENT
OF DISPUTED FACTS
NO. 2:20-CV-01796-DAD-CKD

| Plaintiffs Lund, West, Pickering, Balaszek, Manfras, and Metro – Delayed Discovery | | |
|---|---|---|
| No | Additional Material Fact | Ford's Response |
| | tendency to stall early in her ownership of the Edge, but she attributed those characteristics to its four-cylinder engine and no warning light illuminated.  When a check-engine light later appeared, Romeo Ford identified an oxygen-sensor code but did not perform a repair because the light would not remain illuminated during the inspection.  Metro thereafter had oxygen sensors, spark plugs, and ignition coils replaced, but the hesitation and other symptoms persisted.  It was not until the vehicle lost power and stalled in July 2022 that Imlay City Ford diagnosed cylinder misfires, low coolant, and an internal engine condition requiring complete engine replacement.<br><br>Talley Decl., Ex. 13, T. Metro Dep. Tr. 93:23–25, 94:2–7, 116:20–23, 124:17–20, 126:7–11, 137:16–24, 147:24–150:8, 169:9–10, 173:17–174:12, 190:18–191:15, 210:5–11. | representative of Ford Motor Company and statements made by the dealership are not attributable to Ford Motor Company. Disputed to the extent the purported fact implies Ms. Metro experienced any engine shut-down. The cited evidence only shows that Ms. Metro noticed hesitation on acceleration. |

Dated:  August 5, 2026          O'MELVENY & MYERS LLP

By:     /s/ Randall W. Edwards
Randall W. Edwards

*Counsel for Defendant*
Ford Motor Company

- 19 -

FORD'S RESPONSE TO PLAINTIFFS'
STATEMENT
OF DISPUTED FACTS
NO. 2:20-CV-01796-DAD-CKD