Mark P. Chalos (*pro hac vice*)
**LIEFF CABRASER HEIMANN & BERNSTEIN, LLP**
222 2nd Ave South, Suite 1640
Nashville, Tennessee 37219-2423
Telephone: (615) 313-9000
mchalos@lchb.com

[Additional Counsel on Signature Pages]

*Attorneys for Plaintiffs and the Proposed Classes*

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| VANESSA MILLER, et al., as individuals and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>FORD MOTOR COMPANY,<br><br>Defendant. | Case No. 2:20-cv-01796-DAD-CKD (Consolidated with Nos. 2:21-cv-00417-DAD-CKD, 2:21-cv-00468-DAD-CKD) |
| TREVOR NELSON, et al., as individuals and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>FORD MOTOR COMPANY,<br><br>Defendant. | Case No. 2:24-cv-02231-DAD-CKD<br><br>**PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION TO EXCLUDE EXPERT OPINIONS RELEVANT TO CLASS CERTIFICATION**<br><br>Date: September 21, 2026<br>Time: 1:30 p.m.<br>Judge: Hon. Dale A. Drozd<br>Courtroom: 4, 15th Floor |

## TABLE OF CONTENTS

Page

I. INTRODUCTION ........ 1

II. LEGAL STANDARDS ........ 2

III. THE COURT SHOULD EXCLUDE IN PART DR. LILLO'S TESTIMONY AS IT RELATES TO PRE-RELEASE TESTING. ........ 3

A. Dr. Lillo's Report ........ 3

B. Dr. Lillo's Opinions on Ford's Pre-Release Testing Are Not Supported by Subject Matter Expertise or Reliable Methods. ........ 4

1. Dr. Lillo Lacks Relevant Expertise on Pre-Release Testing ........ 4

2. Dr. Lillo's Opinions on Ford's Pre-Release Testing Are Either Irrelevant or Not the Product of Reliable Application of Expertise. ........ 5

IV. THE COURT SHOULD EXCLUDE DR. ROSSI'S OPINIONS AS STATED IN HIS OPENING REPORT IN ITS ENTIRETY. ........ 7

A. Dr. Rossi's Report ........ 8

B. Dr. Rossi's Report Does Not Fit the Facts of the Case and Is Not Supported by Reliable Methods. ........ 8

1. Dr. Rossi's Report Is Irrelevant to Plaintiffs' Theory of Damages. ........ 8

2. Dr. Rossi's Methods Are Not Reliable and Contradict His Opinions. ........ 10

V. CONCLUSION ........ 13

## TABLE OF AUTHORITIES

**Page**

**Cases**

*Ask Chemicals, LP v. Computer Packages, Inc.*, 593 F. App'x 506 (6th Cir. 2014) ....5

*Barber v. United Airlines, Inc.*, 17 F. App'x 433 (7th Cir. 2001) ....6

*Beaty v. Ford Motor Co.*, 2021 WL 3109661 (W.D. Wash. July 22, 2021) ....9, 10

*Comcast Corp. v. Behrend*, 569 U.S. 27 (2013) ....7, 9

*Cooper v. Brown*, 510 F.3d 870 (9th Cir. 2007) ....2

*Daubert v. Merrell Dow Pharms., Inc.*, 43 F.3d 1311 (9th Cir. 1995) ....2, 11

*Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993) ....2, 3, 13

*Diviero v. Uniroyal Goodrich Tire Co.*, 114 F.3d 851 (9th Cir. 1997) ....3

*In re FCA US LLC Monostable Elec. Gearshift Litig.*, 382 F. Supp. 3d 687 (E.D. Mich. 2019) ....8, 9

*King–Indiana Forge, Inc. v. Millennium Forge, Inc.*, 2009 WL 3187685 (S.D. Ind. Sept. 29, 2009) ....5

*Lust By & Through Lust v. Merrell Dow Pharm., Inc.*, 89 F.3d 594 (9th Cir. 1996) ....2

*Lyman v. Ford Motor Co.*, 2026 WL 1469885 (E.D. Mich. May 26, 2026) ....5

*Mullins v. Premier Nutrition Corp.*, 178 F. Supp. 3d 867 (N.D. Cal. 2016) ....2

*Nguyen v. Nissan N. Am., Inc.*, 932 F.3d 811 (9th Cir. 2019) ....7

*O'Connor v. Ford Motor Co.*, 2026 WL 579329 (N.D. Ill. Mar. 2, 2026) ....10

*In re Packaged Seafood Prods. Antitrust Litig.*, 2020 WL 4530744 (S.D. Cal. Aug. 6, 2020) ....10

