William A. Kershaw
Stuart C. Talley
Ian J. Barlow
KERSHAW TALLEY BARLOW PC
401 Watt Avenue
Sacramento, California 95864
Telephone: (916) 779-7000
Facsimile: (916) 244-4829
bill@ktblegal.com
stuart@ktblegal.com
ian@ktblegal.com

[Additional Counsel on Signature Pages]

*Attorneys for Plaintiffs and the Proposed Classes*

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| VANESSA MILLER, et al., as individuals and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>FORD MOTOR COMPANY,<br><br>Defendant. | Case No. 2:20-cv-01796-DAD-CKD (Consolidated with Nos. 2:21-cv-00417-DAD-CKD, 2:21-cv-00468-DAD-CKD) |
| TREVOR NELSON, et al., as individuals and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>FORD MOTOR COMPANY,<br><br>Defendant. | Case No. 2:24-cv-02231-DAD-CKD<br><br>**PLAINTIFFS' OPPOSITION TO DEFENDANT FORD MOTOR COMPANY'S MOTION TO EXCLUDE CERTAIN OPINIONS OF PLAINTIFFS' EXPERT DR. ALLISE WACHS**<br><br>Date: September 21, 2026<br>Time: 1:30 p.m.<br>Judge: Hon. Dale A. Drozd<br>Courtroom: 4, 15th Floor |

# TABLE OF CONTENTS

Page


I. INTRODUCTION ........ 1

II. LEGAL STANDARD ........ 3

III. ARGUMENT ........ 4

A. Ford's Motion to Exclude Dr. Wachs's Nonexistent "Knowledge" Opinion Should Be Denied. ........ 4

1. Dr. Wachs Offers the Opinion that "Ford's own analysis showed that the failure rates for the EcoBoost engines in the Class Vehicles were very high." ........ 4

2. Ford's Internal Analyses *Do* Show High Rates of Coolant Intrusion, and Dr. Wachs *Does Not* Use This to Opine on Ford's Knowledge. ........ 5

3. Ford's GCQIS Data *Do* Show High Rates of Customer Complaints Involving Coolant, and Dr. Wachs *Does Not* Use This to Opine on Knowledge. ........ 6

4. Plaintiffs Do Not Cite Dr. Wachs for Ford's Knowledge or Awareness of the Defect. ........ 7

B. Ford's Motion to Exclude Dr. Wachs's Analysis of Failure Mode Should Be Denied. ........ 8

1. Dr. Wachs's Opinion on Common Failure Mode Is Well-Supported. ........ 8

2. Dr. Wachs Does Not Offer Opinions as to Ford's Knowledge or the Root Cause of Coolant Intrusion. ........ 10

IV. CONCLUSION ........ 12

# TABLE OF AUTHORITIES

**Page**

**Cases**

*B & R Supermarket, Inc. v. Mastercard Int'l Inc.*,
2021 WL 234550 (E.D.N.Y. Jan. 19, 2021) .......... 12

*Cadena v. Am. Honda Motor Co.*,
2024 WL 4005097 (C.D. Cal. July 2, 2024) .......... 6, 9

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
509 U.S. 579 (1993) .......... 3

*Ellis v. Costco Wholesale Corp.*,
657 F.3d 970 (9th Cir. 2011) .......... 3

*Elosu v. Middlefork Ranch Inc.*,
26 F.4th 1017 (9th Cir. 2022) .......... 3

*Hadi v. Toyota Motor Corp.*,
2026 WL 1770597 (C.D. Cal. May 27, 2026) .......... 6

*In re Chrysler Pacifica Fire Recall Prods. Liab. Litig.*,
767 F. Supp. 3d 495 (E.D. Mich. 2025) .......... 11

*Johnson v. Nissan North America, Inc.*,
2022 WL 2869528 (N.D. Cal. July 21, 2022) .......... 6, 9

*Primiano v. Cook*,
598 F.3d 558 (9th Cir. 2010) .......... 3

*Smargisso v. Air & Liquid Sys. Corp.*,
750 F. Supp. 3d 1046 (N.D. Cal. 2024) .......... 3

