William A. Kershaw
Stuart C. Talley
Ian J. Barlow
KERSHAW TALLEY BARLOW PC
401 Watt Avenue
Sacramento, California 95864
Telephone: (916) 779-7000
Facsimile: (916) 244-4829
bill@ktblegal.com
stuart@ktblegal.com
ian@ktblegal.com

[Additional Counsel on Signature Pages]

*Attorneys for Plaintiffs and the Proposed Classes*

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

VANESSA MILLER, et al., as individuals and on behalf of all others similarly situated,

Plaintiffs,

v.

FORD MOTOR COMPANY,

Defendant.

Case No. 2:20-cv-01796-DAD-CKD (Consolidated with Nos. 2:21-cv-00417-DAD-CKD, 2:21-cv-00468-DAD-CKD)

TREVOR NELSON, et al., as individuals and on behalf of all others similarly situated,

Plaintiffs,

v.

FORD MOTOR COMPANY,

Defendant.

Case No. 2:24-cv-02231-DAD-CKD

**PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANT FORD MOTOR COMPANY'S MOTION TO EXCLUDE CERTAIN OPINIONS OF PLAINTIFFS' EXPERT STEVEN B. BOYLES**

Date: September 21, 2026
Time: 1:30 p.m.
Judge: Hon. Dale A. Drozd
Courtroom: 4, 15th Floor

# TABLE OF CONTENTS


**Page**

I. INTRODUCTION ..... 1

II. RELEVANT BACKGROUND ..... 1

A. Plaintiffs' Point-of-Sale Theory and the Proposed Classes. ..... 1

B. Boyles Identifies a Common Formula and the Data Needed to Apply It. ..... 2

III. LEGAL STANDARD ..... 3

IV. ARGUMENT ..... 5

A. Boyles's Methodology Is Reliable. ..... 5

1. The Cost Approach Is a Recognized, Transparent, and Judicially Accepted Valuation Method. ..... 6

2. Boyles's Model Uses Multiple Independent Data Sources and Accounts for Classwide Variation. ..... 7

3. Sensitivity Analysis, Error Rate, and Testing Objections Do Not Defeat a Simple Valuation Formula. ..... 9

B. The Cost of Repair Model Fits Plaintiffs' Point-of-Sale Theory Under *Comcast* and *Nguyen*. ..... 11

1. *Nguyen* Confirms That Repair Cost Measures Point-of-Sale Injury Even Without Manifestation. ..... 12

2. *Nguyen* Also Supports the Model for Consumer-Protection and Implied-Warranty Claims. ..... 13

C. Boyles's Point-of-Sale Assumption Reflects the Implied-Warranty Standard, Not a "Defect-Free" Guarantee. ..... 14

D. Ford's Individualized Inquiry Objections Concern Weight, Not Admissibility. ..... 15

1. Manifestation and Warranty-Repair Offsets Are Allocation Issues, Not Formula Defects. ..... 16

2. Ownership Duration and Resale Do Not Undermine Point-of-Sale Damages. ..... 19

3. Knowledge and Disclosure Are Liability and Class-Membership Issues, Not Inputs to Boyles's Formula ..... 19

V. CONCLUSION ..... 19

# TABLE OF AUTHORITIES

**Page**

**Cases**

*In re Chrysler Pacifica Fire Recall Products Liability Litigation*,
767 F. Supp. 3d 495 (E.D. Mich. 2025) ..... 7, 13, 15, 19

*Clark v. American Honda Motor Company*,
No. 2:20-cv-03147-AB-MBK, Dkt. 252 (C.D. Cal. Nov. 19, 2025) ..... *passim*

*Comcast Corp. v. Behrend*,
569 U.S. 27 (2013) ..... *passim*

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
509 U.S. 579 (1993) ..... *passim*

*Davidson v. Apple Inc.*,
2019 WL 2548460 (N.D. Cal. June 20, 2019) ..... 15

*Ellis v. Costco Wholesale Corp.*,
657 F.3d 970 (9th Cir. 2011) ..... 3

*Elosu v. Middlefork Ranch Inc.*,
26 F.4th 1017 (9th Cir. 2022) ..... 4

*Kumho Tire Co., Ltd. v. Carmichael*,
526 U.S. 137 (1999) ..... 9

*Lyman v. Ford Motor Co.*,
2026 WL 1469885 (E.D. Mich. May 26, 2026) ..... *passim*

*Lytle v. Nutramax Laboratories, Inc.*,
114 F.4th 1011 (9th Cir. 2024) ..... *passim*

*Nguyen v. Nissan North America, Inc.*,
932 F.3d 811 (9th Cir. 2019) ..... *passim*

*Noohi v. Johnson & Johnson Consumer Inc.*,
146 F.4th 854 (9th Cir. 2025) ..... 10, 11

*Primiano v. Cook*,
598 F.3d 558 (9th Cir. 2010) ..... 4

*Salas v. Toyota Motor Sales, U.S.A. Inc.*,
2024 WL 608245 (C.D. Cal. Jan 16, 2024) ..... 7

*Simmons v. Ford Motor Co.*,
576 F. Supp. 3d 1136 (S.D. Fla. 2021) ..... 7, 13, 14, 15

*Siqueiros v. General Motors LLC*,
676 F. Supp. 3d 776 (N.D. Cal. 2023) ..... 18

*Smargisso v. Air & Liquid Sys. Corp.*,
750 F. Supp. 3d 1046 (N.D. Cal. 2024) ..... 4

## TABLE OF AUTHORITIES
## (continued)

**Page**

*Stiner v. Brookdale Senior Living, Inc.*,
665 F. Supp. 3d 1150 (N.D. Cal. 2023) .......... 4

**Statutes**

Cal. Civ. Code § 1794(b)(2) .......... 13

Cal. Com. Code § 2714(2) .......... 13

Kan. Stat. Ann. § 84-2-714(1)-(2) .......... 14

Md. Code Ann., Com. Law § 2-714(1)-(2) .......... 14

UCC § 2-714 .......... 12

**Court Rules**

Federal Rule of Evidence 702 .......... 4, 5, 6, 17

Rule 23(b)(3) .......... 4

# I. INTRODUCTION

Steven B. Boyles—a CPA, forensic accountant, and accredited valuation professional with more than twenty-six years of experience in damage analysis—was retained to answer a focused question: whether a common methodology can quantify classwide damages from the alleged saw-cut engine-block defect (the "Defect"). Based on his education, training, experience, and analysis of the case materials, Boyles concluded that it can.

