# EXHIBIT 7

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES - GENERAL

| Case No.: 2:20-cv-03147-AB-MBK | Date: November 19, 2025 |
|---|---|

Title: *Winnie Clark, et al. v. American Honda Motor Co., Inc., et al.*

Present: The Honorable **ANDRÉ BIROTTE JR., United States District Judge**

| Evelyn Chun | N/A |
|---|---|
| Deputy Clerk | Court Reporter |

| Attorney(s) Present for Plaintiff(s): | Attorney(s) Present for Defendant(s): |
|---|---|
| None Appearing | None Appearing |

**Proceedings: [In Chambers] SEALED Order on Motion for Class Certification and Related Rule 702 Motions**

The following motions are pending before the Court. The Special Master conducted conferences with the parties on September 29 and October 1, 2025. The Court observed a technology tutorial presented by the parties on October 1, and the Court held a hearing on the motions on October 3, 2025. The Court rules as stated below.

| Motion | Opposition | Reply | Ruling |
|---|---|---|---|
| Plaintiffs' Motion for Class Certification (Dkts. 166-2, 170 (sealed)) | AHM's Opposition (Dkts. 187, 186 (sealed) | Plaintiffs' Reply (Dkts. 200, 208 (sealed)) | **GRANTED** |
| AHM's 702 Motion re Murat Okçuoğlu (Dkts. 181, 180 (sealed)) | Plaintiffs' Opposition (Dkts. 204, 209 (sealed)) | AHM's Reply (Dkt. 239) | **DENIED** |

| Motion | Opposition | Reply | Ruling |
|---|---|---|---|
| AHM's Motion to Strike Menendez Declaration (Dkts. 183, 182 (sealed)) | Plaintiffs' Opposition (Dkt. 205) | AHM's Reply (Dkt. 227) | **DENIED** |
| AHM's 702 Motion re: Steven Boyles (Dkts. 185, 184 (sealed)) | Plaintiffs' Opposition (Dkts. 203, 210 (sealed)) | AHM's Reply (Dkt. 240) | **DENIED** |
| Plaintiffs' 702 Motion re Ashish Arora (Dkts. 201, 211 (sealed)) | AHM's Opposition (Dkt. 230, 235 (sealed)) | Plaintiffs' Reply Dkts. 237-2 238-1 (sealed) | **DENIED** |
| Plaintiffs' 702 Motion re David Harless (Dkt. 202) | AHM's Opposition (Dkt. 228, 233-1) | Plaintiffs' Reply (Dkt. 236) | **DENIED** |
| AHM's Motion for leave to file supplemental Arora Report (Dkt. 229) | Unopposed | N/A | **GRANTED** |
| AHM's MSJ (Dkts. 217, 219 (sealed)); Request for Judicial Notice (Dkt. 218) | Deferred pending resolution of class certification motion | Deferred pending resolution of class certification motion | **DEFERRED**[1] |

For the reasons stated in the Court's order granting the application to seal regarding the Arora 702 Motion (Dkt. 207), the Court **GRANTS** the pending applications to seal at Dkt. 231 (Arora Opp.) and Dkt. 237 (Arora Reply).[2]

[1] Within 14 days of issuance of this Order, the parties shall advise the Special Master whether a briefing schedule should be set for this motion, or alternatively, whether the motion should be denied without prejudice to AHM filing an updated MSJ at the appropriate time.

[2] When filing the Arora Reply, Plaintiffs did not file a standalone version of the redacted document. *See* Dkt. 237-2. At the time of filing the standalone sealed version of the Reply, Plaintiffs shall also file the standalone version of the redacted document.

## I. Background

Plaintiffs filed this putative class action in April 2020. Plaintiffs purchased and/or leased AHM's Acura MDX vehicles covering model years 2016 to 2020. Beginning in model year 2016, the vehicles featured a new "Drive-By-Wire Throttle System." This system uses a gas pedal sensor, rather than cables, to adjust the amount of fuel delivered through the throttle body, thereby affecting speed. Plaintiffs allege a defect in the engine wire harnesses connecting the system components. Specifically, as confirmed by an internal investigation by AHM, Plaintiffs aver the wire harnesses were damaged during the manufacturing process when AHM's third-party supplier quality checked the harness's terminals by applying a physical tool rather than conducting a laser measurement. Plaintiffs aver the damage resulted in reduced terminal spring force, which causes miscommunication in the system. Plaintiffs allege the defective vehicles routinely experience unintended and uncontrollable deceleration, engine stalls, hesitation upon depressing the gas pedal, abrupt shutdowns, and shifts into neutral while driving. Dkt. 108 ("FAC") ¶ 2.

At the pleadings stage, the Court ruled on two motions to dismiss, *see* Dkts. 103, 133, and the case proceeded to the class certification stage. Before the Court are Plaintiffs' motion for class certification and the parties' accompanying Rule 702 motions.

In their motion for class certification, Plaintiffs seek to certify the following classes:

**California Class**
All persons who purchased or leased a Class Vehicle in the State of California.
**CLRA Sub-Class**: All persons who purchased or leased a Class Vehicle in the State of California for personal, family or household purposes.
**Song-Beverly Implied Warranty Sub-Class**: All persons who purchased or leased a new Class Vehicle for personal, family or household purposes and took delivery in the State of California.
**Song-Beverly Express Warranty Sub-Class**: All persons who purchased or leased a new or used Class Vehicle that came with the remainder of the manufacturer's written express warranty in the State of California for personal, family or household purposes, and who provided Defendant with two (2) or more opportunities to repair their Class Vehicle.

**Louisiana Class**

All persons who purchased or leased[3] a Class Vehicle in the State of Louisiana.

**Massachusetts Class**
All persons who purchased or leased a Class Vehicle in the State of Massachusetts.

**Utah Class**
All persons who purchased or leased a Class Vehicle in the State of Utah.

## II. Legal Standards

Daubert Inquiry

"The manner and extent to which the *Daubert* framework applies at the class certification stage is an unsettled question." *Lytle v. Nutramax Lab'ys, Inc.*, 114 F.4th 1011, 1030 (9th Cir. 2024), *cert. denied*, 145 S. Ct. 1308 (2025). The Ninth Circuit acknowledges that some of its precedent endorses a "full *Daubert* test," while other precedent suggests "a more limited *Daubert* inquiry" is appropriate at the class certification stage. *Id.* (contrasting full *Daubert* analysis with an inquiry that does not treat admissibility as dispositive but instead applies it to the weight of evidence at the class certification stage).

Given this range of authority, in *Lytle*, the Ninth Circuit suggested that "the distinction between a "full" and "limited" *Daubert* inquiry [may be] a function of what aspect of FRCP 23 is being addressed." *Id.* For example, whether a model is reliable to show predominance and commonality may turn on factors such as peer review, whereas known error rate may be more applicable to the results of the test. *Id.* It may also turn on the stage of an expert's work. For example, "where an expert's model has yet to be fully developed, a district court is limited at class certification to making a predictive judgment about how likely it is the expert's analysis will eventually bear fruit." *Id.* at 1031. But "[t]his still requires determining whether the expert's methodology is reliable," so at least "a limited *Daubert* analysis may be necessary," with a "more full-blown *Daubert* assessment" applied to "the results of the application of the model" at a later stage. *Id.*

[3] Plaintiffs have amended their request to certify the Louisiana class as to purchasers only. CC Reply at 11.

