# EXHIBIT 8

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

Case No: 2:20-cv-001796-DAD-CKD

Consolidated with Nos.

2:21-cv-00417-DAD-CKD

2:21-cv-00468-DAD-CKD

VANESSA MILLER, et al., as individuals and on behalf of all others similarly situated,

Plaintiffs,

vs.

FORD MOTOR COMPANY,

Defendant.

_____________________________________

The Video Recorded Videoconference Deposition of

DR. ALLISE WACHS,

Taken at 2723 South State Street, Suite 150,

Ann Arbor, Michigan,

Commencing at 8:40 a.m.,

Friday, May 1, 2025,

Before Leisa M. Pastor, CSR-3500, RPR, CRR.

Veritext Job #8041387

A. Okay. 09:10
Q. -- so let me exclude that question there. 09:10
A. Okay. 09:10
Q. I don't mean to botch it completely. Is opinion 1, which is the statements about what Ford knew, independent of opinions 2, 3, and 4? 09:10
A. It's just that it's -- it's just that opinions 2, 3, and 4 were fully reliant on analyzing Ford's warranty data. Whereas opinion 1 was seeing very high failure rates in internal documents that Ford had seen, so... 09:10
So what Ford had in its documents, I didn't analyze. It was just what Ford had in its documents. Whereas opinions 2, 3, and 4 were my analyses of the warranty data. 09:10 09:11
Q. And was your opinion 1 -- are you offering an expert opinion to a reasonable degree of scientific certainty about what Ford's knowledge was? 09:11
A. Well, all I'm doing is showing that there were Ford documents where their estimates of failure rates were very high. 09:11
Q. I'm not quite sure that answered my question, though. 09:11
A. Okay. 09:11
Q. Are you offering an opinion to a reasonable degree of scientific certainty about what Ford's knowledge was at certain points in time? 09:11



Veritext Legal Solutions
866-299-5127 calendar-ca@veritext.com www.veritext.com

A. Oh, like did they know -- when, like did they know it this year or did they know it at that year? No. 09:11 09:11

Q. Okay. And we'll get into some of the more details later, but I was trying to get an overview. 09:11 09:11

So I think you mentioned that in addition to you, your husband, Steven Wachs, also did some work on the case? 09:11 09:12 09:12

A. We -- 09:12

Q. To support your opinions in some way? 09:12

A. We -- basically when you're doing complex analysis you want to make sure that, you know, there are no mistakes and that we're quality controlling each other, that we're both analyzing it similarly. So that's pretty routine. 09:12 09:12 09:12 09:12 09:12

Q. Okay. So I know these terms actually have -- it can be a term of art in some context, but essentially quality control or quality assurance kind of work? 09:12 09:12 09:12

A. Yes. 09:12

Q. Okay. And I think you mentioned in paragraph 11 that you said data has been formatted and reviewed for reliability analysis and validation by Steven Wachs. 09:12 09:12 09:12

A. Right. 09:12

Q. What do you mean by the data's been formatted and reviewed? 09:12 09:12

A. So the software package requires the data be in a 09:12

this case? 09:21
A. Just that this is not a surprise, but just that Ford was aware of the -- of the issue. 09:21 09:21
Q. Why is whether Ford was surprised or aware of the issue relevant to any opinions that you are offering in this case? 09:21 09:21 09:21
A. It's not relevant to my forecast, but it is just relevant that Ford knew that this was a problem. 09:21 09:21
Q. Is it -- and that's an opinion you hold in this case, that Ford knew that it was a problem? 09:21 09:21
A. Just based on the documents, yes. Based on internal Ford documents. 09:21 09:21
Q. Okay. And so the opinion that you hold that Ford knew it was a problem, is based on your review and interpretation of Ford documents at the time? 09:21 09:21 09:21
A. Yes. 09:21
Q. Based on anything else? 09:21
A. No. 09:22
Q. In reaching that opinion are you doing anything other than reviewing the Ford document and reporting what you understand it to mean? 09:22 09:22 09:22
A. For the opinion or for that the rates were high? Yeah, I just reviewed documents. 09:22 09:22
Q. Okay, so essentially you're reviewing a document, and reporting what you understand it to mean? 09:22 09:22

opinion that you're offering in this case? Or was it more of a -- well, let me just leave it at that. Were you relying on the macro for any of your opinions you're offering in this case? 14:48 14:48 14:48 14:48

