RANDALL W. EDWARDS (S.B. #179053)
redwards@omm.com
O'MELVENY & MYERS LLP
Two Embarcadero Center, 28th Floor
San Francisco, California 94111-3823
Tel: +1 415 984 8700

AMY J. LAURENDEAU (S.B. #198321)
alaurendeau@omm.com
O'MELVENY & MYERS LLP
610 Newport Center Drive, 17th Floor
Newport Beach, CA 92660
Tel: +1 (949) 823-6900

KELSEY M. LARSON (S.B. #267982)
klarson@omm.com
O'MELVENY & MYERS LLP
400 S. Hope St., 19th Floor
Los Angeles, CA 90071
Tel: +1 (213) 430-6000

*Counsel for Defendant*
FORD MOTOR COMPANY

**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF CALIFORNIA**

VANESSA MILLER, et al., as individuals and on behalf of all others similarly situated,

Plaintiffs,

v.

FORD MOTOR COMPANY,

Defendant.

Case No. 2:20-cv-01796-DAD-CKD (Consolidated with Nos. 2:21-cv-00417-DAD-CKD, 2:21-cv-00468-DAD-CKD)

TREVOR NELSON, et al., as individuals and on behalf of all others similarly situated,

Plaintiffs,

v.

FORD MOTOR COMPANY,

Defendant.

Case No. 2:24-cv-02231-DAD-CKD

**DEFENDANT FORD MOTOR COMPANY'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO PLAINTIFFS' MOTION TO EXCLUDE EXPERT OPINIONS OF DR. PETER LILLO AND DR. PETER ROSSI**

Date: September 21, 2026
Time: 1:30 p.m.
Judge: Hon. Dale A. Drozd
Courtroom: 4, 15th Floor

## TABLE OF CONTENTS


Page

I. INTRODUCTION ..... 1

II. SUMMARY OF OPINIONS ..... 2

A. Overview of Dr. Lillo's Opinions and Methodology ..... 2

B. Overview of Dr. Rossi's Opinions and Methodology ..... 2

III. LEGAL STANDARD ..... 4

IV. PLAINTIFFS' MOTION TO EXCLUDE DR. LILLO'S OPINIONS REGARDING FORD'S PRE-RELEASE TESTING SHOULD BE DENIED ..... 4

A. Dr. Lillo Is Qualified to Give an Opinion as to Ford's Testing ..... 5

B. Dr. Lillo's Opinion About the Adequacy of Ford's Testing is the Proper Subject of Expert Testimony ..... 7

V. PLAINTIFFS' MOTION TO EXCLUDE THE OPINIONS OF DR. ROSSI SHOULD BE DENIED ..... 10

A. Plaintiffs Do Not Contest Dr. Rossi's Qualifications ..... 10

B. Dr. Rossi's Used Car Market Analysis Is Directly Relevant to Plaintiffs' Proposed Theory of Damages ..... 11

C. Dr. Rossi's Methodology Is Reliable ..... 15

1. Dr. Rossi's Data Choices Are Methodologically Sound ..... 16

2. Dr. Rossi's Analysis Has Ample Statistical Power ..... 18

D. Plaintiffs' Complaints Do Not Warrant Exclusion ..... 19

VI. CONCLUSION ..... 20

## TABLE OF AUTHORITIES

**Page**

**CASES**

*Ask Chems., LP v. Comput. Packages, Inc.*, 593 F. App'x 506 (6th Cir. 2014) .... 9

*Avila v. Ford Motor Co.*, 796 F. Supp. 3d 593 (N.D. Cal. 2025) .... 8

*Barber v. United Airlines, Inc.*, 17 F. App'x 433 (7th Cir. 2001) .... 9

*Beaty v. Ford Motor Co.*, 2021 WL 3109661 (W.D. Wash. July 22, 2021) .... 6, 12, 15

*Comet Techs. USA Inc. v. XP Power LLC*, 2022 WL 2442810 (N.D. Cal. Mar. 2, 2022) .... 19

*Contreras v. Brown*, 2018 WL 7254917 (D. Ariz. Dec. 4, 2018) .... 8

*Cooper v. Brown*, 510 F.3d 870 (9th Cir. 2007) .... 11

*Dew v. E.I. du Pont de Nemours & Co.*, 2024 WL 4349883 (E.D.N.C. Sept. 30, 2024) .... 19

*Dixon v. Int'l Harvester Co.*, 754 F.2d 573 (5th Cir. 1985) .... 8

*Echevarria v. Caribbean Aviation Maint. Corp.*, 841 F. Supp. 2d 565 (D.P.R. 2012) .... 8

*Eisenbise v. Crown Equip. Corp.*, 260 F. Supp. 3d 1250 (S.D. Cal. 2017) .... 6

*Elosu v. Middlefork Ranch, Inc.*, 26 F.4th 1017 (9th Cir. 2022) .... 4

*Engilis v. Monsanto Co.*, 151 F.4th 1040 (9th Cir. 2025) .... 4

*Est. of Goldberg v. Goss-Jewett Co.*, 2021 WL 5414224 (C.D. Cal. Apr. 19, 2021) .... 17

*Hamm v. Mercedes-Benz USA LLC*, 2021 WL 1238304 (N.D. Cal. Apr. 2, 2021) .... 19

*In re FCA Monostable Elec. Gearshift Litig.*, 382 F. Supp. 3d 687 (E.D. Mich. 2019) .... 14, 15

*In re Korean Ramen Antitrust Litig.*, 281 F. Supp. 3d 892 (N.D. Cal. 2017) .... 7

**TABLE OF AUTHORITIES**
**(continued)**


**Page**

*In re Packaged Seafood Prods. Antitrust Litig.*, 2020 WL 4530744 (S.D. Cal. Aug. 6, 2020) .... 15

*In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Pracs., & Prods. Liab. Litig.*, 978 F. Supp. 2d 1053 (C.D. Cal. 2013).... 6

*Keegan v. Am. Honda Motor Co.*, 284 F.R.D. 504 (C.D. Cal. 2012) .... 10

*Lyman v. Ford Motor Co.*, 2026 WL 1469885 (E.D. Mich. May 26, 2026).... 9

*Messick v. Novartis Pharms. Corp.*, 747 F.3d 1193 (9th Cir. 2014).... 1

*O'Connor v. Ford Motor Co.*, 2026 WL 579329 (N.D. Ill. Mar. 2, 2026).... 15

*PODS Enters., Inc. v. U-Haul Int'l, Inc.*, 2014 WL 12628664 (M.D. Fla. June 27, 2014).... 9

*Rivas v. Preston*, 2012 WL 7782960 (W.D. Tex. Feb. 29, 2012).... 8

*Simmons v. Ford Motor Co.*, 2022 WL 168540 (S.D. Fla. Jan. 18, 2022) .... 15

*Siring v. Or. State Bd. of Higher Educ. ex rel. E. Or. Univ.*, 927 F. Supp. 2d 1069 (D. Or. 2013) .... 7

