# EXHIBIT A

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| VANESSA MILLER, et al., as individuals and on behalf of all others similarly situated, | )Case No.: )2:20-cv-001796-DAD-)CKD |
| Plaintiffs, | )Consolidated with )Case Nos. |
| vs. | )2:21-cv-00417-DAD-)CKD; |
| FORD MOTOR COMPANY, | )2:21-cv-00468-DAD-)CKD |
| Defendant. | ) |
| TREVOR NELSON, et al., | )Case No. )2:24-cv-02231-DAD-)CKD |
| Plaintiffs, | ) |
| vs. | ) |
| FORD MOTOR COMPANY, | ) |
| Defendant. | ) |

VIDEO-RECORDED DEPOSITION OF PETER LILLO, PH.D.

Friday, May 29, 2026
San Francisco, California

Stenographically Reported By:
Hanna Kim, CLR, CSR No. 13083 (Morning Session)
Suzanne Hull, CSR No. 13495 (Afternoon Session)
Job No. 8235437

Q. How did you learn how to testify in depositions?
MS. SINCLAIR: Object to form.
THE WITNESS: I -- I don't know what you mean by learn by. I mean, I've done depositions. I've answered questions. It's just basically coin- -- question/answer.
BY MR. CHALOS:
Q. Did you ever take a -- a course or do any reading on how to testify in depositions?
A. No.
Q. Anybody at Exponent ever talk to you about how to answer questions in depositions?
A. Oh, I'm sure we discussed depositions at Exponent.
Q. Do you have any kind of informal or formal training for how to answer deposition questions?
A. Not that I recall.
Q. Did you do work for Ford Motor Company when you were at Exponent?
A. I was retained in Ford cases at Exponent and testified in at least one.
Q. What case was that?
A. I think that would be Droesser v. Ford Motor Company.

Q. Okay. What did that -- what product was at issue there?
A. That's a case about CP4 fuel pumps. So fuel pumps in diesel engines.
Q. You testified in a deposition in that case?
A. Yes.
Q. Okay. Did you work on any other Ford cases when you were at Exponent wherein you were disclosed as an expert?
A. I don't recall.
Q. Do you recall giving any other testimony on behalf of Ford Motor Company when you were at Exponent?
A. Let me consult my testimony list before I answer.
Q. Yeah, your testimony list goes back four years. I'm asking beyond four years. I'm asking just in general.
A. The only one that I recall is -- I suppose it's called Stevens -- my apology -- Stevens v. Ford Motor Company was the CP4 fuel pump case that I testified in while at Exponent.
Q. Okay. You don't recall testifying in any other cases on behalf of Ford Motor Company while

you were at Exponent?
A. No.
Q. Did you, while you were at Exponent, testify in any other cases, period? Not just Ford cases, any others?
A. Yes.
Q. On how many occasions did you give testimony when you were at Exponent?
A. I don't recall the exact number, but I -- I think if you were to look at my testimony list, Employers Mutual Casualty v. Roll-Rite was probably the last deposition I gave at Exponent. And that was in February 2024. So everything prior to that would have been at Exponent.
Q. What was that case about?
A. That's a vehicle fire case.
Q. Okay. And then the earliest deposition listed on your materials considered -- and we'll talk about these in some more detail later today -- is a case in July of 2018 In Re Dollar General Corp. Motor Oil Marketing and Sales Practice.
Did you testify in any depositions for any party prior to 20- -- the July 13th, 2018, deposition listed here?
A. I don't think so.

program? Is that 2005?
A. It may have been a little earlier --
THE COURT REPORTER: Did you say "may have been"? Did you say "may have been"? I just didn't hear you.
THE WITNESS: When?
MR. CHALOS: I think he did, but we -- let me try it again. Let's -- we'll just clear it up.
BY MR. CHALOS:
Q. When did you finish this school program? Was that in 2005?
A. I don't have years listed on my CV. It would have been, I think, possibly a little bit before then. The -- the date that I have for the AS degree may have been shortly after I finished the program because the AS degree required more than just the automotive aspect of it. There were general ed classes, English, math, classes such as that.
So I would say it was probably a little bit before 2005.
Q. Got it.
And then you worked at Dirks Automotive Transmission and -- Transmission Repair in Oroville, California, for two years; is that right?

