# EXHIBIT B

PROPOSED TO BE FILED UNDER SEAL – PUBLIC REDACTED VERSION

**Lillo Engineering, Inc.**
5610 Scotts Valley Dr.
Suite B, PMB 571
Scotts Valley, CA 95066

# Expert Rebuttal Report of Peter Lillo, Ph.D., P.E.

---

## Vanessa Miller et al. v. Ford Motor Company,
## U.S.D.C. Eastern District of California,
## Case No.: 2:20-cv-01796-DAD-CKD

## and

## Trevor Nelson et al. v. Ford Motor Company,
## U.S.D.C. Eastern District of California,
## Case No.: 2:24-cv-02231-DAD-CKD

Prepared for

Randall Edwards, Esq.
O'Melveny & Myers LLP
Two Embarcadero Center, 28th Floor
San Francisco, CA 94111

Prepared by

Peter Lillo, Ph.D., P.E, A.S.E. Master Certified Technician
Principal Engineer
Lillo Engineering, Inc.

April 17, 2026

Lillo Engineering Project No.: 250647

# Contents


| | Page |
|---|---|
| **Declaration of Peter Lillo, Ph.D., P.E.** | **1** |
| **Summary of Opinions** | **2** |
| **Dr. Colin Jordan's Claims** | **4** |
| Dr. Jordan's Unfounded Theory of Defect | 6 |
| Dr. Jordan Fails to Acknowledge the Substantial Differences in the Design of the Subject Engines and Vehicles and the Impact Those Differences Have on the At-Issue Failure Mechanisms and Rates | 10 |
| Dr. Jordan Has Not Identified Anything Unreasonable About Ford's Design and Development Process | 11 |
| The 1.5- and 2.0-liter Coolant Intrusion Failure Mechanisms Have Different Root Causes (Neither of Which is Dr. Jordan's Theory of Defect) | 15 |
| Dr. Jordan's Disregard for CSP 19B37 (Mitigation of the 1.5-Liter Coolant Intrusion Failure Mechanism) is Unwarranted | 22 |
| Dr. Jordan's Assumption that 1.6-liter Subject Engines Have Experienced Widescale Coolant Intrusion Concerns is Inaccurate | 23 |
| Dr. Jordan's Claim that Ford Had (or Should Have Had) Early Awareness of At-Issue Coolant Intrusion Failure Mechanisms is Baseless | 25 |
| Dr. Jordan Overstates the Rates Associated with Subject Engine Coolant Intrusion | 27 |
| Dr. Jordan Overstates the Severity of Symptoms Associated with Subject Engine Coolant Intrusion | 28 |
| Dr. Jordan Has Not Investigated the Cause of the Named Plaintiffs' Repairs | 32 |
| Dr. Jordan's Attempt to Assess Cylinder Head Gasket "Leak Potential" Based on Appearance Lacks a Reliable Methodology | 32 |
| Dr. Jordan's Repair Opinions are Flawed | 39 |
| **Spoliation of Evidence by Plaintiffs' "Consulting" Expert Richard Hille** | **41** |
| **Exhibit A: Curriculum Vitae of Peter Lillo, Ph.D., P.E., A.S.E. Master Certified Automotive Technician** | **A-1** |
| **Exhibit B: List of Materials** | **B-1** |
| **Exhibit C: Testimony of Peter Lillo, Ph.D., in the Past Four Years** | **C-1** |

# Declaration of Peter Lillo, Ph.D., P.E.

I, Peter Lillo, declare as follows:

1. My name is Peter Lillo. I am the Principal Engineer at Lillo Engineering, Inc. an engineering consulting company located in Scotts Valley, California. I completed my B.S. (U.C. Berkeley), M.S. and Ph.D. (University of Michigan - Ann Arbor) in Mechanical Engineering, my minor in Chemical Engineering (U.C. Berkeley) and my A.S. in Automotive Chassis Systems, Automotive Engine Machining and Services, and Automotive Engine Performance. I am a licensed Professional Engineer in the State of California. I am also an ASE Master Certified Automotive Technician and have worked as a master technician in automotive and transmission repair shops. My experience includes the design and failure root cause analyses of products, including automotive engines and their components. I have personally diagnosed and repaired thousands of automotive issues, including engine coolant intrusion concerns and cylinder head gasket failures.

2. Attached and marked as **Exhibit A** to this Declaration is a copy of my current curriculum vitae. Lillo Engineering currently bills my time at the rate of $395 per hour. My compensation is not contingent on the outcome of this matter.

3. A list of materials that I considered for the preparation of this report are provided in **Exhibit B**. A list of my prior testimony in the last four years is provided in **Exhibit C.**

4. This rebuttal report has been prepared in the matters of *Vanessa Miller et al. v. Ford Motor Company*, U.S.D.C. Eastern District of California, Case No.: 2:20-cv-01796-DAD-CKD (Consolidated with Nos. 2:21-cv-00417-DAD-CKD, 2:21-cv-00468-DAD-CKD) and *Trevor Nelson et al. v. Ford Motor Company*, U.S.D.C. Eastern District of California, Case No.: 2:24-cv-02231-DAD-CKD. The scope of services performed during this evaluation may not adequately address the needs of other users of this report, and any re-use of this report or its findings, conclusions, or recommendations presented herein are at the sole risk of the user.

5. I produced an initial expert report for these matters on March 20, 2026, that contains analysis and opinions, which remain true and acute. Since then, I received and reviewed the initial reports produced by other experts in these matters, including the report produced by Dr. Colin Jordan, which counsel for Ford Motor Company has asked me to analyze and respond to.

6. The opinions in this Declaration are provided to a reasonable degree of engineering certainty. I reserve the right to supplement this Declaration and to expand or modify opinions based on review of additional material as it becomes available through any additional work, or review of additional work performed by others. I understand that I may be asked to prepare additional reports to address issues as they arise in the future.

7. At trial, I may provide exhibits including excerpts from reference books, treatises and standards, documents produced by all parties in the matter as well as charts and diagrams illustrating my analysis and opinions. I may also present my analysis and opinions that are discussed and shown in this, and prior, reports for the matter.

## Summary of Opinions

8. The following is a summary of my opinions in this matter. It is noted that this summary cannot contain all my technical evaluations, analyses, conclusions, and recommendations. Hence, this summary shall remain attached to and is intended to be read along with the main part of this report.

9. Opinion 1: Dr. Jordan's opinions are flawed for the below reasons:

i. Dr. Jordan's theory that the saw-cut feature in the subject engines is a "defect" is inconsistent with the evidence, including that other manufacturers have successfully implemented saw-cut cylinder block designs in their engines.

ii. Dr. Jordan fails to acknowledge the differences in design between the 1.6-liter, 1.5-liter, 2.0-liter, and 2.3-liter subject engines and how those design differences impact the undisputed differences in failure mechanisms and warranty rates among the four at-issue engines.

iii. Ford reports performing an extensive amount of preproduction modeling and testing of the subject engines, of the type typically performed throughout the industry (e.g. component, engine, and vehicle level testing). Dr. Jordan critiques the processes that Ford used when designing and developing the subject engines, but does not report studying those processes, nor has he identified anything unreasonable about them or how they differed from accepted standards.

iv. The 1.5-liter and 2.0-liter coolant intrusion mechanisms have different root causes, neither of which align with Dr. Jordan's theory of defect. The root cause for the 1.5-liter subject engine failure mechanism was the combination of factors that led to coolant boiling within the engine block assembly. As discussed in my initial report, that boiling was found to primarily occur when the engine was shut off while warm and coolant ceased to circulate through the block, which frequently occurs during automatic engine start-stop events. The underlying root cause of the 2.0-liter subject engine coolant intrusion failure mechanism, which also affected some 2.3-liter subject engines to a lesser extent, were the factors that led to cylinder head gaskets wearing at a higher-than-expected rate.

v. Dr. Jordan baselessly denies that Ford's Customer Satisfaction Program ("CSP") 19B37, which provided a software update to reduce instances of boiling in the saw-cut, was effective in reducing the need for coolant intrusion repairs for the 1.5-liter vehicles.

vi. Dr. Jordan's assumption that 1.6-liter subject engines experienced widespread coolant intrusion concerns is unsupported by data or evidence. Both Plaintiffs' and Ford's warranty experts found rates of coolant intrusion approximately 10 times lower in the 1.6-liter than 1.5-liter engines, and Dr. Jordan has not identified even a single 1.6-liter repair that is attributable to either the 1.5- or 2.0-liter subject engine failure mechanisms.

vii. Dr. Jordan's claim that Ford had early awareness of at-issue coolant intrusion failure mechanisms is baseless. Dr. Jordan identifies no evidence that Ford was aware of instances of the coolant-intrusion failure mechanism that occurred during the pre-production process of designing and testing the subject engines. The technical service bulletins identified by Dr. Jordan were issued after the design of the subject vehicles, and after the sale of virtually all the class vehicles.

viii. Dr. Jordan's claims regarding the rates of coolant intrusion are inaccurate and disconnected from reality, and unsupported by the warranty rates calculated by Ford and experts in this matter. Dr. Jordan's "expectations" that rates of engine replacement repairs associated with the 1.6-liter subject engine are higher than the 1.5-liter subject engine, and that the rates associated with 2.3-liter subject engines are higher than the 2.0-liter subject engines, are untrue.

ix. Dr. Jordan overstates the severity of the symptoms associated with coolant intrusion, and selectively quotes from some Named Plaintiffs' deposition testimony in an attempt to characterize the symptoms as being more severe than actual. In reality, the vast majority of coolant intrusions repairs are prompted by mild symptoms, such as a white smoke from the tailpipe, a rough running engine and/or illumination of the check engine light.

x. Dr. Jordan has not investigated the cause of the Named Plaintiffs' engine repairs. His assumption that they have all been caused by his theory of defect, rather than any of the many potential alternative causes, is unreliable.

xi. Dr. Jordan's attempt to assess the cylinder head gasket "leak potential" based on appearance lacks a reliable methodology. Dr. Jordan's suggestion that a loss of elastomeric sealant material, as assessed via a visual inspection, can somehow be correlated with potential for coolant intrusion, is not supported by any reference or data. In fact, we both examined long-lived and well-performing cylinder head gaskets that showed a loss of elastomer material, which did not prevent the gasket from functioning properly.

xii. Dr. Jordan's suggestion that engine long block assemblies should always be replaced as a single unit for the purpose of maintaining *"wear-matched, tolerance-sensitive components as a complete, factory-assembled system"* is inconsistent with standard practice in the automotive industry. The proper repair for a 1.5-liter subject engine coolant intrusion issue is an engine short block replacement (not a complete engine long block replacement). The proper repair for a 2.0- or 2.3-liter subject engine coolant intrusion repair is an engine long

block replacement, which per Dr. Jordan's estimates, costs about twice as much of an engine short block replacement. Subject engines that don't exhibit coolant intrusion don't require either repair.

xiii. Most members of the Plaintiffs' proposed class have not experienced a coolant intrusion repair ($0 cost of repair). Those who have, experienced different costs depending on the make/model/model-year of their subject vehicle, the extent of damage their engine experienced, whether the vehicle was under warranty at the time, the labor rate of the repair shop that performed the repair, among other factors, all of which can only be accurately assessed on a case-by-case basis. There is no single repair cost (average of otherwise) listed in Dr. Jordan's report that could possibly be applicable to all members of the Plaintiffs' proposed class or even that could be applicable to all members who experienced an at-issue repair. The "average" costs that Dr. Jordan provides in his report are not reliable estimates that can be assumed applicable to all at-issue repairs.

10. Opinion 2: The actions of Plaintiffs' expert Richard Hille, as described in his declaration, constitutes spoliation of the evidence (three subject engine long block assemblies removed from named Plaintiffs' vehicles) per the definitions provided in ASTM E860-22. His destructive disassembly of the evidence at his facility in Santa Ynez, CA altered the state and condition of the evidence and prevented me and other experts from ever having the opportunity to observe the engines in their as-received condition.

# Dr. Colin Jordan's Claims

11. Dr. Jordan is the Plaintiffs' engineering expert. He is a mechanical engineer who worked as a crashworthiness engineer for automotive manufactures in the 1980s, taught mechanical engineering at Kettering University in the 1990s, worked for a power and light company for a few years in the early 2000s, and has spent most of the last two decades performing accident reconstruction analysis. He strongly critiques Ford's design of the subject engine cylinder blocks.

12. In his report, Dr. Jordan states that he was retained by Plaintiffs' counsel to *"examine allegations of defect in design, material selection, manufacturing, and/or workmanship"* of the subject engines, and if found, *"to determine the root cause and cost to repair of such defect."*[1] His analysis did not focus specifically on determining the root causes of at-issue repairs (e.g. any subject engine replacement or repair that he attributes to his theory of defect), and whether those root causes were similar across the proposed class vehicles, but rather identifying a "defect" in the subject engines and assessing the cost to remedy the alleged "defect." He does not report completing an independent root cause

[1] Dr. Jordan Report, page 1

analysis for even a single subject engine coolant intrusion concern, but appears to assume all such repairs are attributable to his unfounded theory of defect.

13. Dr. Jordan appears to accept the findings of Ford's own investigation of the 1.5-, 2.0- and 2.3-liter subject engine coolant intrusion repairs. He does not deny that some the different displacement subject engines have experienced different failure mechanisms initiated by coolant boiling in the saw cut (1.5-liter subject engine) and cylinder head gasket scrubbing/wear (2.0- and 2.3-liter subject engine). Yet, he claims that the root cause of those different failure mechanisms is his theory of defect (a saw-cut feature in the engine block that is allegedly "impossible" to seal), not the root causes identified by Ford. He misconstrues Ford documents and testimony to suggest that Ford agrees with that claim, but from my review of the available information, it is clear that they do not. Rather, Dr. Jordan is the architect of the Plaintiffs' theory of defect.

14. Dr. Jordan has not shown that the saw-cut feature in the subject engine cylinder blocks is abnormal or impossible to seal or that it was the root cause of the at-issue repairs. As an initial matter, his opinion of the impossibility of sealing is rejected because even within the proposed class vehicles, the actual field performance data shows that the majority of engines do not experience coolant leaks or have problems with the sealing he criticizes. In addition, throughout his report, he repeatedly cites as supposed support for his claims and theories documents and testimony that do not support them. He also repeatedly overstates the rate and severity of the at-issue repairs. He disregards the effect of critical mid-class period subject engine design changes on the at-issue failure mechanisms, such as the introduction of engine start-stop technology in some subject vehicles in model-year 2017 (which significantly contributed to the 1.5-liter subject engine failure mechanism) and the redesign of the cylinder head gasket used in 2.0- and 2.3-liter subject engines in mid-2016 (which significantly contributed to the 2.0- and 2.3-liter subject engine failure mechanism). He baselessly denies the effectiveness of Ford's service campaigns (e.g., CSP 19B37) and speculates that the only way to address the at-issue coolant intrusion concerns is to eliminate the saw-cut feature in the engine block.

15. In his report, Dr. Jordan frequently misconstrues documents or concerns that are applicable to one group of subject engines and says they apply to other groups of subject engines for which they are, in fact, inapplicable. For example, he suggests that the coolant intrusion failure mechanism that sometimes arises in 1.5-liter subject engines is prevalent in 1.6-liter subject engines,[2] but it is not.

16. Dr. Jordan also offers unreliable opinions regarding the "leak potential" of used cylinder head gaskets that he inspected based upon their appearance alone. Not only does his "leak potential" analysis lack any scientific methodology, but he misleadingly attempts to use it make apples-to-apples comparisons between the apparent degradation of gaskets with significantly different amounts of usage, which would be more like comparing apples to oranges. Furthermore, he fails to show any correlation between the gasket aesthetics that he observes and the actual field performance of the gaskets.

---

[2] Jordan Report p. 44.

17. The many flaws in the opinions and analysis presented in Dr. Jordan's report will be discussed in detail in the following sections.

## Dr. Jordan's Unfounded Theory of Defect

18. Dr. Jordan claims that *"the Class Vehicles equipped with the subject Ford EcoBoost engines contained a design defect that permits coolant intrusion into the combustion chamber"* and that *"the design defect is the 'saw-cut or cooling slot machined into the narrow bore bridge area (i.e., the wall) between the cylinders."*[3] Even more specifically, he claims that the *"bore bridge of the class engines was too narrow to accommodate a sawcut,"*[4] that *"the saw-cut on the bridge bore created a leak path specifically between the saw-cut in the block and the cylinder head gasket,"* and that *"The saw-cut dissected an already small area in the bore bridge which made the job of the gasket an impossible task."*[5]

19. Dr. Jordan's theory of defect is predicated on the idea that the saw-cut feature in the subject engines' cylinder blocks is "impossible" to seal. However, that idea is inconsistent with the fact that saw-cut features are successfully utilized in many subject and non-subject engines. For example, as can be seen in the benchmark data shown in Figure 1, numerous OEMs other than Ford use cylinder blocks with saw-cut bore bridges of similar width to the subject engines. Similarly, Ford has utilized saw-cut cylinder blocks in 3.5- and 7.3-liter engines and the at-issue 1.6-liter subject engines, none of which have experienced widescale coolant intrusion concerns or repairs.

[3] Dr. Jordan Report, page 2-3

[4] Dr. Jordan Report, page 4

[5] Dr. Jordan Report, page 19, 47

[redacted]

Figure 1 [redacted]

20. Notice that [redacted] One such example is the saw-cut cylinder block assembly shown in Figure 2 and Figure 3 used by Volvo in vehicles for model-years 2008-2016.

---

[6] FORD-MILLER 00360118, slide 11 of 37



Figure 2 Saw-cut cylinder block in the 3.0-liter turbocharged engine used by in variety of 2008-2016 Volvo automobiles.[7]



Figure 3 Photograph of the deck surface of a used 3.0-liter turbocharged engine removed from a 2012 Volvo S60 T6 AWD.[8]

21. Similar to the subject engines, the Volvo engine is turbocharged and features an aluminum cylinder block with an approximately 1 mm wide saw-cut that dissects an

---

[7] OEM service and repair information (Alldata.com) for a 2014 Volvo S8 AWD L6-3.0L Turbo VIN 90 B6304T4, Engine Cylinder Block Assembly, Overhaul, Cylinder Block, Measurement.

Engine OEM Part# 36001436. Fitment information found at https://usparts.volvocars.com/p/Volvo__/Engine-Complete/71854792/36050645.html, accessed on 4/3/2026.

[8] https://www.ebay.com/itm/116699235916, accessed on 4/3/2026. The identify of the donor vehicle for the cylinder block was confirmed by decoding the VIN number (YV1902FH8C2109292) marked on side of the block.

approximately 9 mm wide bore bridge.[9] Yet, there are no coolant intrusion related recalls, TSBs, or service campaigns applicable to the saw-cut Volvo engines.

22. Illogically, in his report, Dr. Jordan critiques Ford for copying the saw-cut design of other manufacturers who appear to have successfully implemented the saw-cut feature while simultaneously claiming that such a design is destined to fail. For example, he opines that ***"Ford also admitted it tried to copy the competition's design…."***[10] In reality, many subject and non-subject engines (including Ford's own other engines and those competitor ones that Ford allegedly copied) with saw-cut bore bridges of similar width have survived many years and tens of thousands of miles without experiencing coolant intrusion. As such, Dr. Jordan's claim that their cylinder head gaskets face an impossible sealing task, is simply false.

