# EXHIBIT E

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

VANESSA MILLER, et al., )
Plaintiffs, )
vs. ) NO. 2:24-cv-01796
FORD MOTOR COMPANY, ) DAD-CKD
Defendant. )
______________________________)
AND RELATED ACTION. )
______________________________)

DEPOSITION OF:

PETER ROSSI, PH.D.

TUESDAY, JUNE 2, 2026

9:23 A.M.

REPORTED BY:

Sari M. Knudsen

CSR No. 13109

you.

Appendix C to Exhibit 2, this is the list of materials that you considered in forming your opinions that are set forth in your March 20, 2026 report?

A Yes. I mean, it's -- I think it also lists some of the articles but not all of the articles. It doesn't, of course, list the data that we used.

No. It does. It does it in the end. So it does list data as well. It doesn't list individual YouTube videos or individual forum posts, but it gives you some of the -- so it's not -- it's sort of a -- it's not completely comprehensive, but of course, all that information was available in the back-up documents which are provided along with the report.

Q Okay. So between -- there are other appendices to your -- we call it your "initial report," if -- when I say that, you understand I'm talking about your March 20 report?

A Yes, I do.

Q Okay. So are all of the materials that you considered in forming your opinions that are set forth in the March 20 report -- are those all listed somewhere in Exhibit 2, whether it's in Appendix C

or somewhere else in the report?

A I believe that's correct. I mean, D obviously has some of the disclosure events which include the videos and so on. I think it's an attempt to be comprehensive. It does, of course -- Appendix C does cite the data which, I think -- excuse me -- is the most fundamental thing of importance here. Because ultimately this is providing empirical evidence in support of these opinions.

Q And the data you are talking about is the J.D. Power values online?

A Yes. The used vehicle data. Used vehicle valuation data, I should say.

Q This --

A I'm sorry. And also -- I didn't mean to -- we also use the NAVIS data, the North American Vehicle Information System data, provided by Ford, and this is basically sales data.

Why did we use that? It establishes which -- which makes and which trim levels had maximum market share. So that -- I think that is referenced here and also, of course, provided as part of the back-up materials.

Q And in connection with your work here, did

you undertake to do a benefit-of-the-bargain analysis?

A No, I did not.

Q Your opinions in the first report, the March 20 report, that was an analysis of the used car market. Is that right?

A Well, no. It's -- it's an -- it does involve the used car market. That is correct. But the purpose of it is to test the plaintiffs' fundamental theory that if information was known about the alleged defect in the engines, the EcoBoost engines, that market values would have fallen greatly.

And that's the purpose of it.

Q And the purpose of that undertaking was -- or let me ask that differently.

The analysis that you did in connection with your first report was an analysis of the data from the used car market. Is that right?

A The primary empirical analysis was to use used car values to see if they responded as information became available to the market regarding the EcoBoost engine and its performance problems, which is the fundamental proposition that the plaintiffs are proposing.

Q Did you do -- in any of your work, not just related to your first report but all the work in this case, did you undertake any analysis of the pricing of the new car market?

A Well, I mean, the empirical analysis in this report starts from the vehicle as new. Right? So the first information is the price -- the new price. So we gather that as of 2017. Right?

Did I look explicitly solely at new car pricing alone, no. Nor was it -- it was simply not a -- helpful to this question about does this information -- if it were -- as it becomes disclosed to the market, available to the market, does this information affect vehicle prices.

Q Did you look at the impact of the information regarding the coolant intrusion issue on the new car pricing?

A Not explicitly, no.

MR. CHALOS: I think we are probably at a good breaking point.

MS. LAURENDEAU: Great. Let's take a break.

THE VIDEOGRAPHER: We are going off the record. The time is 11:36 A.M.

(Whereupon a recess was taken)

THE VIDEOGRAPHER: This is media three. We are

going back on the record. The time is 11:52 A.M.
BY MR. CHALOS:
Q Professor Rossi, looking at Appendix A of Exhibit 2, your C.V., has anything changed since you included this C.V. with your first report dated March 20?
A Usually there's a date on this. So I -- I don't know if there is one. A very little. I mean, the number of cites is up. The number of downloads is up. But I don't -- I think there's -- no. I think it's virtually the same.
Q In Appendix B of Exhibit 2, your trial and deposition history, have you given any testimony by deposition or at trial since the "Christina Arlington Smith versus TikTok" case, excluding the deposition we're here about today?
A I don't think so.
Q Looking at Exhibit -- sorry -- Appendix B to Exhibit 2, I -- based on our discussion earlier, of all of these cases, I counted two where you testified on behalf of plaintiffs. Does that sound right?
A I think so.
Q And the two I'm counting, one is the "Epic Games versus Apple," and the second is "Heraeus

trend. Although, remember, the Plaintiffs have argued that no information was available to the marketplace at any time. And there -- that's the basis of their claims, that there was a failure to disclose. So -- but I was just trying to be as -- you know, fully reflect the limitations of that analysis.