*PODS Enters., Inc. v. U-Haul Int'l, Inc.*, 2014 WL 12628664 (M.D. Fla. June 27, 2014) ....6

## TABLE OF AUTHORITIES
**(continued)**

**Page**

*Primiano v. Cook*,
598 F.3d 558 (9th Cir. 2010) .......... 2

*Rathmann v. Ford Motor Co.*,
2023 WL 6122709 (W.D. Tex. July 10, 2023) .......... 10

*United States v. Downing*,
753 F.2d 1224 (3d Cir. 1985) .......... 3

**Court Rules**

Fed. R. Evid. 702 .......... 2, 3, 11

# I. INTRODUCTION

Between 2013 and 2019, Ford manufactured and distributed millions of vehicles with a uniform defect: the turbocharged "EcoBoost" engine Ford installed in these cars is prone to failure because Ford sawed troughs into the aluminum engine block in the narrow sections between the cylinders (the "Saw Cut Defect"), which allows engine coolant to circulate in that area. The defective design results in engine coolant leaking into the engine cylinders, causing engine failure. Ford's inadequate pre-release safety testing contributed to its release of these defective engines, as did its decision to ignore the adverse results of such testing. And every consumer who purchased one of these defective vehicles overpaid at the point of sale in the amount that it would cost to replace the saw cut engine with a non-defective cross-drilled engine.

Having concluded discovery, Plaintiffs have moved for class certification in this litigation. *Miller*, Dkt. 162. Though the parties' experts dispute many aspects of the case, Plaintiffs now make this targeted challenge regarding two of Ford's proffered experts: Dr. Peter Lillo and Dr. Peter Rossi.

First, Dr. Lillo's report and testimony should be excluded as to Ford's pre-release testing. Dr. Lillo lacks the relevant experience to offer this portion of his opinion: he has never worked for an automaker, designed a production engine or engine component, performed production-level pre-release validation, or defined the conditions adequate testing should capture. Nor did Dr. Lillo employ a reliable methodology: he did not interview any Ford engineers, examine any engines, or independently verify any testing documents. His opinions instead rely on parroting selected in-house descriptions of Ford's testing and do not offer independent analysis.

Second, Dr. Rossi's testimony should be excluded in its entirety, because his methodology relies principally on data concerning the used car market for the Class Vehicles, which is irrelevant to the issues at hand. None of the proposed classes include purchasers of used vehicles. Plaintiffs' theory of damages is the well-recognized principle that when a purchaser is defrauded into purchasing a defective product, they are deprived of the benefit of the bargain *at the point of sale*. And Plaintiffs assert that the proper measure of damages in this case is the cost

of restoring Plaintiffs to what they bargained for: i.e., the cost of replacing their defective engines with non-defective engines. Nothing about Dr. Rossi's analysis of the used car market engages with that theory of harm or damages. Moreover, even if the used car market were of some relevance (which it is not), Dr. Rossi's analysis is methodologically suspect, based upon cherry-picking supportive results, and at times contradicts his conclusions.

For these reasons, the Court should partially exclude Dr. Lillo's opinions and exclude Dr. Rossi's opinions in their entirety.

## II. <u>LEGAL STANDARDS</u>

To be admissible, expert testimony must (1) "help the trier of fact to understand the evidence or to determine a fact in issue;" (2) be "based on sufficient facts or data;" (3) be "the product of reliable principles and methods;" and (4) "reliabl[y] appl[y] the principles and methods to the facts of the case." Fed. R. Evid. 702. The expert must also be qualified "by knowledge, skill, experience, training, or education." *Id.* Therefore, "[e]ven the most qualified expert may not offer any opinion on any subject; the expert's opinion must be grounded in his or her personal 'knowledge, skill, experience, training, or education.'" *Mullins v. Premier Nutrition Corp.*, 178 F. Supp. 3d 867, 900 (N.D. Cal. 2016) (quoting Fed. R. Evid. 702). The burden is on the proponent of the expert testimony to show, by a preponderance of the evidence, that the admissibility requirements are satisfied. *Lust By & Through Lust v. Merrell Dow Pharm., Inc.*, 89 F.3d 594, 598 (9th Cir. 1996); *see also* Fed. R. Evid. 702 Advisory Committee Notes.