*Stiner v. Brookdale Senior Living, Inc.*,
665 F. Supp. 3d 1150 (N.D. Cal. 2023) .......... 3

*Tunnell v. Ford Motor Co.*,
330 F. Supp. 2d 707 (W.D. Va. 2004) .......... 6

## I. INTRODUCTION

In this car defect class action, Plaintiffs retained Dr. Allise Wachs, an experienced statistician and reliability engineer with extensive experience in the automotive industry, to testify about the failure rates of Ford's saw-cut EcoBoost engines and the scope of the coolant intrusion problem across the Class Vehicles. Dr. Wachs offers five opinions in this case:

> First, Ford's own analysis showed that the failure rates for the EcoBoost engines in the Class Vehicles were very high.
>
> Second, I used a reliability analysis to predict the reliability of the Class Vehicles at three, five, ten, and fifteen years from purchase. This analysis is attached as I understand from Plaintiffs' Counsel that these three part numbers correspond to the engine assembly, the short block, and the engine block for the Class Vehicles, which are the major components that require repair or replacement when engine coolant intrudes into the EcoBoost engine's cylinders because of the Engine Defect. Exhibit A. The analysis shows the failure rates worsen and reach high rates for all Class Vehicles.
>
> Third, I compared the reliabilities of the Class Vehicles with EcoBoost engines to the reliabilities of the same vehicles that did not have an EcoBoost engine with a saw cut on the engine block bore bridge. The reliabilities of the Class Vehicles were significantly worse than the reliabilities of the same vehicles without the EcoBoost engines with a saw cut on the engine block bore bridge. This analysis is attached as Exhibit A.
>
> Fourth, I compared overall warranty claim rates of the Class Vehicles to non-class comparators and found that the claim rates for the Class Vehicles were 20–202x worse than for non-class versions of the same vehicle.
>
> Fifth, based on my analysis of Ford's internal documents, Ford's warranty data relating to engine coolant and replacement of engine block components, and testimony from Ford personnel, the failure mode giving rise to the warranty claims in the Class Vehicles appears to be the same. So, even though the failure rates may differ by vehicle platform and engine sizes, the failure mode appears to be the same across the Class Vehicles.[1]

Notably, none of these opinions state anything about Ford's knowledge or the root cause of engine failure.

Though it couches its challenge as targeted at Dr. Wachs's first and fifth opinions, Ford primarily challenges entirely *different* opinions that Wachs has either never made, expressly disclaimed, or both.

[1] Dkt. 190-6 (Expert Report of Allise Wachs) ("Wachs Rep.") ¶¶ 21-25.

First, Ford seeks to exclude testimony about "Ford's knowledge," Dkt. 188-1 ("Mot.") at 1, and "awareness," *id.* at 2, but Dr. Wachs has never offered such an opinion. Her actual opinion is that Ford's own data—its internal warranty analyses and customer complaint databases—show high failure rates for coolant intrusion. That is a factual observation well within her statistical expertise and industry experience, not an opinion about Ford's knowledge. Ford conflates Dr. Wachs's (correct) interpretation of what Ford's internal data show with a (never given) opinion about Ford's corporate state of mind. Dr. Wachs expressly disclaimed any opinion regarding Ford's knowledge in her deposition, and Plaintiffs did not rely on any such opinion in their class certification briefing.[2]

Similarly, Ford improperly conflates failure mode and root cause. Dr. Wachs's fifth opinion—that the failure mode of coolant intrusion is the same across the Class Vehicles—is a statistical observation about what the warranty data show, not an engineering opinion about the cause of the defect. Ford repeatedly attacks Dr. Wachs for opining on "root cause," Mot. at 1, 5, but she has again expressly disclaimed offering any root cause opinion. Moreover, as Dr. Wachs repeatedly explained, the purpose of the Excel macro was to confirm the methodology of her failure-rate analysis—an analysis that Ford does not dispute. If Ford actually does have a dispute with Dr. Wachs's statistical methodology they should raise it before the jury. Attempting to spin Dr. Wachs's statistical failure analysis into a root cause engineering analysis is simply constructing a straw man in order to find something to challenge.