Boyles's methodology includes applying a straightforward, transparent formula—Engine Assembly Part Cost + (Average Labor Cost × Total Repair Hours)—to measure the reasonable cost of curing the Defect. In other words, his approach calculates the difference between the Class Vehicle as represented (with a merchantable, nondefective engine) and as delivered (with Defect). This approach rests on recognized valuation standards, reliable record evidence, and the well-accepted point-of-sale theory Plaintiffs advance here. *See Nguyen v. Nissan North America, Inc.*, 932 F.3d 811, 817-22 (9th Cir. 2019) (approving cost-of-repair damages method).

Ford's motion does not identify a flaw in that common formula. Instead, it raises factual questions regarding damages that are more properly the subject of arguments to the jury. Plaintiffs respectfully ask the Court to deny Ford's motion to exclude Boyles.

# II. RELEVANT BACKGROUND

## A. Plaintiffs' Point-of-Sale Theory and the Proposed Classes.

Plaintiffs seek certification of state classes of consumers who purchased new Ford vehicles equipped with a 1.5L ("Sigma") or 2.0L/2.3L ("Duratec") saw-cut EcoBoost engine. Dkt. 162-1 at 21. The Sigma classes seek certification of claims under Colorado, Illinois, Indiana, and Maryland law; the Duratec classes seek certification of claims under California, Florida, Kansas, Michigan, Nebraska, and North Carolina law. *Id*. at 21-22. Every putative state class asserts claims under statutory consumer-protection law or for breach of implied warranty of merchantability. *Id*. at 22.

Regardless of state or class membership, every Plaintiff alleges the common saw-cut design in the Class Vehicles was defective, and Ford uniformly failed to disclose it prior to the

point of sale. Dkt. 162-1 at 39-40. The common Defect creates a common damages methodology: Ford's nondisclosure of the Defect caused an overpayment for every Class Vehicle at the point of sale; the reasonable cost of replacing the defective engine with the nondefective cross-drilled design provides a common proxy for the resulting overpayment.[1] Boyles therefore measures the cost of curing the alleged point-of-sale defect, not any later performance issues or an owner's eventual repair expense. To the extent a jury decides that there should be damages offsets for later events, such as periods of uninterrupted use of the vehicle, Mr. Boyles's methodology allows for such adjustments.[2]

### B. Boyles Identifies a Common Formula and the Data Needed to Apply It.

Plaintiffs' damages expert Steven Boyles is a CPA, forensic accountant, and accredited valuation professional with more than twenty-six years of experience.[3] He has qualified as an expert in federal and state courts, and he has provided trial testimony in over thirty matters, arbitration testimony in over fifteen matters, and deposition testimony in over sixty matters.[4] Ford does not challenge his qualifications.

Mr. Boyles applies a common methodology for quantifying the economic loss caused by the alleged Defect.[5] He opines that damages common to every Class Vehicle can be calculated using the so-called "Cost Approach"—that is, determining the value of "the cure necessary to provide class members with the asset for which they bargained."[6] In this case, that means calculating the difference between the Class Vehicle as represented (with a merchantable, nondefective engine) and as delivered (with the Defect).[7] The formula is concrete: Engine Assembly Part Cost + (Average Labor Cost x Total Repair Hours).[8]

---

[1] Dkt. 190-17 (Expert Report of Steven B. Boyles) ("Boyles Rep.") ¶¶ 16-21, 33-41.
[2] Boyles Rep. at ¶ 53.
[3] *Id.* ¶¶ 1-5.
[4] *Id.* ¶¶ 3-5.
[5] *Id.* ¶ 7.
[6] *Id.* ¶ 36.
[7] *Id.* ¶¶ 16-21, 33-39.
[8] *Id.* ¶¶ 40-41.

Boyles identifies how each variable can be populated, using three independent methods to cross-check those inputs. First, Plaintiffs' engineering expert Dr. Jordan's engine-specific engineering analysis provides distinct short-block and long-block part costs (ranging from $734.29-$1,589.69 for short-block components and $3,314.56-$5,198.70 for long-block components) and labor times (15.8-22.7 hours).[9] Second, Ford's own internal repair estimates are approximately $[redacted] for a Sigma long-block repair and $[redacted] for a Duratec long-block repair.[10] Third, data from the Automotive Management Network provides state-specific labor rates (which populate the Average Labor Cost variable in the formula, enabling jurisdiction-by-jurisdiction calculation rather than producing an independent total-cost estimate), as well as a national median of $145 per hour.[11] That rate can be combined with actual repair invoices produced in this matter (which include the cost of the replacement parts and hours required to repair the Defect).[12] These sources converge: Jordan calculated an average of $5,089;[13] Ford's internal estimates average $[redacted];[14] and the invoice-based estimate is approximately $5,871.17.[15] Boyles further explains that different reliable inputs may be inserted without changing the common method and that objective transaction data may support time-in-service or other refinements if legally required.[16]

## III. <u>LEGAL STANDARD</u>

Ford's motion is governed by the standard set forth in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), under which "the trial court must act as a 'gatekeeper' to exclude junk science that does not meet Federal Rule of Evidence 702's reliability standards." *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 982 (9th Cir. 2011); *see*

[9] Dkt. 190-1 (Declaration of Dr. Colin Jordan, Ph.D., P.E.) ("Jordan Rep.") ¶ 71; Boyles Rep. ¶¶ 30-31.
[10] Boyles Rep. ¶¶ 43-44.
[11] *Id.* ¶¶ 45-47.
[12] *Id.* ¶¶ 48-50.
[13] Jordan Rep. ¶ 19.
[14] Boyles Rep. ¶¶ 43-44.
[15] *Id.* ¶¶ 48-50.
[16] Boyles Rep. ¶¶ 51–53.