Any *Daubert* inquiry will turn on relevance and reliability. *See* Fed. R. Evid. 702; *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 588 (1993) ("*Daubert I*"). Under Rule 702, the Court examines whether (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the expert testimony is based on sufficient facts or data; (c) the testimony is the result of reliable principles and methods; and (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case. Fed. R. Evid. 702. Thus, to be admissible, expert evidence must "logically advance[ ] a material aspect of the proposing party's case." *Daubert v. Merrell Dow Pharm., Inc.*, 43 F.3d 1311, 1315 (9th Cir. 1995) ("*Daubert II*"). The trial judge plays an important "gatekeeping role" when considering whether testimony is reliable, which "entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." *Id.* at 592–93.

The focus "must be solely on principles and methodology, not on the conclusions that they generate." *Id.* at 595. "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Id.* at 596.

<u>Class Certification</u>

At the class certification stage, the Court "is merely to decide [whether a class action is] a suitable method of adjudicating the case." *Edwards v. First Am. Corp.*, 798 F.3d 1172, 1178 (9th Cir. 2015). Before a class may be certified, the Court must conduct a "rigorous analysis" to determine whether the prerequisites of Federal Rule of Civil Procedure 23 have been satisfied." *Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 664 (9th Cir. 2022) (en banc). Plaintiffs must "actually prove—not simply plead—that their proposed class satisfies each requirement of Rule 23." *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 275 (2014). Plaintiffs bear the burden of establishing the Rule 23 prerequisites by a preponderance of the evidence. *Olean*, 31 F.4th at 665.

"Rule 23(a) ensures that the named plaintiffs are appropriate representatives of the class whose claims they wish to litigate." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 349 (2011) ("*Dukes*"). Thus, "to take advantage of Rule 23's procedure for aggregating claims, plaintiffs must make two showings." *Olean*, 31 F.4th at 665.

*First*, "the plaintiffs must establish 'there are questions of law or fact common to the class,' as well as demonstrate numerosity, typicality and adequacy of representation." *Id.* (quoting Fed. R. Civ. P. 23(a)). "A common question 'must be of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke.'" *Id.* (quoting *Dukes*, 564 U.S. at 350).

*Second*, the plaintiffs must show that the class fits into one of three categories," as relevant here, that "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." *See* Fed. R. Civ. P. 23(b)(3). The predominance inquiry considers whether common issues are more prevalent or important than non-common, individual issues. *Id.* at 666 (citing *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016)).

In conducting this analysis, "the merits of the class members' substantive claims are often highly relevant when determining whether to certify a class. More importantly, it is not correct to say a district court *may* consider the merits to the extent that they overlap with class certification issues; rather, a district court *must* consider the merits if they overlap with the Rule 23(a) requirements." *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 981 (9th Cir. 2011) (citing *Dukes*, 564 U.S. at 351-52).

## III. Analysis

The Court first resolves the parties' 702 motions and then turns to the class certification motion.

### A. Okçuoğlu 702 Motion

#### 1. Summary of Arguments

AHM moves to exclude two opinions offered by Plaintiffs' Expert Murat Okçuoğlu as not based on reliable methodology, facts, or data: (1) all 2016–2020 MDXs are equipped with wiring harnesses with the potential for intermittent connectivity issues because they were inspected with a T-1 gauge; and (2) the intermittent connectivity issues resulting from the use of the T-1 gauge create safety risks. Okc. Mot. at 6.

AHM argues that, instead of conducting his own independent investigation and vehicle inspections, Okçuoğlu adopted AHM's internal investigation analysis; but in doing so, he improperly changed two findings. Namely, AHM's study found (1) only *mis*use of the gauge has the potential to deform wiring harness connections, and (2) this applied to 2020 model year vehicles only. *Id.* AHM also disputes whether the range of symptoms experienced by the named Plaintiffs qualify as "safety concerns." *Id.* at 7. AHM contends "[s]ince Mr. Okçuoğlu's opinions do not contain any independent analysis of the T-1 gauge or how it affects the wiring harness, they would not help the jury." *Id.* at 11. AHM avers that no facts or data support Okçuoğlu's opinions that the deformation from the T-1 gauge caused Plaintiffs' issues, or that all 2016-2020 MDXs suffered from the deformation. *Id.* at 14-18. Finally, AHM contends Okçuoğlu is not qualified to offer vehicle safety opinions. *Id.* at 18-21.

Plaintiffs respond that AHM's challenges to Okçuoğlu's analysis are misplaced where he reviewed AHM and third-party vendor documents and oversaw his own independent vehicle inspection and testing. Okc. Opp. at 8. Plaintiffs note that experts may form an opinion based on information provided by others, and he is free to disagree with AHM's conclusions about that information. *Id.* Plaintiffs aver that AHM's challenges misrepresent Okçuoğlu's opinions and challenge his conclusions as opposed to their admissibility. Plaintiffs reiterate that "Okçuoğlu's opinion is that the manifestations—stalling, hesitations, going into limp mode, etc.—relate to deformation of the wire harness caused by use of the T-1 gauge in the Class Vehicle manufacturing process." *Id.* at 10. Plaintiffs note it is undisputed that using the T-1 gauge can cause deformation of the wire harness terminal, resulting in intermittent loss of connection, and no meaningful protocol exists to test the wire harnesses for the deformation other than destructive testing, further supporting Okçuoğlu's analysis. *Id.* at 10-11. Finally, Plaintiffs argue Okçuoğlu's safety issue opinions are well supported by his analysis of Plaintiffs' deposition testimony and AHM warranty data describing defect manifestations. *Id.* at 14. Plaintiffs aver his opinions are supported by decades of experience in the automotive industry, including experience concerning vehicle dynamics, handling, performance, and safety evaluation. *Id.*

**2. Analysis**

The parties do not address the level of *Daubert* inquiry the Court should apply at this stage.[4] The parties appear to agree that expert testimony presented in support of, or in opposition to, class certification must be relevant and reliable. Thus, the Court will apply Rule 702, which codifies *Daubert*, as to admissibility. Under that rule, the Court finds it more likely than not that Okçuoğlu has provided a sufficient basis to support his opinions. *First*, Okçuoğlu has "over forty years of active involvement in automotive engineering, vehicle design, vehicle manufacturing and vehicle testing, including engine management systems, electrical systems, vehicle and engine wiring harnesses." Dkt. 180-2 at 3. Under Rule 702(a), the Court finds this specialized technical knowledge relevant to understanding the evidence.

*Second*, Okçuoğlu's defect-related testimony is based on sufficient facts or data, as required by Rule 702(b). As part of his analysis, Okçuoğlu reviewed documents provided by AHM, Sumitomo Electric Wiring Systems, Inc. (AHM's third-party supplier who assembled the engine wire harness), deposition testimony of AHM representatives, and deposition testimony of Plaintiffs. Dkt. 180-2 at 5; *see also id.* ("This evaluation included individual examination, analysis and testing of the Subject and Exemplar Vehicles' engine wiring harness and related components and relevant parts, inspection, driving and testing of the Subject and Exemplar Vehicles and review of all information and data available (including Honda's and SEWS's own testing and analyses) as well as the Acura Parts Catalogue and Acura Factory Service Manuals.").