A. No. Again, I was using it as just a check to see whether or not -- it was a data integrity issue, just to identify rates were high typically the claims that I was using for my forecast had to do with coolant intrusion. 14:48 14:48 14:49 14:49 14:49

Q. And then you also discussed some testimony from Mr. Brewer and Mr. Knott. Were you relying on their testimony for any of the opinions you're offering in this case? Or was that, again, like your macro, just to check for data integrity? 14:49 14:49 14:49 14:49 14:49

A. Right. That was just a collaboration. I wasn't relying on it. 14:49 14:49

Q. Okay. So here in paragraph 25 -- 14:49

A. Yeah. 14:49

Q. -- you said based on your analysis of Ford's internal documents, Ford's warranty data and testimony from Ford personnel, the failure mode appears to be the same. So I want to break that down. 14:49 14:49 14:49 14:49

So in terms of Ford's internal documents, can you identify any Ford document that says the failure mode's the same for all the class vehicles? 14:49 14:50 14:50

A. Yeah, so the one number, most of these numbers are [redacted] But then there was one example of [redacted] And when I looked at that, it was just the 2013 and '14s. So I wondered why that group was -- when all the other groups were right around [redacted] percent, why that group wasn't. So that's what -- that's what paragraph 92 was about. 15:10

Q. Okay. And then in 93 you say, "Perhaps initially technicians were unaware of a design defect and may not have checked for coolant regularly." 15:10

I mean, not to put too fine a point on it, but that's just a guess, right? 15:11

A. I say "perhaps." 15:11

Q. Yeah. 15:11

A. Yeah. 15:11

Q. You're not offering an opinion one way or the other whether that's the reason? 15:11

A. Correct. 15:11

Q. Okay. So then paragraph 95 we talk about -- you're leading into the discussion with Mr. Brewer or Knott. There you use a little different language. Instead of talking about the failure mode being the same, you say there that the testimony from Ford personnel was the root cause for the coolant intrusion was the same? 15:11

A. I'm only saying that because what they say said. I'm 15:11

not opining on root causes, so I'm just saying what they were talking about. 15:11 15:11

Q. Okay. And there when they're talking about root cause, they were talking about root cause with respect to a particular engine, right? A particular engine size. So they were not equating root cause between the 1.5 and the 2.0-liter for example? 15:11 15:11 15:11 15:11 15:12

A. Well, the last -- the last sentence of paragraph 96, Mr. Brewer testified that the 2.0-liter and the 2.3-liter had the simple root cause. 15:12 15:12 15:12

Q. Okay. So one, neither Mr. Brewer nor Mr. Knott was talking at all about the 1.6; is that -- 15:12 15:12

A. Right. 15:12

Q. -- right? 15:12

And neither of them was suggesting that the root cause for the 1.5 was the same as the 2.3-liter right? 15:12 15:12 15:12

A. Not -- not in here, no. 15:12

Q. Okay. Did you do any -- did you identify what percentage of warranty repairs in your reliability analysis are attributable to the same root cause? 15:12 15:13 15:13

A. Again, I didn't do a root cause analysis, I did a failure mode analysis. 15:13 15:13

Q. Okay. A couple of cleanup questions here. 15:13

So in Exhibit B, the macro explanation, you 15:13

CERTIFICATE OF NOTARY

I, LEISA PASTOR, certify that this deposition was taken before me on the date hereinbefore set forth; that the foregoing questions and answers were recorded by me stenographically and reduced to computer transcription; that this is a true, full and correct transcript of my stenographic notes so taken; and that I am not related to, nor of counsel to, either party nor interested in the event of this cause.

LEISA PASTOR, CSR-3500, CRR,
Notary Public,
Monroe County, Michigan
My Commission expires: 9/7/27