*Sportspower Ltd. v. Crowntec Fitness Mfg. Ltd.*, 2020 WL 3213704 (C.D. Cal. Feb. 3, 2020).... 4, 19

*Torliatt v. Ocwen Servicing LLC*, 570 F. Supp. 3d 781 (N.D. Cal. 2021) .... 8

*United States v. Holguin*, 51 F.4th 841 (9th Cir. 2022).... 4

*United States v. Sandoval-Mendoza*, 472 F.3d 645 (9th Cir. 2006).... 11

*Walashek v. Air Liquid Sys. Corp.*, 2016 WL 614030 (S.D. Cal. Feb. 16, 2016) .... 7, 10

*Weidman v. Ford Motor Co.*, 646 F. Supp. 3d 928 (E.D. Mich. 2022).... 17

*Wendell v. GlaxoSmithKline LLC*, 858 F.3d 1227 (9th Cir. 2017).... 4

**TABLE OF AUTHORITIES**
**(continued)**

**Page**

*Won v. Gen. Motors, LLC*,
2022 WL 3010886 (E.D. Mich. July 28, 2022) .......... 15

**OTHER AUTHORITIES**

G. Huang & H. Liu, "Estimating expectations-based reference-price effects in the used-car retail market," 19 Quantitative Mktg. & Econ. 457 (2021) .......... 14

*Reference Manual on Scientific Evidence* (4th ed.) .......... 19

**RULES**

Fed. R. Evid. 702 .......... 1, 4, 7

**MEMORANDUM OF POINTS AND AUTHORITIES**

## I. INTRODUCTION[1]

Plaintiffs' objections to Dr. Peter Lillo and Dr. Peter Rossi's opinions are unfounded. Both experts are undeniably qualified through sufficient "knowledge, skill, experience, training, [and] education", and present opinions that are "both relevant and reliable." *See* Fed. R. Evid. 702; *see also Messick v. Novartis Pharms. Corp.*, 747 F.3d 1193, 1196 (9th Cir. 2014). Plaintiffs' motion should be denied.

Dr. Lillo is a licensed mechanical engineer with over twenty years of experience in the automotive field. Unable to question Dr. Lillo's qualifications, Plaintiffs invent a standard out of whole cloth, contending that Dr. Lillo is not qualified because he never was employed by an automobile manufacturer to engage in pre-production testing of an engine that was later used in a production vehicle. But numerous courts have rejected that proposition. Plaintiffs also contend that Dr. Lillo's opinions should be excluded because he relied on engineering documents and Ford engineer deposition testimony—materials that other courts have held can be relied on. Plaintiffs' gambit to exclude Dr. Lillo boils down to the basic fact that they disagree with his opinions. That is not grounds to exclude a reliable and relevant expert opinion.

Similarly, Dr. Rossi is an accomplished economist and statistician who has testified in over twenty-one cases and has over forty years of experience in his field. He relied on widely accepted econometric methodology—differences-in-differences regression—to test Plaintiffs' theory that Plaintiffs overpaid for their Class Vehicles as a result of the alleged defect. Plaintiffs do not and could not dispute Dr. Rossi's qualifications. Rather, Plaintiffs make two primary challenges—that Dr. Rossi's used car market analysis does not "fit" their theory of damages and that his methodology is unreliable—both of which fail on the merits. The Court's gatekeeping function ensures only that expert testimony be based on reliable methodology that is relevant to the issues in the case. Dr. Rossi's opinions easily satisfy both requirements. As to "fit", Dr. Rossi's analysis is directly relevant because it tests the foundational assumption underlying

---

[1] Unless otherwise indicated, all internal quotation marks and citations are omitted and all emphasis is added.

Plaintiffs' damages theory: whether knowledge of the alleged defect would have caused consumers to pay less for their vehicles and its inverse, whether, as a result, Plaintiffs overpaid for their vehicles. As to reliability, Dr. Rossi's methodology is a well-established econometric technique applied to industry standard data, with extensive sensitivity analyses confirming the robustness of his results.

In short, the opinions of both Dr. Lillo and Dr. Rossi easily satisfy the requirements of Rule 702, and Plaintiffs' motion should be denied in its entirety.

## II. SUMMARY OF OPINIONS

### A. Overview of Dr. Lillo's Opinions and Methodology

Dr. Peter Lillo is Ford's technical expert and he offers several opinions on the different designs and performance of the GTDI engines in the proposed class vehicles, different causes and failure mechanisms of coolant intrusion in different segments of the proposed class vehicles, and certain Named Plaintiffs' vehicles and experiences. *See generally* Chalos Decl. Ex. 1 (Lillo Rpt). The only opinion Plaintiffs seek to exclude is his opinion that discussed Ford's pre-release testing. Mot. at 3; Lillo Rpt. ¶¶ 12, 50-52, 148-49, 308. In his report and deposition, Dr. Lillo opined on Ford's testing processes, noting the number of tests run, and the inherent limitations of testing done on a dynamometer, which made it not possible to test for every real-world condition. Lillo Rpt. ¶¶ 50-52. In forming these opinions, Dr. Lillo reviewed Ford's Design Failure Mode and Effects Analysis ("DFMEA") and Design Verification Report ("DVPR") documents (*id.* ¶ 50, Ex. B) among other production documents, including all those that Plaintiffs' technical expert, Dr. Jordan, relied upon in forming his own opinions. Laurendeau Decl. Ex. B, Lillo Rebuttal Rpt. Ex. B.[2]

### B. Overview of Dr. Rossi's Opinions and Methodology

Dr. Rossi was asked by Ford's counsel to assess whether valid economic evidence confirms Plaintiffs' theory that Class Members "overpaid" for Class Vehicles. *See* Chalos Decl.

[2] All references to "Ex." refer to the exhibits attached to the concurrently filed Declaration of Amy J. Laurendeau in Support of Defendant Ford Motor Company's Opposition to Plaintiffs' Motions to Exclude Opinions Relevant to Class Certification.