A. Yeah, that sounds correct.
Q. When you were at JP Automotive and Dirks Automotive, did they specialize in any particular type of vehicle?
A. No. Those were both general automotive repair shops. JP Automotive, completely general, just about every type of vehicle.
At Dirks, I was also the technician. I was one of -- eventually we had two. But I was basically the technician doing all of the general repair.
That's also a -- a transmission repair shop, so we had lots of technicians who were focused on transmissions. But I was the -- the general repair tech there who did everything bumper to bumper on any type of vehicle that came in the door.
Q. Okay. And then you enrolled at University of California, Berkeley?
A. Yes, then I -- I transitioned into engineering -- engineering. So I took -- I took some of the general ed courses and the math and the science courses that I needed to transfer to Berkeley at Butte College in Oroville.
Q. Mm-hmm.
A. And I then transferred to UC Berkeley

where I ended up getting a bachelor's degree in mechanical engineering, a minor in chemical engineering.

And when I was there, I also got into engine research. I was working at an engine research laboratory.

Q. Okay. What -- what kind of engines did you work on there in that laboratory?

A. A variety of different types of engines. I think one of the bigger projects I worked on was -- it was a gasoline spark-ignited engine where I set up the test cell. We were experimenting with skip-fire technology, so technology where you shut off cylinders, deactivate cylinders, in order to improve efficiency. So I was taking some advanced measurements and I built up a test cell.

But we had a variety of different projects going on. We had, you know, some weird ones, like hydrogen and argon engines. And -- and we had some more typical ones like I was just talking about, just automotive gasoline engines.

Q. Okay. And then you -- you got your undergraduate degree in engineering from Berkeley?

A. Yes, bachelor in mechanical engineering, minor in chemical engineering.

Q. Okay. And then you went to University of Michigan from there?
A. Yes, ultimately I went to University of Michigan both while at Berkeley and then for a little period after.
At the time that I was studying at Berkeley I also worked at Sandia National Labs at their engine research center. So I did engine-related research for a while there and then entered the Ph.D. program at the University of Michigan.
Q. Oh, I see.
So you got your master's on your way to getting your Ph.D.?
A. I got my master's and Ph.D. from University of Michigan, but I -- I did some research in between -- basically between my bachelor's and when I went to University of Michigan and some of that research during my undergraduate studies as well.
Q. Got it.
Did you have a focus for your Ph.D. program?
A. Yes. So I was in the thermal sciences -- thermal fluid sciences track at the University of

Michigan mechanical engineering Ph.D. program, and my focus -- my research focus was on automotive engines and ways to make them cleaner and more efficient. So I was doing research and collaboration with General Motors.

Q. Have you ever worked for an automaker?

A. Not directly for. I have not been employed by an OEM, but for the last decade I've been consulting in -- in the automotive fields and in other fields.

And, as I mentioned, I did engine-related research for a number of years, including during my Ph.D. studies, in collaboration with automotive OEMs in the industry.

Q. Did you ever do any work with Ford?

A. You're talking during the years I was doing research?

Q. I suppose. Whatever you're talking about.

A. When I was doing engine-related research, I don't recall doing any research specifically with Ford.

Q. Why did you not go to work for an automaker after you finished school?

A. I got a great job offer from Exponent. I -- you know, I started my career in automotive

repair where I really enjoy diagnostics and failure analysis.

Exponent, their roots -- you know the company used to be called Failure Analysis Associates. They do a lot of failure analysis. So technically it was a perfect fit, and I -- I enjoy investigating technical challenges and issues, so I accepted a job with them.

Q. Were you always based out of the Menlo Park office with Exponent?

A. Yes.

Q. Were you ever offered a job by an automaker?

A. I don't recall applying for a job or being offered a job by an OEM.

Q. You're using the term "OEM."

What does that mean?

A. I'm talking about auto manufacturers. Original equipment manufacturer.

Q. So, for example, General motors, Ford Motor Company, Fiat Chrysler, those -- or FCA, those are OEMs?

A. Yes.

Q. Okay. Are you a statistician?

A. No, I don't consider myself a

statistician. As an engineer, I've taken statistics class. And engineers, we widely use statistics, but I don't consider myself a statistician.

Q. Okay. Do you -- you're not a lawyer; right?

A. I'm not a lawyer.

Q. Okay. Are you an accountant?

A. No.

Q. Are you an economist?

A. No.

Q. Okay. You have some publications listed here in Exhibit 3. I count eight publications.

Let's start with the first one in time, the 2011 where you're listed as the last author on the SAE technical paper.

What is the subject matter of that paper?

A. Yeah, this is a paper -- SAE is Society of Automotive Engineering. This is a paper about diesel engines and strategies that can be used to reduce the amount of soot that they produce.

Q. Have you ever designed an engine for an automaker?

A. I have designed aspects of engines used for research. For example, during my graduate studies I built the engine cell that I was working

in and the -- and that was in collaboration with General Motors, but those were research engines.

Q. Have you ever designed an engine that went into production by an automaker?

A. Not one that went into production. The engines that I was working with then were research engines.

Q. Okay. The next paper you've got listed here from 2012 was another SAE technical paper, "Diesel spray ignition detection and spatial/temporal correction."