23. Throughout his report, Dr. Jordan offers vague statements suggesting that the width of the subject engines' bore bridges are inadequate, such as *"It is important to note that all of the class engines have a bore bridge width of less than 9 mm,"*[11] and *"The saw-cut in the bore bridge (i.e., the wall between cylinders) reduces structural thickness in a critical region subject to high thermal and mechanical loads. This reduction in material thickness undermines the integrity of the bore bridge against cyclic stresses and thermal gradients typical in turbocharged engines."*[12] In his report, Dr. Jordan also states that the subject engines' *"bore bridge is approximately 8 mm with a saw-cut of 0.9 mm, leaving less than 4 mm on each side of the saw-cut to seal the coolant from the combustion chamber."* Based on those dimensions, he jumps to the conclusion that this "*prevented the gasket from maintaining a durable seal under operating conditions."*

24. However, Dr. Jordan does not provide any engineering analysis, data, testing, or reference to substantiate his claim that 4 mm of sealing width on each side of the at-issue saw-cuts is inadequate. Nor does he report having quantified the stresses or thermal gradients inside the subject engines (or any engine), let alone assessing how wide the subject engines' bore bridges needs to accommodate them. Without doing so, his proclamation that the saw-cut and/or width of the bore bridge in subject engines is inadequate from a sealing, structural or thermal perspective is baseless. Furthermore, without doing so, he has no basis to claim that the bore bridge needed to be larger than 9 mm, or any other specific width, to accommodate a saw-cut feature and avoid the at-issue failure mechanisms. And indeed, despite critiquing the bore bridge widths that Ford specified for the subject engines, Dr. Jordan fails to offer any direct opinion regarding how wide the bore bridges should have been in the subject engines to avoid

---

[9] Dr. Jordan Report, page 99-103

OEM service and repair information (Alldata.com) for a 2012 Volvo S60 T6 AWD L6-3.0L Turbo (mechanical specifications) specifies that the width of Volvo's 3.0-liter turbocharged engines saw-cut is 0.85-1.15 mm

According to Ford's benchmark test data (FORD-MILLER 00360118, slide 11 of 37), the width of Volvo's 3.0-liter turbocharged engines saw-cut is 9 mm.

[10] Dr. Jordan Report, page 5

[11] Dr. Jordan Report, page 4

[12] Dr. Jordan Report, page 13

coolant intrusion concerns. Without doing so, his critiques of the subject engine bore bridge width are vague, and his suggestion that the bore bridges should have been larger than 9 mm is arbitrary.

## Dr. Jordan Fails to Acknowledge the Substantial Differences in the Design of the Subject Engines and Vehicles and the Impact Those Differences Have on the At-Issue Failure Mechanisms and Rates

25. In his report, Dr. Jordan acknowledges that the different displacement subject engines have different bore bridge widths, and reports measuring widths of 8.3, 8.6, and 8.9 mm in the 1.5-, 2.0-, and 2.3-liter subject engines that he inspected, respectively.[13] However, he fails to acknowledge the many other significant differences in the design of the subject engines (e.g., cylinder blocks, cylinder heads, cooling systems, etc.) and subject vehicles (e.g., overall size and design), many of which I discussed in my initial report. Yet, even for the differences he acknowledges, such as in the width of the bore bridge (the very feature he critiques), he does not report performing any analysis of the effect of those differences on the at-issue failure mechanisms or rates. He provides no basis for the idea that all subject vehicles are similarly susceptible to any common failure mechanism or issue.

26. Simultaneously to Dr. Jordan and I producing our initial expert reports for this matter, Dr. Lennox produced an expert report that shows substantial (e.g. order of magnitude) differences in warranty rates of engine replacement repairs among subject vehicles of different make/model/model year and engine displacement. For example, her report shows that the rate of repair associated with 1.6-liter subject engine equipped subject vehicles is much lower than 1.5-liter subject engine equipped vehicles, and continued to decrease between model-year 2013 and 2015 (as Ford resolved 1.6-liter subject engine overheating issues that were unrelated to the coolant intrusion failure mechanisms). It also shows that the rate of repair associated with 1.5-liter subject engine equipped vehicles has varied between vehicles of differing model (e.g. Escape vs Fusion) and model-year (e.g. pre-and-post the standardization of engine start-stop technology in model-year 2017). It also shows that the rate of repair associated with 2.0-liter subject engine equipped vehicles has varied between vehicles of differing model (e.g. Edge vs Escape) and model-year (e.g. pre-and-post the introduction of the re-designed cylinder head gasket around model-year 2017). It also shows that 2.3-liter subject engine equipped vehicles experienced lower rates of repair than 2.0-liter subject engines.[14] The warranty repair rates published in Dr. Lennox's report are consistent with the analysis that I presented in my initial report, including my conclusion there are many substantial differences in the design of subject vehicles and engines that have impacted the at-issue

[13] Dr. Jordan Report, page 98

[14] Dr. Lennox Report, page 14

failure mechanisms and rates. Dr. Jordan's failure to recognize and acknowledge those differences is a major flaw in his analysis.

## Dr. Jordan Has Not Identified Anything Unreasonable About Ford's Design and Development Process

27. In his report, Dr. Jordan claims that *"Failures in Ford's design and development processes enabled this defect to be passed to the consumer."*[15] He points to changes that Ford implemented in their design and development processes as a result of lessons learned from their investigation of 1.5- and 2.0-liter subject engine coolant intrusion, and claims that they are all *"basic fundamental engineering concepts that were well-known in the automotive industry and engineering community. Ford knew or should have known all these fundamental engineering principles and the consequences of violating them well before production of the Class Vehicles."*[16] Those changes included modified dynamometer testing procedures to better replicate the customers cooling system, improvements in computer aided engineering (CAE) modeling to better predict peak metal temperatures and customer driving conditions, and new engine design guidance advising that aluminum blocks with a saw-cut used in gasoline turbocharged direct injection (GTDI) engines must have bore bridges that are at least 13.5 millimeters thick.

28. However, all automotive engine testing and modeling processes have limitations, and none can account for every possible condition or failure mechanism. Furthermore, it is normal for an automotive manufacturer's processes to evolve over time as a result of continual improvement efforts. The fact that Ford made changes to their design and development processes as a result of learning from the unique 1.5- and 2.0-liter subject engine coolant intrusion failure mechanisms does not establish that the processes were unreasonable to begin with.

29. As someone who spent years performing engine dynamometer testing in collaboration with computations modelers at automotive manufacturers, I can attest to the challenges associated with engine dynamometer testing and the modeling of complex flows and temperature profiles inside automotive engines. Assessing internal engine flows and temperatures is not a matter of applying *"basic engineering concepts"* as Dr. Jordan suggests. Rather, the test methods and computational modeling techniques used to make such assessments are highly complex and ever evolving. Although both dynamometer testing and CAE modeling provides engine designers with incredibly helpful insights, neither can be used to make perfectly accurate and complete assessments of an engine's real-world performance. Manufacturers like Ford perform extensive component, engine, and vehicle level testing before introducing their engines to the road. However, it is impossible to test (or accurately model) an automotive engine under all conditions that it will experience in the real world or to recognize every failure mechanism that might arise.

---

[15] Dr. Jordan Report, page 5

[16] Dr. Jordan Report, page 6

30. With regards to CAE modeling, Dr. Jordan more specifically claims that *"Ford admitted it improperly used Computer Aided Engineering ("CAE") to design the engine block/ head gasket/ cylinder head system statically and dynamically, and further underestimated the temperature of the coolant in the bore bridge. As companies like Ford try to do less testing they rely on CAE to prove out their design theoretically; unfortunately, Ford misused this tool and released a defective design to the public. Ford also admitted it tried to copy the competition's design without properly assessing all the constraints with their own engine."*[17]

31. However, as the sole basis for that claim, Dr. Jordan cites a single email chain from 2020 titled "19B37 1.5L Coolant Intrusion PAC" that includes discussion between Ford employees regarding lessons learned from their investigation of 1.5-liter subject engine coolant intrusion. In the cited email conversation, a Ford Director of Global Engine Engineering mentioned that at the time the 1.5-liter subject engine was designed, [redacted] and a Ford chief engineer of global engine engineering responded by explaining, [redacted][18] The email chain (1) does not pertain to the 1.6-, 2.0- or 2.3-liter (i.e., most) subject engines included in the Plaintiffs' proposed class and (2) does not demonstrate that Ford engineers ever misused CAE tools when designing the 1.5-liter subject engine. Rather, it documents that the computational modeling processes and capabilities at Ford (like the rest of the industry) have continued to progress over time, and that Ford now more accurately models the temperature and flows inside engines than they did at the time the engines were designed, which is to be expected.

32. As supposed basis for the idea that Ford's testing was inadequate, Dr. Jordan cites one document and one page of testimony from the transcript of the deposition of a Ford engineer, Mr. Wade. The document that he cites as the sole evidence of inadequate testing is a Preventative Action Closure Paper titled "2017-2019 NA Fusion/Escape 1.5-L Coolant Intrusion" that is inapplicable to 1.6-, 2.0- and 2.3-L subject engines (like every other document he cites in support of his critiques of Ford design processes).[19] The paper states, [redacted] and that in response to that finding, [redacted] The testimony that Dr. Jordan cites from the transcript of Mr. Wade's deposition includes nothing more than a four-word confirmation that Ford modified the boundary (pressure) conditions of one of the dynamometer tests.

---

[17] Dr. Jordan Report, page 5

[18] FORD-MILLER 00184459 - FORD-MILLER 00184460

[19] Dr. Jordan Report, page 6

33. It is impossible for an automotive manufacturer to perfectly reproduce all the drive cycles and conditions that an engine might experience on the road via dynamometer testing pre-production. Unique internal thermal conditions that occur under very specific operating conditions, such as coolant boiling within the engine block of the 1.5-liter subject engine during stop-start events, and slowly developing conditions, such as both the 1.5- or 2.0-liter subject engine failure mechanisms, are precisely the type of issues that are difficult to recognize during preproduction testing. As such, it is unsurprising that Ford did not identify the 1.5-liter and 2.0-liter subject engine coolant intrusion failure mechanisms during preproduction testing, and it makes sense that after learning of the failure mechanisms, they developed new testing procedures to try to identify such issues should they ever arise in the future.

34. It is easy now with the benefit of hindsight for Dr. Jordan to suggest that Ford should have implemented the CAE modeling improvements, dynamometer test procedure changes or updated design guidance that Ford implemented after considerable engineering efforts over months and years of analyzing field failures to gain an understanding of the 1.5- and 2.0-liter subject engine coolant intrusion failure mechanisms. However, he provides no basis for the idea that anyone in the automotive industry had knowledge of the two unique failure mechanisms when the subject engines were being developed or even reason to anticipate them. He also provides no evidence showing that Ford failed to do any particular test or modeling procedure that was in regularly accepted in the industry or understood to be important or that would have detected either of those two unique failure mechanisms.

35. In his report, Dr. Jordan cites four patents that he thinks should have informed Ford of "problems" with a saw-cut engine block. However, none the cited patents establish that Ford's use of the saw-cut design was unreasonable or known to be "impossible."

36. Three of the four patents, including the 2016 Toyota U.S. Patent 9,353,701 B2 (and the related 2011 Japanese Patent that predated it) and the Ford U.S. Patent No. 9,470,176 B2, pertain to cross-drilled engine block designs. They provide no discussion of saw-cut designs, and do not support Dr. Jordan's suggestion that saw-cut designs are deficient.

37. The 2004 U.S. Patent 6,776,127 that Dr. Jordan cites in his report briefly describes saw-cut cylinder blocks but does not suggest that they are inherently deficient. Rather, it discusses how a variety of different inter-bore cooling techniques are used in the industry, showing how common and effective the saw-cut design is. For example, the patent states:

***"In order to overcome interbore overheating, many types of interbore cooling Systems have been proposed including:***

> ***1) a full saw cut in the top Surface;***
>
> *2) double saw cuts in the top Surface, one on each side of the Water passage;*
>
> *3) crossed-drilled passages from the top Surface of Stepped bore diameter extending from each end of the interbore bridge;*

*4) cast water passages; and*

*5) a water passage created by using a glass core.*

***Each System has its own advantages and disadvantages.*** *There are many parameters to consider before choosing any particular design, and one particular design may work on one specific application, and not necessarily on others."*

38. The patent states that *"Interbore cooling options like a full saw cut, double saw cuts, and glass core are, however, available.* ***A full saw cut is widely used for cylinder blocks with liners."*** It then describes that the saw-cut approach to interbore cooling has the upside of bringing *"water flow closer to the hottest spot on the interbore region"* and the downside of requiring expensive gaskets to seal. It mentions the possibility of leakage if the opening at the top deck of a saw-cut block is not properly sealed, but it does not state that it is impossible to effectively seal a saw-cut cylinder block, or risky to use this design, as Dr. Jordan claims.

39. In his report, Dr. Jordan fails to mention that the 2004 patent also describes the downside of using cross-drilled passages for interbore cooling. More specifically, it states that cross-drilled passages *"are not at the hottest part of the interbore bridge and therefore are not totally effective in providing the cooling where it is required. Furthermore, they require complex and relatively expensive drilling operations."* In other words, the cross-drill design that Dr. Jordan touts cannot provide coolant flow directly to some of the most critical upper regions of the bore bridge region like the saw-cut design can. Hence, a manufacturer who is concerned about adequate cooling in that area may be inclined to favor a saw-cut design over a cross-drill design.

40. In his report, Dr. Jordan also fails to mention that Patent US 9,353,701 also describes the benefit of designing engine block bore bridge regions to be as narrow as possible. For example, it states that *"In order to reduce the weight and size of an engine, it is preferable that each portion of the cylinder block be thin, and that the inter-bore partition walls also be as thin as possible."*

41. In other words, the patents that Dr. Jordan cites not only do not support the idea that the saw-cut design is inherently deficient, but they also outline the reasoning as to why a manufacturer would implement the very features that Dr. Jordan critiques Ford for utilizing in the subject engine.

42. Ultimately, Dr. Jordan has not identified anything unreasonable about the processes Ford used when designing and developing the subject engines.

## The 1.5- and 2.0-liter Coolant Intrusion Failure Mechanisms Have Different Root Causes (Neither of Which is Dr. Jordan's Theory of Defect)

43. In his report, Dr. Jordan opines that *"The Saw-Cut Was the Root Cause of the Engine Defect"* in the title of a section of his report. This opinion is predicated on the inaccurate assumption that a "defect" exists in the subject engines.

44. Dr. Jordan does not report performing any independent root cause analysis of failed subject engines. Nor does he deny the accuracy of Ford's investigative findings, including that the 1.5- and 2.0-liter subject engines experienced different failure mechanisms resulting in coolant intrusion repairs. However, he inaccurately suggests that both mechanisms stem from the same root cause (his unfounded theory of defect).

45. For example, in his report, Dr. Jordan states, *"Ford determined the root cause of Sigma engine coolant intrusion to be coolant boiling at the junction of the block saw-cut and head gasket joint, compromising the sealing at this joint and allowing coolant intrusion. Ford similarly determined that Duratec engine coolant intrusion had a root cause of the breakdown of the anti-corrosion protective coating on the gasket, eroding the head gasket sealant and allowing coolant intrusion. Both of these root causes are ultimately due to the presence of the saw-cut in these engines."*[20]

46. However, from an engineering perspective, the coolant-boiling (a thermal/fluid issue) based failure mechanism that resulted in 1.5-liter subject engine coolant intrusion repairs is fundamentally different than the scrubbing-based failure mechanism (a mechanical wear issue) that resulted in 2.0- and 2.3-liter coolant intrusion repairs. They resulted in different damage and arose due to different underlying issues. Dr. Jordan's claim that both mechanisms stem from the same root cause is technical nonsense.

47. The root cause for the 1.5-liter subject engine failure mechanism was the combination of factors that led to coolant boiling within the engine block assembly. As discussed in my initial report, that boiling was found to primarily occur when the engine was shut off while warm and coolant ceased to circulate through the block, which frequently occurs during automatic engine start-stop events. The failure mechanism became more common when Ford introduced automatic start-stop technology as a standard feature in model-year 2017. As such, one of the primary factors contributing to the cause of the failure mechanism was lack of coolant flow shortly after the engine was shut off (a system level design issue). Ford was able to mitigate the issue in by recalibrating the control of the electric water pump to ensure that coolant flow continued for adequate time during shutdowns (i.e., the software upgrade introduced via CSB 19B37).

48. The underlying reason (root cause) of the 2.0-liter subject engine coolant intrusion failure mechanism, which also affected some 2.3-liter subject engines to a lesser extent, were the factors that led to cylinder head gaskets wearing at a higher-than-expected rate.

[20] Dr. Jordan Report, page 4

An elevated rate of 2.0-liter subject engine coolant intrusion repairs began emerging in engines manufactured around or after March 2016 when Ford introduced a newly designed cylinder head gasket (corresponding to the part number changing from -CA to -DA). As such, the design and material composition of the updated (-DA) cylinder head gasket was a causal factor in the 2.0-liter subject engine coolant intrusion failure mechanism. Notably, Dr. Jordan does not discuss the cylinder head gasket design change at all in his report. Instead, he appears to have overlooked the role of the design change and titled a chapter of his report "*The Gasket Was Not the Root Cause of the Defect*."

49. Dr. Jordan also claims that *"From an engineering standpoint, the saw-cut in the area between the cylinders is the root cause, or the failure mechanism, of the coolant intrusion for both the Sigma and the Duratec engines. When the saw-cut was removed in favor of a cross-drilled block the defect failed to exist."*[21] In other words, he argues that because elimination of the saw-cut cylinder block was effective at preventing the 1.5- and 2.0-liter failure mechanisms, the saw-cut itself must have been the root cause of the mechanisms.

50. However, it should be recognized that there can be multiple ways for an automotive failure mechanism, such as the at-issue failure mechanisms, to be mitigated or prevented. The at-issue failure mechanisms could have been prevented without elimination of the saw-cut feature, and the success of the PCA does not establish that that saw-cut feature itself was the root cause of the failure mechanisms.

a. In order for the 1.5-liter subject engine failure mechanism to progress to a coolant intrusion issue, boiling has to first occur inside the cylinder block, which then results in damage forming at the interface of the cylinder block and gasket, which eventually progresses to form a path for coolant to leak into the engine's cylinder(s). Ford could have and, in fact, did different design solutions to stop that failure mechanism process at numerous points in its progression. For example, another means of preventing the failure mechanism is aa change in the design or control of the 1.5-subject engine cooling system to prevent boiling from occurring within the cylinder block, as Ford later did for vehicles already on the road via campaign 19B37. They could have designed the sealing joint to be more robust to boiling/corrosive coolant. Or they could have prevented boiling coolant from contacting the cylinder block/gasket interface, as they did by switching from a saw-cut to cross-drilled block design.

b. In order for the 2.0-liter subject engine failure mechanism to progress to a coolant intrusion issue, an accumulation of cylinder head gasket scrubbing/wear needs to result in coolant becoming trapped under the head gasket's sealing bead, resulting in corrosive damage to the cylinder block or head deck surface, eventually resulting in coolant leaking into a cylinder. Ford could have designed a variety of different solutions for the failure mechanism. For example, they could have sought to reduce the motion and rate of scrubbing (wear) at the head joint by redesigning numerous engine components without implementing a cross-drilled block, including by

[21] Dr. Jordan Report, page 4

redesigning the cylinder head gasket (e.g., revert back to a -CA like gasket), the cylinder block, cylinder head, and cylinder head bolts. Or they could have re-calibrated (altered the control of) the 2.0-liter subject engine to reduce in-cylinder pressures, which would have reduced motion and wear at the joint, but had the negative effect of reducing the engine power and/or performance. Or they could have prevented coolant from reaching the areas of the sealing joint that were experiencing the scrubbing-based failure mechanism (as they did by switching from a saw-cut to cross-drilled block design).