It does have some probative value, I believe, in terms of sensitivity to the choice of year. There is this issue with the recall. I think differing readers of this analysis may have differing conclusions as to the severity of that as a problem.

Q Did you review the recall notice that Ford issued in November of 2012?

A No, I did not. My -- as you know, my main analysis focuses on the 2017, which doesn't include a 1.6 liter EcoBoost engine.

Q Did you do any sensitivity analyses involving 2013 vehicles other than the Ford Escape 1.6 liter engine?

A I don't believe so. But if -- just if you can give me one second --

Q Sure.

A -- and I'll check my appendix.

Q Yeah. It's Appendix G.
A No. I'm familiar with it. Thank you.
Q Okay.
A Okay. Here we go.
So I'm sorry. Your question was did I do any other sensitivity analyses involving 2013. Did I get that correct?
Q That's right.
A No. I performed others with respect to addition -- removal of COVID data and so on and the length of the base period, but not with respect to -- other than what I've already done and as reported in that appendix on the '13.
Q Who determines -- switching gears. We are talking about the J.D. Power trade-in condition definitions.
Who determines whether a vehicle would be listed as clean, average or rough?
A I believe this comes from a J.D. Power's surveys and partial transaction data from dealers.
So I believe -- I do not know exactly who does that, but they make that classification, and it -- it certainly originates in information from the dealer. Whether J.D. Power itself makes that condition -- that determination or allows the dealer

to make their own determination, I do not know.
Q Somewhere in your data, does it include the information as to how many vehicles in the data fit into each of these categories of condition?
A Not directly.
However, the bulk of the data is in the clean condition. And the reason for that is that the clean condition data has the most number of time periods reported. So there's actually missing data for some months and some periods in the average and rough condition values.
So the clean has the most information behind it. And I should also say that it's -- I have had some experience with this data over the years and had the opportunity to look at the correlation between the clean and average condition data, and it's very highly correlated.
So if it were -- when I say "highly correlated," I mean over .9. So if it were to be redone with average condition data, which we did not do here, my guess -- my -- it is highly likely that you would see nothing different.
Q And you are basing that on analyses you've done in other cases with respect to other vehicles?
A Correct.

Q So you haven't done that analysis with respect to the class vehicles. Is that fair?
A That's correct.
Q Okay.
A But other U.S. sales vehicles in the same period. And noting that this correlation is very, very high. Not the level of the correlation. So they essentially move in lockstep.
Q And the definition of "clean," according to J.D. Power, is a vehicle with no mechanical defects and passes all necessary inspections with ease. Is that right?
A Yes.
Q And the -- I'm looking on page H-2 of Exhibit 2.
A Yes.
Q And the definition of -- J.D. Power's definition of "average" is "mechanically sound but may require some repairs or servicing to pass all necessary inspections." Right?
A That's what it says.
Q Okay.
A It doesn't mean defect free. It means that -- essentially "clean" means it runs, and it looks reasonably clean without too many cosmetic

defects. "Average" means it may require some repairs, and it may have some cosmetic flaws.

Q Okay. Well, you just summarized. But the definitions that you included in your report on page H-2, those are quotes from J.D. Power's documents. Right?

A They are.

Q All right. Let us look at some other documents here.

Okay. Let's mark this as the collective Exhibit No. 3. Yeah.

And then mark this as collective Exhibit No. 4. Those are the invoices.

A Oh, these are separate. Okay.

(Whereupon Plaintiffs' Exhibit 3 and Exhibit 4 were marked for identification)

BY MR. CHALOS:

Q Okay. So we've marked as collective exhibits two sets of documents that are invoices.

The first set, I believe -- and I'm going to ask you to confirm this -- are the invoices related exclusively to your work, as Exhibit 3.

Exhibit 4, I believe, are the invoices related to your work plus the Compass Lexecon team.

So if you can just look through those and

see if it's correct?

A I've never seen any of these before.

Q Oh, okay. So those are between Compass Lex and Ford's counsel?

A Yes. They do not provide them. I mean, I suppose if I asked them, I would get them. But I don't -- I simply -- as we mentioned earlier this morning, I send on a monthly basis an accounting of my hours by day, and they implement that, and I get a direct deposit of that amount.

Q Okay. So if you could take a look -- we are looking in Exhibit 3 now.

And if you can look at the -- it should be the first in that stack. There's a letter dated March 17, 2026 on top.

Do you see that?

A I do.

Q And then if you kind of flip over a few pages, the third page has a section that says "Summary of Professional Services," and your name is listed there.

Do you see that?

A I do.