Under Rule 702, only relevant and reliable expert opinion testimony is admissible. *See Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589 (1993). Expert testimony is reliable "if the knowledge underlying it has a reliable basis in the knowledge and experience of the relevant discipline." *Primiano v. Cook*, 598 F.3d 558, 565 (9th Cir. 2010) (citation omitted). The court's task "is to analyze not what the experts say, but what basis they have for saying it." *Daubert v. Merrell Dow Pharms., Inc.* ("*Daubert II*"), 43 F.3d 1311, 1316 (9th Cir. 1995). Expert testimony must "relate to scientific, technical or other specialized knowledge, which does not include unsubstantiated speculation and subjective beliefs." *Cooper v. Brown*, 510 F.3d 870, 942 (9th

Cir. 2007) (quoting *Diviero v. Uniroyal Goodrich Tire Co.*, 114 F.3d 851, 853 (9th Cir. 1997)).

In addition to being reliable, the expert testimony must be relevant; it must help "the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702. As the Supreme Court held in *Daubert*, "[t]he consideration has been aptly described by Judge Becker as one of 'fit.' 'Fit' is not always obvious, and scientific validity for one purpose is not necessarily scientific validity for other, unrelated purposes." 509 U.S. at 591 (quoting *United States v. Downing*, 753 F.2d 1224, 1242 (3d Cir. 1985) (internal citation omitted)).

## III. THE COURT SHOULD EXCLUDE IN PART DR. LILLO'S TESTIMONY AS IT RELATES TO PRE-RELEASE TESTING.

### A. Dr. Lillo's Report

In his expert report, Dr. Lillo offers a number of wide-ranging opinions on the engines at issue in the class certification motion (as well as the 1.6L EcoBoost engine, which is not among the engines in the proposed Class Vehicles) and their purported differences; the nature of the coolant intrusion suffered by the Class Engines; his view of the root cause or causes of coolant intrusion in the Class Engines; the engines and vehicles belonging to the named plaintiffs in this case; and Ford's knowledge.[1] Plaintiffs and their experts disagree with Dr. Lillo on a number of fronts, but as relevant to the motion for class certification challenge only a portion of his Opinion 11: that "Ford's pre-release testing" was "extensive."[2]

Dr. Lillo describes Ford's testing at paragraphs 50-52. While he references the existence of Design Verification Plans and Reports at paragraph 50, he offers no analysis of these documents other than to say that the reports demonstrate "compliance (or a passing result) for a wide variety of performance and durability tests."[3] Dr. Lillo offers no opinion as to whether the tests were designed or carried out appropriately to simulate reasonably foreseeable conditions. Rather, Lillo's report simply summarizes and reproduces the deposition testimony of Ford's

[1] Ex. 1 ("Lillo Rep.") ¶¶ 2-18, 298-314. "Ex. " refers to exhibits to the Declaration of Mark P. Chalos in Support of Plaintiffs' Motion to Exclude Expert Opinions Relevant to Class Certification, attached hereto.

[2] *Id.* ¶¶ 12, 298.

[3] *Id.* ¶ 50.

engineers as to the type and number of tests that were run.[4]

Finally, Dr. Lillo acknowledges that Ford's own internal reports [redacted]:

[redacted]

Other than to note the inherent limitations of pre-production testing, *id.* ¶¶ 148–149, Dr. Lillo does not offer any further analysis of these reports or whether they reflect shortcomings in Ford's pre-production testing.

Based upon these portions of his report, Dr. Lillo opines that Ford's pre-release testing was "extensive."[6]

### B. <u>Dr. Lillo's Opinions on Ford's Pre-Release Testing Are Not Supported by Subject Matter Expertise or Reliable Methods.</u>

#### 1. <u>Dr. Lillo Lacks Relevant Expertise on Pre-Release Testing.</u>

Dr. Lillo has never been employed by an automobile manufacturer.[7] He has never designed an engine, cylinder head, or head gasket that went into production.[8] He has never done pre-production modeling for an automaker for a vehicle that actually went into production.[9] Rather, Dr. Lillo's experience with engine design is through consulting and through long-ago academic research on experimental engines in collaboration with General Motors during graduate school.[10] Because Dr. Lillo has no experience with pre-release modeling or testing for an engine that is actually being prepared to be offered to consumers, he has offered no opinion as