Ford's request to exclude these opinions should fail, first and foremost because Dr. Wachs does not actually offer them. The first and fifth opinions she *does* offer—that Ford's internal data show high failure rates and that Ford's warranty data show a common failure mode of coolant intrusion across the set of analyzed warranty claims bearing the word "coolant"—are well within Dr. Wachs's expertise and are well-supported. Plaintiffs respectfully ask the Court to deny Ford's motion.

---

[2] *See* Ex. 8 (Excerpts of the May 1, 2026 Deposition of Dr. Allise Wachs) ("Wachs Dep.") 25:23-26:2 ("Q: Are you offering an opinion to a reasonable degree of scientific certainty about what Ford's knowledge was at certain points in time? A. Oh, like did they know -- when, like did they know it this year or did they know it at that year? No.").

## II. LEGAL STANDARD

Ford's motion is governed by the standard set forth in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), under which "the trial court must act as a 'gatekeeper' to exclude junk science that does not meet Federal Rule of Evidence 702's reliability standards." *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 982 (9th Cir. 2011); *see Elosu v. Middlefork Ranch Inc.*, 26 F.4th 1017, 1020 (9th Cir. 2022) ("District courts have a longstanding responsibility to screen expert testimony, and to prevent unfounded or unreliable opinions from contaminating a jury trial."). Under this framework, expert testimony is admissible if:

> (1) the witness is sufficiently qualified as an expert by knowledge, skill, experience, training, or education; (2) the scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (3) the testimony is based on sufficient facts or data; (4) the testimony is the product of reliable principles and methods; and (5) the expert has reliably applied the relevant principles and methods to the facts of the case.

*Elosu*, 26 F.4th at 1023; *see Smargisso v. Air & Liquid Sys. Corp.*, 750 F. Supp. 3d 1046, 1057 (N.D. Cal. 2024) ("Expert testimony is admissible under Federal Rule of Evidence 702 if the expert is qualified and if the testimony is both relevant and reliable.").

"Although a district court may screen an expert opinion for reliability, and may reject testimony that is wholly speculative, it may not weigh the expert's conclusions or assume a factfinding role." *Elosu*, 26 F.4th at 1020. Even "shaky" evidence must be admitted; "cross examination, contrary evidence, and attention to the burden of proof, not exclusion," is the proper remedy for *any* admissible evidence. *Primiano v. Cook*, 598 F.3d 558, 564 (9th Cir. 2010). Plaintiffs, as the party offering Dr. Wachs's testimony, bear the burden of showing, "by a preponderance of the evidence, that the admissibility requirements are satisfied." *Stiner v. Brookdale Senior Living, Inc.*, 665 F. Supp. 3d 1150, 1168 (N.D. Cal. 2023).

## III. ARGUMENT

### A. Ford's Motion to Exclude Dr. Wachs's Nonexistent "Knowledge" Opinion Should Be Denied.

Defendants first challenge Dr. Wachs's purported opinions on "Ford's Supposed Analysis and Knowledge." Mot. at 2. But while Dr. Wachs *does* offer an opinion on Ford's warranty analyses, which Ford largely ignores, she *does not* offer an opinion on Ford's knowledge, which Ford focuses on. Ford knows this: Dr. Wachs's summary of the opinions she intends to offer does not say anything about Ford's knowledge and awareness,[3] and Ford acknowledges that she explicitly disclaimed any such opinion in her deposition, Mot. at 1 (citing Dkt. 190-7, Wachs Dep. 25:7-26:2, 33:19-23). Ford points to a single paragraph of her report in which she references knowledge, *id.* at 2 (citing Wachs Rep. ¶ 15), but that single stray reference does not amount to an opinion she intends to offer to the jury.

#### 1. Dr. Wachs Offers the Opinion that "Ford's own analysis showed that the failure rates for the EcoBoost engines in the Class Vehicles were very high."

In her report, Dr. Wachs offers the opinion that Ford's internal analyses showed high rates of coolant intrusion. That opinion rests upon Ford's internal analysis of coolant intrusion rates in 1.5L and 2.0L class vehicles, and is further corroborated by internal Ford correspondence, as well as noting the high rate of Ford's customer complaints involving the word "coolant."[4]As Dr. Wachs summarizes in her supplemental report, these Ford analyses conclude that "Coolant intrusion 10-year failure projections for class vehicles with 2.0L engines range from [redacted] Another estimate for warranty repairs alone on 1.5L class vehicles is [redacted]% at 5 years and [redacted]% at 7 years."[5] Ford does not and cannot challenge that, as Dr. Wachs

---

[3] Wachs Rep. ¶¶ 20-25.