*Elosu v. Middlefork Ranch Inc.*, 26 F.4th 1017, 1020 (9th Cir. 2022) ("District courts have a longstanding responsibility to screen expert testimony, and to prevent unfounded or unreliable opinions from contaminating a jury trial."). Under this framework, expert testimony is admissible if:

> (1) the witness is sufficiently qualified as an expert by knowledge, skill, experience, training, or education; (2) the scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (3) the testimony is based on sufficient facts or data; (4) the testimony is the product of reliable principles and methods; and (5) the expert has reliably applied the relevant principles and methods to the facts of the case.

*Elosu*, 26 F.4th at 1023; *see Smargisso v. Air & Liquid Sys. Corp.*, 750 F. Supp. 3d 1046, 1057 (N.D. Cal. 2024) ("Expert testimony is admissible under Federal Rule of Evidence 702 if the expert is qualified and if the testimony is both relevant and reliable.").

"Although a district court may screen an expert opinion for reliability, and may reject testimony that is wholly speculative, it may not weigh the expert's conclusions or assume a factfinding role." *Elosu*, 26 F.4th at 1020. Even "shaky" evidence must be admitted; "cross examination, contrary evidence, and attention to the burden of proof, not exclusion," is the proper remedy for *any* admissible evidence. *Primiano v. Cook*, 598 F.3d 558, 564 (9th Cir. 2010). Plaintiffs, as the party offering Mr. Boyles's testimony, bear the burden of showing, "by a preponderance of the evidence, that the admissibility requirements are satisfied." *Stiner v. Brookdale Senior Living, Inc.*, 665 F. Supp. 3d 1150, 1168 (N.D. Cal. 2023).

At the class-certification stage, a damages model satisfies Rule 23(b)(3) if it is capable of measuring the damages attributable to the plaintiff's theory of liability. *Comcast Corp. v. Behrend*, 569 U.S. 27, 35 (2013). Thus, plaintiffs must show that their damages stemmed from the defendant's actions creating legal liability, though uncertainty regarding the exact amount of Class Members' damages does not prevent certification when a valid method for calculating those damages has been proposed. *Nguyen*, 932 F.3d at 817. The Ninth Circuit has explicitly approved a benefit-of-the-bargain model based on the average cost of replacing an allegedly

defective automotive component where the sale of the defective vehicle was the liability-triggering event and repair cost provides a reasonable measure of point-of-sale damages. *Id.* at 819-21.

## IV. ARGUMENT

Boyles's testimony satisfies Rule 702 and should be admitted. His methodology is reliable because it applies the generally accepted Cost Approach valuation method, supports each input with multiple independent and converging data sources, and charts a transparent, testable path from formula to classwide calculation. His cost-of-repair model fits Plaintiffs' point-of-sale damages theory because it measures the difference in value attributable to the alleged Defect at the time of sale, precisely the nexus *Comcast* and *Nguyen* require. And his assumption that Class Members bargained for a merchantable, nondefective engine reflects the implied-warranty standard, not an invented "defect-free" guarantee.

Ford's challenges fail because they do not identify a methodological defect. Ford's reliability objections misapply *Daubert*'s flexible factors to a straightforward valuation formula. Its fit objections ignore binding Ninth Circuit authority approving cost-of-repair as a point-of-sale measure. Lastly, its individualized-inquiry arguments—concerning manifestation rates, warranty repairs, ownership duration, and consumer knowledge—concern the weight, merits, or allocation of the evidence, not the admissibility of the common method. At minimum, any issue concerning a particular state-law claim or factual application can be addressed through refinement or limitation rather than the wholesale exclusion Ford seeks.

### A. Boyles's Methodology Is Reliable.

Boyles uses a recognized valuation method, identifies a transparent and testable equation, supports its inputs with multiple converging sources, and explains how objective differences can be incorporated without changing the common method. Ford's argument that Boyles's methodology is unreliable because it lacks testing, peer review, general acceptance, and sufficiently representative data misapplies Rule 702 and *Daubert*. Dkt. 189-1 ("Mot.") at 2, 7-9.

Rule 702 requires the proponent to show, more likely than not, that the expert's

specialized knowledge will help the factfinder, that the testimony is based on sufficient facts or data, that it is the product of reliable principles and methods, and that the expert has reliably applied those principles and methods to the facts of the case. Fed. R. Evid. 702. At class certification, the inquiry is whether the proposed method can address commonality or predominance and is likely to produce common answers at trial.

**1. The Cost Approach Is a Recognized, Transparent, and Judicially Accepted Valuation Method.**

Boyles applies a generally accepted valuation method, not a novel scientific theory. The Cost Approach is recognized by the Uniform Standards of Professional Appraisal Practice (USPAP) and defined in the International Glossary of Business Valuation Terms. In practical terms, the approach values an asset by asking what it would cost to replace the service capability the asset was supposed to provide.[17] Boyles identifies the appraisal standards recognizing the approach, defines the valuation objective, states the equation, identifies each variable, and describes the data sources.[18] Notably, the formula's transparency is a reliability safeguard: changing an input changes the result in a predictable way.

Ford contends that Boyles's methodology lacks general acceptance because it has not been tested, subjected to peer review, or evaluated for known error rates—criteria Ford draws from *Daubert*'s nonexclusive reliability factors. Mot. at 7-9. Ford further argues that Boyles relies on only ten repair invoices from Named Plaintiffs, that he did not adjust his figures for variations in labor rates across the proposed class states, and that *Nguyen* is distinguishable because the defect there could not be cured by any post-sale repair. Id. at 8-9. These arguments misapply the *Daubert* framework to a recognized valuation formula. If Ford believes another input is better supported, its experts can substitute those values and show the effect. That ability to test the result through the inputs—and to use the same equation across vehicles—is a strength of the method, not a defect.

Courts repeatedly accept cost of repair as a proxy for point-of-sale overpayment in

---

[17] Boyles Rep. ¶¶ 36-38.