Further, he conducted "a design review, physical inspection, operation, analysis and testing of" Plaintiff Marguerite Floyd's vehicle, as well as a 2016 Acura MDX, "including their engine wiring harness and related components." *Id.* Based on these facts and data, the Court finds it more likely than not that Okçuoğlu has provided a sufficient basis for his opinions.[5]

---

[4] This is true for all the 702 motions.

[5] AHM's challenge to Okçuoğlu's conclusion that all MDXs are defective based on use of the T-1 gauge misinterprets Plaintiffs' defect theory, which avers that, because the T-1 was used on all such models, and because manifestations of the defect in the harness wires cannot be identified except through destructive testing, any Plaintiff who bought such a model is subject to manifestation of the defect at any given time. Okçuoğlu's did not purport to, nor was he required to, establish an error rate; his opinions relate to an undisclosed defect at the time of sale, not manifestations thereof. AHM suggests Okçuoğlu's should have conducted causation-based testing, but that was not necessary here where AHM had already identified the cause of the

*Third*, in conducting his examinations, Okçuoğlu "used well-established vehicle and system field performance evaluation methodology and protocols, similar or identical to methods and protocols used by the automotive trade and industry, including automotive manufacturers, automotive system suppliers, automotive component suppliers and automotive service and repair professionals, based on scientific principles." Dkt. 180-2 at 5. Okçuoğlu analyzed AHM's data concerning the problematic T-1 testing procedure and analyzed vendor data to conclude that the procedure was applied to the wire harness in all class vehicles. *Id.* at 7-8. His methodology included considering whether the data supported AHM's conclusions or different conclusions based on, *e.g.*, assumptions AHM relied on such as concluding a DTC code must be present for the defect to be present. This analysis is provided in Okçuoğlu's report, and the Court finds it more likely than not that his testimony is the result of reliable principles and methods, and his opinions reflect a reliable application thereof. *See* Fed. R. Civ. P. 703(c)-(d). AHM may disagree with the conclusions Okçuoğlu's reached, but that is a cross-examination issue not a class certification issue.

A similar analysis applies regarding Okçuoğlu's safety opinion. The Court finds it more probable than not that Okçuoğlu has provided a sufficient basis for that opinion. For example, Okçuoğlu states that, "[f]ollowing an intense 15-year vehicle research and development career with almost all US and European automobile manufacturers, I began conducting detailed systems analyses of vehicle design issues that lead to safety, reliability or utility issues." Dkt. 180-2 at 3. Based on that experience, he concludes that "manifestations such as stalling, engine hesitation, failure to accelerate and the vehicle going into "limp" mode, a limited power mode where only minimum engine and transmission functions are preserved for returning to safety" "give rise to safety concerns." *Id.* at 27. For example, he opines that such manifestations could lead to the defective car being rear-ended, and he goes on to cite NHTSA and other data concerning damage and death caused by such crashes. *Id.* at 27-28. Thus, the Court finds for purposes of the class certification stage, Plaintiffs have carried their burden under Rule 702. *See, e.g.*, *Lytle*, 114 F.4th at 1031.

By way of a Notice of Supplemental Authority, Defendants advise that similar opinions offered by Okçuoğlu were excluded in a different case. *See* Dkt. 246 (citing *In re Honda Idle Stop Litig.*, 2024 WL 5265402, at *2 (C.D. Cal. Dec. 10, 2024)

---

defect and ordered its vendor to stop applying the T-1 gauge in the manufacturing process.

(excluding opinions for lack of independent testing and for failing to describe specific tools and methodologies used)). Plaintiffs respond that the Court should disregard the Notice because it does not present new authority where the cited decision issued eight months before briefing was completed in this case. Dkt. 247. In any event, Plaintiffs aver that, in the *Honda Idle Stop* case, the motion to exclude concerned "two peripheral opinions." *Id.* at 1. As suggested in that opinion, Plaintiffs argue that, in this case, Okçuoğlu not only "provided "sufficient detail about what principles and methods derived from those experiences inform[ed]" his opinions, but also performed his own inspections and testing. *Id.* at 2 (quoting 2024 WL 5265402, at *3).

Although the supplemental authority is not new, in its discretion, the Court will consider it. Having reviewed the *Honda Idle Stop* decision, the Court concludes it does not change the analysis above concerning Okçuoğlu's opinions.

For the foregoing reasons, AHM's Okçuoğlu 702 Motion is **DENIED**.

**B. Motion to Strike Menendez Declaration**

**1. Summary of Arguments**

AHM moves to strike the declaration of third-party witness Federico Menendez, an employee of Sumitomo Electric Wiring Systems, Inc., as untimely disclosed under Rule 26. AHM contends that the declaration was responsive to several discovery requests (*e.g.*, all documents supporting the alleged manufacturing defect; allegations concerning typicality; allegations concerning AHM's knowledge of the defect), but Plaintiffs kept the declaration for three months and did not disclose it until submitting it with their motion for class certification. Menendez Mot. at 3, 5-6. The declaration states, in relevant part, "For the model years 2016 through 2020 Acura MDX vehicles, SEWS's standard operating procedure was to use the T1 gauge to check the terminal gap for every engine wiring harness produced for the entire period of time it produced those harnesses." Dkt. 167-2 at 207. AHM contends this non-disclosure is not harmless because SEWS did not disclose to AHM it used the T-1 gauge through the entire 2016-20 period, and SEWS continues to disagree with AHM whether the T-1 gauge is responsible for the problems. Menendez Mot. at 6-7. In the alternative, AHM seeks leave to depose Menendez and the opportunity to file a further brief opposing Plaintiffs' motion for class certification. *Id.* at 7.

Plaintiffs respond that the motion fails for several reasons, including AHM's long-standing knowledge of Menendez, including working with him through its own

defect investigation, and the fact that AHM was willing to depose Menendez but instead filed its strategic motion to strike his declaration. Menendez Opp. at 1. Plaintiffs aver that declarations are work product until filed, and thus no prior disclosure was required. *Id.* at 1, 4-5. Plaintiffs contend that, despite AHM's knowledge that the SEWS used the T-1 gauge in at least model years 2019-2020, AHM made a "tactical decision" to not ask SEWS about other model years. *Id.* at 2 n.1. Additionally, Plaintiffs subpoenaed Menendez during discovery and provided notice to AHM. *Id.* at 3. AHM also produced to Plaintiffs communications between AHM and Menendez, showing AHM's knowledge that Menendez had relevant information. *Id.*

**2. Analysis**

Federal Rule of Civil Procedure 26(e)(1)(A) imposes a continuing duty to update discovery responses as a party obtains new facts that are responsive. "If a party fails to provide information or identify a witness as required by Rule 26(a) or (e)," Rule 37 provides the penalty for nondisclosure: "the party is not allowed to use that information or witness to supply evidence on a motion … unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1).