Ex. 6, (Rossi Rpt.) ¶¶ 7-17; *see also* Chalos Decl. Ex. 8, (Boyles Rpt.) ¶ 17; Dkt. 162-2 at 39. Dr. Rossi conducted a difference-in-differences regression analysis[3] using industry-standard market data from J.D. Power's Values Online database. Rossi Rpt. ¶¶ 24-25, 86. Dr. Rossi compared the depreciation rates of four Class Vehicles—the 2017 1.5L Ford Escape, the 2017 2.0L Ford Escape, and 2017 1.5L Ford Fusion, and the 2017 2.3L Ford Mustang—against carefully selected comparator vehicles, including both non-EcoBoost Ford models as well as competing vehicles from other manufacturers, identified using Consumer Reports and U.S. News & World Report data, across 13 years of monthly data. Rossi Rpt. ¶¶ 71-80. Dr. Rossi also analyzed public disclosure of the alleged engine defect that had occurred at the time of analysis, including YouTube videos, consumer forums, online news articles, NHTSA complaints, and Ford manufacturer communications. *Id.* ¶¶ 21, 27-61. His report documents the volume and intensity of these disclosures, and provides a clear timeline of available sources related to the alleged engine defect. *Id.* Dr. Rossi conducted 42 statistical tests across multiple vehicles, states, and specifications. *Id.* ¶¶ 95-96. Dr. Rossi also conducted extensive sensitivity analyses, including alternative base period lengths, alternative model years, alternative geographic regions, and the inclusion of the COVID-19 period, to validate his findings. *Id.* ¶ 100. Dr. Rossi's regression analysis yielded clear results: the Class Vehicles did not depreciate at a greater-than-expected rate relative to the comparator vehicles, despite the extensive dissemination of information about the alleged engine defect. *Id.* ¶¶ 25, 95-98. In fact, in several instances, the comparator vehicles depreciated faster than some of the Class Vehicles. *Id.* ¶¶ 95-96.

Plaintiffs seek to exclude the entirety of Dr. Rossi's testimony (Mot. at 1), which in sum addresses public disclosure, market efficiency, and the comparative depreciation of Class Vehicles, in order to ultimately conclude that market transactional data does not support Plaintiffs' theory that disclosure of the alleged defect would have reduced the market value of the

[3] A "difference-in-differences" regression analysis a technique that compares a "treatment" group to a "control" group and provides a statistically valid test for any difference in how the two groups respond to a "treatment." Rossi Rpt. ¶ 24 n.28.

Class Vehicles and caused classwide economic injury. Rossi Rpt. ¶¶ 101-103.[4]

## III. LEGAL STANDARD

Under Federal Rule of Evidence 702, expert witness testimony is admissible if (1) the expert's "scientific, technical, or other specialized knowledge" will help the trier of fact, (2) the testimony is based on sufficient facts or data, (3) the testimony is based on reliable methods, and (4) the opinion reflects a reliable application of the methods to the facts of the case. Fed. R. Evid. 702; *see also Engilis v. Monsanto Co.*, 151 F.4th 1040, 1048 (9th Cir. 2025).

While the Rule 702 inquiry is "flexible", the district court "must ensure that all admitted expert testimony is both relevant and reliable." *United States v. Holguin*, 51 F.4th 841, 852 (9th Cir. 2022); *Wendell v. GlaxoSmithKline LLC*, 858 F.3d 1227, 1232 (9th Cir. 2017). "Testimony is 'relevant' if the knowledge underlying it has a valid connection to the pertinent inquiry" and is "reliable" if it is "bas[ed] in the knowledge and experience of the relevant discipline." *Engilis*, 151 F.4th at 1047. If an expert's methodology is sound and relevant, disputes about the degree of relevance or accuracy are not grounds for exclusion. *Sportspower Ltd. v. Crowntec Fitness Mfg. Ltd.*, 2020 WL 3213704, at *2 (C.D. Cal. Feb. 3, 2020). The fact that one could reach a different conclusion about data does not render an opinion inadmissible. *See Elosu v. Middlefork Ranch, Inc.*, 26 F.4th 1017, 1026 (9th Cir. 2022) ("Rule 702 does not license a court to … select between competing versions of the evidence, or to determine the veracity of the expert's conclusions[.]")

## IV. PLAINTIFFS' MOTION TO EXCLUDE DR. LILLO'S OPINIONS REGARDING FORD'S PRE-RELEASE TESTING SHOULD BE DENIED

Plaintiffs argue that Dr. Lillo is unqualified to offer an opinion on Ford's testing and that he did not apply reliable methodology because, Plaintiffs wrongly posit, Dr. Lillo simply repeats testimony from Ford's engineers. Mot. at 4-6. To the contrary, Dr. Lillo has ample qualifications, and his comments about Ford's testing reflect an application of his expertise to assessing the detailed engineering information in the record, including discussing Ford's engineering testimony that informs his opinions.

[4] Dr. Rossi also submitted an rebuttal expert report on June 1, 2026. Plaintiffs are not seeking to exclude the opinions in this rebuttal report.

**A. Dr. Lillo Is Qualified to Give an Opinion as to Ford's Testing**

Dr. Lillo is a licensed mechanical engineer, with over twenty years of experience in the industry, focusing on the fields of automotive technology, engines, thermal sciences and combustion. Lillo Rpt., Ex. A (Lillo CV). His experience with engine issues and testing is extensive. Among other things, he has degrees in automotive engine performance and in mechanical engineering, culminating in a Ph.D. in mechanical engineering from the University of Michigan, Ann Arbor. While working on his Ph.D. thesis, Dr. Lillo performed engine related research and even designed and tested engines for General Motors. Ex. A, Lillo Dep. 84:21-85:2, 99:14-102:14. Much of his work has involved dynamometer testing and helping develop computational models that furthered the development of cleaner and more efficient production engines. *Id*. at 106:24-109:23. Dr. Lillo not only has experience performing dynamometer testing, but also designed dynamometer facilities, which are used to test engines. *Id.* at 238:15-23. After building such facilities, *id*., he spent years collaborating with engine modelers at automobile manufacturers to improve computational models and the design of engines, like those at issue in this matter, *id*. at 87:3-88:19, 99:14-100:3, 101:10-104:14.

There is more: among other professional qualifications, he is an ASE Certified Advanced Level Engine Performance Specialist, a member of the Society of Automotive Engineers, and he has been an Alternate Member: Technical Committee on Internal Combustion Engines (INT-AAA), NFPA 37 Standard for the Installation and Use of Stationary Engines and Gas Turbines from the National Fire Protection Association. Lillo Rpt., Ex. A (Lillo CV). He has experience testing engines in top laboratories including at UC Berkeley, University of Michigan, and Sandia National Laboratories. Ex. A, Lillo Dep. 79:17-81:11. Dr. Lillo also has published more than half-a-dozen peer-reviewed engine-related papers, including in journals such as the International Journal of Engine Research, many of which involve results of engine testing studies designed and performed by Dr. Lillo. *See* Lillo Rpt., Ex. A. In addition, Dr. Lillo is also a trained automotive technician with over twenty years of experience in the industry and has extensive experience in testing, root cause analysis, and product evaluations. *Id*. Dr. Lillo has served as an expert for Honda, FCA, Kia, Hyundai, Mercedes-Benz, as well as Ford, and has served as an expert in many

cases involving engine issues, just within the past four years, including *Stevens v. Ford*, S.D. Tex., Case No. 2:18-cv-00456; *Jamil et al. v. Mercedes-Benz USA*, C.D. Cal., Case No. 2:22-cv-08130-FLA-AJR; *Droesser et al. v. Ford Motor Company*, E.D. Mich., Case No. cv-11744-LJM-APP; and *Baus (Lyman) et al. v. Ford Motor Company*, E.D. Mich., Case No. 2:21-cv-10024-GAD-EAS. Lillo Rpt. Ex. D; Ex. A, Lillo Dep. 67:17-23; 169:21-170:5; 168:23-169:5; 167:24-168:11. Dr. Lillo has also provided opinions related to a manufacturer's pre-production testing procedures in engine cases. *E.g.*, *Lyman*, E.D. Mich., Case No. 2:21-cv-10024-GAD-EAS, Dkt. 227-6; *Stevens*, S.D. Tex., Case No. 2:18-cv-00456, Dkt. 129-5. Dr. Lillo's opinions, related to testing or otherwise, have never been excluded or limited by any court. Ex. A, Lillo Dep. 119:4-15.