What is that about?

A. That is also a paper about diesel engines, diesel sprays, and -- and measurements that can be made to better understand diesel combustion.

Q. Okay. The next paper there in the Journal of Physical Chemistry says "Plenoptic single-shot 3D imaging of an in-cylinder fuel spray geometry," and then I guess German words.

What's all that?

A. Yeah, it's published in the Journal -- Journal of Physical Chemistry in -- in a German journal.

Q. Did you write that paper in German?

A. I did not.

Q. Do you speak German?
A. I don't.
Q. Me neither.
What's that all about, though, that paper?
A. That paper is about imaging flows inside engines, ways of understanding flows inside engines.
Q. So you were able to photograph fuel spray in an engine cylinder?
A. Yes. We were using cameras that are capable of reconstructing in three dimensions to image flows inside cylinders to understand velocities, directions, things of that sort.
Q. Okay. That -- it says "International Journal of Engine Research in Press."
What does that mean? Sorry. I'm -- okay. My mistake.
So you have the 2015 Journal of Physical Chemistry paper.
And then the next paper you have listed there looks like -- well, what is the next paper?
A. The next paper is also about looking at flows inside engines.
Q. And was that actually published?
A. Yes.
Q. Okay. Have you ever designed a cylinder

head that went into production by an automaker?
A. No.
Q. Have you ever designed a head gasket that went into production by an automaker?
A. Not that went into production, but I -- I did design the head gaskets that were used on research engines.
Q. And none -- none of the research engines that you ever designed ever went into production; is that right?
A. No, not that I'm aware of. The -- the research was to im- -- you know, improve the cleanliness and efficiency of engines. So aspects of the research were hopefully used to forward the performance of production engines, but the research engines were not put into vehicles. They were for research purposes.
Q. Okay. Are you aware of any of the research that you did specifically being used by an automaker to forward the performance of any production engines?
A. It's -- a lot of it certainly went to forward the -- the modeling abilities and efforts of auto manufacturers.
So I was working in close collaboration

with General Motors and particularly modelers at General Motors who were trying to more accurately model what's going on inside an engine.

So I was performing a lot of experiments that helped validate and guide their modeling efforts, which then those models are used -- obviously the purpose of the research is for those models to be used to -- to better build engines, to better design them.

Q. Okay. Are you aware of any of your research specifically being used by General Motors or any other automaker in production engines?

A. I don't know specifically what aspects have been used for production engines. I know it's been used to improve their models, which presumably they have then used to improve their production engines, but I -- the research that I was doing was in collaboration with -- with researchers, so it was not directly in production engines.

Q. Automakers use modeling to test engines preproduction; is that right?

A. Yes. They -- they use modeling to aid in the design of many components and systems.

Q. And what's the purpose of that?

A. Well, models, if properly designed and

calibrated, can provide a lot of insight that you can't get through measurement.

For example, if -- if you have a model -- model of in-cylinder flows or in-engine flows and it's an accurate model, you can assess the flows throughout the system just using a computer, where it would take an incredible amount of effort to do the same through measurement. And measurements are also inherently intrusive.

So one thing you get out of models is insights that you just can't get from -- you know, that you just can't get or you can't get with ease from experiments.

You can also in some cases run a lot more models than experiments. You can accelerate models. So there's lots of advantages to using models. And I think the entire industry is using a combination of modeling and experimentation or testing.

Q. Mm-hmm. Is one of the purpose of using models on engine's preproduction to simulate foreseeable conditions that the engine will experience in the field?

A. Yes, you're trying to understand the conditions -- the conditions that the engine's going to experience, the temperatures, pressures, things

that are difficult to recognize through experimentation or testing.

Q. That's something that all the automakers are doing these days?

MS. SINCLAIR: Object to form.

THE WITNESS: My understanding is that all major auto manufacturers are using both modeling and testing in the design and validation process.

BY MR. CHALOS:

Q. What's the difference between modeling and testing?

A. Well, modeling is typically done on a computer, and testing is done with physical components.

Q. And one purpose of preproduction testing is also to simulate foreseeable real-world conditions that the engine would experience in the field; right?

A. Yes. They're -- they're trying to test the engine under conditions that it's going to experience on the road.

Q. And that's a prudent thing for an engine manufacturer to do; right?

MS. SINCLAIR: Object to form.

THE WITNESS: I agree. It's prudent to

do, and my understanding is all of them do them.

Obviously both testing and modeling have limitations -- inherent limitations, but it's -- they're both good things to do.