51. As Mr. Dunahay explained in deposition, Ford made the decision to implement cross-drilled blocks in 1.5-liter subject engines before they understood the root cause of coolant intrusion issues. As such, the fix was broadly designed to eliminate the possibility of the failure mechanism but not necessarily to address the not yet known root cause. More specifically, he testified:

*"So I -- when we initially made that decision we didn't understand root cause. We knew that we had saw cuts in our -- saw cuts in our arsenal of engines that were -- that behaved very, very well and were incredibly durable. We still had them. But for some reason, this saw cut area was aggravating some warranty claims. And although we didn't understand it, we said let's just get the coolant out of there, okay? And so we made the decision to get the coolant out of the interface. Again, even though we had saw cuts that had the same interface that we weren't having issues with."*[22]

52. Mr. Dunahay also testified that after gaining an understanding of the root cause of 1.5-liter subject engine coolant intrusion repairs, Ford realized that there were other ways than eliminating the saw-cut to prevent the failure mechanism from occurring, such as by maintaining coolant flow through the engine block for a period after the engine was shut down. More specifically, he testified that, ***"So the -- on the 1.5-liter where the root cause is the stagnant coolant, we were able to keep the coolant moving with an auxiliary pump. And that eliminated the boiling in the saw cut which eliminated the root cause."***[23]

53. Aside from briefly stating in his report that *"the use of software patches, and auxiliary water pump proved ineffective"* at preventing subject engine coolant intrusion repairs,[24] Dr. Jordan's report is notably devoid of any discussion regarding CSP 19B37 or any analysis the effectiveness of the software calibration changes. He does not report performing any analysis of the effectiveness of the CSP, but had he accepted (rather than baselessly denying) its effectiveness, then he would have to admit that the 1.5-liter subject engine coolant intrusion issues can be mitigated without elimination of the saw-cut feature that he alleges is defective.

54. In his report, Dr. Jordan cites a bulletin produced by the Automotive Engine Rebuilders Association (AERA) titled "Ford Ecoboost Head Gasket Causation on 2015-2019 1.6,

[22] Deposition of John Dunahay, August 27, 2025, page 65:1-67:1

[23] Deposition of John Dunahay, August 27, 2025, page 26:17-22

[24] Dr. Jordan Report, page 15

2.0 & 2.3L Engines" that he claims supports his opinion that the saw-cut feature is the root cause of at-issue coolant intrusion issues. However, the information provided in that AERA publication is unreliable for numerous reasons including:

a. The bulletin is undated and the neither the authors of it nor their credentials are identified;

b. No supporting evidence, data, or sources has been shown or identified by the AERA or the bulletins authors to substantiate their guess that head gasket failures that they had seen or heard of in 1.6-, 2.0- and 2.3-liter engines were caused by the combination of a saw-cut channel and narrow bore bridge;

c. The authors appear misinformed about which displacement subject engines experienced an elevated rate of coolant intrusion, as they included the 1.6-liter subject engine (which didn't experience widescale intrusion concerns) and excluded the 1.5-liter subject engine (some of which had the highest rates of all at-issue engines) from their bulletin; and

d. The AERA admits that the information in the bulletin may be inaccurate and added a disclaimer to it that states, "*AERA does not assume responsibility for data accuracy or consequences of its application*."

e. The AERA published another bulletin titled "*Cylinder Block Caution on 2017-2019 Ford 2.0L Ecoboost Engines*" that admits that the AERA does not have any evidence to support their suggestion that the saw-cut is the cause of coolant intrusions in those engines. More specifically, it states that *"There has been discussion that the slot cast between the cylinders does not provide enough clamp load surface area to properly seal the head gasket. At the printing of this bulletin,* ***AERA does not have any documentation to verify the claim and is only cautioning our members of the problem."***[25]

55. Additionally, Dr. Jordan falsely claims that the AERA bulletin establishes that *"Their professional experience and expertise in rebuilding saw-cut EcoBoost engines led them to conclude that using a cross-drill engine block was the only viable solution…"* [26] However, contrary to what Dr. Jordan claims, the AERA bulletin explicitly suggests an alternative solution to coolant intrusion concerns that does not include eliminating the saw-cut feature: increased head gasket clamping force.

a. More specifically, the bulletin states *"AERA members who are having issues with the early style blocks are installing head studs to provide more clamping force on the head gasket."* Head studs are a type of high strength fasteners that can be used to increase an engine's cylinder head gasket clamping force.

---

[25] https://www.engineprofessional.com/TB25/TB011625-2.pdf, accessed on April 6, 2026

[26] Dr. Jordan Report, page 20

56. In his report, Dr. Jordan also suggests that Ford witness testimony supports his opinion that "the saw-cut was the root cause of the engine defect" in 1.5-, 2.0-, 2.3-liter subject engines. However, as was discussed in my initial report, the deposition testimony of Ford witnesses demonstrates agreement among engineers at Ford that the cause of 1.5-liter subject engine coolant intrusion issues was coolant boiling within the cylinder block (exacerbated by the introduction of engine start-stop functionality), and the cause of 2.0-liter subject engine coolant intrusion issues was an elevated rate of cylinder head gasket scrubbing/wear (exacerbated by a change in the design of the cylinder head gasket). None of the Ford witnesses testified that the 1.5- and 2.0-liter subject engine failure mechanisms had a common root cause or that the saw-cut feature was specifically the root cause of any of the at-issue repairs as Dr. Jordan claims.

57. More specifically, in his report, Dr. Jordan cites the testimony of three Ford engineers as supposed basis for the idea that the saw-cut feature was the root cause of subject engine coolant intrusion repairs. I have reviewed the complete testimony (including the select statements cited by Dr. Jordan) and found that it does not support Dr. Jordan's claims.

a. Dr. Jordan cites Mr. Brewer's answer to the question of what the ultimate root cause of 1.5-liter subject engine coolant intrusion repairs was. In that answer, Mr. Brewer explained that *"**the coolant in the saw cut would actually boil. Then that boiling would boil off the water in the coolant and ultimately leave an acidic deposit on the head and block deck, which would ultimately eat away at the aluminum**."*[27] Mr. Brewer's testimony indicates that the root cause of the repairs was coolant boiling in the engine block, not use of the saw-cut feature itself.

b. When asked in deposition what the root cause of 2.0-liter subject engine coolant intrusion repairs, Mr. Brewer explained that *"On 2 liter, we ultimately root-caused the failures to what we call 'scrubbing,' which is horizontal motion in the joint. So at the same time the combustion pressure is pushing up on the head, it's trying to expand the bore and the block, and it's trying to push the head sideways as well. And, ultimately, **we determined that there was too much horizontal motion in the joint, which would ultimately wear out the head gasket and wear out the mating surfaces on the head and the block.**"* When further asked what was causing the horizontal motion, Mr. Brewer explained *"Well, **fundamentally, it's from combustion pressure**. Right? Yeah, I'll just leave it there. The driving forces, the combustion pressure within the engine."*[28] Mr. Brewer did not opine that the saw-cut feature, itself, caused the scrubbing-based failure mechanism, or associated repairs. Rather, he attributed the root cause to the factors the resulted in excessive horizontal motion within the cylinder head gasket joint, such as high combustion pressures.

---

[27] Deposition of Todd Brewer, September 17, 2025, page 68:18-70:14

[28] Deposition of Todd Brewer, September 17, 2025, page 75:8-76:11

Dr. Jordan did not cite Mr. Brewer's direct testimony regarding the root cause of 2.0- or 2.3-liter coolant intrusion repairs. Rather, his citations point towards testimony regarding other topics.[29]

c. Mr. Henne testified that ***"the failure mode on the 1.5-liter engine was related to coolant boiling in the saw cut of the block. That the failure – the root cause of the failure mode."*** He also testified that *"I'm not aware of internal coolant issues on 1.6."* He also testified that *"**The internal coolant on the 2.0/2.3 does not have – so the 2.0/2.3 does not have boiling in the saw cut. It's related to – more related to coolant being trapped on the bore bridge – on the deck face in the bore bridge.** And then that local coolant contributing to corrosion of the other components."*[30] When asked what the cause of cylinder head gasket coating degradation was on 2.0- and 2.3-liter subject engines, Mr. Henne testified that ***"In my opinion, it was a combination of things. It's the chemical interaction between the coolant and the coating and some scrubbing effect on the coating due to potentially motion of the engine from firing and also thermal expansion and contraction."***[31] He agreed that the presence of the saw cut allowed coolant to contact the deck face.[32] However, he never agreed that the use of the saw-cut itself was the root cause of the repairs.

Dr. Jordan did not reference most of the above direct testimony that Mr. Henne provided regarding the root cause of at-issue coolant intrusion repairs. Rather, his citations point towards other topics (e.g., discussion of the head gasket suppliers' opinions regarding the cause of coolant intrusion repairs).[33]

d. Mr. Dunahay testified, ***"So on the 1.5-liter, there was boiling in the saw cut area between the cylinder head and the cylinder block. And that boiling basically boiled off the water from the coolant and then started -- the coolant would start to dig underneath the head gasket because of that boiling. The root cause of that boiling was because of stagnant coolant that was left in the cylinder block/cylinder head interface. And when you shut down the vehicle, the coolant doesn't -- isn't being pushed through anymore, and therefore it sits, gets exposed to the energy from the head and block. And then once it starts to boil off, then it, over time, can start to dig into the head of the block. That's the 1.5-liter."*** He then continued his testimony by stating *"**So on the 2.0-liter, the root cause is different. It -- there was scrubbing between the head gasket, the head gasket was being scrubbed.** And once the head gasket was scrubbed, it would allow coolant to go underneath the coating and get to the interface which is between the head gasket and the cylinder block or cylinder head. And we call it the fire ring, which is the – basically the part of the gasket that is the primary separator. It would start – it would get next to the fire ring, it would*

29 Deposition of Todd Brewer, September 17, 2025, page 84:24-87:3
Dr. Jordan Report, page 29, 32

30 Deposition of Joseph Henne, August 13, 2025, page 56:11-57:11

31 Deposition of Joseph Henne, August 13, 2025, page 79:21-89:22

32 Deposition of Joseph Henne, August 13, 2025, page 137:22-138:4

33 Dr. Jordan Report, page 23, 29, 32

*then become elevated in temperature. And once it became elevated in temperature it would boil off and start to dig. But it was not the stagnant coolant that was in the other application."* He testified that the 2.3- liter subject engines experienced the same failure mechanism as the 2.0-liter subject engines but, due to differences in its design, at a much lower rate. [34] Notice that Mr. Dunahay describes two distinctly different failure mechanisms with different root causes, neither of which are Dr. Jordan's theory of defect.

58. Dr. Jordan (not Ford) is the architect of his unfounded theory of defect.

59. There is sufficient information, data, and evidence produced in this matter that documents the failure mechanisms, root causes, and rates of at-issue repairs, much of which I outlined in my initial report. Despite the large amount of available information, Dr. Jordan cites only three Ford-produced documents as a supposed-basis for the claim that the saw-cut is the root cause of 2.0-liter subject engine coolant intrusion repairs. Furthermore, none of those three documents support his claim.[35]

a. His first citation is a single slide showing a line trace (dimensional measurement) of corrosive damage that occurred on the deck of a 2.0-liter subject engine but provides no findings or information regarding the root cause of the damage.[36]

b. His second citation is a single slide with a few bullet points, none of which describe the root cause of 2.0-liter subject engine coolant intrusion repairs.[37]

c. His third citation is a Prevent Action Closure Paper that Dr. Jordan opines "applies to all engines" but is titled "2017-2019 NA Fusion/Escape 1.5L Coolant Intrusion" and explicitly only pertains to 1.5-liter (not 2.0-liter) subject engines.[38]

60. Similarly, as the flawed basis for the claim that the saw-cut is the root cause of 2.3-liter subject engine coolant intrusion repairs, Dr. Jordan cites only two of the same previously discussed production documents. Neither of them supports his claim, for the same reasons discussed in the section on Dr. Jordan's "2.0-liter Subject Engine Claims."[39]

61. Similarly, Dr. Jordan cites only two documents as the flawed basis for the claim that the saw-cut is the root cause of 1.5-liter subject engine coolant intrusion repairs.[40]

a. His first citation is the same, previously discussed Preventative Action Closure Paper titled "2017-2019 NA Fusion/Escape 1.5L Coolant Intrusion." It describes

---

[34] Deposition of John Dunahay, August 27, 2025, page 20:1-22:10

[35] Dr. Jordan Report, page 29

[36] FORD-MILLER 00139399 at 00139401

[37] FORD-MILLER 00126435 at 00126436

[38] Dr. Jordan Report, page 29
FORD-MILLER 00184458

[39] Dr. Jordan Report, page 29

[40] Dr. Jordan Report, page 23

how [redacted] not Dr. Jordan's theory of defect.[41]

b. The second citation is a slide with a few bullet points, none of which describe the root cause of 1.5-liter subject engine coolant intrusion repairs.[42]

62. Neither the production documents nor testimony produced by Ford that Dr. Jordan cites support the claim that the saw-cut feature is the root cause of at-issue failure mechanisms and repairs. Rather, Dr. Jordan's opinion that "The Saw-Cut Was the Root Cause of the Engine Defect" is his own, and it is baseless.

63. Dr. Wachs also opines, with no engineering expertise, that the "root cause" of coolant intrusion is the same in all vehicles in the proposed class. In support of her opinion, she selectively quotes out of context excerpts of the deposition of Tim Knott and Todd Brewer. But Mr. Brewer's testimony makes clear that he was discussing there being the same root cause for the 1.5-liter engines at different rates, not a common root cause across different engines and different times. Separately, Mr. Brewer also states that *"The 2.[0]-liter and the 2.3 had a different issue than the 1.5."*[43] In the passage immediately preceding that cited by Dr. Wachs, Mr. Knott also stated that the root cause for the 1.5-liter was different than the 2.0-liter: *"1.5 wasn't the gasket change. That was really boiling in the saw cut."*[44]

64. As both Ford witnesses clearly testified, and as discussed above, the root cause of coolant intrusion failure mechanism for the 1.5-liter subject engines was different from the 2.0-liter subject engines.

## Dr. Jordan's Disregard for CSP 19B37 (Mitigation of the 1.5-Liter Coolant Intrusion Failure Mechanism) is Unwarranted

65. Dr. Jordan does not report studying or assessing the effectiveness of the software upgrade that Ford introduced via CSP 19B37 (cooling system control) in any way, yet he denies its effectiveness.

66. Ford reports that the CSP was effective at mitigating 1.5-liter subject engine coolant intrusion repairs. Dr. Jordan has not produced any analysis, data, or evidence to refute Ford's findings.

67. In his report, Dr. Jordan claims that the 1.5-liter subject engine coolant intrusion failure mechanism cannot be avoided via those actions introduced via CSP 19B37. As supposed

[41] FORD-MILLER 00184458

[42] FORD-MILLER 00126435 at 00126436

[43] Deposition of Todd Brewer, September 17, 2025, page 132:24-133:9.

[44] Deposition of Timothy Knott, September 24, 2025, page 101:5-9.

basis for that claim he cites select testimony from two Ford witnesses and a single comment in an email conversation, none of which support his claim.

a. The only production document cited by Dr. Jordan is an email from a Ford engineer located in China that includes a single statement regarding the warranty data for auxiliary and non-auxiliary pump equipped Sigma engines in China.[45] It is unclear why Dr. Jordan would focus his analysis on email chatter about Chinese warranty rates, when the actual warranty data and rates pertaining to the vehicles at-issue in this matter are available. Nonetheless, his citation is of little to no relevance to named Plaintiffs subject vehicles which were sold in the U.S. (not China).

b. Dr. Jordan cites testimony regarding the inability of CSP 19B37 to heal damage (e.g., corrosive pitting) that already occurred,[46] which does not establish that the CSP and associated actions are incapable of avoiding the initiation of coolant intrusion in 1.5-liter subject engines (e.g., if implemented early) or of slowing the progression of damage initiated prior to application of the CSP.

c. Dr. Jordan cites testimony discussing how Ford did not implement a campaign similar to CSP 19B37 on early model-year vehicles equipped with the 1.5-liter subject engine because they were not found to be experiencing the failure mechanism, and Ford's concern that introducing an auxiliary water pump to those vehicles might have the undesirable effect of creating flow restriction that could cause boiling issues to arise. Or more specifically, Mr. Guinta testified that *"We can put a pump in which creates a concern that we can mitigate by turning the pump on more. But why wouldn't you just start to – leave it alone because it's not broken."*[47] Mr. Guinta's testimony regarding the lack of need to develop a fix for non-auxiliary pump equipped 1.5-liter subject engines does not in any way diminish the effectiveness of the fix that Ford developed for those vehicles that had with auxiliary pumps.

68. Dr. Jordan's opinion that CSP 19B37 is ineffective is unreliable, as it is not supported by any data or evidence.

## Dr. Jordan's Assumption that 1.6-liter Subject Engines Have Experienced Widescale Coolant Intrusion Concerns is Inaccurate

69. Ford does not report discovering evidence of widescale coolant intrusion concerns associated with 1.6-liter subject engines, nor have I seen any such evidence. In his report, Dr. Jordan does not present any such evidence of widescale 1.6-liter subject

---

45 Dr. Jordan Report, page 25
FORD-MILLER 00215338 at 00215340

46 Deposition of John Dunahay, August 27, 2025, page 28:11-30:13

47 Deposition of Michael Guinta, August 20, 2025, page 110:4-112:3 and 176:6-19

engine coolant intrusion issues either. Yet, he suggests that they are occurring with no documentary support or analysis.

70. For example, in his report, he states that *"Ford determined specifically the root cause of the coolant intrusion in the Sigma motors to be* [redacted] which inaccurately implies that Ford "determined" 1.6-liter subject engines (part of the Sigma family of engines) to be susceptible to the 1.5-liter subject engine coolant intrusion failure mechanism. Dr. Jordan also claims that *"Vehicles equipped with the saw-cut design exhibit extremely high failure rates, with the 1.5L Sigma engine reaching a projected failure rate of up to 65 percent at 10 years or 100,000 miles. Given that the 1.5L Sigma is derived from the 1.6L Sigma, similar failure rates would be expected for the 1.6L Sigma engine."* Dr. Jordan does no analysis of available data on the 1.6-liter or any analysis of the multiple differences in the engines' designs that could impact failure rates. He just makes a bold assertion.

71. However, all the warranty repair rate analysis produced in this matter by Ford[48] and independent statistical experts show that 1.6-liter subject engines have experienced substantially lower rates of replacement than 1.5-liter subject engines. For example, Dr. Lennox estimates the warranty replacement rate of 1.6-liter subject engines to be approximately 1%, which is about 5 to 10 times lower than that of 1.5-liter subject engines. The Plaintiffs' own warranty rate expert, Dr. Wachs, estimates that 1.6-liter subject engines have experienced failure rates that are about an order of magnitude ~10X lower than 1.5-liter subject engines and only of about 1 to 2% after 10 years in service.[49] As such, Dr. Jordan's *"expectation"* that 1.6-liter subject engines have experienced similar failure rates as 1.5-liter subject engines and rates of the order of 65% or more demonstrates an unfamiliarity with the facts and evidence available in this matter and a gross misunderstanding of the actual field performance of 1.6-liter subject engines, which is much better than he claimed.