Q Okay. And it says "Peter Rossi, Economist. Billing rate, $1,500." And then it says "Hours:

5," for a total amount of $7,500.

Do you see that?

A I do.

Q Is this the -- reflective of the time that you spent in February of 2026 on these matters?

A I -- I believe that in -- in -- I think if you go to the last page of that letter, you will see the actual numbers that I submitted --

Q Right.

A -- along with my own comments. I think those are my comments or they are roughly edited versions of my comments.

So I have not seen any of this. But I probably sent a date, an hour and a topic or a subject or type of work.

Q So that page has three entries. One dated February 11. One dated February 16. And one dated February 25. Is that right?

A Yes.

Q Okay. And is this, as far as you know, accurate in terms of the time you spent during that time period on these matters?

A I have no reason to doubt it.

Q Okay.

A But I have no reason to -- I don't recall

Q Okay. And let me see. The second page has -- it says "Charges, Professional Services: $362,436.25."
Do you see that?
A I do.
Q And then it has an additional $5,000 for computer and database charges.
Do you see that?
A I do.
Q And the total of the March 17 bill is $367,436.25?
A I do.
Q Okay. And if you look at the next page, there's a list of people. You are on the top. And then there are -- let me see -- six other people listed.
You see that?
A I do.
Q So we talked about them earlier, but who is Niall MacMenamim?
A Niall MacMenamim. MacMenanim. MacMenanim. Niall is a, I think, Senior Vice President or Executive Vice President at Compass Lexecon, and he's sort of in charge of this engagement from their perspective.

Q Okay. And the next person is Zhaoning Wang.

Do you see that?

A Yes, I do.

Q And who is that?

A That's -- she is an economist, Ph.D., from Harvard Economics Department or has worked on the empirical analysis.

Q And what did Mr. MacMenamim do?

A He's like the organizer of their efforts.

So I said, okay, we are going to do this kind of depreciation analysis. We have to go get the data. We are going to get the J.D. Power data, and we are going to have to choose comparator vehicles. We are going to have to choose base vehicles. We are going to have to assemble the data. We are going to have to do sensitivity analysis. We are going to do some kind of regression analysis in the spirit of a difference-indifference specification.

And then Niall organized -- organizes and supervises and helps this team achieve that goal.

Q What is a difference-indifference analysis?

A A difference-indifference analysis is an old idea that actually originated in biostatistics.

But it's the idea of using a control series and a target series. In this case, the control is the comparator, and the target is the base vehicle. And in the -- in its original form, it was just a difference in averages between two points in time.

In this -- in this situation, as we have -- it's called a regression style difference/indifference. Since we have monthly data, we are looking at differences in trends.

But the idea of difference/indifference is an attempt to control for factors in the environment outside of the key factor that you are interested in. In this case, the control for differences between vehicles except for the critical engine in -- that the base vehicle is equipped with.

Q So the assumption that underlies the analysis that you did in connection with your first report is that other than the coolant intrusion issue alleged in this case, all of the other factors were the same between the control group and --

A No.

Q -- target --

A No. The point is that the -- the comparator vehicle represents the influence of all other common factors such as demand for cars, the

condition of the economy, the current interest rates, interest in the SUV -- let's -- we are talking about the Escape. The SUV category, or I should say small -- all those sorts of things common to this thing so that those are being controlled for by the comparator.

We are not assuming they are the same between the two periods. It's being controlled for by the comparator. In other words, that they affect the comparator vehicle or control vehicle in the same way as the base vehicle. They have the same change of -- of -- effect on the change in prices and that the -- the difference that's being parceled out -- partialed out, partialed out, is the effect of the base engine. That's the idea of it.

It's not assuming that everything is the same. It's saying we are going to use these comparators as a way of controlling without having to name explicitly and go capture data on the GEP of the economy and whether there's a Trump tariff on this or what have you. Right? Or whether small SUVs, you know, have experienced an increase or decline. No. The comparator vehicle is controlling for that. That's the idea.

And that is -- this idea is a -- very

commonly used in economics -- in both research and economics to identify causal effects as well as in litigation.

Q Is there, underlying that, an assumption that the comparator vehicles are typical of the market in some way?

MS. LAURENDEAU: Objection. Vague.

THE WITNESS: Not -- not that they are typical, but that they -- that by essentially differencing out them, comparing the focal vehicle name, the one with the EcoBoost engine to those, that you are controlling for those other market factors. They don't have to be representative of the market. It just -- it has to be that those factors are influencing the control as well as the base and that then the only difference is the -- is the -- is the engine composition of the base versus the compared. That is the idea.

And note there are multiple comparators being used for each -- each base focal vehicle. Right? And that also provides you with some assurance that this is reasonable.

Q Did you use any hierarchical Bayesian methods in any of your analysis in this case?