---

[4] *Id.* ¶¶ 51-52.
[5] *Id.* ¶ 148 (citing Ex. 4 (Brewer Ex. 114)); *id.* ¶ 178 (offering nearly verbatim analysis of similar report for 2.0-liter engine) (citing Exs. 4-5 (Brewer Exs. 114-115)).
[6] *Id.* ¶¶ 12, 308.
[7] Ex. 2 ("Lillo Dep. Tr.") 82:6-8, 100:4-7; Ex. 3 at 3 (Lillo CV).
[8] Lillo Dep. Tr. 85:3-7, 86:25-87:11.
[9] *Id.* 87:8-88:19.
[10] *Id.* at 101:10-102:10.

to what conditions are reasonably foreseeable and should be tested for prior to release.[11]

Dr. Lillo is thus not qualified to opine on the adequacy of Ford's pre-production testing. He does not establish expertise in how an engine should be tested prior to production; he does not know or refuses to say what the "reasonably foreseeable" conditions are that should be tested for;[12] and he therefore has no reasonable basis to opine whether Ford's testing in this case was adequate or whether Ford should have known of the Saw Cut Defect prior to production of the Class Engines.

**2. Dr. Lillo's Opinions on Ford's Pre-Release Testing Are Either Irrelevant or Not the Product of Reliable Application of Expertise.**

It is, in fact, not clear whether Dr. Lillo *has* an opinion as to the adequacy of Ford's testing. While he states, discussing real-world performance data, that the defect "could not possibly have been identified by Ford immediately after the engines went onto the road," he does not say that Ford's testing *could not* or *should not* have uncovered the defect, but simply that it was "extensive."[13]

To the extent Dr. Lillo's opinion is merely that Ford does a lot of testing—("According to Mr. Wade, in total, the subject engines were put through about 530 tests before being released to the road[.]"[14])—it is not an expert one. Rather, it simply regurgitates the deposition testimony of Ford's engineers. *See Ask Chemicals, LP v. Computer Packages, Inc.*, 593 F. App'x 506, 511 (6th Cir. 2014) (citing *King–Indiana Forge, Inc. v. Millennium Forge, Inc.*, 2009 WL 3187685, at *2 (S.D. Ind. Sept. 29, 2009) ("When an expert's proffered opinion merely parrots information provided to him by a party, that opinion is generally excluded.")). Dr. Lillo does not say whether Ford's tests are designed well, how they compare to testing in the industry, or whether 530 tests is a lot for a vehicle engine. Rather, his "wholesale adoption of the engineers' opinions merely parrots the findings of others and does not reflect an independent expert analysis." *Lyman v.*

[11] *Id.* at 92:19-93:5; 95:9-97:6.
[12] Lillo Dep. Tr. 92:19-93:5.
[13] Lillo Rep. ¶¶ 12, 308.
[14] *Id.* ¶ 52.

*Ford Motor Co.*, 2026 WL 1469885, at *23 (E.D. Mich. May 26, 2026). Accordingly, his opinion that the testing is "extensive" offers a factfinder no expertise beyond what the testimony of Ford's engineers or Ford's documents would provide.

To the extent, however, that Dr. Lillo's opinion is intended to suggest that Ford's pre-production testing process was adequate, was up to industry standard, or otherwise should not have been expected to identify the Saw Cut Defect, that opinion should be excluded because, as described above, he is not qualified to offer such an opinion and it is not the product of a reliable methodology. In specific, Dr. Lillo merely parrots the testimony of Ford's engineers, while failing to grapple with contrary evidence.

Where an expert "ignore[s] certain facts and data, while accepting others," and does not "adequately explain why" that is the case, that expert's testimony is properly excluded. *Barber v. United Airlines, Inc.*, 17 F. App'x 433, 437 (7th Cir. 2001); *see also PODS Enters., Inc. v. U-Haul Int'l, Inc.*, 2014 WL 12628664, at *4 (M.D. Fla. June 27, 2014) ("Dr. Leonard's blind acceptance of and reliance on one-sided data from U-Haul, his failure to apply any analytical methodology whatsoever, and his parroting of the generic definition urged by U-Haul render his post–1998 opinions unreliable and therefore inadmissible."). Here, Dr. Lillo similarly inexplicably ignores certain facts and data.