[4] Wachs Rep. ¶ 58; Dkt. 190-11 (Supplemental Expert Report of Allise Wachs) ("Wachs Supp. Rep.") ¶ 3.c (replacing paragraphs 56 and 57 of opening report).

[5] Wachs Supp. Rep. ¶ 3a (replacing parts of paragraph 14 of opening report).

concludes, Ford's internal data do in fact show high rates of coolant intrusion in the Class Engines.

**2. <u>Ford's Internal Analyses *Do* Show High Rates of Coolant Intrusion, and Dr. Wachs *Does Not* Use This to Opine on Ford's Knowledge.</u>**

Instead of challenging the opinions Dr. Wachs actually intends to offer at trial, Ford first aims at a withdrawn portion of her report. Ford focuses extensively on Dr. Wachs's analysis of a single Ford presentation that was contained within paragraphs 56-57 of her original report. *See* Mot. at 3. But Ford acknowledges that when Ford's expert Dr. Kristin Lennox corrected Dr. Wachs's interpretation of the Ford presentation (based on Dr. Lennox's conversation with the Ford engineer who created it), Dr. Wachs *withdrew* those paragraphs of the report in their entirety.[6]

Ford next aims at the Supplemental Report's discussion of internal Ford analyses. Ford does not dispute that the Supplemental Report correctly characterizes the Ford report as showing high failure rates (indeed, failure rates nearly identical to Dr. Wachs's own statistical projections[7]). Rather, Ford claims that the document is offered "to support her narrative that Ford's internal warranty analysis '[redacted]' and thus demonstrates knowledge."[8]

The key to Ford's shell game is in the quotation marks.[9] Ford *quotes* Dr. Wachs as stating that "Ford's internal analyses 'show high failure rates for coolant intrusion,'" Mot. at 3 (quoting Wachs Supp. Rep. ¶ 4), which is indisputably correct. Ford then *claims* that this statement is intended to "demonstrate[] knowledge," *id.* (not quoting anything), which is wrong. Dr. Wachs will offer no more than her opinion that Ford conducted internal analyses that showed rates of engine failure from coolant intrusion as high as [redacted]% for certain class vehicles, which results corroborate her own (unchallenged) statistical findings. A jury might (very easily) infer that this

---

[6] *See* Wachs Supp. Rep. ¶ 1.

[7] *See id.* ¶ 3.c.

[8] Mot. at 3 (citing Wachs Supp. Rep.; Wachs Rep.).

[9] Indeed, a careful check of each of Ford's characterizations of Dr. Wachs's opinions reveals a persistent disconnect between accurate quotations and inaccurate paraphrasing.

means that Ford had knowledge of coolant intrusion, but that is the jury's province—not an opinion that Dr. Wachs intends to offer.[10]

### 3. Ford's GCQIS Data *Do* Show High Rates of Customer Complaints Involving Coolant, and Dr. Wachs *Does Not* Use This to Opine on Knowledge.

Ford similarly attacks Dr. Wachs's use of the GCQIS customer complaint data on the false premise that it supports an opinion as to knowledge: "As another support for her opinion that Ford's own analysis indicates [redacted], *thus demonstrating Ford's purported knowledge*, . . . ." Mot. at 9 (emphasis added). Once again, the inference is entirely Ford's, not Dr. Wachs's. Dr. Wachs does (correctly) note the statistical prevalence of "coolant" in Ford's customer complaint database for Class Vehicles as support for her statement that "Ford's own data included [redacted] of customer complaints on top of the substantial warranty claims data."[11] And examination of customer complaints is an entirely appropriate matter for an expert, and relevant to the opinion that Ford's Class Vehicles suffered high rates of coolant intrusion. For instance, in *Johnson v. Nissan North America, Inc.*, 2022 WL 2869528 (N.D. Cal. July 21, 2022), Nissan criticized plaintiffs' expert "for failing to examine particular failures and having insufficient data." *Id.* at *10. As the court noted, however, the expert did "examine consumer complaints submitted to the government" about the alleged defect. *Id.* Nissan was free to attack "the weight" of this evidence, but it was not per se unreliable. *Id.* at *8; *see also Cadena v. Am. Honda Motor Co.*, 2024 WL 4005097, at *4 (C.D. Cal. July 2, 2024) (Honda's arguments regarding expert's "reliance on anecdotal statements from Honda customers" went to "the weight of the evidence," not whether his testimony was reliable). Here, too, Ford is free to quibble with