[18] *Id.* ¶¶ 33-52.

automotive-defect cases. *See Nguyen*, 932 F.3d at 817-22 (holding that average cost of replacing a defective component was a cognizable benefit-of-the-bargain measure where "the sale of the vehicle with the known defect is the liability-triggering event"). This method is "straightforward and uncontroversial," and courts have denied *Daubert* challenges materially identical to Ford's. *In re Chrysler Pacifica Fire Recall Products Liability Litigation*, 767 F. Supp. 3d 495, 510 (E.D. Mich. 2025) (calling the method "straightforward and uncontroversial"); *Salas v. Toyota Motor Sales, U.S.A. Inc.*, 2024 WL 608245, at *54 (C.D. Cal. Jan 16, 2024) (denying *Daubert* motion where expert averaged repair costs from manufacturer's own database, finding that "basic arithmetic" linking the data to the opinion did not create an impermissible analytical gap).[19] That uniform acceptance answers Ford's assertion that the method lacks general acceptance or reliable application.

### 2. <u>Boyles's Model Uses Multiple Independent Data Sources and Accounts for Classwide Variation.</u>

Boyles's opinion rests on four independent and converging sources: Dr. Jordan's engineering analysis, Ford's internal repair estimates, Automotive Management Network labor-rate data, and actual repair invoices.[20] The model accounts for engine-specific and state-specific variation by using appropriate part costs, repair times, and labor rates while preserving one common formula. Ford's criticisms therefore target the values of particular inputs—not the reliability or classwide workability of the methodology.

The report also accounts for classwide variation rather than ignoring it. It separately provides short- and long-block part-cost ranges and labor times for the 1.5L, 2.0L, and 2.3L engines, as well as state-specific labor rates.[21] Boyles confirmed that these differences affect the values assigned to the model's variables—not the structure of the model itself. The same formula applies, with engine size, short- versus long-block replacement, and repair jurisdiction reflected

[19] *See also Clark* Order at 13-15; *Lyman v. Ford Motor Co.*, 2026 WL 1469885, at *20 (E.D. Mich. May 26, 2026); *Simmons v. Ford Motor Co.*, 576 F. Supp. 3d 1136, 1148-49 (S.D. Fla. 2021).

[20] Boyles Rep. ¶¶ 22-31, 42-50.

[21] Boyles Rep. ¶¶ 29-31, 42, 45-47.

in the appropriate inputs.[22] Ford therefore identifies a potential dispute over the values ultimately assigned to PC, LC, and LT—not a methodological gap or an inability to account for classwide variation.

Ford's focus on ten invoices misstates the role those invoices play. Mot. at 8. Ford argues that Boyles's repair calculations are "based only on 10 repair invoices from Named Plaintiffs, the majority of whom Plaintiffs are not even setting forth as class representatives," that Boyles "does not know if Named Plaintiffs are representative of the class as a whole," and that he "did not adjust his model for variations in the labor rates in the putative class states." *Id.* But Boyles did not treat them as a representative sample on which the methodology rests; he described them as "data points" used "in conjunction with" other available data.[23] Ford may advocate different input values. That is why the formula uses variables. Boyles explained that the presently identified rates and costs demonstrate both a workable method and the availability of information needed to apply it. Depending on the classes ultimately certified—whether defined by state, vehicle type, or time period—the relevant information can be refined, including through Ford's warranty database, and inserted into the same formula.[24] Additional data may permit more precise inputs; it does not render the existing, convergent sources methodologically insufficient. *See* Ex. 7 to Declaration of Mark Chalos, *Clark v. American Honda Motor Company*, No. 2:20-cv-03147-AB-MBK, Dkt. 252 (C.D. Cal. Nov. 19, 2025) at 15 ("*Clark* Order"); *Lytle v. Nutramax Laboratories, Inc.*, 114 F.4th 1011, 1029-34 (9th Cir. 2024).

Ford's representativeness critique also fails because the invoices are not the methodology's foundation—they are one of four potential sources for the input values. Mot. at 8. Dr. Jordan's engineering analysis already provides engine-specific cost distinctions (short-block versus long-block part costs and labor times) for each engine family. Automotive Management Network data supplies state-specific labor rates covering every proposed class state. Ford's own

---

[22] Chalos Decl. Ex. 6, Transcript of May 15, 2026, Deposition of Steven B. Boyles ("Boyles Dep.") 124:1-17, 171:7-18.

[23] Boyles Dep. 264:12-265:8.

[24] Boyles Dep. 265:9-266:4.

internal repair estimates provide an independent benchmark. The invoices serve as an additional cross-check confirming that the other sources produce figures consistent with observed market experience. An expert need not rely on a single representative sample when multiple independent sources converge on a consistent range. *See Clark* Order at 15; *Lytle*, 114 F.4th at 1029-34.

**3. <u>Sensitivity Analysis, Error Rate, and Testing Objections Do Not Defeat a Simple Valuation Formula.</u>**

Ford argues that Boyles's methodology is unreliable because he performed no testing or sensitivity analysis, did not consider any alternative methodologies, acknowledged that repair costs could vary with inflation, and conceded that his formula's variables are tentative and not finalized. Mot. at 7-8. Ford further contends that Boyles admitted the model "would need to be adjusted for numerous class members" but has not contemplated exactly how the allocation will be conducted. *Id.* Ford concludes that a methodology whose inputs are admittedly provisional cannot be considered reliable. *Id.*

These arguments mischaracterize both Boyles's work and the applicable standard. First and foremost, Boyles's opinion concerns a valuation method, built on a straightforward equation, not a complex scientific model. The *Daubert* factors are flexible, not a rigid checklist mechanically applied to every kind of expert testimony. *Daubert*, 509 U.S. at 593–94; *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 150 (1999). The formula is transparent and testable through its identified inputs: changing an engine cost, labor rate, or repair time produces a predictable change in the result. Ford's demand for peer-reviewed literature or laboratory-style testing therefore does not identify a defect in the method.