Assuming the Menendez declaration is a document under Rule 26, and that it should have been disclosed in a supplemental response to AHM's written discovery, the Court finds that Plaintiffs have demonstrated that disclosing the declaration attached to their motion was substantially justified or harmless. SEWS was a manufacturing partner of AHM, and AHM knew of and was in contact with Menendez before Plaintiffs learned of him. Indeed, SEWS was integral to AHM's internal investigation conclusions. AHM could have met with Menendez further or deposed him as it saw fit. That AHM did not ask SEWS or Menendez about the extent of the T-1 gauge use outside of the 2020 model year was not Plaintiffs' doing.

Moreover, AHM knew that Plaintiffs listed in their initial disclosures employees of third parties, and Plaintiffs issued a third-party subpoena to Menendez. Although Plaintiffs did not proceed with a deposition, AHM could have sought a deposition to follow up on the AHM document production relating to Menendez and ask questions supplemental to the internal investigation. AHM could have requested the deposition during the time between Plaintiffs' motion and AHM's motion to strike. *Compare* Dkt. 166 (August 2, 2024 motion for class certification) *with* Dkt. 176-8 (December 6, 2024 motion to strike).

Since before this case was filed, AHM had unique access to Menedez as a third-party partner of AHM who participated in an in-depth internal investigation. AHM was on notice that Plaintiffs might seek information from him and in turn AHM could have sought whatever information it wanted, including following up on questions it opted not to ask during the investigation.

For the foregoing reasons, AHM's motion to strike is **DENIED**. The Court, however, grants AHM leave to depose Menendez. If AHM believes the evidence obtained through that deposition undermines the Court's reasoning herein, AHM may seek decertification as appropriate.

### C. Boyles 702 Motion

#### 1. Summary of Arguments

AHM challenges the damages model offered by Plaintiffs' expert, Steven Boyles, on the basis that it ignores the probability that the wiring-harness defect exists in a given MDX, instead assuming every wiring harness lacks value even absent the defect. Boyles Mot. at 5. AHM avers that Boyles's damages model does not account for known variations in the proposed class by *e.g.*, adjusting damages for lessees who only paid for a portion of the total value of the vehicle, but making no adjustment for buyers who later sold their vehicles or bought used vehicles, thereby paying less than the full purchase price. *Id.* at 5, 12-14 (arguing violation of Rule 702(d) for arbitrary application). AHM argues "the risk of the alleged defect actually occurring" is a "fundamental aspect[]" of valuation and cannot be omitted from any damages model. *Id.* at 9. AHM contends a "sound valuation method" must consider "the probability a risk will come to fruition, instead of just assuming it will." *Id.* AHM contends this error results in Boyles improperly treating this as an inherent design defect case where every vehicle has the same defect," where it is actually "a manufacturing defect dependent on manifestation." *Id.* at 10. Boyles opines that "the alleged Defect is itself the injury, regardless of whether the faulty part manifests and causes performance issues," but AHM avers this statement "does not actually match Plaintiffs' defect theory nor Mr. Okcuoglu's opinion," or general "benefit of the bargain" principles. *Id.* at 11-12. AHM also challenges Boyles's opinion under Rule 702(b) for being "unable to take into account factual variations." *Id.* at 14. For example, named Plaintiff Brown leased and MDX and then bought it outright at the end of the lease, but AHM observes Boyles's model does not account for the fact that Brown would receive an adjusted damages amount as a lessee and a full damages amount as a later buyer. *Id.* at 15. Finally, AHM challenges Boyles's opinion that consumers expect a defect-free vehicle when data suggests most

vehicles have a defect of some sort and consumers rely on warranty protections, including here where some class members received a wiring-harness repair under warranty already. *Id.* at 16.

Plaintiffs respond that Boyles properly "calculate[d] classwide damages through a benefit-of-the-bargain model," which uses repair costs as a proxy for the difference in value for a defect-free car versus the purchased/leased car. Boyles Opp. at 1; *see id.* at 3-4. Plaintiffs aver that the Ninth Circuit has approved this methodology as sound and reliable. *Id.* at 2, 7. Plaintiffs state there is no difference between the defect in this case, which arose from the same defective manufacturing process applied to every vehicle, and a design defect. *Id.* at 2; *see also id.* at 5-6 (manufacturing process exposed all vehicles to wiring harness defect that may manifest without repair). Plaintiffs reject AHM's challenge regarding probability where "the risk of manifestation is irrelevant because Plaintiffs' theory is that, without being aware of the Defect, Plaintiffs overpaid for their Vehicles at the time of purchase." *Id.* at 2, 6 Where Boyles's methodology focuses on loss at the time of sale, Plaintiffs contend post-sale activity is irrelevant to damages. *Id.* at 2, 8-9. Plaintiffs note that the cost of repair is the same whether Plaintiffs purchased a new or used vehicle. *Id.* at 2, 9. Plaintiffs dismiss AHM's concern that a class member who leased then purchased a car would recover a windfall where AHM's own records could be used to exclude such a buyer from double recovery. *Id.* at 2, 7-8. Plaintiffs contend the relevant inquiry is whether damages are capable of being measured on a classwide basis by tracing each plaintiff's damage to the same injury. *Id.* at 10. Finaly, Plaintiffs argue that Boyles was entitled to assume liability for purposes of calculating damages, supporting his conclusion that consumers expect a defect-free vehicle. *Id.* at 11. Plaintiffs contend this challenge presents a merits issue, and AHM's damages expert does not support with reliable data his counter-conclusion that consumers expect defects. *Id.*

**2. Analysis**

Under Rule 702, the Court finds it more likely than not that Boyles has provided a sufficient basis to support his opinions. Boyles's damages opinion reflects a reliable application of reliable principles and methods concerning Plaintiffs' damages theory. Fed. R. Evid. Rule 702(d). Before attempting to calculate classwide damages, Boyles states his understanding of Plaintiffs' damages theory: "Plaintiffs have brought their claims to obtain the value they bargained for but did not receive as a result of the Defect (*i.e.*, that value of the vehicle they received, with the Defect, versus the value of the vehicle they bargained for, without the Defect)." Dkt. 167-2 ¶ 17. Boyles explains that "Class Members can be made whole and

receive the value they bargained for upon an appropriate remedy of the Defect. Accordingly, a reasonably simple and straightforward approach to make Class Members whole, and to provide them with what they bargained for, is to compensate them for the cost to properly remedy the Defect." *Id.* ¶ 20; *see also id.* ¶ 21 ("Plaintiffs contend that to make them whole and provide Class Members with the defect-free vehicle they bargained for; they are entitled to a payment measured by the cost necessary to cure the Defect. Accordingly, an element of the measure of damages (value that the Class Member bargained for but did not receive) would be a payment in the amount of the average cost to cure the Defect for each Class Member.").