Plaintiffs nonetheless contend that Dr. Lillo is "unqualified" to discuss Ford's testing because Dr. Lillo himself has "never been employed by an automobile-manufacturer and never designed an engine, cylinder head, or head gasket that went into production. Mot. at 4. Plaintiffs' standard is simply made up. Plaintiffs have ***zero*** citations to any law imposing a requirement that an expert must have been employed by a particular type of company or that an expert is unable to evaluate engineering issues about pre-production testing absent personal experience designing a specific production component. Plaintiffs' argument has been rejected by myriad other courts. *E.g.*, *Eisenbise v. Crown Equip. Corp*., 260 F. Supp. 3d 1250, 1258 (S.D. Cal. 2017) (expert qualified to opine on reasonableness of manufacturer's forklift design process due to his experience, even though he had "never been employed by a company that designs or manufactures lift trucks, and has never designed any component part of a lift truck"); *In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Pracs., & Prods. Liab. Litig*., 978 F. Supp. 2d 1053, 1089 (C.D. Cal. 2013) (expert's "extensive graduate and undergraduate coursework" rendered him qualified to opine about vehicle's software, even though he was not a software engineer); *Beaty v. Ford Motor Co.*, 2021 WL 3109661, at *3 (W.D. Wash. July 22, 2021) (expert qualified to opine about sunroofs due to his automotive training and experience even though he had "never been directly responsible for designing or engineering a sunroof"). Dr. Lillo's education, first-hand automotive experience, training, and on-point research work

involving engine design and testing render him extremely qualified to opine about the adequacy of Ford's testing of engine components. Fed. R. Evid. 702 (expert witness is "qualified as an expert by knowledge, skill, experience, training, or education").

Plaintiffs also misconstrue Dr. Lillo's testimony when they contend that he is unqualified because he supposedly was unable to testify as to "what conditions are reasonably foreseeable and should be tested prior to release" because he did not have experience "with pre-release modeling or testing for an engine that is actually being prepared to be offered to consumers." Mot. at 5. But Dr. Lillo was not "unable" to testify to conditions that should be tested because of some supposed lack of experience. Rather, as he explained, "I have offered the opinion that it's impossible to test all of the conditions. There are inherent limitations to modeling and testing. And even if – even if you have a really thorough and diligent modeling and testing program, failure modes can arise in the field that – that weren't indicated or found during modeling and testing." Ex. A, Lillo Dep. 93:3-14. Plaintiffs cite no authority that an expert must offer the opinion that the other side wishes him to have for the expert's testimony to be admissible. *E.g.*, *In re Korean Ramen Antitrust Litig.*, 281 F. Supp. 3d 892, 932 (N.D. Cal. 2017) (opinion that did not take position on how prices were set in antitrust case still admissible); *Siring v. Or. State Bd. of Higher Educ. ex rel. E. Or. Univ.*, 927 F. Supp. 2d 1069, 1079 (D. Or. 2013) (report that "by itself" did not prove existence of discrimination still relevant because the opinion was helpful to the jury to prove a fact at issue); *see also Walashek v. Air Liquid Sys. Corp.*, 2016 WL 614030, at *4 (S.D. Cal. Feb. 16, 2016) ("disagreement with [expert's] conclusions is not a basis to exclude his opinion").

**B. <u>Dr. Lillo's Opinion About the Adequacy of Ford's Testing is the Proper Subject of Expert Testimony</u>**

Plaintiffs also are wrong that Dr. Lillo's testing opinion is not proper expert testimony because he relies on Ford's internal documents and witness testimony to form his opinions about the extent of Ford's testing. Mot. at 5. It is true that in forming his opinion regarding testing, Dr. Lillo reviewed testing documents Ford's Design Failure Mode and Effects Analysis ("DFMEA") and Design Verification Report ("DVPR") documents, and he reviewed testimony from Ford

engineers describing the various tests. Lillo Rpt. ¶¶ 50-52. But there is, of course, nothing wrong with experts relying on internal documents and testimony to obtain the underlying facts that they then analyze for their opinions. Indeed, that is what experts should do to have a reliable factual foundation for their analysis. And courts commonly hold that interpreting and relying on internal complex documents can be the proper subject of expert testimony, where, as here, that work underlies an expert's analysis about the subject of the documents based on the expert's skill, training, and experience. *E.g.*, *Avila v. Ford Motor Co.*, 796 F. Supp. 3d 593, 598 (N.D. Cal. 2025) (analyzing "internal correspondence, technical service bulletins (TSBs), NHTSA complaints, and vehicle repair records" proper subject of expert testimony); *Torliatt v. Ocwen Servicing LLC*, 570 F. Supp. 3d 781, 791 (N.D. Cal. 2021) (expert could opine on content of company's loan documents because they used "technical, industry-specific language."); *Dixon v. Int'l Harvester Co.*, 754 F.2d 573, 580 (5th Cir. 1985) (expert permitted to testify when he "examined a set of blueprints of the tractor"); *Echevarria v. Caribbean Aviation Maint. Corp.*, 841 F. Supp. 2d 565, 569 (D.P.R. 2012) (expert's report based on "sufficient facts or data" when he "examined 'engineering reports, deposition testimony, accident site and wreckage photographs, accident investigation reports, helicopter maintenance and historical records, maintenance manual, illustrated parts catalog, and inspection checklists'"); *Contreras v. Brown*, 2018 WL 7254917, at *5 (D. Ariz. Dec. 4, 2018) (rejecting challenge to expert testimony where expert relied on "the accident report, Plaintiffs' depositions, photographs of the vehicles, and online databases with information on the weights of the vehicles to reach his conclusions"); *Rivas v. Preston*, 2012 WL 7782960, at *5 (W.D. Tex. Feb. 29, 2012) (expert permitted to rely on "the depositions of plaintiff and defendant" and other items).