BY MR. CHALOS:

Q. What are the inherent limitations?

A. You can't -- you can't test an engine under every condition it's going to experience on the road.

If you just think about different --

Q. Mm-hmm.

A. -- people driving different vehicles in different environments --

Q. Mm-hmm.

A. -- the drive cycles that the vehicles undergo are going to be unique from person to person. It's -- it's not possible to test all the conditions.

Q. Mm-hmm.

A. And there's -- there's inherent limitations to every type of testing in terms of what you can physically do, the amount of time you have, lots of factors.

Q. The goal of preproduction modeling and testing is to simulate the reasonable foreseeable --

reasonably foreseeable conditions that the vehicle would experience; right?

A. I mean, they're doing the testing to understand how the -- how it's going to perform on the road or during preproduction. Sometimes they're going through revisions of -- of designs and testing how those different designs perform.

Q. In other words, there's an inherent limitation that for modeling and testing they can't test every possible condition; right?

A. I agree. They cannot test every possible condition.

Q. But what they're supposed to do is test the reasonably foreseeable conditions; right?

MS. SINCLAIR: Object to form.

THE WITNESS: Do you mind repeating that?

BY MR. CHALOS:

Q. Sure.

What automakers should do in modeling and testing is they should evaluate the reasonably foreseeable conditions that the engine would experience in the field?

A. I haven't formed opinions in this case on every con- --

THE COURT REPORTER: One second.

I have or haven't? I --

THE WITNESS: Haven't.

I haven't formed opinions in this case in every condition that a manufacturer should test their engine.

I have offered the opinion that it's impossible to test all of the conditions. There are inherent limitations to modeling and testing.

MR. CHALOS: Mm-hmm.

THE WITNESS: And even if -- even if you have a really thorough and diligent modeling and testing program, failure modes can arise in the field that -- that weren't indicated or found during modeling and testing.

BY MR. CHALOS:

Q. What should an automaker do when that happens?

A. Investigate the issue and, you know, try to resolve it.

Q. Should they stick their customer with the bill?

MS. SINCLAIR: Object to form.

THE WITNESS: I don't have financial opinions with regards to that.

BY MR. CHALOS:

Q. What about an engineering opinion?
MS. SINCLAIR: Object to form.
THE WITNESS: I -- stick them -- stick them with what bill? I don't -- I don't see that being as an engineering -- I guess an engineering topic. I don't think I fully understand what you're asking.
What -- what bill are we talking about?
BY MR. CHALOS:
Q. The bill to fix the failure mode that arises in the field.
A. There --
MS. SINCLAIR: Object to form.
THE WITNESS: There are so many different types of failure modes with so many different root causes.
From an engineering perspective, I'm not analyzing the economics of it.
MR. CHALOS: Okay.
THE WITNESS: I'm -- I'm analyzing the technical aspects of it.
BY MR. CHALOS:
Q. Okay. So you do not intend to at trial offer any opinions regarding the economics associated with repairing the class vehicles'

preproduction modeling or testing?
A. I -- I don't recall discussing goals in -- in my report.
Q. Okay. Well, as you sit here today, do you have an opinion about that?
A. It's -- it's just such a vague question I'm not sure I -- I even understand it.
Manufacturers have many different goals when -- when doing preproduction modeling and testing. They're trying to design their engines to perform well on the road. They're revising the design of components. They have -- they have lots of goals.
I'm not sure I -- I understand. Are you asking me whether I've put together some comprehensive list of every goal?
Q. No. I'm asking whether you intend at trial to offer an opinion about what the goals of preproduction modeling and testing should be?
MS. SINCLAIR: Object to form.
THE WITNESS: In a vague sense, no. But if you have some example of a goal, I --
MR. CHALOS: Mm-hmm.
THE WITNESS: -- I might discuss that.
BY MR. CHALOS:

Q. Okay. Is one of the goals of preproduction modeling and testing for automakers to test the reasonably foreseeable conditions that an engine would experience in the field?

A. I have done no analysis of reasonably -- the definition of reasonably foreseeable. They test their engines under many different conditions.

Q. Mm-hmm.

A. And I think in this case the Ford deponents have described performing hundreds of tests on the subject engines before producing them. But I have not specifically tried to define reasonably foreseeable conditions and analyzed that.

Q. Have you ever done preproduction modeling for an automaker?

A. I am not myself a modeler, but I worked with modelers for quite a number of years who were modeling engines, trying to improve the models used for production of engines. So I've worked quite extensively with auto manufacturer modelers.

My role in those collaborations has been more as the experimentalist helping guide their modeling effort.

Q. This is for the experimental engines when you were in school?

A. This was -- this was for research engines, but it was in collaboration with modelers who were modeling engines for auto manufacturers.

Q. Okay. And have you ever worked for an auto manufacturer directly --

A. I have not been employed by an auto manufacturer. I've collaborated with them. I've worked in the automotive industry, but I haven't been directly employed by an auto manufacturer.