72. Additionally, the few references that Dr. Jordan cites in his report as supposed basis for the idea that 1.6-liter subject engines have experienced similar coolant intrusion failure mechanisms and rates as 1.5-liter subject engines all primarily or entirely pertain to other (not 1.6-liter) engines. For example:

a. On page 35 of his report, Dr. Jordan cites two documents as supposed basis for the idea that all Sigma engines are susceptible to coolant intrusion as a result of coolant boiling in the saw-cut region of the cylinder block. However, neither document focuses on 1.6-liter subject engines. One of the documents is a slide deck titled "Coolant Intrusion 1.5L GTDI Engine" and the other a slide deck that explicitly

---

48 Ford FSQR Presentation, January 24, 2022, FORD-MILLER 00441292 (Exhibit 125 from the deposition of Timothy Knott, September 24, 2025)

49 Dr. Lennox Report, page 12
Dr. Wachs Report, page 24

pertains to coolant intrusion in 1.5-, 2.0-, and 2.3-liter (not 1.6-liter) subject engines.[50]

b. On page 26 of his report, Dr. Jordan poses the vague question, "*Was the coolant in the saw-cut area of the bore bridge the root cause of the EcoBoost engine failure*?" in 1.6-liter subject engines. He also answers "YES" to that question and provides three references as basis for that answer. Not only is the question poorly posed, as the "engine failure" he is talking about is unclear (individual 1.6-liter subject engines have failed and/or required replacement for many different reasons unrelated to coolant intrusion or Dr. Jordan's theory of defect), but all three references that he provides as supposed basis primarily or entirely pertain to other displacement subject engines, not 1.6-liter. [51]

73. Dr. Jordan does not report studying the failure mechanisms or rates that 1.6-liter subject engines have experienced. He does not report identifying even a single instance of a 1.6-liter subject engine that experienced either the 1.5- or 2.0-liter coolant intrusion failure mechanism. His suggestion that such issues are prevalent in 1.6-liter subject engines is not supported by data or evidence and is baseless.

## Dr. Jordan's Claim that Ford Had (or Should Have Had) Early Awareness of At-Issue Coolant Intrusion Failure Mechanisms is Baseless

74. Dr. Jordan claims that *"Ford Motor Company was aware of this defect, as evidenced by a cascade of Technical Service Bulletins ("TSBs") spanning multiple years, culminating*

---

[50] FORD-MILLER00126922, at 00126924-25 (Slides produced by Ford titled "Coolant Intrusion 1.5L GTDI Engine")

FORD-MILLER00140639, at 0014644. (Slides produced by Ford pertaining to coolant intrusion in 1.5, 2.0, and 2.3-liter engines)

[51] FORD-MILLER 00184458 (A Preventative Action Closure Paper produced by Ford titled "2017-2019 NA Fusion/Escape 1.5L Coolant Intrusion)

FORD-MILLER 00126435 (Slide deck produced by Ford titled "Coolant Intrusion 15MY-18MY Sigma & Duratec Cost Mitigation Strategy"). The third slide in the deck describes the Problem Description to be that [redacted] The deck includes limited information pertaining 1.6-liter subject engine repairs, including on slide 16, where a variety of [redacted] are discussed.

FORD-MILLER 00124270 (Slide deck produced by Ford titled "BEP 1.5L GTDi Block Bore Bridge Deck Surface Corrosion/erosion"). The slide deck discusses [redacted] None of the [redacted] claims or photographs in the presentation pertain to 1.6-liter subject engines.

[52] Dr. Jordan Report, page 4

*in an engineering change to remove the saw-cut design from being used in any Ford engine with a bore bridge narrower than 13.5 mm."*[52]

75. However, the only TSBs identified by Dr. Jordan all date to 2019, well-after the design of the subject engines and after the sale of virtually all class vehicles (according to his own table defining class vehicles). One TSB (19-2139) and CSP (19B37) pertaining to coolant intrusion in 1.5-liter subject engines were both issued in a single year (2019). Ford also issued its first TSB related to coolant-intrusion in the 2.-liter in 2019 (TSB 19-2172). Ford has never issued any coolant intrusion related TSBs that are applicable to the 1.6- and 2.3-liter subject engines, and the 1.5- and 2.0-liter subject engine bulletins are only applicable to certain model and model-year subject vehicles. None of Ford's bulletins are applicable to all of the vehicles included in the Plaintiffs' proposed class, and the bulletins produced in 2019 and later do not provide any basis for Dr. Jordan's suggestion that Ford knew, or should have known, when designing and validating the engines or shortly after they went into production that either the 1.5- or 2.0-liter subject engine had coolant intrusion failure mechanisms.

76. Dr. Jordan does not report studying or gaining a complete understanding of the testing or modeling that Ford performed while designing and validating the subject engines. In his report, he does not provide any examples of even a single incident of coolant intrusion occurring in a subject engine prior to production.

77. In his report, Dr. Jordan admits that Ford did not see cooling intrusion during the development process of the Sigma (1.5- and 1.6-liter) subject engines but claims that it was seen during testing of the Duratec (2.0- and 2.3-liter) subject engines.[53] However, as supposed basis for that claim, Dr. Jordan references nothing more than a single email and a few pages of deposition testimony provided by Mr. Henne, neither of which support his claim. In fact, in the cited testimony Mr. Henne explicitly states that Ford <u>did not</u> see the Duratec coolant intrusion failure mechanism during prior testing.[54]

a. The Ford email conversation is from March 2018 (long after the design phase was complete), and it includes limited discussion regarding [redacted][55] The test results indicate that some of the [redacted] However, **the test results do not indicate that any of those incidents of** [redacted] Furthermore, I am not aware of (nor has Dr. Jordan presented) any examples of at-issue repairs caused by a cylinder head gasket cracking, and Dr. Jordan explicitly claims that his theory of defect is unrelated to

52 Dr. Jordan Report, page 4

53 Dr. Jordan Report, page 25, 27, : Dr. Jordan poses the question "Why didn't Ford see coolant intrusion in the Development process? And answers the question "Dyno tests didn't duplicate real world driving" and cites references he claims support his answer.

54 Dr. Jordan Report, page 31, 33

55 NELSON-FORD 0010971 - NELSON-FORD 0010975 (Henne Deposition Exhibit 8)

cylinder head gasket design. Thus, the failure mechanism discussed in the email does not demonstrate any awareness of the coolant intrusion failure mechanisms at-issue in this matter, but it does demonstrate Ford's motivation to introduce the updated (-DA or -HA part number) cylinder head gasket in mid-2016, which was thought to feature an improved fatigue life.

b. In the testimony that Dr. Jordan cited, Mr. Henne explains the cylinder head gasket cracking failure mechanism that was seen during the accelerated testing of the early build 2.0- and 2.3-liter subject engines and how that motivated the introduction of the updated cylinder head gasket (-DA part number). However, he also explained that it was not the same failure mechanism that led to coolant intrusion on some Duratec engines. In fact, in the testimony cited by Dr. Jordan, he explicitly stated that Ford did not recognize the at-issue coolant intrusion failure mechanism during any of their prior testing and that due to the unique nature of the failure mechanism, it still could not be reproduced through testing as of March 2018. More specifically, he testified that *"And this"* (coolant intrusion failure mechanism) "***is a failure mode that didn't – didn't come out of our prior testing****. And obviously it's a failure mode that we – we're much better in our analysis at predicting, and we have some additional tests that look for conditions that could contribute to this issue. But we don't have a test today that duplicates the failure that we saw on these engines."*[56]

78. Dr. Jordan's claim that Ford knew of the so-called "Engine Defect" or coolant intrusion failure mechanisms in any of the subject engines during preproduction testing is baseless and is not supported by data or evidence.

## Dr. Jordan Overstates the Rates Associated with Subject Engine Coolant Intrusion

79. Dr. Jordan does not report performing any warranty data analysis. Yet, he authored a section of his report titled *"The Saw-Cut Engines Suffered High Failure Rates."* In that section, Dr. Jordan misleadingly states that *"Vehicles equipped with the saw-cut design exhibit extremely high failure rates, with the 1.5L Sigma engine* ***reaching a project failure rate of up to*** [redacted] ***percent at 10 years or 100,000 miles****."*[57] In reality, the rate projection that he mentioned—not even an actual rate—was potentially only applicable to model-year 2017-2019 1.5-liter subject engines that did not undergo the FSA (CSP 19B37). The document says that the CSP was expected to reduce that projected rate. Many of those vehicles did have the CSP completed, which reduced their probability of a future subject repair. Dr. Jordan provides no data or evidence that those projections were ever "suffered" in real life, like he claims. In fact, Plaintiffs' repair rate expert, Dr. Wachs, estimates the actual rates for model-year 2017-2019 vehicles to be a fraction of what Dr. Jordan suggests was "suffered."

---

56 Deposition of Joseph Henne, August 13, 2025, page 161:21-168:25

57 Dr. Jordan Report, page 44

80. Dr. Jordan also opines that he expects the "failure rate" of 1.6-liter subject engines to be higher than 1.5-liter subject engines; and 2.3-liter subject engines higher than 2.0-liter subject engine. However, all the information and evidence in this matter, including the warranty repair rate data, shows the opposite to be true. Dr. Jordan's opinions regarding the rates of at-issue repairs have no basis and no reliability and appear based on his speculative and inaccurate understanding of the actual rates, as have been calculated and disseminated by Ford and other experts in this matter.

## Dr. Jordan Overstates the Severity of Symptoms Associated with Subject Engine Coolant Intrusion

81. Dr. Jordan agrees that subject engine coolant intrusion issues often result in the mild symptoms reported by Ford, such as a low coolant level, white exhaust smoke, and/or an illuminated check engine light and a rough running engine due to misfires. [58] However, throughout his report he also suggests that it results in more severe symptoms, such as damage to engine bearings as a result of coolant contamination of the engine's oil,[59] hydrolock,[60] catastrophic engine failure resulting in engine stalling, and/or the complete loss of motive power of a vehicle.[61]

82. In fact, Dr. Jordan devotes entire sub-sections of his report to topics including "Loss of Power While Driving," "Loss of Power-Assisted System," "Unexpected Deceleration" and "Failure in Hazardous Situations."[62] In those sections, he cites five documents as support of the idea that at-issue coolant intrusion issues result in those types of events. However, all the cited documents pertain to investigations of incidents involving overheating of 1.6-liter subject engines (likely due to external leaks), and there is no evidence to indicate that any of those incidents were caused by coolant intrusion or Dr. Jordan's theory of defect.

83. Dr. Jordan also claims that twelve (about half) of the named Plaintiffs experienced loss of power due to his theory of defect and cited select portions of their deposition testimony as support for those claims.[63] However, many of the Plaintiffs he cited experienced issues and repairs found to likely be unrelated to coolant intrusion, and none have been found to experience coolant intrusion specifically due to his unfounded theory of defect. Additionally, much of the testimony cited by Dr. Jordan describes milder symptoms or requires more context than he provides. For example:

a. Amber West (2013 Ford Fusion, 1.6-liter subject engine): Dr. Jordan misleadingly cites a select portion of Ms. West's testimony where she discusses an issue that she

---

[58] Dr. Jordan Report, page 3, 8

[59] Dr. Jordan Report, page 3

[60] Dr. Jordan Report, page 12

[61] Dr. Jordan Report, page 3

[62] Dr. Jordan Report, page 9

[63] Dr. Jordan Report, page 8

had with her subject vehicle in 2019 that resulted in the vehicle losing power but then regaining normal operability after being shut off for 10 minutes. Repair records show that a technician tried but was unable to duplicate the loss of power issue, and there is no information or evidence to indicate that the loss of power incident was caused by coolant intrusion. Her at-issue coolant intrusion repair did not occur until about two years and 40,000 miles later, and records show that the at-issue coolant intrusion repair was prompted by the check engine light being illuminated, not loss of power concern. [64]

b. Evan West: Ms. West (not Evan) was the primary driver of the Wests subject vehicle.[65] When describing incidents of stalling, Mr. West prefaced his testimony by stating *"from what my wife told me."* and *"it never broke down on me"*[66] Dr. Jordan's citation of Mr. West's second-hand account of the reported loss of power events is not reliable evidence of any unsafe situation caused by Dr. Jordan's theory of defect.

c. Anthony Cicero (2017 Ford Escape, 1.5-liter subject engine): Mr. Cicero describes his subject vehicle going into limp home mode (limited power and speed) and the check engine light illuminating while in a parking lot once, and then the vehicle exhibiting an abnormal ticking noise and sluggish acceleration (not loss of power) thereafter before taking it to a dealership for repair.[67] As I discussed in my initial report, the technician who performed Mr. Cicero's at-issue repair noted finding damage to the engine's valves and piston that he attributed to preignition/detonation,[68] which is type of abnormal combustion that can occur due to a variety of reasons unrelated to coolant intrusion. There is no evidence that the repair (or the symptoms leading up to it) were caused by the 1.5-liter coolant intrusion failure mechanism.

d. Brian Lee Simonds (2017 Ford Edge, 2.0-liter subject engine): Dr. Jordan cites the following deposition testimony provided by Mr. Simonds, describing the symptoms leading up to his at-issue repair: *"I told my fiancé that something was wrong and then we went out there and that's when the light was on. And then I was, like, we got to take it in. I was smelling something burning and it was shaking real bad."*[69] The record for his repair similarly describes the symptoms reported by Mr. Simonds to be *"vehicle was shaking, CE light came on, also smelled a burning smell."* The records indicate that Mr. Simonds's subject vehicle experienced shaking that was not severe

---

64 Deposition of Amber West, September 5, 2025, page 50:6-71:9
PLTF_0004869 - PLTF_0004877

65 Deposition of Amber West, September 5, 2025, page 14:2-6

66 Deposition of Evan West, September 4, 2025, page 88:3-89:18

67 Deposition of Anthony Cicero, October 22, 2025, page 100:23-118:18

68 PLTF_0004255 - PLTF_0004265 (Cicero Deposition Exhibit 7)

69 Deposition of Brian Simonds, page 69:12-23

enough to prevent him from driving the vehicle into the shop for repair, and not engine power loss, like Dr. Jordan claims.

e. David Speigner (2017 Ford Escape, 2.0-liter subject engine): In deposition, Mr. Speigner described a progression of symptoms leading up to his at-issue repair. He testified that the symptoms started with an abnormal smell and loss of coolant, and that it progressed to a rough running engine and illuminated check engine light. The testimony that Dr. Jordan cites in his report reads, *"the check engine light came a little later in the process. Especially as it progressed to the – to the rough running, the cranking, the engine vibrating, whatever you call it. At some point, there was – there was a check engine light that showed up"*[70] which does not support Dr. Jordan's claim that Mr. Speigner's subject vehicle experienced a loss of power or any other severe condition. Rather, the mild symptoms described by Mr. Speigner are consistent with those that Ford advises typically accommodate a coolant intrusion concern. The Ford technician who performed the diagnosis for the loss of coolant concern that Mr. Speigner reportedly brought his vehicle into the shop for did confirm that it was experiencing coolant intrusion and repaired it accordingly.[71]

f. Jillian Constable (2016 Ford Edge, 2.0-liter subject engine): The testimony provided by Ms. Constable that Dr. Jordan cites describes the symptoms leading up to her at-issue repair, as follows: *"…It was just like – like when it would start, it was almost, like, turning over more, like it was – it would start but it wouldn't like, start, like, strong, if that makes sense. It was like – and this it would – it was running, like really rough for the first, like, little bit of time that the engine was running and then once you started to drive it for a little while, then it started to feel more normal. But at the beginning, it was just like this sort of, like, rough feeling. I don't know how to explain it. It just didn't feel normal to what it typically had been."* Her testimony describes her subject vehicle's engine running rough for the first few minutes after startup and does not support Dr. Jordan claim that it experienced a loss of power condition.

g. Scott Pickering (2014 Ford Fusion, 1.5-liter subject engine): The testimony provided by Mr. Pickering that Dr. Jordan cites is selective and includes a description of his subject vehicle's engine being difficult to start, fluctuating in speed (RPM), and occasionally stalling shortly after startup, as well as white smoke emanating from the tailpipe. However, in additional testimony that Dr. Jordan either missed or disregarded, Mr. Pickering clarified that he does not recall the engine ever stalling while the vehicle was in gear and testified that *"I don't recall it stalling on the road when I was operating it."*[72] Mr. Pickering's testimony regarding symptoms that occurred while his subject vehicle was not even in gear does not support Dr. Jordan's claim that he experienced loss of power conditions.

---

[70] Deposition of David Speigner, February 11, 2026, page 87:14

[71] PLTF_0005105 - PLTF_0005106 (David Speigner Deposition Exhibit 8)

[72] Deposition of Scott Pickering, March 12, 2025, page 97:16-100:4

h. Teresa Balaszek (2017 Ford Escape, 1.5-liter subject engine): Ms. Balazek had two at-issue engine repairs. Her deposition testimony that Dr. Jordan cites describes the symptoms that prompted her to seek the second repair as *"high heat warnings"* and that *"it just wouldn't accelerate anymore. Maybe 2 miles per hour."*[73] Her description is consistent with the subject vehicle having entered a failsafe mode due to the engine overheating. Following those symptoms, she brought the vehicle to a repair shop owned by members of her family where the cylinder head gasket was found to be failed and was replaced.[74] Automotive engines can overheat for many different reasons resulting in cylinder head damage. There is no indication that the repair (or associated symptoms) that Mr. Balaszek described in the testimony that is cited by Dr. Jordan was caused by coolant intrusion.

i. Tracy Ann Metro (2018 Ford Edge, 2.0-liter subject engine): As was discussed in my initial report, Ms. Metro's subject vehicle experienced engine damage for reasons unrelated to coolant intrusion. The technician who performed the at-issue repair found low compression in one of the engine's cylinders. That cylinder's walls were found to be washed with fuel, valve damage, and the piston rings leaking excessively. The technician does not report finding coolant intrusion, and the repair actions that he performed were unrelated to coolant intrusion.[75] As such, the testimony that Ms. Metro provided regarding loss of power due to an issue unrelated to coolant intrusion cannot possibly support any of Dr. Jordan's conclusions regarding symptoms associated with coolant intrusion.

j. Tyson John Batdorf (2017 Lincoln MKC, 2.0-liter subject engine): Mr. Batdorf described that his subject vehicle's engine started overheating, "sputtering," stuttering, losing power and going into limp mode. He and his wife also drove the vehicle for some time before seeking diagnosis for the issues and then continued to drive the vehicle for months without repair after it was diagnosed as needing a new engine, although it was never confirmed to have coolant intrusion.[76] As such, his continued usage of the vehicle without addressing its known engine issues likely contributed to the frequency and severity of the symptoms he experienced.

84. In his report, Dr. Jordan also cites complaints issued to NHTSA as support for his claim that coolant intrusion results in severe or safety symptoms. More specifically, he states that the *"National Highway Safety Traffic Safety Administration (NHTSA) has had numerous complaints of stalling and power loss due to this defect…"*[77] However, Dr. Jordan does not report investigating any of the NHTSA complaints that he references,

---

[73] Deposition of Teresa Balaszek, August 6, 2024, page 66:11-70:25

[74] PLTF_0004473 (Balaszek Deposition Exhibit 3)

[75] PLTF_0002604 - PLTF_0002610 (Tracey Metro Deposition Exhibit 8)

[76] Deposition of Tyson John Batdorf, April 8, 2025, page 100:5-23, 131:2-132:2
PLTF_0000042 (Tyson Batdorf Deposition Exhibit 5)

[77] Dr. Jordan Report, page 9

and none of them should be assumed to have resulted from coolant intrusion, let alone coolant intrusion caused by Dr. Jordan's unfounded theory of defect.

85. Unlike Dr. Jordan, in my investigation I have reviewed hundreds of records pertaining to the at-issue coolant intrusion repairs (e.g., warranty claims, repair invoices). The vast majority document the mild symptoms that Ford reports prompt the repairs and not the more severe symptoms that Dr. Jordan focuses on in his report.

## Dr. Jordan Has Not Investigated the Cause of the Named Plaintiffs' Repairs

86. In his report, Dr. Jordan states that all the Plaintiff invoices and engines he reviewed or inspected required an engine replacement, and that *"All of the Plaintiff engines I inspected had a loss of elastomeric material (gasket sealing bead) on the stainless steel cylinder head gasket in the bore bridge area with a resultant coolant leak into the combustion chamber."*[78]

87. However, engine repairs, including replacement, occur for many different reasons. In my report, I discussed the findings of my investigation of the named Plaintiffs' repairs and how they likely occurred due to a variety of causes and some for reasons unrelated to the at-issue coolant intrusion failure mechanisms. Dr. Jordan does not report utilizing any reliable investigate methodology to determine the cause of any of the named Plaintiff's at-issue repairs, and his assumption that they are all attributable to his theory of defect is unreliable.