A No. I did not.

errors made in Dr. Huang's report
and deposition."
Q Who told you to be brief?
A That's my own thing.
Q Okay. So do you have in your mind other errors that you think Dr. Huang's report and deposition contain?
A I do.
Q Okay. What are they?
A Among --
MS. LAURENDEAU: Object to the form to the extent it's overbroad and that you are asking about a lengthy report and deposition transcript.
But to the extent you have things in mind currently, Professor Rossi, you may answer.
MR. CHALOS: I'm sorry. Are you instructing the witness how to answer the question? It sounded like you are.
MS. LAURENDEAU: You can interpret what I said however you want. I said what I said.
BY MS. CHALOS:
Q Okay. Ignore anything she says, Doctor, other than -- she's making an objection for the record. So any direction she gives you you can ignore unless she tells you don't answer a question

because it's privileged or there's some court order. Anything else you can just ignore and answer my question.

Do you understand that?

A Sure.

Could you please repeat the question?

Q Yeah.

You directed me to footnote 6 wherein you said,

"In the interest of brevity, I'm not addressing all of the errors made in Dr. Huang's report and deposition."

And I asked you in your mind, do you have --

"Do you have in your mind other errors that you think Dr. Huang's report and deposition contained?"

You said, "I do."

My question was, "What are they?"

A They --

MS. LAURENDEAU: Same objection.

THE WITNESS: They include -- but this is not an exhaustive list. They include first, Dr. Huang says that I use the first date of the month for each

J.D. Power monthly observation. That is correct. And he believes that somehow will -- is detrimental to my analysis. But he's unaware, because he's never actually worked with J.D. Power data, that the -- J.D. Power reports the same monthly value for all days of the month. So it's immaterial which day of the month that it has. That's No. 1.

No. 2 -- and again, this is not an exhaustive list. This is the best of my recollection, sitting here today.

No. 2, and -- is that Professor Huang utilizes incorrectly the T distribution for his power calculations. The statistics involved in my regression do not have a T distribution. They have a -- and I'm sorry for the use of technical terms. I can't put this in any other way. They have what is called an "asymptotic normal distribution." They do not have a T distribution because my regression standard errors are estimated as -- this is an acronym -- HAC or heteroskedastic auto correlation corrected errors. And they don't have -- that renders the distribution not of a T form.

So that's the second error made by Mr. Huang.

I believe there may -- there may -- there

certainly do exist others. I just don't have them at my fingertips today.

MS. LAURENDEAU: Can we take a break now?

MR. CHALOS: Sure.

THE VIDEOGRAPHER: We are going off the record. The time is 2:30 P.M.

(Whereupon a recess was taken)

THE VIDEOGRAPHER: This is media five. We are going back on the record. The time is 2:49 P.M.

BY MR. CHALOS:

Q Doctor, if you would please turn to your first report, Exhibit No. 2. If you have that in front of you.

A I do.

Q And if you would please turn to Appendix D. I'm looking at page D-1.

A I -- I'm there on D-1. I'm at D-1.

Q Okay. What is the purpose of Appendix D in general in the context --

A I think D -- well, obviously there's a bunch of different disclosure events that we catalog.

One is these YouTube videos. And we only use YouTube videos that meet certain filtering criteria and have certain minimum number of views.

I believe 50,000 is the correct number. And that's listed here. There's some 50 or so of them.

Then there -- let's see. D-1 is the YouTube. D-2 is the forum threads and some kind of views measure. D-3 is the online news articles that actually list each one there. D-4 is the list of technical service bulletins. SSM is something like Special Service Message maybe, and CSP stands for Consumer Satisfaction Program which are basically extended warranty programs of various kinds.

So there's just a list of all of them. Just to -- and I think that's -- that concludes 15 -- excuse me. Appendix D. Excuse me.

Q Who -- first of all, who found the materials that are reflected in Appendix D?

A Well, the -- the person I -- some member of the Compass Lex team. I directed them to do this. They search criteria, and the methodologies is laid out in the report.

Q And what did you instruct them to do?

A Well, to -- I knew that there were -- I mean, I just -- when I first got involved with the case, I just Googled "EcoBoost engine," and I got a whole bunch of YouTube videos.

And I also knew from other cases that there

I, SARI M. KNUDSEN, CSR NO. 13109, in and for the State of California, do hereby certify:

I am the deposition officer that stenographically recorded the testimony in the foregoing deposition;

Prior to being examined, the deponent was first duly sworn by me;

The foregoing transcript is a true record of the testimony given;

Before completion of the deposition, review of the transcript was not requested. If requested, any changes made by the deponent (and provided to the reporter) during the period allowed are appended hereto.

Dated the 10th day of June, 2026.

__________________________________

SARI M. KNUDSEN, CSR NO. 13109