For example, a key internal Ford document Dr. Lillo cites stated that [redacted] and recommended [redacted][15] Dr. Lillo simply brushes off this critical admission,[16] and instead quips without support [redacted][17] But as Dr. Lillo acknowledged, one of the purposes of preproduction testing is "trying to test the engine under conditions that it's going to experience on the road." Ford admits it failed to do this, and Dr. Lillo simply waves it away. This is a heartland example of an expert ignoring

[15] Ex. 4 (Brewer Ex. 114) (emphasis added).
[16] Lillo Rep. ¶¶ 148, 178.
[17] *Id.* ¶¶ 149, 179.

contrary facts without adequate explanation.

In short, Dr. Lillo's opinion that Ford's pre-production testing was "extensive" is not an admissible expert opinion and should be excluded on that basis. Alternatively, to the extent Dr. Lillo seeks to offer any testimony as to the adequacy or competence of Ford's pre-production testing, he is not qualified to offer such an opinion, and such an opinion would be improper parroting of Ford's experts and cherry-picking of favorable data. Accordingly, Dr. Lillo should be precluded from offering testimony as to Ford's pre-production testing process.

## IV. THE COURT SHOULD EXCLUDE DR. ROSSI'S OPINIONS AS STATED IN HIS OPENING REPORT IN ITS ENTIRETY.

Consistent with controlling Ninth Circuit precedent, Plaintiffs have set forth a straightforward theory of damages in this case. Plaintiffs allege they overpaid for their Class Vehicles because Ford did not disclose the Saw Cut Defect at the point of sale, and therefore Plaintiffs did not receive the benefit of their bargain (a vehicle without the Defect). *See Nguyen v. Nissan N. Am., Inc.*, 932 F.3d 811, 821 (9th Cir. 2019) (holding that a damages model that uses "the average cost of repair" to calculate "the amount [every class member] purportedly overpaid in purchasing [an allegedly defective] vehicle" passes muster under *Comcast*). As Plaintiffs' damages expert, Steven Boyles, explains in his report, "because there is a defect that was undisclosed to the buyer, the buyer did not receive that for which they bargained."[18]

Mr. Boyles proposes to calculate those "benefit-of-the-bargain" damages by comparing "the difference in the value represented and the value received (what the vehicle is worth with and without the Defect)."[19] In this case, every Class member was denied the benefit of their bargain in an amount equal to the cost of repairing the Saw Cut Defect.[20] These "cost of repair" damages will "provide the class the benefit of their bargain because they would be in the same position they would have had the car not been sold with a defective engine."[21] Mr. Boyles

[18] Ex. 8 (Expert Report of Steven B. Boyles) ("Boyles Rep.") ¶ 21.
[19] *Id.* ¶ 33.
[20] *Id.* ¶ 18.
[21] *Id.*

presents a straightforward formula to measure these benefit-of-the-bargain damages: PC + (LC x LT), where "PC" is the engine assembly part cost, "LC" is the average labor cost, and "LT" is the total hours necessary to perform the repair procedures.[22]

### A. Dr. Rossi's Report

Ford offers Dr. Rossi to present alternative theories of damages and critique Mr. Boyles' methodology. Dr. Rossi, analyzing certain limited subsets of used-car sales data, concludes that because certain models of the Class Vehicles did not later depreciate faster than comparator vehicles after the buying public had knowledge of the Saw Cut Defect, Plaintiffs must be mistaken that Class Vehicle purchasers were deprived of the benefit of the bargain at the point of sale.[23]

### B. Dr. Rossi's Report Does Not Fit the Facts of the Case and Is Not Supported by Reliable Methods.

#### 1. Dr. Rossi's Report Is Irrelevant to Plaintiffs' Theory of Damages.

The fundamental disconnect—or lack of "fit"—between Dr. Rossi's report and Plaintiffs' theory of damages is between new and used vehicles. Mr. Boyles uses the cost of repair as the measure of damages for new vehicles *at the point of sale*: each purchaser bargained for a car free of an engine defect, each purchaser was denied what they bargained for, and each purchaser can be restored to what they bargained for by the cost to repair their engine with a defect-free (i.e., cross-drilled) model.

Dr. Rossi, however, focuses on what those purchasers could get, years later, if and when they decided to sell those vehicles. That is a fundamentally different question. It is, moreover, one that makes little sense for a car purchased new for personal use (which is how the proposed classes are defined, Dkt. 162-1 at 21; Dkt. 180 at 1). These are not investment assets, but rather items purchased to be consumed and which may rapidly depreciate for a variety of reasons. Even if Dr. Rossi's analysis of the used car market were reliable—and, as discussed below, it is not—

---

[22] *Id.* ¶ 41.