---

[10] Ford's cited cases about the impermissibility of expert testimony as to state of mind are thus entirely inapposite. *See* Mot. at 7; *cf., e.g., Hadi v. Toyota Motor Corp.*, 2026 WL 1770597, at *3 (C.D. Cal. May 27, 2026) (expert sought to testify about "what Toyota knew and should have done"); *Tunnell v. Ford Motor Co.*, 330 F. Supp. 2d 707, 729 (W.D. Va. 2004) (holding that evidence of "Ford's engineering choices or motivation . . . may well be admissible through other direct and circumstantial means," but expert cannot opine as to Ford's knowledge or subjective "motivation").

[11] Wachs Rep. ¶ 58.

the methodology or argue—to the jury—that the [redacted] of customer complaints using the word "coolant" do not establish Ford's knowledge of the existence of a defect.

What Ford cannot do is manufacture opinions that are never made, attribute them to Dr. Wachs, and then attempt to exclude them. Ford's claim is that Dr. Wachs's discussion of the GCQIS customer complaint data "does not, as Dr. Wachs posits, show that Ford's customer complaint data reflected '[redacted] of customer complaints,' or that Ford had knowledge of the alleged defect due to some hypothetical Ford analysis of the customer complaints. Ex. F, Wachs Rep. ¶¶ 14-16, 58." Mot. at 10. Again, while Dr. Wachs does correctly quantify "[redacted] of customer complaints" involving the word "coolant," she does not posit that Ford therefore had knowledge of the alleged defect, let alone because of some invented hypothetical Ford analysis.

**4. <u>Plaintiffs Do Not Cite Dr. Wachs for Ford's Knowledge or Awareness of the Defect.</u>**

Ford justifies its focus on a nonexistent knowledge opinion that Dr. Wachs does not offer by arguing that Plaintiffs cited Dr. Wachs's reports for such a proposition.[12] This is simply false. The cited paragraph of Plaintiffs' opening motion begins with the sentence, "Ford knew the defective engines were doomed," citing exclusively to an internal Ford email. Dkt. 162-1 (Pls.' Mot. for Class Certification) at 15. The next sentence states, "Plaintiffs' warranty statistics expert, Dr. Allise Wachs, analyzed Ford's warranty data and found high probabilities for coolant intrusion in engines across all Class Vehicles." *Id.* Again, *that is an opinion on failure rates*. It is true that Plaintiffs are arguing to the Court—as they will argue to the jury—that one can infer from the high failure rates and Ford's analyses confirming those higher failure rates that Ford knew or should have known of the Defect, but that is an inference for the factfinder. Dr. Wachs simply will not offer that opinion.

Ford's citation to Plaintiffs' reply brief is even more baffling. The cited pages are a response to Ford's arguments about differences in manifestation rates defeating predominance.

---

[12] *See* Mot. at 1 (citing Dkt. 162-1 (Pls.' Mot. for Class Certification) at 15; Dkt. 180 (Pls.' Reply in Support of Class Certification) at 7-8).

*See* Dkt. 180 (Pls.' Reply in Support of Class Certification) at 7-8. Neither Ford's briefing on this point, nor its discussion of its expert Dr. Lennox, nor Plaintiffs' responsive briefing, nor Plaintiffs' discussion of Dr. Wachs's report have *anything* to do with knowledge. Rather, Plaintiffs simply cite Dr. Wachs to state that the failure rates for all Class Vehicles were unacceptably high and far higher than non-saw cut Ford equivalents. *Id.* at 8.