*Daubert*'s peer-review and general-acceptance factors are most relevant to novel scientific methodologies. For a recognized valuation formula drawing on published appraisal standards such as USPAP, broad judicial acceptance serves the same gatekeeping function. *See Kumho Tire*, 526 U.S. at 150 ("the factors identified in *Daubert* may or may not be pertinent in assessing reliability, depending on the nature of the issue, the expert's particular expertise, and the subject of his testimony"). Here, the Cost Approach is recognized by professional appraisal standards, has been accepted by multiple federal courts in analogous automotive-defect cases

(including the Ninth Circuit). *See supra* Section IV.A.1 (collecting cases approving cost of repair as a point-of-sale measure). The Cost Approach produces results that can be independently verified by substituting different inputs into the same transparent formula. Ford identifies no peer-reviewed literature rejecting the approach or any methodological criticism from the relevant professional community.

Boyles has gone above and beyond what is required by the law. In *Lytle*, the Ninth Circuit affirmed certification of a consumer class action alleging that a pet-health-product manufacturer violated the California CLRA by falsely marketing its product as promoting joint health. 114 F.4th at 1029-34. The manufacturer argued that certification was improper because the plaintiff's damages expert had not yet executed his proposed damages model. The court rejected that argument, holding that "class action plaintiffs may rely on an unexecuted damages model to demonstrate that damages are susceptible to common proof so long as the district court finds, by a preponderance of the evidence, that the model will be able to reliably calculate damages in a manner common to the class at trial." *Id.* at 1024. The court emphasized that the expert must "chart out a path to obtain all necessary data and demonstrate that the proposed method will be viable as applied to the facts of a given case." *Id.* at 1032. And in applying a limited *Daubert* analysis, the court explained that factors such as error rate "may be more applicable to the later-executed results of the test" than to the validity of the methodology itself. *Id.* at 1030-31. Thus, an expert need not fully execute a damages model before certification; the expert must provide a reliable methodology and a concrete path to implementation.

*Noohi v. Johnson & Johnson Consumer Inc.*, 146 F.4th 854, 860-65 (9th Cir. 2025), reaffirmed that incomplete final execution does not defeat a model where the expert has designed the method and identified the needed data. Boyles does just that here and considerably more: he supplies the formula, sample calculations, multiple independent data sources, objective differentiators, and an implementation path.[25] His reservation of final input selection until the Court defines the classes is consistent with the Ninth Circuit's analysis in *Lytle* and *Noohi*.

---

[25] Boyles Rep. ¶¶ 40-53; Boyles Dep. 234:4–12, 265:9-266:4.

Ford's characterization of Boyles's inputs as impermissibly "tentative" or "provisional," Mot. at 8, misreads both his testimony and the applicable standard. Boyles identified specific, verifiable values drawn from engineering analysis, manufacturer records, and published market data. That he reserves the right to refine those values once the Court defines the certified classes reflects prudent methodology, not unreliability. Indeed, in *Lytle* the Ninth Circuit expressly held that an expert need not fully execute a damages model before certification. 114 F.4th at 1029. Boyles has identified the path to allocation by specifying the formula, the data sources, and the objective differentiators—engine type, state, and short- versus long-block replacement—that will drive any later refinements. A speculative possibility that the expert may err in later execution does not justify exclusion now. *Noohi*, 146 F.4th at 864.

### B. The Cost of Repair Model Fits Plaintiffs' Point-of-Sale Theory Under *Comcast* and *Nguyen*.

Ford's next argument—that Boyles's cost-of-repair model does not fit Plaintiffs' legal claims, Mot. at 6-7—fails under *Comcast* and *Nguyen*. Ford argues that Boyles's cost-of-repair model does not fit Plaintiffs' legal claims because it calculates damages "without regard" to the specific causes of action, fails to distinguish fraud from warranty measures, and omits factors such as vehicle condition, mileage, and wear and tear that Ford contends are relevant to implied-warranty damages. *Id.* at 6. Ford further contends that Boyles did not calculate the difference between what consumers bargained for and received, analyze fair market value, or reach conclusions about supply and demand, and that *Nguyen* is distinguishable because the defect there could not be cured by post-sale repairs. *Id.* at 9. However, as discussed below, *Nguyen* directly approves repair cost as a point-of-sale measure for consumer-protection and implied-warranty claims, and the model measures the alleged defect-as-injury at the time of sale rather than later performance—precisely the fit *Comcast* requires.

The *Clark* Order is especially instructive because it considered the same expert, the same Cost Approach, and nearly the same defense objections in an automotive-defect class action. There, like here, Boyles treated the defect itself as the point-of-sale injury, used average repair cost as the benefit-of-the-bargain proxy, drew repair-cost inputs from the manufacturer's

warranty database and public labor-rate sources, and provided adjustments for different transaction types. *Clark* Order at 13-15. Honda argued that the model ignored the probability of manifestation, resale, used purchases, warranties, and consumers' supposed expectation of defects. *Id.* The court found, more likely than not, that Boyles's opinion "reflects a reliable application of reliable principles and methods," matches the plaintiffs' theory, permissibly assumes liability, and rests on sufficient data. *Id.* at 13-15. It emphasized that *Nguyen* was not limited to design-defect cases and that disputes about additional databases or market-specific labor rates concerned the calculation's correctness, not the model's ability to calculate classwide damages. *Id.* at 14-15. Limited adjustments did not undermine classwide capability. *Id.* at 15.

### 1. ***Nguyen* Confirms That Repair Cost Measures Point-of-Sale Injury Even Without Manifestation.**

*Nguyen* answers Ford's core fit objection. The "central issue" in *Nguyen* was whether a benefit-of-the-bargain model measured by the average cost of replacing a defective automotive component satisfied predominance. 932 F.3d at 816-17. The Ninth Circuit held that it did. For the CLRA consumer-protection claim, repair cost provided a cognizable and reasonable basis for computation. *Id.* at 817-18. For the Song-Beverley implied-warranty claim, California law expressly included the cost of repairs necessary to conform accepted goods, and UCC § 2-714 supplied benefit-of-the-bargain damages. *Id.* at 818-19.