Boyles makes clear that, under his model, the damages issue is not one of performance or manifestation, but rather "the buyer did not receive that for which they bargained," *i.e.*, "the alleged Defect is itself the injury, regardless of whether the faulty part manifests and causes performance issues." *Id.* ¶ 22. Against that backdrop, Boyles offers his benefit-of-the-bargain damage formula that can be applied to all class members. *See id.* ¶¶ 23-28, 36-37. Boyles explains he captured the benefit of the bargain through "employing the commonly utilized Cost Approach to directly value the cure necessary to provide Class Members with the asset for which they bargained. The Cost Approach is not only generally accepted in deriving the value of an asset, it is a required consideration of valuation professionals and appraisal experts in valuing assets." *Id.* ¶ 27. To calculate the cost of repair, he used AHM's warranty database along with publicly available sources regarding average labor rates. *Id.* ¶¶ 40-43. He also applies a different formula for vehicle lessees based on returning the car with a certain residual value. *Id.* ¶¶ 45-50.

Boyles's application of the benefit of the bargain model and cost approach using available data more likely than not provides a sufficient basis for him to offer his opinion on the average repair cost (*i.e.*, damages) to be applied classwide. AHM questions whether Boyles's model matches Plaintiffs' theory. The Court finds that it does: he opines that each class member was subject to the defect at the time of purchase because each vehicle suffered from the same faulty manufacturing step, therefore each class member is entitled to the cost of repair where the defect can manifest in any given vehicle and there is no way to measure for the defect short of destructive testing. The Ninth Circuit has approved this theory for consumer protection claims like those Plaintiffs raise here, including CLRA and Song-Beverly Act claims, noting that "[c]ourts have viewed similar models of recovery favorably in the past." *Nguyen v. Nissan N. Am., Inc.*, 932 F.3d 811, 818 (9th Cir. 2019) (collecting cases). This observation was not limited to design defect cases. Although *Nguyen* involved an alleged defect "regarding the design" of a defective part, the

court approved this damages model where the allegations asserted common proof as to that defect was "substantially the same for all Class Vehicles, and individual factors do not affect whether the Class [V]ehicles were sold with a defective" part. *Id.* at 819.

Further, it was proper for Boyles to assume Plaintiffs can prove liability, as damages experts are required to do. His analysis shows it is more likely than not he reliably applied the principles he cited to the facts of this case.

Similarly, it is more likely than not Boyles bases his opinions on sufficient facts or data where he uses AHM's warranty database and publicly available records concerning average labor rates. Whether other databases may have been available or different labor rates exist in different markets, the question is not whether his calculation is correct, it is whether the model would allow calculation of classwide damages. Boyles explained that with additional sales and lease records, unique factual scenarios can be adjusted under the model (*e.g.*, lessee later purchases vehicle). The need to make limited adjustments does not undermine the conclusion that damages are capable of being calculated on a classwide basis. Plaintiffs have carried their burden under Rule 702 for purposes of the class certification stage. *See, e.g.*, *Lytle*, 114 F.4th at 1031. Other issues raised by AHM can be explored at the merits stage.

### D. Harless 702 Motion

#### 1. Summary of Arguments

In response to Boyles's cost-of-repair damages model, AHM proffers Dr. David Harless, Ph.D., to critique Boyles and offer an alternative damages model. Plaintiffs seek to exclude Harless under Rule 702 based on several asserted methodological errors. *First*, Plaintiffs aver that Harless's overbroad class and repair cost opinions disregard Plaintiffs' theory that injury occurred at the time of sale, including by opining that class members who sold their vehicles before the defect became public were not harmed and focusing on the probability of manifestation. Harless Mot. at 4-6. *Second*, Plaintiffs contend his opinion is unreliable because it relies on deprecation in the real estate market and uses the Volkswagen clean diesel scandal case as a benchmark to conclude that the market prices in news of the defect. *Id.* at 8-9. *Third*, Plaintiffs argue that Harless does not reliably apply his model to the facts of this case where he did not analyze whether comparison vehicles he used to discount damages provide a proper control group. *See generally* Harless Mot.

AHM responds that evidence tending to show that some Plaintiffs received the benefit of the bargain or fair market value in their purchases because they resold their vehicles before the alleged defect was raised thereby passing any overpayment on to a new buyer, is relevant to show Boyles's damages analysis is over-inclusive as to those Plaintiffs. Harless Opp. at 6-7. AHM argues Harless's repair cost opinion focusing on manifestation probability is proper for the reasons it argues Boyles's damages model is deficient. *Id.* at 8-9. AHM contends the studies on which Plaintiffs rely to undermine Harless actually support his opinion in that they suggest if an issue giving rise to a product recall can be repaired for free, it will not change resale value. *Id.* at 13. In sum, AHM argues that Harless's opinions follow basic supply and demand principles, which assume that when word of the alleged defect reaches the market, prices adjust accordingly so consumers are not overpaying. AHM avers that Harless properly relied on the practice of express consumer warranties to fix defects in stating that consumers may expect some level of defects in the cars they buy. *Id.* at 16.

**2. Analysis**

Under Rule 702, the Court finds it more likely than not that Harless's opinions are relevant and reliable for the purposes of assisting the Court with analyzing the class certification motion. Harless's fair market value opinion reflects a reliable application of reliable principles and is offered to rebut Plaintiffs' damages theory. Fed. R. Evid. Rule 702(d). Harless "compar[ed] depreciation of the Subject Vehicles to that of comparable vehicles from other original equipment manufacturers (OEMs) in the respective submarket of luxury midsize SUVs with three seating rows." Dkt. 199-6 (Harless Report) ¶ 8. As Boyles did, Harless assumed Plaintiffs could establish liability. *Id.* Applying these assumptions and considering "prior experience with and other reliable authorities on the used vehicle market," he concluded "any disparity between prices paid versus fair market value under a hypothetical disclosure would subsequently impact used vehicle prices as information about the alleged defect became known." *Id.* He relied on academic and industry literature to inform his opinions concerning how prices adjust to the market. *See, e.g.*, *id.* ¶¶ 9, 20-22.

To the extent aspects of Harless's opinions are in tension with Plaintiffs' damages theory, Harless cannot change the theory. *See, e.g.*, *In re Honda Idle Stop Litig.*, 347 F.R.D. 528, 548 (C.D. Cal. 2024) ("Defendant's arguments about the relevance of ex post events are inconsistent with Plaintiffs' theory of liability," which is "the defect was inherent in each of the Class Vehicles at the time of purchase, regardless of when and if the defect manifested") (citation omitted). The Court, however, can consider his opinions in the context of considering the reliability

of Boyles's damages model. AHM has carried its burden under Rule 702 for purposes of the class certification stage. *See, e.g.*, *Lytle*, 114 F.4th at 1031. Other issues raised by Plaintiffs can be explored at the merits stage.

For the foregoing reasons, Plaintiffs' motion is **DENIED**.