Plaintiffs argue, with no analysis, that Dr. Lillo "parrots" or "wholesale adopt[s]" opinions from Ford's engineers, Mot. at 5, but they do not specify what opinions Plaintiffs believe Dr. Lillo adopted, other than Dr. Lillo accepting what the documents and witnesses showed about the type of tests performed.[5] But Dr. Lillo's opinion is not just a recitation of what the Ford

[5] Plaintiffs also bizarrely complain that Dr. Lillo did not interview any Ford engineers, Mot. at 1, as if interviewing the engineers was categorically required but discussing facts learned from their

witnesses say. Rather, Dr. Lillo explicitly did not rely solely on Ford's witness testimony—he relied on his ample experience investigating and testing engines, as discussed above, as well as Ford's DFMEA and DVPR documents to reach his own conclusion that Ford's pre-release testing "was extensive but that the types of coolant intrusion failure mechanisms at issue take time in service and mileage to develop and could not possible have been identified by Ford immediately after the engines went on the road." Lillo Rpt. ¶ 12. That expert opinion is based on his experience and expertise regarding engine testing and modeling, and it gives helpful context to the trier of fact about the limitations of pre-production testing and modeling, which by their nature cannot replicate every possible real-world condition. *See also id*. ¶¶ 50-52, 149, 178, 308; Ex. A, Lillo Dep. 90:6-91:23. He also provides detailed analysis of the pre-production testing in his rebuttal report. *E.g*., Ex. B, Lillo Rebuttal Rpt. Opinion 1.iii; ¶ 77. Such an opinion is not the result of "parroting" Ford's witnesses, nor is it the subject of lay understanding, but the result of Dr. Lillo's expertise.

Plaintiffs' authorities do not help them: first, *Ask Chems., LP v. Comput. Packages, Inc*., 593 F. App'x 506, 510-11 (6th Cir. 2014), involved an expert who did no analysis of plaintiff's proffered damages estimates and excluded the opinion because there was a "lack of independent verification or analysis of the revenue projections"—which is not the case here, where Dr. Lillo independently analyzed multiple documents, testing protocols, and reviewed witness testimony to come to his conclusions. Second, *Lyman v. Ford Motor Co*., 2026 WL 1469885, at *23 (E.D. Mich. May 26, 2026), involved an expert who lacked expertise in engineering at all, which is not the case for Dr. Lillo. Third, *Barber v. United Airlines, Inc*., 17 F. App'x 433, 437 (7th Cir. 2001), involved an expert who discounted data entirely with no explanation. And fourth, *PODS Enters., Inc. v. U-Haul Int'l, Inc*., 2014 WL 12628664, at *4 (M.D. Fla. June 27, 2014), involved an expert who simply adopted the definition of a word provided to him by counsel and thus did not base his opinion on expert analysis. None of these cases are applicable here, where Dr. Lillo used his training and expertise to analyze and review underlying complex documents and data, as

depositions rendered an opinion improper "parroting."

well as testimony, to reach his own opinion on testing.

Plaintiffs also disagree with Dr. Lillo's opinion that "not every ... possible failure mechanism can be identified prior to release," Mot. at 6, but that does not make Dr. Lillo's opinion inadmissible. Plaintiffs' argument that a Ford document supposedly disagrees with Dr. Lillo's opinion, Mot. at 6, likewise provides no basis to exclude Dr. Lillo's opinion. At best, it is a weak argument for cross-examination. As a threshold matter, Plaintiffs are not clear how Dr. Lillo's opinion contradicts Ford's finding that pre-release testing did not identify the existence of the alleged defect—Dr. Lillo recognized that it is not possible to test for every real-world condition in advance. More fundamentally, merely disagreeing with an expert's opinion, or finding a document that supposedly disagrees, does not mean it should be excluded. *E.g.*, *Walashek*, 2016 WL 614030, at *4. *Keegan v. Am. Honda Motor Co*., 284 F.R.D. 504 (C.D. Cal. 2012), is instructive. In *Keegan*, plaintiffs argued that an expert should be excluded because he did "did not review critical relevant information" and "ignored a key piece of evidence." *Id*. at 519. The court however, rejected that argument, holding "[t]hese arguments, however, essentially attack [the expert's] conclusion, not his methodology or the reliability of his opinions" and denying exclusion because "the merits of plaintiffs' substantive attack … must be resolved by the trier of fact, after assessing all of the evidence and determining which opinions are most credible." *Id*. at 520. Such is the case here—Plaintiffs may disagree with Dr. Lillo's findings, but that does not warrant exclusion under Rule 702, and Plaintiffs cite no law to the contrary. Dr. Lillo's opinion that Ford completed extensive pre-production testing is the proper subject of expert testimony and based on sound analysis.

## V. **<u>PLAINTIFFS' MOTION TO EXCLUDE THE OPINIONS OF DR. ROSSI SHOULD BE DENIED</u>**

### A. **<u>Plaintiffs Do Not Contest Dr. Rossi's Qualifications</u>**

Dr. Peter Rossi is the James Collins Professor of Marketing, Statistics, and Economics at the UCLA Anderson School of Management, with a joint appointment in the UCLA Department of Economics. *See* Rossi Rpt. ¶¶ 1-5, Appendix A. He holds a Ph.D. in Econometrics from the University of Chicago (1984), an MBA from the University of Chicago (1980), and a B.A. in

Mathematics and History from Oberlin College (1976). *Id.* He previously held faculty positions at the University of Chicago Booth School of Business and the Northwestern University Kellogg School of Management. *Id.* Dr. Rossi's qualifications in economics, econometrics, and statistics are extraordinary. *Id.* He has authored over 65 refereed publications in the fields of Statistics, Economics, Econometrics, and Marketing. *Id.* His work has garnered over 27,000 citations on Google Scholar. *Id.* He has been elected a Fellow of the American Statistical Association, a Fellow of the Journal of Econometrics, and an INFORMS Society of Marketing Fellow—distinctions that place him at the very top of his discipline. *Id.* Critically, Dr. Rossi has extensive prior experience as an expert witness in precisely the type of case now before this Court. *Id.* He has served as an expert in numerous consumer protection class actions, product defect cases, and cases involving market prices and transactional data. *Id.* Dr. Rossi's expert opinions have never been excluded by a court. *See* Rossi Rpt. ¶ 5. In this case specifically, Plaintiffs' own rebuttal expert (Dr. Huang), retained to critique Dr. Rossi's analysis, acknowledged Dr. Rossi's extensive experience and work as an economist. Ex. C, Huang Dep. 32:16-33:10.