Q. What do you mean you've worked in the automotive industry?

A. Well, I've been working as an automotive engineer for -- you know, for the last ten years as a consultant.

Prior to that, I was doing research in collaboration with auto manufacturers.

And then prior to that I was a technician working hands on. That wasn't directly with the manufacturers, but that was with their products, with the vehicles.

So I've been working in the automotive industry for more than 20 years.

Q. Okay. And when you define "automotive industry," you're talking about your work at Exponent and your work at Lillo Engineering?

A. No. And the work prior to that. The work I did as a researcher. And I would consider the automotive repair industry part of the broader automotive industry as well.

Q. Okay. So let's talk about the OEMs, as you -- you've called them.

That's the --

A. Yes.

Q. -- auto manufacturers? Okay.

Have you ever been hired by an auto manufacturer to work on preproduction modeling for a vehicle that has actually gone into production?

A. I have worked with modelers at automotive manufacturers to help improve the models that they use for that process.

So they have been using models that could be used on production, engine, design. I've been working on the research side of that helping them improve those models.

Q. You're currently doing that?

A. Not currently. That's what I did when I was working in research.

Q. Okay. And this is when you were in school?

A. And at Sandia National Labs.

Q. That was between college and graduate school?
A. Yes.
Q. Okay.
A. And some of it was also during school.
Q. Okay. Have you ever been hired by an automotive manufacturer to work on preproduction testing for any vehicle that's gone into production?
A. Not a production vehicle. I was working with research engines.
Q. That's the same work you were just talking about with General Motors?
A. Yes, with General Motors, and then I did work at Sandia as well.
Q. Okay. And that's what we just talked about when you were in school and when you were between college and graduate school; right?
A. That. And then at UC Berkeley I was also working in collaboration with a company. It was a supplier and not a manufacturer.
Q. Okay. And did any of that work involve a production -- a vehicle that went into production?
A. The -- the work at UC Berkeley we were working with production engines, so the engines that we were doing testing on were production engines.

But the research work was on research engines, not production engines.

Q. Okay. What -- what production engines were you working with at UC Berkeley?

A. I don't recall anymore.

Q. These were passenger vehicles?

A. Yes.

Q. These were engines that were being tested preproduction?

A. No. They were post-production, but we were testing different control techniques that could be used to improve their performance.

Q. Were any of those techniques actually put into production that you're aware of?

A. The company I was collaborating with, I know that they did eventually work with automotive manufacturers and -- but to what extent the exact techniques I worked with --

Q. Mm-hmm.

A. -- were utilized by industry, I don't know.

Q. They may have been, or they may not have been?

A. I know that the general concept was. But the specifics of the engine and the testing that we

were doing when I was there, I don't know if that was or not.

Q. What is the general concept?

A. It was skip-fire concept. So it's basically shutting off a few cylinders at times, which allows you to keep the throttle valve open on the engine a little more and reduces pumping losses and improves the efficiency --

Q. Did you invent --

A. -- of the engine.

Q. -- did you invent that?

A. No, I did not invent that, but I was -- I was doing testing of those sorts of strategies and helping them refine them.

Q. Okay. Let's go back to Exhibit 3.

I'm looking at your publications here. "Lillo PM, Topological development of homogenous charge and stratified charge flames in an internal combustion engine."

And this is your Ph.D. dissertation; is that right?

A. Correct.

Q. Okay. What does all the -- what do all those words mean?

A. It is a very technically strong title.

Basically it's -- it's a -- it's -- it's a study of flames propagating in engines and discussion of technical topics related to flame propagation in engines and improving the cleanliness and efficiency of them.

Q. Okay. What's "homogenous charge"?

A. That's a well-mixed charge. So in most gasoline engines you mix air and fuel together before you burn it --

Q. Mm-hmm.

A. -- so it's well mixed, and we call it homogenous.

Q. Meaning each charge has the same mix?

A. Not necessarily, but the air and the fuel are mixed together.

Q. Oh, I see.

And what is a "stratified charge"?

A. Stratified charge is where you have different amounts of fuel and air in different parts of the cylinder. So it's -- it's kind of a -- it's kind of a mixture of diesel and gasoline processes.

And stratified charge can be used to improve the efficiency of engines.