88. Furthermore, although Dr. Jordan reports observing elastomeric material (gasket sealing bead) loss on cylinder head gaskets from a 1.6-liter subject engine and two 2.0-liter subject engines after they were removed from named Plaintiffs' engines and tampered with by Mr. Hille, he provides no reliable connection between his elastomeric material observations and the cause of the three repairs. As will be discussed more in the next section, the areas of the used gaskets that Dr. Jordan highlights in his report as exhibiting "loss of elastomeric material" are not even the areas of the gasket that were found to be leaking.

## Dr. Jordan's Attempt to Assess Cylinder Head Gasket "Leak Potential" Based on Appearance Lacks a Reliable Methodology

89. Dr. Jordan reports inspecting three exemplar subject engines, two exemplar non-subject engines, and four previously spoliated named Plaintiffs' (evidence) engines. He does not report identifying the leak path that resulted in coolant intrusion in any of the engines, let alone reliably determining the cause of any such leakage.

[78] Dr. Jordan Report, page 6

90. Dr. Jordan's analysis of the four named Plaintiffs' engines that he inspected is superficial in nature and with disregard for the actual cause for their repairs. For example, in his report:

a. Dr. Jordan shows a photograph of the cylinder head gasket removed from the Wests' 1.6-liter subject engine, with the bore bridge region that resides between cylinder# 2-3 circled and notes *"loss of material in bore bridge."*[79] However, despite Dr. Jordan's concern about the aesthetics of the 2-3 bore bridge region of the cylinder head gasket, the Wests' engine was found to have coolant in cylinder #4 and its cylinder block deck exhibited obvious mechanical damage around cylinder #4 for reasons that cannot possibly be related to the area circled by Dr. Jordan.

b. Dr. Jordan shows a photograph of the cylinder head gasket removed from Mr. Mullen's 2.0-liter subject engine with the bore bridge region that resides between cylinder# 2-3 circled, and notes *"loss of elastomeric material in bore bridge."*[80] However, the engine was replaced due to coolant in cylinder #1 that could not possibly have originated in the area circled by Dr. Jordan.

c. Dr. Jordan shows a photograph of the block side of the cylinder head gasket removed from Ms. Miller's 2.0-liter subject engine with a bore bridge region circled and notes "loss of elastomeric material in bore bridge"[81] However, the engine was replaced due to coolant in cylinder #3, and as I discussed in my initial report, the damage and leak path that resulted in the intrusion was evident on the cylinder head (not block). As such, the repair was not caused by any issue with the block side of the gasket that Dr. Jordan focused his visual analysis on.

91. In his report, Dr. Jordan discusses his attempt to qualitatively (and unreliably) assess the "leak potential" of the used cylinder head gaskets he inspected, based on their appearance, alone. He concludes that *"The inspections revealed that non-Class Vehicle engines with cross-drilled blocks showed much better gasket elastomer coating integrity (low leak potential) than the gaskets from Class Vehicle engines (which had the saw-cut)."*[82]

92. However, I am not aware of, nor does Dr. Jordan present, any scientific methodology that can be used to quantify the "leak potential" of a used MLS cylinder head gasket based on appearance alone. As such, the opinions that Dr. Jordan formed based on an attempting to do so are unreliable and lack scientific basis.

93. It should be recognized that Dr. Jordan and I have inspected numerous used MLS cylinder head gaskets from subject and non-subject engines that were removed from vehicles after extensive usage (e.g., high mileage). They all show elastomeric material loss in many areas of the gaskets, including gaskets removed from engines without a

---

79 Dr. Jordan Report, page 107

80 Dr. Jordan Report, page 109

81 Dr. Jordan Report, page 111

82 Dr. Jordan Report, page 97

saw-cut bore bridge, and including gaskets that did not leak. Our inspection efforts confirmed that it is normal for even a well performing used MLS head gasket to exhibit elastomer loss after being removed from the engine.

94. For example, the block side of the cylinder head gaskets removed from normally operating high (150,000+) mileage exemplar 1.5-liter subject engine (MY 2018, with a saw-cut block) and an exemplar 2.0-liter subject engine (MY 2015, without a saw-cut block) are shown in Figure 4 and Figure 5. Notice that both long-lived and well-performing cylinder head gaskets exhibit loss of elastomer material, which although that appearance may concern Dr. Jordan, it does not constitute a functional problem.




Figure 4 Photographs of the cylinder head gasket (block side) of a 1.5-liter subject engine from a 2018 Ford Fusion. Notice that the elastomeric material is missing from many areas of the gasket. Yet, the cylinder head gasket was found to not be leaking (performing well) at the time that the exemplar engine was removed from a vehicle that had 157,298 miles of prior usage.[83]

[83] LILLO_2025-8-28_IMG_0635, LILLO_2025-8-28_IMG_0616




Figure 5 Photographs of the cylinder head gasket (block side) of a 2.0-liter EcoBoost engine from a 2015 Ford Escape that does not feature a saw-cut cylinder block. Notice that the elastomeric material is missing from many areas of the gasket. Yet, the cylinder head gasket was found to not be leaking (performing well) at the time that the exemplar engine was removed from a vehicle that had 191,805 miles of prior usage.[84]

95. The process of removing MLS cylinder head gaskets is inherently destructive and typically results in elastomer seal material separating or tearing from the gasket during removal. For example, when the cylinder head gasket shown in Figure 5 was removed, some of the gasket's elastomer material remained affixed to the cylinder block assembly (see Figure 6). Similarly, some elastomer material from MLS cylinder head gaskets often remains affixed to the deck of the cylinder head assembly during removal. Material can also separate entirely and become lost during the disassembly process. It is well known in the automotive industry that MLS cylinder head gaskets sustain damage during removal, and this one of the reasons why it is best practice to not reinstall a used cylinder head gasket, even if it was performing well before removal.

[84] LILLO_2025-8-28_IMG_0635, LILLO_2025-8-28_IMG_0616




Figure 6 Photographs of the non-saw cut engine cylinder block deck surface of a 2.0-liter EcoBoost engine from a 2015 Ford Escape and the elastomeric material (from the cylinder head gasket) that stuck to it when the engine was disassembled. The exemplar engine was removed from a vehicle that had 191,805 miles of prior usage and that was confirmed to not have coolant intruding into any of its cylinders.[85]

96. Any attempt to interpret the cause of elastomer loss on used MLS cylinder head gaskets is complicated by the fact that all MLS cylinder head gaskets, even normally wearing and functioning ones, can lose elastomer material over time. Also, damage inevitably occurs during the engine disassembly and gasket removal process, among other factors. I am not aware of any reliable correlation between the appearance of a destructively removed MLS cylinder head gasket and its "leak potential," nor did Dr. Jordan establish one.

97. Dr. Jordan attempted to compare the condition of used head gaskets that he removed from the following five used exemplar engines that he acquired and disassembled:

85 LILLO_2025-8-28_IMG_0558, LILLO_2025-8-28_IMG_0557

a. Dr. Jordan's Exemplar Engine #1 is a 1.5-liter subject engine removed from a 2017 Ford Escape that was totaled in a collision after 8.5 years and 152,738 miles of prior usage.

b. Dr. Jordan's Exemplar Engine #2 is a 2.3-liter subject engine removed from a 2018 Ford Mustang that was totaled after 8.5 years and 137,229 miles of prior usage.

c. Dr. Jordan's Exemplar Engine #3 is 2.0-liter Ecoboost engine with a cross-drilled cylinder block removed from a 2017 Escape that was totaled in a collision. It was a replacement (not original) engine, so its mileage and time in service is unknown. However, it could not possibly have been used for more than 88,598 miles, since that was the vehicles total mileage at the time it was totaled.

d. Dr. Jordan's Exemplar Engine #4 is a three-cylinder, 1.5-liter "Dragon" Ecoboost engine with a cross-drilled engine removed from a 2020 Ford Escape that was totaled in a collision after 70,041 miles of prior usage.

e. Dr. Jordan's Exemplar Engine #5 is a 1.6-liter subject engine removed from a 2017 Ford Fiesta. No VIN or repair records have been produced for the vehicle that the engine was removed from. Dr. Jordan appears to have disregarded his findings from inspecting it, as he does not discuss the engine in his report or list his documentation from the inspection of it in his list of materials.

98. Like all automotive components, cylinder head gaskets experience wear and degradation with continued usage (e.g., accrual of mileage). Notice that the two exemplar subject engines with saw-cuts that he selected for his analysis are both high mileage engines that had accrued twice, if not more, mileage than the non-subject (non-saw-cut equipped) engines that he selected for comparison. Dr. Jordan does not mention the substantial difference in usage histories of the gaskets that he has compared in his report, and his attempt to make apples-to-apples comparisons between gaskets that experienced significantly different amounts of usage and expected wear and tear is misleading.

99. Dr. Jordan also inaccurately claims that the cylinder head gaskets removed from the non-subject (non-saw-cut) engines that he inspected showed *"no loss of material in the bore bridge."*[86] However, contrary to those claims as can be seen in Figure 7 and Figure 8, the non-subject engine gaskets that he inspected, like all used MLS cylinder head gaskets, show substantial loss of elastomeric material, including in the bore bridge areas.

86 Dr. Jordan Report, page 98, 100




Figure 7 Annotated photograph of the cylinder head gasket the Dr. Jordan removed from an exemplar three-cylinder 1.5-liter engine that does not have a saw-cut engine block.[87] Notice that, contrary to what Dr. Jordan claims, it is missing elastomeric bead material in numerous areas including the bore bridges.




Figure 8 Annotated photographs of the cylinder head and block deck surfaces from an exemplar 2.0-liter Ecoboost engine that does not have a cross-driller (rather than saw-cut) engine block.[88] Notice that, contrary to what Dr. Jordan claims, elastomeric bead material lost from the cylinder head gasket can be seen to be affixed to the deck surfaces in numerous areas, including the bore bridges.

---

[87] IMG_8564

[88] IMG_8326, IMG_8315

100. In his analysis, Dr. Jordan overemphasizes the importance of his observations regarding loss of elastomeric material and completely disregards the real-world performance of the cylinder head gaskets he inspected. For example, in his report, when discussing the exemplar 1.5-liter subject engine that he acquired and inspected, he discusses his concern about the loss of elastomer material from the cylinder head gasket[89] but fails to mention that the gasket survived 152,738 miles of prior usage. In fact, the gasket out-lived the vehicle that it was installed in, which was retired after a long life due to collision damage.

101. Whether or not Dr. Jordan approves of their appearance, it should be recognized that the long and successful life of many of the subject engine cylinder head gaskets that he inspected is entirely inconsistent with the idea that his elastomeric material observations reliably correlate to real-world performance or that his unfounded theory of defect could possibly have resulted in any tangible impact (e.g., repair) felt by all members of the Plaintiffs' proposed class. Similarly, the long (approximately 149,000-192,000 miles) and successful life of the exemplar subject engines that I acquired disproves those ideas as well.

## Dr. Jordan's Repair Opinions are Flawed

102. As was discussed in my initial report, Ford recommends that coolant intrusion in 1.5-liter subject engines be repaired by replacing the engine short block assembly (with reusage of the cylinder head assembly) and that coolant intrusion in 2.0-liter subject engines be repaired by replacing the engine long block assembly (which includes replacement of the cylinder head assembly). The difference in repair action is attributable to the differences between the 1.5- and 2.0-liter coolant intrusion failure mechanisms. More specifically, the 2.0-liter mechanism sometimes results in corrosive damage forming on the cylinder head deck surface (necessitating replacement of the cylinder head assembly), whereas the 1.5-liter mechanism does not (so the cylinder head assembly can typically be reused).

103. Dr. Jordan claims that *"From an engineering and reliability perspective, a long block replacement is preferred over a short block replacement in the field because it replaces all wear-matched, tolerance-sensitive components as a complete, factory-assembled system."*[90] In other words, Dr. Jordan suggests that Ford's recommendation regarding 1.5-liter subject engine coolant intrusion repairs should be ignored and that all at-issue repairs should include replacement of the entire engine long block assembly.

104. Dr. Jordan's suggestion that engine long block assemblies should always be replaced as a single unit for the purpose of maintaining *"wear-matched, tolerance-sensitive components as a complete, factory-assembled system"* is inconsistent with standard practice in the automotive industry. The purpose of an at-issue repair is to fix a coolant intrusion concern, not to *"wear-match"* all the components on the vehicle or to

[89] Dr. Jordan Report, page 100

[90] Dr. Jordan Report, page 7

unnecessarily replace or refurbish undamaged components or assemblies. Contrary to what Dr. Jordan suggests, cylinder head assemblies are often reused in engine repairs, and engine short block replacements are a common procedure in the automotive repair industry.

105. The idea that a complete long block replacement is necessary to repair 1.5-liter subject engine coolant intrusion concerns is refuted by the historical success of short block replacements. Dr. Jordan's suggestion that it is preferable to replace long block assemblies is not supported by any data (e.g., demonstrating improved repair outcome), and is with complete disregard for the obvious downside of replacing long block instead of short block assemblies of incurring unnecessarily costs.

106. In his report, Dr. Jordan provides various estimates of repair costs based on his research and analysis of select named Plaintiffs' records. For example, he estimates that the average cost to replace an at-issue short block assembly is $3,720 and that the average cost to replace an at-issue long block assemblies is nearly twice that amount, at $6,458. He also provides an average of his short and long block replacement cost estimates, of $5,089,[91] which is of no practical relevance, as coolant intrusion repairs always involve one procedure or the other and never the average of the two.

107. In order to calculate the average short and long block replacement costs, Dr. Jordan estimated the short and long block replacement cost for one make/model/model subject vehicle equipped with a 1.5-, 1.6-, 2.0- and 2.3-liter subject engines (a total of four vehicles) and then averaged them. It is unclear how he selected those four specific vehicles out of the much wider variety of make/model/model-year vehicles that are at-issue in this matter. However, vehicle selection aside, he illogically includes costs related to a 1.5-liter subject engine equipped vehicle in his long block cost estimates (when that vehicle would typically be repaired via a short block replacement) and costs related to 2.0- and 2.3-lite subject engines in his short block replacement cost estimate (when those vehicles would typically be replaced via a long block replacement) – the result of which is an unjustifiable increase in the average long block replacement cost of $668.

108. In reality, most members of the Plaintiffs' proposed class have not experienced a coolant intrusion repair ($0 cost of repair). Those who have, experienced different costs depending on the make/model/model-year of their subject vehicle, the extent of damage their engine experienced, whether the vehicle was under warranty at the time, the labor rate of the repair shop that performed the repair, among other factors, all of which can only be accurately assessed on a case-by-case basis. There is no single repair cost (average of otherwise) listed in Dr. Jordan's report that could possibly be applicable to all members of the Plaintiffs' proposed class or even that could be applicable to all members who experienced an at-issue repair. The "average" costs that Dr. Jordan provides in his report are not reliable estimates that can be assumed applicable to all at-issue repairs.

91 Dr. Jordan Report, page 7

## Spoliation of Evidence by Plaintiffs' "Consulting" Expert Richard Hille

109. In my initial report, I discussed the fact that Plaintiffs' counsel or representatives collected evidence removed from four named Plaintiffs' vehicles during subject repairs, including three engine long block assemblies, and that someone destructively disassembled and spoliated most of that evidence before I had an opportunity to inspect it during the multiparty inspection on February 11, 2026.

110. Up to the date initial expert reports were produced for this matter, the Plaintiffs did not produce any documentation pertaining to the evidence's chain of custody or prior handling. At the multiparty inspection, the attorney and expert for the Plaintiffs were unable or unwilling to provide any information regarding who disassembled (spoliated) the evidence prior to the inspection or what documentation (if any) existed from their non-noticed and destructive effort.

111. I first became aware of who spoliated the evidence upon reviewing Dr. Jordan's initial expert report for this matter, which was published on March 20, 2026, and the Declaration of Richard Hille that was produced as an appendix to it. In Dr. Jordan's report, he states, *"I understand that Plaintiffs' Counsel's* ***consulting expert performed a*** *visual inspection and non-destructive* ***partial disassembly of three Plaintiff engines prior to my inspection.****"*[92] I disagree that the partial disassembly was "non-destructive," as explained below.

112. Despite relying upon Mr. Hille and introducing his declaration as an exhibit to his report, Dr. Jordan does not report having received any documentation (e.g., photographs, videos, notes) pertaining to Mr. Hille's disassembly effort. Nor have plaintiffs produced any to Ford or otherwise made them available to me before the date of this rebuttal report. I may have further opinions related to those vehicles if that documentation is ever made available.

113. In Mr. Hille's declaration, he explains that he was retained by Plaintiffs' counsel *"as a non-testifying consulting expert to investigate the potential claims"* for this matter. He admits to receiving the engine long block assemblies removed from three of the named Plaintiffs' subject vehicles in 2020-2021, and then to disassembling them in his facility in Santa Ynez, CA. He describes removing components from the engines and storing those components in boxes, as well as extracting fluid samples from the engines, which he later sent to a lab for testing (where they were destructively consumed). His declaration describes documentation that he took of his efforts, but I have not seen, nor did Dr. Jordan produce with his report, any photographs, videos, or other documentation produced by Mr. Hille. He produced fluid test results that are reportedly related to the fluid samples that he collected from the engines. However, no documentation has been

[92] Dr. Jordan Report, page 97

produced to confirm the source or method of fluid sampling associated with those test results.

114. In his declaration, Mr. Hille attempts to justify his actions by stating that *"At no time did I or anyone to my knowledge do anything destructive or otherwise alter the condition of the engines and related engine components that are discussed in this declaration. The work I performed, including the non-destructive disassembly and visual inspections, was, to my understanding, part of the due diligence to confirm that the subject engines experienced the defect at issue. I did no more disassembly than was reasonably necessary to conduct my visual examination."*[93]

115. The fact that the Plaintiffs reportedly felt the need to have a consulting expert pre-process the physical evidence prior to making it available for other parties, apparently to "confirm" that it features damage they attribute to their theory of defect (1) demonstrates an attempt to be selective in the evidence produced by the Plaintiffs in this matter and (2) is also an acknowledgement that even the Plaintiffs' own experts cannot confidently identify damage they attribute to their theory of defect without performing extensive engine disassemblies, which could not practically be performed on a class-wide basis.

116. As was discussed in my initial report, the act of disassembling and removing the cylinder head assembly from an automotive engine is inherently destructive and cannot possibly be completed without altering the condition of internal engine components, such as the cylinder head gaskets' sealing surfaces that are at-issue in this matter. It is simply wrong to refer a disassembly as "non-destructive." Hence, it is standard practice for experts, whether in a consulting or testifying role, to notify other interested parties before disassembling an engine likely to be subject of civil litigation and to invite them to participate in the proposed actions.

117. ASTM E860-22 (Standard Practice for Examining and Preparing Items That Are or May Become Involved in Criminal or Civil Litigation) defines destructive testing as *"testing, examination, re-examination, disassembly, or other actions likely to alter the original, as-found nature, state, or condition of items of evidence so as to preclude or adversely affect additional examination and testing."* Mr. Hille's actions – removing and boxing dozens of internal engine components; loosening, disassembling, reassembling, and retightening the sealing-joints and their fragile elastomer sealant beads that are at-issue in this matter; and draining and destroying engine fluids – certainly alter "*the original, as-found nature, state, or condition*" of the evidence. From a technical perspective, Mr. Hille's and Dr. Jordan's claims that such actions are "non-destructive" is unjustifiable and deprived me from an opportunity to evaluate the condition of the engines internal components upon initial removal, include the condition of the cylinder head gasket sealing surfaces which are directly at-issue in this matter.