[23] Ex. 6 (Expert Report of Peter Rossi) ("Rossi Rep."), ¶¶ 23-25.

it would be fundamentally irrelevant to the question of whether Plaintiffs were deprived of the benefit of their bargain at the point of sale.

*In re FCA US LLC Monostable Elec. Gearshift Litig.*, 382 F. Supp. 3d 687 (E.D. Mich. 2019), is directly on point. There, the plaintiffs' experts calculated the point of sale damages and the defendant offered Dr. Bruce Strombom, an economist, who analyzed used car sales data to critique the plaintiffs' damages methodology. As the Court found:

> However, Dr. Strombom admitted that he did not know how used car prices could be used to estimate point-of-sale damages, he never has tried to apply used car sales data in that fashion in any case, and he is not aware of any academic literature endorsing the use of used car sales prices to estimate point-of-sale damages in a concealed defect case. . . . Thus, by Dr. Strombom's admission, the work that he did, and was qualified to do, has no bearing on the estimation of point-of-sale damages.

*Id.* at 695. The court, citing *Comcast Corp. v. Behrend*, 569 U.S. 27, 35 (2013), held that "the defendant has not put forth any sufficiently reliable expert opinion that estimation of used car resale prices reliably can be applied to estimate point-of-sale damages, or to impeach the calculation of such damages by an otherwise reliable and widely accepted method such as conjoint analysis." *Id.* at 696.[24]

Dr. Rossi's analysis suffers from precisely the same infirmity as Dr. Strombom's in the FCA gearshift litigation. Dr. Rossi admits he conducted no analysis of the new car market (other than to identify the initial prices of the analyzed vehicles): "Q Did you look at the impact of the information regarding the coolant intrusion issue on the new car pricing? A Not explicitly, no."[25] Nor does Dr. Rossi claim anywhere in his report that his analysis can be used to infer the value

---

[24] While the *In re FCA US LLC Monostable* court allowed the defendant's expert to testify as to diminution of value in the used car market, that was because the plaintiffs had asserted such a theory of damages at the class certification stage. 382 F. Supp. 3d at 695. Here, Plaintiffs are not asserting any diminution of value theory at class certification, so Dr. Rossi's report has no bearing whatsoever.

[25] Ex. 7 (Rossi Tr. 78:15-18); *see also id.* at 78:1-14 ("Q Did you do -- in any of your work, not just related to your first report but all the work in this case, did you undertake any analysis of the pricing of the new car market? A Well, I mean, the empirical analysis in this report starts from the vehicle as new. Right? So the first information is the price -- the new price. So we gather that as of 2017. Right? Did I look explicitly solely at new car pricing alone, no. Nor was it -- it was simply not a -- helpful to this question about does this information -- if it were -- as it becomes disclosed to the market, available to the market, does this information affect vehicle prices.").

of new cars subject to the Defect, or otherwise discuss the relationship between the used and new car markets.

Although some courts have come out the other way on this question, those decisions are distinguishable. In *Beaty v. Ford Motor Co.*, 2021 WL 3109661 (W.D. Wash. July 22, 2021), the court allowed expert analysis of used-vehicle prices in large part because the expert opined that "any alleged overpayment that these class members allegedly made at the original point of sale would have been passed on to the buyer of the used Class Vehicle, causing those class members to suffer no damages at all." *Id.* at *3.[26] In other words, the expert's analysis of the resale market was relevant because he connected that analysis to the existence of point-of-sale damages. *See id.*

Here, however, Dr. Rossi made no attempt in his opening report to connect used car market prices to new car sale prices. Instead, his opening report uses the used-vehicle data to address the purported "theory that, had consumers known of the alleged Engine Defect and consequences for vehicle reliability and longevity, the market value of Class Vehicles would fall, resulting in class-wide economic injury."[27] But this is not Plaintiffs' damages theory. As such, there is no fit between Dr. Rossi's opening report and Plaintiffs' actual damages theory, and exclusion is merited. *See In re Packaged Seafood Prods. Antitrust Litig.*, 2020 WL 4530744, at *2 (S.D. Cal. Aug. 6, 2020) (no *Daubert* "fit" when expert testimony does not relate to damages theory at issue).