Because Dr. Wachs correctly analyzes Ford's internal data showing high rates of coolant intrusion and many customer complaints involving coolant, and because she does not offer an opinion as to Ford's knowledge, Ford's motion to exclude that nonexistent knowledge opinion should be denied.

**B. Ford's Motion to Exclude Dr. Wachs's Analysis of Failure Mode Should Be Denied.**

Dr. Wachs's fifth opinion is that, "based on [her] analysis of Ford's internal documents, Ford's warranty data relating to engine coolant and replacement of engine block components, and testimony from Ford personnel, the failure mode giving rise to the warranty claims in the Class Vehicles appears to be the same. So, even though the failure rates may differ by vehicle platform and engine sizes, the failure mode appears to be the same across the Class Vehicles."[13]

Yet again, Ford attempts to sandwich multiple opinions that Dr. Wachs does *not* offer around one that she does offer. Ford, *quoting* Dr. Wachs's report, argues that "Dr. Wachs's opinion that 'the failure mode appears to be the same across the Class Vehicles' should be excluded" and then, *paraphrasing* her report, argues that her supposed "extrapolations from this opinion, that a common failure mode evidences both Ford's knowledge of the alleged defect and a common cause of the failure mode" should also be excluded. Mot. at 10. One is an attack on an actual opinion, and one is an attack on two nonexistent opinions, but all should be denied.

**1. Dr. Wachs's Opinion on Common Failure Mode Is Well-Supported.**

Dr. Wachs uses quantitative analysis of technician comments in Ford's warranty database for a discrete purpose: confirming that the warranty claims she used in her reliability analysis

[13] Wachs Rep. ¶ 25.

were in fact related to coolant intrusion. Dr. Wachs explained: "The macro was run for two reasons. First, I wanted to substantiate that the warranty claims were primarily about coolant entering cylinders. Second, I wanted to see whether the majority of comments described coolant intrusion in all Class Vehicles."[14] In other words, the macro was a data integrity check, not an independent engineering opinion. She similarly confirmed this at her deposition: "I was using it as just a check to see whether or not — it was a data integrity issue, just to identify . . . [whether] typically the claims that I was using for my forecast had to do with coolant intrusion."[15]

The macro confirmed that for all Class Vehicles, at least 76% of warranty claims were categorized as "likely" coolant intrusion, with most between [redacted]%, and less than [redacted]% categorized as "not detected." This validates Dr. Wachs's filtering methodology—confirming that searching for "coolant" in technician comments is turning up relevant warranty claims. Ford does not challenge this statistical methodology. And in this regard it is an appropriate tool. As Dr. Wachs explained (and Ford does not challenge), "[u]sing an Excel macro to analyze large sets of data is a generally accepted practice in the field of statistics."[16] Indeed, as Dr. Wachs notes, Ford used a similar (albeit cruder) mechanism to identify warranty claims related to coolant intrusion for the class vehicles.[17]

Ford argues that Dr. Wachs did not do a sufficiently robust, randomized data integrity check. Mot. at 9-10. But that is a dispute that goes to weight, not admissibility. *See Johnson*, 2022 WL 2869528, at *10; *Cadena*, 2024 WL 4005097, at *4. If Ford wanted to proffer an expert to opine that the Ford warranty claims with "coolant" in the technician comment field actually had nothing to do with coolant intrusion it was free to do so, but (perhaps for obvious reasons) it did not.

---

[14] Wachs Rep. ¶ 89.
[15] Wachs Dep. 204:5-9.
[16] Wachs Rep. ¶ 88.
[17] *See* Wachs Rep. ¶ 59 (discussing Ford's use of keyword searches for "coolant" in its failure analysis).

### 2. Dr. Wachs Does Not Offer Opinions as to Ford's Knowledge or the Root Cause of Coolant Intrusion.

Ford then turns its attention to manufactured opinions that Dr. Wachs does not give: "allegations about Ford's knowledge and the root cause of the alleged defect." Mot. at 11. Ford first paraphrases Dr. Wachs as "assert[ing] that the macro results demonstrate the knowledge of Ford technicians," *id.*, which, in fact, she does not do. Ford repeatedly asserts a supposed knowledge opinion, but Dr. Wachs does not offer such an opinion.