*Nguyen* also rejects the premise underlying Ford's manifestation argument, namely, Ford's contention that because the Defect will not manifest in every vehicle, Boyles's model improperly assumes 100% of Class Vehicles require repair and calculates the same damages regardless of whether their failure rate is 0.5% or 99%. Mot. at 11-12. The Ninth Circuit squarely rejected this characterization: later performance problems do not bear on an alleged point-of-sale injury. 932 F.3d at 819-22. The "sale of the vehicle with the known defect" was the liability-triggering event, and the loss occurred at purchase. *Id*. at 820. Disputes about the accuracy of the replacement-cost calculation, the existence of the defect, and the manufacturer's knowledge were merits questions. *Id.* at 821. The fit is at least as direct here. Plaintiffs allege that every Class Vehicle contains the same saw-cut design and a cross-drill replacement engine cures the

Defect.[26] Boyles measures the reasonable cost of that cure.[27] The model does not seek damages from unrelated conduct, combine multiple theories, or value later performance symptoms. It translates the asserted point-of-sale injury into a common monetary proxy, precisely what *Comcast* requires and *Nguyen* approves.

Ford's attempt to distinguish *Nguyen* because, here, a repair was available to affected purchasers reverses the logic of a repair-cost model. Mot. at 9. The ability to cure the Defect is what makes repair cost a workable proxy and, in this context, a ceiling on the reasonable cost attributable to curing the common Defect. *Nguyen* did not hold that the model is proper only when repair is impossible. In fact, it repeatedly described the remedy as the "cost of replacing" the defective system and held that the system defect "exists—and must be remedied—whether or not the symptoms have manifested." 932 F.3d at 819-21. Ford's objections about later performance or individual repair histories therefore do not undermine the common formula.

**2. *<u>Nguyen</u>* <u>Also Supports the Model for Consumer-Protection and Implied-Warranty Claims.</u>**

*Nguyen*'s reasoning applies to both components of Plaintiffs' theory. It approved the same repair-cost proxy for consumer-protection and implied-warranty claims under California law. 932 F.3d at 817-22. Courts applying other states' laws likewise admit repair-cost models as evidence of point-of-sale overpayment. *See, e.g.*, *Simmons*, 576 F. Supp. 3d at 1148-49; *In re Chrysler Pacifica*, 767 F. Supp. 3d at 509-11; *Lyman*, 2026 WL 1469885, at *20-22.

The implied-warranty measure reinforces rather than defeats the model. Under the UCC, the measure of damages for breach of warranty is the difference "at the time and place of acceptance" between the value of the goods accepted and the value they would have had if they had been as warranted. Cal. Com. Code § 2714(2). The same standard governs Song-Beverly claims: California law provides that the measure of damages 'shall include the cost of repairs necessary to make the goods conform.'" Cal. Civ. Code § 1794(b)(2); *see Nguyen*, 932 F.3d at

---

[26] Jordan Rep. ¶¶ 7(d), 15, 17-19.
[27] Boyles Rep. ¶¶ 33-52.

818-19 (applying this measure to approve cost-of-repair as benefit-of-the-bargain damages under both Song-Beverly and the CLRA). Equivalent UCC provisions in the other class states likewise permit loss from nonconformity to be determined "in any manner which is reasonable."[28] Ford's contention that Boyles must account for post-sale mileage, wear, and use misreads that standard. Mot. at 6. It cites no authority imposing that requirement on a model valuing a defect present at acceptance.

Ford's fraud-specific objection—that Boyles did not separately calculate fair-market value, supply-and-demand curves, or a different damages figure—likewise confuses the ultimate application of a remedy with the admissibility of a common valuation method. Mot. at 6-7. The relevant question is not whether every state's law provides the same remedy, but whether the expert's methodology is admissible to help the trier of fact on at least one claim. *Simmons*, 576 F. Supp. 3d at 1149 (holding that "[t]o avoid exclusion on *Daubert* grounds, it is only necessary for Plaintiffs to demonstrate that the measure of damages set forth in [the expert's] report can apply to at least one of Plaintiffs' claims"). If a particular state's law ultimately calls for a narrower remedy, that may limit recovery; it does not render the method inadmissible across all claims. *See Simmons*, 576 F. Supp. 3d at 1143, 1148-49 (denying Ford's motion to exclude an analogous repair-cost model and explaining that the expert's opinion need not independently establish classwide damages or provide a remedy under every state's law); *Lyman*, 2026 WL 1469885, at *22 (declining to exclude Stockton's repair-cost opinions even though damages might not be available under one state's law). Boyles's assignment is to identify a reasonable method for quantifying the loss attributable to the alleged Defect, not to resolve every claim element or adjudicate every state-law measure.

### C. Boyles's Point-of-Sale Assumption Reflects the Implied-Warranty Standard, Not a "Defect-Free" Guarantee.

Ford's argument that the model ignores the actual bargain rests on a premise Boyles does not make. Mot. at 10. His report assumes that new-car purchasers bargained for a merchantable

---

[28] *See, e.g.*, Kan. Stat. Ann. § 84-2-714(1)-(2); Md. Code Ann., Com. Law § 2-714(1)-(2).

vehicle with a nondefective engine and values only the cure of the alleged Defect.[29] The model need not separately value every possible defect, routine maintenance, or a lifetime performance guarantee. *Lyman*, 2026 WL 1469885, at *21 ("The reliability of an expert's methodology is not undermined by his reliance on assumed facts drawn from the allegations of a pleading, so long as there is some support for those assumptions in the record."); *In re Pacifica*, 767 F. Supp. 3d at 510-511 (same); *Clark* Order at 15 (same). It is well established that a damages expert may permissibly assume the truth of the liability theory.

Ford's warranty disclaimer does not disclose or ratify the alleged preexisting design Defect. Mot. at 10. A warranty allocating responsibility for defects that arise or manifest after sale is not a disclosure that every engine was sold with this alleged Defect, and it does not erase point-of-sale diminution. *Nguyen* specifically observed that the manufacturer's contention that it never promised defect-free vehicles was a merits argument beyond the class-certification inquiry. 932 F.3d at 822 n.8. *Clark* rejected the same objection to Boyles. *Clark* Order at 13-15. Courts confronting Ford's identical "actual bargain" argument likewise have rejected it as a basis for exclusion. *Lyman*, 2026 WL 1469885, at *20; *Simmons*, 576 F. Supp. 3d at 1148. Ford's reliance on *Davidson v. Apple Inc.*, 2019 WL 2548460, at *14 (N.D. Cal. June 20, 2019) does not change that result. Mot. at 11. *Davidson* involved a conjoint survey that omitted an express-warranty attribute even though the survey sought to reconstruct consumers' purchase choices. Boyles does not conduct a conjoint survey or purport to estimate subjective willingness to pay. He values the objective cure for a defect assumed to exist at sale—a method that *Nguyen* approved and that was admitted in *Clark*.