**E. Arora 702 Motion**

**1. Summary of Arguments**

Plaintiffs challenge AHM's technical expert's, Ashish Arora, experiment seeking to test what diagnostic trouble codes (DTCs) relate to the T-1 gauge defect. Plaintiffs aver that Arora's experiment, which caused a *complete* loss of electrical connectivity, did not simulate the defect, which results from an *intermittent* loss of connectivity. Arora Mot. at 1. Arora opined that, when experiencing a throttle body-related DTC and switching into "fail safe" mode, the subject vehicle did not experience sudden deceleration or engine stalling. *Id.* at 2. Further, Arora found that none of Plaintiffs' vehicles experienced throttle body-related DTCs and the reported symptoms are inconsistent with such an issue. *Id.* But Plaintiffs explain the vehicle system logic is designed to ignore brief malfunctions consistent with intermittent connectivity failures such that issues arising from the defect do not result in DTCs or other traces. *Id.* at 4. This also means technical examinations after reported symptoms cannot detect or replicate the problem. *Id.*; *see also id.* at 9 (testing confirmed what AHM knew already: "when there is a complete loss of connection in the terminal lasting more than 250 milliseconds the system generates a DTC and the vehicle enters limp mode," neither of which occurs when the defect manifests). Because Arora tested for on/off connections, Plaintiffs argue his tests are irrelevant to offering insight into the complications of intermittent signals, *i.e.*, they are unrelated to the defect. *Id.* at 7.

AHM responds that even Plaintiffs' expert, Okçuoğlu, concedes the alleged defect can manifest in the way Arora tested. Arora Opp. at 3. AHM contends that, once Plaintiffs learned intermittent connection events lasting less than 200 or 250 milliseconds would not impact vehicle operation, Plaintiffs revised their defect theory to reflect intermittency. *Id.* But whichever definition of defect is applied, AHM argues that Arora's testimony is relevant to at least a subset of vehicles. *Id.* at 4. AHM contends that Arora's testimony is relevant to provide context of AHM's investigation concerning the defect, shows no safety risk, and supports AHM's contentions against class certification. *Id.* at 5-7; *see also id.* at 9-13 (Arora supports AHM's arguments of no common defect; AHM's knowledge evolved over time;

AHM's repairs were sufficient; Plaintiffs' incidents were not caused by the defect and individualized inquiries predominate; etc.). AHM avers that Arora's testing shows that the symptoms of which Plaintiffs complained were not caused by the alleged defect. *Id.* at 7.

**2. Analysis**

Under Rule 702(a), the Court finds it more likely than not that Arora's opinions are relevant for the purpose of assisting the Court with analyzing the class certification motion. The parties' experts agree that the defect can manifest in the way proposed by Arora (*i.e.*, DTC code registering when the connectivity issue lasts longer than 250 milliseconds). *See* Dkt. 186-30 (Arora Report) ¶ 38 & n.13. As stated with respect to Harless, although AHM's expert cannot change Plaintiffs' defect theory, AHM has shown relevance as to at least some aspects of that theory, which also relate to AHM's corresponding knowledge and related defenses. For the purposes of class certification, AHM has met its burden.

For the foregoing reasons, Plaintiffs' motion is **DENIED**. AHM's unopposed motion to provide a supplemental report is **GRANTED**.[6]

**F. Plaintiffs' Class Certification Motion**

**1. Background**

Plaintiffs move under Federal Rule of Civil Procedure 23(a) and (b)(3), which requires that "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy," for an order certifying the following classes of consumers:

- California Class (along with a CLRA sub-class; Song-Beverly implied warranty sub-class; and Song-Beverly express warranty sub-class);
- Louisiana Class;
- Massachusetts Class; and
- Utah Class.

As stated, Plaintiffs allege a defect in the Acura RDX model years 2016-2020, based on the "Drive-By-Wire Throttle System" that uses a gas pedal sensor to adjust

[6] The Court understands this report has been prepared and served.

the amount of fuel delivered through the throttle body. Specifically, Plaintiffs allege that the class vehicles suffered from a manufacturing defect in the engine wire harness resulting from a third-party parts supplier applying a physical tool (T-1 gauge) to quality check the harness terminals, which, ironically, resulted in deforming the terminals, thereby causing reduced terminal spring force, which was not observable without destructive testing. An engine wire harness is a series of terminals, or female connectors, connected through electric wiring to transmit power, ground, and signals.

According to Plaintiffs' expert, Okçuoğlu, there is no "proper" use of the T-1 gauge that would prevent the deformation, loss of spring force, and corresponding electrical resistance. CC Mot. at 5 (citing Dkt. 171-1 (Ex. A) at 7). Therefore, Plaintiffs contend all engine wire harnesses in the class vehicles are subject to the defect. *Id.*

Plaintiffs allege that the electrical connectivity defect in the harness causes uncontrollable deceleration, including hesitation, stalling, shutdowns, going into Limp Mode, or deceleration instead of acceleration, often at highway speeds. AHM sold approximately 294,000 class vehicles nationwide, including 40,103 in California, 2,098 in Louisiana, 8,676 in Massachusetts, and 1,781 in Utah.

### 2. Analysis

In conducting its analysis, the Court begins by observing that, "'Rule 23 does not set forth a mere pleading standard;'" rather, in addition to meeting the Rule 23(a) prerequisites, a party musty "'satisfy through evidentiary proof at least one of the provisions of Rule 23(b).'" *Hernandez v. Christensen Bros. Gen. Eng., Inc.*, 670 F. Supp. 3d 996, 1008 (C.D. Cal. 2023) (quoting *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011) ("*Dukes*")).

The Court finds that Plaintiffs' have satisfied the Rule 23(a) prerequisites by a preponderance of the evidence as set forth below.

#### *a. Numerosity*

Rule 23(a)(1) requires a class to be "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). Although no specific threshold is required, Plaintiffs have satisfied the numerosity requirement by showing that each proposed class ranges from nearly 2,000 to over 40,000 members. *See* Dkt. 171-9 (Ex. I). AHM does not contest numerosity. *See generally* CC Opp.

***b. Commonality***

Rule 23(a)(2) requires "questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). A common question "must be of such a nature that it is capable of classwide resolution—which means that the determination of its truth or falsity will resolve an issue that is central to the validity of each of the claims in one stroke." *Dukes*, 564 U.S. at 350.

Plaintiffs have satisfied common questions of fact where proving their claims requires analysis of the same alleged defect arising from manually inserting the T-1 gauge during the manufacturing process, which, distinct from manual spot checks that may be applied in some assembly scenarios, uniquely applied to every single vehicle over the course of a multi-year period. This implicates the same set of vehicles (Acura RDX model years 2016-2020), and same applicable warranty. *See, e.g.*, *Dukes*, 564 U.S. at 359 ("even a single [common] question will do"); *Wolin v. Jaguar Land Rover N. Am., LLC*, 617 F.3d 1168, 1172 (9th Cir. 2010) ("Appellants easily satisfy the commonality requirement" where "claims of all prospective class members involve the same alleged defect, covered by the same warranty, and found in vehicles of the same make and model"); *MacDougall v. Am. Honda Motor Co.*, 2023 WL 9687349, at *6 (C.D. Cal. Oct. 3, 2023) (commonality met through same alleged defect, same make and model, and same warranty); *Salas v. Toyota Motor Sales, U.S.A., Inc.*, No. 15-cv-08629 FMO (Ex), 2019 WL 1940619, at *10 (C.D. Cal. Mar. 27, 2019) (common issues regarding defect, defendant's knowledge, defendant's omissions, and repair value predominated over individual issues).