### B. <u>Dr. Rossi's Used Car Market Analysis Is Directly Relevant to Plaintiffs' Proposed Theory of Damages</u>

Plaintiffs contend that Dr. Rossi's depreciation analysis is irrelevant because he focuses on used car market data while Plaintiffs' damages theory (according to them) is based on new vehicle "benefit of the bargain" damages measured by cost of repair. Mot. at 8. Plaintiffs are wrong. In the expert context, relevance requires that the evidence "logically advance a material aspect of the party's case." *Cooper v. Brown*, 510 F.3d 870, 942 (9th Cir. 2007). An expert opinion testimony, in particular, is relevant if "the knowledge underlying it has a valid connection to the pertinent inquiry." *United States v. Sandoval-Mendoza*, 472 F.3d 645, 654 (9th Cir. 2006). Plaintiffs' relevance argument fundamentally misunderstands both the purpose and significance of Dr. Rossi's analysis, which is in fact relevant to Plaintiffs' theory of damages. Plaintiffs allege they "overpaid" because, had they known of the defect, they would have paid less for their vehicles. *See* Dkt. 162-1 ("Mot. for Class Cert.") at 39 ("Plaintiffs allege they overpaid for their Class Vehicles because Ford did not disclose the Saw Cut Defect at the point of sale[.]"; *see also*

Dkt. 144 ("Second Am. Consol. Compl.") ¶¶ 20, 32, 44, 58, 69, 79, *et cetera* ("As a result of Ford's conduct and concealment of the Engine Defect, [Plaintiff] had overpaid for [his/her] [vehicle].") According to Plaintiffs, putative class members bargained for a defect-free vehicle at the point-of-sale, were denied that bargain and overpaid, and are now entitled to the cost of repair to restore them to their original bargain. Dkt. 162-1 at 39-40. Plaintiffs' theory is, at its core, that the alleged defect affected the value of the Class Vehicles. That is inherently a claim regarding the market value of the vehicle—which Dr. Rossi's analysis directly addresses. As Dr. Rossi explained, "the purpose of [his analysis] is to test the plaintiffs' fundamental theory that if information was known about the alleged defect in the engines…that market values would have fallen greatly." Ex. E, Rossi Dep. at 77:4-13. If knowledge of the defect would cause a reasonable consumer to bargain for and pay less, then that diminished willingness to pay would manifest in observable market transactions—particularly once the alleged defect became widely known. *See* Rossi Rpt. ¶ 20. As Dr. Rossi noted, since the sale of the Class Vehicles, there has been an increasing amount of information regarding the alleged engine defect. *Id.* ¶ 21. Applying an analysis of this increased exposure to information of the alleged defect alongside the used-car market, Dr. Rossi found no circumstances where Class Vehicles depreciated faster than comparators, refuting Plaintiffs' theory that the defect resulted in class-wide economic harm. *Id.* ¶¶ 25-26.

Plaintiffs mischaracterize Dr. Rossi's opinions, wrongly claiming that it they are not relevant to Plaintiffs' claims because of the "fundamental disconnect" between "new and used vehicles"—a contention that their own rebuttal expert denied. Mot. at 8; Ex. C, Huang Dep. 47:16-23 (the "new car market is tightly connected to the used car market."). But under Plaintiffs' "benefit of the bargain" framing, their theory requires that the alleged defect reduced vehicle value—if the defect did not reduce what the vehicles were worth, there was no "overpayment" and no "bargain" was lost at the point-of-sale.

The used car market provides an observable dataset needed to test this premise. Dr. Rossi used the used-car market as a proxy for assessing lower market value: the foundation for Plaintiffs' theory of damages. Rossi Rpt. ¶¶ 18, 20; *see, e.g.*, *Beaty*, 2021 WL 3109661, at *3

(analysis of used vehicle price model was relevant in assessing Plaintiffs' theory of class damages because if there was no drop in used vehicle prices, then "any alleged overpayment that these class members allegedly made at the original point of sale would have been passed on to the buyer of the used Class Vehicles" and "suggests the alleged defect did not move market prices.") By the time of Dr. Rossi's analysis, the alleged defect had been the subject of extensive public disclosure. Dr. Rossi analyzed YouTube videos with over 3 million views, forum posts with over 1 million views, NHTSA complaints, and media coverage. Rossi Rpt. ¶¶ 21, 29-50. If Plaintiffs are correct in their assumption that knowledge of the defect would have caused consumers to pay less for those vehicles, then used car prices should have declined relative to comparable vehicles following these disclosure events. *Id.* ¶ 24.

Dr. Rossi's analysis is highly relevant, regardless of how Plaintiffs characterize their damages theory—whether it's "benefit of the bargain", "cost of repair" or "diminution in value." Plaintiffs' theory rests on the premise that the alleged defect economically harmed consumers by reducing what the vehicles were worth. Dr. Rossi's market analysis provides an objective, transaction-based approach that bears directly on this premise. The Class Vehicles did *not* depreciate at a greater rate than comparator vehicles. In many cases, the comparator vehicles actually depreciated *faster* than the Class Vehicles. This directly undermines the foundational assumption of Plaintiffs' damages model. Put simply, it makes it less likely that knowledge of the defect would affect vehicle market values at the point of sale. That Dr. Rossi tested this using available market transaction data makes his analysis *more* reliable than Plaintiffs', whose expert did not rely on any market evidence to support their theory.

Notably, Plaintiffs' rebuttal damages expert, Dr. Huang, does not dispute Dr. Rossi's central proposition about market values. *See* Ex. C, Huang Dep. 107:22-108:11 ("Q. But you would agree that if it's true the disclosure to the market of information about the alleged defect would impact the value of the class vehicles, then when we look at the prices of used class vehicles, those should be declining faster than the prices for comparator vehicles that are being sold that don't contain the defect, correct? A. So, I-my understanding, and I agree, that disclosing negative information…will lower the consumer's value for the product in question and that will

reduce the demand."); *see also* Ex. D, Rossi Sur-Rebuttal Rpt. ¶ 1 ("Dr. Huang does not dispute the central proposition [] that used vehicle prices reflect consumer perceptions and consumer preferences and, therefore, can be used to directly test whether disclosure of the alleged Engine Defect would cause vehicle prices to fall[.]"). ***Moreover, Dr. Huang himself testified that the "new car market is tightly connected to the used car market."*** Ex. C, Huang Dep. 47:16-23.

In fact, much of Dr. Huang's empirical work used very similar approaches with used vehicle data and there, he accepts the validity of using used vehicle data to test the impact of disclosure on market value—underscoring the relevance and fit of Dr. Rossi's analysis. *See, e.g.*, G. Huang & H. Liu, "Estimating expectations-based reference-price effects in the used-car retail market," 19 Quantitative Mktg. & Econ. 457, 458, 463 (2021) (analyzing used car sales and pricing); *see also* Ex. C, Huang Dep. 49:21-23 ("And in my publication here, Publication Number 4, I used regression analysis of the used car retail market.").

Plaintiffs rely on *In re FCA Monostable Electronic Gearshift Litigation* to argue that expert opinions analyzing the used car market cannot be applied to a damages theory that plaintiffs were deprived of the benefit of their bargain at the point of sale. Plaintiffs' reliance on *In re FCA* is misplaced and runs contrary to the findings in that case. 382 F. Supp. 3d 687 (E.D. Mich. 2019); *see* Mot. at 8. In *In re FCA*, the defendant relied on an economist, Dr. Strombom, to critique plaintiff's damages expert's conjoint analysis and survey related to purported classwide damages. 382 F. Supp. 3d at 692. The court held that an analysis of the used car market could not be used to *estimate or calculate* damages for point-of-sale damages. *Id.* at 695. But the court allowed Dr. Strombom to testify regarding his statistical regression analysis, which showed no evidence of depreciation of class vehicles on the used car market. *Id.* at 696 ("The Court will allow testimony by Dr. Strombom about whether he found any evidence of increased depreciation of class vehicles on the used car market.").