Q. Are you aware of any automaker using your work reflected in your Ph.D. dissertation in any

production engine?
A. A stratified charge is used in production engines.
Q. The concept of stratified charge?
A. The concept of stratified charge.
Q. Did you invent that?
A. No, I did not invent the concept. But in research in all of these fields there's a lot of researchers who work really hard to forward these technologies.
They're -- a lot of the technologies are -- are in the research phase because they have challenges associated with them, which are not easy to overcome. So I was part of a -- you know, a field of experts who are working in -- in the area of stratified charge --
THE COURT REPORTER: Dr. Lillo, could you slow down a little bit, please.
Thank you.
THE WITNESS: -- to try to forward -- try to forward that field as a whole, and it has been used in production.
BY MR. CHALOS:
Q. Your work has been used in production?
A. Stratified charge -- is what I'm saying is

my work is part of a much bigger puzzle. There's -- there's big challenges associated with a lot of alternative combustion approaches and I'd say advanced engine designs.

And so researchers, like what I was doing at the time, a collection of researchers collectively address these problems and move the ball forward so that the technologies can make it into the field in production.

Q. So my question is more limited than that.

Has the work that's reflected in your Ph.D. dissertation, are you aware of any automaker using your work in a production vehicle?

A. Well, the work in my dissertation was in collaboration with General Motors. And working with them, I saw them making changes to their modeling approach based on what I was finding in my studies.

So I know that their models are a little better because of the work that I did.

Q. Okay. What changes did General Motors make to its models based on your work?

A. Oh, there are so many -- so many specific changes, so I would be --

Q. I'm sorry, there are so many specific changes that General Motors made to its modeling

based on your work?

A. Yes, that we were -- that we were working with. So we were working with a group that was doing something called large eddy simulation --

THE COURT REPORTER: Something called "large eddy"?

THE WITNESS: -- large eddy simulation, which is advanced modeling approach that can more accurately simulate in-cylinder flows and different aspects of engine performance.

And I was meeting with researchers on -- on a regular basis comparing -- comparing my results with their models.

And quite often their models would be off because it's challenging to -- to model the things that they were trying to do.

So we would work on revising their models so that their models would more closely match the test results.

And part of the purpose of my thesis as well was to identify some of the limits that they run into in modeling and different modeling approaches so that they could, you know, use their models appropriately and understand what can and cannot be modeled with certain types of -- of --

we'll say certain types of models.

BY MR. CHALOS:

Q. So what changes did they make based on your work?

A. They improved their models.

Q. Okay. How?

A. So a lot of it would be things like the temperatures that they would be predicting would be off by a lot. So I would measure the temperature. They would model the temperature. We would look at the specific models that they were using. And we would discuss how we could better model it.

There's often -- modelers often have a variety of options for the types of sub-models that they can use. And we would try to figure out which ones were best so that they could apply it so that ultimately, in the end, the models were accurately predicting what we were actually seeing in the engine.

And so I would see -- over the period of my Ph.D. work, for example, we would start with a model that would have an inaccuracy at first, and we'd end with a model that was more accurate.

Q. Okay. So other than this temperature issue, what other ways did your work in your mind

that's reflected in your Ph.D. dissertation lead to General Motors changing its models?

A. Well, we were -- temperature was one example of one parameter. Flow was another one. Sprays was another one. General engine performance, what -- sort of the pressures that we were getting out of the engine was another one. Heat transfer.

There were lots of -- lots of aspects of the process that we were testing and they were modeling, and we were working together to forward their modeling effort.

Q. Who is "we"?

A. It would be myself --

Q. Mm-hmm.

A. -- my Ph.D. advisor, other people who were in our laboratory, and researchers at General Motors.

Q. Who was your Ph.D. advisor?

A. Dr. Volker Sick.

Q. How do you spell that?

A. S-I-C-K.

Q. Where is Dr. Sick?

A. He's at the University of Michigan.

Q. Did he work for General Motors?

A. I don't believe he's ever worked directly

A. Well, I've published reports as a consultant, both in consulting cases and in litigation cases.
Q. And what do you mean when you say "published"?
A. Well, produced. Wrote a report, usually signed it at the bottom, dated it.
Q. Okay. So let me, then, ask it more specifically.
Have you published anything, other than the papers that are listed here, in any kind of peer reviewed publication, in other words, a scientific journal or something of that nature?
A. Not in scientific journals, no.
Q. Okay. How about in books, textbooks? Something like that.
A. No.
Q. So when you say you published reports, you mean, you've drafted them and then produced them to the person who hired you to create the report?
A. Yes. I drafted them. Finalized them, produced them as -- as a consultant in either litigation or non-litigation matters.
Q. When you're talking about reports in litigation, you're talking about your Rule 26 or

whatever the state equivalent of that report?
A. Expert reports.
Q. Okay. Okay.
Well, since you brought it up, have you ever had any of your opinions successfully challenged on a Daubert or a state equivalent standard?
A. No.
Q. Do you understand what I mean by that?
A. I -- I think I do. And, no, I'm not aware of any of my opinions or reports ever being excluded.
Q. Okay. Have you ever had your opinions limited by any court?
A. No.
Q. Have your opinions ever been challenged in any court under the applicable evidentiary standard, whether it's Daubert or some state equivalent?
A. I don't know what standards they use to challenge it, but I've had my opinions challenged, never successfully.
Q. And you've never -- we covered this earlier, I believe.
You've never presented your opinions in any trial; is that right?