118. ASTM E860-22 defines spoliation of evidence as "the loss, destruction, or material alteration of an object or document that is evidence or potential evidence in a legal proceeding by one who has the responsibility for its preservation," which has occurred

[93] Richard Hille Declaration, page 3

as a result of Mr. Hille's actions. Notably, ASTM E860-22's definition of spoliation does not differentiate between actions taken by a consulting or testifying expert.

# Exhibit A: Curriculum Vitae of Peter Lillo, Ph.D., P.E., A.S.E. Master Certified Automotive Technician

**Lillo Engineering, Inc.**
5610 Scotts Valley Dr.
Suite B, PMB 571
Scotts Valley, CA 95066

## Peter Lillo, Ph.D., P.E., C.F.E.I.

Principal Engineer

Scotts Valley, CA
plillo@lilloeng.com
office: (831)588-3978
www.lilloengineering.com



## Professional Profile

Dr. Lillo is a mechanical engineer who specializes in failure analysis and the assessment of issues involving vehicles, engines, machines, fires, explosions, or any combination of those topics. His professional background is in mechanical engineering, automotive technology, and the thermal sciences. Dr. Lillo often investigates the root cause of failures, as well as claims of defect and issues involving automobiles, trucks, buses, tractors, ATVs, and other types of vehicles or machinery. Dr. Lillo obtained his Ph.D. in the fields of thermal sciences and combustion. He has experience investigating the cause, origin and progression of fires, explosions, and other thermal events in a variety of environments including residential and commercial structures, vehicles, and machinery. As an expert in both vehicles and fire, he often analyzes complex vehicle fire incidents or issues.

Dr. Lillo is trained in the field of automotive repair, and he practiced as a master certified technician. He is also a professional mechanical engineer. He has diagnosed the cause of thousands of vehicle failures and issues and has been solving automotive problems for more than twenty years. He has expertise in the fields of engines, fuel systems, emissions control devices, automatic and manual transmissions, brakes, steering and suspension systems, HVAC systems, electrical and computer systems, drivability, among others. His experiences include working with many different types of light and heavy-duty vehicles, tractors, as well as engines in both mobile and stationary applications. He has performed smog related inspections and repairs in the state of California. He often analyzes records and data to gain an

understanding of real-world failure modes, failure rates, repairs, and their outcomes, as well as to assess vehicle or machine performance and trends. He has extensive experience inspecting and testing vehicles and their components. He consults on best practices, standard of care, warranty issues, preventative maintenance, or other topics in the field of vehicle service and repair. He frequently investigates and determines the root cause of vehicle and engine failures and issues.

Dr. Lillo also carries out work relating to combustion, fluid flow, thermodynamic, heat transfer processes, mechanical engineering, and product safety. For example, he performs engineering analysis of power producing devices such as engines and turbines, as well as appliances, gas utilities and pipelines, consumer devices, hydraulic and pneumatic systems, boilers, heating/cooling systems, and combustion emissions issues such as carbon monoxide poisoning incidents. He conducts proactive work, such as product evaluations and testing, as well as reactive work, such as failure analysis and product recall investigations. Dr. Lillo has extensive experience designing and performing scientific tests, measurements, and research. He has published peer-reviewed articles on the topics of engines, combustion strategies, fuel sprays, ignition processes and mechanical and optical diagnostics.

Prior to founding Lillo Engineering, Inc., Dr. Lillo was a Senior Managing Engineer at Exponent. During the eight years he worked there, he investigated the cause of hundreds of failures and fires and consulted on wide variety of engineering and automotive topics.

Dr. Lillo earned an A.S. in Automotive and Engine Technologies (De Anza College), a B.S. in Mechanical Engineering (U.C. Berkeley), and an M.S and Ph.D. in Mechanical Engineering (University of Michigan - Ann Arbor). While at the University of Michigan, he used advanced laser based optical diagnostics to study flame, airflow and fuel spray development inside automotive engines. He has also worked in combustion laboratories at both Sandia National Laboratories and UC Berkeley.

## Academic Credentials & Professional Honors

Ph.D., Mechanical Engineering, University of Michigan, Ann Arbor, 2016

M.S., Mechanical Engineering, University of Michigan, Ann Arbor, 2013

B.S., Mechanical Engineering, University of California, Berkeley, 2010

A.S., Automotive Chassis Systems, De Anza College, 2005

A.S., Automotive Engine Performance, De Anza College, 2005

A.S., Engine Machining and Service, De Anza College, 2005

Graduate Research Fellowship, National Science Foundation, 2011-2014

Alternate Member: Technical Committee on Automotive and Marine Service Stations (AUV-AAA), NFPA 30A Code for Motor Fuel Dispensing Facilities and Repair Garages, National Fire Protection Association,

2018-present

Alternate Member: Technical Committee on Internal Combustion Engines (INT-AAA), NFPA 37 Standard for the Installation and Use of Stationary Engines and Gas Turbines, National Fire Protection Association, 2017-present

## Licenses and Certifications

Licensed Professional Mechanical Engineer, California, M39287

ASE Certified Master Automotive Technician

ASE Certified Medium/Heavy Truck Technician

ASE Certified Advanced Level Engine Performance Specialist

Certified Fire and Explosion Investigator (CFEI)

Certified Vehicle Fire Investigator (CVFI)

Fire Investigation 1A (Cause and Origin), California Office of State Fire Marshal

## Experience

President and Principal Engineer, Lillo Engineering Inc., Scotts Valley, CA 2024-present

Senior Managing Engineer, Exponent, Menlo Park, CA, 2016-2024

Graduate Student Researcher, Quantitative Laser Diagnostics Laboratory, University of Michigan, 2011-2016

Combustion Research Intern, Sandia National Laboratories, 2010-2011

Student Researcher, Combustion Analysis Laboratory, University of California, Berkeley, 2008-2010

Master Automotive Technician, Dirks Automotive and Transmission Repair, Oroville, CA, 2006-2007

Master Automotive Technician, J.P. Automotive, San Jose, CA, 2002-2006

## Professional Affiliations

Society of Automotive Engineers

National Associate of Fire Investigators

National Fire Protection Agency

## Publications

Kazmouz SJ, Haworth DC, Lillo PM, Sick V. Extension of a thickened flame model to highly stratified combustion—Application to a spark-ignition engine. Combustion and Flame, 236, 111798, 2022.

Kazmouz, Samuel J., Daniel C. Haworth, Peter Lillo, and Volker Sick. Large-eddy simulations of a stratified-charge direct-injection spark-ignition engine: Comparison with experiment and analysis of cycle to-cycle variations. Proceedings of the Combustion Institute, 2020.

Lillo PM, Zhuang H, Sick V. Topological development of homogeneous-charge and spray-guided stratified-charge flames in an internal combustion engine. International Journal of Engine Research 2017, 1468087417727192.

Lillo PM. Topological development of homogeneous-charge and stratified-charge flames in an internal combustion engine. Ph.D. dissertation., University of Michigan, 2016.

Chen H, Lillo PM, Sick V. Single-shot 3D imaging of fuel injection in a spark-ignited direct-injected gasoline engine. International Journal of Engine Research in press.

Lillo PM, Greene ML, Sick V. Plenoptic single-shot 3D imaging of in-cylinder fuel spray geometry. Zeitschrift für Physikalische Chemie (Journal of Physical Chemistry), 2015.

Lillo PM, et al. Diesel spray ignition detection and spatial/temporal correction. No. 2012-01-1239. SAE Technical Paper, 2012.

Polonowski CJ, Mueller CJ, Gehrke CR, Bazyn T, Martin GC, Lillo PM. An experimental investigation of low-soot and soot-free combustion strategies in a heavy-duty, single-cylinder, direct-injection, optical diesel engine. (No. 2011-01-1812). SAE Technical Paper, 2011.

# Exhibit B: List of Materials

Materials I considered for the preparation of this Declaration include,

All documents discussed and referenced in this report including all footnoted documents and documentation, such as photographs, videos, and notes, from the inspections that Lillo Engineering performed of exemplar and evidence engines and components including those removed from four named Plaintiffs' subject vehicles, the three exemplar subject vehicles and engines that Lillo Engineering acquired and disassembled, and exemplar cylinder head gaskets.

**Pleadings**
First Amended Consolidated Class Action Complaint for Damages, Vanessa Miller et al. v. Ford Motor Company, U.S.D.C. Eastern District of California, Case No. 2:20-cv-01796-DAD-CKD, September 28, 2022

First Amended Class Action Complaint, U.S.D.C. Eastern District of California, Case No. 2:24-cv-02231-DAD-CKD, December 16, 2024

Defendant Ford Motor Company's Amended Answers and Objections to Plaintiffs' Interrogatories, Set Two, Vanessa Miller et al. v. Ford Motor Company, U.S.D.C. Eastern District of California, Case No. 2:20-cv-01796-TLN-CKD, February 24, 2026

Included in and Email from Sherry Rozell (counsel for Ford) on February 2, 2024 transmitting Defendant Ford Motor Company's Amended Answers and Objections to Plaintiffs' Interrogatories, Set Two to the Plaintiffs

Vanessa Miller's Responses and Objections to Defendant Ford Motor Company's Third Set of Interrogatories, December 19, 2025, Vanessa Miller et al. v. Ford Motor Company, U.S.D.C. Eastern District of California, Case No. 2:20-cv-01796-DAD-CKD

Order Granting in Part and Denying in Part Defendant's Motion to Dismiss Certain Claims Brought by Plaintiffs in the First Amended Consolidated Complaint, Vanessa Miller et al. v. Ford Motor Company, U.S.D.C. Eastern District of California, Case No. 2:20-cv-01796-DAD-CKD, March 28, 2024

Order Granting in Part and Denying in Part Defendant's Motion to Dismiss Plaintiffs' First Amended Consolidated Complaint, Vanessa Miller et al. v. Ford Motor Company, U.S.D.C. Eastern District of California, Case No. 2:20-cv-01796-DAD-CKD, September 4, 2025

Minute Order Granting Stipulation to Dismiss Named Plaintiffs Monterio Butcher, Rachel Goodrich, and Jeffrey Hodges, Vanessa Miller et al. v. Ford Motor Company, U.S.D.C. Eastern District of California, Case No. 2:20-cv-01796-DAD-CKD, October 1, 2025

Minute Order on Joint Stipulation including Court's Ruling on Plaintiffs Motion to Substitute Named Plaintiffs, Vanessa Miller et al. v. Ford Motor Company, U.S.D.C. Eastern District of California, Case No. 2:20-cv-01796-DAD-CKD, November 25, 2025

Order Granting Plaintiffs' Motions to Substitute Named Plaintiffs and Class Representatives, Vanessa Miller et al. v. Ford Motor Company, U.S.D.C. Eastern District of California, Case No. 2:20-cv-01796-DAD-CKD, December 23, 2025

**Expert Report and Associated Exhibits**
Dr. Colin Jordan, 3/20/2026
Dr. Elizabeth Wachs, 3/20/2026
Dr. Kristin Lennox, 3/20/2026
Declaration of Richard Hille, 3/16/2026
Steven B. Boyles, 3/20/2026

**Depositions and Exhibits**
Ford Witnesses

- Brewer, Todd, 9/17/2025
- Dunahay, John, 8/27/2025
- Giunta, Michael, 8/20/2025
- Hansen, Randy, 9/10/2025
- Henne, Joseph, 8/13/2025
- Knott, Tim, 9/24/2025
- Push, Jeff, 9/25/2025
- Rollinger, John, 8/19/2025
- Selthofer, Sara, 8/28/2025
- Steslicki, Michael, 9/30/2025
- Tuneff, Mark, 10/15/2025
- Wade, Robert, 10/17/2025

Named Plaintiffs

- Balaszek, Teresa, 8/6/2024
- Batdorf, Tyson J., 4/8/2025
- Bozhinov, Harlampi, 8/9/2024
- Christodaro, Darrick, 6/13/2025
- Cicero, Anthony, 10/22/2025
- Constable, Jillian, 9/16/2024
- Gonzalez, David, 3/27/2025
- Hoffer, Amy, 11/8/2024
- Hoffer, Kevin, 1/31/2025
- Kennedy, Mark, 10/21/2025
- Krecek, John, 12/12/2024
- Lund, Patsy, 6/12/2025
- Manfra, Aaron, 11/13/2024
- Manfra, Victoria, 11/15/2024
- Metro, Tracey Ann, 10/28/2025
- Miller, Vanessa, 6/4/2025
- Mullen, Bradley, 2/10/2026
- Morford, Craig, 8/23/2024
- Morford, Kelli, 8/21/2024

- Nelson, Sarah, 11/20/2025
- Nelson, Trevor, 12/3/2025
- Pickering, Scott, 3/12/2025
- Pirog, Robyn, 8/16/2024
- Simonds, Brian, 10/14/2024
- Speigner, David, 2/11/2026
- West, Amber, 9/5/2025
- West, Evan, 9/4/2025

**Production Documents**
FORD-MILLER 00081693
FORD-MILLER 00125829
FORD-MILLER 00125891
FORD-MILLER 00125892 - FORD-MILLER 00125899
FORD-MILLER 00138279 - FORD-MILLER 00138280
FORD-MILLER 00139252 - FORD-MILLER 00139253
FORD-MILLER 00139399.pptx
FORD-MILLER 00139453 - FORD-MILLER 00139454
FORD-MILLER 00140035 - FORD-MILLER 00140049
FORD-MILLER 00140079
FORD-MILLER 00140080.pptx
FORD-MILLER 00140381 - FORD-MILLER 00140384
FORD-MILLER 00140648.pptx
FORD-MILLER 00140733 - FORD-MILLER 00140735
FORD-MILLER 00141099.pptx
FORD-MILLER 00173790 - FORD-MILLER 00173791
FORD-MILLER 00173792.pptx
FORD-MILLER 00174345.pdf
FORD-MILLER 00174856.pdf
FORD-MILLER 00176026.pdf
FORD-MILLER 00180024
FORD-MILLER 00180025 - FORD-MILLER 00180033
FORD-MILLER 00182218
FORD-MILLER 00182219.pptx
FORD-MILLER 00204082
FORD-MILLER 00204083.pptx
FORD-MILLER 00209559 - FORD-MILLER 00209560
FORD-MILLER 00209713
FORD-MILLER 00209714.xlsx
FORD-MILLER 00217949 - FORD-MILLER 00217950
FORD-MILLER 00218199.pptx
FORD-MILLER 00221021.pptx
FORD-MILLER 00221434 - FORD-MILLER 00221435
FORD-MILLER 00221436.pdf
FORD-MILLER 00222971
FORD-MILLER 00222972.xlsx

FORD-MILLER 00223924 - FORD-MILLER 00223925
FORD-MILLER 00223928.pdf
FORD-MILLER 00226044.pdf
FORD-MILLER 00226405 - FORD-MILLER 00226406
FORD-MILLER 00226407.pptx
FORD-MILLER 00278714.pdf
FORD-MILLER 00326594- FORD-MILLER 00326625
FORD-MILLER 00360118.ppt
FORD-MILLER 00382243 - FORD-MILLER 00382245
FORD-MILLER 00382246.pptx
FORD-MILLER 00404775- FORD-MILLER 00404783
FORD-MILLER 00410875 - FORD-MILLER 00410877
FORD-MILLER 00410878 - FORD-MILLER 00410891
FORD-MILLER 00441286- FORD-MILLER 00441313
FORD-MILLER 00456910
FORD-MILLER 00471363.pptx
NELSON-FORD 0060497 - NELSON-FORD 0060501
NELSON-FORD 0060502.pptx
FORD-MILLER 00744695
FORD-MILLER 00756042.pdf
DFMEA Documents

- FORD-MILLER 00456540
- FORD-MILLER 00457405 - FORD-MILLER 00457585
- FORD-MILLER 00457086 - FORD-MILLER 00457118
- FORD-MILLER 00456975 - FORD-MILLER 00457071
- FORD-MILLER 00457207 - FORD-MILLER 00457223
- FORD-MILLER00040567 - FORD-MILLER 00040615
- NELSON-FORD 0052707 - NELSON-FORD 0052711
- NELSON-FORD 0052707 - NELSON-FORD 0052711
- FORD-MILLER 00040616 - FORD-MILLER 00040622
- FORD-MILLER 00457072 - FORD-MILLER 00457085
- FORD-MILLER 00457586 - FORD-MILLER 00457592
- FORD-MILLER 00457313 - FORD-MILLER 00457404
- FORD-MILLER 00457231 - FORD-MILLER 00457308
- FORD-MILLER 00457119 - FORD-MILLER 00457122
- NELSON-FORD 0052712 - NELSON-FORD 0052716
- FORD-MILLER 00457224 - FORD-MILLER 00457230

DVPR Documents

- FORD-MILLER 00019332 - FORD-MILLER 00019334
- FORD-MILLER00019355 - FORD-MILLER 00019374
- FORD-MILLER 00457138 - FORD-MILLER 00457206
- FORD-MILLER00019335 - FORD-MILLER 00019346
- FORD-MILLER00019381 - FORD-MILLER 00019392
- NELSON-FORD 0052865

- FORD-MILLER 00457123 - FORD-MILLER 00457137
- FORD-MILLER 00457158 - FORD-MILLER 00457177
- FORD-MILLER00018724 - FORD-MILLER 00018739
- FORD-MILLER00019329 - FORD-MILLER 00019334
- FORD-MILLER00019347 - FORD-MILLER 00019354
- FORD-MILLER00019375 - FORD-MILLER 00019377
- FORD-MILLER 00019378 - FORD-MILLER 00019380
- FORD-MILLER00019393 - FORD-MILLER 00019400
- NELSON-FORD 0052865
- NELSON-FORD 0052870
- FORD-MILLER00018740 - FORD-MILLER 00018753
- FORD-MILLER00019329 - FORD-MILLER 00019331
- NELSON-FORD 0052869
- NELSON-FORD 0052866
- NELSON-FORD 0052717
- NELSON-FORD 0052729
- NELSON-FORD 0052740
- NELSON-FORD 0052786
- NELSON-FORD 0052751
- NELSON-FORD 0052786
- NELSON-FORD 00528212015
- NELSON-FORD 0052821
- FORD-MILLER00040623

**Named Plaintiff Records**
Balaszek
[redacted]RD-MILLER 00116091
[redacted]ASIS.pdf
[redacted]ehicleInfoReport.pdf
[redacted]-FactoryInvoice.pdf
[redacted]-NonWarranty.pdf
[redacted]-TSBSSMGSB.pdf
[redacted]-Warranty.pdf
[redacted]-QLSInfo.pdf
[redacted]-WindowSticker.pdf
Batdorf

- FORD-MILLER 00455550 (New Vehicle Invoice)
- FORD-MILLER 00455551 (VIN FSA Details)
- FORD-MILLER 00455555 (Repair Orders Details by VIN Chart)
- FORD-MILLER 00455556 (OASIS Results)
- FORD-MILLER 00455558 (QLS Concern List)
- FORD-MILLER 00455560 (TSB SSM GSB - 2017 MKC [redacted]
- FORD-MILLER 00455570 (Vehicle Information Report)
- FORD-MILLER 00455576 (Standard Claims List)

- FORD-MILLER 00455586 (Monroney Sticker)

Bozhinov

[redacted] - Factory Invoice
[redacted] - FSA History
[redacted] - GCCT
[redacted] - Non Warranty
[redacted] - OASIS
[redacted] - QLS
[redacted] - TSB SSM GSB
[redacted] - Vehicle Info Report
[redacted] - Warranty
[redacted] - Window Sticker