**2. <u>Dr. Rossi's Methods Are Not Reliable and Contradict His Opinions.</u>**

In addition to the lack of fit from Dr. Rossi's irrelevant analysis of the used car market, his opinions rest on flawed assumptions and unreliable tests on used vehicle price depreciation that serve no benefit to the jury. Dr. Rossi's analysis is rife with sample-selection problems and lacks statistical power to support his conclusion that market transaction data refutes Plaintiffs' damages theory (it does not).[28] These flaws make clear that Dr. Rossi's analysis is neither

---

[26] *See also Rathmann v. Ford Motor Co.*, 2023 WL 6122709, at *2–3 (W.D. Tex. July 10, 2023) (citing *Beaty* and holding similarly); *O'Connor v. Ford Motor Co.*, 2026 WL 579329, at *14 (N.D. Ill. Mar. 2, 2026) (same).

[27] Rossi Rep. ¶ 26.

[28] *See generally* Ex. 9 (April 17, 2026 Expert Rebuttal Report of Dr. Guofang Huang, Ph.D.)

grounded on "sufficient facts or data" nor "the product of reliable principles and methods" to help the Court and the jury understand a fact in issue (*i.e.*, Plaintiffs' damages theory). Fed. R. Evid. 702; *see also Daubert II*, 43 F.3d at 1318 ("[T]he test under *Daubert* is not the correctness of the expert's conclusions but the soundness of his methodology.").

To start, Dr. Rossi limited his pricing analysis to trade-in values for used model year 2017 Class Vehicles that were in J.D. Power's "clean condition," and used the trade-in prices from just the *first* day of each month to represent the monthly prices.[29] This does not accurately reflect the used car market.[30] J.D. Power assigns three categories for trade-in values: "Clean," "Average," and "Rough." A vehicle in "Clean" condition is the highest rating, with "no mechanical defects" and only minor cosmetic and interior wear.[31] In contrast, a vehicle in "Average" condition has "moderate imperfections and an average finish," with an interior that "reflects some soiling and wear in relation to vehicle age," and a vehicle in "Rough" condition has considerable damage and requires "substantial reconditioning and repair to be made ready for resale."[32] By ignoring vehicles in "Average" and "Rough" condition, Dr. Rossi limited his depreciation analysis to Class Vehicles that were already in great condition (and therefore held better value) for their age. Furthermore, by using the trade-in prices on only the first day of each month to represent the full month, Dr. Rossi failed to account for daily supply and demand fluctuations that affect used car prices, which in turn limited the accuracy of his analysis.[33]

Next, Dr. Rossi compared the prices for his narrow selection of used Class Vehicles against comparator vehicles he selected to test whether the chosen Class Vehicles depreciated faster after the alleged engine defect was disclosed to used car purchasers. This analysis requires a leap of faith, given that Ford never admitted to the Defect and continues to deny it. But even if there was a valid disclosure of the Defect, Dr. Rossi's tests lack statistical power to show how

("Huang Rep.") ¶¶ 11–24.

[29] *See* Ex. 6, Rossi Rep. ¶¶ 66–67, 85.

[30] *See* Ex. 9, Huang Rep. ¶¶ 13–16.

[31] *See* Frequently Asked Questions, *J.D. Power*, available at https://www.jdpowervalues.com/frequently-asked-questions; *see also* Ex. 6, Rossi Rep. at H-2.

[32] *Id.*

[33] *See* Ex. 9, Huang Rep. ¶¶ 15–16.

any such disclosure affected used vehicle prices. In statistics, "power" is a critical measurement of how likely a test will detect and reject an incorrect claim that no effect exists (known as the "null hypothesis").[34] Put another way, statistical power measures whether a test can reliably detect a real effect when one actually exists, such as the effect that disclosure of the Defect has on depreciation of used Class Vehicle prices. Statistical power is calculated as a probability percentage (i.e. the higher the percentage, the higher the power and reliability of the test) and is necessary to interpret statistical test results.[35] Dr. Rossi failed to include this in his analysis.

Plaintiffs' marketing and economics expert, Dr. Guofang Huang, Ph.D., calculated the statistical power of Dr. Rossi's tests by taking all of his far-fetched assumptions as true,[36] and found that even in the best-case "upper bound" scenario, where awareness of the defect for used Class Vehicles climbed from 0% to 100% following disclosure, the likelihood that Dr. Rossi's tests would reject a *false* null hypothesis was "almost always below 50%."[37] In other words, Dr. Rossi's analysis is not reliable because his study could not accurately distinguish between valid and invalid relationships between disclosure of the defect and used car prices for the limited Class Vehicles he examined.