Ford, for example, asserts that "Dr. Wachs does not have the requisite engineering expertise[18] or factual knowledge to establish whether the macro's purported detection of customer complaint rates has any connection to Ford's knowledge of the 'alleged defect' in 2017, let alone for the proposed class vehicles as a whole. Dr. Wachs's opinions about Ford's knowledge based on complaint rates should thus be excluded as speculative and not relevant to a finding of fact." Mot. at 11. Setting aside the fact that the macro analyzed technician comments, not customer complaints,[19] Dr. Wachs once again says nothing about Ford's knowledge in relation to the Excel macro (or anything else).

The bulk of this portion of Ford's motion is focused on yet another opinion that Dr. Wachs does not offer: the root cause of the engine failures at issue. Beginning with Dr. Wachs's report, her summary of opinions makes clear that she is analyzing "the failure mode giving rise to the warranty claims in the Class Vehicles,"[20] not the root cause of such failure. And she confirmed this repeatedly in her deposition: "Again, I didn't do a root cause analysis, I did a failure mode analysis."[21]

---

[18] To the extent Ford actually intended to attack Dr. Wachs's qualifications to analyze Ford's warranty claims data to determine the common patterns of failure (the opinion she *does* offer), her extensive experience in performing such analyses for manufacturers across industries should put those to rest, *see* Wachs Rep. ¶¶ 3-6 (discussing qualifications).

[19] *See* Wachs Rep. ¶ 84 ("I used an Excel macro to examine Technician Comments in the warranty data (the data used for the reliability analysis).").

[20] *Id.* ¶ 25.

[21] Wachs Dep. 219:22-23.

Ford nevertheless apparently quotes Dr. Wachs as claiming that "the root cause for coolant intrusion was the same." Mot. at 11 (purportedly quoting Wachs Rep. ¶¶ 93-94). Where that language actually appears in Dr. Wachs's report is at paragraph 95, where she states that the "results [of the macro] are consistent with testimony from Ford personnel that the root cause for coolant intrusion was the same."[22] But Dr. Wachs there is simply (accurately) stating *what Ford engineers testified* as confirmation that her overall statistical analysis was indeed identifying coolant intrusion as the common failure mode.[23] She is not offering her own root cause opinion as to what caused the coolant intrusion.[24]

Lest there was any confusion on this score, Ford's attorney and Dr. Wachs ably cleared it up at her deposition: "Q. And then you also discussed some testimony from Mr. Brewer and Mr. Knott. Were you relying on their testimony for any of the opinions you're offering in this case? Or was that, again, like your macro, just to check for data integrity? A. Right. That was just a [corroboration]. I wasn't relying on it."[25] The point was subsequently reinforced: "So then paragraph 95 we talk about – you're leading into the discussion with Mr. Brewer or Knott. There you use a little different language. Instead of talking about the failure mode being the same, you say there that the testimony from Ford personnel was the root cause for the coolant intrusion was the same? A. I'm only saying that because what they say said. *I'm not opining on root causes, so I'm just saying what they were talking about*."[26]

---

[22] Wachs Rep. ¶ 95.

[23] *See id.* ¶¶ 96-97 (quoting deposition testimony of Todd Brewer and Tim Knott).

[24] Failure mode analysis and root cause analysis are fundamentally distinct inquiries. *See In re Chrysler Pacifica Fire Recall Prods. Liab. Litig.*, 767 F. Supp. 3d 495, 507 (E.D. Mich. 2025) (finding expert who "disclaims any opinion about . . . the root cause of the vehicle fires" had extensive experience in "failure mode analysis" and offered reliable "application of general engineering principles to the facts," while excluding other portions of opinion). *Compare also* https://tractian.com/en/glossary/failure-mode ("A failure mode is the specific way in which a component, system, or process fails to perform its required function. It describes what goes wrong and how it goes wrong physically or functionally, independently of why it happened or what consequence it produces.") *with* https://tractian.com/en/glossary/root-cause-analysis ("Root cause analysis is a subsequent, structured investigation aimed at understanding why the failure occurred and preventing it from happening again.").