**D. <u>Ford's Individualized Inquiry Objections Concern Weight, Not Admissibility.</u>**

Ford raises a series of individualized-inquiry objections, arguing that the model ignores manifestation and failure rates that vary across vehicle lines, fails to account for Class Members who received free warranty repairs under program 21N12, lacks time-of-ownership or resale adjustments, and provides no method to determine whether Class Members knew of the alleged

[29] Boyles Rep. ¶¶ 16, 18-21, 33-41.

Defect. Mot. at 11-13. Ford also relies on Boyles's admission that the formula will not equal actual damages for every individual Class Member. *Id.* at 3, 13. However, these objections concern the weight of evidence, later merits determinations, or ministerial allocation—not the reliability of the common valuation method—and courts have uniformly rejected them as grounds for excluding cost-of-repair models.

### 1. Manifestation and Warranty-Repair Offsets Are Allocation Issues, Not Formula Defects.

Ford's manifestation and repair-offset objections fail for two related reasons. First, manifestation rates do not alter Boyles's defect-as-injury model given Plaintiffs' theory that the common Defect existed at the time of sale. Second, Ford's own warranty and campaign records can identify complete, no-cost corrective repairs, allowing any required exclusion, credit, or other allocation to be addressed objectively. Those are questions about the legal effect of later events and the implementation of a common measure—not reasons to exclude the formula.

Ford's probability hypotheticals begin from the wrong premise: they assume that the relevant injury is the possibility of a future engine failure. Mot. at 11-12. That is not Plaintiffs' theory. Plaintiffs allege that every Class Vehicle was already equipped with the Defect when it was sold. The injury occurred at that point, when customers paid for a vehicle free of the undisclosed Defect but received a defective vehicle instead.[30]

The Ninth Circuit confronted essentially the same argument in *Nguyen*. Nissan argued that the damages model improperly assumed every vehicle would manifest a clutch failure. The court rejected that characterization because the plaintiff's theory was that the defect was inherent in every vehicle at the time of purchase. As the court explained, "the sale of the vehicle with the known defect is the liability-triggering event, not when the overheating manifests." *Nguyen*, 932 F.3d at 820. The court therefore held that the average cost of repair could serve as a proxy for the alleged point-of-sale overpayment, leaving the accuracy of the repair calculation and the existence of the defect for the merits. *Id.* at 821-22. *Clark* applied the same reasoning to Boyles's cost-of-repair model, concluding that the relevant damages issue was "not one of performance or

[30] Dkt. 162-1 at 39-40; Boyles Rep. ¶ 21.

manifestation," but whether purchasers received what they bargained for. *Clark*, Dkt. 252, at 14-15; *see also Lyman*, 2026 WL 1469885, at *21. Manifestation evidence may bear on Ford's challenge to Plaintiffs' underlying Defect theory. It does not make Boyles's valuation of that theory methodologically unreliable.

Ford's repair-offset argument likewise concerns objective allocation, not the reliability of the formula. Ford asserts that Boyles would award the full repair cost to a new purchaser who already received a complete corrective repair. Mot. at 3-4, 12. Boyles testified that, if Ford's records showed a new-car purchaser actually received a complete, genuinely corrective repair at no cost that eliminated the underlying Defect, as opposed to a short-block replacement that retained the saw-cut design, his objective and adaptable cost-of-repair model could account for that later event.[31] His conditional testimony concedes neither that any such repair occurred nor that it would as a matter of law eliminate point-of-sale damages. That testimony demonstrates the model's objectivity and adaptability—not a methodological defect. What matters for class certification is that, should an offset be necessary, it can be done in a simple, straightforward manner: Ford can identify any complete corrective replacements through its own warranty and campaign records and apply an objective credit or exclusion if the governing law requires it.

Moreover, the same objective, record-based inquiry underscores the speculative nature of Ford's related suggestion that some Class Members knew of the Defect at purchase. Ford has identified no actual Class Member who knew of the Defect at the time of purchase. Although Plaintiffs bear the ultimate burden of showing that Boyles's testimony satisfies Rule 702, Ford, as the party seeking exclusion, must identify a concrete failure in Rule 702 or a genuine class-certification barrier; it cannot meet that burden by positing an unidentified purchaser. Without a single actual person in this category, Ford's objection remains speculative and insufficient to defeat the common methodology.

Nor does the actual record support Ford's hypothetical picture of a classwide cure. The evidence shows that Ford spent years applying what were, at best, Band-Aid fixes to the Saw Cut

[31] Boyles Dep. 169:6-170:13.

Defect. Ford did not replace the defective saw cut engine with the cross drill until every Class Vehicle was sold, and thus after every Class Member's point-of-sale injury. Furthermore, Ford's 21N12 customer satisfaction program ("CSP") was limited to certain 2017-2019 1.5L Escape and Fusion vehicles, operated only during a specified time/mileage period, and required symptoms and confirmation before authorizing a short-block replacement.[32] Ford describes this program as a "free warranty repair," Mot. at 12, but that is not an accurate description given these many caveats. In addition, CSP 21N12 purported to "offer[] a refund for owner-paid repairs" prior to November 30, 2022, a category that would include people who paid to replace a defective saw-cut engine with another defective saw-cut engine.[33] Those individuals still owned Class Vehicles with the Defect; they were indisputably not made whole by any "refund."