AHM's knowledge of and response to the alleged defect are also common factual questions. *See In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Pracs., & Prods. Liab. Litig.*, No. 8:10-ML-2151 JVS (FMOx), 2012 WL 7802852, at *2 (C.D. Cal. Dec. 28, 2012) ("*In re Toyota*") (commonality satisfied where "class members' claims all arise from allegations regarding a common defect," the "claims derive from similar or identical warranties," and the claims "are based on common advertisements and representations regarding their vehicles"); *see also Chamberlan v. Ford Motor Co.*, 402 F.3d 952, 962 (9th Cir. 2005) (affirming common issues regarding defective design, defendant's knowledge, defendant's duty, defendant's failure to disclose, materiality, CLRA violations, etc.).

AHM argues that commonality is not met because the defect caused by human error inserting the T-1 gauge affects very few MDXs. CC Opp. at 8. AHM asserts, "[t]here is no common defect because "mere use of the T-1 gauge does not cause

problems," rather, per AHM's investigation, "occasional misuse by a technician during the 2020 model-year production … could lead to intermittent connections.[7] *Id.* at 10-11. But the Ninth Circuit has "held that proof of the manifestation of a defect is not a prerequisite to class certification." *Wolin*, 617 F.3d at 1173. Thus, "neither the possibility that a plaintiff will be unable to prove his allegations, nor the possibility that the later course of the suit might unforeseeably prove the original decision to certify the class wrong, is a basis for declining to certify a class which apparently satisfies the Rule." *Id.* (quoting *Blackie v. Barrack*, 524 F.2d 891, 901 (9th Cir.1975)). The Ninth Circuit has also cautioned that courts must focus on Plaintiffs damages theory as alleged. *See Nguyen*, 932 F.3d at 819 (defendant and district court "mischaracterized" plaintiff's theory, noting "Plaintiff's theory is that the defect was inherent in each of the Class Vehicles at the time of purchase, regardless of when and if the defect manifested").

Moreover, AHM's assertion ignores Plaintiffs' evidence that all 2016-2020 RDXs were subject to the manual insertion process, not just the 2020 RDXs subject to AHM's investigation. It also ignores Plaintiffs' theory, that putative class members were injured at the time of sale because AHM did not disclose that the 2016-2020 RDX being purchased or leased was subject to this manual process, which may have led to a physical deformity, a deformity that cannot be identified without destructive testing. [8] AHM's commonality argument regarding merchantability fails for the same reason. *See* CC Opp. at 13.

AHM argues its knowledge and repair response cannot be common issues because its knowledge "evolved over time." *Id.* at 12, 13. When and how AHM's knowledge evolved is an issue common to Plaintiffs' consumer fraud claims (and AHM's defenses). For example, AHM's focus on DTC codes and related repairs is

---

[7] Relying on AHM's investigation alone overlooks Plaintiffs' evidence of drivability issues they contend arise from the defect, which would not trigger a DTC or other observable event if the electrical connection was interrupted intermittently for less than 250 milliseconds. In assessing commonality, the Court examines all the evidence, not just the evidence arising from AHM's limited-scope internal investigation.

[8] AHM's argument that it provided effective repairs where most vehicles repaired probably had not suffered from the defect manifesting misses the point. *See* CC Opp. at 14. AHM does not dispute that it did not offer a harness repair to all customers, whether at the time of purchase/lease or thereafter. It also admits it did not inspect the harnesses to check for scratching (*i.e.*, evidence relating to manifestation), which might have informed its decisions on what to repair and when.

relevant to the reasonableness of its response. The fact AHM's knowledge and responses evolved does not make these issues uncommon to the entire class or relevant timeframe. Whether complaints of various symptoms relate to the defect or other potential causes is a merits issue.

### *c. Typicality*

Rule 23(a)(3) requires the claims of the representative plaintiffs to be typical of the claims of the class. Fed. R. Civ. P. 23(a)(3). Typicality is satisfied where (1) "other members have the same or similar injury" as the named plaintiffs; (2) "the action is based on conduct which is not unique to the named plaintiffs"; and (3) "other class members have been injured by the same course of conduct." *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 984 (9th Cir. 2011). The purpose of requiring typicality is to ensure "absent class members will [not] suffer if their representative is preoccupied with defenses unique to it." *Id.*; *see also In re Toyota,* 2012 WL 7802852, at *3 (typicality met where "all the class members allege they have suffered the same injuries based on a common course of [defendant's] conduct," such that "[t]he Class Representatives' claims are thus typical of the class").

Here, all class members purchased or leased a 2016-2020 RDX manufactured by AHM, each of which had the same wire harness subject to the alleged defect based on manual application of the T-1 Gauge. The class members, including the class representatives, may be made whole by having the wire harness in their vehicle replaced, or receiving the value of such a replacement representing the loss in the benefit-of-the-bargain at the time of purchase. Dkt. 171-1, (Ex. A) at 29.

AHM argues, based on the data generated from its internal investigation, that "none of [the class representatives] appear to have suffered a problem stemming from wiring-harness deformation." CC Opp. at 20-21. This argument assumes a jury will accept Arora's analysis concerning how to identify a manifestation of the defect and the resulting symptoms and ignore Plaintiffs' countervailing engineering opinions. It also ignores Plaintiffs' evidence that driveability issues can occur without triggering a DTC based on brief electrical interruptions. These are merits issues that need not be resolved at the class certification stage where the class representative Plaintiffs' drivability allegations are generally consistent with the alleged defect. Further, they are not subject to unique defenses that would defeat class certification. *See, e.g.*, *In re Honda Idle Stop Litig.*, 347 F.R.D. 528, 542 (C.D. Cal. 2024) (typicality not defeated by potential husband-wife standing arguments, statute of limitations arguments, etc.).

### *d. Adequacy*

Rule 23(a)(4) requires that "the representative parties," both named Plaintiffs and their counsel, will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). To determine adequacy, the Court asks: "(1) do the named plaintiffs and their counsel have any conflicts of interest with other class members and (2) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class?" *Ellis*, 657 F.3d at 985.

The Court has identified no conflicts between the named Plaintiffs and their counsel and the rest of the class. The record demonstrates the named Plaintiffs and their counsel will prosecute the action vigorously on behalf of the class, as demonstrated by the named Plaintiffs' participation thus far, including producing documents, responding to discovery, providing their vehicles for inspection, and being deposed. Counsel, who are quite experienced in litigating class action cases, have litigated the matter competently and zealously. *See* Dkt. 171-21 (Ex. U), Dkt. 171-22 (Ex. V). AHM does not contest adequacy. *See generally* CC Opp.

### *e. Ascertainability*

A class must be ascertainable in that its members are readily identifiable. *Keegan v. Am. Honda Motor Co.*, 284 F.R.D. 504, 521-22 (C.D. Cal. 2012).

Class members may be readily identified in this case through vehicle purchase and lease records. This requirement is satisfied and unchallenged.

### *f. Predominance and Superiority*

Even where the Rule 23(a) prerequisites are satisfied, a class action may not be maintained unless the Court finds the questions of law or fact common to class members predominate over any questions affecting individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy. Fed. R. Civ. P. 23(b)(3).