Here, Dr. Rossi was not retained to critique an expert's calculation or estimation of damages—the portion of Dr. Strombom's analysis that the *FCA* court rejected. Rather, Dr. Rossi was retained to test whether market transaction data supports Plaintiffs' foundational premise that vehicle value declines when the defect is disclosed—a distinct and plainly relevant inquiry that

even the *In re FCA* court allowed. *See id.* at 695 ("Dr. Strombom conducted an analysis of the prices of class vehicles on the used car market…that testimony certainly is pertinent to rebut the plaintiffs' claims that they suffered class-wide damages based on increased depreciation of their cars long after the initial sales[.]").[6]

Courts have routinely held that analyses similar to Dr. Rossi's difference-in-differences regression analysis of the used car market are relevant in assessing the viability of plaintiffs' claim of economic injury. *See, e.g.*, *Beaty*, 2021 WL 3109661, at *3 ("Even assuming [expert's] methodology cannot reliably calculate class members' original point-of-sale damages, his analysis of resale data is nonetheless a reliable proxy to determine whether class members who later sold their Class Vehicles suffered any damages.")[7]; *see also O'Connor v. Ford Motor Co.*, 2026 WL 579329, at *14 (N.D. Ill. Mar. 2, 2026) (denying exclusion of expert's analysis of used vehicle values assess classwide damages at the point-of-sale); *Simmons v. Ford Motor Co.*, 2022 WL 168540, at *4 (S.D. Fla. Jan. 18, 2022) (denying exclusion of expert opinion that defect did not have an appreciable effect on vehicle values using trade-in values, rebutting plaintiffs' claim they were denied the benefit of their bargain in purchasing a class vehicle); *Won v. Gen. Motors, LLC*, 2022 WL 3010886, at *7 (E.D. Mich. July 28, 2022) (rejecting exclusion of expert's hedonic regression analysis based on the third-party resale data to determine classwide damages).

### C. **Dr. Rossi's Methodology Is Reliable**

Plaintiffs also assert Dr. Rossi's methods are not reliable—because his sample selection for his used car analysis is insufficient and his model lacks power—and therefore should be

---

[6] Plaintiffs also cite *In re Packaged Seafood Products Antitrust Litigation* for the proposition that expert testimony must relate to the damages theory at issue. 2020 WL 4530744, at *2 (S.D. Cal. Aug. 6, 2020); *see* Mot. at 10. There, the court struck portions of the *plaintiff's* expert's opinion related to damages not alleged in plaintiff's complaint and ordered plaintiffs to amend their complaint as "[p]laintiffs cannot argue that expert testimony is relevant to a claim that is not alleged." *In re Packaged Seafood*, 2020 WL 4530744, at *2. As explained above, Dr. Rossi's opinions are relevant to Plaintiffs' diminution in value theory. *See* Dkt. 144.

[7] Plaintiffs' attempt to distinguish *Beaty* by claiming Dr. Rossi cannot connect an analysis of used cars to news cars is baseless: Dr. Rossi's analysis of the used car market is clearly being used to evaluate Plaintiffs' overall market value claim and the results easily connect to Plaintiffs' new theory of damages. *See* Rossi Rpt. ¶ 14; *see also* Ex. D, Rossi Sur-Rebuttal Rpt. ¶ 1. The court in *Beaty* correctly found that a used car market analysis is helpful to the trier of fact in determining whether an alleged defect affected the market value of the vehicle—the same claim here. 2021 WL 3109961, at *3.

excluded. Plaintiffs are wrong. Dr. Rossi's choice of sample vehicles and time periods is grounded in clear and methodologically sound reasoning. And Plaintiffs have no support for their claim of "low statistical power"—Dr. Rossi showed that his model has high power and produced statistically significant results.

**1. <u>Dr. Rossi's Data Choices Are Methodologically Sound</u>**

Plaintiffs challenge three of Dr. Rossi's data choices: his use of "clean condition" trade-in values, his use of first-of-month pricing data, and his focus on model year 2017 vehicles, arguing these "do not accurately reflect the used car market." Mot. at 11. None of these challenges has merit.

***Clean Condition Values.*** Plaintiffs argue that only selecting "clean condition"[8] vehicles limited Dr. Rossi's depreciation analysis because these vehicles naturally hold their value. Mot. at 11. This is a false premise as vehicle depreciation would still be evident in "clean condition" vehicles if the alleged defect did in fact affect market value. *See* Rossi Rpt. ¶¶ 20, 23-24; *see also* Ex. E, Rossi Dep. 119:22-120:2. The purpose of Dr. Rossi's analysis is to isolate the effect of the alleged defect on vehicle depreciation. Dr. Rossi's use of "clean condition" trade-in values was a deliberate and sound methodological choice designed to control for vehicle condition as a confounding variable. Comparing vehicles of varying conditions—"Clean", "Average", and "Rough"—would introduce a new variable unrelated to the alleged defect and could create correlation without causation. And, as Dr. Rossi explained, selecting "clean" condition reflects the highest quality and most complete data. *See* Ex. E, Rossi Dep. at 118:6-22 ("The bulk of the data is in the clean condition...So clean has the most information behind it"); *see also* Rossi Sur-Rebuttal Rpt. ¶ 1 n.4 ("It would be inappropriate to use other condition types from J.P. Power in my analysis."). Based on his prior experience with used car data, Dr. Rossi testified that even if

[8] "Clean condition" is a term used by J.D. Power to describe the condition of vehicles. Rossi Rpt., Appendix H-2. J.D. Power defines "clean" as "No mechanical defects and passes all necessary inspections with ease; paint, body, and wheels may have minor surface scratching with a high gloss finish; interior reflects minimal soiling and wear, with all equipment in complete working order; vehicle has a clean title history; vehicle will need minimal reconditioning to be made ready for resale." *See* "Frequently Asked Questions," *J.D. Power*, available at https://www.jdpowervalues.com/frequently-asked-questions, last accessed Aug. 25, 2026.

his analysis were redone using the "average" condition, the results would be the same. *See* Ex. E, Rossi Dep. 118:13-25. By holding the vehicle condition constant, Dr. Rossi ensured that any observed differences in depreciation rates are attributable to relevant factors. *See* Rossi Rpt. ¶¶ 85-89; *see also* Ex. E, Rossi Dep. 118:2-25, 128:10-15.