A. Correct.
MR. CHALOS: Let's mark this as the next numbered exhibit.
(Lillo Deposition Exhibit 4 was marked for identification.)
THE COURT REPORTER: Exhibit 4.
BY MR. CHALOS:
Q. Okay. I've handed to you what we've marked as Exhibit Number 4. I'll represent to you that this was attached to your March 2026 report.
Can you tell the jury, please, what this document is?
A. This is the list of materials that I considered when preparing my expert report.
Q. Does this document, Exhibit 4, contain all of the materials that you considered in connection with your opening report in this case?
A. It is certainly intended to. I -- I did note that I also have a bunch of footnoted references in the documents. And I intended to include all of those footnotes in the back here. But, yes, that was my intent to -- for this list to be inclusive.
Q. Okay. Looking at this Exhibit 4, is there anything that you considered in connection with your

and Safe Fleet Acquisition Corp.; is that right?
A. Correct. At least one of those two entities. I think it was counsel for Roll-Rite. I'm not sure if they have a relationship with Safe Fleet. I'd have to go back and check.
Q. Okay. Well, you listed here you were hired by John Zidow from Strong & Hanni, counsel for Roll-Rite and Safe Fleet Acquisition Corp.
Do you see that?
A. Yes.
Q. Okay. So do you think you were hired by both of those companies?
A. Based on that note, I think so, yes.
Q. Okay. You gave a deposition there?
A. Yes.
Q. And that was a vehicle fire case?
MS. SINCLAIR: Object to form.
THE WITNESS: Yeah, that was a -- a case involving a cement truck that caught on fire in a warehouse.
BY MR. CHALOS:
Q. Was anybody injured in that fire?
A. I'd have to go back and remind myself, but I don't think so.
Q. And do you know what happened with that

case?
A. It's awaiting trial.
Q. Is it set for trial?
A. It was set for trial and then something happened and they delayed trial, I think, until sometime next year.
Q. Okay. The Graves, et al., versus Smitty's Supply Company, is that different from the other Smitty's company -- other Smitty's Supply case that we talked about?
A. It's a different lawsuit. It's a similar topic. It's about allegations that a tractor hydraulic fluid product damaged all the equipment it was used in.
Q. Okay. And that was the deposition you gave in May of 2024?
A. Yes.
Q. Is that case still ongoing?
A. I don't think so.
Q. Okay. And in that case you testified for the defendant?
A. Yes. I was retained by counsel for Smitty's.
Q. The next case here is Jamil versus Mercedes Benz, and you gave a deposition in May of

2025 in that case; is that right?
A. Yes.
Q. And you were hired by counsel for Mercedes Benz?
A. Correct.
Q. And what's the nature of that case?
A. That case involves piston failures and allegations related to piston failures.
Q. In what vehicles?
A. It's a variety of different makes and models that have the M274 engine.
Q. Is that case ongoing?
A. I think so.
Q. Okay. And you gave testimony on behalf of Mercedes Benz in that case?
A. I did.
Q. Do you know who the plaintiffs' lawyers are in that case?
A. I don't.
Q. Do you remember who deposed you?
A. I don't.
Q. Okay. All right.
The next case, Baus, B-A-U-S, v. Ford Motor.
You were hired by Ford Motor in that case?

A. I was hired by counsel for Ford Motor Company.
Q. Okay. And what's the nature of that case?
A. That case involves allegations related to oil consumption in engines.
Q. And you gave a deposition on behalf of Ford Motor Company in August of 2025?
A. I gave a deposition in August 2025.
Q. Okay. Was that on behalf of Ford Motor Company?
A. Well, I don't know what you mean by "on behalf." I was retained by Ford Motor Company --
Q. Okay.
A. -- or counsel for Ford Motor Company.
Q. Do you remember who the plaintiffs' lawyers were in that case?
A. I think Steve Calamusa took my deposition for that case.
Q. Was that in person, or was it on Zoom?
A. That was on Zoom.
Q. Okay. The next case here, Droesser versus Ford Motor, you gave a deposition in Apr- -- I'm sorry, October 2025; is that right?
A. Correct.
Q. Okay. And who -- you were hired by

counsel for Ford Motor Company in that case?
A. Yes.
Q. Okay. And what's the nature of that case?
A. That case pertains to a high pressure fuel pump used in diesel engines.
Q. What is the allegation in general there?
A. I mean, there's lots of allegations. It's -- that -- that matter is related to the Stevens matter that we discussed earlier. But that's a nationwide class action instead of a state class action.
Q. Okay. And that involves fuel pumps in diesel engines?
A. Yes.
Q. And you gave a deposition in October -- I may have asked you this -- in October of 2025 in that case?
A. Correct.
Q. Okay. And you were hired by Ford's counsel there?
A. Yes.
Q. Do you remember who the plaintiffs' lawyers were in that case?
A. No.
Q. The next case is In Re: Kia Hyundai

Vehicle Theft Marketing Sales Practices and Product Liability Litigation - Government Entities Track; is that right?