Christodaro

- 1FMCU9GD5HUD28657 FORD-MILLER 00116086
- 03_1FMCU9GD5HUD28657-QLSInfo.pdf
- 03_1FMCU9GD5HUD28657-WindowSticker.pdf
- 6_1FMCU9GD5HUD28657-OASIS.pdf
- 6_1FMCU9GD5HUD28657-VehicleInfoReport.pdf
- 07_1FMCU9GD5HUD28657-FactoryInvoice.pdf
- 07_1FMCU9GD5HUD28657-NonWarranty.pdf
- 07_1FMCU9GD5HUD28657-TSBSSMGSB.pdf
- 07_1FMCU9GD5HUD28657-Warranty.pdf

Cicero

[redacted]RD-MILLER 00116074
[redacted] CQIS.pdf
[redacted] ASIS.pdf
[redacted] ehicleInfoReport.pdf
[redacted]FactoryInvoice.pdf
[redacted]NonWarranty.pdf
[redacted]TSBSSMGSB.pdf
[redacted]Warranty.pdf
[redacted]QLSInfo.pdf
[redacted]WindowSticker.pdf

Constable

- FORD-MILLER 00456000 (New Vehicle Invoice)
- FORD-MILLER 00456001 (VIN FSA Details)
- FORD-MILLER 00456013 (Warranty Claims and Customer Case Records)
- FORD-MILLER 00456022 (Repair Orders Details by VIN for United States)
- FORD-MILLER 00456024 (OASIS Results)
- FORD-MILLER 00456025 (QLS Concern List)
- FORD-MILLER 00456028 (TSB SSM GSB - 2016 Edge [redacted])
- FORD-MILLER 00456037 (Vehicle Information Report)

Gonzalez

- FORD-MILLER 00456043 (New Vehicle Invoice)

- FORD-MILLER 00456044 (VIN FSA Details)
- FORD-MILLER 00456055 (Warranty Claims and Customer Case Records)
- FORD-MILLER 00456059 (Repair Orders Details by VIN for United States)
- FORD-MILLER 00456060 (OASIS Results)
- FORD-MILLER 00456062 (QLS Concern List)
- FORD-MILLER 00456063 (TSB SSM GSB – 2014 Escape [redacted]
- FORD-MILLER 00456074 (Vehicle Information Report)
- FORD-MILLER 00456078 (Standard Claims List)

Kennedy

- FORD-MILLER 00455861 (New Vehicle Invoice)
- FORD-MILLER 00455862 (VIN FSA Details)
- FORD-MILLER 00455873 (Repair Orders Details by VIN for United States)
- FORD-MILLER 00455874 (OASIS Results)
- FORD-MILLER 00455876 (QLS Concern List)
- FORD-MILLER 00455882 (TSB SSM GSB - 2016 Edge [redacted]
- FORD-MILLER 00455892 (Vehicle Information Report)
- FORD-MILLER 00455898 (Standard Claims List)
- FORD-MILLER 00455906 (Monroney Sticker)

Krecek

- FORD-MILLER 00455907 (New Vehicle Invoice)
- FORD-MILLER 00455908 (VIN FSA Details)
- FORD-MILLER 00455915 (Warranty Claims and Customer Case Records)
- FORD-MILLER 00455919 (CQIS Detail Report)
- FORD-MILLER 00455921 (Repair Orders Details by VIN for United States)
- FORD-MILLER 00455924 (OASIS Results)
- FORD-MILLER 00455925 (QLS Concern List)
- FORD-MILLER 00455930 (TSB SSM GSB - 2017 Edge [redacted]
- FORD-MILLER 00455938 (Vehicle Information Report)
- FORD-MILLER 00455944 (Standard Claims List)
- FORD-MILLER 00455951 (Monroney Sticker)

Lund

- 1FMCU9G95GUB74249 FORD-MILLER 00116138
- 02_1FMCU9G95GUB74249-QLSInfo.pdf
- 02_1FMCU9G95GUB74249-WindowSticker.pdf
- 3_1FMCU9G95GUB74249-GCQIS.pdf
- 7_1FMCU9G95GUB74249-OASIS.pdf
- 7_1FMCU9G95GUB74249-VehicleInfoReport.pdf
- 08_1FMCU9G95GUB74249-FactoryInvoice.pdf
- 08_1FMCU9G95GUB74249-NonWarranty.pdf
- 08_1FMCU9G95GUB74249-TSBSSMGSB.pdf
- 08_1FMCU9G95GUB74249-Warranty.pdf

Manfra, Aaron & Victoria

- FORD-MILLER 00455620 (New Vehicle Invoice)
- FORD-MILLER 00455621 (VIN FSA Details)

- FORD-MILLER 00455630 (September 2020 Customer Complaint)
- FORD-MILLER 00455634 (Repair Orders Details by VIN for United States)
- FORD-MILLER 00455635 (OASIS Results)
- FORD-MILLER 00455637 (QLS Concern List)
- FORD-MILLER 00455640 (TSB SSM GSB - 2017 Fusion [redacted]
- FORD-MILLER 00455648 (Vehicle Information Report)
- FORD-MILLER 00455653 (Standard Claims List)
- FORD-MILLER 00455657 (Monroney Sticker)

Metro

[redacted] D-MILLER 00116096
[redacted] ASIS.pdf
[redacted] ehicleInfoReport.pdf
[redacted] FactoryInvoice.pdf
[redacted] NonWarranty.pdf
[redacted] TSBSSMGSB.pdf
[redacted] Warranty.pdf
[redacted] QLSInfo.pdf
[redacted] WindowSticker.pdf

- D192381-Miller-[redacted]-Tracey Ann Metro-Vehicle Information

Miller

- 2_2FMPK4K96HBB28812-GCQIS.pdf
- 2FMPK4K96HBB28812 FORD-MILLER 00116103
- 3_2FMPK4K96HBB28812-OASIS.pdf
- 3_2FMPK4K96HBB28812-VehicleInfoReport.pdf
- 04_2FMPK4K96HBB28812-FactoryInvoice.pdf
- 04_2FMPK4K96HBB28812-NonWarranty.pdf
- 04_2FMPK4K96HBB28812-QLSInfo.pdf
- 04_2FMPK4K96HBB28812-TSBSSMGSB.pdf
- 04_2FMPK4K96HBB28812-Warranty.pdf
- 04_2FMPK4K96HBB28812-WindowSticker.pdf

Morford, Kelli & Craig

[redacted] Factory Invoice
[redacted] FSA History
[redacted] Non Warranty
[redacted] OASIS
[redacted] QLS
[redacted] TSB SSM GSB
[redacted] Vehicle Info Report
[redacted] Warranty
[redacted] Window Sticker

- FORD-MILLER 00456137 (New Vehicle Invoice)
- FORD-MILLER 00456138 (VIN FSA Details)
- FORD-MILLER 00456141 (Repair Orders Details by VIN for United States)
- FORD-MILLER 00456142 (OASIS Results)

- FORD-MILLER 00456144 (QLS Concern List)
- FORD-MILLER 00456147 (TSB SSM GSB – 2017 Escape [redacted]
- FORD-MILLER 00456159 (Vehicle Information Report)
- FORD-MILLER 00456167 (Standard Claims List)
- FORD-MILLER 00456170 (Monroney Sticker)

Mullen

- FORD-MILLER 00905609
- FORD-MILLER 00905656
- FORD-MILLER 00905660

Pickering

- FORD-MILLER 00455725 (New Vehicle Invoice)
- FORD-MILLER 00455726 (VIN FSA Details)
- FORD-MILLER 00455742 (Warranty Claims and Customer Case Records)
- FORD-MILLER 00455758 (CQIS Detail Report)
- FORD-MILLER 00455766 (Repair Orders Details by VIN for United States)
- FORD-MILLER 00455769 (OASIS Results)
- FORD-MILLER 00455771 (QLS Concern List)
- FORD-MILLER 00455774 (TSB SSM GSB - 2014 Fusion [redacted]
- FORD-MILLER 00455787 (Vehicle Information Report)
- FORD-MILLER 00455792 (Standard Claims List)
- FORD-MILLER 00455817 (Monroney Sticker)

Pirog

[redacted] Factory Invoice
[redacted] FSA History
[redacted] GCCT
[redacted] Non Warranty
[redacted] OASIS
[redacted] QLS
[redacted] TSB SSM GSB
[redacted] Vehicle Info Report
[redacted] Warranty
[redacted] Window Sticker

Simonds

- FORD-MILLER 00455658 (New Vehicle Invoice)
- FORD-MILLER 00455659 (VIN FSA Details)
- FORD-MILLER 00455672 (Warranty Claims and Customer Case Records)
- FORD-MILLER 00455684 (CQIS Detail Report - Dec. 2020)
- FORD-MILLER 00455687 (Repair Orders Details by VIN for United States)
- FORD-MILLER 00455690 (OASIS Results)
- FORD-MILLER 00455691 (QLS Concern List)
- FORD-MILLER 00455693 (TSB SSM GSB - 2015 Fusion [redacted]
- FORD-MILLER 00455702 (Vehicle Information Report)
- FORD-MILLER 00455707 (Standard Claims List)
- FORD-MILLER 00455724 (Monroney Sticker)

Speigner

- FORD-MILLER 00905564
- FORD-MILLER 00905607
- FORD-MILLER 00905608

West, Amber & Evan

- FORD-MILLER 00116120 (FSA History The Wests)

**Service Bulletin, Service Program and Recall Documents**

CSP 13B13

- FORD-MILLER 00084689
- FORD-MILLER 00085355
- FORD-MILLER 00085359
- FORD-MILLER 00085369
- FORD-MILLER 00117452
- FORD-MILLER 00117459
- FORD-MILLER 00117461
- FORD-MILLER 00117451

CSP 19B37

- 14D Printable View 19X91 w attachments.pdf
- 19B37 - FCSD Backup File.pdf
- 19X91 Fact Sheet - 20XX 1.5L GTDI Coolant Intrusion_- REVIEWED.pdf
- 19B37 S1.pdf
- 19B37 S2.pdf
- 19B37 S3.pdf
- 19B37.pdf
- R19B373V1.pdf
- r19B37C1-S2.pdf
- r19B37C1-S2_SP.pdf
- r19B37PC_ESCAPE.pdf
- r19B37PC_FUSION.pdf
- R19B37S3V4.pdf
- RATTV.pdf
- RATTVI.pdf
- RCUSTOMERREMINDLTRv2.pdf

21N12 Recall

- 21-615 Fact Sheet DRAFT - 1.5L vehicles repaired under 19B37 - one time repair.pdf
- 21N12 ASO Backup File.pdf
- 21N12 FCSD Backup File Subject to Protective Order.pdf
- R19B37C1ENGLISHv3.pdf
- R19B37C1SPANISHv3.pdf
- R21N123.pdf
- R21N12BULL.pdf

FSA 12S39

- 12S39 ASO.pdf
- 12S39 FCSD Subject to Po.pdf
- 12S39_12X38 Fact Sheet.pdf
- 12S39_12X38.pdf
- 12S39_14D_Final w attachments.pdf
- R12S39.pdf
- R12S393.pdf
- R12S39BS.pdf
- R12S39C1.pdf

FSA 12S41

- 12S41 FCSD -Subject to Protective Order.pdf
- 12S41_12X53 Fact Sheet.pdf
- 12S41_14D_Final w attachments.pdf
- 12S41-S1.pdf
- 12S41-S2.pdf
- 12S41-S3.pdf
- 12S41-S4.pdf
- 12S41-S5.pdf
- 12S41.pdf

FSA 13S12

- 13S12 14D.pdf
- 13S12 FCSD -Subject to Protective Order.pdf
- 13S12_13X57 Fact Sheet.pdf
- 13S12-S1.pdf
- 13S12-S2.pdf
- 13S12-S3.pdf
- 13S12.pdf
- R13S12.pdf
- R13S123.pdf
- R13S124.pdf
- R13S125.pdf
- R13S12ES.pdf
- R13S12F1.pdf
- R13S12F2.pdf
- R13S12QA.pdf
- R13S12VD.pdf

FSA 17S09

- 17S09 FCSD -Subject to Protective Order.pdf
- 17S09_16X85 Fact sheet.pdf
- 17S09-S1.pdf
- 17S09-S2.pdf
- 17S09-S3.pdf
- 17S09.pdf
- 16X85 - FSA Financial Estimate.xlsx

- 17S09 14D.pdf
- 17S09-S3-A4.pdf
- 17S09-S3-A5.pdf
- 17S09-S3-A6.pdf
- 17S09-S3-A7.pdf
- 17S09-S3-A8.pdf
- 17S09-S3V2.pdf
- 17S09-S3_Fiesta_JUL13.pdf
- 17S09C1-P_2019.pdf
- PART 573 DEFECT INFORMATION REPORT.pdf
- r17S09-Jun18-E.pdf
- r17S09.pdf
- r17S093.pdf
- r17S09c1.pdf
- r17S09C1_P_S_2019.pdf
- r17S09C1_RA_2019.pdf
- r17S09C1_RA_S_2019.pdf
- r17S09RR.pdf
- r17S09_ESCAPE_CHECK.pdf
- r17S09_FIESTA_CHECK.pdf
- r17S09_FUSION_CHECK.pdf
- r17S09_TC_CHECK.pdf
- RCONL-17V209-7053.pdf
- RCONL-17V209-5855.pdf

GSBs

- FORD-MILLER 00143263
- FORD-MILLER 00143266

SSMs

- 32040.pdf
- 44479.pdf
- 44517.pdf
- 44849.pdf
- 45887.pdf
- 47462.pdf
- 47625.pdf
- 47826.pdf
- 47849.pdf
- 48106.pdf
- 48150.pdf

TSBs

- 16-0130.pdf
- 16-0150.pdf
- 17-0028.pdf
- 17-2270.pdf

- 18-2353.pdf
- 19-2139.pdf
- 19-2172.pdf
- 19-2208.pdf
- 19-2346.pdf
- 19-2375.pdf
- 20-2100.pdf
- 21-2269.pdf
- 22-2133.pdf
- 22-2134.pdf
- 22-2229.pdf
- 22-2322.pdf

**CARFAX Reports**
Bardorf Subject Vehicle, [redacted] 3/18/26
Bozhinov Subject Vehicle, [redacted] 3/15/26
Christodaro Subject Vehicle, 1FMCU9GD5HUD28657, 3/12/26
Constable Subject Vehicle, [redacted] 3/13/26
Gonzalez Subject Vehicle, [redacted] 3/15/26
Lund Subject Vehicle, 1FMCU9G95GUB74249, 3/13/26
Metro Subject Vehicle, [redacted] 3/18/26
Morford Subject Vehicle, [redacted] 3/14/26
Mullen Subject Vehicle, [redacted] 3/14/26

**Exemplar Vehicle Fluid Test Results - Bureau Veritas Sample Analysis Reports**
2015 Escape with 2.0-liter subject engine, Coolant (Lab No. 202507300892)
2015 Escape with 2.0-liter subject engine, Engine Oil (Lab No. 202507292476)
2016 Escape with 1.6-liter subject engine, Coolant (Lab No. 202507300891)
2016 Escape with 1.6-liter subject engine, Engine Oil (Lab No. 202507292474)
2018 Fusion with a 1.5-liter subject engine, Coolant (Lab No. 202507300890)
2018 Fusion with a 1.5-liter subject engine, Engine Oil (Lab No. 202507292478)
New Motorcraft Engine Oil (Lab No. 202507300893)
New Motorcraft Coolant (Lab No. 202507292477)

**Manuals and Brochures**
Owner's Manual and Brochure for all Subject Vehicles

**Service and Repair Information**
Ford Service and Repair Information for all Subject Vehicles (Alldata.com)

**Warranty Data**
Miller GSAR Data

- FORD-MILLER 00905692
- FORD-MILLER 00905693
- FORD-MILLER 00905694

- FORD-MILLER 00905695
- FORD-MILLER 00905696

Nelson GSAR Data

- NELSON-FORD 0297724
- NELSON-FORD 0297725
- NELSON-FORD 0297726

**Superior Forensic Engineering Inspection Photographs and Documents**

Balaszek (IN) 2023.08.15

- BALASZEK_SFE_1001- BALASZEK_SFE_1123
- BALASZEK_SFE_CYLINDER1_1001- BALASZEK_SFE_CYLINDER1_1005
- BALASZEK_SFE_CYLINDER2_2001- BALASZEK_SFE_CYLINDER2_2005
- BALASZEK_SFE_CYLINDER3_3001- BALASZEK_SFE_CYLINDER3_3004
- BALASZEK_SFE_CYLINDER4_4001- BALASZEK_SFE_CYLINDER4_4006

Christodaro (CO) 2023.08.02

- CHRISTODARO_SFE_1001- CHRISTODARO_SFE_1159

Cicero (IL) 2022.10.18

- CICERO_SFE_1001- CICERO_SFE1097 Cylinder 1-2

Manfras (MD) 2023.04.26

- MANFRA_SFE_1001- MANFRA_SFE_1071

Wests (CA) Part 1 - 2022.03.10

- WEST_SFE_1001- WEST_SFE_1059

Wests (CA) Part 2 - 2022.04.04

- WEST_SFE_2001- WEST_SFE_2068

Gonzalez (2025.11.24)

- GONZALEZ_SFE_PB240163- GONZALEZ_SFE_PB240197
- GONZALEZ_SFE_Cylinder 1-1- GONZALEZ_SFE_Cylinder 1-7
- GONZALEZ_SFE_Cylinder 2-1- GONZALEZ_SFE_Cylinder 2-7
- GONZALEZ_SFE_Cylinder 3-1- GONZALEZ_SFE_Cylinder 3-9
- GONZALEZ_SFE_Cylinder 4-1- GONZALEZ_SFE_Cylinder 4-8

Kennedy (2025.12.03)

- KENNEDY_SFE_PC040229- KENNEDY_SFE_PC040280

Krecek (2025.11.10)

- KRECEK_SFE_PB100322- KRECEK_SFE_PB100382

Metro (2025.07.30)

- METRO_SFE_P7300163- METRO_SFE_P7300214
- METRO_SFE_Cylinder 1-1- METRO_SFE_Cylinder 1-7
- METRO_SFE_Cylinder 2-1- METRO_SFE_Cylinder 2-7
- METRO_SFE_Cylinde 3-1- METRO_SFE_Cylinder 3-6
- METRO_SFE_Cylinder 4-1- METRO_SFE_Cylinder 4-7

Miller (2025.02.17)

- MILLER_SFE_P2170001- MILLER_SFE_P2170068

Mullen (2025.09.24)

- MULLEN_SFE_P9230163- MULLEN_SFE_P9230219
- MULLEN_SFE_Cylinder 1-1- MULLEN_SFE_Cylinder 1-11

- MULLEN_SFE_Culinder 2-4- MULLEN_SFE_Cylinder 2-14
- MULLEN_SFE_Cylinder 3-1- MULLEN_SFE_Cylinder 3-8
- MULLEN_SFE_Cylinder 4-1- MULLEN_SFE_Cylinder 4-6

Nelson (CA)-prospective 2024.03.13

- NELSON_SFE_1001- NELSON_SFE_1068
- NELSON_SFE_Cylinder 1-1- NELSON_SFE_Cylinder 1-6
- NELSON_SFE_Cylinder 2-1- NELSON_SFE_Cylinder 2-6
- NELSON_SFE_Cylinder 3-1- NELSON_SFE_Cylinder 3-9
- NELSON_SFE_Cylinder 4-1- NELSON_SFE_Cylinder 4-11

Pickering (2025.11.07)

- PICKERING_SFE_PB070259- PICKERING_SFE_PB070321
- PICKERING_SFE_Cylinder 1-1- PICKERING_SFE_cylinder 2-7
- PICKERING_SFE_Cylinder 2-1- PICKERING_SFE_cylinder 2-7
- PICKERING_SFE_Cylinder 3-1- PICKERING_SFE_Cylinder 3-7
- PICKERING_SFE_Cylinder 4-1- PICKERING_SFE_Cylinder 4-9