Given that Dr. Rossi's study is inconclusive at best, he has no foundation to claim that his analysis of used car price depreciation "conclusively refute[s] Plaintiffs' diminution of market value theory"[38] or that "market transactional data refutes Plaintiffs' theory that, had consumers known of the alleged Engine Defect and consequences for vehicle reliability and longevity, the market value of Class Vehicles would fall, resulting in class-wide economic injury."[39] Not only is he wrong about the framing of Plaintiffs' classwide damages model (which looks at cost of repair for Class Vehicles rather than used vehicle depreciation), his own flawed tests, even under the most charitable light, lack statistical power to actually disprove anything. As Dr. Huang

---

[34] *Id.* ¶ 23.
[35] *See id.* ¶¶ 23, 49.
[36] *Id.* ¶¶ 35–42.
[37] *Id.* ¶¶ 43–44.
[38] *See* Ex. 6, Rossi Rep. ¶ 25.
[39] *Id.* ¶ 26.

observed, Dr. Rossi's tests "have little potential in informing us about whether the disclosure of the alleged engine defect lowers consumer value for the Class Vehicles."[40] This is exactly the type of unreliable and irrelevant expert opinion that warrants exclusion. *See Daubert*, 509 U.S. at 597 (trial court is tasked with "ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand").

## V. **CONCLUSION**

For the foregoing reasons, Plaintiffs respectfully request that the Court exclude Dr. Lillo's opinions on Ford's pre-release testing and exclude Dr. Rossi's opinions as expressed in his opening report in their entirety.

Dated: August 12, 2026

Respectfully submitted,

LIEFF CABRASER HEIMANN &
BERNSTEIN, LLP

*/s/ Mark P. Chalos*

Mark P. Chalos (*pro hac vice*)
222 2nd Ave South, Suite 1640
Nashville, Tennessee 37219-2423
Telephone: (615) 313-9000
mchalos@lchb.com

Phong-Chau G. Nguyen (S.B. #286789)
LIEFF CABRASER HEIMANN &
BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, California 94111-3339
Telephone: (415) 956-1000
pgnguyen@lchb.com

Annika K. Martin (*pro hac vice*)
Gabriel Panek (*pro hac vice*)
Lucas Issacharoff (*pro hac vice*)
LIEFF CABRASER HEIMANN &
BERNSTEIN, LLP
250 Hudson Street, 8th Floor
New York, New York 10013-1413
akmartin@lchb.com
gpanek@lchb.com
lissacharoff@lchb.com

---

[40] *See* Ex. 9, Huang Rep. ¶ 48; *see also id.* ¶¶ 49–51.

Cody R. Padgett (S.B. #275553)
Majdi Y. Hijazin (*pro hac vice*)
Abigail J. Gertner (*pro hac vice*)
1875 Century Park East, Suite 1000
Los Angeles, California 90067
Telephone: (310) 556-4811
cody.padgett@capstonelawyers.com
majdi.hijazin@capstonelawyers.com
abigail.gertner@capstonelawyers.com

William A. Kershaw
Stuart C. Talley
Ian J. Barlow
KERSHAW TALLEY BARLOW PC
401 Watt Avenue
Sacramento, California 95864
Telephone: (916) 779-7000
Facsimile: (916) 244-4829
bill@ktblegal.com
stuart@ktblegal.com
ian@ktblegal.com

Russell D. Paul (*pro hac vice*)
Amey J. Park (*pro hac vice*)
Natalie Lesser (*pro hac vice*)
BERGER MONTAGUE PC
1818 Market Street, Suite 3600
Philadelphia, PA 19103
Telephone: (215) 875-3000
rpaul@bm.net
apark@bm.net
nlesser@bm.net

Thomas P. Thrash (*pro hac vice*)
William T. Crowder (*pro hac vice*)
THRASH LAW FIRM PA
1101 Garland Street
Little Rock, AR 72201
Telephone: (501) 374-1058
tomthrash@sbcglobal.net
willcrowder@thrashlawfirmpa.com

Patrick Newsom (*pro hac vice*)
NEWSOM LAW PLC
40 Music Square East
Nashville, Tennessee 37203
Telephone: 615-251-9500
patrick@newsom.law

*Attorneys for Plaintiffs and the Proposed Classes*