[25] Wachs Dep. 204:10-16.

[26] *Id.* 218:19-219:2 (emphasis added).

Experts may use record facts to support their analysis without impermissibly straying into opinions about state of mind or other ultimate questions. In *B & R Supermarket, Inc. v. Mastercard Int'l Inc.*, 2021 WL 234550 (E.D.N.Y. Jan. 19, 2021), for example, the Court rejected the defendant's argument that the plaintiff's expert was "rehash[ing] the factual record for the purpose of drafting a facts section and speculating about Defendants' agents' state of mind and motivations"; rather, the expert was "evaluating whether this 'secondary evidence' was consistent with" his model. *Id.* at *13. Such review of the factual record to confirm consistency with the expert's model was permissible under *Daubert.*

Dr. Wachs uses Ford's deposition testimony, like the macro, to confirm what her statistical analysis shows: a high rate of engine failure across the class vehicles attributable to the same failure mode of coolant intrusion. Such use of models, confirmed by textual analysis and deposition testimony, *see id.*, is entirely appropriate. And indeed, it is telling that Ford does not challenge the core of Dr. Wachs's statistical findings: that Ford's Class Vehicles suffered from extremely high engine failures connected to coolant intrusion, at rates far above non-saw cut comparator Ford vehicles. Ford instead mounts collateral attacks on opinions that Dr. Wachs does *not* give, and its motion should be denied accordingly.

## IV. <u>CONCLUSION</u>

For the foregoing reasons, Plaintiffs respectfully ask the Court to deny Ford's motion to exclude Dr. Wachs's nonexistent opinions about knowledge and root cause, as well as her actual opinions about failure rates and failure mode.

Dated: August 26, 2026

Respectfully submitted,

LIEFF CABRASER HEIMANN &
BERNSTEIN, LLP

<u>/s/ *Mark P. Chalos*</u>

Mark P. Chalos (*pro hac vice*)
222 2nd Ave South, Suite 1640
Nashville, Tennessee 37219-2423
Telephone: (615) 313-9000

mchalos@lchb.com

Phong-Chau G. Nguyen (S.B. #286789)
LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, California 94111-3339
Telephone: (415) 956-1000
pgnguyen@lchb.com

Annika K. Martin (*pro hac vice*)
Gabriel Panek (*pro hac vice*)
Lucas Issacharoff (*pro hac vice*)
LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
250 Hudson Street, 8th Floor
New York, New York 10013-1413
akmartin@lchb.com
gpanek@lchb.com
lissacharoff@lchb.com

Cody R. Padgett (S.B. #275553)
Majdi Y. Hijazin (*pro hac vice*)
Abigail J. Gertner (*pro hac vice*)
1875 Century Park East, Suite 1000
Los Angeles, California 90067
Telephone: (310) 556-4811
cody.padgett@capstonelawyers.com
majdi.hijazin@capstonelawyers.com
abigail.gertner@capstonelawyers.com

William A. Kershaw
Stuart C. Talley
Ian J. Barlow
KERSHAW TALLEY BARLOW PC
401 Watt Avenue
Sacramento, California 95864
Telephone: (916) 779-7000
Facsimile: (916) 244-4829
bill@ktblegal.com
stuart@ktblegal.com
ian@ktblegal.com

Russell D. Paul (*pro hac vice*)
Amey J. Park (*pro hac vice*)
Natalie Lesser (*pro hac vice*)
BERGER MONTAGUE PC
1818 Market Street, Suite 3600
Philadelphia, PA 19103
Telephone: (215) 875-3000
rpaul@bm.net
apark@bm.net
nlesser@bm.net

Thomas P. Thrash (*pro hac vice*)
William T. Crowder (*pro hac vice*)
THRASH LAW FIRM PA
1101 Garland Street
Little Rock, AR 72201
Telephone: (501) 374-1058
tomthrash@sbcglobal.net
willcrowder@thrashlawfirmpa.com

Patrick Newsom (*pro hac vice*)
NEWSOM LAW PLC
40 Music Square East
Nashville, Tennessee 37203
Telephone: 615-251-9500
patrick@newsom.law

*Attorneys for Plaintiffs and the Proposed Classes*