In any event, Ford's records will show if a Class Member received a refund or repair as part of CSP 21N12, making it easy to isolate these individuals should any offset be warranted. Regardless, even if Ford could identify a Class Member who later received a genuinely corrective warranty repair, that individual was still harmed at the moment of purchase. That consumer paid for a vehicle represented as free of the undisclosed Defect and therefore overpaid at the point of sale. *Nguyen* holds that the sale of a vehicle with the defect is the liability-triggering event and approves measuring the resulting point-of-sale loss through the cost of curing the defect, without automatically reducing that valuation based on point-purchase use or other benefits. 932 F.3d at 819-21. *See also Siqueiros v. General Motors LLC*, 676 F. Supp. 3d 776 (N.D. Cal. 2023) (involving a class definition that excluded vehicles that had already received an adequate piston-ring replacement, illustrating that an objectively identifiable corrective repair may be addressed through class definition). Any legally required adjustment should therefore be treated as a question of allocation and determined from objective repair records, rather than as a defect in the common point-of-sale valuation methodology. A later repair does not automatically create a credit or exclusion, and any such credit or exclusion would

---

[32] Dkt. 190-22 (Customer Satisfaction Program 21N12).

[33] *Id.* at FORD-MILLER 00117447.

not negate the original overpayment or render Boyles's formula inadmissible.

#### 2. Ownership Duration and Resale Do Not Undermine Point-of-Sale Damages.

The relevant factor under Plaintiffs' point-of-sale theory is the vehicle's condition at the original sale, not the owner's later use. Ford argues that Boyles's formula does not adjust for how long a Class Member retained the vehicle or whether the Class Member later sold it. Mot. at 12. But Plaintiffs' alleged injury occurred at the original transaction, when each Class Member purchased a new vehicle whose value was allegedly diminished by the undisclosed Defect. Dkt. 162-1 at 21, 39-40. Later mileage, wear, use, or resale may bear on mitigation or allocation of an individual's recoverable damages; they do not alter whether the point-of-sale loss occurred, or whether the reasonable cost of curing the Defect provides evidence of the difference in value at purchase. Ford identifies no reason why the cost-of-repair ceiling ceases to provide that evidence merely because a purchaser later used or sold the vehicle. *See Nguyen*, 932 F.3d at 819-21 (holding that point of sale injury occurred at purchase regardless of later vehicle performance).

#### 3. Knowledge and Disclosure Are Liability and Class-Membership Issues, Not Inputs to Boyles's Formula

Boyles's assignment also does not include deciding what each purchaser knew. He is a valuation expert, not Ford's knowledge or disclosure expert. He assumes Plaintiffs prove their liability theory: Ford sold new vehicles with a material, undisclosed Defect.[34] That is proper. *Clark* Order at 15; *In re Pacifica*, 767 F. Supp. 3d at 510-11. Thus, whether Ford disclosed the Defect to a purchaser, whether the omission was material, and whether any individual had disqualifying knowledge are liability or class-membership questions. They do not alter the arithmetic of the repair-cost proxy for purchasers.

## V. CONCLUSION

The record and governing authorities confirm that Boyles's Cost Approach is a recognized, transparent, and judicially accepted valuation method. It measures the point-of-sale injury that *Comcast* requires and *Nguyen* approves: the reasonable cost of curing the common

---

[34] Boyles Rep. ¶¶ 16-21, 39-40.

defect provides a common proxy for the overpayment every Class Member suffered at purchase. An expert need not fully execute a damages model before certification where the methodology is reliable and the path to all necessary data has been charted. *Lytle*, 114 F.4th at 1029-34. Boyles has done considerably more by supplying the formula, sample calculations, multiple converging data sources, and an implementation path. Ford's challenges go to the weight of the evidence, not the admissibility of the common method. For these reasons, Plaintiffs respectfully request that the Court deny Ford's motion to exclude Steven B. Boyles's opinions and testimony at class certification.

Dated: August 26, 2026

Respectfully submitted,

LIEFF CABRASER HEIMANN &
BERNSTEIN, LLP

/s/ *Mark P. Chalos*

Mark P. Chalos (*pro hac vice*)
222 2nd Ave South, Suite 1640
Nashville, Tennessee 37219-2423
Telephone: (615) 313-9000
mchalos@lchb.com

Phong-Chau G. Nguyen (S.B. #286789)
LIEFF CABRASER HEIMANN &
BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, California 94111-3339
Telephone: (415) 956-1000
pgnguyen@lchb.com

Annika K. Martin (*pro hac vice*)
Gabriel Panek (*pro hac vice*)
Lucas Issacharoff (*pro hac vice*)
LIEFF CABRASER HEIMANN &
BERNSTEIN, LLP
250 Hudson Street, 8th Floor
New York, New York 10013-1413
akmartin@lchb.com
gpanek@lchb.com
lissacharoff@lchb.com

Cody R. Padgett (S.B. #275553)
Majdi Y. Hijazin (*pro hac vice*)
Abigail J. Gertner (*pro hac vice*)
1875 Century Park East, Suite 1000

Los Angeles, California 90067
Telephone: (310) 556-4811
cody.padgett@capstonelawyers.com
majdi.hijazin@capstonelawyers.com
abigail.gertner@capstonelawyers.com

William A. Kershaw
Stuart C. Talley
Ian J. Barlow
KERSHAW TALLEY BARLOW PC
401 Watt Avenue
Sacramento, California 95864
Telephone: (916) 779-7000
Facsimile: (916) 244-4829
bill@ktblegal.com
stuart@ktblegal.com
ian@ktblegal.com

Russell D. Paul (*pro hac vice*)
Amey J. Park (*pro hac vice*)
Natalie Lesser (*pro hac vice*)
BERGER MONTAGUE PC
1818 Market Street, Suite 3600
Philadelphia, PA 19103
Telephone: (215) 875-3000
rpaul@bm.net
apark@bm.net
nlesser@bm.net

Thomas P. Thrash (*pro hac vice*)
William T. Crowder (*pro hac vice*)
THRASH LAW FIRM PA
1101 Garland Street
Little Rock, AR 72201
Telephone: (501) 374-1058
tomthrash@sbcglobal.net
willcrowder@thrashlawfirmpa.com

Patrick Newsom (*pro hac vice*)
NEWSOM LAW PLC
40 Music Square East
Nashville, Tennessee 37203
Telephone: 615-251-9500
patrick@newsom.law

*Attorneys for Plaintiffs and the Proposed Classes*