<u>Predominance</u>

The predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation. *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 594 (1997). Although "[t]here is no definitive test for determining

whether common issues predominate," "in general, predominance is met when there exists generalized evidence which proves or disproves an [issue or] element on a simultaneous, class-wide basis, since such proof obviates the need to examine each class members' individual position." *Galvan v. KDI Distrib., Inc.*, SA CV 08–0999 JVS (ANx), 2011 WL 5116585, at *8 (C.D. Cal. Oct. 25, 2011) (alteration in original) (internal quotation marks and citation omitted).

Here, several common factual issues predominate, including whether the class vehicles were subject to a common defect, whether and when AHM learned about this defect, whether AHM failed to disclose the defect, the materiality of the defect, and common damages calculation based on a repair cost model, to name a few. This satisfied predominance. *See, e.g.*, *Wolin*, 617 F.3d at 1173 ("Common issues predominate such as whether Land Rover was aware of the existence of the alleged defect, whether Land Rover had a duty to disclose its knowledge and whether it violated consumer protection laws when it failed to do so.").

There are also several common legal issues, including whether AHM has breached any implied warranty. Although Plaintiffs rely on various state statutes to establish these claims, the statutes in California, Massachusetts, and Utah are each based on adopting UCC § 2-314. *See* CC Mot. at 16 (summarizing provenance of state statutes). Plaintiffs' allegations concerning value and drivability are quintessential implied warranty issues. A similar analysis applies to Plaintiffs' breach of express warrant claims, which state that AHM should have repaired or replaced the wire harness in class vehicles. Both California and Utah base their statutes off of UCC § 2-313, and the sub-class definitions account for additional requirements (*e.g.*, California law requires a plaintiff to present their vehicle for repair at least twice).

As to Plaintiffs' consumer protection law claims, they contend that defects affecting acceleration, deceleration, or the ability to maintain a constant speed are safety defects. Plaintiffs' claims turn on AHM's knowledge (*e.g.*, what did it learn related to this issue in 2014 and what did it do when it became aware of the specific wire harness issue through its internal investigation), resulting responses, and nondisclosures.

AHM argues that Plaintiffs' various state statutory-fraud claims will require individual inquiries at trial, including whether the wiring-harness defect caused the class members' malfunctions; whether and when each class member knew of the wiring-harness issue; whether the wiring-harness defect was material to each class member; and where Plaintiffs bought their vehicles. CC Opp. at 14-16.

The Court finds these proposed individual issues do not undermine predominance. Based on Plaintiffs' benefit-of-the-bargain theory, where the injury occurred at the time of purchase, the injury was paying too much for a car subject to the wiring harness defect, not injury from individual class plaintiffs' driveability issues and manifestations of the defect. The same is true for individual plaintiffs' knowledge and materiality; whether they knew of drivability complaints about a given MDX or MDXs generally is not the same as classwide knowledge of a wire-harness defect that all 2016-2020 models were subject to based on manual T-1 gauge insertion, especially where AHM did not acknowledge and/or respond to the issue publicly.

Turning to Plaintiffs' implied warrant claims, AHM argues that individualized issues such as whether class members still own their MDXs, whether class members have privity with AHM, and whether the defect manifested and/or what experience the drivers had, will need to be resolved. CC Opp. at 16-17. The Court finds that these issues either go to damages or can been resolved through narrowed sub-class definitions (*e.g.*, Plaintiffs' implied warranty claims apply to new purchasers from authorized dealers; Plaintiffs Louisiana claims can apply to purchasers only; Plaintiffs Song-Beverly claims apply to delivery in California only).

Next, turning to Plaintiffs' express warranty claims, AHM argues each class member must proffer evidence that they presented their MDX for repair. CC Opp. at 18-19. AHM contends the California express-warranty class is still over inclusive because the Song-Beverly Act applies to new vehicles only. *Id.* at 19. To the extent Plaintiffs' sub-class definitions are overbroad, this can be corrected.

Finally, turning to damages, AHM reiterates its complaints with Boyles's damages model, such as differences to buyers and lessees and purchasers of used MDXs depending on where they bought their vehicle. CC Opp. at 19-20. These differences may be accounted for using AHM's vehicle records and they do not undermine the predominance of key issues. *See, e.g.*, *In re Honda Idle Stop Litig.*, 347 F.R.D. 528, 548 (C.D. Cal. 2024) ("there may be parts of the liability case that are broader than the model, but the benefit-of-the-bargain damages fit with each class and claim").

<u>Superiority</u>

Rule 23(b)(3) requires "that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy," taking into account

class members' interests in separate actions and the difficulties in managing a class action. Where "classwide litigation of common issues will reduce litigation costs and promote greater efficiency," *i.e.*, "[w]here recovery on an individual basis would be dwarfed by the cost of litigating on an individual basis," the superiority requirement is met. *Valentino v. Carter-Wallace, Inc.*, 97 F.3d 1227, 1234 (9th Cir. 1996. Class actions are appropriate "where no realistic alternative to class resolution exists." *In re Toyota*, 2012 WL 7802852, at *4

This inquiry considers a list of non-exclusive factors including: "(A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action." Fed. R. Civ. P. 23(b)(3)(A)-(D).

Plaintiffs have demonstrated superiority by a preponderance of the evidence where their defect damages theory is based on replacement cost for a single part. Requiring individual cases, each with low damages, would create a wasteful and inefficient scenario for the parties and the courts.

Further, the Court observes that, to the extent the common questions identified above are informed by expert analysis, a class action presents the superior method of resolving these issues. *See In re Toyota*, 2012 WL 7802852, at *4 (superiority "clearly establishe[d]" where "extreme complexity of proof as to the alleged defect" combined with "relatively low value of recovery per Subject Vehicle," plus "little incentive to generate the costly and time-consuming expert evidence needed to assert the claims at issue here in an individual action").

AHM does not address superiority, except to assert that individual lawsuits under California's Song-Beverly Act are feasible for the issues Plaintiffs raise. CC Opp. at 22. Based on its own internal investigation data, AHM asserts the number of resulting cases is "very unlikely" to "overwhelm the courts." *Id.* at 23. Whether some types of individual actions are "feasible" does not answer the superiority question, however, especially where AHM's prediction regarding case volume is based on self-serving data.

Because the Court grants the motion under Rule 23(b)(3), the Court declines to reach Plaintiffs' alternative argument concerning certification under Rule 23(c)(4).

## IV. CONCLUSION

The Court **GRANTS** Plaintiffs' motion for class certification as to the Class defined on pages 3-4 of this order, including the stated subclasses, **DENIES** the parties' respective Rule 702 motions, and otherwise rules as stated on pages 1-2 of this Order.

Within 7 days of receiving the sealed version of this Order, the parties shall provide a copy of the Order showing their proposed redactions for the forthcoming publicly available version of the Order.

Within 21 days of receiving this Order, the parties shall file a further proposed schedule, including the terms and timing of class notice, deadlines relating to motion practice and pretrial filings, and a proposed trial date.

**IT IS SO ORDERED**.