***First-of-Month Values.*** Second, Plaintiffs argue that using trade-in prices for the first day of the month "fails to account for daily supply and demand fluctuations" which therefore limited the accuracy of Dr. Rossi's analysis. Mot. at 11. Plaintiffs offer no explanation of how using daily, rather than first-of-month, data would change the results—nor could they. J.D. Power—the well-respected industry source that Dr. Rossi relied on—reports the same monthly value for all days of the month. Ex. E, Rossi Dep. at 148:3-7 (" J.D. Power reports the same monthly value for all days of the month."). Therefore, "it's immaterial which day of the month that it has." *Id.*

***Focus on Model Year 2017.*** Third, Plaintiffs critique Dr. Rossi's allegedly "narrow selection of used Class Vehicles" when he focused on model year 2017 Class Vehicles for his analysis. Mot. at 11; *see also* Chalos Decl. Ex. 9, Huang Rpt. ¶ 51 (critiquing "small sample size of data used[.]") This misstates Dr. Rossi's analysis. Dr. Rossi's focus on model year 2017 vehicles ensured adequate time-series data spanning the relevant disclosure period while analyzing vehicles that could potentially be affected by the alleged defect. Rossi Rpt. ¶¶ 66-67. Importantly, Dr. Rossi's analysis did not stop there—he also conducted sensitivity analyses using the model year 2013 vehicles, and the results were consistent. Rossi Rpt. ¶ 100. Plaintiffs' challenge to this choice ignores the sensitivity analysis that directly addresses it and Plaintiffs provide no other basis to challenge Dr. Rossi's selection criteria. *See, e.g.*, *Weidman v. Ford Motor Co.*, 646 F. Supp. 3d 928, 931 (E.D. Mich. 2022) ("Any issue regarding the credibility or accuracy of admitted expert testimony goes not to the admissibility of the evidence, but to the weight of the evidence, and can be addressed via cross examination[.]"; *Est. of Goldberg v. Goss-Jewett Co.*, 2021 WL 5414224, at *1 (C.D. Cal. Apr. 19, 2021) ("purported weaknesses of [expert's] opinions are matters for cross-examination, not exclusion[.]").

**2. Dr. Rossi's Analysis Has Ample Statistical Power**

Plaintiffs are also wrong that Dr. Rossi's tests "lack statistical power." Mot. at 12. Relying on their own expert's (Dr. Huang's) analysis, Plaintiffs argue that Dr. Rossi's study "could not accurately distinguish between valid and invalid relations between disclosure of the defect and used car prices[.]" Mot. at 12. But Plaintiffs' challenge to the statistical power of Dr. Rossi's analysis rests on a fundamental misunderstanding of his findings. Statistical power concerns arise when a study *fails to find* an effect, or in other words, when a researcher cannot reject a null hypothesis. Ex. D, Rossi Sur-Rebuttal Rpt. ¶¶ 2-3, 6. In that situation, low statistical power might mean that an effect exists, but the study lacks ample precision to detect it.

Here, Dr. Rossi did not fail to reject a null hypothesis. His regression analysis affirmatively showed that comparator vehicles depreciated faster than Class Vehicles in multiple comparisons—directly contradicting Plaintiff's theory. Rossi Rpt. ¶ 100. The fact that multiple comparators showed statistically faster depreciation, at $p<0.01$ significance levels, demonstrates that Dr. Rossi's model has sufficient power to detect differential depreciation when it exists. Ex. D, Rossi Sur-Rebuttal Rpt. ¶ 6. If Dr. Rossi's model had low power, it would not be able to produce these highly significant results. *Id.*

Moreover, Dr. Huang's statistical power critique is meritless. As Dr. Rossi testified, Dr. Huang did not test Dr. Rossi's power against a damages reduction of appropriate magnitude—a key requirement. *Id.* ¶ 4. Instead, Dr. Huang tested against dramatically smaller values by incorporating arbitrary assumptions about awareness rates and incidence probabilities to reduce the damages values to smaller numbers sufficient to apply his power criticism. Ex. D, Rossi Sur-Rebuttal Rpt. ¶ 4. When Dr. Rossi corrected Dr. Huang's calculations, the results were overwhelming: when tested against the damages that Plaintiffs' own expert asserts each Class Member suffered, Dr. Rossi's analysis had high power. *Id.* ¶¶ 6-7.

Dr. Rossi's analysis is further supported by extensive sensitivity analyses that confirm the reliability of his findings across a wide range of alternative specifications, including:

- Alternative cumulative coefficients summing all post-base-period years;
- Six-month versus twelve-month base periods;

- Model year 2013 vehicles in addition to model year 2017 vehicles;
- California versus Michigan geographical variation;
- Inclusion and exclusion of the COVID-19 period (July 2020-December 2021)

This difference-in-differences regression is a widely accepted econometric method expressly endorsed in the *Reference Manual on Scientific Evidence* (4th ed.). *See Dew v. E.I. du Pont de Nemours & Co.*, 2024 WL 4349883, at *5 (E.D.N.C. Sept. 30, 2024) ("Courts have recognized the difference-in-difference methodology as acceptable under Rule 702") (collecting cases). Dr. Rossi's application of this method—using industry standard data from J.D. Power, carefully selected comparator vehicles, monthly time-series data, 27 vehicle combinations across multiple states, and ultimately 42 total statistical tests—reflects a rigorous and reliable application of accepted practice. *See Hamm v. Mercedes-Benz USA LLC*, 2021 WL 1238304, at *9 (N.D. Cal. Apr. 2, 2021) (finding used car "regression analyses have been frequently accepted by courts within the Ninth Circuit.") (collecting cases).

### D. <u>Plaintiffs' Complaints Do Not Warrant Exclusion</u>

Even if the Court were to credit any of Plaintiffs' criticisms—and it should not—those minor criticisms do not go to the heart of the expert's reliability or relevancy. Disputes over an expert's data choices, the scope of analysis, or the statistical power of a specific test are precisely the type of disagreements courts in this circuit have repeatedly held are best resolved through cross-examination and competing expert testimony, not exclusion. *See Comet Techs. USA Inc. v. XP Power LLC*, 2022 WL 2442810, at *4 (N.D. Cal. Mar. 2, 2022) ("[Q]uestions over the reliability of methodologies are best addressed using cross-examination, not exclusion."); *Sportspower*, 2020 WL 3213704, at *2 ("When the methodology is sound, and the evidence relied upon sufficiently related to the case at hand, disputes about the degree of relevance or accuracy … may go to the testimony's weight, but not its admissibility."). The appropriate remedy for Plaintiffs' (unfounded) weakness in Dr. Rossi's reliable testimony is cross-examination and the presentation of competing expert analysis, not exclusion. *See Sportspower*, 2020 WL 3213704, at *2 ("[E]xcluding expert testimony is the exception, rather than the rule.").

## VI. CONCLUSION

For the foregoing reasons, the Court should deny Plaintiffs' motion to exclude the opinions of Dr. Peter Lillo and Dr. Peter Rossi.

Dated: August 26, 2026

O'MELVENY & MYERS LLP

By: /s/ *Amy J. Laurendeau*
Amy J. Laurendeau

*Counsel for Defendant*
Ford Motor Company