A. Correct.

Q. Okay. And you were hired by whom in that case?

A. I was hired in that case by Hyundai.

Q. And what's the nature of that case?

A. That case is related to the Kia Boyz method of theft and Kia Boyz thefts and the allegation that certain vehicles are too easy to steal.

Q. Did you say "Kia voice"?

A. Kia Boyz.

Q. What does that mean?

A. Oh, there's a social media trend that was started by a group called the Kia Boyz.

Q. Oh, I see, Kia Boy- -- like B-O-Y-S --

A. B-O-Y- --

Q. Okay.

A. B-O-Y-Z.

Q. Ah. I should have known that.

Boies means something different to us in our legal world. We think of some other guy named Boies, but...

A. Yes.
Q. Okay. Does it -- what does it mean?
A. You would have to ask Ford as for exactly what their definition of the permanent and corrective action is.
Q. You are here as Ford's engine expert, aren't you?
A. I am here as an expert retained by Ford, but their exact definition of terms -- I can explain to you what they did, the technical effect of what they did, but as to the acronyms they like to use or the specific words they like to use, that is a question for Ford, not for me.
Q. You looked at a lot of Ford documents, at least you said you did; right?
A. I have looked at lots of documents produced in this matter by Ford, by the plaintiffs -- lots of documents.
Q. And you didn't see anywhere in there a definition for permanent and corrective action?
A. I don't recall a precise definition for permanent and corrective action. I have seen the term.
MR. CHALOS: Let's take a break.
THE VIDEOGRAPHER: This is the end of media

number four.

We are off the record at 2:58 p.m.

(Short recess taken.)

THE VIDEOGRAPHER: This is the beginning of media five.

We are going back on the record at 3:13 p.m.

BY MR. CHALOS:

Q. What is a dyno?

A. It is a shortened abbreviation for dynamometer. Sometimes I describe that as, like, a treadmill for an engineer. It is a device that you attach the engine to. The engine is stationary but it drives the dynamometer, and the dynamometer acts as a load to simulate usage.

Q. Have you ever used a dynamometer?

A. Many times. I have designed dynamometer cells.

Q. You have designed what?

A. Dynamometer cells.

Q. What is that?

A. Basically, the entire test setup for dynamometers, a variety of different types of dynamometers.

Q. Have you ever designed a dyna- -- dynamometer for an auto maker?

A. I wouldn't say directly for an auto maker. I have designed a dyno cell that I used in graduate school, which was in collaboration with an auto maker.
Q. When Ford concluded what the root cause was of the coolant intrusion issue in the 1.5 liter engines, do you believe that Ford made a distinction between the 1.5 liter engines with the auto start/stop and the engines without auto stop/start?
A. I think that they found that the vast majority of repairs for any of the 1.5 liter engines that occurred due to coolant intrusion were caused by coolant boiling within the saw cut; so the same failure mechanism.
Q. Once corrosion begins at the bore bridge area is there any way to reverse it?
A. Not that I am aware of. You are not going to be able to reverse the corrosive damage. It may -- if it is minor damage, it may not progress; so you may be able to continue to use an engine with some corrosive damage for a long period of time or maybe even the life of the vehicle. But it is not going to heal itself.
Q. So if there is coolant -- if there is a pathway for coolant to get from the saw cut into

CERTIFICATE OF REPORTER

I, Hanna Kim, a Certified Shorthand Reporter, do hereby certify:

That prior to being examined, the witness in the foregoing proceedings was by me duly sworn to testify to the truth, the whole truth, and nothing but the truth;

That said proceedings were taken before me at the time and place therein set forth and were taken down by me in shorthand and thereafter transcribed into typewriting under my direction and supervision;

I further certify that I am neither counsel for, nor related to, any party to said proceedings, not in anywise interested in the outcome thereof.

Further, that if the foregoing pertains to the original transcript of a deposition in a federal case, before completion of the proceedings, review of the transcript [X] was [ ] was not requested.

In witness whereof, I have hereunto subscribed my name.

Dated: 3rd day of June, 2026

______________________________

Hanna Kim

CLR, CSR No. 13083