Simmonds (2025.12.04)

- SIMMONDS_SFE_Cylinder 1-3- SIMMONDS_SFE_PC040228
- SIMMONDS_SFE_Cylinder 1-1- SIMMONDS_SFE_Cylinder 1-9
- SIMMONDS_SFE_Cylinder 2-1- SIMMONDS_SFE_Cylinder 2-8
- SIMMONDS_SFE_Cylinder 3-1- SIMMONDS_SFE_Cylinder 3-8
- SIMMONDS_SFE_Cylinder 4-1- SIMMONDS_SFE_Cylinder 4-8

Bozhinov (2025.12.15)

- Bozhinov_SFE_PC150164- Bozhinov_SFE_PC150202
- Bozhinov_SFE_Cylinder 1-1- Bozhinov_SFE_Cylinder 1-8
- Bozhinov_SFE_Cylinder 2-1- Bozhinov_SFE_Cylinder2-7
- Bozhinov_SFE_Cylinder 3-1- Bozhinov_SFE_Cylinder3-3
- Bozhinov_SFE_Cylinder 4-1- Bozhinov_SFE_Cylinder 4-8

Constable 2025.12.17

- Constable_SFE_PC170164- Constable_SFE_PC170221

Morford (2025.12.11)

- Morford_SFE_PC110164- Morford_SFE_PC110203
- Morford_SFE_Cylinder 1-1- Morford_SFE_Cylinder 1-8
- Morford_SFE_Cylinder 2-1- Morford_SFE_Cylinder 2-13
- Morford_SFE_Cylinder 3-1- Morford_SFE_Cylinder 3-12
- Morford_SFE_Cylinder 4-1- Morford_SFE_Cylinder 4-14

Pirog (2025.12.18)

- Pirog_SFE_PC180222- Pirog_SFE_PC180253
- Pirog_SFE_Cylinder 1-1- Pirog_SFE_Cylinder 1-7
- Pirog_SFE_Cylinder 2-1- Pirog_SFE_Cylinder 2-8
- Pirog_SFE_Cylinder 3-1- Pirog_SFE_Cylinder 3-9
- Pirog_SFE_Cylinder 4-1- Pirog_SFE_Cylinder 4-12

**Photographs of the Named Plaintiffs' Evidence Engines Shared by Plaintiffs' Counsel Shortly Before the Multiparty Inspection**

- Ford Engines for Inspection.pdf (7 photographs)

**References**

Erjavec, Jack, "Automotive Technology." Cengage Learning Inc, 2020

Halderman, James D., and Chase D. Mitchell, "Automotive Technology," Pearson, 2020

Heywood, John, "Internal Combustion Engine Fundamentals," 2018

Greuter, Ernst, and Stefan Zima, "Engine Failure Analysis," SAE International, 2012

National Fire Protection Association (NFPA) 921 – Guide for Fire and Explosion Investigations, 2024

Kestly, Mike, et al. Accelerated testing of multi-layer steel cylinder head gaskets. No. 2000-01-1188. SAE Technical Paper, 2000.

Brewer, T. and Chen, X., "Cylinder Head Gasket Fretting/Scrub Mechanism Investigation and Analysis Procedure Developments," SAE Technical Paper 2017-01-1091, 2017, doi:10.4271/2017-01-1091.

**Case File Produced by Dr. Jordan**

Exemplar Engine Photographs and Videos

- All Engines (36 items)
- Eng #1 2017MY Escape 1.5L Sigma (111 items)
- Eng #2 2017MY Escape 2.0L (198 items)
- Eng #3 2016 MY Mustang 2.3L Duratec (204 items)
- Eng #4 2020 MY Escape 1.5L Dragon 3 cyl (86 items)
- Eng #5 2017 MY Fiesta 1.6L Sigma (76 items)
- IMG_9482 (1 photograph)

engines santa barbara 2-11-2026 (366 photographs)

Engine Purchases

- 2016 FORD MUSTANG ECOBOOST PREMIUM 2.3L-[redacted]-carfax
- 2016 FORD MUSTANG ECOBOOST PREMIUM 2.3L-[redacted] window sticker
- 2017 excape [redacted]-CARFAX
- 2017 excape [redacted]-ORIGINAL WINDOW STICKER
- 2017 excape 2.0L [redacted]-CARFAX
- 2017 excape 2.0L [redacted]-original window sticker
- 2020 FORD ESCAPE SE_1.5L [redacted] car fax
- 2020 FORD ESCAPE SE_1.5L [redacted] car fax
- 2020 FORD ESCAPE SE_1.5L [redacted] window sticker
- 2020 FORD ESCAPE SE_1.5L [redacted]-windowSticker
- engine purchases

Report References

- 2025 08-27 Service RO (Pickering)
- 2025 11-07 VI RO (Pickering)
- All Data
- Autofiles - Ford Edge models by year
- Autofiles - Ford Escape models by year

- Autofiles - Ford Explorer models by year
- Autofiles - Ford Focus RS models by year
- Autofiles - Ford Focus ST models by year
- Autofiles - Ford Mustang models by year
- Autofiles - Ford Taurus models by year
- Autofiles - Lincoln MKC models by year
- Autofiles - Lincoln MKT models by year
- Autofiles - Lincoln MKZ models by year
- Autofiles- Ford Fusion models by year
- Automobie Catalog
- EcoBoost Engine Displacement-model and model year check- ALLDATA
- EcoBoost Engine Displacement-model and model year check- Autofiles
- EcoBoost Engine Displacement-model and model year check- Village Ford
- Ford Authority
- Ford Ecoboost Head Gasket Caution (AERA)
- Ford Ecoboost Head Gasket Caution cont
- ford_acronyms_list
- Motor Reviewer
- plaintiff work order summary
- Safety Recall 17S09
- TSB 19-2139
- TSB 19-2172
- TSB 19-2208
- TSB 19-2346
- TSB 20-2100
- TSB 21-2269
- TSB 22-2133
- TSB 22-2134
- TSB 22-2229
- TSB 22-2322
- Village Ford
- Design and Analysis of Gasket Sealing
- Design and Structural Analysis of Aluminum
- DESIGN AND THERMAL ANALYSIS OF HEAD ENGINE
- EP0744541B1- toyota european patent
- JP2012188959A - Cylinder block - Google Patents
- JP2012188959A - Cylinder Blocks - Google Patents- early toyota patent-2011
- JP2012188959A-early toyota patent in Japanese
- MC-10144937-9999 -2.0L SSM47462
- Reply To_ Coolant issues with the EcoBoost engines _ Ford Authority
- tuning pro article
- US6776127- 2004 patent
- US9353701- Toyota Patent
- US9470176- Ford Patent

- 17D09 head gasket replacement focus-2.3L
- CSP 1937 and 21N12-1.5L
- Customer Satisfaction Program 17B32 - Supplement #2 Cylinder Head Gasket Replacement-2.3L
- MC-10213728-0001-1.5L
- MC-10213732-0001 -1.5L
- Recall Notice 17V209-3326-1.6L
- Recall notice -17V209-4589 Focus RS
- TB011625-2 -2.0L
- TB071725-2 1.6L-2.0L-2.3L
- TSB 19-2046 2.0L
- TSB 19-2139-1.5L
- TSB 19-2172 2.0L
- TSB 19-2208 -2.0L
- TSB 19-2346- 2.0L
- TSB 20-2100 -1.5L
- TSB 21-2269 1.5L
- TSB 22-2133 2.0L
- TSB 22-2134 -1.5L
- TSB 22-2229 -2.0L
- TSB 22-2322 -1.5L

Ford Engines for Inspection.pdf

**Case File Produced by Dr. Wachs**
Class 2013-2014 Fusion 1.6L codes coolant
Class 2013-2016 Escape 1.6L codes coolant
Class 2014-2019 Fusion 1.5L codes coolant
Class 2015-2018 Edge 2.0L codes coolant
Class 2015-2019 MKC 2.3L codes coolant
Class 2015-2019 Mustang 2.3L codes coolant
Class 2016-2019 Escape 2.0L codes coolant
Class 2016-2019 Explorer 2.3L codes coolant
Class 2016-2019 Fusion 2.0L codes coolant
Class 2016-2019 MKC 2.0L codes coolant
Class 2016-2019 MKZ 2.0L codes coolant
Class 2017-2019 Escape 1.5L codes coolant
fn 1 - embedded table_01_26_082625
fn 1

**Case File Produced by Mr. Boyles**
Arkansas
California
Colorado
Florida
Georgia

Illinois
Indiana
International Glossary of Business Terms
Kansas
Maryland
Michigan
Minnesota
Nebraska
New Jersey
North Carolina
Ohio
Tennessee
Texas
USA
USPAP
Washington
Wisconsin

**Ford Produced Documents Relied Upon by Dr. Jordan**
FORD-MILLER 00000211.pdf
FORD-MILLER 00074579 - FORD-MILLER 00074589.pdf
FORD-MILLER 00074590.pdf
FORD-MILLER 00074838.pdf
FORD-MILLER 00074842.pdf
FORD-MILLER 00074856.pdf
FORD-MILLER 00075107.pdf
FORD-MILLER 00076358.pdf
FORD-MILLER 00081263.pdf
FORD-MILLER 00081285.xls
FORD-MILLER 00081286.xls
FORD-MILLER 00081429.pdf
FORD-MILLER 00081911.pdf
FORD-MILLER 00081962.pdf
FORD-MILLER 00083836.xls
FORD-MILLER 00085507.pdf
FORD-MILLER 00085510.pdf
FORD-MILLER 00116091.pdf
FORD-MILLER 00116120.pdf
FORD-MILLER 00119708.pdf
FORD-MILLER 00120325.pdf
FORD-MILLER 00122131.pdf
FORD-MILLER 00122253.pdf
FORD-MILLER 00122907.pdf
FORD-MILLER 00122998.pdf
FORD-MILLER 00123006.pdf
FORD-MILLER 00123032.pdf

FORD-MILLER 00123050.pdf
FORD-MILLER 00123682.pdf
FORD-MILLER 00123740.pdf
FORD-MILLER 00123769.pdf
FORD-MILLER 00123949.pdf
FORD-MILLER 00124125.pdf
FORD-MILLER 00124241.pdf
FORD-MILLER 00124270.pdf
FORD-MILLER 00124557.pdf
FORD-MILLER 00124612.pdf
FORD-MILLER 00124747.pdf
FORD-MILLER 00124856.pdf
FORD-MILLER 00124957.pdf
FORD-MILLER 00125034.xls
FORD-MILLER 00125140.pdf
FORD-MILLER 00125334.pdf
FORD-MILLER 00125396.pdf
FORD-MILLER 00125512.pdf
FORD-MILLER 00125583.pdf
FORD-MILLER 00126397.pdf
FORD-MILLER 00126435.pdf
FORD-MILLER 00126480.pdf
FORD-MILLER 00126661.pdf
FORD-MILLER 00126870.pdf
FORD-MILLER 00126893.pdf
FORD-MILLER 00126922.pdf
FORD-MILLER 00126999.pdf
FORD-MILLER 00127042.pdf
FORD-MILLER 00138320.pdf
FORD-MILLER 00138344.pdf
FORD-MILLER 00138354.pdf
FORD-MILLER 00138391.pdf
FORD-MILLER 00139208.pdf
FORD-MILLER 00139227.pdf
FORD-MILLER 00139300.pdf
FORD-MILLER 00139331.pdf
FORD-MILLER 00139399.pdf
FORD-MILLER 00139416.pdf
FORD-MILLER 00139444.pdf
FORD-MILLER 00139508.pdf
FORD-MILLER 00139509.pdf
FORD-MILLER 00139564.pdf
FORD-MILLER 00139586.pdf
FORD-MILLER 00139614.pdf
FORD-MILLER 00139632.pdf
FORD-MILLER 00139636.pdf

FORD-MILLER 00139647.pdf
FORD-MILLER 00139970.pdf
FORD-MILLER 00140639.pdf
FORD-MILLER 00140820.pdf
FORD-MILLER 00140899.pdf
FORD-MILLER 00140963.pdf
FORD-MILLER 00141131.pdf
FORD-MILLER 00141186.pdf
FORD-MILLER 00141190.pdf
FORD-MILLER 00141197.pdf
FORD-MILLER 00141218.pdf
FORD-MILLER 00141423.pdf
FORD-MILLER 00141654.pdf
FORD-MILLER 00141860.pdf
FORD-MILLER 00141861.pdf
FORD-MILLER 00141863.pdf
FORD-MILLER 00141873.pdf
FORD-MILLER 00141894.pdf
FORD-MILLER 00173454.pdf
FORD-MILLER 00174502.pdf
FORD-MILLER 00176145.pdf
FORD-MILLER 00179413.pdf
FORD-MILLER 00180025.pdf
FORD-MILLER 00184458.xls
FORD-MILLER 00184459.pdf
FORD-MILLER 00184461.xls
FORD-MILLER 00203065.xls
FORD-MILLER 00203326.pdf
FORD-MILLER 00204819.xls
FORD-MILLER 00205000.xls
FORD-MILLER 00205689.xls
FORD-MILLER 00215338.pdf
FORD-MILLER 00217759.xls
FORD-MILLER 00223253.xls
FORD-MILLER 00352201.xls
FORD-MILLER 00356701.xls
FORD-MILLER 00366588.pdf
FORD-MILLER 00369316.xls
FORD-MILLER 00369886.pdf
FORD-MILLER 00386440.pdf
FORD-MILLER 00430668.pdf
FORD-MILLER 00430670.xls
FORD-MILLER 00430796.xls
FORD-MILLER 00433375.xls
FORD-MILLER 00441286.pdf
FORD-MILLER 00455560.pdf

FORD-MILLER 00455640.pdf
FORD-MILLER 00455758.pdf
FORD-MILLER 00455774.pdf
FORD-MILLER 00455792.pdf
FORD-MILLER 00455882.pdf
FORD-MILLER 00455915.pdf
FORD-MILLER 00455919.pdf
FORD-MILLER 00455930.pdf
FORD-MILLER 00455944.pdf
FORD-MILLER 00456013.pdf
FORD-MILLER 00456028.pdf
FORD-MILLER 00458325.pdf
FORD-MILLER 00472327.xls
FORD-MILLER 00472700.xls
FORD-MILLER 00472701.xls
FORD-MILLER 00473799.xls
FORD-MILLER 00473871.xls
FORD-MILLER 00473873.xls
FORD-MILLER 00522010 - FORD-MILLER 00522019.pdf
FORD-MILLER 00700661.xls
FORD-MILLER 00717342.xls
FORD-MILLER 00727127.xls
FORD-MILLER 00780354.xls
FORD-MILLER 00902507.xls
FORD-MILLER 00902679.pdf
FORD-MILLER 00902705.xls
FORD-MILLER 00903252 CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER.xls
FORD-MILLER 00903254 CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER.xls
FORD-MILLER 00904121
FORD-MILLER 00904124
FORD-MILLER 00904138
FORD-MILLER 00904144
FORD-MILLER 00904145
FORD-MILLER 00904150
FORD-MILLER 00905564
NELSON-FORD 0279054

# Exhibit C: Testimony of Peter Lillo, Ph.D., in the Past Four Years

*In Re: Kia Hyundai Vehicle Theft Marketing, Sales Practices, and Product Liability Litigation – All Subrogation Claims,* U.S.D.C. Central District of California Southern Division, No. 22-ML-03052-JVS-KES, James M. Sabovich, Callahan & Blaine, Counsel for Hyundai Motor America and Kia America, March 6, 2026, Deposition.

*In Re: Kia Hyundai Vehicle Theft Marketing, Sales Practices, and Product Liability Litigation - Government Entities Track,* U.S.D.C. Central District of California Southern Division, No. 8:22-ML-03052-JVS-KES, Justin Griffin, Quinn Emanuel Urquhart & Sullivan LLP, Counsel for Hyundai Motor America and Kia America, March 5, 2026, Deposition.

*Droesser et al. v. Ford Motor Company*, U.S.D.C. Eastern District of Michigan, Case No.: 2:23-cv-11744-LJM-APP, Brian Schmalzbach, McGuireWoods LLP, Counsel for Ford Motor Company, October 3, 2025, Deposition.

*Baus et al. v. Ford Motor Company*, U.S.D.C. Eastern District of Michigan, Case No.: 2:21-cv-10024-GAD-EAS, Ian Edwards, Klein Thomas Lee & Fresard, Counsel for Ford Motor Company, August 7, 2025, Deposition.

*Lena Jamil et al. v. Mercedes-Benz USA, Inc.,* U.S.D.C. Central District of California, Case No.: 2:22-cv-08130-FLA-AJR, Eric Knapp, Winston & Strawn LLP, Counsel for Mercedes-Benz USA, Inc., May 30, 2025, Deposition.

*Graves et al. v. Smitty's Supply, Inc., et al.*, U.S.D.C. Western District of Missouri, Case No.: 4:20-MD-02936-SRB, Nikki Cannezzaro, Cannezzaro Marvel LLC, Counsel for Smitty's Supply Inc., and CAM2 International LLC, May 23, 2024, Deposition.

*Employers Mutual Casualty Company v. Roll-Rite and Safe Fleet Acquisition Corp.*, U.S.D.C. Utah, Central Division, Case No. 2:22-cv-00393-DAO, John Zidow, Strong & Hanni PC, Counsel for Roll-Rite and Safe Fleet Acquisition Corp., February 23, 2024, Deposition.

*Kai Lee v. State Farm General Insurance Company*, Case No. 3:22-cv-00548-LB, U.S.D.C. Northern District of California, Ronald D. Schivo, Utrecht & Lenvin LLP, Counsel for Kai Lee, December 7, 2023, Deposition.

*In Re: Smitty's/CAM2 303 Tractor Hydraulic Fluid Marketing, Sales Practices, and Products Liability Litigation*, U.S.D.C. Western District of Missouri, Case No.: 4:20-MD-02936-SRB, Nikki Cannezzaro, Cannezzaro Marvel LLC, Counsel for Smitty's Supply Inc., and CAM2 International LLC, February 21, 2023, Deposition.

*Markeith Mitchell et al. v. Harbor Freight Tools USA, Inc.,* U.S.D.C. Central District of California, Case No.:2:20-CV-05451-DMG-KK, Michael Roth, King & Spalding LLP, Counsel for Harbor Freight Tools USA, January 4, 2023, Deposition.

*NGL Energy Partners v Regent Equipment Leasing*, District Court, City and County of Denver, State of Colorado, Case No. 2020CV33354, David Hansen, Kumpf Charsley & Hansen, Counsel for Regent Equipment Leasing, February 9, 2022, Deposition.

*Eric Stevens et al. v. Ford Motor Company*, Case No. 2:18-cv-00456, U.S.D.C. Southern District of Texas, Corpus Christy Division, Cole Geddy, McGuireWoods LLP, Counsel for Ford Motor Company, June 9, 2021, Deposition.

*William Edward Baker v. Alpha Consolidated Holdings, Inc., and Illinois Tool Works, Inc. d/b/a Gumout*, U.S.D.C. Delaware, Case No. 18-976 (LPS)(CJB), Thomas W. Yeh, Latham & Watkins LLP, Counsel for Alpha Consolidated Holdings, April 14, 2021, Deposition.

*Rosa Cheung v. Kai Lee,* CGC-19-578079, State of California, County of San Francisco, Michael Bracamontes, Bracamontes & Vlasak P.C., Counsel for Plaintiff, September 10, 2020, Deposition.

*In Re Dollar General Corp. Motor Oil Marketing and Sales Practice Litigation,* U.S.D.C. Western District of Missouri, Western Division, MDL No. 2709, R. Trent Taylor, McGuireWoods LLP, Counsel for Dollar General Corp., July 13, 2018, Deposition.